CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)



**U.S. Department of Justice**

Office of Professional Responsibility

*950 Pennsylvania Avenue, N.W., Suite 3266*
*Washington, D.C. 20530*

**MAY 3 0 2018**

## MEMORANDUM

TO:          James A. Crowell IV
                   Acting Director
                   Executive Office for U.S. Attorneys

                   John V. Geise
                   Chief
                   Professional Misconduct Review Unit

                   Robert M. Duncan, Jr.
                   United States Attorney
                   Eastern District of Kentucky[1]

FROM:      Robin C. Ashton
                   Counsel

SUBJECT:  Report of Investigation into the Conduct of Former United States Attorney R. Booth Goodwin II and Former Assistant U.S. Attorney Steven Ruby in *United States v. Blankenship*, Cr. No. 5:14-00244 (S.D.W. Va.)

      Enclosed is the Office of Professional Responsibility (OPR) Report of Investigation into the conduct of former United States Attorney R. Booth Goodwin II and former Assistant U.S. Attorney Steven Ruby in *United States v. Blankenship*, Cr. No. 5:14-00244 (S.D.W. Va.).

      On April 5, 2010, an explosion in the West Virginia Upper Big Branch (UBB) coal mine killed 29 coal miners. The United States Attorney's Office for the Southern District of West Virginia (USAO) commenced a criminal investigation shortly after the explosion.

      On November 13, 2014, a federal grand jury indicted Donald Blankenship, Chief Executive Officer and Chairman of the Board of Directors of Massey Energy Company, which owned UBB. Ruby led the government's criminal investigation and litigation team. Goodwin was an active

---

[1]    In May 2018, the United States Attorney's Office for the Southern District of West Virginia was recused from the *Blankenship* case. The United States Attorney's Office for the Eastern District of Kentucky now represents the government in that matter.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

participant during the criminal investigation and trial. Blankenship was represented by the law firm Zuckerman Spaeder LLP (Zuckerman). The *Blankenship* case was tried in the fall of 2015. At the conclusion of the trial, Blankenship was convicted of a misdemeanor conspiracy to violate mine safety standards and acquitted of all other charges.

In March 2016, Zuckerman sent a letter to the Department of Justice Criminal Division's Assistant Attorney General, alleging, among other things, that: (a) the government failed to disclose exculpatory e-mails in the possession of the Mine Safety and Health Administration (MSHA); (b) the government made false statements to the court and jury about Blankenship's involvement in Massey budget decisions; (c) the government did not call MSHA inspectors to testify at trial in order to avoid revealing the government's discovery violations; and (d) an MSHA employee destroyed MSHA documents shortly after the UBB explosion. Zuckerman's allegations were forwarded to OPR.

As a result of its investigation, OPR found that Zuckerman's initial misconduct allegations were without merit. OPR found that: (a) the government did not withhold exculpatory MSHA e-mails; (b) the government did not make false statements about Blankenship's involvement in the Massey budget process; (c) the government did not inappropriately decide not to use MSHA inspectors as trial witnesses; and (d) there was no evidence to support the allegation that an MSHA employee destroyed MSHA documents shortly after the UBB explosion.

During OPR's investigation, however, OPR learned that the government had failed to disclose to the defense numerous memoranda of interviews (MOIs) written by law enforcement agents on the prosecution team. Although prior to the *Blankenship* trial the government disclosed to the defense approximately 370 MOIs, it failed to disclose 61 MOIs, including 11 pertaining to pre-indictment interviews, and 50 pertaining to post-indictment interviews. As a result of its investigation, OPR made the following factual findings and reached the following conclusions regarding Ruby's and Goodwin's conduct related to the failure to disclose the 61 MOIs:

(1) Some of the undisclosed MOIs contained discoverable statements that were required to be disclosed by applicable Department discovery rules and policies, including United States Attorneys' Manual Section 9-5.001(C)(1)-(3). OPR concludes that neither Ruby nor Goodwin withheld discoverable statements from the defense with the intent of preventing the defense from obtaining those statements. However, OPR found that: (a) Ruby recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in 11 pre-indictment MOIs; (b) Ruby and Goodwin recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in some of the 50 post-indictment MOIs; (c) Ruby and Goodwin recklessly violated discovery requirements imposed by a January 2010 memorandum from then-Deputy Attorney General David Ogden (the Ogden Memorandum), which requires prosecutors to "develop a process for review of pertinent information to ensure that discoverable information is identified;" (d) Ruby's and Goodwin's "process" for deciding which statements contained in post-indictment MOIs to disclose was to rely on their memory of what was said during interviews, some of which occurred months before they made disclosure decisions; their deficient process resulted in the failure to disclose discoverable statements contained in numerous post-indictment MOIs; and (e) because Ruby and Goodwin recklessly violated the Department's discovery policies regarding the disclosure of discoverable statements, they committed professional misconduct.

Case 5:18-cv-00591 Document 763-4 Filed 09/03/24 Page 3 of 97 PageID #: 1047
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

(2) OPR found insufficient evidence to conclude that Ruby's and Goodwin's failure to disclose discoverable statements contained in the undisclosed MOIs violated *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or West Virginia Rule of Professional Conduct (RPC) 3.8(d), which requires the disclosure of information that tends to negate the accused's guilt. The government violates its *Brady* obligations only if, *inter alia*, a defendant is prejudiced by the failure to disclose. Zuckerman Spaeder LLP, the firm representing Blankenship, and the entity in the best position to explain whether, how, and to what extent the defense was prejudiced by the government's failure to disclose the 61 MOIs, explicitly declined OPR's request to provide it with that information. Prosecution team members credibly told OPR that the discoverable statements contained in the 61 undisclosed MOIs were not only available to the defense from other sources, but were in fact used during the defense's cross-examination of government witnesses. Based on the facts known to it, OPR cannot prove by preponderant evidence that Blankenship was prejudiced by the government's failure to disclose the discoverable statements in the 61 MOIs, and so cannot conclude that the government's conduct violated *Brady, Giglio*, or West Virginia RPC 3.8(d).

(3) Ruby failed to make a full disclosure of discoverable statements contained in three MOIs, and statements made during one proffer session, which he attempted to summarize in two summary disclosure letters. OPR found Ruby's disclosures to be inadequate and incomplete. Although OPR concludes that Ruby's inadequate disclosures were not intended to withhold exculpatory statements from the defense, OPR nevertheless concludes that Ruby's inadequate disclosures were made in reckless disregard of the requirement, as set forth in the Ogden Memorandum, that prosecutors take "great care" when making disclosures by summary letter. Ruby was responsible for both of the deficient letter disclosures. OPR found that Goodwin was also responsible for the inadequate and incomplete disclosures in one of the two summary disclosure letters. OPR finds that Ruby and Goodwin recklessly violated the Ogden Memorandum's requirements and therefore committed professional misconduct.

(4) The government filed three arguably misleading pleadings with the court, and Ruby made one arguably misleading statement in court, regarding the government's MOI disclosures. Those pleadings and Ruby's statement may have led the court to reasonably, but erroneously, believe that the government had disclosed all MOIs in its possession. OPR reached the following conclusions about the alleged misstatements to the court:

(a) Ruby and Goodwin did not intentionally mislead the court regarding the government's MOI disclosures.

(b) Ruby and Goodwin did not violate West Virginia RPC 3.3(a)(1), which prohibits an attorney from *knowingly* making a false statement to the court, because OPR found that neither Ruby nor Goodwin intentionally made false statements to the court.

(c) OPR found insufficient evidence to conclude that the government's pleadings and Ruby's statement in court about the government's MOI disclosures violated West Virginia RPC 4.1, which prohibits attorneys from knowingly making false material statements to third parties such as Zuckerman Spaeder LLP.

Case 5:18-cv-00591   Document 73-2   Filed 03/04/19   Page 4 of 97 PageID #: 1048
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

(d) OPR did not reach a conclusion about whether Ruby and Goodwin recklessly made misleading statements to the court about the government's MOI disclosures. When OPR investigates an allegation that the government made misleading statements to the court, OPR would ordinarily request to interview the court to ask how the court interpreted the statements at issue. OPR could not follow its usual procedures in the *Blankenship* case because the case is being actively litigated and the court would be unable to engage in *ex parte* communications with the government. OPR is therefore unable to ascertain the court's views as to whether the court was misled by the government's statements about its MOI disclosures.

In early 2017, OPR informed the USAO that the government had not disclosed numerous MOIs to the defense. Shortly thereafter, the USAO disclosed all 61 MOIs to the defense. In the fall of 2017 and the spring of 2018, the USAO made additional disclosures of MSHA documents to defense counsel. In December 2017, Blankenship obtained new counsel from the law firm McGuireWoods, LLP. On April 18, 2018, McGuireWoods filed a "Motion to Vacate and Set Aside Defendant's Conviction and Sentence Pursuant to 28 U.S.C. § 2255." The motion alleges that the government's failure to disclose prior to trial 61 MOIs, as well as certain MSHA documents that were disclosed to the defense in 2017 and 2018, violated *Brady* and *Giglio*, and that the government had made misrepresentations to the court regarding its discovery disclosures.

OPR has informed Goodwin and Ruby of the results of its investigation, and has advised them to contact the Professional Misconduct Review Unit (PMRU) if they intend to appeal OPR's findings and conclusions. OPR will inform McGuireWoods of the results of OPR's investigation after the PMRU has addressed the merits of Goodwin's and Ruby's anticipated appeal of OPR's findings and conclusions.

Enclosure

cc:   Scott Schools
      Associate Deputy Attorney General
      (with enclosure)

      Jay Macklin
      General Counsel, EOUSA
      (with enclosure)

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# DEPARTMENT OF JUSTICE



# OFFICE OF
# PROFESSIONAL RESPONSIBILITY

# REPORT

Investigation of Allegations of
Misconduct Against Former United States
Attorney R. Booth Goodwin II and Former
Assistant U.S. Attorney Steven Ruby Related to *United
States v. Blankenship*, Cr. No. 5:14-00244 (S.D.W. Va.)

May 30, 2018

NOTE: THIS REPORT CONTAINS SENSITIVE AND PRIVACY ACT
PROTECTED INFORMATION.  DO NOT DISTRIBUTE THE REPORT OR
ITS CONTENTS WITHOUT THE PRIOR APPROVAL OF THE OFFICE OF
PROFESSIONAL RESPONSIBILITY.

Case 5:18-cv-00591   Document 03-4   Filed 09/03/19   Page 6 of 97 PageID #: 1050
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# INTRODUCTION

On April 5, 2010, an explosion in the Upper Big Branch (UBB) coal mine, located in West Virginia, killed 29 coal miners. UBB was then owned and operated by a subsidiary of the Massey Energy Company (Massey). Donald Blankenship was Massey's Chief Executive Officer and Chairman of the Board of Directors. The United States Attorney's Office for the Southern District of West Virginia (USAO) commenced a criminal investigation shortly after the explosion.

A federal grand jury indicted Blankenship on November 13, 2014, and returned a three-count Superseding Indictment on March 10, 2015. Blankenship was charged with conspiracy to violate federal mine safety standards, in violation of 30 U.S.C. § 820(d) and 18 U.S.C. § 371; causing false statements to be filed with the Securities and Exchange Commission, in violation of 18 U.S.C. §§ 1001(a)(2) and (3) and 18 U.S.C. § 2; and causing false statements to be made in connection with the purchase and sale of securities, in violation of 15 U.S.C § 78ff and 18 U.S.C. § 2.

Assistant U.S. Attorney (AUSA) Steven Ruby led the government's criminal investigation and litigation team. United States Attorney R. Booth Goodwin II was an active participant in the criminal investigation and litigation team, including conducting the direct examination of several witnesses at trial and delivering the government's closing argument. Both Ruby and Goodwin have left the federal service. The other members of the prosecution team included AUSA #1



AUSA #2 , DOL Attorney , FBI SA #1 DOL SA #1 , Paralegal #1 , and Paralegal #2 .

The trial of *United States v. Blankenship*, Cr. No. 5:14-00244 (S.D.W. Va.) began on October 1, 2015. The government presented the testimony of 27 witnesses. The defense rested without calling any witnesses. The jury reached a verdict on December 3, 2015. Blankenship was convicted of a misdemeanor conspiracy to violate mine safety standards and acquitted of all other charges. On April 6, 2016, the court sentenced Blankenship to one year in prison and imposed a substantial fine. Blankenship appealed to the U.S. Court of Appeals for the Fourth Circuit, which after oral argument affirmed his conviction. Blankenship appealed to the Supreme Court, which denied his petition for a writ of certiorari. *United States v. Blankenship*, 846 F.3d 663 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 315 (October 10, 2017). In the spring of 2017, Blankenship was released from federal prison.

Blankenship was represented by the Washington, D.C. law firm Zuckerman Spaeder LLP (Zuckerman).[1] In March 2016, Zuckerman sent a letter to the Department of Justice (Department or DOJ) Criminal Division's Assistant Attorney General, alleging, *inter alia*, that the government had violated its constitutional obligations by failing to disclose exculpatory documentary and testimonial evidence from several sources. Zuckerman did not raise on appeal any of the allegations contained in its March 2016 letter to the Department. One of Zuckerman's allegations was that the government had failed to disclose exculpatory statements obtained during several

---

[1]       On December 14, 2017, Zuckerman informed OPR that it no longer represented Blankenship. Shortly thereafter, OPR was notified that Blankenship had retained new counsel from the law firm McGuireWoods LLP.

Case 5:18-cv-00591   Document 103-4   Filed 09/03/19   Page 7 of 97 PageID #: 1051
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

pretrial witness interviews. Zuckerman's allegations were forwarded to the Department's Office of Professional Responsibility (OPR). OPR opened an inquiry into Zuckerman's allegations, which was later converted to an investigation.

OPR's investigation of Zuckerman's misconduct allegations included the following investigative measures. OPR: (1) reviewed the e-mail accounts of Ruby, Goodwin, AUSA #1, AUSA #2, Paralegal #1, and Paralegal #2 for the relevant time periods; (2) obtained Ruby's written response to Zuckerman's initial misconduct allegations;[2] (3) on several occasions obtained additional information and documents from Ruby to supplement his written response;[3] (4) on several occasions obtained additional information and documents from Zuckerman pertaining to its misconduct allegations;[4] (5) on several occasions obtained information and documents from the USAO;[5] (6) reviewed relevant documents, pleadings, and trial transcripts; and (7) interviewed Ruby, AUSA #1, AUSA #2, DOL SA #1, DOL Attorney, FBI SA #1, Paralegal #1, and Paralegal #2.[6] As described in more detail below, Goodwin declined OPR's requests for an interview.

In its initial letter to the Department, Zuckerman alleged, among other things, that: (a) the government failed to disclose exculpatory e-mails in the possession of the Mine Safety and Health Administration (MSHA); (b) the government made false statements to the court and jury about Blankenship's involvement in Massey budget decisions; (c) the government did not call MSHA inspectors to testify at trial in order to avoid revealing the government's discovery violations; and (d) an MSHA employee destroyed MSHA documents shortly after the UBB explosion.

As a result of its investigation, OPR found that Zuckerman's initial misconduct allegations were without merit. OPR found that: (a) the government did not withhold exculpatory MSHA e-mails; (b) the government did not make false statements about Blankenship's involvement in the Massey budget process; (c) the government did not inappropriately decide not to use MSHA inspectors as trial witnesses; and (d) there was no evidence to support the allegation that an MSHA employee destroyed MSHA documents shortly after the UBB explosion.

After receiving Ruby's Written Response, OPR asked him some follow up questions. In response to one of those questions, Ruby cited a Memorandum of Interview (MOI) to support his contention that certain information had been disclosed to the defense. When OPR cited that MOI

---

[2]    June 4, 2016 Ruby Written Response (Written Response). Ruby's Written Response is attached at Tab A.

[3]    *See e.g.*, September 30, 2016 Ruby letter to OPR, attached at Tab B; January 19, 2017 Ruby e-mail to OPR, attached at Tab C.

[4]    *See e.g.*, April 19, 2016 Zuckerman e-mail to OPR; December 19, 2016 Zuckerman e-mail to OPR; May 16, 2017 Zuckerman letter to OPR.

[5]    *See e.g.*, January 24, 2017 USAO e-mail to OPR; June 5, 6, and 28, 2017 USAO e-mails to OPR; November 6, 2017 USAO e-mail to OPR.

[6]    OPR's interview of Ruby was conducted under oath in the presence of a court reporter, and was transcribed. The transcript is attached at Tab D. OPR's other interviews were digitally recorded. Some of those interviews were later transcribed. On October 27, 2017, OPR sent Ruby a copy of his interview transcript, and offered him the opportunity to comment on or make corrections to the transcript. Ruby did not respond to OPR's offer.

OPR - 000007

Case 5:18-cv-00591   Document 03-4   Filed 08/03/18   Page 8 of 97 PageID #: 1052
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

to Zuckerman, Zuckerman told OPR that it never received the MOI.  After checking USAO records, Ruby told OPR that the MOI was mistakenly not disclosed to the defense.  OPR thereafter undertook an exhaustive investigation of the government's handling of MOIs.

During the criminal investigation, law enforcement agents assigned to the investigation had written hundreds of MOIs.  OPR found that although prior to the *Blankenship* trial the government disclosed to the defense approximately 370 MOIs, it failed to disclose 61 MOIs, including 11 pertaining to pre-indictment interviews, and 50 pertaining to post-indictment interviews (collectively, "undisclosed MOIs").[7]

After OPR learned of the government's failure to disclose 61 MOIs, OPR asked Goodwin for a written response pertaining to that issue.  On May 24, 2017, Goodwin responded with a two-page letter that did not answer most of OPR's questions.[8]  OPR twice asked Goodwin (who was no longer a Department of Justice employee) for an opportunity to interview him.  OPR informed Goodwin that it had obtained information that was inconsistent with Goodwin's statement to OPR in his short written response that, "It is frustrating to me if memoranda of interview were not turned over."[9]  OPR also told Goodwin that it was concerned that "at least three pleadings filed by the government contain arguably misleading information about the government's disclosure of [MOIs]."[10]  Goodwin declined OPR's first request for an interview and failed to reply to OPR's second request.

As a result of its investigation, OPR made the following factual findings and reached the following conclusions regarding Ruby's and Goodwin's conduct related to the failure to disclose the 61 MOIs:

(1) Some of the undisclosed MOIs contained discoverable statements that were required to be disclosed by applicable Department discovery rules and policies, including United States Attorneys' Manual Section 9-5.001(C)(1)-(3).  OPR concludes that neither Ruby nor Goodwin withheld discoverable statements from the defense with the intent of preventing the defense from obtaining those statements.  However, OPR found that:  (a) Ruby recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements

---

[7]     In early 2017, OPR informed the USAO that the prosecution team had not disclosed numerous MOIs.  Shortly thereafter, the USAO produced 61 previously undisclosed MOIs to the defense.  Although Zuckerman told OPR that Blankenship's defense was prejudiced by the government's failure to disclose the 61 MOIs, it declined OPR's request to identify how the defense had been prejudiced, stating in part that it might raise that issue with the court.  On April 18, 2018, McGuireWoods filed a "Motion to Vacate and Set Aside Defendant's Conviction and Sentence Pursuant to 28 U.S.C. § 2255."  The motion alleges that the government's failure to disclose prior to trial 61 MOIs, as well as certain MSHA documents that were disclosed to the defense in 2017 and 2018, violated *Brady* and *Giglio*, and that the government made misrepresentations to the court regarding its MOI disclosures.  In May 2018, the United States Attorney's Office for the Southern District of West Virginia was recused from the *Blankenship* case.  The United States Attorney's Office for the Eastern District of Kentucky was assigned to handle *Blankenship*, and will respond to the Section 2255 motion.

[8]     Goodwin's May 24, 2017 letter is attached at Tab E (Goodwin Letter).

[9]     Goodwin Letter at 1; October 5, 2017 OPR e-mail to Goodwin.

[10]    *Id.*

- 3 -

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

contained in 11 pre-indictment MOIs; (b) Ruby and Goodwin recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in some of the 50 post-indictment MOIs; (c) Ruby and Goodwin recklessly violated discovery requirements imposed by a January 2010 memorandum from then-Deputy Attorney General David Ogden (the Ogden Memorandum), which requires prosecutors to "develop a process for review of pertinent information to ensure that discoverable information is identified;" (d) Ruby's and Goodwin's "process" for deciding which statements contained in post-indictment MOIs to disclose was to rely on their memory of what was said during interviews, some of which occurred months before they made disclosure decisions; their deficient process resulted in the failure to disclose discoverable statements contained in numerous post-indictment MOIs; and (e) because Ruby and Goodwin recklessly violated the Department's discovery policies regarding the disclosure of discoverable statements, they committed professional misconduct.

(2) OPR found insufficient evidence to conclude that Ruby's and Goodwin's failure to disclose discoverable statements contained in the undisclosed MOIs violated *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or West Virginia Rule of Professional Conduct (RPC) 3.8(d), which requires the disclosure of information that tends to negate the accused's guilt. The government violates its *Brady* obligations only if, *inter alia*, a defendant is prejudiced by the failure to disclose. Zuckerman Spaeder LLP, the firm representing Blankenship, and the entity in the best position to explain whether, how, and to what extent the defense was prejudiced by the government's failure to disclose the 61 MOIs, explicitly declined OPR's request to provide it with that information. Prosecution team members credibly told OPR that the discoverable statements contained in the 61 undisclosed MOIs were not only available to the defense from other sources, but were in fact used during the defense's cross-examination of government witnesses. Based on the facts known to it, OPR cannot prove by preponderant evidence that Blankenship was prejudiced by the government's failure to disclose the discoverable statements in the 61 MOIs, and so cannot conclude that the government's conduct violated *Brady, Giglio*, or West Virginia RPC 3.8(d).

(3) Ruby failed to make a full disclosure of discoverable statements contained in three MOIs, and statements made during one proffer session, which he attempted to summarize in two summary disclosure letters. OPR found Ruby's disclosures to be inadequate and incomplete. Although OPR concludes that Ruby's inadequate disclosures were not intended to withhold exculpatory statements from the defense, OPR nevertheless concludes that Ruby's inadequate disclosures were made in reckless disregard of the requirement, as set forth in the Ogden Memorandum, that prosecutors take "great care" when making disclosures by summary letter. Ruby was responsible for both of the deficient letter disclosures. OPR found that Goodwin was also responsible for the inadequate and incomplete disclosures in one of the two summary disclosure letters. OPR finds that Ruby and Goodwin recklessly violated the Ogden Memorandum's requirements and therefore committed professional misconduct.

(4) The government filed three arguably misleading pleadings with the court, and Ruby made one arguably misleading statement in court, regarding the government's MOI disclosures. Those pleadings and Ruby's statement may have led the court to reasonably, but erroneously, believe that the government had disclosed all MOIs in its possession. OPR reached the following conclusions about the alleged misstatements to the court:

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

(a) Ruby and Goodwin did not intentionally mislead the court regarding the government's MOI disclosures.

(b) Ruby and Goodwin did not violate West Virginia RPC 3.3(a)(1), which prohibits an attorney from *knowingly* making a false statement to the court, because OPR found that neither Ruby nor Goodwin intentionally made false statements to the court.

(c) OPR found insufficient evidence to conclude that the government's pleadings and Ruby's statement in court about the government's MOI disclosures violated West Virginia RPC 4.1, which prohibits attorneys from knowingly making false material statements to third parties such as Zuckerman Spaeder LLP.

(d) For the following reasons, OPR did not reach a conclusion about whether Ruby and Goodwin recklessly made arguably misleading statements to the court about the government's MOI disclosures.  When OPR investigates an allegation that the government made misleading statements to the court, OPR would ordinarily request to interview the court to ask how the court interpreted the statements at issue.  OPR could not follow its usual procedures in the *Blankenship* case, because the case is being actively litigated, and the court would be unable to engage in *ex parte* communications with the government.  OPR is therefore unable to ascertain the court's views as to whether the court was misled by the government's statements about its MOI disclosures.  In its Section 2255 motion, McGuireWoods has alleged that the government made misrepresentations to the court about its MOI disclosures.  The defense, if it chooses, may further pursue that allegation in the post-conviction litigation, which will allow the court to inform the parties as to whether it was misled by the statements at issue.

On March 22, 2018, OPR sent its draft report to the USAO, Ruby, and Goodwin, and provided them with an opportunity to review and comment on the draft report.  The USAO told OPR that it had no substantive comments about the draft report.  Ruby submitted an eight-page letter, and Goodwin submitted a four-page letter, in response to OPR's draft report.[11]  After carefully considering Ruby's and Goodwin's comments, OPR changed one of its findings and made minor revisions to its report.

## I.    FACTUAL BACKGROUND

### A.    Upper Big Branch Coal Mine Explosion

On April 5, 2010, an explosion killed 29 coal miners in West Virginia's Upper Big Branch (UBB) coal mine.  UBB was then owned and operated by a subsidiary of the Massey Energy Company (Massey).  At the time of the explosion, Donald Blankenship was Massey's Chief Executive Officer and Chairman of the Board of Directors.

---

[11]    Ruby's comments on the draft report are attached at Tab F.  Goodwin's comments on the draft report are attached at Tab G.

Case 5:18-cv-00591 Document 70-24 Filed 09/05/18 Page 11 of 97 PageID #: 1055
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

## B.    The Mine Safety and Health Administration's Post-Explosion Investigations

The Mine Safety and Health Administration (MSHA), a component of the U.S. Department of Labor (DOL), enforces federal laws, regulations, and safety standards (collectively, safety standards) governing coal mine safety. During the period covered by the indictment, MSHA coal mine inspectors regularly inspected UBB and issued citations and imposed monetary fines when they found violations of safety standards. After the UBB explosion, MSHA conducted an investigation to determine the cause(s) of the accident. In a December 6, 2011 report, MSHA concluded that the 29 coal miner deaths were preventable and resulted from Massey's failure to comply with applicable federal safety standards.[12] After the UBB explosion, MSHA also conducted an internal review of its own pre-explosion enforcement activities at UBB, and issued a report of the results of that review on March 6, 2012.[13]

The MSHA post-explosion investigation concluded that the physical conditions that led to the explosion were the result of a series of basic and avoidable safety violations at UBB. The MSHA investigation concluded that the UBB accident began with a small explosion resulting from the ignition of methane gas, triggering a much larger explosion of coal dust, which killed the 29 miners. According to MSHA, Massey could have prevented the initial methane gas explosion if it had properly maintained UBB's "longwall" coal-mining machine. When properly working and maintained, a longwall coal-mining machine uses sprays of water to both suppress potentially-explosive coal dust that is generated as result of mining coal, and to reduce heat generated by the longwall coal-mining machine during its operation that could ignite methane gas released during the mining process.

MSHA found that UBB's longwall coal-mining machine was not properly maintained, which likely caused the initial methane gas ignition. In addition, MSHA found that Massey failed to follow basic safety procedures for detecting levels of methane gas in the mine. MSHA also found that Massey failed to comply with the MSHA-approved ventilation and roof control plans for UBB, which increased the probability of unsafe levels of methane gas accumulation. Underground coal mines must maintain adequate ventilation to provide miners with safe air to breathe, and to prevent the accumulation of unsafe levels of methane and other dangerous gasses. MSHA found that Massey failed to install proper supports for the mine's roof, which contributed to the accumulation of methane gas. Finally, MSHA found that Massey violated basic safety standards by allowing an excessive accumulation of coal dust, which ultimately fueled the large explosion. MSHA found that Massey failed to properly use rock dust in the mine, which can control and render inert coal dust and prevent it from catching fire.[14]

---

[12]    MSHA's *Report of Investigation, Underground Coal Mine Explosion, April 5, 2010, Upper Big Branch Mine-South, Performance Coal Company, Montcoal, Raleigh County, West Virginia, ID No. 46-08436*, December 6, 2011.

[13]    *Internal Review of MSHA's Actions at the Upper Big Branch Mine-South, Performance Coal Company, Montcoal, Raleigh County, West Virginia*, March 6, 2012.

[14]    MSHA's *Report of Investigation*, Executive Summary at 2.

- 6 -

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

## C.    Criminal Investigation

The USAO commenced a criminal investigation soon after the UBB mine explosion occurred.

### 1.    The Prosecution Team

The government's investigative and prosecution team consisted of USAO attorneys, an FBI Special Agent, a DOL Office of the Inspector General (DOL OIG) Special Agent, and DOL attorneys, several of whom were appointed as Special AUSAs for the *Blankenship* trial.

R. Booth Goodwin II was the United States Attorney for the Southern District of West Virginia from 2010 to the end of 2015.[15]  Goodwin was an active member of the USAO's investigative and prosecution team.  Goodwin participated in discovery decisions, witness interviews, and pretrial and trial strategy.  Goodwin conducted the examination of several witnesses during the *Blankenship* trial and delivered the government's closing argument.  Ruby told OPR that he and Goodwin met daily to discuss the *Blankenship* case.  Ruby asserted that Goodwin approved all significant decisions the trial team made during the UBB explosion investigation and *Blankenship* litigation.[16]

Steven Ruby was an AUSA in the USAO from 2009 to early 2017.[17]  In 2012, Ruby was appointed Counsel to the United States Attorney.  Ruby led the prosecution team and was involved in almost every decision the team made.  Ruby was a relatively inexperienced federal trial prosecutor; Ruby told OPR that prior to the *Blankenship* case, he had tried two relatively minor cases in federal court.[18]

---

[15] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



[16]    September 28, 2017 OPR interview of Steven Ruby (Ruby Interview) at 9.  Specifically, Ruby said, "I would say the decision-making authority on decisions of any significance rested with [Goodwin].  The . . . grunt work of preparing for trial was largely me, but . . . the case was very important to him, and not without reason.  It was obviously a significant case.  And he made clear from the beginning, that . . . any decision of significance had to be made by him, and he reiterated that more strongly around the summer of 2015.  And that [continued] through the pretrial process and all the way through trial."  *Id.* at 190-91.

[17] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[18]    *Id.* at 28. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



OPR - 000012

Case 5:18-cv-00591   Document 70-34   Filed 09/09/19   Page 13 of 97 PageID #: 1057
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)



_____s. ____ was added to the *Blankenship* prosecution team in February 2015, in large part because of his extensive trial experience.

_____, and was immediately assigned to the *Blankenship* team. Because of her federal court inexperience, _____was assigned primarily to conduct legal research, writing, and other supporting tasks.

_____was Ruby's chief DOL point-of-contact. _____ assisted the prosecution team with searches of MSHA documents and other tasks. _____ was appointed as a Special AUSA (SAUSA), and attended the *Blankenship* trial (though he did not play an active role during the trial).

_____ has been an FBI Special Agent (SA) for 15 years. _____ was assigned to the criminal investigation shortly after the UBB mine explosion.

_____ has been a DOL OIG SA for 16 years. _____ was assigned to the criminal investigation shortly after the UBB mine explosion.

_____ is a paralegal specialist in the USAO. _____was responsible for almost all of the technical aspects of the government's collection of evidence and the disclosure of materials to the defense.

_____ was a legal assistant in the USAO at the time of the *Blankenship* investigation and trial_____ _____ assisted _____ and prosecution team attorneys with various administrative tasks.

## 2. Blankenship's Defense Team

Blankenship was represented by a large team of attorneys from the Washington, D.C. law firm Zuckerman Spaeder LLP (Zuckerman), as well as local counsel. The lead attorney was a nationally prominent criminal defense attorney, William Taylor, III. Zuckerman defended Blankenship aggressively throughout the criminal investigation, trial, and appellate proceedings.

## 3. Pre-Indictment Criminal Investigation

The UBB mine exploded in April 2010. Blankenship was indicted in November 2014. During the four and one-half intervening years, the USAO conducted an active criminal investigation. As a result of obtaining documents during that investigation, and obtaining documents generated by MSHA's accident investigation and internal review following the UBB mine explosion, at the time of the indictment the USAO possessed over four million pages of documents related to the explosion. _____ maintained a computer software electronic searchable database (called Relativity) into which ___ put most of the documents the government received through its investigation. _____ placed Bates-stamp markings on the electronic documents both in Relativity and on the paper documents maintained elsewhere.

Case 5:18-cv-00591   Document 7033-1   Filed 09/05/18   Page 14 of 97 PageID #: 1058
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

During the criminal investigation, the prosecution team interviewed numerous witnesses, some multiple times. ██████, ████████, or both, attended almost all of those interviews. Ruby attended almost all interviews, and Goodwin attended many as well, including interviews of witnesses whose MOIs were not disclosed to the defense.[19]  Either ██████ or ████████ took handwritten notes during witness interviews, and they thereafter drafted memoranda to memorialize the substance of the interviews.[20]  Neither ██████ nor ████████ sent drafts of their MOIs to others who attended the interview for review or comment.[21]  Both ██████ and ████████ said that no one ever told them to include or omit information in any of the MOIs they wrote.[22]

██████ and ████████ prepared MOIs for witnesses who were being prepared for their trial testimony. ██████ did so in all cases. ████████ said that on occasion, when a witness had nothing new to say during a witness preparation session, ██ would not memorialize that preparation session in an MOI.[23]

Once completed, ██████ and ████████ either hand-delivered or e-mailed MOIs to the USAO. ██████ and ████████ almost always gave completed MOIs to ████████, though they would occasionally give them to Ruby or Paralegal #2. ████████ put completed MOIs in the Relativity database, and would apply a Bates-stamp label beginning with the letters "MOI" and ending with a six-digit number. The first page of the first Bates-stamped MOI was labeled, "MOI-000001." ████████ would apply Bates-stamp label numbers to the MOIs ██████ received based solely on when ██████ received them, and not based on the dates of the interview or the dates of when the MOI was drafted. By the time the *Blankenship* trial ended (a few MOIs were prepared during trial), ██████ and ████████ had written over 425 MOIs.

---

[19]     A few interviews were conducted by attorneys from the Criminal Division and not the USAO. For example, ████████████████████████████████████████████████████████, by ██████ and an attorney from the Criminal Division's Fraud Section. One of Zuckerman's initial misconduct allegations was that the government had failed to disclose exculpatory evidence ██████ provided the government during that interview. When asked about this allegation, Ruby initially told OPR that ██████ had not been interviewed because the government refused to grant ██ immunity. Ruby Written Response at 10. Later, however, OPR learned that the government had failed to disclose 11 pre-indictment MOIs, including ██████ MOI. When OPR asked Ruby about this, Ruby told OPR that because he had not been present during ██████ interview, he had forgotten that the Criminal Division had interviewed ██████. Ruby reiterated that ██████ ████████████████ January 19, 2017 Ruby e-mail to OPR.

[20]     ████████ memoranda were labeled as FBI form 302s. ██████ memoranda were labeled as DOL/OIG reports of interview. Because the prosecution team Bates-stamped all of these memoranda using the letters "MOI" (Memorandum of Interview), OPR will refer to these documents as MOIs.

[21]     ██████ said that ██ might have provided Ruby with a draft MOI for ██████ ██████████████████████ (though OPR found no evidence that ██ did so). The ██████ MOI was the only post-indictment MOI disclosed to the defense. September 26, 2017 OPR interview of ██████ ████████████ at 23.

[22]     ██████ Interview at 24-25; September 27, 2017 OPR interview of ████████ ████████████ Interview) at 48.

[23]     ████████ Interview at 17.

Case 5:18-cv-00591 Document 70-1 Filed 09/06/18 Page 15 of 97 PageID #: 1059
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

### D.    The *Blankenship* Indictment

#### 1.    The Indictment and Superseding Indictment

Blankenship was indicted on November 13, 2014.  A three-count Superseding Indictment was returned on March 10, 2015, charging Blankenship with conspiracy to violate federal mine safety standards, in violation of 30 U.S.C. § 820(d) and 18 U.S.C. § 371; causing false statements to be filed with the Securities and Exchange Commission, in violation of 18 U.S.C. §§ 1001(a)(2) and (3) and 18 U.S.C. § 2; and causing false statements to be made in connection with the purchase and sale of securities, in violation of 15 U.S.C § 78ff and 18 U.S.C. § 2.

#### 2.    The Government's Factual Basis for Alleging Criminal Conduct:  The Mine Safety Count[24]

The indictment set forth an extensive factual recitation supporting the charge that Blankenship conspired with others to violate mine safety standards.  That charge was premised upon, *inter alia*, the following factual allegations.

##### a.    Blankenship Failed to Employ Sufficient Workers

The indictment alleged that unsafe conditions in UBB were caused in part because Blankenship, in order to increase profits, employed an insufficient number of workers to do the jobs that were required to keep UBB conditions safe.[25]

##### b.    Blankenship Imposed Aggressive Production Quotas

The indictment alleged that unsafe conditions in UBB were caused in part because Blankenship set coal production quotas that left too little time for workers to implement and maintain safety measures.[26]

##### c.    Blankenship Emphasized Profit Over Safety

The indictment alleged that unsafe conditions in UBB were caused in part because Blankenship decided that profits would be maximized by paying regulatory fines instead of paying

---

[24]    OPR's Report will not discuss the indictment's securities-related charges, because the discovery issues discussed below do not relate to those counts.  The indictment alleged that after the UBB explosion, Blankenship had violated federal securities laws by authorizing and approving statements to the public that falsely asserted that Massey strove to comply with mine safety standards and that Massey did not condone safety violations.  The indictment alleged that such statements were fraudulent and deceived sellers and potential purchasers of shares of Massey stock. The jury acquitted Blankenship of the securities-related charges.

[25]    Indictment ¶¶ 24, 26, 27, 30, 36, 49, 92, 100(a).

[26]    Indictment ¶¶ 24, 26, 27, 30, 36, 49, 68, 100(a), 100(g).

- 10 -

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

workers to implement safety measures or for structural improvements to enable UBB to comply with federal safety standards.[27]

### d. UBB Managers Were Instructed to Violate Safety Standards

The indictment alleged that during the indictment period, Blankenship instructed and encouraged UBB managers to violate mine safety standards. The indictment alleged that Blankenship disregarded safety violations when communicating with UBB managers, which led them to understand that Blankenship accepted and expected such violations. The indictment alleged that members of the conspiracy falsified the results of coal dust samples taken in UBB as required by federal safety standards.[28]

### e. Budget Decisions Were Made to Maximize Profit, Regardless of the Impact on Safety

The indictment alleged that Blankenship was the highest-ranking official involved in Massey's annual budget and production plan process, which determined how many workers were budgeted for safety-related positions, and set the amount of coal each mine was required to produce. The indictment alleged that Blankenship repeatedly denied requests by UBB managers to hire more workers to fill jobs that were critical to mine safety, and reduced the number of workers in such positions.[29]

### f. Employee Compensation Rewarded Profit While Ignoring Mine Safety Violations

The indictment alleged that Blankenship used employee compensation as a means of communicating to employees that it was acceptable for UBB to violate mine safety standards.[30]

### g. UBB Provided Workers with Advance Warning Regarding the Presence of MSHA Inspectors

The indictment alleged that unsafe conditions in UBB existed in part because UBB employees outside the mine unlawfully provided employees working in the mine with advance notice that MSHA inspectors had arrived at UBB, and were on the way to inspect the mine.[31]

---

[27]     Indictment ¶ 58.

[28]     Indictment ¶¶ 59, 91, 94, 99, 100(b), 100(f).

[29]     Indictment ¶¶ 50, 67, 69.

[30]     Indictment ¶¶ 79, 95, 100(h).

[31]     Indictment ¶¶ 37, 97, 98, 100(c), 100(d), 100(e).

OPR - 000016

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

## II.   FACTS   RELEVANT   TO   ZUCKERMAN'S   INITIAL   MISCONDUCT ALLEGATIONS

On March 7, 2016, Zuckerman sent a letter to the Department of Justice alleging that the *Blankenship* prosecution team had engaged in prosecutorial misconduct.[32]   At that time, Zuckerman was unaware that the government had not disclosed 61 MOIs, and therefore did not raise that issue in its letter (although Zuckerman did question why it had received only one MOI memorializing a post-indictment interview).   Zuckerman's allegations are set forth below.

### A.   The Government Allegedly Misrepresented Blankenship's Attendance at Budget Meetings

Zuckerman alleged that the government failed to disclose exculpatory evidence and misled the court regarding Blankenship's attendance at budget and planning meetings for Massey and its subsidiaries, including UBB.   Zuckerman noted that one of the government's central allegations was that in order to increase profits, Blankenship refused to adequately staff UBB to ensure mine safety.   Zuckerman alleged that the government failed to disclose evidence that was inconsistent with that contention, and that the government elicited false testimony to support its contention.[33]

Specifically, Zuckerman alleged that ███████ told the government in a pretrial interview that Blankenship did not attend Massey budget and planning meetings, a fact that Zuckerman said was inconsistent with the government's contention that Blankenship made decisions regarding staffing levels for safety-related positions.[34]   Zuckerman said that the government never disclosed the information ███████ had provided the government. Zuckerman also alleged that the government told the court and the jury that Blankenship attended budget and planning meetings, which the government knew was false because of the information ███████ provided.   Zuckerman alleged that Ruby designed his questions to ███████ in such a way as to avoid directly asking about Blankenship's presence at budget and planning meetings, and to create the false impression that Blankenship was involved in those meetings.[35]

In his written response to this allegation, Ruby stated that Zuckerman had misstated the government's contention.   Ruby said that Blankenship's attendance at budget and planning meetings was irrelevant; what the government contended and proved at trial was that Blankenship made budget and planning decisions.   Ruby stated that while Blankenship may not have attended some budget and planning meetings, the information discussed in those meetings was provided to

---

[32]   Zuckerman sent its letter to the Criminal Division's Assistant Attorney General.   The letter was forwarded to OPR.

[33]   March 7, 2016 Zuckerman letter to DOJ at 1-8.

[34]   ███ did not testify at trial.   Presumably, Zuckerman spoke with ███ or ███ attorneys after ███ spoke with the government, and were told what information ███ had provided the government during ███ interview.

[35]   *Id.* at 3-8.

Case 5:18-cv-00591  Document 70-24  Filed 09/05/18  Page 18 of 97 PageID #: 1062
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

him, and that Blankenship made the ultimate budget and planning decisions, including decisions about staffing.[36]

Ruby also responded to Zuckerman's allegation by asserting that the information ▮▮▮▮ provided that the government allegedly withheld – that Blankenship did not attend all budget and planning meetings – was provided to the defense in other materials the government had disclosed, including:[37]  (1) an October 22, 2014, ▮Witness #4▮  MOI ▮Witness #4▮ ▮▮▮▮▮▮▮;[38] (2) an August 23, 2013, ▮Witness #5▮  MOI (▮Witness #5▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; an August 2009 calendar of Blankenship's activities; and (3) voluminous e-mails that showed that Blankenship received information about the budget and planning process outside of committee meetings.[39]

OPR asked ▮AUSA #1▮ ▮AUSA #2▮ ▮FBI SA #1▮ and ▮DOL SA #1▮ for their views regarding Zuckerman's allegation that the government withheld evidence that showed that Blankenship did not attend budget and planning meetings. Each agreed with Ruby's explanation that the government's contention, supported by evidence presented at trial, was that Blankenship made the final budget and planning decisions, and that Blankenship's presence or absence at budget and planning meetings was not relevant.[40]

---

[36]  Ruby Written Response at 6-7.

[37]  Ruby also made the obvious point that Blankenship himself knew whether he attended budget and planning meetings.  September 30, 2016 Ruby letter to OPR at 6.  It would therefore be difficult for the defense to allege that the failure to disclose ▮Witness #▮ statements about those meetings would have prejudiced the defense.

[38]  Although Ruby told OPR that the October 22, 2014 ▮Witness #4▮ MOI had been disclosed, as discussed above, that assertion was erroneous.  When OPR asked Zuckerman to respond to Ruby's contention that the information they alleged had been withheld was provided in other documents, including the October 2014 ▮Witness #4▮ MOI, Zuckerman told OPR that it never received that MOI.  OPR had told Ruby that OPR might show Zuckerman any documents Ruby used to refute Zuckerman's allegations: "We may show any such documents to Taylor and ask him to explain his allegation that Blankenship's defense was prejudiced by the government's decision not to produce ▮Witness #▮ statements in light of the production of those documents." July 18, 2016 OPR e-mail to Ruby.  The fact that Ruby cited and provided OPR with a copy of the ▮Witness #4▮ MOI, knowing that OPR intended to show it to Zuckerman, tends to support Ruby's assertion that the failure to disclose 11 pre-indictment MOIs, including the October 2014 ▮Witness #4▮ MOI, was a mistake, and that he had not been aware of that mistake until Zuckerman told OPR that it never received the October 2014 ▮Witness #4▮ MOI.  Similarly, in both Ruby's Written Response and his September 30, 2016 letter to OPR, Ruby discussed an MOI from an undisclosed pre-indictment interview of ▮Witness #6▮ ▮▮▮▮▮▮▮▮▮▮  Ruby's citation to the undisclosed ▮Witness #6▮ MOI, knowing that OPR might show that MOI to Zuckerman, is further evidence that Ruby mistakenly believed that the MOI had been disclosed.

[39]  OPR noted that the voluminous e-mails that Ruby provided OPR to demonstrate Blankenship's involvement in the budget and planning process outside of the budget and planning committee meetings were e-mails that were sent to Blankenship, and did not include return e-mail communications.  When asked about this, witnesses told OPR that it was very unusual for Blankenship to send e-mails.  Rather, he would either communicate by telephone, or he would make handwritten notes on the messages sent to him, which would then be faxed to whoever needed to know Blankenship's thoughts, response, or instructions.  September 27, 2017 OPR interview of ▮AUSA #1▮ ▮▮▮▮ Interview) at 54; September 27, 2017 OPR interview of ▮AUSA #2▮ ▮▮▮▮ Interview) at 67; ▮DOL SA #▮ Interview at 41-42; ▮FBI SA #1▮ Interview at 58.

[40]  ▮AUSA #1▮ Interview at 52-53; ▮AUSA #2▮ Interview at 66; ▮DOL SA #▮ Interview at 38-40; ▮FBI SA #1▮ Interview at 57.

Case 5:18-cv-00591    Document 70-1    Filed 09/05/18    Page 19 of 97 PageID #: 1063
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Zuckerman's supposition that the government had interviewed ▮Witness #3▮ and decided not to disclose her MOI was correct, for Ruby acknowledged that he decided not to disclose ▮Witness #3▮ MOI.[41]   However, while Zuckerman alleged that decision was made to suppress exculpatory evidence, Ruby said he made that decision because ▮Witness #3▮ statements were inculpatory, not exculpatory.[42]  Ruby said that ▮▮▮ confirmed that Blankenship had final approval over the budget and planning process, which was consistent with the government's contention.[43]

The MOI memorializing ▮Witness #3▮ interview addressed Blankenship's role in the budget and planning process, as well as other issues.[44]   The MOI contains the following statements about Blankenship's involvement in the budget and planning process:

- *Blankenship reviewed data on spreadsheets pulled from a computer program used for budgeting.*

- *Blankenship was provided with production figures supported by detailed worksheets.*

- *Blankenship used to attend budget meetings, but in 2008, when the location for the meetings changed, Blankenship did not attend them.*

- *Blankenship became less involved in the budget review over a two-to-three-year span.*

- *Blankenship was not involved in the final business plan reviews.*

- *If Blankenship reviewed the budget plans he reviewed them on his own.*

- *Blankenship received three copies of the final plan book.*

- *▮Witness #3▮ would keep Blankenship updated on the process of preparing the plan summary, and Blankenship would call or fax questions to ▮Witness #3▮*

- *Blankenship reviewed a high-level summary of the budget book.*

---

[41]    Ruby Written Response at 6. Ruby affirmatively considered disclosing ▮Witness #3▮ MOI, but then decided against producing it.  On September 10, 2015, Ruby sent himself a "to do" list for the *Blankenship* case.  Included in that list was the notation, "Produce ▮Witness #7▮▮Witness #3▮▮Witness #8▮ [MOIs]" On September 21, 2015, Ruby sent Zuckerman a letter summarizing discoverable information from the ▮Witness #7▮ and ▮Witness #8▮ MOIs, but not the ▮Witness #3▮ MOI.

[42]    Ruby Written Response at 6.  In his interview, after reviewing certain statements in the ▮Witness #3▮ MOI, Ruby acknowledged that his initial statement to OPR was not correct.  Ruby acknowledged that some of ▮Witness #3▮ statements were discoverable.  Ruby Interview at 134-37.  *See* summary of ▮Witness #3▮ MOI discussed below in Section III(E)(6).

[43]    Ruby Written Response at 6.

[44]    As noted in Section III(E)(6) below, OPR identified several statements in ▮Witness #3▮ MOI that are inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment, and therefore should have been disclosed to the defense.

- 14 -

Case 5:18-cv-00591  Document 70-31  Filed 09/06/18  Page 20 of 97 PageID #: 1064
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Some statements in the ▮▮ MOI support the government's contention that Blankenship was involved in the budget and planning process. Others contradict that position (and are inconsistent with other statements in the MOI). In particular, the statement that, "Blankenship was not involved in the final business plan reviews," is inconsistent with the government's contention that Blankenship had the final say regarding Massey's business plans. OPR asked ▮FBI SA #1▮, who wrote the ▮▮MOI, and Ruby about this statement, and whether it contradicted the government's factual basis for alleging criminal conduct. ▮FBI SA #1▮ said that statement was "probably a poorly worded sentence on my part," and noted that it was not consistent with the other statements in the MOI.[45] ▮FBI SA #1▮ said that even if ▮Witness▮ had made that statement, it was not consistent with the government's evidence.[46] Ruby said that the statement that Blankenship was not involved in business plan "reviews" referred to meetings, not decisions, and so was not inconsistent with the government's factual basis for alleging criminal conduct.[47] OPR examined ▮FBI SA #1▮ handwritten notes taken during ▮Witness #3▮ pretrial interview, which contained the statements used to draft ▮▮ MOI. On page five of ▮FBI SA #1▮ notes, ▮▮ wrote, "Final Business Plan Reviews – DB [Blankenship] not involved in meetings." ▮FBI SA #1▮ handwritten notes show that the statement in ▮Witness #3▮ MOI that Blankenship was not involved in final business plan reviews was not an accurate description of what ▮Witness #3▮ said during ▮▮ interview.

## B. The Government Allegedly Withheld Exculpatory MSHA E-Mails

Zuckerman alleged that the government intentionally withheld exculpatory evidence because the government did not disclose any e-mails from the two MSHA inspectors who wrote the majority of UBB citations during the indictment period.[48] Zuckerman further alleged that among the 70,000 pages of MSHA documents it had subpoenaed shortly before the trial, it found only two e-mails to or from eight MSHA inspectors who inspected UBB during the indictment period.[49] Zuckerman alleged that it had information from two current or former MSHA employees who told Zuckerman that MSHA employees communicated by e-mail. Zuckerman therefore inferred that the government intentionally failed to disclose MSHA inspector e-mails that contained exculpatory information.

Ruby told OPR that Zuckerman's allegation was factually false, as the government had disclosed to the defense "hundreds" of MSHA inspector e-mails.[50] OPR asked Ruby to send it a

---

45   ▮FBI SA #1▮ Interview at 60.

46   *Id.* at 61.

47   Ruby Interview at 136.

48   March 7, 2016 Zuckerman letter to DOJ at 10.

49   *Id.* at 11.

50   Ruby Written Response at 13.

- 15 -

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

sample of those e-mails; Ruby then sent OPR about 20 e-mails to or from many of the MSHA inspectors who had inspected UBB during the indictment period.[51]

In addition to providing OPR with e-mails to and from some of the MSHA inspectors who inspected UBB during the indictment period that had been disclosed to the defense, Ruby told OPR that the reason why there were fewer substantive e-mails to or from MSHA inspectors about UBB than one would ordinarily expect was that MSHA had a policy that directed MSHA inspectors to discuss inspection findings only in official MSHA documents.[52] Ruby said ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ told him about that MSHA policy.[53]

In fact, Zuckerman was aware of MSHA's policy regarding e-mail communications well before it alleged that the government had engaged in misconduct by failing to disclose exculpatory MSHA inspector e-mails.  On September 17, 2015, Zuckerman filed a motion to compel MSHA to comply with an early-return subpoena Zuckerman had sought in August 2017.  Zuckerman alleged in part that the documents the government produced in response to the subpoena failed to include MSHA inspector e-mails, and that those e-mails were likely exculpatory.  On September 24, 2015, the Department of Labor filed a brief in opposition to the motion to compel.[54]  The DOL informed the court that the reason why the MSHA documents produced to the defense did not include voluminous e-mails in which UBB conditions were discussed was that MSHA policy required MSHA inspectors to use official MSHA forms to record their observations about mine conditions.[55]

▮▮▮DOL Attorney▮▮▮ told OPR that Ruby accurately described to OPR the MSHA policy that discouraged MSHA inspectors from discussing their inspection findings in anything other than official documents, and that such discussions were not likely to be found in MSHA e-mails because of that policy.[56]

---

[51]    September 30, 2016 Ruby letter to OPR, exhibits 39-59.

[52]    Ruby Written Response at 13.

[53]    Ruby Interview at 66. ▮▮▮, ▮▮▮ and ▮▮▮ said they had not heard of any such MSHA policy. ▮▮▮ Interview at 54; ▮▮▮ Interview at 46; ▮▮▮ Interview at 53-54. ▮▮▮ said ▮ recalled that Ruby told ▮▮▮ about such an MSHA policy. ▮▮▮ Interview at 47-49.

[54]    Zuckerman incorporated by reference its September 17 motion into a second motion to compel filed on November 6, 2015.  The court denied that motion on December 9, 2015.

[55]    The DOL brief cited the following passage in an MSHA Citation and Order Writing Handbook: "For Coal inspectors, the forms provided to document inspectors' observations during enforcement activities are MSHA Form 7000 Series.  Inspectors are not to take notes on other paper and copy them to these forms unless otherwise directed." September 24, 2015 brief at 4.

[56]    October 13, 2017 OPR interview of ▮▮▮DOL Attorney▮▮▮ Interview).

OPR - 000021

Case 5:18-cv-00591   Document 70-4   Filed 09/06/18   Page 22 of 97 PageID #: 1066
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

**C.     The Government Allegedly Did Not Have MSHA Inspectors Testify at Trial to Avoid Revealing Discovery Violations**

A significant part of the government's evidence adduced at trial was the volume and seriousness of the citations that MSHA inspectors issued after inspecting UBB during the indictment period. However, the government did not call any MSHA inspectors to testify during the trial. Zuckerman alleged that "the only conceivable explanation" for why the government did not have MSHA inspectors testify was that "doing so would have exposed Jencks and discovery violations."[57]  Zuckerman did not support its allegation with any testimonial or documentary evidence.

Ruby told OPR that the government intentionally decided not to use MSHA inspectors as witnesses, but not for the reasons Zuckerman alleged.  Ruby said that he was concerned that a West Virginia jury might be hostile or unreceptive to the testimony of MSHA inspectors, who are federal government employees, and who are sometimes perceived by some in the West Virginia federal jury pool as hostile to the coal industry, a key West Virginia employer.  Ruby said that the government was able to elicit from coal miner witnesses the same facts about unsafe conditions in UBB as the government would have elicited from MSHA inspectors.[58]  Both DOL Attorney and FBI SA #1 told OPR that they recalled that the government did not use MSHA inspectors as trial witnesses for the same reason Ruby articulated.[59]

**D.     An MSHA Employee Allegedly Destroyed Documents Shortly After the UBB Explosion**

Zuckerman alleged that the government failed to investigate or disclose evidence concerning MSHA's destruction of UBB records after the mine explosion.  In support of its allegation, Zuckerman cited two declarations filed in an unrelated civil proceeding concerning an attempt by the Massey subsidiary that owned UBB to obtain documents from MSHA.  One declaration was from a former-MSHA employee; the other was from an employee of a different Massey subsidiary.  The two declarations contained allegations that in the summer of 2010, an MSHA employee destroyed MSHA documents related to UBB.[60]

The defense raised the document destruction issue with the court.  In a December 9, 2015 decision, the court denied the defense motion related to the allegation.  The court found that the two declarations the defense cited were "rife with hearsay."[61]  The court noted that two of the MSHA officials accused of the document destruction submitted sworn declarations denying the

---

[57]     March 7, 2016 Zuckerman letter to DOJ at 11.

[58]     Ruby Written Response at 14.

[59]     DOL Attorney Interview; FBI SA #1 Interview at 52-53. Ruby said that he recalled discussing this issue with Goodwin. Ruby Interview at 68.  Neither AUSA #2 nor DOL SA #1 recalled any discussion about not using MSHA inspectors as trial witnesses. AUSA #2 Interview at 52-53; DOL SA #1 Interview at 47.

[60]     March 7, 2016 Zuckerman letter at 11-12.

[61]     December 9, 2015 opinion at 5.

Case 5:18-cv-00591   Document 70-54   Filed 09/09/18   Page 23 of 97 PageID #: 1067
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

allegations, and that one of the two declarants cited by the defense acknowledged in an *in camera* hearing during the *Blankenship* trial that he had no firsthand knowledge of any document destruction. Ruby said that the government had been unaware of the allegation of document destruction until mid-trial, when Zuckerman raised the issue with the court.[62]

### E. The Government Allegedly Failed to Disclose Exculpatory Evidence Provided by ████████

████████ ████████ entered into an immunity agreement with the government prior to trial. ████████ cross-examination lasted five-days. During cross-examination, ████████ testified that he had committed no crimes; ██ and Blankenship had not conspired to violate mine safety laws; Blankenship did not instruct him to violate mine safety laws; and that Blankenship wanted and ordered UBB to reduce MSHA violations. ████████ also testified on cross-examination that he or his attorneys made similar statements to the government prior to trial. Zuckerman alleged that the government intentionally failed to disclose those statements to the defense before trial.[63]

Ruby told OPR that ████████ statements during cross-examination identified by Zuckerman surprised the government. Ruby said that it was not uncommon in federal criminal practice for witnesses to change their stories during cross-examination. The government interviewed ████████ six times prior to and during trial, but disclosed only one of the six MOIs memorializing those interviews. None of the statements that Zuckerman alleges were intentionally withheld were contained in any of the five undisclosed MOIs. ████████ told OPR that if ████████ had made statements during interviews that ██ had not conspired with Blankenship, or that ██ had not broken any laws, ██ would have put those statements in the MOIs ██ drafted.[64] ████████ said that the closest ████████ came to making a statement such as those he made during cross-examination was a statement contained in an April 8, 2015 undisclosed MOI: ████████ advised that ██ never knowingly gave a direct order where ██ told someone to do something that caused a law to be broken."[65] Ruby, however, did not view that statement as inconsistent with the government's factual basis for alleging criminal conduct. Ruby said that the government's contention was that the conspiracy to violate mine safety standards in order to maximize profits was a tacit, and not an explicit, agreement.[66]

OPR examined the handwritten notes that ████████ and ████████ took during ████████ six interviews by the prosecution team, which they used to write ████████ MOIs (not all were legible). OPR did not find any evidence that ████████ said to the government before trial the

---

[62]    Ruby Written Response at 5.

[63]    March 7, 2016 Zuckerman letter to DOJ at 9.

[64]    ████ Interview at 42-43.

[65]    ████ Interview at 44.

[66]    Ruby Interview at 123.

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

statements ▮ made during cross-examination that were the basis for Zuckerman's misconduct allegation.

OPR asked Zuckerman whether it was aware of any evidence other than ▮Witness #4▮ statement on cross-examination that ▮ or ▮ attorneys provided that information to the government, that supported its contention that the government intentionally failed to disclose ▮Witness #4▮ statements. Zuckerman said it was not aware of any additional evidence to support its contention.[67]

## F.     The Government Allegedly Failed to Disclose Two Specific Exculpatory Documents

Zuckerman alleged that the government failed to disclose two exculpatory documents: a letter from an MSHA manager in which he expressed his approval of a Massey plan to reduce MSHA citations; and a summary of an MSHA inspector report in which the inspector expressed positive opinions regarding UBB conditions.

### 1.     The "Applaud" Letter

On September 17, 2015, the defense filed a motion to compel MSHA to comply with an early-return subpoena. The defense claimed that MSHA's search for documents in response to the subpoena was deficient because MSHA's response did not include a July 24, 2009, letter from ▮Witness #9▮ (UBB was located in District 4) to ▮Witness #10▮ ▮. In the letter, ▮Witness #9▮ twice stated that ▮ "applaud[ed]" a new Massey initiative to eliminate hazards to miners working in Massey coal mines. Zuckerman's contention that the government had not disclosed this document was correct. OPR asked Zuckerman how it obtained the "applaud" letter, given that the government had not disclosed it. Zuckerman told OPR that it "did not have permission" to tell OPR how it obtained the letter.[68]

Ruby told OPR that he first saw the "applaud" letter when reviewing the defense's September 17, 2015 motion to compel.[69] Ruby said that he asked ▮DOL Attorney▮ to try to determine why the letter had not been disclosed to the defense. According to Ruby, DOL could not find a copy of the "applaud" letter in any DOL file, and did not know why DOL did not have a copy. Ruby said that ▮DOL Attorney▮ speculated that whoever sent the letter ▮Witness #9▮ or an administrative staff member) may not have kept a copy for DOL records.[70] ▮DOL Attorney▮

---

[67]     May 16, 2017 Zuckerman letter to OPR, Exhibit 3 at 4.

[68]     *Id.*, Exhibit 3 at 6.

[69]     Ruby Written Response at 9. OPR asked ▮Paralegal #1▮ to search the Relativity database for the "applaud" letter. ▮Paralegal #1▮ could not find that letter in the database, which supports Ruby's contention that the letter was not in the government's possession. September 28, 2017 ▮Paralegal #1▮ e-mail to OPR.

[70]     September 30, 2016 Ruby letter to OPR at 9.

Case 5:18-cv-00591    Document 70354    Filed 09/08/18    Page 25 of 97 PageID #: 1069
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

confirmed Ruby's recollection. ███ said that Ruby asked ███ to try to determine why the "applaud" letter had not been disclosed, and that DOL could not find the letter in its files.[71]

Ruby's assertion that the government had not seen the "applaud" letter before September 17, 2015 was not entirely correct. On August 22, 2014, several months before Blankenship was indicted, Ruby and █AUSA #2█ met with two attorneys representing █Witness #10█ ████████████████████████████. █AUSA #2█ took extensive notes during that meeting. It is clear from a review of those notes, and an e-mail that █AUSA #2█ sent to Ruby later that day, that █Witness #10█ attorneys described the "applaud" letter in detail during the meeting, but for unstated reasons did not provide the government with a copy of the letter.[72] Thus, in August 2014, Ruby and █AUSA #2█ were informed about, but not provided a copy of, the "applaud" letter.

OPR found that █AUSA #2█ notes from the August 22, 2014 meeting with █Witness #10█ attorneys contained discoverable material. That material includes the following representations by █Witness #10█ attorneys:

- █Witness #10█ *wanted the Hazard Elimination Program (a new Massey safety initiative) to reduce violations by 20%, but Blankenship wanted them reduced by 50%.*

- *Massey mines were safe.*

- *MSHA violations were not related to safety.*

- *Having zero MSHA violations was not realistic.*

- *If you fix 75 violations, MSHA would find 75 more.*

- *MSHA inspections are subjective.*

- *MSHA was harder on Massey than other mines.*

- *The number of MSHA violations corresponds to the number of MSHA inspection hours.*

- *Receiving violations did not mean that a mine was unsafe.*

- *Blankenship received the weekly minutes from the Hazard Elimination Committee.*

- *"Report cards" (documents containing information about mine conditions) were Blankenship's idea to increase accountability.*

On June 22, 2015, in response to a court order discussed below, Ruby sent Zuckerman a letter in which he provided the defense with information that it might claim to be *Brady* material. In that letter, Ruby summarized the discoverable statements made by █Witness #10█ attorneys as follows:

---

[71]    █DOL Attorney█ Interview.

[72]    In █AUS█ notes, █AUSA█ noted, "need this ltr," and in █AU█ e-mail █AUS█ commented that █H█e had not "seen the whole thing [letter]." August 22, 2014 █AUSA█ e-mail to Ruby.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

"Blankenship was involved in the development of violation targets and report cards for the so-called hazard elimination program. ███████ also believed that Massey made some degree of effort to comply with mine safety laws."

On September 27, 2017, OPR received ███████ notes from ███ meeting with ███████ attorneys. On October 5, 2017, OPR provided those notes to the USAO, alerting it to the fact that the notes might contain discoverable material, and noting that as far as OPR was aware, the government had not made any disclosures to the defense about the statements by ███████ attorneys; in fact, OPR's statement was incorrect, as Ruby had made the minimal disclosure noted above in his letter of June 22, 2015. On October 20, 2017, the USAO made a supplemental disclosure to the defense about ███████ attorneys' statements to the government. The USAO noted the following statements by ███████ attorneys:

- ███████ *suggested a goal of 20% reduction of MSHA violations at Massey mines in conjunction with the Hazard Elimination Program; Blankenship responded that there should be a 50% reduction goal.*

- ███████ *believed that the number of citations at Massey corresponded to the number of MSHA inspection hours.*

- ███████ *believed that not all violations at Massey related to safety and that violations did not mean the mines were unsafe.*

- ███████ *believed that Blankenship shared his view that the number of violations cited did not mean the mines were unsafe but corresponded to the number of MSHA inspection hours.*

On November 18, 2017, OPR realized that Ruby had in fact made a short disclosure regarding statements made by ███████ attorneys in his June 22, 2015 letter to Zuckerman. On that date, OPR informed the USAO that OPR's prior statement that to its knowledge Ruby had not made such a disclosure was erroneous.

2.    **MSHA Inspector ███████ Inspection Notes**

In response to the defense's August 2015 request for an early-return subpoena, the government produced thousands of pages of documents. Among them was a chart summarizing the results of MSHA inspections of various mines, including UBB. One entry on the chart summarized the results of an October 14, 2009 inspection of UBB by MSHA inspector ███████, who found, among other things, that "the section is very clean and well kept . . . the belts are well rock dusted and very clean. The condition of this mine is very good. Management is trying very hard to improve the condition of the mine, they are doing a good job." Zuckerman alleged that the government's failure to disclose that document except in response to the

Case 5:18-cv-00591   Document 70-1   Filed 09/05/18   Page 27 of 97 PageID #: 1071
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

defendant's subpoena indicated that the government had failed to properly search MSHA documents for exculpatory evidence.[73]

In response to Zuckerman's allegation, Ruby said that the reason why the document containing the summary of ▆▆▆▆▆ UBB inspection was not disclosed earlier was because it contained information about other mines as well as UBB.[74]  Ruby stated that although the chart containing that entry was not disclosed, the government had disclosed the handwritten notes taken by MSHA inspectors who were at UBB on October 14, 2009.[75]  OPR reviewed those notes and found that they contain many, but not all, of the positive comments about UBB conditions that were in the chart entry quoted above.

## III.   FACTS RELEVANT TO THE GOVERNMENT'S MOI DISCLOSURES

### A.   Ruby's Initial Statements to OPR Regarding Disclosure Decisions

In Ruby's first communications with OPR, he said that he was the prosecution team member primarily responsible for decisions regarding what material should be disclosed to the defense and the timing of those disclosures, and that other attorneys on the prosecution team played only "minor roles in discovery matters."[76]  Ruby also said that the prosecution team's law enforcement agents were not involved in discovery decisions.[77]  However, during his OPR interview, Ruby clarified his earlier statements regarding who made disclosure decisions.  In his interview, Ruby said that his initial statements to OPR were meant to describe discovery decisions related to the government's initial – and by far the largest – disclosure of information after the indictment.  Ruby said that his initial statements to OPR did not accurately describe the process by which the decision was made not to disclose MOIs of interviews occurring post-indictment, discussed below.[78]

### B.   The Government's Initial Disclosures

On December 4, 2014, the government provided the defense with its initial discovery disclosures.  Essentially, the government provided the defense with almost all of the four million

---

[73]     In its September 17, 2015, motion to compel MSHA to comply with its subpoena, Zuckerman raised the issue of the government's failure to disclose the chart containing the summary of ▆▆▆▆▆ October 14, 2009 UBB inspection as evidence that the government was violating its discovery obligations.  Zuckerman incorporated by reference its September 17 motion into a second motion to compel filed on November 6, 2015.  The court denied that motion on December 9, 2015.

[74]     Ruby Written Response at 11-13.

[75]     Id.

[76]     Id. at 3, fn. 4.  ▆AUSA #1▆ said that Ruby made most of the case-related decisions, but also that ▆▆ was not privy to what Ruby and Goodwin discussed in ▆▆ absence.  ▆AUSA #1▆ Interview at 10-11.

[77]     Ruby Written Response at 3, fn. 4.  Both ▆DOJ SA #1▆ and ▆FBI SA #1▆ said that they did not know who made disclosure decisions.  ▆DOJ SA #1▆ Interview at 7; ▆FBI SA #1▆ Interview at 10.

[78]     Ruby Interview at 32-33.

Case 5:18-cv-00591  Document 703-4  Filed 09/05/18  Page 28 of 97 PageID #: 1072
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

pages of documents in its Relativity database, as well as other materials (some of which could not be put into Relativity for technical reasons). The vast majority of the documents the government disclosed came from Massey, Massey's corporate subsidiaries (including UBB), and MSHA. The government's initial disclosures also included more than 300 MOIs. The government's December 4, 2014 disclosures were provided to the defense in an electronic database, which enabled the defense to search the documents disclosed.

The defense acknowledged that the government's initial disclosure of documents and MOIs contained what it contended was exculpatory material. In a pleading filed in February 2015, the defense stated that its review of the four million pages of documents the government disclosed in December 2014 "revealed information highly favorable to the defense."[79] In a pleading filed in July 2015, the defense stated that the government had conducted over 350 interviews, and that "the [MOIs] of many of those interviews make plain that persons interviewed gave exculpatory information to the government."[80] As discussed below, the fact that the defense acknowledged that the government disclosed what the defense considered to be exculpatory material is relevant to OPR's assessment of whether Ruby and Goodwin intentionally withheld exculpatory material in undisclosed MOIs and MSHA documents.

## C. Ruby and Goodwin Decide to Disclose Some, But Not All, MOIs

Ruby and Goodwin provided OPR with conflicting information about who decided to disclose only some of the MOIs in the government's possession. Ruby told OPR that he and Goodwin decided that the government should disclose essentially all materials in its possession as of the date of the government's initial disclosures in December 2014.[81] That decision included the disclosure of all of the hundreds of MOIs in the government's possession at that time. Ruby said that it was their intention to disclose all MOIs reflecting pre-indictment interviews.[82]

Ruby told OPR that after the indictment was filed, Zuckerman conducted an extremely aggressive defense of Blankenship that included (in the prosecution team's view) personal attacks on Goodwin and ██████████████████████████████████████████.[83] Ruby said that these aggressive attacks caused Goodwin to change his views regarding the scope of the government's future disclosures.[84] According to Ruby, Goodwin decided that the

---

[79]   Memorandum in Support of Defense Motion . . . to Enforce the Government's *Brady* Obligations at 3.

[80]   Motion to Compel Compliance with *Brady* Order and for Other Appropriate Relief at 4.

[81]   Ruby Interview at 34-35.

[82]   *Id.* at 96.

[83]   *Id.* at 38-39. ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████

[84]   Ruby said that his belief about why Goodwin changed his views as to the scope of the government's disclosures was an inference based on his understanding and recollection of events. *Id.* at 41. In Goodwin's comments

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

government would disclose only material that was required to be disclosed by applicable rules and policies.[85] As one consequence of this policy change, they decided that the government would not disclose any MOI that reflected a post-indictment interview, but would instead disclose by letter information in those MOIs that was required to be disclosed.[86] Specifically, Ruby said:

> [Goodwin] started, at some point, to develop a view that we are not going to give them more than we have to. He said, "we are not" – he said those words to me at least once, but I don't think he thought that we were – I don't think he thought that we were violating our discovery obligations. I think his view was that there was no requirement to turn over the [MOIs] in full, as long as we disclose the exculpatory information, and I didn't argue with that.[87]

Ruby emphasized that he would not have unilaterally made the decision not to disclose post-indictment MOIs:

> The U.S. Attorney personally ran the case. And I have -- I would like to think that I have some skills as a lawyer that I think were helpful to our team at trial and pretrial proceedings, but to be perfectly blunt, I was not the discovery expert here. The U.S. Attorney had a lot more seniority, not just in terms of rank in the office, but also in time in the office than I did. And I didn't make any of the decisions about disclosure of post-[indictment] MOIs without consulting with him.[88]

Because Goodwin chose not to fully cooperate with OPR's investigation, OPR was unable to ask him whether Ruby's account of the decision not to disclose MOIs reflecting post-indictment interviews was correct, or whether Goodwin had a different recollection and account of that decision. Although Goodwin declined OPR's request to interview him, he did send OPR a short letter in response to OPR's request for a written response to the allegation that the government had failed to disclose MOIs containing discoverable statements. In his letter, Goodwin stated: "[I]t was my intention and direction to [Ruby] that all information we gathered during the lengthy

---

on OPR's draft report, he adamantly denied the inference that Ruby drew regarding the decision to restrict the scope of the government's disclosures: "Any perception that I did or did not do something because of personal attacks made on me and my family by the defense is absolutely false." April 19, 2018 Goodwin letter at 4.

[85]    Ruby Interview at 8. In addition to deciding that the government would only disclose what was required, Ruby said that Goodwin also decided that the government would no longer respond to Zuckerman's e-mail correspondence about the case (Zuckerman's attorneys frequently raised issues with the government by e-mail). *Id.* at 124-26. According to Ruby, Goodwin said that if Zuckerman wanted information from the government, the defense could file a motion with the court, to which the government would respond. As noted below, Zuckerman sent Ruby several e-mails asking questions about the disclosure of MOIs, to which Ruby did not respond.

[86]    *Id.* at 38-39.

[87]    *Id.* at 39.

[88]    *Id.* at 21.

OPR - 000029

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

investigation be provided . . . If anything was not produced, I am confident it must have been inadvertent . . . It is frustrating to me if memoranda of interview were not turned over."[89]

OPR asked Ruby to respond to the assertions in Goodwin's letter to OPR. Ruby said,

All I can say to that is that we specifically discussed how we were going to handle the post-[indictment] MOIs. And I don't know if he, in writing this, is thinking about his -- the approach that we took on the materials from the pretrial phase when we did just produce it all or at least intended to produce it all. I don't know. I don't know what he is referring to there, but we certainly had many conversations about the approach that we took with the post-[indictment] MOIs.[90]

OPR found no independent evidence to support Ruby's contention that Goodwin knew about and authorized the decision not to disclose post-indictment MOIs. OPR found no e-mails or documents to support Ruby's assertion, and no witnesses said that they believed Goodwin knew of or authorized the decision. Ruby said that he usually did not communicate with Goodwin by e-mail, because his office was near Goodwin's, and they would be in each other's offices many times a day to discuss the *Blankenship* case.[91]

Paralegal #1 maintained the Relativity electronic database where the vast bulk of the documents the government obtained during its investigation was stored. Paralegal #1 also maintained and regularly updated a spreadsheet containing an index of the documents stored in Relativity or elsewhere in the government's possession. Paralegal #1 put a substantial amount of information in the spreadsheet about documents in the government's possession, including notations about instructions from the attorneys regarding a particular document or class of documents. Beginning in August 2014, Paralegal #1 spreadsheet contained an entry that Goodwin wanted "to produce everything we have in this case." This entry was included in all of the later versions of the spreadsheet that OPR reviewed. This entry is arguably inconsistent with Ruby's assertion that after the government's initial disclosures in December 2014, Goodwin decided to disclose to the defense only material that the government was required to disclose. Ruby told OPR that he believed that this entry in Paralegal #1 spreadsheet referred to a decision that he and Goodwin had made to disclose essentially all material in the government's possession at the time of the initial December 2014 disclosure, and that it did not apply to later disclosure decisions, including decisions about the disclosure of MOIs reflecting post-indictment interviews.[92]

---

[89]      May 24, 2017 Goodwin written response. OPR had sent Goodwin a request for written response on May 23, 2017. Goodwin responded to OPR's questions in five paragraphs, and did not respond to most of OPR's questions. In contrast, Ruby's June 4, 2016 written response, and Ruby's September 30, 2016 letter to OPR, totaled 25 pages, and Ruby attached hundreds of pages of exhibits to his correspondence.

[90]      Ruby Interview at 92.

[91]      *Id.* at 194.

[92]      *Id.* at 34-36.

Case 5:18-cv-00591 Document 70-24 Filed 09/05/18 Page 31 of 97 PageID #: 1075
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

In sum, Ruby and Goodwin provided OPR with inconsistent and conflicting information about who made the decision not to disclose post-indictment MOIs, but rather to disclose by letter only those statements they deemed discoverable contained in post-indictment MOIs.[93]

Ruby told OPR that all members of the prosecution team were aware and approved of the decision not to disclose post-indictment MOIs, and instead to make required disclosures by summary letter. In a January 19, 2017 e-mail to OPR, Ruby stated, "the decision to make disclosures from post-indictment interviews by means of letters rather than production of full interview memoranda was a decision made by the prosecution team, and ultimately the then-U.S. Attorney." In his interview, Ruby stated, "the team discussed, fairly extensively, over the course of the pretrial process, the issue of what was exculpatory from our post-indictment witness interviews and agreed that the disclosure letters that we sent included everything that was even arguably exculpatory. And the U.S. Attorney personally signed off on the completeness of those letters."[94]

OPR found no evidence to support Ruby's contention that the prosecution team members were aware of (other than ▮Paralegal #1▮▮▮▮▮▮▮▮) or approved the decision not to disclose post-indictment MOIs. ▮AUSA #1▮ ▮AUSA #2▮ ▮DOL SA #1▮ and ▮FBI SA #1▮ told OPR that prior to the start of OPR's investigation, they believed that the prosecution had disclosed to the defense all MOIs, whether reflecting pre- or post-indictment interviews.[95] All said they were unaware that the government had intentionally not disclosed MOIs reflecting post-indictment interviews.[96] ▮DOL SA #1▮ and ▮FBI SA #1▮ said they were surprised to learn that some MOIs were not disclosed.[97] ▮AUSA #1▮ said

---

[93]    On April 19, 2018, Goodwin sent OPR a four-page letter with comments concerning OPR's draft report. As to the disclosure of post-indictment MOIs, Goodwin states, "I apparently do not recall matters in the exact way [Ruby] does," apparently referring to Ruby's contention that Goodwin made the decision not to disclose post-indictment MOIs, and instead to disclose discoverable information in those MOIs by letter. April 19, 2018 letter at 3. In his comments on OPR's draft report, Goodwin defends the decision not to disclose post-indictment MOIs in their entirety by asserting that post-indictment MOIs were prepared during trial preparation, and their disclosure would have revealed the prosecution's trial strategy. OPR disagrees with Goodwin's assertion as it related to most, if not all, of the undisclosed post-indictment MOIs. For example, some of the undisclosed post-indictment MOIs relate to the prosecution team's discovery in May 2015 that prior to the UBB explosion, ▮Witness #13▮
▮▮▮▮▮▮▮▮, had written a memorandum that was at least in part critical of Massey's safety practices. The MOIs generated as a result of that discovery reflected the prosecution team's initial gathering of evidence related to the ▮▮▮ memorandum, and did not relate to its trial preparation strategy.

[94]    *Id.* at 20.

[95]    ▮AUSA #1▮ Interview at 13; ▮AUSA #2▮ Interview at 11-12; ▮DOL SA #1▮ Interview at 10; ▮FBI SA #1▮ Interview at 15. ▮DOL Attorney▮ told OPR that ▮▮ was not involved in discovery decisions, and so did not know what decisions the prosecution had made regarding the disclosure of MOIs. ▮DOL Attorney▮ Interview.

[96]    ▮FBI SA #1▮ told OPR that he recalled only one instance when ▮▮ knew that an MOI would not be disclosed. ▮FBI SA #1▮ said that ▮▮ had been present for an interview that occurred during the *Blankenship* trial. ▮FBI SA #1▮ recalled that Ruby told ▮▮ SA ▮ that the MOI ▮FBI SA #1▮ intended to draft would not be disclosed because the interview was solely for the purposes of trial preparation. ▮FBI SA #1▮ said ▮▮ did not recall any other situation where ▮▮ knew that an MOI ▮▮ prepared would not be or was not disclosed. ▮FBI SA #1▮ Interview at 13.

[97]    ▮DOL SA #1▮ Interview at 10-11; ▮FBI SA #1▮ Interview at 15.

OPR - 000031

Case 5:18-cv-00591   Document 70-51   Filed 09/05/18   Page 32 of 97 PageID #: 1076
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

██ was "kind of shocked" to learn that all MOIs were not disclosed.[98] ███ said ███ simply assumed that all MOIs were being disclosed, and that ███ had "no reason to doubt" that all MOIs were disclosed.[99]

The evidence shows that ████ knew that Ruby had decided not to disclose some MOIs. ████ maintained a spreadsheet in which ███ made notations about some of the documents in the government's possession. Among the entries on the spreadsheet are several that indicate that on January 29, 2015, Ruby had directed ███ not to produce five MOIs to the defense. In addition, at various times in 2015, ████ sent Ruby several e-mails about MOIs that the USAO had received that indicate that ███ understood or was aware that Ruby did not want those MOIs produced.[100] No one else was copied on those e-mails, and OPR found no evidence that ████ told anyone else about Ruby's instruction not to disclose certain MOIs.

### D.    Disclosure of Pre-Indictment MOIs

#### 1.    The Government Disclosed 372 Pre-Indictment MOIs

On April 21, 2015, Ruby sent Zuckerman a list of 372 MOIs that the government had previously disclosed (most on December 4, 2014). The list was organized by Bates-stamp numbers, and did not contain the names of the persons interviewed. The listed MOIs were marked with Bates-stamp numbers from MOI-000001-001361.[101] In his transmittal e-mail, Ruby told Zuckerman that "these memoranda are not Jencks material; the United States has provided them as a courtesy to the defense." All of the 372 MOIs contained information about interviews that had been conducted prior to the November 2014 indictment.

#### 2.    The Government Did Not Disclose 11 Pre-Indictment MOIs

Ruby told OPR that he and Goodwin intended to disclose to the defense all MOIs that memorialized interviews conducted before the November 13, 2014 indictment. During the course of its investigation, however, OPR learned that the government had not disclosed to the defense 11 MOIs resulting from pre-indictment interviews. Attached at Tab H to this Report is a chart containing information about the 11 pre-indictment MOIs that were not disclosed to the defense, including the witness' name, date of interview, Bates-stamp labels, the date the USAO received the MOI from ████ or ████ , and whether the witness testified at trial.

As shown in the chart attached at Tab H, the USAO first received these 11 MOIs after the initial indictment was filed in November 2014, and after the government's initial disclosures were made on December 4, 2014, and in some cases many months later. ████ drafted ten of the

---

[98]   ███ Interview at 19.

[99]   ███ Interview at 12.

[100]   *See e.g.*, April 21 and June 23, 2015 ████ e-mails to Ruby.

[101]   There are two small gaps in the Bates-stamp labels: 001284 and 001346-1348 are missing. The reason why 001284 is missing is not relevant to OPR's investigation. The MOI with Bates-stamp numbers 1346-1348 is missing because it reflected a post-indictment interview and was therefore not disclosed. Ruby did not inform Zuckerman about the reasons for those gaps.

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

11 MOIs; ███████ drafted one of the MOIs. ██████ e-mailed several of the 11 MOIs directly to Ruby, and the remainder to ██████ or ████████ who forwarded them to Ruby.  Most of the 11 MOIs were attached to transmittal e-mails, and each e-mail contained an icon for the attached MOI that showed the MOI's pre-indictment date.  Thus, if Ruby had read the transmittal e-mails carefully, he either knew or should have known that the 11 MOIs reflected pre-indictment interviews.

The e-mails that transmitted those 11 MOIs to Ruby made clear that the attached MOIs had not previously been disclosed.  For example, ██████ sent Ruby an e-mail on January 23, 2015, attaching the September 18, 2014 ██████ MOI (*see* Tab H).  In ████ e-mail, ██████ asked Ruby if he wanted to add the ██████ MOI to the next discovery production.  OPR did not find a response to this e-mail.  As another example, on February 13, 2015, ██████ sent Ruby an e-mail attaching several MOIs, including the ████████, ████████, ████████, and ████████ MOIs (*see* Tab H).  In ████ e-mail, ██████ informed Ruby that ████ had received the MOIs "this week."  As noted immediately above, the dates on the icons attached to these e-mails showed clearly that the attached MOIs were pre-indictment MOIs.  Thus, if Ruby had carefully read these e-mails, he knew or should have known that some of the attached MOIs were pre-indictment MOIs that had not been disclosed.

OPR asked Ruby why he did not provide the defense with the 11 pre-indictment MOIs, in light of Ruby's stated intent to disclose all such MOIs.  Ruby told OPR that he did not intentionally withhold the 11 MOIs from the defense.  Rather, Ruby said that the failure to disclose those 11 MOIs was a mistake.  Ruby said that he assumed that any MOIs the USAO received after November 2014 related to post-indictment interviews and therefore were not going to be disclosed. Ruby said that he must have been so busy with other matters that he never looked at the dates of the 11 MOIs when he received the e-mails transmitting them.  Ruby said that because he received all of the 11 MOIs after the initial indictment was returned, sometimes months after the MOI was drafted, he must have assumed that the MOIs memorialized post-indictment interviews.[102]

Specifically, Ruby stated, "And all I can say is that, I mean, to be bluntly honest, I didn't keep track of them.  I just didn't -- I did not -- I lost visibility of the fact that there were, if I knew it at the time, that there were memos from '14 that hadn't been put in the file yet or completed yet at the time of the indictment.  And, you know, those just didn't get produced."[103]

Ruby denied that he intentionally failed to disclose the 11 pre-indictment MOIs in order to withhold exculpatory evidence from the defense:  "[N]obody in this office or on the trial team intentionally withheld anything that they believed should have been produced to the defense in the *Blankenship* case."[104]

---

[102]    Ruby said that, "my belief at the time was that that the . . . MOIs that were coming in post-indictment were from post-indictment interviews."  Ruby Interview at 97-98.

[103]    *Id.* at 97.

[104]    *Id.* at 4-5.

Case 5:18-cv-00591   Document 70-14   Filed 09/05/18   Page 34 of 97 PageID #: 1078
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

### 3. The Government Made One Letter Disclosure of Information In a Pre-Indictment MOI

On September 21, 2015, shortly before trial, Ruby sent Zuckerman a letter in which he disclosed potential exculpatory statements obtained during interviews of three witnesses: ██████, ██████, and ████████.[105] The ████████ interview was conducted, and an MOI was drafted, prior to the November 2014 indictment. Ruby did not receive the MOI until February 2015. Ruby provided the defense with some of the discoverable statements from the ████ interview in the letter, but did not provide the defense with the ████████ MOI. OPR asked Ruby why he did not disclose the entire ████████ MOI, as that would have been consistent with what Ruby said was the government's decision to disclose all pre-indictment MOIs. Ruby told OPR that,

> I've given some thought to how that happened. It hadn't been produced. I don't remember paying attention to the date of interview on ████. And all I can -- the only explanation I can come up with for why it didn't register is number one, we were in the week before trial and all of that going on and number two, you do, over the course of an investigation a thousand interviews, and you are not necessarily going to have an accurate mental chart of when they all happened. It just didn't -- I did not -- I have no recollection of noticing at the time I included the language about the ████ interview when the interview had taken place.[106]

As discussed below, OPR found that Ruby's letter disclosure did not fully disclose all of ████ discoverable statements. *See* Sections III(D)(4) and III(E)(4).

### 4. The 11 Undisclosed Pre-Indictment MOIs Contained Discoverable Statements

OPR found that all of the 11 pre-indictment MOIs that were not disclosed to the defense contained statements inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment (*see* Section I(D)(2) above), or that were otherwise helpful to the defense. Those MOIs, or discoverable statements in those MOIs, therefore should have been disclosed prior to trial. OPR concluded that the 11 undisclosed pre-indictment MOIs listed in the chart attached at Tab H included the following discoverable statements:[107]

---

[105]    

[106]    Ruby Interview at 99-100.

[107]    OPR is not suggesting that its understanding of the *Blankenship* case is sufficient so as to allow it to act as the final arbiter concerning the relevance or discoverability of each statement contained in the undisclosed MOIs. Rather, it has set forth in this Report what it believes are the clearest examples of discoverable statements contained in the MOIs.

Case 5:18-cv-00591   Document 70-34   Filed 09/05/18   Page 35 of 97 PageID #: 1079
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

a. Two ███████ MOIs. ████████████████████████████.

- ████ asked ████████ if a certain action ████ wanted to take was legal, but ████ ignored the question and said do it.[108]

- No MSHA inspector had ever said for ████ not to call ahead; this was not an enforced rule.

- ████ was never told not to put something in the log book.

- UBB had good ventilation when a certain fan was operating.

b. ███████ MOI. ████████████████████████████
████████.

- ████ suspected that compensation was tied to safety.

- There were a lot of safety violations enforced now that were not before.

- If Blankenship had not been involved, the list of safety-related initiatives would be half of what it was.

- ████ always tried to follow the law.

- Committing violations was not intentional.

- It was not manpower shortages, but the level of experience that contributed to violations.

- Massey put pressure on people and held them accountable.

- ████ never told anyone to break the law.

- The intent was zero violations.

- Massey section staffing was the industry standard.

- Safety was implied and always there (████ gave the example of telling someone you love them, if you don't tell them every time you see them, it does not mean you don't love them, and this was the same for Blankenship and safety).[109]

---

[108] This statement was potential impeachment material as to ████, one of the government's most important witnesses, which would be required to be disclosed by *Giglio v. United States*, 405 U.S. 150, 154 (1972).

[109] Ruby summarized this statement in the ████ MOI in his letter disclosure as discussed in Section III(E)(4), below.

Case 5:18-cv-00591 Document 70-34 Filed 09/06/18 Page 36 of 97 PageID #: 1080

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

- *If something was wrong, you were expected to stop and fix it.*

- *It is not economically possible to have zero violations, you would have to shut down every mine.*

- *There were no discussions that violations were ok. There were discussions about trying to get better.*

- *You were always trying to achieve zero violations.*

- *If Massey was tolerant of violations, then everyone in the industry is as well.*

- *Upper management wanted* ▮Witness #8▮ *to read every violation.*

- *Everyone was trying to do a good job, but could have done better.*

- *It was a useless exercise to get MSHA approval because MSHA put up hurdles, and the process was dysfunctional.*

- *Every mine has safety violations.*

- ▮Witness #8▮ *was reprimanded for running a mine with no air.*

- ▮Witness #8▮ *feared discipline as a result of compliance issues.*

- *Massey did a good job reporting violations.*

c. ▮Witness #4▮ MOI. ▮Witness #4▮ ▮▮▮▮▮▮

- *There was enough air in the mine to meet the minimum requirements.*

- *The violation reduction program started in 2009.*

- *Blankenship sometimes attended budget meetings.*

- *Violations were a cost of doing business.*

- *MSHA is always going to write violations.*

- *Blankenship felt MSHA made things up.*

- *If* ▮Witness #4▮ *told someone to break the law it went from civil to criminal.*

- *There will always be MSHA violations to cite.*

Case 5:18-cv-00591   Document 70-34   Filed 09/05/18   Page 37 of 97 PageID #: 1081
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

d.  ████████████  MOI.  ████████████████████████████████████

- *When Blankenship wrote on a report card (a document containing information about mine conditions), it meant he was not happy with failed rates and violations, that a corrective action plan was needed, and that he wanted to set up a meeting.*

- *Violation reduction targets were the first step to getting something in place to start reducing violations and to show improvement.*

- *Prior to 2009, Massey did not have a target number for violations until ████████ implemented the Hazard Elimination Program; the target was derived from numbers from the previous quarter.*

- *The target would have been a 50% reduction in violations based on the average of the last two quarters.*

- *Blankenship was familiar with the Hazard Elimination Program.*

e.  ████████████████  MOI.  ████████████████████████████████

- *The Hazard Elimination Program called for a 50% reduction in violations.*

- *People left the meeting where the plan was discussed wanting to reduce violations.*

- *MSHA and Massey disagreed about what constituted a violation, because it is a subjective decision.*

f.  Two ████████████████ MOIs. ████████████████████████████

- *Blankenship received daily violation reports.*

- *████████ was brought in to obtain more useful safety information related to violations.*

- *████████ said that they needed to be better at tracking trends and that safety was lacking.*

- *████████ wanted to see the full violations.*

- *████████ believed accidents were discussed in the context of best practices and how to prevent future accidents.*

g.  ████████████  MOI.  ████████████████████████████████

- *In 2009, no one wanted to buy coal.*

- *There was pressure to run coal, but not enough to overlook safety.*

Case 5:18-cv-00591 Document 70-34 Filed 09/05/18 Page 38 of 97 PageID #: 1082

CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

- *UBB was run well, and* ███████ *had not heard anything negative about the mine.*

h. ███████ MOI. ████████████████████

- *Massey's primary focus was safety.*

- *Blankenship pushed safety more than any CEO in the industry.*

- *People have been fired because of safety violations.*

- ███ *had a positive opinion of safety at all Massey mines.*

i. ███████ MOI. ████████████████████

- *The sense was that MSHA wrote violations at Massey that it did not write at other mines.*

- ███████ *believed that the violations per inspection rate was not as bad as at other mines.*

- *There was a sense that MSHA was picking on Massey, and that some violations were legitimate and some were not.*

- *No one thought that you could go through an inspection and not receive any violations.*

- *There was a big push to conduct accurate respirable dust sampling.*

- ███████ *did not believe that Massey had an attitude that it was acceptable to receive violations and then just keep on going.*

E.    **Non-Disclosure of Post-Indictment MOIs**

1.    **The Government Did Not Disclose 50 Post-Indictment MOIs**

The prosecution team continued to interview witnesses after the November 2014 indictment, and those interviews were memorialized in MOIs. As discussed above, Ruby (and Goodwin, according to Ruby) decided not to disclose post-indictment MOIs to the defense, and instead decided to provide by summary letter any discoverable statements contained in the MOIs. OPR found that the government possessed, but did not disclose prior to or during trial, 50 post-indictment MOIs. Attached at Tab I to this Report is a chart containing information about the 50 post-indictment MOIs that were not disclosed to the defense, including the witness' name, date of interview, Bates-stamp numbers, and whether the witness testified at trial.

2.    **The Government Disclosed One Post-Indictment MOI**

Notwithstanding the decision to not disclose post-indictment MOIs, the government did in fact disclose one post-indictment MOI. On August 27, 2015, Ruby sent Zuckerman an MOI

- 33 -

Case 5:18-cv-00591    Document 70-34    Filed 09/05/18    Page 39 of 97 PageID #: 1083
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

memorializing the interview of ███████, who had been interviewed on July 21, 2015.[110]
████████

OPR asked Ruby why, if he and Goodwin decided not to disclose post-indictment MOIs, he nevertheless provided the ████ MOI to Zuckerman. Ruby said that there was no formal process by which he decided which post-indictment MOIs should be disclosed, and that he relied on his recollection of the substance of the post-indictment interviews.[111] Ruby said that ████ "was somebody who was without question going to give exculpatory testimony, if ██ were called . . . there was a lot of exculpatory material in there in ████ interview."[112]

OPR found no evidence in the trial team's e-mail accounts or elsewhere that Ruby discussed with anyone his decision to disclose the ████ MOI to the defense. ████ said that ██ did not recall that ████ provided more exculpatory evidence than did other witnesses.[113] ████ said that ██ did not know why the ████ MOI was disclosed, and did not recall that ████ provided information that was particularly harmful to the government's case.[114] ████ said ██ had no recollection of discussing the ████ MOI with Ruby.[115]

Ruby sent Zuckerman the ████ MOI on August 27, 2015. The next day, Zuckerman sent an e-mail to Ruby, Goodwin, and ████, in which Zuckerman asked whether there were "additional interviews . . . that contain exculpatory information [] that you have not turned over [such as] ████ , ████ [and] ████ ." OPR found no evidence that the government responded to Zuckerman's question. In fact, the government possessed MOIs for ████ ████ and ████ that had not been disclosed (the ████ MOI was one of the 11 pre-indictment MOIs that were not disclosed, and the ████ and ████ MOIs were post-indictment MOIs).[116] About two weeks later, Ruby sent himself a list of things to do on the *Blankenship* case, including deciding whether to "Produce ████ ████ ████ [MOIs]"[117] Although this item on Ruby's to-do list makes it appear that Ruby was considering how to respond

---

[110]    The ████ MOI was marked with the Bates-stamp labels ████ .

[111]    Ruby Interview at 129. Ruby said that, "in retrospect and with infinite time and resources, would we have done that [process] differently? Probably." *Id.* at 130.

[112]    *Id.*

[113]    ████ Interview at 24.

[114]    ████ Interview at 37.

[115]    ████ Interview at 26.

[116]    ████ ████████████████████████████████. ████

[117]    September 10, 2015 Ruby e-mail to himself.

Case 5:18-cv-00591 Document 703-1 Filed 09/06/18 Page 40 of 97 PageID #: 1084

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

to Zuckerman's question about the existence of additional MOIs, Ruby said that he could not be sure whether he was thinking about Zuckerman's question when he wrote that to-do list item.[118]

### 3. The Witness #2 MOI Contained Discoverable Statements

OPR identified the following discoverable statements in the Witness #2 MOI:

- *People said MSHA picked on Massey and was harder on Massey than other companies.*

- *Massey started a Hazard Elimination Committee to reduce hazards, and Blankenship asked Witness #2 to sit in on meetings and to give advice.*

- *Blankenship wanted two safety personnel working in UBB every day.*

- *After two safety engineers were added at UBB, there was a drop in violations.*

- *Witness #2 believed the rock dusting was always good.*

- *Blankenship thought Massey was pretty good compared to other operators.*

- *MSHA decisions about mine operations caused a decrease in ventilation airflow.*

- *Witness #2 described a list of Massey safety innovations.*

- *Many MSHA violations reflect opinions.*

- *MSHA inspectors have quotas (one violation per inspection day).*

- *The largest number of violations at any mine is for coal accumulation, and you can always find coal accumulation.*

### 4. Ruby Made One Letter Disclosure of Discoverable Statements Contained in Three MOIs

As noted above, Ruby told OPR that he intended to review all post-indictment MOIs to determine if the witnesses provided potentially exculpatory statements, and if so, to disclose those statements by letter, rather than by disclosing the entire MOI. This decision was unusual for the USAO. The USAO discovery policy in effect in 2015 stated that, "Generally, we disclose reports of interview to defense counsel, in the exercise of an expansive discovery practice."[119] AUSA #1

---

[118]   Ruby Interview at 156-57.

[119]   October 20, 2010 USAO Discovery Policy at 6.

Case 5:18-cv-00591 Document 703-1 Filed 09/06/18 Page 41 of 97 PageID #: 1085
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

told OPR that the standard USAO practice was to disclose MOIs, and not to make disclosures by letter.[120]

In fact, Ruby sent one letter to Zuckerman in which he made disclosures of information obtained during witness interviews.[121] On September 21, 2015, shortly before trial, Ruby sent Zuckerman a letter disclosing information provided by ███████, ██████████, and ██████ ██████████ was interviewed, and ██ MOI was written, before the indictment. ██████ was interviewed six times, both before and after the indictment. The information about ██████ contained in the September 21 letter was obtained during post-indictment interviews. ██████ interview occurred post-indictment.

Ruby told OPR that when deciding which statements to disclose from post-indictment MOIs, including the ██████ and ██████ MOIs, he relied on his memory for what had been said during interviews: "[T]here wasn't a formal process in place for reviewing [] post-indictment MOIs to see if, should they be produced, should they not be produced. We really relied on our recollections of the interviews. And in retrospect and with infinite time and resources, would we have done that differently? Probably."[122] Ruby acknowledged that his process for selecting statements to disclose was "imperfect" and "not ideal,"[123] and that "in retrospect with more time and more resources and the benefit of hindsight, I would certainly say that a different approach would have been better."[124] Ruby said that while he did not recall whether he looked at the ██████ MOI before deciding what to disclose, he "probably" reviewed it.[125]

Ruby said that Goodwin was aware that Ruby was making disclosure decisions about statements contained in post-indictment MOIs based on Ruby's memory, and not based on a review of the MOIs themselves:

> The [] post-indictment [MOIs] were not being reviewed. I don't know that we had a specific conversation about it, but based on the conversations that we did have -- it was clear when we discussed the subject of what to put in these [disclosure] letters, that we were having that discussion based on our recollections of witness interviews. I mean, there would have been -- there would have been no reason for him to believe that there was a systematic process in place to -- the evidence, I

---

[120]    ██████ Interview at 10, 12.

[121]    On June 22, 2015, Ruby sent Zuckerman a letter in which he identified discoverable material. The letter contained one paragraph in which Ruby provided discoverable statements the government obtained during two separate proffers from attorneys representing two Massey employees. No MOIs were generated from those proffer sessions. Ruby's disclosure of discoverable statements from one of those proffer sessions is discussed in Section II(F)(1) above.

[122]    Ruby Interview at 129-30.

[123]    Id. at 131-33.

[124]    Id. at 132-33.

[125]    Id. at 132.

Case 5:18-cv-00591   Document 70-1   Filed 09/06/18   Page 42 of 97 PageID #: 1086
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

guess, based on -- the evidence that he would have had, based on our discussions, was that we were working from recollection and that neither he nor I nor anybody else undertook to put in place a process where we systematically reviewed each MOI for discoverable information.[126]

Ruby's September 21, 2015, letter disclosed very little information. The letter informed the defense that: (1) ▓▓▓ said ▓▓ was not sure that Blankenship received the memorandum about mine safety that ▓▓▓ had sent ▓▓ in February 2010;[127] (2) ▓▓▓ said that ▓▓ did not agree with a particular MSHA mine ventilation policy; and (3) ▓▓▓ said that Blankenship was interested in safety even though he did not expressly say so,[128] and that Blankenship was involved with a number of changes to equipment that ▓▓▓ believed improved safety.

Ruby told OPR that all of the members of the prosecution team reviewed the September 21, 2015 letter before it was sent: "[T]he team discussed, fairly extensively, over the course of the pretrial process, the issue of what was exculpatory from our post-indictment witness interviews and agreed that the disclosure letters that we sent included everything that was even arguably exculpatory. And the U.S. Attorney personally signed off on the completeness of those letters."[129] Ruby said that ▓▓AUSA #1▓ reviewed the disclosure letter and agreed that everything exculpatory had been disclosed.[130]

OPR reviewed the e-mail accounts of all of the attorneys on the prosecution team. OPR found no evidence that Ruby sent a draft of the September 21, 2015 letter to anyone for his or her review. OPR found no evidence that any of the attorneys commented on the September 21, 2015 letter before or after it was sent. Ruby said it was not surprising that there were no such e-mails, as he would have simply walked to ▓▓AUSA #1▓ or Goodwin's office to show them a hard copy of the draft letter to obtain their views, and would not have sent a draft by e-mail.[131]

▓▓AUSA #1▓ ▓AUSA #2▓▓DOL SA #1▓ and ▓FBI SA #1▓ all denied that they had ever reviewed or approved of a draft of the September 21, 2015, letter, or had seen the final letter at the time it was sent.[132] ▓AUSA #1▓

---

[126]   *Id.* at 189-90.

[127]   ▓Witness #13▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The ▓▓▓ memorandum contained ▓▓▓ findings of ▓▓ review of Massey safety issues.

[128]   The letter paraphrased the MOI, which stated that ▓▓▓ likened Blankenship's interest in safety to a romantic relationship where one person knows the other loves him or her even if not expressly stated.

[129]   Ruby Interview at 20. Although Ruby referred to "disclosure letters," OPR is only aware of one letter in which disclosures were made about information contained in MOIs. As noted above in Section II(F)(1), Ruby sent a letter in June 2015 in which he made disclosures about information obtained in two attorney proffer sessions. According to Ruby, Goodwin "signed off" on the disclosure letters by reviewing and approving them before they were sent.

[130]   *Id.* at 16.

[131]   *Id.* at 87.

[132]   ▓AUSA #1▓ Interview at 21-22; ▓AUSA #2▓ Interview at 22-23; ▓DOL SA #1▓ Interview at 35; ▓FBI SA #1▓ Interview at 50.

OPR - 000042

Case 5:18-cv-00591    Document 70354    Filed 09/05/18    Page 43 of 97 PageID #: 1087
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

said he was certain he had never seen the letter before it was sent, for when he first saw the letter in 2017, he did not know who ██████████ was, and would have reviewed the ████████ MOI before signing off on the letter.[133] ████████ said that ██ did not believe that the September 21, 2015 letter contained all of the discoverable statements in the ████████ MOI that Ruby summarized.[134]

OPR asked Ruby for his response to ████████ assertion that ████████ never reviewed the September 21, 2015 letter. Ruby said that he recalled asking Goodwin and ████████ for their input on the letter, and said that "I am very confident" that ████████ reviewed the letter. However, Ruby also said that he did not think that ████████ was being untruthful.[135] Ruby said he had a specific recollection of talking to Goodwin about whether the September 21 letter accurately described what ████████ had said in ██ interview, and that Goodwin said that he was fine with the language in the draft letter.[136]

### 5.    Ruby's September 21, 2015 Letter Did Not Disclose All Discoverable Statements Contained in the Three MOIs

OPR compared the discoverable statements in the ████████ ████████ and ████████ MOIs to the information contained in Ruby's September 21, 2015 disclosure letter. OPR concluded that Ruby did not disclose all discoverable statements contained in those MOIs.[137]

### 6.    Some of the 50 Undisclosed Post-Indictment MOIs Contained Discoverable Statements

In addition to the ████████ and ████████ post-indictment MOIs, which were partially summarized in a letter disclosure, there were 48 other post-indictment MOIs that were neither disclosed nor summarized. Some of those 48 post-indictment MOIs contained statements that were inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment, or were otherwise helpful to the defense. Those MOIs, or the discoverable statements contained in them, should have been disclosed prior to trial. OPR concluded that, at a minimum, the undisclosed post-indictment MOIs contained the following discoverable statements:

---

[133]    ████████ Interview at 21-22. ████████ told OPR that ██ disagreed with Ruby's contention that the team had agreed to make a disclosure by letter of information in post-indictment MOIs. *Id.* at 25.

[134]    *Id.* at 23.

[135]    Ruby Interview at 87, 91-92.

[136]    *Id.* at 89.

[137]    *Compare* Section III(D)(4) above (summarizing the discoverable statements in the ████████ MOI) and Section III(E)(6) below (summarizing the discoverable statements in the ████████ and ████████ MOIs), with the few statements Ruby included in the September 21, 2015 disclosure letter.

CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

a. Four Chris ███████ MOIs.[138]

- ███████ never gave an order causing a law to be broken.

- ███████ was surprised that dust fraud was occurring, as the company did not want cheating on dust sampling.

- No amount of money or resources can cure all violations at a mine.

- MSHA decisions endangered the health and safety of miners.

- Several UBB managers did all they could to focus on safety.

b. Five ███████ MOIs.[139]

- Blankenship told ███████ that Massey needed to reduce violations, and that Massey was going to look at and get a handle on violations.

- Blankenship told ███████ that he did not know why miners thought he wanted things done a certain way.

- ███████ said everyone should comply with all regulations and that they should not worry anymore.

- ███████ told ███████ to tell ███████ and ███████ about ███ findings concerning safety, and ███████ took all of ███████ notes.

- ███████ told ███████ that Blankenship wanted to meet with ███████

- Blankenship asked ███████ what he should do about ███████' findings.

- Blankenship never challenged ███████ over the issues ███ raised.

- ███████ told ███████ ███ wanted ███ to teach workers how to ventilate.

- ███████ told ███████ to tell Blankenship ███ views.

- Blankenship talked about a commitment to safety.

- Blankenship wanted ███████ to tell him about the issues.

- ███████ was hired to teach foremen about ventilation, respirable dust, and safety issues.

---

[138] The government disclosed to the defense one ███████ pre-indictment MOI, and mistakenly failed to disclose a second ███████ pre-indictment MOI.

[139] The government disclosed to the defense one ███████ pre-indictment MOI.

- 39 -

Case 5:18-cv-00591   Document 70-34   Filed 09/05/18   Page 45 of 97 PageID #: 1089
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

- *You would be hard pressed to go to a mine and not find some violations.*

- *UBB was going to fail because of MSHA ventilation system requirements.*

- *An MSHA official said belt air should not be used to ventilate mines;* ▓▓ *told him to reconsider for certain mines.*

- *The UBB mine was set up to fail based on the ventilation system MSHA forced the UBB mine to use.*

c. ▓▓▓▓▓ MOI.

- *Blankenship said not to make production figures too aggressive.*

- ▓▓▓▓ *said* ▓▓ *wanted to focus on more serious violations and eliminate them.*

- *Blankenship told* ▓▓▓ *to reprogram the system to determine who was responsible for violations and for not eliminating violations.*

- *Blankenship wanted to know the identity of repeat offenders.*

d. Witness #7 MOI.

- *Blankenship wanted a report from* ▓▓▓ *meeting with* ▓▓▓

- *The legal warnings that* ▓▓▓ *placed on the* ▓▓▓ *memorandum were more expansive than usual, but* ▓▓ *could have cut and pasted them, and does not recall adding the warnings to prevent* ▓▓▓ *from sharing the report with* Witness #18 ▓▓▓▓▓▓.[140]

- *Blankenship and* ▓▓▓ *thought* ▓▓ *was legitimate and were looking for solutions from* ▓▓

- ▓▓▓ *thought Blankenship would want to see the* ▓▓ *memorandum.*

- *The Hazard Elimination Committee began work at about the same time that* ▓▓ *started raising safety issues.*

- *The Hazard Elimination Committee discussed the issues* ▓▓ *raised.*

---

[140]   Zuckerman told OPR that the portions of the ▓▓ MOI that concerned the legal warnings that ▓▓ placed on the ▓▓ memorandum (regarding the issue of safety in Massey mines) were exculpatory because they were inconsistent with the government's contention during trial that those warnings were intended to keep ▓▓ memorandum secret.  May 16, 2017 Zuckerman letter to OPR, Exhibit 2 at 6-8.

Case 5:18-cv-00591   Document 76-3   Filed 09/06/18   Page 46 of 97 PageID #: 1090
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

e.   █████████ MOI.  ██████████████████████████
████████████████████████████

- *When ████████████████████████████████ told Blankenship that production was going to drop, because ███████ wanted to get it right.*

f.   Two ███████ MOIs.  ██████ had been a mine superintendent at UBB.

- *██████ said that ███████ was willing to accept a certain amount of violations to get a certain mine operation set up, and that ███████ made a conscious decision to violate the law.[141]*

- *The track at the UBB mine usually looked pretty decent.*

- *UBB was one of the better mines.*

g.   ███████ MOI.  ██████████████████████

- *██████ called ███████ the most arrogant a\*\*h\*\*\* someone would have to deal with in their life.[142]*

- *██████ believed that the MSHA report on the explosion was ridiculous.*

h.   ███████ MOI.  ███████████████████.

- *UBB appeared to be a typical coal mine.*

- *The belt appeared to be rock dusted well.*

- *If the conditions ██ saw had been worse, ██ would have written citations to coincide with ██ notes.*

- *██████ never had a Massey Energy employee complain about not being able to talk to MSHA inspectors.*

**F.   The USAO and Prosecution Team Members Acknowledged that Some of the Undisclosed MOIs Contained Discoverable Statements**

In early 2017, in part as a result of information provided by OPR, the USAO learned that the government had not disclosed 11 pre-indictment MOIs and 50 post-indictment MOIs prior to the *Blankenship* trial.  By this time, both Ruby and Goodwin had left the USAO.  After reviewing

---

[141]   This statement was potential *Giglio* material as to ███████ one of the government's most important witnesses.

[142]   This statement was potential *Giglio* material as to ███████ one of the government's most important witnesses.

Case 5:18-cv-00591 Document 70-34 Filed 09/05/18 Page 47 of 97 PageID #: 1091
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

the MOIs, the USAO decided to provide Zuckerman with the 61 MOIs, which it did in several productions.[143] ███████ told OPR that the USAO concluded that some of the MOIs contained statements that should have been disclosed prior to trial.[144] ██████ stated, "I think we should have turned over all of these [undisclosed MOIs]. And I think these statements are exculpatory, they should have been included in our production . . . we should have turned [them] over . . . under Department policy and under *Brady*."[145]

OPR asked the prosecution team members for their views – based on their extensive knowledge of the government's case and Blankenship's defense – as to whether some of the statements in the undisclosed MOIs would have been helpful to the defense had they been disclosed prior to trial.[146] Those statements (italicized for clarity) and the responses of the team members follow.

*Blankenship or Massey was willing to spend money to improve safety.* Ruby, ████████ ████ and ████████ told OPR that statements of this sort would have been helpful for the defense.[147]

*Blankenship cared about safety.* ████████████ and ████████ told OPR that statements of this sort would have been helpful for the defense.[148]

*Blankenship wanted MSHA violations reduced.* Ruby, ████████████████████ and ████████ told OPR that statements of this sort would have been helpful for the defense.[149]

---

[143]    In its transmittal letters, the USAO stated that it was not taking a position as to whether the MOIs were required to have been disclosed prior to trial, or whether the defense suffered any prejudice as a result of the failure to have disclosed those MOIs.

[144]    ███████ Interview at 14.

[145]    ██████ Interview at 40-42.

[146]    Rather than question witnesses about their views regarding voluminous individual statements from undisclosed MOIs, OPR asked them about common themes that were found in many of the undisclosed MOIs. OPR asked witnesses about certain potentially exculpatory statements even if they were only contained in one or two MOIs.

[147]    Ruby Interview at 176; ███████ Interview at 30-31; ██████ Interview at 36; ██████ Interview at 30. Ruby said such statements "in isolation" would be helpful.

[148]    ███████ Interview at 33; ██████ Interview at 30; ██████ Interview at 37.

[149]    Ruby Interview at 177; ███████ Interview at 33; ██████ Interview at 36; ██████ Interview at 30; ██████ Interview at 37. Ruby said such statements "in isolation" would be helpful. ███████ said Blankenship wanted to reduce violations not to improve safety, but to reduce monetary fines.

Case 5:18-cv-00591    Document 70-1    Filed 09/05/18    Page 48 of 97 PageID #: 1092
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

*Blankenship wanted to receive information about Massey or UBB violations in order to reduce them.* Ruby, [AUSA #1] [AUSA #2] [DOL SA #1] and [FBI SA #1] told OPR that statements of this sort would have been helpful for the defense.[150]

*Blankenship or other Massey leaders wanted workers to comply with safety regulations.* Ruby, [AUSA #2] and [DOL SA #1] told OPR that statements of this sort would have been helpful for the defense.[151]

*Blankenship or Massey wanted to start a program to reduce violations and to teach workers how to reduce violations.* Ruby, [AUSA #1] [AUSA #2] [DOL SA #1] and [FBI SA #1] told OPR that statements of this sort would have been helpful for the defense.[152]

*Blankenship did not want production targets to be too aggressive.* [AUSA #1] [AUSA #2] [DOL SA #1] and [FBI SA #1] told OPR that statements of this sort would have been helpful for the defense.[153] Ruby told OPR that this statement "maybe" was discoverable.[154]

*Blankenship wanted to receive information about who was committing violations.* Ruby, [AUSA #1] [AUSA #2] [DOL SA #1] and [FBI SA #1] told OPR that statements of this sort would have been helpful for the defense.[155]

*MSHA decisions and policies made mine conditions less safe.* [AUSA #1] [AUSA #2] [DOL SA #1] and [FBI SA #1] told OPR that statements of this sort would have been helpful for the defense.[156] Ruby told OPR that statements of this sort would not have been helpful for the defense.[157]

---

[150]    Ruby Interview at 178; [AUSA #1] Interview at 33-34; [AUSA #2] Interview at 36; [DOL SA #1] Interview at 31; [FBI SA #1] Interview at 37. Ruby said such statements "in isolation" would be helpful. [AUSA #1] said Blankenship wanted to reduce violations not to improve safety, but to reduce monetary fines.

[151]    Ruby Interview at 178-79; [AUSA #2] Interview at 36; [DOL SA #1] Interview at 31. Ruby said such statements "in isolation" would be helpful.

[152]    Ruby Interview at 179; [AUSA #1] Interview at 34; [AUSA #2] Interview at 36; [DOL SA #1] Interview at 31; [FBI SA #1] Interview at 40. Ruby said such statements "in isolation" would be helpful. [AUSA #1] said that while helpful, most Massey workers never heard of the program to reduce violations and were not invited to attend the initial meeting about the program.

[153]    [AUSA #1] Interview at 34-35; [AUSA #2] Interview at 37; [DOL SA #1] Interview at 31; [FBI SA #1] Interview at 40.

[154]    Ruby Interview at 134-35. Ruby said that this statement was not inconsistent with the government's theory of the case, as the government maintained that whatever the production quota was, Blankenship told workers to beat that figure. Ruby said the statement was therefore neither exculpatory nor material. *Id.* at 134-35. OPR notes that the indictment does not support Ruby's interpretation, as it asserted that production quotas left too little time for workers to implement required safety measures.

[155]    Ruby Interview at 179; [AUSA #1] Interview at 35; [AUSA #2] Interview at 37; [DOL SA #1] Interview at 32; [FBI SA #1] Interview at 40. Ruby said such statements "in isolation" would be helpful.

[156]    [AUSA #1] Interview at 35; [AUSA #2] Interview at 37; [DOL SA #1] Interview at 32; [FBI SA #1] Interview at 40.

[157]    Ruby Interview at 180.

- 43 -

Case 5:18-cv-00591   Document 70352   Filed 09/05/18   Page 49 of 97 PageID #: 1093

CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

*MSHA violations reflect opinions, not facts.* ▮AUSA #1▮ and ▮AUSA #2▮ told OPR that statements of this sort would have been helpful for the defense.[158] Ruby and ▮FBI SA #1▮ told OPR that statements of this sort would not have been helpful for the defense.[159]

*MSHA was aware of dangers but did not act in response.* ▮AUSA #1▮ ▮AUSA #2▮ and ▮DOL SA #1▮ told OPR that statements of this sort would have been helpful for the defense.[160] Ruby and ▮FBI SA #1▮ told OPR statements of this sort would not have been helpful for the defense.[161]

*UBB operations met minimum regulatory requirements.* ▮AUSA #2▮ told OPR that statements of this sort might be helpful to the defense.[162] ▮AUSA #1▮ and ▮FBI SA #1▮ told OPR that statements of this sort would not have been helpful for the defense.[163]

*UBB was a well-run mine.* Ruby, ▮AUSA #1▮ ▮AUSA #2▮ and ▮FBI SA #1▮ told OPR that statements of this sort would have been helpful to the defense.[164]

*MSHA inspectors were sometimes complimentary of UBB conditions.* ▮AUSA #1▮ ▮AUSA #2▮ and ▮DOL SA #1▮ told OPR that statements of this sort would have been helpful for the defense.[165] Ruby told OPR that statements of this sort were marginally helpful.[166] ▮FBI SA #1▮ told OPR that statements of this sort would not have been helpful for the defense.[167]

*UBB had decreasing numbers of infractions.* ▮AUSA #1▮ ▮AUSA #2▮ ▮DOL SA #1▮ and ▮FBI SA #1▮ told OPR that statements of this sort would have been helpful for the defense.[168] Ruby told OPR that statements of this sort might be helpful for the defense.[169]

---

[158]   ▮AUSA #1▮ Interview at 35; ▮AUSA #2▮ Interview at 37.

[159]   Ruby Interview at 181; ▮FBI SA #1▮ Interview at 40.

[160]   ▮AUSA #1▮ Interview at 35-36; ▮AUSA #2▮ Interview at 37; ▮DOL SA #1▮ Interview at 32.

[161]   Ruby Interview at 181; ▮FBI SA #1▮ Interview at 40.

[162]   ▮AUSA #2▮ Interview at 37.

[163]   ▮AUSA #1▮ Interview at 36; ▮FBI SA #1▮ Interview at 40.

[164]   Ruby Interview at 184; ▮AUSA #1▮ Interview at 36; ▮AUSA #2▮ Interview at 37; ▮FBI SA #1▮ Interview at 40. Ruby said such statements would be helpful if they referred to safety, not profit.

[165]   ▮AUSA #1▮ Interview at 36-37; ▮AUSA #2▮ Interview at 38; ▮DOL SA #1▮ Interview at 33.

[166]   Ruby Interview at 185-86. Ruby said such evidence was akin to saying that for 29 out of 30 days, a bank robber did not rob a bank.

[167]   ▮FBI SA #1▮ Interview at 41. ▮FBI SA #1▮ said that if MSHA inspectors found positive conditions, it could have been because the mine had advance notice of MSHA inspectors' visits.

[168]   ▮AUSA #1▮ Interview at 38; ▮AUSA #2▮ Interview at 38; ▮DOL SA #1▮ Interview at 33; ▮FBI SA #1▮ Interview at 41-42.

[169]   Ruby Interview at 186. Ruby said that the statement itself was not true.

- 44 -

Case 5:18-cv-00591   Document 70-51   Filed 09/08/18   Page 50 of 97   PageID #: 1094
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

*MSHA was biased against Massey as opposed to other companies.*  Ruby, █████████████ ███████ and ███████ told OPR that statements of this sort would have been helpful for the defense.[170]

*There was no difference in conditions or violations between UBB and other mines.* ██████ and ██████ told OPR that statements of this sort would have been helpful for the defense.[171] ██████ told OPR that statements of this sort would not have been helpful for the defense.[172]

*It is impossible to have perfect mine conditions; there will always be citations that can be written.*  ██████ and ██████ told OPR that statements of this sort would have been helpful for the defense.[173] ██████ and ██████ told OPR that statements of this sort would not have been helpful for the defense.[174]

*Violations of safety standards were not intentional.*  Ruby, ██████ ██████ ██████ and ██████ told OPR that statements of this sort would have been helpful for the defense.[175]

*Violations of safety standards were not a result of a worker shortage, but worker inexperience.* ████████████████████ and ██████ told OPR that statements of this sort would have been helpful for the defense.[176]

### G.   Prosecution Team Members Asserted that the Defense Was Not Prejudiced by the Failure to Disclose 61 MOIs

As noted above, prosecution team members acknowledged that some of the undisclosed MOIs contained discoverable statements that should have been disclosed prior to trial.  However, these same witnesses asserted that most, if not all, of those discoverable statements were available to the defense from other sources, including produced documents and disclosed MOIs.  These witnesses asserted that during the defense's cross-examination of the government's witnesses,[177] it

---

[170]   Ruby Interview at 187; ██████ Interview at 38; ██████ Interview at 38; ██████ Interview at 33; ██████ Interview at 41-42.  Ruby said that such statements "in isolation" were helpful. ██████ said that if MSHA was biased, it was because of all the violations found at Massey mines.

[171]   ██████ Interview at 39; ██████ Interview at 39.

[172]   ██████ Interview at 42.

[173]   ██████ Interview at 39; ██████ Interview at 39.

[174]   ██████ Interview at 33-34; ██████ Interview at 42.

[175]   Ruby Interview at 188; ██████ Interview at 39; ██████ Interview at 39; ██████ Interview at 34; ██████ Interview at 41-42.  Ruby said that such a statement "in isolation" would be helpful.

[176]   ██████ Interview at 40; ██████ Interview at 39; ██████ Interview at 34; ██████ Interview at 41-42.  Ruby said that because ██████ made this statement, it was not relevant because ██████ did not work at UBB.

[177]   The defense called no witnesses.

Case 5:18-cv-00591 Document 70-34 Filed 09/09/18 Page 51 of 97 PageID #: 1095
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

was able to introduce documents and elicit testimony that covered essentially all of the discoverable statements that were contained in the undisclosed MOIs.

Ruby made this point as follows:

> [T]o the extent there was information that could be regarded as materially favorable [in the undisclosed MOIs], most or all of that information was available to the defense in some other form. In that regard, it is important to emphasize the larger context of the discovery, in which hundreds of other memos and interview transcripts--including memos and transcripts of interviews with many of these same witnesses--were disclosed, not to mention hundreds of thousands of documents, many of which disclosed the same information discussed in these memos. One of the benefits of making broad disclosures is that even if discoverable information from one source is inadvertently omitted from a production, the same information will be made available from another source. If there were inadvertent omissions here, you will find that this redundancy effect generally applied.[178]

Ruby added that the fact that the discoverable statements contained in the undisclosed MOIs was readily available to the defense by the time of trial from other sources is evidence that the failure to disclose the statements in those MOIs was not intentional, for it would make no sense to suppress information already in the defense's possession.[179]

At the conclusion of Ruby's OPR interview, he agreed to provide OPR with evidence to support his claim that the discoverable statements in the 61 undisclosed MOIs were available to the defense from other sources.[180] A few days after Ruby's interview, OPR sent him a list of over 100 arguably discoverable statements from some of the 61 MOIs, most of which are discussed in this report, and asked him whether the information in those statements was "known or available to the defense from other sources."[181] Ruby did not respond to OPR's question, and did not provide OPR with evidence that the defense had access to the information in those statements from other sources.

Ruby's assertion that there was significant overlap between statements contained in the undisclosed MOIs and other materials that were disclosed is partially correct. Some witnesses whose MOIs were not disclosed had been interviewed on other occasions, either by the prosecution team, before the grand jury, or by MSHA after the UBB explosion, and the MOIs, grand jury transcripts, or MSHA interview transcripts had been disclosed to the defense. However, the USAO told OPR that for six important witnesses whose statements were memorialized in undisclosed MOIs — Witness #3 , Witness #15 , Witness #7 , Witness #8 , Witness #16 , and Witness #1 — the prosecution team had not disclosed any other MOI, grand jury transcript, MSHA

---

[178]   January 19, 2017 Ruby e-mail to OPR.

[179]   Ruby Interview at 178.

[180]   *Id.* at 197.

[181]   October 3, 2017 OPR e-mail to Ruby.

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

transcript, immunity agreements, or proffer agreements.  Of course, the information in the undisclosed MOIs for those six witnesses may have been available from other sources, such as Massey or MSHA documents, or MOIs for other witnesses.

[AUSA #1] told OPR that many of the discoverable statements in the undisclosed MOIs were brought up by the defense during trial.[182]  [AUSA #2] stated, "I don't think any of these [undisclosed MOIs] would have changed the direction of trial . . . Because most of it was introduced during their cross-examination of our witnesses . . . none of [them] would have changed the outcome of the trial had we disclosed [them]."[183]  [DOJ SA #1] said that many of the statements in the undisclosed MOIs that would have been helpful to the defense were brought out during the defense's cross-examination of the government's witnesses.[184]  [FBI SA #1] told OPR that many of the statements in the undisclosed MOIs that may have been helpful to the defense were brought out by the defense during the trial.[185]

It is important to note that no one, including Ruby, told OPR that the reason why the 61 undisclosed MOIs were not disclosed was because the information in those MOIs was available to the defense from other sources, including the 372 disclosed MOIs or the four million pages of discovery produced to the defense.  If that had been the reason why some or all of the 61 MOIs were not disclosed, OPR would have to undertake a different factual and legal analysis than that reflected in this report.  But neither Ruby nor anyone else asserted that claim.  The reason why the 11 pre-indictment MOIs were not disclosed was because, as Ruby admitted, he made a mistake, and not because he knew that the defense already possessed the statements in those 11 MOIs.  And the reason why the 50 post-indictment MOIs were not disclosed was because, according to Ruby, he and Goodwin decided to make disclosures by letter, and not because they knew that the defense already possessed the statements in those 50 MOIs.  The fact that the defense may have possessed some or all the discoverable statements contained in the undisclosed MOIs is therefore only relevant to the issue of whether the defense was prejudiced by the failure to disclose the 61 MOIs.  It is not relevant to the issue of whether the government violated its discovery obligations when it failed to disclose them.

## H.   Blankenship's Defense Team Declined to Explain How the Government's Failure to Disclose 61 MOIs Prejudiced the Defense

OPR asked Zuckerman whether and how Blankenship's defense had been prejudiced by the government's failure to disclose 61 pre- and post-indictment MOIs.  Zuckerman declined to fully answer OPR's question, but stated:

A number of the questions that you have posed ask us to address prejudice to the defense from the government's failure to disclose exculpatory information.  While

---

[182]   [AUSA #1] Interview at 30-39.

[183]   [AUSA #2] Interview at 40-42.

[184]   [DOJ SA #1] Interview at 48-49.

[185]   [FBI SA #1] Interview at 43.

OPR - 000052

Case 5:18-cv-00591   Document 76-34   Filed 09/05/18   Page 53 of 97 PageID #: 1097
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mr. Blankenship was prejudiced by the government's misconduct, we do not address that issue in our responses. Nor do we believe this is the appropriate forum to address prejudice, especially because we may yet raise such issues with the Court. Even if the government misconduct did not prejudice the defense, respectfully, that is not the question. The issue is whether the government prosecutors committed misconduct.[186]

## I.    The Government Identified for the Defense Ten MOIs that Contained Discoverable Statements

### 1.    The Court Orders the Government to Identify *Brady* Material

On June 12, 2015, in response to a defense motion, the court directed the government to designate and disclose to the defense all *Brady* material of which it was aware. A few days after the court's order, ███ recalled that Ruby asked ███ to review the MOIs ███ had drafted to identify those that contained *Brady* material.[187] On June 19, 2015, ███ sent Ruby an e-mail, attaching 12 MOIs, stating, "Per our discussion. I have reviewed and attached the following." Of the 12 MOIs attached to ███ June 19 e-mail, ten were pre-indictment and two were post-indictment.[188] Of the ten pre-indictment MOIs ███ selected, six had not been disclosed previously to the defense.[189]

On June 22, 2015, pursuant to the court's order, Ruby sent Zuckerman a letter identifying documents and MOIs that "the Defendant might claim are *Brady* material."[190] Ruby identified ten MOIs as possibly containing *Brady* material: ███ (May 11, 2010); ███ (April 28, 2010); ███ (November 16, 2011); ███ (February 5, 2012); ███ (June 9, 2012); ███ (November 10, 2011); ███ (February 4, 2014); ███

---

[186]    May 16, 2017 Zuckerman letter to OPR at 1. Blankenship's attorneys did in fact eventually raise this issue with the court. On April 18, 2018, McGuireWoods filed a "Motion to Vacate and Set Aside Defendant's Conviction and Sentence Pursuant to 28 U.S.C. § 2255." The motion alleges that the government's failure to disclose 61 MOIs as well as certain MSHA documents prejudiced Blankenship's defense.

[187]    ███ Interview at 14-15. Ruby told OPR that he did not recall asking ███ or ███ to conduct a search of MOIs they drafted to look for *Brady* material. Ruby Interview at 57. ███ said that ███ did not recall Ruby asking ███ to conduct a search of the MOIs ███ drafted to look for *Brady* material. ███ Interview at 27, 30. OPR found no evidence that ███ conducted such a search.

[188]    Pre-indictment MOIs: ███ (March 11, 2014); ███ (April 28, 2010); ███ (May 11, 2010); ███ (June 4, 2014); ███ (August 14, 2014); ███ (August 27, 2014); ███ (November 10, 2011); ███ (November 10, 2011); ███ (November 10, 2011); ███ (February 5, 2014). Post-indictment MOIs: ███ (January 16, 2015); ███ (January 21, 2015).

[189]    The six MOIs pertained to ███; ███; ███; ███ ███ and ███.

[190]    June 22, 2015 Ruby letter to Zuckerman at 1. In the letter, Ruby stated that, "the United States does not know of any evidence that truly tends to exculpate [the] Defendant."

Case 5:18-cv-00591   Document 70-34   Filed 09/05/18   Page 54 of 97 PageID #: 1098
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

███ (August 27, 2014); ███ (November 15, 2010); ███ (August 27, 2014). All ten MOIs were pre-indictment and had previously been disclosed to the defense.

Ruby said he did not recall how he chose the ten MOIs he identified as containing potential *Brady* material.[191] There are, however, significant overlaps, as well as significant differences, between the list of 12 MOIs ███ selected, and the list of ten MOIs Ruby ultimately selected. ███ selected two post-indictment MOIs. Ruby did not select either one. ███ and Ruby selected the same MOIs for ███, ███ ███ and ███ ███ and Ruby both selected MOIs from ███ and ███ but selected different MOIs; ███ had been interviewed multiple times.[192] Although ███ selected MOIs from ███ ███ and ███ as containing potential *Brady* material, Ruby did not select those MOIs in the list he sent to the defense. The ███ ███ and ███ MOIs had not been disclosed, and as discussed above, each contained statements that OPR finds should have been disclosed.

## 2. Discoverable Statements in the Ten MOIs Identified By Ruby

OPR reviewed the ten MOIs that Ruby told the defense might contain potential *Brady* material in order to identify the discoverable statements contained in those MOIs. As discussed later in this report, OPR found no difference between the discoverable statements contained in those ten MOIs and the discoverable statements contained in some of the 61 undisclosed MOIs. This finding supports both OPR's conclusion that the discoverable statements in some of the 61 undisclosed MOIs should have been disclosed to the defense, and the prosecution team's assertion that the defense was not prejudiced by the failure to disclose the 61 MOIs, because the discoverable statements in them were available to the defense from other sources, such as MOIs that had been disclosed.

OPR found that the ten MOIs Ruby identified as containing potential *Brady* material contained the following discoverable statements.

a. ███ MOI. ███ ███.

- *Blankenship wanted to see the report cards (regarding mine conditions) even if he was traveling.*

- *Blankenship never told ███ to say or not to say something to investigators.*

- *███ was never concerned that what Blankenship was asking ███ to do might be against the law.*

---

[191]   Ruby Interview at 59-60. Ruby told OPR that he did not have a formal process for reviewing all of the MOIs. Ruby said that based on his discussions with the trial team, he believed the team knew the evidence well enough to make disclosure decisions without a formal review process. *Id.* at 61.

[192]   Notably, ███ identified MOIs pertaining to ███ and ███ that had not been disclosed. Ruby selected MOIs pertaining to ███ and ███ that had been disclosed.

Case 5:18-cv-00591   Document 70-54   Filed 09/06/18   Page 55 of 97 PageID #: 1099
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

b.  ████████ MOI. ████████
████████ Although both DOL SA #1 and Ruby identified the ████ MOI as one that contained discoverable statements, OPR did not identify any such statements in ████████ MOI.[193]

c.  ████████ MOI. ████████
████████████

- *Blankenship would not directly tell you to break the law.*

- *Blankenship never instructed ████ not to inform MSHA of issues ██ was experiencing at [a mine].*

d.  ████████ MOI. ████████.

- ████████ *had once advised ████ to operate the mine in a way that would have violated the law.*

e.  ████████ MOI.

- ████████ *made a decision to shut down a Massey mine because of high methane levels.*

- ████████ *discussed with Blankenship spending $1 million for certain seals to be installed at a Massey mine and Blankenship approved the purchase.*

- *Blankenship never specifically directed ████████ to keep producing coal while the mine was in violation status.*

- ████████ *said ██ was unaware that ████ or anyone else at Massey ever took the position that something needed to be withheld from MSHA.*

f.  ████████ MOI. ████████

- *There were no safety issues at UBB that affected ████ personally and ██ did not believe any safety issues contributed to the explosion.*

- ████████ *believed that the water problem at a certain mine section was under control at the time of the explosion.*

---

[193]    OPR asked the USAO, Ruby, and ████ why Ruby and ████ put the ████ MOI on the list of MOIs they described as containing potential *Brady* material.  The USAO said that the ████ MOI was identified because "██ had some positive things to say about Blankenship and ██ relationship with ████████ December 15, 2017 USAO e-mail to OPR.  Ruby did not respond to OPR's e-mail.  ████ told OPR that ████ had had positive work experiences with Blankenship, as evidenced by several positive comments ████ made about Blankenship as noted in ████ MOI.  December 4, 2017 ████ e-mail to OPR.  OPR does not necessarily agree that such information was discoverable material that was required to be disclosed in a case about a conspiracy to violate mine safety standards and securities law violations.

- 50 -

OPR - 000055

Case 5:18-cv-00591   Document 703-4   Filed 09/06/18   Page 56 of 97 PageID #: 1100
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

- ██████ was never told to lie to an inspector and never heard of anyone else lying.

- On the day of the explosion mine conditions and air quality was good, and no methane was detected.

- ██████ did not believe negligence played any part in the explosion.

- ██████ wanted to know what caused the explosion, but cannot link the explosion to something someone did or did not do.

g. **Witness #22** MOI. **Witness #22** ████████████████

- ██████ never asked ███ men to do anything that was unsafe.

- **Witness #4** told **Witness #22** men that if **Witness #22** ever did anything that was not safe, ██ would be fired.

- Blankenship and ██████ wanted miners to work safely.

h. **Witness #26** MOI. **Witness #26** ████████████████

- ██████ never observed a violation that was not fixed.

- ██████ focused on safety at his operations.

- With MSHA's scrutiny there were going to be violations.

- ██████ mine managers thought they were running safe operations.

- It was not accepted that ██████ mines were going to violate safety standards.

- When Massey began to grow, ██████ and ██████ attended more budget meetings than Blankenship.

- Massey's management did not tolerate violations.

- ██████ was not aware of giving the mines advance notice of the presence of MSHA inspectors.

- ██████ was never told by ███ superiors that advance notice should be given at ███ mines.

- Every mine would receive violations.

- ██████ was never told by anyone at Massey to specifically break the law or that they did not care how often ██ broke the law.

- ██████ was not aware of any actions by Blankenship that ██ believed were illegal.

Case 5:18-cv-00591    Document 76-21    Filed 09/05/18    Page 57 of 97 PageID #: 1101
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

i. ███████ MOI. ███████████████████████████████

- *A certain statistical measure of safety was the only thing that figured into executive compensation before the UBB explosion.*

- *Bonuses were tied to production, safety, and performance.*

- *Group president bonuses were based on safety, production, and environmental violations.*

- *Safety was always discussed at Massey and the discussions seemed real and important.*

j. ███████ MOI.

- *The "kill the spider" program to eliminate mine hazards was initiated on August 1, 2009.*

- *███████ wanted to reduce the number of citations and injuries.*

- *The Hazard Elimination Program reduced citations and accidents at Massey.*

- *Blankenship set a goal of reducing hazards by 50%.*

- *During ███████ first visit to UBB ██ found the mine well ventilated and rock dusted.*

- *A ventilation test was created after Blankenship told ███████ that he wanted to ventilate a mine.*

- *███████ once shut down a mine without any discouragement for doing so.*

- *███████ was sure that MSHA knew that advance notice was being given of their inspections.*

- *Blankenship never turned down any suggestions ███████ made regarding ventilation.*

- *During the first year of the Hazard Elimination Program, there were fewer citations and penalties at Massey.*

**J.    Potential *Giglio* Material in Undisclosed MOIs**

In late June 2015, Ruby asked ███████ to review all of the MOIs drafted during the *Blankenship* investigation and prosecution and identify all negative statements in those MOIs about ███████ [194] ███████ created a 59-page chart as a result of her MOI review. The chart

---

[194]    Ruby told OPR that he did not recall asking ███████ to prepare the chart. Ruby Interview at 152-53. Ruby said that there was a lot of negative information about ███████ in MOIs that were disclosed, and that he did not recall thinking about disclosure issues in connection with the chart. *Id.* at 153-54.

Case 5:18-cv-00591   Document 70-14   Filed 09/03/18   Page 58 of 97 PageID #: 1102
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

contained the witness' name, the MOI date and Bates-stamp numbers, and a summary description of the negative information about ███████ contained in the MOI. ███████ sent the chart to Ruby on June 29, 2015, and at Ruby's request to █████ on July 13, 2015.[195]

The chart contained information culled from numerous MOIs that had been disclosed to the defense, and other information culled from ten MOIs that had not been disclosed. Among other statements, an undisclosed MOI from a March 17, 2015, interview of ███████ stated that ███████ was willing to accept a certain number of violations in order to get a certain mining operation set up, and that ███████ made a conscious decision to violate the law.

## IV.    FACTS RELEVANT TO THE GOVERNMENT'S REPRESENTATIONS TO THE COURT AND THE DEFENSE ABOUT MOI DISCLOSURES

The defense filed numerous motions seeking orders requiring the government to comply with its *Brady* obligations and to disclose the handwritten notes taken by government agents during witness interviews. In response to those motions, the government made representations to the court and the defense about its MOI disclosures. Zuckerman has alleged that the government's representations to the court and the defense were false or misleading.[196] In addition, Zuckerman sent Ruby several e-mails about the government's MOI disclosures, one of which revealed Zuckerman's misunderstanding of the government's practice, to which Ruby did not respond.

### A.    February, May, and July 2015 Pleadings Regarding MOI Disclosures

On February 6, 2015, the defense filed a "Motion to Enforce the Government's *Brady* Obligations." The supporting memorandum requested that the government produce handwritten or typewritten notes from the interviews the government had conducted. On February 20, 2015, the government filed a response entitled, "United States' Response to Defendant's Motion to . . . Enforce the Government's *Brady* Obligations." In the response, the government opposed Blankenship's motion, stating in part, "the United States has provided extensive discovery. . . . Includ[ing] . . . materials which the United States is not required to disclose, including FBI 302s."[197] The government did not inform the court that it was not disclosing post-indictment MOIs to the defense. Ruby electronically signed the pleading.

███████ drafted the February 20, 2015 brief, and sent a draft to Goodwin and Ruby before it was filed.[198] Ruby told ███████ that he thought the draft "looks great."[199] Goodwin told Ruby

---

[195]        ███ told OPR that did not recall why ███████ sent ███ the chart, but that around that time, the team was preparing for the cross-examination of witnesses. ███████ Interview at 68. If, as ███████ asserts, ████ believed that all MOIs were being disclosed, then ████ would not have been aware that the chart contained potential *Giglio* material that had not been disclosed to the defense.

[196]        May 16, 2017 letter from Zuckerman to OPR, Exhibit 1 at 3.

[197]        Brief at 2.

[198]        February 19, 2015 e-mail from ███████ to Goodwin, Ruby, and ███████

[199]        February 19, 2015 e-mail from Ruby to ███████ Goodwin, ███████ and ███████

Case 5:18-cv-00591   Document 70352   Filed 09/06/18   Page 59 of 97 PageID #: 1103

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

that he reviewed the draft and that "no further changes [are] necessary."[200]   Goodwin also sent a draft of the pleading to ██████.[201]

On May 6, 2015, the defense filed a brief entitled, "Motion to Compel Production of Witness Interview Notes . . . Containing *Brady* Information."   In the motion, the defense stated that its February 6 motion requested "all handwritten and typewritten notes of witness interviews . . . which contain *Brady* information."[202]   The motion again requested "all handwritten and typewritten notes of witness interviews . . . that contain *Brady* material."[203]   It is clear that the defense was seeking the underlying materials for all witness interviews.   On May 14, 2015, the government filed a response entitled, "United States' Response to Defendant's Motion to Compel Production of Witness Interview Notes and Records of Attorney Proffers Containing *Brady* Information."   In the brief, the government opposed Blankenship's motion to obtain attorney and agent handwritten notes taken during witness interviews, stating in part, "the United States has exceeded its discovery obligations by producing – in a digitally searchable format – typed 302 reports that summarize witness interviews, regardless of whether they contain exculpatory information."[204]   The government did not inform the court that it was not disclosing post-indictment MOIs to the defense.   Ruby electronically signed the pleading.

██████ drafted the May 14, 2015, brief, and sent a draft to Ruby.[205]   Ruby sent the draft to ██████.[206]   The brief was filed after minor revisions.   On May 14, ██████ sent a copy of the filed brief to Goodwin and others on the prosecution team.[207]

On July 8, 2015, the defense filed a Motion to Compel Compliance with *Brady* Order.   The motion requested an order compelling the government to "produce all handwritten and typewritten notes . . . of witness interviews."[208]   It is clear that the defense was seeking the underlying materials for all witness interviews.   On July 14, 2015, the government filed a response entitled, "United States' . . . Response to Defendant's Motion to Compel Compliance With *Brady* Order."   In the brief, the government opposed Blankenship's motion to compel the government to disclose *Brady* material, stating in part, "the United States has produced memorandums that reflect the substance of well over 300 witness interviews.   The Court has already rejected Defendant's claim that he is entitled to the United States' work product relating to witness interviews, and since the United

---

[200]   February 20, 2015 e-mail from Goodwin to ██████ and Ruby.

[201]   February 20, 2015 e-mail from Goodwin to ██████.

[202]   Defense motion at 1.

[203]   *Id.* at 4.

[204]   Brief at 2.

[205]   May 13, 2015 e-mail from ██████ to Ruby.

[206]   May 13, 2015 e-mail from Ruby to ██████.

[207]   May 14, 2015 e-mail from ██████ to Goodwin and others.

[208]   Defense motion at 12.

Case 5:18-cv-00591   Document 70-1   Filed 09/06/18   Page 60 of 97 PageID #: 1104
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

States has complied with [the court's] Brady Order with respect to the substance of those interviews, there is no need to revisit that ruling."[209]  The government also wrote that, "Defendant's renewed request for . . . notes of interviews, should be denied . . . [because] the United States has already produced memorandums that memorialize the substance of those interviews. . . ."[210]  The government did not inform the court that it was not disclosing post-indictment MOIs to the defense. Ruby electronically signed the pleading.

Ruby drafted the July 14, 2015 brief, and sent a draft to Goodwin, ███████ and ███████ for their review.[211]  Both Goodwin and ███████ made revisions to the draft.[212]

███████ told OPR that when ██ drafted the February pleading, ██ believed that the government had disclosed all MOIs, and did not intend to mislead the court.[213] ███████ said that with respect to all three pleadings, ██ believed that the government had disclosed all MOIs.[214]  Ruby told OPR that with respect to these three pleadings, the government did not intend to mislead the court through the government's representations about its MOI disclosures.  Ruby stated, "we certainly didn't file anything with the intent of misleading the court or say anything in a pleading with the intent of misleading the court . . . . [A]ll of these statements were intended to refer to the pre-indictment interview memoranda that we had produced."[215]

## B.    Ruby's Statement During Trial Regarding MOI Disclosures

During ███████ five-day cross-examination, ███████ testified that ██ had not conspired with Blankenship and had not committed any crimes, and that Blankenship wanted MSHA violations reduced.  ███████ testified that ██ or ██ attorneys had provided that information to the government prior to trial.  The defense then alleged that the government violated its Brady obligations by failing to disclose that information.  (This allegation is discussed more fully above in Section II(E).)  The prosecution and defense discussed this matter with the court, outside the presence of the jury.  During that discussion, Ruby told the court, "We've turned over Grand Jury material from this witness [███████]  We have also turned over 302s from our interviews with this witness . . . and so to the extent that there is exculpatory information that we had from this witness, that's been turned over to the defense."[216]

---

[209]     Brief at 8.

[210]     Brief at 12.

[211]     July 13, 2015 e-mail from Ruby to Goodwin, ███████ and ███████

[212]     See various e-mails among Ruby, Goodwin, ███████ and ███████ from July 13 and July 14, 2015, including a July 13, 2015 e-mail from Goodwin to the team, in which Goodwin asks to receive the most current draft for review.

[213]     ███████ Interview at 22.

[214]     ███████ Interview at 45.

[215]     Ruby Interview at 105, 109.

[216]     October 30, 2015 Trial Transcript at 3712.

OPR - 000060

Case 5:18-cv-00591   Document 70-34   Filed 09/05/18   Page 61 of 97 PageID #: 1105
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

DOL SA #1 and FBI SA #1 prepared six MOIs memorializing Witness #4 interviews from the following dates: October 22, 2014; November 11, 2014; April 2, 2015; September 12, 2015; September 21, 2015; and October 18, 2015. In fact, the government had disclosed only the pre-indictment MOI dated November 11, 2014. According to Ruby, he mistakenly believed that the second pre-indictment MOI, dated October 22, 2014, had also been disclosed. Because the remaining four Witness #4 MOIs reflected post-indictment interviews, Ruby intentionally had not disclosed them. Ruby's statement to the court that the government had "turned over 302s from our interviews with this witness" was arguably misleading.[217]

Ruby told OPR that he did not intend to mislead the court, and that his statement was meant to refer to the two pre-indictment MOIs (one of which Ruby mistakenly believed had been disclosed).[218] Ruby said that he did not mean to state that all of Witness #4 MOIs had been disclosed and that it never crossed his mind to mislead the court.[219] Witnesses told OPR that Goodwin attended the trial every day.[220] Because Ruby's statements about the disclosure of Witness #4 MOIs were made in open court, Goodwin presumably heard them. Because Goodwin declined OPR's request for an interview, OPR was unable to ask Goodwin why he did not correct Ruby's arguably misleading statement, if, as Ruby asserts, Goodwin knew that the government had not disclosed post-indictment MOIs.

### C.   Zuckerman Asked the Government Whether It Was Disclosing All MOIs

On April 15, 2015, a Zuckerman attorney sent an e-mail to Ruby, asking, "From your earlier statements to us and the Court, we understand that all of the [MOIs] that the government conducted as part of its investigation . . . have been provided to the defense. . . . If our understanding is incorrect, please let us know."[221] On April 17, 2015, the same Zuckerman attorney sent another e-mail to Ruby, asking him to respond to the attorney's April 15 e-mail. OPR found no evidence that Ruby forwarded either of these e-mails to anyone. Both AUSA #1 and AUSA #2 told OPR that they did not recall seeing this e-mail.[222] OPR found no evidence that Ruby responded to Zuckerman's question, notwithstanding that the e-mail showed that Zuckerman wrongly understood that it had

---

[217]   OPR notes that Ruby's statement to the court on October 30, 2015 that "[w]e have also turned over 302s from our interviews with this witness" occurred only 12 days after the government's final interview of Witness #4 on October 18, 2015. Ruby attended that interview. In addition, Witness #4 was interviewed twice in September 2015, the month before Ruby made his arguably inaccurate statement to the court; both Ruby and Goodwin attended those interviews.

[218]   Ruby Interview at 118.

[219]   *Id.* at 119-20.

[220]   AUSA #1 Interview at 29.

[221]   In his April 15, 2015 e-mail, the Zuckerman attorney stated that the defense could not locate all of the MOIs that the government had previously disclosed, and that the MOIs appeared to have different Bates-stamp markings. Ruby responded to that portion of Zuckerman's April 15 e-mail. On April 21, 2015, Ruby sent Zuckerman a list of all MOIs that the government had disclosed, arranged by Bates-stamp numbers.

[222]   AUSA #1 Interview at 21; AUSA #2 Interview at 48.

Case 5:18-cv-00591  Document 70-31 Filed 09/05/18  Page 62 of 97 PageID #: 1106
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

received all MOIs in the government's possession.[223]  OPR asked Ruby why he did not respond to Zuckerman's e-mail.  Ruby said that as a result of Goodwin's decision that the team should not respond to Zuckerman's e-mails, he may not have read the e-mail carefully, but that it was not his intent to mislead Zuckerman by failing to respond.[224]

### D.  Evidence that Zuckerman Knew or Should Have Known that the Government Was Not Disclosing All MOIs

As described above, on several occasions the government made statements to the court that could be read to indicate that the government was providing the defense with all MOIs in its possession.  OPR found no reason to believe that the court knew or should have known that the government was not in fact disclosing all MOIs to the defense.  In contrast, OPR found evidence that by August 2015 Zuckerman knew or should have known that the government was not disclosing all MOIs.

First, Zuckerman was aware that the ▮Witness #2▮ MOI that was disclosed in August 2015 was the only post-indictment MOI it received.  In its March 7, 2016 letter to the Department of Justice alleging government misconduct, Zuckerman noted that the government "provided the defense with only a single [MOI] conducted after the indictment was returned."[225]

Second, on September 21, 2015, Ruby sent Zuckerman a letter in which he disclosed potential exculpatory statements the government had obtained during interviews of ▮Witness #7▮ ▮, ▮Witness #8▮ , and ▮Witness #13▮  In the letter, Ruby told Zuckerman that the information he was disclosing came from witness interviews.  Zuckerman therefore knew that at least for these three witnesses, the government was not providing complete MOIs memorializing the interviews.

Third, all of the MOIs disclosed to the defense were marked with Bates-stamp numbers.  In August 2015, Ruby sent the defense the ▮Witness #2▮ MOI, with Bates-stamp markings MOI 1534-1540.  The highest Bates-stamp marking of an MOI provided to the defense prior to the disclosure of the ▮Witness #2▮ MOI was MOI 1356-1361.  Had Zuckerman carefully examined the MOIs it received from the government, it would have seen that there was a gap of almost 200 pages.  The obvious explanation for that gap is that there were MOIs marked with Bates-stamp numbers MOI 1362-1533 that the government had not disclosed.[226]

---

[223]  ▮USA #2▮ said that ▮#3▮ was generally aware that Ruby did not respond to all of Zuckerman's e-mails. ▮USA #2▮ said that the team was concerned that whatever the response, it would be used against the government. ▮USA #2▮ Interview at 49-50.

[224]  Ruby Interview at 124-26.

[225]  March 7, 2016 letter at 3.

[226]  The fact that there was a 200-page Bates-stamp number gap between the ▮Witness #2▮ MOI and next highest numbered MOI is evidence that Ruby did not intentionally mislead the defense about the existence of undisclosed MOIs.  Had Ruby sought to hide the existence of the undisclosed MOIs, he would have directed that the ▮Witness #2▮ MOI be marked with the Bates-stamp number MOI-1362, the number immediately after the last page of the highest Bates-stamp number on an MOI disclosed to the defense.

Case 5:18-cv-00591   Document 703-4   Filed 09/09/18   Page 63 of 97 PageID #: 1107
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Fourth, OPR found evidence to suggest that Zuckerman was communicating with some witnesses after those witnesses had been interviewed by the government. If that is so, and if Zuckerman never received MOIs for those witnesses, then Zuckerman knew or should have known that it was not receiving all MOIs. For example, in its March 7, 2016 letter to the Department, Zuckerman stated that it had learned that "the government interviewed several individuals who provided information that obviously was favorable to Mr. Blankenship's defense but was never disclosed."[227] When OPR asked Zuckerman to identify those individuals, Zuckerman identified Witness #1 , Witness #6 , and Witness #8 . In fact, the government had interviewed Witness #1 and Witness #8 and had not disclosed the MOIs from those interviews (though Ruby did provide the defense with some information about Witness #8 interview in his September 21, 2015 letter as discussed above). It is reasonable to conclude that Zuckerman spoke to those witnesses or their counsel after the government had interviewed them, and thus had reason to believe that it had not received all MOIs, if MOIs had been prepared after the government's interviews of those witnesses.

In sum, there is substantial evidence that by August 2015, Zuckerman was or should have been aware that it was not receiving all MOIs the government generated.

## V.    FACTS RELEVANT TO THE GOVERNMENT'S SEARCH FOR EXCULPATORY EVIDENCE

Zuckerman alleged that the government systematically withheld exculpatory evidence. OPR found evidence inconsistent with Zuckerman's assertion that the government ignored or intentionally violated its discovery obligations. OPR found that the government searched MSHA documents at least three times for exculpatory evidence. In addition, as noted above, in pleadings filed with the court, the defense acknowledged that the government had disclosed what the defense described as exculpatory material both in MOIs and documents that the government had disclosed.

### A.    February 2015 Search of MSHA Documents

According to DOL Attorney , in February 2015, Ruby instructed the DOL to search MSHA documents for potentially exculpatory evidence.[228] On February 20, 2015, DOL Attorney sent Ruby an e-mail describing in detail how DOL intended to search MSHA documents. In DOL Attorney e-mail, DOL Attorney stated that DOL would use the following search terms to identify potentially relevant documents: Blankenship; UBB; Upper Big Branch; PCC; Performance Coal; Advance Notice. DOL Attorney told Ruby that those search terms would be used to search the e-mail accounts of four groups of MSHA employees within specific time frames: MSHA District 4 (which included UBB) from January 1, 2008 to April 5, 2010; MSHA Headquarters from January 1, 2008 to March 6, 2012; the MSHA Accident Investigation team, from April 12, 2010 to December 6, 2011; and the MSHA Incident Review team, from April 29, 2010 to March 6, 2012. DOL Attorney also told

---

[227]    March 7, 2016 letter at 3.

[228]    DOL Attorney Interview.

Case 5:18-cv-00591   Document 70354   Filed 09/05/18   Page 64 of 97 PageID #: 1108
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Ruby that DOL would search Incident Review team non-e-mail documents, using the same search terms.[229]

On February 24, 2015, Ruby forwarded ███ e-mail to Goodwin.  Goodwin responded to ███ e-mail on February 24, 2015.[230]  Goodwin told ███ that "the point of this exercise is to determine if there is any 'exculpatory' information concerning Massey/UBB in general, and Defendant Blankenship in particular."  Goodwin told ███ that such exculpatory information would include, but would not be limited to "(1) statements or indications that Blankenship/UBB was good on safety; (2) statements or indications that MSHA was targeting UBB/Blankenship for improper motives (e.g. because he was critical of MSHA); or (3) statements or indications that citations issued at UBB might be overstated."

On March 26, 2015, ███ told Ruby that DOL attorneys had reviewed about 24,000 e-mails and marked 936 as potentially exculpatory, though ███ noted that "[m]ost of these are not likely to be exculpatory when you review them—we're erring on the side of inclusion."[231]  In March 27 and 30 e-mails, ███ informed Ruby that contractors for DOL were sending Ruby discs containing the 936 e-mails.  Ruby forwarded both e-mails to ███.

When OPR initially interviewed the trial team members, they either said they had no knowledge of the February/March 2015 MSHA e-mail searches, or did not recall whether the government had disclosed any of the 936 e-mails identified by DOL attorneys.[232]  Because no prosecution team member could recall with any certainty whether any of the 936 MSHA e-mails that DOL attorneys had identified as potentially exculpatory had been disclosed, OPR asked the USAO to determine what had happened to the 936 e-mails.

---

[229]   Ruby told OPR that he thought that DOL attorneys searched non-e-mail documents only from the Incident Review team because non-e-mail documents from the other three groups had already been searched.  Ruby Interview at 51-52.

[230]   Ruby told OPR that he believed that Goodwin responded to ███ e-mail because this was around the time ███████████████████████

[231]   March 26, 2015 e-mail from ███ to Ruby.  ███ also told Ruby that the team reviewing the e-mails had stopped reviewing e-mails that had been sent "to" those whose e-mail accounts were searching, and were only searching e-mails that had been sent "from" those whose e-mail accounts they were searching.  ███ told OPR that DOL had stopped searching "to" e-mails because they were mostly duplicative of other e-mails, and the search terms were so broad that they captured irrelevant documents such as media reports about the UBB explosion that were contained in "to" e-mail accounts, but not in "from" e-mail accounts.  ███ Interview.

[232]   ███ and ███ said they had no knowledge about the February/March DOL search of MSHA e-mails.  ███ Interview at 21-22; ███ Interview at 50.  ███ said ███ did not know whether the 936 e-mails identified by DOL attorneys were disclosed.  ███ Interview at 29.  Even though contemporaneous e-mails showed that ███ reviewed the 936 e-mails identified by DOL attorneys, during ███ interview ███ had no recollection of doing so.  ███ Interview at 33.  ███ said ███ had no knowledge about whether any of the 936 e-mails identified by DOL attorneys were disclosed.  ███ Interview.  Ruby said he did not recall why in February 2015 he asked DOL to initiate a search of MSHA documents for exculpatory evidence.  Ruby Interview at 51.  Ruby said that most of the 936 e-mails identified by DOL attorneys were not exculpatory, and some were disclosed, though he did not recall how many.  *Id.* at 52-53.

Case 5:18-cv-00591 Document 70-4 Filed 09/05/18 Page 65 of 97 PageID #: 1109
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

After reviewing its records, the USAO determined that Ruby had asked ▮▮▮ to review the e-mails identified by DOL attorneys. ▮▮▮ reviewed the e-mails, and selected those ▮▮▮ believed might be discoverable. On April 1, 2015, ▮▮▮ sent Ruby a link to an electronic folder containing the e-mails ▮▮ had identified, and on April 3 ▮▮▮ sent the same link to Goodwin, ▮▮▮ and Ruby (again). In those e-mails, ▮▮▮ said that ▮▮ had identified e-mails about how MSHA inspectors "did not know how advance notice worked," and identified post-explosion e-mails that contained MSHA employees' negative opinions about Blankenship or Massey. On April 6, 2015, Ruby sent Zuckerman a letter concerning various issues. At the end of the letter, Ruby stated that the government was disclosing "a small set of additional documents." Those documents included nine MSHA e-mails (and one attached spreadsheet) related to the issue of advance notice. These e-mails were among the 936 e-mails identified by DOL attorneys as potentially containing exculpatory material. The government did not at that time disclose any of the other 936 e-mails identified by DOL attorneys.

After OPR asked the USAO to try to determine how many of the 936 e-mails identified by DOL attorneys had been disclosed, the United States Attorney asked the *Blankenship* team to review those e-mails to determine if further disclosures were warranted. On November 17, 2017, the USAO sent Zuckerman a disc containing 48 e-mails that were among the e-mails the DOL attorneys had identified as potentially exculpatory in March 2015 that had not previously been disclosed. OPR asked the USAO to explain why it had selected those 48 e-mails to disclose to the defense. The USAO said that, "[t]here is no one specific reason why the emails were selected. If they arguably related in any way to a negative attitude toward or treatment of Massey or Blankenship, we included them."[233]

Nine of the 48 MSHA e-mails that the USAO disclosed in November 2017 were dated before the UBB mine explosion. The 48 e-mails contained information about several different issues, including the following: MSHA employees' negative opinions of Blankenship or Massey (most of those date from after the UBB mine explosion); whether MSHA inspectors knew about or enforced the rule against mines providing advance notice of MSHA inspector activities; discussions of various issues related to UBB as MSHA's report of its internal review about the explosion was being drafted and revised; and technical discussions of various conditions at UBB prior to the explosion (in some cases several years before the explosion). OPR did not reopen its investigation to determine whether the government was required to disclose the 48 e-mails before trial because: (a) OPR reached conclusions regarding similar disclosure issues with respect to MOIs; (b) OPR's investigation was substantially complete when the USAO disclosed the 48 MSHA e-mails; and (c) Blankenship's Section 2255 motion raised the issue of the late disclosure of the 48 MSHA e-mails and is pending before the court.[234]

---

[233]    December 15, 2017 USAO e-mail to OPR. The defense discussed some of the 48 e-mails in its Section 2255 motion.

[234]    On April 6, 2018, after OPR's investigation was complete, the USAO informed OPR that on that date it had made another disclosure of MSHA documents to Blankenship's attorneys. The USAO disclosed documents related to MSHA's disciplining of four MSHA employees as a result of information learned during its internal review of its pre-explosion enforcement activities at UBB. The documents showed that two employees received one-day suspensions, one employee received a letter of reprimand, and one employee received a letter of counseling. The defense discussed some of these documents in its Section 2255 motion. In May 2018, the USAO informed OPR that

- 60 -

Case 5:18-cv-00591    Document 70-34    Filed 09/05/18    Page 66 of 97 PageID #: 1110
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

### B.    June 2015 Search of Selected Documents in the USAO's Database

The defense made repeated motions seeking an order compelling the government to disclose *Brady* material. Although the court largely denied those motions, on June 12, 2015, the court ordered that the government should "designate and disclose to defense counsel any and all *Brady* material by the close of business on June 22, 2015."[235] To comply in part with the court's order, Ruby selected approximately 600 documents. On June 18, 2015, Ruby told [AUSA #1] and [AUSA #2] that he and they would each review approximately 200 documents to identify potential *Brady* material. Both [AUSA #1] and [AUSA #2] reviewed their sets of documents and sent Ruby a list of documents that they suggested be identified as potential *Brady* material.[236] On June 21, 2015, Ruby sent a letter to the defense, identifying approximately 140 documents and ten MOIs as containing potential *Brady* material.

### C.    September 2015 Search of MSHA Documents

On August 13, 2015, the defense moved for an early-return subpoena seeking production of certain MSHA documents. The government thereafter disclosed approximately 70,000 pages of documents. Ruby asked DOL attorneys to search those documents for discoverable evidence. On September 8, 2015, [DOL Attorney] sent Ruby an e-mail, attaching a chart listing 115 documents that might be considered exculpatory. [DOL Attorney] told OPR that many of the documents on the chart were duplicates, and so the actual number of potentially exculpatory documents was less than 115. In a September 10, 2015, letter to Zuckerman, Ruby identified as potentially exculpatory two of the documents that [DOL Attorney] had identified in [ ] chart. Ruby told OPR that although he had no recollection of how many of the documents identified in the September search as potentially exculpatory were disclosed, some of the documents on the chart [DOL Attorney] prepared were used by the defense at trial, which suggested that they had been disclosed.[237] [DOL Attorney] said that the defense used some of the documents on [DOL Attorney] chart during its cross-examination of witnesses during trial.[238]

[DOL SA #1] and [AUSA #1] told OPR they had no knowledge about the September search of MSHA documents.[239] [AUSA #2] said that [ ] did not recall ever seeing the chart [DOL Attorney] sent Ruby listing the

---

it was disclosing additional MSHA documents to the defense, some of which were related to the MSHA documents disclosed on April 6.

[235]    Memorandum Opinion and Order at 14.

[236]    Neither [AUSA #1] nor [AUSA #2] knew whether Ruby accepted their suggestions as to what documents should be designated as discoverable. [AUSA #1] Interview at 26-28; [AUSA #1] Interview at 41, 45-46. [AUSA #2] said that to identify potential *Brady* material, [ ] looked for documents in which Blankenship expressed anger about a mine's safety record, or where he said something positive about mine safety. [AUSA #2] Interview at 26-28.

[237]    Ruby Interview at 64-65.

[238]    [DOL Attorney] Interview.

[239]    [DOL SA #1] Interview at 21-22; [AUSA #1] Interview at 51.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

115 documents.[240]  ███ said ██ was aware of the September search of MSHA documents because there had been discussions in court about that issue during pretrial motions.[241]

As noted above, in March 2015, DOL attorneys identified 936 MSHA e-mails as potentially exculpatory.  In September 2015, in response to a subpoena, the government produced thousands of MSHA documents.  The USAO told OPR that there were approximately 200 documents that were included in both the March and September 2015 sets of documents.[242]  Thus, in September 2015, the government had disclosed to the defense about 200 of the e-mails that DOL attorneys had identified in March 2015 as potentially exculpatory.

## VI.   APPLICABLE STANDARDS

### A.   OPR's Analytical Framework

OPR finds professional misconduct when an attorney intentionally violates or acts in reckless disregard of a known, unambiguous obligation imposed by law, applicable rule of professional conduct, or Department regulation or policy.  In determining whether an attorney has engaged in professional misconduct, OPR uses the preponderance of the evidence standard to make factual findings.

An attorney intentionally violates an obligation or standard when the attorney (1) engages in conduct with the purpose of obtaining a result that the obligation or standard unambiguously prohibits; or (2) engages in conduct knowing its natural or probable consequence, and that consequence is a result that the obligation or standard unambiguously prohibits.

An attorney acts in reckless disregard of an obligation or standard when (1) the attorney knows or should know, based on his or her experience and the unambiguous nature of the obligation or standard, of an obligation or standard; (2) the attorney knows or should know, based on his or her experience and the unambiguous applicability of the obligation or standard, that the attorney's conduct involves a substantial likelihood that he or she will violate, or cause a violation of, the obligation or standard; and (3) the attorney nonetheless engages in the conduct, which is objectively unreasonable under all the circumstances.  Thus, an attorney's disregard of an obligation is reckless when it represents a gross deviation from the standard of conduct that an objectively reasonable attorney would observe in the same situation.

If OPR determines that an attorney did not engage in professional misconduct, OPR determines whether the attorney exercised poor judgment, made a mistake, or acted appropriately under all the circumstances.  An attorney exercises poor judgment when, faced with alternative courses of action, he or she chooses a course of action that is in marked contrast to the action that the Department may reasonably expect an attorney exercising good judgment to take.  Poor judgment differs from professional misconduct in that an attorney may act inappropriately and thus exhibit poor judgment even though he or she may not have violated or acted in reckless

---

[240]   ███ Interview at 33.

[241]   ███ Interview at 29.

[242]   November 6, 2017 USAO e-mail to OPR.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

disregard of a clear obligation or standard.  In addition, an attorney may exhibit poor judgment even though an obligation or standard at issue is not sufficiently clear and unambiguous to support a professional misconduct finding.  A mistake, on the other hand, results from an excusable human error despite an attorney's exercise of reasonable care under the circumstances.

## B.  Standards of Conduct

### 1.  Applicable Bar Rules

Department of Justice regulations provide that Department attorneys shall, in all cases, conform to the rules of ethical conduct of the court before which a particular case is pending.[243] *Blankenship* was pending before the U.S. District Court for the Southern District of West Virginia. That court has adopted the West Virginia Rules of Professional Conduct (RPC) as the rules governing the professional conduct of attorneys who litigate criminal cases in that court.[244] █████

███████████████████████████████████[245]████████████████████████
██████████████████████████████████████████████████████████████
█████████████████████████[246]  Therefore, OPR applies the West Virginia RPC in evaluating the conduct of Ruby and Goodwin.[247]

### 2.  Duty to Disclose Favorable Evidence to the Defense

The *Blankenship* prosecution team had a duty to disclose favorable evidence to the defense. This duty was required by:  (a) the Constitution, as explained and promulgated in *Brady* and its progeny; (b) Department of Justice policy, as set forth in the United States Attorneys' Manual (USAM), the Ogden Memorandum, and USAO rules; and (c) the West Virginia RPC.

---

[243]    28 C.F.R. §§ 77.3 and 77.2(j)(1)(i).

[244]    Local Rule of Criminal Procedure 44.7.

[245]    Because Goodwin declined to be interviewed by OPR, OPR does not know whether Goodwin is a member of any other state bar.

[246]    ██████████████████████████████████████████

[247]

████████████████████████████████████████  As discussed below, West Virginia RPC 3.8(d) requires prosecutors to make certain pretrial disclosures to the defense. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, no West Virginia court or disciplinary authority has discussed whether the scope of West Virginia RPC 3.8(d) is broader than, or co-extensive with, a prosecutor's duty under *Brady*.  For the reasons OPR explains below, it does not reach a finding as to whether Ruby and Goodwin violated West Virginia RPC 3.8(d). ████████████████████████████████████████████████████████████████rs.

- 63 -

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

### a.      Constitutional Obligations

The Fifth Amendment's due process requirements as explained in *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny require a prosecutor to disclose to the defense evidence favorable to the accused that is material either to guilt or punishment. *Brady*, 373 U.S. at 87. In addition, the government must disclose material evidence affecting a witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154 (1972). Exculpatory or impeachment evidence is material if its "omission is of sufficient significance to result in a denial of the defendant's right to a fair trial," *United States v. Agurs*, 427 U.S. 97, 108 (1976), or its suppression undermines confidence in the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 678 (1985).

A *Brady* violation occurs when:  (1) evidence that is material and favorable to the accused, either because it is exculpatory or because it is impeaching; (2) is suppressed by the government, either willfully or inadvertently; and (3) prejudice ensues. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

*Brady* is not violated if the defendant either knows of the exculpatory evidence or could have obtained it through the exercise of due diligence. *See, e.g., United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004); *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) (the *Brady* rule "does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense."); *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) (when the exculpatory evidence at issue is "not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine."); *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir.1990) ("there is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant.").

### b.      Department of Justice Policies

### (i)      The United States Attorneys' Manual

The Department's policy on the disclosure of exculpatory and impeachment information is set forth in Section 9-5.001 of the U.S. Attorneys' Manual (USAM), which generally requires prosecutors to produce exculpatory and impeachment information beyond that which is constitutionally and legally required. Section 9-5.001(C) is titled, "Disclosure of exculpatory and impeachment information beyond that which is constitutionally and legally required." That section expressly states that prosecutors must disclose information "beyond what is 'material' to guilt" as articulated under the Supreme Court precedent cited above. Section 9-5.001(C)(1)-(3) reads:

(1)  Additional exculpatory information that must be disclosed.  A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.

(2)  Additional impeachment information that must be disclosed.  A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence—including but not limited to witness testimony—the prosecutor

- 64 -

Case 5:18-cv-00591  Document 70-1  Filed 09/05/18  Page 70 of 97 PageID #: 1114
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence. This information must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime.

(3) Information. Unlike the requirements of *Brady* and its progeny, which focus on evidence, the disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence.

USAM Section 9-5.001(F) summarizes prosecutors' disclosure obligations as follows: "[T]his policy encourages prosecutors to err on the side of disclosure in close questions of materiality and identifies standards that favor greater disclosure in advance of trial through the production of exculpatory information that is inconsistent with any element of any charged crime and impeachment information that casts a substantial doubt upon either the accuracy of any evidence the government intends to rely on to prove an element of any charged crime or that might have a significant bearing on the admissibility of prosecution evidence."

### (ii)  USAO Policies

The USAO Discovery Policy became effective in October 2010. Section I(C) notes that, "The Department of Justice has adopted a policy that requires us to go beyond even the strict requirements of *Brady* and *Giglio* and other relevant case law." Section I(C) then summarizes the requirements of USAM Section 9-5.001. The USAO Discovery Policy notes that a prosecutor's disclosure obligations are also governed by West Virginia RPC 3.8(d), discussed below.  The USAO Discovery Policy specifically addresses the disclosure of MOIs: "Generally, we disclose reports of interview to defense counsel, in the exercise of an expansive discovery practice."

### (iii)  The January 2010 Ogden Memorandum

On January 4, 2010, then-Deputy Attorney General David W. Ogden issued a detailed memorandum (the Ogden Memorandum) to all Department prosecutors that set forth rules regarding criminal discovery. The memorandum directs prosecutors to familiarize themselves with the government's disclosure obligations, including the duties set forth in *Brady* and *Giglio* and the Department's policies as set forth in USAM § 9-5.001. The memorandum encourages prosecutors "to provide discovery broader and more comprehensive than the discovery obligations" imposed by *Brady* and *Giglio* and the Federal Rules of Criminal Procedure.

The Ogden Memorandum specifically addresses the disclosure of information obtained during trial preparation meetings with witnesses. The memorandum notes that although such meetings "generally need not be memorialized . . . prosecutors should be particularly attuned to new or inconsistent information disclosed by the witness during a pretrial witness preparation session."[248]

---

[248]  Ogden Memorandum, Step 1, Gathering and Reviewing Discoverable Information, Section B(8)(b).

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

The Ogden Memorandum requires prosecutors to "ensure that [information the government obtains] is reviewed to identify discoverable information," and to "develop a process for review of pertinent information to ensure that discoverable information is identified."[249]

The Ogden Memorandum specifically addresses the practice of making required disclosures by letter: "If discoverable information is not provided in its original form and is instead provided in a letter to defense counsel, including particular language, where pertinent, *prosecutors should take great care* to ensure that the full scope of pertinent information is provided to the defendant."[250]

### c.    West Virginia Rule of Professional Conduct 3.8(d)

West Virginia RPC 3.8(d) requires that a prosecutor in a criminal case shall "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense . . . ." Most states have a rule of professional conduct similar or identical to West Virginia RPC 3.8(d). There is a split among the courts and disciplinary authorities of those states as to whether the scope of a prosecutor's duties under 3.8(d) is broader than, or co-extensive with, the requirements of *Brady* and its progeny.

Courts and authorities that interpret the scope of 3.8(d) as broader than the requirements of *Brady* include:  *McMullan v. Booker*, 761 F.3d 662, 675 (6th Cir. 2014); *Brooks v. Tennessee*, 626 F.3d 878, 892–93 (6th Cir. 2010); *United States v. Wells*, No. 3:13-CR-00008-RRB, 2013 WL 4851009, at *4 (D. Alaska Sept. 11, 2013); *United States v. Acosta*, 357 F. Supp. 2d 1228, 1232-36 (D. Nev. 2005); *In re Kline*, 113 A.3d 202, 212-16 (D.C. 2015); *In re Feland*, 820 N.W.2d 672, 678 (N.D. 2012); *Schultz v. Commission for Lawyer Discipline*, No. 55649, 2015 WL 9855916 (Texas Bd. Discipl. App. December 17, 2015); State Bar of Arizona Ethics Comm. Op. 94-07 (1994); Association of the Bar of the City of New York Prof'l Ethics Committee, Formal Opinion 2016-3, "Prosecutors' Ethical Obligations to Disclose Information Favorable to the Defense" (July 22, 2016).

Courts and authorities that interpret the scope of 3.8(d) as co-extensive with the requirements of *Brady* include:  *United States v. Weiss*, Criminal Case No. 05-CR-179-B, 2006 WL 1752373, at *5-7 (D. Colo. June 21, 2006); *In re Attorney C*, 47 P.3d 1167, 1170-71 (Colo. 2002);  *In re: Ronald Seastrunk*, No. 2017-B-0178, 2017 WL 4681906 (La. October 18, 2017); *Disciplinary Counsel v. Kellogg-Martin*, 923 N.E.2d 125, 135-39 (Ohio 2010);  *State ex rel. Oklahoma Bar Ass'n v. Ward*,  353 P.3d 509, 520-22 (Okla. 2015);  *In re Riek*, 834 N.W.2d 384, 388-93 (Wis. 2013).

As far as OPR is aware, neither West Virginia courts nor disciplinary authorities have yet addressed the issue of the scope of RPC 3.8(d). OPR therefore does not know whether that rule imposes a greater disclosure obligation on the *Blankenship* prosecutors than that required by *Brady* and its progeny.

---

[249]    Ogden Memorandum, Step 2, Conducting the Review.

[250]    Ogden Memorandum, Step 3, Making the Disclosures, Section C (emphasis added).

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

RPC 3.8(d) does not by its express terms address the issue of whether a prosecutor violates its requirements if he acts recklessly, or whether the rule is violated only by intentional acts. OPR is aware of only one authority that appears to have addressed this issue with regard to West Virginia RPC 3.8(d), albeit in *dicta*. In *Lawyer Disciplinary Board v. Hatcher*, 483 S.E.2d 810, 817-18 (W.Va. 1997) (emphasis added), the court noted in passing that a prosecutor "who *knowingly* fails to make a timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, also runs the risk of violating the West Virginia Rules of Professional Conduct, particularly Rule 3.8, concerning the special responsibilities of a prosecutor." *Hatcher* appears to interpret Rule 3.8(d) to mean that prosecutors are subject to discipline under RPC 3.8(d) only if they intentionally fail to disclose evidence that tends to negate the guilt of the accused.

### d.     No Duty to Disclose Entire MOIs

In the *Blankenship* case, the government voluntarily disclosed hundreds of MOIs and did not disclose 61 MOIs. There is no legal requirement that the government disclose to the defense entire MOIs. In fact, Fed. R. Crim. P. 16(a)(2) explicitly exempts reports of law enforcement agents from mandated government pretrial disclosures:

> Information Not Subject to Disclosure. Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.

*See United States v. Fort*, 472 F.3d 1106, 1107 (9th Cir. 2007) ("We hold that the documents in dispute [reports prepared by local law enforcement agents] are not discoverable because they are covered by Federal Rule of Criminal Procedure 16(a)(2) whether prepared by federal, state, or local officials."); *United States v. Holihan*, 236 F. Supp. 2d 255, 263-64 (W.D.N.Y. 2002) ("The FBI 302 reports are internal investigative documents 'made by the attorney for the government or any other government agent investigating or prosecuting the case' and, as such, are excepted from Rule 16 discovery. Fed. R. Crim. P. 16(a)(2). Such information may also qualify as Jencks Act material pursuant to 18 U.S.C. § 3500, and for which the court is without authority to order pretrial disclosure.").

Of course, notwithstanding Rule 16(a)(2), the government must make a timely disclosure of all potential *Brady* and *Giglio* material in an MOI. As the Ogden Memorandum makes clear, that disclosure can be made by means other than the disclosure of the entire MOI, such as by letter.

### 3.     Duty of Candor

#### a.     Prosecutors Have a General Duty of Candor to the Court

A Department attorney has a general duty of candor to the court that emanates from case law and judicial expectations:

Case 5:18-cv-00591   Document 705-1   Filed 09/05/18   Page 73 of 97 PageID #: 1117
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

> All attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice. An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly. This concept is as old as common law jurisprudence itself.

*Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1546 (11th Cir. 1993). *See also Berger v. United States*, 295 U.S. 78, 88 (1935) (stating that "The United States Attorney is the representative . . . of a sovereignty . . . whose interest [] in a criminal prosecution is not that it shall win a case, but that justice shall be done."); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-58 (4th Cir. 1993) (noting that lawyers have the "first line task" of ensuring the integrity of the adversary system).

Lack of candor encompasses not just overt false statements but also the selective omission of relevant information. *Ndreko v. Ridge*, 351 F. Supp. 2d 904, 910 (D. Minn. 2004). As one court stated: "Selective omission of . . . relevant . . . information exceeds the bounds of zealous advocacy and is wholly inappropriate." *Montgomery v. City of Chicago*, 763 F. Supp. 301, 307 (N.D. Ill. 1991). Stressing the relationship between candor and the administration of justice, one federal court highlighted the increased obligation of attorneys appearing in federal court:

> Attorneys appearing before a federal court are its officers. As such, they owe a primary duty to the administration of justice. They owe the court and the public duties of good faith and complete candor in dealing with the judiciary. In addition, as officers of the court, they have a duty to protect and preserve the right to a fair trial. To fulfill such requirements, attorneys must ensure that they bring all conditions and circumstances that are relevant in a given case directly before the court.

*In re Dinova*, 212 B.R. 437, 447 (1997).

### b.   West Virginia RPC 3.3(a)(1)

West Virginia RPC 3.3, Candor Toward the Tribunal, reads in part, "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." RPC 3.3(a)(1). As defined in the RPC, "'knowingly' . . . denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." RPC 1.0(f).

By its express terms, RPC 3.3(a)(1) arguably prohibits only false statements, and does not address statements that are factually correct yet misleading. Also, by inclusion of the word "knowingly," RPC 3.3(a)(1) arguably prohibits only intentional false statements, and not false statements made recklessly. As far as OPR is aware, neither West Virginia courts nor disciplinary authorities have yet addressed the issue of the scope of RPC 3.3(a)(1), and whether it prohibits reckless or misleading statements. Other jurisdictions and authorities have interpreted the scope of 3.3(a)(1) to include reckless and misleading statements. *See, e.g., In the Matter of Egbune*, 971 P.2d 1065, 1065 (Colo. 1999) (when considering Rule 3.3(a)(1), recklessness is equivalent to "knowing" for disciplinary purposes); *Office of Disciplinary Counsel v. Wrona*, 908 A.2d 1281, 1289 (Pa. 2006) (an attorney violated Rule 3.3(a)(1) because the attorney made accusations against

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

the presiding judge "with reckless disregard of the truth or falsity of the accusations."); Annotated Model Rules of Professional Conduct (8th Edition), Rule 3.3, Statements Or Omissions That Mislead ("courts routinely employ Rule 3.3(a)(1) and equivalent rules to discipline lawyers who have misled through their silence . . . Any differences between 'false' and 'misleading' statements are irrelevant for Rule 3.3(a)(1) purposes)" (citations and quotations omitted).

### c.    West Virginia RPC 4.1

West Virginia RPC 4.1, Truthfulness In Statements To Others, reads in part, "In the course of representing a client a lawyer shall not knowingly:  (a) make a false statement of material fact or law to a third person; or (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client."  Comment 1 to RPC 4.1 reads in part, "A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts . . . Misrepresentations can [] occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements."  OPR notes that the comment to RPC 4.1 expressly discusses misrepresentations, whereas the comments to RPC 3.3 do not, though both rules prohibit false statements.

## VII.    FINDINGS AND ANALYSIS

In the following section, OPR sets forth its findings and analysis regarding the allegations that:  (1) the government engaged in misconduct in the manner alleged by Zuckerman in its correspondence with the Department; (2) the prosecution violated its discovery obligations by failing to disclose discoverable statements contained in 61 undisclosed MOIs; (3) the prosecution failed to include all discoverable information made in a proffer session and contained in three MOIs that it summarized in two disclosure letters; and (4) the prosecution made misrepresentations and false statements to the court and Zuckerman regarding its disclosure of MOIs.

### A.    Zuckerman's Initial Allegations Lack Merit

In Zuckerman's initial letter to the Department alleging prosecutorial misconduct, Zuckerman complained that the government had engaged in a pattern of misconduct.  OPR finds that those claims lack merit.

Perhaps most important, OPR found that the prosecution team's conduct was inconsistent with Zuckerman's portrayal of it as intentionally suppressing a wide variety of evidence and information in order to prevent the defense from having access to such material.  Perhaps the best example of that inconsistency is Ruby's direction to MSHA soon after the indictment was filed to conduct a thorough search for exculpatory documents.   In response to Ruby's direction, Department of Labor attorneys and other personnel spent a significant amount of time searching MSHA e-mails and documents for discoverable evidence.  While it is true that few e-mails were disclosed as a result of that time-consuming search, if Ruby had acted consistently with Zuckerman's portrayal of him, he would not have asked MSHA to conduct that search.[251]  Ruby

---

[251]      As noted, Ruby initiated a search of MSHA e-mails for exculpatory material, and Goodwin provided DOL attorneys conducting the search with examples of potentially exculpatory topics.  Ruby directed ▮USA #2▮ to review the

Case 5:18-cv-00591 Document 70-3  Filed 09/06/18  Page 75 of 97 PageID #: 1119
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

was responsible for two additional searches of documents for exculpatory evidence in June and September 2015, and directed the government's initial discovery production, which disclosed to the defense four million pages of documents in an electronically searchable format.

### 1. The Government Did Not Misrepresent the Facts Concerning Blankenship's Attendance at Budget Meetings

OPR finds Zuckerman's contention that the government presented false information to the court and jury by arguing that Blankenship attended Massey budget and planning meetings to be without merit. Neither the indictment nor the evidence the government presented at trial asserted that Blankenship attended every budget meeting. Indeed, as Zuckerman alleged, and as the evidence Ruby provided to OPR showed, Blankenship did not attend every budget meeting. But that fact is irrelevant. As alleged in the indictment and argued at trial, the government contended that Blankenship made budget and planning *decisions* that placed profit over safety. It is irrelevant where those decisions were made – in a budget meeting or elsewhere. What is important is who made them, and the government presented evidence that Blankenship made such decisions. OPR finds Zuckerman's allegation to be without merit.

### 2. The Government Did Not Withhold MSHA Inspector E-Mails

Zuckerman alleged that the government disclosed only two e-mails between MSHA inspectors regarding UBB conditions, and inferred that the government must have been intentionally withholding other exculpatory e-mails. Ruby provided OPR with numerous e-mails to and from MSHA inspectors who had inspected the UBB mine, which showed that Zuckerman's inference was incorrect. Moreover, even if it were the case that the government disclosed fewer MSHA inspector e-mails than one would expect, when Zuckerman raised this issue with the court, Department of Labor attorneys cited an MSHA policy that discouraged MSHA inspectors from documenting inspection findings in documents other than the official forms used for such purposes. The court rejected the defense's argument that the government had failed to disclose all exculpatory MSHA inspector e-mails. OPR finds Zuckerman's allegation to be without merit.

### 3. The Government Appropriately Relied on UBB Miners to Testify About UBB Conditions

Zuckerman alleged that the government did not use MSHA inspectors as trial witnesses because it was trying to hide exculpatory or damaging testimony. Other than noting that MSHA inspectors did not testify, Zuckerman offered no evidence to support its claim. Ruby plausibly explained that the government did not call MSHA inspectors at trial because the trial team was concerned that a West Virginia jury might unfavorably view the testimony of federal government

---

MSHA e-mails identified by DOL attorneys as potentially exculpatory and to select those that might be discoverable. OPR finds that these facts support a conclusion that Ruby and Goodwin did not intentionally withhold exculpatory material. However, prior to trial the government disclosed very few of the e-mails the DOL attorneys had identified, and the USAO disclosed 48 additional MSHA e-mails in 2017. Given these facts it is possible that notwithstanding Ruby's and Goodwin's laudatory intent when initiating the search of MSHA e-mails, they failed to conduct a sufficient review of the e-mails identified by the search. For the reasons stated above, OPR did not attempt to resolve that issue. As the defense has raised the issue of the late disclosure of the 48 MSHA e-mails in its Section 2255 motion, the government and the court will have an opportunity to address that issue.

Case 5:18-cv-00591   Document 703-1   Filed 09/09/18   Page 76 of 97 PageID #: 1120
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

employees, and because the government could use coal miners to elicit the same facts about UBB conditions. Several trial team members agreed with Ruby's explanation. OPR found Zuckerman's allegation to be without merit.

### 4.     The Court Found No Merit to the Claim that an MSHA Employee Destroyed MSHA Documents Shortly After the UBB Explosion

Zuckerman alleged that the government failed to investigate an allegation that shortly after the UBB explosion an MSHA employee destroyed documents related to UBB. Zuckerman raised this issue with the court, which questioned one of the two persons who had made the allegation. The court rejected the allegation, finding it rife with hearsay. Zuckerman presented no additional information to OPR. Ruby told OPR that the government had not learned of the allegation until Zuckerman raised it mid-trial. As the court examined and rejected this claim, and because Zuckerman presented OPR with no new evidence, OPR finds the claim to be without merit.[252]

### 5.     The Government Did Not Withhold Exculpatory Statements Made by ▮Witness #4▮

Zuckerman alleged that during cross-examination, ▮Witness #4▮ made exculpatory statements; that ▮Witness #4▮ testified that ▮▮ made those statements to the government prior to trial; and that the government did not disclose those statements during discovery. Zuckerman told OPR that other than ▮Witness #4▮ testimony, it had no other evidence to support its contention that the government intentionally withheld exculpatory statements allegedly made by ▮Witness #4▮ None of the five undisclosed ▮Witness #4▮ MOIs, nor the handwritten notes of the agents who wrote those MOIs, contained the exculpatory statements that ▮Witness #4▮ made during cross-examination. Ruby told OPR that the government was surprised by ▮Witness #4▮ testimony on cross-examination. OPR found no evidence to support Zuckerman's allegation that the government knew about and intentionally withheld the exculpatory statements ▮Witness #4▮ made during cross-examination.

### 6.     The Government Did Not Intentionally Withhold Two Discoverable Documents

Zuckerman alleged that the government withheld two exculpatory documents:  a letter in which an MSHA official "applaud[ed]" a Massey initiative to reduce safety violations, and a chart

---

[252]     As discussed above, in November 2017, the USAO disclosed 48 MSHA e-mails to the defense.  In one of those e-mails, dated December 4, 2011, an MSHA employee wrote to another MSHA employee the following: "How many miners worked their entire career at UBB?  We had a shredding party here in Beckley and the charts you printed for everyone were modified so that they can't be read."  Blankenship's attorneys discuss this e-mail in their Section 2255 motion, and assert that it supports their contention that MSHA intentionally destroyed documents.  The content of the December 4, 2011 e-mail is unrelated to Zuckerman's contention during trial that an MSHA employee destroyed MSHA documents shortly after the UBB explosion.  The MSHA employees named in the two alleged incidents are different, and the document destruction referenced in Zuckerman's original allegation allegedly occurred more than a year prior to the December 2011 e-mail.  The December 4, 2011 e-mail therefore does not provide any new support for the allegation that an MSHA employee destroyed documents shortly after the UBB explosion.  OPR did not reopen its investigation to determine whether the government was required to disclose the December 4, 2011 e-mail before trial because OPR's investigation was substantially complete at the time it first learned of the e-mail and because Blankenship's Section 2255 motion raised the issue of the late disclosure of that e-mail, and the motion is pending before the court.

CONFIDENTIAL— DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

showing, *inter alia*, the results of a UBB inspection by an MSHA inspector who was complimentary of UBB conditions.

OPR found no evidence that the prosecution team possessed the "applaud" letter prior to the time when Zuckerman attached it to one of its discovery motions in September 2015. The "applaud" letter was sent by an MSHA official to ██Witness #10██ When ██Witness #10██ attorneys met with Ruby and ██AUSA #2██ in August 2014, they discussed the contents of the letter, but ██AUSA #2██ notes of the meeting and contemporaneous e-mails make clear that for unknown reasons, ██Witness #10██ attorneys did not give the government a copy of the letter. Ruby subsequently disclosed by letter some of what ██Witness #10██ attorneys told Ruby and ██AUSA #2██ though as noted below, OPR found that Ruby's summary failed to disclose all of the discoverable statements contained in ██AUSA #2██ notes taken during the meeting. Although Zuckerman's allegation that the government intentionally did not disclose the "applaud" letter was incorrect, OPR found that Ruby should have made further disclosures about what ██Witness #10██ attorneys told him in August 2014.

The prosecution team did not possess the chart containing the exculpatory entry made by an MSHA inspector. Ruby explained that because the chart contained information about mines other than UBB, it was not included within the scope of documents the team had requested. Ruby correctly noted, however, that the team had disclosed the handwritten notes taken by the MSHA inspector, and that those notes contained many of the exculpatory statements found in the chart entry. OPR finds that although the government did not intentionally withhold the chart with the notation about the UBB inspection, it would have been better if the government had obtained and disclosed all relevant documents, regardless of whether they related solely to UBB. In any event, the disclosure of the handwritten notes greatly reduced or eliminated any prejudice resulting from the failure to disclose the chart.

## B. The Failure to Disclose Discoverable Statements Contained in MOIs

### 1. The Failure to Disclose 11 Pre-Indictment MOIs Was Not Intended to Suppress Exculpatory Statements

The government disclosed to the defense 372 pre-indictment MOIs, but failed to disclose 11 pre-indictment MOIs. OPR finds that Ruby alone was responsible for the failure to disclose the 11 MOIs. However, Ruby's failure to disclose them was not intended to withhold exculpatory material from the defense.

#### a. Ruby Alone Was Responsible For the Failure to Disclose 11 Pre-Indictment MOIs

Ruby and the prosecution team's legal assistants were responsible for the technical aspects of the government's discovery disclosures, whether by letter, e-mail, overnight delivery, or other means of providing information. OPR found no evidence that Goodwin, ██AUSA #1████AUSA #2████DOL SA #1██ or ██FBI SA #1██ transmitted to the defense any discovery disclosures. Ruby, or a legal assistant acting at Ruby's direction, sent the defense all of the MOIs disclosed by the government. Therefore, no one on the prosecution team, other than Ruby and the legal assistants, had actual knowledge of what MOIs were disclosed or not disclosed, and any knowledge they had regarding that issue came from Ruby, the legal assistants, or through a review of the government's discovery productions.

- 72 -

Case 5:18-cv-00591   Document 70-34   Filed 09/05/18   Page 78 of 97 PageID #: 1122
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Ruby told OPR that he and Goodwin decided to disclose all pre-indictment MOIs. Although he could have assigned the task to others, Ruby decided to make all of the government's discovery disclosures himself, aided by the legal assistants, who faithfully followed Ruby's directions. All of the 11 undisclosed pre-indictment MOIs were sent to Ruby or a legal assistant after they were drafted. None were sent to any other attorney on the prosecution team. Therefore, no attorney other than Ruby knew that the law enforcement agents on the prosecution team had sent the USAO 11 MOIs for pre-indictment interviews several months after the November 2014 indictment, and after the government's December 2014 initial discovery disclosures to the defense. OPR found that AUSA #1 AUSA #2 DOL SA # and FBI SA #1 were credible witnesses, and found no evidence to contradict their assertions that they believed all MOIs had been disclosed.

Based on the foregoing facts, OPR finds that Ruby is solely responsible for the failure to disclose the discoverable statements contained in the 11 pre-indictment MOIs identified in the chart attached at Tab H to this report.

> **b.    Ruby's Failure to Disclose Discoverable Statements In 11 Pre-Indictment MOIs Was Not Intended to Withhold Exculpatory Material from the Defense**

Ruby asserted that his failure to disclose 11 pre-indictment MOIs was not intended to withhold exculpatory statements from the defense. Although there is some evidence that contradicts Ruby's assertion,[253] OPR finds that preponderant evidence supports Ruby's contention that his failure to disclose discoverable statements contained in the 11 pre-indictment MOIs was a result of Ruby's mistaken belief that those 11 MOIs were post-, not pre-, indictment MOIs.

There are several sources of evidence that support Ruby's contention that his failure to disclose the 11 pre-indictment MOIs was unintentional. First, there appears to be no logical reason why Ruby would have disclosed 372 pre-indictment MOIs, but not the 11 MOIs identified in the chart attached at Tab H. If the 11 undisclosed MOIs contained discoverable statements that were obviously more exculpatory than the discoverable statements contained in the hundreds of disclosed MOIs, one might then draw a reasonable inference that Ruby intentionally treated those 11 MOIs differently. But OPR found no difference in the exculpatory value of the discoverable statements contained in the disclosed and undisclosed pre-indictment MOIs. *Compare* Section III(D)(4) above (discoverable statements in 11 undisclosed pre-indictment MOIs) with Section III(I)(2) above (discoverable statements in ten disclosed pre-indictment MOIs that Ruby identified for the defense as containing potentially exculpatory statements). It is counterintuitive to suggest that Ruby intentionally disclosed hundreds of MOIs, and also intentionally withheld 11 MOIs, even though the exculpatory value of the discoverable statements contained in those 11 MOIs was no different than the exculpatory value of the discoverable statements contained in the MOIs that were disclosed.[254]

---

[253]    For example, the fact that Ruby received e-mails that clearly showed the dates of the pre-indictment MOIs, makes it more difficult to accept his explanation that he believed all MOIs he received after the indictment reflected post-indictment interviews.

[254]    Indeed, in a pleading filed in July 2015, the defense acknowledged that "many" of the 350 MOIs disclosed by the government contained "exculpatory information." Motion to Compel Compliance with *Brady* Order at 4.

Case 5:18-cv-00591   Document 70-34   Filed 09/05/18   Page 79 of 97 PageID #: 1123

CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Second, the only difference that OPR observed between the disclosed and undisclosed pre-indictment MOIs was that the 11 pre-indictment MOIs that were not disclosed were not provided to the USAO until after the November 2014 indictment, and in some cases many months after the indictment. That fact supports Ruby's contention that he thought that all MOIs the USAO received after November 2014 contained statements made during post-indictment interviews, which he and Goodwin had decided not to disclose.

Third, Ruby's responses to OPR's questions suggest that he believed that all pre-indictment MOIs had been disclosed. During its investigation, OPR told Ruby that it might show Zuckerman all of the material that Ruby provided to OPR, in order to obtain Zuckerman's response to Ruby's contentions. Thereafter, Ruby provided OPR with two of the 11 undisclosed pre-indictment MOIs (pertaining to Witness #4 and Witness #6 , see chart attached at Tab H). If Ruby had intentionally withheld the Witness #4 and Witness #6 MOIs, it would make no sense for him to then provide them to OPR, knowing that OPR intended to show them to Zuckerman, which would immediately claim a discovery violation (which is exactly what happened with the Witness #4 MOI).

Fourth, many of the discoverable statements contained in the 11 undisclosed pre-indictment MOIs were available to the defense from other sources, including the hundreds of disclosed MOIs. It makes little sense to intentionally withhold statements that the defense already possessed.

OPR finds that preponderant evidence supports a finding that Ruby's failure to disclose 11 pre-indictment MOIs was not the result of an intentional decision to withhold exculpatory evidence.

**2.    The Decision Not to Disclose 50 Post-Indictment MOIs Was Not Intended to Suppress Exculpatory Statements**

The government did not disclose 50 post-indictment MOIs. OPR finds that the failure to disclose those 50 MOIs was intentional, and that Ruby and Goodwin were responsible for that decision. Although the decision to not disclose 50 post-indictment MOIs was intentional, OPR finds that neither Ruby nor Goodwin made that decision with the intent to withhold exculpatory evidence from the defense.

**a.    Ruby and Goodwin Made the Decision Not to Disclose Post-Indictment MOIs**

According to Ruby, he and Goodwin decided not to disclose to the defense post-indictment MOIs; they decided instead that they would make any required disclosures of potentially exculpatory statements contained in those MOIs by letter. Ruby also stated that all of the prosecution team members knew and approved of that decision. AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 however, all denied that they knew about and approved of the decision to disclose discoverable statements in post-indictment MOIs by letter, and to withhold the remainder of the MOIs. To the contrary, all told OPR that they thought all MOIs, including those memorializing post-indictment interviews, were disclosed to the defense.

CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

OPR found no documentary evidence, including contemporaneous e-mails, to support Ruby's contention that others knew about his and Goodwin's plan for how they would handle their disclosure obligations pertaining to the potentially exculpatory statements contained in post-indictment MOIs. OPR found ███████ and ███████ to be credible witnesses. OPR told ███████ and ███████ that they were not subjects of OPR's investigation. They therefore did not face disciplinary consequences as a result of their conduct, and had no incentive to mislead OPR regarding their knowledge of the disclosure of MOIs. Because ███████ ███████ and ███████ were credible, had no reason to provide OPR with inaccurate information, and because OPR found no documentary evidence inconsistent with their assertions, OPR finds that the preponderant evidence supports their contention that they believed that all MOIs, whether pre- or post-indictment, were disclosed to the defense.

The issue of whether Goodwin, as Ruby insists, knew and approved of the decision not to disclose post-indictment MOIs is more complicated. In a short written statement that did not address the majority of OPR's written questions to him, Goodwin told OPR that he instructed Ruby to make full disclosures, and that it would be frustrating to learn that some MOIs were not disclosed. When OPR asked Goodwin for an interview, OPR informed him that because he both supervised and participated in the *Blankenship* prosecution, OPR considered him to be a subject of OPR's investigation. Goodwin declined OPR's request for an interview. After OPR interviewed Ruby, OPR again asked Goodwin for an interview, and informed him that it had received information inconsistent with Goodwin's professed frustration at learning that some MOIs had not been disclosed, and that OPR had concerns that the government had filed three pleadings that might have contained misleading information about the disclosure of MOIs. Goodwin did not respond to OPR's second interview request. In Goodwin's response to OPR's draft report, which sets forth in detail Ruby's claim that it was Goodwin who made the decision not to disclose post-indictment MOIs, Goodwin did not clearly agree with or refute that claim. Goodwin merely stated that, "I apparently do not recall matters in the exact way [Ruby] does."[255]

OPR found Ruby to be credible. He acknowledged that he made mistakes regarding the process he followed in determining which post-indictment MOIs to disclose, and the process he followed to decide what information to put in his summary disclosure letters. Ruby provided OPR with specific details regarding Goodwin's role in making the decision not to disclose post-indictment MOIs, and regarding Goodwin's review and approval of the September 21, 2015 letter disclosure. Ruby's specific recollection is largely unrebutted because of Goodwin's decision not to answer most of OPR's written questions, and refusal to be interviewed. Although Goodwin stated that he was "frustrated" if MOIs were not disclosed, that general denial is not sufficient to overcome the evidentiary weight of Ruby's specific recollection.

OPR acknowledges that it is treating Goodwin differently than it is treating ███████ ███████ and ███████ All five deny that they knew that MOIs were not disclosed, and there is no documentary evidence to contradict those denials. All five would therefore seem to be similarly situated and deserving of the same treatment by OPR. There are, however, significant differences among the five that led OPR to conclude that Goodwin – unlike ███████ ███████ ███████ and

---

[255]   April 19, 2018 Goodwin letter to OPR at 3.

Case 5:18-cv-00591 Document 70-24 Filed 09/05/18 Page 81 of 97 PageID #: 1125
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

██████ – knew about the decision to withhold post-indictment MOIs and to make any required discovery disclosures by letter.

First, Goodwin was the United States Attorney, and he had supervisory authority over Ruby. It is difficult to believe that Ruby, a relatively inexperienced prosecutor, would make a decision to stop disclosing MOIs in such a high-profile case without consulting with Goodwin.[256] In contrast, the evidence shows that Ruby made most discovery decisions without consulting ████████████████ or ████████

Second, the facts show that the *Blankenship* case was of the utmost importance to Goodwin, who was deeply involved in the government's investigative and pretrial work, attended every day of trial, examined several of the government's witnesses at trial, and delivered the government's closing argument. OPR found Ruby's assertion credible that because of the importance of the *Blankenship* prosecution, Goodwin was involved in every major prosecution decision, including the decision not to disclose certain MOIs.[257] Ruby also plausibly explained that Goodwin became irritated at Zuckerman's aggressive defense strategy, and responded to it by reducing the government's discovery disclosures to the required minimum; as stated previously, this explanation was emphatically denied by Goodwin himself.

Third, because ████████ ██████ ██████ and ██████ agreed to OPR's request to be interviewed, OPR was able to ask them specific questions about Ruby's contention that the prosecution team was aware and approved of the decision not to disclose post-indictment MOIs and to make required disclosures by letter. Goodwin's refusal to be interviewed prevented OPR from asking him similar questions.

Fourth, in both civil and administrative disciplinary proceedings, courts and disciplinary authorities may draw an adverse inference when a witness refuses to testify after probative evidence has been offered against them. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Book v. U.S. Postal Service*, 675 F.2d 158, 160 fn.4 (8th Cir. 1982) (in affirming a Merit Systems Protection Board order of dismissal from the federal service, the court stated, "Although the silence of Book may be considered and thereby produce an adverse inference, the disciplinary action, whatever it may be, may not be based exclusively on the employee's failure to testify but it must be demonstrated by independent evidence that it is warranted."). Here, OPR told Goodwin that OPR had evidence that was inconsistent with his initial statement that he was frustrated if MOIs were not disclosed. The evidence to which OPR referred was Ruby's testimony that Goodwin knew and approved of the decision not to disclose post-indictment MOIs, and Goodwin's approval of the letters sent to the defense that summarized several MOIs. Goodwin chose to remain silent despite being informed that OPR had obtained evidence inconsistent with his initial assertions.

---

[256] Ruby said that if Goodwin had not decided to stop disclosing post-indictment MOIs, he probably would have continued the practice of disclosing all MOIs. Ruby Interview at 192.

[257] Indeed, Goodwin participated in many of the witness interviews for which MOIs were not disclosed. Goodwin attended four of ██████ interviews; two of ██████ interviews; and the interviews of ████████ ██████ ██████ and ██████ among others.

CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

After OPR provided Goodwin with OPR's draft report, which contained a detailed account of Ruby's claim that it was Goodwin who decided not to disclose post-indictment MOIs, Goodwin did not provide OPR with specific information about that decision, noting only that he and Ruby did not recall matters in exactly the same way.

OPR may therefore, under the case law cited above, draw an adverse inference from Goodwin's silence.   Accordingly, given Goodwin's refusal to provide any information, explanation, or contrary evidence even after being informed there was probative evidence against him, OPR can rely on the uncontroverted evidence before it and infer that Goodwin was aware and approved of the decision not to disclose post-indictment MOIs, and also of the letters summarizing discoverable statements contained in several MOIs.

In sum, under the circumstances discussed above, it is appropriate for OPR to treat Goodwin differently from the other trial team members.

Although OPR finds that Ruby and Goodwin intentionally did not disclose 50 post-indictment MOIs, OPR does not find that Ruby's and Goodwin's decision was made with the intent to withhold exculpatory evidence from the defense.  The primary bases for this conclusion are the facts that:  (a) Ruby made a letter disclosure of some of the discoverable statements contained in the [Witness #1] and [Witness #2] post-indictment MOIs; (b) Ruby disclosed the entire [Witness #2] post-indictment MOI; (c) Ruby made no effort to conceal the existence of the post-indictment MOIs (the [Witness #2] MOI had Bates-stamp numbers of 1534-1540, and the next highest Bates-stamped MOI that was disclosed was numbered 1356-1361); (d) it would make little sense to intentionally withhold information contained in MOIs when, as the trial team credibly asserted, that information was available to the defense from other sources; (e) it would make little sense to withhold information contained in MOIs when the government knew that the defense was talking with at least some of the witnesses whose MOIs were not disclosed;[258] and (f) the defense acknowledged that the government disclosed exculpatory material in both disclosed MOIs and documents; there is no logical reason why Ruby and Goodwin would authorize the disclosure of some exculpatory material, but intentionally withhold other exculpatory material of the same nature as that previously disclosed.

### b.  The Government Had No Duty to Disclose Entire MOIs

The fact that Ruby and Goodwin intentionally did not disclose 50 MOIs does not by itself demonstrate that any specific discovery obligation was thereby violated. Fed. R. Crim. P. 16(a)(2) explicitly exempts law enforcement agents' reports from Rule 16's mandatory disclosure requirements.  Although the USAO discovery policy for the Southern District of West Virginia provides that the usual practice in that office is to disclose MOIs, that practice is not mandatory. The analysis of a claim that the government violated its discovery obligations because it failed to disclose entire MOIs would therefore be straightforward, except for the fact that the government did in fact disclose in their entirety 372 MOIs.  Given those prior disclosures, absent some reason to believe otherwise, it would be reasonable for the defense to conclude that the government was

---

[258]     Many of the undisclosed MOIs memorialized interviews with high-ranking Massey employees.  It is likely that Blankenship and his attorneys had ready access to those witnesses.

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

disclosing all MOIs in their entirety. OPR's analysis of the issue of whether Ruby and Goodwin misled Zuckerman and the court is discussed in Section VII(D) below.

### 3. Some of the Undisclosed MOIs Contained Discoverable Statements

Although the government did not have a duty to disclose MOIs in their entirety, the Constitution, Department policy, and the West Virginia RPC impose a duty on the government to disclose certain types of material. Specifically, the government is required to disclose evidence or information (as distinct from admissible evidence) that: is favorable to the accused and that is material either to guilt or punishment; is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense; casts substantial doubt upon the accuracy of any evidence – including but not limited to witness testimony – the prosecutor intends to rely on to prove an element of any crime charged; and that tends to negate the guilt of the accused or mitigates the offense.

#### a. Statements Inconsistent with the Government's Factual Basis for Alleging Criminal Conduct

Some of the undisclosed MOIs contained statements that were inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment (*see* Section I(D)(2)(a)-(g), above). A sample of such statements follows.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that UBB conditions were unsafe and caused the explosion, and at least by implication that MSHA citations were accurate, reliable, unbiased, and evidenced unsafe UBB conditions. There were a variety of statements in undisclosed MOIs that were inconsistent with that factual basis, such as those suggesting that UBB was run safely; MSHA violations were subjective; MSHA was biased against Massey; MSHA violation citations were inevitable and unrelated to safety; and that MSHA decisions made UBB unsafe. Several examples of such statements contained in undisclosed MOIs follow.

Witness #14, stated that when a certain fan was running, UBB had good ventilation. Witness #8, said that it was not possible to have zero MSHA violations. Witness #12, said that MSHA violations were subjective. Witness #1, said that UBB was a well-run mine. Witness #17, said that MSHA wrote violations for Massey mines that it did not write for other mines and that the violations per inspection rate for Massey were not as bad as for other mines. Witness #4 said that MSHA decisions endangered miner health and safety. Witness #13, said that UBB was going to fail because of MSHA ventilation requirements that UBB was required to use. Witness #19 said that UBB was one of the better mines.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that Blankenship cared more about profit than about safety, and that Blankenship disregarded safety violations when communicating with employees. There were statements

Case 5:18-cv-00591   Document 70-34   Filed 09/03/18   Page 84 of 97 PageID #: 1128
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

contained in undisclosed MOIs that were inconsistent with that part of the indictment. Several examples follow.

Witness #8 said that if Blankenship had not been involved, the number of Massey safety initiatives would have been half of what it was. He maintained that Massey put pressure on employees and held them accountable, and that there never discussions indicating that safety violations were acceptable. Witness #8 said that ▮ feared being disciplined over compliance issues.

Witness #6, said that when Blankenship made notations on citation reports, it meant that ▮ was not happy with the violations and that ▮ wanted a corrective action plan. Witness #6 said ▮ started the Hazard Elimination Program to cut violations by 50%. Witness #16, said that Massey's primary focus was safety, that Blankenship pushed safety more than any other CEO, and that people were fired because of safety violations. Witness #17 said that ▮ did not believe that Massey had the attitude that safety violations were acceptable.

Witness #4 said that several UBB managers did all they could to focus on safety. Witness #9 said that Blankenship told Witness #9 that Massey needed to reduce violations and that ▮ talked about a commitment to safety. Witness #3, said that Blankenship told ▮ to reprogram the computer system so that it could determine who was responsible for violations and to identify repeat offenders. Witness #15, said that accidents were discussed in the context of best practices and how to prevent them from recurring.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that Blankenship compromised worker safety by failing to hire a sufficient number of employees to accomplish jobs necessary for adequate safety. There was at least one statement in an undisclosed MOI that was inconsistent with that portion of the indictment. Witness #8 stated that it was worker inexperience, not manpower shortages, that led to safety violations.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that members of the conspiracy falsified respirable dust samples. There were statements in undisclosed MOIs that were inconsistent with that portion of the indictment. For example, Witness #17 said that there was a big push to conduct accurate respirable dust sampling. Witness #4 said that ▮ was surprised that dust fraud was occurring as Massey did not want cheating on dust sampling.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that Blankenship used employee compensation to send the message that profit was more important than safety. There were statements in undisclosed MOIs that were inconsistent with that portion of the indictment. For example, Witness #8 stated that ▮ suspected that compensation was tied to safety.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that Blankenship set coal production quotas so high as to preclude workers from performing necessary safety tasks. There were statements in undisclosed MOIs that were inconsistent with that portion of the indictment. For example, Witness #8 said that Blankenship instructed that production figures should not be too aggressive. Witness #1 said that in 2009, no one

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

wanted to buy coal. That statement is arguably inconsistent with the indictment, for if demand for coal was low, then there would be little pressure to increase coal production if the mined coal could not be sold.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that UBB miners unlawfully received advance notice that MSHA inspectors were on their way to conduct inspections. There were statements in undisclosed MOIs that were inconsistent with that portion of the indictment. For example, [Witness #14] stated that the prohibition against advance notice was not an enforced rule.

### b. Statements Casting Doubt On [Witness #4] Testimony

Many MOIs contained statements critical of [Witness #4], arguably one of the government's most important witnesses. There were so many such statements that after Ruby asked [Paralegal #1] to identify negative statements made about [Witness #4] in MOIs, she prepared a 59- page chart. Some of the statements in [Paralegal #1] chart came from ten undisclosed MOIs. For example, [Witness #14] stated that [Witness #4] ignored [Witness #14] question about whether a particular action was legal, and ordered [Witness #14] to do it.

### c. Ruby Disclosed 11 MOIs as Possible *Brady* Material, But Failed to Disclose 61 Others Containing the Same or Similar Statements

Prior to trial, Ruby told the defense that the government had identified 11 MOIs that the defense might conclude contained potential *Brady* material, including the [Witness #2] MOI and the ten MOIs Ruby identified in June 2015 as part of a larger disclosure letter. OPR agrees with Ruby that the 11 MOIs he identified for the defense contained discoverable statements. *See* Sections III(E)(3) and III(I)(2) above (the [Witness #2] MOI and the ten MOIs, respectively). OPR also found that some of the 61 undisclosed MOIs contained discoverable statements. *See* Sections III(D)(4) and III(E)(6) above (discoverable statements in the 11 pre-indictment MOIs and 50 post-indictment MOIs, respectively). After comparing the discoverable statements contained in the 11 MOIs Ruby identified for the defense and the discoverable statements in some of the 61 undisclosed MOIs, OPR found that there were no significant differences between the discoverable statements in those two sets of MOIs. This finding supports OPR's conclusion that the discoverable statements in the 61 undisclosed MOIs should have been disclosed, and also supports the prosecution team's contention that the defense was not prejudiced by the failure to disclose those statements, because they were available to the defense from other materials in its possession.

OPR provides below examples of similar discoverable statements contained in both the 11 MOIs Ruby identified for the defense as containing potential *Brady* material, and in some of the undisclosed 61 MOIs.

[Witness #2], said that MSHA was harder on Massey than other companies; [Witness #17] similarly had stated that MSHA wrote violations for Massey that it did not write for others. [Witness #2] said MSHA violations are opinions; [Witness #12] similarly had stated that MSHA violations were subjective. [Witness #2] said that rock dusting was always good; [Witness #11] similarly had stated that when [ ] inspected UBB [ ] found

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

the rock dusting to be good. ▇▇▇▇ said that MSHA decisions caused a decrease in airflow ventilation; ▇▇▇ similarly had stated that UBB was going to fail because of MSHA ventilation decisions.

▇▇▇▇ said that ▇▇▇▇ once advised him to operate UBB in such a way as to violate the law; ▇▇▇ said essentially the same thing in an undisclosed MOI. ▇▇▇▇▇▇ ▇▇▇▇▇▇, said that Massey management did not tolerate violations; ▇▇▇▇ similarly had stated that Massey put pressure on people and held them accountable. ▇▇▇▇▇▇ ▇▇▇▇▇▇, said that a certain statistical measure of safety was the only thing that figured into executive compensation; ▇▇▇▇ similarly had stated that ▇▇ suspected that compensation was tied to safety. ▇▇▇▇ said that safety was always discussed at Massey; ▇▇ similarly had stated that accidents were discussed in the context of best practices and how to prevent them from recurring. ▇▇▇▇ said that ▇▇ was sure that MSHA knew that miners received advance notice of inspections; ▇▇▇▇ similarly had stated that the prohibition against advance notice was not an enforced rule.

4.    **The Failure to Disclose Discoverable Statements Violated Department Policy**

As shown above, statements in some of the 61 undisclosed MOIs contained evidence or information that was inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment. These statements were therefore required to be disclosed by USAM Section 9-5.001(C)(1)-(3) and by the USAO discovery policy. The failure to do so violated those policies.

OPR's conclusion is consistent with the actions of the USAO and the opinions of most of the prosecution team. The USAO learned in 2017 that the government had not disclosed 61 MOIs, and shortly thereafter appropriately disclosed all of those MOIs to the defense.[259] In addition, when OPR asked members of the prosecution team whether certain statements contained in the undisclosed MOIs would have been helpful to the defense, there was general agreement that most of the statements identified by OPR would have been helpful.

The Ogden Memorandum requires prosecutors to "develop a process for review of pertinent information to ensure that discoverable information is identified." The "process" that Ruby and Goodwin followed when determining which statements in post-indictment MOIs to disclose was to try to recall from memory what had been said during the interviews they attended. Neither Ruby nor Goodwin actually reviewed post-indictment MOIs before making disclosure decisions. Ruby acknowledged that relying on his memory was not an ideal way to handle his disclosure obligations. OPR finds that not only was that process not ideal, but that it violated the Ogden Memorandum requirements, because relying on one's memory of numerous interviews cannot ensure that all discoverable information is disclosed. The process by which Ruby and

---

[259]    The USAO told the defense that the production was not an admission that the 61 MOIs were required to be disclosed prior to trial or that the defense was prejudiced by the government's failure to disclose them.

Case 5:18-cv-00591   Document 76-21   Filed 09/05/18   Page 87 of 97 PageID #: 1131
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Goodwin made disclosure decisions regarding statements contained in post-indictment MOIs therefore violated Department policy.[260]

### 5.     Ruby and Goodwin Committed Professional Misconduct by Recklessly Violating Their Duty to Disclose Discoverable Evidence

Ruby was responsible for the government's failure to disclose discoverable statements contained in 11 pre-indictment MOIs.   Ruby and Goodwin shared responsibility for the government's failure to disclose discoverable statements contained in 50 post-indictment MOIs. Both therefore violated the Department's discovery policies.  OPR found that neither Ruby nor Goodwin intentionally violated the Department's discovery policies for the purpose of withholding discoverable evidence from the defense.  OPR found that Ruby's and Goodwin's violation of the Department's discovery policies was the result of their reckless conduct, and therefore constituted professional misconduct.[261]

Ruby stated that while he intended to disclose all pre-indictment MOIs, he mistakenly failed to disclose 11 such MOIs.  That mistake was a result of Ruby's reckless conduct.  Ruby received e-mails and attachments that clearly showed that he was receiving for the first time pre-indictment MOIs, albeit after the November 2014 indictment had been returned and the December 2014 initial discovery disclosures had been made.  Moreover, Ruby said that he "probably" reviewed the ▮Witness #▮ MOI before summarizing it.  OPR ultimately credited Ruby's contention that he failed to notice the dates of those 11 MOIs when he received them, and that he did not notice the date of the ▮Witness #▮ MOI.  Those failures, however, were the result of Ruby's reckless disregard of information that would have alerted him to the fact that numerous pre-indictment MOIs had not been disclosed.  Ruby's failure to notice the dates of the 11

---

[260]     In his April 19, 2018 response to OPR's draft report, Goodwin asserted that OPR's conclusion that it was reckless not to have a system for reviewing potentially discoverable material in MOIs was erroneous, because that review happened in "real time" during witness interviews.  OPR finds Goodwin's argument unpersuasive, and disagrees with his assertion that reviews happened in "real time."  The government's post-indictment interviews occurred throughout the winter, spring, and summer of 2015.  Ruby sent one letter in September 2015 disclosing discoverable statements in three MOIs.  Ruby's "review" of post-indictment interviews to decide what to disclose occurred in September 2015, not in "real time."

[261]     In his May 7, 2018 response to OPR's draft report, Ruby asserted that OPR's conclusion that he had recklessly violated the Department's disclosure policies was erroneous.  Ruby argued that none of the statements in the 61 undisclosed MOIs would have been helpful to the defense, and that the defense clearly agreed with that assessment, because although the defense possessed the 61 MOIs in early 2017, it did not file its Section 2255 motion until April 2018.  Ruby's argument is not persuasive.  OPR expressly stated that it did not reach the conclusion that the failure to disclose the 61 MOIs violated *Brady* or *Giglio*, precisely because OPR could not establish that the defense had been prejudiced by the failure to disclose them.  The Department's discovery policies state explicitly that the Department imposes discovery obligations on prosecutors that are broader than those required by *Brady* and *Giglio*. Ruby never claimed that he decided not to disclose the 11 pre-indictment MOIs and the 50 post-indictment MOIs because they did not contain helpful information.  He claimed that he mistakenly failed to disclose the 11 pre-indictment MOIs, and intentionally withheld the 50 post-indictment MOIs.  Therefore, the issue of whether the statements in the 61 MOIs would actually have been helpful to the defense is relevant only to the analysis of whether the defense was prejudiced by the failure to disclose the 61 MOIs, and not to the issue of whether the failure to disclose them violated the Department's broad disclosure policies.

Case 5:18-cv-00591    Document 70332    Filed 09/05/18    Page 88 of 97 PageID #: 1132

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

undisclosed pre-indictment MOIs and the resulting failure to disclose the discoverable statements in those MOIs, caused the government to violate its disclosure obligations.

Ruby was equally reckless in the manner in which he made decisions about what statements to disclose from post-indictment MOIs. Ruby stated that he relied on his memory of what occurred during post-indictment interviews when making decisions about what statements to disclose to the defense. That process led Ruby to disclose the ███Witness #2███ MOI in its entirety, but to provide only limited information about the ██Witness #7██ and ██Witness #15██ MOIs in a letter disclosure. Ruby disclosed no other statements from any of the other post-indictment MOIs.

For several reasons, OPR finds the process Ruby employed was so haphazard and inadequate that it demonstrated a reckless disregard of the government's discovery obligations. First, Ruby did not attend at least two post-indictment interviews, including a May 2015 ██Witness #13██ interview and a September 2015 ██Witness #5██ interview. Ruby could not rely on his memory when attempting to ensure that discoverable statements for interviews he did not attend were appropriately disclosed. Second, given all of Ruby's duties and responsibilities pertaining to such a large and complex case, it was reckless for him to rely on his memory when identifying discoverable statements made in 50 post-indictment interviews. Many of those interviews occurred months before Ruby sent his September 2015 letter disclosing discoverable statements contained in post-indictment MOIs. Ruby acknowledged to OPR that relying on his memory when determining which statements contained in post-indictment MOIs to disclose was an imperfect and not ideal process. OPR finds that Ruby's decision to rely on his memory to identify discoverable statements in 50 post-indictment MOIs was unjustifiable and objectively unreasonable.

Ruby told OPR that Goodwin was aware that Ruby was not reviewing post-indictment MOIs, and instead was using his memory to decide whether they contained discoverable statements that were required to be disclosed. Goodwin apparently approved of, or at least did not object to, that reckless practice. In addition, Goodwin attended numerous post-indictment interviews, including multiple interviews of two of the government's most important witnesses, ██Witness #4██ and ██Witness #15██ and interviews of others who provided discoverable statements, such as ██Witness #3██ ██Witness #7██ ██Witness #5██ ██Witness #15██ and ██Witness #16██ Goodwin therefore either was, or should have been, aware that there were statements made during those interviews that were required to be disclosed. OPR found no evidence that Goodwin made any effort to ensure that any exculpatory statements made in post-indictment MOIs were disclosed, even though he knew, and was in large part responsible for the fact, that the MOIs themselves would not be. According to Ruby, he and Goodwin discussed what disclosures needed to be made from post-indictment MOIs, and Goodwin agreed with Ruby's decisions regarding those disclosures. As discussed below, OPR found that those disclosures were deficient. OPR concludes that Goodwin acted in reckless disregard of his obligation to take the requisite steps to ensure that the government complied with the Department's discovery policies.

In sum, OPR concludes that both Ruby and Goodwin recklessly violated the Department's disclosure policies, and therefore committed professional misconduct.[262]

---

[262]    Although OPR found that Ruby and Goodwin recklessly violated their obligations under the Department's broad discovery policies, ████████████████████████████████████████████████

CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

6.  **OPR Found Insufficient Evidence Based Upon Which It Could Determine Whether the Failure to Disclose Discoverable Statements Contained in Undisclosed MOIs Violated *Brady*, *Giglio*, or West Virginia RPC 3.8(d)**

OPR found that Ruby and Goodwin committed professional misconduct by acting in reckless disregard of their obligation imposed by Department policy to disclose discoverable statements in some of the 61 undisclosed MOIs. That finding, however, is not a sufficient basis upon which to conclude that Ruby and Goodwin also violated the requirements of *Brady* and *Giglio* with respect to those discoverable statements. A prosecutor violates *Brady's* requirements only if a defendant is prejudiced by the disclosure violation. Witnesses OPR interviewed adamantly maintained that Blankenship suffered no prejudice as a result of the government's failure to provide him with the discoverable statements contained in the 61 undisclosed MOIs, because those same statements were available to the defense from other sources, including the 372 MOIs that were disclosed, as well as the millions of pages of documents that also were disclosed. The fact that undisclosed evidence was known and available to the defense from other sources is a well-recognized defense to an alleged *Brady* violation.[263]

In such circumstances, OPR ordinarily would attempt to rigorously test the accuracy of the prosecution team's assertion that the discoverable statements contained in the undisclosed MOIs were known and available to the defense from other sources. Here, however, OPR faced a serious obstacle in attempting to engage in such an assessment. OPR asked Zuckerman to provide OPR with evidence that Blankenship's defense was prejudiced by the government's failure to disclose discoverable statements contained in the 61 undisclosed MOIs. Although Zuckerman alleged generally that Blankenship had in fact been prejudiced, Zuckerman explicitly declined to provide OPR with any evidence to support its assertion. Zuckerman stated that it did not believe that OPR's investigation was "the appropriate forum" to address its claim of prejudice, at least in part because Blankenship might raise the issue with the court.

Zuckerman, the party in the best position to know whether Blankenship was prejudiced by the government's failure to disclose discoverable statements contained in the 61 undisclosed MOIs, declined to provide OPR with the requested information about that issue. Because the prosecution team credibly asserted that Blankenship was not prejudiced, and because OPR has insufficient countervailing information to refute the government's contention, OPR cannot establish by preponderant evidence that Blankenship was in fact was prejudiced by the government's nondisclosures; it therefore similarly cannot establish that the government's failure resulted in a *Brady* or *Giglio* violation.[264]

---

[263]    *See* cases cited in Section VI(B)(2)(a) above.

[264]    Because West Virginia authorities have not, to OPR's knowledge, decided whether the scope of West Virginia RPC 3.8(d) is broader than, or co-extensive with, the scope of *Brady* and its progeny, OPR cannot find that Ruby and Goodwin violated RPC 3.8(d). Although OPR found that Ruby and Goodwin recklessly violated the

Case 5:18-cv-00591   Document 70-32   Filed 09/05/18   Page 90 of 97 PageID #: 1134
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

### C. Ruby and Goodwin Recklessly Violated the Ogden Memorandum's Requirement That Letter Disclosures Contain All Exculpatory Material

On June 22, 2015, and September 21, 2015, Ruby sent Zuckerman letters in which he provided them with discoverable statements made in two attorney proffer sessions, and three MOIs, respectively. The Ogden Memorandum states that when disclosure of exculpatory material is made by letter, "*prosecutors should take great care* to ensure that the full scope of pertinent information is provided to the defendant."[265] OPR concludes that Ruby and Goodwin recklessly violated that requirement, and therefore committed professional misconduct.

Ruby's June 22, 2015, letter to Zuckerman informed Zuckerman that attorneys representing Witness #10 had provided the government with discoverable material. Ruby summarized that material in two sentences: "Blankenship was involved in the development of violation targets and report cards for the so-called hazard elimination program. Witness #10 also believed that Massey made some degree of effort to comply with mine safety laws." When OPR examined AUSA #2 handwritten notes from the attorney proffer session, it found that those notes contained the following discoverable statements:

- Witness #10 *wanted the hazard elimination program to reduce violations by 20%, but Blankenship wanted them reduced by 50%.*

- *Massey mines were safe.*

- *MSHA violations were not related to safety.*

- *Having zero violations was not realistic.*

- *If you fix 75 violations, MSHA would find 75 more.*

- *MSHA inspections are subjective.*

- *MSHA was harder on Massey than other mines.*

- *The number of violations corresponds to the number of MSHA inspection hours.*

- *Receiving violations did not mean that a mine was unsafe.*

- *Blankenship received the weekly minutes from the Hazard Elimination Committee.*

- *Report cards were Blankenship's idea to increase accountability.*

On September 21, 2015, Ruby sent a letter to Zuckerman in which he provided discoverable statements contained in the three MOIs of Charlie Witness #8 Witness #13, and Witness #7

---

[265]     Ogden Memorandum, Step 3, Making the Disclosures (emphasis added).

Case 5:18-cv-00591 Document 70-54 Filed 09/05/18 Page 91 of 97 PageID #: 1135

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

████ Ruby's disclosures regarding those three MOIs were highly truncated. Ruby revealed that: (1) ████ said ████ was not sure that Blankenship received the memorandum about mine safety that ████ had sent ████ in February 2010; (2) ████ said that ████ did not agree with a particular MSHA mine ventilation policy; and (3) ████ said that Blankenship was interested in safety even though ████ did not expressly say so, and Blankenship was involved with a number of changes to equipment that ████ believed improved safety. OPR reviewed the ████ and ████ MOIs to identify discoverable statements. OPR's analysis of the ████ MOI is set forth in Section III(D)(4) above, and OPR's analysis of the ████ and ████ MOIs is set forth in Section III(E)(6) above.

OPR finds that Ruby's June 22, 2015, and September 21, 2015, letter disclosures did not fully disclose all of the discoverable statements made by ████ attorneys, or contained in the ████ ████ and ████ MOIs. The fact that Ruby made a partial disclosure is evidence that supports his contention that he did not intentionally withhold exculpatory evidence. Nevertheless, OPR finds that Ruby did not disclose all of the discoverable statements ████ attorneys, and ████ ████ and ████ provided the government. That failure was at least in part a result of Ruby's reckless decision to rely on his memory of what occurred during his discussions with ████ attorneys and what was said in the ████ and ████ interviews when making required disclosures. Because Ruby did not take "great care" when making those letter disclosures, he recklessly violated the Ogden Memorandum's requirements and committed professional misconduct.

Ruby asserted that Goodwin reviewed and approved the contents of the September 21, 2015 letter before Ruby sent it to Zuckerman, and that Goodwin knew that Ruby was relying on his memory when deciding what information to include in the disclosure letter. Because Goodwin declined OPR's request for an interview, and thus did not rebut Ruby's contentions, the preponderant evidence supports Ruby's claim that Goodwin reviewed and approved the letter and was aware of the process by which Ruby was making disclosure decisions. OPR therefore finds that Goodwin also recklessly violated his duty to take "great care" when making a letter disclosure of exculpatory information, and hence committed professional misconduct.[266]

### D. Ruby and Goodwin Did Not Intentionally Mislead the Court or Zuckerman About the Government's MOI Disclosures

In response to defense motions requesting, *inter alia*, the disclosure of exculpatory evidence and the handwritten notes of the agents who drafted MOIs, the government filed three pleadings that in part discussed the government's MOI disclosures. Ruby, ████ and ████ each drafted one of the pleadings, and all of the prosecution team attorneys, including Goodwin, either reviewed drafts of the pleadings or received copies of them after they were filed. The three pleadings contained statements about the government's disclosure of MOIs. The February 2015 pleading stated that "the United States has provided extensive discovery . . . including . . . FBI 302s." The May 2015 pleading stated that "the United States has . . . produc[ed] . . . typed 302 reports." The July 2015 pleading stated that "The United States has produced [MOIs] that reflect

---

[266]     Although OPR found that Ruby and Goodwin recklessly violated Department discovery policies regarding disclosure letters, ████████████████████████████

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

the substance of well over 300 witness interviews." Each of those statements, taken in isolation, was technically accurate. The United States did disclose numerous FBI 302s and over 300 MOIs.

However, even if technically correct, OPR finds that given the context in which they were made, those statements, both individually and collectively, were potentially misleading. In response to defense motions to obtain handwritten notes from all government interviews, OPR finds that any neutral party, such as the court, reading the government's responses might reasonably interpret them to mean that the United States had disclosed to the defense all 302s and memoranda of witness interviews, and the government therefore was not required to disclose the underlying notes. At the time each of those pleadings was filed, the government possessed post-indictment MOIs that had not been disclosed, and Ruby and Goodwin knew those MOIs would in fact not be disclosed. Moreover, those statements were central to the government's arguments that the defendant's motions should be denied because the government had complied with, or exceeded, its discovery obligations. For example, the court denied a defense motion to obtain agents' handwritten notes taken during witness interviews, because the substance of those interviews was contained in disclosed MOIs. The court may well have resolved that motion differently if it had known that for some witnesses, the defense received neither an MOI nor the agent's handwritten notes.

During trial, in response to a defense argument that the government had failed to disclose certain exculpatory statements that Witness #4 had allegedly made to the government prior to trial, Ruby told the court that the government had "turned over 302s from our interviews" of Witness #4 Although the government had disclosed one Witness #4 pre-indictment MOI, and Ruby incorrectly believed that the government had disclosed a second pre-indictment MOI, at the time Ruby made that statement to the court, the government had not disclosed five Witness #4 MOIs, some of which were completed shortly before Ruby made his statement to the court. OPR finds that given the context in which this statement was made, it was potentially misleading. OPR finds that any neutral party, such as the court, listening to that statement might reasonably interpret it to mean that the United States had disclosed all of Witness #4 's 302s to the defense.

Ruby told OPR that neither the government's pleadings nor his oral statements to the court concerning the government's MOI disclosures were meant to mislead the court. Ruby said that all of the government's representations regarding MOI disclosures were intended to refer to the government's production of pre-indictment MOIs. In his May 7, 2018 response to OPR's draft report, Ruby argued in part that: (1) none of the government's written statements were made in the context of a discussion about whether all MOIs had been disclosed; (2) the natural interpretation of assertions that the government disclosed MOIs is that the government did not disclose all MOIs; and (3) the small prosecution team was overwhelmed by Blankenship's much larger defense team, and therefore had little time to carefully parse every word in every pleading. Ruby also argued that: (1) the court would not have naturally interpreted his oral statement to mean that all Witness #4 MOIs had been disclosed; (2) defense counsel knew that the government had interviewed Witness #4 and had not disclosed all MOIs; and (3) the court did not reference MOIs in a later discussion about Witness #4 while it did mention Witness #4 grand jury testimony.

Given OPR's factual findings, and after carefully considering Ruby's objections to those findings, OPR reaches the following conclusions regarding the allegation that the government filed

Case 5:18-cv-00591  Document 70-34  Filed 09/05/18  Page 93 of 97 PageID #: 1137
CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

false or misleading pleadings and made one false or misleading statement to the court regarding the government's MOI disclosures.

### 1. Neither Ruby Nor Goodwin Intentionally Misled the Court Regarding the Government's MOI Disclosures

For several reasons, OPR concluded that neither Ruby nor Goodwin intentionally made false written or oral statements to the court regarding the government's MOI disclosures. First, as discussed below, OPR found that by the time of trial, Zuckerman knew that the government had not disclosed all MOIs in their entirety. If Ruby and Goodwin had intended to mislead the court by asserting that the government had disclosed all MOIs, they would not have given the defense information that showed that assertion to be false. Second, the only possible reason why Ruby or Goodwin would have intentionally provided the court with false information about the government's MOI disclosures would be to hide a disclosure violation. But OPR found that neither Ruby nor Goodwin intentionally withheld potentially exculpatory material from the defense. Since neither Ruby nor Goodwin believed they had done anything wrong, or had anything to hide from the court, they had no reason to intentionally mislead the court about the government's MOI disclosures.

### 2. Neither Ruby Nor Goodwin Intentionally Violated West Virginia RPC 3.3(a)(1)

Because OPR found that neither Ruby nor Goodwin intentionally misled the court regarding the government's MOI disclosures, OPR also found that neither Ruby nor Goodwin violated West Virginia RPC 3.3(a)(1), which prohibits an attorney from "knowingly . . . mak[ing] a false statement of fact . . . to a tribunal."

### 3. Neither Ruby Nor Goodwin Intentionally Violated West Virginia RPC 4.1

OPR finds that neither Ruby nor Goodwin violated West Virginia RPC 4.1 in their communications with Zuckerman. Zuckerman was arguably misled by the government's first pleading in February 2015 about the extent of the government's MOI disclosures. Thereafter, in April 2015, Zuckerman twice asked Ruby whether the government was disclosing all MOIs. Ruby failed to answer Zuckerman's questions. Zuckerman was aware of Ruby's silence at the time the government filed its May and July pleadings containing representations about the government's MOI disclosures. In August 2015, Zuckerman received the only post-indictment MOI disclosed by the government, and in September 2015 it received a letter disclosing statements made during three witness interviews. Finally, it appears that Zuckerman spoke to witnesses who had been interviewed by the government, and for whom the government had not disclosed an MOI. Thus, beginning in April 2015, and certainly before the start of the trial, Zuckerman possessed information indicating that the government was not disclosing all MOIs. OPR therefore finds insufficient evidence to conclude that Ruby and Goodwin violated RPC 4.1 by "knowingly . . . mak[ing] a false statement of material fact" to Zuckerman.

Ruby's failure to respond to Zuckerman's questions about whether the government was disclosing all MOIs in its possession does not violate RPC 4.1, for as a comment to RPC 4.1 makes

- 88 -

Case 5:18-cv-00591   Document 703-4   Filed 09/05/18   Page 94 of 97 PageID #: 1138

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

clear, an attorney "has no affirmative duty to inform an opposing party of relevant facts." While Ruby may not have violated RPC 4.1, OPR nevertheless finds that his conduct fell below the high standards the Department expects its prosecutors to maintain. The Department expects its prosecutors to deal honorably with opposing counsel, even if prosecutors vehemently disagree with how opposing counsel are representing defendants. Ruby's repeated failure to correct Zuckerman's misunderstanding of the extent of the government's MOI disclosures falls short of the Department's expectations for how its prosecutors will communicate with opposing counsel.

**4.      Because OPR Was Unable to Interview the Court, OPR Does Not Reach a Conclusion As to Whether Ruby or Goodwin Recklessly Violated Their Duty of Candor to the Court**

The question as to whether OPR can prove by preponderant evidence that Ruby and Goodwin recklessly violated their general duty of candor to the court by making misleading written and oral assertions about the government's MOI disclosures is exceedingly close. OPR believes that the most natural understanding of Ruby's oral statement that the government had disclosed "302s from our interviews" of ███Witness #4███ is that the government had disclosed all of ███Witness #4███ MOIs. OPR also believes that the most logical reading of the government's assertions in three pleadings about its MOI disclosures, in the context of defense motions for orders requiring the government to disclose all handwritten notes of interviews, is that the government had disclosed all MOIs. However, Ruby offered several arguments in support of his contention that the government's statements were not made recklessly.

OPR acknowledges that it is possible that the court may not have interpreted the written and oral statements at issue in the same manner as has OPR. In such circumstances, OPR would ordinarily seek to interview the court, so as to learn how the court interpreted the government's statements about its MOI disclosures. If the court understood that the government had disclosed all MOIs, OPR would very likely find that Ruby and Goodwin recklessly made the statements at issue in violation of their duty of candor to the court. If the court understood that the government had disclosed some, but not necessarily all, MOIs, OPR would likely find that Ruby and Goodwin did not violate that duty.

Because the *Blankenship* case is being actively litigated, and Blankenship has alleged in his Section 2255 motion that the government made misrepresentations to the court about its MOI disclosures, OPR cannot at this time engage the court in *ex parte* communications about that issue. Because OPR is currently unable to obtain the evidence it needs to resolve the question as to whether the court was misled by Ruby's and Goodwin's statements, OPR will not make a finding resolving the question of whether Ruby and Goodwin recklessly violated their duty of candor to the court. Because the defense has raised that issue in its Section 2255 motion, the court will have an opportunity to provide the parties with its view of the merits of the defense's allegation.

Although OPR does not reach a conclusion as to whether Ruby or Goodwin recklessly violated their duty of candor to the court by making misleading statements about the government's MOI disclosures, OPR finds that the pleadings they filed and Ruby's oral statement to the court about those disclosures were a product of their exceedingly careless conduct. Both Ruby and Goodwin should have been much more careful about the written and oral statements they made to the court. Ruby's assertion that the defense overwhelmed the government by virtue of its greater

- 89 -

CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

resources, even if true, does not excuse a careless course of conduct by government attorneys. The Department expects its prosecutors to take great care when informing the court about the government's actions to comply with its constitutional obligations. Neither Ruby nor Goodwin adhered to that expectation in their communications with the court about the government's MOI disclosures. If either Ruby or Goodwin had remained in the federal service, OPR would have referred this finding to the Department to take whatever action it thought appropriate to ensure that such conduct was not repeated.

## CONCLUSION

On April 5, 2010, an explosion in the West Virginia Upper Big Branch (UBB) coal mine killed 29 coal miners. The United States Attorney's Office for the Southern District of West Virginia commenced a criminal investigation shortly after the explosion.

On November 13, 2014, a federal grand jury indicted Donald Blankenship, Chief Executive Officer and Chairman of the Board of Directors of Massey Energy Company, which owned UBB. AUSA Steven Ruby led the government's criminal investigation and litigation team. United States Attorney R. Booth Goodwin II was an active participant during the criminal investigation and trial. Blankenship was represented by the law firm Zuckerman Spaeder LLP (Zuckerman). The *Blankenship* case was tried in the fall of 2015. At the conclusion of the trial, Blankenship was convicted of a misdemeanor conspiracy to violate mine safety standards and acquitted of all other charges.

In March 2016, Zuckerman sent a letter to the Department of Justice Criminal Division's Assistant Attorney General, alleging, among other things, that: (a) the government failed to disclose exculpatory e-mails in the possession of the Mine Safety and Health Administration (MSHA); (b) the government made false statements to the court and jury about Blankenship's involvement in Massey budget decisions; (c) the government did not call MSHA inspectors to testify at trial in order to avoid revealing the government's discovery violations; and (d) an MSHA employee destroyed MSHA documents shortly after the UBB explosion. Zuckerman's allegations were forwarded to the Department's Office of Professional Responsibility (OPR).

As a result of its investigation, OPR found that Zuckerman's initial misconduct allegations were without merit. OPR found that: (a) the government did not withhold exculpatory MSHA e-mails; (b) the government did not make false statements about Blankenship's involvement in the Massey budget process; (c) the government did not inappropriately decide not to use MSHA inspectors as trial witnesses; and (d) there was no evidence to support the allegation that an MSHA employee destroyed MSHA documents shortly after the UBB explosion.

During OPR's investigation, however, OPR learned that the government had failed to disclose to the defense numerous memoranda of interviews (MOIs) written by law enforcement agents on the prosecution team. Although prior to the *Blankenship* trial the government disclosed to the defense approximately 370 MOIs, it failed to disclose discoverable statements contained in 61 MOIs, including 11 pertaining to pre-indictment interviews, and 50 pertaining to post-indictment interviews. As a result of its investigation, OPR made the following factual findings and reached the following conclusions regarding Ruby's and Goodwin's conduct related to the failure to disclose the 61 MOIs:

- 90 -

Case 5:18-cv-00591   Document 703-4   Filed 09/05/18   Page 96 of 97 PageID #: 1140
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

(1) Some of the undisclosed MOIs contained discoverable statements that were required to be disclosed by applicable Department discovery rules and policies, including United States Attorneys' Manual Section 9-5.001(C)(1)-(3). OPR concludes that neither Ruby nor Goodwin withheld discoverable statements from the defense with the intent of preventing the defense from obtaining those statements. However, OPR found that: (a) Ruby recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in 11 pre-indictment MOIs; (b) Ruby and Goodwin recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in some of the 50 post-indictment MOIs; (c) Ruby and Goodwin recklessly violated discovery requirements imposed by a January 2010 memorandum from then-Deputy Attorney General David Ogden (the Ogden Memorandum), which requires prosecutors to "develop a process for review of pertinent information to ensure that discoverable information is identified;" (d) Ruby's and Goodwin's "process" for deciding which statements contained in post-indictment MOIs to disclose was to rely on their memory of what was said during interviews, some of which occurred months before they made disclosure decisions; their deficient process resulted in the failure to disclose discoverable statements contained in numerous post-indictment MOIs; and (e) because Ruby and Goodwin recklessly violated the Department's discovery policies regarding the disclosure of discoverable statements, they committed professional misconduct.

(2) OPR found insufficient evidence to conclude that Ruby's and Goodwin's failure to disclose discoverable statements contained in the undisclosed MOIs violated *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or West Virginia Rule of Professional Conduct (RPC) 3.8(d), which requires the disclosure of information that tends to negate the accused's guilt. The government violates its *Brady* obligations only if, *inter alia*, a defendant is prejudiced by the failure to disclose. Zuckerman Spaeder LLP, the firm representing Blankenship, and the entity in the best position to explain whether, how, and to what extent the defense was prejudiced by the government's failure to disclose the 61 MOIs, explicitly declined OPR's request to provide it with that information. Prosecution team members credibly told OPR that the discoverable statements contained in the 61 undisclosed MOIs were not only available to the defense from other sources, but were in fact used during the defense's cross-examination of government witnesses. Based on the facts known to it, OPR cannot prove by preponderant evidence that Blankenship was prejudiced by the government's failure to disclose the discoverable statements in the 61 MOIs, and so cannot conclude that the government's conduct violated *Brady, Giglio*, or West Virginia RPC 3.8(d).

(3) Ruby failed to make a full disclosure of discoverable statements contained in three MOIs, and statements made during one proffer session, which he attempted to summarize in two summary disclosure letters. OPR found Ruby's disclosures to be inadequate and incomplete. Although OPR concludes that Ruby's inadequate disclosures were not intended to withhold exculpatory statements from the defense, OPR nevertheless concludes that Ruby's inadequate disclosures were made in reckless disregard of the requirement, as set forth in the Ogden Memorandum, that prosecutors take "great care" when making disclosures by summary letter. Ruby was responsible for both of the deficient letter disclosures. OPR found that Goodwin was also responsible for the inadequate and incomplete disclosures in one of the two summary disclosure letters. OPR finds that Ruby and Goodwin recklessly violated the Ogden Memorandum's requirements and therefore committed professional misconduct.

- 91 -

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

(4) The government filed three arguably misleading pleadings with the court, and Ruby made one arguably misleading statement in court, regarding the government's MOI disclosures. Those pleadings and Ruby's statement may have led the court to reasonably, but erroneously, believe that the government had disclosed all MOIs in its possession. OPR reached the following conclusions about the alleged misstatements to the court:

(a) Ruby and Goodwin did not intentionally mislead the court regarding the government's MOI disclosures.

(b) Ruby and Goodwin did not violate West Virginia RPC 3.3(a)(1), which prohibits an attorney from *knowingly* making a false statement to the court, because OPR found that neither Ruby nor Goodwin intentionally made false statements to the court.

(c) OPR found insufficient evidence to conclude that the government's pleadings and Ruby's statement in court about the government's MOI disclosures violated West Virginia RPC 4.1, which prohibits attorneys from knowingly making false material statements to third parties such as Zuckerman Spaeder LLP.

(d) For the following reasons, OPR did not reach a conclusion about whether Ruby and Goodwin recklessly made arguably misleading statements to the court about the government's MOI disclosures. When OPR investigates an allegation that the government made misleading statements to the court, OPR would ordinarily request to interview the court to ask how the court interpreted the statements at issue. OPR could not follow its usual procedures in the *Blankenship* case, because the case is being actively litigated, and the court would be unable to engage in *ex parte* communications with the government. OPR is therefore unable to ascertain the court's views as to whether the court was misled by the government's statements about its MOI disclosures. In its Section 2255 motion, McGuireWoods has alleged that the government made misrepresentations to the court about its MOI disclosures. The defense, if it chooses, may further pursue that allegation in the post-conviction litigation, which will allow the court to inform the parties as to whether it was misled by the statements at issue.

OPR - 000097