CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# TAB

# A

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D.W. Va.)

*U.S. Department of Justice*

*United States Attorney*
*Southern District of West Virginia*

---

| | |
|---|---|
| *Robert C. Byrd United States Courthouse* | *Mailing Address* |
| *300 Virginia Street, East* | *Post Office Box 1713* |
| *Suite 4000* | *Charleston, WV 25326* |
| *Charleston, WV 25301* | *304-345-2200* |
| *1-800-659-8726* | *FAX  304-347-5104* |

\* \* \*

### <u>ATTENTION</u>: THIS SUBMISSION AND ITS ATTACHMENTS CONTAIN SEALED AND GRAND JURY MATERIAL

\* \* \*

June 4, 2016

**By email: mark.masling@usdoj.gov**

Mr. Mark Masling, Esq.
Assistant Counsel
Office of Professional Responsibility
Department of Justice
950 Pennsylvania Ave., N.W., Suite 3266
Washington, D.C. 20530

Re: *United States v. Donald L. Blankenship*, No. 5:14-cr-00244 (S.D. W. Va.)

Dear Mr. Masling:

Defendant Donald L. Blankenship ("Defendant"), the former Chief Executive Officer and Chairman of the Board of Directors of Massey Energy Company ("Massey"), was convicted in December 2015 of conspiring to violate mandatory federal mine safety and health standards at his company's Upper Big Branch mine ("UBB"), where 29 coal miners were killed in an explosion in April 2010. On April 6, 2016, he was sentenced to a year in prison, the maximum term authorized by law for his offense. Defendant is now serving that sentence at the federal prison camp in Taft, California; on May 12, 2016, a three-judge panel of the United States Court of Appeals for the Fourth Circuit unanimously denied his motion for release pending appeal. In litigating that motion, the parties provided what amounted to full briefing of Defendant's appeal: more than 40 pages of briefing on each side, substantially exceeding the normal page limits for briefs on the merits. After receiving this detailed briefing, the Fourth Circuit did not find that Defendant presented even a substantial question that, if decided in his favor, was likely to result in reversal. In other words, given Fourth Circuit case law, the panel did not find that Defendant raised even a close question or a question that reasonably might be decided either way.

Defendant is part of the rare class of defendants who can, in effect, write a blank check for an army of high-powered defense attorneys not only to defend him on the merits but also to mount an endless series of attacks against the individual prosecutors handling his case. Regrettably, those attacks are now part of the standard playbook for such defendants, and this case is no exception. Defendant's motion and trial practice relied heavily on allegations of

Case 5:18-cv-00591 Document 70-25 Filed 09/30/19 Page 3 of 132 PageID #: 1144
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 2

prosecutorial misconduct, each of which the court examined and found to be baseless.[1]
Having tried and failed to discredit the prosecution in court, Defendant now rehashes a litany
of his losing claims in a complaint directed to Assistant Attorney General Caldwell.[2] At the
request of Office of Professional Responsibility ("OPR") Counsel Robin A. Ashton, the
instant letter responds to that complaint.

At the outset, it bears noting that none of the claims in Defendant's complaint are the
subject of a current dispute in his criminal case or his appeal. Most were raised and rejected in
the district court. The minority that were not raised before or during trial have not been raised
in any post-trial motion. And none of the claims in Defendant's complaint are mentioned in
his statement of issues he will raise on appeal.[3] In other words, every contention in
Defendant's complaint is one that he either has lost in court and abandoned or deemed
insufficiently meritorious to pursue in court at all. Referring to Defendant's claims using the
numbering in OPR Counsel Ashton's letter, claims number two, three, five, seven, eight, nine,
and ten were rejected by the district court. Claims one, four, and six were never asserted in
court and lack any merit.

### Background on the United States' discovery production

Since most of Defendant's assertions allege discovery violations, some discussion is in
order regarding the discovery that the United States produced. Defendant was indicted on
November 13, 2014, and arraigned on November 20, 2014. On December 4, 2014, two weeks
after arraignment, the United States turned over its entire electronic document database to the
defense. The database was searchable and contained full metadata to permit filtering and
sorting during Defendant's document review. The United States made 15 additional discovery
productions before trial, supplementing the original production with newly obtained materials.
Well before trial, the United States identified for Defendant several thousand pages of
documents that the United States specifically identified as *Brady* material that Defendant
should review with care. And although the district court specifically ruled that the United
States was not required to produce its own memoranda of witness interviews, the United
States nonetheless produced such memoranda for all the witnesses that it would call at trial,
along with dozens of other witnesses that it did not call.

Defendant was the fifth defendant prosecuted in the wake of the UBB mine explosion,
and the United States produced documents and transcripts from all four previous

---

[1] *See, e.g.*, Dist. Ct. Doc. 217 (Apr. 8, 2015 Order rejecting Defendant's allegation of vindictive and selective
prosecution) (attached as Exhibit 1); ███████████████████████████████████████████████████
████████████████████████████████████ Dist. Ct. Doc. 222 (Apr. 8, 2015 Order rejecting Defendant's allegation
of *Brady* violations) (attached as Exhibit 3); Dist. Ct. Doc. 294 (Aug. 10, 2015 Order rejecting Defendant's
allegation that United States improperly failed to produce documents from MSHA) (attached as Exhibit 10); Dist.
Ct. Doc. 549 (Dec. 9, 2015 Order denying Defendant's final allegations of discovery misconduct) (attached as
Exhibit 5).

[2] The complaint to AAG Caldwell was sent and signed by Defendant's counsel, but it begins by stating that
counsel represents Defendant and that "[w]e write to request" a review of purported prosecutorial misconduct. It
appears that defense counsel has filed the complaint on Defendant's behalf. Accordingly, this response refers to
the complaint as Defendant's.

[3] *United States v. Blankenship*, No. 16-4193 (4th Cir. 2016) (Doc. 15) (docketing statement filed Apr. 22, 2016)
(attached as Exhibit 6).

Case 5:18-cv-00591 Document 70-55 Filed 06/17/25 Page 4 of 132 PageID #: 1145
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 69
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 3

prosecutions. These included documents from the prosecutions of Witness #29, a former low-ranking UBB supervisor who pleaded guilty to making false statements; Witness #30, UBB's former security chief, whom a jury convicted of making false statements and obstructing justice; Witness #31, UBB's former mine superintendent, who pleaded guilty to conspiring to impede the Mine Safety and Health Administration's ("MSHA") safety enforcement efforts at UBB; and Witness #25, a former Massey division president, who pleaded guilty to conspiring to impede MSHA and conspiring to violate mandatory mine safety and health standards. Witness #31 and Witness #29 were called as witnesses by the United States in Defendant's trial.

The United States produced voluminous discovery from the records of MSHA, which is the federal agency that enforces mine safety laws. These included all safety citations issued at UBB during the period covered by the indictment, all of the handwritten notes that supported those citations, and the other administrative documents that the United States possessed relating to safety inspections at the mine. Contrary to Defendant's contention, which is addressed in more detail below, the United States also produced hundreds of emails to and from MSHA inspectors who inspected UBB during the indictment period. And the United States produced the transcripts of hundreds of witness interviews that MSHA conducted during its investigation of the explosion.[4]

In sum, the United States made what was very nearly an open-file production, one that went well beyond its obligations under the law or Department of Justice policy. Defendant suggests that the United States made it difficult for him to obtain necessary discovery, but the truth of the matter is that almost all of the more than 250 exhibits that Defendant introduced at trial were drawn from the United States' discovery production.

**Discovery motion practice and trial practice**

From the beginning of this case, Defendant sought—without success—to advance claims of discovery misconduct by the United States. Many of the accusations that the district court rejected are now repeated in Defendant's complaint to AAG Caldwell, so a brief history is provided here. On February 6, 2015, Defendant made his first allegation that the United States had failed to produce *Brady* material.[5] On April 8, 2015, the court rejected that accusation, finding that Defendant's motion for production of further *Brady* material was premature at best and noting no evidence of *Brady* violations by the United States.[6] On May

---

[4] OPR Counsel Ashton's letter requests information on prosecution team members and their roles in discovery. The lead prosecutor was the undersigned, who also was primarily responsible for discovery, including the discovery matters discussed herein. The undersigned's professional experience and qualifications are set forth in a footnote at the end of this submission. Paralegal #1 also worked extensively on discovery productions, as did Paralegal #2. Other attorneys on the trial team were AUSA #1, AUSA #2; and former United States Attorney R. Booth Goodwin II, Mr. Goodwin and AUSA #1 and played only minor roles in discovery matters. Case agents were FBI SA #1 and DOL SA #1. Neither agent played a role in discovery matters.

[5] Dist. Ct. Doc. 112 (Memorandum in Support of Motion to Enforce the Government's *Brady* Obligations, attached as Exhibit 7).

[6] Dist Ct. Doc. 222 (attached as Exhibit 3).

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 4

27, 2015, Defendant filed a motion seeking to compel the United States to produce additional documents from MSHA that he suggested were improperly being withheld.[7] And on July 8, 2015, before the court ruled on the MSHA-related motion, Defendant again leveled broader accusations that the United States had failed to produce *Brady* material, and sought an evidentiary hearing on his claims.[8]

On August 10, 2015, the court terminated as moot the May 27 motion for additional MSHA documents, finding, "It clearly appears that the United States has searched items within its and/or MSHA's 'possession, custody, or control,' including documents relating to the investigation of UBB through [the] lens of both *Brady* and Rule 16. The Defendant has not pointed to any specific portion of Rule 16 with which the United States has not complied."[9] Also on August 10, 2015, the court rejected Defendant's broader, July 8, 2015 claim of *Brady* violations, finding no reason to conduct the evidentiary hearing that Defendant sought.[10]

On September 17, 2015, Defendant filed another motion claiming that MSHA materials were being withheld improperly.[11] The district court did not rule on that claim before trial began on October 7, 2015, but ultimately rejected it after additional mid-trial briefing, described below.

The trial in this matter lasted several weeks. During that time, Defendant made—and the court rejected—further allegations of discovery misconduct. Three of those mid-trial claims are significant here. The first concerned **Witness #4** ████████████████████ at the time of the explosion. On Friday, October 30, 2015, the United States concluded its redirect examination of **Witness #4** At the end of redirect, Defendant asserted the United States had committed "a gross *Brady* violation" by not disclosing, before **Witness #4** testimony, pro-defense statements that the defense was able to elicit from him on cross-examination.[12] Defendant sought to question **Witness #4** further regarding this purported *Brady* violation.[13] The court considered Defendant's position over the ensuing weekend and made a ruling on Monday, November 2, 2015. The court did not find any *Brady* violation. It did offer to let Defendant question **Witness #4** further, if he so desired, to develop his claim of misconduct.[14] But when offered the opportunity to do what he had demanded a few days earlier—examine **Witness #4** regarding the purported *Brady* violation—Defendant abandoned that demand and said nothing more about this alleged misconduct the rest of the trial.

Defendant's second mid-trial misconduct claim involved a witness named **Witness #13**. **Witness #13** ████████████████████████ The United States called **Witness #13** as a witness in Blankenship's trial. After **Witness #13** direct examination, the defense gave the United States and the court a copy of a declaration by **Witness #13** that was submitted in an unrelated civil matter in 2011

---

[7] Dist. Ct. Doc. 261 (Motion to Compel Production of MSHA Material, attached as Exhibit 8).
[8] Dist. Ct. Doc. 283 (Motion to Compel Compliance with *Brady* Order and for Other Appropriate Relief, attached as Exhibit 9).
[9] Dist. Ct. Doc. 294 (attached as Exhibit 10).
[10] Dist. Ct. Doc. 295 (attached as Exhibit 11).
[11] Dist. Ct. Doc. 377 (attached as Exhibit 12).
[12] Trial Tr. 3702:8-14 (attached as Exhibit 13).
[13] *Id.*
[14] Trial Tr. 3724:5-23 (attached as Exhibit 14).



Case 5:18-cv-00591  Document 70-35   Filed 09/05/19  Page 6 of 132 PageID #: 1147

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 5

(the "███ declaration").[15] In that declaration, ███ claimed that, after the UBB explosion, a **Witness #32** ███████ told ███ ██ saw another MSHA employee remove documents from that office. **Witness #32** ████████████ and the name of the MSHA employee who purportedly removed documents from the district office was **Witness #33** . The ███ declaration did not say what the purportedly removed documents were.

Defendant claimed that the United States had committed misconduct by not producing the ███ declaration to him before trial.[16] He moved for a mistrial or, in the alternative, a recess for the court to investigate the alleged misconduct.[17] The United States explained, in response, that it had no knowledge of the ███ declaration until Defendant produced it at trial.[18] The court denied the motion for a recess, choosing instead to review the allegations at a later time.[19]

The next day, November 5, 2015, the defense disclosed two more declarations from the same 2011 civil matter in which the ███ declaration was filed.[20] One was from █████, according to ███ told ███ that documents had been removed from the MSHA district office. **Witness #32** declaration said that ███ never told ███ that ███ saw **Witness #33** removing documents from the MSHA office and that ███ did not, in fact, see **Witness #33** remove documents.[21] The second newly disclosed declaration was from **Witness #33** ████████, the MSHA employee who purportedly had removed the documents. **Witness #33** also rejected ███ allegations.[22]

That same day, November 5, 2015, while ███ was still on the witness stand, the court itself questioned ███ about ███ declaration. In particular, the court—presumably seeking to confirm the United States' statement that it was unaware before trial of any allegation of document removal—asked whether ███ had discussed the matter with any attorneys other than those who prepared his declaration.[23] ███ testified that ███ had not.[24] A day later, on November 6, 2015, as the trial continued, Defendant filed a written motion reasserting his claim that the United States committed misconduct by not disclosing the ███ declaration.[25] The district court denied that motion, expressly finding no evidence to support the claim of misconduct by the United States.[26]

The third mid-trial allegation of misconduct was part of that same November 6 defense motion, which was Defendant's final bid in the district court to suggest misconduct by

---

[15] Def. Trial Ex. 568 (attached as Exhibit 15). Note that this exhibit was marked and reviewed by the court but not admitted into evidence at trial.

[16] Trial Tr. 4117:3-4119:9 (attached as Exhibit 16).

[17] *Id.* 4119:1-9 (included in Exhibit 16).

[18] *Id.* 4119:11-4120:3 (included in Exhibit 16).

[19] *Id.* 4120:4-19 (included in Exhibit 16).

[20] Trial Tr. 4398:3-6 (attached as Exhibit 17).

[21] **Witness #32** declaration was filed in the district court as **Witness #32** to District Court Document 496, a filing by the United States, and is attached as Exhibit 17A to this response.

[22] **Witness #33** declaration was filed in the district court as **Witness #33** to District Court Document 496 and is attached as Exhibit 17B to this response.

[23] Trial Tr. 4404:13-21 (included in Exhibit 17).

[24] *Id.*

[25] Dist. Ct. Doc. 481 (attached as Exhibit 4).

[26] Dist. Ct. Doc. 549, at 6 (attached as Exhibit 5).

Case 5:18-cv-00591   Document 70-35   Filed 09/06/19   Page 7 of 132 PageID #: 1148
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 6

the United States. Defendant incorporated, as part of that motion, his September 17, 2015 motion claiming MSHA materials were being improperly withheld, on which the court had not yet ruled as of November 6.[27] As already noted, the court then denied the November 6 motion, finding no evidence of misconduct.

### Responses to specific defense claims

OPR Counsel Ashton's letter requests responses to ten contentions raised in Defendant's complaint to AAG Caldwell. The remainder of this response addresses those contentions in turn.

### (1) Allegation regarding Witness #3

Defendant first complains that the United States failed to disclose purportedly exculpatory information provided by Witness #3. Specifically, Defendant complains that ████ said he did not attend certain budget review meetings, including meetings in the indictment period, and that the United States failed to disclose this information. Witness #3 ████████ who was involved in the company's annual budgeting process. Although ████ did provide the United States information about Defendant's role in that process, the information was inculpatory rather than exculpatory. Specifically, ████ confirmed for the United States that throughout the relevant time period, Defendant possessed final approval authority over Massey's annual budget, and that this authority had nothing to do with his presence or absence in any specific budget meeting, but rather was exercised based on written copies of draft budgets. ████ stated that Defendant received these written drafts at various stages of the annual budgeting process, including a near-final version of the budget, which Defendant personally adjusted before it was finalized. After receiving these drafts, Blankenship communicated directly with ████ every day, regarding his wishes on budgeting matters. Although ████ did corroborate what the United States already knew and had already disclosed to the defense (more on this disclosure below)—that Defendant did not attend all meetings in the budgeting process—the import of ████ information was to confirm that Defendant was personally involved in the budgeting process and had final approval authority. ████ did not indicate that it was material to that authority whether Defendant was present at particular meetings in the budgeting process.

The United States chose not to call ████ as a witness in part because ████ testimony would have been cumulative of other testimony and evidence, and in part because ████ would have presented poorly on the witness stand. When interviewed, ████ spoke in a barely audible voice and appeared extremely anxious. Because the United States did not plan to call ████ as a witness, and because the information ████ provided was inculpatory and cumulative of other inculpatory information already disclosed, the United States did not produce information about the interview with ████ to the defense. That decision was made by the undersigned.

Defendant also alleges that the United States elicited false or misleading testimony from Witness #4 on the subject of Defendant's role in the budgeting process. Defendant claims that the United States elicited testimony that suggested Defendant was present in budgeting meetings when it knew that he had not been. But the United States did

---

[27] Ex. 4.

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 7

not elicit testimony that Defendant was present in any budget meeting. The pertinent transcript section is attached as Exhibit 18 to this response. It shows that the United States elicited testimony from ███████ not that Defendant attended budget meetings, but that he was the highest-ranking Massey official involved in the budgeting process generally.

That very fact—that Defendant was the highest-ranking official involved in the budgeting process—was explicitly conceded by defense counsel in his own cross-examination of ███████ In cross-examining ███████ on the budgeting process, defense counsel led ███████ through the steps of that process, then stated, "the final plan that we, that we end up with here is the one that's ultimately approved by Mr. Blankenship presumably."[28] ███████ agreed with that statement. It is difficult to see how Defendant can complain that the United States elicited false or misleading testimony about his preeminent role in the budgeting process when defense counsel elicited substantively the same testimony on cross-examination. That testimony, moreover—that Defendant was the highest-ranking official involved in the budgeting process—is supported by every pertinent piece of evidence in the record.

Finally, as noted above, the United States did disclose to the defense evidence that Defendant often was absent from meetings in the budgeting process. That information was provided to the United States by ███████, and was disclosed to the defense in the United States' initial, December 4, 2014 discovery production. Notably, armed with that information, the defense cross-examination of ███████ did not include a single question suggesting that Defendant's presence or absence at budgeting meetings had any bearing on his ultimate authority over the budget. Defendant's silence on this point at trial, and his acknowledgement in the ███████ cross-examination that Defendant was the final approver of Massey's budgets, underscores the inculpatory explanation ███████ gave the United States: Defendant possessed final approval power in the budgeting process, and his presence or absence at a given budgeting meeting had nothing to do with that.

**(2) Allegation regarding ███████**

Defendant also claims that the United States failed to disclose a statement by ███████ that ███ and Defendant had no agreement to violate mine safety laws. ███████ however, did not make such a statement to the United States before trial. On the contrary, the information that ███████ provided the United States before trial, as well as ███ testimony in the grand jury, ███████

███████ also reaffirmed this earlier testimony in ███ direct and redirect examinations at trial. It is true that on cross-examination, the defense was able to elicit testimony from ███████ that was inconsistent with ███ testimony in the grand jury and on direct and redirect examination. But as anyone who tries criminal cases likely has learned the hard way, it is not uncommon for a witness sympathetic to the defense to give unanticipated pro-defense testimony on cross-examination. Just because a witness "goes south" on cross-examination does not mean that the United States committed a discovery violation. In this case, as explained above, the court reviewed Defendant's misconduct allegation mid-trial and found no violation. And when the court granted Defendant's request to examine ███████ further to bolster his position, Defendant reversed course and abandoned his complaint altogether.

---

[28] Trial Tr. 3180:15-17 (attached as Exhibit 19).

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 8



.[31] Nothing that **Witness #4** told the United States before █ trial testimony contradicted that grand jury testimony. And, as already noted, █ reaffirmed each of those items of testimony on the witness stand at trial.[32]

Defendant's complaint also raises **Witness #4** trial testimony that Defendant ordered █ to reduce safety violations. That testimony pertained to a program that Massey introduced in 2009, several months before the UBB explosion, called the Hazard Elimination Program, in which the company's mines were assigned targets for the number of illegal safety violations they were allowed to commit. Each mine's nominal target was to commit half as many illegal safety violations as it had during a specified earlier period. At trial, Defendant contended that this directive, to commit only half as many illegal safety violations as before, represented a defense to the charges against █.

Setting aside the question of that defense's validity, the United States conspicuously disclosed before trial that **Witness #4** had received the instruction to reduce violations by half. The United States produced to Defendant—and explicitly identified as *Brady* material—numerous emails and memoranda that **Witness #4** among others, received regarding the instruction to commit only half as many illegal safety violations. The reduce-by-half directive was, for example, highlighted in an exhibit the United States used in the grand jury, which was disclosed to Defendant.[33] To the extent Defendant contends the United States did not disclose this directive to reduce violations, his claim lacks any basis.

Like many of the purported grievances Defendant raises in his complaint, this one was litigated and resolved in the district court. As explained above, after **Witness #4** testimony, the defense asked the court to find the same *Brady* violations that he alleges here.[34] The court found no such violation. It did offer to let Defendant examine **Witness #4** further to seek evidence of such a violation if Defendant wished to do so.[35] Defendant chose not to pursue further testimony from **Witness #4** on the issue, and elected not to pursue its *Brady* claim any further in the district court.

---

[29] **Witness #4** G.J. Tr. 106:13-16 (Nov. 12, 2014) (attached as Exhibit 20).
[30] *Id.* 106:17-24.
[31] *Id.* 108:3-5.
[32] Trial Tr. 3321:8-3326:22 (attached as Exhibit 21).
[33] Exhibit 50 from the November 12 and 13, 2014, grand jury session, which shows the targets to commit only half as many illegal safety violations as in a previous period, and which was produced to Defendant many months before trial, is attached as Exhibit 22 to this response.
[34] Trial Tr. 3724:5-23 (attached as Ex. 14).
[35] *Id.*

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S. D. W. Va.)

Mark Masling
June 4, 2016
Page 9

### (3) Allegation regarding purported statement that Massey "applaud[ed]" Massey initiative

Defendant also alleges that the United States failed to produce a letter from an MSHA official to a Massey official "applaud[ing]" a purported Massey safety initiative (the "'applaud' letter"). The United States did not possess that letter until it received a copy attached to a pretrial defense motion, despite substantial efforts to locate it. The defense filed a copy of the "applaud" letter with the court on September 17, 2015, as an exhibit to a motion to compel production of documents by MSHA.[36] After the defense made the letter available in this manner, MSHA attorneys, at the request of the United States, sought to locate a copy of the letter in MSHA's files, but determined that the letter was not in the files that were in MSHA's possession. The United States does not know how Defendant obtained the "applaud" letter, but it is notable that he chose not to introduce it at trial and chose not to call its author as a witness, even though the author, **Witness #9**, was on the defense witness list.

The United States' purported failure to produce the "applaud" letter has already been litigated in the district court. Defendant complained about the letter and the United States' purported failure to produce it in his September 17, 2015 motion to compel noted above. But Defendant provided no evidence that the "applaud" letter had ever been in the United States' possession. After Defendant incorporated the September 2015 motion into his final, November 2015 motion alleging discovery violations, the Court denied that motion, finding no evidence that the United States had failed to meet its discovery obligations.[37]

### (4) Allegation regarding statement in June 22, 2015 *Brady* letter

Defendant next alleges that the United States made the following statement in a June 22, 2015 letter to defense counsel: "'[T]he United States does not know of any evidence' required to be disclosed under *Brady*."   In fact, the United States did not make that statement. Rather, the United States said the following: "[T]he United States does not know of any evidence that *truly* tends to exculpate Defendant." (Emphasis added.)[38]

This statement was made to clarify that, even though the United States was producing documents that might be offered to support various anticipated defense theories, it did not accept the legitimacy of any of those theories. In other words, the United States did not regard evidence that might be used support the defense's theories as truly exculpatory. That caveat was important because the United States intended to (and ultimately did) submit motions *in limine* challenging the validity of the theories it expected the defense would offer at trial, and did not want to have its production of documents construed as a concession that any defense theory was legitimate. Such qualifying statements are commonplace in discovery productions.

As Defendant is well aware, the United States produced voluminous evidence pursuant to its obligations under *Brady* and Rule 16. In fact, the very statement of which Defendant complains was part of the preface to a letter that designated hundreds of pages of *Brady* material that Defendant should be alert to in preparing his defense. The qualifying language that the United States offered in its June 22, 2015 *Brady* letter was not false, nor did it suggest any disregard of the United States' discovery obligations.

---

[36]  Dist. Ct. Doc. 377 (attached as Exhibit 12).
[37]  Dist. Ct. Doc. 549 (attached as Exhibit 5).
[38]  The letter in question is attached as Exhibit B to Defendant's complaint to AAG Caldwell.

Case 5:18-cv-00591   Document 79-3   Filed 10/05/19   Page 11 of 132 PageID #: 1152
CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 10

**(5) Allegation regarding** ███████, **Witness #6** ████████ **and other witnesses**

Defendant next contends that the United States failed to provide exculpatory information from interviews with various witnesses. OPR Counsel Ashton's letter asks about witnesses whom the United States purportedly interviewed, including **Witness #1**, ████ ████, and **Witness #8**. With respect to **Witness #1**, the United States never interviewed ███ The United States sought to interview **Witness #1**, but ███ counsel refused to permit such an interview unless the United States entered into an immunity agreement with ███ The United States declined to do so and thus was unable to speak with ███

With respect to **Witness #6**, the United States interviewed ████ and turned over to Defendant two memoranda reflecting those interviews.

With respect to **Witness #8**, the United States interviewed ████ and turned over a summary of information favorable to the defense: specifically, that ████ believed Defendant was interested in safety and made changes to Massey equipment that improved safety at the company's mines. Defendant argued in the district court that such summaries were inadequate and the defense was entitled to whatever work product the United States generated in connection with the interview—notes, memoranda, or the like. The court denied the motion, specifically finding that production of interview memoranda and notes was not required.[39]

The United States also disclosed information from other witnesses that it believed could be favorable to the defense. For example, the United States notified the defense of favorable information provided in the form of proffers from counsel for **Witness #10** ████████████████████████; and **Witness #18** ████████████. The United States informed the defense that **Witness #7** ████████████████████, could not confirm that Defendant personally saw a particularly damning February 2010 internal memorandum about safety-law violations at Massey, which was a key piece of evidence. The United States informed the defense that ████ who was the United States' key witness, disagreed with an important aspect of MSHA's approach to ventilation at UBB; that fact became a cornerstone of the defense case. And the United States turned over—and flagged as *Brady* material—numerous memoranda of witness interviews that described various Massey safety programs that also became central to the defense case.[40] These are only examples of pertinent disclosures made by the United States.

**(6) Allegation regarding individuals with immunity agreements**

Defendant further complains about the information that the United States provided regarding individuals with immunity agreements. Defendant claims the United States provided him no information that it received from any such witness before that witness entered into his or her immunity agreement.[41]

---

[39] Dist. Ct. Doc. 279, at 12 (June 12, 2015 Order) (attached as Exhibit 24).

[40] For an example, see the memorandum of interview of **Witness #34** ████████████, who spoke favorably of Massey's so-called "S-1" or "Safety First" program, attached as Exhibit 23. This memorandum was disclosed to Defendant on December 4, 2014. Defendant chose not to call ████ as a witness.

[41] OPR Counsel Ashton's letter also requests a response concerning a September 21, 2015 letter from defense counsel. Defendant's complaint is correct that the United States did not respond to that letter. From shortly after the indictment in this case, it became clear that part of Defendant's strategy was to use his superior resources and

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 11

That claim simply is incorrect. Of the 21 witnesses with whom the United States entered into immunity agreements, all 21 were interviewed by the United States before those immunity agreements were reached, and the United States produced to Defendant memoranda documenting all of those pre-immunity interviews. Those memoranda reflect the information that the United States received from the witnesses prior to their immunity agreements.

Notably, most of the 21 witnesses with immunity agreements were not witnesses against Defendant. Rather, they were witnesses against the other Massey defendants prosecuted earlier in the post-explosion investigation, and the United States disclosed their immunity agreements only out of an abundance of caution. For example, seven of the witnesses with immunity agreements were UBB security guards interviewed in the investigation of Witness #30 who was convicted in 2011 after a jury trial. Others were witnesses who were interviewed solely in connection with the investigations of Witness #31 and Witness #25, both of whom pleaded guilty to mine safety crimes. In fact, of the 27 witnesses the United States called at Defendant's trial, only four had immunity agreements. And pre-immunity interviews with all four of them were disclosed to Defendant in December 2014, nearly a year before trial.

### (7) Allegation regarding MSHA inspection materials

Defendant also asserts that the United States did not properly produce materials relating to MSHA's inspections of the UBB mine. This contention was raised and rejected in the district court. The United States recognized and complied with its obligation to produce inspection-related materials that were favorable to the defense, material to preparing the defense, or otherwise subject to the United States' disclosure duties. Accordingly, the United States obtained from MSHA and produced to Defendant what it understands to be all records from MSHA's inspections of UBB during the indictment period. These included all citations issued at UBB during the indictment period, all notes taken by inspectors during inspections of the mine, logs of when each area of the mine and piece of mechanical equipment in the mine was inspected, results of all testing done as part of mine inspections (including testing to assess the amount of coal dust miners were breathing, the flow of fresh air in the mine, and the application of material designed to prevent the spread of fires and explosions), logs reflecting reviews of written records at the mine, and records of citations that mine officials contested, among other documents. In total, the United States produced thousands of pages of records detailing every inspection visit of UBB during the indictment period. A sample citation and sample set of inspector notes are attached as Exhibits 25 and 26, respectively, to this response.

Despite this extensive production, Defendant complains about the inspection-related records he received. His complaint appears to be this: Shortly before trial, he issued a trial subpoena to MSHA that resulted in the production of thousands of pages of documents that

---

larger legal team to make so many motions and demands that the United States could not keep up with them and also prepare for trial. As the case went on, the United States did not respond to every one of the many letters that Defendant sent, particularly letters demanding material that had already been produced. Because the United States had already produced its pre-immunity information from all 21 witnesses with immunity agreements, the undersigned concluded it was unnecessary to correspond further on that subject.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 12

had not previously been produced. Defendant suggests that because many of these documents were not produced until his subpoena to MSHA, there was some misconduct on the part of the United States.

The reason that the trial subpoena yielded new documents, however, was that it was vastly overbroad. It required the production of thousands of pages of material that had nothing to do with the case (or with safety inspections of UBB) and thus had not been part of previous productions by the United States. For example, the documents responsive to the subpoena included various lists of every mine (coal mine, metal mine, sand and gravel quarry, and mining-related processing facility, among others) in the United States. Printed out, these lists each filled more than 5,000 pages. Because the lists included UBB, they had to be produced in response to Defendant's subpoena, even though they were entirely unrelated to the case. The subpoena swept in many other similarly non-germane documents, resulting in a wildly inflated page count that said nothing about the adequacy of the United States' previous productions.

From these tens of thousands of pages of documents, Defendant was able to identify only a single, brief item that he claimed was favorable to him and previously unproduced. It was a typed summary of a mine inspection conducted on October 14, 2009, which Defendant attached as Exhibit K to his complaint. In listing the results of the inspection, it noted, among other things, that "The mine roof appears solid. The section is very clean and well kept. All ventilation controls are up. Traveled the section belt and the longwall belt. The belts are very well rock dusted and very clean." The summary also identified the inspectors who conducted this October 14, 2009 inspection.

The specific document in question summarized inspections at many mines, not just UBB, and it was not among the documents that MSHA provided to the United States when the United States requested records of UBB inspections. Because the United States did not possess that specific document before Defendant's subpoena to MSHA, it did not produce it to Defendant.

But the United States did obtain, and did produce to Defendant early on, other records of the same October 14, 2009 inspection. These included the original inspection notes made by the inspectors who were at the mine that day. Those notes reflect favorable comments about what was observed during that inspection, similar to the comments from the typed summary that was produced in response to the trial subpoena to MSHA: "The mine roof along the track appears solid."[42] "The section is very clean." "All ventilation controls are in place." "The belt entry is well rock dusted." "The section is well rock dusted." "Had closeout with Witness #35 spoke to him about a good job on the #6 and #5 North beltlines." The notes also identified the inspectors who made these positive comments. It is difficult for Defendant to claim that the United States' failure to obtain the typed summary through its initial document request to MSHA represents intentional misconduct when the United States did locate and produce the original, handwritten notes that the summary was based on.

As noted above, Defendant raised this claim in the district court, and the court found no merit in it. In his September 2015 motion claiming misconduct relating to MSHA materials, filed shortly before trial, Defendant complained that the production of the typed summary of

---

[42] The pertinent notes are attached as Exhibit 26.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 13

the October 14, 2009 inspection showed that other discoverable material was being improperly withheld.[43]  Defendant then incorporated the September 2015 motion's allegations into his November 6, 2015 motion to compel the production of such purportedly concealed material.[44]  The court denied that motion, expressly finding that there was no evidence the United States had failed to meet its discovery obligations.[45]

### (8) Allegation regarding Mine Safety and Health Administration emails

Defendant also contends that the United States made an inadequate production of emails from MSHA inspectors. In particular, he suggests that the United States produced only two emails from MSHA inspectors who inspected UBB during the indictment period. That premise is incorrect. The United States recognized its duty to search for and produce emails that fell within its discovery obligations. Accordingly, the United States produced hundreds (at least) of emails to and from MSHA officials, including hundreds from MSHA inspectors who inspected UBB during the indictment period. In preparing this response, the undersigned sampled two different sets of MSHA emails produced to Defendant to obtain a general sense of how many were produced. Even this cursory check disclosed at least 300 emails that were sent to or from MSHA inspectors who inspected UBB during the indictment period. Some of these emails were correspondence between inspectors and Massey employees, and were produced to the United States by Massey or Alpha. At least 150 were internal MSHA emails retrieved by MSHA through searches of its employees' email accounts, which were conducted at the United States' request. The emails produced included emails to or from Witness #36, Witness #37, and Witness #11.

Defendant raised his claim of an insufficient email production, like the others in his complaint, in the district court. He appeared to believe that there must be thousands of emails to and from MSHA inspectors discussing the substance of the violations they discovered at UBB. The United States' review, however, disclosed that relatively few such emails exist. The reason for this is straightforward: MSHA has (and had during the indictment period) a policy that discourages inspectors from discussing the substance of safety violations outside the formal records that exist for that purpose. Those formal records are, primarily, the citation form for citing violations and the official, handwritten notes that inspectors make to document the observations underlying citations. Those records were disclosed to Defendant in December 2014. Although Defendant undoubtedly hoped to find a trove of emails in which inspectors discussed their UBB inspections in more casual terms, it simply did not exist.

In the district court, Defendant raised this "not enough emails" claim in his September 2015 motion seeking more MSHA documents, which was incorporated into his final, November 2015 discovery allegations.[46]  As noted above, the district court denied that November 2015 motion, finding no evidence of any inadequacy in the United States' discovery.[47]

---

[43] Dist. Ct. Doc. 377 (attached as Exhibit 12).
[44] Dist. Ct. Doc. 481 (attached as Exhibit 4).
[45] Dist. Ct. Doc. 549 (attached as Exhibit 5).
[46] *See* Exhibit 4.
[47] *See* Exhibit 5.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 14

### (9) Allegation regarding MSHA inspectors as witnesses

Defendant next complains that the United States did not call MSHA inspectors as witnesses. He conjectures that this was to conceal a discovery violation. Defense counsel is correct that the United States did not call as witnesses inspectors who inspected UBB before the explosion. But the reason had nothing to do with a discovery violation. Rather, the United States decided not to call MSHA inspectors for garden-variety reasons of trial strategy.

First, the witnesses were unnecessary. The United States decided that the most effective way to prove the existence of rampant safety violations at UBB was through the testimony of coal miners who worked there. The United States believed that the jury would identify more readily with rank-and-file coal miners than with federal inspectors. Accordingly, the United States presented the testimony of around a dozen UBB coal miners, who testified they were required to violate mine safety laws continually, working in often harrowing conditions in order to increase profits and cut costs.

Second, the United States concluded that there were substantial disadvantages to calling MSHA inspectors as witnesses. At the moment, public opinion in West Virginia generally is hostile toward the federal government, and particularly hostile to federal regulation that affects the mining industry. Political candidates and elected officials here regularly contend that the federal government is waging a "war on coal," and that federal overregulation is to blame for the recent economic decline in the coal industry. The United States anticipated that the defense would seek to capitalize on this sentiment. That expectation proved correct: In the cross-examination of one witness, the defense managed, over the United States' objection, to invoke no fewer than 48 times the suggestion that President Obama personally was responsible for the investigation that led to the charges against Defendant.[48] In these circumstances, the United States believed that calling federal mine regulators as witnesses would permit the defense to press its theme of excessive federal interference with the local mining industry—and feared that theme would hold powerful appeal for the jury.

The issue of calling MSHA inspectors as witnesses was litigated in the district court. Defendant asserted that the United States could not introduce evidence of safety citations issued at UBB unless it called as witnesses the inspectors who wrote the citations.[49] The court rejected that claim, ruling that citations could be offered as evidence of notice to Defendant and other conspirators, and that the United States was not required to call MSHA inspectors as witnesses if it chose not to do so.[50]

### (10) Allegation regarding MSHA document destruction.

Defendant's final claim is another one that the district court reviewed and rejected. Defendant suggests that the United States committed discovery violations in connection with the purported destruction of documents by Witness #33, an MSHA employee in MSHA's district office in southern West Virginia. A full description of Defendant's contention

---

[48] Trial Tr. 4808-35 (attached as Exhibit 27).

[49] Dist. Ct. Doc. 399 (Defendant's objection to admitting MSHA citations without calling inspectors as witnesses) (attached as Exhibit 28).

[50] Voir Dire Tr. 853:11-855:3 (attached as Exhibit 29). The court ruled on several evidentiary disputes on the last full day of voir dire. Those rulings, including the ruling that the United States was not required to call MSHA inspectors as witnesses, therefore are part of the voir dire transcript.

Case 5:18-cv-00591   Document 70-5 Filed 09/05/19   Page 16 of 132 PageID #: 1157
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 69
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling
June 4, 2016
Page 15

and the district court's ruling is provided above, in the section on motion and trial practice. To summarize here, the United States was not aware of the ▮▮▮▮ declaration or ▮▮▮▮ allegation about documents being removed until Defendant produced the ▮▮▮ declaration at trial. After reviewing the matter, the district court squarely rejected Defendant's claim that the ▮▮▮ memorandum provided any evidence of discovery violations by the United States.[51] The person who ▮▮▮ claimed mentioned the document removal to ▮▮▮ said, in essence, that ▮▮▮ had no idea what ▮▮▮ was talking about.[52] The district court recognized that there was no basis to pursue the matter further.[53]

## Conclusion

Defendant's complaint largely recycles a set of claims that were raised in the district court and found to lack merit. The contentions that he raises for the first time in his complaint are similarly unsupported. None of his claims is the subject of any current dispute in his criminal case or appeal, Defendant having either abandoned them after losing in the district court or not regarded them as serious enough to raise in court at all. The record demonstrates that the United States more than satisfied its discovery obligations in this case. Defendant's complaint warrants no further action by OPR.

Respectfully submitted,

Steven R. Ruby[54]
Assistant United States Attorney

---

[51] Exhibit 5.
[52] Exhibit 17A.
[53] Exhibit 5.
[54] OPR Counsel Ashton's letter requests information on the writer's professional background and qualification.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# TAB

# B

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship

**United States Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

| | |
|---|---|
| *Robert C. Byrd United States Courthouse*<br>*300 Virginia Street, East*<br>*Suite 4000*<br>*Charleston, WV 25301*<br>*1-800-659-8726* | *Mailing Address*<br>*Post Office Box 1713*<br>*Charleston, WV 25326*<br>*304-345-2200*<br>*FAX  304-347-5104* |

September 30, 2016

**By email: mark.masling@usdoj.gov**

Mr. Mark Masling, Esq.
Assistant Counsel
Office of Professional Responsibility
Department of Justice
950 Pennsylvania Ave., N.W., Suite 3266
Washington, D.C. 20530

Re: *United States v. Donald L. Blankenship*, No. 5:14-cr-00244 (S.D. W. Va.)

Dear Mr. Masling:

This letter responds to your follow-up questions regarding the letter of complaint submitted by counsel for the defendant (hereinafter "Defendant") in the above-referenced case. This response includes each of your questions in italic type with my response provided afterward.

1. *Taylor alleged that prosecutors failed to disclose to the defense prior to trial certain exculpatory assertions that* **Witness #4** ███████████ *made during* ██ *cross-examination. The assertions to which Taylor referred are set forth in his letter to Criminal Division Assistant Attorney General Leslie Caldwell (Caldwell). In your written response, you stated that* **Witness #4** *exculpatory assertions were "unanticipated." However, in trial transcript excerpts attached to Taylor's letter to Caldwell,* **Witness #4** *testified that either* ██ *or* ██ *attorney told the government prior to trial that* ██ *did not believe* ██ *committed a crime and had not participated in a criminal conspiracy to commit mine safety regulation violations. Is it your contention that* **Witness #4** *testimony was false, and that neither* **Witness #4** *nor* ██ *attorneys provided those assertions to the government prior to trial? To further our understanding of this issue, please provide us with all documents reflecting what* **Witness #4** *or* ██ *attorneys told the government (prosecutors, agents, or others) outside of the grand jury prior to trial, including handwritten notes of interviews, and memoranda summarizing the substance of those interviews.*

The memoranda of **Witness #4** statements to the prosecution team are enclosed as Exhibits 1 through 6 to this letter. As they reflect, **Witness #4** did not specifically tell the prosecution team that ██ did not believe ██ committed any crime and did not participate in a criminal conspiracy.

**Witness #4** did, however, make two statements to the prosecution team that expressed ██ view that any criminal culpability on ██ part was limited. It is possible that ██ had those statements in mind when ██ testified that ██ had denied committing a crime or engaging in a criminal conspiracy. The first of these two statements was that there will

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 69
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling, Esq.
September 30, 2016
Page 2

always, in any mine, be violations of safety laws that regulators can cite if they choose. This statement was disclosed to the defense in the memorandum of ██████████ October 22, 2014 proffer session, enclosed as Exhibit 1. *See* Ex. 1 at MOI-001401 ("There are always going to be violations that MSHA could cite."). Second, ████████ said that while ██ was in charge of UBB, ██ believed that a tacit agreement to violate a mine safety law was not a crime. ██ believed that in order to commit a mine safety crime, one had to expressly order a safety violation to be committed. This statement was disclosed to the defense in the same memorandum cited above. See Ex. 1 at MOI-001403. The memorandum of the interview in which ████████ made these statements was produced to the defense on December 4, 2014.

Prior to the prosecution team's interviews with ████████ United States Attorney (USA) Goodwin and I discussed with ████████ counsel the possibility that ████████ could be charged. In this discussion, ████████ counsel made the two points discussed above: ████████ believed that there will always be violations of safety laws in any coal mine. And ██ did not believe that a tacit understanding to allow routine safety violations to continue—as distinct from an express order to commit safety violations—was criminal. As explained above, both these statements by ████████ were disclosed to the defense in a memorandum of interview. I interpreted these statements to mean that ████████ believed ██ had little or no criminal culpability. But I do not recall ████████ counsel making the specific statement that ████████ did not believe had had committed any crimes or participated in a criminal conspiracy. Rather, my recollection is that ███ counsel instead spoke in the more particularized terms that I have described and that were disclosed to the defense.

████████ counsel made these statements in a telephone conversation in which I participated while I was out of the office ████████████████. I do not have notes of the conversation.

By the time ████████ testified at trial, I assumed—perhaps mistakenly—that ███ counsel had informed ██ that a tacit understanding can form the basis of a criminal conspiracy and that willful mine safety violations are crimes even in contexts where violations occur regularly. ████████ had testified in the grand jury that preventable violations of mine safety laws were committed routinely at UBB and that there was an understanding—of which Defendant was a part—that such violations would be tolerated as a cost of doing business. I thus did not anticipate ████████ blanket statements on cross-examination that ██ did not believe ██ had committed a crime or participated in a conspiracy.

*2.   Taylor alleged that the government wrongfully failed to disclose prior to trial statements made by* ██████████ *that Blankenship did not attend preliminary or final business plan review meetings during the indictment period.  In your written response to this allegation you told us, among other things, that information reflecting the assertion that Blankenship did not attend preliminary or final business plan meetings was disclosed to the defense in the government's December 4, 2014 pretrial disclosures, in documents relating to* ████████  *Please provide us with copies of the documents to which you referred, including Bates stamps or other markings showing that those documents were produced to the defense prior to trial.  We may show any such documents to Taylor and ask him to explain his allegation that Blankenship's defense was prejudiced by the government's decision not to produce* ████ *statements in light of the production of those*

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling, Esq.
September 30, 2016
Page 3

*documents.*

        The prosecution team produced several documents to the defense disclosing that
Defendant did not attend all—or even many—Massey business plan meetings. To
summarize (more detail is provided below), the prosecution team disclosed that Witness #5
, said
Defendant never participated in the business-plan meetings that Witness #5 attended. The
prosecution team also disclosed that Witness #4 , said
Defendant "was not always part of" meetings involving mine staffing and participated only
"sometimes" in meetings conducted in the business planning process. And the prosecution
team disclosed a calendar that conclusively showed Defendant did not attend some of the
business planning meetings during the period that the calendar covered and strongly
indicated that he did not attend any of them. Still other documents produced by the
prosecution team disclosed that Defendant participated in the business-plan process
primarily remotely, not by attending meetings in person.

        Witness #5 was, during much of the indictment period, Witness #5
remained beyond the end of the
indictment period. In an interview with a case agent on August 23, 2013, Witness #5 stated
that ___ "could not remember an occasion where Witness #10 and BLANKENSHIP
attended a five year budget meeting where he (Witness #5 was also in attendance.
However, Witness #5 was aware that Witness #10 had attended some five year budget
meetings." Ex. 7 at 2 (Witness #5 memorandum of interview). The "five year budget
meetings" were the same business-plan reviews to which Witness #5 referred; the company's
annual business plans each covered a five-year forward-looking period. *See, e.g.*, Ex. 9 (Aug.
17, 2006 email from Witness #1 to Defendant regarding 2007-2011
business plan). The memorandum of the August 23, 2013 Witness #5 interview was produced
to the defense well before trial.

        Witness #4 . The United States also produced the memorandum of an
October 22, 2014 proffer interview with Witness #4 , in which Witness #4 stated
that Defendant "was not always part of" meetings regarding mine staffing and only
"sometimes" attended meetings conducted during the business planning process. See Ex. 1
at 4 (last two paragraphs on page). The United States produced this memorandum to the
defense well before trial.

        *August 2009 calendar.* The United States further produced a calendar that showed that
Defendant was not scheduled to attend business-plan meetings in the period that the
calendar covered and was out of town when several of the meetings occurred. The calendar
was set out in a document entitled Don L. Blankenship Schedule Reminder, August 19-31,
2009. *See* Ex. 8. According to this calendar, on August 26 and 27, 2009, four business-plan
meetings were scheduled for Massey's regional office in Julian, West Virginia. *See id.* at 4-5.
The calendar showed that on those dates, Defendant was on a trip to Baltimore, Maryland,
and Washington, D.C. *Id.* On August 28, 2009, two more business-plan meetings were
scheduled for Massey's Julian office. *Id.* at 5. But on that date, Defendant was scheduled to
attend a meeting at his office in Belfry, Kentucky. (In an unusual arrangement, Blankenship's

Case 5:18-cv-00591  Document 705-8 Filed 05/19/21  Page 21 of 132 PageID #: 1162
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling, Esq.
September 30, 2016
Page 4

worked out of a small building in rural Kentucky belonging to a minor Massey subsidiary, while the rest of Massey's executives worked either in the company's Richmond, Virginia headquarters or its Julian, West Virginia regional headquarters.)

    More generally, the calendar showed that business planning meetings were not events that Defendant was scheduled to attend. On the calendar, each day's listing showed two types of events. Events that Defendant was scheduled to attend were listed in large type immediately after the date. Below these events was a bullet-point list of other notes that were provided for informational purposes rather than to indicate that Defendant was scheduled to attend or participate. For example, in the first page of the calendar, the large-type section shows that Defendant had a "PR Effort Conference Call" scheduled from 4:00 to 4:30 p.m. on August 19. Ex. 8 at 1. At the bottom of the entry for August 19 appear two informational bullet points, in smaller type, noting the occurrence of a race at a racetrack in Tennessee (Defendant's son regularly competed in minor automobile racing events) and that ███████. *Id.* The next entry, for August 20, shows, in large type, three appointments in which Defendant was scheduled to participate, followed by small-type bullet points noting, among other things, that two executives were on vacation and that two business-plan meetings were to be conducted. *Id.* at 1-2. This pattern continues throughout the calendar, with business-plan meetings noted in the informational bullet points used to notify Defendant of executives' vacations and similar matters—not among the events that he was scheduled to actually attend.

    The United States requested from Massey all Defendant's calendars but did not receive similar calendars from other time periods.

    *Emails reflecting Defendant's remote participation in the business-plan process.* The prosecution team also disclosed that much of Defendant's participation in the business-plan process was accomplished by reviewing and responding to documents that he received by email rather than attending business-plan meetings. Enclosed as Exhibits 9 through 34 are email messages that reflect this fact.[1] These messages span a period of time from August 2006 through August 2010. For example, Exhibit 9 is an August 17, 2006 email message from Witness #1 ██████) to Defendant, Witness #3, and Witness #27, Witness #27 ████████. Attached to the message was an Excel spreadsheet of production data for the company's 2007-2011 business plan (as noted above, the business plan for each year covered that year plus four years into the future). The message said that Witness #1 ███ had scheduled a call that day to discuss the planning document with Defendant by telephone.

    Exhibit 18 is a June 10, 2008 email to all Massey's operating group presidents—including Witness #4 ███████ that included UBB—to which was attached the 2009 production plan "that has been reviewed by the Chairman"—*i.e.*, Defendant. The email specified that various portions of the business plan could be changed only with Defendant's personal approval. These included "feet per shift," which referred to the

---

[1] Some of these exhibits do not have Bates numbers printed on the exhibit documents themselves. These exhibits were produced to the defense as part of an electronic document database that indicated the exhibits' Bates numbers in database fields rather than on the faces of the documents. For purposes of reference, the beginning Bates number of each of these exhibits is reflected in the name of the pertinent exhibit file included with this letter. This same system is used to provide the Bates number of any other enclosed exhibit that does not have Bates numbers printed on the document itself.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling, Esq.
September 30, 2016
Page 5

number of linear feet of coal that each working shift was expected to produce. The feet-per-shift requirement was a key constraint on the amount of time that each mine could devote to safety-related tasks. The email contained no reference to any business-plan meeting.

Exhibit 31 is a September 15, 2009 email from [Witness #3] to Defendant, which said that "the current roll-up on the group plans" for 2010 was attached. The email went on to inform Defendant that there was "[s]till a lot of work to do & reviews to go thru." [Witness #3] statement informing Defendant that there were still a lot of reviews to go through, and [Witness #3] email providing Defendant with a summary of the plan as it stood at that point in the review process, further establish that Defendant did not personally attend all the business-plan reviews.

These three examples are illustrative, but the entire set of exhibits from Exhibit 9 to 34 bear review. They show that much of Defendant's involvement in the business-plan process took place outside of meetings, and that the prosecution team disclosed this fact. Equally important, they show that business-plan meetings with officials of individual mines were not the principal vehicle by which Defendant exercised his authority over Massey's business plans, whether he attended the meetings or not.

The voluminous business-plan spreadsheets that were attached to these emails are not included with the exhibits to this letter but can be provided if needed.

*3. Taylor alleged that the government produced to the defense only two e-mails to or from the eight Mine Safety and Health Administration (MSHA) inspectors who inspected the Upper Big Branch (UBB) mine during the indictment period. In your written response, you stated that you had searched the government's document production to the defense and identified at least 300 e-mails to or from MSHA inspectors during the indictment period. You stated that at least 150 of those e-mails were internal MSHA e-mails, including internal e-mails to or from* Witness #36 *,* Witness #37 *and* [Witness #11] [Witness #11] *Please provide us with a sample of those e-mails, including internal e-mails, with Bates stamps or other markings showing that those e-mails were produced to the defense prior to trial. We may show any such e-mails to Taylor and ask him to explain his allegation that only two such e-mails were produced in light of the existence of those additional e-mails.*

Exhibits 39 through 59 are examples of email messages that were sent to or from MSHA inspectors and were produced to the defense prior to trial. Exhibits 42 through 59 were produced to the defense as ".msg" (Microsoft email message) format files without Bates numbers, in a September 8, 2015 production. They are enclosed herewith with the same filenames under which they were produced to the defense, with the exception that an exhibit number has been added to the beginning of each filename.

Notable documents among these exhibits include Exhibits 41A, 50, 51, 53, 57, and 59, which are emails to and from Witness #36; Exhibit 59, which is an email to Witness #37 and Exhibits 39, 49, and 56, which are emails to and from Witness #11.

In connection with this issue, I note that the defense errs in claiming that only eight inspectors inspected UBB during the indictment period. As the United States disclosed to the defense in a document beginning at Bates number VP-MSHA-108222, which is enclosed as Exhibit 60 hereto, at least 24 inspectors issued citations at UBB during the indictment period.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 69
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling, Esq.
September 30, 2016
Page 6

    *4.  In your written response, you stated that the government produced to the defense memoranda of witness interviews for all witnesses testifying at trial, as well as for "dozens" of witnesses who did not testify. You also stated that you made the decision not to produce to the defense the memorandum or memoranda summarizing the interview(s) of* <mark>Witness #3</mark>*.  Please explain why you decided to produce memoranda for some non-testifying witnesses but not others, and state how many non-testifying witness memoranda were produced to the defense and how many were not produced. In addition, please provide us with copies of all documents reflecting what* <mark>Witness #3</mark> *or* <mark>####</mark> *attorney told the government (prosecutors, agents, or others) outside of the grand jury prior to trial, including handwritten notes of interviews, and memoranda summarizing the substance of those interviews.*

    The prosecution team's initial discovery production, made on December 4, 2014, included all memoranda that the prosecution team had prepared to that point in the investigation, without regard to whether they were required to be produced. This approach resulted largely from necessity: The United States was allotted two weeks after Defendant's November 20, 2014 arraignment in which to produce all its discovery, which comprised several million pages of documents. ███████████████████████████████████████████
██████████████████████████████████████  I was the person most familiar with the discovery materials in the prosecution team's possession and had primary responsibility for coordinating their production. Under those circumstances, in order to meet our deadline, the prosecution team took what was effectively an open-file approach to interview memoranda that had been prepared prior to indictment.

    After Defendant was indicted, the prosecution team took a narrower approach to producing information from witness interviews. During this post-indictment period, most of the prosecution team's meetings were trial-preparation meetings with witnesses who had already been interviewed at least once prior to indictment and who were being prepared to testify at trial. During this period, the prosecution team did not produce every interview memorandum that was generated; rather, information generally was produced if it was new and its production was required.

    After the interview with <mark>Witness #4</mark> as I noted in my previous letter to you, I did not regard as exculpatory <mark>####</mark> statement that Defendant did not attend all business-review meetings. The significance of <mark>Witness #4</mark> statement, as I understood it, was that Defendant had ultimate authority over Massey's business plans without regard to attendance at meetings. The indictment and superseding indictment contained no allegation that Defendant attended business-plan meetings; rather, they alleged that Defendant had approval authority over Massey's budgets and production requirements. *See* Superseding Indictment ¶ 50 (ECF 169). And at trial, at least, the defense seemed to agree that the question of whether Defendant attended or did not attend specific meetings was immaterial. As explained in my previous letter, the defense did not question <mark>Witness #4</mark> about Defendant's attendance at meetings. This was true even though the United States had disclosed <mark>Witness #4</mark> and <mark>Witness #5</mark> statements about Defendant's non-attendance at business-plan meetings. It goes without saying, moreover, that Defendant himself also knew whether he had missed many business-plan meetings, yet his counsel was silent on that issue in <mark>Witness #4</mark> cross-examination—

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling, Esq.
September 30, 2016
Page 7

presumably because the meeting issue was immaterial to the defense.

 With respect to your question about numbers of interview memoranda produced, the prosecution team produced several hundred memoranda of pre-indictment interviews of witnesses who ultimately did not testify. After the explosion, the criminal-investigation team interviewed as many as possible of the hundreds of miners who worked at UBB; many of those interviews were unproductive, but the memoranda reflecting them nonetheless were produced to the defense. Similarly, many witnesses were interviewed in aspects of the broader Massey investigation that did not directly pertain to Defendant, including the prosecutions of the four other defendants convicted as a result of the investigation. The memoranda of those interviews also were produced.

 There were approximate 15 memoranda of interviews of non-testifying witnesses that were not produced. These memoranda pertained to interviews conducted in the post-indictment, trial-preparation phase of the case, during which time the prosecution team conducted only a fraction of the number of interviews that it conducted during the four-and-a-half-year period between the explosion and the indictment.

 The memorandum of the interview with <mark>Witness #3</mark> is enclosed as Exhibit 61.

 *5.  Please inform us as to whether the prosecution team (or others) searched, or arranged for others to search, MSHA documents for possibly relevant (both inculpatory and exculpatory) documents in connection with any criminal investigation or prosecution related to the Upper Big Branch mine explosion.  If so, please provide us with all documents relating to what documents were searched, and how those searches were conducted (manually, electronically, using search terms, etc).  Please provide us with copies of all instructions to MSHA as to how to search for relevant documents.  To be clear, we are only looking to learn about the search methodology (if any), and are not seeking the documents identified in any such searches.*

 Relatively early in the prosecution team's investigation, MSHA produced to the prosecution team all its files from pre-explosion inspections of the UBB mine. MSHA also produced to the prosecution team all the memoranda of interviews that it conducted as part of MSHA's own investigation of the UBB explosion. MSHA further produced to the prosecution team its complete file of ventilation plans for UBB, along with all correspondence concerning ventilation plans. These materials contained both information that was inculpatory and information that the defense might have regarded as favorable to it. The United States produced all these materials to the defense.

 The prosecution team did not expect to find a large number of substantive UBB-related communications outside these official files because MSHA discouraged its personnel from discussing mine-related matters in communications other than those that were included in official files. Nonetheless, the prosecution team requested that attorneys with the United States Department of Labor (DOL) conduct an electronic search of email and other documents to identify any potentially exculpatory information not in the official mine file. (DOL is MSHA's parent agency.) The documents that the prosecution team requested be searched included all electronic documents collected in MSHA's internal review of its own performance in inspecting and regulating UBB prior to the explosion.

 The DOL review team agreed to use search terms to search several different sets of documents. Documents that matched the search terms were reviewed by DOL attorneys to

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 697
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling, Esq.
September 30, 2016
Page 8

identify possible exculpatory information, and documents that were identified as possibly exculpatory were then referred to members of the prosecution team for final review. I conferred with the DOL review team to establish search terms and sets of documents to be searched electronically. USA Goodwin provided further guidance to the DOL review team on which documents should be flagged as potentially exculpatory.

The instructions to the DOL review team are enclosed as Exhibit 62.

After this initial search, Defendant sought a trial subpoena that would require production of a broader set of documents. When Defendant sought this subpoena, the prosecution team requested that MSHA voluntarily identify all documents responsive to the proposed subpoena, regardless of whether they otherwise were required to be produced in discovery. MSHA did so, and the prosecution team voluntarily produced those documents on September 8, 2015. The proposed subpoena upon which MSHA was asked to base this search is attached as Exhibit 62A.

*6. Taylor alleged that the government failed to disclose prior to trial allegations that MSHA had destroyed relevant documents. Those allegations were contained in a declaration signed by* Witness #13 *. In your written response you asserted that the government had not known about the ___ declaration prior to the defense's use of that document during the trial. To further our understanding of this issue, please provide us with all documents reflecting what ___ or ___ attorneys told the government (prosecutors, agents, or others) outside of the grand jury prior to trial, including handwritten notes of interviews, and memoranda summarizing the substance of those interviews. With regard to the allegations in the ___ declaration, please inform us as to whether the prosecution team conducted any investigation of the allegations contained in that declaration, and if so, what investigative measures were undertaken and what was learned about those allegations.*

The memoranda reflecting the United States' interviews with ___ are enclosed as Exhibits 63 through 68. These documents reflect that, as explained in my earlier letter to you, ___ made no mention to the United States of any destruction of MSHA documents. After the defense introduced the declaration that ___ filed in a 2011 Massey civil suit against MSHA, the United States reviewed that declaration, as well as other contradictory declarations filed by other witnesses. The United States also was present when the trial court questioned ___ under oath regarding ___ declaration. ___ declaration claimed that an Witness #27 had told ___ that ___ saw another MSHA supervisor remove documents in trash bags from a local MSHA office. Witness #27, in a separate declaration, denied that ___ had seen this or told ___ that ___ had seen it. See June 6, 2016 Letter from Ruby to Masling, Ex. 17A. The MSHA supervisor denied that it had occurred. See *id.* Ex. 17B. The court considered these declarations and ___ testimony and concluded that no further inquiry was required. The prosecution team, after considering the same evidence, agreed, and found no substantial basis to investigate further.

*7. Taylor alleged that the government failed to disclose prior to trial an MSHA letter in which a district manager "applaud[ed]" Massey's mine safety initiative. Please clarify your written response to this allegation; we are not clear as to whether the government searched for that letter prior to receiving a copy that was attached to a defense motion. If the government searched for that letter prior to receiving the defense*

Case 5:18-cv-00591   Document 70-5   Filed 10/05/18   Page 26 of 132 PageID #: 1167
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 69
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling, Esq.
September 30, 2016
Page 9

*motion, please explain how the government learned about it. Also, please clarify your statement that the defense provided no evidence to show that the "applaud letter" was ever in the government's possession. If that letter was written by an MSHA official, wasn't the letter at that time in the government's possession? If so, is there any explanation for why the substantial search efforts you described failed to locate it?*

The prosecution team first learned of the "applaud" letter when it received the copy of that letter that was attached to a defense motion before trial. Prior to reviewing that motion, the United States did not search specifically for the "applaud" letter, although, as explained above, it did cause MSHA and DOL to conduct searches that were intended to locate documents such as the "applaud" letter if they existed. It was these general searches for exculpatory documents that my prior letter referred to when it mentioned our "substantial efforts" at identifying discoverable documents.

After the United States received the copy of the "applaud" letter attached to the defense motion, it asked MSHA to search all files that might reasonably contain a copy of the letter. The purpose of this request was to determine whether the "applaud" letter was in MSHA's files but was missed in prior document collections. This specific search for the "applaud" letter was unable to locate a copy of the letter anywhere in MSHA's files. According to the DOL attorney who supervised the search, employees at the local MSHA office believed, based on experience with the office's practices for maintaining correspondence, that it was possible that no copy of the letter was retained or filed when it was sent.

*8. Taylor alleged that the government failed to disclose prior to trial exculpatory information provided by* **Witness #6** *In your written response, you asserted that the government provided the defense with two memoranda reflecting the government's interviews of* **Witness #6** *To further our understanding of this issue, please provide us with all documents reflecting what* **Witness #6** *or* **Witness** *attorneys told the government (prosecutors, agents, or others) outside of the grand jury prior to trial, including handwritten notes of interviews, and the two memoranda summarizing the substance of those interviews. In addition, in your written response you discuss disclosing to the defense "favorable" information from* **Witness #10** *,* **Witness #18** *, and* **Witness #7** *Please provide us with the documents the government provided to the defense containing the favorable information you described.*

The memoranda reflecting the United States' interviews with **Witness #6** are enclosed as Exhibits 35 and 36. Enclosed as Exhibits 37 and 38 are letters in which the United States disclosed information from **Witness #10** **Witness #18** and **Witness** that the defense might have viewed as favorable to its position.

*9. Taylor alleged that the government failed to disclose information provided to the government by persons who entered into immunity agreements with the government. In your written response, you asserted that the government provided the defense with memoranda documenting pre-immunity interviews for all such witnesses. Please clarify whether the government provided the defense with "information provided to the government by these individuals or their counsel during discussions that led to the execution of the agreements." Please also clarify whether those witnesses or their counsel "professed innocence," and if so, whether those statements were disclosed to the defense.*

Case 5:18-cv-00591 Document 70-8 Filed 07/05/18 Page 27 of 132 PageID #: 1168
CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 69
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Mark Masling, Esq.
September 30, 2016
Page 10

The prosecution team's discussion with counsel for ▮▮Witness #4▮▮ is explained above, in the response to your first question. The statements made by ▮▮Witness #4▮▮ ▮Witness #4▮ counsel that minimized ▮▮Witness #4▮▮ criminal culpability were disclosed as described in that response.

With respect to other witnesses who entered into use immunity agreements, all substantive information that those witnesses or their counsel provided prior to entering into the agreement was provided in the witnesses' proffer interviews, and the memoranda of all those proffer interviews were disclosed to the defense.

Your question also asks about "professions of innocence." There were four witnesses who testified at trial under use-immunity agreements: ▮▮Witness #4▮▮, ▮Witness #39▮, ▮▮▮▮ ▮Witness #40▮ ▮Witness #40▮ and ▮Witness #24▮ ▮Witness #24▮ Of these four, ▮▮Witness #4▮▮ was the only one with whom (or with whose counsel) the United States discussed the possibility that the witness might be charged criminally. In the cases of ▮Witness #39▮ ▮Witness #40▮ and ▮Witness #24▮ because there was never any discussion of possible charges as to which they might have professed their innocence, the question of whether there was a profession of innocence does not squarely apply. In an effort to answer the question, however, I note that ▮▮▮▮ and ▮Witness #40▮ both were involved in providing advance notice of mine inspections. Both truthfully admitted their involvement in this practice, but both explained that they had been directed by others to engage in it. I do not know whether their statements about being directed by others constitute professions of innocence within the meaning of your question, but, in any event, those statements were disclosed in memoranda of interviews that were produced to the defense. ▮Witness #24▮ meanwhile, was involved in the preparation of a filing with the Securities and Exchange Commission ("SEC") that was the subject of Counts Two and Three of the superseding indictment. ▮Witness #24▮ stated that ▮▮ worked out of Massey's Richmond headquarters, did not receive information about safety violations at the company's mines—including UBB—and therefore did not know whether the statements made in the SEC filing were true or false. Again, the United States never discussed the possibility of charging ▮Witness #24▮ and I do not know whether ▮▮▮▮ statement about ▮▮▮ lack of knowledge of Massey's safety practices at UBB constitutes a profession of innocence within the meaning of your question, but, in any event, it was disclosed to the defense in the memorandum of ▮Witness #24▮ interview.

Please do not hesitate to contact me if you have further questions.

Sincerely,

Steven R. Ruby
Assistant United States Attorney

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# TAB

# C

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 697
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

| | |
|---|---|
| **From:** | Steven Ruby |
| **To:** | Masling, Mark (OPR) |
| **Subject:** | Memoranda |
| **Date:** | Thursday, January 19, 2017 8:22:09 AM |
| **Attachments:** | Witness #15 – 2014-03-11.pdf |
| | Witness #15 – 2015-03-31.pdf |
| | Witness #2 – 2015.09.29.pdf |
| | Witness #41 – 2015-09-13.pdf |
| | Witness #42 – 2015-09-17.pdf |
| | Witness #2 – 2015-07-21.pdf |
| | Witness #40 – 2015-07-31.pdf |
| | Witness #7 – 2015-06-30.pdf |
| | Witness #44 – 2015-06-24.pdf |
| | Witness #45 – 2015.03.26.pdf |
| | Witness #17 – 2014.03.11.pdf |
| | Witness #16 – 2011-11-10.pdf |
| | Witness #1 – 2011-11-10.pdf |

Mark,

I am sending, in this and two follow-up emails, the bulk of the memos you requested.
There are a smaller number -- about a dozen -- still outstanding that I will request
from the U.S. Attorney's Office as soon as personnel there are available this morning.
I will ask that they be provided today, so you will have them by the time you are
finished with this set.

In submitting these, there are some important points to make. First, most of the
information in the memos is either inculpatory or neutral with respect to the charges
against the defendant.

Second, to the extent there was information that could be regarded as materially
favorable, most or all of that information was available to the defense in some other
form. In that regard, it is important to emphasize the larger context of the discovery,
in which hundreds of other memos and interview transcripts--including memos and
transcripts of interviews with many of these same witnesses--were disclosed, not to
mention hundreds of thousands of documents, many of which disclosed the same
information discussed in these memos. One of the benefits of making broad
disclosures is that even if discoverable information from one source is inadvertently
omitted from a production, the same information will be made available from another
source. If there were inadvertent omissions here, you will find that this redundancy
effect generally applied.

Third, with regard to the memos that were prepared by FBI SA #1, you will see that
FBI SA #1 trial testimony did not focus on information provided by witnesses in
whose interviews ██ participated. On the contrary, testimony of that nature from ██
FBI SA #1 generally would have been hearsay. Accordingly, you will find that ██ trial
testimony focused on ██ review of specific sets of voluminous documents, all of which
were produced to the defense, and that ██ testimony involved little or no discussion
of the witness interviews reflected in his memos.

Fourth, some of the memos in this set relate to interviews from phases of the
investigation that ultimately did not result in charges against the defendant or pertain
to trial. And some of the memos in this set were produced to the defense -- I believe

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

you have referred to these in one of your outstanding requests.

Fifth, in compiling these memoranda, I discovered that one of them was from a 2011 interview with Witness #1 ████, which was conducted by Witness #46 ███████ ████████████████ rather than an attorney from the U.S. Attorney's Office. In a previous submission, I stated that our team had not interviewed Witness #1 That statement was based on the fact that when the USAO team sought an interview with Witness #1 in approximately 2012 or 2013 regarding a broad range of practices at Massey, Witness #1 refused to be interviewed. Witness #46 interview, which was much narrower than the one that Witness #1 refused, Witness #46



████████████████████ The memo was among a group of memos from pre-indictment interviews that were provided late by the agents who prepared them and inadvertently omitted from our production. I did not recall that Witness #46 had interviewed Witness #1 in ████ early investigation of contract fraud. But given the nature of the interview, I do not believe its omission was material.

Sixth, as I explained in our recent telephone conversation, the decision to make disclosures from post-indictment interviews by means of letters rather than production of full interview memoranda was a decision made by the prosecution team, and ultimately the then-U.S. Attorney, who closely supervised the investigation, and personally oversaw and participated in the trial. The entire prosecution team, including the then-U.S. Attorney, reviewed and approved the letter-form disclosures that were made regarding post-indictment interviews.

Seventh, and finally, I believe that the trial transcript will establish that the defense not only possessed, in some form, all discoverable information contained in these memos, but also used it at trial. Even if you reach a conclusion that some aspects of these memoranda should have been disclosed, there was no material prejudice to the defense from the omission to disclose them.

As we discussed, I am preparing further written responses to your outstanding questions. To the extent you find that these memoranda (or the other unproduced memoranda that you already have) contain information that requires further explanation, I request the opportunity to explain why that information was not viewed as exculpatory, was otherwise made available to the defense, or was adduced at trial.

Steve

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# TAB

# D

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

1

U. S. DEPARTMENT OF JUSTICE

OFFICE OF PROFESSIONAL RESPONSIBILITY


                                    )
OFFICE OF PROFESSIONAL              )
RESPONSIBILITY INVESTIGATION   )
                                    )
INTERVIEW UNDER OATH OF:            )
FORMER ASSISTANT UNITED             )
STATES ATTORNEY STEVEN RUBY    )

_____


*   *   *

INTERVIEW UNDER OATH OF

FORMER ASSISTANT UNITED STATES ATTORNEY STEVEN RUBY

Thursday, September 28, 2017

9:14 a.m.

*   *   *

Robert C. Byrd U.S. Courthouse

300 Virginia Street, Suite 4000

Charleston, West Virginia 25301

*   *   *


██████████████, Professional Court Reporter

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              2

1                    APPEARANCES OF COUNSEL:

2

3   U.S. DEPARTMENT OF JUSTICE, OFFICE OF PROFESSIONAL

4   RESPONSIBILITY:

5

6           Mark Masling, Esquire

7           950 Pennsylvania Avenue, NW

8           Washington, DC 20530

9           Telephone:  (202) 514-3365

10          Fax:  (202) 598-5842

11          E-mail:  mark.masling@usdoj.gov

12

13

14          John J. Sciortino, Esquire

15          950 Pennsylvania Avenue, NW

16          Washington, DC 20530

17          Telephone:  (202) 514-3365

18          Fax:  (202) 598-5842

19          E-mail:  john.sciortino@usdoj.gov

20

21

22

23

24

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                                3

1                        I N D E X

2    WITNESS                                            PAGE

3    Steven Ruby, Esquire

4        Examination By Mr. Masling ................. 4

5

6                      E X H I B I T S

7

8    NOTE:  All exhibits mentioned or referred to within the

9    transcript were retained by attorney.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

4

```
 1                    *   *   *
 2              STEVEN RUBY, ESQUIRE
 3    being first duly sworn, was examined and deposed as
 4    follows:
 5                    *   *   *
 6            E X A M I N A T I O N
 7    BY MR. MASLING:
 8        Q.    All right.
 9             It is September 28th of 2017.  I am Mark
10    Masling, assistant counsel, Department of Justice Office
11    of Professional Responsibility.  With me is OPR
12    Assistant Counsel John Sciortino.  We are in the United
13    States Attorney's Office for the Southern District of
14    West Virginia, interviewing a subject of the United
15    States versus Blankenship OPR investigation, former
16    Assistant United States Attorney Steven Ruby.
17             Based on what we've talked about briefly
18    before we went on the record, I understand that you
19    would like to make some preliminary statements, which is
20    totally fine and the floor is yours.
21        A.    Thank you.
22             The first and general point that I want to
23    make as we get started is that nobody in this office or
24    on the trial team intentionally withheld anything that
```

Case 5:18-cv-00591   Document 705-3 Filed 09/05/18   Page 36 of 132 PageID #: 1177
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

5

1    they believed should have been produced to the defense

2    in the Blankenship case, nor would we have done that.

3    With that said, I'll talk a little bit preliminary about

4    the main question that I believe you want to discuss,

5    which is how did we handle the post-indictment

6    memorandum of interview of witnesses.

7        Q.    Yes, although there were some pre-indictment,

8    but yes.

9        A.    I understand.  By way of background and to

10   explain or to give background for some of the

11   conversations that I had with other members of the trial

12   team, I was concerned about discovery from the beginning

13   of the case.  Before we charged the case, I had repeated

14   conversations with the U.S. Attorney about the

15   challenges that we would face with discovery.

16           There were hundreds, maybe thousands of MOIs;

17   there were millions of documents in the case that came

18   from many different sources that had been collected over

19   years.  And with that much discovery, I understood that

20   there was a not insignificant risk that we would make a

21   mistake somewhere.  And my point to the U.S. Attorney

22   was about specifically the approach that I anticipated

23   the defense would take with a case that size that the

24   defense would, based on some experience that I had in

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

6

1    similar cases, file a very large number of motions,

2    attempt to put us in a situation where our team, which

3    was almost certain to be small, relative to the team

4    that we expected the defense would have, would be

5    pressed for time, would be under pressure and would

6    eventually make some sort of mistake, and that that

7    mistake was most likely to come because of the volume of

8    materials in the production of discovery.

9              And it had been my experience that in cases

10   like the Blankenship case, high-profile cases, it is a

11   defense tactic to, if that kind of mistake can be forced

12   or if that kind of mistake occurs, to push hard, if

13   there is a conviction for an OPR investigation.  And the

14   U.S. Attorney and I frankly had a conversation where I

15   said there is a good chance that with the risks of

16   discovery that are involved here and knowing the candid

17   defense counsel that we are dealing with, that we are

18   going to end up sitting here in this chair where I'm

19   sitting today.

20             We had this conversation before we presented

21   the indictment about discovery.  The U.S. Attorney did

22   not share the concern that I had about the volume of

23   discovery and the discovery issues that we were going to

24   face in the case.  He was, I think it's fair to say,

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                            7

1    dismissive of those concerns.  We pressed forward.

2         We indictment the case around the middle of

3    November 2014, I think, November 12th or 13th.  And the

4    initial stages of our discovery production were hectic.

5    They are often hectic because you have a short deadline

6    to make your initial discovery production.  I think ours

7    was due early December, the initial discovery

8    production, December 4th or so.  I was -- and I think

9    you know this, Mark, from written submissions I made

10   before -- ██████████████████████████████████████

11   ███████████████████████████

12          █████████████████████████████████████████

13   ███████████████████████████████████████.  So

14   there was a really intense period of work to put

15   together the initial discovery production between

16   mid-November and the first week of December, ███████████

17   █████████████████████████████████████████████████████

18   ████████████████████████████████████████████

19        Q.    Just to tell you this as a compliment to you,

20   we've heard -- this is slightly exaggerated -- ████████████

21   ████████████████████████████████████████████████

22   ██████████████████████████████████████

23        A.    Yes, it's --

24        Q.    Those things were said with admiration?

Case 5:18-cv-00591   Document 705-1 Filed 06/05/19 Page 39 of 132 PageID #: 1180
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

8

1        A.      That's good to know.   In that initial period

2    of gathering and producing discovery, I had another

3    conversation, probably more than one with the U.S.

4    Attorney about the challenges we were facing with

5    discovery, the challenges the discovery was going to

6    pose to the case.   And his response was he wasn't

7    worried about it because we were almost done with

8    discovery and there wouldn't be any significant

9    resources required for it after that.

10            Anyways, in one of those conversations during

11   that period of time when the U.S. Attorney made the

12   point that as a general matter, we wouldn't need to

13   produce anything from the post-indictment interviews,

14   post-indictment interviews that we conducted with

15   witnesses, unless there was something there that was

16   exculpatory and that hadn't produced before.

17            And the idea there was that, as a general

18   matter, the post-indictment interviews that were

19   conducted were going to need to be disclosed.   That was

20   sort of the Genesis of the approach that was taken,

21   which was that post-indictment interview memos wouldn't

22   be produced in whole, that there would be -- if there

23   were exculpatory information that came to light in those

24   interviews, that it would be produced.

Case 5:18-cv-00591   Document 705-1   Filed 08/05/19   Page 40 of 132 PageID #: 1181
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

9

1              But -- and we were aware, of course, that we

2      needed to disclose anything from a post-indictment

3      interview if it was exculpatory, but the approach to

4      identifying that information was an informal one.  After

5      interviews, we, the case team, would discuss -- the

6      trial team would discuss what witnesses had to say and

7      we regularly discussed more broadly the evidence that

8      existed in the case.

9              And the U.S. Attorney's view, which he

10     consistently expressed, was that there really wasn't any

11     exculpatory evidence in the case.  This is something

12     that you all may have touched on already with other --

13     with other folks that you've talked to, but, at this

14     point, it might be useful to talk about the U.S.

15     Attorney's role in the case.

16             It's unusual for, at least in my experience

17     here, for a U.S. Attorney to be personally involved in

18     prosecuting and trying a case.  This case didn't follow

19     the usual pattern.  The U.S. Attorney decided early on

20     that he wanted to be deeply involved in the case

21     personally.  And there wasn't any decision of any

22     significance in the case that was made without his

23     personal approval.

24             That was true in the earlier cases that arose

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                          September 28, 2017

                                                                    10

1    from the UBB investigation, so the Witness #30 case, the

2    Witness #25 case, the Witness #31 case, and it was true with

3    Blankenship.  With Blankenship, the U.S. Attorney and I

4    met more or less daily, sometimes many times a day.  And

5    certainly folks here in the office can confirm that

6    during the period of time leading up to the indictment

7    and after the indictment when I was here, that I was in

8    his office and he was in my office multiple times daily

9    talking about the case and making decisions about what

10   was going to be done in the case.

11          You have mentioned that the U.S. Attorney --

12   and I hope I'm not misquoting you, but that the U.S.

13   Attorney said that he doesn't recall being involved in

14   any decision about producing interview memorandum.

15       Q.    Not exactly.  I'll show you what he said.

16   It's possible I misstated, but I'll show you what he put

17   in writing for us.

18       A.    And I'll comment on it at that point, but I'll

19   say this now, and if it's responsive to what he said,

20   say it again then.  I have a specific recollection of

21   discussing that with the U.S. Attorney, the subject of

22   how we were going to handle post-indictment MOIs and the

23   way in which we eventually did handle them.

24              MR. SCIORTINO:  And this discussion was

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                      September 28, 2017

                                                              11

1    after indictment, but before the first big production?

2              THE WITNESS:   It was during the -- so we

3    made the first big production in early December.   There

4    were subsequent follow-up productions through the -- I

5    would say the early part of the following year.   And I

6    don't -- I certainly in retrospect wish that I had taken

7    detailed notes of my conversations with him, but as a

8    practical matter, that's a difficult thing to do with a

9    trial team.

10   BY MR. MASLING:

11       Q.    And your boss.

12       A.    Sure.   I would put that discussion, that

13   initial discussion, John, you know, within the two or

14   three months after the -- and I don't have the dates in

15   front of me, but the two or three months after

16   indictment when we were making our intensive initial

17   productions of discovery.

18       Q.    I don't think that's -- I think it was later,

19   but I'll show you some stuff to suggest it was later.

20       A.    Okay.

21             Well -- and there were -- so to expand on that

22   a little bit, and I'll get to this in a second, this is

23   something that we discussed, it came up at various

24   points during the course of the case.   There came a

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                             12

1    point in the case, as you know, where the Court ordered

2    the government to identify exculpatory material, which

3    we were aware.

4            And in response to that order, the U.S.

5    Attorney and I -- and my recollection is that these also

6    involved AUSA #1         -- had lengthy discussions about

7    what we needed to identify.  We drafted a letter based

8    on those discussions and identified the material that

9    the group had discussed, and the U.S. Attorney reviewed

10   the letter.  He was familiar with the witness interviews

11   that we had conducted post-indictment, he participated

12   in many of those interviews.  We discussed all of them

13   that were of any significance.

14           And the U.S. Attorney agreed and AUSA #1

15   also reviewed the letter and agreed that we had

16   identified in that letter all of the exculpatory

17   information that we were aware of and then some, that

18   the letter had erred on the side of breath.  There was

19   at least one letter that went out with supplemental

20   information.

21           And again, I don't remember if AUSA #2

22   reviewed that letter.  I know that I gave the U.S.

23   Attorney the letter to review because I wanted his

24   personal okay for it.  My recollection is that AUSA

Case 5:18-cv-00591   Document 705-3 Filed 09/05/19   Page 44 of 132 PageID #: 1185
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                              September 28, 2017

                                                              13

1    AUSA #1 also reviewed the letter and again, that we all

2    agreed that everything that was -- go ahead.

3         Q.    I'm just -- do you know when was this?

4         A.    This was the -- again, I wish I had more time

5    to get my dates right before we sat down today, but this

6    was the second letter that was sent to the defense

7    making disclosures responsive to the Court's order or

8    identifying evidence responsive to the Court's order.  I

9    want to say it was fairly shortly before trial.

10        Q.    You are not talking about the letter

11   disclosure?

12        A.    There was a first letter disclosure and a

13   second letter.

14        Q.    Right.

15              I don't know if this is the letter you are

16   talking about.  This is the only other one I know about?

17        A.    This may be it.  I can look at the

18   correspondence.  I apologize --

19        Q.    That's okay.

20        A.    I just didn't have a chance to completely

21   refresh my recollection on all of this, but certainly

22   this letter was one.  For the record, this is a letter

23   dated September 10, 2015 from me to William W. Taylor,

24   III, identifying items that the defense may claim are

Case 5:18-cv-00591   Document 705-7 Filed 10/05/18   Page 45 of 132 PageID #: 1186
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

14

1    Brady material.  And this is a letter that I reviewed

2    with the U.S. Attorney before it went out.

3              In any event, one of the letters, and it may

4    have been the first, the first letter that we sent out

5    that was responsive to the Court's order to identify

6    exculpatory material identified information from witness

7    interviews and the specific phrasing in the letter was,

8    if I recall correctly, and this was something that we

9    talked, and I think I do remember it correctly, was that

10   we were disclosing that information.

11             In other words, not just that we were

12   identifying it as something we were pointing them to in

13   materials that had already been disclosed, but that we

14   were disclosing this information from witness

15   interviews, via the letter, if that distinction makes

16   sense.

17        Q.    I got lost.  Is this the June whatever letter,

18   the initial response to the Court's order saying

19   identify?

20        A.    That sounds right.  Can I take a look?

21             MR. SCIORTINO:  It's the one that has the

22   list --

23   BY MR. MASLING:

24        Q.    Attached to that is a long list of Bates

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                   September 28, 2017

15

1    stamps.  And the very last page has 10 or so MOI

2    destinations?

3         A.    Wasn't there -- and I'm assuming that you all

4    studied this more recently than I have.  I believe there

5    was a letter that discussed, for example, a Massey

6    official named Witness #8

7         Q.    That's a different letter.  This is our binder

8    of documents, not all of which we'll talk about, but

9    some of which.  So there is a tab called OPR general,

10   and I assume it was in some of the documents that I sent

11   to you.  Look at OPR 148 and 149.  This is a letter

12   disclosure concerning information that Witness #8 Witness #7

13   and Witness #13 had --

14        A.    This is the one I was thinking of, and I

15   wasn't quite right about the phrasing, but the

16   discussions, in any event -- and as I said, the U.S.

17   Attorney reviewed this letter as well, which made

18   additional disclosure about witnesses.  And we discussed

19   again the subject of whether we needed to disclose the

20   entire memorandum or whether we were only required to

21   disclose information from the memorandum that we

22   believed to be exculpatory.

23             And his view, again, was that there was no

24   requirement to disclose -- to disclose an entire

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

16

1    memorandum of interview, either pre-indictment or

2    post-indictment, but the requirement was to disclose

3    exculpatory material, and that we had satisfied our

4    obligation to do that with this correspondence and also

5    satisfied the Court's direction to identify exculpatory

6    material for the defense.

7         So those weren't the only points when we

8    discussed that issue, but when the Court entered that

9    order requiring disclosure of -- or identification of

10   exculpatory material, and when we prepared these

11   letters, again, that was the point of view of the U.S.

12   Attorney, that we had identified in these letters,

13   everything from our witness interviews that could be

14   exculpatory.

15        And again, you know, it's -- you hesitate to

16   say anything about the former U.S. Attorney or about

17   other AUSAs who are on the trial team that can be

18   regarded as negative information about them, but, as I

19   said, AUSA AUSA #1 also reviewed the letters and agreed

20   that we had identified in here everything that we were

21   aware of that was exculpatory that he was aware of.  And

22   I certainly don't believe that he or I or the U.S.

23   Attorney drew those conclusions in bad faith.

24        Certainly, from my standpoint, and I believe

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

17

1    from the standpoint of the other members of the trial

2    team who were involved, it was our belief that we had

3    complied with the Court's order and complied with our

4    obligations under Brady.  We specifically -- and some of

5    the questions that OPR has sent raised the issue of <span style="background:red;color:black">Witness #13</span>

6    <span style="background:black;color:red">Witness #13</span>   We specifically discussed the issue of <span style="background:red">Witness #13</span>

7    and --

8         Q.    Who is we?

9         A.    Me, the U.S. Attorney and AUSA <span style="background:red">AUSA #1</span>  We had

10   all been in the interviews with <span style="background:red">Witness #13</span>.  I don't know

11   if everybody was in every interview, but I believe that

12   everybody had been -- it's possible that all three of us

13   had been in every view.  At minimum, we had all been at

14   some of those interviews.

15        Q.    Nobody was at the first one.  The agent went

16   to his house.

17        A.    Okay.

18        Q.    But anyway.

19        A.    The interviews that the U.S. Attorney's Office

20   had conducted with <span style="background:black;color:red">Witness #13</span> were the interviews that I'm

21   referring to.

22        Q.    Okay.

23        A.    And had all discussed what <span style="background:red">Witness #13</span> had said

24   in the interviews with the U.S. Attorney's office, the

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                          18

1    three of us had discussed that and all agreed that what

2    was included about Witness #13 in the letter that --

3        Q.    9/21 letter?

4        A.    Yes, that's Batesed OPR General00148 and 149,

5    that that was the extent of exculpatory information from

6    Witness #13 interviews with us.  By the point in the case,

7    certainly when this letter was sent and you guys can

8    figure out from the e-mail what the timing was of what

9    I'm about to discuss relative to the first letter, the

10   June letter, sometime around -- sometime in the summer

11   of 2015, there came a point where the U.S. Attorney took

12   even more detailed control of the case or more direct

13   control of the details of the case.

14            He had become upset that AUSA #1 and I had

15   had conversations with the defense about a continuance

16   of a trial date.  After that, he called the team into a

17   meeting, me AUSA #1 , AUSA #2 -- I don't remember if

18   either of the agents were there -- into a meeting in the

19   main conference room down the hall here in the U.S.

20   Attorney's Office and very, I'll say, firmly told us

21   that no decision in the case could be made without his

22   approval.

23            And that was the basis on which we proceeded

24   for the rest of the case, certainly, including his

Case 5:18-cv-00591   Document 705-5   Filed 02/05/19   Page 50 of 132 PageID #: 1191
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              19

1    review of this letter.  And I don't recall if the other

2    letter, the June letter went out, the first letter of

3    response to the Court's order, went out before or after

4    that directive from the U.S. Attorney, but regardless of

5    that, he certainly reviewed the first letter and

6    expressed his view that it did identify everything we

7    were aware of that was exculpatory.

8          The issue came up again in the testimony of

9    Witness #4 at trial or maybe at the end of that

10   testimony.  The defense suggested that the government

11   had failed to disclose exculpatory information about

12   Witness #4 that we should have known about from

13   discussions with Witness #4  We argued that issue in court and

14   then the team discussed it over a weekend during which

15   we briefed issues relating to Witness #4

16         And at no point did the U.S. Attorney or

17   anybody else on the team suggest that there was

18   information from our discussions of Witness #4 that we

19   should have disclosed, and in particular, nobody

20   suggested that there was any exculpatory information

21   that we should have disclosed.  On the contrary, the

22   U.S. Attorney's position was that we had disclosed

23   everything with regard to Witness #4 that we were

24   obligated to.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                                20

     1              To summarize a few points based on that

     2     history, and then we can turn to questions.  Number one,

     3     to come back to where I started, nobody on the trial

     4     team ever intentionally withheld anything that any of us

     5     believed should have been disclosed.  Certainly

     6     somebody, and this is true in lots of cases, somebody

     7     who reviews the decisions that we make could conclude

     8     that we made the wrong calls, but there was not any

     9     intentional wrongdoing, not on my part, not on the U.S.

    10     Attorney's part, not on the agent's part, not on the

    11     part of anybody else on the team.

    12              Two, the team discussed, fairly extensively,

    13     over the course of the pretrial process, the issue of

    14     what was exculpatory from our post-indictment witness

    15     interviews and agreed that the disclosure letters that

    16     we sent included everything that was even arguably

    17     exculpatory.  And the U.S. Attorney personally signed

    18     off on the completeness of those letters.

    19              Three, and I'm going to be direct here.  It

    20     seems that Zuckerman has tried to create the idea, and

    21     maybe I'm misinterpreting this because these are the

    22     questions you are asking me, but it seems that Zuckerman

    23     has tried to create the idea that I was making all of

    24     the decisions in this case unilaterally.

Case 5:18-cv-00591   Document 705-5   Filed 08/05/19   Page 52 of 132 PageID #: 1193
CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                          September 28, 2017

21

    Q.    No.

    A.    So I'll truncate that point and say that that
was not the case.  The U.S. Attorney personally ran the
case.  And I have -- I would like to think that I have
some skills as a lawyer that I think were helpful to our
team at trial and pretrial proceedings, but to be
perfectly blunt, I was not the discovery expert here.
The U.S. Attorney had a lot more seniority, not just in
terms of rank in the office, but also in time in the
office than I did.

         And I didn't make any of the decisions about
disclosure of post-trial MOIs without consulting with
him.  I also -- and I know you all understand this, but
at the same time I feel obliged to say it:  I hope that
you don't lose sight of the difference between how trial
prep decisions look in hindsight and how they look at
the time they are being made.

         You can, in a review like this, look at a few
dozen lines from a memoranda of interview and certainly
conclude when you look at those in isolation that we
should have done things differently, but in a real life
trial and pretrial it's relentless time pressure.  We
were -- to the point you made earlier, Mark, ████████
███████████████████████████████████████.  And

Case 5:18-cv-00591  Document 705-5  Filed 08/05/19  Page 53 of 132 PageID #: 1194
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

1   I know that the defense now wants you to isolate certain

2   aspects of the process, put them under a microscope and

3   conclude two years later that we were corrupt

4   prosecutors.

5        Q.   That's more accurate as to what they've said.

6        A.   I hope that the context in which the entire

7   pretrial process takes place is kept in mind.  I am --

8   last, I'll say this:  I'm reluctant to whine, but since

9   I'm a subject, I'll just lay it all out there.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

23



1    ████████████████  ██████████████████████████████,

2    but to be perfectly honest, if the Zuckerman lawyers are

3    going to attack us for not making every decision

4    perfectly in the context of an unbelievably high

5    pressure case, then I would respectfully request that

6    that be considered in the context of what I was going

7    through at the time.

8        Q.   ████████████████████████████████

9    ████████████████████████

10       A.   ████████████████████████████████

11   ██████████████████████████████████████  █

12   ████████████████████████████  ████████████

13   ████████████████.

14       Q.   ████████████████████

15       A.   ████████████████████  ████████████████

16   ████████████████████████████████████████████████████

17   ██████████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ██████████████████████████████████████████

21   ████████████████████████████████████████████

22   ██████████████████████████████████████

23   ██████████████████████████████████████

24   ██████████████████████████████████████████████

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

24



1
2       Q.
3
4       A.
5
6       Q.
7       A.
8
9
10
11
12
13
14      Q.
15              MR. SCIORTINO:
16
17              THE WITNESS:  So thank you for letting me
18      put that on the record.
19      BY MR. MASLING:
20      Q.    Of course.  So let's -- I want to get some
21      background.  I actually don't want to start with MOIs.
22      I want to start with the basics for exculpatory
23      evidence, but we'll get to the MOIs.  So you've given us
24      some information in your written response about your

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

25

1    background, but if you could just talk to us a little

2    bit about your experience at the U.S. Attorney's Office

3    before the Blankenship case.

4            Did you work on any matter other than

5    Blankenship while the Blankenship investigation was

6    going on?

7       A.    Yes.

8       Q.    Why don't you tell us a little bit about --

9       A.    Just to give you a quick version or

10   pre-Blankenship of pre-Blankenship:  I started here in

11   October, I believe, September or October of 2009.  I was

12   originally assigned to the drug and violent crime unit.

13   The office of organization was slightly different then,

14   but it was -- I don't remember exactly what the name

15   was, but it was functionally the drug and violent crime

16   unit.  My supervision was ███████████████████████████

17   ██████████████████

18            I initially did fairly routine firearms cases

19   for the most part, so felony possession, domestic

20   violence misdemeanor in possession, bank robbery here or

21   there.  After -- let's see, what was the timing.  The

22   UBB explosion was in April of 2010.  I had been here

23   about six, seven months, give or take.

24            The -- at that point, Mr. Goodwin was not the

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

26

1    U.S. Attorney, he was the -- and again, I may be getting

2    the precise titles wrong, but functionally, he was the

3    chief of the white collar crimes section.  He had been,

4    I'm fairly certain at that point, nominated to be U.S.

5    Attorney.  He asked me to work with him directly on the

6    UBB investigation, and so I was involved in that

7    investigation from the beginning at his request.

8              And the way that the office divided cases, a

9    case like that doesn't necessarily always fit neatly

10   into white collar or any other section.  It's a

11   workplace safety crime, which is kind of -- that was the

12   way that it was regarded in the beginning, which is an

13   unusual kind of case.  But in the way that the office

14   divided up cases, it fell into the purview of white

15   collar crimes.

16             So Mr. Goodwin, then AUSA Goodwin had the

17   case.  He asked me to help him with it, and I worked

18   with him on the investigation from the beginning.

19   During the time that we did the UBB investigation -- so

20   there were a number of cases, as you know, and I alluded

21   to this earlier, arising from the UBB investigation that

22   pre-dated the Blankenship case, and I worked on all of

23   those.

24             I also worked on other cases while the

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                      September 28, 2017

27

1    investigation arising from UBB was going on.  So there

2    was a series of vote fraud cases in Lincoln County,

3    which is near here that ultimately led to the

4    convictions of three elected officials, and I handled

5    those.  There was a series of -- another series of

6    public corruption cases in Mingo County, which is

7    another county in our district with a longstanding

8    political corruption problem.

9         These cases ultimately led to the convictions

10   of four elected officials, including a sitting State

11   Court judge.  I handled those.  So there was -- there

12   were some -- there was another interesting and time

13   consuming case that happened during the course of the

14   post-UBB investigation with an extortioner who was

15   sending death threat extortion letters to a series of

16   wealthy individuals around the country, Harvey

17   Weinstein, the movie producer, the gentleman who founded

18   Groupon.

19        One of the victims lives part-time in this

20   district, so his attorney reported the case to us when

21   he got the threat.  And I handled that case.  We tracked

22   down the person who was making the threats prosecuted

23   him, convicted him.  He plead, so there were a number of

24   other large -- certainly not as large as Blankenship or

Case 5:18-cv-00591   Document 705-2 Filed 09/05/19   Page 59 of 132 PageID #: 1200
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

28

1    the post-UBB investigation, in terms of the -- just the

2    size of the investigation, but a number of large cases

3    that I handled during the course of the post-UBB

4    investigation.

5           Now, if your question is from indictment to

6    trial, I would say that my time was at least 90 percent

7    Blankenship.  There may have been a couple other

8    investigations that were moving along during that period

9    of time.

10      Q.    It's not a really important question.  It was

11   more for background.

12      A.    Sure.

13      Q.    So how many cases had you tried to verdict

14   before you tried the Blankenship case?

15      A.    Two.

16           MR. SCIORTINO:  What kind of cases were

17   those?

18           THE WITNESS:  One was a counterfeiting

19   case, counterfeit currency case.  And the other was a --

20   it arose out of the vote fraud cases that we did in

21   Lincoln County.  It was an assault on a federal officer

22   case.  So an FBI agent had gone out to investigate the

23   vote fraud, the witness had pulled a gun on him, and we

24   prosecuted that as an assault on a federal office.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

29

1    BY MR. MASLING:

2        Q.    What bar or state bars are you an active

3    member of?

4        A.    New York, D.C. and West Virginia.

5        Q.    This is going to sound like a loaded question

6    in light of how we started out, but it's the same

7    question we've asked everybody that we've interviewed so

8    far:  Based on your experience working closely with the

9    former United States Attorney, Mr. Goodwin, did you form

10   an opinion of his professionalism and ethics, and if so,

11   what was that?

12       A.    Look, I don't think that anyone here in the

13   office would disagree with the view that Mr. Goodwin

14   liked media exposure.  That was a priority, certainly

15   for him during his time in office and, you know, this is

16   the only U.S. Attorney's Office I've worked in, but I

17   think it's probably fair to say that he's not the only

18   U.S. Attorney of whom that's ever been true.

19       Q.    Have you ever heard of the Southern District

20   of New York?

21       A.    I have.  I think I saw somebody from there on

22   the cover of time magazine.

23       Q.    Yes.

24       A.    He -- I would say that the -- you know, I

Case 5:18-cv-00591   Document 705-5 Filed 06/05/19 Page 61 of 132 PageID #: 1202
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

1    certainly would not call him unethical.  I think that

2    you can see from some of the correspondence that you

3    mentioned, Mark, in an earlier discussion that there

4    were areas where he and I disagreed about, priorities in

5    the case.  You know, I, as I said, repeatedly before

6    indictment and after indictment approached him about the

7    importance of making sure that we got discovery right.

8              And, you know, look, you asked the question

9    about how many cases I tried before I did this case, so

10   there is no point avoiding the subject.  I raised it

11   with the U.S. Attorney in conversations about discovery.

12   I did not have a tremendous amount of experience in

13   making the calls that we were going to have to make.

14             MR. SCIORTINO:  I'm guessing the

15   counterfeiting case and assault case had nowhere near

16   the --

17             THE WITNESS:  That is accurate.

18             MR. SCIORTINO:  --  discovery issues

19   complexity.

20             THE WITNESS:  That is accurate.  You know,

21   my hope in having those conversations was that we would

22   get more -- that I would get more help in making the

23   calls that needed to be made in discovery, handling

24   discovery generally because I was -- as I said before, I

CONFIDENTIAL - DO NOT DISCLOSE
Case 5:18-cv-00591   Document 70-5   Filed 05/05/19   Page 62 of 132 PageID #: 1203
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

31

1    was deeply concerned that if there was one area of the

2    case in which we might make a mistake that would come

3    back and be problematic, it would be discovery, just

4    because there were so many moving parts.

5    BY MR. MASLING:

6         Q.    We heard that AUSA #1 was added to the

7    trial team, in part, because of AUSA #1 fairly extensive

8    experience with criminal trials and criminal discovery.

9              Is that accurate?

10        A.    My view on that is that AUSA #1 was added,

11   yes, certainly because of AUSA #1 experience, probably

12   primarily because ■■■ was a good trial lawyer with a good

13   courtroom presence who the U.S. Attorney thought would

14   be an asset to us in trying the case.  And I think that

15   was accurate, without a doubt.

16             But, yes, I would say generally that the

17   thinking was that AUSA #1 experience in having had -- tried

18   many cases, having been in the office for a long time,

19   would be beneficial in all of work that we had to do

20   leading up to trial as well.  ■■■ was known as a quick

21   writer and a good writer.  ■■■ would be able to help us

22   with the avalanche of briefing that we expected.  So,

23   yes, I would say that's accurate.

24        Q.    There is a tab in the binder, OPR Ruby, which

Case 5:18-cv-00591 Document 705-3 Filed 10/05/18 Page 63 of 132 PageID #: 1204
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                            32

1    is the materials that you have provided to us.  And take

2    a look at OPR Ruby 0003 and footnote 4.  And it says, in

3    part, "Mr. Goodwin and AUSA #1  and AUSA #2 played only

4    minor roles in discovery matters and later on neither of

5    the case agents played a role in discovery matters."

6          Do you think that's an accurate description of

7    how discovery matters were handled?

8    A.    Well, when I -- I thought about this.  When I

9    wrote this, what I was thinking of in terms of our

10   discovery production was the initial phase of production

11   where we pushed out 99 percent of the discovery that got

12   produced in the case, the however many million

13   documents, the --

14   Q.    I heard four.  Is that about right, 4 million?

15   A.    Documents?

16   Q.    Yes?

17   A.    That seems high.

18         MR. SCIORTINO:  Maybe pages.

19         THE WITNESS:  Pages, yes.

20         MR. MASLING:  Yes.

21         THE WITNESS:  That's a reasonable number.

22   I don't remember now what the actual number was.  I know

23   the pages were in the millions.  And that was certainly

24   with regard to volume of discovery and with regard to

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

33

1    that initial production of discovery, that was mostly

2    done with me and Paralegal #1 our paralegal.  And, you

3    know, we -- we, at that point, you know, AUSA #1

4    AUSA #1 if ▪▪▪ was on the trial team at all at that point,

5    ▪▪ had only been recently added.

6    BY MR. MASLING:

7         Q.    No, ▪▪ was only February 1st, I think, of

8    2015?

9         A.    And ▪▪ -- that initial push, like I said, that

10   was largely mechanical.  We decided we were going to

11   push out everything essentially, the entire document

12   database.  And all of the pre-indictment MOIs, although,

13   as it turns out, we missed some, which I'm sure we'll

14   get to.

15        Q.    Yes.

16        A.    And the -- so that -- anyway, that's what that

17   referred to, when I wrote this, what I thought of as our

18   discovery production was this initial push of getting

19   things out that we had had before indictment.  I

20   certainly wouldn't say that -- that's not accurate with

21   regard to the narrower issue, which has come to be

22   obviously a significant issue for OPR with regard to the

23   handling of the post-indictment MOIs.

24              For the post indictment MOIs, I don't think

Case 5:18-cv-00591   Document 705-3   Filed 09/05/19   Page 65 of 132 PageID #: 1206
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

34

1    those were at least not largely at issue in this initial

2    response.  The U.S. Attorney had a significant role in

3    decision-making.  AUSA #1 , I know, reviewed these

4    letters with me because I wanted to make sure we got it

5    right.  I would not say that AUSA #2 , even after

6    indictment, AUSA #2 role in the post-indictment memos, MOIs

7    has been small, maybe none.  I don't know, I don't

8    remember.

9         Q.    Talk to us a little bit about the general

10   discovery philosophy leaving aside the MOI issue for a

11   second, which I know was probably the subject of

12   explicit discussions, but was there a, let's just give

13   them everything, essentially open file?  Was there, we

14   are going to be selective?  I mean, what drove discovery

15   decisions, if anything?

16        A.    With regard to -- so with regard to

17   pre-indictment materials, the materials that we had

18   before the indictment, we discussed, and at that point

19   it was -- and you've confirmed that, and my recollection

20   is that AUSA #1 was not part of the trial team then.

21   The U.S. Attorney and I discussed it and decided that

22   given the volume of documents and our relatively limited

23   resources, what made the most sense was just to hand

24   them the entire document database, which we did.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

35

1        We had an online relatively database, which

2    was maintained out of the facility in South Carolina

3    that we gave them and that we were going to produce,

4    just go ahead and produce all of our pre-indictment

5    MOIs, produce MSHA's views, the two-day transcripts of

6    interviews with miners after the explosion.

7        There may have been -- and I don't remember.

8    There may have been a couple of small categories that we

9    decided were not discoverable, but for the most part, in

10   terms of volume, 99.9 percent of the materials that we

11   had were the online document database, and we decided to

12   just turn that over.

13       Q.    I think I sent you, among the documents that I

14   sent, were some excerpts from spreadsheets that I

15   believe were prepared by Paralegal #1    .  And you had

16   reviewed them and you had asked Goodwin to review them

17   to make decisions about disclose and not disclose.  And

18   so OPR General OP001 is an e-mail from Paralegal #1 to you and

19   Goodwin saying, here's a portion of index, and then on

20   the next page there is this bullet point I wanted to ask

21   you about.

22       It's in the middle of page, OPR General 002,

23   and it's got a date of -- and this was an entry that was

24   made by Paralegal #1 8/4/2014, so pre-indictment.  First

Case 5:18-cv-00591   Document 705-5   Filed 09/05/18   Page 67 of 132 PageID #: 1208
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                     September 28, 2017

36

1    sentence says, "Booth said he wants to produce
2    everything that we have in this case," and then there
3    was some further discussion.
4              But I wanted to ask you:  Did you ever hear
5    him say anything like that, or how would you interrupt
6    how Paralegal #1 had written about what Goodwin had said to
7    her?
8         A.    I assume -- let me answer both parts of the
9    question.
10        Q.    Okay.
11        A.    The discussion that -- this is consistent with
12   the discussion that Booth and I had early in the case,
13   and then again when it came time to produce discovery,
14   that we were going to turn over the entire document
15   database.  That is what I interpret that to mean.
16        Q.    We haven't talked to him because he declined
17   us for an interview.
18        A.    Right.
19        Q.    But we've heard it suggested, and it's just a
20   suggestion -- and I don't believe they've heard from
21   Goodwin about this, that at least somebody's interrupted
22   this to mean the MOIs as well.  It's like whatever there
23   is in this case I want it turned over.
24        A.    Right.

Case 5:18-cv-00591   Document 705-3   Filed 09/05/19   Page 68 of 132 PageID #: 1209
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

37

1      Q.    And I take it, based on kind of your
2  introductory that you would disagree with that
3  characterization?
4      A.    Certainly.  I mean, there is no question that
5  when -- you know, this is a pre-indictment -- this was
6  our view of what we would do with the pre-indictment
7  materials, that we would turn over all of the
8  pre-indictment MOIs, that we would turn over all of the
9  pre-indictment documents in the document database.
10  Booth's view was that post-indictment MOIs were
11  different.
12          I -- and in the discussions that we had about
13  how we were going to handle those, whether to disclose
14  the entire MOI, whether to disclose only exculpatory
15  material, his view was that we were satisfying our
16  obligations by disclosing exculpatory materials.
17          MR. SCIORTINO:  Did you argue with him?
18          THE WITNESS:  No.  No, I didn't.  And
19  certainly in retrospect -- I mean, look, it would have
20  been -- in retrospect, it would have been much better,
21  we could have avoided much of this process, if we had
22  just handed over everything.  And I don't believe that
23  there was anything in those memos that would have
24  affected the outcome of the case.  It certainly wasn't

Case 5:18-cv-00591   Document 705-3 Filed 09/09/19   Page 69 of 132 PageID #: 1210
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                   September 28, 2017

38

1   the decision not to produce them certainly -- or to

2   produce them in whole certainly wasn't based on a desire

3   to hold back something from the defense that we thought

4   would help them.

5        I think the memos are -- you know, granting

6   that there are pieces of the memos that you can argue

7   about, the memos as a whole are very strongly favorable

8   to the government's case.  You know, I've wondered what

9   motivated the initial position that the U.S. Attorney

10  took, and as I said, it came up in the course of a

11  conversation we had about the difficulty of dealing with

12  discovery.

13       He again, was not concerned about it, said

14  that we didn't need to turn over post-indictment

15  pretrial memos in their entirety.  And then, you know,

16  to some degree, and I'm drawing inferences here, but

17  after the briefing and the case started, it seemed to me

18  that he felt like he was under siege, and we all did to

19  some degree, the briefing, the motion practice that we

20  got from the defense, as often happens in these kinds of

21  cases, it personal, they attacked us personally; they,

22  in particular, attacked him personally and his father.

23       Asked for all of the judges in the district to

24  be recused because his father was on the bench and

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

39

1    eventually I think even filed a mandamus petition in the

2    Fourth Circuit with a reproduction of his father's

3    official painting in which there is a photograph of the

4    former U.S. Attorney on his father's desk.  And I think

5    that -- I know that, you know, that Booth took that very

6    personally.

7            And I think that he started, at some point, to

8    develop a view that we are not going to give them more

9    than we have to.  He said, "we are not" -- he said those

10   words to me at least once, but I don't think he thought

11   that we were -- I don't think he thought that we were

12   violating our discovery obligations.  I think his view

13   was that there was no requirement to turn over the memos

14   in full, as long as we disclose the exculpatory

15   information, and I didn't argue with that.

16       Q.    When did he say that to you, to the best of

17   your recollection?

18       A.    It was in the -- I can't put a date on it.  It

19   was in response to -- there were a series of motions

20   that were filed by the defense, motions to compel, and

21   it was in the context of our discussions of the motions

22   to compel.  It was either, we've given them everything

23   we have to, or we are not going to give them any more

24   than we have to.  Words to that effect, that, you know,

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              40

1    there was an interest in taking a firm line with these

2    guys.

3           You know, we opposed -- as you saw, we opposed

4    the motion to identify exculpatory material, period.

5    And that was his position generally, I guess, two-fold.

6    Number one, we've given them everything we have to, we

7    are not going to do that and, I don't think there is any

8    meaningful exculpatory evidence in the case.

9           Q.    Would you agree with me that the statement to

10   the effect of, "we" are not going to give them anything

11   more than we have to, seems inconsistent with how

12   **Paralegal #1** had written what he told **Paralegal #1** which said, he

13   wants to produce everything that we have?

14          A.    Like I said --

15          Q.    Things change I know, but between what you've

16   just told us he said and what we are reading here seems

17   not consistent to me.

18          A.    What I think happened was that there was a --

19   in his discussions with me and, as a result, in the way

20   that I came to see the discovery, a distinction between

21   pre-indictment, we pushed everything out in this very

22   large initial production, and then post-indictment, we

23   are going to -- we've done everything we are going to do

24   and we are not going to do anymore.  We've given them

Case 5:18-cv-00591 Document 705-3 Filed 09/09/19 Page 72 of 132 PageID #: 1213
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

1    what we are going to give them.  And not to say -- and

2    again, it was always an understanding that exculpatory

3    material from the post-indictment interviews would be

4    produced, but that the full memoranda would not be.

5                    MR. MASLING:  Anything more on these?

6                    MR. SCIORTINO:  Yes, I have a couple more.

7            So there was a change in Mr. Goodwin's

8    philosophy from pre-indictment to post-indictment, it

9    sounds like, and you've discussed how part of that was

10   due to the fact that things got personal with the

11   judge's father and all of the motions you were given and

12   everything?

13                   THE WITNESS:  That's -- I mean, that's

14   not -- and I want to be clear, that's an inference that

15   I'm drawing.

16                   MR. SCIORTINO:  Okay.

17                   THE WITNESS:  He never said to me that the

18   -- I guess the contentious nature of the litigation and

19   the personal sorts of motions that they have filed was

20   the reason, specifically was the reason not to produce

21   post-indictment MOIs in whole or not to -- to resist the

22   motion to identify exculpatory material.  He never

23   explicitly drew that connection.

24           What I observed is that as the defense filed

Case 5:18-cv-00591   Document 705-2  Filed 09/05/19  Page 73 of 132 PageID #: 1214
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

42

1    those motions, he took an increasingly hard line in how

2    we were going to deal with the defense, not just on

3    discovery, but in other matters as well.

4        Q.   Did that same personal aspect of the case

5    afflict you also, or mostly just the U.S. Attorney?

6        A.   Well, I was -- I would say I wasn't pleased

7    that they filed motions accusing us of grand jury

8    misconduct.  Nobody likes to see that kind of thing.

9    You know, I would, but I don't think that I took it -- I

10   don't think that I took it as person, in part, because

11   the attacks weren't as personal -- perhaps the attacks

12   weren't as personal with regard to me.  Nobody put my

13   picture in a brief.

14            MR. SCIORTINO:  That seems to me that this

15   approach that we are not going to give them anything we

16   don't have to is fundamentally strategically unsound in

17   a case such as this because there is no witness safety

18   issues, you know that you have this big highly financed

19   defense attorney -- defense firm that's arguing about

20   discovery over and over again, specifically in e-mails

21   and briefs about memorandums of interview in particular.

22            So by not giving them anything you don't have

23   to, in effect, you are giving them something even

24   better, which is something to argue about and something

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

43

1    to bring up on appeal with OPR and all of this stuff

2    where a much safer approach would be just to hand

3    everything over all the time, which is what you do, for

4    instance, in a capital case, when you know that there is

5    going to be extraordinary be post-litigation scrutiny of

6    your conviction.

7           So at the time, did anyone perceive that

8    perhaps that this is winning the battle, but losing the

9    war from a strategic perspective?

10    A.    So I guess I would say that, you know, as I

11   said I was very concerned about discovery from the

12   beginning.  I had -- it was one of the most significant

13   sources of stress that I had in the course of the case.

14   With regard to these MOIs specifically, you know, I

15   would say it was not -- and again, this -- this may seem

16   odd since it's now become such a point of focus, but in

17   the course of preparing for the trial, it wasn't our

18   perception -- and certainly we didn't do an interview in

19   the run up for trial where we got any kind of a

20   bombshell exculpatory revelation.

21          And I think, based on the conversations that

22   the trial team had, everybody's perception of the

23   pretrial interviews that we did was that there was very

24   little exculpatory information in those.  And, you know,

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

44

1    I can't say that we -- we worked together on the letters

2    that we were going to send, everybody reviewed the

3    letters, signed off on the letters, but, you know, I

4    can't say that what was happening with the

5    post-indictment MOIs was something that we thought a lot

6    about at the time in terms of what might raise an issue

7    on appeal or might raise an issue on OPR.  There

8    was just -- again, when I say it may seem odd now, you

9    take it out of context and put it under a microscope, it

10   seems obvious that we should have had that thought.

11            MR. SCIORTINO:  Here is what else seems odd

12   to me, just having done cases where you are expecting a

13   lot of scrutiny down the road, the approach that you are

14   taking by not giving them anything that we don't have to

15   is actually more work for you, right, because you

16   described yourself as under siege, responding to all

17   this stuff.  And it's more trouble to go through 30

18   memorandums of interviews and figure out what's

19   exculpatory and how to summarize it fairly in a letter

20   than just to hand it all over.

21            So why would you do that to yourself?

22            THE WITNESS:  I agree with that.  I'll tell

23   that you the U.S. Attorney expressed a concern in

24   connection with what we were going to produce and not

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                   September 28, 2017

45

1     produce, in particular, in connection, for example, with

2     the motions to produce agent notes, that he did not

3     think that the other side was playing fair, and I agreed

4     with that in some ways.

5            I believed -- he certainly believed, I also

6     believed that their briefing, many of the arguments that

7     they made were misleading with regard to -- with regard

8     to their factual claims.  And he had the view, and I

9     heard him say, and to be clear, I agreed with it, that

10    anything you give these guys, they are going to twist it

11    and distort it and find some misleading way to use it.

12           And again, that is a position that I heard him

13    take in connection with discovery specifically.  So to

14    connect that to the question that you asked, again, in

15    retrospect, certainly, it would have been less work to

16    just hand these things over.

17           MR. SCIORTINO:  What you just said concerns

18    me because we are talking about memorandums of

19    interviews here.  So are you saying that there was a

20    concern that the defense would be unfairly able to use

21    the information in the memorandums of interviews that

22    were not disclosed?

23           THE WITNESS:  That comment was made

24    specifically with regard to agent notes.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              46

1           MR. SCIORTINO:  Well, presumably the

2    memorandum and agent notes were fairly coextensive,

3    right?

4           THE WITNESS:  Yes, but, I guess, in

5    response to your question about adding work, I think

6    that, no, that the U.S. Attorney's stated view was that,

7    based on what we had seen early on in the motion

8    practice, these guys, the Zuckerman lawyers, the defense

9    counsel, weren't going to fairly represent anything that

10   was given to them.  And so we would follow our Brady

11   obligations and provide exculpatory material, but there

12   was a move away from the initial -- I mean, the

13   pre-indictment view that we were just going to produce

14   everything.

15          And there was also a difference, I guess to

16   come back to your point, Mark, on the difference in the

17   statement on OPR General 2, the spreadsheet about

18   producing everything pre-indictment, versus the -- I

19   don't know if nuance is the right word, but the more

20   particularized approach that was taking post-indictment.

21   Part of that, I think, was just the reality of the

22   volume of what had to be produced from the

23   pre-indictment materials.

24          Again the U.S. Attorney's stated view, and

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                        September 28, 2017

47

1    this is something that he said in response to my

2    concerns about the possibility of mistakes in discovery

3    was there wasn't any -- there was no practical

4    possibility that we could go through all of the

5    pre-indictment material because there was so much of it,

6    and make individualized decisions about what was

7    discoverable and what was not.

8              And so pre-indictment, everything was just

9    going to get pushed out.  Post-indictment, the volume

10   was smaller, and I would say that that accounted for

11   some of the difference in approach.

12             MR. SCIORTINO:  I have to follow-up with

13   just one express question.  Was there some concern on

14   your part or Mr. Goodwin's part or both that there was

15   something about the content of the post-indictment

16   interviews, whether reflected in the notes or

17   memorandum, that the defense was going to be able to use

18   unfairly?

19             THE WITNESS:  No.  There was no -- nothing

20   specific about that content.  I wouldn't say that there

21   was anything in there that we felt like they would be

22   able to use unfairly.  It was -- when I say that, I

23   think that was just a generalized view on his part that

24   they would use unfairly anything that they were given.

Case 5:18-cv-00591  Document 705-2  Filed 09/09/21  Page 79 of 132 PageID #: 1220
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

48

1              MR. SCIORTINO:   Thanks.

2    BY MR. MASLING:

3         Q.    Do you want to take a break?

4         A.    I'm good.

5         Q.    All right.

6              I want to talk a little bit about the search

7    for exculpatory evidence.  So if you look at OPR General

8    170 and some succeeding pages, I believe these were

9    among the documents that I sent you within the last

10   couple of weeks.  So it appears from the e-mail and the

11   subsequent pages that -- and we want to ask you how this

12   came to be -- that Department of Labor attorneys were

13   searching certain categories of MSHA e-mails and certain

14   documents possessed by certain people for exculpatory

15   information.

16             And this back and forth sets forth the search

17   terms that would be used, and Mr. Goodwin is telling

18   them general -- what would constitute exculpatory

19   evidence.  So the first question is:  How did this

20   happen?  How did this come to pass?

21             Why was this search done?

22        A.    The Department of Labor?

23        Q.    Yes.

24        A.    Why was DOL doing the search?

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                        September 28, 2017

49

1      Q.    Yes.

2      A.    So it -- the DOL, of course, is the parent

3   agency of the Mine Safety and Health Administration, and

4   again, to the best of my recollection, there had been --

5   I don't know if this came before or after.  At some

6   point, there were motions from the defense for

7   information from MSHA.

8            We already produced in the initial rounds of

9   discovery a lot of information from MSHA, but, I guess,

10  in general terms, you know, the reason that we had asked

11  DOL, I believe that the -- and again, I don't remember

12  all of the timing, but I believe, at this point --

13  certainly at some point in the pretrial phase, this ████

14  DOL Attorney ██████████████████████████████████████████

15  DOL Attorney and we had asked ████ to coordinate pretrial a

16  review of MSHA records to see if there was discoverable

17  material in there.

18           And I don't know if -- as to what specifically

19  prompted this search at this time.  I don't remember if

20  there was -- if it had been a motion or a request from

21  the defense or just a view on our part that that was a

22  source of information that needed to be reviewed, but it

23  was being reviewed because of MSHA's -- because MSHA had

24  conducted their own underlying investigation.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              50

1          Q.    I mean, do you remember there being a

2    discussion about whether the Department of Labor was

3    part of the prosecution team, given that there was an

4    agent from OIG, and you had made the Department of Labor

5    attorneys and the special assistant assisting you with

6    the search for evidence and, therefore, you needed to

7    see whether those folks possessed exculpatory

8    information that needed to be disclosed?

9          A.    As to whether we phrased it in exactly those

10   terms, are they part of the prosecution team, yes, I

11   have a recollection of discussing that internally.  And

12   the reason that I paused before I answered the question

13   is that -- and I remember having a discussion about it

14   with the U.S. Attorney, frankly, I can't remember where

15   he came out on it, but we did do -- there was a search

16   of -- and ultimately this was one phase of it.

17   Ultimately, before trial, there was a very extensive

18   search of any source of information at MSHA that we

19   thought reasonably might contain exculpatory

20   information.

21         Q.    We'll talk about that in a bit.  Do you have

22   any recollection of who initialed this search?  Was it

23   folks at MSHA calling you up and saying, well, we thing

24   we better take a look at our e-mail records or --

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              51

1        A.    No.

2        Q.    -- you all from this end saying to them, we

3    think you should be searching?

4        A.    We initialed it, that much I remember.  MSHA

5    didn't call us and say -- or DOL didn't call us and say,

6    we think we have information that you need to see, or we

7    think we might have information that you need to see.

8    This was something we initialed.

9        Q.    Flip over to 171.  And this has the proposed

10   parameters of the search.  So there is date ranges and

11   there is district 4, headquarters, the AI team and the

12   IR team.  And what the -- this was a search for e-mails,

13   except for the IR team, which was going to search

14   documents and not just e-mails.

15             My question is:  Do you know why only the IR

16   team's documents were searched and not D4, headquarters

17   and AI?

18       A.    So I think from the timing of this, and I

19   think that maybe the reason that Booth ended up

20   answering directly is that I was out at this point.

21   ████████████████████████████████████████████████

22       Q.    Okay.

23       A.    And I think that's why Booth wound up

24   answering it.  I don't specifically -- and it's possible

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                          52

1    I responded.  I don't remember responding to this e-mail

2    from ▆DOL Attorney▆   I think that ultimately documents were

3    searched from the AI team and headquarters.  Again, but,

4    if I were to -- and again, I will -- I don't have a

5    specific recollection of how this decision was made, but

6    just reasoning through it, we already had and had

7    already produced documents from the AI team in the

8    initial rounds of discovery.

9             And so that -- again, I'm offering some

10   reasoning based on putting some facts together about why

11   this decision might have made sense at the time.  The AI

12   stuff had largely already been produced.

13        Q.   Flip over to 173.  173 is an e-mail from

14   ▆DOL Attorney▆ to you March 26, 2015.  And in the second line,

15   ▆▆ tells you that they've identified 936 potentially

16   exculpatory documents.

17            And my question to you is:  What happened to

18   those?

19        A.   My belief is that our team reviewed these and

20   these were ultimately -- what we determined was

21   exculpatory was ultimately produced in a supplemental

22   production.

23        Q.   Do you have any recollection of when that

24   might have been?

OPR - 000180

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

53

1        A.     No.  I mean --

2        Q.     Or how about how many of the 936 did you

3   all --

4        A.     Well, I think we concluded that ███ was right,

5   that most of these were not exculpatory when we reviewed

6   them, but as to an exact -- I mean, I don't think it was

7   close to 936, but I don't remember the exact number.

8        Q.     Who did the review on this end?

9        A.     There were -- so let me preface this by saying

10  that there were multiple rounds of information that we

11  received from MSHA, and I don't know who exactly was

12  involved in reviewing each, but I believe at least in

13  the review, I probably would have been involved.  AUSA #1

14  AUSA #1  AUSA #2   and I -- and, again, I don't -- the

15  specific productions run together, but with these MSHA

16  productions, I discussed the results, and what we were

17  actually going to produce and what the results of the

18  review were with the U.S. Attorney before we finalized

19  them.

20       Q.     But I'm gathering that you don't actually have

21  a specific recollection of this, this is more, this is

22  how it should have happened?

23       A.     Well, this is how we did the MSHA.  And the

24  reason that I'm not certain as to this one is I'm pretty

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                          September 28, 2017

                                                        54

1    sure there was more than one of these MSHA instances in

2    which MSHA provided us information that we ultimately

3    disclosed to the defense.  And I know that AUSA #1

4    and AUSA #2   were involved in reviewing documents from

5    that data that MSHA had gathered.

6        Q.    Look at OPR General 174.  In the second

7    paragraph it says, "Please note, you will see some twos

8    mixed in the exculpatory materials we reviewed twos for

9    a couple of days until we decided to put those on hold."

10   What seems to have happened, based on this e-mail and

11   some of the prior ones is that somebody decided we are

12   not going to -- we are only going to research e-mails

13   that had been sent by the recipient not that had been

14   received -- by the e-mail account holder, but not those

15   that had been received by the e-mail account holder.

16          And I wanted to ask you if you had an

17   understanding of why that decision was paid and who made

18   it?

19       A.    I don't remember exactly.  I don't.  To be

20   honest, I don't know.  Again, trying to reason as to

21   what happened there, I know that MSHA had difficulty in

22   gathering information, gathering their old e-mails and

23   so forth.  I don't know if that had to do with it.

24       Q.    Okay.

Case 5:18-cv-00591   Document 703-5   Filed 09/05/18   Page 86 of 132 PageID #: 1227
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                              September 28, 2017

55

1      A.    I mean we -- yes, on that one, that's the best

2   that I can do.

3      Q.    Okay.

4      A.    I don't remember exactly what ████ referring

5   to there or why that happened.

6            MR. SCIORTINO:  Could there have been a

7   redundancy issue in the sense that everything in the two

8   box, one person could be in the one box from somebody

9   else?

10           THE WITNESS:  That's possible.  That could

11  be it.  As I sit here, I can't tell you why exactly what

12  ████ referring to or why or who made the decision.

13           MR. SCIORTINO:  Was there ever any

14  consideration of just turning all of this stuff over

15  wholesale without going through this review process?

16           THE WITNESS:  No, not that I recall.

17  Again --

18           MR. SCIORTINO:  Was this part of that

19  post-indictment philosophy of only giving over what you

20  had to?

21           THE WITNESS:  Well, I mean, certainly the

22  U.S. Attorney ultimately was overseeing these reviews

23  and productions and this was just sort of the way

24  that -- I guess I would say this was the way that it

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

56

 1   played out.  I don't remember making any kind of a -- or

 2   discussing any kind of a wholesale production of what we

 3   got from MSHA.

 4        Q.    So we've referenced this letter before, and

 5   this doesn't have a Bates stamp.  It's the June 22, 2015

 6   letter from you to Mr. Taylor, I believe, in response to

 7   the Court's order for identification of actually

 8   exculpatory material.  Tell us what you remember about

 9   the process that you went through to come up with a list

10   of materials that were attached to your letter.

11        A.    We -- do you mind if I take a look --

12        Q.    Of course.

13        A.    -- and refresh my recollection on what we did

14   attach?

15                          *   *   *

16                     (Brief break)

17                          *   *   *

18   BY MR. MASLING:

19        Q.    So we've asked DOL SA #1   and FBI SA #1

20   whether they had been asked to search for any documents

21   in response to the Court's order to identify exculpatory

22   materials.  And DOL SA #1   said, yes, ███ had been

23   asked by you to search MOIs.  So if you look at OPR

24   General 118, doesn't seem to be the same page I'm on.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

57

1    118.

2        A.    OPR General 00118?

3        Q.    Oh, it is because I've written on mine.  But

4    before ███ we get to this page, I want to -- well, first

5    of all, do you have a recollection of asking DOL SA #1

6    DOL SA #1 to search MOIs for potentially exculpatory

7    materials?

8        A.    We asked them -- I recall them to review their

9    notes.  I don't believe we asked them to review MOIs.  I

10   think we asked them to compare their notes with their

11   MOIs and see if there were any -- are there any

12   inconsistencies in the notes, anything that's in the

13   note that's not reflected in the memos that would

14   require us to produce the notes or to disclose some

15   portion of the notes.  That, I recall.  I don't recall

16   asking them, either of them to specifically review the

17   MOIs and see if they thought something in the MOIs was

18   exculpatory.

19       Q.    That's what DOL SA #1 told us.  FBI SA #1

20   FBI SA #1 said ███ didn't recall being asked anything to

21   do or prepare for this, so we were wondering whether you

22   had any recollection of why, and this may be wrong, you

23   asked DOL SA #1 to undertake the search but not FBI SA #1

24   FBI SA #1

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                        September 28, 2017

58

1      A.     Whatever we asked them, generally, if we asked

2    one of them to do something, we asked the other one to

3    do it.  My recollection is that we asked both of them,

4    as I said, to review the notes, but -- to compare the

5    notes to the MOIs and see if there is anything in your

6    notes that you failed to reflect in the MOI that we

7    need -- could potentially be exculpatory.

8      Q.     So you see from this e-mail that DOL SA #1 says

9    to you, "Per our discussion, I've reviewed and attached

10   the following, and he attaches a number of MOIs."  And

11   what he told us was that [redacted] believed that, arguably,

12   these MOIs contained material that could be helpful to

13   the defense and argued to be exculpatory.

14          Any recollection of a discussion that I just

15   related to you as DOL SA #1        recalled it?

16     A.     No, I can't say I know what this is.  I don't

17   know.

18     Q.     It seems clear [redacted] right because if you look

19   at the MOIs that were disclosed, some of them are on

20   this list.  So if you look at OPR 1222, the last page

21   from the 6/22 letter, it's the list of MOIs.

22     A.     Okay.

23     Q.     And there were some of the ones that you

24   identified to the defense as being potentially

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

59

1    exculpatory, ▮▮▮▮▮ had suggested to you might fall in

2    that category.

3         A.    Okay.

4         Q.    Does that help at all?

5         A.    I don't -- I honestly don't remember ever

6    asking ▮▮▮▮▮▮▮▮ to -- I don't know if I asked ▮▮▮▮ for

7    specific MOIs and this is what he sent or -- I mean, it

8    would surprise me if I had asked ▮▮▮▮▮▮▮▮ to

9    independently draw conclusions about what they thought

10   we ought to -- I mean, what memos they thought we ought

11   to disclose.  You know, I could imagine asking ▮▮▮▮

12   specifically for these, but I just don't recall the

13   conversation between me and ▮▮▮▮ that led to this e-mail.

14        Q.    Let's go it a different way then.  So if you

15   look at OPR General 122, that's the last page of the

16   list of documents to identify for the defense that's

17   potentially exculpatory.  How did you come up with this

18   list?  If you want, so here is -- let me show you.

19   These are the MOIs that has the names there and the

20   dates of them.

21        A.    Again, you know, when you scrutinize the

22   process, you certainly wish that you had an answer that

23   reflected more formality.  My recollection -- and again,

24   I don't remember specifically how we chose the

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

60

1    individuals who were on this list.  I remember having a

2    discussion with the trial team in the course of our

3    discussions about how we were going to respond to this

4    court order, and we talked about those documents, what

5    documents do we know of that we need to disclose, what

6    categories of documents can we describe that we should

7    identify.

8           So to correct what I said previously, we were

9    talking here about identification, pointing out

10   potentially exculpatory information that we should

11   identify in response to the court order.  We had

12   conversations about specific, you know, are there

13   witnesses who said things to us that we need to identify

14   in response to this court order, and there certainly

15   were names that -- on here that I remember coming up

16   during the course of that conversation.

17          So -- and at this point, I don't remember

18   specifically what it was that we thought these witnesses

19   might have said, but I recall **Witness #27** was a name

20   that we discussed and somebody we interviewed not too

21   long before the indictment that we believed ought to go

22   on the list, even though, again, the U.S. Attorney's

23   view was that there was nothing truly exculpatory in

24   there.

Case 5:18-cv-00591   Document 705-3 Filed 06/05/19   Page 92 of 132 PageID #: 1233
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

1          Witness #23          , again, was somebody who -- I

2     can't remember the reason, but it essentially was a

3     discussion among the trial team of this is a person who

4     said something that we ought to flag in this letter that

5     we were going to send out.  There was not, to be

6     clear -- and maybe this contrast will clarify what I'm

7     trying to say.

8               There was not a process where we sat down and

9     reviewed every single memo de novo or from scratch and

10    tried to sort out or go back and, you know, look at each

11    and every one of the thousand MOIs or whatever that had

12    already been produced.  It was based on discussions that

13    we had as a trial team and we felt like, at that point,

14    we knew the evidence well enough that we were in a

15    position to make those calls.

16    Q.    Okay.

17               MR. SCIORTINO:  It's kind of a Monumental

18    task that the judge gave you.

19               THE WITNESS:  In our view it was, you know,

20    given the timing requirement, there was just no possible

21    way to go through every document in the case and

22    individually, you know, take a look at each one and

23    discuss whether or not this is something that we have

24    to -- that we can identify or not.

Case 5:18-cv-00591   Document 705-5   Filed 06/05/19   Page 93 of 132 PageID #: 1234
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              62

1              MR. SCIORTINO:  Yes, and you have to crawl

2    inside the defense's mind and decide what they -- it was

3    a strange project.

4              THE WITNESS:  Yes, we thought so as well.

5    And we felt like, given the circumstances, we felt like

6    we did the best we could to respond to what she asked us

7    to do.

8              MR. MASLING:  You done?

9              MR. SCIORTINO:  Yes.

10   BY MR. MASLING:

11      Q.    Flip to OPR General 182, please.  So I want to

12   can you if our guess about this is right.  So September

13   2015, again, the Department of Labor attorneys are

14   searching through some documents to potentially identify

15   some exculpatory material.  And our assumption was that

16   in response to the early returned subpoena that had been

17   filed by the defense and the subsequent production of

18   70-some-odd thousand documents in response to that

19   subpoena, that the prosecution team decided we should

20   look at those documents and see what's in there.

21              Is that right, to the best of your

22   recollection, or is this something else entirely?

23      A.    Let me see what's attached.  Are these

24   attachments --

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                            63

1         Q.    Yes, so the 184 through whatever it is the

2   chart that had been attached with the identification of

3   the potentially exculpatory documents.

4         A.    So trying to reconstruct that episode in the

5   case, there was -- I know the subpoena you are referring

6   to.  There was an early return subpoena, which I believe

7   we agreed -- I believe we agreed we would respond to or

8   MSHA agreed to respond to.  And our view was that it

9   was -- it was overbroad.

10          I mean, it swept in a lot of documents that

11  didn't really have anything to do with the case, which

12  we obviously, when you've got that subpoena, then what's

13  responsive is what's responsive to what they are asking

14  for rather than what might be more narrowly relevant to

15  the case.  There was some effort certainly to figure out

16  what in that large set of documents might actually bear

17  on the case.  How we actually implemented that, I can't

18  say I recall precisely.

19        Q.    Does reviewing these e-mails and the chart

20  help at all?

21        A.    I don't know.  I don't know where -- I don't

22  know who said -- who identified these, who marked these.

23  It looks like it was probably somebody at DOL.

24        Q.    I think it was ▇DOL Attorney▇  Well, on 183 ▇DOL Attorney▇

Case 5:18-cv-00591   Document 705-5   Filed 09/09/19   Page 95 of 132 PageID #: 1236
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

64

1    says, column H is ██████ recommendations and ████ notes, but

2    whether ████ made the initial cut, I don't know.

3           The ultimate question is:  Do you have any

4    recollection of what happened to the documents that were

5    identified in this chart as potentially exculpatory?

6         A.    No.  I'd have to try to reconstruct it.

7    Sitting here, I don't know what we did with these.  At

8    this point, we were --

9         Q.    Pretty close to trial?

10        A.    Yes.

11          We were weeks out, and trying to deal with

12   this massive production that -- last-minute production

13   that we were making of the MSHA documents that were

14   mainly MSHA documents and doing all the other things

15   that you have to do right up to trial.  As I sit here, I

16   just don't remember where this went.

17        Q.    Okay.

18        A.    I don't know -- yes, I just don't know.

19        Q.    Okay.

20          Before we turn to MOIs, we spent a little time

21   talking to folks about the initial set of Zuckerman

22   allegations, and I just want to ask you some questions

23   about those.  So one of --

24        A.    So let me --

Case 5:18-cv-00591   Document 705-3   Filed 09/09/24   Page 96 of 132 PageID #: 1237
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

65

1      Q.    Sure.

2      A.    Some of these -- and I'm trying to figure out

3   where these went, I do see, based on <span style="background-color:red">DOL Attorney</span>

4   descriptions here, documents that it looks like went

5   to -- I mean, certainly that the defense got because

6   there are documents described on here that were used at

7   trial.  So, for example, the -- on OPR General 190, the

8   biggest bully on the block document, the defense got

9   that because that was mentioned at trial, I believe, an

10  exhibit that was used at trial but certainly mentioned.

11          So yes, I'd have to try to sit down and

12  reconstruct it to see how these got to the defense, but

13  certainly, just based on flipping through it, there were

14  documents that went through that did go to the defense.

15  I'm sorry, I interrupted you.

16     Q.    No, no, that was an important point.  One of

17  Zuckerman's initial allegations was that the government

18  had intentionally withheld exculpatory evidence based on

19  their inference that there should have been more e-mails

20  between MSHA inspectors.  In response, you told us there

21  was a policy that MSHA had that discouraged MSHA

22  inspectors from communicating by e-mail, and that their

23  findings were supposed to be restricted to the actual

24  official MSHA documents.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

66

1          We asked DOL SA #1 and AUSA #2 and

2     FBI SA #1 about that and all three of them said

3     they'd never heard of such a policy, which is a little

4     surprise, especially from DOL SA #1 because ▓▓ comes

5     from the Department of Labor.  AUSA #1 remembered you

6     making that statement, so I wanted to ask you:  Where

7     did that come from?

8               Is there somebody at MSHA that we can ask

9     about that, just to nail that down?

10         A.    That came from DOL Attorney

11              MR. SCIORTINO:  That's easy.

12              THE WITNESS:  And I don't remember if ▓▓

13    ever showed it to me or not, but we had -- we discussed

14    that fairly extensively and ▓▓ said, look, you are not

15    going to find a lot of e-mails that are specific -- that

16    are enforcement specific.  You'll find some dirty jokes

17    and --

18              MR. SCIORTINO:  And football scores.

19              THE WITNESS:  Right, but they are

20    instructed to generally refrain from having casual

21    e-mail conversations about enforcement matters because

22    MSHA wants everything to be in the official documents

23    that go with an inspection.

24              MR. SCIORTINO:  Is that a written policy?

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

                                                              67

1              THE WITNESS:  I don't know.  My impression

2     from him is that it was, but, again, as I sit here, I

3     can't recall whether it was in writing or if I asked to

4     see it.  I don't remember, but that information came

5     from DOL Attorney .

6              MR. MASLING:  Zuckerman drew a negative

7     inference from the fact that no MSHA inspectors

8     testified at trial, and said that's obviously because

9     they would have said something that would have hurt

10    their case.  And your response was, no, we didn't want

11    to put on anybody who was a representative of the

12    federal government before a jury in West Virginia and

13    the same information could come in through the miners.

14    I'm now blanking on who didn't remember that and who did

15    remember that.  Three of them did and one of them did,

16    and I don't remember who now.

17             MR. SCIORTINO:  I think that -- hang on,

18    I'll tell you.

19    BY MR. MASLING:

20       Q.    The question is going to be:  Who can we ask

21    besides, the folks we interviewed so far and the U.S.

22    Attorney won't talk to us, to nail that down?

23       A.    As to why we didn't call them?

24       Q.    Yes.

Case 5:18-cv-00591   Document 705-3 Filed 02/05/19   Page 99 of 132 PageID #: 1240
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

68

1      A.     That's a -- I don't know if the agents would

2    know this or not.  That was -- and the only other person

3    who is probably going to have -- who participated in

4    those conversations would have been Booth, would have

5    been the U.S. Attorney.  But that was -- I mean that

6    was -- it was clear to us from the beginning that -- and

7    certainly the U.S. Attorney and I had these

8    conversations.

9           I feel -- and I don't have a specific

10   recollection, but we talked about it enough that I would

11   think that at least one of the other AUSAs would have

12   been involved in these conversations.  One of our

13   challenges in doing this case, we knew from the outside

14   there was going to be hostility toward the federal

15   government in Southern West Virginia.  And --

16           MR. SCIORTINO:  FBI SA #1 agreed.  FBI SA #1

17   was the one who corroborated that.

18           MR. MASLING:  FBI SA #1

19           THE WITNESS:  And in particular, it's even

20   more pointed than just hostility toward the federal

21   government.  It's specifically a view that's widely held

22   in Southern West Virginia that the federal government is

23   responsible for the difficulties that the coal industry

24   is having, and that the coal industry is overregulated,

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

69

1    specifically.

2              And we believed that this was that this case

3    would be cast, and to some degree it was, as part of the

4    Obama administration's "war on coal," which is a theme

5    that recurs in political campaigns here in West

6    Virginia, that we knew a lot of jurors would be familiar

7    with that phrase and it would resonate with them.

8              And to the extent possible, we thought that

9    the right strategic decision was to try to avoid putting

10   a witness on the stand who, on cross-examination, would

11   unavoidably be taken through lines of questioning that

12   suggested that MSHA is just anti-coal, that they are

13   overregulating mines in a way that -- you know, it's a

14   natural theme, right, MSHA overregulates.

15             It's a theme that they could absolutely

16   legitimately ask if you put an MSHA inspector on the

17   stand to try to explore the question of whether MSHA's

18   regulations are heavy-handed or excessive, but that's

19   something that is 100 percent guaranteed in Southern

20   West Virginia to resonate with jurors in a way that

21   touches themes that go beyond the case and go to the

22   idea that the federal government is regulating the coal

23   industry out of business.  That was the concern, and

24   that's something that we talked about.

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

70

1      Q.    Okay.

2      A.    And certainly the U.S. Attorney and I talked

3  about it many times.  It sounds like FBI SA #1 ████ -- I

4  mean, we didn't involve the agents in all of the

5  discussions about trial strategy, but it was -- that

6  concern was -- was probably our principal concern in the

7  case, so I'm sure that's something that I would have

8  discussed with FBI SA #1 █  We viewed -- certainly I viewed and

9  discussed with the U.S. Attorney, and I think others on

10  the case team would recall this.

11         We viewed the case -- the real difficulty in

12  the case as the likelihood that many jurors here would

13  view it as a referendum of whether you are pro-coal or

14  anti-coal, whether than focusing on the merits of the

15  case itself.  And to a large degree, I believe that's

16  what happened.  You know, it's hard to overstate.  And I

17  think if you don't live here, it may be hard to

18  appreciate how strongly the fate of the coal industry

19  influences the political conversation and the economic

20  conversation.

21         And with -- like I said, with that being the

22  overarching strategic concern that we had about trying

23  the case, that it was going to come about when you are

24  pro-coal or anti-coal, as opposed to what the evidence

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

71

```
 1    shows.  We just thought that it did not make sense to

 2    put somebody on the stand who was going to be cast as

 3    the bogeyman, who is driving the coal industry out of

 4    business.

 5              MR. SCIORTINO:  FBI SA #1                also

 6    said that had you called the MSHA inspectors, their

 7    testimony would have been broadly consistent with the

 8    miner's testimony.

 9              THE WITNESS:  That's right.  We were

10    prepared for what they were going to say.  They wouldn't

11    have been bad for us as witnesses.  In some ways --

12              MR. SCIORTINO:  In terms of the content?

13              THE WITNESS:  Yes.  In some ways, in terms

14    of the substance of their testimony, I regretted that we

15    couldn't call them because many of them would have been

16    devastating in terms of what they observed at that mine

17    and that they -- the citations that they wrote, same

18    citation over and over and over again, just to see what

19    they were doing disregarding -- the brazen lawlessness

20    that they saw was taking place there.

21              But all of that information we could get from

22    the miners.  And having it come from a miner who is

23    affiliated with the company as opposed to a fed, there

24    is just no contest there.  But ████ was right.  We talked
```

Case 5:18-cv-00591 Document 703-5 Filed 09/05/19 Page 103 of 132 PageID #: 1244
CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                      September 28, 2017

72

1    to -- we had anticipated -- I think they put -- they,

2    the defense, put inspectors on their witness list, so we

3    had to go talk to them and see what are you going to say

4    if you get called.

5              And yes, there weren't any of them that I

6    would have been concerned about in terms of the

7    substance of their testimony.  It's just, you know,

8    these Zuckerman guys are good cross-examiners.  We

9    had -- I think I said this in one of my responses, we

10   had Witness #24 (ph) on the stand, who was a financial

11   guys -- I think it's Witness #24 -- from Massey and Eric

12   Delinsky at Zuckerman managed to get President Obama's

13   name into the cross-examinations like 25 times over

14   objection, which is just -- if you -- president Obama's

15   approval rating in West Virginia is probably about 10

16   percent.  So, you know, we knew pretty well --

17   BY MR. MASLING:

18        Q.    Just for the record, in Washington, D.C., it's

19   like 98 percent.

20        A.    So we knew pretty well that if we put one of

21   these guys up, they were going to be turned into a

22   symbol of federal government excess.

23              MR. SCIORTINO:  I think we covered that.

24   BY MR. MASLING:

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

73

1        Q.    OPR General 201 and 202.  This has been -- I

2   don't know, we call it the applaud letter.  One of the

3   Zuckerman allegations was that this letter was not

4   produced during discovery, it's exculpatory, and then

5   made the inference, well, it had to to be intentionally

6   withheld.  And you told us in your written response, and

7   we asked you about it, that you had never seen a

8   document that once you saw it, you had an extensive

9   search conducted for it but nobody could actually find

10  it in the MSHA files.

11       A.    Correct.

12       Q.    So my first question is -- I couldn't -- I had

13  your e-mail accounts and e-mail accounts of other folks.

14  I did not get e-mail accounts for the agents because

15  it's too much trouble, and probably wouldn't have gotten

16  it from the Department of Labor, but I couldn't find any

17  e-mail exchanges about this letter at this time.  There

18  is something early, but at this time, I couldn't find

19  anything about it.

20            So what's your recollection of who you asked

21  to search for it?

22       A.    DOL Attorney  DOL Attorney  was our contact, our

23  principal contact.  There were a couple of others that

24  we dealt with, but ███ was our principal contact for

Case 5:18-cv-00591  Document 703-5  Filed 09/05/18  Page 105 of 132 PageID #: 1246
CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

74

 1    information that we wanted DOL to search for.  And we --

 2    for better or for worse, probably for worse, in this

 3    case, I don't do a whole lot of substantive

 4    communication by e-mail.  Usually, if somebody is down

 5    the hall from me I go see them.  If they are not, I tend

 6    to pick up the phone.

 7         Q.    Okay.

 8         A.    But I certainly recall that we -- when this

 9    allegation came up -- I think this came up in pretrial

10    motion practice.

11         Q.    Right.  This is attached to a September 17,

12    2015 motion, so it's pretty late

13         A.    And we asked DOL Attorney did we miss this, where

14    is this, do you have a copy of it?  And they had a

15    search done at district 4 where this Witness #9

16    Witness #9

17         Q.    Right.

18         A.    And just couldn't find it.

19         Q.    So as it turns out, you all knew about this

20    before.  I'm not sure if you've seen it before, but you

21    knew about it before.  So take a look at OPR 162.  I

22    don't want to be accused of hiding anything.  This was

23    among the documents I sent you.

24         A.    Sure.  I hear you.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

75

1        Q.    This is an e-mail from ██████ to you, August 22,

2   2014.  We obtained only yesterday █████ note from this

3   meeting from which this e-mail derives, and apparently

4   was a meeting with ██████████ attorney without ██████████ being

5   present.  So take a second and take a look at this

6   e-mail.

7        A.    Okay.

8        Q.    Does this refresh your recollection at all of

9   when -- and it's clear from this e-mail and from ██████

10  notes, which I'll show you in a second, that you didn't

11  actually have the letter, but it was being described to

12  you ██████████ attorneys.  And, of course, the letter is a

13  ██████████ letter to ██████████ saying -- applauding the hazard

14  elimination program.

15            Does this refresh your recollection at all

16  about when you might have learned about the existence of

17  the letter?

18       A.    Honestly, I don't remember it.  I don't

19  remember this e-mail.  I don't remember that coming up

20  in a discussion with ██████████ lawyers.  I'm not disputing

21  what █████ saying.  I mean, █████ clearly got a detailed

22  account of it here.

23            MR. SCIORTINO:  What was ██████████ situation?

24            THE WITNESS:  ███' wanted -- I believe the

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                            76



1    situation with ▮▮▮▮ is ▮▮ wanted immunity and we

2    wouldn't give it to ▮▮▮▮

3                 MR. SCIORTINO:  Can you provide more

4    context?

5                 THE WITNESS:  You mean as to why?

6                 MR. SCIORTINO:  What was your interest in

7    ▮▮▮▮  What was ▮▮▮ concern about being in jeopardy?

8                 THE WITNESS:  ▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮

10                MR. SCIORTINO:  ▮▮▮▮▮▮▮

11   ▮▮▮▮▮

12                THE WITNESS:  ▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮

15   ▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮

20        ▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

77

1   Witness #10

2   Witness #10

3   Witness #10          .

4                Witness #10

5   Witness #10

6   Witness #10

7   Witness #10                                         I

8   don't -- to come back to your question, Mark, you know,

9   I just don't remember.  I don't remember seeing the

10  letter and I don't remember this discussion of the

11  letter.

12  BY MR. MASLING:

13       Q.    I don't think you saw the letter.  I think

14  it's pretty clear you didn't see it, but you learned

15  kind of the basic fact about the letter, which is you

16  having Witness #9                 saying I think that your

17  hazardous elimination program is a good thing.

18       A.    Right.

19       Q.    And I applaud your effort.  And AUSA #2 quoting,

20  I think, from what -- Witness #10 lawyers description to you

21  in this meeting.

22       A.    Again, I just have zero recollection of it.

23       Q.    Okay.  So as I said, I hadn't sent these to

24  you because we didn't have them until yesterday.  These

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

78

1    are AUSA #2 notes that ▮▮▮▮ made at the meeting.  And

2    after reviewing the notes, we understand that this is

3    before the indictment, but it raises a concern, after

4    reviewing the notes, that the information in here was

5    arguably helpful to the defense, and there should have

6    been some disclosure based on what Witness #10 lawyers told

7    you.

8              There was no -- this was just a lawyers'

9    meeting so there was no MOIs that came out of this, but

10   it raises the issue of whether there maybe should have

11   been a letter of disclosure.  Witness #10 suggested a

12   20-percent reduction.  They had this -- they wanted to

13   reduce violations.  Don Blankenship responded with 50

14   percent.  So that, one might argue, would be helpful to

15   the defense.

16             Mine Act of 2009 changed, Blankenship

17   increased interest in violations at Massey after that

18   change.  Witness #10 believes Massey's mines were safe.  The

19   accident -- there was a focus on accidents instead of

20   violations.  Witness #10 believed if you fixed 75 violations,

21   MSHA would fine 75 more; zero violations are

22   unrealistic; 100 percent reduction is not an option;

23   violations are not related to safety; inspections are

24   subjective; MSHA is harder on Massey than any other

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

79

1    mines, and it kind of goes on in that theme.

2           So the question is:  Do you ever recall

3    thinking, after hearing what the lawyers had to say to

4    you, in that argument, and then there was this present

5    slide presentation apparently where they made this

6    presentation to you.  I assume the point was, give our

7    ███ immunity, and then you can have access to them.  Do

8    you recall ever thinking, we need to make a disclosure

9    based on what they just told you.  I'm happy to show

10   this to you.

11        A.    That's fine.  With regard to that, I remember

12   we had a meeting with them.  What I remember from the

13   meeting is that they wanted immunity, we wouldn't give

14   it to them.  I don't remember -- I don't remember a

15   discussion one way or another about the substance of the

16   meeting, other than their demand for immunity and our

17   view that we weren't going to grant it.  I just don't.

18           MR. SCIORTINO:  Was part of the reason that

19   you were not interested in granting immunity is because

20   ███ was not going to be a helpful witness?  It sounds

21   like ███ would not be a helpful witness to the

22   prosecution.

23           THE WITNESS:  We thought -- no.  I

24   thought -- my recollection is that ███ would have had

Case 5:18-cv-00591 Document 703-5 Filed 09/05/18 Page 111 of 132 PageID #: 1252
CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

80

1    value to us in that he could put on Blankenship

2    everything that -- you know, he could put on Blankenship

3    a lot directly, if he -- based on -- we didn't get to

4    talk to him, but based on correspondence that we had and

5    telephone recordings that we had.  ████ wouldn't have been

6    a perfect witness, but my recollection was that ███ was

7    somebody that I would have liked to have testified.

8              Witness #10

9    Witness #10

10   Witness #10

11   Witness #10

12   Witness #10

13   Witness #10

14   Witness #10

15             MR. SCIORTINO:  I'm just asking this

16   question because I was never faced with this situation,

17   and I really don't know the answer to it.  But say that

18   you are in a meeting with a potential witness' lawyers

19   and the witness' lawyers convey to you secondhand

20   exculpatory information that you don't hear in the

21   witness itself and you kind of hear it through their

22   lawyers.  What is your obligation with respect to the

23   information?

24             Does it change as opposed to hearing it

Case 5:18-cv-00591   Document 703-3   Filed 09/05/18   Page 112 of 132 PageID #: 1253
CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

81

1      directly from Witness #10 himself?

2                   THE WITNESS:  So --

3                   MR. SCIORTINO:  I was never confronted with

4      that situation before.

5                   THE WITNESS:  So I would -- to give you

6      probably a good accurate answer to that question or an

7      answer that I'm confident in, I would have to consult

8      some sources of authority, but -- well, about this, I'm

9      just going to say, as I sit here right now, without

10     thinking about it a little further, I don't want to give

11     you an inaccurate answer.

12                  And again, I just -- I don't think, as a legal

13     matter, as a matter of department policy, I'm sure you

14     guys know the answer to that.  I'm not sure I do, if it

15     makes a differences or not.

16                  MR. SCIORTINO:  Would Don Blankenship have

17     had access to this information separately from those

18     notes, do you think?

19                  THE WITNESS:  Yes.  I mean, just about

20     everything in here was information that -- the hazard

21     elimination program was covered in exhaustive detail in

22     what we disclosed.

23                  MR. SCIORTINO:  Would Blankenship have

24     known that Witness #10 was broadly in his corner, I guess?

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

                                                                82

1            THE WITNESS:  That, I assume so.  I mean,
2    they were close.
3            MR. SCIORTINO:  Was Witness #10 on the defense
4    witness list.
5            THE WITNESS:  Yes, ██ was.  I assume, you
6    know, that Blankenship had access to this information,
7    but, you know, there are certain witnesses that I know
8    for sure that defense counsel had extensive
9    conversations with.  I don't know for sure what they
10   talked -- as I sit here -- I may have known at some
11   point, but as I sit here, I don't know if they talked to
12   Witness #10 or not.
13           I mean, he certainly knew -- he had had enough
14   conversations with Witness #10 over the years, and enough
15   correspondence that was reflected in the disclosures to
16   know that Witness #10 had said things that indicated that ██
17   believed that MSHA was against Massey or was harder on
18   Massey than other people that Massey's mines were safe
19   and so forth.  So there were disclosures made in the
20   form of correspondence documents telephone recordings.
21   There were a number of telephone recordings with Witness #10
22   that would have informed Blankenship that Witness #10 had
23   those views.
24   BY MR. MASLING:

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                        September 28, 2017

                                                                   83

1          Q.     OPR General 203 is impossible to read.  I'm

2     not going to read it.  So this is one of the documents

3     in the 70,000 that was produced pursuant to the early

4     return subpoena.  And again, Zuckerman said, well, this

5     wasn't disclosed to us before we subpoenaed it and,

6     therefore, it was intentionally withheld.  It's the top

7     bullet from Witness #11

8          A.     Yes, I remember this one.

9          Q.     The mine road appears -- the roof appears

10    solid, section is very clean and well-kept, the

11    ventilation controls are up, the condition of the mine

12    is very good and management is trying very hard to

13    improve the condition of the mine.  They are doing a

14    good job.

15               So did you ever figure out why your earlier

16    discovery productions didn't include this document?

17         A.     I don't believe we had it.

18         Q.     Did you figure out why you didn't have it?

19         A.     We had, early on, asked -- well, so, yes, I do

20    know the answer to why we didn't have it.

21         Q.     Okay.

22         A.     We had asked MSHA for their -- all of their

23    files in district 4 regarding the inspections of the UBB

24    Mine.  What I think happened here, and I could be wrong

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

84

1    because I do not have the whole thing in front of me,

2    but I think this was a spreadsheet that had information

3    about lots of mines, not just UBB, and I don't

4    believe -- I mean, I assume that somebody there

5    concluded that because -- it wasn't in what they

6    regarded as their file of UBB information or their

7    information about UBB because it was somewhere else in

8    the organization.

9            It was a spreadsheet that somebody -- I don't

10   know who kept it or how it was compiled, but it was a

11   spreadsheet that collected information on lots of mines.

12   We did, I believe, and I think I pointed this out in my

13   written response, produce his notes that seem to have

14   resulted in the information that's reflected here.  That

15   was turned over.

16       Q.   It's not coextensive, but it's close?

17       A.   Yes.

18       Q.   With the applaud letter -- well, I'm calling

19   applaud letter, you had asked DOL Attorney to try and figure

20   out why you hadn't got that before.

21           Do you remember making a similar request to

22   DOL Attorney about why this bullet wouldn't have been in

23   there, or was it clear based on what you told us?

24       A.   I don't think I did.  I think I concluded that

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              85

1    the reason we hadn't gotten it was because it had been

2    mixed in with a spreadsheet that had information about

3    many mines in the district, maybe every mine in the

4    district.

5        Q.    MOIs.

6        A.    Can we take a restroom break?

7        Q.    Of course.

8                         *   *   *

9                      (Brief break)

10                        *   *   *

11   BY MR. MASLING:

12       Q.    So I want to go blow by blow through decision

13   by decision, but before we do that, I want to tell you

14   generally what we've been told, and then get your

15   response.  And you are not going to be -- the question

16   is do you have a response.  So DOL SA #1 ███████ -- correct

17   me if I'm wrong, this is the best to my memory.  DOL SA #1

18   DOL SA #1 said ███ was shocked that all MOIs weren't

19   disclosed.  AUSA #2 said ████ had no idea no MOIs were

20   disclosed.  AUSA #1 said ███ had no idea no MOIs were

21   disclosed.  FBI SA #1 ███████ said ███ had no idea no MOIs

22   were disclosed except for one, which was one that ██ had

23   prepared during trial, and ██ had a conversation with

24   you in which you said we are probably not going to

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

1    produce this because it's a trial prep session and not

2    to gather facts.

3                    MR. SCIORTINO:  I think ▓▓ said work

4    product or something like that.

5                    MR. MASLING:  Maybe.

6    BY MR. MASLING:

7        Q.    And we'll get to what Goodwin said in writing

8    in a second.

9             So do you have a response to what they told

10   us?

11       A.    As to what the agent said, I don't know that

12   we discussed with them what we were disclosing or not

13   disclosing.  And I don't know that AUSA #2 would have

14   known what was being disclosed or not.  I'm surprised --

15   you know, like I said, I recall discussions with AUSA #1

16   AUSA #1 and with the U.S. Attorney in a group setting

17   about our approach to handling these memos, so it --

18                    MR. SCIORTINO:  Do you mean the

19   post-indictment?

20                    THE WITNESS:  The post-indictment MOIs.  So

21   it surprises me to hear ▓▓ say that.  Certainly, my

22   belief at the time was that ▓▓ understood that we were

23   not producing these things in their entirety and were,

24   instead, making disclosures via letter of what -- I

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                      September 28, 2017

87

1    mean, it's cetera just hard to imagine, ████ reviewed the

2    letters.

3    BY MR. MASLING:

4        Q.    ████ said ████ didn't.  We showed AUSA #1 the letters.

5    Well, there was only one real letter, the September 21,

6    2015 letter that describes what Witness #7 Witness #15 and Witness #8

7    had said, at least in part.

8        A.    Right.

9        Q.    And we showed that letter to AUSA #1 and to AUSA #2

10   and the agents, and all of them denied having ever seen

11   that before.  We searched the e-mail accounts of the

12   folks in the U.S. Attorney's Office and there is no

13   evidence that you -- unlike the practice with briefs,

14   which went back and forth by e-mail, there is no

15   evidence that that letter was sent to anyone, as far as

16   we can tell.  And I think the e-mail records are

17   complete.

18       A.    It doesn't surprise me that I wouldn't have

19   e-mailed it.  Like I said, it's short enough that -- I

20   don't recall specifically how I showed it to the U.S.

21   Attorney or to AUSA #1      , but I do recall asking for

22   their input on it.  And I'm not saying that AUSA #1 is

23   lying.  That one was in the last stages of the run up to

24   trial.

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

88

1          But I wanted to get ████ input and the U.S.

2     Attorney's input on those letters because -- in part

3     because -- in a substantial part because they dealt with

4     discovery and I had significant concerns about, as I

5     said, discovery in the case and making sure that we

6     didn't fall into a trap somewhere.  I mean, did they --

7          Q.   Do you recall AUSA #1 or Goodwin making changes

8     or edits to the September 21, 2015 letter?

9          A.   I don't remember if they did or not.  I think

10    honestly, you know, my general recollection on these

11    letters was that they looked at them and said more or

12    less, I think that's fine, looks good.  I don't remember

13    getting edits from them.  As best I can recall on that

14    issue, they agreed with both of those letters that were

15    responsive to the June letter and the September letter

16    as they were written.

17         Q.   So AUSA #1 said to us ████ was pretty sure that ████

18    never saw the letter because -- I mean AUSA #1 seen it

19    since because AUSA #1 been dealing with this stuff, but ████

20    never heard of Witness #8  And if ████ had heard of Witness #8 ████

21    would have said, I want to see the MOI.  AUSA #1 now

22    reviewed the Witness #8 MOI and has said to us ████ thought

23    that the description in the September 1st letter was

24    inaccurate and misleading?

Case 5:18-cv-00591   Document 703-5   Filed 09/03/19   Page 120 of 132 PageID #: 1261
CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

89

1      A.    I don't know -- again, I'm sorry to hear ███

2   say that.  That description is a memorable description.

3   I don't know if I -- I don't specifically recall or

4   recall specifically discussing ███ with ███   I

5   recall specifically discussing ███ with the U.S.

6   Attorney.

7      Q.   ███ wasn't at ███ interview, it was you and

8   Mr. Goodwin, I believe, who were at ███ interview.

9      A.    I recall specifically discussing ███ with

10  the U.S. Attorney and that -- and the description that's

11  in the ███ letter is -- the description that's in the

12  letter regarding ███ is -- I don't know what the right

13  word for it is, but it's a pretty specific

14  characterization of what ███ told us and that one, I

15  discussed with the U.S. Attorney and said, in substance,

16  are you okay with this.  Do you think this is -- does

17  this captures what ███ told us.  And we discussed what

18  ███ had said to us and he was fine with it.  He agreed

19  with the description.

20      Q.   Let me show you the only communication we've

21  had with the former U.S. Attorney.  Here's the letter

22  that he sent us.  Take a look at that and if you care to

23  respond to what it says.

24      A.    Yes.

OPR - 000217

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                             90

1            All I can say to that is that we specifically

2       discussed how we were going to handle the post-trial

3       MOIs.  And I don't know if he, in writing this, is

4       thinking about his -- the approach that we took on the

5       materials from the pretrial phase when we did just

6       produce it all or at least intended to produce it all.

7       I don't know.  I don't know what he is referring to

8       there, but we certainly had many conversations about the

9       approach that we took with the post-trial memos.

10              MR. MASLING:  For the record, it's a May

11      24, 2017 from Mr. Goodwin to Robin Ashin (ph), who is

12      the OPR counsel.  It has not been Bates stamped.

13              MR. SCIORTINO:  May I follow up on AUSA #1

14              MR. MASLING:  Yes.

15              MR. SCIORTINO:  The thing about AUSA #1 is

16      completely irreconcilable with your recollection.  ████

17      says that ████ involvement in discovery was basically

18      limited to this project where you are reviewing stuff

19      that's already been produced in response to the judge's

20      order that you designate things that are exculpatory.

21      ████ said that ████ was -- after that order came down, ████

22      was basically assigned a range of documents that it was

23      AUSA #1 job to go through.

24              But ████ was unequivocal that ████ was under the

Case 5:18-cv-00591  Document 703-5  Filed 09/03/21  Page 122 of 132 PageID #: 1263
CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

91

1    impression that every MOI in the case had been produced.

2    ███ said that ████ own practice strongly disfavors letter

3    disclosures, and that ████ almost never does that unless

4    there is some witness safety issue, and you are worried

5    that a witness is going to get killed.  ███ said, in

6    every case, every other case like this one where there

7    is no witness safety issues, ███ just turns over the MOIs

8    and never writes letters.

9           So ████ recollection is completely at odds with

10   yours in that one, ███ says ███ was unaware of any

11   undisclosed MOIs, period.  And two, ███ says, had you

12   looped ████ in about this disclosure letter, ███ would not

13   have been on board with it because ███ just doesn't do it

14   that way.  So it's hard to square what you guys are

15   saying one day after the other.

16          Is it possible that you are misremembering

17   that ███ was involved in this disclosure letter?

18       A.    I'm trying to figure out why ████ would say

19   that.  I -- you know, you hear somebody say that and you

20   wonder if you are misremembering it, but my recollection

21   is that -- I am very confident, as I sit here and think

22   about it, that ████ looked at those letters.  And I

23   don't know if ███ --

24   BY MR. MASLING:

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

92

1        Q.    There is too many questions about the 6/22
2    letter.  It's just the one letter, the September 21,
3    2016 because the June 22nd letter doesn't make -- I mean
4    it makes some disclosures in the letters, but not about
5    MOIs.
6             MR. SCIORTINO:  Yes, that stuff's all been
7    produced.  It's just the unproduced stuff we are talking
8    about now.
9             THE WITNESS:  Right.  So specifically as to
10   the September letter, so I'll say generally in response
11   to all of that, my belief certainly was that AUSA #1 was
12   aware of how we were handling the memoranda.  And is it
13   possible that I assumed that based on conversations, you
14   know, that ███ was present for and ███ didn't fully
15   understand it.  If ███ says ███ didn't know or ███ didn't
16   believe at the time that we were handling the post-trial
17   memoranda in the way that we did, I don't think AUSA #1 a
18   liar.
19             It was my belief, and I believe ███ was present
20   for conversations in which Booth and I discussed it.  I
21   don't know.  I don't know what to say to that.  Like I
22   said, at the time -- it came up again in motion
23   practice, either right before trial or during trial when
24   there was another motion filed by the defense, another

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

93

1    motion to compel.  And at that stage -- you know, at

2    that stage, we again discussed our approach to the

3    memoranda.

4            Is it possible -- you know, is it possible

5    that the conversations that I'm thinking about were all

6    conversations between me and Booth and ███ was absent,

7    I suppose so.  I don't know what to make of it.  My

8    belief, certainly at the time, was that ███ understood

9    how we were handling the post-trial MOIs and was on

10   board with it, but if ███ says he wasn't.

11   BY MR. MASLING:

12       Q.    The person who can break the tie won't talk to

13   us?

14            MR. SCIORTINO:  Well, the three things ███

15   says are, one, ███ was completely unaware that any MOIs

16   had not been disclosed; two, that ███ never seen that

17   letter before, and had ███ seen that letter, would have

18   advised against it because ███ doesn't like letters of

19   disclosures; and 3, having seen the letter for the first

20   time yesterday, ███ thought it was inadequate and

21   insufficiently --

22            MR. MASLING:  ███ saw the letter before

23   yesterday.

24            MR. SCIORTINO:  Oh, did ███  Yes, I'm

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

94

1      sorry, ███ saw it in connection with the post-trial

2      stuff.  But having seen the letter for the first time

3      post-trial, ███ thought it was inadequate and

4      insufficiently detailed summary of the MOIs.

5                  MR. MASLING:  At least the Witness #8 one.

6                  MR. SCIORTINO:  At least the Witness #3 one.

7                  THE WITNESS:  I don't know that AUSA #1 would

8      have known.  ███ wasn't on the case and Witness #8 as it

9      turns out, and I didn't realize this until I started

10     looking at this in connection with questions from you,

11     Witness #3 was a pre-indictment MOI that didn't get produced.

12     And I can't remember right now if that one came in

13     post-indictment.  I don't remember what happened.  It

14     came in -- there was a delay in getting it.

15                  You know, I don't know if -- here is what I

16     can tell you.  I do not have any record, I don't have

17     any notes, I don't have an e-mail showing it to AUSA #1

18     Our offices were next door to each other.  We looked at

19     stuff, at documents and discussed case issues

20     one-on-one.  Certainly, in this period of time, we would

21     have been together.  During this period of time, meaning

22     September, we would have been together just about all

23     day every day.

24                  I believe that I showed it to AUSA #1  You know,

CONFIDENTIAL -- DO NOT DISCLOSE
Case 5:18-cv-00591   Document 709-5   Filed 09/05/19   Page 126 of 132 PageID #: 1267
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

1    if ████ says AUSA #1 never seen it, I don't know what to make

2    of that.  There were -- obviously, there were a million

3    things going on at that period in time, we were

4    preparing various witnesses and so on.  I don't know if

5    ████ interpreted it as a -- I mean, if ████ genuinely

6    thought that we were producing all the MOIs, and ████

7    interrupted that letter as identifying exculpatory

8    material in something that had already been produced,

9    like the -- as we did with the documents that were

10   referred to in the June letter, then maybe that accounts

11   for why AUSA just looked at it and let it go.

12           I don't know.  Until you told me that ████ said

13   that -- I have not, since this whole thing started, I

14   have been very careful not to discuss anything about the

15   OPR inquiry at first, and then the investigation with

16   anybody else who was involved in the events at the time.

17   And it surprises me to hear that ███ says that.

18   I don't know quite what to make of it.  I guess I can

19   speculate about what might reconcile it, but all I can

20   say is at the time, I believed that ████ understood the

21   approach that we were taking and was on board with it.

22   Now, ████ was never -- certainly, ███ was not involved

23   in -- I don't think ███ was present for the conversation

24   that the U.S. Attorney and I had early on in discovery

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                              September 28, 2017

96

1    about how we were going to handling these, but I did --

2    I was fairly confident -- I was quite confident until

3    you told me that ███ says otherwise that ███ was well

4    aware of it after ███ got involved in the BY case

5    BY MR. MASLING:

6         Q.    So for specific MOIs, let's start with the

7    MOIs that were not disclosed that reflected interviews

8    conducted pre-indictment.  First, let me ask you, had it

9    been your intent that all MOIs reflecting pre-indictment

10   interviews be disclosed?

11        A.    Yes.

12        Q.    So let me show you which ones they are and

13   let's ask about why they might not have been disclosed.

14   So there is a tab that says OPR MOI, and there's a

15   chart.  You are going to be inherently suspect of the

16   chart because it was prepared by Zuckerman.  But as far

17   as I can tell, it's pretty accurate, although there was

18   a typo or two.  So the pre-indictment MOIs are -- is --

19   so Witness #48 , 11/21/2014, that's post-indictment,

20   right because the indictment was earlier in November?

21        A.    That's right.  The indictment was the 11 or

22   12th of November.

23        Q.    So Witness #14        another Witness #14      , Witness #8

24   Witness #4    Witness #6    Witness #12   Witness #15                ,

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

97

1      Witness #1    Witness #16    Witness #17     So is there an explanation

2      as to why those MOIs were not disclosed, despite your

3      intention that they should have been?

4           A.    What I believe happened was that we pushed out

5      everything that we had done at -- everything that we had

6      in the file at the time of the indictment.  And when I

7      say, "pushed out," we produced those MOIs in the initial

8      rounds of discovery.  I believe after -- and to be

9      clear, my belief until you raised the issue with me

10     whenever that happened, was that all of the MOIs or

11     pre-indictment interviews had been disclosed.  There

12     were -- when I -- when you made me aware that that was

13     not the case, and I looked at the circumstances of some

14     of the memos that were not -- that were pre-indictment

15     interviews were not produced, it looks like those came

16     in late, in some cases very late.

17          Q.    That's right.

18          A.    And all I can say is that, I mean, to be

19     bluntly honest, I didn't keep track of them.  I just

20     didn't -- I did not -- I lost visibility of the fact

21     that there were, if I knew it at the time, that there

22     were memos from '14 that hadn't been put in the file yet

23     or completed yet at the time of the indictment.  And,

24     you know, those just didn't get produced.  My belief at

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              98

1    the time was that the indictments that were -- the MOIs

2    that were coming in post-indictment were from

3    post-indictment interviews.

4         Q.    [DOL SA #1]   drafted all of the undisclosed

5    pre-indictment interviews, except for one, which was

6    authored by [FBI SA #1]  Does that mean anything?  Do you

7    think that that contributes at all to our understanding

8    of why they came to the United States Attorney's office

9    late?  They seem to be drafted pretty close in time to

10   when the interview took place, but didn't get sent over

11   here until, as you know, some significant time after.

12        A.    I mean, you know, I would say all things -- I

13   would say that [FBI SA #1]       is a stronger agent in

14   terms of [SA] organization and recordkeeping and getting

15   things to us.  It doesn't -- you know, I don't know if

16   that contributes to the understanding of how it happened

17   at all, but does it surprise me that the ones that came

18   in late, in some cases really late, came in from [DOL SA #1]

19   [DOL SA #1] no.

20        Q.    Okay.

21        A.    And, you know, I hate to criticize either of

22   those guys.  It's un --

23        Q.    I mean, they did get here.  They got here in

24   plenty of time to produce them.  So it wasn't like they

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

99

1      came in after trial.

2          A.    That's right.  I mean, I don't want to -- you

3      know, it's unfortunate that in the course of something

4      like this, you wind up saying things that seem critical

5      of people.  I respect both those guys a great deal.

6          Q.    So getting back for a second to the September

7      21, 2015 letter, you had said to us that your intent had

8      been to disclose all pre-indictment MOIs.  But you

9      didn't do that for Witness #8 right, you just decided to

10     summarize it rather than just disclose the whole thing.

11         A.    I know.

12         Q.    So why did you do that?

13         A.    All I can say about that is, at that point, it

14     didn't register with me that Witness #8 was pre-indictment.

15         Q.    Okay.

16         A.    That seems, again that -- I've given some

17     thought to how that happened.  It hadn't been produced.

18     I don't remember paying attention to the date of

19     interview on Witness #8  And all I can -- the only

20     explanation I can come up with for why it didn't

21     register is number one, we were in the week before trial

22     and all of that going on and number two, you do, over

23     the course of an investigation a thousand interviews,

24     and you are not necessarily going to have an accurate

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              100

1    mental chart of when they all happened.  It just

2    didn't -- I did not -- I have no recollection of

3    noticing at the time I included the language about the

4    Witness #6 interview when the interview had taken place.

5                 MR. SCIORTINO:  Well, by the time the

6    philosophy of discovery had changed too, right?

7                 THE WITNESS:  Correct.

8                 MR. SCIORTINO:  That's after you had the

9    this discussion with Mr. Goodwin that you are only going

10   to turn over the stuff that is required to turn over,

11   after things had gotten personal with the defense, et

12   cetera, all of the stuff that you discussed earlier

13   today had happened in the intervening months.

14                So is that an explanation?

15                THE WITNESS:  I don't know if we had made a

16   different call if I had realized it was pre-indictment,

17   but, at that point, my assumption, my belief at that

18   point was that everything that was unproduced was

19   post-indictment.  So I was looking -- I looked at it.

20   It would not have -- I don't remember specifically

21   thinking this, but it would not have occurred to me that

22   if it was unproduced, it was pre-indictment because I

23   thought we -- I certainly would have thought anything

24   that was from -- that one was from -- when was it from,

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

101

1    Witness #8    It was old.

2         Q.    2014, February 2014.

3         A.    Yes.

4              I certainly believed in September of 2015, I

5    certainly believed that anything from February of '14

6    would have gone out in the initial rounds of discovery.

7    I just didn't pay attention to the fact it was a

8    February 14th interview.

9         Q.    The distinction between post-indictment and

10   pre-indictment, did that have any legal basis, do you

11   know, or was it just a factual, how are we going to

12   handle new material that comes in after our big initial

13   production?

14        A.    I don't know that there is a little basis for

15   it.  I mean, the assertion that I recall the U.S.

16   Attorney making is that we don't have to produce --

17   there is no requirement to produce MOIs.  You have to

18   produce information from the MOIs, if it falls within a

19   category it has to be produced.  I don't think that was

20   specific to pre or post, but the other assertion that

21   went along with that was that generally post-indictment

22   interviews, trial prep interviews aren't going to be

23   disclosed.  And clearly there were interviews that we

24   conducted post-trial that --