CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                        September 28, 2017

                                                              102

1        Q.     Post-indictment?

2        A.     I'm sorry, post-indictment that were

3    interviews with witnesses that we hadn't spoken with

4    pre-indictment, which, you know, are in a different

5    category than maybe your core pretrial interview in a

6    typical case where it's a trial prep session and there

7    is nothing new in many cases or exculpatory that comes

8    to light.  And so it wouldn't be something that was --

9    that you would ordinarily produce, but -- and I don't --

10   I -- I guess to answer the question, I don't think

11   that -- I certainly, at the time, didn't have the view

12   that there was a legal difference.  It was just a

13   practical difference in how we were treating them.

14       Q.     Maybe we should do this before we go to the

15   blow by blow.  You've learned today that AUSA #2  and

16   AUSA #1   said that they thought all of the MOIs were

17   being disclosed Zuckerman had said they thought all of

18   the MOIs were being disclosed.  And they based that on a

19   number of things.  But let me ask you -- I want to talk

20   about what Zuckerman knew or should have known or didn't

21   know.

22              So let's start out with a general question:

23   Do you believe that Zuckerman knew they were only

24   getting some MOIs?

CONFIDENTIAL — DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

1        A.    At the time I did, yes.

2        Q.    Why?

3        A.    I mean, I suppose they could -- I guess they

4    knew.  I assumed that they knew because they were, one,

5    just general practice; two, because they were also

6    talking with witnesses and counsel for witnesses that we

7    were conducting trial prep interviews.  They knew that

8    we had -- they knew that we had spoken with **Witness #13**.

9    We knew that they had had an extensive interview with

10   **Witness #13**, just to give an example, and even got a --

11   you know, we got a summary of that interview over the

12   telephone from **Witness #13** lawyer who told us what Zuckerman

13   had asked and what **Witness #13** had said.

14            The -- and they knew that what we had -- and

15   certainly by the September 21st letter or whatever the

16   date was, they knew that what we had disclosed from the

17   **Witness #13** interviews was fairly brief, and was the

18   information that we believed from our conversations with

19   **Witness #13** was required to be disclosed.

20            So I believe that Zuckerman was aware that we

21   were not -- that's an example.  Also, we knew that they

22   were having extensive discussions with **Witness #4**,

23   or at least with **Witness #4** counsel and knew what we

24   had been discussing, what we had discussed with

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

1    Witness #4  in our meetings with him.  So, I mean, I
2    can't -- two things, number one, I believed at the time
3    that Zuckerman understood that we weren't disclosing
4    post-trial interview memos, and as I sit here now, I
5    still believe that Zuckerman knew at the time that we
6    weren't disclosing post-trial interview memos.
7         Q.    Let's look at a few specific documents and
8    pleadings.  There is a tab, OPR court.  If you go to --
9    I got them out of order, but if you go to 006 and 7, 006
10   through 9, this is the first pleading that talks about
11   MOIs.  So this is filed in February of 2015, it's after
12   the decision, I take it, to only disclose pre-indictment
13   MOIs.
14        And on the second page 0007, in the middle of
15   the first full paragraph, "Defendant concedes the United
16   States has provided extensive discovery, which included
17   in that discovery materials, which the United States is
18   not required to disclose, including FBI 302s."
19        And you are going to see that there are
20   similar statements and two more pleadings down the road.
21   To me, and I'm not asking you who made the final call, I
22   read this as meaning all 302s because if there had only
23   been some, it would have said some.
24        Do you remember what the intent was in either

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

105

1    writing this or approving the language?

2         A.    I -- well, first of all, I can tell that you

3    we certainly didn't file anything with the intent of

4    misleading the court or say anything in a pleading with

5    the intent of misleading the court.

6         Q.    Okay.

7         A.    I don't know, and we can look at what the

8    other statements were later in the later pleadings.  You

9    know, at this point, the intent of the statement and the

10   intent of the brief or response was to make the point

11   that our discovery had been broader than what's

12   required, and that we had -- you know, I certainly don't

13   think that was intended.

14             And at the time this particular statement was

15   made, I don't know whether it was true are on not.  I

16   mean, obviously, there was what I call the inadvertently

17   undisclosed.

18        Q.    No, there were post-indictment interviews?

19        A.    That were not disclosed.

20        Q.    Yes.

21        A.    But the intent of the statement was not to

22   indicate -- and I see how you could read it that way,

23   but the intent of the statement wasn't to indicate that

24   we had produced all 302s, the intent of the statement

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

106

1    was to make a point that we had gone above and beyond

2    our obligations of producing discovery.  It said that we

3    had had produced 600,000 documents, we had produced FBI

4    302s when we could have instead relied on letter

5    disclosures or just exculpatory material, that we had

6    them given more than we had to give them.

7         Q.    Okay.

8               Flip to OPR 10, which is the next pleading

9    that talks about 302s.  So this is filed May 14th of

10   2015 at the top of OPR Court 11.  It says here, "The

11   United States exceeded its discovery obligation by

12   producing a digitally searchable format, type 302

13   reports that summarize witness interviews, regardless of

14   whether they contained exculpatory information."

15              And then down below because this is a request

16   for the agent notes, it says, "Obligation does not

17   require unrestricted access to handwritten notes taken

18   by agents in witness interviews, especially when the

19   type-written equivalent has been produced."

20              Let's just do the last one, too, and then

21   we'll ask them all together.  So the next final pleading

22   was filed in July of 2015.  It's 00019 and on 00020,

23   there is a representation to the Court that what's been

24   produced include -- and this is at the bottom --

CONFIDENTIAL—DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

1    "Designations include memorandums of witness interviews

2    conducted by federal agents, despite defendant's

3    suggestion that the United States has not disclosed

4    those interviews."

5            And then on 0026, it says, "In fact, the

6    United States has produced memorandums that reflect the

7    substance of well over 300 witness interviews, and in

8    compliance with the Brady order, the United States

9    designated a number of those as containing possible

10   Brady material."

11       A.    So I lost you a little bit, Mark.  What was

12   the second to last one?

13       Q.    The second to last one was at 0020.

14       A.    Can I mark on this?

15       Q.    Of course.  It starts with "notably" down at

16   the bottom.  And then on page 0026, up at the top, and

17   then on the bottom of page 0020.  So the question is:

18   If you take all of these together, and I can tell you

19   how I read them, as a representation of the Court that

20   the United States is producing all MOIs and, therefore,

21   you don't need the agent notes because you have the

22   MOIs.

23           And I know you've said, and I assume it's true

24   for everything, that there was no intention to mislead

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

108

1    the Court and the defense about that, but these are well

2    after the decision -- especially the last one, well

3    after the decision was made not to disclose some of the

4    MOIs.

5              And I guess the question is:  Why didn't you

6    say that?

7        A.    Well, the -- again, I've tried to reconstruct

8    this in my mind.  In the dispute over notes, I --

9    certainly my understanding of what the defense was

10   asking for at the time was notes of -- notes of

11   interviews that they could use to compare to memoranda.

12   In other words, we've given you these memoranda, now

13   they are coming back and asking for the notes, so they

14   can use the notes to compare them to the memoranda and

15   say there are inconsistencies here, he said happy and

16   the memo reflected glad.

17       Q.    Or from their perspective, a deliberate

18   omission of exculpatory material?

19       A.    Sure, or from their perspective --

20       Q.    What they would want to know from their

21   perspective.

22       A.    Sure, understood.  And our point was that

23   we've given them these memos, and unless there is

24   something -- unless they have some specific reason to

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

1   believe that the notes are different from the memo that

2   they've already been provided, and the law generally

3   doesn't require us to turn over the notes to them.

4        Q.    That's true.

5        A.    That was the point that we were trying to

6   make.  And there was -- the first thing I can say is

7   that all of these statements were intended to refer to

8   the pre-indictment interview memoranda that we had

9   produced.  And as to your question of why we didn't say

10  that there were post-indictment interview memoranda that

11  we hadn't produced, you know, again, all I can say to

12  that is that we -- and I say we -- I don't know -- I'm

13  not sure what AUSA #1 would say about this, but --

14       Q.    We asked AUSA #1  We asked AUSA #1 and AUSA #2 what

15  they intended when they either drafted this, because you

16  didn't draft some of these.  They drafted them and you

17  reviewed them, or you drafted and they reviewed them.

18  We asked them what they understood this to mean and what

19  they understood this to mean was consistent with what he

20  had told you that we meant all MOIs.

21       A.    What I was going to say --

22       Q.    Sorry.

23       A.    -- is that we had discussions about the -- not

24  about the MOIs specifically, but about the interviews

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

110

1    that were conducted post-indictment.  And the consensus

2    was that there was no significant exculpatory

3    information that hadn't, in the post-indictment

4    interviews, that -- generally, the consensus was that

5    there was no -- and again, I'll just tell you what the

6    U.S. Attorney said, and I didn't hear anybody disagree

7    with him, that there was really no exculpatory

8    information in anything anybody has told us since the

9    indictment, so.

10       Q.    Did anybody say in response to that, that's

11   true but our disclosure obligations are broader within

12   Brady pursuant to department policy?  So maybe we don't

13   think it's exculpatory, but our disclosure obligations

14   go beyond that pursuant to department policy.

15       A.    I'm trying to recall.  I think in those

16   discussions the -- my understanding of what he meant was

17   that he was using the word exculpatory synonymously with

18   discoverable as a sort of shorthand for information that

19   was required to be disclosed.

20       Q.    Okay.

21       A.    I -- and again, I hate to put too much on

22   AUSA #2   because AUSA #2 was very junior, even more junior

23   than I was and was not --

24       Q.    AUSA #2 is kind of as junior as you can get.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

111

1    A.    Yes, but, you know, it -- and maybe ███ didn't

2  say this, but if AUSA #1 thought that there was -- ███

3  was in most of the post-trial or many of the post-trial

4  interviews.  We certainly discussed most of the

5  post-trial interviews with any significance.

6          If ███ thought there was exculpatory

7  information from those interviews that needed to be

8  disclosed, ███ was aware of the Court's order to identify

9  exculpatory information and point the other side to

10 where it was.  And I don't recall ever having a

11 conversation with AUSA #1 where ███ said -- I can confirm

12 that there was never a conversation with AUSA #1 where ███

13 said, we need -- this is exculpatory, we need to

14 identify this, and I said no.

15         We certainly would have identified anything

16 that ███ said that ███ thought needed to be disclosed, and

17 the same thing with the U.S. Attorney.  His view was it

18 would have been disclosed in the letters was more than

19 sufficient.

20         MR. SCIORTINO:  Well AUSA #1 was under the

21 impression that the entire memorandum was --

22         THE WITNESS:  Right.  I understand that.

23 The point I'm making --

24         MR. SCIORTINO:  You are saying the court

Case 5:18-cv-00591  Document 703-5  Filed 09/05/19  Page 11 of 123 PageID #: 1284
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                          112

1    order --

2              THE WITNESS:  It's a little bit different.

3    The court order required us -- I guess, you know, it

4    surprises me --

5              MR. SCIORTINO:  Was that on a reoccurring

6    basis that the court order required you to do that on an

7    ongoing basis?

8              THE WITNESS:  Yes.  I don't have it in

9    front of me, but that was my understanding of it was

10   that if we -- I don't know if it said or not but we

11   continued to disclose stuff a week before trial or ten

12   days before trial.

13             MR. SCIORTINO:  With respect to this

14   pleadings, which, I guess, were drafted at least in the

15   first instance by someone like AUSA #2 ███████.

16             THE WITNESS:  I don't know who drafted

17   these.

18             MR. SCIORTINO:  Is it possible that when

19   you were looking --

20             MR. MASLING:  I know, if you want to know.

21   So the February one was draft by AUSA #1 the May one was

22   drafted by AUSA #2 and the July one was drafted by

23   Mr. Ruby, but everybody saw them.

24             MR. SCIORTINO:  So is it possible that at

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              113

1     least on the ones not drafted by you, you were more

2     focused on reviewing this issues about the notes and

3     making sure that that point was made, that whatever's in

4     the notes, if it's also in the memoranda, you don't get

5     the notes, or you might not have been really focused on

6     this issue about whether the way it was described and

7     the way memoranda were generally described that

8     inadvertently suggested that they all were produced.

9               THE WITNESS:  That's -- I mean, yes.

10              MR. SCIORTINO:  In the rush of trial --

11              THE WITNESS:  The point that I was trying

12    to make was exactly that, that the law doesn't require

13    us to turn over notes for memos that have already been

14    disclosed.

15              MR. SCIORTINO:  So when you were reviewing

16    those, that's the issue you were focused on, not this

17    other stuff?

18              THE WITNESS:  That's right.  And that's

19    what I believed.  And I could go back.  It's possible

20    that I misunderstood their motion, but that's what I

21    believed they were after was notes for -- the notes that

22    corresponded to memoranda that we had already produced.

23    BY MR. MASLING:

24        Q.    There was a big blunder of those motions, but

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                  September 28, 2017

114

1   I think what you were responding to in these sections of

2   the briefs was their request for the notes?

3        A.    Yes.  And in particular, my understanding was

4   that they were asking for notes that corresponded to

5   MOIs that had been produced.

6        Q.    That they knew existed, basically?

7        A.    Yes.

8              And as to the post -- you know, I, again,

9   would -- I know these kinds of statements may not be

10  worth much to you guys, but I can tell you that if I

11  would have read it and thought it was misleading to the

12  Court, I would have changed it or taken it out.

13             That was -- the question of whether there

14  was -- the question of whether they were post-indictment

15  MOIs or the fact that they were post-indictment MOIs

16  that hadn't been produced, which is not what I was

17  focused on when I was thinking about these motions or

18  these responses or drafting the one from July that I

19  apparently wrote.

20       Q.    Did the U.S. Attorney review pleadings before

21  they were filed?

22       A.    Depends.  Sometimes he did, sometimes he

23  didn't.  And I would say more frequently the -- more

24  frequently, I would discuss with him the significant

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              115

1    portions of them, and this is what they are saying, here

2    is our response.

3        Q.    I know he saw the July one.

4               MR. SCIORTINO:  Can I direct your attention

5    back to 148, General 148.  This is the disclosure

6    letter.

7               THE WITNESS:  I'm here.

8               MR. SCIORTINO:  Does this letter tell

9    Zuckerman that you are not getting all of the MOIs

10   implicitly.

11              THE WITNESS:  Yes.  This was the one that I

12   was referring to when I said with ███ at least.

13              MR. SCIORTINO:  And also with Witness #8 right?

14              THE WITNESS:  Yes.  They would have known

15   that we interviewed, and at the time I thought that

16   Witness #8 -- or assumed that Witness #8 was a post-indictment

17   MOI.

18              MR. SCIORTINO:  So at least with respect to

19   these --

20              THE WITNESS:  ████████████████████████████

21   ██████████████████.

22   BY MR. MASLING:

23       Q.    Yes.

24              Whenever you want to take a break?

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

116

1      A.    Yes.

2            MR. SCIORTINO:  At least with respect to

3      these, Zuckerman had a clue that these were MOIs that

4      they weren't getting.

5            THE WITNESS:  Yes, and with █████ in

6      particular.  They knew that we had spoken with █████

7      presumably.  I can't imagine that they looked at this,

8      knowing the extent of our discussions with █████ because

9      they had interviewed ████ as well, knew that we had

10     interviewed █████ knew that we had turned over a lot of

11     documents relating to █████  I can't -- I would be -- I

12     just do not believe that they didn't realize that there

13     were MOIs post-indictment interview MOIs that they

14     weren't getting.

15     BY MR. MASLING:

16     Q.    I mean, there is another argument to be made

17     that Zuckerman knew or should have known, and that is

18     you, in fact, did produce one post-indictment MOI,

19     right, and that was Witness #2 ████████ (ph)?

20     A.    Right, we did.

21     Q.    And if they really paid attention, they would

22     have looked at the Bates stamp number and seen this big

23     gap between the last one they got and the one that they

24     got in August or September of 2015.  And, in fact, we'll

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

117

1    look at those and they sent you an e-mail after they got

2    them and said, "Thanks, but whatever everybody else?"

3    So one might infer from that that they would have known.

4         A.    Like I said, do I think they knew?  Yes, I

5    think they knew.  And, John, this letter that you

6    pointed to is what -- and the ███████ point is equally

7    valid, but the point on █████ that I made, and also

8    ████████ I think the ████████ was post-indictment?

9         Q.    Yes.

10        A.    Here we disclosed that these people have been

11   interviewed by federal agents, they don't have MOIs for

12   them.  Again, I believe and continued to believe that

13   they were fully aware that we weren't producing

14   post-indictment MOIs in their entirety.

15        Q.    Let's go to one last issue about

16   representations to the Court.  OPR Court 0037.  So this

17   is a partial transcript of --

18        A.    Witness #4

19        Q.    -- a conversation between you and the Court

20   and defense counsel during Witness #4

21   cross-examination.  And the jury, at this point, had

22   been excused.  And on lines 8 through 10, you say to the

23   Court, we've turned over grand jury material from this

24   witness.  We've also turned over 302s from our interview

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

118

1    with this witness.

2         Do you have a concern that you made an

3    inaccurate statement to the court?

4         A.    I think we had.  Had we not turned over 302s?

5         Q.    One of them, and you had four that had not

6    been disclosed or five?

7         A.    And what was their allegation.  The allegation

8    that we were addressing here, I think, was that we had

9    known that ▓▓ was going to say that ▓▓ didn't

10   participate in a conspiracy with the defendant, which we

11   didn't know.  I did not -- I didn't think:  I knew that

12   ▓▓ was -- I suspected that ▓▓ was not going to be a

13   terrific witness for us on cross, in part, because I

14   knew that they had been spending an enormous amount of

15   time prepping with ▓▓ counsel.  You know, at this

16   point, I -- and again, there is no intention there to

17   tell the Court that we produced post-indictment MOIs.

18   We had two, at least, pre-indictment MOIs on Witness #4 .

19        Q.    Right, but you didn't produce one.

20        A.    Well, at the time I believed that we had.

21        Q.    I see.

22        A.    So certainly, again, there was no intention of

23   misleading the Court here.  And at the time I made that

24   statement, I don't know if I -- I certainly believed

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

119

1    that to be accurate, that we had turned over 302s from

2    our pre-indictment interviews with Witness #4    And the

3    point is what was at issue here was whether or not we

4    had known beforehand that the witness was going to

5    testify that █ didn't participate in a conspiracy with

6    Blankenship.

7            And I believed, and I'll have to go back and

8    look at all █ grand jury testimony, but █

9    acknowledged -- short explanation of what the issue was

10   and what our response was, █ had acknowledged or why we

11   responded the way we did, █ had acknowledged that there

12   was an understanding in which █ and Blankenship were

13   participants that there was going to be routine safety

14   violations at UBB.

15           So, in our minds, █ had acknowledged -- █

16   may not have understood what the legal definition of a

17   conspiracy was, and I think █ admitted that on

18   redirect, █ had acknowledged the elements of the

19   conspiracy.  So I think it came as a surprise to us that

20   █ testified that there was no conspiracy.

21       Q.   Do you think it's a fair or unfair reading of

22   the statement we have also turned over 302s from my

23   interviews with this witness, to read it as meaning,

24   we've turned over all our 302s from interviews of this

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                            120

1    witness?

2        A.    You know, I can tell you that that was not

3    what I meant when I said it.  And again, it's -- and I

4    understand that this is what you guys do.  It's a

5    painful process to have bits and pieces picked out of

6    the record from a nine-week trial and --

7        Q.    The interview focused on potential problems.

8        A.    I know, I understand.

9        Q.    He we don't go through all of the stuff that

10   was done right because we'd be here a long time and

11   there would be no point to that if we've already

12   concluded that you've done something right.

13       A.    I understand.  I would -- and again, you know,

14   this is the kind of thing that when a defendant tells me

15   this, it makes me roll my eyes, but I have -- it's just

16   not -- the thought of trying to say something that would

17   mislead Judge Bergenner would just never cross my mind.

18             MR. SCIORTINO:  You mean to say we've

19   turned over all relevant 302s?

20             THE WITNESS:  We've turned over everything

21   that could be exculpatory.  And we all may differ, but

22   at the time, certainly I believed that to be true.  We

23   had turned over ███ 302.  We turned over 302s

24   pre-indictment, and we had disclosed everything that

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                            121

1    Witness #4 had told us that we believed to be

2    exculpatory.

3              And to the point that they were making, there

4    was nothing that Witness #4 had told us that led me to

5    believe ▮ would testify that ▮ didn't participate in a

6    conspiracy.  I assumed -- I mean, ▮ had told us what ▮

7    told us, and my belief was that ▮ lawyers explained to

8    ▮ had explained to ▮ what a conspiracy was.

9              MR. SCIORTINO:  Was ▮ testimony on cross

10   that ▮ hadn't participated in any conspiracy?  I read

11   that part of the transcript, and the defense attorney

12   walks ▮ through this line of questioning fairly

13   confident that you can tell ▮ knows what the answers

14   were going to be.

15             How surprised were you when you heard all of

16   that stuff?

17             THE WITNESS:  Surprised.  Like I said, I

18   thought that Witness #4 -- I felt like, and if you read

19   the redirect, you can probably tell I felt like

20   Witness #4 had deviated from what ▮ told us in the grand

21   jury and what ▮ had told us before the grand jury.  I

22   felt like ▮ had backed up on us.  I didn't think -- I

23   knew that -- I expected that ▮ was somewhat sympathetic

24   to Blankenship, just because they had worked together

Case 5:18-cv-00591   Document 705-5   Filed 09/05/19   Page 21 of 123 PageID #: 1294
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                          September 28, 2017

1    for so long and Blankenship had given Witness #4 start.

2            But I didn't think [Witness #4] lawyers would let [Witness #4]

3    do that.  I didn't think [Witness #4] lawyers would let [Witness #4]

4    deviate.  It was pretty risky.  I mean there was -- I

5    don't know that we had a -- there is probably not a

6    perjury case there, but I've had lawyers ask me after

7    [Witness #4] testimony, are you going to go after [Witness #4] are you

8    going to take a look at [Witness #4] for perjury.  It was a

9    really risky strategy on [Witness #4] part, so, yes, I was

10   surprised.

11   BY MR. MASLING:

12        Q.    The one statement that FBI SA #1 pointed

13   us to in a post-indictment MOI, which seemed to be

14   arguably consistent with [Witness #4] testimony on cross that [Witness #4]

15   didn't conspire with Blankenship is from an MOI in April

16   of 2015.  I'll just read it to you, but I can show it to

17   you.  The last sentence says, "Witness #4 advised that [Witness #4]

18   never knowingly gave a direct order or [Witness #4] told someone

19   to do something that caused a law to be broken."

20           Would that have been an exculpatory statement

21   or inconsistent with other statements that [Witness #4] had made

22   that should have been disclosed to the defense?

23        A.    That [Witness #4] said that [Witness #4] had never given a direct

24   order?

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

123

1          Q.     OPR MOI 110, if you want to look at it.  This

2     is from April 2nd, 2015, post-indictment.  We asked

3     FBI SA #1          was it a surprise to you what Witness #4

4     had said on cross.  Well, there was this one statement

5     that ███ had made.

6          A.     Well, I mean, maybe our view of it was overly

7     legalistic, but that was -- and again, you can get --

8     there is no question that you can get blinkered by your

9     own view of the case.  But our theory was not that

10    Blankenship or Witness #4  had ever ordered anybody

11    directly to commit -- to violate a mine safety law,

12    rather it was that there was a tacit understanding that

13    mine safety law, that employees, that everybody had a

14    tacit understanding or expectation -- which is what

15    Witness #4   admitted to -- that everybody at the mine was

16    going to violate safety laws when it was necessary in

17    order to maximize profit.  And that statement is not

18    something that struck me then or strikes me now as

19    inconsistent with that.

20         Q.     Okay.  Do you want to take a second?

21                Do you want to take a break?

22         A.     ████████████████████████████

23         Q.     That's very important.

24         A.     If you all don't mind, I might need a minute

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

124

1    to see.

2                        *   *   *

3                    (Brief break)

4                        *   *   *

5    BY MR. MASLING:

6        Q.      Take a look at OPR General 59.

7        A.      General, okay.

8        Q.      So the bottom is an e-mail from Steve Herman

9    from the Zuckerman firm to you, and he asked you a

10   question.  He said, "We understand that all memoranda of

11   interviews that the government has conducted as part of

12   its investigation, as well as the documents used during

13   those interviews have been provided to the defense."

14   That's on April 15, 2015.  A few days later up on top,

15   he says, "Can you respond to the e-mail."

16           We see no evidence that you actually responded

17   to this, so the first question is:  Did you respond?

18       A.      I don't recall responding to it.

19       Q.      I didn't see it, but, you know, if you delete

20   and then delete again or do it really fast, it doesn't

21   show up?

22       A.      How do you know that?

23       Q.      I'm very careful about these things.  No, you

24   have to know that in this job because the absence of

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

125

1    something doesn't me it didn't happen.

2         A.    I did not know that.

3              MR. SCIORTINO:   I didn't know that.

4    BY MR. MASLING:

5         Q.    That used to be true.  It was true then it is

6    not true now.  So now it's immediately captured by the

7    server and you cannot go delete and then delete it from

8    the delete box and go whoo that was a close one.

9         A.    Interesting.  No, I don't have any

10   recollection of responding to him.

11        Q.    Do you think you should have responded with a

12   correction to his understanding because it's wrong?

13        A.    Well, again, I will provide some background

14   here, based on the direction I got from the U.S.

15   Attorney, which his view on correspondence from the

16   defense was that -- and this is close to a quote, if

17   they want a response from us, they can file something

18   and we'll respond.

19             His view was that generally, we should not

20   respond to correspondence from them, and, in general,

21   minimize our discussions with them outside of briefing

22   that was filed before the Court.  That was a directive.

23   Should we have responded to this --

24        Q.    And by this, let's be clear, it's giving you

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

126

1    their understanding of a discovery issue and their

2    understanding is wrong.

3        A.    Again, I can't say that I have a specific

4    recollection of this.

5        Q.    Okay.

6        A.    I didn't make a conscious decision, didn't

7    make a decision -- an intentional decision to leave them

8    with a misunderstanding of the record.  You know, I

9    can't say because of the instruction that I had from the

10   U.S. Attorney, you know, I can't say that I -- in fact,

11   I would say that I did not carefully review all of the

12   correspondence that we got from the defense.

13               MR. SCIORTINO:  Was this directive ever

14   communicated to the defense.

15               THE WITNESS:  That we are not going to talk

16   to you?

17               MR. SCIORTINO:  No, that if you have

18   something substantive to complain about discovery, or if

19   you have a discovery request, put it in the e-mail, just

20   file something and we'll respond to it.

21               THE WITNESS:  No, I don't believe so.

22               MR. SCIORTINO:  I remember when I was an

23   AUSA, there were certain defense attorneys who would lay

24   little traps in conversations and e-mails and stuff and

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                      September 28, 2017

127

1    say, as we previously discussed, this, this and this,

2    which wasn't right, you know.  And then they would take

3    your failure to disagree with them as some sort of

4    substantive admission.

5              THE WITNESS:  Yes.

6         We may have said that at some point.  Part of

7    his concern, I think, and what he expressed to me was

8    that, again, I'm paraphrasing, that everything they sent

9    us was an attempt to trip us up somehow, to create a

10   mistake, inject a mistake, create a mistake in the

11   proceedings that they could use later.

12             MR. MASLING:  They are very tactical

13   people.

14             MR. SCIORTINO:  Was there anything ever

15   expressly said to them, my failure to address anything

16   in your e-mails wasn't that I agree with it?

17             THE WITNESS:  I certainly -- I can tell you

18   I thought about writing that.  I don't know if I sent an

19   e-mail or a letter that said or not.

20             MR. SCIORTINO:  But there was some of that

21   dynamic going on with this --

22             THE WITNESS:  That's certainly true.  I

23   mean, our belief was that their correspondence was that

24   it was -- it was intended to trip us up, was intended to

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

128

1    further bury us in paper and generally was meant to be

2    tactical rather than constructive, and that those were

3    reasons that the U.S. Attorney explained in telling me

4    that we should, in general, not respond to their

5    correspondence as distinct from their pleadings.

6              And after -- at some point in the summer --

7    now, this pre-dated that, but at some point in the

8    summer of 2015, I was formally or officially banned from

9    talking to them at all.  And part of the reason that

10   he -- I don't know if this is in the e-mail or not --

11   part of the reason --

12   BY MR. MASLING:

13        Q.    I know what the reason, but the ban --

14        A.    Yes, part of the reason that he said he got so

15   upset about our communications with the defense was that

16   he had previously told me not to talk to those guys at

17   all.  Now, I have not interrupted to be that sweeping,

18   but he certainly said that we should generally not

19   respond to their correspondence.  I didn't interrupt it

20   to be a complete ban on communicating with them, but

21   that was how he -- that's what he said he had told me

22   when we had our disagreement in summer of 2015.

23        Q.    All right.

24              Let's talk a little bit about Witness #2

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

129

1    (ph).   So ▮▮▮ MOI is at OPR MOI 27, that's where it

2    starts.   So you or someone -- my question is:   Who made

3    the decision to disclose this MOI in its entirety?   And

4    it was the only post-indictment MOI that was disclosed.

5         So I guess my first question is:   Who made the

6    decision to disclose it?

7         A.   I was -- let me look at this.   I mean, I

8    remember participating in the interview.   I can't say I

9    recall specifically, since I was in there and the only

10   other AUSA it looks like in the interview was AUSA #2 but

11   I probably made the decision to disclose it.

12        Q.   So -- and we ask because, you know, we've

13   looked at these ad nauseam now, and this just doesn't

14   seem different in any way from the other MOIs.

15        And so do you have a recollection of why you

16   chose this one as, we are not going to do a letter of

17   disclosure, which you did pretty shortly thereafter for

18   the other three, this one needs to go in its entirety?

19        A.   Witness #2 -- so two-part answer to that.

20   Number one -- and again, this -- there wasn't a formal

21   process in place for reviewing MOIs to post-indictment

22   MOIs to see if, should they be produced, should they not

23   be produced.   We really relied on our recollections of

24   the interviews.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

130

1          And in retrospect and with infinite time and

2    resources, would we have done that differently?

3    Probably.  This interview -- and I don't know if it

4    comes across from the MOI or not, it may not.  This

5    interview struck me as -- in the witness Witness #2 I

6    remember this -- struck me as somebody who was without

7    question going to give exculpatory testimony, if ██ were

8    called.

9          And in that way -- and again, I don't know if

10   that is -- if that comes across in the MOI, or if that

11   was more my impression from the demeanor of the witness

12   and the way ██ said what ██ said.  And, of course, the

13   MOI is a summary.  I don't know if the -- at this point,

14   it's beyond my recollection whether the agent wrote it

15   up in the same way that Witness #2 said it.

16          But my recollection of what I thought at the

17   time was that Witness #2 -- that there was a lot of

18   exculpatory material in there in ██ interview.  Again,

19   I don't remember what the MOI said, but that there was a

20   lot of exculpatory material or what the defense would

21   regard as exculpatory material, at least discoverable

22   material in his interview, and that we should probably

23   just go ahead and turn over that MOI.

24               MR. SCIORTINO:  It would be too difficult

Case 5:18-cv-00591   Document 705-5   Filed 06/05/19   Page 30 of 123 PageID #: 1303
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

131

1   to summarize in a letter?

2              THE WITNESS:  Yes, that's a good way of

3   putting it.  I thought there was more in there or enough

4   in there in ████ interview that it made sense just to

5   turn over the whole thing.  And again, acknowledging

6   that the process we used was probably an imperfect

7   process.

8              If somebody else had said, there is so much

9   exculpatory information in one of these, in this

10  interview or that interview or that MOI or that MOI that

11  we really need to indicate, that we really need to point

12  to the whole thing as exculpatory under our duty to

13  identify exculpatory evidence pursuant to the court

14  order, I probably would have said, okay, let's turn over

15  that whole MOI, too.

16       Q.    Even with the order you still have to turn

17  that --

18       A.    Sure, that's right.  And if somebody had

19  said -- now, apparently, the other members of the team

20  take the position that they thought that we were

21  disclosing all of the MOIs, but there wasn't any

22  other -- there wasn't any MOI or any interview taken

23  that -- to my recollection, that any of them were in for

24  which they said, exculpatory, got to designate.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

132

1              MR. SCIORTINO:  Right.  So this imperfect

2       process that you described where you would not go

3       through the post-indictment MOIs to look for exculpatory

4       evidence, but relied on your recollection of having been

5       in, was that how you drafted this letter, or did you --

6       this one, this letter that says OPR General 148.

7              MR. MASLING:  The September 21st letter.

8              MR. SCIORTINO:  Yes, did you rely on your

9       recollection for that, or did you actually go back and

10      look at the MOIs to draft the letter?

11             THE WITNESS:  I would say I relied on --

12      identifying witnesses, that was from recollection.  In

13      developing the phrasing, the actual language that was in

14      the letter -- that's a good question.  For ███████ I think

15      for ██████ certainly that was -- we had discussed ██████ a

16      lot internally, all of us, and that would have been from

17      recollection.  ███████ would have been from recollection.

18      I don't remember if I went back and looked at the MOI

19      from ██████ or not.  Probably.  It was old enough that I

20      probably would have.

21             MR. SCIORTINO:  That's kind of a risky

22      approach though isn't it, if you are trying to remember

23      an entire --

24             THE WITNESS:  Well, like I said, it's

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              133

1    certainly not ideal, but in retrospect with more time

2    and more resources and the benefit of hindsight, I would

3    certainly say that a different approach would have been

4    better.

5    BY MR. MASLING:

6        Q.    OPR MOI 73, which is ███Witness #3███  MOI.  So in

7    your written response to us, you had told us that you

8    personally had made the decision that ███Witness #3███ MOI

9    did not have to be disclosed because you thought it was

10   inculpatory and not exculpatory.

11             Do you remember that?

12       A.    I do.  Now, I can add to that.

13       Q.    Sure.

14       A.    Again, ████ was another person who we discussed

15   internally, and I was not alone in that view.

16       Q.    I want to show you some things that are in ████

17   MOI, which look to us to be arguably helpful to the

18   defense and ask you whether you should have disclosed

19   this, even though you decided not to.  So if you look at

20   the top of page 3 of ████ MOI, so it's 0075, first full

21   paragraph talking about worksheets, about coal

22   production and --

23       A.    Is this the one that begins, "The summary of

24   final production"?

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              134

1      Q.    Yes.

2           The sentence says, "Blankenship would tell

3      them to go back and make sure that the figures used were

4      not too aggressive."  So the way I read that, and it may

5      not be the way you recall or what it said is that the

6      government's theory of the case was it was produce,

7      produce, produce, we don't care about safety, and here

8      █████████ is saying Blankenship was saying, I don't want the

9      production estimates in the future to be too aggressive.

10     A.    I mean, yes, I see what you are saying.  First

11     of all, I don't remember making a specific determination

12     or having any specific discussion with others -- who

13     else was in this -- with the U.S. Attorney about that

14     line.  Reading it now -- again, reading it now, I don't

15     know that I view it as inconsistent with our view of the

16     case.

17           Our view was that -- and the evidence was that

18     in Blankenship's push for production -- there was

19     significant evidence that Blankenship's push for

20     production came in the form of telling mines to beat

21     plan.  So whatever the numbers were in the plan, what he

22     pushed for was to beat plan at every instance.  I can --

23     Q.    And here you have a statement that's arguably

24     inconsistent with that.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

135

1      A.    Well, this is talking about how the plan was

2   developed.  I understand what you are saying.

3      Q.    So we asked both agents who were on this case

4   since April of 2010 and AUSA #1 and AUSA #2, who

5   were on the case later -- all four of them, as well as

6   you, know the case way better than we do, and we put

7   before them a series of statements like this one, who

8   were derived from one MOI or more than one MOI that

9   weren't disclosed, and I'll tell you all four them, when

10  we told them about this said that would have been

11  helpful for the defense.

12     A.    Well, I --

13     Q.    So you can disagree.

14     A.    As I said, it's -- I don't believe -- do I

15  think it's material, no.  Could you look at it and --

16     Q.    Materiality isn't the description of

17  disclosure obligations?

18     A.    I understand.  Could you look at it and

19  conclude that it should have been -- that it was

20  discoverable, yes.  Given the context of the case, is it

21  necessarily discoverable, is it exculpatory, I would say

22  no.  Is it necessary discoverable, I would say, maybe,

23  but, again, at the time, at least, that was not -- our

24  interpretation of or our understanding of how

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

136

 1    Blankenship pushed for production was separate from what

 2    went into these worksheets.

 3         Q.    Flip over to 76, the next page, the first full

 4    paragraph.  And the MOI states in part ███████ stated that

 5    "Blankenship became less involved in the budget review

 6    over a two-to-three-year span."  And then further on in

 7    that paragraph, "Blankenship was not involved in the

 8    final business plan reviews."  That seems directly

 9    contrary to one of the government's main points that

10    Blankenship was making all of the decisions?

11         A.    See, I disagree with that.

12         Q.    Okay.

13         A.    The reason is, again, it was never -- what I

14    understand -- what we understood to happen was that

15    Blankenship made the final decision without regard to

16    whether he was in a meeting or not.

17         Q.    We agree with that completely, so one could

18    read this as it had nothing to do with meetings, it's

19    just that he was not involved in final business plan

20    reviews.  It doesn't say anything about meetings.

21         A.    That's not my understanding of that.  My

22    understanding was that the final business plan review

23    was a meeting.

24         Q.    Okay.

Case 5:18-cv-00591   Document 703-5   Filed 09/05/19   Page 36 of 123 PageID #: 1309

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

                                                            137

1           The agent who drafted this pretty much agrees

2    with you on that one.  Go to 77, the pinaltin (ph)

3    paragraph.  "Witness #10 told Witness #3 wanted to focus on the

4    more serious types of violations.  Witness #10 was

5    specifically interested and focused on eliminating

6    series violations.  Blankenship told Witness #3 reprogram the

7    system to determine which people were responsible for

8    violations and who was responsible for not eliminating

9    violations.  Blankenship wanted to know who were the

10   repeat offenders."

11          Do you think that should have been disclosed

12   or would have been helpful to the defense?

13       A.    Was that discoverable?

14       Q.    Another way of asking the same question, but,

15   yes.

16       A.    Yes.

17          I mean look, in retrospect, seeing what -- you

18   know, seeing the evidence that they put on at trial,

19   that is one that the fairest way of saying it is that's

20   probably one we missed.  Now, I believe that, I mean,

21   certainly, I don't know if this specific information, I

22   haven't looked for it, but certainly similar information

23   to this was in documents that we disclosed that were

24   plenty of e-mails about Blankenship making statements

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                                138

1    that could be read as telling people to -- I mean,

2    everything regarded the hazard elimination program could

3    be regarded as Blankenship making statements, telling

4    people to track and reduce violations.

5                   MR. SCIORTINO:  And that came into

6    evidence, right?

7                   THE WITNESS:  It did, over and over and

8    over.

9                   MR. SCIORTINO:  Something about the spider,

10   too.  Let's not forget the spider.

11                  THE WITNESS:  Kill the spider.

12                  MR. MASLING:  Kill the spider.  Let's get

13   it right.

14                  THE WITNESS:  Look, I mean, do I think

15   that -- do I think that this -- and I don't know if

16   there are specific e-mails in which Blankenship gave

17   ▮▮▮▮ this instruction or not, I just don't remember, but

18   certainly there was a mountain of similar evidence that

19   was produced, and it came in at trial.  All I can say

20   about this one is, again, it seems like one we missed.

21   BY MR. MASLING:

22       Q.    When you told OPR that the ▮▮▮▮ MOI contained

23   only inculpatory information, do you remember whether

24   you reviewed the MOI?

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

139

1        A.    I did review it.  And like I said, it is --
2   again, all I can say about this one is I would describe
3   it as one that we missed, one that I missed.  I don't
4   think this statement is -- again, in the context of the
5   case and in the context of the evidence that was
6   produced, I don't think it's strongly exculpatory, but I
7   wouldn't -- sitting here now, I would not describe that
8   as inculpatory.
9        Q.    All right.
10            Let's go blow by blow for some of these
11   things.
12                 MR. MASLING:  What time do you have to
13   leave?
14                      *   *   *
15                 (Brief break)
16                      *   *   *
17   BY MR. MASLING:
18        Q.    Kind of not chronological, just kind of go
19   e-mail by e-mail, OPR General 32.  And it's a fair
20   response, as you've been doing, but to say, I don't
21   remember, this is a long time ago.  We are not looking
22   at details, so.  So Paralegal #1        to you, this is
23   post-indictment, and ███ sends you a Witness #4
24   MOI, and ███ only has one, and ███ says, if you believe

OPR - 000267

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

140

1    there should be more than one, I would be glad to e-mail

2    ███ and check and, in fact, there had been two

3    interviews with Witness #4 --

4         A.    Yes there were.

5         Q.    -- before that.  I take it you probably just

6    didn't remember that there had been two?  Do you have

7    any recollection of the e-mail or the response?

8         A.    No, I don't.

9         Q.    Because the e-mail suggests that ███ thinks

10   there is more than one?

11        A.    I read that -- and again, just sort of knowing

12   my dealing with Paralegal #1 I might have asked for the

13   Witness #4 302s generally, and maybe that was ███

14   response.  I'm speculating.

15        Q.    Okay.

16        A.    I don't remember this or responding to it.

17        Q.    OPR 34.  So this is -- well, I'm not sure I

18   have any questions for this one.  Nope, forget that one.

19   Good to the next page, 34?

20        A.    So Friday January 23, 2015, and Paralegal #1 sends

21   you a 302 for Witness #14 pre-indictment, which ███

22   identifies as September 18, 2014, and ███ said, "Let me

23   know if you would like to add it to the discovery

24   production."  And, of course, you don't because that's

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                          141

1    one of the ones that wasn't disclosed.

2          I just wanted to ask if you have any

3    recollection of why you wouldn't have said yes because

4    it's pre-indictment?

5    A.    No.  One of the other things that I guess I

6    have more sympathy for now is witnesses who say they

7    don't read carefully or remember all of their e-mails.

8    I don't.  I just don't remember this at all.

9    Q.    Okay.

10   A.    I don't know why I wouldn't.  If I had noticed

11   it or looked at the date or looked at what it was about,

12   I would have realized that this is something that should

13   be included.  I just don't remember it.

14   Q.    If you have a problem with that, you should

15   come work at OPR because no one ever e-mails us ever.

16   Most of my e-mails come from Living Social and Groupon.

17   I'm sure that's really interesting to you.  So this is a

18   spreadsheet that ██Paralegal #1██ gave us yesterday or two

19   days before, two days ago.  And it reflects that you

20   told ██ not to make some disclosures of MOIs on January

21   19th of 2015.

22          And so I've highlighted them on that page, and

23   there is one on another page.  And some are post-MOIs,

24   which would be consistent with what you've told us, but

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                          142

1     the Witness #14 on top is pre-indictment.

2               And, again, the question is:  Do you remember

3     why you told █████ not to disclose that one?

4          A.    Yes.  Like I said, at this point, my belief

5     was that everything pre-MOI or pre-indictment had

6     already gone out, and I probably -- if I told █████ to do

7     that, it was just because I wasn't looking, did not look

8     at the date.  I wasn't looking closely at the date of

9     when the interview actually was.  That one was -- yes,

10    that one was pre-indictment, as you said.  And I, at

11    this point, as best I recalled, thought that we had

12    already pushed out everything that was pre-indictment.

13         Q.    So do you think it would be fair to say that

14    after December 4th of 2014, when you had the big initial

15    disclosure, every MRI that crossed your desk, you

16    thought we weren't going to disclose pursuant to this

17    discussion you had with the U.S. Attorney that, if

18    necessary, we are going to make a letter of disclosure

19    about disclosable information in it?

20         A.    Yes, that's accurate.

21         Q.    OPR 44.  I think we are going to get the same

22    answer to a bunch of these e-mails at this point.  So

23    this is a different Witness #14 MOI, and it's from Paralegal #1 to

24    you saying, we just found another one from 2012.  █████

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              143

1    doesn't ask if you want to produce it, but ████ just

2    tells you, I went ahead and I Bates labeled it and

3    stamped it.  So I wanted to ask you if you had any

4    recollection of this and why you didn't say, go ahead

5    and disclose that one.

6         A.    I don't.  I mean, I'll say, just generally,

7    Paralegal #1 as you've observed, is very good.  Paralegal #1 you

8    know, terrific at ████ job.  Paralegal #1 very good about

9    communicating, which means you get a lot of e-mails from

10   ████ and whatever Paralegal #1 decided to do with the document

11   is almost always right.  So did I -- I did not -- in a

12   lot of cases, if it seemed like it was something routine

13   that was coming in, and ████ was telling me what ████ done

14   with it, I didn't always read the e-mails, and I would

15   say very rarely, if it seemed like something that was

16   routine, focus on it or give it much thought.

17        Q.    OPR 46.  So here Paralegal #1 sends you a bunch of

18   MOIs, some pre and some post-indictment.  This is the

19   first time you've seen the Witness #8 as far as we know, the

20   Witness #8 MOI, the first Witness #4 MOI, the Witness #6 MOI that

21   hadn't been disclosed and Witness #12  So again, I'm

22   shorthand about this by me asking you a leading

23   question.

24             Do you think it's fair to say that what

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              144

1    happened was you looked at these and thought they were

2    all post-indictment MOIs?

3         A.    I do.  And I don't know if I was -- you know,

4    this was around the time ████████████████████████████

5    ██████████████████████████████████.  I haven't

6    looked at my calendar and compared this, but this right

7    around that time, and I was not -- and I believe, and I

8    have to look they timing, we were, at this point -- this

9    was right around the time when we got the first big wave

10   of motions.  And at that point, everything stopped,

11   except our responses to the motions.

12        Q.    Yes, there were a lot.

13        A.    Yes, there were 75, 100 altogether motions,

14   pretrial motions in limine and other things.

15        Q.    I'm going to skip over some now because I

16   think we know what the answer is, so let's see.  Go to

17   OPR 3623.  So I think in your initial presentation to

18   us, you had thought that you had had this conversation

19   with the United States Attorney about what to do with

20   post-indictment MOIs, like in the first few months of

21   2015, and I said to you I think it was a little later.

22   So here is why I thought it was a little later.  If you

23   look -- and there is four different -- I characterize

24   this as like a to-do list that you send yourself --

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              145

1        A.    Yes.

2        Q.    -- that you are thinking about, and it's

3    better to write it down, otherwise you forget.  So at

4    the top of 0063, you have a question to yourself, what

5    do we do with 302s and MOIs that are being generated and

6    prepped.  So this suggests to me that you hadn't

7    resolved the issue; is that right, or were you making

8    the distinction between prep interviews and pre and

9    post-indictment interviews?  Was that kind of a

10   different line to draw?

11            What do you remember?

12       A.    Let me see what else is in here, so I can

13   remember what the context was.

14       Q.    And then the next couple of pages are from a

15   day or two later, kind of a revised to-do list, and it

16   has the same question at 0068.  And there is a couple

17   more like this, but they say the same thing, all in this

18   general time frame.

19       A.    I am still -- two things, I'm fairly confident

20   that the original discussion with the U.S. Attorney

21   happened earlier than this.

22       Q.    Okay.

23       A.    At various points -- and I don't know what the

24   context for this was or what motions had been filed.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              146

1    Like I said earlier, there were various points in the

2    case when we had this discussion again, and I don't

3    remember -- you know, I don't remember specifically what

4    prompted me to include this or to put this in a to-do

5    list, but what I do recall, like I said, is that at

6    various points in the case, some of them at least in

7    response to things the defense filed, I would have a

8    conversation with the U.S. Attorney and say, how do we

9    want to handle this.  They filed X, do we want to take a

10   different position, what do we want to do.  I don't know

11   if that's specifically what this refers to, but that's

12   what this brings to mind.

13        Q.    I forgot this before, but one thing FBI SA #1

14   FBI SA #1 told was that in what ██ was kind of

15   characterizing as true trial prep sessions where you are

16   not asking questions, you are really, we are going to

17   ask you this, what are you going to say -- I mean, they

18   are really like rehearsals, right -- that ██ would not

19   prepare 302s for those sessions.

20            But if that if the witness would say something

21   new, not exculpatory or disclosable, just something new,

22   that's when ██ would write a 302.  Is that consistent

23   with your understanding?  ██ couldn't think of an

24   example.  We said, well, give us an example of somebody

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

147

1    who was really a trial prep and you didn't prepare a

2    302, but ██ couldn't think of anybody.

3          A.    I can't --

4          Q.    Which fine.  We are not saying there is any

5    issue with that.

6          A.    Sure.  I can't think of an example of that.

7          Q.    But did you know ██ was doing that?

8          A.    No.  I mean, ██ was preparing -- and, you

9    know, I mean, one of the reasons -- one of the issues

10   here fairly obviously is that we -- I, at least, was not

11   paying sort of line-by-line attention to the MOIs that

12   came in post-indictment.  I sort of -- like I said,

13   there wasn't a process where we sat down and reviewed

14   those and figured out what to do with them, or do they

15   need corrections or anything like that.

16         Post-indictment, there was just so much going

17   on, we didn't do that.  I was relying on -- and in

18   discussions that we had as a team, were relying on our

19   recollection of the interviews.  I was not -- from my

20   point of view, I guess what I saw is we do the interview

21   and at some point later -- even one-to-one

22   correspondence, MOIs were being dropped off at the

23   office, I was aware of that.  I would not say that I

24   knew -- I did not know if it was FBI SA #1 ██████████

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

148

1    practice to do a different version of an MOI for what we

2    would call a formal or a -- or what we would call

3    narrowly a trial prep session.  I was not aware of that.

4         Q.    ▮▮ wouldn't do it differently, ▮▮ wouldn't do

5    anything at all because there was nothing to write down

6    if there was nothing new.

7         A.    Right.

8         Q.    If you had told us in the past, we are going

9    to ask you this what are you going to say, if we ask you

10   on cross what are you going to say, you know, trial

11   prep.

12        A.    There just wasn't a process where we do the

13   interview and two or three weeks later, I go back and

14   check to see what MOI did I get, or did I get an MOI

15   from the interview.

16             MR. SCIORTINO:  How could you possibly -- I

17   mean, given the crush of this trial, the trial prep all

18   of the things that you have to do, how could you

19   possibly keep 30 separate post-indictment -- was is

20   it 60?

21             MR. MASLING:  60.

22             MR. SCIORTINO:  60 separate post-indictment

23   interviews in your memory?  Doesn't that run a grave

24   risk that you are going to forget something?

Case 5:18-cv-00591   Document 703-5   Filed 02/05/19   Page 48 of 123 PageID #: 1321
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

149

```
1              THE WITNESS:  Well I --
2              MR. MASLING:  Not all were trial witnesses,
3    but there were a lot that were.
4              MR. SCIORTINO:  That's right.  That just
5    seems like a lot to demand of your memory
6              THE WITNESS:  I'm not saying that we didn't
7    go back.  I guess my point is the memos come in, Paralegal #1
8    gets them, generally speaking, puts them in a file.  And
9    if a witness was a witness that we were going to call at
10   trial, then when we went to prepare the witness,
11   generally speaking, I would look at the memo from the
12   file, but I didn't have a process of kind of checking
13   off memos as, here is interview X, let's make sure we
14   have a corresponding MOI X.  So I don't know that I
15   would have -- I don't know that it would have
16   necessarily registered that a particular interview, that
17   ▉▉ thought it was a trial prep session that ▉▉ didn't
18   produce a memo or produce a different form.
19        Q.    ▉▉ didn't say different form, ▉▉ just didn't
20   do it at all.
21        A.    Right.
22        Q.    Because there was nothing to write down.  So
23   my understanding when MOIs came in, this is from
24   Paralegal #1 -- or ▉▉ and Paralegal #2 maintained what they called
```

OPR - 000277

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

150

1    witness files, which was for any MOI, whether they were

2    going to be a trial witness or not, they just called

3    them witnesses in like a folder and any MOI of the grand

4    jury testimony or MSHA were put in that folder.  Then I

5    see e-mails from you saying, bring me the witness folder

6    for X, and then you presumably get everything related to

7    that witness?

8         A.    You get everything that they have, right.

9         Q.    So in prepping trial witness, I assume you

10   would have seen, if they had not been disclosed, that

11   MOIs should have been generated in the case?

12        A.    Yes, but if there were a particular section

13   with a witness that didn't result in an MOI, I don't

14   know that I would realize that.  They bring a witness

15   file and you flip through what's in it and try to

16   prepare an outline.  But certainly at that point, I

17   guess to go back to -- we are still on the issue of, you

18   know, FBI SA #1          , the difference in how ▮▮▮

19   prepared -- ▮▮▮ not preparing memos for trial prep

20   sessions, I don't think looking at the witness file

21   would have made me aware of that.

22        Q.    That's most people's practice is not to do the

23   MOIs or 302s or whatever they are for trial prep.

24        A.    Sure.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

                                                              151

1        Q.    This is about your fight over the extension

2    request, but I don't think -- I don't think you've

3    answered these questions about why, when you received

4    the MOIs, they reflected post-indictment interviews --

5    pre-indictment interviews, post-indictment, you assumed

6    that he had been disclosed or believed they were

7    actually post-indictment interviews because they were

8    coming in post-indictment?

9        A.    That's right.  And truthfully, like I said,

10   there were occasions when, if an MOI got dropped off and

11   Paralegal #1 sent me an e-mail that said the MOI had gotten

12   dropped off, it wasn't my practice to immediately open

13   it up and read it and see what was in there.  It would

14   go in the file, and when I needed the file, I would ask

15   for the file, but I wasn't reviewing those e-mails to

16   see what was there or not or checking off whether MOIs

17   from each view interview had come in.

18       Q.    Okay.

19             OPR General 125.  So, at some point, you had

20   asked Paralegal #1 to go through the MOIs and to pull out

21   negative comments about Witness #4 and ▓▓▓ did, and

22   created a chart.

23             Do you have a recollection of asking ▓▓▓ to do

24   that?

OPR - 000279

Case 5:18-cv-00591  Document 705-5  Filed 09/05/18  Page 51 of 123 PageID #: 1324
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              152

1        A.    I don't.  I can see that I did, but I don't

2   remember doing that.

3        Q.    So I have not attached the whole chart.  What

4   I have done is attached here those pages which contain

5   information taken from undisclosed MOIs, some of which

6   were post-indictment, and I think some of those, which

7   were pre-indictment.  And the question is -- you know, I

8   guess this is probably relevant to pre-indictment MOIs

9   that were disclosed.

10            Did you consider whether this information

11   needed to be disclosed to the defense as Giglio?  It's

12   not an issue for pre-indictment that wasn't disclosed

13   because they already had them.  But for MOIs that

14   weren't disclosure, like the ones we've been talking

15   about, did you consider whether you needed to make a

16   disclosure, a Giglio disclosure, based on the material

17   that Paralegal #1 had pulled together for you?

18       A.    These pre-indictment MOIs were undisclosed?

19       Q.    No, no, no, I misspoke.  Well, there were a

20   few pre-indictment MOIs, like the Witness #14   There was a

21   mistake that it was pre-indictment, but it wasn't

22   disclosed.

23       A.    Right.

24       Q.    And that there were some that were actually

Case 5:18-cv-00591  Document 705-5  Filed 09/05/19  Page 52 of 123 PageID #: 1325
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              153

 1    post-indictment MOIs that intentionally were not

 2    disclosed because you were going to do letters for those

 3    one?

 4         A.    But not all of the ones pre-indictments were

 5    undisclosed.

 6         Q.    No, I just didn't copy those pages because the

 7    defense had those.

 8         A.    Okay.

 9              Again, I don't remember asking ███ for this.

10    I don't know why I asked ███ for this or what the

11    purpose of this was in the case.

12         Q.    I assume it was to prepare Witness #4 for

13    cross-examination?

14         A.    I don't know.  I don't have any recollection

15    of asking her for these.

16         Q.    A few weeks later, you had this sent to AUSA #2

17    but Paralegal #1 says to AUSA #2, "Steve asked me to send you

18    this spreadsheet," but ███ doesn't say what you want ███

19    to do with it.  That's at 141, so I don't know if you

20    intended ███ to do something with it.

21              The real question is:  Was these Giglio

22    material that should have been disclosed?

23         A.    We, I mean I can tell you that I certainly

24    don't recall thinking through whether or not these were

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

154

1    pre or post-indictment, or whether or not they had been

2    disclosed.  I mean, I tell you that there was -- there

3    was an enormous amount of negative comment concerning

4    Witness #4  in pre-indictment interviews with both us --

5    pre-indictment interviews with us and the interviews

6    that came out the MSHA -- that were done in the MSHA

7    investigation.

8            So I was aware that there were lots of people

9    who would express critical views of Witness #4   I

10   don't -- you know, if -- and it looks like there

11   were post-indictment interviews that Paralegal #1 at least

12   characterized -- I didn't read the comments, but that

13   Paralegal #1 characterized probably accurately is negative

14   comments about Witness #4  I don't remember doing -- as I

15   sit here right now, I don't remember post-indictment

16   interviews where people were attacking Witness #4   And I

17   don't know if those would have stuck out in my mind at

18   the time.

19           Again, this may be an example of -- and this

20   may be an example of asking Paralegal #1 to put together

21   something, not, and then having ____ forward it on to

22   AUSA #2 without taking a close look at it.  But when I

23   thought about the subject of negative comment regarding

24   Witness #4  what I was thinking of was probably what I

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

155

1    thought would be dozens of interviews that were done

2    relatively early in the case where people said negative

3    things about Witness #4 which already would have been

4    disclosed.

5            And I don't know -- you know, this is just the

6    reality of preparing for trial is you ask people to pull

7    things together because you have an idea about this or

8    that that you might want to do, and then you run out of

9    time to deal with it, and it falls by the wayside and

10   you end up not using their work product.

11       Q.   Who was going to -- never mind.

12            MR. MASLING:   Anything?

13   BY MR. MASLING:

14       Q.   144 and 145.  So DOL SA #1 send you the Witness #2

15   in July, and you disclose it about a month later in

16   August.

17            Do you remember anything about the gap, like

18   why it took a month to decide to disclose the Witness #2

19   MOI?

20       A.   Did we get it in July?

21       Q.   Yes, 144.  Shoot, I read it wrong.  Never

22   mind, ignore the question.  146 and 147.  146, so you

23   send the Witness #2 MOI to Zuckerman, and they write

24   back, "Thanks, but how about Witness #3 Witness #1 Witness #7

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

                                                              156

 1            Do you remember responding to this e-mail?

 2    And I haven't found any response to this.

 3        A.    No, I don't remember responding to it.

 4        Q.    But shortly after, and this is the next page,

 5    you send yourself another to-do list and in the middle

 6    it says, "Produce Witness #7 question mark; Witness #3 question

 7    mark; Witness #8 question mark." Do you remember why you

 8    were thinking about the issue of disclosing those MOIs?

 9    I kind of assumed it maybe was in response to the

10    question from Zuckerman, but I could be completely

11    wrong.

12        A.    I don't know.  And that e-mail was two weeks

13    before then, two weeks and trial prep time.  And we

14    didn't -- where he didn't -- I think I worked at least

15    10 hours every day on weekends from the end of July

16    until the end of trial, and usually 15, 18-hour days on

17    weekdays.  That would have been -- it would have

18    certainly felt like a long time.  I would be surprised

19    if that's what I was thinking about when I -- I don't

20    know.

21            The answer is I don't know why I put that in

22    there.  It could have been a response, it could have

23    been that I was -- late at night on September 10th --

24    thinking about things that were rattling around in my

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                            157

1    head that we needed to look at.  I don't know.

2         Q.    That line suggests to me, I'll ask you if this

3    is right, that in thinking about Witness #7 Witness #8 and Witness #8

4    that you thought that those might be -- those MOIs might

5    contain discoverable information that you had to think

6    about whether to disclose it or how to disclose it as it

7    turned out with Witness #8 and Witness #7

8         A.    Yes.  And at some point later, we did include

9    the statements about Witness #8 and Witness #7

10        Q.    Right.

11        A.    So that -- you know, I taught about it some

12   more and included those.  So I guess I agree with

13   your -- yes, it does indicate that that was something

14   that I was thinking about, whether or not we needed to

15   make some sort of disclosure relating to them, and

16   ultimately in the September 21st, I think is the date

17   letter, we did include the statements about Witness #7 and

18   Witness #8

19        Q.    Which are on the next page, 148 and 149.

20   We've talked about this a little, but we have to talk

21   about it a little more.  And the real question is Witness #8

22   because as we read Witness #8 at least as I read Witness #8 it's

23   full of -- it's kind of like Witness #2   I mean, it's

24   got favorable information after favorable information,

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

                                                               158

1    and this paragraph is arguably not sufficient.  So I

2    want to walk you through what Witness #8 said, and then ask

3    you if you think your summary was fair.

4              The Witness #8 MOI is OPR MOI 3020059.  And I just

5    want to read you -- I'm just going to go through them

6    all, and then ask you if your one-paragraph summary is a

7    fair description of what Witness #8 told you.  And I'm just

8    telling you what I personally -- and although we did ask

9    a bunch of these to other people we've interviewed and

10   they pretty much agreed that, yes, this would have been

11   favorable.

12             Third full paragraph.  "Witness #8 suspected that

13   somewhere compensation was tied to safety.  Witness #8 stated

14   that ▮ could make a list of safety things that ▮ was

15   involved with, and if Don Blankenship was not involved,

16   the list would be half that."  Last paragraph, "There

17   was not a period of time that Witness #8 was not trying to

18   follow the law."  Next page, first full paragraph,

19   "Committing violations was not intentional."

20        A.   What was the previous one, there was not a

21   period of time when?

22        Q.   "That Witness #8 was not trying to follow the law."

23   The next page, first full paragraph, "Committing

24   violations was not intentional."  Third full paragraph,

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                          September 28, 2017

159

1    "Witness #8 stated that it was not a shortage of manpower

2    that contributed to violations, it's the level of

3    experience."  Next paragraph, "Massey put pressure on

4    people and held them accountable."  Two paragraphs down,

5    "Witness #8 never instructed anyone to break the law the

6    intent was always zero violations."

7           The last paragraph, there is a description

8    about staffing and █████ says, "That was the industry

9    standard that was done at Massey."  Top of page 3,

10   "Safety was implied and always there.  Witness #8 gave the

11   example of telling someone you love them, if you don't

12   tell them every time you see them, it doesn't mean you

13   didn't love them.  Witness #8 stated that was the same with

14   Blankenship, safety was implied."

15          Next sentence, "Witness #8 explained that if there

16   was something wrong at the mine you were expected to

17   stop, fix the problem and move on."  Two down, "It's not

18   economically feasible to have zero citations."  Two

19   down, "You are always trying to achieve zero violations.

20   Witness #8 stated that tolerant implies it's okay to receive

21   violations.  And if that was true, then everyone in the

22   industry is tolerant of violations."

23          Next down, "There were discussions about

24   trying to get better.  Massey was not tolerant of

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

160

1    anything.  It recognized that the head winds were

2    getting stronger, referring to compliance such as agency

3    blitzes."  Next paragraph, "▮▮▮▮▮ stated that upper

4    management wanted ▮▮ to read every citation that was

5    written.  Everyone at Massey was trying to do a good

6    job, but could have done better.  ▮▮▮▮▮ believed that ▮▮

7    was doing everything in ▮▮▮ power that ▮▮ could."

8         Next paragraph, "Massey spent more time doing

9    useless exercises trying to get things approved by MSHA.

10   MSHA was putting up hurdles all the time.  The whole

11   process was dysfunctional."  Next page at the top, "You

12   can go to any mine and find safety violations."  Next

13   paragraph, "▮▮▮▮▮ believed that ▮▮▮ was reprimanded for

14   running with no air on a section.  ▮▮▮▮▮ could not

15   recall the specifics with the reprimand."  ▮▮▮▮▮ stated

16   that ▮▮ feared discipline over certain compliance issues

17   from time to time."

18        And lastly, the second from the bottom, "▮▮▮▮▮

19   believed that Massey was doing a good job reporting

20   accidents."  So all of that sounds to our -- we are

21   educated, but not as educated to you all's ears as being

22   potentially helpful to the defense.

23        And if you look at your paragraph that you

24   wrote, it says "▮▮▮▮▮ said that ▮▮▮ believed defendant

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                            161

1    was interested in safety, even though defendant did not

2    expressly say that. ▮▮▮ compared ▮▮▮▮▮ relationship with

3    the defendant in this regard to a romantic relationship

4    in which one partner knows that the other loves him or

5    her, even if the other person does not often say so.

6    Witness #8 also stated that Blankenship was involved in a

7    number of changes related to Massey equipment that Witness #8

8    believed improved safety."

9         So the question is:  Do you think your

10   one-paragraph summary was a fair description of the

11   disclosable information in the Witness #8 MOI?

12        A.    Do you know that Witness #8 -- Witness #8 had nothing to

13   do with UBB. ▮▮▮ didn't work there, wasn't a manager

14   there. Witness #8

15   Witness #8   As far as I know, I don't think ▮▮▮ had ever

16   been to UBB until after the explosion when ▮▮▮ was part

17   of the group from the company that was there to help

18   coordinate investigation activities.  So a lot of this

19   is specific to Witness #8 experience at a different mine

20   called ▮▮▮▮▮▮▮▮▮.  And I don't know if anybody has

21   pointed that out yet or not.

22        Q.    Actually, not.

23        A.    Witness #8 was a, at best, a peripheral witness.

24   ▮▮▮ wasn't anywhere near UBB. ▮▮▮ was -- not only was ▮▮▮

Case 5:18-cv-00591   Document 705-5  Filed 09/05/19  Page 61 of 123 PageID #: 1334
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                      September 28, 2017

162

1    at a different mine, it was a different group.  Massey

2    called its divisions groups effectively.  And so a lot

3    of what [Witness #8] said that had to do with [redacted] specific

4    experience, and I couldn't keep up and mark every single

5    statement that you flagged, but a lot of what [redacted] said

6    had to do specifically with -- all of what [redacted] said had

7    to do specifically -- had to do with [redacted] experience at

8    [Witness #8] operation.  [redacted] wouldn't have any knowledge of what

9    happened at UBB or direction that Blankenship gave at

10   UBB.  Now, you can argue that anything anybody says

11   about --

12                MR. SCIORTINO:  Well, it seems like an

13   argument for not including [redacted] in the disclosure letter

14   at all.

15                THE WITNESS:  Yes.

16                MR. SCIORTINO:  Having decided to include

17   [Witness #8] why did you pick out these two little things in a

18   much longer report?

19                THE WITNESS:  You know, again, as I sit

20   here, I don't recall what analysis there was of each of

21   the statements that you cited.  I do recall that part of

22   the thinking on [Witness #8] and as we go through this, part

23   of the discussion that -- and [AUSA #1] says [redacted] doesn't

24   remember ever hearing about [Witness #8] and [redacted] may not have,

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

163

1    I don't know, but part of the discussion of what do we

2    do with Witness #8 was Witness #8 wasn't at UBB.

3           I mean, I take your point, John, but the

4    statements -- the statements that are in the letter --

5    so the statement that Blankenship was involved in a

6    number of changes related to as Massey equipment that

7    Witness #8 believed improved safety, for example, that's

8    something that is broader than just Witness #8 mind, Witness #8

9    recollection of Witness #8 relationship or Witness #8 view of

10   Blankenship's -- I lost the page.  What was the memo?

11                 MR. MASLING:  59.

12                 MR. SCIORTINO:  So you picked out the

13   things that was more broadly applicable, not just in

14   Witness #8 mind, but UBB.

15                 THE WITNESS:  I won't say that we got

16   everything that was broadly applicable, but that was

17   certainly part of the thinking in how I thought, at

18   least, what Witness #8 had to say was that most of what Witness #8

19   had to say was specific to a mine that was far away from

20   UBB.

21                 MR. SCIORTINO:  Was this one of the ones, I

22   can't remember, that you relied on your memory of the

23   interview instead of going back over --

24                 THE WITNESS:  I don't remember.  I mean

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                                164

1    that's -- the statements that are in the letter are what

2    stuck out in my mind from the interview.

3                    MR. SCIORTINO:  The Witness #8 relationship

4    thing?

5                    THE WITNESS:  That stuck out.  And Witness #8

6    went through a list of safety changes at Massey that the

7    defense went through a hundred times at trial, if they

8    went through it once, that Blankenship had people wear

9    reflective stripes, and he made changes to the equipment

10   to do this and that to make it safer.  You know, that

11   was a theme of Witness #8 in the interview.  And I think

12   the statement about how the safety changes that have

13   been made at Massey, how there wouldn't be half of those

14   made if it hadn't been for Blankenship or something like

15   that.

16   BY MR. MASLING:

17        Q.    First, let's get an answer to the original

18   question, which is, do you think that your summary of

19   disclosable material in the Witness #8 MOI is a fair summary

20   of the -- in your September 21st letter is a fair

21   summary of the disclosable material in the MOI?

22        A.    So I guess my answer to that is, number one, I

23   think it affects what's disclosable in here, that Witness #8

24   was, in his mind wasn't even in the UBB --

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                               September 28, 2017

165

1        Q.    Was it a fair summary or not?

2        A.    My answer is that I would have to answer

3    that -- I would have to look take a look the memo in

4    light of the fact that ▆Witness #8▆ is at a completely

5    different mine from ▆Witness #4▆ and give some thought to,

6    in light of that, what's disclosable or not.  I'm not

7    trying to --

8        Q.    No, no.  So let's make it a little more

9    specific.  You write in your September 21st letter,

10   "▆Witness #8▆ also stated that Blankenship was involved in a

11   number of changes related to Massey equipment that ▆Witness #8▆

12   believed improved safety."  And what the MOI says is

13   that "▆Witness #8▆ stated that ▆▆ could make a list of safety

14   things that ▆▆ was involved with, and that if Don

15   Blankenship was not involved, the list would be half

16   that."

17             Let me tell you my -- I can tell you my

18   personal reading of this is that it would be much more

19   helpful to the defense to have what was in the MOI, than

20   what was in your letter.  And I guess I'd like you, if

21   you choose to respond to my opinion.

22       A.    I mean, I take your point.  I think that what

23   is in the letter certainly puts -- it tells the defense

24   that ▆Witness #8▆, if you talk to ▆Witness #8▆ is somebody who

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

166

1    is going to say that Don Blankenship made significant

2    changes at Massey mines, made significant changes that

3    ▓▓▓▓▓▓ at least thought improved safety.  I'm not arguing

4    with you about the wording.

5              Would it have been more helpful to quote what

6    the MOI said, probably, yes, but I don't think that the

7    defense was deprived of ultimately the information

8    that -- the information that that would have helped them

9    if they chose to talk to ▓▓▓▓▓▓  I don't know if they

10   did or not.

11        Q.    Right, but you can't rely on the defense going

12   to interview a witness when you make disclosure

13   decisions.  You can't say, well, we know they are going

14   to talk to ▓▓▓▓▓ so we don't have to disclose anything,

15   right?

16        A.    I understand that.

17        Q.    That's right, isn't it?

18        A.    Yes, I believe that's right.

19        Q.    And I have no -- I mean, maybe ▓▓▓ was their

20   favorite witness and ▓▓▓ spent all day with them.  I

21   don't know.

22              I don't think you knew that for a fact or how

23   much time?

24        A.    No, I did not.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              167

1        Q.    Unlike maybe Witness #13 where you had an actual,

2    yes, here's the answer they asked and --

3        A.    We didn't have a similar discussion regarding

4    Witness #13 that's right.

5              MR. MASLING:  Do you want to go into the

6    Ogden memo?

7              MR. SCIORTINO:  I thought you said you

8    didn't want to do that?

9              MR. MASLING:  Go ahead.

10             MR. SCIORTINO:  So before this trial, the

11   United States Department of Justice drafted up discovery

12   obligations for prosecutors in the form of this Ogden

13   memo, which I believe your office was trained on.

14             Does that ring a bell?

15             THE WITNESS:  Yes.

16             MR. SCIORTINO:  And the Ogden memo imposes

17   upon prosecutors certain affirmative obligations with

18   respect to the search for discoverable information,

19   including affirmative obligation to actually make

20   sure -- you don't have to do it yourself, but you are

21   responsible for making sure that, among other things,

22   witness interviews are gone through for discoverable or

23   exculpatory or impeachable information in a systematic

24   fashion.

Case 5:18-cv-00591 Document 705-5 Filed 02/05/19 Page 67 of 123 PageID #: 1340
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

168

1          Was that done in this case?

2          THE WITNESS:  So I don't want to parse and

3  I don't want to split hairs too finely.  I can tell you

4  that there was not a process, as I said before, where

5  anybody sat down and went through MOIs, at least post --

6  where anybody sat down and went through MOIs with a

7  specific purpose of identifying discoverable

8  information.  We -- as I said before, we discussed it

9  regularly, both in the context of identifying

10  discoverable information and implementing the Court's

11  order to designate Brady material, but there was not a

12  process where we sat down and systematically reviewed

13  the MOIs that were coming in in the way that you

14  described.

15          MR. SCIORTINO:  The only other relevant

16  portion of the Ogden memo that I can think of is the --

17  I can get the exact requirement.  The Ogden memo

18  expresses a preference for turning over source material

19  in discovery, but expressly allows for summaries, which

20  is what you did in this case, but it does say that --

21  let me get the exact line, I'm sorry.  It does say that

22  prosecutors are directed to make sure that the full

23  scope of pertinent information is provided to the

24  defense.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

169

1            So you can do summaries, but you have to take
2     what is characterized as great care to ensure the full
3     scope of pertinent information is provided to the
4     defense.
5            Was that done with respect to your summary?
6            THE WITNESS:  I would say -- and again, I
7     would like to, with regard to Witness #8 take a closer look
8     at that.  With regard to the statements, the summary on
9     Witness #7 and the summary on Witness #13 are we going to go
10    through those memos?  I have --
11           MR. MASLING:  I sent you Zuckerman's -- we
12    asked Zuckerman, tell us what information in those
13    disclosed MOIs that you thought was exculpatory, and
14    they covered Witness #4 and Witness #7  So I don't want to go
15    through it, but if you want to go through, it's in the
16    materials that I sent you, and when you review the
17    transcript or any other time before we finish, if you
18    look at that, that's fine.
19           MR. SCIORTINO:  The concern is that you
20    described a process by which the MOIs would come in, and
21    you said you were not able to, due to the crush of
22    preparing for this monster trial, able to review them
23    line by line for discoverable information.  Instead, you
24    as the trial team kind of relied on your collective

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

170

1    memory of the interviews without recourse to the --

2                    THE WITNESS:  That's accurate.

3                    MR. SCIORTINO:  My question to you is:  Do

4    you believe that that complied with the Ogden memo's

5    obligation to take great care for the full scope of

6    pertinent information to summarize for the defense?

7                    THE WITNESS:  Certainly our process fell

8    short of the requirements in the memo.  If there were --

9    and on Witness #8 -- I'm not trying to be evasive about

10   Witness #8  I think it's significant that Witness #8 was in a

11   different mine, in a different mine group.  I don't know

12   that as I sit here right this second, I can answer that

13   question about Witness #8

14           On Witness #7 and Witness #13 I don't recall information

15   in their memoranda.  I don't recall information from

16   their interviews that we didn't accurately summarize.

17   Look, I mean, my suspicion is that, even when I take

18   another look at the Witness #9 memo, even in light of the

19   fact that ████ wasn't at that mine, there are things that

20   we should have stated differently in the summary.  I

21   won't disagree with your view, Mark, that it would have

22   been more helpful to the defense to, and more compliant

23   with the full scope requirement of the Ogden memo that

24   you just quoted, John, to say -- to quote the language

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

                                                            171

1    from the MOI directly.

2              MR. SCIORTINO:  Or just provide it.

3              THE WITNESS:  Or just provide the MOI.

4              MR. SCIORTINO:  Were you and the rest of

5    trial team -- I guess I should say were you taking more

6    of a holistic approach when you were thinking about

7    post-indictment memoranda to disclose, like, you would

8    go back and remember, yes, was it -- how do you say that

9    ▮Witness #2▮ name, the one that was disclosed.

10             MR. MASLING:  ▮Witness #2▮

11             THE WITNESS:  ▮Witness #2▮

12             MR. SCIORTINO:  I remember that was quite

13   good for the defense, so we are going to disclose that

14   in its entirety.  ▮Witness #3▮ on the other hand, was basically

15   a prosecution witness, and while ▮▮ may have said

16   specific lines here and there that could be cherry

17   picked and be helpful for the defense, overall, ▮▮ was

18   a strong prosecution witness whether we call ▮▮ or not.

19             So, in your mind, that one wasn't really

20   necessary to be disclosed?

21             THE WITNESS:  I'd say that's an accurate

22   description of how we approached the process.

23             MR. SCIORTINO:  Okay.

24   BY MR. MASLING:

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

172

1        Q.     We are getting close.  One little question,

2    then a bigger set of questions, then we'll be done, at

3    least I'll be done.  This goes to the issue of whether

4    the material that wasn't disclosed before trial might

5    have been available to the defense from other sources.

6           So we were told that for the following

7    witnesses, whose MOIs weren't disclosed, that there was

8    no other source of information for them available for

9    the defense, so no memorandum of interview, no grand

10   jury transcripts, no MSHA transcripts, no immunity

11   agreements, proffer agreements, no voluntary productions

12   for ███████ Witness #15 ███████ ███████ ███████ and Witness #1

13           Does that sound right?  And Paralegal #1 told

14   us that.

15       A.     If ███ checked the list.  I suspect ███ list

16   is right.

17       Q.     Have you seen the letter, the disclosure

18   letters that went to Zuckerman from the U.S. Attorney's

19   Office?

20       A.     Yes.

21       Q.     You saw they provided charts that said, well,

22   we didn't give you this, but we did give you this, this,

23   this and this, but there was nothing for those six

24   witnesses.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

173

```
 1        A.      Okay.

 2                The only thing that I would add to that is

 3    that for most or all of those witnesses, there was

 4    contemporaneous -- there were contemporaneous documents,

 5    e-mails, faxes and so forth between Blankenship and

 6    those witnesses that reflected communication with those

 7    witnesses.

 8                To take a hypothetical example, if the

 9    complaint is that witness X -- we didn't have anything

10    from witness X, and witness X talked about the hazard

11    elimination program and what a great thing it was, or

12    Massey's safety innovations that Blankenship had pressed

13    and what great things those were, there, in many cases,

14    would be correspondence that reflects the same thing,

15    that reflects -- to put it concretely -- and I don't

16    know if Witness #10 was on the list or not.

17        Q.      No.

18        A.      But to put it concretely, in the case of Witness #10

19    Witness #10 for example, there is extensive correspondence

20    in which Witness #10 and Blankenship talk about the hazard

21    elimination program.  Witness #10 didn't have an MOI, so ▪▪

22    wouldn't be on the list.  But my point is I don't

23    have any reason to disagree with that list, if that's

24    Paralegal #1 list.
```

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

174

1      Q.    Okay.

2      A.    I would add the caveat that there, for many of

3   these witnesses, there were lots of documents disclosed

4   that would have given the defense insight into what

5   those witness were involved in.

6      Q.    All right.  Last topic for me.  So --

7      A.    Mind if I have a quick break before we start

8   this?

9      Q.    Oh, sure.

10                      *   *   *

11                 (Brief break)

12                      *   *   *

13            MR. SCIORTINO:  On the last point about

14   these various witnesses for which the defense didn't

15   have any other source of information besides the MOIs,

16   it's possible also that that content was maybe not

17   available through those witness, but was redundant to

18   other content disclosed in discovery or in evidence at

19   trial.  For instance, as you said, they could have all

20   talked about the -- what was it called?

21            MR. MASLING:  Hazard elimination.

22            MR. SCIORTINO:  Or kill the spider.  So

23   they could have all been talking about the same stuff

24   that other witnesses had talked about.

Case 5:18-cv-00591   Document 705-5   Filed 09/05/19   Page 74 of 123 PageID #: 1347
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

175

1                 THE WITNESS:  I think in most of these

2      cases, that is the case.  Maybe they are, but I don't

3      think that even Zuckerman is going to be able to point

4      to lot of examples of things that some witness said that

5      wasn't disclosed by another witness or disclosed in the

6      documents that were produced.

7                     MR. SCIORTINO:  Or that some of these were

8      closely associated with the defense, so they could have

9      had direct access to them?

10                    THE WITNESS:  That's right.  And I know of

11     some that they had direct access to.  I know that they

12     interviewed Witness #7  I know that they interviewed Witness #8

13     from conversations with the counsel for those witnesses.

14                    MR. MASLING:  It has to be, otherwise they

15     would not have kept asking you for her MOI.

16                    THE WITNESS:  Right.

17                    MR. SCIORTINO:  That's all I have.

18                    MR. MASLING:  So here is the last exercise.

19     Rather than go MOI by MOI by MOI, we kind of pulled out

20     bullet points that were either in one or usually

21     multiple MOIs that weren't disclosed.  And what we did

22     is we asked the two agents and the two AUSAs that we

23     spoken with for their views about whether these

24     statements taken in isolation would have been helpful to

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                              176

1    the defense to have been disclosed.

2              And I want to give you the same opportunity to

3    give us your views.  And, at this point, I'm only going

4    to tell you -- I'm going to leave out the ones where

5    they say, no, it's not helpful because if they all agree

6    it's not helpful, then we are going to say it's not

7    helpful.  But I want to ask you about the ones that they

8    say, yes, that would have been helpful for the defense

9    to have known.

10             First, "Blankenship was willing to spend money

11   to increase the safety of workers."

12        A.   So can -- I mean, looking at it in isolation,

13   I can give you a two-part answer.  Number one, that was

14   certainly redundant with lots of evidence that was

15   disclosed.  Is that a statement that, in isolation, is

16   helpful to them, yes, but there was already a great deal

17   of evidence that was used over and over again at trial

18   that we had disclosed to them about money that

19   Blankenship spent on safety, programs that he put in

20   place, equipment that he had altered and modified for

21   supposedly in the service of safety, rewards programs

22   that he used with employees to supposedly encouraged

23   them pursue safety.  So in isolation, yes, but I do not

24   believe that the disclosure of that statement from one

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                     September 28, 2017

177

1    additional MOI would have added anything to what they

2    had.

3    BY MR. MASLING:

4         Q.    "Blankenship wanted to see the number of

5    violations or citations reduced."

6         A.    So I would give you the same answer to that.

7    You know, there was just a mountain of evidence of

8    statements that Blankenship made that -- in which he

9    claimed to want safety violations to be reduced.  And we

10   didn't dispute that he made the statements.  In any

11   event, there was plenty of evidence on that point.  One

12   more from another MOI or a couple more MOIs would have

13   been one or two more.

14        Q.    But in isolation --

15        A.    In isolation, that is a statement that I would

16   say would tend to be helpful.

17        Q.    "Blankenship wanted information about Massey

18   and UBB violations in order to be able to reduce them."

19        A.    Wanted information about violations in order

20   to be able to reduce them.  Was it Massey generally or

21   UBB specific?

22        Q.    Both.

23        A.    Okay.

24              My answer to that is probably going to be the

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

178

1    same.  That --

2         Q.    Okay.

3         A.    -- in isolation if there were the only place

4    where that statement occurred, then it probably would

5    have been helpful to the defense.  But it was certainly

6    redundant of a great deal of evidence that was produced.

7    And just let me pause for a minute there on the question

8    of -- on the subject of intent.

9              It's -- and Zuckerman is certainly going to

10   make the case, but it seems to me significant that for

11   statements like this, which are variations on the theme

12   that Blankenship wanted violations reduced, wanted

13   safety improved, you know, we turned over such an

14   enormous volume of evidence on that subject, which

15   formed the centerpiece of their case really at trial.

16             It's just hard for me to -- hard for me to

17   swallow the claim that we intentionally withheld

18   memoranda that added one more data point on these issues

19   to the enormous amounts of original evidence because we

20   thought it was going to make a differences to the

21   outcome of the case.  It's just not there.

22        Q.    "Blankenship wanted workers to comply with

23   applicable federal regulations."

24        A.    Again, in isolation, that is a statement that

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

179

1    would tend to be helpful to the defense, again, if it

2    was an enormous amount of evidence that was disclosed on

3    the same point.

4         Q.    "Blankenship started a program to reduce

5    violations and citations and to teach workers better

6    safety practices."

7         A.    Same answer.

8         Q.    And we talked about this one.  This was only

9    in one MOI.  "Blankenship did not want production

10   targets to be too aggressive."

11        A.    This is the ██Witness #3██

12        Q.    Yes.

13        A.    The answer that I gave on that when we talked

14   about the memo is what I would say now.

15        Q.    Okay.

16             "Blankenship wanted information about who was

17   committing violations."

18        A.    Same answer as to the earlier one.  Again, in

19   insolation, he wanted information about who was

20   committing violations.  You could -- it is a piece of

21   evidence that the defense could use to make an argument.

22   Now -- and I understand we don't get to evaluate whether

23   the argument is any good necessarily in light of the

24   totality of the evidence, but that's information -- I'm

Case 5:18-cv-00591 Document 705-5 Filed 09/05/19 Page 79 of 123 PageID #: 1352
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

180

1    not saying that we looked at these statements and say,

2    well, they got this from other source, we don't have to

3    produce it, but, the fact of the matter is they did get

4    that, again, from original documents that were

5    Blankenship's original correspondence to them.

6         Q.    "MSHA decisions -- some MSHA decisions made

7    conditions in the means more dangerous than they

8    otherwise would have been."

9         A.    Some MSHA decisions made conditions in the

10   means more dangerous than they otherwise would have

11   been.

12        Q.    I think it's like the ████ ventilation issue

13   where ████ saying I thought what they were requiring us

14   to do is make the thing more dangerous.

15        A.    It's funny, we -- I didn't think that that

16   whole line of questioning from ████ was relevant to the

17   question of whether or not ██ was violating the safety

18   laws.  Whether or not you think MSHA makes things more

19   dangerous, ██ was not -- you know, ██ was not on trial

20   for making the mine more dangerous or not more

21   dangerous.  The issue was violations of mine safety

22   laws.  And that one, I'm not sure that I think that one

23   is actually helpful to the defense in defending against

24   the charges in the case.

Case 5:18-cv-00591   Document 705-9   Filed 06/05/19   Page 80 of 123 PageID #: 1353
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

181

1              MR. SCIORTINO:  I guess it's kind of a jury

2      appeal type of thing.

3              THE WITNESS:  Sure.

4      BY MR. MASLING:

5      Q.    "Violations written by MSHA inspectors are

6      reflective of opinions but not facts."

7      A.    Again, I don't know if that's that helpful or

8      not.  I think that's true in any regulatory situation,

9      that a regulatory exercises some degree of judgment.  I

10     don't know if that's a defense.

11     Q.    Okay.

12             "MSHA was aware of dangers, but didn't take

13     any action in response to being aware of them."

14     A.    Again, I don't know how that relates to what

15     he was charged with.

16     Q.    "UBB operations met minimum regulatory

17     requirements."

18     A.    Do you know what the context for that was?

19     Q.    I don't.  Generally, it was followed by, but

20     they didn't exceed them.  There was more than one person

21     that said, well, we met the minimum standards for X.  We

22     didn't exceed it, but we met the minimum.

23     A.    It's hard to say without context.  UBB met the

24     minute minimum regulatory requirements.  For the record,

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

182

1    let me add that as a caveat to all of these.  There may

2    be context to all of these.  There may be context for

3    these that when you look at the statement that changes

4    the meaning of the statement from when you view it in

5    isolation.

6         Q.    I tried not to do that, but I can't guarantee

7    that that didn't happen?

8         A.    UBB met the minimum regulatory requirements.

9    Do you know who said that?

10        Q.    I don't.

11        A.    The reason I'm pausing is if you look at their

12   violation history, I can't even imagine what that would

13   have meant.

14        Q.    My assumption, and I don't remember is that

15   it's some higher-level person, like a president or vice

16   president or somebody at headquarters.

17        A.    If you take that statement literally in

18   isolation, strip it out and you have a witness who says

19   UBB met the minimum regulatory requirements in the face

20   of all of the evidence of their safety violations then I

21   suppose --

22              MR. SCIORTINO:  I think Witness #4 said it.

23              THE WITNESS:  Did ▮ say minimum regulatory

24   requirements?  I mean what Witness #4 said if this is

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

183

1    what -- what Witness #4 said about minimum requirements

2    is that Blankenship would staff the mines at the

3    absolute minimum --

4    BY MR. MASLING:

5         Q.    It probably was Witness #4

6         A.    -- at the absolute minimum necessary for

7    perfect conditions, which ensured that, since there were

8    no perfect conditions in real life, there were going to

9    be violations.  That was part of Witness #4 Keebler

10   analysis of Blankenship, where ▮ said ▮ started a

11   Keebler and ▮ thought of everything in terms of numbers

12   and if you add a certain number -- that ▮ essentially

13   staffed the mines in a way that did ensure violations.

14   I don't know if that's what ▮ meant by that.

15        Q.    I don't know.

16        A.    So I guess my answer is that one to me seems

17   completely context dependent, but if a witnessed just

18   said UBB met minimum regulatory requirements, period.

19        Q.    So this appears to come from this is a --

20   where does that come from?  So there was enough there to

21   meet the minimum requirement, that was from Witness #4

22   the long-wall face was staffed for perfection, from the

23   same MOI page.

24             MR. SCIORTINO:  Is that what you were kind

Case 5:18-cv-00591   Document 705-5   Filed 08/05/19   Page 83 of 123 PageID #: 1356
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                      September 28, 2017

184

1    of saying?

2              THE WITNESS:  Yes.  What ███████ saying -- I

3    mean, my interpretation of that, and I'm confident

4    that's what ███ meant, is that Massey was staffed to

5    meet -- UBB was staffed to do the absolute minimum if

6    everything was perfect, but that nothing was ever

7    perfect in real life, so violations were guaranteed.

8    BY MR. MASLING:

9        Q.    Okay.

10       A.    I don't remember -- again, I could have

11   remembered -- Witness #4  acknowledged that there were

12   lots of violations.  I don't know that ███ would have

13   said -- actually, said Massey met the minimum regulatory

14   requirements generally.

15       Q.    "UBB was a well-run mine."

16       A.    I think from Blankenship's point of view that

17   was true.  A well-run mine from ███ perspective is one

18   that made a lot of money.  I don't know if that's what

19   that means.

20       Q.    So not helpful.

21       A.    I mean, if the statement was that UBB was a

22   well-run mine with regard to complying with the law,

23   then, yes, but not if the statement was if it was a

24   well-run mine with regard to something else not that ███

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

185

1    was charged with.

2                   MR. SCIORTINO:  Too ambiguous to be helpful

3    perhaps?

4                   THE WITNESS:  Sure.  Until it blew up, I

5    think Blankenship would have said that UBB was run fine

6    because it was printing money.

7    BY MR. MASLING:

8         Q.    You know MSHA inspector would write reports

9    based on their inspections and from time to time, they

10   would write positive comments about the mine and the

11   Witness #11  blurb was an example of that, well-run mine

12   they are trying to do a good job or something like that.

13   So in various places in some of these undisclosed MOIs,

14   there are statements about positive evaluations from

15   MSHA inspections.

16                  The question is:  Would that have been helpful

17   to the defense, kind of like a snapshot on this day at

18   this time, I had something positive to say about the

19   mine?

20        A.    Would it have been helpful?  Arguably,

21   marginally.  I don't know that it goes to the issue

22   of -- and a part of our view, and this is another

23   subject that we talked about, me and the U.S. Attorney,

24   and I'm fairly sure AUSA #1 , and even briefed, I

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                   September 28, 2017

186

1    believe, in some of the motion practice is that it just

2    wasn't -- it's not relevant.

3           It's not a defense to say that there were

4    times when the mine did things right.  We equated it

5    to -- you know, we equated it to a bank robbery case in

6    which the bank robber wants to say that he drove past --

7    you know, he didn't rob banks on the other 30 days of

8    the month, and that's just not -- that wasn't something

9    that was relevant and is not from a legal standpoint, at

10   least, shouldn't be helpful to the defense.

11   Q.    I'm not sure this is the time to get into the

12   discussion of whether that's an apt analogy.  I'm not

13   entirely convinced that that's an apt analogy, but okay.

14          "UBB had a decreasing number of infractions."

15   A.    Do you know what the context was?

16   Q.    I think after the kill the spider thing the

17   number of infractions went down.

18   A.    I don't know who said that.  It's not

19   accurate.  Again, I suppose if somebody said it and you

20   take it out of context and say UBB had a decreasing

21   number of infractions, period, even if it's just flatly

22   not true, I suppose you could say it's helpful to the

23   defense, but not helpful in the sense that they had, and

24   we had disclosed to them all of the same numbers that we

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                            187

1    had that actually showed what had gone on with regard to

2    safety at the mine.

3         Q.    "MSHA was bias against Massey versus other

4    companies."

5         A.    Again, if -- not knowing what the context is

6    you take that statement --

7         Q.    That's pretty straightforward.  And this goes

8    with the next one, "There is no difference between

9    conditions at the UBB mine and any other mine in any

10   other coal mining operation.  It's all the same, you

11   can't run a perfect mine, and if there's more

12   violations, it's because they are picking on you because

13   they don't like you for whatever reason they don't like

14   you."

15        A.    So taking those separately, the one you just

16   read that MSHA was bias against Massey, taking it in

17   isolation could be helpful to the defense was covered

18   abundantly in all kinds of evidence that we disclosed.

19   That was a commonly held view stated in writing by

20   Witness #10 by Blankenship, by lots of others.  The next one

21   that you mentioned, if the statement is that UBB is no

22   different than any other mine?

23        Q.    In terms of the number of violations, both the

24   quality and quantity of violations.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

188

1        A.     To me, that is -- that doesn't really bear on

2    the question of whether or not the law was being broken

3    at UBB.

4        Q.     "Violations were not intentional."

5        A.     Again, I think context is important, in that

6    violations were not intentional on the part of workers

7    at the mine because they are put in circumstances that

8    make it impossible for them to follow the law, that's

9    helpful to us.  That's inculpatory.  If the statement is

10   that Blankenship didn't intend any violations to happen.

11       Q.     I think it's the latter or Massey management.

12       A.     If the statement is that Blankenship didn't

13   intend any violations to happen, then a statement like

14   that, I suppose would tend to be helpful to the defense,

15   but without context it's hard to say.

16       Q.     Last one on my list, and I think this came

17   from Witness #8 and ██ said, "The violation weren't due to

18   manpower shortages they were due to inexperienced

19   workers."

20       A.     That's 100 percent specific to his mine, which

21   was a completely different operation from UBB.  I don't

22   know how ██ could have possibly commented on manpower

23   shortages at UBB.

24       Q.     I thought your whole theory of the case was

Case 5:18-cv-00591   Document 705-5   Filed 09/05/19   Page 88 of 123 PageID #: 1361
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

189

1    that Blankenship was too cheap to staff it

2    appropriately?  Not your whole theory, but that was one

3    of your points.

4         A.    That is a point, but the point was about his

5    staffing at UBB.  ███████ for all I know -- do I think

6    that it's true that ███████ where Witness #8

7    Witness #8 ███████████████████████████ was abundantly

8    staffed, probably not.  But even if it was, I don't

9    think it changes the evidence of what happened at UBB.

10                  MR. MASLING:  Okay.

11                  MR. SCIORTINO:  I have some follow-up about

12   the Ogden, but I don't want to jump topics.

13                  MR. MASLING:  Jump topics.

14                  MR. SCIORTINO:  Specifically with U.S.

15   Attorney Goodwin, was he broadly aware or specifically

16   aware that memoranda of interviews post-indictment were

17   not being reviewed?

18                  THE WITNESS:  The interview of memoranda

19   post-indictment were not being reviewed.  I don't know

20   that we had a specific conversation about it, but based

21   on the conversations that we did have -- it was clear

22   when we discussed the subject of what to put in these

23   letters, that we were having that discussion based on

24   our recollections of witness interviews.

Case 5:18-cv-00591  Document 705-5 Filed 09/05/19  Page 89 of 123 PageID #: 1362
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

190

     1          I mean, there would have been -- there would
     2     have been no reason for him to believe that there was a
     3     systematic process in place to -- the evidence, I guess,
     4     based on -- the evidence that he would have had, based
     5     on our discussions, was that we were working from
     6     recollection and that neither he nor I nor anybody else
     7     undertook to put in place a process where we
     8     systematically reviewed each MOI for discoverable
     9     information.
    10               MR. SCIORTINO:  Can you, just in narrative
    11     terms, give us an understanding of what his role was?
    12     Was he the first chair?  Was he kind of the big picture
    13     guy, leaving the nuts and bolts to you, or was
    14     he directing things on a day-to-day basis?
    15               THE WITNESS:  In pretrial --
    16               MR. SCIORTINO:  Like who does the buck stop
    17     with, is it you or him.
    18               THE WITNESS:  So I would say the
    19     decision-making authority on decisions of any
    20     significance rested with him.  The work -- sort of the
    21     grunt work of preparing for trial was largely me, but --
    22     and in particular, you know, he was -- the case was very
    23     important to him, and not without reason.  It was
    24     obviously a significant case.

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

191

```
 1            And he made clear from the beginning, that,
 2    like I said, any decision of significance had to be made
 3    by him, and he reiterated that more strongly around the
 4    summer of 2015.  And that conditioned through the
 5    pretrial process and all the way through trial.  Now, in
 6    terms of who sat where at trial, I sat first chair and
 7    opened and did the rebuttal close and took more
 8    witnesses than him, but the decision-making authority
 9    was his.
10            MR. SCIORTINO:  Who would you say is
11    responsible for their not being a process to ensure that
12    the Ogden memo was complied with, with respect to these
13    memoranda?
14            THE WITNESS:  It was, I would have to say,
15    a lapse by all of us.
16            MR. SCIORTINO:  Okay.
17            THE WITNESS:  You know, it, in retrospect,
18    should have been done, wasn't done.  And you know, I, in
19    retrospect -- I certainly wish that I had been more, you
20    know, more specific with him about the need to do that,
21    rather than -- I mean, we did talk frequently about the
22    need to make sure we had adequate resources and
23    processes in place for discovery, which didn't lead to
24    much of anything, but in retrospect, it was the failure
```

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

192

1   to put a better process in place is probably a failure

2   of the rest of the team.

3            MR. SCIORTINO:  But for his instructions to

4   you that we are only going to give to the defense what

5   we have to give to the defense -- in other words, if he

6   was not involved in the trial and you were -- it was

7   your case entirely, do you think you would have turned

8   over the post-indictment memoranda in their entirety.

9            THE WITNESS:  I think if we hadn't had the

10  conversation -- if he and I hadn't had the conversation

11  in which he said that we don't need to produce these in

12  their entirety, we can summarize what's exculpatory, I

13  would have just kept doing what I was doing, meaning

14  produce stuff as it comes in.

15           MR. SCIORTINO:  It certainly seems like it

16  would have been a lot easier.

17           THE WITNESS:  Yes, it would have.  And like

18  I said -- and I understand why you are going through the

19  list of those statements that jump out from those memos,

20  but there is just nothing there that -- and I don't know

21  if you all have read -- I hope you haven't had the

22  burden of reading the entire trial transcript --

23  BY MR. MASLING:  --

24       Q.   Not yet.

Case 5:18-cv-00591  Document 705-5  Filed 09/05/19  Page 92 of 123 PageID #: 1365
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

193

1    A.    -- but there is nothing in there that would
2  have made the least bit of difference at trial.  And
3  you've seen enough of Zuckerman to know that if they
4  thought that there was even a glimmer of possibility
5  that anything in there would have made a difference in
6  the outcome of the case, they would have been in there
7  with a motion while he was still in prison.
8    Q.    I don't know what they are doing.
9    A.    They fight -- I've never seen anybody litigate
10 like them.  Every single little thing, meritorious,
11 meritless, whatever.  If they think that an argument is
12 too weak to even take a run at it with the court, then
13 you know it's weak.
14              MR. SCIORTINO:  I would like to take five
15 minutes just to review notes.
16                      *   *   *
17                  (Brief break)
18                      *   *   *
19              MR. SCIORTINO:  So Mark mentioned that we
20 are probably not going to have the opportunity to talk
21 to Mr. Goodwin directly.  Is there anything that you can
22 tell us that might help fill in that gap that you think
23 would be important for us to know?
24              THE WITNESS:  Why he doesn't want to talk

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

194

1   to you?

2                  MR. SCIORTINO:  No, just anything that we

3   could have gotten from him directly that you can help us

4   with directly.

5   BY MR. MASLING:

6       Q.    Tape recordings of his phone calls, just to go

7   with a pattern in this case?

8       A.    No.  Like I said, if you guys have got the

9   e-mails, that's it.

10      Q.    But, as you said, you didn't communicate much

11  by e-mail because you were walking down the hall?

12      A.    Yes, he was right there, I was right there.

13  If you need to corroborate, his assistant at the time

14  will tell you that I was in his office multiple times

15  daily for long stretches, and he was in mine during the

16  course of this case.  It's just when you are sitting

17  that close to somebody, unless you are sending them

18  a long document to review, it's a little odd to

19  communicate by e-mail and not particularly efficient.

20  It's just not a lot of e-mails between us.

21                  MR. SCIORTINO:  Was his status of U.S.

22  Attorney awkward for you?

23                  THE WITNESS:  Was his status of U.S.

24  Attorney awkward for me?  Yes.

Case 5:18-cv-00591  Document 70-5  Filed 08/05/21  Page 94 of 123 PageID #: 1367
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

                                                              195

1              MR. SCIORTINO:  I'm thinking I never had to

2    try a case with a U.S. Attorney.  It seems to me like I

3    would not have enjoyed it.

4              THE WITNESS:  ███████████████████████████

5    ██████████████████████████████  █████████████████

6    ████████████████████████████████████████████

7    ██████████████████  ████████████████████████████

8    ███████████████████  I just think that this

9    case is just too many challenges for an office our size.

10             And it was -- part of what motivated me to do

11   that, and I didn't say, was that it just too -- you

12   know, it was too difficult to try to handle the case

13   with him over your shoulder micromanaging decisions.

14   ███████████████████████████████████████

15   ██████████████████████████████████████████

16   ████████████

17             MR. SCIORTINO:  I'm sorry.

18   BY MR. MASLING:

19        Q.   Our last question, as I mentioned is:  Is

20   there anything we haven't discussed today that you think

21   is relevant to our assessment of these conduct

22   allegations we are looking at?

23        A.   I'll say, as I said a minute ago, I have not

24   searched since the -- I did searches of the document

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                September 28, 2017

196

1    database, in putting together my response to your first

2    set of questions.  I think there was another set after

3    that --

4         Q.    Yes.

5         A.    -- that I included documents with.

6         Q.    Yes.

7         A.    I have not done searches of the document

8    database to see if there are documents that would -- or

9    identify documents that would make what was in these

10   MOIs redundant.  I think the documents are there, I

11   think I can probably pick them out from the trial

12   exhibits because almost everything from the list that

13   you read was a central theme.

14            The list of points that were made in these

15   MOIs was a central theme of their case, that they

16   supported, at great length, with materials that we did

17   provide them.  I don't know if that matters to what you

18   guys are trying to do or not, to see how extensive our

19   disclosures were on the same subjects that they are

20   complaining about now.  I know it's not the end of

21   story.  I don't know if it's a component of what you are

22   looking at.

23        Q.    I can't tell you not to do it.  It's not going

24   to hurt anything if you do it.  I'm not clear at this

Case 5:18-cv-00591   Document 705-5   Filed 09/05/18   Page 96 of 123   PageID #: 1369
CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

197

1    point how much it would help, so I guess I'm going to

2    leave it to you for the moment, and then we'll go back

3    and we'll talk to our folks, and if they say, you idiot,

4    of course you need to do that, and you need to do it

5    right away, I'll let you know, but you can tell us now,

6    yes, you are going to go through that exercise, and it's

7    not going to hurt.

8        A.    Yes, I'll do it.  Is there a list that I

9    should look at of subjects?

10       Q.    I sent you a list a long time ago, and that

11   had kind of -- but that was partial so what I'll do is

12   I'll send you a supplement to that.

13              MR. SCIORTINO:  That table that Paralegal #1 made

14   would probably be helpful, the color-coded one.

15   BY MR. MASLING:

16       Q.    That's incomplete.  So let me send you a

17   supplement to that list, but if you want to start

18   working on it after we are done here, that will keep you

19   busy for a while?

20       A.    I'll block out an hour every night.

21              MR. MASLING: So we are done.  Thank you

22   very much, greatly appreciate it.

23              (Whereupon, this proceeding was concluded at

24   2:59 p.m.)

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Steven Ruby                                    September 28, 2017

                                                                198

```
 1    THE STATE OF        :
      WEST VIRGINIA       :
 2                        : SS:  C E R T I F I C A T E
      COUNTY OF OHIO      :
 3

 4         I, ███████████, Professional Court Reporter and
      Notary Public within and for the State of West Virginia,
 5    duly commissioned and qualified, do hereby certify that
      the within-named witness, STEVEN RUBY, Esquire, was by
 6    me first duly sworn to testify to the truth, the whole
      truth and nothing but the truth in the cause aforesaid.
 7
           I do further certify that the within testimony
 8    was by me reduced to stenotype in the presence of the
      witness; afterwards reduced to Computer Aided
 9    Transcription under my direction and control; that the
      foregoing is a true and correct transcription of the
10    testimony given by said witness; and this deposition was
      concluded without adjournment.
11
           I do further certify that I am not a relative,
12    counsel or attorney of either party, or otherwise
      interested in the event of this action.
13
           I, to the best of my ability, do further certify
14    that the attached transcript meets the requirements set
      forth within Article 27, Chapter 47 of the West Virginia
15    Code.

16         IN WITNESS THEREOF, I have hereunto set my hand
      and affixed my seal of office at Wheeling, West
17    Virginia, on the 25th day of October, 2017.

18

19                        ████████████, Professional
                          Court Reporter, Notary
20                        Public within and for the
                          State of West Virginia
21

22    My Commission expires:
      June 19, 2022
23

24
```

OPR - 000326

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# TAB

# E

CONFIDENTIAL - DO NOT DISCLOSE

May 24, 2017

The Honorable Robin C. Ashton, Counsel
Office of Professional Responsibility
United States Department of Justice
950 Pennsylvania Avenue, N.W., Suite 3266
Washington, D.C. 20530

Dear Ms. Ashton,

Thank you for your May 23, 2017 letter. I am not surprised that Bill Taylor has, yet again, tried to put the trial team in this important case on the defensive. Shortly after the indictment, Mr. Taylor went directly to and gained an audience with DAG Cole to complain about the prosecution. Please see the attached letter from me to DAG Cole. It was against the backdrop described in that letter that it was my intention and direction that Mr. Taylor have nothing about which he could reasonably complain concerning our investigation and prosecution. I know Mr. Taylor is not alone in trying such maneuvers—I just wish they were not effective.

Of course, I have been gone from the office a year and a half, so I do not have at my disposal the case file—but I gather you have that already. However, I do know that we provided expansive discovery to the defense—well beyond that which we were required to provide—including perhaps hundreds of memoranda of interview. Indeed, it was my intention and direction to the lead AUSA, Mr. Ruby, that all information we gathered during the lengthy investigation be provided. In fact, I believe the defense actually complained about the volume of information we produced. If anything was not produced, I am confident it must have been inadvertent.

I also cannot imagine that if any material was not produced that such material contained anything new that had not already been disclosed to or more available to the defendant. Significantly and specifically, I am not aware of any exculpatory information concerning Mr. Blankenship, and accordingly, I certainly do not know of any exculpatory information not being disclosed.

It is frustrating to me if memoranda of interview were not turned over. My frustration is not born from any concern that any information contained therein would have made any difference in the outcome or fairness of the trial, because I

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

have no such concerns. Rather, I am frustrated that Mr. Taylor could finally succeed in putting on the defensive a trial team who took on a tough, worthy and just case. I trust that you will not allow that to occur.

Thank you again for your letter and for your long and distinguished service to our nation.

Sincerely,

R. Booth Goodwin II

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order Docket No. 646
United States v. Blankenship, No. 5:14-cr-00244 (S.D.W. Va.)

*United States Department of Justice*

*United States Attorney*
*Southern District of West Virginia*

---

*Robert C. Byrd United States Courthouse*
*300 Virginia Street, East*
*Suite 4000*
*Charleston, WV 25301*
*1-800-659-8726*

*Mailing Address*
*Post Office Box 1713*
*Charleston, WV 25326*
*304-345-2200*
*FAX: 304-347-5104*

November 22, 2014

Via Email: ███████ @usdoj.gov

The Honorable James M. Cole
Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Re: United States v. Donald L. Blankenship

Dear Deputy Attorney General Cole:

Yesterday, I received a letter from William Taylor, who represents a former coal executive named Don Blankenship in a case in my district. I believe that you have also received the letter, and I understand that Mr. Taylor has managed to speak with you directly. I am not surprised, unfortunately, that Blankenship's high-powered defense lawyer would attempt to exploit his Washington access to attack me and my staff personally. This is regrettable but predictable, especially in a case where the actual evidence is as strong as it is here.

I must admit, however, that I was surprised that Mr. Taylor could so quickly win a private audience with you to complain that he and his client were not accorded special treatment—that is, prior review at the highest levels of the Department of the charges in this case, something obviously not available to ordinary defendants or defense lawyers. And I was surprised that immediately after Mr. Taylor sent his letter, Mr. Goldberg called me to suggest that I am expected to respond. I do not believe that Mr. Taylor's bid to pull strings warrants a response, so his apparent ability to set the Department's agenda in this matter concerns me.

If Mr. Taylor has already succeeded, however, in his strategy of putting the prosecutors on the defensive, here is what you should know: Shortly after the explosion at the Upper Big Branch mine killed twenty-nine coal miners amid evidence of rampant law-breaking, Mr. Taylor made an impromptu visit to my office, apparently to fish for clues as to where our investigation might be headed. Along with one of my assistants, I met with him. Mr. Taylor probed to discover what we might have learned about his client Blankenship, the longtime CEO of Massey Energy Company, which ran the mine.

As one would expect, we declined to provide details of our investigation in response to Mr. Taylor's inquiries. With Blankenship, obstruction and tampering were paramount concerns. In a previous investigation of criminal conduct at one of Blankenship's companies—conduct that led to the deaths of two coal miners and a criminal guilty plea by a Massey Energy Company subsidiary—and in the early stages of the Upper Big Branch investigation, witnesses had told us of Massey's pressure to prevent cooperation with the authorities. With that in mind, when Mr. Taylor

CONFIDENTIAL - DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 6317
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

said that he wanted to be kept apprised of his client's status as the investigation progressed, and to be given detailed information about our case as it developed, we remained noncommittal, leaving the door open to future discussions if they served the best interests of the case but not binding ourselves. We took the same approach, for the same reasons, on the one or two subsequent occasions, a couple of years ago, when Mr. Taylor called our office to probe some more. Suffice to say that our understanding of these conversations differs from the one that Mr. Taylor has professed, and that we have quickly learned to deal with him only in writing.

Although we did not share details of the investigation with Mr. Taylor, he apparently remained aware of them through contact with witnesses whom we interviewed. We know that shortly before charges were presented against Blankenship, Mr. Taylor had learned enough about the investigation's progress to obtain, pursuant to an agreement between Blankenship and Massey's successor company, many of the very documents that were presented in the grand jury—and others to which we have been denied access on grounds of privilege. His claims of surprise are hyperbole.

Contrary to Mr. Taylor's assertion, the United States Attorneys' Manual lists many reasons not to notify a defendant in advance that he is the target of an investigation, and most or all of them apply here. USAM 9-11.153. Significantly, and in addition to the risk of obstruction explained above, the presiding magistrate judge found earlier this week that Blankenship poses a serious flight risk, a fact of which we were well aware when charges were presented.

Mr. Taylor's attacks on the indictment are similarly unfounded. I have been personally involved in this case from the outset; I know the facts and the charges. I thoroughly reviewed the indictment and personally appeared in the grand jury for its presentation and the presentation of the powerful evidence in support of it. The laws being applied are familiar ones. If there is any novelty in this prosecution, it is only the notion that the laws on coal miners' safety apply to CEOs just as fully as to rank-and-file miners. Notably, when the Attorney General visited my district months ago, I informed him and his counselor, Channing Phillips of the charges to be brought in this indictment and received their support. Neither of them asked me to subject the case to further review by the Department before it was presented. Days before the indictment was presented to the grand jury, I forwarded an "urgent report" and followed up with Mr. Phillips, and I understand that he updated the Attorney General on the case at that time. Mr. Taylor's suggestion that I acted without prudent consultation with Department officials lacks merit.

If Mr. Taylor objects to the indictment, he should assert his objections in court, just as other defendants do. His apparent belief that wealthy defendants or their powerful lawyers are entitled to special, detailed, pre-judicial or extrajudicial scrutiny of charges by high-level Department officials—a process unavailable to ordinary defendants—is offensive and deeply corrosive to the basic ideals of our justice system and our Department.

With this response, I hope that you will consider this inquiry closed. Our case is a strong one and a just one, and Mr. Taylor should not be permitted to use his contacts at the Department as part of his plan to bury us in paper and prevent us from preparing for trial.

Sincerely,

R. Booth Goodwin II
United States Attorney

OPR - 000331

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# TAB

# F

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# STEVEN R. RUBY



May 7, 2018

Robin C. Ashton, Esq.
Counsel
United States Department of Justice
Office of Professional Responsibility
950 Pennsylvania Ave., NW, Ste. 3266
Washington, D.C. 20530

  *Re: Don Blankenship matter*

Dear Ms. Ashton:

   Neither of the reckless disregard findings in OPR's draft report is justified. The one regarding duty of candor is the more obviously flawed of the two, so I will begin there and then turn to the duty to disclose.

### Duty of candor: Analysis of statements cited in draft report

   The draft report's duty of candor conclusion rests on parts of sentences from three briefs plus a sentence from the trial transcript. Crucially, the draft report acknowledges that these statements were themselves accurate. But it concludes that the Court naturally would have read them to mean something other than what they actually said: That *every* memorandum of interview ("MOI") had been produced, when in fact a relatively small minority (60 or so out of around 400) had not been.

   That conclusion fails for two reasons: One, the question of whether every MOI had been produced was not part of the context in which those statements were made. When the statements are viewed in context, there is no reason that unproduced MOIs needed to be raised to make the statements complete. And two, the draft report misunderstands a basic fact about how lawyers and judges read legal arguments: These readers know that lawyers speak precisely and make the strongest arguments that they can support. If a legal argument asserts that one has "reviewed precedents," it thus does not imply that one reviewed "every precedent that could be found." Quite the opposite: The reader recognizes that if the attorney could have made the latter, stronger statement, he or she would have. So if a lawyer says that he "produced 302s," it is emphatically *unnatural* to read it to mean that he produced *every* 302. The absence of an absolute qualifier would imply just the opposite, for if the lawyer could have accurately said that *every* 302 was produced, he would have. At the least, it is not reckless for a lawyer to assume that a judge will give his words a limited interpretation when

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Robin C. Ashton, Esq.
May 7, 2018
Page 2

the context does not suggest a broader one. And here the contexts did not suggest an interpretation beyond what the words themselves said.

**The February statement.** The first statement with which the draft report finds fault is one from a February 2015 brief. The brief stated that the prosecution had already produced "extensive discovery material," including "over 600,000 documents" as well as "FBI 302's." It did not purport to say that *every* document or *every* 302 had been produced.

The statement was true. And contrary to the draft report's view, it would not have been natural to read the brief to *imply* more than it said. The statement regarding the 302s was offered as support for the point that the discovery already produced was "extensive." "Extensive" is not "total," and as noted above, one would expect the prosecution to describe its discovery production in the strongest possible terms. The most natural reading of the word "extensive," in context, thus would recognize the possibility that something less than every document had been produced.

The draft report cites a February 19, 2015 email to show that I reviewed the February statement. ██████████████████████████████████

**The May statement.** The next statement highlighted in the draft report is from a May 2015 brief. The May statement was made in response to a defense request for the agent notes "underlying" MOIs that the prosecution had already produced, because the defense claimed that the MOIs "sanitized" the underlying notes.[1] In other words, the defense was asking for interview notes to compare to MOIs that it already had. Such requests for notes are common. The prosecution produces MOIs and the defense then seeks the notes corresponding to the MOIs to see if anything can be gained by comparing them. The corresponding government response is also common: The defense was not entitled to the MOIs in the first place, much less the underlying notes. That was the response here: The prosecution produced the 302s that we produced, even though it need not have, and it was not obliged to produce the notes that underlay them.

In that context—a request for notes to compare to 302s already produced—other 302s that had not been produced were simply not part of the discussion. The most natural reading of the statement that the government had "produc[ed] . . . typed 302 reports" was not that every 302 had been produced, but instead that the statement did not address that question. At the time, it would not have occurred to me that it needed to.

I did not prepare the May brief, but the draft report notes that my electronic signature was on it. As OPR is no doubt aware from its review of the case, that does not mean that I reviewed the brief in any detail; I was often too busy with other work to do so, and OPR cites no evidence that I conducted a detailed review of the May brief.

---

[1] *Blankenship* ECF 248 at 1, 3.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Robin C. Ashton, Esq.
May 7, 2018
Page 3

**The July statement.** The next highlighted statement is from a July 2015 brief, which the draft report says I prepared.[2] The context was the same as the May statement: a request for notes to compare to MOIs that had already been produced. The pertinent defense brief made even clearer that these comparator notes were what it was seeking.[3] And the prosecution response was similar: Memoranda of the interviews in question had already been produced, and the defense had no entitlement to those notes.

As with the earlier statements, the issue of whether every MOI was produced was never raised and never occurred to me as part of the discussion. Indeed, the July statement was even less susceptible than the May statement to the reading that the draft memo proposes: It said, "the United States has produced memorandums that reflect the substance of well over 300 witness interviews." It is difficult indeed to see how *that* statement, which sought to quantify the number of MOIs that had been produced, could naturally be read to mean that *every* MOI had been produced.

**The trial statement.** Finally, the draft report cites part of a sentence from the trial transcript. After the testimony of Witness #4 , the defense claimed that the prosecution knew and should have disclosed that Witness #4 would deny being part of a criminal conspiracy. I responded, correctly, that the accusation was false, and that "[t]he testimony that the witness had given us and the statements that ▇ had given us previously" did not lead us to believe that ▇ would make such a denial.[4] Indeed, on redirect, Witness #4 testified that ▇ did not even understand what a criminal conspiracy was.[5] As part of my response, I also stated that the prosecution had produced grand jury material and 302s regarding Witness #4 .

As the draft report is quick to point out, this response was technically off base—by a single letter, the "s" after "302." At the time I spoke, I did not have a tally handy of Witness #4 302s that had been produced. I thought it was more than one, hence the plural "302s." The draft report concludes that I genuinely that belief. In fact, only one 302 had been disclosed, but my error in that regard was no violation of the duty of candor.

The draft report, however, asserts that I should have realized that when I said "302s," the Court could naturally believe that I meant "all 302s." Just as with the other three statements, this conclusion does not withstand scrutiny. The purpose of my statement, viewed as a whole, was to tell the Court that I knew of no undisclosed exculpatory information regarding Witness #4 (Which was true.) Nothing about that context raised an issue of whether every 302 had been disclosed, and nothing about it prompted me, in the

---

[2] If the draft report says so, I have no reason to dispute it, though for the most part I do not recall which briefs I drafted. I do recall that many briefs were collaborations, with more than one attorney contributing language to them.

[3] *Blankenship* ECF 283 at 5 n.2 ("[T]here is clearly room for misunderstanding or outright error when the agent transfers information from his or her rough notes to the final memo; and . . . the rough notes might be more credible and favorable to the defendant's position." (internal quotation marks, citations, and ellipses omitted)).

[4] Trial Tr. 3712.

[5] *Id.* 3327.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Robin C. Ashton, Esq.
May 7, 2018
Page 4

midst of making an argument on my feet in court, to consider even for a moment whether that question was pertinent.

On the contrary, by that time, it was clear that defense counsel *knew* we had conducted interviews with ███Witness #4███ from which no MOI was produced. OPR's draft report acknowledges as much. And it was plain from the three-and-a-half-day friendly cross-examination of ███Witness #4███ that the defense had better access to ███ that we did. If the defense had thought that the question of undisclosed interviews was germane to the point about which we were arguing, then it would have raised that question.

If there is any doubt about whether Judge Berger may have been misled by the statement regarding 302s, the rest of the transcript dispels it. After considering the ███Witness #4███ issues over a weekend, Judge Berger convened the parties on a conference call to make rulings.[6] On the *Brady* allegations, she noted that "the defense has been provided with ███Witness #4███ *grand jury testimony* and nothing here necessitates recross."[7] She relied in no way on the reference to 302s. And—more important—she offered the defense the opportunity to further question ███Witness #4███ outside the jury's presence "to determine if there is *Brady* material that has not or was not disclosed."[8] In fact, she made the offer twice, and the second time it was even stronger: "Mr. Taylor, *if you stand on your position* regarding the *Brady* material, I will want to explore that out of the presence of the jury with questions to ███ ███Witness #4███ about his statements in terms of telling anyone that ███ had not conspired with the defendant outside of *grand jury material* that you already have."[9]

Perhaps not surprisingly, after the Court offered to take testimony to help establish the defense's *Brady* allegations regarding ███Witness #4███ the defense promptly dropped the issue for the rest of the trial.  These portions of the transcript, which the draft report conspicuously omits, demonstrate that Judge Berger was in no way misled by the brief reference to 302s, nor was the defense. That the judge demonstrably was not misled is strong evidence that I was not reckless in how I referred to the 302s.

**Summary regarding duty of candor.** Each of the challenged statements was in fact true, with the exception of an innocent mistake in the statement made at trial. And each of them was made in a context in which the statement was not misleading. A reasonable judge or lawyer reading or hearing the statements would recognize that the absence of an absolute modifier ("every" or "all") indicated that something more limited was intended. There is no indication that Judge Berger was misled by any of the statements. On the contrary, with regard to the trial statement, at least, she clearly was not.

---

[6] *Id.* 3720.
[7] *Id.* 3724.
[8] *Id.*
[9] *Id.* 3731 (emphasis added).

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Robin C. Ashton, Esq.
May 7, 2018
Page 5

### Duty of candor: Analysis of context

The draft report's duty of candor findings also fail to consider the case's larger context, in two important respects. *First*, they pluck a handful of words from the millions that were produced, written, and spoken in the course of the case, and put them under the microscope divorced from any consideration of the real-world circumstances of litigation. From the indictment through the end of the trial, the small prosecution team was under relentless time pressure. The defense sought—successfully—to bury us in paper, filing scores of motions that, with exhibits, ran to thousands of pages. Four prosecution attorneys faced off against a much larger defense team, and the workload was staggering. We managed. But for the most part, there was no choice but to write briefs in a hurry. We lacked the luxury of leisurely analyzing every word and phrase. Even if one concludes that these three phrases from that mountain of briefing could have been constructed more carefully, they do not show reckless disregard.

There is a hindsight bias inherent in the draft report's conclusion on duty of candor. The unproduced MOIs have dominated the thinking of OPR's investigators for more than a year now. OPR views them as the most important part of its work on the case and has come to see their nonproduction as a grave problem. The OPR personnel handling the investigation therefore find it incomprehensible that we could file briefs or speak to the Court on the question of MOIs and not see that the unproduced ones were an important issue. From the vantage point of those prosecuting the case, though, it looked very different. Correctly or not, I discerned no problem in the way that the post-indictment MOIs were being handled; we had kept an eye out for any information truly helpful to the defense while juggling the hundreds of other tasks for which we were responsible. From that point of view, our omission to spot the issue and raise it with the Court can be criticized, but it was not reckless.



CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Robin C. Ashton, Esq.
May 7, 2018
Page 6



**Duty to disclose**

The finding of reckless disregard of the duty to disclose is similarly flawed, for many of the same reasons. It fails to account for both the extraordinary time pressure that the prosecution team faced and for my own ███████████. It also misses key facts concerning the supposed instances of reckless disregard. Most important, few if any of the statements on which the draft report focuses would genuinely have been helpful to the defense. The clearest evidence of this? When the defense received the supposedly helpful MOIs in early 2017, it did nothing with them at all. That is, a defendant and defense team notable for tenaciously pressing claims based even on thin support found nothing in the memos to justify so much as an attempt to challenge the conviction, despite the fact that the defendant was then in prison. This inaction persisted for well over a year after receiving the MOIs, until the filing last month of a § 2255 motion that was coupled with a campaign ad and press release from the defendant's Senate bid, in which polls revealed him to be falling well behind his opponents. If the statements were helpful, why could the defense make nothing of them until they became a prop at the end of a political campaign?

The truth is that the statements would have been of little help at all. One reason is the specific nature of the charges against the defendant. He was not charged with causing the Upper Big Branch explosion, so statements that went to the explosion's cause rather than to safety law violations did not help his defense. Statements that Massey Energy personnel disagreed with the mine safety laws were similarly unhelpful; disagreement with the law is not a defense.

Another reason that the unproduced statements ultimately proved unhelpful is that they were virtually all cumulative of other evidence that was produced in the case. The draft report, for example, cites witness references to a program that featured the slogan "kill the spider" and involved "report cards" on supposed safety performance at mines. But the prosecution disclosed myriad documents regarding that program, many of which the defense used as exhibits at trial. Those witness statements thus added nothing helpful to the defense. Another example: The draft report cites witness statements suggesting that some number of safety violations would occur at any mine. Besides being a matter of common sense, this was also a matter of public record; a publicly available federal database of mine safety citations demonstrated that every mine in the country commits some number of safety violations (albeit usually far smaller than UBB), and the defense used information from that database at trial. Again, the witness statements added nothing helpful. Similarly, claims about safety

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Robin C. Ashton, Esq.
May 7, 2018
Page 7

programs that the defendant purportedly implemented were copiously disclosed to the defense in documents, as were claims that he often said that safety violations should be reduced. The defense introduced those documents at trial, as well.

That the supposedly helpful statements ultimately did nothing for the defense is crucial in a couple of ways. It demonstrates that not identifying them as helpful, especially amid the time pressure of trial preparation, was not as egregious a transgression as the draft report suggests. And it shows that the prosecution's process for identifying statements that needed to be disclosed was not so bad after all. The draft report derides that approach as "relying on memory." But if it was truly reckless, then why could defense counsel, when pressed by OPR, not point to a single statement whose nonproduction prejudiced the defense? Did we show poor judgment? Perhaps. But not reckless disregard.

**Conclusion**

The defendant in this case has made clear that his main aim, besides getting elected to the Senate, is to retaliate against the prosecutors and judges who handled his case. He has spent hundreds of thousands of dollars airing television ads and mailing pamphlets attacking the prosecutors and judges by name (along with a United States senator who he claims masterminded a conspiracy against him). He has spent hundreds of thousands more (maybe millions) in legal fees pressing OPR to generate a report that accuses us of misconduct. And if he gets that report, he will spend another fortune using it to smear us. Like virtually every other prosecutor or former prosecutor, I lack anything approaching the resources needed to combat an ultrarich defendant bent on revenge. I lack, in fact, even the time even to prepare a page-for-page response to the draft report; taking a leave of absence that would allow me to spend as much time on this as OPR has is not an option, to say nothing of the amount of time that the defense has spent engaging OPR.

OPR should not be a vehicle for wealthy defendants to destroy the careers of prosecutors who make mistakes. Unfortunately, using OPR in precisely that way is now part of the playbook for those defendants and their attorneys: Overwhelm the prosecutors with superior numbers before and during trial in hopes of forcing a mistake; then use the same outsize resources to persuade OPR to spend years on a frame-by-frame review of everything the prosecution did until a mistake is discovered; then use the mistake to attack the prosecutors personally. Before we ever presented the indictment, I predicted that that was exactly what the defense would do in this case. And here we are.

All of that is to say that the stakes are high, not just for me but for OPR, which I trust desires a fair outcome here notwithstanding the pressure to which it has been subjected. The draft report overreaches in its findings of reckless disregard. I am not convinced that the statements cited in the duty of candor findings were even mistakes, but they were certainly no worse than errors in judgment. And while I certainly wish, in hindsight, that there had been time to take a different approach to post-indictment interview disclosures, whatever shortcomings arose in that process were errors in judgment, as well.

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

Robin C. Ashton, Esq.
May 7, 2018
Page 8

Surely the sort of reckless disregard portrayed in the draft report would have resulted in at least one unproduced statement that a defense lawyer could claim was prejudicial.

Before you reach a decision on the report, I request the opportunity to meet with you and discuss the matter in more detail. I am aware that the defense has enjoyed many opportunities to exchange information with your office and to lobby for its desired outcome. If you intend to make professional misconduct findings that will wreck my career, I think it only fair to let me first present my case in person. It is unwise, in any event, to deem a person reckless based on a paper record. Far better to talk to them face to face and get a sense of who they are.

I look forward to hearing from you.

Sincerely,

Steven R. Ruby

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# TAB G



April 19, 2018

The Honorable Robin C. Ashton, Counsel
Office of Professional Responsibility
United States Department of Justice
950 Pennsylvania Avenue, N.W., Suite 3266
Washington, D.C. 20530

Dear Ms. Ashton,

I am in receipt of your office's draft report dated March 22, 2018. I continue to fear that your office has been sucked into a political vortex by a callous, shameless, greedy, arrogant and morally bankrupt individual and his team of hired guns. Indeed, I see a Department of Justice that is on a political precipice that was previously unthinkable—at least to me during my 15 years of proud service to that institution. You must know that this is out of a common playbook for well-healed defendants and their connected lawyers: If you are not successful in beating the charges—and sometimes even if you are—attack the professional prosecutors. Put them on the defensive and make them and other prosecutors think twice about bringing a tough but worthy case designed to hold rich and well-connected defendants accountable.

As I said in my initial letter to you, such a play would not be as concerning if it did not involve the use of the Justice Department itself so deeply and effectively—especially lately. What I am not sure you appreciate is the kind of effect your office has on career prosecutors. Indeed, having been one, I know how concerning it would have been to even be accused of being reckless or lacking candor—even if no violation of law is found. Such is compounded when defendants with nearly limitless resources are able to take, twist and trumpet such allegations—as here—in a political campaign. Because of these matters, and if you are not persuaded to revise you report, I hope you will very carefully consider whether you publicly release a report with such loaded terms and phrases such as "reckless" and "violating a duty of candor"—especially considering that Blankenship has already made a very public, political and calculated issue of your investigation and its "potential" findings so close to a primary election for U.S. Senate in which appallingly he is a candidate.

Of course, I agree with your conclusion that "discoverable material" was not intentionally withheld. I also agree that no one violated the tenets of *Brady v.*

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
d States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

*Maryland*, *Giglio v. United States* or the West Virginia Rules of Professional Conduct.

However, I most certainly disagree that anyone on the prosecution team engaged in any sort of "reckless" behavior or violated any duty of candor. Indeed, given the report's findings that there were no violations of *Brady*, *Giglio* or the Rules of Professional Responsibility it seems rather inconsistent for the report to conclude that there was any recklessness or any lack of candor.

As I told you before, I did not and do not have access to the case file. Even if I did, it would likely take months to get to the point where I could meet your allegations point by point.

However, first let me say, it certainly is true that I placed a great deal of faith and confidence in Steve Ruby. I continue to believe that faith and confidence was well placed. Anyone who knows and has worked with him would agree that it is not a mistake—much less reckless—to do so. Steve is a brilliant attorney. This was an extraordinary investigation and series of prosecutions and Steve led the charge deliberately and admirably. He had an amazing command of the facts and the law bearing on the investigation.

Anyone who truly understands the investigation and the resulting prosecution of Blankenship knows that Blankenship used so-called safety initiatives and other professions of safe working conditions as a cudgel to beat back credible allegations of abhorrent conditions in the mines he oversaw—including Upper Big Branch. The constant talk of safety was designed to give the illusion that Blankenship cared about safety. Accordingly, it is certainly unsurprising that there is a lot of such talk in the material at issue in your report. Our case proved that he did not truly care about anything but profits, and it did so primarily with the testimony of individuals like the miners who saw the shocking conditions first-hand day in and day out. Because of Blankenship's massive propaganda machine, again it is unsurprising that his most devoted acolytes would say and say again that he cared about safety.

Despite the team's intent that all investigative materials generated by the expansive investigation be provided in the discovery process after the indictment was returned, the failure to turn over but 10 out of more than 300 Memoranda of Interview for interviews conducted pre-trial seems to be simply an oversight apparently resulting from the fact that the MOIs were generated after discovery had gone out. I would differ strongly with your conclusion that such an oversight was in any way "reckless".

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
d States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

As to the other material, while I apparently do not recall matters in the exact way Steve does, I would note that there is a very real difference between Memoranda of Interview for interviews conducted pre-indictment, and Memoranda of Interview prepared as a part of trial preparations post indictment.

After the indictment was returned in this case, I recall that the Court set the matter for trial within I believe 70 days. The trial team started almost immediately preparing for trial, which of course involved meeting with witnesses. Even though the trial was continued twice more, I seem to recall that the trial team was in almost a constant state of trial preparation.

While I have not had the opportunity to review them, the Memoranda of Interview that were apparently not released to the defense were most certainly generated as a result of preparations for trial. As such, these Post-Indictment MOIs are likely more accurately described as memoranda of trial preparation sessions. To disclose trial preparation memoranda wholesale would have disclosed key elements of our trial strategy. It would be entirely reasonable—and certainly not reckless—to decide not to turn over such memoranda. That being said, I do recognize a continuing obligation to turn over new exculpatory information, but I certainly do not recall any scenario or discussions where the team felt there was any such information where such information was not or had not been produced. I also cannot understand how it could be determined to be "reckless" not to have a system for review when most assuredly team members were in the trial preparation sessions. How was any "review" necessary when it was being experienced in real time?

As you recognize, the government is not obligated to turn over the entirety of any MOIs. While it is true, we generally did so—and did so here—this was a rather unique case. Even if the Post-Indictment MOIs contained "discoverable" information, I am entirely confident that the information was redundant of information disclosed in our expansive discovery or was otherwise available-- likely more available—to the defense. It is certainly telling that the defense specifically declined your invitation to state with particularity how the defense was prejudiced. Their goals were simply to try to punish the prosecution team for having the temerity to prosecute and convict someone they viewed should be untouchable. As an aside, I do not recall any reciprocal discovery being provided. However, it is evident from the vigorous and exhaustive defense Blankenship's team put on that the defense was likely privy to as much—if not more— information about the allegations than the investigative and prosecution team was.

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
d States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

It is also telling that the defense has gone to the Court, here on the eve of a primary election. Given the Court's involvement now, I cannot imagine why your office would wade into these turbulent, politically charged waters.

Two more items of note: Any perception that I did or did not do something because of the personal attacks made on me and my family by the defense is absolutely false. Also, if one has spent any time dealing with or speaking to members of Blankenship's defense team, I cannot imagine one would not make the prudent decision to only deal with them through written communication—and even then—only when absolutely necessary.

I believed at the time the prosecution team had complied with all of our discovery obligations and your report has not persuaded me otherwise. There was no "recklessness"; there was no violation of the duty of candor to the Court by anyone on the prosecution team.

After apparently being hounded by Blankenship's hired guns and spending probably significant parts of two years looking at these matters, I appreciate that your office might feel pressure to do "something" with that work. However, I hope your office will recognize that this was a difficult case. It resulted from a long investigation into the deadliest mine disaster in a generation. The case against Blankenship for conspiring to willfully violate mine safety laws was a strong one built brick by brick.  Blankenship had a defense that I am sure cost Alpha Natural Resources tens of millions of dollars, and he walked away with tens of millions of dollars in his pocket after putting miners at risk every day he was in charge. Both the Court and the prosecution team bent over backward to see that Blankenship received a fair trial, he did in fact receive a fair trial, and he was convicted. It was a hard-fought and impressive victory for making mines—indeed all workplaces—safer. A report from your office with loaded terms and phrases—even while finding no violations of *Brady, Giglio* or the Rules of Professional Conduct—would unfairly call into question that work and erode the very real good that resulted. The only benefits would accrue to a scoundrel now running for the United States Senate to further erode protections for workers.

Sincerely,

R. Booth Goodwin II

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# TAB

# H

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

## Pre-Indictment MOIs Not Disclosed

| | Last Name | First Name | Interview Date | MOI Date | MOI # | Date MOI received by the USAO | Testified At Trial |
|---|---|---|---|---|---|---|---|
| 1 | Witness #14 | | 9/18/2014 | 11/17/2014 | MOI-001362-001366 | 1/23/2015 | No |
| 2 | Witness #14 | | 1/25/2012 | 1/25/2012 | MOI-001389-001390 | 2/4/2015[1] | No |
| 3 | Witness #8 | | 2/5/2014 | 2/7/2014 | MOI-001391-001395 | 2/12/2015 | No |
| 4 | Witness #4 | | 10/22/2014 | 10/23/2014 | MOI-001396-001404 | 2/12/2015 | Yes |
| 5 | Witness #6 | | 8/14/2014 | 8/18/2014 | MOI-001417-001419 | 2/12/2015 | No |
| 6 | Witness #12 | | 6/4/2014 | 6/6/2014 | MOI-001427-001430 | 2/12/2015 | No |
| 7 | Witness #15 | | 11/27/2012 | 11/28/2012 | MOI-001431-001435 | 3/23/2015 | No |
| 8 | Witness #15 | | 3/11/2014 | 3/12/2014 | MOI-001436-001439 | 3/23/2015 | No |
| 9 | Witness #1 | | 11/10/2011 | 11/14/2011 | MOI-001505-001507 | 6/19/2015 | No |
| 10 | Witness #16 | | 11/10/2011 | 11/14/2011 | MOI-001508-001510 | 6/19/2015 | No |
| 11 | Witness #17 | | 3/11/2014 | 3/14/2014 | MOI-001511-001514 | 6/19/2015 | No |

[1] Found in USAO files; not clear when USAO received.

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

# TAB

# I

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

### Post-Indictment MOIs Not Disclosed

| | Last Name | First Name | Interview Date | MOI Date | MOI # | Testified At Trial |
|---|---|---|---|---|---|---|
| 1 | Witness #48 | | 11/21/2014 | 11/21/2014 | MOI-001346-001348 | No |
| 2 | Witness #49 | | 1/16/2015 | 1/21/2015 | MOI-001367-001368 | No |
| 3 | Witness #66 | | 1/20/2015 | 1/21/2015 | MOI-001369-001372 | Yes |
| 4 | Witness #50 | | 1/15/2015 | 1/27/2015 | MOI-001373-001376 | Yes |
| 5 | Witness #51 | | 1/28/2015 | 2/2/2015 | MOI-001377-001379 | Yes |
| 6 | Witness #52 | | 1/27/2015 | 2/2/2015 | MOI-001380-001381 | No |
| 7 | Witness #53 | | 1/28/2015 | 2/2/2015 | MOI-001382-001384 | Yes |
| 8 | Witness #40 | | 1/27/2015 | 2/2/2015 | MOI-001385-001388 | Yes |
| 9 | WItness #54 | | 11/21/2014 | 2/2/2015 | MOI-001405-001407 | No |
| 10 | Witness #14 | | 1/16/2015 | 1/20/2015 | MOI-001408-001409 | No |
| 11 | Witness #3 | | 2/4/2015 | 2/6/2015 | MOI-001410-001415 | No |
| 12 | Witness #5 | | 1/21/2015 | 1/26/2015 | MOI-001416 | No |
| 13 | Witness #66 | | 1/30/2015 | 2/6/2015 | MOI-001420-001426 | No |
| 14 | Witness #19 | | 3/17/2015 | 3/30/2015 | MOI-001440-001441 | Yes |
| 15 | Witness #41 | | 3/19/2015 | 3/30/2015 | MOI-001442-1444 | Yes |

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

|  | Last Name | First Name | Interview Date | MOI Date | MOI # | Testified At Trial |
|---|---|---|---|---|---|---|
| 16 | Witness #55 | | 3/17/2015 | 3/30/2015 | MOI-001445-001448 | Yes |
| 17 | Witness #27 | | 3/31/2015 | 3/31/2015 | MOI-001449-001450 | Yes |
| 18 | Witness #15 | | 3/25/2015 | 3/31/2015 | MOI-001451-001453 | No |
| 19 | Witness #4 | | 4/2/2015 | 4/8/2015 | MOI-001454-001457 | Yes |
| 20 | Witness #56 | | 4/3/2015 | 4/7/2015 | MOI-001458-001459 | Yes |
| 21 | Witness #42 | | 4/1/2015 | 4/13/2015 | MOI-001460-001461 | Yes |
| 22 | Witness #19 | | 4/9/2015 | 4/13/2015 | MOI-001462-001463 | Yes |
| 23 | Witness #57 | | 4/1/2015 | 4/13/2015 | MOI-001464-001465 | No |
| 24 | Witness #66 | | 4/8/2015 | 4/13/2015 | MOI-001466-001467 | Yes |
| 25 | Witness #58 | | 4/29/2015 | 4/30/2015 | MOI-001473 | No |
| 26 | Witness #13 | | 5/4/2015 | 5/5/2015 | MOI-001474-001478 | Yes |
| 27 | Witness #59 | | 4/23/2015 | 4/30/2015 | MOI-001479-1480 | Yes |
| 28 | Witness #20 | | 5/14/2015 | 5/21/2015 | MOI-001481-001484 | No |
| 29 | Witness #13 | | 5/12/2015 | 5/26/2015 | MOI-001485-001490 | Yes |
| 30 | Witness #13 | | 5/29/2015 | 6/19/2015 | MOI-001491-001504 | Yes |
| 31 | Witness #45 | | 3/26/2015 | 3/31/2015 | MOI-001515 | No |

CONFIDENTIAL – DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

| | Last Name | First Name | Interview Date | MOI Date | MOI # | Testified At Trial |
|---|---|---|---|---|---|---|
| 32 | Witness #44 | | 6/24/2015 | 6/25/2015 | MOI-001516-001517 | No |
| 33 | Witness #7 | | 6/3/2015 | 7/9/2015 | MOI-001518-001527 | No |
| 34 | Witness #43 | | 7/31/2015 | 8/5/2015 | MOI-001528-001529 | Yes |
| 35 | Witness #13 | | 7/27/2015 | 8/5/2015 | MOI-001530-001533 | Yes |
| 36 | Witness #60 | | 9/9/2015 | 9/10/2015 | MOI-001541-001545 | No |
| 37 | Witness #4 | | 9/12/2015 | 9/23/2015 | MOI-001546-001549 | Yes |
| 38 | Witness #4 | | 9/21/2015 | 9/23/2015 | MOI-001550-1551 | Yes |
| 39 | Witness #42 | | 9/17/2015 | 9/23/2015 | MOI-001552 | Yes |
| 40 | Witness #13 | | 8/28/2015 | 9/11/2015 | MOI-001553-1554 | Yes |
| 41 | Witness #41 | | 9/13/2015 | 9/23/2015 | MOI-001555 | Yes |
| 42 | Witness #27 | | 9/29/2015 | 9/29/2015 | MOI-001556-001560 | Yes |
| 43 | Witness #61 | | 9/24/2015 | 10/5/2015 | MOI-001563-001567 | No |
| 44 | Witness #11 | | 9/24/2015 | 10/5/2015 | MOI-001568-001569 | No |
| 45 | Witness #31 | | 9/30/2015 | 10/5/2015 | MOI-001570 | No |
| 46 | Witness #62 | | 9/28/2015 | 10/5/2015 | MOI-001571-001573 | Yes |
| 47 | Witness #33 Witness #63 Witness #64 | | 9/24/2015 | 10/5/2015 | MOI-001574 | No |
| 48 | Witness #55 | | 9/29/2015 | 10/5/2015 | MOI-001575 | Yes |
| 49 | Witness #65 | | 10/13/2015 | 10/15/2015 | MOI-001576-001578 | Yes |

CONFIDENTIAL -- DO NOT DISCLOSE
Pursuant to Protective Order, Docket No. 691
United States v. Blankenship, No. 5:14-cr-00244 (S.D. W. Va.)

|    | Last Name | First Name | Interview Date | MOI Date | MOI # | Testified At Trial |
|----|-----------|------------|----------------|----------|-------|--------------------|
| 50 | Witness #4 |           | 10/18/2015     | 10/20/2015 | MOI-001579-001582 | Yes |