Message

| | |
|---|---|
| **From**: | Dondis, Lynn - MSHA [/O=DOL/OU=MSHA-ARL/CN=RECIPIENTS/CN=DONDIS.LYNN] |
| **Sent**: | 2/5/2013 10:41:11 PM |
| **To**: | Stricklin, Kevin G - MSHA [stricklin.kevin@dol.gov]; Mattos, Jay P - MSHA [mattos.jay@dol.gov]; Merrifield, Neal H - MSHA [merrifield.neal@dol.gov]; Hafeez, Syed - MSHA [hafeez.syed@dol.gov]; Fesak, George M - MSHA [fesak.george@dol.gov]; Triebsch, George - MSHA [tribsch.george@dol.gov]; Duncan, Jeffrey A - MSHA [duncan.jeffrey@dol.gov]; Cameron, Ernest - MSHA [cameron.ernest@dol.gov] |
| **CC**: | Parker, Douglas - MSHA [parker.douglas@dol.gov]; Aaronson, Julie E - MSHA [aaronson.julie@dol.gov] |
| **Subject**: | Issues likely to generate questions |
| **Attachments**: | MSHA.doc.doc |

We are preparing questions for the acting Secretary of Labor and Joe that are likely to be asked them when they testify before Congress.  FYI, I have attached the questions we prepared for last year.  We are not asking you to answer the questions but instead to IDENTIFY ISSUES in your program area that are most likely to generate questions.

Please provide me with a list of issues by COB Friday, February 8.

Thanks, Lynn

Lynn Dondis
Special Assistant to the Assistant Secretary for
Mine Safety and Health
Mine Safety and Health Administration
U.S. Department of Labor

(Tel): (202) 693-9477

## MSHA – Backlog Reduction Status

**Question:  Congress has offered significant financial support to reduce the backlog of cases pending before the Federal Mine Safety and Health Review Commission.  Yet many cases involving significant fines could be dismissed by the Commission because petitions were not filed in a timely fashion by MSHA.  Some petitions were filed several months after the petition was due.  How do you explain this behavior?**

- We are grateful for your support in our backlog reduction efforts, and the backlog continues to decline.

- MSHA has taken numerous steps to reduce the number of contested cases, including implementing a pre-assessment conference process in January of this year.

- However, we cannot have a system where mine operators who contest valid citations are rewarded by evading the associated fines.  This is not what Congress intended.  This is not what the courts should permit.

- We believe that the timely filing of petitions is important, and we have put in place procedures to ensure timely filing.

**ONLY IF ASKED on late petitions filed by MSHA**

- The petitions you mention were filed late in a district with the largest number of contested citations and the largest number of underground coal mines with significant health and safety problems.

- The workload was large enough to necessitate splitting the district into two districts, effective June 14, 2011.

## MSHA – Cut to State Grants

**Question:  Why is MSHA proposing a reduction to state grants in the 2013 budget?  Hasn't the agency found that training for miners and supervisors is a key to preventing disasters?**

- In order to meet other funding requirements for essential and mandatory functions of the Agency, we proposed a reduction of $5 million in grant funds.

- Some states will continue to provide services.  Where services are eliminated or reduced, operators will find other sources to provide the training.

- Training is an obligation of the mine operator under the Mine Act and we anticipate that operators will become more engaged in providing quality training to their employees.

- **To continue to assist the mining industry in meeting its training obligations, MSHA is increasing the production and distribution of high-quality training materials that are available through the MSHA website.**

Confidential Agency Document
DLB-001465

**MSHA – Dust Rule**

**Question:  How can MSHA be moving forward with its proposed dust rule that is based on unsound science?  The House Appropriations Conference Report prohibited moving forward on it until GAO issued a report or the statutory deadline passed, neither of which has happened.**

- This rule is an important part of the "End Black Lung Now" initiative launched in 2009.

- **Thousands of miners have died from Black Lung**, and the cost of compensation for disabled miners exceeds $45 billion since 1970.  Miners even younger than 40 continue to get sick from excessive dust exposure.

- The dust rule is based on the best available science.  MSHA held a lengthy public data comment period and conducted seven public meetings.

- The agency also requested that anyone with additional data or information not considered in the proposed rule provide it to the agency.

- **About the Appropriations Rider:** MSHA is in compliance with the House rider regarding the respirable dust final rule. The agency will neither implement nor enforce the rule until the conditions in the Appropriations Conference Report rider are met.

Confidential Agency Document
DLB-001466

## MSHA – Frivolous or Inconsistent Citations

**Question:  MSHA inspections are inconsistent and have recently started citing for penalties conditions that have existed for years.  Some of these are exorbitant penalties on frivolous, non-safety related violations.  These frivolous penalties contribute to the backlog and remove the focus from where it should be – on real health and safety concerns.  What is the agency doing to prioritize its attention to areas of legitimate concern?**

- The Mine Act requires MSHA to inspect all mines and enforce federal safety and health standards.  Inspectors are required to issue a citation if they observe a violation of any of MSHA's mandatory standards.

- MSHA has instituted a number of actions to improve the consistency of its inspections, including a new training program for field office supervisors and required training for all journeymen inspectors.

- In order to be responsive to industry concerns, MSHA has reached out to operators to address issues of concern.

- If you have a specific concern about a case or citation, please send the information to my staff and they will investigate and respond back to you.

Confidential Agency Document
DLB-001467

<u>**MSHA – Internal Review (NEGATIVE)**</u>

**Question:  How will you be implementing the recommendations and correcting the weaknesses identified by the Internal Review?  Didn't the Internal Review show that MSHA was at least partially responsible for the UBB explosion?**

- All of the UBB investigative reports found that <u>Massey had a culture of noncompliance and that it deliberately took actions to hide hazards from MSHA</u>.  In fact, a Massey official stated that he would "always spread extra rock dust if he knew someone was coming."

- In the months leading up to the explosion, inspectors identified <u>hundreds of hazardous conditions and violations</u>, issued citations and orders, and followed up to ensure conditions and violations were corrected.

- The Internal Review Report examined MSHA's enforcement actions under a microscope and made specific recommendations.

- **The Agency has already undertaken many important corrective actions that address issues discussed in this report, and Assistant Secretary Main is available if you have more specific questions.**

- **Pass Mine Safety legislation:**
    - Yet we also know that MSHA's current toolbox isn't sufficient.  Miners are fearful of speaking out about safety hazards and need stronger whistleblower protections.
    - MSHA needs to be able to take immediate action when lives are at risk.  We need stronger tools to shut down a dangerous mine and formidable criminal provisions that will deter operators from knowingly putting miners' lives at risk.
    - We can't wait months or years when our miners are dying.

- <u>I urge you to take action to protect our nation's miners.</u>

<u>**MSHA – Internal Review / Accomplishments Since UBB (POSITIVE)**</u>

**Question:  Earlier this month MSHA released its Internal Review of their UBB investigation which identified numerous weaknesses in the agency.  What steps have you taken to ensure that MSHA is fulfilling its responsibilities to keep our Nation's miners safe each day?**

- Following the explosion at the Upper Big Branch Mine, MSHA developed a program to target mines that merit increased agency attention and enforcement due to their poor compliance history.

- Since April 2010, MSHA has conducted more than 400 of these impact inspections.  After mines receive an initial impact inspection, the total rate of Significant and Substantial (S&S) violations has declined almost 20% while unwarrantable failure violations are down almost 40%.

- **The regulations enforced by MSHA save lives.**  They contain standards that can drastically reduce the likelihood of injury or illness.  MSHA has taken steps to fully enforce existing standards and write new standards that will address the most hazardous conditions in our mines.

- All the enforcement and regulations in the world won't prevent mining deaths if mine operators don't take seriously their obligation to protect the health and safety of their miners.

- That's why MSHA has worked to engage the industry directly through new programs such as "Safety Pro in a Box", *Rules to Live By*, and a new online tool that allows operators and miners alike to monitor the safety of any mine by allowing them to track how a specific mine matches up to the criteria for a Potential Pattern of Violations.

### MSHA – Kuzar Retirement

**Question:  When Mr. Kuzar was appointed, he must have expected he stay until the end of the investigation.  Do you really expect us to believe that he left of his own volition and not because of disagreements within the team?**

- The Internal Review team's investigation was exceptionally comprehensive and detailed.

- By longstanding policy and practice, the career leader of the MSHA Program Evaluation and Information Resources unit provides leadership and direction for these Reviews.

- Mr. Kuzar was the technical leader of the team.  When he retired, he was quickly replaced, allowing the work to continue unabated.

- Because members of the Review team spent much of their time in Beckley at the Mine Academy - hours from home, it's understandable that after 36 years of dedicated public service, Mr. Kuzar wished to retire.

- Mr. Kuzar's statements to the press and to staff of this committee have been consistent -- that he wished to retire.

- We have no evidence supporting the theory he left for any other reason than his desire to retire.

Confidential Agency Document
DLB-001470

**MSHA – Office of Assessments Reorganization**

**Question:  How is the reorganization of MSHA's Office of Assessments going to affect the Office of Accountability?  Why is this important program being moved into Special Enforcement?**

- MSHA's Office of Assessments has been reorganized as the Office of Assessments, Accountability, Special Enforcement and Investigations.

- By establishing and centralizing accountability functions within the Assessments program area, MSHA will enhance the management, administrative, and analytical support for this program while retaining its independence from the mine inspection program areas.

Confidential Agency Document
DLB-001471

<u>**MSHA – Pattern of Violations (POV) Proposed Rule**</u>

**Question:  MSHA's recently proposed POV rule eliminates the need for final orders, allowing MSHA to place a mine on POV without meaningful judicial review.  The rule also doesn't require MSHA to put the criteria for placing a mine on POV in the rule itself.  Why is DOL proposing a rule that puts no checks on the agency's power to shut down a mine?  Will you commit today that any final rule with comply with <u>Constitutional due process requirements</u>?**

- Prior to this Administration, the POV tool had been on the books for <u>30 years</u> but was never successfully used.  **This tool is key to our strategy for dealing with mines that continuously violate serious safety and health rules.**

- If an operator contests a <u>violation</u>, it can take years for the violation to become a <u>final order</u>.  **Miners cannot <u>wait years</u> to be protected.**

- MSHA created an <u>online version</u> of the POV tool to increase transparency and allow operators and other stakeholders to monitor a mine's performance.

- In terms of due process, operators have avenues to ask for an <u>expedited hearing</u> or <u>temporary relief</u> from a POV order if they think it is wrong.

- We are carefully considering all comments on this issue from 7 months of open comment period and <u>5 public hearings</u>.  The rule will not violate due process.

**Status:**
- MSHA is currently drafting the final rule. It will go into Departmental review in the next couple of weeks.

Confidential Agency Document
DLB-001472

## MSHA – Pre-Assessment Conferencing

**Question:  After making a big announcement on using this Pre-Conferencing Pilot, some of my constituents have been denied conferences because, according to MSHA, it lacks the resources to have a meeting with the operator.  When will MSHA fully implement its Pre-Contest Conferencing process?**

- The pre-assessment conferencing process was implemented in January 2012 in all districts, resources permitting.

- Each district is determining how to best implement the program based on the resources available.

- With the huge numbers of cases that operators are contesting, our Conference and Litigation Representatives won't be able to conduct conferences and still meet judges' deadlines in some Districts.

- Even with Congress's help with the backlog, in some of our District offices, all our efforts are going towards just keeping up.

- However, those offices are seeking more relief from SOL's backlog offices, and we intend to expand the use of conferences as resources are available.

Confidential Agency Document

## MSHA – Enforcement versus Compliance Assistance

**Question: In a hearing with Assistant Secretary Main, it was clearly stated that even if a mine operator proactively sought a preventative inspection, the inspector must issue a citation if violations were observed. Why can't MSHA offer formal, penalty-free compliance assistance to all mines, similar to OSHA's onsite consultation program?**

- Under this Administration, MSHA has undertaken a significant effort to engage the mining community, miners' representatives, and operators in education and outreach efforts to clarify requirements and improve compliance.

- For instance, we post inspector training programs on the MSHA website for public viewing, we meet and collaborate with associations, operators, and mining stakeholders, and we explain new enforcement policies and expectations <u>before</u> those policies are implemented.

- We offer compliance assistance services to mine operators through on-site visits, conferences, training, and other assistance.

- We also can conduct pre-operational compliance assistance visits before mining begins or before new equipment is operated.

- Ensuring adequate enforcement resources is not at the expense of providing operators with compliance assistance.

Confidential Agency Document
DLB-001474

### MSHA – Cut to Small Mines Program

**Question:  Your 2013 budget request appears to reduce FTE associated with the Small Mines office.  Also, I have heard reports that the leadership does not support the office, that it is going to be moved out of headquarters and that even the staff are unsure about the future of the program.  Shouldn't the Administration be putting more resources toward small mining operations rather than fewer?**

- The Small Mines Office was renamed the Small Mines Consultation Program (SMCP) to better reflect and identify the important work they do.  The SMCP assists small mines that have limited resources to develop and maintain effective safety, health and training programs.

- This office is being restructured to be more similar to OSHA's penalty-free compliance assistance program – which offers free consultations to small and medium sized employers.

- This program will be expanded by leveraging expertise and resources working directly with the mining industry, including state aggregate associations and other partners.

- The modest cut in the FY 13 budget <u>will not result in a reduction in workload and performance,</u> which is scheduled to increase in FY 2013 as enhanced training and field coordination reforms started this year take effect.

**MSHA – Failure to Transmit Critical Documents (Kline)**

**Question:  I recently sent Assistant Secretary Main a letter regarding two incidents in which MSHA failed to transmit critical documents and reports to mine operators, including a report addressing methane outbursts at Massey's Upper Big Branch Mine.  Your own investigation recognized that methane contributed to the UBB disaster.  How do we know there aren't more instances where MSHA fails to transmit critical documents to mine operators?**

- MSHA had communicated the contents of the reports to the mine operators verbally.  However, we agree that we also need to ensure that hard copies of those reports and documents are received by the mine operators.

- After being made aware of these instances, MSHA revised its procedures and issued a Procedure Instruction Letter to all MSHA personnel setting out specific procedures that must be followed to transmit these reports to operators in a timely manner and confirm delivery.

Confidential Agency Document
DLB-001476

## MSHA - Plan Approvals

**Question:  How can you justify cutting plan approvals when your own internal review found that MSHA specialists failed to identify some significant deficiencies in Massey's plans?**

- The cut to plan approvals is for 17 clerical positions.

- The enforcement staff that evaluate and approve plans for new mining operations and existing mines are not being cut.

- Plans address complex issues, such as unique geological conditions and ventilation issues.  They also assess the effectiveness of operator dust control and sampling programs.

- Despite the slight reprioritization of resources, we will be able to meet our FY 2013 performance goals for plan approvals.

- We remain committed to addressing all of the weaknesses found in the internal review.

- **The Agency has already undertaken many important corrective actions that address issues discussed in this report, and Assistant Secretary Main is available if you have more specific questions.**

**From:** Colangelo, Matthew - OSEC
**Sent:** Thursday, November 13, 2014 4:59 PM
**To:** Skinner, Wayne - OSEC; Smith, M. Patricia - SOL
**Subject:** FW: Blankenship indicted

Wayne - if Tricia doesn't have it - do you have a number (or can you get one) for Booth Goodwin, the U.S. Attorney in West Virginia? thanks

**From:** Thomas Perez
**Sent:** Thursday, November 13, 2014 4:55 PM
**To:** Block, Sharon I - OSEC; Colangelo, Matthew - OSEC; Smith, M. Patricia - SOL
**Subject:** Re: Blankenship indicted

Can u get me the number of the US Atty in WV. Booth Goodwin.

**From:** Block, Sharon I - OSEC
**Sent:** Thursday, November 13, 2014 4:25:59 PM
**To:** Colangelo, Matthew - OSEC; Thomas Perez
**Subject:** Fw: Blankenship indicted

And sometimes bad things happen to bad people.

**From:** Zaffirini, Tony - OCIA
**Sent:** Thursday, November 13, 2014 4:24:10 PM
**To:** Jayaratne, Adri - OCIA; Block, Sharon I - OSEC
**Subject:** Blankenship indicted

FYI

http://www.justice.gov/usao/wvs/press_releases/2014-11-Nov/attachments/1113142_Blankenship_Indictment.html

1

Confidential Agency Document
DLB-001532

**From:** Louviere, Amy - MSHA
**Sent:** Monday, July 26, 2010 3:18 PM
**To:** Baxter, Derek - MSHA
**Subject:** RE: quick question

Here you go.

In numerous public statements, press events and documents, officials at Massey mining have attempted to shift blame for the safety records in their mines by asserting that MSHA forced changes to the Upper Big Branch's ventilation plan, over the vigorous objections by Massey, and have implied that those changes may have caused the April 5, 2010, explosion that killed 29 miners.   In short, Massey claims MSHA forced it to adopt a ventilation plan at UBB that MSHA created, and implies that as a result of that plan, there was not enough fresh air to ventilate the face of the longwall, where it speculates the explosion occurred after a methane release from a floor crack.  This memo compares the public allegations made by Massey Energy with the facts based upon the official records of the mine's ventilation system.

The facts simply do not support Massey's assertions.  First, as you know, MSHA doesn't draft ventilation plans, but only reviews plans to determine whether or not the submitted plan meets the minimum standards under the regulations.  If we did draft mine ventilation plans, we certainly would not have drafted this particular plan which was minimally adequate, but not ideal.  Second, Massey's actions, the ventilations plan it submitted, and its representations to MSHA did not indicate that the company expressed or held any serious concerns about the volume of air at the longwall.  Third, this is a mine that had serious and varied ventilation problems for a number of years, and in the months leading up to the explosion.  Because of the concern about this particular mine, MSHA conducted two unannounced ventilation sweeps that uncovered serious ventilation issues, including air flowing backwards near the longwall less than a month before the explosion.  In addition, between September 2009 and the April 5, 2010, explosion, MSHA cited Massey 23 times for failing to follow the ventilation plan on file.

It appears that Massey's public relations and legal teams are trying to position Massey as a company deeply committed to safety, desperately trying to make the mine safer, thwarted by MSHA's insistence on lower levels of mine safety.  My guess is that this strategy is to deflect the blame to make the case that the company was acting within the legal standard of reasonableness, and was not culpable for the conditions at the mine when the explosion occurred.

**Massey's Narrative**
Massey CEO Don Blankenship claims "MSHA required several changes since September 2009 that made the ventilation plan significantly more complex [and] significantly reduced the volume of fresh air to the face of the longwall mining operation." [Blankenship Testimony to Senate Appropriations Subcommittee, 5/20/10].   The Charleston Gazette reported that Massey Board Member Stanley Suboleski participated in a press conference and claimed that "MSHA had forced Massey -- over the objections of company engineers -- to make airflow changes in the longwall section of the mine," and that those changes "included MSHA ordering the company to stop using the controversial practice of using a conveyor belt tunnel to bring fresh air into the mine." [Charleston Gazette, April 26, 2010].

Massey also released two internal MSHA memoranda documenting two releases of methane from cracks in the floor in 2003 and 2004, and a number of mitigation techniques including increased airflow across the working longwall sections [Massey Release, June 15, 2010].  Massey also reported that the mine rescue teams saw a crack "between 20 and 100 feet long" at the tailgate of the longwall section.  Suboleski called the crack "the number one culprit" in terms of the cause of the explosion in a local TV interview [WOWK-TV, June 16, 2010].

Massey seems to be pushing the narrative that a massive amount of methane was released due to the crack in the floor, and that MSHA, against Massey's strenuous objections, ordered changes to the mine's ventilation plan that prevented an adequate amount of air to flow across the longwall face.  Massey want to portray itself as a good corporate actor, passionately committed to the safety of its employees, that was thwarted in providing a safe environment for its miners by MSHA.

**Why Push This Story?**
Outside of the fact that all publicly traded companies spend resources and energy to burnish their corporate image and their company's brand, Massey has reason to quickly shift blame from their managers and their corporate leadership.  Federal and state officials are investigating the cause of the disaster, and any tragedy of this magnitude will undoubtedly result in civil litigation with the potential for multimillion dollar judgments.  But more importantly, as has widely been reported, the Justice Department confirmed the existence of a criminal investigation into Massey Energy in a letter to DOL on May 14, 2010.

**Summary of the Facts**
Under federal law, mine operators are required to submit ventilation plans to the agency to determine whether or not those ventilation plans meet the standards established by the regulations.  MSHA's sole job is to determine whether or not a mine meets the standards. If the plan meets the regulatory standards, MSHA is required to approve the plan.  If it does not meet the standards, MSHA cannot approve the plan.  MSHA doesn't draft plans, and MSHA can only insist that a plan meet the minimum standards.

Massey Energy has had a number of problems with its ventilation plans, particularly at this mine.  Our ventilation staff reports that a very large percentage of Massey's ventilation submissions, when first presented, did not meet the technical requirements or the standards laid out in the regulations.  Even those plans eventually approved by MSHA usually required technical assistance by our experts to help bring the submissions in to compliance with the rules.  Remarkably, during a conversation about meeting the regulatory requirements on belt air, the Massey engineer drafting the ventilation plans indicated that he did not have a copy of the regulations.  Subsequently, MSHA staff provided him a copy of the regulations to aid his efforts to draft a plan that would meet the minimum legal standards.  District staff indicates that Massey's mines throughout the region had difficulty with ventilation – both in its submitted plans, and in following their plans once they've been approved.  For all mine ventilation plans, for example, operators are required to provide air readings for all submitted changes.  Between September and April, Massey submitted eight plan changes at UBB that failed to provide air readings – a basic requirement that applies to all ventilation plan submissions.

Perhaps even more importantly, even after MSHA approved UBB's ventilation plan, Massey had serious problems following their plan.  Between September 2009 and April 5, 2010, MSHA cited Massey 23 times at UBB for either failing to follow the approved plan or for making intentional changes without approval by MSHA.

Summary of Timeline of Relevant UBB Ventilation Plan
In August 2009, Massey received approval of a ventilation plan for the longwall section that was in operation at the time of the explosion in April 2010.  This plan required changes to the existing ventilation plan, and Massey submitted a plan that was to go in effect on September 1, 2010 [should be 2009].  Because of our ventilation

team's experiences and history with the Massey's Upper Big Branch mine, MSHA sent a team to sweep the mine on September 1, 2010, [should be 2009] to determine Massey's compliance with the plan.

At that time, MSHA found a number of violations, including the fact that Massey was making material changes to the mine's ventilation system while miners were working in the mine – a clear violation of the law.  MSHA ventilation inspectors also found air flowing backwards across the longwall face.  Amazingly, the inspectors found a mine foreman present at the longwall, standing in the reversed air flow.  As a result, MSHA cited the mine for failing to follow its plan, and for making changes to its plan without approval, and shut the mine down until Massey fixed the problems and fully implemented its ventilation plan change.  It took Massey four days to solve these problems, at which point, the mine reopened.  When it reopened, Massey reported 189,000 cubic feet per minute (cfm) of fresh air reaching the tailgate evaluation point.  The regulations require 30,000 cfm of fresh air to flow across longwall faces like this mine.  When the ventilation was properly followed, more than six times the minimum air volume was flowing through the longwall ventilation circuit.

On September 1, 2009, UBB was operating on a base ventilation plan that contained a large number of revisions.  MSHA asked Massey to create a single new base plan with all of the approved changes incorporated in that plan.  This was approved on September 11, 2009, and was the base plan in effect at the time of the explosion.  MSHA requested this action to make the plan more understandable and easier to follow.

This ventilation plan and all subsequent changes were approved because they met the minimum standards set forth under the regulations.  There were a number of plan components submitted by Massey management that were approved as meeting the minimum standards even though MSHA would have preferred a different approach.  For example, instead of using overcasts, which allow for continual airflow at locations where miners are required to cross an aircourse, Massey used double doors that, if left open inappropriately, will cause air to stop reaching the working sections of the mine.  Doors are easier and cheaper to construct than overcasts, but they can completely rob the working sections of air when they are left opened. The regulations do not require overcasts, and so MSHA ventilation specialists do not require them.  The approval of a valid ventilation plan does not mean there are not issues as to how a company approaches safety in adhering to its plan.  For example, a mine may choose to use doors instead of overcasts in its ventilation plan, but it is required to ensure that the doors are used properly to ensure continual and adequate air flow.

Massey had problems following the plans it submitted.  For example, on September 16, 2009, five days after the new base plan was implemented, MSHA inspectors found that Massey was not following the approved plan at UBB, and issued a number of citations.
The problems at the mine continued throughout the year, with MSHA continuing to inspect the mine and finding problems with ventilation.  Massey submitted numerous changes to the ventilation plan, many of which were denied because the company failed to provide basic information, such as air flow readings, as required under the law.

Given the history of ventilation problems at the mine, a District team of ventilation specialists made another unannounced sweep of the mine on March 9, 2010.  Again, although the teams found sufficient air flowing through the mine (107,000 cfm at the longwall), Massey was not following the approved plan, because air at the outby side of the tailgate of the longwall was actually flowing backwards.  In other words, less than a month before the explosion, the inspectors found that the mine had an adequate quantity of air but that Massey was failing to properly allocate the air to assure proper ventilation and adherence to the approved ventilation plan.  As a consequence air was flowing the wrong way at critical areas of the working section of the mine.  An additional troubling point -- mine management is required by law to conduct examinations of air flow.  If properly conducted mine management would have identified, reported, and corrected the hazard before MSHA inspectors discovered the problem.

Volume of Air Controversy

Blankenship and Suboleski are presenting a case that Massey was trying to get increased amounts of fresh air to the longwall face, but was thwarted by MSHA. In fact, the problems with ventilation at this mine had less to do with the volume of air, and more to do with Massey's inability to properly manage the air it had and to follow its approved ventilation plan. In fact, Massey made two requests to marginally increase the amount of air on the longwall face, and MSHA approved both of those requests.

The regulations required this kind of longwall face to have 30,000 cfm of fresh air flowing across the face. On September 4, 2009, as this panel was starting, Massey reported 189,000 cfm at the tailgate evacuation point. But, as you may recall, three days earlier, MSHA had shut the mine down because air was flowing backwards through the mine, and the mine had not yet fully implemented the plan. On March 9, 2010, less than a month before the explosion, an MSHA inspector found 107,310 cfm of air flow at the longwall. That same inspector also found, and cited Massey for, air flowing backwards at the tailgate entry. Both the September and March inspections were a result of surprise inspections by ventilation experts, and both found air flowing the wrong way at the longwall. In the nine months that this panel was being worked, MSHA cited Massey 23 times for failing to follow its ventilation plan. Massey clearly had a problem properly directing the air in its mine, and had a problem following the approved ventilation plan.

In addition, on January 7, 2010, and contrary to its post-explosion public positioning, Massey actually proposed dramatically reducing the amount of air on the longwall face by using the air from the existing ventilation plan to ventilate a proposed section near the Ellis Portal. Massey had hoped to begin mining the older section of the mine, allowing it to produce more coal. According to Massey, this plan would have reduced the amount air at the longwall face and Headgate 22 by 150,000 cfm. MSHA denied this request because it was not clear that the system would work as planned. Massey's recent professed concern with the amount of air at the longwall and on the headgate is entirely at odds with fact that Massey proposed to reduce the volume of air in those sections by 150,000 cfm so it could mine more coal in another area of the mine.

As for the comments of Blankenship and Suboleski regarding MSHA's "forced change" to their plan, those appear to be a mischaracterization of MSHA's request that UBB comply with  regulations limiting the use of belt air that became effective in 2009. Ironically, those regulations were promulgated, in part, as a response to the fire at Massey's Aracoma Mine that killed two miners. The presumption is against belt air because of the potential in the event of a fire for belt air to carry contaminants and smoke from a burning conveyer belt to the working face of a mine. The regulations give mine operators a choice: either a) discontinue the use of belt air, or b) provide justification to MSHA for its continued use. Because the UBB plan, which provided for the use of belt air prior, was approved prior  to the new belt air rules, MSHA provided the company with a significant amount of time to either stop using belt air, or to document the need to continue to use belt air. There were difficulties getting Massey to take action either way. In fact, on December 9, 2009, MSHA sent a copy of the relevant regulations to Massey's ventilation engineers after MSHA was informed that the engineers did not have a copy of the regulations they were supposed to following.

A week or so after the courtesy copy of the regulations were handed to a Massey engineer, Massey submitted a plan to stop using belt air to ventilate the working sections of the mine. MSHA approved that plan. Five days later, Massey returned to MSHA and reported that the ventilation plan was not working, and requested to use belt air because it was not able to get its initial plan to properly function. Massey's request provided that belt air would be used up to the crossover at the 29 Break, and noted that Massey would provide a long term plan to deal with belt air within 30 days. MSHA approved the request, and specifically asked if Massey thought it needed belt air beyond the 29 Break. Massey said it was confident that the plan it submitted would work. Incidentally, Massey never filed its long term plan. At the time of the explosion, the longwall operations had passed the 29 break, but it is not clear whether or not Massey was using belt air at the time of the explosion.

In any event, after Massey stopped using belt air in mid-December it discovered that its new plan wasn't working as predicted. So Massey requested that MSHA allow it to continue to use belt air , for an interim period. When Massey made the case that belt air was necessary, MSHA approved its use. Massey had the

opportunity to justify the continued use of belt air past the interim period, but did not submit a request for its use.  And Massey's claim that they were vigorously trying to get more air to the working sections is not consistent with their request, made less than a month after their belt air request, to divert 150,000 cfm of air so that a new section could be mined.

Contrary to Massey's post-explosion public positioning, a request for a ventilation plan revision was submitted prior to the explosion to MSHA to mine additional entries off of the longwall tailgate.  The request states that approximately 60,000 cfm of ventilating air would be directed from the longwall intake to this section.  The request was waiting to be reviewed by District ventilation specialists when the disaster occurred.

Like every other underground coal mine, Massey was required at UBB to document and certify that adequate amounts of air were flowing to working sections of the mine every working day, on every shift.  If an inspection had indicated that air volume or flow was inadequate, the company would be required to fix the problem before work may begin.  If, at any point, it determined that an inadequate amount of air was flowing to any working section, Massey is obligated under the law to halt mining operations until the ventilation problems were resolved.  Every day, for every shift, Massey supervisors signed a document indicating there was an adequate amount of air in the working sections of their mine.  Falsifying those records is a felony.

Finally, if Massey believed that this particular mine posed unique threats to miner safety and health that required actions to be taken beyond the statutory or regulatory minimums, it had a duty under the law to take the steps necessary to provide a safe workplace for its miners.  Prior to the explosion at UBB, Massey did not indicate a belief that this mine required extraordinary steps, and its mine ventilation plan and mine ventilation practices are not reflective of a company showing extraordinary concern about the safety of the miners working underground.  In fact, the record shows the opposite – a company that requested to reduce the amount of air flowing to the working sections of the mine, a company that routinely submitted plans that did not meet regulatory requirements, and a company that had serious problems following its plans and managing the air flowing underground.


Amy Louviere
Public Affairs Director
Mine Safety and Health Administration
202.693.9423
www.msha.gov



Amy Louviere
Public Affairs Director
Mine Safety and Health Administration
202.693.9423
www.msha.gov