**From:** James Sharpe [mailto:grosharp@msn.com]
**Sent:** Tuesday, March 13, 2012 5:52 PM
**To:** Louviere, Amy - MSHA
**Subject:** Disciplinary Action re: UBB

Amy -

By now, the Agency surely has decided whether disciplinary action is appropriate against any MSHA personnel re: UBB.  I know you cannot release names, but MSHA should be able to talk in general terms about the number of personnel who were disciplined (if any), whether they were managerial/supervisory or non-supervisory personnel and the nature of the disciplinary action; e.g., transfer, demotion, etc.

In this e-mail, I am asking the Agency to supply that information.

Thanks,

Jim

James Sharpe, CIH
President
Sharpe Media, LLC.
Publisher of Sharpe's Point: On Mine Safety. Extracting Insights for Industry
4519 34th St. S.
Arlington, VA 22206-1914
703-379-0652 (o)
914-840-0716 (f)
sharpemedia@verizon.net
http://www.onminesafety.com

Confidential Agency Document
DLB-000278

MSHA0105

| | |
|---|---|
| **From:** | Louviere, Amy - MSHA |
| **To:** | Silvey, Patricia - MSHA |
| **Subject:** | disciplinary actions |
| **Date:** | Friday, March 16, 2012 6:26:16 PM |

Here's what Joe said in response to Kathy Snyder's question about disciplinary actions:

"The report is being reviewed to determine whether or not any such actions are merited based on the findings of the report, and that's something that will be acted on going forward. With regard to the way the system works, these will be by federal rules – by processes and procedures as well."

Amy Louviere

Public Affairs Director

Mine Safety and Health Administration

202.693.9423

www.msha.gov

Confidential Agency Document
DLB-000279

MSHA0106

| From: | Tarr, Jane E - MSHA |
|---|---|
| To: | Silvey, Patricia - MSHA |
| Cc: | Stricklin, Kevin G - MSHA; Dondis, Lynn - MSHA |
| Subject: | Info re counseling etc.. |
| Date: | Tuesday, July 17, 2012 11:18:09 AM |
| Attachments: | Counseling Memos.pdf |

Pat,

Here are a couple of questions and answers regarding counseling vs counseling reduced to writing vs oral admonishment, etc...Also, the answer to my question regarding what goes into an official personnel file.

1. Is a letter of counseling considered disciplinary?  I'm reading a document that states:
 The contract states a disciplinary action is an oral admonishment confirmed in writing.  Would the Union argue that a ltr of counseling is another word for oral admonishment?  Yes they would have they have in the past...the Department has 3 prior arbitration decisions they lost over this very issue. See attached (it's old but still relevant).

2. I'm trying to differentiate the difference between a letter of counseling vs an oral admonishment confirmed in writing.  I think the answer to #1 would dictate whether the emp is entitled to union representation.   The NCFLL contract at Article 13, Section 1,D states that "Nothing in this Article confers a right to representation during a counseling session.....however, when you follow-up in writing re: the counseling session..that is when things get a little blurry as in the attached arbitration decision (the memo that was issued to the employee in that arbitration is also included at the end of the arb decision)

3. Am I correct in that only Reprimand and above, i.e. suspensions, demotions, removals go into an OPF?  Counsellings and oral admonishments confirmed in writing stay in the working file and are removed after the appraisal year?  Correct.

U.S. Department of L...

3535 Market Street
Philadelphia, Pennsylva... 19104



November 7, 1985

OASAM/LMR NOTICE  3-86

MEMORANDUM FOR:       ALL SUPERVISORS AND MANAGERS
                     Outside D.C. Metropolitan Area

FROM:                NORMAN A. BAILLIE
                     Acting Regional Administrator - OASAM

SUBJECT:             Counseling Sessions Confirmed in Writing Under
                     the DOL/NCFLL Agreement

The purpose of this notice is to provide guidance to supervisors
and managers concerning Counseling Memoranda.

In accordance with Article 13, Section 1(A), of the DOL/NCFLL
contract defines an oral admonishment confirmed in writing as a
disciplinary action.  Two arbitration awards have held that a
so-called "counseling memorandum," which provides a written
confirmation of an oral counseling session concerning employee
misconduct, is an "oral admonishment confirmed in writing" within
the DOL/NCFLL contract's definition.  Therefore, the following is
further guidance concerning Article 13, Section 1(A):

    1.  If a supervisor or manager intends to issue a counseling
    memorandum as a follow-up or confirmation to an oral coun-
    seling session on an employee's misconduct, then the oral
    counseling becomes a disciplinary meeting and the memorandum
    becomes a disciplinary action under the DOL/NCFLL contract.
    Thus, the employee has the right to be informed in advance
    that discipline is to be the principal topic of discussion
    at the oral counseling session and, upon request, to be
    accompanied by a union representative at the session
    [Article 12 Section 1(C)].  In addition, the employee may
    grieve the entire matter [Article 13, Section 3(A)].

    2.  If the supervisor or manager does not issue a counseling
    memorandum, to the employee, the oral counseling session
    does not constitute a disciplinary action.  The supervisor
    or manager may keep notes on the counseling session (for
    example, a memorandum to file) in his/her working file.

Confidential Agency Document
DLB-000281

MSHA0108

3.   The DOL/NCFLL contract provisions on oral admonishments confirmed in writing concern issues of employee conduct, not employee performance.   Periodic counseling on performance under Article 43 of the DOL/NCFLL contract does not constitute admonishment regarding misconduct.   Therefore, written confirmation issued to an employee of oral performance counseling or a written performance counseling memorandum issued to an employee where no oral discussion occurred, are not disciplinary actions under Article 13. Accordingly, the employee has no right to a union representative in a performance counseling meeting even if the counseling is confirmed in writing to the employee involved.

The above applies to the DOL/NCFLL Contract only.   Please note that this is an intra-management communication and is not to be shared with bargaining unit employees, even if requested.   If you have any questions concerning this notice, please feel free to contact the Labor Relations Office.

Confidential Agency Document
DLB-000282

MSHA0109

UNITED STATES OF AMERICA
FEDERAL MEDIATION AND CONCILIATION SERVICE

In the Matter of the Arbitration Between

UNITED STATES DEPARTMENT OF LABOR,

Employer,

FMCS CASE NO.
82K18760
JS NO. 743

-and-

OPINION
AND
AWARD

NATIONAL COUNCIL OF FIELD LABOR LOCALS,
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
AFL-CIO (William A. Watkins, Grievant),

Union.

Before:  JOHN E. SANDS, Impartial Arbitrator

OPINION

On October 6, 1982 the parties agreed to submit
the following issue to arbitration by me:

1.  Was the December 18, 1981 memorandum from Samuel
Weitman  to William Watkins requiring daily reporting
"a disciplinary action" within Article 13.1 of the
parties' collective bargaining agreement?

2.  If so, was the said memo for just and sufficient cause
and for reasons which promote the efficiency of the
Department?

3.  In any event, did the said memorandum violate
Article II, Section 5 of the parties' contract?

4.  Did the employer violate Article 13.1 (C) of the
parties' contract by failing to notify grievant
Watkins that meetings of November 30, 1981 and
December 21, 1981 would principally concern discipline
or potential discipline and by thus foreclosing grievant's
being accompanied by an NFCLL representative?

4-20-83

83.2.3    MSHA0110

-2-

.5.  If the arbitrator finds a violation of either Article 13. 1 or Article  2.5 what shall the remedy be?[Record p.2.]

In accord with my authority under the parties' collective bargaining agreement I conducted hearings in Albany, New York on October 6, October 7 and November 4, 1982.  A hearing scheduled for November 5 was unnecessary. Both parties appeared by representative and had full opportunity to adduce evidence, to crossexamine each other's witnesses, and to make argument in support of their respective positions.  Neither has raised any objection to the fairness of this proceeding.

On the entire record so produced, I find the following relevant facts.  Grievant is William Watkins, a G.S. 12, Step 2 Compliance Officer ("CO") in the Albany Area Office of the United States Department of Labor's Employment Standards Administration, Wage-Hour Division. Watkin's salary grade is one above the journeyman level, and he is competent to handle the most sophisticated wage-hour investigations which come into his Area Office.

COs are field investigators who operate independently with wide latitude for responsible judgement concerning the organization and scheduling of their work.

83.2.4

4-20-83

Confidential Agency Document
DLB-000284

MSHA0111

-3-

Investigations require travel to employer establishments (or those of their attorneys and accountants), and to witnesses' homes, examination and evaluation of records, interviews with employees and others in person or by telephone, determinations of compliance with statutory requirements, and, if non-compliance is found, computation of what must be paid to establish compliance.  COs also participate in preparing cases for litigation.  The critical and non-critical elements of CO work appear in the Position Description, Union Exhibit 1.

Because COs move among a number of locations more or less suited to efficient processing of their work, they frequently must change locations as their investigations reach new stages.  For example, numbers transcribed in a manufacturing plant's noisy payroll office can be more efficiently analyzed and processed in the reading room of a nearby public library or even, during slack hours, at a quiet restaurant table.  Much is necessarily left to the COs' common sense and judgment  in determining how and where most productively to spend their working hours.  Indeed, these parties have even negotiated limited authority for such employees such as COs to reschedule their workdays ". . . to enhance the [Agency's] ability to carry out [its] missions."(Joint Exhibit 1, Article 25.1(A), p.92.)

4-20-83

83.2.5

Confidential Agency Document
DLB-000285

MSHA0112

-4-

Where there exists wide latitude for judgment, there is also opportunity for abuse. To avoid such problems, rational management requires careful monitoring of employees' work performance. This the employer accomplishes with its Form WH-40, "Compliance Officer's Weekly Report," which COs must fill out daily and submit weekly to their supervisors. The employer's Field Operations Handbook, the administrative "Bible" for COs, describes the WH-40 and how it must be prepared and submitted. Time entries must be made in whole hour increments. Page 54 of the Field Operations Handbook provides this paragraph (c) concerning "additional reporting requirements:"

> Additional requirements (e.g., reporting on a daily basis) may be necessary for a limited period of time on a selective basis for COs where there appears to be a problem of time utilization. Any additional reporting required of individual COs must be cleared by the AD with the ARA. Although additional time reporting can be required where needed in selected individual cases, it should be understood that there is no authority to require additional time reporting on an AO or RO basis.[Joint Exhibit 4.]

One limitation on COs' discretion with respect to scheduling and location of work performance does appear clear. Even grievant concedes that, at least prior to March of 1981, COs had to get prior approval for working at their homes. If bad weather prevented travel, or if a CO completed field work too late to return to the Area Office, but too early to quit work, and in either case the CO had work to do with him or her, ". . . you'd call in for the okay to work at home," testified grievant.

Confidential Agency Document
DLB-000286
4-20-83

MSHA0113

-5-

All other Albany COs agreed that, although there was some uncertainty concerning the precise circumstances under which work at home would be approved-indeed, Area Director Samuel Weitman refused to articulate specific guidelines covering all cases - it was generally frowned upon and, if done without prior approval, was done "sub rosa"(the shop steward's words).

Grievant contends, however, that there were three occasions during 1981 on which Area Director Weitman greatly expanded the scope of COs' judgment to include occasional work at home.  At an Area Office meeting on March 20 in Oneonta, and at unit meetings on October 30 in Utica and November 30 in Albany, Weitman responded to the Albany Area Offfice's apparently poor case statistics by urging his COs to reduce their case time expenditures without cutting recoveries by "working smarter."  Working smarter meant using time-saving expedients such as self-audits, calling witnesses into the Area Offices, and doing more analyses in the field to eliminate needless travel time and expense.  (Watkins testified that Weitman mentioned "home" among the appropriate field locations for such work; Weitman insists he did not, and no other CO recalls that statement.) Watkins inferred that any way he could cut time would be acceptable to Weitman.

4-20-83

83.2.7

Confidential Agency Document
DLB-000287

MSHA0114

-6-

Following the November 30th unit meeting - at
which Weitman had seemed particularly upset by Albany's
then-recent number 56 ranking among the Division's 73
Area Offices in statistics at a time marred by threatened
reductions-in-force  - Weitman called Watkins into his
office for a private meeting as to which Watkins received
no prior notice.  At that meeting Weitman criticized
Watkins and counseled him concerning his having gone home
to work early on November 25, the Wednesday afternoon
before Thansgiving. (Shortly before that, on November 13th,
Weitman had criticized  and counseled grievant in a
telephone conversation for grievant's use and accounting
of his work time on the preceding afternoon.)  Watkins
disagreed with Weitman's assessment of the circumstances,
discussed the matter with him, and left Weitman's office
thinking the matter had concluded.

On December 21, however, Area Director Weitman
called Watkins into his office and handed him Joint Exhibit
2, a two-page memorandum dated December 18, 1981.  That
memorandum, which I have attached to this Award as an appen-
dix, describes in detail the two incidents which concerned
Weitman, Weitman's confrontation of grievant as to each,
grievant's claimed justification of his actions and Weit-
man's rejection of grievant's explanations.

83.2.8

4-20-83

Confidential Agency Document
DLB-000288

MSHA0115

-7-

The memorandum further counsels grievant on how he should have conducted himself in each instance.

Based on his expressed concerns, Weitman instituted two new reporting requirements for Watkins to be effective from January 4, 1982 through July 2, 1982: (a) submission of daily WH-40 reports and (b) twice-daily contacts at the start and end of each work day for Watkins to advise Weitman orally of his "plans, activities and accomplishments" for that day. (In fact Weitman suspended these special reporting requirements effective May 24, 1982.)

Weitman's December 18 memorandum concludes with this paragraph, which illustrates its generally admonitory tone:

> The purpose of this memorandum and the reporting
> requirements I have imposed is to assist you in im-
> proving your utilization and proper accounting of time.
> In no way is this meant as discipline, but rather it is my
> sole purpose to counsel you on the problems that have come
> to my attention, as regards your utilization of time. I
> must advise you, however, that if I become aware of
> future incidents of the nature described above concerning
> time utilization some form of disciplinary action will be
> taken. [Joint Exhibit 2.]

Watkins initiatiated this grievance on December 24, 1981. In his behalf the Union argues first that the December 21 memorandum and grievant's daily reporting re-quirements constituted "disciplinary actions" covered by Article 13 of the parties' contract for which (a) the

4-20-83

83.2.9

Confidential Agency Document
DLB-000289

MSHA0116

-8-

employer lacked just and sufficient cause as well as
reasons which would promote the efficiency of the De-
partment and (b) the employer failed to give adequate
notice of its disciplinary purpose so that grievant
could have Union representation at his meetings with
Weitman concerning those subjects;  second, if not dis-
cipline, the double reporting requirements imposed on
grievant went far beyond those authorized by paragraph
(c) of the Field Operations Handbook's page 54; and
third,Weitman's blanket ban on work at home without
prior approval constitutes a change of working conditions
for which Article 2.5 of the parties' contract requires
and the employer failed to give advance notice and oppor-
tunity to negotiate.

The employer, on the other hand, argued there was
neither discipline nor change of policy affecting working
conditions in this case - only appropriate counseling and
monitoring of the work performance of an employee who had
strayed from long-established and well-recognized rules of
conduct.

On the entire record before me I find that the
employer did violate Article 13 of the parties' contract
so to require expungement from the record of the December
18 memorandum.

83.2.10

4-20-83

Confidential Agency Document
DLB-000290

MSHA0117

-9-

I do not, however, find that the employer's having imposed daily reporting requirements on grievant violated any contractual limitation or that the employer imposed any new policy affecting working conditions in violation of Article 2.5.  I reach  those conclusions for the following reasons.

First, I find that the December 18 memorandum constitutes Article 13 "disciplinary action."  Article 13.1(A) defines covered "disciplinary actions" as ". . . an oral admonishment confirmed in writing . . . . " (Joint Exhibit 1, p.27.)  To "admonish" reads Webster's Third New International Dictionary (at p.28), is "1:  to indicate duties, obligations, or requisite action to (a person):  express warning or disapproval to about remissness or error esp. gently, earnestly and solicitously in urging duty, caution, or amendment . . . ."  That definition, which accords with general usage of the term, accurately describes the substance and purpose of Area Director Samuel Weitman's December 18 memorandum and of his December 21 conference with grievant. I therefore find the memorandum to be an oral admonishment reduced to writing and a disciplinary action within the express terms of Article 13.1.  Its words are so clear and unambiguous that I find unpersuasive the employer's parol evidence concerning the bargaining history of that provision.

4-20-83

83.2.11

Confidential Agency Document
DLB-000291

MSHA0118

-10-

I find similarly unavailing the employer's argument that this reading of "admonishment" includes all appropriate management efforts to counsel employees so that they may mend their ways and avoid real discipline in the future.  The simple answer is that "admonishment" is the word the parties chose for their contract, and that does embrace counseling which identifies and reproves past error.  The parties having so agreed, Article 16.6(B) of their contract withholds my authority to alter and or modify their words.

More to the point, however, is that the employer may counsel without the ambit of Article 13 discipline by not reducing to writing the substance of its oral admonishments and by limiting its written counseling memoranda to prospective direction for future conduct or mere confirmations of the fact of counseling conferences at which such directions were given.  Area Director Weitman's lengthy rehearsal of Watkins' faults does reduce his oral admonishment to writing and constitutes disciplinary action within Article 13's meaning, notwithstanding Weitman's disclaimer of disciplinary intent.

83.2.12

4-20-83

Confidential Agency Document
DLB-000292

MSHA0119

-11-

Second, since Weitman's December 21 conference with Watkins concerned disciplinary action, Article 13.1 (C) entitled grievant to union representation. The employer's failure to give adequate notice and opportunity for such representation violated that provision and requires expungement of the disciplinary action - the December 18 memorandum. I shall so direct in my Award.

Third, the employer's procedural violation of Article 13. 1(C) is dispositive and renders moot any question of just and sufficient cause for Weitman's disciplinary action - that is, Weitman's having reduced to writing his oral admonishment of Watkins. There is no question that oral admonishment alone is not discipline and therefore falls outside my arbitral jurisdiction.

Similarly, Weitman's having required Watkins to submit to daily WH-40s and to "check-in" twice-daily do not come within the contract's definition of disciplinary action. They are both appropriate supervisory techniques to monitor subordinates' job performance in areas perceived to require improvement, and on the record before me I find no reason to conclude that Weitman acted in bad faith. I accordingly deny the union's prayer for an order expunging grievant's daily WH-40s.

4-20-83

83.2.13

Confidential Agency Document
DLB-000293

MSHA0120

-12-

Finally, I find the bases for Weitman's having counseled grievant to involve no "changes relating to personnel policies, practices and matters affecting working conditions of bargaining unit employees . . . ," for which Article 2.5 requires notice and opportunity to negotiate.  Nothing which occurred during 1981 changed what had been clear at the Albany Area Office, that working at home is a touchy subject which requires careful judgment and clearance on a case-by-case basis. All COs whose testimony reached that subject agreed that Weitman refused to give precise guidelines when they tried to press him for a general rule on home home work and that Weitman had consistently told them to call in if they had any question.

In fact, Weitman's position accords with the following paragraph of Director of Personnel Management Frank A. Yeager's April 12, 1979 memorandum on "Work at Home:"

> It must be emphasized, however, that the required management approval of at-home work assignments must be based on the facts and circumstances peculiar to the particular work situation.  Because of the disparate and infrequent circumstances in which at-home work assignments would be appropriate, there is no Department policy governing such assignments.  Each such situation must be decided on its own merits. [Employer Exhibit 8.]

83.2.14

4-20-83

Confidential Agency Document
DLB-000294

MSHA0121

-13-

Although that memorandum was not posted at the
Albany Area Office, I am satisfied that its substance
has been communicated and is well understood by all
Area Office personnel; and I credit the testimony of
employer witness Guy Morone to that effect.  There is
accordingly no change within Article 2.5's reach, and
the employer therefore has not violated that provision's
mandate.

By reason of the foregoing, I issue the following.

AWARD

1.  The December 18, 1981 memorandum from
Samuel Weitman to William Watkins requiring daily report-
ing was "a disciplinary action" within Article 13.1 of
the parties' collective bargaining agreement.

2.  The employer did violate Article 13.1 (C) of
the parties' contract by failing to notify grievant Watkins
that meetings of November 30, 1981 and December 21, 1981
would principally concern discipline or potential discipline
and by thus foreclosing grievant's being accompanied by an
NFCLL representative.

4-20-83

83.2.15

Confidential Agency Document
DLB-000295

MSHA0122

-14-

3.   Having found a dispositive violation of Article 13.1 (C), the question is moot whether the December 18, 1981 memorandum was for just and sufficent cause and for reasons which would promote the efficiency of the Department.

4.   The said memorandum did not violate Article 2, Section 5 of the parties' contract.

5.   The employer shall take all steps necessary to expunge from the record the December 18, 1981 memorandum from Samuel Weitman to William Watkins in evidence in this proceeding as Joint Exhibit 2.

Dated:   January 20, 1983
South Orange, New Jersey

JOHN E. SANDS
Impartial Arbitrator

83.2.16

4-20-83

Confidential Agency Document
DLB-000296

MSHA0123

Case 5:18-cv-00591   Document 703-10   Filed 09/05/18   Page 20 of 202   PageID #: 1702

ALBANY, NEW YORK



**DATE** December 16, 1981

**REPLY TO ATTN OF** Mr. Samuel Weitman
Area Director, Albany Area Office

**SUBJECT:** Reporting Requirements

**TO:** Mr. William Watkins
Wage Hour Compliance Specialist

During the month of November two incidents came to my attention which greatly concern me involving your utilization and accounting for time spent on case assignments. Specifically, these incidents were as follows:

On November 13, 1981 I contacted you at Saratoga Hospital to ascertain your whereabouts the previous afternoon, November 12, 1981 from 4:00 to 5:00 p.m., as you were not in the Area Office when I tried to meet with you. You explained that you left the Area Office in order to conduct a 4:00 p.m. interview of an employee at Service Laundry in Schenectady, New York. I then asked you why your WH-40, left on my desk before you departed for Schenectady did not account for this interview, but rather showed two hours charged to Miscellaneous Technical Assistance and six hours charged to computing and report writing for the Samaritan Hospital file. You replied by stating that you charged this time to Samaritan Hospital file so as not to exceed the 27 hour performance standard element on the Service Laundry case, as it was your understanding this was the way I wanted it done. I advised you that this was certainly not the way I wanted it done as it was absolutely wrong to prepare a WH-40 accounting for time on a case in the Area Office, when in fact you were in the field working on another case.

On November 25, 1981 I requested that my secretary contact the entire staff to advise them that an all employee meeting had been scheduled for November 30, 1981. Upon calling Saratoga Hospital around 3:20 p.m., my secretary was advised by the Personnel Department that you had left there a short while ago. My secretary then tried and was successful in reaching you at your home (around 3:30 p.m.) to relay my message regarding the November 30, 1981 staff meeting. On November 30, 1981 when you reported to the Area Office, I questioned you as to what time you left Saratoga Hospital on November 25, 1981. You replied that you had left between 2:00 and 2:30 p.m. to go home to do computations. I explained to you that I tried contacting you at your home twice on the afternoon of November 25, 1981 but got no answer. You explained that you heard the phone ring, but did not answer it since you did not want any distractions. I then asked you why you had picked up the phone when my secretary called earlier. You explained that you happed to be

83.2.18

Confidential Agency Document
APPENDIX
DLB-000297

4-20-83

MSHA0124

-2-

close to the phone at the time so you decided to pick it up.  I then advised you that you should have returned to the office when you left Saratoga hospital.  You indicated that it was your understanding the Compliance Specialists could work at home or in the library.  I advised you that Compliance Specialists were not authorized to work out of their homes unless specifically authorized by me, which in this instance was not the case.

In light of the above, I have decided to institute the following two actions. as regards you, effective January 4, 1982 through July 2, 1982:

1.   In accordance with the Field Operations Handbook, I am placing you on a daily reporting requirement whereby you will be submitting your WH-40 to me on a daily basis.  This will be done between 4:30 and 5:00 p.m. every day that you are in the Area Office.  On days that you are out in the field you will be expected to complete WH-40's covering the day's activities which will be submitted to me upon your return to the Area Office.  In my absence, your WH-40 is to be submitted to the Assistant Area Director, or if we should both be absent, the acting Area Director.

2.   You are to contact me either personally or via phone (when in the field) twice daily, between 8:30 and 9:00 a.m. and again between 4:30 and 5:00 p.m. to advise me of your daily plans, activities and accomplishments.  In my absence, you will be expected to contact the Assistant Area Director, or if we should both be absent, the acting Area Director.

The purpose of this memorandum and the reporting requirements I have imposed is to assist you in improving your utilization and proper accounting of time.  In no way is this meant as discipline, but rather it is my sole purpose to counsel you on the problems that have come to my attention, as regards your utilization of time.  I must advise you, however, that if I become aware of future incidents of the nature described above concerning time utilization some form of disciplinary action will be taken.

cc:  AAD Martin

4-20-83

83.2.19

Confidential Agency Document
DLB-000298

MSHA0125

**EMPLOYEE TIME AND LEAVE RECORD — 1984**

DL FORM 1-1076

E: 326 DUR 01 COST CTR TK

De/Vess HUNTER JUDITH H
EMPLOYEE NAME

SOC SEC NO

75/05/19
SERVICE COMPUTATION DATE

| PAY PERIOD | SUN | MON | TUES | WED | THUR | FRI | SAT | SUN | MON | TUES | WED | THUR | FRI | SAT | ANNUAL LEAVE EARN/(USED) BAL | SICK LEAVE EARN/(USED) BAL | COMP LEAVE Wrk'd/(used) HR | TOTAL LWOP AWOL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAY PERIOD 02 ** 12/25/83 - 1/7/84 END OF 1983 LEAVE YEAR | DEC 25 | 26 H | 27 | 28 | 29 | 30 | 31 | JAN 1 | 2 H | 3 | 4 | 5 | 6 | 7 | | | | |
| PAY PERIOD 03 1/8/84 - 1/21/84 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 340 | 283 | | |
| PAY PERIOD 04 1/22/84 - 2/4/84 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | FEB 1 | 2 | 3 | 4 | 2 344 | 5 358 | | |
| PAY PERIOD 05 2/5/84 - 2/18/84 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 358 | 17 269 | | |
| PAY PERIOD 06 2/19/84 - 3/3/84 | 19 | 20 H | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | MAR 1 | 2 | 3 | 356 | 277 | | |
| PAY PERIOD 07 3/4/84 - 3/17/84 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 363 | 10 277 | | |
| PAY PERIOD 08 3/18/84 - 3/31/84 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 253 | 281 | | |
| PAY PERIOD 09 4/1/84 - 4/14/84 | APR 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 327 | 10 273 | | |
| PAY PERIOD 10 4/15/84 - 4/28/84 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 321 | 279 | | |
| PAY PERIOD 11 4/29/84 - 5/12/84 | 29 | 30 MAY 1 | | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 277 | 281 | | |
| PAY PERIOD 12 5/13/84 - 5/26/84 | 13 | 14 H | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 223 | 283 | | |
| PAY PERIOD 13 5/27/84 - 6/9/84 | 27 | 28 H | 29 | 30 | 31 | JUN 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 226 | 1 288 | | |
| PAY PERIOD 14 6/10/84 - 6/23/84 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 224 | 1 291 | | |
| | | | | | | | | | | | | | | | 232 | 295 | | |

DAILY RECORD OF ACTIVITY

* Comp Time should be used 1 year from date earned or forfeited unless administratively ordered. Reduce balance after 1 year
** Begin entire line from 1983 Employee Time and Leave Record.
*** Reduce annual leave to appropriate annual leave ceiling.
**** Start new accumulation

1. TIMEKEEPERS COPY

Confidential Agency Document
DLB-000299
MSHA0126

**From:**       Cameron, Ernest - MSHA
**To:**         Silvey, Patricia - MSHA
**Subject:**    Re: re
**Date:**       Wednesday, September 26, 2012 11:12:55 AM

Yes maam.

**From:** Silvey, Patricia - MSHA
**Sent:** Wednesday, September 26, 2012 10:13 AM
**To:** Cameron, Ernest - MSHA
**Subject:** RE: re

Please discuss this, in person, with me.  Tx.

**From:** Cameron, Ernest - MSHA
**Sent:** Wednesday, September 26, 2012 8:46 AM
**To:** Silvey, Patricia - MSHA
**Cc:** Cameron, Ernest - MSHA
**Subject:** re
**Importance:** High

Ms.
Silvey:
Sep. 26, 2012

Good morning to you.

We should have the five draft proposal disciplinary actions to you today.   As part of the proposed drafts I understand you would like me or Kimberlee to be the liaison for any oral replies.  While I have no problem being the p.o.c. for this effort I wanted to remind you that I will be out of the office October 4-14, 2012, and should any of these employees wish to meet with you I would not be available to facilitate their request.

While Kimberlee is an option to substitute for me – should the employees have any technical questions it would have to be referred to LMR.   As such, I would encourage you to consider permitting us to have Jacquelyn Hicks serve as the p.o.c. for this effort and I will accept full responsibility for any hiccups that occur though I doubt there would be any.   Jacquelyn exercises the utmost discretion in dealing with LMR matters and I have full faith and confidence in her abilities.

Please let me know if you have any concerns with using LMR or if you would like to discuss further.

Regards,

Ernest

*Ernest A. Cameron*
*Director, Administration and Management*
*Mine Safety and Health Administration*

Confidential Agency Document
DLB-000300

MSHA0127

1100 Wilson Blvd. Room 2125
Arlington, VA
Phone - 202-693-9800
cameron.ernest@dol.gov

Confidential Agency Document
DLB-000301

MSHA0128

| | |
|---|---|
| **From:** | Crawford, Nancy M - MSHA |
| **To:** | Silvey, Patricia - MSHA |
| **Cc:** | Cameron, Ernest - MSHA |
| **Subject:** | RE: Request of an extension |
| **Date:** | Thursday, December 13, 2012 6:47:41 AM |

Thanks.

Nancy Crawford
Director, Human Resources
MSHA Administration & Management
202-693-9808

**From:** Silvey, Patricia - MSHA
**Sent:** Wednesday, December 12, 2012 5:50 PM
**To:** Crawford, Nancy M - MSHA
**Cc:** Cameron, Ernest - MSHA
**Subject:** RE: Request of an extension

Extension—OK.

**From:** Crawford, Nancy M - MSHA
**Sent:** Wednesday, December 12, 2012 5:33 PM
**To:** Silvey, Patricia - MSHA
**Cc:** Cameron, Ernest - MSHA
**Subject:** FW: Request of an extension

From Mr. Winston – please see below.

Nancy M. Crawford
Director, Human Resources
Mine Safety and Health Administration
US Department of Labor
1100 Wilson Blvd, Room 2126
Arlington, VA 22209-3939
202-693-9808 Office
202-578-1354 BB

**From:** Winston, Donald E - MSHA
**Sent:** Wednesday, December 12, 2012 10:05 AM
**To:** Crawford, Nancy M - MSHA
**Subject:** Request of an extension

Ms. Crawford,

I received a disciplinary proposal on December 5, 2012 and I received the Internal Review transcripts on December 10, 2012. Which means my response is due on December 18, 2012. Considering the severity of the proposal and the approaching holidays, I am requesting an extension of the response time until January 18, 2013. Also, I have talked with Ms. Silvey and she indicated I will be able to talk with her next week. By granting me the extension I will have amble time to finalize my response after our meeting. You have been very helpful.

Thank you,

Confidential Agency Document
DLB-000302

MSHA0129

Don Winston

Confidential Agency Document
DLB-000303

MSHA0130

| | |
|---|---|
| **From:** | Thomas, Charles J - MSHA |
| **To:** | Silvey, Patricia - MSHA; Cameron, Ernest - MSHA; Crawford, Nancy M - MSHA |
| **Cc:** | Thomas, Charles J - MSHA; |
| **Subject:** | Written Reply to December 4th, 2012 Notice of Proposed Seven (7) Day Suspension and request for oral reply |
| **Date:** | Friday, December 21, 2012 10:37:08 AM |
| **Attachments:** | December 21,2012 resp. P Silvey.PDF |

Ms. Silvey,

Attached is the electronic copy of my written response to the December 4th, 2012, *"Notice of Proposed Seven (7) Day Suspension"*.

The accompanying attachments are too large to scan and will be provided as hard copies. I have given the attachments and the originial written response to Earnest Cameron.

I also would like to have an oral reply and I have contacted Nancy Crawford, Director of Human Resources Division by both e-mail and phone this date.

I am available anytime for an oral response after December 27th at your convenience.

Respectfully,

Charles J. Thomas
Deputy Administrator for Coal

Confidential Agency Document
DLB-000304

MSHA0131

December 21, 2012

MEMORANDUM FOR PATRICIA W. SILVEY
             Deputy Assistant Secretary for Operations

THROUGH:         EARNEST A. CAMERON
                    Director of Administration and Management

                    NANCY CRAWFORD
                    Director of Human Resources

                    KEVIN G. STRICKLIN
                    Administrator for Coal Mine Safety and Health

FROM:            CHARLES J. THOMAS   *Charles J. Thomas 12/21/2012*
                    Deputy Administrator for Coal Mine Safety and Health

SUBJECT:       Mitigating facts and background on why a Seven (7) Day
                    Suspension is not warranted to Charles J. Thomas over the UBB
                    Internal Review alleging poor oversight in memorandum dated
                    December 4, 2012

On April 5, 2010 , and explosion occurred at the Upper Big Branch Mine (UBB) killing
29 miners and injuring 2.  The internal review investigation team determined and I quote
from page 1 of the executive summary:  *"The MSHA Accident Investigation team
determined that the explosion occurred because Performance Coal
Company (Operator) and its parent company, Massey Energy Company
(Massey), violated fundamental safety standards and failed to take
corrective actions to prevent catastrophic explosion."*

<u>Background Information on Charles J. Thomas</u>

I am not confident that everyone involved in the decision to propose discipline for me
does not fully know my background, experience, work ethic or what makes me tick as a
Senior Executive.  As background concerning myself, I am 56 years old, graduated from
Barrackville High School with honors, near Fairmont, West Virginia.  I am a veteran of
the United States Marine Corps who **<u>volunteered</u>** and was not drafted and served a six
(6) year military obligation of 3 years active service and 3 years inactive reserves in the
10th Marines field artillery regiment.  While in the United States Marine Corps I was
meritoriously promoted two (2) times.  Prior and after the military service I attended
WVU for four complete semesters with a 3.2 GPA and graduated from Fairmont State
College while working in the Engineering Department at Federal #2, Federal #1, and
Joanne Mine, and attending night school and earned a Bachelor's degree in Board of

Regents. I have accumulated over 50 hours of post graduate work at both WVU and Marshall University in Master's Degree Safety Management while employed with MSHA, but did not finish my Master's Degree when I was promoted and chose to accept the roof control supervisors position and was promoted and moved to Pelham, AL to work as the Roof Control/Impoundment/Electrical Supervisor. I worked in the Engineering Departments for Eastern Associated Coal Company that provided surveying and mapping and plan submittals for Federal #1 Mine, Federal #2 Mine, and Joanne Mine at Rachel, WV. I also worked in the surveying and engineering department at Martinka #1 mine at Fairmont, WV for over three years before being promoted into production management.

I obtained my Mine Foreman/Examination certification in 1981 and have been employed as a timber crew foreman, belt foreman, production foreman, and longwall production foreman and longwall coordinator. I am a former "**volunteered**" member of the American Electric Power (AEP) Southern Ohio Coal Company, **Martinka #1 Mine Rescue** team and the Department of Labor, **MSHA, MEO Rescue Team** from 9-11-1995 until 4-1-2002. I have participated in numerous mine fires, mine explosions, and mine recovery operations. To name a few, Galatia Mine Fire, Oak Grove Mine Seal Explosion, Jim Walters #5 Mine Explosion and recovery, Loveridge Mine Fire, Oxbow Mine Explosion and recovery, Willow Creek Mine and UBB Mine explosion and recovery. During these operations I have voluntary risked by life in oxygen deficient atmosphere while under apparatus at 98% methane and 2 % oxygen. This rescue team work is on a "volunteer basis." I also placed 7th in the 1988 National Drager BG 174-A Bench contest in Louisville, KY when with employed with AEP.

I have worked in three different coal districts D2, D3, and D11 in Pennsylvania, Northern West Virginia, and the Alabama District office in Birmingham. Being an inspector in three different Coal Districts has exposed me to many different mining methods, different geology, different equipment and coal seams and coal safety cultures. I have been a regular inspector, accident investigator, roof control supervisor, electrical supervisor, impoundment supervisor, field office supervisor, roof control specialist in HQ, Chief of Health in HQ, and Director and established the first MSHA Accountability Office from the ground up and interviewed over 24 candidates from both coal and metal to make a final selection of two accountability auditor specialist at the GS-14 level. I acted as the Deputy Administrator for Coal from April 2009 until September 2010 and now Deputy Administrator for Coal reporting directly to Kevin Stricklin the Administrator.

I have investigated four coal mining fatals as lead investigator and assisted in numerous others and have an oversight role on the fatal contributing factor enforcement issuances here in HQ. While Chief of Health I was the lead investigator on the Tri-Star double fatal highwall collapse in Coal District 3 in Maryland. The unwarrantable contributing factor enforcement actions were not challenged by opposing counsel because the facts and evidence were substantially documented. The penalties ordered in the settlement motion were $105,324.00 and it required that I and the investigation team be very forceful in defending the enforcement actions with the Regional SOL. I stood firm against Regional SOL advisement to not support unwarrantable and was successful. This may and I believe

did prevent an internal review investigation in Coal District 3. My immediate supervisor Kevin Stricklin is in agreement with that assessment.

I have interviewed and hired the last seven (7) Coal District Managers. These seven new District Managers consume a vast amount of my time coaching, mentoring, making mine visits and answering their questions on both the "Administrative and Enforcement" side of their job descriptions. I do not know of anytime in MSHA history except the inception that seven (7) District Managers were brought on board the Agency in a three year period and it is a very tall task to train, instruct, provide oversight on that many senior field management persons at one time. No other Deputy was faced with that challenge except the first Deputy Administrator. I received nothing but positive feedback from the DMs and my supervisor Kevin Stricklin. If I was doing a poor or substandard job of that mentoring it was never mentioned in my performance appraisals, mid-year reviews, or in conversations on a daily basis. It is very hurtful and demeaning to be told my conduct was and I quote from Specification 1, "This reflects a lack of management oversight on your part in ensuring effective implementation of an important provision of the MINER Act.

Let's stop right there for a moment, there were many provisions of the Miner Act such as lifelines, refuge alternatives, seals, wireless communication, tracking of miner's underground, mine rescue team improvement and response, family liaison, breathable air, emergency response plans. It is not fair that everything was properly implemented and one component is alleged to have not been properly oversight implemented and that was flagrant violation oversight. The real problem of administering oversight is with SOL not being supportive of the inspector, FOS, ADM, DM, Deputy and Administrator. I have in my possession and to be made part of this response to the notification of proposed seven (7) day suspension over thirteen (13) examples where SOL would not support the flagrant assessment. This constant rejection of applying the MINER Act has connections with the legal support not entirely the enforcement component. If Districts constantly submit packages to the regional SOL and they get rejected it is a policy process problem not an oversight problem. On many occasions I have had to be "pulled back" because I get emotional and argumentative about the SOL decisions and have been told I need to look at the big picture. The major responsibility I am charged by the ACT is the health and safety of the miner our most precious resource. Congress intent was to raise penalties on egregious repeat violations of the same standard that are termed flagrant. I have always stalwartly supported that endeavor, but SOL has not always been supportive in all cases. Discussions have been made by the Solicitor for MSHA that certain Regional SOL are "soft" and I requested that District 5 flagrant review be switched to Nashville and that idea was rejected. **So as a Deputy Administrator I have tried and suggested that changes be made.** Again it is hurtful and demeaning and soils my reputation to make a statement that I did not provide proper oversight on the flagrant portion of the 2006 MINER ACT.

Confidential Agency Document
DLB-000307

MSHA0134

Fact:

**At the time of the explosion, sophisticated computer tools that are now used to identify Potential Pattern of Violations mines and mines that warrant impact inspection did not exist.**

Fact:

**Identification of potentially flagrant violations by inspectors and managers alike is extremely difficult without computer tools. Such tools were not available until after the explosion.**

When all components of the 2006 MINER ACT were implemented on time, training conducted, and oversight was provided on my part. There were many new coal mine inspectors at UBB and this is a mitigating circumstance, there were temporary acting field office supervisors at UBB and that was stated in the IR report, which is also a mitigating circumstance. I was acting as Deputy Administrator until September 2010 and directed most of my attention to Districts 5, D7, D8, and D9 as instructed that is another mitigating circumstance.

My father Charles Junior Thomas was an MESA/ MSHA inspector in the Fairmont, WV MSHA field office for 27 years and served in the Navy for 7 years and was one of the persons who did the body recovery at Farmington No. 9 mine for three years the recovery operations took place. His MESA coveralls had the smell of dead flesh, he had difficulty eating lunch underground at Farmington No. 9 mine, he recovered two of my classmates bodies they were (Roger Carpenter from Fairmont who son was a classmate is a former mine rescue and benchman from Federal #2 and a Bud Hillberry whose son Ken I graduated high school with)  My father was my friend, mentor, coach and role model and he is the primary reason I am filing this reply. His reputation and my reputation are at stake. This is a shock and very hurtful and stressful for me to go through defending my reputation my integrity and my family honor.  In one word it is "PAINFUL" to me and my family. My wife asked me what did I do wrong? My answer is nothing, I did my duty, I did my job, and I enforced the regulations with integrity and with enthusiasm.  I was asked recently about the rock dusting unwarrantable failures being issued to Consol. There were unwarrantable failures issued at Road Fork #51, Justice and other mines in D4, there were unwarrantable failures issued at Consol and Patriot Mines.  The reason that UBB mine exploded was they were mining on the longwall without water pressure, water sprays and cutting bits maintained.  My oversight was not the cause and this memorandum I am answering alludes to that.   One of the things I remember most is that my father said, "Son whatever you do, remember this, MESA is an enforcement agency and you are charged with going to mine, finding hazards and citing them to be corrected, you have no friends when you go underground and people cannot buy respect, they have to earn it.  Don't overlook citations for your high school friends or neighbors, you cut them some slack they will expect it every time, they will tell others you are soft. <u>He also told me to always turn in a rock dust survey with a AAA inspection to "prove" you have the mine compliant. He told me that rock dust covers a multitude of sins."</u>

Confidential Agency Document
DLB-000308

MSHA0135

What he meant that proper rock dust application inerted the explosive float coal dust. My deceased brother was a coal miner (roof bolter), my grandfather James G. Thompson was the Safety Director at CONSOL Robinson Run #95 mine in Shinnston, WV trainer of first aid and mine rescue teams, and my great grandfather hand loaded coal at Owens Mine, near Shinnston, WV. I am a fourth generation Coal Miner and have lost family members such as my Uncle, Guy Thompson in a track motor haulage accident where he was crushed to death by empty coal cars that were off track and put himself in a pinch point position trying to re-rail the wrecked coal cars. Saying all that I know Coal Mining, I know the sad stories of fatalities in my family and in my classmate's family. I was born into it and lived, breathed, and heard discussion around the dining room table about fires, explosions, and fatal accidents. I know and fully realize the importance of my role, leadership, and the vast responsibility that my office holds. I was competent enforcing all regulations and petitions of modification.

Fact: **The internal review team nor did the UBB accident investigation team interview me to hear the facts, circumstances, mitigating issues that were charged against me in this memorandum dated December 4, 2012.** The team had ample time, opportunity to ask me questions, but they failed to do so. I would now like an opportunity to tell what I know and what I did in oversight prior, during, and after the UBB explosion on April 5, 2010. If the prevention and protection of the miners is the primary focus and goal of this accident investigation and internal review audit, Senior Management, the investigators, and the Internal Review audit should have alerted me, counseled me on the alleged failure to conduct my official duties directly after the physical investigation not 973 days later (from the time of the explosion at UBB until the day I received by proposal to suspend for seven (7) days was 973 days that miners were alleged to be at risk.) The two (2) alleged stipulations are very egregious but the administering of unjust discipline was very slow when Miners were supposedly at risk. No one in Headquarters or any member of the IR team told me during my performance appraisal or midyear appraisal to cease and desist of how I was conducting enforcement oversight. This confounds me that I was never informed either orally or in written form that my oversight was deficient during conversations or performance ratings. Kevin Stricklin as my witness knows how passionately I require District Managers to enforce ventilation, rock dusting, permissibility, and especially roof control plans and all standards. On numerous occasions Kevin said I like that I have to "pull you back Charlie" it is more difficult to spur people ahead to make aggressive enforcers out of Managers and HQ folks. I also ask that you ask Industry Leaders for Consol, Patriot, Jim Walters what type of enforcer I was. Names that I know would give you an honest assessment of my oversight on enforcement are Lou Barletta, Dave Clise, John Higgins, Jim Siko, Tim Underwood, Cliff Forest, Mike Sinozich, Terry Hudson, Walt Scheller, Dale Byrum, David Hales, Sam Kitts, Alan Dupree, Kenny Murray, Doug Conaway, Gary Wirth, Jeff Wirth, Anthony Webb. Anyone of them will tell you where I stand on enforcing the law especially rock dusting, face ventilation, and permissibility, and mine rescue stations and equipment. Ask any of them if I and the DMs under my oversight use all the enforcement tools when warranted and supported by SOL?

MSHA0136

Fact:  An explosion could occur today this very instance if a foreman on a longwall would permit the production crew to mine coal without water sprays and without water pressure and without proper cutting bits being maintained at all times.

Fact: I fully understand Congress intent with the 2006 MINER ACT to increase penalties and identifying and correcting hazards present to coal miners by whatever enforcement method is more important than how much a penalty is going to be assessed. Our primary mission is the health and safety of the coal miner our most precious resource, not how much money the US Treasury collects.  I know the message that we try to send to the Coal Operators to change their behavior is the penalty amount, but our primary mission is the health and safety of the coal miner our most precious resource. What box is checked on a citation/order form is secondary to identifying and correcting hazards in coal mines. I will provide data that more citations and orders were written in 2009 and 2010 in the history of MSHA. I and the inspectorate that I am in charge of take that responsibility seriously and just because one field office did not issue enough flagrant' s is not reflective of the entire nation.

Fact: Figure 11, page 104 of internal review team report indicated that rockdusting was improving in all Districts, and that UBB was going in a downward trend instead of upward. So in essence rockdusting was improving in most mines except UBB under COAL HQ oversight.

Fact: The Headquarters managed "Dust Busters" prior to UBB explosion were identifying and citing deficiencies in face ventilation and respirable dust requirements Nationwide; this was not only a UBB problem but a National problem that was being addressed.

Fact:  I had to make a headquarter decision to complete mandatory Mine Act 4s and 2s EO1 inspection or send supervisors and journeyman inspectors to training. The inspections are mandated by the ACT, the training is a policy requirement.
Training was an issue that we could not address at the time of UBB because of staffing and the sheer number of trainees.

Fact: Attached are Monthly "Key Indicator Reports" that my secretary RoseAnn Dickens prints for my review every month. I have e-mails, I have phone conversations with DMs and their staff concerning indicators that need addressed. Since I have assumed the acting and full time position of Deputy Administrator for Coal:

1. Abatement times have decreased nationwide
2. Vacates have decreased nationwide
3. Level of enforcement increased
4. Amount of time underground during 103(i) mandatory spot inspections have increased.
5. Reportable Roof falls have decreased and roof fall fatals have decreased.

Confidential Agency Document
DLB-000310

The oversight of the plans is a joint effort in headquarters. Plans are reviewed by the Coal Division of Safety, the health aspects of the plans are reviewed by the Coal Division of Health. I feel that I am being singled and discriminated when there are others on the Headquarters staff this responsibility is delegated to, and they did identify problems in certain districts and the Administrator directed me to investigate further.

Fact: Kevin Stricklin told me to **concentrate my enforcement oversight efforts in District 5, Districts 7, District 8, and District 9 because of the level of enforcement, accident trends, reportable roof falls, roof related injuries and concerns that both of us had with the plan approval process.** I would be insubordinate to not follow the Administrators instruction while learning and training in my "Acting" capacity as Deputy Administrator. I was never temporary promoted while "Acting" Deputy Administrator for Coal, it is customary if one acts more than 30 days they are compensated for the job description they were filling, we do that for DMs, ADMs, and FOS, but I was never paid Deputy Administrator wage scale while acting for over 14 months. Kenny Murray was the prior Deputy Administrator and I found oversight lacking in Health where MMUs were given out freely in D6, I was not aware of this problem in D4 and at UBB, so this demonstrates there were problems that I did identify and I did correct in other Districts. There was also dust fraud with sampling devices in D6 that the Division of Health investigated and found vermiculite inside a sampling cassette.

### District 5 Deputy Administrator Oversight Involvement

Conducted an all enforcement meeting in District 5 in September 23-25, 2009 because of concerns with low level of enforcement and not utilizing all enforcement tools, S&S rate increased immediately and level of enforcement increased
I organized and participated in a **"Saturation Inspection"** at **Richard Gilliam Mines** in October of 2009 in District 5, primary focus was on accumulations and roof control plan compliance. Company was ultimately sold as result of enforcement actions. This saturation inspection was selected by me on repeat non-compliance by one particular operator before PPOV was initiated.

### District 7 Deputy Administrator Oversight Involvement

Participated in KY Coal Association Safety Committee Meeting in District 7, focused on mine examiners conducting adequate examinations and roof control plan upgrades when warranted.

Made underground mine visits in D7 pertaining to roof control problems I identified.

### District 8 Deputy Administrator Oversight involvement

DM meeting at Academy November 16-20, 2009 to provide oversight and discussion of enforcement actions.

Underground Mine Visits in D8, discussed enforcement, staffing, and plans with DM December14-18th and also made a mine visit to D10 same trip. Primary focus was roof control, rockdusting, bleeder evaluations and general conditions of the mine.

<u>District 9 Deputy Administrator Oversight involvement</u>

July 13, 2009 District 9 "All Employee Meeting" Grand Junction, CO went over general inspection procedures manual front to back with all ARs.  I answered questions from the inspectors in all field offices.  As a follow-up to the office of accountability, I was aware of the low S&S rate and requested Richard McDorman provide training on S&S, Gravity, and Negligence determination in all D9 field offices.

February 7-February 11, 2010 Mine Visits Texas Lignite Surface Mines Longview, Elgin, TX and roll out for end black lung in Austin, TX.  I found that the lignite mines were in good compliance and commended the Texas inspectorate.

June 22-26, 2010 Bull Mountain UG mine visit, Roundup, MT this mine had compliance problems on PPOV. Division of Safety and I walked the tailgate of the longwall and evaluated the bleederless system after carbon monoxide problems at this mine. Found that the new system was working according to plan requirements and CO was low.

Answering Specification 1,

I was never interviewed on how I provide oversight on flagrants.  Kevin Stricklin reviewed all flagrants, I did review approximately 20 flagrants received in HQ and gave the Administrators my recommendations. HQ maintains flagrants on the Coal Digital Dashboard.  Here is the link:  <u>W:\COAL\Specproj\Flagrants</u>

During performance appraisals where I was rated Exemplary and Highly Effective nothing verbally or written told or instructed me that I was deficient on reviewing or providing oversight on flagrants. **The PIL is currently expired and I have no written directive to provide oversight on flagrants at present time.** MSHA COAL, MSHA METAL, and SOL do not have a current policy or directive in affect to follow or guide both Management and inspectors at this present time.

I have attached several SOL "Special Assessment for Review Packages" to present my case that it is difficult to get support for flagrant.  I have read and summarized reasons that SOL gave "not to support flagrant determination to the DM and to the Administrator", these packages with memorandums to DMs, "conditioned" folks that it had to be a compelling case to be supported by SOL.  We all know that no one can predict how a commission will rule.

What is more important is that miner's got hazards abated quickly to protect their health and safety. Gravity and Negligence determinations are important but not as important as Miner health and safety.

Some of the explanations given by SOL are:

"It would be difficult" but no concrete reason given for not supporting flagrant Order # 8357920.

"Have reservation" "Thin evidence" "It is likely that a non-flagrant special assessment would serve well as a flagrant assessment" This is not what Congress intended in my humble opinion.

A RTLB (Rules to Live By) standard Order # 8353173 may meet the standard we do not recommend assessing it as flagrant violation as citation 835172 involves same condition, and citing both "APPEARS" to be double dipping. CMI ARs are required to cite each and every violation they observe. In this case the inspector notes indicate:

Question: Why did the foreman not rockdust this area?
Foreman's Answer: "Didn't have a scoop driver because he quit.

This shows aggravated conduct above ordinary negligence when the foreman made a conscious decision not to comply with the law, mine coal and not rockdust as required by the standard. There are photos in this package at BELL COUNTY COAL CORPORATIN, JELLICO #1, ID 15-19336


Answering Specification 2

This specification mentions mine plans. If the mine plans were followed by the operator at UBB there would have been no mine explosion. There were more citations and orders issued at this District 4 mine than any other mine in D4. How can my oversight be deficient when more orders were issued at this mine than any in the Nation.

The ventilation plan was violated, the roof control plan was violated, the mine examiners did not conduct required bleeder examinations around the longwall perimeter. Checking a box on a checklist, or have two independent plans on ventilation and respirable dust parameters did not cause the explosion. The District had been doing separate vent and dust plans for 30 years, other Deputy Administrator and Administrators had not been following policy and did not make corrections. This is not egregious conduct on my part. Two other "acting" Deputy Administrators and Kenny Murray preceded me. I feel really hurt that I am singled out on this "policy" requirement that does not harm miners.

The District Manager and the Assistant District Manager for Technical Programs are responsible to review and utilize checklists, if our audits would have caught this I would

MSHA0140

have provided oversight. It is not reasonable to believe that I have the time to look at 450 underground vent plans and provide oversight of whether a checklist was properly filled out or whether it was utilized. The more important point is whether the plans are adequate for current mining conditions. I firmly believe the plans were adequate in D4 and if followed by the operator this tragedy could have been avoided or mitigated.  It should not be expected the Deputy Administrator or Administrator be personally responsible for 450 actual Underground Mine Plan reviews. **My role is to audit and give training to field personnel and  policy, not review the plans on a mine by mine basis.  Mr. Rich Kline was responsible for this to sign off on the plan.  I removed him from his position when I came aware and transferred him to Anthracite Coal District 1, this would have come out in the interview had I been given an opportunity to tell what I knew. A mitigating factor is that I did not sign the plan the DM, ADM, and either vent or roof supervisor signed the plan. How can I be held personally responsible for something I did not see. Kevin will tell you that before I make a mine visit, I request a copy of the vent, roof, and ERP and have the Division of Safety review it before I make a mine visit, and any deficiencies are put on the plan and given to the DM to correct when I make the mine visit. This would have come out in interviews had I been afforded the opportunity by the AI or the IR team members.**


Additional Mitigating Factors

- Operator Conduct:  The operator's intentional and illegal conduct interfered with MSHA's ability to fulfill its responsibilities under the Mine Act.
- Resource Limitations:  Budgetary constraints and retirements of experienced inspectors depleted MSHA's inspectorate. Increased funding after Sago, Darby, and Aracoma disasters resulted in and inexperienced workforce in District 4, a district that was responsible for inspecting 437 coal mines and facilities at the time of the UBB explosion.
- Directive System:  The agency Directives System had fallen into disuse and MSHA did not consistently use it to provide its employees with instructions and information necessary to effectively and efficiently implement program and mission-support activities. As a result, District 4 inspectors, many of whom had limited MSHA experience, were not aware of or did not know where to locate all policies and procedures they were required to follow.
- Acting Supervisors:  MSHA did not have a program when I became "Acting" Deputy Administrator to train inspectors who might be assigned to filling as acting supervisors.
- The Technical Assistant District Manager:  Rich Kline is now retired, was directly responsible for the identifying and correcting significant deficiencies in the review and approval of the roof control, ventilation, and dust control plans identified by the IR.  On the contrary, the ADM condoned approving the roof control plan without a pillar stability analysis.  Oversight by the District 4 manager was also lacking, but he had asked me to remove Kline from the District. I as an "Acting" Deputy Administrator did not get questioned by the AI or the IR teams to see what actions I was in the process of taking with Mr. Kline. My long

MSHA0141

career in enforcement identified that the DM was having issues with the ADM, we were in the process of acting on them when the UBB explosion occurred. I was never questioned by the AI or the IR teams concerning ADM Kline.

- Inspector and Supervisory Inexperience:  Because of the reduction in staffing in the years before 2006, many experienced inspectors left MSHA and could not be replaced. As a result, new-appointed inspectors , some of whom had not completed all of their entry-level training, were called on to mentor trainees and oversee their on-the-job training.  Inspector and supervisor inexperience was evident at UBB.
    - All but one of the lead inspectors assigned to conduct regular inspections were hired b MSHA after the 2006 coal mine disasters.  A newly-hired trainee needs approximately two years to complete classroom and on-the-job training to become a journeyman inspector.
    - The most experienced lead inspector at UBB had 52 months of MSHA experience when he began his inspection; the least experienced had 13 months of MSHA experience.  The average experience for an inspector was 30 months, including training

- **Computer Glitch in PPOV-  I was not responsible for the computer glitch that failed to identify UBB as a PPOV, this is beyond my role and my area of responsibility.**
**Where is the discipline for this oversight? No one from the IR asked me about this oversight and how it may have prevented the UBB explosion.**

**District 4 split was delayed- I was not responsible for the delay to split D-4, this request was submitted during previous Administrator Ray McKinney. According to records the D4 submit request dates back to 2004. District 4 after being split in half is still the biggest Coal District in MSHA with forty-six (46) active underground mines and is still the largest Coal District.  Having one District Manager over such a large District is difficult to manage and was out of my control to make the split happen.  I have attached documentation when the D4 split was first proposed and a timeline.**

**In summary, I was the "Acting" Deputy Administrator in a trial training and observation period from April 2009 to September 2010 and did not have full authority to make independent decisions on splitting D4, or major policy changes without concurrence of MSHA top staff.**

**It is unjust and unfair that I was not afforded the opportunity to face a "jury of my peers" and be interviewed by either the UBB Accident Investigation Team or the**

UBB Internal Review Team to give facts, reasons, observations of what I knew about UBB, District 4, or MSHA Coal in general.

I worked for, received, and was evaluated as Exemplary and Highly Effective twice the last three ratings on performance.  At no time during my "Acting" Deputy Administrator did anyone give me anything in writing or verbally that my oversight was not effective or lacking substance. On the contrary I have evidence that flagrant enforcement actions were repeatedly denied or rejected by Regional SOL 14 times. This constant rejection caused District Managers to be "conditioned" not to recommend enforcement actions for flagrant determination and there was no computer prompt to inform or remind inspectors and specialists to consider enforcement actions for flagrant.

The policy of having separate ventilation and dust control plans was prevalent in District 4 for over 30 years and did not contribute or cause the UBB explosion this was a breach of policy that was accepted by previous Administrator, Deputy Administrators, and District Mangers.

I was the only "Acting" Deputy administrator given a letter for alleged failure to carry out duties. There were two other "Acting" Deputies' prior to my detail in COAL.

In closing this proposed seven (7) day suspension memorandum has tarnished my family and my reputation, made me feel hurt, and has caused me to be stressed and have difficulty sleeping and upset my stomach.  I have always put the Miner's health and safety as the principal mission of this Agency and in my efforts to enforce the regulations, policies, and procedures and at no time have I been inadequate in providing oversight to ensure that the regulations were not being rigorously enforced.  At no time was I informed either in writing or verbally that my oversight, leadership, or level of enforcement was lacking by either my immediate supervisor or anyone higher in the MSHA chain of command or organization chart.

I do not believe these specifications have merit or substance, and strenuously find them unfair, unjust, and undeserving to a career Senior Executive Deputy who made multiple visits to underground Coal Mines and provided "hands on" oversight.

The Upper Big Branch coal mine explosion was caused by the operator's non-compliance, and this was the most heavily cited underground coal mine in District 4. The fault lays with the coal operator not me, and the accident investigation has proved that fact and I should not be a scapegoat.

The PPOV list is at a historic all-time low of four mines. This is a good trend under my oversight and nobody can deny that fact. I have an attachment pointing that out as well.

The PPOV list is at a historic all-time low of four mines. This is a good trend under my oversight and nobody can deny that fact. I have an attachment pointing that out as well.

Page 1 of the UBB IR Executive Summary under _Significant findings._  Paragraph 6 states, *"As detailed in the MSHA Accident Investigation report, Massey, through its subsidiary Performance Coal Company, violated numerous, widely –recognized safety standards and failed to prevent or correct numerous hazards that ultimately caused the catastrophic explosion.*

*The Operator concealed its highly non-compliant conduct in a number of significant ways. The Operator provided advance notice of MSHA inspections, allowing foreman to correct violations before inspectors arrived underground to detect them."*

Other underlying causes were Resources, Inspector Experience, Management Turnover, Directive System, and Training.  These are mitigating factors that were not in my immediate control.

This is a mitigating factor which makes it difficult for an "Acting" Deputy Administrator to detect trends in violations or hazards when the Company conceals them from our inspectorate and our management structure.

Please give my facts, attachments, and memorandum your due consideration. I am not deserving of this seven (7) day suspension which takes money not only away from me but my wife and mother. It is painful to be thought of and wrongfully accused of failure to perform my duties and has caused me much anguish.  I also feel that I was singled out from other "Acting" Deputy Administrators.

If the Miners are MSHA's highest priority, why was I never instructed, coached, mentored, or informed that my oversight was lacking until 973 days after the UBB Disaster by anyone in MSHA?

Attachments include Key Indicator
Attachment Tri-Star Settlement Agreement
Attachment of District 4 split timeline
Attachment of 13 Flagrant Legal Analysis

Confidential Agency Document
DLB-000317

MSHA0144

| | |
|---|---|
| **From:** | Silvey, Patricia - MSHA |
| **To:** | Kramer, Donna L - OASAM HRC |
| **Cc:** | Molina, Monique V - MSHA |
| **Subject:** | FW: December 15, 2012 memorandum |
| **Date:** | Thursday, January 17, 2013 9:51:53 PM |

FYI

---

**From:** Selfe, Lincoln L - MSHA
**Sent:** Thursday, January 17, 2013 3:48 PM
**To:** Silvey, Patricia - MSHA
**Cc:** Carpenter, Charles E - MSHA
**Subject:** December 15, 2012 memorandum

Good Afternoon Ms Silvey,

Tomorrow is the deadline for my responses to you concerning the memorandum I was given in December 15, 2012 by Ernest Cameron. I hope I have provided adequate mitigating information and clarified the issues from the Internal Review Team. I am still very upset with these allegations and how they have been misinterpreted and singled me out for a disciplinary action when the team actually identified the issues as nationwide issues, not specific to me and CMS&H District 4. One thing I failed to include in my response is that I am a Certified Mine Safety Professional and have been recognized as a Professional Member of the International Society of Mine Safety Professionals. I have strived to be a mentor and set an example for MSHA in every assignment that I have performed in my 30 year career. I hope this has stood out to you from my past work experiences, performance appraisals, and the various duties I have performed for MSHA. I also want to thank you for the face to face meeting December 18th at the academy and giving me the opportunity to discuss the issues in person. If you need any clarifications or have other questions that will assist you in making the right decision, please do not hesitate to contact me.

Thank you,
Link Selfe

Confidential Agency Document
DLB-000318

MSHA0145

| | |
|---|---|
| **From:** | Selfe, Lincoln L - MSHA |
| **To:** | Silvey, Patricia - MSHA |
| **Subject:** | Re: December 15, 2012 memorandum |
| **Date:** | Thursday, January 17, 2013 9:52:16 PM |

Thank you again.

**From:** Silvey, Patricia - MSHA
**Sent:** Thursday, January 17, 2013 09:51 PM
**To:** Selfe, Lincoln L - MSHA
**Cc:** Carpenter, Charles E - MSHA
**Subject:** RE: December 15, 2012 memorandum

Dear Link,
I appreciate your presentation to me and our team in at the Academy.  As I stated then, I hope to have a decision to you soon.
Take care,
Pat

**From:** Selfe, Lincoln L - MSHA
**Sent:** Thursday, January 17, 2013 3:48 PM
**To:** Silvey, Patricia - MSHA
**Cc:** Carpenter, Charles E - MSHA
**Subject:** December 15, 2012 memorandum

Good Afternoon Ms Silvey,

Tomorrow is the deadline for my responses to you concerning the memorandum I was given in December 15, 2012 by Ernest Cameron. I hope I have provided adequate mitigating information and clarified the issues from the Internal Review Team. I am still very upset with these allegations and how they have been misinterpreted and singled me out for a disciplinary action when the team actually identified the issues as nationwide issues, not specific to me and CMS&H District 4. One thing I failed to include in my response is that I am a Certified Mine Safety Professional and have been recognized as a Professional Member of the International Society of Mine Safety Professionals. I have strived to be a mentor and set an example for MSHA in every assignment that I have performed in my 30 year career. I hope this has stood out to you from my past work experiences, performance appraisals, and the various duties I have performed for MSHA. I also want to thank you for the face to face meeting December 18th at the academy and giving me the opportunity to discuss the issues in person. If you need any clarifications or have other questions that will assist you in making the right decision, please do not hesitate to contact me.

Thank you,
Link Selfe

Confidential Agency Document
DLB-000319

MSHA0146

| | |
|---|---|
| **From:** | Molina, Monique V - MSHA |
| **To:** | Silvey, Patricia - MSHA |
| **Cc:** | Molina, Monique V - MSHA |
| **Subject:** | FW: Question on personnel matter |
| **Date:** | Tuesday, February 26, 2013 5:30:52 PM |
| **Attachments:** | MSHA delegation for formal grievances.doc |

**Is this ok to put in final?**

---

**From:** Kramer, Donna L - OASAM HRC
**Sent:** Tuesday, February 26, 2013 5:14 PM
**To:** Molina, Monique V - MSHA
**Subject:** RE: Question on personnel matter


Donna L. Kramer
Supervisory Human Resources Specialist
Office of Human Resources Consulting
and Operations
U.S. Department of Labor
OASAM/OHRCO
Phone: 202-693-7686
Kramer.Donna.L@dol.gov

The contents of this email and any attachments to it may contain confidential and/or legally priviledged information. This information is only for use by the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking action based upon the information contained herein is strictly prohibited. If this email was received in error, please notify the sender and return the documents immediately.

*How Was My Service?  Click Here (3 minute survey):* http://dol-hrc.customerservicesurvey.sgizmo.com/s3/

---

**From:** Molina, Monique V - MSHA
**Sent:** Tuesday, February 26, 2013 5:10 PM
**To:** Kramer, Donna L - OASAM HRC
**Subject:** RE: Question on personnel matter

yes

---

**From:** Kramer, Donna L - OASAM HRC
**Sent:** Tuesday, February 26, 2013 4:54 PM
**To:** Molina, Monique V - MSHA
**Subject:** Question on personnel matter

Monique,

I have a draft delegation authority for review and possible signature.  May I email the draft?

Donna L. Kramer
Supervisory Human Resources Specialist

Confidential Agency Document
DLB-000320

MSHA0147

Office of Human Resources Consulting
and Operations
U.S. Department of Labor
OASAM/OHRCO
Phone: 202-693-7686
Kramer.Donna.L@dol.gov

The contents of this email and any attachments to it may contain confidential and/or legally priviledged information. This information is only for use by the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking action based upon the information contained herein is strictly prohibited. If this email was received in error, please notify the sender and return the documents immediately.

*How Was My Service?  Click Here (3 minute survey):* http://dol-hrc.customerservicesurvey.sgizmo.com/s3/

Confidential Agency Document
DLB-000321

MSHA0148

MEMORANDUM FOR:    JOHN MORAN
                   Deputy Assistant Secretary
                   Veterans Employment and Training Service

FROM:              JOSEPH A. MAIN
                   Assistant Secretary
                   Mine Safety and Health Administration

SUBJECT:           Delegation of Authority

Pursuant to DOL Personnel Regulation (DPR) 771, Section 3.b.1.a, I am delegating to you the authority to make determinations and to serve as the Deciding Official on behalf of the Mine Safety and Health Administration (MSHA) concerning administrative grievances which may be filed by employees Lincoln Selfe, Donald Winston, and Charles Thomas. The grievances would be related to the disciplinary actions these individuals received for failure to carry out official duties. The purpose of this delegation is to expedite grievance processing.

Please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686, if you have any questions about the foregoing.

Confidential Agency Document
DLB-000322

MSHA0149

| | |
|---|---|
| **From:** | Kramer, Donna L - OASAM HRC |
| **To:** | Molina, Monique V - MSHA |
| **Subject:** | Letters are in SOL for review |
| **Date:** | Tuesday, March 19, 2013 12:59:53 PM |
| **Attachments:** | Selfe decision letter.doc |
| | Winston decision letter.doc |

Donna L. Kramer
Supervisory Human Resources Specialist
Office of Human Resources Consulting
and Operations
U.S. Department of Labor
OASAM/OHRCO
Phone: 202-693-7686
Kramer.Donna.L@dol.gov

The contents of this email and any attachments to it may contain confidential and/or legally priviledged information. This information is only for use by the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking action based upon the information contained herein is strictly prohibited. If this email was received in error, please notify the sender and return the documents immediately.

*How Was My Service?  Click Here (3 minute survey):* http://dol-hrc.customerservicesurvey.sgizmo.com/s3/

Confidential Agency Document
DLB-000323

MSHA0150

April 2, 2013

MEMORANDUM TO:      LINCOLN L. SELFE, JR.
                    Supervisory Mine Safety and
                    Health Inspector

FROM:               PATRICIA W. SILVEY
                    Deputy Assistant Secretary for Operations

SUBJECT:            Decision Letter of Proposed Seven (7) Day
                    Suspension

By letter dated December 5, 2012, Ernest Cameron, Director, Administration and
Management, proposed to suspend you from pay and duty status for seven (7)
calendar days from your position of Supervisory Mine Safety and Health
Inspector.[1], GS-1822-14, in the District 4 Office in Mount Hope, WV, of the Mine
Safety and Health Administration (MSHA).  This decision is taken to promote the
efficiency of the Federal Service and is based on your failure to carry out your
official duties.

On December 20, 2012, you presented me with your oral reply to the proposed
suspension.  Also in attendance at the oral reply were Executive Assistant
Monique Molina, MSHA, and Donna Kramer, Supervisory Human Resources
Specialist, Office of the Assistant Secretary and Management (OASAM).

During the oral reply you also provided your written reply.  An extension was
granted until January 18, 2013, to allow you to supplement your written reply, if
you so desired.  On January 17, 2013, you submitted an e-mail containing
additional information for my consideration.

I have considered the oral and written replies that you presented to me as well as
the proposed suspension issued to you by Mr. Cameron and all supporting
documentation.

**Discussion on Decision to Suspend:**
Specification 1 of the proposed suspension concerned your failure to provide
adequate management oversight ensuring that inspectors and supervisors under
your supervision reviewed potentially flagrant violations in accordance with the
procedures established by Procedure Instruction Letter (PIL) No. I08-III-02.

During your oral reply and in your written reply, you noted that of the two types of
flagrant violations, inspectors only had difficulty with the repeated failure or S & S
violations.  You also stated that at the time of the Upper Big Branch (UBB) mine

---

[1] This position is commonly referred to as the Assistant District Manager.

MSHA0151

accident there was not any mechanism available to assist inspectors in determining whether or not a cited violation was a repeat violation other than the inspectors or his/her supervisor's memory.  You cited the lack of clear and concise guidance relative to the interpretation of the PIL No. I08-III-02 on specifically what two previous standards mentioned in the PIL actually refers to. Both of your replies also references the matters as being nationwide in scope and your belief that you should not disciplined for a nationwide problem.

Although I have considered your comments, for the purpose of this decision letter, I am focused on your actions regarding lack of adequate management oversight on potentially flagrant violations in accordance with the PIL procedures.

As stated in the proposed suspension, one of the key responsibilities of your position is to evaluate the results of policy implementation within your enforcement responsibility.  The Mt. Hope Field Office inspectors issued eight section 104(d)(2) orders for violations at UBB that met the "numbered objective criteria" in PIL No. I08-III-02 for review as potentially flagrant violations.  The eight violations issued were not reviewed as potentially flagrant violations by inspectors or supervisors.

In both your oral and written replies you did not offer any explanation as the reasons why only 9% of the 66 potentially flagrant violations required to be reviewed were reviewed within your enforcement responsibility.  Therefore, I find that this specification is supported by the evidence.

Specification 2 of the proposed suspension concerned your failure to provide necessary management oversight to ensure that Right of Entry (ROE) trainees in the Mt. Hope Field Office did not conduct inspection activities apart from Authorized Representatives, (ARs).

In your oral and written replies you stated that you did not have any knowledge that ROE trainees were conducting inspection activities apart from the ARs.  You also stated that you had no reason to believe or question that the directives you had issued regarding parameters of when an ROE trainee could be apart from the AR were not being followed.  You asserted that if you knew these actions occurred you would have taken disciplinary action against those who failed to follow your directives, which were in compliance with Section 103(a) of the Miner Act.

Although, the Internal Review (IR) team determined that for portions of five of the six regular inspections at UBB, ROE trainees did conduct inspection activities apart from the ARs, I cannot find any evidence that indicates you were aware of these occurrences.  As such, this specification as cited in the proposal cannot be supported.

Your failure to effectively use established Agency tools to identify and correct errors on the part of your subordinate inspectors and supervisors regarding Accompanied Activities (AAs) and Field Activity Reviews (FARs) is cited in Specification 3 of the proposed suspension.  This specification also references supervisors' lack of documentation of required information on many AA and FAR forms such as correct event activity codes, dates of the Uniform Mine File reviews, dates when inspectors were debriefed, and, in some cases, supervisors not accompanying inspectors on all aspects of an inspection or investigation.  Your failure to identify apparent deficiencies in two second level reviews you conducted was also mentioned.

In the oral and written replies, you stated that the infractions listed in this specification are not limited to District 4; this is a national issue.  You also stated that ADM training is non-existent; you met with supervisors and addressed the issue of complete documentation; and instructed the supervisors that they had to travel with the inspector doing inspection activities in order to use the visit as an AA.

After reviewing this specification and your replies, I have determined that Specification 3 is not supported by the evidence.

**Penalty Selection:**
In reaching my decision to sustain one (1) of the three (3) specifications in the proposed seven (7) day suspension issued to you, I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981)

I considered the nature and seriousness of your actions.  Failing to carry out your official duties is one of the most serious infractions that can be committed.  As a management official you are tasked with setting a positive example for subordinate employees.  You were and still are assigned to review the work of the management and inspection personnel under your jurisdiction.  If you are unable to enforce agency policies and follow National Office directives, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the very miners MSHA is tasked with protecting.

A Supervisory CMS&H Inspector is a prominent position.  You are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to.  Additionally, you are recognized by the mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006.  Your responses to the IR team relative to Specification 1 indicated that you were aware of the criteria in PIL No. I08-III-02 for reviewing violations as potentially flagrant.

Although, as you indicated in both your oral and written replies, there may be other districts in violation of the Agency policies and directives, you failed to accept any responsibility for your actions. Your statements that every other ADM in the country needs to be disciplined since you are being disciplined and MSHA is using the IR report as a "gotcha" does not indicate your acknowledgement that you could have carried out your official duties better. This is particularly troublesome to me. Even if other districts have deficiencies, you are responsible for District 4 and must be held accountable.

I have also considered your "Highly Effective" performance ratings for Fiscal Years (FY) 2010 and 2011, the lack of any prior disciplinary action in your personnel file, and your approximate 30 years of federal service.

I am unaware of other mitigating factors that warrant consideration as you did not share any with me.

It is my belief that you will not commit these same or similar infractions in the future. I am confident that you can be successful in carrying out all of your upcoming official duties. Your dedication to MSHA and all miners during your career is appreciated.

However, these mitigating factors do not outweigh the seriousness of your actions. I have determined that a two (2) calendar day suspension will promote the efficiency of the service and is the least action I can take to correct your unacceptable conduct.

Your two day suspension will take place beginning on April 9, 2013, and continue through April 10, 2013, during which time you will be in a non-pay status. Paid leave may not be used to offset the loss of pay resulting from suspension. A Standard Form 50, Notification of Personnel Action, will be accessible via your Electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 11, 2013. You will continue in your current position, grade and salary pending the effective date of this action. Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

You are hereby advised that continued misconduct by you will not be tolerated in the future. Any recurrence of misconduct by you may lead to more severe disciplinary action or adverse action, up to and including your removal from Federal Service.

**NOTICE OF RIGHTS:**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008. You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of

this action.  A formal grievance must:  (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested.  Your grievance must be filed with:

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325
Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a MSPB appeal as outlined above, or by filing a complaint with the Office of Special Counsel.  The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB.  A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, political affiliation, or physical handicap, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor.  If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Directorate of Civil Rights, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC  20212.  The Department of Labor will review the merits of the case as well as the charge of discrimination.  For further information regarding the EEO complaint process, you may contact the Department of Labor, Civil Rights Center at (202) 693-6500.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency.  However, you must designate your choice of representative in writing to Mr. Moran.  Any choice must include your representative's name, address, and phone number.

Confidential Agency Document
DLB-000328

MSHA0155

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status.  You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Departments Employee Assistance Program (EAP).  The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind and services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

March 27, 2013

MEMORANDUM TO:    DONALD WINSTON
Supervisory Mine Safety and
Health Specialist

FROM:    PATRICIA W. SILVEY
Deputy Assistant Secretary for Operations

SUBJECT:    Decision Letter of Proposed Seven (7) Day
Suspension

By letter dated December 5, 2012, Ernest Cameron, Director, Administration and Management, proposed to suspend you from pay and duty status for seven (7) calendar days from your position of Supervisory Mine Safety and Health Specialist, GS-1822-13, in the Mount Hope, WV District 4 Office, of the Mine Safety and Health Administration (MSHA). This decision is taken to promote the efficiency of the Federal Service and is based on your failure to carry out your official duties.

On December 20, 2012, you presented me with your oral reply to the proposed suspension. Also in attendance at the oral reply were Executive Assistant Monique Molina, MSHA, and Donna Kramer, Supervisory Human Resources Specialist, Office of the Assistant Secretary and Management (OASAM).

During the oral reply I granted an extension for submission of any written reply until January 18, 2013. On January 7, 2013, you submitted your written reply.

I have considered the oral and written replies that you presented to me as well as the proposed suspension issued to you by Mr. Cameron and all supporting documentation.

**<u>Discussion on Decision to Suspend</u>**
Specification 1 of the proposed suspension concerned your failure to follow CMS&H Memo No. HQ-08-058A, when you recommended that the District 4 Manager approve the base roof control plan submitted in October 2009 for Upper Big Branch (UBB), without requiring Performance Coal Company to submit a risk assessment specific to the

MSHA0157

particular mining operation, including the data and evaluation supporting the proposed roof control plan.

During your oral and written replies, you noted that CMS&H Memo No. HQ-08-058A lists four criteria to be used in determining if a roof control plan is complex and/or non-typical. The fourth criteria concerned other conditions considered unusual by the District Managers, such as retreat mining between two gob areas, mining of high stress areas created by multiple seam interaction, or active mining above or below longwall panels or isolated remnant pillars.

After reviewing this specification, I have determined that the Memo does allow the District Manager's to exercise discretion relative to risk assessments. As such, this specification as cited in the proposal cannot be supported.

Specification 2 of the proposed suspension concerned your failure to implement provisions of CMS&H Memo No. HQ-08-059A when you did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and revisions. Instructions for all roof control personnel to begin using these checklists were e-mailed to District Managers and Assistant District Managers on January 27, 2009.

Additionally, the District 4 plan approval records for the October 2009 UBB base roof control plan did not contain the Headquarters or the District 4 checklists.

In both your oral and written replies you stated that prior to CMS&H Memo No. HQ-08-059A being issued District 4 developed checklists to be used when reviewing roof control plans. You stated that the District 4 checklists contained a large majority of the items that the CMS&H Memo No. HQ-08-059A checklist contained and thought the District 4 checklist was sufficient.

During your replies, you acknowledged that you continued to complete the District 4 checklists even after the Headquarters checklists were disseminated. You also affirmed that the October 2009 UBB base roof control plan file did not contain any checklist, Headquarters or District 4's.

In your written reply you admitted that you were aware that instructions requiring roof control specialists to use the Headquarters checklists were e-mailed on January 27, 2009, to the District Managers

MSHA0158

and Assistant District Managers.  However, you stated that the e-mail distribution of the checklists did not include roof control supervisors; you did not receive the Headquarters checklist; and you were not informed that you had been using an incorrect checklist.

During the oral reply, you asserted the same position that your written reply contained regarding the checklists; you were not on the e-mail distribution list, did not receive the Headquarters checklist, and not informed that you were using an incorrect checklist.  However, during the oral reply, I asked you whether or not you received the Headquarters checklist.  Your response was that you could not say and you were not going to lie to me.  If you received the checklist, it would have been from District Manager Richard Kline[1].  You continued to state that you could only tell me that you were not aware of the Headquarters checklist.

Based on the information shared during the oral reply, I find that this specification is supported by the evidence.

### Penalty Selection:

In reaching my decision to sustain one (1) of the two (2) specifications in the proposed seven (7) day suspension issued to you, I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981)

I considered the nature and seriousness of your actions.  Failing to carry out your official duties is one of the most serious infractions that can be committed.  As a management official you are tasked with setting a positive example for subordinate employees.  You were and still are assigned to review the work of the inspection and technical personnel under your jurisdiction.  If you are unable to enforce agency policies and follow National Office directives, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the very miners MSHA is tasked with protecting.

A Supervisory CMS&H Specialist is a prominent position.  You are recognized by the mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006.  You are also recognized by the Office of the Solicitor (SOL) as an expert on roof control as they have

---

[1] District Manager Kline has retired.

Confidential Agency Document
DLB-000332

MSHA0159

utilized your expertise on several legal cases which settled in a positive manner in MSHA's favor.

As a Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to. Although the Internal Review team concluded that the District 4 checklists for reviewing roof control plans were adequate to ensure the plans submitted by Performance Coal Company included the required information, you were unable to explain why any checklist was missing from the October 2009 UBB base roof control plan.

Regardless of what happened to the checklist from the October 2009 UBB base roof control plan, I find that you failed to exercise due diligence in implementing the checklists in CMS&H Memo No. HQ-08-059A.

I have also considered your "Highly Effective" performance ratings for Fiscal Years (FY) 2009, 2010 and 2011 and the lack of any prior disciplinary action in your personnel file, and your 20 years of federal service.

It is my belief that you will not commit these same or similar infractions in the future. I am confident that you can be successful in carrying out all of your upcoming official duties and appreciate the dedication that you have shown to MSHA.

However, these mitigating factors do not outweigh the seriousness of your actions. I have determined that a one (1) calendar day suspension will promote the efficiency of the service and is the least action I can take to correct your unacceptable conduct.

Your one day suspension will take place beginning on April 9, 2013, during which time you will be in a non-pay status. Paid leave may not be used to offset the loss of pay resulting from suspension. A Standard Form 50, Notification of Personnel Action, will be accessible via your Electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 10, 2013. You will continue in your current position, grade and salary pending the effective date of this action. Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

MSHA0160

You are hereby advised that continued misconduct by you will not be tolerated in the future. Any recurrence of misconduct by you may lead to more severe disciplinary action or adverse action, up to and including your removal from Federal Service.

**NOTICE OF RIGHTS:**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008. You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of this action. A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested. Your grievance must be filed with:

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325
Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a MSPB appeal as outlined above, or by filing a complaint with the Office of Special Counsel. The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB. A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, political affiliation, or physical handicap, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor. If you file an EEO

Confidential Agency Document
DLB-000334

MSHA0161

complaint with the U.S. Department of Labor, you should submit it to the Directorate of Civil Rights, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC 20212. The Department of Labor will review the merits of the case as well as the charge of discrimination. For further information regarding the EEO complaint process, you may contact the Department of Labor, Civil Rights Center at (202) 693-6500.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency. However, you must designate your choice of representative in writing to Mr. Moran. Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status. You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Departments Employee Assistance Program (EAP). The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind and services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

| From: | Louviere, Amy - MSHA |
|---|---|
| To: | Main, Joseph A - MSHA; Silvey, Patricia - MSHA |
| Cc: | Aaronson, Julie E - MSHA |
| Subject: | draft statement on disciplinary actions |
| Date: | Friday, April 19, 2013 11:25:31 AM |

Draft Statement:

Since the explosion at the Upper Big Branch Mine, the Mine Safety and Health Administration has taken a number of actions to improve mine safety and continues to work with the Department of Justice regarding any wrongdoings.

MSHA's internal review specifically determined that agency actions did not contribute to the accident, or to its severity. Nevertheless, we found that improvements could be made, and set about to make them. These improvements covered a wide variety of actions, including the splitting of District 4 into two districts, monthly impact inspections, training for supervisors and a revamped pattern of violations process. In addition, following the findings of the internal review, MSHA has administered appropriate disciplinary actions.

Confidential Agency Document
DLB-000377

MSHA0204

| | |
|---|---|
| **From:** | Main, Joseph A - MSHA |
| **To:** | Silvey, Patricia - MSHA |
| **Cc:** | Louviere, Amy - MSHA |
| **Subject:** | Re: draft statement |
| **Date:** | Monday, April 22, 2013 6:16:57 PM |

Ok

**From:** Silvey, Patricia - MSHA
**Sent:** Monday, April 22, 2013 06:15 PM
**To:** Main, Joseph A - MSHA
**Cc:** Louviere, Amy - MSHA
**Subject:** RE: draft statement

We're sending this to others now for clearance.  Amy wanted you to clear first.

**From:** Main, Joseph A - MSHA
**Sent:** Monday, April 22, 2013 6:13 PM
**To:** Silvey, Patricia - MSHA
**Cc:** Louviere, Amy - MSHA
**Subject:** Re: draft statement

Did SOL clear? Others need to clear?
Thanks

**From:** Main, Joseph A - MSHA
**Sent:** Monday, April 22, 2013 06:11 PM
**To:** Silvey, Patricia - MSHA
**Cc:** Louviere, Amy - MSHA
**Subject:** Re: draft statement

Ok

**From:** Silvey, Patricia - MSHA
**Sent:** Monday, April 22, 2013 06:09 PM
**To:** Main, Joseph A - MSHA
**Cc:** Louviere, Amy - MSHA
**Subject:** FW: draft statement

Joe,
Please see revised draft statement below.  We received a comment from Nancy, and this statement
reflects her comment.

On March 6, 2012, MSHA issued the Agency's Internal Review (IR) Report of Agency
enforcement actions related to the Upper Big Branch Mine accident.  Although the IR Report
specifically concluded that MSHA's actions did not contribute to the accident, we determined
that regulatory and administrative improvements were needed in a number of areas.  We
immediately began to implement these improvements, which covered a wide variety of
actions, including the splitting of District 4 into two districts, monthly impact inspections,
training for supervisors and agency enforcement staff, and a revamped pattern of violations

Confidential Agency Document
DLB-000380

MSHA0207

process.  We administered disciplinary actions, where appropriate.  We also continue to work with the Department of Justice regarding any wrongdoing.

During my tenure at MSHA, I have had the opportunity to work with many employees dedicated to the Agency's mission of improving safety and health of miners.  I am committed to assuring that MSHA carries out that mission as effectively as possible, and we are holding our employees to a high standard in the performance of their duties.

-- MSHA Assistant Secretary Joseph A. Main

Confidential Agency Document
DLB-000381

**From:** Silvey, Patricia - MSHA
**Sent:** Monday, April 22, 2013 6:10 PM
**To:** Main, Joseph A - MSHA
**Cc:** Louviere, Amy - MSHA
**Subject:** FW: draft statement
**Importance:** High

Joe,
Please see revised draft statement below. We received a comment from Nancy, and this statement reflects her comment.


On March 6, 2012, MSHA issued the agency's Internal Review (IR) Report of agency enforcement actions related to the Upper Big Branch Mine accident. Although the IR Report specifically concluded that MSHA's actions did not contribute to the accident, we determined that regulatory and administrative improvements were needed in a number of areas. We immediately began to implement these improvements, which covered a wide variety of actions, including the splitting of District 4 into two districts, monthly impact inspections, training for supervisors and agency enforcement staff, and a revamped pattern of violations process. We administered disciplinary actions, where appropriate. We also continue to work with the Department of Justice regarding any wrongdoing.

During my tenure at MSHA, I have had the opportunity to work with many employees dedicated to the agency's mission of improving the safety and health of miners. I am committed to assuring that MSHA carries out that mission as effectively as possible, and we are holding our employees to a high standard in the performance of their duties.


     -- MSHA Assistant Secretary Joseph A. Main

Confidential Agency Document
DLB-000382

MSHA0209

| | |
|---|---|
| **From:** | Rose, Sydney T - OASAM HRC |
| **To:** | Silvey, Patricia - MSHA |
| **Subject:** | Re: Sorry, but we"re probably going to have an Est completion date for getting your investigation report |
| **Date:** | Thursday, July 16, 2015 7:18:52 PM |

Pat:  I never got a chance to call today.  I'm sorry!  I'm on the train and will be home about 9:15.  I can call you then, if it's not too late.

Sydney

From: Silvey, Patricia - MSHA
Sent: Thursday, July 16, 2015 12:45:18 PM
To: Rose, Sydney T - OASAM HRC
Cc: Williamson, Christopher - MSHA
Subject: Sorry, but we're probably going to have an Est completion date for getting your investigation report

We will have a number of actions to take after that--disciplinary action (writing letter, explaining why not, etc).  I have another issue to talk to you about re earlier e-mail.  Tx

Confidential Agency Document
DLB-000400

MSHA0227

**U.S. Department of Labor**

Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



APR 1 2 2006

CMS&H Memo No. HQ-06-053-A (SUB-C71)

MEMORANDUM FOR DISTRICT MANAGERS

FROM:          RAY McKINNEY
               Administrator for
               Coal Mine Safety and Health

SUBJECT:       New Procedures for Collecting and Tracking Rock Dust
               Samples

The attached procedures for collecting, submitting, and tracking rock dust samples are to be implemented by July 1 in all bituminous coal districts. These procedures implement the computer-based, Rock Dust Data Retrieval application which will ensure that relevant compliance actions are taken and that wet sample tracking is consistently conducted. The system will generate a form listing locations where samples were not collected due to wet conditions during the previous year (refer to attached sample Form MSHA Form 2000-210). This form, which must be filed with each E01 inspection report for underground bituminous coal mines, will be used by enforcement personnel to verify that previously wet areas were re-inspected.

Mr. Bob Hardman will host a NetScreen meeting April 20 to provide "train-the-trainer" instruction on use of the computer application. This meeting will be directed at IT specialists and other persons who will be responsible for training in the use of and providing future assistance to enforcement personnel regarding the system. Please provide Mr. Hardman with email addresses of the persons who will logon to the meeting for your district.

If you have any questions, please contact Chris Weaver at 202-693-9506.

Attachments

Confidential Agency Document
DLB-000437          MSHA-2ECAMERON-0037

## Procedures for Rock Dust Samples

1. <u>Collecting Samples</u>.  Collect samples to substantiate the violation when citing inadequate rock dust.  Samples should be collected when any doubt exists concerning adequacy of rock dust applications in the active workings of the mine; including working sections in areas at least 40 feet outby the working faces.  Collect samples of mixed dust by the band or perimeter method from the entry or room, including a 1-inch depth of the material on the floor.  Combine dust from the roof, ribs, and floor into one "band" sample.  If the amount collected is more than required, thoroughly mix the sample, cone and quarter to cut the bulk to the desired amount.  Occasionally, it may be necessary to take more than one strip, but in such case, the total width of the strip must be the same for the roof, each rib, and floor.  Collect separate samples of dust from the roof, ribs, or floor when necessary.  Where a greater entry height makes it impractical or unsafe to collect full perimeter samples, collect a floor sample and a sample from the ribs to the maximum height that can be done safely and practically.  The rib sample and the floor sample may be either combined or prepared separately.  When rib samples are collected and reported separately, assume the incombustible content of the rib sample represents the incombustible content of the rib and roof surface at the sampling location.

Fill the plastic sample bags at least half full.  The identifying tags are blank and inspectors can use their own numbering system on the face of the tag.  Include the name of the inspector and the name of the mine on the back of the tab.  Consecutively number or code the samples for any one inspection.  The numbers or code used shall not exceed three digits.  Be certain that the identification is legible.  The bags are long enough to permit tying a knot in the open ends when they contain the average size sample.  Securely tie the string of the tag within the formed knot of the sample bag.

The inspector must consecutively number spot location samples with numbers only.  Do not use letters, since letters are used to designate dust survey samples.  Spot location samples and dust surveys shall be listed on separate sample cards, but they can be mailed in the same box.

The laboratory needs the inspector's name, the name of the mine, the properly numbered tag attached firmly to the sample, and a completed sampling card.  If the mine name is clearly printed on the A-1 sample tag and about every other tenth bag of the survey samples, it will be sufficient for the laboratory's needs.  Do not put these sample numbers in the column for "Lab. No." For the "Sample of" column, the word "band" is acceptable for a sample representing the full perimeter at the point of sampling.  Include the words "return air course" or "intake air course" in parentheses, as applicable, after the location of each sample on the cards forwarded with the samples.  All samples submitted

without the collector's name and office address will be analyzed but the report will be held until this information is received.

Tests for methane shall be made at each rock dust sample location with a properly calibrated hand-held methane detector and the results recorded in the inspection notes. If less than 1.0 percent methane is detected, that percentile will be used to determine compliance with 30 CFR 75.403; concerning additional incombustible content when methane is present in the ventilating current. Where methane is detected at or above 1.0 percent on a hand-held methane detector at sampling location, a bottle sample of mine air shall also be collected at the sample location and the bottle number recorded in the inspection notes. The bottle sample will be sent for analysis and the results used to determine compliance with 30 CFR 75.403.

It is the responsibility of the Mount Hope laboratory supervision to ensure that rock dust spot and survey analysis reports and accompanying analysis data are promptly made available for use by the districts. The Rock Dust Data Retrieval Application permits monitoring of prompt issuance of citations/orders for non-compliant samples or surveys, tracking wet survey location re-inspections, mining analysis data, and printing of oversight reports.

Each Regular Safety and Health Inspection report must contain a printed copy of the inspector-submitted MSHA Form 2000-156. If MSHA management has given the inspector instructions not to collect a survey, the supervisor responsible for inspections at the mine shall document clearly why a survey was not conducted. Such documentation shall contain, as a minimum: documentation why a survey was not collected, the inspection event number, the MMU number, the supervisor's signature, and the date the document was prepared. This document shall be included within the inspection report. The responsible supervisor shall assure that all rock dust spot or survey analysis reports returned from the Mount Hope Lab by email attachment to the district are included within the appropriate inspection report. A citation or order shall be promptly issued for non-compliant rock dust spot samples or surveys. The citation or order number of each non-compliance issuance shall promptly be entered into the Rock Dust Sample Submission Application and the data uploaded.

2.  Rock Dust Surveys. During each Regular Safety and Health Inspection, a uniform rock dust survey shall be made in each advancing working section to determine compliance with 30 CFR 75.403. If for any reason a survey is not possible, the inspectors must promptly notify their supervisor. The supervisor, after consulting with district management, will provide guidance to the inspector. The surveys are to be kept current, up to and including the last row

of pillars immediately outby the loading point. For example, if a working section has advanced and the loading point moved one crosscut or more inby since the last Regular Safety and Health Inspection, a survey must be conducted.

Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed. All active entries not previously surveyed on retreating sections; including longwall units, will be surveyed. Include in the collection of dust samples a representative number of crosscuts.

*Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.* The status of each of these individual wet locations must be determined during each regular inspection conducted within this one-year period. *Spot samples must be collected if conditions permit on a re-inspection of a previously wet area.* The previous compliance/non-compliance determination of rock dust surveys will not be affected by the additional analysis of spot samples collected during re-inspection of wet areas. A citation or order should be issued when non-compliance is indicated for 10% or more of the individual spot samples collected during re-inspection of areas previously indicated too wet for survey sampling. If the status of a re-inspected wet area changes, it must be updated by the inspector in the Rock Dust Sample Submission Application and the data uploaded.

Rock dust surveys should include samples from a representative number of crosscuts. Where possible, the maximum interval between sample locations shall be not more than 500 feet. If the sampling location is less than 40 feet from the face, do not take a sample. Normally, not more than five rows of samples will be collected without including dust samples from the crosscuts. If more than five rows of samples are collected without including a line of crosscut samples, an explanation must be provided in the narrative portion of the inspection notes explaining why crosscut samples were not included in the survey. The survey number shall precede the sample number when two or more surveys are made.

Determine the starting point from the face for such surveys, associating that point with something relatively permanent such as an intersection, survey station, pump room, or borehole. To say that a sample was collected a certain distance from a working face is meaningless. The sampling area must be well described and precisely identified so it can be located on the mine map by either the operator or another inspector at a later date.

3. <u>Data Submittal and Mailing of Bagged Samples</u>. Rock dust spot or survey sampling data must be entered into and submitted utilizing the Rock Dust Submittal Application. Any combination of bagged rock dust samples and/or wet locations (including those where all locations are wet) are considered a survey. *It is extremely important that all survey data be entered into and submitted utilizing the Rock Dust Submittal Application.* Entering this data and providing the subsequent updates concerning citation or order issuance and wet sample status provides assurance that compliance actions are being taken and that wet sample tracking is being consistently conducted in all bituminous districts.

Mail the samples as soon as possible in accordance with postal regulations. Securely seal the shipping boxes to prevent loss of samples in transit. Include the return address on the shipping label. Use a regular corrugated pasteboard carton, but fill voids around the bags with crumpled newspaper to keep the bags from breaking open from rough handling. Do not use crumpled manila envelopes, excelsior, paper towels, or tissues as packing. Dust Sampling Lab Report (MSHA Form 2000-156) should be prepared and uploaded to the Mt. Hope Lab Server using the Inspector Laptop Rock Dust Database. A copy of MSHA Form 2000-156 must be printed and shipped with the bagged sample(s). Compliance/noncompliance concerning rock dust spot samples or rock dust surveys will be determined at the Mount Hope lab and the results returned to the three email addresses submitted by the inspector on MSHA Form 2000-156.

The Mount Hope laboratory supervisor will notify the appropriate District Manager should spot or survey boxed samples arrive at the lab and no accompanying MSHA Form 2000-156 data is available on the file server. Hard copies of MSHA Form 2000-156 will no longer be accepted for submittal of rock dust spot or surveys to determine compliance with 30 CFR 75.403. *Only data concerning spot or survey samples collected to determine compliance with 30 CFR 75.403 should be entered and submitted utilizing the Rock Dust Submittal Application.* Visual determinations are normally sufficient to determine non-compliance with 75.400.

## Drawing #1

This drawing shows separate surveys where a single MMU has mined multiple distinct areas of a mine.  In this case, three zero points are required to clearly show the extent of each survey.



Surveys will be kept current to the last full row of pillars immediately outby the working section loading point.

A separate survey will be conducted in each distinct mined area (in this case, the Mains, 1 Right, and 2 Right).  Each area is also to be considered separate and distinct for compliance/non-compliance determinations.

**Survey 001-0 C**
Conducted in 2 Right
Zero Point = Survey Spad 20

**2 RIGHT**

**1 RIGHT**

**Survey 001-0 A**
Conducted in Mains
Zero Point = Mine Drifts

**Survey 001-0 B**
Conducted in 1 Right
Zero Point = Survey Spad 12

MAINS

## Drawing #2

**This drawing shows how each sample location would be designated, documented on the bag sample tag, and entered on each of the three distinct surveys. The three surveys are separate and would be entered as separate surveys in the Rock Dust Sample Submission Application. The surveys also would be considered separately for compliance or non-compliance determinations.**



U.S. Department of Labor
Mine Safety and Health Administration



**Record Count:** 7

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

**From:** 4/6/05 to 4/6/06    **Event Number:** _____

Selection Criteria:

1500000

| | Office Cd | Mine ID | Survey Date | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ Remains Wet<br>☐ Sampled<br>☐ Inaccessable | 0609 | 1500000 | 6/8/05 | 4567890 | | 0010 | First Left Mains Headings | A1 | I | 5' Inby Spad #5422 | JOHN DOE |
| ☐ Remains Wet<br>☐ Sampled<br>☐ Inaccessable | 0609 | 1500000 | 6/8/05 | 4567890 | | 0010 | First Left Mains Headings | A1X | I | 25' Inby Spad | JOHN DOE |
| ☐ Remains Wet<br>☐ Sampled<br>☐ Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | | 0010 | 001 MMU , 2 South Panel | A2 | I | 25' Inby spad #5433 (#2 entry) | JOHN DOE |
| ☐ Remains Wet<br>☐ Sampled<br>☐ Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | | 0010 | 001 MMU , 2 South Panel | I2 | R | 25' inby spad #5433 (#2 entry) | JOHN DOE |
| ☐ Remains Wet<br>☐ Sampled<br>☐ Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | | 0010 | 001 MMU , 2 South Panel | B1 | I | 25' inby spad #5433 (#2 entry) | JOHN DOE |
| ☐ Remains Wet<br>☐ Sampled<br>☐ Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | | 0010 | 001 MMU , 2 South Panel | A1 | I | 25' inby spad #5433 (#2 entry) | JOHN DOE |
| ☐ Remains Wet<br>☐ Sampled<br>☐ Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | | 0010 | 001 MMU , 2 South Panel | J2 | R | 5' inby spad #5433 (#2 entry) | JOHN DOE |

MSHA-2ECAMERON-0044

MSHA Form 2000-210 (1/06)

Confidential Agency Document
DLB-000444

Thursday, April 06, 2006

conducted with affected miners and mine supervisors to evaluate their familiarity with plan requirements.

*Documentation Required: The inspector's evaluation of mining near a potential body of water or under water shall be documented in the hard-copy inspection notes to show the in-mine location), the date started, and the date this procedure was fully completed. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. No other documentation is required unless a violation is observed.*

12. **Potable Water (Working Section).** The inspector shall determine if potable water is available.

*Documentation Required: Availability of potable water shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU). A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, availability of the potable water shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

13. **Rock Dust Survey.** The inspector shall conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the mine. Rock dust surveys shall also be conducted in previously mined active areas. Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.

*Documentation Required: The mechanized mining unit number (MMU), the sampling area description, the survey begin zero point, each sampling point (referenced in feet from the zero point), the percentile of methane detected on a hand-held detector and the number of any air bottle collected at each sampling location shall be documented in the inspection hard-copy notes for each survey collected. Additionally, a minimum amount of rock dust survey information shall be documented in the Inspection Tracking System MMU Log to show the MMU number, the date survey was started and the date fully completed. No other documentation is required unless a violation is observed.*

14. **Sanitary Facilities.** Sanitary facilities located on a working section shall be inspected for compliance with applicable standards.

*Documentation Required: Sanitary facility observations shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU), the date started, and the date this procedure was fully completed for that MMU. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, sanitary facilities observations shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

 Confidential Agency Document 69
DLB-000445        MSHA-2ECAMERON-0045

*__Documentation Required:__  The locations and results of Ventilation (Diesel Equipment) tests for the presence of carbon monoxide and nitrogen dioxide shall be documented in the inspection hard-copy notes.  No other documentation is required unless a violation is observed.*

K.  __Air Sample Locations.__  The quantity of airflow shall be measured and samples of mine air collected for analysis to determine the quality of the air at the following locations:

1.  In each of the working section return entries, outby and as close as practical to the last permanent stopping (to determine section face liberation); and

2.  At all locations where air leaves the mine (to determine total mine methane liberation).  On blowing ventilation systems this may include roadways, belt conveyor entries, and/or other areas where air leaves the mine.

Samples of mine air shall also be collected and submitted for analysis where methane is detected at or above 1.0 percent on a hand-held methane detector at a rock dust survey or spot sampling location. Samples may also be collected at other locations deemed necessary to evaluate air quality.

*__Documentation Required:__  The quantity of airflow measured, the hand-held methane and oxygen readings in percentile, the bottle number of samples collected, and the location of the measurement or collection shall be documented in the hard-copy notes.  Additionally, where it will be considered for total liberation of methane at the mine the bottle number and location description shall be entered by the inspector into the Inspection Tracking System Air Samples for Total Liberation section.  Samples collected that will not be considered for total liberation purposes shall be entered by the inspector into the Inspection Tracking System Air Samples Collected section.*

When special samples are collected in connection with a problem arising at a mine or to substantiate a violation (e.g., less than 19.5 volume per centum of oxygen, more than 0.5 volume per centum of carbon dioxide, harmful quantities of other noxious or poisonous gases), inform laboratory personnel of the problem involved.  Mark the Mine Atmosphere Sample Record for special samples with a conspicuous red "S" on the front of the card in the upper left corner.  Such samples are given preference over other samples and the analytical results will be promptly reported to the appropriate office.

2.   Procedures for Processing Air Samples taken to substantiate violations:

    a.   Describe in the citation or order the location where the air samples were taken to substantiate the violation.

    b.   Make a notation on the Mine Atmosphere Sample Record stating the number of the citation or order, the initials of the inspector, and the date and time of issuance.

Where possible, mail the maximum number of samples that a holder/mailer will accommodate at one time; however, mail air samples within five calendar days after collecting (the five days include Saturday and Sunday). Samples collected from more than one mine may be mailed in the same holder/mailer.  Mail all air samples (in accordance with postal regulations) to MSHA's Gas Analysis Laboratory in Mt.  Hope, WV.

If the analysis of an air sample discloses a violation not determined with testing instruments during the inspection, the inspector shall issue the appropriate enforcement action.

B.  Rock Dust Samples

1.   Collecting Samples.  Collect samples to substantiate the violation when citing inadequate rock dust.  Samples should be collected when any doubt exists concerning adequacy of rock dust applications in the active workings of the mine including working sections in areas at least 40 feet outby the working faces.  Collect samples of mixed dust by the band or perimeter method from the entry or room, including a 1-inch depth of the material on the floor. Combine dust from the roof, ribs, and floor into one "band" sample.  If the amount collected is more than required, thoroughly mix the sample, cone and quarter to cut the bulk to the desired amount.  Occasionally, it may be necessary to take more than one strip, but in such case, the total width of the strip shall be the same for the roof, each rib, and floor.  Collect separate samples of dust from the roof, ribs, or floor when necessary.  Where a greater entry height makes it impractical or unsafe to collect full perimeter samples, collect a floor sample and a sample from the ribs to the maximum height that

can be done safely and practically. The rib sample and the floor sample may be either combined or prepared separately. When rib samples are collected and reported separately, assume the incombustible content of the rib sample represents the incombustible content of the rib and roof surface at the sampling location.

Fill the plastic sample bags at least half full. The identifying tags are blank and inspectors can use their own numbering system on the face of the tag. Include the name of the inspector and the name of the mine on the back of the tab. Consecutively number or code the samples for any one inspection. The numbers or code used shall not exceed three digits. Be certain that the identification is legible. The bags are long enough to permit tying a knot in the open ends when they contain the average size sample. Securely tie the string of the tag within the formed knot of the sample bag.

The inspector shall consecutively number spot location samples with numbers only. Do not use letters, since letters are used to designate dust survey samples. Spot location samples and dust surveys shall be listed on separate sample cards, but they can be mailed in the same box.

The laboratory needs the inspector's name, the name of the mine, the properly numbered tag attached firmly to the sample, and a completed sampling card. If the mine name is clearly printed on the A-1 sample tag and about every other tenth bag of the survey samples, it will be sufficient for the laboratory's needs. Do not put these sample numbers in the column for "Lab. No." For the "Sample of" column, the word "band" is acceptable for a sample representing the full perimeter at the point of sampling. Include the words "return air course" or "intake air course" in parentheses, as applicable, after the location of each sample on the cards forwarded with the samples. All samples submitted without the collector's name and office address will be analyzed but the report will be held until this information is received.

Tests for methane shall be made at each rock dust sample location with a properly calibrated hand-held methane detector. If less than 1.0 percent methane is detected, that percentile will be used to determine compliance with 30 CFR 75.403 (concerning additional incombustible content when methane is present in the ventilating current). Where methane is detected at or above 1.0 percent on a hand-held methane detector at a sampling location, a bottle sample of mine air shall also be collected at the sample location. The bottle sample will be sent for analysis and the results used to determine compliance with 30 CFR 75.403.

It is the responsibility of the Mount Hope laboratory supervision to ensure

Confidential Agency Document
DLB-000448                    MSHA-2ECAMERON-0048

that rock dust spot and survey analysis reports and accompanying analysis data are promptly made available for use by the districts. The Rock Dust Data Retrieval Application permits monitoring of prompt issuance of citations/orders for non-compliant samples or surveys, tracking wet survey location re-inspections, mining analysis data, and printing of oversight reports.

The responsible supervisor shall assure that all rock dust spot or survey analysis reports returned from the Mount Hope Lab by email attachment to the district are included within the appropriate inspection report. A citation or order shall be promptly issued for non-compliant rock dust spot samples or surveys. The citation or order number of each non-compliance issuance shall promptly be entered into the Rock Dust Sample Submission Application and the data uploaded.

2.  <u>Rock Dust Surveys</u>.  During each Regular Safety and Health Inspection, a uniform rock dust survey shall be made in each advancing working section to determine compliance with 30 CFR 75.403. If for any reason a survey is not possible, the inspectors shall promptly notify their supervisor. The supervisor, after consulting with district management, will provide guidance to the inspector. The surveys are to be kept current, up to and including the last row of pillars immediately outby the loading point. If a working section has advanced and the loading point moved 500 feet or more since the last Regular Safety and Health Inspection, a survey shall be conducted.

Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed. All active entries not previously surveyed shall be surveyed. Outby areas of a retreating section and active areas where advancing MMUs have been removed are considered active entries for rock dust survey purposes. Include in the collection of dust samples a representative number of crosscuts. Drawings Number 1 and 2 on the following pages provide further guidance concerning rock dust surveys.

*Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.* The status of each of these individual wet locations shall be determined during each regular inspection conducted within this one-year period. *Spot samples shall be collected if conditions permit on a re-inspection of a previously wet area.* The previous compliance/non-compliance determination of rock dust surveys will not be affected by the additional analysis of spot samples collected during re-inspection of wet areas. A citation or order should be issued when non-compliance is indicated for 10% or more of the individual

Confidential Agency Document
DLB-000449          MSHA-2ECAMERON-0049

spot samples collected during re-inspection of areas previously indicated too wet for survey sampling. If the status of a re-inspected wet area changes, it shall be updated by the inspector in the Rock Dust Sample Submission Application and the data uploaded.

Rock dust surveys should include samples from a representative number of crosscuts. Where possible, the maximum interval between sample locations shall be not more than 500 feet. If the sampling location is less than 40 feet from the face, do not take a sample. Normally, not more than three rows of samples will be collected without including dust samples from the crosscuts. If more than three rows of samples are collected without including a line of crosscut samples, an explanation shall be provided in the narrative portion of the inspection notes explaining why crosscut samples were not included in the survey. The survey number shall precede the sample number when two or more surveys are made.

Determine the starting point from the face for such surveys, associating that point with something relatively permanent such as an intersection, survey station, pump room, or borehole. The sampling area shall be well described and precisely identified so it can be located on the mine map by either the operator or another inspector at a later date.

3. <u>Data Submittal and Mailing of Bagged Samples.</u> Rock dust spot or survey sampling data shall be entered into and submitted utilizing the Rock Dust Submittal Application. Any combination of bagged rock dust samples and/or wet locations (including those where all locations are wet) are considered a survey. *It is extremely important that all survey data be entered into and submitted utilizing the Rock Dust Submittal Application.* Entering this data and providing the subsequent updates concerning citation or order issuance and wet sample status provides assurance that compliance actions are being taken and that wet sample tracking is being consistently conducted in all bituminous districts.

Mail the samples as soon as possible in accordance with postal regulations. Securely seal the shipping boxes to prevent loss of samples in transit. Include the return address on the shipping label. Use a regular corrugated pasteboard carton, but fill voids around the bags with crumpled newspaper to keep the bags from breaking open from rough handling. Do not use crumpled manila envelopes, excelsior, paper towels, or tissues as packing. Dust Sampling Lab Report (MSHA Form 2000-156) should be prepared and uploaded to the Mt. Hope Lab Server using the Inspector Laptop Rock Dust Database. A copy of MSHA Form 2000-156 shall be printed and shipped with the bagged sample(s). Compliance/noncompliance concerning rock

Confidential Agency Document
DLB-000450                    MSHA-2ECAMERON-0050

dust spot samples or rock dust surveys will be determined at the Mount Hope lab and the results returned to the three email addresses submitted by the inspector on MSHA Form 2000-156.

The Mount Hope laboratory supervisor will notify the appropriate District Manager should spot or survey boxed samples arrive at the lab and no accompanying MSHA Form 2000-156 data is available on the file server. Hard copies of MSHA Form 2000-156 will no longer be accepted for submittal of rock dust spot or surveys to determine compliance with 30 CFR 75.403. *Only data concerning spot or survey samples collected to determine compliance with 30 CFR 75.403 should be entered and submitted utilizing the Rock Dust Submittal Application.* Visual determinations are normally sufficient to determine non-compliance with 75.400.

Confidential Agency Document
DLB-000451          MSHA-2ECAMERON-0051

### Drawing #1

**This drawing shows separate surveys where a single MMU has mined multiple distinct areas of a mine. In this case, three zero points are required to clearly show the extent of each survey.**



Surveys will be kept current to the last full row of pillars immediately outby the working section loading point.

A separate survey will be conducted in each distinct mined area (in this case, the Mains, 1 Right, and 2 Right). Each area is also to be considered separate and distinct for compliance/non-compliance determinations.

**Survey 001-0 C**
Conducted in 2 Right
Zero Point = Survey Spad 20

**2 RIGHT**

**1 RIGHT**

**Survey 001-0 A**
Conducted in Mains
Zero Point = Mine Drifts

**Survey 001-0 B**
Conducted in 1 Right
Zero Point = Survey Spad 12

Confidential Agency Document
DLB-000452          MSHA-2ECAMERON-0052



**Drawing #2**

This drawing shows how each sample location would be designated, documented on the bag sample tag, and entered on each of the three distinct surveys. The three surveys are separate and would be entered as separate surveys in the Rock Dust Sample Submission Application. The surveys also would be considered separately for compliance or non-compliance determinations.



Mine Safety and Health Administration

*U.S. Department of Labor*

# Rock Dust Sample Submission User's Guide

**Coal Inspector Version**
**Version 2.00**
**01/03/2005**

Copyright © 2005 Mine Safety and Health Administration, U.S. Department of Labor

# Table of Contents

TABLE OF CONTENTS ........................................................................................................... 1

APPLICATION OVERVIEW ................................................................................................. 1

   OPENING THE APPLICATION ................................................................................................. 1
     *Create a New Rock Dust Sample Submission Form* ..................................................... 2
     *Open an Existing Rock Dust Sample Submission Form* ................................................ 3
     *Update Citation Numbers / Wet Samples Status* .......................................................... 4
   MAIN SWITCHBOARD .............................................................................................................. 5
     *Current Form Options* .................................................................................................. 6
     *Other Options* ............................................................................................................... 7
   TOOL AND MENU BARS ......................................................................................................... 7
     *Menu Bars* ................................................................................................................... 7
     *Tool Bars* ..................................................................................................................... 8
   SETTING DEFAULT INFORMATION ....................................................................................... 9
     *Defaults Tab* ................................................................................................................ 9
     *Paths Tab* ................................................................................................................... 11

ROCK DUST SAMPLE SUBMISSION FORM ................................................................. 13

   COMPLETING THE FORM ...................................................................................................... 13
     *Mine Information Tab* ................................................................................................ 13
     *Samples Tab* .............................................................................................................. 16
     *Inspector Information Tab* ......................................................................................... 17
   SUBMITTING THE FORM ....................................................................................................... 19
   REVIEWING LAB ANALYSIS ................................................................................................. 19
   SUBMITTING UPDATES ......................................................................................................... 20

Confidential Agency Document
DLB-000455                    MSHA-2ECAMERON-0055

# Application Overview

This application is to be used to submit samples collected during rock dust surveys of coal mines or spot samples collected where previously wet areas have dried sufficiently to collect a sample. It is to be used to determine compliance with 30 CFR 75.403 only. Other types of samples (rock dust quartz content, samples collected to support 75.400 citations, etc.) are to be submitted using the hand written rock dust card.

This is Phase II of the development of the Rock Dust Sample Submission application. Principle changes for the Inspector version include:

✓ Adding ability to update wet sample status
✓ Improving the process for adding a citation number to previously submitted surveys

The inspector will see a few changes to the screens from earlier versions of the application. These were necessary to support handling of the new update forms.

Help screens have been updated to the new HTML format. These screens can be accessed by clicking on the Help option on the Menu Bar and selecting Help Topics. The Help feature can also be activated by pressing the F1 key from anywhere within the program.

## *Opening the Application*

Double-click on the Rock Dust Sample Submission shortcut on the desktop to open the application.



Rock Dust
Application

**Figure 1 – Rock Dust Sample Submission Shortcut (Inspectors' Program)**

As the application opens, it wants to know if the user is creating a new submission form, reviewing an existing form, or creating a new update form.

## Create a New Rock Dust Sample Submission Form

When the application is started for the first time, the initial screen appears as in Figure 2, below. The radio button "Create a new Rock Dust Sample Submission form" is marked. Click "OK" to open the Main Switchboard. A blank submission form is attached to the application as the Current Form.



**Figure 2 – Opening Screen for First Use**

When electing to create a new form, a warning message is displayed if there is an existing form that has not yet been submitted.



**Figure 3 – New Form Warning Message**

Starting a new form when there is an existing un-submitted form causes the existing form to be replaced, as only one form can be in process at any given time. Once the application is opened, a different form can be selected by using either buttons available on the Main Switchboard or using the Tool and Menu Bars.

## Open an Existing Rock Dust Sample Submission Form

If there is a form in process, the initial screen appears as in Figure 4, below. The radio button "Open an existing Rock Dust Sample Submission form" is marked. The "Current working form" selection is highlighted. Click "OK" to attach the form to the application as the Current Form.



**Figure 4 – Opening Screen for Current Working Form**

Forms are submitted to a LAN location and archived to a local folder. Forms are stored in a layer of folders identified by District, Mine ID, and MMU. A previously submitted form can be viewed by selecting the form from the history list and clicking OK. To view a submitted form not in the list, select "More Forms…" and click OK. Select the desired form from the Windows Open dialog box and click OK. (The Open dialog box and the history list default to the local archive folder. The lab removes the forms from the LAN location as they are processed.) The selected form is attached to the application as the Current Form. Existing forms may be reviewed, but not changed.

## Update Citation Numbers / Wet Samples Status

To create an update form, mark the radio button for, "Update Citation numbers and/or Wet sample status".   Then, click "OK".



**Figure 5 – Opening Screen for Update Forms**

The Updates Form opens, ready for the user to enter citation number or wet sample status update information.  See the Submitting Updates section for a look at the Updates Form.

## *Main Switchboard*

The Main Switchboard is divided into two segments.  The left side contains information about the application, current form, and network status.  The right side is the work area, devoted to creation, viewing, and submission of the forms.



**Figure 6 – Main Switchboard**

On first use of the application, the Main Switchboard appears as in Figure 6, above.

On the left, version information is displayed.  Because this is the application that resides on the inspector's computer, the display reads "Inspector Version" followed by the version number.

Below the version information is the status of the current form.  Because a new blank form is attached to the application, there is no information to display for Mine ID, MMU Number, and Date Collected.  This information is updated as the form is completed.

The Form Status is "Not Submitted" at this time.  The words are in **RED** to remind the inspector that the form has not yet been submitted.  Once the form is submitted, the status is changed to "Submitted" and the text is **Black**.  In addition, the submitted form name is printed below the Form Status line.  The form name consists of the Mine ID, an underscore, the MMU Number, the MMU Alpha Suffix, an underscore, the collection date, and ".xml".  Example: 4202028_0010A_20031010.xml.

The last item on the left is an Offline/Online flag indicating whether or not the user is connected to the network and whether an archive folder has been specified and is valid.  The Rock Dust Sample Submission forms can be completed offline.  However, once completed, the inspector must be online to submit the form to the LAN.  The Offline flag

is **RED.**  The Online flag is **GREEN.**  The colored Offline and Online flags allow the inspector to easily recognize the status of the network connection and archive folder.  The user must be connected to the network and an archive folder must be specified to submit a form.

On the right, the screen is divided.  The upper portion on the screen allows the inspector to work on the current form.  The lower portion allows the inspector to view a previously submitted form, create a new form, create and submit an update form, or exit the program.  All options are accessed by buttons located to the left of the option description.  Underlined letters within options indicate selection can be made by holding down the Alt-Key and the underlined letter key simultaneously.  Example:  Alt-V opens the View/Edit Current Form option.

## Current Form Options

**View/Edit Current Form**
Open the current Rock Dust Sample Submission form for review and/or editing.  Caption changes to View Current Form if a submitted form has been selected as the Current Form.

**Submit Current Form**
Submit the current Rock Dust Sample Submission form to the LAN.  The user is first asked to verify the form submission.



**Figure 7 – Submit Option**

Select "Yes" to submit or "No" to return to the form.  Upon submission, the user is presented with a verification message.



**Figure 8 – Submit Verification**

Click "OK".  At this time, the user is offered the option to print the submitted form.



**Figure 9 – Print Verification**

Select "Yes" to print or "No" to return to the form.  When printing, no other options are offered.  The form is sent directly to the default printer.

## Other Options

**Open/Create Different Form**
Use to select a previously submitted form or create a new form.  When electing to create a new form, a warning message is displayed if there is an existing form that has not yet been submitted (see Figure 5 for the New Form Warning Message).

**Update Submitted Data**
Use to enter Citation Number and Wet Sample Status updates.  Updates are submitted directly from the update form.

**Exit Application**
Close the Rock Dust Sample Submission application.

## *Tool and Menu Bars*

Tool and menu bars are displayed in the upper left corner of the screen.  They provide the ability to perform routine actions from a centralized location.  Additionally, they manage default information required by the Rock Dust Sample Submission application.

Tool and menu bars are displayed from the Main Switchboard, the Submission and Update forms, and the Preview screens.  Each set varies in its options.

## Menu Bars

The Menu Bar appears just below the application name in the upper left corner of the screen. Below are descriptions of menu bar options that might be available.

File
    **New** – Create new a new form
    **Open** – Open current or existing form
    **Close** – Close form
    **Page Setup** – Set page parameters
    **Print** – Print form
    **Preview** – Preview form on screen
    **Update** – Update submitted data
    **Exit** – Exit application

Edit    **Undo** – Undo last action
        **Cut** – Cut information
        **Copy** – Copy information
        **Paste** – Paste information

View    **Zoom** – Size text
        **Select Page Display** – Display multiple pages

Tools   **Options** – Set or display default information

Window  Standard window display options

Help    **Help Topics** – Selected help screens
        **About** – Application version information

## Tool Bars

Tool bars are located just below the menu bars.  Below are descriptions of Tool Bar options that might be available.



**New** – Create new a new form

**Open** – Open current or existing form

**Print** – Print current form

**Preview** – Preview current form

**Cut** – Remove text

**Copy** – Copy text

**Paste** – Paste text

**Undo** – Undo last action

**Update** – Update submitted data

**View** – Select screen view

**Close** – close open screen

## *Setting Default Information*

The Rock Dust Sample Submission application requires the entry of default data prior to creating and submitting actual forms. Some of the default data is preset if IPAL is installed on the computer.

To set or preview default data, open the Rock Dust Sample Submission application, click on the Tools option on the Menu Bar, and then click on Options. The Options screen has two tabs: Defaults and Paths.

## Defaults Tab

The *Defaults tab* is topmost and has 2 sections. The top section contains inspector information and the lower section displays e-mail addresses of the inspector, supervisor, and clerk who are to receive notification when the lab has completed processing of the samples.

Information contained on this tab is automatically inserted into the new Rock Dust Sample Submission form. If information is not entered here, it will need to be entered on each Rock Dust Sample Submission form that is completed.



Figure 10 – Default Data for Inspector Information Tab

If IPAL is installed on the computer, there is a check in the Get from IPAL box and the inspector's AR Number, Name, and Office information are pulled from the IPAL user information. Changes to the User Profile in IPAL changes information displayed here.

Input fields are described below.

**Get from IPAL:**  A check in the box allows the application to retrieve inspector information from the IPAL application.  The check is preset by the application if IPAL is installed on the computer.  If IPAL is not on the computer, inspector information is blank and must be entered by the inspector if default information is desired.

**AR Number:**  Inspector's 5-digit assigned AR Number.

**AR Name:**  First Name, Middle Initial, and Last Name.  Example:  Steven J. Jones

**F. O. Code:**  4-digit Field Office Code.  Example:  0602

**Field Office:**  City and State of Field Office.  Example:  Elkhorn City, KY

**E-mail Addresses:**  E-mail addresses for the inspector, the inspector's supervisor, the clerk, and the Manager must be entered in their respective fields to provide default information for new Rock Dust Sample Submission forms.  Click on the lookup button to the right of each field to open the e-mail address book.



**Figure 11 – E-Mail Address Lookup – Supervisor**

The Title Bar displays which address is to be selected.  Select the appropriate name and click "OK".  A Microsoft Outlook message announces that the program is trying to access e-mail addresses.  Place a check in the "Allow access for" box and click "Yes".



Figure 12 – E-Mail Address Verification

The selected e-mail address is placed in the appropriate field on the Defaults screen.

## Paths Tab

The *Paths tab* contains information required by the application to create, submit, and retrieve the Rock Dust Sample Submission form.



Figure 13 – Default File Paths

Fields on the Paths tab are described below:

**Submission Folder:** Target location for the submitted Rock Dust Sample Submission form. This field is preset by the application and is only to be changed if the target destination is officially changed. If this occurs, the District IT Specialist or Help Desk

personnel will notify inspectors and provide instructions.  Inappropriate changes will result in the non-functioning of the application.

**Update Folder:**  Target location for the submitted Rock Dust Update form.  As with the Submission Folder, this field is preset by the application and is only to be changed if the target destination is officially changed.  If this occurs, the District IT Specialist or Help Desk personnel will notify inspectors and provide instructions.  Inappropriate changes will result in the non-functioning of the application.

**Submission Archive Folder:**  Target location for the archive copy of the submitted Rock Dust Update form.  This field is preset to the application folder but can be changed by the inspector.  This path must be set in order to submit forms.

**Mine/Event Table Path and Database:**   File containing mine and event information used by the Rock Dust application.  If IPAL is installed on the computer, there is a check in the Use IPAL Data Container box and D:\Inspect\Ipaldat.mdb is entered in text box.  If IPAL is not installed, another database path could be entered.  Generally, it is the path for Ipaldown.mdb.

**Use IPAL Data Container (IPALDAT.MDB):**  A check in the box allows the application to retrieve needed information from the IPAL data container.  The check is preset by the application if IPAL is installed on the computer.  If IPAL is not on the computer, there is no check in the box and the inspector must input the path provided by the IT Specialist or Help Desk personnel to access required mine and event information.

# Rock Dust Sample Submission Form

Information about the samples taken must be entered into the Rock Dust Sample Submission form and the form submitted to the lab for analysis.

## *Completing the Form*

Click on the View/Edit Current Form button to display the input screen. The Rock Dust input screen is divided into categories, dependent upon the type of information that is required. Each category of information has its own tab. Each tab is described below.

### Mine Information Tab

This is the initial Rock Dust input screen that is displayed when the form is opened. Changes can only be made if the form has not yet been submitted.

The Mine Information tab is split into 3 sections. The first section is devoted to mine information. The second section holds comments by the collector (inspector). The third section is the area below the Mine Information and Collector's Comments that indicates when special processing is required. Command buttons are located at the bottom of the screen.



Figure 14 – Mine Information Tab

### Mine Information Section

This section includes the area between Spot/Survey and Zero Point. Input fields are described below.

**Spot/Survey:** The inspector must designate whether this is a Spot or Survey sample. The radio button defaults to Survey. Click on the Spot radio button to designate a Spot

survey. The field next to the Spot/Survey designation is to be used for a more detailed survey description. The survey description field is not required.

**Mine ID:** Select the Mine ID from the combo box or the Mine Lookup. If the "Survey" radio button is checked, only Mine IDs attached to underground mines are listed in the combo box. The Mine ID can be entered manually. This is a required field.

**Mine:** The Mine Name is automatically entered when the Mine ID is selected. The Mine Name can be changed by highlighting and typing over the displayed name. This is a required field.

**Company:** This is also known as the Operator Name. It is entered automatically when the Mine ID is selected. The Company or Operator Name can be changed by highlighting and typing over the displayed name. This is a required field.

**Event Number:** Select the Event Number from the combo box or Event Lookup. If the "Survey" radio button is checked, only Event Numbers attached to underground mines are listed in the combo box. Once a Mine ID is displayed in the Mine ID combo box, only Event Numbers attached to that Mine ID are listed in the Event Number combo box. If an Event Number attached to another Mine ID is selected from the Event Lookup, the Mine ID, Mine Name, and Operator Name are updated to match the selected Event Number. The Event Number can be entered manually. This is a required field.

**MMU #1:** Enter the 4-digit MMU Number where the sample was taken. Enter only the 4 digits. The field is preformatted and the dash (-) is automatically displayed. Example: 001-0. This is a required field.

**Super-Section:** Check if MMU is a super-section. A super-section references two MMUs with a single common dumping point. This field defaults to No.

**MMU #2:** Enter a second 4-digit MMU Number where the sample was taken. Enter only the 4 digits. The field is preformatted and the dash (-) is automatically displayed. Example: 001-0. Entry allowed only if Super-Section is checked.

**Date Collected:** Enter the date the sample was taken in the format MM/DD/YYYY. The field is preformatted and the slashes (/) are automatically displayed. Example: 12/05/2003. This is a required field.

**MMU Alpha Suffix:** Enter the alpha suffix for the MMU. This field is used to distinguish between multiple forms with the same Mine ID, MMU, and Date Collected. The suffix defaults to "A" but will automatically be changed to the next available suffix based on submitted forms in the archive. This is a required field.

**Sampling Area:** Enter the area in the mine where the sample was taken. Examples are: Mains; South Mains; Panel #5 and #6; Old No. 3 Section. This is a required field.

**Zero Point:** A location tied to something relatively permanent such as a survey spad number, intersection number, or borehole that can easily be referenced from the mine

map. All survey sample locations will be referenced from the zero point. Examples are: Survey Spad #1107, 2 Rt. Panel / 22 crosscut, 3 Left Power Borehole. This is a required field.

**Collector's Comments Section**

This is the boxed area on the right side of the screen. Input fields are described below.

**Advancing/Retreating:** The inspector must designate whether the sample was taken while Advancing or Retreating. The radio button defaults to Retreating. Click on the Advancing radio button to designate an Advancing survey. This is a required field.

**Comments:** Enter any comments regarding the sample in this space. Comments are not required.

**Processing Information Section**

The processing information section has only one purpose, to identify special processing requirements. If checked, lab personnel are alerted that priority processing is requested.

**Special (Process Immediately):** Check if the sample requires priority processing. This is not a required field.

**Command Buttons**

The command buttons aid the inspector in completing the Rock Dust Sample Submission form. They are described below.



**Figure 15 – Mine Information Tab Command Buttons**

**Validate:** Click the Validate button to identify any fields that still need to be entered. All required fields are checked for data. If any required field is blank, the system prompts for data to be entered.

**Preview:** Click the Preview button to view a copy of the completed form on screen. If the form has not been submitted, a draft copy of the form is displayed. If more editing is needed on a draft, close the preview screen and make changes prior to submitting the form.

**Print:** Click the Print button to print the current Rock Dust Sample Submission form. If the form has not been submitted, the option to print a draft copy is displayed (see Figure 16). If the form has been submitted, the option to print the current form is displayed (see Figure 9).



**Figure 16 – Print Draft Option**

**Save:** Data is saved only when the user clicks on the <u>S</u>ave button or <u>C</u>lose button. Data is saved as the current working form. When entering several samples, click on the <u>S</u>ave button periodically to ensure data is not lost.

**Close:** Click the <u>C</u>lose button to close the current Rock Dust Sample Submission form. Entered data is saved. The user is returned to the Main Switchboard.

## Samples Tab

The Samples tab provides a data input area to record information about the samples that are being prepared for submission to the lab. Command buttons are located at the bottom of the screen.



**Figure 17 – Samples Tab**

### Data Input Area

One record (line) is to be completed for each sample taken. Input fields are described below.

**Bag Number:** Enter the Bag Number. The Bag Number can be up to 7 characters. It can contain text or numbers. This is a required field. Examples: A-1; 1-A-3X; Spot #1.

**Sample Type:**  Select the type of sample from the combo box.  Choices:  Band, Roof, Roof/Rib, Roof/Floor, Rib, Rib/Floor, Floor, Wet, and No Sample.   This is a required field.

**Location in Mine:**  Enter the location in the mine in feet inby the zero point where the sample was taken.  This is a required field.  Examples:  0+250', 0+500', 0+750', 0+1000', etc.

**Intake/Return:**  Use the combo box to select the air course from which the sample was taken.  Choices:  Intake Airway (I) or Return Airway (R).  This is a required field.

**Handheld CH4:**  Enter the reading from the CH4 reader.  The field is formatted to contain 2 digits, a decimal point, and 1 digit.  Numbers can range from 0.0 to 99.9.  The field is preformatted and the decimal (.) is automatically displayed.  Enter only the numbers.  Examples:  12.4; 3.2; 0.0.  This is a required field.

**Bottle Number:**  If a bottle is submitted, enter the preprinted Bottle Number from the label.  This is not a required field.  Examples:  C1234, D1235, etc.

### Command Buttons

The command buttons available on the Mine Information tab are also available on the Samples tab.  Two buttons have been added to the left of the original buttons:  New Sample and Delete Sample.  On a new form, these buttons are inactivated as seen on Figure 17.  Once the first sample record is started, these buttons are activated and available for use.  They are described below.

| New Sample | Delete Sample | Validate | Preview | Print | Save | Close |
|---|---|---|---|---|---|---|

Figure 18 – Samples Tab Command Buttons

**New Sample:**  Click the New Sample button to add another sample to the form.  A new record line opens below the last record.  Each line is a separate sample record.

**Delete Sample:**  Click the Delete Sample button to delete a sample from the form.  Place the cursor within the record or click on the arrow to the left of the record before clicking on the Delete Sample button.   Respond "Yes" when asked to verify the record is to be deleted.

## Inspector Information Tab

The Inspector Information tab has two sections.  The first contains information about the collector.  The second identifies individuals who are to receive e-mail notification of the analysis results from the lab.  Command buttons are located at the bottom of the screen.

All fields on the Inspector Information tab are filled automatically from default data entered into the Tools-Options-Defaults screen.  If there are blank fields on the Inspector Information tab, use the Tools-Options-Defaults screen to reset the default information.  See Setting Default Information for instructions on entering this information.

Typing over the displayed data or filling in blank fields on the Inspector Information tab results in the changed information being applied to the current form only. Information entered directly into the Inspector Information tab is not saved as default data.



Figure 19 – Inspector Information Tab

## Collector

Input fields are described below. All fields are required and data is to be displayed as in Figure 19, above.

**AR Number:** Inspector's 5-digit AR Number.
**Collector Name:** Inspector's First Name, Middle Initial, and Last Name.
**Field Office Code:** Inspector's 4-digit office code.
**Field Office Location:** City and state where the inspector's field office is located.

## E-mail Addresses

Input fields are described below. All fields are required and data is to be displayed as in Figure 19, above. The lookup button accesses the office e-mail address book. See Defaults Tab for instructions on selecting e-mail addresses.

**Inspector:** E-mail address of the inspector.
**Supervisor:** E-mail address of the inspector's supervisor.
**Clerk:** E-mail address of the Field Office MIS clerk.
**Manager:** E-mail address of the District or other manager.

## Command Buttons

The command buttons are the same as those located on the Mine Information tab (see Command Buttons, Page 13, for descriptions).

## *Submitting the Form*

Once all required information is entered into Mine Information, Samples, and Inspector tabs, close the form.  Verify the Online flag is posted and click the Submit Current Form button.   Follow the screens to print a copy of the form (see Figures 7, 8, and 9).  Close the application.  Forward the printed Rock Dust Sample Submission form along with samples to the lab.

## *Reviewing Lab Analysis*

Upon completion of analysis, the lab e-mails survey results to the inspector, the inspector's supervisor, and the clerk.



| Subject: | Rock Dust Analysis Results |
| Attach... | RockDust.htm (24 KB) |

```
Analysis results for:
Mine ID:          42-02263
Mine Name:        BEAR CANYON NO. 3 MINE
Company Name:     C.W. MINING COMPANY
Event Number:     4268799
MMU Number:       011-1
Date Collected:   04/30/2004
MMU Alpha Suffix: A

The survey is NON-COMPLIANT.  33.33 percent of the samples are non-compliant.

An attachment is included for viewing the form.
```

Figure 20 – Lab E-mail of Analysis Results

Double-click on the attachment to view the Rock Dust Report.   Header information includes inspector and mine information submitted with the samples.

Rock Dust Sample Submission Form

U.S. Department of Labor
Mine Safety and Health Administration

☐ Spot  ☑ Survey

| Collector | | | Field Office | | F. O. Code | |
| John Q. Doe (23654) | | | Aztec, NM | | 0902 | |
| Inspector Email | | Supervisor Email | | Clerk Email | Manager Email | |
| Doe.John@DOL.GOV | | Doe.Jane@DOL.GOV | | Doe.James@DOL.GOV | Doe.William@DOL.GOV | |
| Mine ID | Mine | | | Company | | |
| 42-02263 | BEAR CANYON NO. 3 MINE | | | C.W. MINING COMPANY | | |
| Event Number | MMU #1 | | Super-Section | MMU #2 | Date Collected | |
| 4268799 | 011-1 (A) | | No | | 04-30-2004 | |
| Sampling Area | | | Zero Point | | | |
| Old No. 3 Section | | | 0+00 | | | |
| Collector's Comments | | | | | | |
| ☑ Advancing |
| ☐ Retreating |

| Lab Number | Bag Number | Sample Type | Location in Mine | Intake/ Return | Handheld CH4 | Bottle No. (If App.) | Bottle Analysis | Dust Analysis | Required | Compliant |
|---|---|---|---|---|---|---|---|---|---|---|
| 637964 | A01 | Rib/Floor | #1 entry xc 32/33 00 + 500 feet | I | 0.3 | E8262 | 0.18 | 87.3 | 66.8 | Yes |
| 637965 | A02 | Roof/Rib | #1 entry xc 35/36 00 + 1,000 feet | I | 0.3 | | | 89.6 | 68 | Yes |
| 637966 | A03 | Rib/Floor | #1 entry xc 35/36 00 + 1,400 feet | I | 0.6 | | | 56.6 | 71 | No |

| For Laboratory Use Only | | | |
| Date Received | Lab Numbers | | Date Emailed |
| 06-12-2004 | 637964 to 637966 | | 12-22-2004 |
| Lab Comments | | | SURVEY IS NON-COMPLIANT |

MSHA Form 2000-156, Jun 81 (revised)

Figure 21 – Rock Dust Report

For each sample submitted, the following information is returned:

| ITEM | DESCRIPTION |
|---|---|
| Lab # | Up to 15 characters – assigned by lab |
| Bag Number | Number from sample bag – entered by collector |
| Sample Type | Type of sample submitted – entered by collector |
| Location in Mine | Sample location – entered by collector |
| Intake/Return | Air Course – entered |
| Handheld CH4 | Reading from CH4 Reader – entered by collector |
| Bottle Number | Number from sample bottle – entered by collector |
| Bottle Analysis | Analysis results for submitted bottle – entered by lab. Numbers can range from 0.00 to 99.99 |
| Dust Analysis | Results from dust analysis – entered by lab. |
| Required | Rating required to meet compliance standards – entered by lab |
| Compliant | Compliance rating for sample – entered by lab |

**Table 1 – Sample Information**

This report also includes the following:

| ITEM | DESCRIPTION |
|---|---|
| Date Received | Date lab samples received at the lab. |
| Lab Numbers | Range of lab numbers included in the report |
| Date E-mailed | Date analysis results emailed from lab |
| Lab Comments | Any additional comments form the lab |
| Form Compliance Rating | Located in the lower right corner of the report |

**Table 2 – Report Information**

If the survey results are Non-Compliant, the inspector must issue a citation/order as appropriate. See the Update Submitted Data section, below, for instructions on submitting an update form.

## Submitting Updates

Rock Dust Sample Submission, Version 2.0, provides inspectors the ability to submit updates to previously submitted surveys and records. Inspectors can add a Citation Number to a non-compliant survey and an updated Wet Sample Status for wet sample records.

The lab application will accept update submissions from the inspector, clerk, and supervisor listed in the e-mail addresses on the original Rock Dust Sample Submission form. Other submissions will be rejected.

To create and submit an update form, open the Rock Dust Sample Submission application. Verify the Online flag is displayed.

Click on the Update Submitted Data button to display the Updates Form.



**Figure 22 – Updates Form – Citation Number**

The Updates Form opens to the Citation Numbers update screen. The inspector can update one or more surveys by adding the required information. The Mine ID, MMU Number, Date Collected, and MMU Alpha Suffix information is required to identify the survey to be updated. The Citation Number of the issued violation must also be entered.



**Figure 23 – Updates Form – Wet Sample Status**

The Wet Sample Status update screen allows the inspector to update one or more wet sample records. The Mine ID, MMU Number, Date Collected, MMU Alpha Suffix, and Bag Number information identifies the wet sample record to be updated. The Status Code, Status Date, and Comments provide the data to update the original record.

Citation Numbers and Wet Sample Status updates can be submitted together or separately. Complete either or both forms and click on the Submit button. The user is asked to confirm the submission.



Figure 24 – Confirm Update Submission

Select "Yes" to submit or "No" to return to the form.

A Microsoft Outlook message announces that the program is trying to access e-mail addresses. Place a check in the "Allow access for" box and click "Yes".



Figure 25 – Outlook Message

Upon submission, the user is presented with a verification message.



Figure 26 – Submit Verification

Click "OK" to close the message.

Close the Updates form.



Mine Safety and Health Administration

*U.S. Department of Labor*

# Rock Dust XML Data Retrieval

# User's Guide

Production Version 1.0.0
04/20/2006

## Application Overview

This application is to be used to view data collected during rock dust surveys of coal mines or spot samples collected where previously wet areas have dried sufficient to collect a sample.

This application was created in Access 2002. It is designed to allow the inspector field access to analysis data concerning previously submitted Rock Dust survey or spot samples collected to determine compliance with 30 CFR 75.403.

Complete national data or a single district data must be downloaded to this data retrieval application. A connection to the W: drive must be established to download this data.

## Opening the Application

Double-click on the Rock Dust Data Retrieval (RDDR) shortcut on the desktop to open the application.

Confidential Agency Document
DLB-000479                    MSHA-2ECAMERON-0079

The application always opens to the Main Switchboard view shown below:



You must be logged on to the MSHA network to download initial data to your computer. After the network connection has been established, click on the "Open maintenance form/update data" button. The screen shown below will appear:

First, select All Bituminous Districts or a single district for data import. Then, click the update data button to begin the download. You will be notified when the data transfer is complete.

**The data must be current within seven days to use this application.**  If the data is more than seven days old, the user will be prompted to update the data.

3

Confidential Agency Document
DLB-000480          MSHA-2ECAMERON-0080

Clicking on the "View non-compliant surveys without citations entered into the database" opens the form view shown below:



You may select an office Code from the Office combo box, a Mine ID, Company name, Mine name, AR #, Collector name, Event #, or MMU # as a single entry or any combination as filtering criteria. Click the Apply Criteria button to view your data. Clicking the Print Report will send the

4

Confidential Agency Document

onscreen data to your default printer. Clicking the Refresh Data button deletes the screen view and readies the application for new criteria entry. Click the Close Form button to return to the Main Switchboard.



Clicking on the "View prior wet locations" opens the form shown below:



This form will allow the user to view or print all Rock Dust Survey wet locations entered into the Rock Dust Submittal Application and transmitted to the Mt. Hope lab server. Closing this form returns the user to the Main Switchboard.

5

Confidential Agency Document
DLB-000482          MSHA-2ECAMERON-0082

Coal Mine Safety and Health

Rock Dust Survey Data Retrieval Application

# Main Switchboard

*about this application...*

Exit

Data Loaded: District 6                    Data Updated: 4/11/06

View non-compliant surveys without citations entered into database

View prior survey wet locations          1 year wet location tracking

View survey compliance (all data)

View survey compliance (by user date range)

Open maintenance form/update data

Version 1.0.0 - 04\20\2006

Clicking the "1 Year wet location tracking opens the form shown below:

Coal Mine Safety and Health

District 6

**Prior Rock Dust Survey - Wet Locations Tracking**      The locations listed on this form are within 1 year prior to the sample collected dat

**Record Cour**

| Apply Criteria | Refresh Data | Preview Report | Print Report | Close Form | 0 |

Enter Mine ID below and click the Apply Criteria button to view data.

| Mine ID | Date Collected | Event # | MMU #1 #2 | Sampling Area | Bag # | Intake/ Return | Zero Point | Collector |
|---------|----------------|---------|-----------|---------------|-------|----------------|------------|-----------|
|         |                |         |           |               |       |                |            |           |

From the form view shown above, the user will print MSHA Form 2000-210; (Rock Dust Survey Wet Locations Tracking). The user must pick a Mine ID from the combo box; click the Apply Criteria button to view data. The printed form shows prior reported wet locations for a 1-year period of time.

**Data must be current within seven days to use this application.** If the data is more than seven days old, the user will be prompted to update the data.

Once a Mine ID is selected, the Preview Report and Print Report command buttons will be enabled for use.

MSHA Form 2000-210 is required to be printed, mine conditions for each prior wet sample location shown on the form evaluated in the mine, the status of each sample location marked, and the completed form turned in with each bituminous underground mine E01 completed event.

If the status of a location "Remains Wet", no further action is required. If a sample is collected at any location or a location becomes inaccessible, the data for that location will be updated utilizing

6

Confidential Agency Document

the Rock Dust Submittal Application. Once sampled or indicated as inaccessible, those locations will drop off the data for future dates within the 1-year period.



Clicking the "View survey compliance (all data)" opens the form shown below:



7

As referenced earlier in this document, you may enter single or multiple criteria, view, and print from this form. This form contains data beginning 10/01/2004 entered by the Bituminous Coal Districts.

You may also select a specific data beginning and ending range from the Main Switchboard and open this form specific to that range. Clicking the "View survey compliance (by user date range)" opens the same view; with a selected begin and end date for the data.

**Data Updates**

The data is uploaded to the W: drive at the end of each business day by the Mt. Hope, WV National Air/Dust Lab. Your database accuracy is dependent on your download frequency.

Confidential Agency Document
DLB-000485                    MSHA-2ECAMERON-0085

*Interview*

185

```
1      A:   No, sir, I've not provided any guidance on that.
2      Q:   Okay.  How does District 4 ensure that all wet surveys
3  are uploaded because no results will come back from the lab?
4      A:   I don't know.
5      Q:   Do you understand what -- what we're saying?
6      A:   He's saying, how do I -- okay, I'm not going to have
7  any survey results from the lab.  How do I assure that wet
8  surveys are input into the system?
9      Q:   Uh-huh.
10      A:   I don't know how they do it.  I know they do it, but I
11  don't know what the procedure is.
12      Q:   Well, if you don't know, you don't know.  That's all.
13      A:   I don't.
14      Q:   How is it determined when an area is too wet to sample?
15  How do they determine an area is too wet to sample?
16      A:   They squeeze it and it sticks together and they can't
17  get a sample out of it.
18      Q:   Okay.  Do they do it in all the -- all right.  Just
19  picture, we're going to run a survey.
20      A:   They do it where there marks are, where that says
21  basically is what they do.
22      Q:   In all -- in all -- a line across in all the entries?
23      A:   Yes.  Yes.
24      Q:   They wouldn't just walk up one entry and see water in
25  it and say, well, this survey's too wet?
```

186

```
1       A:   No.

2       Q:   Okay.  That's what I was --

3       A:   Okay.

4       Q:   Well, that -- here's the next part of it.  Can

5   inspectors look at general areas or entries to determine if an

6   entire area is too wet to sample or do they have to go to each

7   sampling location?

8       A:   They'd have to check each sampling location.

9       Q:   Okay.  Are you aware of MSHA policy regarding areas too

10  wet to sample?

11      A:   I'm probably aware of it, Jack, but I can't recite it

12  for you.

13      Q:   All right.

14      A:   I'm sure I've read it.

15      Q:   What were the procedures in your field offices to

16  revisit areas identified as too wet to sample on subsequent

17  visits?

18      A:   They're required to do that.

19      Q:   On their subsequent visits to --

20      A:   Yes.

21      Q:   -- to go, recheck to see if it's dried out.

22      A:   On subsequent EO1's.

23      Q:   Yeah.

24      A:   I'm not going to say the subsequent -- like, if I go

25  back today and it's wet, I'm not going to go back tomorrow to see
```

Confidential Agency Document
DLB-000487            MSHA-2ECAMERON-0087

1  if it's still wet.

2       Q:   No.  I understand.

3       A:   But on the next EO1, yes, they go back.

4       Q:   I understand.  Do you have your supervisors follow-up

5  at the mine when the survey had all samples marked "too wet to

6  sample" --

7       A:   No, I have not.

8       Q:   -- to see if it was actually too wet or if the mine had

9  dried out enough to take the samples?  You haven't.

10      A:   No.

11      Q:   Why wasn't the wet tracking report from the Rock Dust

12 Data Retrieval application used until the quarter before the

13 accident?  Do you -- would you know why?

14      A:   Because we thought we were using it but then we found

15 out we weren't, and we had to go back and do retraining on it,

16 and basically, ▮▮▮▮ did the training because ▮▮▮ set everything up

17 and we had to -- had to train our inspectors in how to access it

18 and use it.

19      Q:   Okay.  How do you ensure that the wet tracking report

20 is being properly completed?

21      A:   I don't.

22      Q:   Who does?

23      A:   The supervisors I assume is doing it.

24      Q:   Okay.

25      A:   That would fall into their area of responsibility.

1    Q:    Have you identified any problems with the wet tracking

2  application?

3    A:    Just identified when we weren't doing it.

4    Q:    What's that now?

5    A:    Identified when we weren't doing it and we had to get a

6  fix in for it.

7    Q:    During what portion of regular inspection would rock

8  dust survey -- surveys -- rock dust surveys normally be taken?

9    A:    They should be taken in the beginning of the EO1 so we

10 can get the samples back and, if they're out of compliance, cite

11 them before the end.

12   Q:    Do you --

13   A:    Two things you want to do is get your TL's and get your

14 rock dust survey in the first part of the quarter so that samples

15 can be run and you get your results back prior to the end.

16   Q:    What was the first thing you said?

17   A:    Total liberations.

18   Q:    Oh, I'm sorry.

19   A:    TL's.

20   Q:    Different terminology, different place.

21   Q:    Do you give that training or do supervisors give that

22 training to the inspectors?  I mean, is that common practice that

23 they -- that's when they -- it's expected that they take those?

24   A:    Yes, supervisors do that.  They should provide

25 oversight to make sure it gets done.

1      A    I try to use a map, yeah, a scaled map.

2      Q    What procedures did you have in the Mount Hope Field

3  Office for revisiting areas that were previously too wet to

4  sample?

5      A    Usually, it was done while you was traveling your air

6  course or if you had outby stuff to do that day.  Most of the

7  time it was done if you traveled the air course.  You know, you

8  have that, the one you're tracking, I guess, on your computer,

9  and you try to map out where it's at and observe them locations

10 and if it remains wet or if it's inaccessible or if the status

11 changes.

12     Q    Do you map those places out off of that wet tracking

13 form?

14     A    No, sir.

15     Q    Seems like it would be awful hard to figure out where

16 each spot is just from looking at that form?

17     A    It would.  It is.

18     Q    Do you really feel like you're physically looking at

19 all of them or are you just staying this area looks a little too

20 wet and you don't go to each place, if you're not mapping it out?

21     A    Well, I guess, if you don't map it, you're not looking

22 at that exact location where he took his exact sample.

23     Q    Is the revisiting those areas based on just general

24 observations then or are they specific to each location, in

25 reality?

Confidential Agency Document
DLB-000490                    MSHA-2ECAMERON-0090

1      A    I don't guess I understand what you're asking me.

2      Q    I guess, when you travel the airway, do you just pretty

3   much go through the whole thing and then just make a general

4   observation if the whole area seems too wet, or do you physically

5   try to go to each location?

6      A    Just a general observation.

7      Q    Is it usually just from traveling one entry in the air

8   course?

9      A    Yeah.

10     Q    Is -- we couldn't find in the database where a

11  previously wet area had ever been resampled at Upper Big Branch.

12  Why do you think that was?

13     A    I can't answer that.  You know, I guess **for** one, the

14  wet tracking thing was kind of, I know as far as I was concerned,

15  it was new to me, you know, as far as like filling out forms,

16  resampling, it was all new.  And I think prior to the explosion,

17  I was instructed on how to conduct -- I guess, fill that form

18  out.  If the status changed on anything, I had to go into the

19  computer and change it, so --

20     Q    Do you still feel very clear on it?

21     A    It's clearer, but it's, you know, like you said,

22  without maps and stuff it's hard to determine an exact location

23  of each individual wet survey.

24     Q    Have you ever -- have you since collected any samples

25  from previously wet areas?

1   A   No, sir.

2   Q   What procedure do you use if you were to collect one?

3  How would you identify the bag number on that?

4   A   You would -- if I ain't mistaken, you use the same

5  number that they used.

6   Q   And what kind of sample would it be?

7   A   Well, it depends on what kind you took.  I mean, if

8  you're asking like a band --

9   Q   Would it be a spot or a survey?

10   A   I'm saying it's going to be a spot.

11   Q   And how would you update -- how would you update the

12  computer to tell them when it was collected or is that something

13  you do?

14   A   Yeah.  Yeah, we do it, because I -- let's see.  I think

15  you go in Rock Dust application.  Down on the bottom, it's a

16  Citation, Wet Survey Update, you get that bag number, location,

17  MMU number, MMU suffix, and you enter that and what status has

18  changed.

19   Q   And we noticed that in your quarter you did use that

20  form.

21   A   Yeah.

22   Q   Prior to that though, we noticed it was a little

23  sporadic, it wasn't always used.  Prior to this quarter, was that

24  form used as a rule in the field office or was there any real

25  tracking prior to that?

1      A      Are you talking about the computer?

2      Q      Yeah.

3      A      That was the first I'd heard of it was when I was at

4   UBB, you know, that --

5      Q      And when did you fill that form out?

6      A      It was late in the quarter, I mean, close to the end

7   that I was made aware that I had to -- I had to change stuff.

8   So, you know, here I'm looking at a map and trying to figure out

9   when I traveled that area, what the conditions was and -- because

10  some of it, I think it's -- if it's inaccessible, gob area, you

11  know, it's two different things so you just can't -- so I'm

12  looking at the map trying to figure out if it's inaccessible or

13  if it's gobbed, too wet, and it was confusing.  But it was very

14  late in the quarter.

15     Q      So the quarter prior to that, how were we -- if we used

16  that form to know where to look for the previously wet areas and

17  we didn't use it the quarter before, how were we tracking to even

18  know we were looking for them?  Do you think we were?

19     A      I don't know.

20     Q      In your case, were you?

21     A      I mean, technically, no.  I mean, you know, you get a

22  -- just like I said, a general observation of the entire area,

23  you know.

24     Q      Would you have even known that there was previously wet

25  samples from three quarters ago when you were traveling that air

1 course prior to that?

2      A    No, I wouldn't have.

3      Q    When do you normally take rock dust samples in the

4 quarter?  Early, late, middle?

5      A    Generally, I take mine toward the end.

6      Q    Why's that?

7      A    Just to try to kind of help the next guy out, because

8 it's -- and I don't know if it really helps him, but if they do

9 theirs at the start, they don't have a lot to catch up to do.  I

10 don't guess it's a real thing, I just -- most of the time mine's

11 toward the end.  I don't know why, it just is.

12      Q    Is it because we put it off until then maybe and wait

13 until we get our airways first?

14      A    No, I don't so much think it's that, I mean.

15      Q    Doesn't that cause a problem with writing a citation on

16 a different event if you're doing it toward the end?

17      A    It does now, yeah.

18      Q    It does?

19      A    Yeah.

20      Q    Do you always write your own violations for samples

21 that you've collected?

22      A    No.  I mean, I've wrote -- if I have a mines that the

23 previous guy took samples and it come back, and this is the next

24 quarter and they come back out of compliance, I've issued them

25 through his survey.

U.S. Department of Labor
Mine Safety and Health Administration

Record Count: 202

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010     Event Number: 6286108

Selection Criteria:
       4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | #2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2A1 | I | 50' INBY SPAD 23137 | |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+00'
(#1 ENTRY)

| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2B1 | I | 50' INBY SPAD 23137 | |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+00'
(#2 ENTRY)

| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2C1 | R | 50' INBY SPAD 23137 | |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+00'
(#3 ENTRY)

| 040? | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2A2 | I | 50' INBY SPAD 23137 | |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+500'

| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2B2 | I | 50' INBY SPAD 23137 | |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+500'

MSHA Form 2000-210 (1/06)

Confidential Agency Document
DLB-000495

Tuesday, March 16, 2010

1 of 41 Pages

MSHA-2ECAMERON-0095

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010     Event Number: *6286108*

Selection Criteria:
4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | #2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2C2 | R | 50' INBY SPAD 23137 | |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+500' | |
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2A3 | I | 50' INBY SPAD 23137 | |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+1000' | |
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2B3 | I | 50' INBY SPAD 23137 | |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+1000' | |
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2C3 | R | 50' INBY SPAD 23137 | |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+1000' | |
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2A3X | I | 50' INBY SPAD 23137 | |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+1050' | |

MSHA-2ECAMERON-0096

MSHA Form 2000-210 (1/06)

Confidential Agency Document
DLB-000496

Tuesday, March 16, 2010

2 of 41 Pages

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking     From: 3/16/2009 to 3/16/2010     Event Number: 6286108

Selection Criteria:
   4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2B3X | I | 50' INBY SPAD 23137 | ~~WILLIAM BANER~~ |

[ ] Remains Wet
[ ] Sampled
[✓] Inaccessible                                       Sample Location = 0+1050'

| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2A4 | I | 50' INBY SPAD 23137 | ~~WILLIAM BANER~~ |

[ ] Remains Wet
[ ] Sampled
[✓] Inaccessible                                       Sample Location = 0+2000'

| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2B4 | I | 50' INBY SPAD 23137 | ~~WILLIAM BANER~~ |

[ ] Remains Wet
[ ] Sampled
[✓] Inaccessible                                       Sample Location = 0+2000'

| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2C4 | R | 50' INBY SPAD 23137 | ~~WILLIAM BANER~~ |

[ ] Remains Wet
[ ] Sampled
[✓] Inaccessible                                       Sample Location = 0+2000'

| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2A5 | I | 50' INBY SPAD 23137 | ~~WILLIAM BANER~~ |

[ ] Remains Wet
[ ] Sampled
[✓] Inaccessible                                       Sample Location = 0+2500'

MSHA-2ECAMERON-0097

MSHA Form 2000-210 (1/06)

Confidential Agency Document
DLB-000497

Tuesday, March 16, 2010

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010   Event Number: 6286108

Selection Criteria:
        4608436

MSHA-2ECAMERON-0098

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | #2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2B5 | I | 50' INBY SPAD 23137 | WILLIAM BENNETT |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+2500' | |
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2C5 | I | 50' INBY SPAD 23137 | WILLIAM BENNETT |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+2500' | |
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2A6 | I | 50' INBY SPAD 23137 | WILLIAM BENNETT |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+3000' | |
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2B6 | I | 50' INBY SPAD 23137 | WILLIAM BENNETT |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+3000' | |
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2C6 | R | 50' INBY SPAD 23137 | WILLIAM BENNETT |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+3000' | |

MSHA Form 2000-210 (1/06)

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010    Event Number: _C286108_

Selection Criteria:
    4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2A6X | I | 50' INBY SPAD 23137 | ~~[redacted]~~ |
| | | | | | | | | | | Sample Location = 0+3050' | |
| 0401 | 4608436 | 4/15/2009 | A | 4119936 | 0290 | | #1 SECTION | 2B6X | I | 50' INBY SPAD 23137 | ~~[redacted]~~ |
| | | | | | | | | | | Sample Location = 0+3050' | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4A1 | R | 50 FT. INBY SPAD #22809 | ~~[redacted]~~ |
| | | | | | | | | | | Sample Location = 0+00 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4A2 | R | 50 FT. INBY SPAD #22809 | ~~[redacted]~~ |
| | | | | | | | | | | Sample Location = 0+500 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4A3 | R | 50 FT. INBY SPAD #22809 | ~~[redacted]~~ |
| | | | | | | | | | | Sample Location = 0+1000 FT. | |

Row 1:
- [ ] Remains Wet
- [ ] Sampled
- [✓] Inaccessible

Row 2:
- [ ] Remains Wet
- [ ] Sampled
- [✓] Inaccessible

Row 3:
- [✓] Remains Wet
- [ ] Sampled
- [ ] Inaccessible

Row 4:
- [✓] Remains Wet
- [ ] Sampled
- [ ] Inaccessible

Row 5:
- [✓] Remains Wet
- [ ] Sampled
- [ ] Inaccessible

MSHA-2ECAMERON-0099

Confidential Agency Document
DLB-000499

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010    Event Number: 6286108

Selection Criteria:
4608436

| Office Cd. | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4A4 | R | 50 FT. INBY SPAD #22809 | ~~████~~ |
| ☑ Remains Wet | | | | | | | | | | | |
| ☐ Sampled | | | | | | | | | | | |
| ☐ Inaccessible | | | | | | | | | Sample Location = 0+1500 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4A5 | R | 50 FT. INBY SPAD #22809 | ~~████~~ |
| ☑ Remains Wet | | | | | | | | | | | |
| ☐ Sampled | | | | | | | | | | | |
| ☐ Inaccessible | | | | | | | | | Sample Location = 0+2000 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4A6 | R | 50 FT. INBY SPAD #22809 | ~~████~~ |
| ☑ Remains Wet | | | | | | | | | | | |
| ☐ Sampled | | | | | | | | | | | |
| ☐ Inaccessible | | | | | | | | | Sample Location = 0+2500 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4A7 | R | 50 FT. INBY SPAD #22809 | ~~████~~ |
| ☑ Remains Wet | | | | | | | | | | | |
| ☐ Sampled | | | | | | | | | | | |
| ☐ Inaccessible | | | | | | | | | Sample Location = 0+3000 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4B1 | R | 50 FT. INBY SPAD #22809 | ~~████~~ |
| ☐ Remains Wet | | | | | | | | | | | |
| ☐ Sampled | | | | | | | | | | | |
| ☑ Inaccessible | | | | | | | | | Sample Location = 0+00 FT. | |

MSHA-2ECAMERON-0100

MSHA Form 2000-210 (1/06)

Confidential Agency Document
DLB-000500

Tuesday, March 16, 2010

6 of 41 Pages

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

**From: 3/16/2009 to 3/16/2010**     **Event Number:** 6286108

Selection Criteria:
  4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4B2 | R | 50 FT. INBY SPAD #22809 | ~~————~~ |
| | | | | | | | | | | Sample Location = 0+500 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4B3 | R | 50 FT. INBY SPAD #22809 | ~~————~~ |
| | | | | | | | | | | Sample Location = 0+1000 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4B4 | R | 50 FT. INBY SPAD #22809 | ~~————~~ |
| | | | | | | | | | | Sample Location = 0+1500 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4B5 | R | 50 FT. INBY SPAD #22809 | ~~————~~ |
| | | | | | | | | | | Sample Location = 0+2000 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | AB6 | R | 50 FT. INBY SPAD #22809 | ~~————~~ |
| | | | | | | | | | | Sample Location = 0+2500 FT. | |

For each record:
- ☐ Remains Wet
- ☐ Sampled
- ☑ Inaccessible

MSHA-2ECAMERON-0101

Confidential Agency Document
Tuesday, March 16, 2015
DLB-000501

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010

**Event Number:** 6286108

Selection Criteria:
4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4B7 | R | 50 FT. INBY SPAD #22809 | JOEY ATHEY |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+3000 FT.

| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4C1 | I | 50 FT. INBY SPAD #22809 | JOEY ATHEY |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+00 FT.

| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4C2 | I | 50 FT. INBY SPAD #22809 | JOEY ATHEY |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+500 FT.

| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4C3 | I | 50 FT. INBY SPAD #22809 | JOEY ATHEY |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+1000 FT.

| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4C4 | I | 50 FT. INBY SPAD #22809 | JOEY ATHEY |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+1500 FT.

MSHA-2ECAMERON-0102

Confidential Agency Document
DLB-000502

MSHA Form 2000-210 (1/06)

Tuesday, March 16, 2010

8 of 41 Pages

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010    Event Number: 6286108

Selection Criteria:
     4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4C5 | I | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet<br>☐ Sampled<br>☑ Inaccessible | | | | | | | | | | Sample Location = 0+2000 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4C6 | I | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet<br>☐ Sampled<br>☑ Inaccessible | | | | | | | | | | Sample Location = 0+2500 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4C7 | I | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet<br>☐ Sampled<br>☑ Inaccessible | | | | | | | | | | Sample Location = 0+3000 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4D1 | R | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet<br>☐ Sampled<br>☑ Inaccessible | | | | | | | | | | Sample Location = 0+00 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4D2 | R | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet<br>☐ Sampled<br>☑ Inaccessible | | | | | | | | | | Sample Location = 0+500 FT. | |

MSHA-2ECAMERON-0103

MSHA Form 2000-210 (1/06)

Confidential Agency Document
DLB-000503
Tuesday, March 16, 2010

9 of 41 Pages

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010    Event Number: 6286108

Selection Criteria:
   4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | #2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4D3 | R | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+1000 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4D4 | R | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+1500 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4D5 | R | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+2000 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4D6 | R | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+2500 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 4D7 | R | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+3000 FT. | |

MSHA-2ECAMERON-0104

Confidential Agency Document
DLB-000504

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010   Event Number: 6286108

Selection Criteria:
4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | #2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 43AX | R | 50 FT. INBY SPAD #22809 | ~~(redacted)~~ |
| ☑ Remains Wet<br>☐ Sampled<br>☐ Inaccessible | | | | | | | | | | Sample Location = 0+1050 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 46AX | R | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☑ Remains Wet<br>☐ Sampled<br>☐ Inaccessible | | | | | | | | | | Sample Location = 0+2550 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 43BX | I | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet<br>☐ Sampled<br>☑ Inaccessible | | | | | | | | | | Sample Location = 0+1050 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 46BX | I | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet<br>☐ Sampled<br>☑ Inaccessible | | | | | | | | | | Sample Location = 0+2550 FT. | |
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0400 | 0410 | #2 SECTION | 43CX | R | 50 FT. INBY SPAD #22809 | ~~JOEY ATHEY~~ |
| ☐ Remains Wet<br>☐ Sampled<br>☑ Inaccessible | | | | | | | | | | Sample Location = 0+1050 FT. | |

MSHA-2ECAMERON-0105

Confidential Agency Document
DLB-000505

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010    Event Number: 6286108

Selection Criteria:
4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 4/8/2009 | A | 4119936 | 0640 | 0650 | #3 section | 1F3X | R | 50' inby spad 22905 | WILLIAM H BANE II |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+1050' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 2A1 | R | 50' inby spad 23168 | JOEY ATREY |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+00' (#1 ENTRY) | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 2B1 | R | 50' inby spad 23168 | JOEY ATREY |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+00' (#2 ENTRY) | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 2C1 | I | 50' inby spad 23168 | JOEY ATREY |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+00' (#3 ENTRY) | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 2D1 | I | 50' inby spad 23168 | JOEY ATREY |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+00 (#4 ENTRY) | |

MSHA-2ECAMERON-0106

Confidential Agency Document
DLB-000506
Tuesday, March 16, 2010

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010     Event Number: 6286108

Selection Criteria:
4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|-----------|---------|------------|------------------|---------------|--------|-----|---------------|-------|-----|------------|-----------|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 2A2 | R | 50' Inby spad 23168 | ████ |

☑ Remains Wet
☐ Sampled
☐ Inaccessible

Sample Location =  0+500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 2B2 | R | 50' Inby spad 23168 | ████ |

☑ Remains Wet
☐ Sampled
☐ Inaccessible

Sample Location =  0+500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 2C2 | I | 50' Inby spad 23168 | ████ |

☑ Remains Wet
☐ Sampled
☐ Inaccessible

Sample Location =  0+500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 2D2 | I | 50' Inby spad 23168 | ████ |

☑ Remains Wet
☐ Sampled
☐ Inaccessible

Sample Location =  0+500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 1A3 | R | 50' Inby spad 23168 | ████ |

☐ Remains Wet
☐ Sampled
☐ Inaccessible

Sample Location =  0+1000'

MSHA-2ECAMERON-0107

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010     Event Number: 6286108

Selection Criteria:
4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | #2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 1B3 | R | 50' inby spad 23168 | ~~JOEY ATKEY~~ |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+1000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 1C3 | I | 50' inby spad 23168 | ~~JOEY ATKEY~~ |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+1000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0290 | | Tailgate area | 1D3 | I | 50' inby spad 23168 | ~~JOEY ATKEY~~ |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+1000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A1 | R | 50' inby spad 23181 | ~~JOEY ATKEY~~ |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+00' (#1 ENTRY) | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B1 | I | 50' inby spad 23181 | ~~JOEY ATKEY~~ |
| ☐ Remains Wet ☐ Sampled ☑ Inaccessible | | | | | | | | | | Sample Location = 0+00' (#2 ENTRY) | |

MSHA-2ECAMERON-0108

Confidential Agency Document
DLB-000508

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010    Event Number: 6286108

Selection Criteria:
    4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|-----------|---------|-----------|------------------|---------------|--------|-----|---------------|-------|-----|-----------|-----------|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C1 | I | 50' inby spad 23181 | |

☐ Remains Wet
☐ Sampled
☑ Inaccessible                                                                                         Sample Location = 0+00' (#3 ENTRY)

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1D1 | R | 50' inby spad 23181 | |

☐ Remains Wet
☐ Sampled
☑ Inaccessible                                                                                         Sample Location = 0+00' (#4 ENTRY)

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A2 | R | 50' inby spad 23181 | |

☐ Remains Wet
☐ Sampled
☐ Inaccessible                                                                                         Sample Location = 0+500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B2 | I | 50' inby spad 23181 | |

☐ Remains Wet
☐ Sampled
☐ Inaccessible                                                                                         Sample Location = 0+500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C2 | I | 50' inby spad 23181 | |

☐ Remains Wet
☐ Sampled
☐ Inaccessible                                                                                         Sample Location = 0+500'

MSHA-2ECAMERON-0109

Confidential Agency Document
Tuesday, March 16, 2010
DLB-000309

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010     Event Number: 6286108

Selection Criteria:
  4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1D2 | R | 50' inby spad 23181 | ~~BY ATHEY~~ |
| | | | | | | | | | | Sample Location = 0+500' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A3 | R | 50' inby spad 23181 | ~~BY ATHEY~~ |
| | | | | | | | | | | Sample Location = 0+1000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B3 | I | 50' inby spad 23181 | ~~BY ATHEY~~ |
| | | | | | | | | | | Sample Location = 0+1000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C3 | I | 50' inby spad 23181 | ~~BY ATHEY~~ |
| | | | | | | | | | | Sample Location = 0+1000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1D3 | R | 50' inby spad 23181 | ~~BY ATHEY~~ |
| | | | | | | | | | | Sample Location = 0+1000' | |

For row 1 (1D2): ☐ Remains Wet  ☐ Sampled  ☑ Inaccessible

For row 2 (1A3): ☐ Remains Wet  ☐ Sampled  ☑ Inaccessible

For row 3 (1B3): ☐ Remains Wet  ☐ Sampled  ☑ Inaccessible

For row 4 (1C3): ☐ Remains Wet  ☐ Sampled  ☑ Inaccessible

For row 5 (1D3): ☐ Remains Wet  ☐ Sampled  ☑ Inaccessible

MSHA-2ECAMERON-0110

MSHA Form 2000-210 (1/06)     Tuesday, March 16, 2010     DLB-000510

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010     Event Number: 6286108

Selection Criteria:
4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A3X | I | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☐ Sampled                                                            Sample Location = 0+1050'
☑ Inaccessible

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B3X | I | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☐ Sampled                                                            Sample Location = 0+1050'
☑ Inaccessible

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C3X | I | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☐ Sampled                                                            Sample Location = 0+1050'
☑ Inaccessible

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A4 | R | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☐ Sampled                                                            Sample Location = 0+1500'
☑ Inaccessible

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B4 | I | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☐ Sampled                                                            Sample Location = 0+1500'
☑ Inaccessible

MSHA-2ECAMERON-0111

MSHA Form 2000-210 (1/06)          Tuesday, March 16, 2010     DLB 000511

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010    Event Number: 6286108

Selection Criteria:
      4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|-----------|---------|------------|------------------|---------------|--------|-----|---------------|-------|-----|------------|-----------|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C4 | I | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+1500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1D4 | R | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+1500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A5 | R | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☐ Sampled
☑ Inaccessible

Sample Location = 0+2000'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B5 | I | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☑ Sampled
☐ Inaccessible

Sample Location = 0+2000'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C5 | I | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☑ Sampled
☐ Inaccessible

Sample Location = 0+2000'

MSHA-2ECAMERON-0112

Confidential Agency Document
DLB-000512

Tuesday, March 16, 2010

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking      From: 3/16/2009 to 3/16/2010     Event Number: 6286108

Selection Criteria:
4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | #2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1D5 | R | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☐ Remains Wet
☑ Sampled
☑ Inaccessible

Sample Location = 0+2000'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A6 | R | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☑ Remains Wet
☐ Sampled
☐ Inaccessible

Sample Location = 0+2500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B6 | I | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☑ Remains Wet
☐ Sampled
☐ Inaccessible

Sample Location = 0+2500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C6 | I | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☑ Remains Wet
☐ Sampled
☐ Inaccessible

Sample Location = 0+2500'

| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1D6 | R | 50' inby spad 23181 | ~~JOEY ATHEY~~ |

☑ Remains Wet
☐ Sampled
☐ Inaccessible

Sample Location = 0+2500'

MSHA-2ECAMERON-0113

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010    Event Number: 6286108

Selection Criteria:
4608436

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | #2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1D8 | R | 50' inby spad 23181 | |
| ✓ Remains Wet / Sampled / Inaccessible | | | | | | | | | | Sample Location = 0+3500' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A9 | R | 50' inby spad 23181 | |
| ✓ Remains Wet / Sampled / Inaccessible | | | | | | | | | | Sample Location = 0+4000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B9 | I | 50' inby spad 23181 | |
| ✓ Remains Wet / Sampled / Inaccessible | | | | | | | | | | Sample Location = 0+4000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C9 | I | 50' inby spad 23181 | |
| ✓ Remains Wet / Sampled / Inaccessible | | | | | | | | | | Sample Location = 0+4000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1D9 | R | 50' inby spad 23181 | |
| ✓ Remains Wet / Sampled / Inaccessible | | | | | | | | | | Sample Location = 0+4000' | |

MSHA-2ECAMERON-0114

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

**From: 3/16/2009 to 3/16/2010**     **Event Number:** 6286108

Selection Criteria:
   4608436

MSHA-2ECAMERON-0115

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A6X | R | 50' inby spad 23181 | |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+2550' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B6X | I | 50' inby spad 23181 | |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+2550' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C6X | I | 50' inby spad 23181 | |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+2550' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A7 | R | 50' inby spad 23181 | |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+3000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B7 | I | 50' inby spad 23181 | |
| ☑ Remains Wet ☐ Sampled ☐ Inaccessible | | | | | | | | | | Sample Location = 0+3000' | |

Coal Rock Dust Survey Data Retrieval System

# Rock Dust Survey Wet Locations Tracking

From: 3/16/2009 to 3/16/2010    Event Number: 6296108

Selection Criteria:
4608436

MSHA-2ECAMERON-0116

| Office Cd | Mine ID | Survey Dt. | MMU Alpha Suffix | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | I/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C7 | I | 50' inby spad 23181 | |
| ☑ Remains Wet<br>☐ Sampled<br>☐ Inaccessible | | | | | | | | | | Sample Location = 0+3000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1D7 | R | 50' inby spad 23181 | |
| ☑ Remains Wet<br>☐ Sampled<br>☐ Inaccessible | | | | | | | | | | Sample Location = 0+3000' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1A8 | R | 50' inby spad 23181 | |
| ☑ Remains Wet<br>☐ Sampled<br>☐ Inaccessible | | | | | | | | | | Sample Location = 0+3500' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1B8 | I | 50' inby spad 23181 | |
| ☑ Remains Wet<br>☐ Sampled<br>☐ Inaccessible | | | | | | | | | | Sample Location = 0+3500' | |
| 0401 | 4608436 | 7/15/2009 | A | 4119293 | 0400 | | head gate toward fan | 1C8 | I | 50' inby spad 23181 | |
| ☑ Remains Wet<br>☐ Sampled<br>☐ Inaccessible | | | | | | | | | | Sample Location = 0+3500' | |

MSHA Form 2000-210 (1/06)

Confidential Agency Document
DLB-000516

(PIL)

## Assistant District Manager for Enforcement (ADM) – Flagrant Violations

**Issue:** The ADM did not provide adequate oversight to ensure that inspectors reviewed potentially flagrant violations in accordance with the procedures established by *Procedure Instruction Letter No. I08-III-02*.

District 4 inspectors issued eight section 104(d)(2) orders for violations at UBB that met the "numbered objective criteria" outlined in PIL I08-III-02 for review as potentially flagrant violations. All eight orders involved the Operator's failure to follow the approved ventilation plan. Seven orders met the criteria for the "repeated failure" to make reasonable efforts to eliminate known violations, and one met both the "repeated failure" and "reckless failure" criteria. However, District 4 personnel did not review any of the eight orders as potentially flagrant violations. As a result, none of the eight orders were submitted to the CMS&H Administrator for a final determination.

In the ADM's enforcement division, only 9% of the 66 potentially flagrant violations required to be reviewed were actually reviewed by PIL No. I08-III-02 as required.

**Supporting Documentation:**

- *Procedure Instruction Letter No. PIL I08-III-0* (PIL I08-III-02.pdf)

**Mitigating Factors:** In District 4, only 7.3% of the potentially flagrant violations were reviewed as required.

EFFECTIVE DATE:  05/29/08          EXPIRATION DATE: 03/31/10
                                   (Reissue of PIL I06-III-04)

PROCEDURE INSTRUCTION LETTER NO.  I08-III-02


FROM:          JAY P. MATTOS
               Director
               Office of Assessments

               KEVIN G. STRICKLIN
               Administrator for
               Coal Mine Safety and Health

               FELIX A. QUINTANA
               Administrator for
               Metal and Nonmetal Mine Safety and Health

SUBJECT:       Procedures for Evaluating Flagrant Violations


## Scope
This Procedure Instruction Letter (PIL) applies to all Coal and Metal and Nonmetal
Mine Safety and Health enforcement personnel.

## Purpose
The purpose of this PIL is to establish uniform procedures for Coal and Metal and
Nonmetal Mine Safety and Health enforcement personnel to properly evaluate flagrant
violations of mandatory safety and health standards as provided in the Mine
Improvement and New Emergency Response Act of 2006 (MINER Act).

## Background
With passage of the MINER Act, a civil penalty of up to $220,000 may be assessed for a
flagrant violation.  The MINER Act states that a flagrant violation is:

> "...a **reckless or repeated failure** to make reasonable efforts to eliminate a
> known violation of a mandatory safety or health standard that substantially and
> proximately caused, or reasonably could have been expected to cause, death or
> serious bodily injury."

Confidential Agency Document
DLB-000518          MSHA-2ECAMERON-0118

2

While conducting inspections and investigations, MSHA inspectors observe violations of mandatory standards and, as a result, issue citations and orders. During that process, inspectors evaluate a mine operator's negligence regarding their knowledge of those violations, from "none" to "reckless disregard." Agency inspectors also have knowledge of citations and orders that were previously issued to a mine. Based on the facts and their observations, inspectors now have the opportunity to designate a violation as flagrant. Some basic statutory requirements must be met for a violation to receive this designation. These violations shall be reviewed thoroughly at every management level in the District and by the Administrator prior to being forwarded for proposed civil penalty assessment.

<u>Procedure</u>
**1)** Flagrant violations cited by Mine Safety and Health Administration (MSHA) inspectors must meet the following evaluation criteria for **reckless failure <u>or</u> repeated failure** violations:

For violations that are the result of **reckless failure** to make reasonable efforts to eliminate a known violation -
   1. Citation or order is evaluated as significant and substantial,
   2. Injury or illness is evaluated as at least permanently disabling,
   3. Citation or order is evaluated as an unwarrantable failure, and
   4. Negligence is evaluated as reckless disregard.

For violations that are the result of **repeated failure** to make reasonable efforts to eliminate a known violation -
   1. Citation or order is evaluated as significant and substantial,
   2. Injury or illness is evaluated as at least permanently disabling,
   3. Type of action is evaluated as an unwarrantable failure, and
   4. At least two prior "unwarrantable failure" violations of the same safety or health standard have been cited within the past 15 months.

In addition, if the violation meets the above criteria it must also be evaluated to determine if it **proximately** caused, or could have reasonably been expected to cause death or serious bodily injury. A proximate cause is one which directly produces the injury or death and without which the injury or death would not have occurred.

In addition to the serious or aggravating circumstances already referenced on the MSHA Special Assessment Review (SAR) Form, the inspector and reviewing supervisors should also document any mitigating circumstances. Examples of mitigating circumstances might include new mine ownership or new safety officials at the mine who have shown an increased commitment to improving compliance.

Confidential Agency Document
DLB-000519          MSHA-2ECAMERON-0119

3

**2)** All flagrant violations will be specially assessed. To initiate the special assessment process, the inspector must complete a SAR Form for each proposed flagrant violation cited, clearly identifying it as potentially flagrant. The above criteria must be addressed on the form. The SAR Form has been revised to include a check box to be used to identify violations as flagrant. Inspectors and higher level reviewers must consider all factors and circumstances and check the "flagrant violation" box in their respective section (section 10 through 13) of the SAR Form before forwarding the SAR Form to the appropriate Administrator for review. All SAR Forms for violations that meet the numbered objective criteria outlined above must be submitted to the Administrator even if the District Manager does not recommend a flagrant violation special assessment because of the absence of proximate cause or the presence of mitigating factors. The Administrator will forward the completed SAR Form along with the underlying citation or order to the Assessment Center in Wilkes-Barre, Pennsylvania.

**3)** When possible and appropriate, MSHA District Managers should notify mine operators and miners' representatives if a mine's enforcement history makes it eligible for issuance of flagrant violations. However, MSHA's failure to notify mine operators and miners' representatives of this eligibility does not preclude issuance of these types of violations.

**Authority**
Section 110 of the Federal Mine Safety and Health Act of 1977, as amended, 30 U.S.C. §820. The Mine Improvement and New Emergency Response Act of 2006, Section 8.

**Filing Instructions**
This procedure instruction letter should be filed behind the tab marked "Procedure Instruction Letters" in the Coal Mine Safety and Health and Metal and Nonmetal General Inspection Procedures Handbook.

**Issuing Office and Contact Person**
Coal Mine Safety and Health
Kenneth Murray (202) 693-9503
Email: Murray.Kenneth@dol.gov

Metal and Nonmetal Mine Safety and Health
Neal Merrifield (202) 693-9645
Email: Merrifield.Neal@dol.gov

Office of Assessments
Linda Weitershausen (202) 693-9712
Email: Weitershausen.Linda@dol.gov

Confidential Agency Document
DLB-000520        MSHA-2ECAMERON-0120

4

## Distribution

Coal Mine Safety and Health enforcement personnel
Metal and Nonmetal Mine Safety and Health enforcement personnel
Assessments

## Field Office Supervisor – Inspection by Trainee

**Issue:**  On January 12, 2010, an AR allowed an ROE trainee to travel to "3 unit" to terminate a citation.  This was confirmed in interviews and is documented on page 10 of the AR's notes for that day.  The Field Office Supervisor initialed these notes on January 20, 2010.

**Supporting Documentation:**

- Page 8 of the Program Policy Manual, Volume I (Page 8 from PPM Vol I.pdf)
- Copy of page 10 of AR's notes for January 12, 2010 (Field Office Supervisor – Inspection by Trainee.pdf)
- Relevant pages of AR's transcript (Field Office Supervisor – Inspection by Trainee.pdf)
- Relevant pages of Field Office Supervisor's transcript (Field Office Supervisor – Inspection by Trainee.pdf)

**Mitigating Factors:** The Field Office Supervisor had 29 months experience as a supervisor when he was reassigned to the Mount Hope field office.  He had received only one week of training related to the core administrative duties of a field office supervisor and was not fully trained on the technical aspects of supervising coal mine inspectors.

quarter would be counted under the one-inspection-per-quarter rule. The same principle would apply to surface mines, except that a 90-day limit and one-inspection-every-six-months rule would be used.

For intermittent and nonproducing mines, MSHA's policy for metal and nonmetal mines requires two inspections a year for underground operations and one inspection a year for surface operations, regardless of the length of time that a mine is in operation during the fiscal year.

103(a)    Authority to Inspect - Authorization for
          Representatives
Inspections and investigations under the Federal Mine Safety and Health Act of 1977 shall be conducted only by persons who have been authorized by the Secretary to conduct such inspections or investigations.  The inspector's authorization shall be available during inspections and investigations.

103(a)    Authority to Conduct Special Investigations - SI
          Credentials
Section 103(a) of the Act authorizes MSHA to conduct special investigations as an integral part of the Agency's enforcement program.  The Technical Compliance and Investigation Divisions (TCID) are responsible for overall administration and management of the special investigations program.  In order to promote the consistent application and management of the program, TCID will develop statistical and management information based on special investigations activities in the field.  This includes evaluating the effectiveness of each district's special investigation program, monitoring district compliance with national policies and procedures, and providing periodic updates on the status of cases. As part of the Agency's accountability program, accountability reviews of the special investigations program will be conducted by the national office on a recurring basis.  TCID has responsibility for the following sections of the Act:

1. Section 105 complaints of discrimination filed by miners and other protected persons;

2. Section 108 injunctive actions; and

3. Section 110 civil and criminal violations of the Mine Act and/or mandatory safety and health standards.

Confidential Agency Document

**Left form:**

MSHA Form 7000-10K, June 93 (revised)

Date 1-12-10

~~[redacted]~~ainee ~~[redacted]~~ went
to 3 unit → Checked
the lifeline citation#
809 0256 is terminated

B wrote out termination
→ Drove Back to
Mt. Hope-

Inspector's Initials ~~[redacted]~~
Supervisor's Initials and Date ~~[redacted]~~    Page No. 10

*U.S. GPO: 2009-541-759

MSHA-DEG-CAMERON-0124

---

**Center form:**

46-0 8436

MSHA Form 7000-10I, June 93 (revised)

DAILY COVER SHEET

Date 1-13-10    Event No. 6286108

Arrived at the Mine 0745   Departed from the Mine

List Records Books Checked   preshift
→ weekly Exam

Accompanied By: Company Representative

GARY MAY

Miners Representative  NA

AREAS OF INSPECTION ACTIVITY:

Discussion with the
mine Superintendent GARY MAY
→ President WAYNE Persinger

Mine is producing

Inspector's Initials ~~[redacted]~~
Supervisor's Initials and Date ~~[redacted]~~  Page No. 1
*U.S. Government Printing Office: 1997 - 508-470

---

**Right form:**

MSHA Form 7000-10K, June 93 (revised)

Date 1-13-09

Met Jerry Pauley
Carried at the mine
at 0745, with the ~~[redacted]~~trainee
Delivered two modificat.
to GARY MAY.
Had A discussion about
0(2) citation on 11 JAN.
When asked Gary May
stated that he was the
person whome told this
section crew to go →
work on the belt. He
also stated that he went
to the area to help. This
was approx 1300hr, 9 JAN.
Mr. May stated that the
belt was down until 1430,
Mr. MAy also stated that
he walked the belt up →

Inspector's Initials ~~[redacted]~~
Supervisor's Initials and Date ~~[redacted]~~  Page No. 2
*U.S. GPO: 2009-541-759

Confidential Agency Document
DLB-000524



Inspector          10-19-2010

34

1    A: Yes.

2    Q: What all did you all cover that day?

3    A: We got some TLs and I went through sets one, three, five

4    seals.

5    Q: So that was the day you were at three set seal?

6    A: Yes.

7    Q: What we were talking about earlier?

8    A: Ah-huh.

9    Q: What all's required to be documented when you're taking

10   air readings at the outby seals, or out by the seals?

11   A: Oh, the air reading out by the seals?

12   Q: Ah-huh.

13   A: CFM and ah, gas checks.

14   Q: Okay.  On page 10 you documented ~~trainee~~ went to

15   three unit and checked the lifeline citation 8090251 is

16   terminated.  Did he go by himself that day?

17   A: I didn't go with him.  I'm sure he went with the company

18   people.

19   Q: Okay.

20   A: But I've forgotten this until I read it down and there

21   it is.

22   Q: Okay.  So did you abate that on his word?

23   A: Yes.

24   Q: Why was that?  Why'd you do it that way?

25

35

1      A:  The reason I did it that way is, one thing to save time,

2  also ~~Trainee~~ was, I was going to do these seals, it was low

3  up in there and I didn't see any sense in him going with me. And

4  he came back outside and checked the shop equipment. Or he did

5  before he went in, I don't remember which but that was, that's

6  what happened this day as best I can tell and with my

7  recollection.

8      Q:  Is that something you all decided to do on your own?

9      A:  I would say, yes.  I don't believe I discussed that with

10  anybody.

11      Q:  In the ITS was the equipment and the items documented

12  with your initials and ~~Trainee~~'s?

13      A:  Yes.

14      Q:  ----but not in the notes.  Are those the items that he

15  checked by himself?

16      A:  Yes.

17      Q:  Okay.  Were there ever any notes made for that, or was

18  that area basically not inspected?

19      A:  I guarantee you ~~Trainee~~ made notes on that.

20      Q:  Okay, but they weren't turned in.

21      A:  They were either turned, given back or that's most

22  likely what had happened.  ~~Trainee~~  I believe always turned

23  his notes in as best as I remember.

24      Q:  Okay.

25

36

1      A:   That was one of those times when he did the tracking

2   also. But we always, if we were together we put both of our

3   initials there.

4      Q:   Ah-huh.   Um, you talked about checking three set of

5   seals that day.   Did you know, I guess you knew they were under a

6   citation that day?

7      A:   Yes, I'm fairly sure I did.

8      Q:   Did you review the record book regarding the weekly

9   examination of those seals before you traveled to them?

10      A:   I don't see that in my notes and I don't see it listed

11   there.

12      Q:   What's your general practice?   Do you generally review

13   the record books of areas that you intend to travel?

14      A:   Yes sir.

15      Q:   Do you recall ever looking at those seal books?

16      A:   I'm sure I did, but I don't recall it at this time, but

17   I -----I also did a bunch more seals another day and probably

18   checked it that day or, I can't imagine me not checking it, but I

19   don't see it here.

20      Q:   All right.

21      Q:   Do you recall anything of significance from your review

22   whenever it did occur regarding the weekly examination of the

23   seals?   Anything stand out in your mind?

24      A:   In the book?

25      Q:   Yes, sir.

Confidential Agency Document
DLB-000527          MSHA-2ECAMERON-0127

Tranee

10-05-2010

35

1    Q:   That's all right.

2    A:   If I did I don't recall it, but I just, I don't know,

3  it just don't seem what I did, so...

4    Q:   Let's go off the record a minute.

5     WHEREUPON, a recess was taken, after which the interview

6  continued as follows, to-wit:

7    Q:   All right, we're returning with Session 3 of he

8  Internal Review Team's interview with Tranee ▊▊▊▊.

9    And we are currently on question 23 and on January 12, 2010

10  you traveled to Upper Big Branch with Inspector ▊▊▊▊▊▊  And

11  I'm gonna provide you with a copy of your notes.  And it's also

12  got several pages of ITS and there's some highlighted things in

13  here.  If you would, look at them and that is some of the stuff

14  I'll be asking you about.

15    A:   Again, I cannot tell you and don't recall of me

16  traveling by myself to terminate a Citation.

17    Q:   Okay.  That was the question.  His notes indicate on

18  page 10 that you may have traveled separately with him and went

19  to No. 3 to check termination of Citation 8090251 and, and so if

20  you, like you said -- I'll let you go ahead and expand on that a

21  little more if you don't recall that.  Go ahead and tell us on

22  the record what you feel about that particular highlighted area

23  of the notes.

24    A:   Well, again, and of course expanding, I don't recall

25  traveling with an AR to terminate a Citation.  I just don't

Confidential Agency Document
DLB-000528        MSHA-2ECAMERON-0128

36

1   recall it if I did.  I don't feel that I did.

2       Q:   Okay.

3       A:   But I'm gonna say, you know, I'm not sure.  I don't

4   know what I can tell you.

5       Q:   Okay.  On pages -- look at the ITS on that one; it's on

6   the back there.

7       A:   Okay.

8       Q:   And pages 33, 34 and 41 of the ITS which is for this

9   event, which is numbered 6286108, how many of the highlighted

10  pieces of equipment or were there any other highlighted pieces of

11  equipment dated 1/12/2010 and initialed PBSV did you inspect --

12  well, separate it from ~~Inspector~~

13      A:   Well, there's none of these highlighted.

14      Q:   Oh, I'm sorry; excuse me.  Let me see this just a

15  minute.  Okay.  Well, let's say on page 33.

16      A:   Uh-huh.  [Yes]

17      Q:   It's showing inner systems and shop equipment down

18  almost practically to the bottom there's several pieces of

19  equipment that are---

20      A:   Separate.

21      Q:   Yes, sir.

22      A:   Okay.  This one here I can tell you, yes, I was by

23  myself outside, because I didn't travel underground that day.

24      Q:   Okay.

25      A:   And I did check these chargers and a welder.  And I did

37

1  check this stuff here.

2      Q:   Okay.  And how did it - can you explain to me how that

3  come about?  I mean, what took place there as far as between --

4  what did Inspector ▓▓▓▓ tell you as far as staying outside and

5  checking that equipment?

6      A:   What was it that day?  I'm just speculating, it just

7  popped in my head.  I think that, you know, he was going in to

8  terminate some Citations or he was going in to do something that

9  day.  And I was left outside, you know, to get this part done on

10 account of this mines was split up in two different areas, two

11 different inspectors.  He still had his regular E01 that he had

12 to get started.  And Beckley Crystal Mine, which I traveled -- I

13 traveled with ▓▓▓▓ a whole lot.  Basically I just helped him, I

14 mean - you know what I'm saying - on that part on that day.  In

15 my experience and stuff as far as checking the cables and stuff

16 like that, and all these chargers, you know, I did, I did check

17 the chargers.

18     Q:   Okay.  Do you recall whether you went underground---

19     A:   I's in the shop.

20     Q:   Yeah.

21     A:   Yeah.

22     Q:   Do you recall if you went underground at all that day?

23     A:   I don't recall going underground that day.

24     Q:   Okay.  All right.  Thank you.

25     A:   Yeah.

Field Office Supervisor

12-01-2010

128

1    Q:   Okay.

2    Q:   What is the District's policy regarding trainees

3  traveling apart from the inspector they were assigned to travel

4  with?

5    A:   What is the District's what?

6    Q:   What is the District's policy regarding trainees

7  traveling apart from the inspector that they're assigned with at

8  the mine?

9    A:   They are not.   They are not to travel alone.

10   Q:   Do you know of or have you heard of any instances where

11 trainees have inspected areas of a mine apart from an AR?

12   A:   I haven't, no.

13   Q:   You haven't?

14   A:   Huh-uh.

15   Q:   Okay.   The 100 percent completion requirement for E01's,

16 and I know you're well aware of that, did that put any pressure

17 upon you or your work group to maybe rush inspections or try to

18 get things done a little bit quicker than maybe what would have

19 been more of a quality inspection rather than a quantity

20 inspection?

21   A:   I don't think so, no.

22   Q:   Okay.   Have you ever had any knowledge of trainees

23 handling violations observed or terminating citations apart from

24 the inspector?

25   A:   No.

Confidential Agency Document

## Inspector – Tailgate Roof Support

**Issue:** Page 19 of the base roof control plan submitted by the operator on October 27, 2009, and approved by the District Manager on December 23, 2009, required the tailgate travelway of initial longwall panels to have supplemental support in the form of two rows of 8-foot long cable bolts or two rows of posts on 4-foot centers installed in the middle of the entry between primary supports. This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times. The MSHA Accident Investigation team found there was only one row of supplemental support in the tailgate travelway as opposed to the two required in the approved plan.

On March 10, the Inspector traveled the 1 North Longwall tailgate travelway on the day shift and did not document a violation of the approved roof control plan. On March 11, the Inspector was in the tailgate travelway to terminate an order for a violation of the ventilation plan. According to the inspection tracking map, he traveled the entire tailgate travelway. The Inspector did not cite a violation of the roof control plan that day and stated in his interview that he did not recall inspecting the travelway for compliance with the roof control plan. Since he counted this inspection toward completion of the regular inspection of the tailgate travelway, inspection procedures required him to examine the travelway for compliance with the roof control plan. This was the last time MSHA inspected the 1 North Tailgate travelway before the explosion.

The Inspector documented that he reviewed the Uniform Mine File (UMF) on January 6, 2010, at the beginning of the regular inspection of UBB for the second quarter of FY 2020. The date stamp on the approval letter shows that the roof control plan was not filed in the UMF until January 20, 2010.

The Field Office Supervisor provided information during an interview on the distribution and filing of approved plans within the field office. He stated copies are provided to him and the inspector assigned to the particular mine and another copy is placed in the UMF.

**Supporting Documentation:**

- Copy of December 23, 2009, roof control plan approval letter showing the approved roof control plan was filed in the UMF on January 20, 2010 (Approval Letter for RC Plan.pdf)

- Page 19 of the approved roof control plan (RC Plan Page 19.pdf)

- UMF certification sheet showing that the Inspector reviewed the UMF on January 6, 2010, for a regular (E01) inspection (The Inspector – Tailgate Travelway.pdf)

- The Inspector's inspection notes for March 11 (The Inspector – Tailgate Travelway.pdf)

- Pertinent pages from The Inspector's Interview (The Inspector – Tailgate Travelway.pdf)

- Inspection Tracking Map (The Inspector – Tailgate Travelway Map.pdf)

**Mitigating Factors:** The single row of posts would have complied with the 2005 roof control plan tailgate travelway requirement but not with the requirement in the 2009 approved plan in effect at the time of the explosion. The approved roof control plan was filed in the UMF two weeks after the Inspector reviewed the file.

Confidential Agency Document
DLB-000533          MSHA-2ECAMERON-0133

*Attachment #2*

**U. S. Department of Labor**

Mine Safety and Health Administration
100 Bluestone Road
Mount Hope, WV  25880-1000

DEC 23 2009

UNDERGROUND MINE FILE
DATE FWD. 1/5/2010
INITIALS

Mr. Berman Cornett
Safety Director
Performance Coal Company
P.O. Box 69
Naoma, WV  25140

Dear Mr. Cornett:

Subject:   Update of the Roof-Control Plan, Upper Big Branch Mine- South,
I.D. No. 46-08436, Performance Coal Company, Montcoal, Raleigh
County, West Virginia, Permit No. 4-RC-11-94-12307-12

Your roof-control plan, received on October 27, 2009, has been reviewed and is
approved.  This approval is based upon a District review of the roof conditions
and roof-control practices in the mine by representatives of the Mine Safety and
Health Administration, and includes any changes made by you at that time.

Should you have any questions concerning your roof-control plan, please contact
Don Winston at this office, (304) 877-3900, Extension 130.

Sincerely,

MSHA
MOUNT HOPE, WV

JAN 06 2010

RECEIVED
MOUNT HOPE FIELD

Robert G. Hardman
District Manager
Coal Mine Safety and Health, District 4

Enclosure

cc:   State Inspector-at-Large, Oak Hill Division (1 encl.)
Mount Hope Field Office (3 encl.)
(1 encl.)
Files/cls

FIELD MINE FILE
DATE FILED 1/20/10
INITIALS

Confidential Agency Document
DLB-000534          MSHA-2ECAMERON-0134

# ROOF CONTROL PLAN DIAGRAM NO. 9
### SUPPLEMENTAL SUPPORT IN TAILGATE ENTRY



□ Primary Roof Support
△ Cable Bolt or Post

In Longwall development entries of initial longwall panels, the Tailgate Entry will have supplemental support in the form of two (2) 8' Cable Bolts or Posts installed between primary support.

This supplemental support shall be maintained 1000' outby the longwall face at all times.

| PERFORMANCE COAL COMPANY, INC. |
| UPPER BIG BRANCH MINE |
| MSHA ID NO. 46-08436   WV State # U-3042-92 |
| ROOF CONTROL PLAN DIAGRAM NO. 9 |
| SUPPLENTAL SUPPORT IN TAILGATE ENTRY |
| DATE: 10-27-06 | SCALE: 1" = 10' |

PAGE 19

Mine File — Reviewed Prior to Inspection

U. S. Department of Labor
Mine Safety and Health Administration



Mine Name

| Date Reviewed | Inspector's Signature | Comments (missing documents, obsolete data, etc.) |
|---|---|---|
| 9-15-09 | | EOI |
| 9-15-09 | | EO2 |
| 9-29-09 | | EO2 |
| 10-2-09 | | EOI |
| 10-5-09 | | Eoi Respirable Dust |
| 10-6-09 | | Eoi Electrical |
| 10-8-09 | | EO2 |
| 10-19-09 | | EO2 |
| 10-20-09 | | EOI Partical Review |
| 10-26-09 | | EO2 |
| 11 05 09 | | EO2 |
| 11 10 09 | | EOI |
| 11-10-09 | | Eoi Review |
| 11-19-09 | | Eoi Review |
| 11-19-09 | | EOI Review limited |
| 11-23-09 | | EO2 |
| 12-5-9 | | EO2 |
| 12-7-09 | | EO.I Respirable Dust / |
| 12-11-09 | | EO2 Partial Review |
| 12-15-9 | | EO2 |
| 12-21-09 | | EOI |
| 12-21-09 | | EOI |
| 12-22-09 | | EO2 |
| 1/6/09 | | EOI |
| 1/6/09 | | EOI |
| 1-7-10 | | EO2 |
| 1-15-10 | | EO2 |
| 1-28-10 | | EO2 |

MSHA Form 2000-137, Oct 79

Confidential Agency Document
DLB-000536

GPO 862 476

MSHA Form 7000-10K, June 93 (revised)

Date 3/16/10

Entry 5
 Ac 6x20
 Ve 955
 Qc 49,778

Entry 4
 Ac 5x21
 Ve 457
 Qc 45,885

Entry 3
 Ac 6x19
 Ve 360
 Qc 41,040

Smoked Entries 3-6
from intls to mouth the
Air was going into
the right cleate.

Inspector's Initials
Supervisor's Initials and Date                Page No. 8
*U.S. GPO: 2009-541-759

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/16/10

There were check curtains
over tube in stoppings
to control Air.
Went over inspection
w/ Jock Rolls informed
him that regulations would
have to increase airflow and
Check curtains would not be
Allowed and stoppings
would have to be installed.
Traveled to the Nose
District office and met
w/ Supervisor to inform
him of situation in the mine
so that he could be aware
action division is submitted
in the morning.

Inspector's Initials
Supervisor's Initials and Date                Page No. 9
*U.S. GPO: 2009-541-759

---

Day

MSHA Form 7000-10I, June 93 (revised)

## DAILY COVER SHEET

Date 3/11/10          Event No. 6296108

Arrived at the Mine 1050   Departed from the Mine

List Records Books Checked CW Pre Shift

Accompanied By: Company Representative Lewis Blanchard
Jason Whitehead, Wayne Braswell, Jack Roles
Everett Hager

Miners Representative
N/A

AREAS OF INSPECTION ACTIVITY:

Tail Gate Entries on
Longwall

Production

Inspector's Initials
Supervisor's Initials and Date                Page No. 1
*U.S. Government Printing Office: 1997 - 508-470

MSHA-2ECAMERON-0137

Attachment #3

Confidential Agency Document
DLB-000537

MSHA Form 7000-10K, June 93 (revised)

Date 3/11/10

ARRIVED AT UPPER BIG
BRANCH MINE - SELLS
PORTALS

MET WITH MANAGEMENT
TO DISCUSS REVISION ON
TAILGATE AND INFORM
THEM THAT ORDER COULD
BE TERMINATED ONCE
REVISION IS VERIFIED BY
CHECKING VENT. CONTROLS
UNDERGROUND @ TAILGATE

REVIEW MAP OF AREA
TO BE INSPECTED WITH
MANAGEMENT

Inspector's Initials _____
Supervisor's Initials and Date _____ Page No. 2
*U.S. GPO: 2009-541-759

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/11/10

CHECK LONGWALL PRE SHIFT
BOOK (NVD)

INTAKE 99,720
9 - 805
160 - 822

MPA - 14,482
MPB - 35,400

GOT WITH CHRIS BLANCHARD,
JASON WHITEHEAD, JACK ROLES,
TIM DAVIS TO GO TO
TAILGATE

CHECK MT-7 MANEUS
(PPO) (13) SCSR's (OK)

Inspector's Initials _____
Supervisor's Initials and Date _____ Page No. 3
*U.S. GPO: 2009-541-759

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/11/10

TRAVEL TO MOUTH OF
LONGWALL ON TAILGATE (NVD)

CHECK VENTILATION CONTROLS
AND COMPARED THEM TO
REVISION SUBMITTED (NVD)

TOOK AIR READINGS AT
REGULATORS AND OUTBY
TAIL

SMOKED OTHER AIRWAYS
ON WAY

TOOK READING @ 160
JACK ON LONGWALL
FACE

Inspector's Initials _____
Supervisor's Initials and Date _____ Page No. 4
*U.S. GPO: 2009-541-759

MSHA-2EGAMERON-0138

Confidential Agency Document
DLB-000538

MSHA Form 7000-10K, June 93 (revised)

Date 3/11/10

TRAVELED OTHER NEUTRAL
SPLITS OUT
CHECK WITH SMOKE TUBES
ON WAY BACK TO MOUTH
AIR FLOW IS AS SHOWN
ON MAP IN ALL AREAS

TRAVEL BACK TO
SURFACE

CALLED MSHA OFFICE

SPOKE WITH VENTILATION
SUPERVISOR INFORMED HIM
OF FINDINGS

LIFTED ORDER ON LONGWALL
@ 1400

Inspector's Initials _____
Supervisor's Initials and Date _____ Page No. 5
*U.S. GPO: 2009-541-759

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/11/10

TYPE OUT TERMINATION

HELD CLOSEOUT w/
MANAGEMENT

RETURN TO Mr. HAPE OFFICE

Inspector's Initials _____
Supervisor's Initials and Date _____ Page No. 6
*U.S. GPO: 2009-541-759

---

MSHA Form 7000-10I, June 93 (revised)    46-08436

DAILY COVER SHEET

Date 3-11-10    Event No. 6286108
Arrived at the Mine 0600    Departed from the Mine _____
List Records Books Checked WEEKLY EXAM
and DAILY EXAM of seals

Accompanied By: Company Representative _____
Harley Taylor
Miners Representative _____

AREAS OF INSPECTION ACTIVITY:

Seal Plowing 15 thru
6

Inspector's Initials _____
Supervisor's Initials and Date _____ Page No. 1
*U.S. Government Printing Office 1997 - 508-470

MSHA-2ECAMERON-0139

Confidential Agency Document
DLB-000539

Inspection
▓▓▓▓ Interview 6/15/2011 Session 2

15

1    Q:    Particularly paragraph about pillar sizing.

2    A:    Okay.

3    Q:    What determines the size the pillar has to be?

4    A:    That is - I think their engineers come up with the

5    [unintelligible] something like that and then they'd send you a

6    roof control plan on the minimum size of entry width.

7    Q:    What constitutes a violation of that standard in

8    respect to pillar size?

9    A:    I guess, anything smaller than what the plan would

10   require.

11   Q:    What if it's larger than what the plan requires and you

12   observe pillar failures?

13   A:    I guess, pillar failure would still be a violation of

14   roof-control plan.

15   Q:    It'll be a violation of the roof-control plan or that

16   standard?

17   A:    I guess the standard.

18   Q:    Would that have ever have occurred to you prior to the

19   accident to look for that as far as compliance to best standard?

20   A:    It would occur to me prior to today.

21   Q:    Thinking back to the head gate entry, the conditions

22   in the head gate entry on the longwall, were there pillar

23   failures? Do you recall or did you go in there?

24   A:    Behind? I never went behind the longwall.

25   Q:    Okay. How do you inspect the longwall tailgate for

16

1    compliance with the roof-control plan?

2        A:   Right off the top of my head, I'm not sure. I guess -

3    I mean we walked out in there.

4        Q:   How did you walk down in there? Do you remember a

5    specific time that you did that?

6        A:   Not right off. I mean, I know - if I'm not mistaken

7    there might be some stuff in there that talks about

8    [unintelligible] something to that effect.

9        Q:   Do you recall accessing the tailgate from the longwall

10   face? If that was possible?

11       A:   If I have - yeah. If I remember correctly yes, sir.

12       Q:   And how did you get out off of the face into the

13   tailgate? What precautions did you take? Were you able to climb

14   over to the side of the last shield or did you have to stop and

15   lock up the panline?

16       A:   If I - if I'm remembering correctly I crossed right -

17   right across the front of the shield.

18       Q:   So you had to go out onto the panline or…?

19       A:   To be honest it's all kinda fuzzy.

20       Q:   I guess, what I'm wonder….

21       A:   I know one day, one of the days that they were down

22   for under an order  and then a couple of other times but I know

23   I have crossed in front of the shield and I have crossed to the

24   panline.

25       Q:   Don't they have a - Do you recall seeing a large

1   shield or guarded piece of metal at the end of the last shield

2   on the tailgate to prevent [rib] rolls, material rock from

3   coming in on the tailgate side?

4       A:    Not right off.

5       Q:    What were the conditions like in the tailgate when you

6   got out there? Was it pretty bad break there at the last shield

7   or was it holding up pretty clean?

8       A:    I've been going – the only day I can really remember

9   being there is the couple of days under the order. I don't

10  remember the conditions being bad.

11      Q:    Do you recall how many [prop setters] they were

12  required to have?

13      A:    No.

14      Q:    Did you check the roof-control plan when you inspected

15  the tailgate to see what the requirements were?

16      A:    I don't recall. No. I don't recall inspecting the

17  tailgate for the roof-control period. I don't recall

18  that.

19      Q:    But when you did inspect it, were you familiar with –

20  because you did go out…

21      A:    Yeah. No. I [didn't].

22      Q:    Do you recall what the conditions in the tailgate

23  looked like? Was it wet? Was it dry?

24      A:    I'm wanting to say maybe a little bit of both.

25  Overall, I think it is – I'm gonna say mostly dry.



## Inspector – Rock Dust Survey of Headgate #22 Section

**Issue:** The March 15, 2010, rock dust survey in Headgate #22 Section should have included two additional rows of samples. The Inspector, assisted by a ROE trainee, collected four rows of samples, stopping 1,000 feet outby the section loading point. Page 45 of the *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook directs the inspector to "conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the mine."

### Supporting Documentation:

- *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook, Handbook Number: PH-08-V-1, January 1, 2008, pages 45 and 62 (Pages from PH08-V-1.pdf)
- Pages 44-46 from transcript of ROE trainee's October 8, 2010, interview where he describes efforts taken by the Inspector to collect samples on March 15, 2010. (Pages 44-46 from the ROE trainee's Transcript - 10-08-2010.pdf)

**Mitigating Factors:** The Inspector demonstrated efforts to follow procedures when conducting a rock dust survey on March 15, 2010, despite adverse conditions. The ROE trainee described the conditions on Headgate #22 Section as "sloppy wet," requiring considerable effort to obtain the eight samples collected (rather than documenting all areas as too wet to sample).

## Inspector – Rock Dust Survey of Old No. 2 Section

**Issue:** Rock dust surveys were not conducted in the Old No. 2 Section panel, where the operator completed mining during the second inspection of fiscal 2010 and moved the MMU to the Tailgate #22 entries. On March 16, 2010, the Inspector submitted a rock dust survey for this MMU with no samples collected. He indicated on the survey submittal form that the "section has not advanced 500 feet from the last survey."

Although the Tailgate #22 entries had not advanced 500 feet, survey samples had not been collected in the 1,000-foot long Old No. 2 Section Panel during previous inspections. Page 45 of the *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook stated that "Rock dust surveys shall also be conducted in previously mined active areas" (in addition to advancing sections). Page 62 of the handbook provided further guidance, which stated: "Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed. All active entries not previously surveyed shall be surveyed. Outby areas of a retreating section and active areas where advancing MMUs have been removed are considered active entries for rock dust survey purposes."

**Supporting Documentation:**

- *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook, Handbook Number: PH-08-V-1, January 1, 2008, pages 45 and 62. (Pages from PH08-V-1.pdf)

- Pages 100-103 and 108-109 from transcript of the Inspector's October 20, 2010, interview, as well as pages 40, 44-45, and 86-87 of his October 21, 2010, interview, where he indicated that he did not understand revised procedures that directed him to collect samples from areas where MMUs had been removed. (Pages from the Inspector's Transcript - 10-20-2010.pdf and Pages from the Inspector's Transcript - 10-21-2010.pdf)

**Mitigating Factors:** Prior to 2008, MSHA procedures directed inspectors to conduct rock dust surveys only on advancing sections. At that time, inspectors typically collected samples only from the advancing set of entries in which the MMU was actively mining during the survey. As a result, inspectors frequently did not collect samples at the inby ends of panels or main entries where mining was completed between surveys. After MSHA implemented the revised inspection procedures in 2008, some inspectors continued to sample only the set of entries being mined at the time of the survey. This practice was not unique to the Inspector, as inspectors conducted surveys in only 3 of the 17 non-pillared panels in active workings at UBB.

The Inspector stated that he was not aware of the revised procedures for collecting rock dust surveys in such areas. He also stated that he primarily learned how to conduct rock dust surveys from more experienced inspectors (who were trained on the old procedures) and that he remembered little from his relevant training at the MSHA Academy.

conducted with affected miners and mine supervisors to evaluate their familiarity with plan requirements.

***Documentation Required:*** *The inspector's evaluation of mining near a potential body of water or under water shall be documented in the hard-copy inspection notes to show the in-mine location), the date started, and the date this procedure was fully completed.  A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed.  No other documentation is required unless a violation is observed.*

12. **Potable Water (Working Section).**  The inspector shall determine if potable water is available.

***Documentation Required:***  *Availability of potable water shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU).  A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed.  Additionally, availability of the potable water shall be documented in the Inspection Tracking System MMU Log to show the MMU number.  No other documentation is required unless a violation is observed.*

13. **Rock Dust Survey.**  The inspector shall conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the mine. Rock dust surveys shall also be conducted in previously mined active areas. Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.

***Documentation Required:*** *The mechanized mining unit number (MMU), the sampling area description, the survey begin zero point, each sampling point (referenced in feet from the zero point), the percentile of methane detected on a hand-held detector and the number of any air bottle collected at each sampling location shall be documented in the inspection hard-copy notes for each survey collected.  Additionally, a minimum amount of rock dust survey information shall be documented in the Inspection Tracking System MMU Log to show the MMU number, the date survey was started and the date fully completed.  No other documentation is required unless a violation is observed.*

14. **Sanitary Facilities.**  Sanitary facilities located on a working section shall be inspected for compliance with applicable standards.

***Documentation Required:***  *Sanitary facility observations shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU), the date started, and the date this procedure was fully completed for that MMU.  A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed.  Additionally, sanitary facilities observations shall be documented in the Inspection Tracking System MMU Log to show the MMU number.  No other documentation is required unless a violation is observed.*

Confidential Agency Document
DLB-000546              MSHA-2ECAMERON-0146

that rock dust spot and survey analysis reports and accompanying analysis data are promptly made available for use by the districts. The Rock Dust Data Retrieval Application permits monitoring of prompt issuance of citations/orders for non-compliant samples or surveys, tracking wet survey location re-inspections, mining analysis data, and printing of oversight reports.

The responsible supervisor shall assure that all rock dust spot or survey analysis reports returned from the Mount Hope Lab by email attachment to the district are included within the appropriate inspection report. A citation or order shall be promptly issued for non-compliant rock dust spot samples or surveys. The citation or order number of each non-compliance issuance shall promptly be entered into the Rock Dust Sample Submission Application and the data uploaded.

2.   Rock Dust Surveys.  During each Regular Safety and Health Inspection, a uniform rock dust survey shall be made in each advancing working section to determine compliance with 30 CFR 75.403. If for any reason a survey is not possible, the inspectors shall promptly notify their supervisor. The supervisor, after consulting with district management, will provide guidance to the inspector. The surveys are to be kept current, up to and including the last row of pillars immediately outby the loading point. If a working section has advanced and the loading point moved 500 feet or more since the last Regular Safety and Health Inspection, a survey shall be conducted.

Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed. All active entries not previously surveyed shall be surveyed. Outby areas of a retreating section and active areas where advancing MMUs have been removed are considered active entries for rock dust survey purposes. Include in the collection of dust samples a representative number of crosscuts. Drawings Number 1 and 2 on the following pages provide further guidance concerning rock dust surveys.

*Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.* The status of each of these individual wet locations shall be determined during each regular inspection conducted within this one-year period. *Spot samples shall be collected if conditions permit on a re-inspection of a previously wet area.* The previous compliance/non-compliance determination of rock dust surveys will not be affected by the additional analysis of spot samples collected during re-inspection of wet areas. A citation or order should be issued when non-compliance is indicated for 10% or more of the individual

Confidential Agency Document
DLB-000547                    MSHA-2ECAMERON-0147

44

1  some things around there.  We checked the supplemental supplies

2  and fire plan.

3       Q:   Let's take a break real quick.

4            WHEREUPON, a recess was taken from the interview,

5  after which it continued as follows, to-wit:                    ROE trainee

6       Q:   Okay.  We're back on the record in Session 3 with ▮▮

7  ▮▮▮▮▮    ▮▮▮▮    during the break I gave you an additional page of

8  notes from the 15th.  I apologize that we haven't given them to

9  you.  Why don't you go ahead and look those over and see if

10 there's any additional items that you did that we need to talk

11 about.

12      A:   I don't see anything.

13      Q:   Look at the last page there.  Well, first of all,

14 look at the first page.

15      A:   Of?

16      Q:   Of the 15th.

17      A:   Okay.

18      Q:   Can you read, read the areas of inspection to us?

19      A:   Oh, okay.  Respirable dust, rock dust survey, clip

20 sequence, fire suppression, oh, one and two section belts,

21 terminate Citations in two sections, one belt.  Rock dust.

22      Q:   I don't think we mentioned the rock dust survey.

23      A:   Let's see here.

24      Q:   Do you recall doing a rock dust survey that day?

25      A:   I do recall doing one rock dust survey that ▮▮▮▮ --

45

1   matter of fact, ███████ the one that was showing me how to do a

2   rock dust survey.

3        Q:   Was that at Upper Big Branch?

4        A:   It was.  I remember most of the, where the took me

5   and we started out and he showed me how to do it.  And most of

6   the area was wet, I mean actually sloppy wet.  The ribs were wet

7   and the floor.  And we went over into the belt area. I believe

8   there was a trickle duster setting in there throwing dust out.

9   And then from that we went on across.  And most, most of the

10  entries were wet.  I do recall that.

11       Q:   Do you recall if that was this day?

12       A:   It had to be, because that's the only time I remember

13  doing any dust survey with ███████

14       Q:   Do you remember whether you got quite a few samples

15  or---

16       A:   We -- I don't know exactly how many samples we got,

17  but most of the stuff was wet.  And on the outer entries and we

18  had got some samples of where we're more closer to the track

19  entries.  But I don't think it was a whole lot; see, most of it

20  was wet.

21       Q:   Can you -- did you go across each row or did you go

22  up and down each entry?  Can you kinda give us an idea how you

23  did that?

24       A:   We, we, uh, did the entries and then we'd go down so

25  far. ███████ was, was guiding me and we'd go down so far and then

46

1   stop, do the entries and then crosscuts.  And then we kept doing

2   that for ever how far he had to go.  I don't know if he knew

3   where it was marked from the last time.  You know, we gathered

4   the samples, put them back in two backpacks and took them with

5   us.

6        Q:   You say you don't remember how he knew where to

7   start?

8        A:   No, I don't know if he had it on his map or if he had

9   it in his notes.  I don't know.  I don't recall that.

10       Q:   Do you remember him saying anything about areas outby

11  that hadn't been sampled before or where the section had moved

12  from?

13       A:   No.

14       Q:   Have you had training yet on, at the academy, on rock

15  dust surveys.

16       A:   We had training here, at the academy, in the

17  classroom; I think it was the last month - or, I'm not sure -

18  of them showing how to take a rock dust survey and how to mark

19  it.

20       Q:   Did they also teach you recordkeeping or note taking:

21  What's required in the notes when you do a rock dust survey?

22       A:   They explained to us on a map and a PowerPoint on how

23  to identify your samples.  As far as actually the notes part of

24  it I'm not sure.

25       Q:   Can you tell me what's required in the notes?

conducted with affected miners and mine supervisors to evaluate their familiarity with plan requirements.

*Documentation Required: The inspector's evaluation of mining near a potential body of water or under water shall be documented in the hard-copy inspection notes to show the in-mine location), the date started, and the date this procedure was fully completed. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. No other documentation is required unless a violation is observed.*

12. **Potable Water (Working Section).** The inspector shall determine if potable water is available.

*Documentation Required: Availability of potable water shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU). A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, availability of the potable water shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

13. **Rock Dust Survey.** The inspector shall conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the mine. Rock dust surveys shall also be conducted in previously mined active areas. Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.

*Documentation Required: The mechanized mining unit number (MMU), the sampling area description, the survey begin zero point, each sampling point (referenced in feet from the zero point), the percentile of methane detected on a hand-held detector and the number of any air bottle collected at each sampling location shall be documented in the inspection hard-copy notes for each survey collected. Additionally, a minimum amount of rock dust survey information shall be documented in the Inspection Tracking System MMU Log to show the MMU number, the date survey was started and the date fully completed. No other documentation is required unless a violation is observed.*

14. **Sanitary Facilities.** Sanitary facilities located on a working section shall be inspected for compliance with applicable standards.

*Documentation Required: Sanitary facility observations shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU), the date started, and the date this procedure was fully completed for that MMU. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, sanitary facilities observations shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

Confidential Agency Document
DLB-000551                        MSHA-2ECAMERON-0151

that rock dust spot and survey analysis reports and accompanying analysis data are promptly made available for use by the districts.  The Rock Dust Data Retrieval Application permits monitoring of prompt issuance of citations/orders for non-compliant samples or surveys, tracking wet survey location re-inspections, mining analysis data, and printing of oversight reports.

The responsible supervisor shall assure that all rock dust spot or survey analysis reports returned from the Mount Hope Lab by email attachment to the district are included within the appropriate inspection report.  A citation or order shall be promptly issued for non-compliant rock dust spot samples or surveys.  The citation or order number of each non-compliance issuance shall promptly be entered into the Rock Dust Sample Submission Application and the data uploaded.

2.  Rock Dust Surveys.  During each Regular Safety and Health Inspection, a uniform rock dust survey shall be made in each advancing working section to determine compliance with 30 CFR 75.403.  If for any reason a survey is not possible, the inspectors shall promptly notify their supervisor.  The supervisor, after consulting with district management, will provide guidance to the inspector.  The surveys are to be kept current, up to and including the last row of pillars immediately outby the loading point.  If a working section has advanced and the loading point moved 500 feet or more since the last Regular Safety and Health Inspection, a survey shall be conducted.

Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed.  All active entries not previously surveyed shall be surveyed.  Outby areas of a retreating section and active areas where advancing MMUs have been removed are considered active entries for rock dust survey purposes.  Include in the collection of dust samples a representative number of crosscuts.  Drawings Number 1 and 2 on the following pages provide further guidance concerning rock dust surveys.

*Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.*  The status of each of these individual wet locations shall be determined during each regular inspection conducted within this one-year period.  *Spot samples shall be collected if conditions permit on a re-inspection of a previously wet area.*  The previous compliance/non-compliance determination of rock dust surveys will not be affected by the additional analysis of spot samples collected during re-inspection of wet areas.  A citation or order should be issued when non-compliance is indicated for 10% or more of the individual

```
 1        A    And I believe that was the reg.  I don't know.  I might
 2  be wrong.
 3        Q    Okay.  But that -- that regulation is for whenever
 4  you're using belt air on a section?
 5        A    Right.  Right.
 6        Q    And I realize that's what he told you to do and that's
 7  what you would have done.  But there were no other provisions in
 8  the ventilation plan that you recall that you would cite that
 9  under?
10        A    No, not that I'm aware of.
11        Q    Do you know who was the person at the Upper Big Branch
12  who maintained the calibration of the CO system?
13        A    Was it ████, ████████████? Is that it?
14  CRAWFORD: ██████
15        Q    Okay.  And I know you didn't do the -- you said
16  Mr. Hicks did that, but do you know if that's the person that he
17  traveled with whenever he did that?
18        A    I can't answer that.
19        Q    We'll talk a little bit about rock dust surveys.
20  What's your understanding of where rock dust samples are required
21  to be collected during an E01?
22        A    On active sections, at no more than 500-foot intervals;
23  crosscuts before -- I guess, less than every 1500 foot, so before
24  every third one, a crosscut sample; every entry up to the feeder.
25        Q    Is there any other places that the handbook requires
```

*Inspector Transcript*

101

1  you to take surveys?

2      A     Not that I'm aware of.

3      Q     What's the intent of a rock dust survey?

4      A     To determine the combustible content.

5      Q     Of?

6      A     Rock dust.

7      Q     For what part of the mine?

8      A     The whole mine, I guess, or for that one particular

9  entry or area.

10     Q     Representative of the area for the whole mine?

11     A     Yes, sir.

12     Q     What do you -- what are you required to do if a section

13  is pillaring?

14     A     I assume nothing.

15     Q     Why's that?

16     A     Because they're on retreat.

17     Q     What instruction have you been given on that?

18     A     None that I'm aware of.

19     Q     Have you had training -- what do you remember of your

20  training for -- how were you trained to collect rock dust

21  samples?

22     A     As far as hands-on training, another inspector showed

23  me how to conduct one, how to take one, and then I think we went

24  over through it in my CMI training at the Academy.

25     Q     Do you remember anything specific from what you were

1  taught at the Academy?

2       A    No, sir, not really.

3       Q    Did you go over the handbook?  Did you use diagrams?

4  Did they --

5       A    I don't recall seeing anything.

6       Q    Did they teach you how to use the rock dust submittal

7  form at the Academy?

8       A    Not that I recall.

9       Q    Have you ever been with another inspector while you

10 were a trainee when, on a section that was pillaring, you had to

11 deal with rock dust?

12      A    No, sir.

13      Q    Have you ever gotten any feedback from a supervisor as

14 to where you should take rock dust samples?

15      A    On a pillaring section or just anywhere?

16      Q    Both, either one.

17      A    Yeah, I mean, you know, we've just been instructed, you

18 know, the mouth of the section.  That's at least every 500 feet

19 just like I explained.

20      Q    Anything specific at the pillaring?

21      A    No, sir.

22      Q    Then where did you get the impression that you didn't

23 have to do anything if they were pillaring?

24      A    I believe it's -- to be honest with you, I don't know.

25 I've never inspected the mines that had a section pillaring

1   taught at the Academy?

2         A    No, sir, not really.

3         Q    Did you go over the handbook?  Did you use diagrams?

4   Did they --

5         A    I don't recall seeing anything.

6         Q    Did they teach you how to use the rock dust submittal

7   form at the Academy?

8         A    Not that I recall.

9         Q    Have you ever been with another inspector while you

10  were a trainee when, on a section that was pillaring, you had to

11  deal with rock dust?

12        A    No, sir.

13        Q    Have you ever gotten any feedback from a supervisor as

14  to where you should take rock dust samples?

15        A    On a pillaring section or just anywhere?

16        Q    Both, either one.

17        A    Yeah, I mean, you know, we've just been instructed, you

18  know, the mouth of the section.  That's at least every 500 feet

19  just like I explained.

20        Q    Anything specific at the pillaring?

21        A    No, sir.

22        Q    Then where did you get the impression that you didn't

23  have to do anything if they were pillaring?

24        A    I believe it's -- to be honest with you, I don't know.

25  I've never inspected the mines that had a section pillaring

1      A    Usually, I try to get the last inspector's -- sometimes

2  they'll make a copy of their rock dust survey sheet submittal

3  form and give it to whoever is preceding them, or I'll try to get

4  their inspection report and try to get spad numbers, or sometimes

5  they might draw on their map, some people draw on their tracking

6  map where they stopped at and I just go from there.

7      Q    Is that not a policy to put it on a tracking map?  I

8  mean, is that not an office policy, I guess, practice I should

9  say?  Everybody doesn't do that?

10      A    I don't know.  I mean, because a lot of times I don't

11  pull it.  I mean, I just look at -- a lot of times they'll give

12  us the submittal and it's got starting point and ending point and

13  we just go off of it.

14      Q    Does the office keep a -- does the office keep a map or

15  any way for you to be able to look real quick and see what all's

16  been surveyed and what hasn't for each month?

17      A    Not as far as rock dust surveys that I'm aware of.

18      Q    How would you know -- if you looked at just the

19  endpoint, say, in the mains --

20      A    Yes, sir.

21      Q    -- let's just take for example the Three Section.

22  Three Section had all these little panels on the side.

23      A    Okay.

24      Q    I know you didn't survey in that area, but how would

25  you know that all those side panels had been -- if the ending

1  point was in the mains, how would you know whether or not they

2  had since mined one of these small panels to the break, to

3  whether or not you were responsible for that?

4      A   I don't know how you'd know.

5      Q   Would you think to even look for that?

6      A   No, sir.

7      Q   Okay.  The handbook specifically says that you have to

8  do all areas mined since the last survey.

9      A   Okay.

10      Q   Has anybody ever explained that to you in that way?

11      A   No, sir.

12      Q   Do you feel like your system is adequate for ensuring

13  that that --

14      A   Not with that scenario you just give me, it's not.

15      Q   What is determined -- how do you determine if an area

16  is too wet to sample?

17      A   Usually, I'll go through that area checking top, ribs,

18  floor.  Usually, if it sticks to my fingers and it bucks up or,

19  you know, balls up, it's too wet to sample.

20      Q   Do you ever -- have you ever collected a sample that

21  was just a little bit damp where you had to just push it through

22  the screen or --

23      A   I think I have.

24      Q   Have you?  Okay.

25      A   Not actually pushed it through the screen, but it felt

40

1   MMUs, was it not?

2   A      Uh, yes, sir.

3        Q      Okay.  Do you know what the policy -- what the

4   inspections procedures require when you're, for the MMU, what

5   areas you have to survey?

6        A      Ask that again.

7        Q      When you do a rock dust survey---

8   A      Okay.

9        Q      ---for an MMU---

10       A      Yes, sir.

11       Q      ---what areas are you required to survey?

12       A      Uh, if I, if I'm understanding it right I, I guess

13   I'll answer it the best I can.  Uh, active minings up to within

14   50 foot of the feeder line -- or tail piece.  Is that what

15   you're asking me?

16       Q      That's part of it.  There's another requirement that

17   says, "All other areas mined by that MMU since the last rock

18   dust survey for that MMU."

19       A      Okay.

20       Q      Were you aware of that at the time you did this

21   inspection?

22       A      No, sir.

23       Q      Have you -- until this interview were you aware of

24   that requirement?

25       A      No, sir.

Confidential Agency Document

1    trying to, uh, mark it on a map and try to locate that spad

2    later.  I mean, I, I document my rock dust surveys in my hard

3    copy notes.  And at that time I didn't; I tried to mark them on

4    a map.  And when I would fill these sheets out I would take, try

5    to take that information off that map.  And, like you said,

6    sometimes spad numbers are hard to see.

7         Q     Okay.  Did you have any assistance in completing that

8    form -- the rock dust submitted form that day?

9         A     Uh, I don't recall having any assistance.

10        Q     Do you recall the training that you had on collecting

11   rock dust samples, or at least which was consistent with it, or

12   when you had the training on rock dust samples?

13        A     As far as, I guess training, you know, kinda

14   wondering where, it's come from other inspectors.

15        Q     As far as the academy training?

16        A     To be honest, I really don't recall, as far as, you

17   know, as far as going through it and determining, maybe, a

18   location they may have.  But, but my -- the only thing I can

19   really think of is the training I received from other

20   inspectors.

21        Q     And where would you have gotten the guidance or

22   perception that you would submit a "no sample" for a section

23   that had moved from another panel?

24        A     If I'm not mistaken, uh, I'm not sure, I mean, I'm --

25   if I filled it out I was probably told I had to fill it out.  I

```
1   don't know if it was by another inspector or, or, or what.  I'm
2   thinkin' I seen in some of the old mine files or, or, or
3   something that where they had a idle section, or a section that
4   hadn't advanced or started yet and they had it in there, and it
5   was just a -- but as far as being instructed, I can't say I was
6   instructed to do it.
7        Q     Why wasn't that form uploaded?
8        A     This one?
9        Q     Uh-huh.  [Yes]
10       A     I don't guess I know.
11       Q     When you enter it into your computer?
12       A     Yes, sir.
13       Q     That sample form will stay in there until you push
14  the "Submit" button?
15       A     Correct.
16       Q     This one wasn't in the database as ever being
17  uploaded or submitted.
18       A     Uh, as far as I know, I thought it was.  Uh...
19       Q     Does the -- does the rock dust submittal application
20  let you know if an upload, if something's been uploaded?
21       A     Uh, if you'll bear with me I'll try to think.  Uh, I
22  think the last thing you do is, is, once you get your
23  information and you got your, the emails who it's sent to, you
24  validate, you save it.
25       Q     Uh-huh.  [Yes]
```

1    for three weeks.  And it was, it was really confusing.

2        Q      Did it make it hard to plan your inspection?

3        A      Huh?

4        Q      Did it make it difficult for you to plan your

5    inspection?

6        A      Uh, yeah.  Yeah, actually I guess it did.

7        Q      Why -- do you know where the samples were collected

8    from the previous quarter for that section?

9        A      I assume up at that crossover to the head gate.  The

10   length of the, yeah.

11       Q      Okay.  Can you show me on the map?

12       A      I assume this crossover here up through---

13       Q      It comes down here; right?

14       A      The quarter before?

15       Q      The before.

16       A      Uh, where it was at down here?  No, sir; I'm not

17   sure.

18       Q      So for that MMU do you know where the rock dust

19   samples were collected for that MMU that you were sampling that

20   day during the previous quarter?

21       A      No, sir; I'm not.

22       Q      So how would you have known where to begin this

23   inspect... -- this rock dust survey?

24       A      Again, I went from their starting point on their

25   panel.

1   Q       So you were just looking at their panel?

2   A       Which I know is wrong now.

3   Q       Okay.

4   A       But at the time I thought I was right.

5   Q       So is that why you didn't collect rock dust samples

6   from the, the panel and rooms that were mined---

7   A       Yeah.

8   Q       ---outby the longwall stop location?

9   A       Yeah, cause this -- I mean, you know, like I said

10  when I started here they, it was idle, and it produced for a

11  week or two and it wouldn't, and I was all over the place.  And

12  when they actually started this one they was completed here.

13  You know, the equipment and stuff was done located here.  I did

14  not do that.

15  Q       Did you know that you needed to do that at that time?

16  A       No, sir; I don't guess I did.

17  Q       Okay.  Did your supervisor ever point out to you that

18  you had missed that area?

19  A       No, sir.

20  Q       Has your supervisor ever asked you to plot on your

21  mine map where you collect -- on your tracking map where you

22  collected your rock dust samples?

23  A       No, sir; not that I'm aware.

24  Q       Why wasn't the survey documented in your notes?

25  A       Uh, uh, like I stated before, uh, you know a lot of

## Roof Control Supervisor – Required Checklist

**Issue:** The District 4 Roof Control Department did not use the checklists required by CMS&H Memo HQ-08-059-A when reviewing the October 2009 base roof control plan for UBB. The checklists from the Administrator's memo were initially required to be used by the roof control department supervisors only. Instructions to begin using the checklists universally were e-mailed on January 27, 2009 from a CMS&H headquarters employee to District Managers and Assistant District Managers. The e-mail required the use of the checklists during the next plan review.

The District 4 Roof Control Department supervisor indicated in his interviews that he began using the checklists for plan reviews immediately after receipt. However, copies of the completed checklists were not included in the District records provided to the IR team for the six-month plan reviews or for the review of the October 2009 base plan as directed by the memorandum.

District 4 also developed seven checklists and other documents for guidance when reviewing initial roof control plans and supplements, general safety precautions to be included in roof control plans, deep-cut minimum precautions, retreat mining precautions and safety precautions for mobile roof supports. While the District 4 Standard Operating Procedures (SOPs) for plan reviews did not require these checklists to be used, the plan reviewers all stated that they used checklists to assist in completing roof control plan reviews. These checklists were not those developed by CMS&H Headquarters for use in the field.

The District 4 checklist included a requirement that the mine operator's calculations for pillar stability be attached to, but not part of, the roof control plan. However, it did not specify that the calculations would be verified by District 4 staff.

**Supporting Documentation:**

- CMS&H Memo HQ-08-059-A (HQ-08-059-A.pdf)

- E-mail requiring use of the checklists during the next plan review (Checklist E-mail - 01-27-2009.pdf)

- District 4 roof control plan SOP (District 4 Roof Control Plan SOP.pdf)

- Pages from Roof Control Supervisor's transcript where he talks about using the checklist but not filing it (Roof Control Supervisor - Missing Checklist.pdf)

- Pages from Roof Control Specialist transcript where he talks about not using the District 4 checklist (Roof Control Specialist - Checklist.pdf)

**Mitigating Factors:** The instructions were not issued via the established directives system.  The IR team found the checklists used by District 4 included most of the considerations listed in the Headquarters checklists, and in some cases included additional considerations.  Some items on the checklists were identical.

**U.S. Department of Labor**     Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



JUN - 6 2008

CMS&H Memo No. HQ-08-059-A (PRT-75)

MEMORANDUM FOR DISTRICT MANAGERS
                         ASSISTANT DISTRICT MANAGERS

FROM:          *for* KEVIN G. STRICKLIN   *Kenneth A. Murray*
                     Administrator for
                     Coal Mine Safety and Health

SUBJECT:             Documentation of Roof Control Plan Reviews

Checklists have been created to aid MSHA personnel in the review and subsequent documentation explaining the rationale behind the approval of roof control plans. The appropriate checklist(s) should be used for review of new underground mine roof control plans, roof control plan revisions, and six month and quarterly roof control plan reviews. These checklists will provide guidance for MSHA personnel to review roof control plans for the prevailing geological conditions and the mining systems used in all underground coal mines.

The "Roof Control Plan Approval Process" document establishes a system for multi-level review and oversight to identify and address deficiencies in roof control plans. The "New Submittal – New Mine Openings (Development Only) Roof Control Plan Review Form Checklist" provides a list of items and safety precautions that should be included in the initial roof control plan for a new mine. This information will be associated with the mine for its entire life. A separate checklist entitled "Roof Control Plan Review Form Checklist for Plan Revisions" is also attached to serve as a guide during the review of associated roof control plan revisions.

During the course of each Regular Safety and Health Inspection (E01), the Plan Review form (MSHA Form 2000-204) is completed by the inspector to document whether the current Roof Control Plan is adequate and/or to describe any deficiencies in the Plan. The form should also be completed by the Roof Control Specialist during Plan reviews. The form shall be signed and dated by the inspector/specialist and their supervisor. A brief narrative relative to the adequacy or deficiency of the Plan should be included on the 2000-204 Form to satisfy the six month plan review of the Roof Control Plan. The regular inspector should conduct the six month reviews of the less complex mines in the District with assistance provided by the roof control specialist as needed. The roof

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

Confidential Agency Document
DLB-000566          MSHA-2ECAMERON-0166

2

control specialist should conduct the six month reviews of the more complex mines in the District. The attached document entitled "Six Month and Quarterly Roof Control Plan Review Form Checklist" should be used when conducting the six month plan review and may be submitted as an attachment to the MSHA Form 2000-204 to further clarify and elaborate on the subject plan review.

All documentation (MSHA Form 2000-204, checklists, drawings, sketches, etc.) explaining the rationale and supporting the decision of the roof control plan approval and associated six month plan review will be maintained as part of the roof control file for that mine.

Three additional checklists are attached and should be used as part of the roof control plan review of addendums associated with mobile roof support systems ("Mine-Specific Mobile Roof Supports Checklist", retreat mining ("Retreat Mining Precautions Checklist" and extended cuts ("Extended Cuts Safety Precautions Checklist").

It is recognized that roof control plans are developed and revised on a mine-by-mine basis taking into consideration the overall safety of affected miners. Consequently, not all items on the checklists are always applicable for each and every mine. If an item on any of the checklists is not applicable during a review, the reviewer should mark the item "N/A." In considering whether to approve a proposed plan, the District Manager shall determine whether the plan is consistent with all relevant, mandatory provisions of the Mine Act and its standards and regulations. In addition, the District Manager should use the attached checklists as guidance and may require additional plan provisions that are necessary to provide miner protection given factors and conditions specific to a particular mine.

The collective bargaining agreement between MSHA and the National Council of Field Labor Locals (NCFLL), which is the recognized bargaining unit for MSHA's mine inspectors, requires concurrence prior to MSHA's implementation of these checklists. Once agreement has been reached, CMS&H will require the approved checklists to be used by inspectors during the next plan review. Until an agreement is reached with the NCFLL relative to the use of these checklists, the checklists shall be completed by the supervisor. The completed checklists are to be dated and signed by the person who filled out the checklist and each level of supervision in the approval process.

Attachments

## Roof Control Plan Approval Process

1. When a new plan, revision, or addendum is received, the Roof Control Department logs the plan into the MSIS. The Roof Control Supervisor assigns the plan to a Roof Control Specialist for review.  The plans are usually reviewed on a first come first serve basis.  Some plans may require Technical Support review and input as described in the approved guidance document.

2. The specialist reviews the plan, and, if there are deficiencies, the specialist contacts the operator. Depending on the number and type of deficiencies the operator may be contacted by telephone, e-mail or a letter signed by the District Manager.  The specialist, Field Office Supervisor, or CMI will visit the mine site if needed, and the specialist will calculate or verify the ARMS / ALPS stability factors if applicable.  The person conducting the review will complete all applicable checklist items for the review and forward through steps 3 through 7.
   Roof Control Specialist date and sign _____

3. The Field Office Supervisor and/or CMI familiar with the mine will be contacted for comments or concurrence.
   Field Office Supervisor date and sign_____
   Coal Mine Inspector date and sign _____

4. The Roof Control Supervisor reviews the plan and makes recommendations or concurs.
   Roof Control Supervisor date and sign _____

5. The ADM Technical Programs reviews the plan and makes recommendations or concurs.
   ADM Technical Programs date and sign _____

6. The District Manager reviews, makes recommendations, or approves the plan and signs the approval letter.
   District Manager date and sign _____

Note:  If deficiencies are found in steps 3 through 6, the plan is sent back to the Roof Control Supervisor / reviewer with comments concerning the deficiencies. All deficiencies must be addressed prior to plan approval.  Sequence of review may vary.

The completed checklist will be reviewed, dated, and signed by each level of supervision in the approval process.

Confidential Agency Document
DLB-000568                    MSHA-2ECAMERON-0168

**Bragg, Melody E - MSHA**

| | |
|---|---|
| From: | ▓▓▓▓▓▓▓ - MSHA |
| Sent: | Wednesday, June 29, 2011 9:17 AM |
| To: | ▓▓▓▓▓▓ - MSHA |
| Subject: | FW: Checklists posted to the W drive |
| Attachments: | June 5 2008 HQ- 08-058-A (2).pdf; Checklist MOU 121708 (2).pdf; June 5 2008 HQ-08-060-A (2).pdf |

▓▓▓▓▓

This email message and attachments will need to be added to the official record.  Thanks!

From: ▓▓▓▓ E - MSHA
Sent: Tuesday, January 27, 2009 3:47 PM
To: zzMSHA-COAL - HQ Division Managers; zzMSHA-Coal District Managers Group; zzMSHA-Coal - Assistant District Managers
Cc: zzMSHA–Coal–District Managers Secretaries Group; ▓▓▓▓▓▓ MSHA; ▓▓▓▓, ▓▓▓▓▓ - MSHA, ▓▓▓▓, ▓▓▓▓▓▓ MSHA
Subject: Checklists posted to the W drive

Folks,

Attached are the June 5, 2008 memos that spoke about various checklists (Roof Control and ERPs specifically).

The attached memo # 060 specifically states "The collective bargaining agreement between MSHA and the National Council of Field Labor Locals (NCFLL), which is the recognized bargaining unit for MSHA's mine inspectors, requires concurrence prior to MSHA's implementation of these checklists. Once agreement has been reached CMS&H will require the approved checklists to be used by the inspectors during the next plan review.  Until an agreement is reached with the NCFLL relative to the use of these checklists, the checklists shall be completed by the supervisor.  The completed checklists are to be dated and signed by the person who filled out the checklist and each level of supervision in the approval process."

Bargaining did take place with the union on a number of checklists EXCLUDING the ERP Checklists. The MOU was signed by Labor and Management and I have been notified today that the forms are now posted on the W drive.  The MOU covers a few other checklists outside of the Roof Control Plans (Slope and Shaft as well as Belt Fire Suppression).

W:\ALLMSHA\DIRECTIV\Forms\2000 series

Roof Control Plan Approval Process - 2000-226
Roof Control Plan Review Form Checklist - 2000-227
New Submittal-New Mine Openings (development only) - 2000-228
Roof Control Plan Review Form Checklist for Plan Revisions - 2000-229
Mine-Specific Mobile Roof Supports Checklist - 2000-230
Extended Cut Safety Precautions Checklist - 2000-231
Retreat Mining Precautions Checklist - 2000-232
Checklist for Review of Slope and Shaft Sinking Plans - 2000-233

Confidential Agency Document

DLB-000569          MSHA-2ECAMERON-0169

Belt Drive Fire Suppression Checklist of Basic Requirements:
Deluge-type Water Spray Systems 2000-222
Water Sprinkler Systems 2000-224
Dry Powder Chemical Systems 2000-225

We are also working on converting them to pdf fillable W:\ALLMSHA\DIRECTIV\Forms\2000 series\2000 fillable )

The memo is still in affect with respect to the ERPs; it had been decided that it was not worth negotiating the ERPs checklist until we had a final rule. With the final rule published we can begin the process.



# CMS&H DISRTICT 4

# STANDARD OPERATING PROCEDURES

# ROOF CONTROL PLAN APPROVAL

September 2006

The following sequence of events is to be used in processing a Roof Control Plan submitted for approval by a mine operator.

All new highwall development and pre-existing highwalls for facing of the portal area for underground mine openings will have an onsite evaluation by the field office or district specialist before the roof control plan is approved. This onsite evaluation will determine if the plan requirements are adequate for the geological conditions. This evaluation must occur after the operator has completed the highwall and before the commencement of any underground development. If the onsite evaluation finds that the highwall is unstable or not developed in competent strata, approval of the roof control plan shall not be granted.

The operator should be informed that additional highwall development or other work is needed prior to approving the roof control plan.

The operator shall submit all plans and revisions to the District Manager.  The plans and revisions will be delivered to the District Office or a Field Office and date stamped, per compliance with a memorandum dated February 13, 1993 from the Administrator.  The Field Office will forward all plans to the District Office, and the plans will be logged into the MSIS system and a tracking number assigned.  The Roof Control Secretary will attach the plan review form (Attachment A) and give to

Confidential Agency Document

the Supervisor for assigning.  The plans will be technically reviewed by the District Roof Control specialist using appropriate regulation requirements listed in the Title 30 CFR Subpart C – Roof Support.  The roof control group reviewer shall contact the assigned inspector and supervisor of the mine to solicit comments on appropriateness of the plan.  Other information that could be pertinent when reviewing a mine plan are items such as: Arlington PIB's , PIL's, roof fall history, previous inspection reports, input from coal mine inspector or supervisor assigned to the mine, accident and injury experience at the mine.  The roof control group shall check that the appropriate miner's representatives had the opportunity to review and make comments on the proposed plans.  This can be done by the miner representative reviews and comments being sent with all new plans or revisions. Minor problems with the roof control plans will be handled by contacting the operator for corrections.  Plans being held for minor corrections shall be kept in a separate file from plans awaiting review. The roof control department shall track plans for minor corrections on a dry erase board kept in the District office.  Immediate need plans will be handled on a case by case basis.

    a.  If the plan is technically acceptable and can be recommended for approval, a letter will be prepared by the Roof Control Work Group, and forwarded through the Roof Control Supervisor, the Assistant District Manager of Technical Programs, the Inspection Division Assistant District Manager (ADM), and then to the District Manger.

Confidential Agency Document

DLB-000572          MSHA-2ECAMERON-0172

b.  If the plan is not acceptable a letter of denial will be drafted, by the Roof Control Work Group, with all deficient items detailed in the letter.  This letter will be routed as above, to the District Manager for signature.

c.  Significant interactions, such as meetings with the operators, should be documented in the MSIS tracking system.

After approval by the District Manager, the plan and the approval letter are returned to the Roof Control Department for distribution. One copy of the completed approved plan shall be sent to the field office for the Uniform Mine File.  A second copy will be distributed to the supervisor/inspector assigned to the mine. The mine operator will be sent the original approval letter.  The date the approval is signed by the District Manager shall be recorded in the MSIS system by the Roof Control Work Group.

Reviews of the roof control plans will be completed every quarter by an AR in the field office, to assure that the plans are suitable to current geological conditions and mining systems in the mine. The assigned mine inspector can also contact the roof control group with concerns.  The 2000-204 form will be used to document the review of the plan as part of the regular E01 inspection. These forms will be entered into the MSIS system every quarter by the field office. The inspector shall record on the form the names of mine officials and miner representative who participated in the review discussion.  If the 2000-204 Form indicates a deficiency or needed change, the form shall be sent to the District Roof Control Supervisor for evaluation.

To insure that the plans in the Uniform Mine File of each field office are current, the field office supervisor will review the active mine files periodically.  He will document

Confidential Agency Document
DLB-000573          MSHA-2ECAMERON-0173

the review by signing the supervisory review form in the Uniform Mine File book. Every quarter the appropriate Field Office Secretary will generate a report for the F.O. supervisor identifying the plans requiring a six month review, as part of the District oversight.

The District Roof Control Work Group will track that no more than three supplements will be permitted on an approved plan before they are incorporated into an updated plan.  The entire plan approval process should normally not exceed 30 calendar days from the time of receiving the plan until it is approved by the District Manger.  In the event this time is exceeded an explanation shall be made under remarks on the sign-off sheet.

Plans and revisions that are no longer applicable at an operation will be maintained in the District office for at least three years.  Then the material will be discarded or archived.

Confidential Agency Document
DLB-000574          MSHA-2ECAMERON-0174

# ATTACHMENT A

## The Following Roof-Control Plan is for Circulation, and Recommendation for Approval or Disapproval

**MSIS No.:** _____                **Field Office Code:** _____

**PLAN INFORMATION**

Company Name: _____

Mine Name: _____ I.D. No.: _____

Date Received: _____

Technical Review Date: _____

Comments: _____

_____

**Recommendation and Comments By:**

District Roof-Control Specialist: _____ Date: _____

Comments: _____

Comments from Inspector & Supervisor Assigned to Mine: _____

_____

District Roof-Control Supervisor: _____ Date: _____

Comments: _____

**Assistant District Manager**
**Technical Programs:** _____ Date: _____

Comments: _____

**Assistant District Manager**
**Inspection Division:** _____ Date: _____

Comments: _____

5   SOP Roof Control – September 2008   Confidential Agency Document

DLB-000575                              MSHA-2ECAMERON-0175