1    MINE SAFETY AND HEALTH ADMINISTRATION

2    UPPER BIG BRANCH MINE - SOUTH

3    INTERNAL REVIEW

4

5    WEDNESDAY, JUNE 15, 2011

6

7

8    AUDIOTAPED

9    INTERVIEW

10   OF *Roof Control Supervisor*

11   ~~RON WINGTON~~

12

13

14

15   MSHA:

16   ~~JACK KUZAR~~

17   ~~JIM FRANCART~~

18   ~~RON BURNS~~

19

20

21   INTERVIEWEE:

22   ~~RON WINGTON~~

23

24

25

Confidential Agency Document

DLB-000576          MSHA-2ECAMERON-0176

9

1  check sheet that came from Arlington but the one I use is not in

2  this form.

3      Q:   Okay.

4      A:   No.  I don't – I don't remember this.  This is not

5  what I use.

6      Q:   Okay.  Alright, the check sheet that you use then,

7  what is that?

8      A:   It came from Arlington.

9      Q:   Is this, ▓▓▓▓ what you use?

10     A:   The letter looks correct.  That roof control approval

11 process is correct.  New submittal, correct, so this looks like

12 it.  Do you want me to look it over [crosstalk]?

13     Q:   No, no, you don't have to review [crosstalk].

14     A:   This certainly looks like it.

15     Q:   Okay.

16     A:   This is what I use.

17     Q:   When was that instituted?  You didn't – you didn't use

18 this, you're saying, but you [know this from here]?

19     A:   Yes.

20     Q:   When did you institute that?

21     A:   Whenever this…

22     Q:   Date from…

23     A:   Yes.  I mean when I got this, it became implemented.

24     Q:   Okay.  Page four of the General Safety Precautions

25 addresses AMS pillar sizing.

10

1    Q:    ▨▨▨, that's the wrong checklist.

2    Q:    Oh, it is?  That's in the other checklist.  Alright,

3  I'm sorry.  Forget that question.

4    Q:    Let's skip number six then.

5    Q:    There is no checklist attached to a copy of the

6  October 2009 roof control plan tracking sheet or six-month

7  review forms.  Was this or any checklist used for this Upper Big

8  Branch plan review?  Would you know?

9    A:    Yeah.  I did this.

10    Q:    Now — now, you did that?

11    A:    Yes and if you go through there, you'll pretty well

12  find it that they're in there.

13    Q:    We can't find the checklist [crosstalk].

14    A:    No, no, on there.  I don't know what [end of] the

15  checklist because I noticed that but I used it.  I did use it

16  and what I'm saying is if you look at the plan and you look at

17  this checklist, I think you'll find it's there.  There may be

18  one I don't know about but I think you'll find it's there.

19    Q:    But you don't save a copy of the checklist?

20    A:    I don't know why I used it.  I know I used it because

21  we had to even go back and get some things changed because it

22  wasn't in there so I know I used it.  Now, why [crosstalk]…

23    Q:    Do you happen to know why a copy wasn't attached or

24  misplaced [crosstalk]?

25    A:    I don't know.  I don't know.  It must — I don't know.

Confidential Agency Document
DLB-000578          MSHA-2ECAMERON-0178

1    I don't have the answer to that because I looked and I know it's

2    not there, but I do know I did it and if you want to go through

3    the plan, I think you – which I'm sure you have, how many

4    weren't in there?

5         Q:    Do you usually keep a copy with your other ones?

6         A:    Yes.  Yes, we do.  I put this – the way we do our

7    plans, we have a folder.  We put the plan on the right with the

8    approval letter and all the back-up on the left and then when we

9    get it approved, she puts everything together and I'll always

10   put this on the left with the routing sheet and I know I did it.

11   And like I say, if there's something that's in here that's not

12   in there… what is it?

13        Q:    Where does those copies normally – where are they

14   maintained in [crosstalk]?

15        A:    In our file.

16        Q:    Okay.  On page six of that document, the checklist

17   requires a check of possible overlying bodies of water.

18        A:    Right, right.

19        Q:    Okay.  Was this checked off on the Upper Big Branch or

20   would you remember?  Was that checked off?

21        A:    I think it was probably checked off I would think.

22        Q:    Don, how do you do that as far as going back and

23   looking for bodies of water?

24        A:    I don't.  The other people do it.  There's usually a

25   statement in there and then again, I don't have the plan for it.

Confidential Agency Document

1          MINE SAFETY AND HEALTH ADMINISTRATION

2             UPPER BIG BRANCH MINE – SOUTH

3                    INTERNAL REVIEW

4

5                 MONDAY, JUNE 13, 2011

6

7

8                      AUDIOTAPED

9                      INTERVIEW

10                        OF

Roof Contol Specialist

11         ~~DARIS BARKER~~

12

13

14

15   MSHA:

16         ~~Dennis Swentosky~~

17         ~~Russ Feerly~~

18         ~~Melody Bragg~~

19

20

21   INTERVIEWEE:

22         ~~Daris Barker~~

23

24

25

Confidential Agency Document

1   opportunity to make a statement and provide us with any other

2   information that you believe to be important.  If at any time

3   after the interview, you recall any additional information that

4   you believe might be useful, please contact ▮▮▮▮▮▮▮ at the

5   telephone number or email address being provided to you.

6       Q:    Okay.  Referring to the Roof Control Department check

7   sheet, is the use mandatory for plan reviews, and I'll provide

8   you with a copy of that.  On the top that says "Initial Roof

9   Control Plan Checklist" refer to 75.221, 75.222 and use the

10  following as a guideline.

11      A:    This checklist right here?

12      Q:    Yes, and is – is that mandatory for the reviews?

13      A:    It's not mandatory that I use the checklist.  I – there

14  is a checklist that ▮▮▮ makes sure that's used  , you know, the

15  Arlington gave out that he's got to go through.

16  Now, internally, we've generated our own checklist that we use

17  just to make sure that we've got, you know, for our own benefit

18  to make sure everything's in there that, that we don't miss

19  anything in it, you know.  So –

20      Q:    Okay.  Is that the checklist that you're talking

21  about?

22      A:    Well… ·

23      Q:    And we're not [crosstalk]

24      A:    It looks, it looks very similar to the one we – the

25  one we use.  I'm just not – this is an initial.  I believe – I

1  believe these are the Arlington check - checklists that you have

2  presented me with, which ours are very similar, so — the ones

3  that we use, so.

4      Q:   Okay.  When was the check sheet in - instituted?  Do

5  you recall?

6      A:   I don't remember the date.  I mean, we've been…

7      Q:   Is it like for a couple of years?  Two years?

8      A:   We've been doing — we've been doing — yeah, it's been

9  a year, two years that Arlington did that.  That was initiated

10  back when ▓▓▓▓▓▓▓▓ was up in Arlington.  Prior to that, prior

11  to that, we had our own that we used that we generated for our

12  own use.

13      Q:   Okay.  And this checklist that you're speaking about

14  that you've used, could we get a copy of that?

15      A:   I'm sure you did if you asked for it.  I'm not sure.

16  I mean, we provided everything that was asked for.

17      Q:   Okay, but I'm…

18      A:   It's very similar to this.

19      Q:   Okay.  Could we get a copy of it then?

20      A:   Sure, if you want. I'll give it out.

21      Q:   Okay.

22      Q:   Exactly what should I request?

23      A:   Just ask for our checklist.  It's, you know, we just

24  use that for our own benefit, you know.  That way…

25      Q:   Yeah.

## Field Office Supervisor – Tailgate Roof Support

**Issue:** Page 19 of the base roof control plan submitted by the operator on October 27, 2009, and approved by the District Manager on December 23, 2009, required the tailgate travelway of initial longwall panels to have supplemental support in the form of two rows of 8-foot long cable bolts or two rows of posts on 4-foot centers installed in the middle of the entry between primary supports. This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times. The MSHA Accident Investigation team found there was only one row of supplemental support in the tailgate travelway as opposed to the two required in the approved plan.

On March 9, 2010, the Field Office Supervisor and a ventilation specialist inspected the tailgate of the 1 North Longwall at UBB. While the ventilation specialist and the Field Office Supervisor identified a serious violation of the ventilation plan and issued an order for that condition, they did not cite a violation of the roof control plan.

The Field Office Supervisor documented that he reviewed the Uniform Mine File (UMF) on January 28, 2010, before accompanying an inspector who was conducting a section 103(i) spot inspection at UBB. The date stamp on the approval letter shows that the roof control plan was filed in the UMF on January 20, 2010.

The Field Office Supervisor told the Internal Review team that he believed UBB was in compliance with all provisions of the approved plan, but stated that he could not recall if posts or cable bolts had been installed in the tailgate entry.

The Field Office Supervisor also provided information during an interview on the distribution and filing of plan revisions within the field office. He stated copies are provided to him and the inspector assigned to that particular mine and another copy is placed in the UMF.

**Supporting Documentation:**

- Copy of December 23, 2009, roof control plan approval letter showing the approved roof control plan was filed in the UMF on January 20, 2010 (Approval Letter for RC Plan.pdf)

- Page 19 of the approved roof control plan (RC Plan Page 19.pdf)

- UMF certification sheet showing that the Field Office Supervisor reviewed the UMF on January 28, 2010, for a section 103(i) (E02) spot inspection. (Field Office Supervisor – Tailgate Travelway.pdf)

- Pages from the Field Office Supervisor's transcript that discuss roof support in the tailgate travelway and how plans are distributed in the field office.  (Field Office Supervisor – Tailgate Travelway.pdf)

- Ventilation Specialist's notes indicating that the Field Office Supervisor traveled with him in the 1 North Longwall tailgate travelway on March 9, 2010.  (Field Office Supervisor – Tailgate Travelway.pdf)

- There were no notes from the Field Office Supervisor for March 9 provided to the IR team.

**Mitigating Factors:** The single row of posts would have complied with the 2005 roof control plan tailgate travelway requirement but not with the requirement in the 2009 approved plan in effect at the time of the explosion.

*Attachment #2*

**U. S. Department of Labor**

Mine Safety and Health Administration
100 Bluestone Road
Mount Hope, WV 25880-1000



DEC 23 2009

UNDERGROUND AC FILE
DATE FWD. 1/5/2010
INITIALS

Mr. Berman Cornett
Safety Director
Performance Coal Company
P.O. Box 69
Naoma, WV 25140

Dear Mr. Cornett:

Subject:    Update of the Roof-Control Plan, Upper Big Branch Mine- South, I.D. No. 46-08436, Performance Coal Company, Montcoal, Raleigh County, West Virginia, Permit No. 4-RC-11-94-12307-12

Your roof-control plan, received on October 27, 2009, has been reviewed and is approved. This approval is based upon a District review of the roof conditions and roof-control practices in the mine by representatives of the Mine Safety and Health Administration, and includes any changes made by you at that time.

Should you have any questions concerning your roof-control plan, please contact Don Winston at this office, (304) 877-3900, Extension 130.

Sincerely,

MSHA
MOUNT HOPE, WV

JAN 06 2010

RECEIVED
MOUNT HOPE FIELD

Robert G. Hardman
District Manager
Coal Mine Safety and Health, District 4

Enclosure

cc:    State Inspector-at-Large, Oak Hill Division (1 encl.)
Mount Hope Field Office (3 encl.)
Lee Barker (1 encl.)
Files/cls

FIELD PRINT FILE
DATE FILED 1/20/10
INITIALS

# ROOF CONTROL PLAN DIAGRAM NO. 9
## SUPPLEMENTAL SUPPORT IN TAILGATE ENTRY



☐ Primary Roof Support
△ Cable Bolt or Post

In Longwall development entries of initial longwall panels, the Tailgate Entry will have supplemental support in the form of two (2) 8' Cable Bolts or Posts installed between primary support.

This supplemental support shall be maintained 1000' outby the longwall face at all times.

PERFORMANCE COAL COMPANY, INC.
UPPER BIG BRANCH MINE
MSHA ID NO. 46-08436   WV State # U-3042-92
ROOF CONTROL PLAN DIAGRAM NO. 9
SUPPLENTAL SUPPORT IN TAILGATE ENTRY

DATE: 10-27-08    SCALE: 1" = 10'

PAGE 19

Supervisor/Accountability Review
Certification

U. S. Department of Labor
Mine Safety and Health Administration

| 1. Mine ID Number | | | | | 2. Mine Name | | 3. Company Name |
|---|---|---|---|---|---|---|---|

| Date Reviewed | Reviewer(s) | | Date Mine File Last Reviewed by Inspector | Comments (missing documents, obsolete data, etc.) |
|---|---|---|---|---|
| | Name | Division/Office | | |
| 7/22/09 | ~~(redacted)~~ | MT Hope | 7/5 0 0 | E.O.~ |
| 7/27/09 | ~~(redacted)~~ | '' | 7/29/09 | EO2 |
| 10-6-9 | ~~(redacted)~~ | '' | 10-2-9 | E2) |
| 1-28-10 | ~~(redacted)~~ | '' | 1-28-10 | E2R |
| 4-6-10 | ~~(redacted)~~ | '' | 4-6-10 | E-09 Review |
| 4-7-10 | ~~(redacted)~~ | M7. Hope | 4-1-10 | E-1 — Review |
| 4-7-10 | Robert Carefoot | MT Hope | 4-5-10 | Health Plans Review - missing Gen Dust Plan Replaced |

MSHA Form 2000-138, July 92 (revised)

MSHA-2ECAMERON-0187

Field Office Supervisor
6-15-2011 Session 1

24

1  place.

2      Q:   What would that be based on?  So many accidents per

3  year or what?

4      A:   It may be based on a current accident, something that

5  has happened whether it be a severe accident or

6  [unintelligible].

7      Q:   Okay.  Is there a – okay.  There's more – is there a

8  particular number of mines that Part 50 is done in District 4

9  per year or per quarter or anything like that?  I mean, to the

10  best of your knowledge.

11      A:   I don't know if there is a specific number that is

12  [unintelligible] Part 50.

13      Q:   Okay.

14      A:   [Unintelligible]

15      Q:   Okay. Have you ever had any conducted in your

16  workgroup?

17      A:   Yes.

18      Q:   Okay.  What was they conducted for?  Was it a fatal

19  accident or an accident?

20      A:   Best of my knowledge, it was a, it was a combination,

21  I think, of both.  I, I think something that occurred that

22  [unintelligible] to us and then…

23      Q:   Okay.  Alright, we're going to go back to the mine.

24  Now, after Big Branch, I'm going to give you some notes that

25  Keith Sigmon, an inspector, done on March the 9th, 2010.  And you

1    traveled with him and that's why, why I'm giving this with you

2    also.  And he traveled up the tailgate of the longwall.  I've

3    got a few things highlighted, but you're welcome to look at

4    these as much as you want to.  This was during an EO1

5    inspection.

6        A:    Uh-huh.

7        Q:    You doing alright?  You need a break or anything?

8        A:    I'm fine.

9        Q:    Alright. What we want to ask you about that, Tom, and

10   if you looked far enough yet, you and ~~████~~ traveled the, the

11   longwall tailgate that day from outby towards the longwall face.

12   Describe how the tailgate was inspected for compliance with 228

13   - 75.228-1 which was the roof control plan.

14       A:    You were trying to the tailgate?

15       Q:    Yes, sir.  How was the tailgate inspected for

16   compliance with the roof control plan that day?  And I - you can

17   say as far as any - what, what type of roof control was supposed

18   to be in the longwall tailgate that day?  How did you ensure

19   that it matched what the plan stated was required?

20       A:    The best of my knowledge have been it - it was a -

21   everything was, was according to the plan that day there.  Best

22   of my knowledge.

23       Q:    I want to give you a copy of out of the roof control

24   plan base 5 that was approved late December of 2009 and it's -

25   there's four grounds there.  Be different ones for different

1  things for the way the longwall will be set up — the longwall

2  tailgate.   And what this is, is the supplemental support that's

3  required in it.   And again, do you remember if all the

4  supplemental support that was required in the tailgate, was it

5  installed in the tailgate on March the 9th, 2010?   I understand

6  that's been well over a year now.

7      A:   I don't recall whether it's the supplementary support

8  like [what I'm —] was in place.   But we did travel that area.

9      Q:   Okay.   The supplemental support would either have been

10  some kind of additional cable bolts or would have been a post

11  standing.   Do you remember seeing any posts?

12      A:   I don't recall a post.

13      Q:   Okay.   Do you remember any — ever crossing any cable

14  bolts?

15      A:   No.

16      Q:   Additional bolts is required as, as shown, I think

17  it's the second page is what I just gave you.

18      A:   Yeah.   I, I, I don't recall.

19      Q:   Okay.   Like I said that has been a long time ago.   Do

20  you or do you encourage the inspectors that you travel with to

21  generally carry a copy of the roof control ventilation plan,

22  whatever that may be…?

23      A:   Yes.

24      Q:   …applicable to what they're doing that day?

25      A:   Yes.

Confidential Agency Document

ventilation specialist                                                27

1        Q:    Do you know if ▓▓▓▓ had a copy of it with him?

2        A:    No, I don't.

3        Q:    Okay.   We'll move on to another subject then? Unless

4   wanting to look or think some more about that that's fine.

5   We'll not rush you a bit.

6        A:    I'm fine.

7        Q:    Okay.   Just generally, maybe, can you tell me what

8   training you've had or given on 75.37(a)(1) - that's the

9   ventilation plan - but the part of it necessarily concerning

10  dust control parameters.   I know that may be a broad topic but

11  the ventilation plan requires certain dust control parameters

12  being in it whether it's outby to control dust at transfer

13  points, [unintelligible] you know whatever or even on the

14  section on equipment or, you know, continuous manner as

15  longwalk, can you just generally say what training that you've

16  had or even given to your inspectors on enforcing that part of

17  the ventilation plan?

18       A:    I'm trying to understand the question.

19       Q:    I know it is a broad, broad topic.   One of concerns

20  that, that we're looking at - or not, we're really looking at -

21  they have teams also looking at, is the dust control of - for

22  float dust along belt lines, water sprays possibly in head

23  drives or something.   What training have you had or have you

24  given concerning dust control parameters?   We're moving a lot

25  down even to that along the belt drives along the belt lines.

*Field Office Supervisor Interview*

*12-1-2010*

70

1   A:  Yes.

2   Q:  Do they ever have a reason to review UMF books that are

3   kept in the Mount Hope Field Office?

4   A:  Yes.

5   Q:  Do they come to the field office to do that?

6   A:  Yes.

7   Q:  Okay.  As far as the supervisor, when do you review the

8   UMF?

9   A:  I -- I try to review them during the whole quarter and,

10  if I'm traveling with the person, I'm traveling with a certain

11  inspector, I review that.  So I try to review then with them the

12  whole quarter.

13  Q:  Tell me about your review as a supervisor.  What do you

14  do as far as the UMF's are concerned?

15  A:  As far as the --

16  Q:  -- Uniform Mine File.

17  A:  -- Uniform Mine File?

18  Q:  Tell me about your review.

19  A:  It's just that -- my review is the same as the

20  inspector's review.  I look at the plans, I look at the

21  ventilation, I look at the roof control, the waivers, the

22  safeguards, and then make sure that he has signed it, showing

23  that he has reviewed it.

24  Q:  Do you ever find any inaccuracies?

25  A:  Do I ever find any?

71

1    Q:  Yeah.

2    A:  Yes, on occasions you do, yes.

3    Q:  Okay.  How do you document your --

4    A:  How do I document it?  I -- I'd sign that I have

5    reviewed it and -- and issue a date when the inspector himself

6    has reviewed it, you know.

7    Q:  Do you have any sort of checklist, say from Mine Plan

8    Approval Database, to compare against the UMF to make sure

9    everything's in it?

10   A:  Do I have a -- do I have a what, a sheet that I go by?

11   Q:  Some sort of a checklist --

12   A:  No, I don't.

13   Q:  -- to make sure everything's in there?

14   A:  No.  No.  Not other than just the order that it's set up

15   which the Uniform Mine File is tabbed to, you know, that each and

16   every document that should be in there, whether it be safeguards

17   or --

18   Q:  How would you know if a supplement to the ventilation

19   plan was missing?

20   A:  How would I know that it was missing?

21   Q:  Uh-huh.

22   A:  Most of the time, revisions and supplements come through

23   and I have to sign off on them, and a copy comes to me and a copy

24   goes to also the inspector that's at that particular mine, and

25   then a copy of that is -- is placed into the Uniform Mine File.

Confidential Agency Document

72

1    Q:  So, say ten months go by after that --

2    A:  Uh-huh.

3    Q:  -- and you're reviewing the Uniform Mine File, how would

4  you know that that document that you saw ten months earlier was

5  missing from the file?

6    A:  If it was missing?

7    Q:  Uh-huh.  You'd just be going from memory?

8    A:  Yeah.  But like I said, again, the specialist would --

9  the system that -- that we are trying to use is that the

10  specialists will come up and whatever is obsolete, they'll --

11  they take it out of the mine file book and everything that's in

12  there is current.  So ever so often -- what I've seen, ever so

13  often the ventilation man or the roof control, they -- they will

14  come up and go over the mine file books.

15    Q:  So do they pull the information out or do they have the

16  secretary do it?

17    A:  No.  They do it themselves.

18    Q:  Do it themselves?

19    A:  Uh-huh.

20    Q:  And then what do they do?  Who do they inform when they

21  take that information out of the Uniform Mine File?

22    A:  They -- once they -- once they go over it and go through

23  the mine file book, and things that's updated they -- the things

24  that are obsolete they take them out, the old.  So that, you

25  know, we know that they're doing it, we know that they're going

1   to at the time.  It's not like they --

2       Q:  How do you know what they took out or put in?

3       A:  How do I know?  I don't know what they -- what they took

4   out or put in per se.

5       Q:  Do you know of any requirements?

6       A:  I know that they're required -- I know that they -- they

7   do an update of it for us.

8       Q:  What documentation is required for them when they do

9   that?

10      A:  What documentation is required for them?

11      Q:  Uh-huh.

12      A:  None that I know of.

13      Q:  How do you know when to remove a document if you're

14  doing the review?

15      A:  I, myself, don't remove it.  I haven't removed it.

16      Q:  ▓▓▓  I've been -- we've been told by several of the

17  inspectors that the field office secretary adds and removes a lot

18  of documents from the UMF.  Do you know of instances where the

19  field office secretary has any involvement in adding or removing

20  documents from the UMF?

21      A:  If -- if she adds and removes, there are -- there are

22  things that she -- that she puts in there, as far as what's

23  ongoing, what's current, what revisions are made.  She is

24  responsible to put those in there.

25      Q:  Are you aware of everything that she puts in there and

74

1  takes out?

2     A:  No, I'm not aware of that, what she puts in and takes

3  out.  No, I'm not aware of everything she puts in and takes out.

4     Q:  Are the inspectors aware of what she puts in and takes

5  out?

6     A:  I don't think they're aware of everything that she puts

7  in and that she takes out.

8     Q:  So if there's a plan change that comes in through the

9  middle of the quarter at some point, and you're not aware of it

10  and the inspectors are not aware of it, then how is the inspector

11  able to inspect adequately?

12     A:  Let me say this:  Any plan, revision of plan that comes

13  in, I get a copy of it and also the inspector get a copy of it.

14  So if there's a new plan or anything, a revision made, I get a

15  copy, the inspector also gets a copy of it, and a copy of it is

16  placed into the mine file by the secretary.

17     Q:  Okay.  So you --

18     A:  And I don't think that she -- she doesn't remove

19  anything out without -- without seeing that, you know, on her

20  own, just take the initiative on her own just to take a plan out.

21  No, I don't -- I'm not aware of that.

22     Q:  So then the answer to the previous question is, you do

23  know what goes in and --

24     A:  Yes.

25     Q:  -- out of the mine file?

Confidential Agency Document
DLB-000596          MSHA-2ECAMERON-0196

75

1    A:  Yeah.  Yeah.  I sign off on it and I -- yes.

2    Q:  Does she only give a copy of the change to the lead AR?

3    A:  To the lead AR?  To the person that's at that mine, yes.

4  Yes.

5    Q:  What about another inspector who has -- helps out on the

6  EO1 from time to time or does EO2's that's already reviewed the

7  file that quarter, but he's not the lead AR?  Would he get a copy

8  of it?

9    A:  He may -- he may get a copy and then me may not, but

10  he's made aware of any changes that have been made.

11    Q:  How is he made aware of it?

12    A:  Through the inspector that has the -- that keeps the

13  files on his inspections that he's done.

14    Q:  So it is just -- is it a practice then that they always

15  check with that inspector before they help out or how do they do

16  that?

17    A:  Yes.  Yes.  The best of my -- what I've seen them and

18  communication, I think they're very good, that they do

19  communicate very well as far as new revisions or whatever's in

20  there, whatever changes have been made.

21    Q:  Okay.  Well, moving away from the UMF for a while.  Tell

22  me what is required on the first day of an EO1 inspection.

23    A:  What's required?

24    Q:  Yes, sir.

25    A:  The inspector -- he's required to be there before --

Confidential Agency Document

Day

MSHA Form 7000-10I, June 93 (revised)

## DAILY COVER SHEET

Date 3/09/10     Event No. 6286108

Arrived at the Mine 0800     Departed from the Mine _____

List Records Books Checked

weekly; Pre low

Accompanied By: Company Representative _____

Miners Representative _____

N/A

AREAS OF INSPECTION ACTIVITY:

LW

_____

PRODUCTION

Inspector's Initials _____
Supervisor's Initials and Date _____   Page No. 1
*U.S. Government Printing Office: 1987 - 508-470

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/09/10

Arrived @ mine 0800
to conduct ventilation survey
@ LW and sections in order
to determine contance or done
btil is sufficient and
also help on EOL.
Reviewed weekly exam
Pus low LW

| DATALLS | 26,268 |
| #9 | 4,076 |
| II 160 | 792 |
| MIA | 12,973 |
| MIB | 12,488 |

Reviewed w/ management
areas of inspection. Barry
Clark and Clyde Onge are
going to each CM dist
and I am going to LW to

Inspector's Initials _____
Supervisor's Initials and Date _____   Page No. 2
*U.S. GPO: 2009-541-759

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/09/10

excellent ventilation.
Travelled from Surface at
Harald Tilly ALWC and
Delbut ALWMC and
MSHA Super. and MSHA
marine.
Worked intake from End
of track to headgate.
Took intake air reading
@ 31 BrK
A = 7 x 21
Vc 730
Q = 107,310 CFM
Travelled to LW tg
LW and took a LW
reading: A = 6 x 20
Vc 1095
Q = 131,400

Inspector's Initials _____
Supervisor's Initials and Date _____   Page No. 3
G3D U.S. GOVERNMENT PRINTING OFFICE: 2009—540-493

MSHA-2ECAMERON-0198

Confidential Agency Document
DLB-000598

MSHA Form 7000-10K, June 93 (revised)

Date 3/9/10

LFM READING @ JACK 9
Vc 1792

Traveled face w/ General observation of cw face / shields. no

LFM Reading @ Jack 140
Vc 1328

Exited cw face in the tail noticed curtain 2 1/2 x-cuts outby face and deflect air over into parallel entries. This curtain was not apart of Approved plan. air Reversed @ MP's outby face. Ed Lilly removed curtain

Inspector's Initials [redacted]

Supervisor's Initials and Date [redacted] Page No. 4

*U.S. GPO: 2009-541-759

MSHA Form 7000-10K, June 93 (revised)

Date 3/09/10

and did not know who put it in place. Myself and FOS [redacted] used Chemical Smoke to test air flow and it was flowing in the wrong direction from the LW face to the mouth of the Section in the no. 5, 6, 7 Entries.

informed Mr. Lilly that the air was not according to the approved plan and that the LW was down and could not run until the ventilation plan could be followed. THAT A citation would be issued High negligence 104d2 order and gravity would be determined upon

Inspector's Initials [redacted]

Supervisor's Initials and Date [redacted] Page No. 5

*U.S. GPO: 2009-541-759

MSHA Form 7000-10K, June 93 (revised)

Date 3/09/10

further evaluation.

Met w/ Wayne Persinger and went over cause the problem. There was no Regulator @ the mouth of the Section to allow intake neutral air up the tail to pressurize the tail Entries.

He wanted to make the change w/ men i.e. However, FOS [redacted] & myself would not allow it b/c the amount of air needed to reverse the air would be greater than 9,000 and this could alter the main intake air by removing

Inspector's Initials [redacted]

Supervisor's Initials and Date [redacted] 3/10/10 Page No. 6

GPO U.S. GOVERNMENT PRINTING OFFICE: 2009—540-493

MSHA Form 7000-10K, June 93 (revised)

Date 3/9/10

Assembly of air monitoring
the station.
Throughout the presence
the stubbed CO2 sensor part
of the ST. And agreed
that regulation needed to
be placed and began to
air placements to change
safe precautions were deemed
no one must were deemed
I am all above 0 =
Discussed 104 d(e) order
for you the major of yellow
half hand air tabyos
Tamil from fatigue
that fell air and clay
Regulate Approved.

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/9/10

That 10130

STANDARD 75.370(a)(1)

Cited Y/O 32897

The Approved ventilation plan
lest out being followed as
the longwall on the bilyoah
while the Approved plan
set on being followed on that
the bilyoah entries were
not flowing in the proper
direction. This air flowing
from two headentry entry to
the two flow on the mine avoid
was hedding on the line are
means that the line are
between A0 on shearly air air
flow. Arther standing the
cold failents on need to the
march of the section

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/9/10

The regulator @ 22488.55
was closed to a slopping
or permanent control stage
Inspector used approval
in the placement area and
your this regulator avoid
have allowed air to permeate
and flow into in its approved
direction.

Also located Anton at
Clossared ventilate or entired
louder to receipt direction of
air.

Imphil Jully - Helded that the
air was standing in the entry
direction to be immaterial
our but was 3/02/10

Confidential Agency Document
DLB-000600          MSHA-2ECAMERON-0200



MSHA Form 7000-10K, June 93 (revised)

Date 3/9/0

MSHA Form 7000-10K, June 93 (revised)

Date 3/9/0

MSHA Form 7000-10K, June 93 (revised)

Date 3/9/0

Inspector's Initials

Supervisor's Initials and Date

*U.S. GPO: 2009-541-769

Page No. 82

Page No. 81

Page No. 80



MSHA Form 7000-10K, June 93 (revised)

Date 3/9/10

6. Day and Laminate
under
I reviewed 6 B.O. col
reviewed slopes coal that
air leaks still not reviews
discussed at Dean Spectrum 1st
and Wayne Persinger

Inspector's Initials _____

Supervisor's Initials and Date _____

G&P U.S. GOVERNMENT PRINTING OFFICE: 2000—640-493

Page No. 89

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/9/10     Event No. 6286103

Arrived at the Mine 0270     Departed from the Mine _____

List Records Books Checked: Per Sour / Soprow
Werry

DAILY COVER SHEET

Accompanied By: Company Representative
Rick Hisson

Miners Representative
N/A

AREAS OF INSPECTION ACTIVITY:
Away Bars, Inspaces, Etc.
Pump
Energy Tax by Ex Sect

Inspector's Initials _____

Supervisor's Initials and Date _____

*U.S. Government Printing Office 1997 - 606-470

Page No. 1

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/9/10

Arrived At Abode B/6
Became Mn2 - Elis Poston
lost with Sistain Worse
and Terry Moods
Supervisor
Visit Dept.
and CM1 Transfer Mn2 Sect
Also of
to Cheek Ventilation on
Sections
Review Map of other
inspectors or Areas To
Be Inspected

Inspector's Initials _____

Supervisor's Initials and Date _____

Page No. 2

U.S. GPO: 2009-541-759

Confidential Agency Document
DLB-000602          MSHA-2ECAMERON-0202

<u>**Roof Control Supervisor – Pillar Stability Analysis**</u>

**Issue:** On December 23, 2009, the District 4 District Manager approved the base roof control plan submitted by the operator in October 2009. The District Manager approved the plan without requiring the operator to submit a risk assessment specific to the particular mining operation, including the submission of data and evaluation supporting the proposal, as directed by CMS&H Memo No. HQ-08-058-A. In particular, the operator did not provide information detailing the basis on which the plan was determined to be appropriate and suitable, such as a pillar stability analysis.

Interviews with District 4 Roof Control department personnel revealed that they did not always request pillar stability analyses from mine operators. Instead, District 4 roof control specialists (Supervisor, and Roof Control Specialist) indicated in their interviews that they requested examples of pillar stability analyses from operators to demonstrate the operators' ability to use the appropriate software.

There was no pillar stability analysis submitted by Performance Coal Company with the October 2009 base plan. A note was affixed to the District 4 plan transmittal sheet by the ADM technical stating that District 4 would "still look at the [longwall] gate pillars – later." The ADM technical was the Roof Control Supervisor's supervisor.

**Supporting Documentation:**

- CMS&H Memo HQ-08-058-A (HQ-08-058-A.pdf)

- District 4 Plan Transmittal Sheet with ADM technical's note (Plan Transmittal with ADM technical Note.pdf)

- December 23, 2009, approved roof control plan (December 2009 Approved Roof Control Plan.pdf)

- Pages from transcripts where Roof Control Supervisor talks about pillar stability analysis and why they didn't require UBB to submit a pillar stability analysis. (Roof Control Supervisor - Requiring PSA.pdf and Roof Control Supervisor - Submit PSA.doc)

- IR team note on Roof Control Supervisor's interview transcript (Note on Roof Control Supervisor Interview Transcript.pdf)

- Pages from transcript where Roof Control Specialist talks about pillar stability analysis and why they didn't require UBB to submit a pillar stability analysis (Roof Control Specialist Requiring PSA.pdf)

- Pages from transcript where ADM technical talks about pillar stability analysis. (ADM technical PSA.pdf)

**Mitigating Factors:** During an off the record discussion with members of the IR team, the Roof Control Supervisor stated he did not receive a copy of CMS&H Memo HQ-08-

058-A.  After the interview was completed, the Roof Control Supervisor showed the interviewers a binder where he kept headquarters memos; the memo was not in the binder.  The memo was addressed to all District Managers and Assistant District Managers and was not issued via the established directives system

A note was affixed to the roof control plan tracking sheet by the ADM technical stating that District 4 would "still look at the [longwall] gate pillars – later."

**U.S. Department of Labor**       Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



JUN – 5 2008

CMS&H Memo No. HQ-08-058-A (PRT-75)

MEMORANDUM FOR DISTRICT MANAGERS
           ASSISTANT DISTRICT MANAGERS

FROM:          KEVIN G. STRICKLIN
               Administrator for
               Coal Mine Safety and Health

SUBJECT:       Approval of Complex and/or Non-typical Roof Control Plans
               and Amendments

Recent evaluations of the Roof Control Plan Approval Process have produced several
recommendations to improve the quality of resulting plans. The current procedures for
review and approval of roof control plans rely on the specific language of 30 C.F.R.
75.222 and 75.223, which were published as final rules in January of 1988.

All new roof control plans and amendments that are complex and/or non-typical shall
be evaluated to assure that plans provide for adequately designed support systems.

Roof control plans considered complex and/or non-typical meet one or more of the
following criteria:  1) room and pillar retreat mining at overburden depths of 1000 feet
or greater; 2) design criteria that does not meet the stability factors calculated using the
Analysis of Retreat Mining Pillar Stability (ARMPS) Computer Program and
recommended in Program Information Bulletin No. P08-8; 3) mines with a history of
bounces or bumps, regardless of the amount of overburden cover; or 4) other criteria
considered unusual by the District Manager, such as retreat mining between two gob
areas, mining of high stress areas created by multiple seam interaction, or active mining
above or below longwall panels or isolated remnant pillars. For complex and/or non-
typical plans or amendments, the mine operator shall provide the data and engineering
evaluations conducted to support their determination that systems provide safe work
environments for miners.

The mine operator shall submit with any complex and/or non-typical plan proposal the
following:

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

Confidential Agency Document
DLB-000605          MSHA-2ECAMERON-0205

a) A risk assessment specific to the particular mining operation that includes depth of overburden, coal strength, pillar recovery method, and development and retreat stability factors. The risk assessment will contain a statement detailing the basis on which the operator has determined that the plan is appropriate and suitable to the mining conditions.

b) Where recommendations are made by consulting engineers, the operator shall provide the reports upon which the assertion of adequacy depends and direct the consultants to cooperate fully with the MSHA plan reviewers in verifying their conclusions.

c) Data from currently available tools such as ARMPS, ALPS, LAMODEL, Rocscience, or other applicable software. MSHA may compare the proposed plan evaluation method against a different evaluation system developed by third parties.

d) Where plans are based in any part on empirical information, such as those utilizing a support system or pillar sizing proven to work under similar mining conditions (e.g., similar mining depth and roof conditions), information sufficient to permit field evaluations of the installed systems and verification of the similarity in mining conditions. This information can be included with the operator's statement in "a" above that the plan is appropriate and suitable to the mining conditions.

e) A detailed and comprehensive review of technical and engineering data submitted in support of the proposed plan, and an analysis of potential hazards and other relevant factors.

MSHA shall first establish that the submitted supporting information is adequate, given the complexity and severity of the mining environment, and request additional information if needed. The evaluation shall also include previous plan submittals and approvals, citation history, and roof fall accidents (injury and non-injury). The assistance of MSHA's Technical Support Roof Control Division shall be sought and their recommendations considered in all complex and/or non-typical plan approvals and amendments. A site visit shall also be made by District personnel where applicable.

MSHA shall not approve the proposed plan or amendment until the operator has provided the data and evaluation supporting the proposal and a confirming evaluation(s) has been completed. MSHA shall keep all plan review information as long as the plan is in effect that explains the rationale behind the approval of plan/amendment, including the completed appropriate checklist evidencing the review with signatures, dates and comments.

Confidential Agency Document
DLB-000606          MSHA-2ECAMERON-0206

3

When and where site mine specific pillar size and pillar stress loading tools have generated reliable design parameters and minimum safety factors, those validated features may be utilized as a basis for plan approvals for mining under the same or less severe conditions.

Confidential Agency Document
DLB-000607          MSHA-2ECAMERON-0207

## DISTRICT 4 PLAN TRANSMITTAL SHEET

### SECTION A: GENERAL INFORMATION

DATE RECEIVED FROM: ☐ OPERATOR ☐ MAIL ☐ OTHER _____ 10/27/2009 RECEIVED BY: _____

MSIS Plan Tracking No. _#9492_

PLAN TYPE: _Roof Control Plan Revision Update_                   4-RC-11-94-12307-12

COMPANY NAME: _Performance Coal Company_

MINE NAME: _Upper Big Branch_                                    I.D. NO. _46-08436_

FIELD OFFICE: ☐ Mt. Hope ☐ Mt. Carbon ☐ Mt. Carbon ☐ Summersville ☐ Princeton ☐ Pineville ☐ Madison ☐ Logan

PLAN SUMMARY / COMMENTS: _Update_

_____

### SECTION B: ON-SITE REVIEW (IF APPLICABLE)

ON-SITE REVIEW CONDUCTED: ☐ YES, ☐ NO                DATE OF REVIEW: _____

METHANE LIBERATION RATE (IF APPLICABLE): _____ CFD   DATE OF SAMPLE: _____

COMMENTS: _____

   ○ COMMENTS RECEIVED FROM MINER'S REPRESENTATIVE?   ☐ YES   ☐ NO   ☐ NO REPRESENTATIVE

   (See reverse)

### SECTION C: PLAN COORDINATION and REVIEW

PLAN COORDINATED WITH (WHEN APPLICABLE): Please date and initial

☐ ADM FOR ENF ~~_____~~ 12/22/09  ☐ FO SUPV _See below_   ☐ CMI ASSIGNED TO MINE _____

☐ HEALTH _____  ☐ VENT _____   ☐ ROOF _____   ☐ TRAINING _____

☐ STATE _____  ☐ TECH SUPPORT _____   ☐ OTHER _____

COMMENTS: _____

### SECTION D: DISTRICT REVIEW

DISTRICT SPECIALIST:   DATE REVIEWED: _12-18-09_   INITIALS: ~~____~~ 11-16-09

RECOMMENDATION: ☑APPROVAL ☐DISAPPROVAL ☐ACKNOWLEDGMENT ☐WAIVER GRANTED ☐WAIVER DENIED ☐FWD TO TS ☐CONCUR WITH STATE ☐OTHER

SPECIALIST SUPERVISOR:   DATE REVIEWED: _12/22/09_   INITIALS: ~~____~~ 12/22/09   ~~____~~ 12/23/09

RECOMMENDATION: ☑APPROVAL ☐DISAPPROVAL ☐ACKNOWLEDGMENT ☐WAIVER GRANTED ☐WAIVER DENIED ☐FWD TO TS ☐CONCUR WITH STATE ☐OTHER

ASSISTANT DM (TECHNICAL):   DATE REVIEWED: _12/22/09_   INITIALS: ~~____~~

RECOMMENDATION: ☑APPROVAL ☐DISAPPROVAL ☐ACKNOWLEDGMENT ☐WAIVER GRANTED ☐WAIVER DENIED ☐FWD TO TS ☐CONCUR WITH STATE ☐OTHER

DISTRICT MANAGER:   DATE: _12/22/12_   INITIALS: ~~____~~

☐APPROVED ☐DISAPPROVED ☐ACKNOWLEDGED ☐WAIVER GRANTED ☐WAIVER DENIED ☐FWD TO TS ☐CONCUR WITH STATE ☐OTHER

### SECTION E: DISTRIBUTION OF APPROVED PLANS   NOTE: FIELD OFFICE - RETURN ORIGINAL TRANSMITTAL SHEET TO ENGINEERING SERVICES

TRACKING DATES (IF APPLICABLE):       MSIS _____/_____  SCANNED _____ UMF _____

   ( In — out)

PROVIDED TO OPERATOR & DISTRICT FILE:   DATE: _____   INITIALS: _____

NOTIFICATION OF APPROVAL:

ASSISTANT DM (ENFORCEMENT) NOTIFIED BY - INITIALS: _____   DATE: _____   PHONE ☐ EMAIL ☐ IN PERSON ☐

FIELD OFFICE SUPERVISOR NOTIFIED BY - INITIALS: _____   DATE: _____   PHONE ☐ EMAIL ☐ IN PERSON ☐

INSPECTOR NOTIFIED BY - INITIALS: _____   DATE: _____   PHONE ☐ EMAIL ☐ IN PERSON ☐

Confidential Agency Document
DLB-000608        MSHA-2ECAMERON-0208

████████ and ██

Update of plan.
Also adding block
splitting plan.

still will look at two
gate pillars - later.

██████

Confidential Agency Document
DLB-000609          MSHA-2ECAMERON-0209

U. S. Department of Labor    Mine Safety and Health Administration
                            100 Bluestone Road
                            Mount Hope, WV  25880-1000



DEC 2 3 2009

Mr. Berman Cornett
Safety Director
Performance Coal Company
P.O. Box 69
Naoma, WV  25140

Dear Mr. Cornett:

Subject:    Update of the Roof-Control Plan, Upper Big Branch Mine- South,
            I.D. No. 46-08436, Performance Coal Company, Montcoal, Raleigh
            County, West Virginia, Permit No. 4-RC-11-94-12307-12

Your roof-control plan, received on October 27, 2009, has been reviewed and is
approved.  This approval is based upon a District review of the roof conditions
and roof-control practices in the mine by representatives of the Mine Safety and
Health Administration, and includes any changes made by you at that time.

Should you have any questions concerning your roof-control plan, please contact
Don Winston at this office, (304) 877-3900, Extension 130.

Sincerely,

Robert G. Hardman
District Manager
Coal Mine Safety and Health, District 4

Enclosure

cc:    State Inspector-at-Large, Oak Hill Division (1 encl.)
       Mount Hope Field Office (3 encl.)
       Lee Barker (1 encl.)
       Files/cls

1

1    MINE SAFETY AND HEALTH ADMINISTRATION

2    UPPER BIG BRANCH MINE – SOUTH

3    INTERNAL REVIEW

4

5    Thursday, September 16, 2010

6

7

8    AUDIO-TAPED

9    INTERVIEW

10   Roof Control Specialist
       OF
11   ~~DONALD HENSLEY~~

12

13

14

15   MSHA:

16   ~~TERRY KIRBY~~

17   ~~GREG DUNCAN~~

18   ~~WHATE PENSLER~~

19

20   INTERVIEWEE:

21   ~~DONALD HENSLEY~~

22

23

24

25

Confidential Agency Document
DLB-000611         MSHA-2ECAMERON-0211

1    that middle entry to make sure that air would back through there.

2          Q:    Uh-huh.   (Yes)

3          A:    So, so on a case by case basis we have, we have dealt

4    with that.

5          Q:    When we started out here at UBB, too, where they had

6    problems with the Headgate and you required additional support in

7    the Headgate entries, so that, that's certainly something you've

8    done here.  But the ARMPS requirement, how do you enforce that,

9    as far as, you know, they're responsible for running this program

10   and to assure they have stability?

11         A:    Right.

12         Q:    How are we enforcing that provision to know that

13   they're doing their job on that?

14         A:    Well, now - I can tell you how we do it now.

15         Q:    Okay.

16         A:    We require them to actually send us an example of, of

17   how they would do it, okay?  I mean, that, that, but as far as

18   every panel, we don't.  I mean, it's like anything else; they're

19   required to follow it.  It's their mine and they're required to

20   follow it.  Now, if we would find problems and we would see that

21   they didn't require it then we'd cite them.  But we don't check

22   ever panel.  I mean that, that's, that would be literally

23   impossible.

24         Q:    Sure.   Sure.   But if we did want to go out and check

25   their work, are inspectors and specialists trained to the point

1          MINE SAFETY AND HEALTH ADMINISTRATION

2              UPPER BIG BRANCH MINE – SOUTH

3                     INTERNAL REVIEW

4

5               WEDNESDAY, JUNE 15, 2011

6

7

8                        AUDIOTAPED

9                        INTERVIEW

10                    *Roof Control Specialist*

11              ~~[REDACTED]~~

12

13

14

15   MSHA:

16       ~~[REDACTED]~~

17       ~~[REDACTED]~~

18       ~~[REDACTED]~~

19

20

21   INTERVIEWEE:

22       ~~[REDACTED]~~

23

24

25

                Confidential Agency Document
                DLB-000613          MSHA-2ECAMERON-0213

1     Q:   It's mandatory stuff.  In your previous interview on

2    page 40 - okay, that's your transcript there.  We understood you

3    did not require pill - pillar stability calculations to be

4    submitted for every panel and required only a sample to be

5    submitted to show you that the company was able to complete the

6    calculations, is that correct?

7     A:   Page number is up on the top - [crosstalk].

8     Q:   Okay I saw them there but I - I think that statement

9    [is what I see but rather than let you…] 00:27:07

10     A:   Well, I mean I knew that.

11     Q:   Is that what it is?

12     A:   That - that sounds correct.

13     Q:   Is that - Okay.  That's correct.  Did you ever receive

14    a copy of Memo number HQ-08-58-A?

15     A:   Now which one…

16     Q:   That's one we already gave you.

17     Q:   Yeah, that's the one we just gave you.

18     A:   This one?

19     Q:   Is that 58?

20     A:   No, that's 59, this one right here.

21     Q:   Yeah.  Did you ever see that memo?

22     A:   I honestly don't remember.  If you all are willing to

23    allow me, I keep all of like roof control memos in a - in a

24    little [buff] folder.  I would be glad to go look at them and

25    see if I've got it, but it is not ringing a bell with me

Confidential Agency Document
DLB-000614      MSHA-2ECAMERON-0214

1   although it's very — if I've read it which I'm sure I should

2   have, it's just not ringing a bell with me.

3        Q:   ▓▓▓ can you — can you for the record, just say who

4   that memo was sent to?

5        A:   To district managers and assistant district managers.

6        Q:   Right.  So the roof control department wasn't one of

7   the recipients of this?

8        A:   Well, I — I can say if ▓▓▓▓▓▓▓ got this, he   *ADM Techical*

9   would've forwarded it to me.  I truly believe he would have done

10  that.  I'm not saying I haven't seen it.  It's just — I'm just

11  saying it's not ringing a bell with me.  It's probable that I

12  have but I can only say probable.

13       Q:   If — well, then you wouldn't know if he didn't.  If

14  you're not sure if you saw it, you probably don't know if you

15  forwarded that to all your specialists and inspectors that

16  conduct the six-month reviews?

17       A:   I don't remember doing it.

18       Q:   Would — would you remember then on how District 4 —

19  [that] highlighted at the bottom of the page two, how did we —

20  Would you remember how you complied with that which states "[The

21  body] should not approve their proposed plan or memo until the

22  operator has provided the data and evaluation supporting the

23  proposal and conferment — confirming evaluation has been

24  completed"?  Does that ringing any bell to you?

25       A:   MSHA heads shall not approve — it don't ring a bell

1   for me.  You know, usually if I get these memos, I try my best

2   to comply with it and I'm not saying I didn't get it.  It's just

3   not ringing a bell with me because like I say, I definitely

4   tried to follow this other one, this -50-059 and then I would

5   follow the 30-day one.

6       Q:   What we'll do for you, whenever we finish, just to be

7   clear, we'll give you a little bit, if you have a folder where

8   you keep these things and you indicated earlier that if it's in

9   there, you had to review it.

10

11

Confidential Agency Document

1

1          MINE SAFETY AND HEALTH ADMINISTRATION

2              UPPER BIG BRANCH MINE – SOUTH

3                    INTERNAL REVIEW

4

5              WEDNESDAY, SEPTEMBER 14, 2010

6

7

8                      AUDIOTAPED

9                      INTERVIEW

10                        OF

11        ~~Roof control Specialist~~ *Roof control Specialist*

12

13

14

15   MSHA:

16          ~~_____~~

17          ~~_____~~

18          ~~_____~~

19          ~~_____~~

20

21

22   INTERVIEWEE:

23          ~~_____~~

24          ~~_____~~

25

Confidential Agency Document
DLB-000617          MSHA-2ECAMERON-0217

1    that -- does that compare it to what you use in your analysis?

2        A:    In the analysis I use what they actually had.  This

3    analysis was run on existing conditions.  It was not run on

4    anything, you know, it wasn't run on what was projected.

5        Q:    Right.  So what they already had driven?

6        A:    This is what they have, right, and crosscut spacing,

7    100 feet, center-to-center distance, 80 feet.  That was the --

8    that's based off of the mine map that I had.  I pulled it off the

9    mine map.

10        Q:    Okay.  And this was spacing of what?

11        A:    Eighty.

12        Q:    Eighty?

13        A:    So they've exceeded it but, you know, like I said,

14    those minimums are not really -- that shouldn't, you know, that's

15    not driving what the minimums are required in the plan.

16        Q:    Okay.

17        A:    Them abiding by that PIL is what's driving -- what they

18    should be -- you know, that's driving their --

19        Q:    Okay.  Under your ARMPS program, that -- that's

20    something you did for ventilation --

21        A:    Right.

22        Q:    -- but that's something that the company should have

23    done before they even drove those panels; right?

24        A:    That's required by their plan.

25        Q:    Right.  Do you know if they provided that information

1  to you for this panel?

2       A:   We do not require them to provide that information for

3  every panel they drive, no.

4       Q:   So they may have done it, they just didn't give it to

5  us or we don't --

6       A:   We don't require it so they don't give it to us.

7       Q:   So the only requirement in the plan is that they use it

8  to --

9       A:   That they abide by the -- yeah, the PIL.

10      Q:   And we don't -- how would we know if they do that or

11  not?

12      A:   Well, we'd have to go check.

13      Q:   Is there any way we could check and be sure that --

14      A:   We could check it anytime we wanted to, I guess, you

15  know, if we had some -- you know, if --

16      Q:   For instance --

17      A:   The checking would be just a matter of going out and

18  somebody that knows how to use the program go out to the mine and

19  check what they have.

20      Q:   But as far as enforcing whether or not they ran the

21  program prior to driving these entries, how were you going to

22  enforce that?  Do we ask them after the fact?  Today, could we go

23  out to the mine and say, can we see your ARMPS analysis for this

24  panel?

25      A:   I don't know if they keep that or not.  We don't -- I

1  mean, there's nothing in the plan to require them to keep that as

2  a record, no.

3      Q:   Okay.  Who would you expect to be responsible for

4  ensuring compliance with that provision of the roof control plan?

5      A:   As far as the company's concerned?  Well, the operator

6  is responsible.

7      Q:   No.  As far as ensuring compliance from an inspection

8  standpoint?

9      A:   From an inspection standpoint?

10     Q:   From an MSHA standpoint.

11     A:   Well, the CMI is -- you know, he's responsible for

12  making the -- the inspection, so if he gets -- if he's in a

13  situation where he's either got a question on it or if he sees

14  some instability, then, you know, all he has to do is come back

15  and ask for help.

16     Q:   Well, he's -- he's doing the plan reviews.  Is that

17  correct?  The CMI, are they doing the six-month reviews?

18     A:   Well, they -- they were probably -- they sign off on

19  that and review it every quarter I'm assuming.

20     Q:   Okay.

21     A:   I always did when I was a CMI.

22     Q:   So --

23     A:   Whether the plan was, you know --

24     Q:   -- one of the things they do as a part --

25     A:   -- adequate or whatever, part of your time, your

1  triple -- you know, EO1, they do it.

2       Q:   One of the requirements for them on a regular

3  inspection is to assure compliance with the roof control plan.

4       A:   That's true, too.

5       Q:   So how would we expect that inspector to ensure that

6  they're complying with that provision, with what it says they

7  have to do?

8       A:   Well, I'm not going to -- I don't know what -- I'm not

9  going to sit there and guess what the capability of each

10  inspector is but, you know, if he can -- if he can run ARMPS, he

11  should be able to check that but, if he can't, then he should be

12  able -- he's either going to have to ask -- if he sees a problem,

13  he's going to have to ask for help.

14       Q:   If --

15       A:   I mean, I don't -- I don't see how -- where you're

16  going with that because, if -- you know, if you're saying you

17  want something quick and easy like minimum centers for every

18  panel, I mean, that's not really what we're doing.

19       Q:   No.   It's just a provision in the plan that looks

20  really good.   To be honest with you, it requires them to do

21  something that they need to do --

22       A:   -- to do engineering, right.

23       Q:   -- to do engineering.   So I guess the -- you're

24  pointing towards conditions in the mine and the provision is --

25  seems irrelevant to that.   The provision is that the need to do

1   -- do this engineering work.  So I would think that the check

2   would be to check that they have done the engineering work, so we

3   would check the engineering work.

4       A:   Well, that's what I'm --

5       Q:   So who would be responsible to check the engineering

6   work?

7       A:   We don't have anybody that goes out and checks their

8   engineering processes.  We don't do that, but we do ask them to

9   supply us with an ARMPS run on a roof control plans, you know.

10  We ask them to provide us with an ARMPS run to make sure that

11  operator does know how to run that.

12      Q:   So we've checked that they know how to do it, but we're

13  not checking that they do it?

14      A:   That they do it?  Well, you know, of course, then

15  again, the proof's in the pudding, you know, if they start having

16  problems.

17      Q:   Yeah.  Do you know if they had problems on the headgate

18  with the pillars or was it heaving, the main problem?

19      A:   From what I understand, from what I was told, that the

20  main problem was heaving, was floor heaving, which I've already

21  stated previously is not -- doesn't necessarily mean that the

22  pillars are unstable.

23      Q:   Nobody ever told you the pillars were crushing out?

24      A:   No.

25      Q:   Would the --

1     A:   Now, I mean, if pillars are crushing out, you know,

2  that's a whole different issue and I'd -- from what I -- from as

3  far as I know, I don't know if anybody from roof control went

4  down there to check on pillars crushing.  Now, I did hear that

5  there was a lot of floor heaving which, you know, that's --

6     Q:   That's not related to this at all though.

7     A:   Right.  It's -- that's a whole different issue, you

8  know.  One of the -- some of the people say, well, how do you

9  correct it?  Well, one way to -- one way that's been successful

10  is you increase pillar sizes.  Well, what that does, that just

11  distributes the load better so maybe that soft material that's in

12  the floor doesn't get -- doesn't hoove.  It doesn't mean that the

13  previous pillar was unstable either.  You know what I'm saying?

14  Just because you increase it and the problem goes away, well,

15  that increases that -- you know, the floor heaving problem but it

16  doesn't necessarily mean that you're going to -- that there was

17  an issue with the pillar stability.  So floor heave is a whole

18  separate issue.  That's just like -- that's just like pillar

19  stability also doesn't guarantee that you're going to have a good

20  stable roof, you know.  That's why we put the bolts in.

21     Q:   You mentioned the inspector signs off on one of those

22  reviews each quarter.

23     A:   Normally.  I always did.

24     Q:   What does that review entail?

25     A:   Well, it means that he's reviewed the roof control plan

1

1    MINE SAFETY AND HEALTH ADMINISTRATION

2    UPPER BIG BRANCH MINE – SOUTH

3    INTERNAL REVIEW

4

5    WEDNESDAY, DECEMBER 15, 2010

6

7    AUDIOTAPED

8    INTERVIEW

9    AD of Technical

10   ████████████

11

12

13   MSHA:

14   ████████████

15   ████████████

16   ████████████

17   ████████████

18   ████████████

19   ████████████

20   ████████████

21

22

23   INTERVIEWEE:

24   ████████████

25

Confidential Agency Document
DLB-000624                    MSHA-2ECAMERON-0224

1    A:  Yeah.

2    Q:  Did you write part of them?  Did you write those

3  numbers?  *RC Supervisor*

4    A:  ~~[redacted]~~ wrote the top part, I wrote, "still to look

5  at longwall eight pillars later.

6    Q:  Okay.  What was the intent, and then did you followup

7  and check on what it indicated?

8    A:  Ah yes.  Now I'm trying to think.  A question came from

9  somewhere about the stability of the pillars at the Upper Big

10  Branch headgate and tailgate.  And I asked ~~[redacted]~~ *Roof Control Supervisor* to look at

11  that again and he did another of the stability analysis from

12  ~~[redacted]~~ and well, I don't know if you guys will get into

13  that, but excuse me, I'm trying to think of all it all went.  We

14  had ventilation in there and ~~[redacted]~~ *Ventilation Supervisor* went up in there and

15  he saw the ribs spalling, he saw floor heave.  ~~[redacted]~~, I

16  don't know and that's where I'm losing it.  I think ~~[redacted]~~ I don't

17  know if ~~[redacted]~~ *RC Supervisor* was in there.  Maybe ~~[redacted]~~ *RC Supervisor* went in.  We

18  didn't see any roof problems.  The roof wasn't breaking up in

19  there but you did have your abutment pressure coming back and

20  getting the floor heave.  So I asked ~~[redacted]~~ *RC Supervisor* to relook at those

21  pillars.  They were submitted whenever, I don't know the date,

22  and the calculation was done and the stability factors were done.

23  And you had numbers of 112 and 113, so you had 112 the

24  calculation being slightly under.  ~~[redacted]~~ program with 113.

25  But then you had to go into that program and look at the input

80

1   parameters in the program.  That was done for shield roof.  That

2   roof in there is more solid, more strong, a more sandstone roof

3   and when you recalculate using your sandstone roof rating factor

4   in the ARMPS, the factor I think was 0.92, if my numbers and my

5   brain is working right today, which meant it was stable.  All

6   that is is one calculation under ARMPS for stability.  That said

7   to me, and to ~~Don Winston~~ *RC Super*, that the pillars were not failing.

8   And that's going to be a question.  That's come up, that's been

9   questioned by people.  That'll be my answer if you ask that again

10  of me later on.

11      Q:  You said that the analysis was done.  Did the company do

12  it or did we require the company to do this analysis?

13      A:  We do require the company to show us that they can do

14  the analysis.  That also is something that ~~Bob Hardman~~ *RC Supervisor* wants to

15  change.  He wants the worst case to be shown and we don't think,

16  ~~John Winston~~ and I do not think that's the way to do it.  I can't

17  take a mine that has a two thousand foot cover over here and

18  three hundred over here and say this side of the mines got to be

19  the worst case for this side.  Those pillars are different.  You

20  design your mine for your cover, your geology, your height to

21  crawl.  That all has to be taken into account.  So if we're in

22  discussion, I'll say with ~~Bob Hardman~~ *DM* the district manager about

23  how the calculations should be done.  We just want to know the

24  operator knows how to use those programs, the ALPS, ARMPS and

25  some of the others.

81

1    Q:  Okay.

2    A:  Let me continue.  When we get into the Upper Big Branch

3 where we have the headgate and the tailgate, we really need a

4 finite element analysis there if you want to get the final answer

5 to it.  We don't require that and we don't have operators that

6 know how to do that now if they have to be tech support or

7 university type thing.

8    Q:  Well, we'll be asking some questions about that about

9 here.  Back to this one, you know, the notes said that you

10 followup on gate pillars later and I think you said it was

11 followed up on?

12    A:  Yes sir.

13    Q:  On that one, did the company run that or did MSHA?

14    A:  ~~XXXXXXXX~~ *RC Specialist* (unidentified name) ran that.

15    Q:  ~~XXXXXXXX~~ *RC Specialist* is a specialist?

16    A:  He works for ~~XXXXXXXX~~ *RC Supervisor*

17    Q:  Okay.

18    A:  A specialist in the district office.

19    Q:  Okay.  Why did he run it?

20    A:  Because ~~XXXX~~ asked him to.  I don't want to be----

21    Q:  Yeah, I know.

22    A:  ---whatever you call that, flipped here.

23    Q:  Yeah, okay. I mean, was he specialized to run it.  Is he

24 familiar with it?  Is he trained to do that?

25

1      A:  Both of them, all of them are.  No, the engineers and

2   *RC Supervisor* ~~are~~ are.

3      Q:  Okay.

4      A:  The other two specialists are not. They're trying to

5   learn it, but---

6      Q:  Okay.

7      A:  Now remember, someone asked a question of those pillars.

8   They said they weren't stable and so on.  I don't remember who it

9   was.

10     Q:  Okay.  And I think you might have referred to this

11  earlier, but what all do you know was happening as far as any

12  pillar design problems or any ground control problems at Upper

13  Big Branch during the time of this last longwall panel was being

14  pulled or being mined?

15     A:  As I recall, as I recall, ~~*Ventilation Supervisor*~~ went in to try

16  to go up that headgate and do the ventilation work there.  He

17  indicated that those ribs were spalling and the floor was

18  heaving.  He called that failure and I think that was taken by

19  other people, and I can't remember who. I don't know. I don't

20  know.  It wasn't the district, so questions were made of the roof

21  control people. It looks like those pillars were not sized

22  properly.  And that's when I asked ~~*RC Supervisor*~~ to please go back

23  and revisit that situation and it's more complicated than that

24  because you had now a single longwall, you have no gob on either

25  side.  And when it's done according to the way ~~*Roof Control Supervisor*~~ wanted

**POSITION DESCRIPTION** *(Please Read Instructions on the back)*

C-1-03.48     PP 0364     CA 125100

| | | | | |
|---|---|---|---|---|
| **2. Reason for Submission** ☐ Redescription ☐ Reestablishment ☒ New ☐ Other | **3. Service** ☐ Hdqtrs. ☒ Field | **4. Employing Office Location** Philadelphia, PA | **5. Duty Station** Shamokin, PA | **6. OPM Certification No.** |

**Explanation** *(Show any positions replaced)*
Vacancy - Recruit

| **7. Fair Labor Standards Act** ☒ Exempt ☐ Nonexempt | **8. Financial Statements Required** ☐ Executive Personnel Financial Disclosure ☒ Employment and Financial Interests | **9. Subject to 1A Action** ☐ Yes ☐ No |
|---|---|---|
| **10. Position Status** ☒ Competitive ☐ Excepted *(Specify in Remarks)* ☐ SES (Gen.) ☐ SES (CR) | **11. Position Is** ☒ Supervisory ☐ Managerial ☐ Neither  **12. Sensitivity** ☐ 1-Non-Sensitive ☒ 2-Noncritical Sensitive ☐ 3-Critical Sensitive ☐ 4-Special Sensitive | **13. Competitive Level Code** GS-1822-01-1? **14. Agency Use** A |

| **15. Classified/Graded by** | **Official Title of Position** | **Pay Plan** | **Occupational Code** | **Grade** | **Initials** | **Date** |
|---|---|---|---|---|---|---|
| **a. U.S. Office of Personnel Management** | | | | | | |
| **b. Department, Agency or Establishment** | | | | | | |
| **c. Second Level Review** | | | | | | |
| **d. First Level Review** | Supervisory Coal Mine Safety & Health Inspector | GS | 1822 | 13 | | 10/1/03 |
| **e. Recommended by Supervisor or Initiating Office** | | | | | | |

**16. Organizational Title of Position** *(if different from official title)*

**17. Name of Employee** *(if vacant, specify)*  VACANCY  YENCHO, THOMAS

**18. Department, Agency, or Establishment**
U. S. Department of Labor

**a. First Subdivision**
Mine Safety & Health Administration

**b. Second Subdivision**
Coal Mine Safety & Health

**c. Third Subdivision**
District 1

**d. Fourth Subdivision**
Wilkes-Barre, PA District Office

**e. Fifth Subdivision**
TID, Shamokin, PA F.O.     Dept. ID: 1855

**19. Employee Review** - This is an accurate description of the major duties and responsibilities of my position

Signature of Employee *(optional)*

**20. Supervisory Certification.** *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.*

**a. Typed Name and Title of Immediate Supervisor**
William D. Sparvieri, Jr.
Assistant District Manager

Signature                Date 9-12-03

**b. Typed Name and Title of Higher-Level Supervisor**

Signature

**21. Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards*

**a. Typed Name and Title of Official Taking Action**
Supervisory Human Resources Specialist

Signature     Date 10/1/03

**22. Position Classification Standard**

**Information for Employees.** The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

*(Handwritten notes box):*
DLES 0125 — Strickln
DLES 0564 — Thomas
P00327 — Winston
SL0011 — Selfe
PP 0364 — Moore

Donna Kramer
3-7686

| **23. Position** | **Initials** | **Date** | **Initials** | **Date** | **Initials** | **Date** | **Initials** | **Date** | **Initials** | **Date** |
|---|---|---|---|---|---|---|---|---|---|---|
| **a. Employee** *(optional)* | | | | | | | | | | |
| **b. Supervisor** | | | | | | | | | | |
| **c. Classifier** | | | | | | | | | | |

**24. Remarks**     EMPL ID: 00012914

**25. Description of Major Duties and Responsibilities (See Attached)**

NSN 7540-00-634-4265     Previous Edition Usable     OF 8 (Rev. 1-85)

<div align="right">

Series | Grade
--- | ---
GS-1822 | 13

</div>

### Supervisory Coal Mine Safety and Health Inspector

#### Major Duties

The incumbent is a supervisory coal mine safety and health inspector who participates with management officials of the District in their administrative management and supervision of Mine Safety and Health Administration's health and safety programs in the field.

Assigns, supervises and reviews the work of inspection, technical, and in some instances clerical personnel under his jurisdiction.

Participates with management officials in the establishment of policy: personnel.management and administration; training and development of coal mine inspectors; organization and planning of work procedures and techniques, which involves work organization, staffing, program planning, fiscal operations, personnel administration, procurement and supply, property management, transportation and travel, facilitating services, and general business operations.

Responsible for the observance of all work rules and regulations, employee relations and conduct.

Responsible for assigning the mines to inspectors to equalize the work load and to ensure they are inspected the prescribed number of times as set forth in the Federal Mine Safety and Health Act of 1977.

On a regular basis, accompanies inspectors, engineers, and other employees, during their regular or special assignments in coal mines and related plants to assure the utmost work efficiency and quality; and makes personal examinations of underground and surface coal mining operations to keep fully informed on the latest technical developments in mining and equipment.

Directs, coordinates and/or assists in on-site rescue and recovery operations following mine explosions, fires, and other mine disasters.

As requested, represents the management officials in Departmental, Mine Safety and Health, Coal Mine Safety and Health, or other Government agency meetings and symposiums on matters concerning the enforcement of coal mine safety and health regulations.

Supervises three to ten inspectors at the GS-12 level and is responsible for quantity and quality of work produced by subordinates, overall review of work to assure policies are followed, planning work, setting priorities and schedules, evaluating performance, counseling subordinates on both technical and administrative procedures, makes recommendations for promotions and reassignments, answers employee grievances according to procedures outlined in the negotiated agreement with AFGE, identifies developmental and training needs of subordinates, initiates disciplinary actions such as warnings and reprimands.

EEO:  As a supervisor, incumbent is responsible for ensuring equal opportunity for all employees under his supervision in the selection of employees for training, promotion, awards and recognition, and other career development opportunities.  The incumbent also ensures fair and unprejudiced employment practices in the recruitment and selection of candidates for appointments to positions under his supervision.  The incumbent is responsible for supporting programs relating to the training and the advancement of employees in "dead-end" positions.  Incumbent is responsible for actively supporting the Equal Opportunity Program in day-to-day activities and is evaluated on his performance in this area on a regular basis.

LMR:  Regardless of the status of local employee organizations, each supervisor is responsible for being knowledgeable about management's role and responsibilities in labor management relations.  Where a local agreement is in effect, supervisors are responsible for becoming completely familiar with the terms of the Agreement.

Safety:  As a supervisor, incumbent is responsible for the on-the-job safety and health of all employees under his/her jurisdiction. Initiates efforts conforming to established local and MSHA Safety Programs to satisfy this responsibility.  Responsibilities include identifying and correcting job safety and health hazards, instructing employees on safety requirements for job assignments, reviewing and reporting loss incidents, in accordance with MSHA and Office of Employees' Compensation regulations, initiating corrective measures for violations of the Occupational Safety and Health Act standards, and directing the periodic inspection of all workplaces.

1. Knowledge Required by the Position

Requires a demonstrated expertise in the enforcement activities required under the Federal Mine Safety and Health Act of 1977, P. L. 95-164, and an extensive knowledge of coal mining.

Must possess managerial and supervisory knowledge in order to effectively manage a complex office and motivate individuals to effectively and equitably enforce coal mine safety and health regulations.

2.   Supervisory Controls

Performs under the direction of the Assistant District/Sub-district Manager, operating within the framework of prescribed Agency and Departmental policies and guidelines.  Exercises independence in planning, scheduling field office operations, as well as carrying out day-to-day responsibilities.  Results of the work of this position are reviewed for adherence to agency policies, and for assurance that program objectives are fulfilled.

Confidential Agency Document
DLB-000631            MSHA-3ECAMERON-0003

3

3. <u>Guidelines</u>

Incumbent is guided by Federal, Departmental, Mine Safety and
Health Administration, and Coal Mine Safety and Health policies,
guidelines, procedures and regulations, and technical guidelines
such as National Electrical Code, IEEE Standards, and National
Fire Codes.

4. <u>Complexity</u>

The incumbent manages a complex network of activities ranging
from very little variation from enforcement procedures to the
origination and establishment of new procedures, techniques and
standards development.  A tremendous amount of pressure exists,
especially during mine disasters; and the incumbent must use
sound judgment in making immediate decisions which may effect the
life and limb of mining personnel and inspectors.

5. <u>Scope and Effect</u>

The responsibilities of this position encompass the enforcement
of all coal mine safety and health standards and regulations in a
uniform and equitable manner, contributing to the overall
effectiveness and enhancing the mission of the Mine Safety and
Health Administration.

The Coal Mine Safety and Health district offices are charged with
enforcing safety and health regulations and providing technical
enforcement assistance to mine operators.  The enforcement
responsibilities and the sanctions imposed by the incumbent are
of economic, social, and frequently political nature, and the
incumbent must effectively deal with grieved parties while
protecting and promoting, as his paramount responsibility, the
health, safety and welfare of the thousands of workers employed
in the industry.  According to the National Safety Council,
underground coal mining is the most dangerous major occupation in
America on the basis of accidental death and serious injury.
There is intense interest in mineral industry health and safety
from the White House, the Congress, the Department of Labor, the
mineral and allied industries, and the public.  Consequently, the
results of coal mine safety work in this and other similar
positions have an effect on the work programs of the Agency, the
Department, and the Federal Government, and must meet the rigid
requirements and high standards of a wide range of interests and
a very wide sector of the public.

6. <u>Personal Contacts</u>

Personal contacts are typically with mine owners, management,
operating officials, safety engineers, attorneys, miners, labor
union officials, and State mine inspectors, as well as with
inspectors, engineers, and specialists within the Agency.

4

7. <u>Purpose of Contacts</u>

These contacts are either for supervisory and coordinating
purposes or for accomplishing health and safety improvements in
coal mines through health and safety inspection and investigative
work, advising on special problems, assisting in health and
safety promotion, conducting health and safety training, safety
association work, etc. Requires keen judgment and diplomacy,
oftentimes dealing with industry officials, union repre-
sentatives, and attorneys on sensitive and controversial matters.

8. <u>Physical Demands</u>

Frequent travel to mine sites is necessary, requiring that the
incumbent be physically capable of performing arduous duties of
this position without hazard to themselves or fellow employees,
and be capable of sustained physical exertion for six to eight
hours under hazardous conditions. Equipment may be carried
weighing up to 40 pounds on normal work periods and up to 80
pounds at two-hour intervals during mine rescue and recovery
operations.

9. <u>Work Environment</u>

Frequent trips to mining operations are necessary. Work
underground may be in close confinement, in and out of small
spaces, where dampness and low water areas are expected.
Crawling on hands and knees is common practice. Climbing ladders
without convenient rest stations is a possibility. On occasion
may operate with little light, and be frequently exposed to
dusts, gases and fumes.

Confidential Agency Document
DLB-000633                    MSHA-3ECAMERON-0005

**POSITION DESCRIPTION** *(Please Read Instructions on t ck)*

| | | 1. Agency Position No. |
|---|---|---|
| | | ES0125 |

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|
| ☐ Redescription ☐ Reestablishment | ☐ New ☐ Other | ☒ Hdqtrs. ☐ Field | Arlington, VA | Arlington, VA | |

| 7. Fair Labor Standards Act | 8. Financial Statements Required | 9. Subject to 1A Action |
|---|---|---|
| ☒ Exempt ☐ Nonexempt | ☒ Executive Personnel Financial Disclosure ☐ Employment and Financial Interests | ☐ Yes ☒ No |

**Explanation** *(Show any positions replaced)*

Recertification. There have been no significant changes to the position since last certified in 2002.

| 10. Position Status | 11. Position Is: | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| ☐ Competitive | ☐ Supervisory | ☐ 1-Non-Sensitive ☒ 3-Critical Sensitive | |
| ☐ Excepted *(Specify in Remarks)* | ☒ Managerial | | 14. Agency Use |
| ☒ SES (Gen.) ☐ SES (CR) | ☐ Neither | ☐ 2-Noncritical Sensitive ☐ 4-Special Sensitive | 8888 |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | ADMINISTRATOR FOR COAL MINE SAFETY AND HEALTH | ES | 1822 | SES | DS | 10/4/06 |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

| 16. Organizational Title of Position *(if different from official title)* | 17. Name of Employee *(if vacant, specify)* |
|---|---|
| | |

| 18. Department, Agency, or Establishment | c. Third Subdivision |
|---|---|
| US DEPARTMENT OF LABOR | |
| a. First Subdivision | d. Fourth Subdivision |
| MINE SAFETY AND HEALTH ADMINISTRATION | |
| b. Second Subdivision | e. Fifth Subdivision |
| COAL MINE SAFETY AND HEALTH | |

| 19. Employee Review - This is an accurate description of the major duties and responsibilities of my position | Signature of Employee *(optional)* |
|---|---|

20. **Supervisory Certification.** *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the* knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statement may constitute violations of such statutes or their implementing reg- ulations.

| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* |
|---|---|
| David G. Dye, Acting Asst Sec for Mine Safety & Health | |
| Signature *David G. Dye*  Date 9/26/06 | Signature  Date |

21. **Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with stan- dards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with most applicable published standards*

22. Position Classification Standards Used in Classifying/Grading Position

| a. Typed Name and Title of Official Taking Action | |
|---|---|
| Daliza Salas, Director of Human Resources | Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Infor- mation on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management. |
| Signature *Daliza Salas*  Date 10-4-06 | |

| 23. Position | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks

25. Description of Major Duties and Responsibilities (See Attached)

| NSN 7540-00-634-4265 | Previous Edition Usable | 5008-106 | OF 8 (Rev. 1-85) U.S. Office of Personnel Management FPM Chapter 295 |
|---|---|---|---|

Confidential Agency Document
DLB-000634                MSHA-3ECAMERON-0006

E50125

## POSITION DESCRIPTION *(Please Read Instructions on the Back)*

| | | 1. Agency Position No. |
|---|---|---|
| | | DLES-0-125 |

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. CSC Certification No. |
|---|---|---|---|---|
| ☐ Redescription  ☒ New | ☒ Dept'l  ☐ Field | Arlington, VA. | Arlington, VA | |
| ☐ Reestablishment  ☐ Other | 7. Fair Labor Standards Act | 8. Employment/Financial Stmt Required | 9. Subject to IA Action |

Explanation *(Show any positions replaced)*

**Recertification. There have been no significant changes to position since last certified, August 27, 1986**

| 7. Fair Labor Standards Act | 8. Employment/Financial Stmt Required | 9. Subject to IA Action |
|---|---|---|
| ☒ Exempt  ☐ Nonexempt | ☐ Yes  ☒ No | ☐ Yes  ☒ No |
| 10. Position Status | 11. Position is | 12. Sensitivity | 13. Competitive Level Code |
| ☐ Competitive | ☒ Supervy | ☒ Critical | N/A |
| ☐ Excepted *(Specify)* 25 4/15/52 | ☐ Managerial | ☐ Noncritical | 14. Agency Use |
| SES GENERAL | ☐ Neither | ☐ Nonsensitive | 8888 |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Civil Service Commission | | | | | | |
| b. Department, Agency, or Establishment | ADMINISTRATOR FOR COAL MINE SAFETY AND HEALTH | ES | 0880 1822 | SES | ADL | 3/8/91 |
| c. Bureau | | | | | | |
| d. Field Office | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

16. Organizational Title of Position *(if different from official title)*    17. Name of Employee *(if vacancy, specify)*

18. Department, Agency, or Establishment

a. First Subdivision  **U.S. Department of Labor**    c. Third Subdivision

b. Second Subdivision  **Mine Safety and Health Administration**    d. Fourth Subdivision

**Coal Mine Safety and Health**    e. Fifth Subdivision  W020000000

19. Employee Review. *This is an accurate description of the major duties and responsibilities of my position.*    Signature of Employee *(optional)*

20. Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.*

a. Typed Name and Title of Immediate Supervisor  **William J. Tattersall  Assistant Secretary for Mine Safety & Health**
Signature  Date 3/5/91

b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)*

21. Classification/Job-Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U. S. Code, in conformance with standards published by the Civil Service Commission or, if no published standards apply directly, consistently with the most applicable published standards.*

Typed Name and Title of Official Taking Action  **Larry K. Goodwin  Director of Personnel Management**
Signature  Date 3-16-91

22. Standards Used in Classifying/Grading Position

*Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the Civil Service Commission. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the Commission.*

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | DD | 9/21/06 | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks

**OPF COPY**

25. Description of Major Duties and Responsibilities *(see attached)*

5008-105    GPO : 1977 O − 241-530 (3051)    Optional Form B (Revised 8-77)  U.S. Civil Service Commission, FPM Chap. 295

Confidential Agency Document
DLB-000635    MSHA-3ECAMERON-0007

## ADMINISTRATOR FOR COAL MINE SAFETY AND HEALTH

### INTRODUCTION

The position of Administrator for Coal Mine Safety and Health is located in the Mine Safety and Health Administration (MSHA), Department of Labor, established under the Federal Mine Safety and Health Act of 1977.  The incumbent exercises management control and direction of all programs authorized by the Federal Mine Safety and Health Act of 1977, P. L. 95-164, to ensure the safety and health of the nation's coal miners.

MSHA program activities function under a vertical and direct line of control; that is, Administrators and Directors exercise, for their respective program areas, staff and line responsibilities for National Office and Field activities.  The Administrator for Coal Mine Safety and Health is responsible for 64 National Office employees and 1,411 field employees, for a total of 1,475 employees in a variety of professional, technical, and clerical support occupations.

Field operations are carried out by ten District Offices, 17 Subdistrict Offices, and 62 Field Offices.  Budget estimates for FY 1991 are approximately $76,434,000.

Coal mining operations are conducted in 26 states.  Safety and health violations and inspection procedures may vary significantly from mine to mine, State to State, and region to region, influenced by a variety of factors indigenous to a mine's geographic location, such as geological and physical features of a mine,  the size and diversity of experienced miner populations, and the state of the economy.  These differences result in a variety of "cause and effect" violations and in an infinite variety of enforcement problems with a corresponding impact on the scope and complexity of responsibility in administering the coal mine safety and health program.

### DUTIES AND RESPONSIBILITIES

Serves as the principal advisor to the Assistant Secretary on matters and policies pertaining to the inspection of the Nation's coal mines, mine conditions and practices, and accident and injury prevention.

Provides managerial direction and leadership in the administration of nationwide coal mine safety and health inspection and assistance programs through a system of District, Subdistrict, and Field Offices located in coal-producing states.

Confidential Agency Document
DLB-000636          MSHA-3ECAMERON-0008

Formulates and coordinates basic policies, programs, and regulations concerning safety and health in the coal mining industry.

Coordinates the development of new or revised mine safety and health standards for application to coal mines, and criteria and methods for ensuring compliance with coal mine safety and health standards.

Ensures that a minimum of four mandatory inspections are conducted annually at all underground mines and two inspections are conducted annually at all surface mines, as required by P. L. 95-164, and that hazardous mines are inspected at frequencies stipulated in the law. There are 1,969 underground mines and 2,676 surface coal mines, which, under the provisions of the Act, require a total of approximately 18,213 inspections per year. The total number of inspections, including intensive inspections, spot inspections, and other investigations amount to over 57,000 events annually.

Exercises decision-making authority within the parameters of Department of Labor and MSHA policy, program objectives, and delegations. Initiates or approves/disapproves recommendations for new or revised policy directives, inspection and enforcement guidelines, and all related matters involving the internal programs and operations where unprecedented policy considerations or political implications are not involved.

Participates and collaborates in the planning and coordination of long-range programs with other MSHA Directors and Administrators and the Associate Solicitor of Labor for Mine Safety and Health. Provides programming input and advice in terms of coal mining expertise, interprets implications of inspection findings and enforcement actions, and makes recommendations as appropriate.

Maintains extensive liaison with key officials in the Bureau of Mines, State and local governments, mine industries, professional associations, energy, ecology, conservation and other consumer-oriented groups, national and international safety and health organizations, and unions for exchange of information, and to promote compliance with legal and regulator safety and health coal mining requirements. As designated, serves as a member of inter-agency and ad hoc committees.

Performs the full range of managerial responsibilities.

SUPERVISORY CONTROLS

Work is performed under the direction of the Assistant Secretary, MSHA, who advises on policy and program objectives and who defines areas for which decision-making authority is delegated.

Confidential Agency Document
DLB-000637                    MSHA-3ECAMERON-0009

**OTHER SIGNIFICANT FACTS**

The position requires the ability to exercise managerial responsibilities over a nationwide multi-dimensional mine safety and health program.  This requires a professional knowledge of mining engineering with emphasis on mine safety and health; OR a professional knowledge of coal mining gained through extensive practical experience or education or the equivalent; a knowledge of safety engineering, safety management and/or industrial health; and a knowledge of the Federal Mine Safety and Health Act of 1977 with applicable implementing regulations.

Confidential Agency Document
DLB-000638                    MSHA-3ECAMERON-0010

**POSITION DESCRIPTION** *(Please Read Instructions on the Back)*

| | | 1. Agency Position No. DLES0504 |
|---|---|---|

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|
| ☐ Redescription  ☐ New | ☒ Hdqtrs  ☐ Field | Arlington, VA | Arlington, VA | |
| ☐ Reestablishment  ☐ Other | | | | |
| Explanation *(Show any positions replaced)* | **7. Fair Labor Standards Act** ☒ Exempt  ☐ Nonexempt | **8. Financial Statements Required** ☒ Executive Personnel Financial Disclosure  ☐ Employment and Financial Interest | **9. Subject to IA Action** ☐ Yes  ☐ No | |

| 10. Position Status | 11. Position Is | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| ☐ Competitive | ☐ Supervisory | ☐ 1–Non-Sensitive  ☒ 3–Critical | |
| ☐ Excepted *(Specify in Remarks)* | ☒ Managerial | ☐ 2–Noncritical Sensitive  ☐ 4–Special Sensitive | **14. Agency Use** |
| ☒ SES (Gen.) SES (CR) | ☐ Neither | | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Office of Personnel Management | Deputy Administrator for Coal Mine Safety & Health | ES | 0340 | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

| 16. Organizational Title of Position *(if different from official title)* | 17. Name of Employee *(if vacant, specify)* |
|---|---|

| 18. Department, Agency, or Establishment Mine Safety and Health Administration | c. Third Subdivision |
|---|---|
| a. First Subdivision Coal Mine Safety and Health | d. Fourth Subdivision |
| b. Second Subdivision | e. Fifth Subdivision |

| 19. Employee Review-This is an accurate description of the major duties and responsibilities of my position. | Signature of Employee *(optional)* |
|---|---|

| 20. Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that* | *this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.* |
|---|---|
| a. Typed Name and Title of Immediate Supervisor **Kevin G. Stricklin, Administrator for CMS&H** | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* **Hilda L. Solis, Secretary of Labor** |
| Signature *[signature]* Date 07/26/2010 | Signature *[signature]* Date 8-2-10 |

| 21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.* | 22. Position Classification Standards Used in Classifying/Grading Position |
|---|---|
| Typed Name and Title of Official Taking Action **Suzy M. Barker, Director, Human Resources** | |
| Signature *[signature]* Date 8/4/2010 | Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management. |

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |
| 24. Remarks | | | | | | | | | | |

| 25. Description of Major Duties and Responsibilities *(See Attached)* |
|---|

| NSN 7540-00-634-4265 | Previous Edition Usable | 5008-106 | OF 8 (Rev. 1-85) U.S. Office of Personnel Management FPM Chapter 295 |
|---|---|---|---|

Confidential Agency Document
DLB-000639                    MSHA-3ECAMERON-0011

## DEPUTY ADMINISTRATOR
## FOR COAL MINE SAFETY AND HEALTH

### Introduction

The position of Deputy Administrator for Coal Mine Safety and Health is located in Coal Mine Safety and Health, Mine Safety and Health Administration (MSHA), Department of Labor (DOL). The incumbent participates with the Administrator for Coal Mine Safety and Health in providing leadership and direction in the planning, development, execution and administration of policies and programs designed to prevent injury, disease, and death from mining in the coal mining industry.

The Mine Safety and Health Administration (MSHA) administers Federal mine safety and health laws by reducing hazardous exposures through enforcing compliance with mandatory safety and health standards; promoting effective training; encouraging adoption of new technologies and improved work practices; and, through its leadership, engaging with stakeholders in order to promote improved safety and health conditions. To carry out this responsibility, MSHA is organized into eight major activities: Coal Mine Safety and Health; Metal and Nonmetal Mine Safety and Health; Educational Policy and Development; Technical Support; Assessments; Standards, Regulations, and Variances; Program Evaluation and Information Resources; and Administration and Management. Approximately 2400 employees comprise MSHA's permanent staff, the majority of which are professional engineers, scientists, mine inspectors and related technical staff.

All MSHA program activities function under a vertical and direct line of control; that is, executive managers exercise, for their respective program areas, staff and line responsibilities for national office and field employees. This position has full line management authority over 11 District Managers and all National Office Coal components (which include the Management Office; Accident Investigation/Accident Prevention; and the Divisions of Safety and Health.) Coal Mine Safety and Health consists of National Office and field employees engaged in a variety of managerial, professional, technical, and administrative support occupations.

The National Office is the principal advisory and policy guidance and development resource for the Assistant Secretary on matters and policies pertaining to: the administration of nationwide coal mine safety and health inspection and assistance programs; analysis of coal mine safety and health conditions and practices; accident and injury prevention; formulation of regulations concerning safety and health in the coal industry; development of criteria and methods for ensuring regulatory compliance; and analysis of records, statistics, and reports to determine conditions and events that demand immediate attention.

Field operations are carried out by 11 district offices and 44 field offices/duty stations. Coal mining operations are located in 26 states, in which a minimum of four regular inspections are required per year for each underground mine and two regular inspections are required per year for each surface mine. Violations and inspection and investigation procedures may vary significantly from mine to mine, state to state, region to region, influenced by a variety of factors indigenous to a mine's geographic location, such as geological and physical features of a mine, the size and diversity of experienced miner populations, and the state of the economy. These differences result in a variety of "cause and effect" violations and in an infinite variety of enforcement problems with a corresponding impact on the scope and complexity of administering coal mine safety and health enforcement, and technical compliance and investigation programs.

### Duties and Responsibilities

Exercises program responsibility for the planning, coordination and direction of all coal mine safety and health activities. The Deputy Administrator:

– provides high-level managerial direction and leadership in the administration of nationwide coal mine safety and health inspection, investigation and assistance programs through a system of district and field offices.
– oversees nationwide safety and health enforcement programs in the coal mining industry. Formulates policies and procedures to ensure proper and consistent nationwide policy implementation. Ensures that new or revised mine safety and health standards for coal mine operations, and criteria and methods for ensuring compliance with coal mine safety and health standards are properly and uniformly applied by all districts and field offices. Evaluates the results of policy implementation in the field to ensure that desired objectives are achieved.
– ensures that mandatory inspections and investigations are conducted annually at all underground and surface mines, as mandated by the Federal Mine Safety and Health Act of 1977 and that hazardous mines are inspected at frequencies stipulated in the law. There are approximately 550 underground and 1,400 surface coal mines, which, under the provisions of the Mine Act, require over 5,200 inspections every year. The total number of mandated inspections and other related inspections and investigations amount to more than 18,000 events annually.
– exercises decision-making authority within the parameters of DOL and MSHA policy, program objectives, and delegations. Initiates or approves/disapproves recommendations for new or revised field directives, inspection and enforcement procedures, policies, or guidelines.

Through Headquarters supervisors and two supervisory echelons (district and field office) in the field, the Deputy Administrator directs the activities of Headquarters, District and field office employees who:

— develop and recommend safety and health criteria, standards and procedures to be used in inspection and enforcement activities;

— formulate and develop inspection and enforcement programs, policy guidelines, and procedures for monitoring and evaluating safety and health mine performance and for preparing analytical and quantitative mine performance evaluation reports;

— develop criteria, minimum standards, and policies and procedures to be implemented by mine operators in establishing training programs for new miners, newly hired experienced miners, miners not task trained, and annual refresher training for all miners;

— conduct annually, as required by law, the minimum number of mandatory inspections in all coal mines and inspect the more hazardous mines with increased frequencies as stipulated by law.

Within the parameters of DOL/MSHA policy and program objectives, the Deputy Administrator exercises developmental and decision-making authority for new or revised policy or procedure directives, inspection and enforcement guidelines, and all matters involving internal program plans and operations that may involve precedent setting policy or political implications.

Maintains extensive liaison with DOL and MSHA top staff, as well as with key officials in the Bureau of Land Management, Occupational Safety and Health Administration, National Institute for Occupational Safety and Health, the Bureau of Alcohol, Tobacco and Firearms, State and local governments, mine industry and professional contacts and associations, energy, ecology, conservation and other consumer-oriented groups, national and international safety and health organizations, and unions to exchange information and promote compliance with legal and regulatory coal mining requirements.  As designated, serves as a member of inter-agency and ad hoc committees.  Serves as the highest-level advisor to the Administrator for Coal Mine Safety and Health in the planning and coordination of long-range programs with other key MSHA officials and the Associate Solicitor for Mine and Safety and Health, and when necessary, key officials in DOL, Departments of Health and Human Services, Interior, and Energy.  Provides program input and advice in terms of coal mining expertise, and interprets implications of inspection findings and enforcement actions, and makes recommendations as appropriate.

Conducts conferences and meetings with Headquarters and field subordinate supervisors and staff members with expertise in specific subject-matter area or on other related matters for exchange of information, ideas and recommendations regarding mine performance evaluations and over-all evaluation of the effectiveness of the coal mine safety and health program. Approves, disapproves, or takes under advisement action recommendations and, as appropriate, utilizes input from staff for use at higher level program and policy planning meetings.

Confidential Agency Document
DLB-000642                    MSHA-3ECAMERON-0014

Performs the full range of managerial responsibilities.

## Supervisory Controls

Work is performed under the direction of the Administrator for Coal Mine Safety and Health, who advises on policy and program objectives and who defines areas for which decision-making authority is delegated.

## Other Significant Facts

Must have expert ability in exercising managerial responsibilities in as much as managerial skills are paramount to effective program planning coordination and direction. Because of intense Congressional interest regarding coal mine safety and health issues, the incumbent must apply intimate knowledge of DOL policies and in depth understanding and insights to objectives of MSHA to ensure that all Congressional correspondence and inquiries are responded to fully and expeditiously.

The Deputy Administrator will, therefore, have to exercise considerable ingenuity through planning and employing administrative and management devices to maximize manpower utilization, to maximize the dollar value of expenditures, motivate staff to increase efficiency and effectiveness in program accomplishments, and in promoting cooperation of State and local governments to legislate and establish their own mine safety and health programs to implement the overall safety and health criteria and program objectives. Must have exceptional skill in "meet and deal" relationships with officials at the highest levels and all levels of government. Additionally, must apply intimate knowledge of DOL policies and policy objectives, keen understanding and insights to objectives of the coal mine safety and health program, and its significance to energy requirements and to the nation's economy.

## EEO

Incumbent is responsible for insuring equal opportunities for all employees under his/her supervision in the selection of employees for training, promotions, awards and recognition, and other career development opportunities. The manager will also ensure fair and unprejudiced employment practices in the recruitment and selection of candidates for appointments to positions under his/her supervision. Incumbent supports programs relating to the training and the advancement of employees. He/She is responsible for actively supporting the Equal Opportunity Program in day-to-day activities and will be evaluated on his/her performance in this area on a regular basis.

## Safety

Confidential Agency Document
DLB-000643

MSHA-3ECAMERON-0015

Incumbent is responsible for the on-the-job safety and health of all employees under his/her jurisdiction. Incumbent initiates efforts conforming to established local and MSHA safety and health programs to satisfy this responsibility. Responsibilities include identifying and correcting job safety and health hazards, instructing employees on safety requirements for job assignments, reviewing and reporting loss incidents in accordance with regulations, initiating corrective measures for violations of the Occupational Safety and Health Act standards, and directing the periodic inspection of all workplaces.

## LMR

Incumbent is responsible for being knowledgeable about management's role and responsibilities in labor management relations, especially pertaining to DOL employee organizations. Where a local agreement is in effect, incumbent is responsible for becoming completely familiar with the terms of the Agreement.

## Work Environment

The work is primarily performed in an office setting; however, incumbent will be required to travel to field offices and mine sites. Mine sites can be dark, wet, cramped, and expose the incumbent to gases, fumes, gas explosions, fires, excessive noise and dust, and roof falls.

## Physical Demands

During mine visits, the incumbent may be required to carry heavy equipment. In addition, walking or climbing over rough and uneven surfaces, crouching, stooping, and similar activities may be required. Incumbent must be physically able to perform arduous duties efficiently and without hazard to themselves or others. Position requires pre- and post-employment drug testing and medical examinations. Medical examination is required for all applicants for positions that involve regular or intermittent performance of inspection, investigation, rescue duties, or duties involving on-site mine visits.

Confidential Agency Document
DLB-000644                    MSHA-3ECAMERON-0016

**POSITION DESCRIPTION** *(Please Read Instructions on the Back)*

| | | | | | 1. Agency Position No. 1242 |
|---|---|---|---|---|---|
| | | | | | 6. OPM Certification No. |

P 00 32 7

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station |
|---|---|---|---|
| ☐ Redescription ☐ New ☐ Reestablishment ☐ Other | ☐ Hdqrs. ☒ Field | Philadelphia, PA | Norton, VA |

| 7. Fair Labor Standards Act | 8. Financial Statements Required | 9. Subject to IA Action |
|---|---|---|
| ☒ Exempt ☐ Nonexempt | ☐ Executive Personnel Financial Disclosure ☐ Employment and Financial Interests | ☐ Yes ☐ No |

Explanation *(Show any positions replaced)*

REASSIGNMENT

| 10. Position Status | 11. Position is: | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| ☒ Competitive | ☐ Supervisory | ☒ 1—Non-Sensitive ☐ 3—Critical Sensitive | GS-1822-13 |
| ☐ Excepted *(Specify in Remarks)* | ☐ Managerial | ☐ 2—Noncritical Sensitive ☐ 4—Special Sensitive | 14. Agency Use |
| ☐ SES (Gen.) ☐ SES (CR) | ☐ Neither | | A |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | Supervisory | | | | | |
| e. Recommended by Supervisor or Initiating Office | Supervisory MS $ H Specialist | GS | 1822 | 13 | | |

| 16. Organizational Title of Position *(if different from official title)* | 17. Name of Employee *(if vacant, specify)* |
|---|---|
| | HARDING, BENJAMIN S. |

| 18. Department, Agency, or Establishment | c. Third Subdivision |
|---|---|
| U. S. Department of Labor | Norton, VA District Office    District 5 |
| a. First Subdivision | d. Fourth Subdivision |
| Mine Safety and Health Administration | Special Investigations Branch — 1930 |
| b. Second Subdivision | e. Fifth Subdivision |
| Coal Mine Safety and Health | Norton, Virginia |

Signature of Employee *(optional)*

19. Employee Review—This is an accurate description of the major duties and responsibilities of my position.

| 20. Supervisory Certification. I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the | knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations. |
|---|---|
| a. Typed Name and Title of Immediate Supervisor Edward R. Morgan District Manager | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* |
| Signature *(signed)* | Date 5-17-04 | Signature | Date |

| 21. Classification/Job Grading Certification. I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards. | 22. Position Classification Standards Used in Classifying/Grading Position |
|---|---|
| Typed Name and Title of Official Taking Action PAT FUSKO  H. L. Spec | |
| Signature *(signed)* | Date 5/24/04 | Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management. |

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks

C-5-04-331 / 00011047

25 Description of Major Duties and Responsibilities *(See Attached)*

NSN 7540-00-634-4265        Previous Edition Usable        5008-106

OF 8  (Rev 1-85)
U.S. Office of Personnel Management
FPM Chapter 295

Confidential Agency Document
DLB-000645        MSHA-3ECAMERON-0017

Mine Safety and Health Administration
Coal Mine Safety and Health

Supervisory Mine Safety and Health Specialist
GM-1822-13 (Special Investigations)

## MAJOR DUTIES

The incumbent is responsible for managing and directing the district's investigation function through a staff of special investigators, complaint processors, accident investigators, and clerical support positions. The work includes programs and activities involved with the enforcement of Sections 101(a), 103, 105(c), and 110 of the Federal Coal Mine Safety and Health Act of 1977, investigating and recommending appropriate action to be taken on discrimination complaints and possible civil and/or criminal violations, and coordinating implementation of policy changes mandated by the Federal Mine Health and Safety Review Commission is maintained between the district office and headquarters and other Coal Mine Safety and Health (CMS&H) and Mine Safety and Health Administration (MSHA) organizations.

Implements and recommends policies and procedures designed to carry out a program of accident investigation, and special investigation for the district office. Manages the planning and implementation, direction, coordination and evaluation of these investigation activities in the district. The incumbent is authorized by and responsible to the District Manager, to take charge and give instructions, guidance, and orders that are appropriate for the particular situation. Maintains close liaison with the headquarters staff in the Office of Investigations. Cooperates with other MSHA organizations engaged in the investigations area, i.e., Office of Assessments and Regional Solicitor's office.

Represents and speaks for the District Manager in contacts with the Office of Investigations, and officials of the Department of Justice, Department of Labor, Office of the Solicitor, State Governments, the mining industry and labor unions concerning CMS&H policies and procedures and the resolution of any conflicts which arise in their application and interpretation. On occasion may act as the District Manager in his absence.

Responsible for developing and coordinating the district's technical position responses to congressional inquiries and in dealings with the Regional Solicitor, and the Department of Justice regarding controversial actions involving potential civil and/or criminal litigations.

Provides advisory and monitoring services to the Assistant District Manager and/or District Manager when preliminary or permanent injunctive orders are requested.

Directs a staff of professional and support personnel. Has normally accepted supervisory responsibilities in the areas of staff selection; assignment and review of work; performance evaluation; and promotion, reassignment, discipline and training of staff members and is consulted by the supervisor of those indirectly supervised in these areas. Incumbent directly supervises each employee in all activities when they are assigned to special and accident investigation projects which cover periods ranging from 2 to 45 days. In addition, coordinates with other organizations within MSHA and CMS&H regarding changes in operations which might impact upon those organizations and advises the District Manager on problems of interaction between the office and other MSHA offices, such as the Office of Assessments and Metal and Nonmetal Mine Safety and Health.

Responsible for workload distribution and work assignments under his jurisdiction and review of investigative case files. Gives advise, counsel and assistance to subordinates on investigative procedures and techniques used for civil or criminal cases.

<u>EEO</u>

As a supervisor, incumbent is responsible for insuring equal opportunity for all employees under his supervision in the selection of employees for training, promotion, awards, and recognition, and other career development opportunities. The incumbent also insures fair and unprejudiced employment practices in the recruitment and selection of candidates for appointments to positions under his supervision. The incumbent is responsible for supporting programs relating to the training and the advancement of employees in "dead-end" positions. The incumbent is responsible for actively supporting the Equal Opportunity Program in day-to-day activities and is evaluated on his performance in this area on a regular basis.

<u>LMR</u>

Regardless of the status of local employee organizations, supervisor is responsible for being knowledgeable about management's role and responsibilities in labor management relations. Where a local agreement is in effect, is responsible for becoming completely familiar with the terms of the agreement.

<u>SAFETY</u>

As a supervisor, incumbent is responsible for the on-the-job safety and health of all employees under his jurisdiction. Initiates efforts conforming to established local and MSHA Safety Programs to satisfy this responsibility. Responsibilities include identifying and correcting job safety and health hazards; instructing employees on safety requirements for job assignments; reviewing and reporting loss incidents, in accordance

with MSHA and Office of Employees' Compensation regulations; initiating corrective measures for violations of the Occupational Safety and Health Act Standards, and directing the periodic inspection of all work places.

## 1. KNOWLEDGE REQUIRED BY THE POSITION

The incumbent must have a thorough knowledge of the enforcement activities required under the Federal Mine Safety and Health Act of 1977.

Knowledge of mining and civil/criminal investigative procedures gained through extensive practical experience and training.

A thorough knowledge of Mine Safety and Health and other organizations in MSHA, as well as individual programs and policies.

Must possess managerial and supervisory knowledge in order to effectively manage a complex office and motivate individuals to effectively and equitably enforce coal mine safety and health regulations.

## 2. SUPERVISORY CONTROL

Performs under the direction of the District Manager, operating within the framework of prescribed Agency and Departmental policies and guidelines. Exercises independence in planning, scheduling and carrying out district investigative responsibilities. Results of incumbent's performance are reviewed for adherence to Agency policies and for assurance that program objectives are fulfilled.

## 3. GUIDELINES

Incumbent is guided by Federal, Departmental, MSHA, and CMS&H policies, guidelines, procedures and regulations. In many instances, guidelines may allow for a great degree of latitude in interpretation and implementation.

## 4. COMPLEXITY

Assignments involve a wide range of unusually controversial and complex investigative activities associated with civil and/or criminal violations of P.L. 95-164 and other special investigations as required under Title I, Section 110 of the Act.

Provides advice, guidance, and assistance for the district, headquarters office as well as the field offices, and recommends policy direction to the District Manager.

## 5. SCOPE AND EFFECT

Actions taken by the incumbent can have far-reaching financial and legal effect on companies and employees of the coal mining industry.

Investigations of possible violations of the Act may result in criminal or civil action being taken against the coal companies and/or parties thereof by the Department of Justice or Labor, resulting in fines, probation or prison terms.

Discrimination complaint investigations may result in MSHA's requiring a coal company to hire or reinstate an employee if sufficient evidence warrants such action. The investigation may also result in requiring the company to pay additional salaries to an employee, when salaries have been withheld. Investigations have an impact on the mandatory standard(s), which the operator proposes to modify in order to achieve a greater degree of safety.

## 6. PERSONAL CONTACTS

The incumbent interacts with corporate officials and high level managers and attorneys across a wide spectrum of the public sector and Federal Government including: Department of Labor, Department of Justice, the Federal Mine Safety and Health Review Commission, State agencies, the mining industry, and labor organizations.

Represents the Agency in special investigations of mine operations and procedures which may involve sensitive issues, such as is the case with investigations regarding possible criminal violations. In many cases, there are issues for which there are no clear-cut answers. The data may be dubious, situations atypical, etc., the incumbent's persuasiveness and recognized expertise are brought to bear in resolving controversies and/or presenting the facts as they appear. Operators are often trying to minimize expenditures of time and money, so the incumbent must convince them of the importance of safety precautions which may be costly.

## 7. PURPOSE OF CONTACTS

The purpose of these contacts is to represent the District Manager and/or the agency to justify, defend, negotiate or settle matters involving significant investigative issues impacting on CMS&H. It requires that the incumbent participate in conferences, meetings, or hearings on these issues.

## 8. PHYSICAL DEMANDS

Frequent travel to mine sites is necessary, requiring that the incumbent be physically capable of performing arduous duties of this position without hazard to himself or fellow employees, and be capable of sustained physical exertion for six to eight hours under hazardous conditions.

## 9. WORK ENVIRONMENT

Work underground may be in close confinement, in and out of small spaces, where dampness and low water areas are expected. Crawling on hands and knees is common practice. Climbing ladders without convenient rest stations is a possibility. On occasion, may operate with little light and be frequently exposed to dusts, gases and fumes.

POSITION DESCRIPTION *(Please Read Instructions on the Back)* C-01-4-46  SL0011

| 1. Agency Position No. |
|---|
| CBP11401 |

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|
| [X] Redescription  [ ] New  [ ] Reestablishment  [ ] Other | [ ] Hdqtrs. [X] Field | Philadelphia,PA | Mount Hope, WV | |

Explanation *(Show any positions replaced)*

Replaces VC91012001, GM-1822-14

| 7. Fair Labor Standards Act | 8. Financial Statements Required | 9. Subject to IA Action |
|---|---|---|
| [X] Exempt  [ ] Nonexempt | [ ] Executive Personal Financial Disclosure  [ ] Employment and Financial Interests | [X] Yes  [ ] No |

| 10. Position Status | 11. Position is: | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| [X] Competitive  [ ] Excepted *(Specify in Remarks)*  [ ] SES (Gen.)  [ ] SES (CR) | [2] Supervisory  [ ] Managerial  [ ] Neither | [X] 1—Non-Sensitive  [ ] 3—Critical Sensitive  [ ] 2—Noncritical Sensitive  [ ] 4—Special Sensitive | GM-1822.30.01-14 |

| | | | | | | 14. Agency Use |
| A |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | Supervisory Coal Mine Safety & Health Inspector | GM | 1822 | 14 | *(initials)* | 5/22/95 |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

| 16. Organizational Title of Position *(If different from official title)* | 17. Name of Employee *(if vacant, specify)* |
|---|---|
| Assistant District Manager | Lincoln L Selfe Jr. |

| 18. Department, Agency, or Establishment | c. Third Subdivision |
|---|---|
| Department of Labor | District 4  Inspection Division |
| **a. First Subdivision** | **d. Fourth Subdivision** |
| Mine Safety & Health Administration | Mount Hope, West Virginia |
| **b. Second Subdivision** | **e. Fifth Subdivision** |
| Coal Mine Safety & Health | |

19. Employee Review—This is an accurate description of the major duties and responsibilites of my position.

Signature of Employee *(optional)*

20. Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the* knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* |
|---|---|
| Michael J. Lawless  District Manager | Robert A. Elam  Deputy Administrator for CMS&H |
| Signature *(signature)* | Date 4/6/95 | Signature *(signature)* | Date 4/19/95 |

21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

22. Position Classification Standards Used in Classifying/Grading Position

Typed Name and Title of Official Taking Action

R. B. KNIGHT
Position Classification Specialist

Signature *(signature)* NB Knight   Date 5/22/95

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks

VC95177001

Confidential Agency Document
DLB-000651        MSHA-3ECAMERON-0023

25. Description of Major Duties and Responsibilities

NSN 7540-00-634-4265        Previous Edition Usable

Supervisory Mine Safety and Health Inspector
(Assistant District Manager for Inspection Programs)
GM-1822-14

Introduction

This position is located in a Coal Mine Safety and Health (CMS&H)
District organization.  The incumbent of this position serves as
an Assistant District Manager exercising administrative and
technical responsibility for the management and oversight of
inspection activities throughout the district as required by the
Federal Mine Safety and Health Act of 1977 (P.L. 95-164) (Mine
Act).  The inspection program consists of inspection activities
and accident investigations in the immediate offices of the
District and Assistant District Managers and the field offices.
The incumbent has staff and line  responsibilities over field
office supervisors who oversee the work of inspection personnel.

Major Duties and Responsibilities

1.   Directs the inspection program throughout the District and
     ensures that all safety and health inspections and accident
     investigations are carried out according to the Mine Act;
     ensures that deadlines are met and proper coordination is
     maintained between the Assistant District Manager's office
     and other organizations within the Agency.

2.   Reviews inspection program operations in the District;
     identifies and resolves problems or recommends to the
     District Manager adjustments to the inspection program;
     ensures district inspection activities are in compliance
     with Agency policies; consults with other District Managers
     and supervisors on work-related changes to enhance
     consistency in implementation of Agency policies,
     guidelines, and directives.

3.   Advises the District Manager and field personnel on a full
     range of health and safety activities, court and/or hearing
     proceedings, and technical and administrative matters;
     incumbent is subject to call at any time to offer testimony
     of fact at hearings and court proceedings on appeals
     presented under provisions of the Mine Act.

4.   Serves as Acting District Manager in the absence of the
     District Manager and directs all District activities.

5.   Acts as a consultant and advisor on mine health and safety
     activities to State mining, health, inspection and commerce
     officials; with mining industry officials; with management
     and labor officials; and with independent mine owners for
     the purpose of rendering expert advice and explaining the
     provisions of the Federal coal mining laws; represents the
     District Manager at technical meetings, conferences, and
     seminars.

6. Directs, coordinates and/or assists in on-site rescue and recovery operations following mine explosions, fires and other mine disasters.

7. Accompanies inspectors, engineers, and other employees, during their regular or special assignments in coal mines and related plants to assure the utmost work efficiency and quality, and makes personal examinations of underground and surface coal mining operations to keep fully informed on the latest technical developments in mining processes and equipment.

8. Serves as a member of various MSHA committees established to develop MSHA policy and guidelines regarding the inspection programs. As an acknowledged specialist on the inspection program and all aspects of coal mine operations, aids the committees in establishing reasonable technical requirements for implementation of the Mine Act; reviews proposed regulatory and programmatic changes; and provides advice on the probable impact of changes on the inspection program and recommends adjustments.

9. Directly or indirectly supervises a large staff of professional, technical, and support personnel located throughout the District; selects or recommends the selection of subordinate staff; makes decisions on work problems presented by subordinate supervisors; evaluates performance or reviews evaluations made by subordinate supervisors; reviews or resolves serious complaints or disciplinary cases.

EEO: As a supervisor, incumbent is responsible for ensuring equal opportunity for all employees supervised by identifying areas where meaningful steps toward equal opportunity are necessary in all facets of personnel management. In the selection of employees for training, promotion, awards, and recognition, and other career development opportunities, is responsible for assisting every employee to develop skills so that the employee may attain a full utilization of talents. The supervisor also insures fair and unprejudiced employment practices in the recruitment and selection of candidates for appointments to positions and is responsible for initiating and supporting programs relating to the training and the advancement of employees in "dead-end" positions. Is responsible for actively supporting the Equal Opportunity Program in day-to-day activities and is evaluated on performance in this area on a regular basis.

LMR: Regardless of the status of local employee organizations, supervisor is responsible for being knowledgeable about management's role and responsibilities

2

Confidential Agency Document
DLB-000653          MSHA-3ECAMERON-0025

in labor management relations.  Where a local agreement is in effect, is responsible for becoming completely familiar with the terms of agreement.

<u>Safety</u>:  As a supervisor, incumbent is responsible for the on-the-job safety and health of all employees under the District's jurisdiction.  Initiates efforts conforming to established local and MSHA safety programs to satisfy this responsibility.  Responsibilities include identifying and correcting job safety and health hazards; instructing employees on safety requirements for job assignments; reviewing and reporting loss incidents, in accordance with MSHA and Office of Employees' Compensation regulations; initiating corrective measures for violations of the Occupational Safety and Health Act standards, and directing the periodic inspection of all work places.

<u>Factors</u>

1.   <u>Knowledge Required by the Position</u>

Comprehensive knowledge of coal mining or extensive practical experience in coal mining and health and safety practices and procedures.

Comprehensive knowledge of the enforcement activities required under the Federal Coal Mine Safety and Health laws, regulations, policies and procedures.

Managerial and supervisory knowledge in order to effectively manage a complex office and motivate individuals to effectively and equitably enforce CMS&H regulations.

Thorough knowledge of CMS&H and other MSHA organizations and their respective individual programs and policies.

Substantial skill in oral and written communications.

2.   <u>Supervisory Controls</u>

Performs under the direction of the District Manager for CMS&H, operating within the framework of prescribed Agency and departmental policies and guidelines.  Exercises independence in planning and scheduling District inspection operations.  Results of incumbent's work are evaluated in terms of effectiveness of programs; adherence to Agency policies and achievement of program objectives.

3

Confidential Agency Document

3.  Guidelines

    Incumbent is guided by the Mine Safety and Health Act of
    1977 and other Federal, departmental, MSHA and CMS&H
    policies, procedures, directives, and administrative and
    technical guidelines in the field of management and
    administration.  Where guidance is vague or unclear
    incumbent has substantial latitude for interpreting and
    applying policies, guidelines, procedures, etc.

4.  Complexity

    The incumbent must apply knowledge, experience, and seasoned
    judgement in planning and coordinating various safety and
    health programs and enforcing a wide range of safety and
    health standards which are continually being issued, revised
    and amended.  Enforcement of these standards often leads to
    controversial and complex actions which have to be
    negotiated in a sensitive manner.

5.  Scope and Effect

    The responsibilities of this position encompass the
    enforcement of all coal mine safety and health standards and
    regulations in a uniform and equitable manner, which
    contributes to the overall effectiveness of the CMS&H
    organization and enhances the mission of MSHA.

    The enforcement responsibilities and the sanctions imposed
    by the incumbent are of economic, social, and frequently
    political in nature, and the incumbent must effectively deal
    with grieved parties while protecting and promoting, as
    their paramount responsibility, the health, safety and
    welfare of the thousands of workers employed in the
    industry.  The incumbent, as a representative of the
    Secretary, has the responsibility and authority to cease the
    operation of a mine if the incumbent detects a violation of
    regulations felt sufficiently severe to endanger the health
    and safety of miners.  Decisions may adversely affect both
    the company and the employees in that the financial burden
    of compliance under certain circumstances could cause
    closure of the mine.

    According to the National Safety Council, underground coal
    mining is the most dangerous occupation in America based on
    accidental death and serious injury rates.  There is intense
    interest in mineral industry health and safety from the
    White House, the Congress, the Department of Labor, the
    mineral and allied industries, and the public.  Conse-
    quently, the mineral and allied industries and other similar
    positions have an effect on the work program of the Agency,

4

the Department and the Federal government, and must meet the
rigid requirements and high standards of a wide range of
interest and a very wide sector of the public.

6.   Personal Contacts

The incumbent interacts with corporate officials and high-
level managers across a wide spectrum of the public sector
and the Federal government including:  Department of Labor,
MSHA, CMS&H, other Federal agencies, State agencies, the
mining industry, labor organizations and the academic
community.

7.   Purpose of Contacts

Regularly meets with high-level officials for the purpose of
rendering expert advice and explaining the provisions of the
law.  Confers with employees of the district to execute the
administrative, technical and enforcement responsibilities
of the organization.

8.   Physical Demands

Works in a basically sedentary environment; however, may
travel to mine sites as necessary, requiring that the
incumbent be physically capable of performing arduous duties
of the position without hazard to himself/herself or fellow
employees, and be capable of sustained physical exertion and
high levels of pressure and stress.

9.   Work Environment

Works primarily in an office setting; however, trips to
mining operations are necessary.  Work underground may be in
close confinement, in and out of small spaces, where
dampness and low water areas are expected.  Crawling on
hands and knees is common practice.  Climbing ladders
without convenient rest stations is a possibility.  On
occasion, may operate with little light, and be frequently
exposed to dust, gases and fumes.

5

Confidential Agency Document

**POSITION DESCRIPTION** *(Please Read Instructions on the Back)*

| | 1. Agency Position No. 200499 |
|---|---|
| | 6. OPM Certification No. |

| 2. Reason for Submission | 3. Service | 4. Employing Office Location Arlington, VA | 5. Duty Station: Arlington, VA | 6. OPM Certification No. |
|---|---|---|---|---|
| ☐ Redescription ☑ New ☐ Hdqtrs ☑ Field | | | | |
| ☐ Reestablishment ☐ Other | 7. Fair Labor Standards Act ☐ Exempt ☑ Nonexempt | 8. Financial Statements Required ☐ Executive Personnel Financial Disclosure ☑ Employment and Financial Interest | | 9. Subject to IA Action ☐ Yes ☑ No |
| Explanation *(Show any positions replaced)* | 10. Position Status ☑ Competitive | 11. Position is ☐ Supervisory ☐ Managerial ☑ Neither | 12. Sensitivity ☐ 1—Non-Sensitive ☐ 3—Critical ☑ 2—Noncritical Sensitive ☐ 4—Special Sensitive | 13. Competitive Level Code |
| | ☐ Excepted *(Specify in Remarks)* ☐ SES (Gen.) ☐ SES (CR) | | | 14. Agency Use 8888 |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | Director, Office of Accountability | GS | 0301 | 15 | DM | 12/7/07 |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | Director, Office of Accountability | GS | 0301 | 15 | | |

16. Organizational Title of Position *(if different from official title)*

17. Name of Employee *(if vacant, specify)*

| 18. Department, Agency, or Establishment U.S. Department of Labor | c. Third Subdivision Office of Accountability |
|---|---|
| a. First Subdivision Mine Safety and Health Administration | d. Fourth Subdivision |
| b. Second Subdivision Office of the Assistant Secretary | e. Fifth Subdivision |
| | Signature of Employee *(optional)* |

19. Employee Review-This is an accurate description of the major duties and responsibilities of my position.

20. Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that* this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* |
|---|---|
| Director, Office of Accountability | |
| Signature *Richard E. Stickler*  Date 12/10/07 | Signature  Date |

21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

22. Position Classification Standards Used in Classifying/Grading Position
PCS 0301 (858 070 Jan 1979)
SBEG

Typed Name and Title of Official Taking Action
Resources Specialist

Signature  Date 12/7/07

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks
Position is at the full performance level.

25. Description of Major Duties and Responsibilities *(See Attached)*

NSN 7540-00-634-4265   Previous Edition Usable   5008-106
OF 8 (Rev. 1-85)
U.S. Office of Personnel Management
FPM Chapter 295

Confidential Agency Document
DLB-000657   MSHA-3ECAMERON-0029

DIRECTOR, OFFICE OF ACCOUNTABILITY (OA)
OFFICE OF THE ASSISTANT SECRETARY
MINE SAFETY AND HEALTH

INTRODUCTION:

The incumbent of this position serves as the Director of the Office of
Accountability (OA) in the Office of the Assistant Secretary.  OA provides
accountability oversight and examines MSHA's existing systems for identifying
potential weaknesses in and adherence to its policies, procedures and guidance
to identify actions that can be taken to ensure MSHA employees are following
applicable directives and identify mining operations at which MSHA is not
exerting appropriate levels of enforcement.

Accountability oversight includes examining required internal audits conducted
after major mining accidents, mandated evaluations of specific functions and
scheduled audits of major MSHA program areas.  Audit results are reported
directly to the Assistant Secretary and key management officials and include
comprehensive recommendations for improvements that include establishment
and/or modification of program objectives, policies, procedures, resource
allocations, as well as disciplinary and/or remedial actions.

DUTIES AND RESPONSIBILITIES:

Plans and directs comprehensive internal audits to ensure adherence to Federal
regulations and DOL and MSHA regulations policies and procedures.

Evaluates the effectiveness of internal controls and operating practices.

Determines compliance with policies and procedures; reports on deviations
uncovered, identified control weaknesses, and prescribes remedial action(s).

Develops modifications to existing programs.

Develops audit findings including recommendations for improvements in
policies, procedures, and methods.

Serves as principal advisor to the Assistant Secretary for MSHA regarding
accountability activities.  Directs the conduct of accountability reviews of audits
and reviews, mandated by MSHA policies and procedures, that may result in
recommendations that have a major impact on MSHA programs and policies.

Recommends actions that can be taken to address and resolve deficiencies wherever they exist.

Coordinates, on behalf of the Assistant Secretary, the implementation of recommended corrective actions.

Performs accountability reviews at the direction of the Assistant Secretary. The incumbent is frequently called upon at any time and may be required to perform this work within short deadlines. Incumbent is faced with constantly changing priorities and must redirect efforts of the staff accordingly.

Coordinates a variety of internal and external accountability reviews with minimal disruption to the programs and operations and keeps the Assistant Secretary informed at all times.

Supervises a staff of GS-14 Accountability Specialists. Hires new staff; schedules, assigns, and reviews work; approves leave; establishes performance requirements and evaluates performance; recommends promotions, reassignments or disciplinary action; and identifies and arranges needed training, as needed. The assigned staff is augmented by drawing on the professional staff of other MSHA program areas, as necessary.

KNOWLEDGE REQUIRED BY THE POSITION:

1. In-depth knowledge of the Federal Mine Safety and Health Act, MSHA regulations, major provisions of Federal, Departmental regulations, directives, and guidelines governing program operations.

2. Extensive knowledge and experience in conducting Coal Mine Safety and Health and Metal and Nonmetal Mine Safety and Health inspections.

3. Thorough knowledge of the provisions of P.L. 95-164 with special emphasis on the requirements of Title 1: miner's rights and entitlements; operator's petitions, citations and orders, pattern of violations, unwarrantable failure, employee discrimination, penalty assessments, judicial reviews and processes.

4. In-depth knowledge of MSHA's goals, mission, enforcement policies, and support activities and their interrelationships and functions.

5. Thorough knowledge of the concepts, principles, theories and practices of performing formal audits enabling the incumbent to serve as an expert in all areas of agency accountability.

6. In-depth knowledge of analytical research and theories, principles and techniques that are directly related to efficient and optimum accomplishments of MSHA's mission.

7. In-depth knowledge of the goals, mission and technical programs of MSHA and their relationship with other Departmental programs and activities.

8. Thorough knowledge of MSHA organization, enforcement policies and supportive activities and their interrelationships and functions.

9. In-depth knowledge of management practices and procedures with emphasis on DOL/MSHA regulation and policy directives.

GRADE EVALUATION FACTORS

FACTOR 1 – Program Scope and Effect

The incumbent manages the oversight and review of all MSHA accountability of programs which are ongoing in all states and territories of the United States. Enforcement of mine safety and health standards is the principal mandate and mission of MSHA, coming from P.L. 95-164 and the vast majority of MSHA employees are engaged in this work. Accountability studies conducted by the Office of Accountability have profound influence on the course of MSHA programs and operations, achievement of MSHA goals and objectives, MSHA policies affecting the mining industry nationwide, and the Secretary of Labor fulfilling his/her responsibilities as prescribed in P.L. 95-164

FACTOR 2 – Organizational Setting

The incumbent reports to the Assistant Secretary an Executive- level position appointed by the President with the advice and consent of by the U.S. Senate.

FACTOR 3 – Supervisory and Managerial Authority Exercised

The incumbent is responsible for making decisions on work problems presented by subordinate non-supervisory employees recommending selections for subordinate non-supervisory positions, and recommending awards and performance bonuses and changes in positions classification.

FACTOR 4 – Personal Contacts

Nature of Contacts:  The incumbent maintains extensive liaison with high-level management personnel in MSHA, the Department of Labor, other Federal and State agencies, the mining industry, labor organizations and members of Congress.  These contacts take place in conferences, meetings, briefings, speeches, and presentations.  Some reviews/reports may necessitate contact with staff of GAO, OMB, Congress, and of other Executive Branch Departments such as Energy or Interior.

Purpose of Contacts:  The incumbent maintains the contacts identified above in the regular course of managing, coordinating and reporting the accountability efforts.  Frequent contacts will be on subjects where substantial room exists for differing opinion, and perception of goals and objectives may conflict.  Substantial persuasion or persistence may be required to obtain information that may prove adverse to MSHA management.  Additionally, the incumbent may be required to explain and defend findings and to justify significant and controversial recommendations.

FACTOR 5 – Difficulty of Typical Work Directed

Principal guidelines are contained in the Mine Act and 30 CFR.  Additional guidelines are also found in OMB circulars, departmental issuance and laws affecting programs and activities of MSHA.  The incumbent operates within the broad scope and authority of the Office of the Assistant Secretary for the purpose of identifying possible agency deficiencies, providing oversight for internal audits, and performing follow up to ensure that corrective actions identified by accountability audits are fully implemented and ongoing.

FACTOR 6 – Other Conditions

Supervision and oversight requires significant and extensive coordination and integration of a number of important projects or program segments of technical and administrative work.

FACTOR 7 – Physical Demands

The work generally requires extensive travel and physical exertion such as walking over rough uneven surfaces, crouching, stooping and similar activities as may be expected to be encountered in a mining environment.

FACTOR 8 – Work Environment

The work environment will consist of both office work and traveling into a mines with exposure to risks and discomforts encountered in a mining environment which require the use of protective clothing such as hard hat, safety glasses, respirator and safety shoes.

Confidential Agency Document

Personnel Actions
07/02/2012
1/4

• Joe Presiding

• Doug, Kevin, Lynn

• IR Report ⇒ large amount of mitigating
     circumstances.

• Other issues ⇒ mitigating factors up front.
     – Expand note
     – Other agencies
     – Aggressive ⇒ mention 104(d) orders at UBB
          toughest enforcement tools.
     – D4 split impliations ⇒ another
          layer of management.
          Plan approvals too. Ⓖ
     – Variety of issues
          ○ Experience
          • Confirmed A/S? since 2004.
          ○ Directives ⇒ Rock dust
          ○ Training issues
          • Additional duties since Sago
     – More on resouce coustraints

• Acting supervisors
     – How long?
     – Were they paid?
     – Did they cuspect?
     – Policy on Moore.

- Page 2 - Turnover in 2003 and 2004

- Matthear was demoted. ⇒ has EEO complaint.
  leave out name.
    - Demotion issue coming out.
    - Who were department supervisors
      when ⁊ no more than that.
    - Leave names of acting supervisors in.
    - Add that acting supervisors were
      still getting paid as inspectors (GS-12)
      if true.

○ Page 4
    - Inspections and investigations.
      Check quote.

- Drop footnotes ⇒ side notes.

- - drop "formal"

○ Page 6
    - Check Humphries ⇒ SI? Yes.
    - Context on 2nd Qtr. Report.
    - How many mines did supervisors
      have compared to othe dist.
    - Easter weekend B.S.
    - Resource limitations ⇒ point to front
    - All inspector experience.

Confidential Agency Document
DLB-000664          MSHA-G.FESAK-0002

3/4

- Bigger preface.

- How did F.O. rank

- D4 and D12 still ~~biggest~~ biggest (mines) in Coal.

- Page 7-8
  - Decentralization of Policy ⇒ when?

- List of actions:
  - Violation of policies
  - Mitigating factors

- How many missed retraining?

- How was OJT inadequate??

- No ~~traing~~ training program for Supervisors in place. Not no training....

- What is rule on going back on stuff missed on earlier inspection?

- Page 9?
  - ADM didn't know trainees were traveling alone.

- Page 10?
  - Ditch "informed"

- Page 11
  - Not in mine file in a manner or what the hell does that mean?

- Page 12
  - 40K v, 30 K.

- Did Kline say they would look at Pillar Stability later.

- Page 15
  - OIG ⟹ did we follow up.
  - PEIR didn't check // look at OIG report.

✳

- Work on exam records
  - Negligence

- Single row of posts.
  - Failure to enforce.
  - Moore.
  - Test results were yellow.

- Not traveling . . .

- Float dust
  - Stevens left Agency....

- Burns stuff DOA

Confidential Agency Document
DLB-000666                    MSHA-G.FESAK-0004

CONFIDENTIAL

George —

When you're check your Files (actually it is a top priority!!) you should focus on following:

Line Selfe — ① He did no follow up to "too wet samples" in Mt Hope or Princeton
② Did no tracking of Flagrants

Bill    ~~Joe Makowiak~~ ① ~~did not coordinate~~ ~~agon longwall~~

Bill    ⟨Don Winston,⟩ ~~① never got atpms memo~~
② ~~allowed reg/inspectors to conduct complex mine~~ ~~VC SIX month reviews~~
③ ~~didn't have enough specialists to conduct~~ ~~complex mine reviews~~

Tom Moore    ① in't off on ROE

② did_____ssed 2 row posts ts:    over→

Jerome Stone ① did not collect
rock dust samples
to w/in 50' of tail piece
in Hg 22

② missed 2 rows of posts
in g

③ Old No. 2 Section
If not justifiable - let me know
Any additions for
these folks let
me know

Confidential Agency Document
DLB-000668          MSHA-G.FESAK-0006