## MSHA PERSONNEL OVERSEEING UBB

The following is a description of the work activities of MSHA and District 4 employees from October 1, 2008 to April 5, 2010, the date the tragedy at the Upper Big Branch (UBB) mine located in southern West Virginia occurred.  (This is also the period that was examined by the Internal Review (IR) team.)[1]  While this memo discusses all personnel who conducted enforcement or other activities concerning UBB, it must be noted that certain MSHA personnel with supervisory and other key responsibilities for MSHA's activities at UBB have retired or otherwise left the agency.

In addition, other government agencies are currently conducting inquiries into the UBB tragedy.  MSHA has provided these agencies information about the work activities of MSHA personnel to assist them in these investigations, the outcomes of which may determine whether or not MSHA takes any action in the future with regard to some of its employees.

The IR report, detailing MSHA's activities in the months leading up to the explosion at UBB and making recommendations for corrective actions, was published on March 6, 2012. MSHA acted immediately to communicate the findings in the report to MSHA personnel.  On that same day, the Administrator for Coal Mine Safety & Health (CMS&H), Kevin Stricklin, convened a mandatory session at the National Mine Health and Safety Academy (Academy) for the employees of District 4 and 12, located in southern West Virginia.  Members of the IR team instructed attendees on the findings in the report, including the deficiencies cited and how to avoid them.  The report was also posted on MSHA's website.

These actions were followed by a mandatory in-depth training session on April 3 and 4, 2012 for District 4 and 12 personnel.  This training, which will also be provided to the other coal districts at MSHA, specifically addressed the issues raised in the report including instruction on rockdusting; ventilation and roof control plan reviews; respirable dust and health; the implementation and enforcement of regulations, including new regulations; knowing and willful violation reviews for special investigations; training plan reviews and miner training; emergency response plans; communications and tracking requirements; longwall electrical permissibility, as well

---

[1] The information in this Memo is primarily taken from the IR report and other public documents, such as the Report of the NIOSH Independent Panel and Assistant Main's testimony before the House and the Workforce Committee on March 27, 2012, which discussed data about MSHA's staffing and resource limitations. Additional information concerning job positions, supervisor duties and dates of service comes from the Coal Mine Safety and Health Administration (CMS&H) personnel files

1

as a separate session with management personnel to discuss supervisory oversight and review of inspection reports.

**MSHA Headquarters:**  During the review period, there were 11 coal districts throughout the country, and the leadership team, which provided overall direction in the administration of the CMS&H program nationwide was and is located at MSHA Headquarters in Arlington, Virginia.  The team includes the Administrator for CMS&H, Kevin Stricklin and the Deputy Administrator, Charles Thomas.

From FY05 to FY08, MSHA lost a total of 252 enforcement personnel from its ranks due to retirements, recruitment by industry, moving to new positions and other reasons. This had enormous implications for CMS&H's enforcement program nationwide and in District 4.  In October 2009, just months before the explosion at UBB, about 55% of coal mine inspectors across the agency had two or fewer years of experience as an inspector.[2] District 4 had more coal mines under its jurisdiction than any other district in the country; yet it had less than 20% of the all the coal inspectors, trainees and specialists in the country.  Its inspectors and supervisors were also inexperienced.

For years CMS&H leadership had been seeking approval to split District 4 into two separate districts in order to increase management staff and provide better oversight of enforcement personnel in the region.  The splitting of District 4 was finally achieved in 2011, and District 12 began its operations in June of that year.  This split has achieved its goal. On March 31, 2010, District 4 had 25 supervisors.  By May 31, 2012, Districts 4 and 12 had 37 supervisors, a more than 40% increase.  Even with the split, these districts are still the largest two CMS&H districts in the country.

Leadership also recognized that District 4 needed additional assistance and acted to 'fill in the gaps.'  During FY08 and FY09, Headquarters provided additional inspectors and specialists to assist District 4 in its inspection activities on at least 80 occasions lasting as much as three weeks at a time. In addition, from the first quarter of FY08 through the second quarter of FY10, District 4 personnel put in over 55,000 hours of overtime, amounting to over $2.7 million in additional pay.

**District 4:** Until District 4 was split into two districts, it covered all of southern West Virginia's 437 coal mines, which included 195 underground mines and 242 surface mines and facilities.  District 4 accounted for 28% of the nation's underground coal mines and 14% of its surface coal mines and facilities.  District 4 also had jurisdiction over 5 of the 39 active longwall mines in the nation.  During the IR review period, the

---

[2] From Testimony of Assistant Secretary Main to the House Education and the Workforce Committee (March 27, 2012).

2

mines and facilities under District 4's jurisdiction employed about 17,000 miners and produced nearly 160 million tons of coal.

The District was comprised of a district office in Mount Hope and seven field offices. The Mount Hope field office's inspection activities included the UBB mine. At the time of the explosion, the Mt. Hope field office had more mines operated by Massey Energy under its jurisdiction---including over 20% of all underground Massey mines---than any other field office in the nation. It also had the second most trainees of any field office in the country with approximately 10 inspectors and trainees per workgroup supervisor versus the national average of 7. The field office also had the most active mechanized mining units (MMUs) per supervisor and the third most active MMUs per underground inspector.[3]

District 4's enforcement activity was aggressive, and during the IR team's review period, District 4 issued over 35,000 citations and orders, accounting for nearly 23% of the total citations and orders and over 34% of unwarrantable failure citations and orders issued at coal mines. As Assistant Secretary Main testified before the House Education and the Workforce Committee on March 27, 2012: "For years, unwarrantable failure citations and orders have been considered the toughest tool available to inspectors." At UBB during this period, District 4 cited 684 violations, of which 56 were unwarrantable failures. In FY09 alone, District 4 issued more 104(d) citations and orders at UBB than at any other mine in the country.

While the IR report found that there were deficiencies in District 4's performance at UBB and also "several instances where enforcement efforts at UBB were compromised because MSHA and District 4 did not follow established Agency policies and procedures," it also found that:

> MSHA inspection and management personnel were dedicated to their work and determined to further the Agency's mission. Although at times limited by their inexperience, inadequate direction, and supervision their primary intent was to protect the health and safety of miners.

The IR team did not find any "evidence that the actions of District 4 personnel or inadequacies in MSHA safety and health standards, policies or procedures caused the explosion."

---

[3] A Mechanized Mining Unit or MMU refers to the section of a mine where a mining machine is used to extract coal.

3

In addition, the IR report stated that intentional efforts on the part of the operator "to evade well-established Mine Act provisions…interfered with MSHA's ability to identify and require abatement of hazardous conditions at the Mine." The operator provided advance notice of inspections and failed to report injuries to MSHA as required. It recorded hazards in its internal books and not in its examination books and intimidated miners into not reporting hazards to MSHA.

The IR report also points to a number of other mitigating factors that led to the deficiencies it identified:

- **Resource Limitations:** Due to attrition and budget constraints, CMS&H's enforcement personnel had eroded from 653 in FY01 to 584 by the end of FY05. Following the 2006 Sago, Darby, and Aracoma disasters, MSHA did receive additional funding to hire more inspectors. However, despite efforts to re-establish staffing levels, at the time of the UBB explosion, the inspection and supervisory staff was significantly composed of new inspectors, replacing a number of experienced inspectors who had retired. As stated above, from FY05 to FY08, CMS&H had lost a large number of enforcement personnel from its ranks, and in 2009 (October), just months before the explosion at UBB, over one-half of coal mine inspectors were inexperienced.

- **Inspector Inexperience:** Mining is a highly technical field, and new hires go through extensive training for up to two years and receive on-the-job training from a journeyman inspector. As a result, even the most experienced of these new inspectors had only been conducting federal mine inspections for a couple of years. In addition, when new inspectors were hired after 2006, there were not enough experienced inspectors to mentor them or oversee their on-the-job training. For example, in FY07, one-third of MSHA enforcement personnel nationwide and in District 4 were still considered trainees. Moreover, agency experience among lead inspectors assigned to UBB during the IR team's review period ranged from 13 to 52 months. This had a significant adverse impact on the agency from which MSHA was only beginning to recover at the time of UBB.

Moreover, CMS&H also experienced an alarming reduction in the number of specialists needed to conduct plan reviews and technically specialized portions of inspections. Between FY01 and FY06, the number of MSHA subject matter specialists in coal mine ventilation, roof control, electrical systems, occupational health, and impoundments fell from 241 to 170, a 29% drop. During this same period, the number of MMUs in the nation rose by 41% from 834 to 1,180, creating a greater need for specialists in underground mines. In addition, in

4

order to complete all mandatory inspections required under the Mine Act, specialists were assisting with more general inspection duties.[4]

- **Management Turnover:** The IR report found that the District 4 District Manager (DM) position was difficult to fill after it was vacated in 2003, and between June 2003 and October 2006, there were six different DMs, four of them temporary (acting). From June 2003 to July 2004, there were 4 acting DMs until Jesse Cole became the permanent DM on July 1, 2004. According to the IR report, these turnovers "contributed to a lack of continuity in management vital to making decisions regarding enforcement and plan approvals."

- **Inexperienced Acting Supervisors:** There were a number of inspectors in the Mt. Hope field office who were "acting" field office supervisors for the inspectors that were assigned to inspect UBB. The IR team found that these acting supervisors were not adequately trained to carry out the responsibilities of the position.[5] As a result, there was "inadequate oversight of inspectors in the workgroup with responsibility for inspecting UBB." "This impacted the guidance provided to inspectors and allowed inspection lapses to go uncorrected."

- **Outdated Directives System:** The MSHA Directives System, created in 1989, was originally designed to centralize the development and dissemination of agency policy and procedures. In the past decade, the system fell into disuse and during the review period, was no longer performing as originally intended. In particular, there was no central oversight to ensure that the system was being used to implement policy or was being used correctly. As a result, it was common for managers and supervisors to provide instructions intended to establish procedures or policy interpretations in memoranda or e-mails that were not fully vetted through, or retained within the Directives System. By October, 2008 when the IR review period began, there were inaccurate and outdated

---

[4] Id.

[5] During the review period, MSHA did not provide supervisory training to inspectors who might be assigned to fill in as acting supervisors. As a result, when someone became an acting supervisor, he did not receive supervisory training. The IR report recommended that a training for temporarily promoted supervisors to address pertinent parts of the CMS&H Supervisor's Handbook be developed. Currently, MSHA is developing a course for newly promoted or acting supervisors that will cover key material and responsibilities that individuals need to have as soon as possible after assuming a new supervisory position. This course will be developed by September 30, 2012. In addition, MSHA will issue guidelines for ADMs to provide the level of oversight necessary for work groups with inexperienced acting field office supervisors.

5

manuals, handbooks and other directives, as well as inconsistencies in a broad range of administrative and program activities, including inspections and investigations, plan reviews supervisory oversight and enforcement actions. According to the IR report, "District 4 inspectors, many of whom had limited MSHA experience, were not aware of or did not know where to locate all policies and procedures they were required to follow."

**Overall Management and Oversight (Headquarters):**[6] During the IR review period, Kevin Stricklin was the Administrator for CMS&H, and in addition to providing direction and leadership in the administration of nationwide coal mine safety and health inspection programs, he is charged with the responsibility for developing criteria and methods for ensuring compliance with coal mine safety and health standards, as well as developing directives that concern the functional responsibilities of CMS&H.[7]

Kenneth Murray was the Deputy Administrator for CMS&H from March 30, 2008 until November 21, 2008 when he left the agency. After that, the position was vacant for four months until Charles Thomas became the acting Deputy on April 12, 2009. Thomas was appointed to that position on a permanent basis on September 26, 2010 after the UBB explosion. According to his position description, the Deputy Administrator has "full line management authority over the 11 District Managers."[8] One of his specific responsibilities is to "ensure that mandatory inspections and investigations are conducted annually at all underground and surface mines" as required by the Mine Act. The IR report specifically found that "there was no indication that the time it took to permanently fill the Deputy Administrator position affected any of the issues identified at UBB."

**District 4 Personnel:** During the review period, Robert Hardman was the DM with management authority over all of District 4. According to MSHA's personnel files, he was hired as the DM for District 4 on October 1, 2006 and was in that position until May 7, 2011, when he was assigned to work on the split of District 4 into two districts. He retired from MSHA on August 31, 2011. The Deputy Administrator for CMS&H has oversight over field operations and is responsible for DM performance evaluations.

There were three Assistant District Managers (ADMs) in District 4: Lincoln Selfe, Luther Marrs, and Richard Kline; they reported directly to the DM. Lincoln Selfe was the ADM for enforcement and had overall management authority over four field offices, including the Mount Hope field office. Luther Marrs was the other enforcement ADM and had management authority over the other three field offices in District 4. He did

---

[6] Information regarding headquarters personnel has been taken from the Administrative Policy and Procedures Manual (APPM) and CMS&H position descriptions.
[7] See MSHA's APPM.
[8] CMS&H now has 12 District Managers.

6

not have any enforcement responsibility for UBB.  Richard Kline was the ADM technical with overall management authority over the specialist departments, which included ventilation, roof control, electrical, health, and impoundments.  Selfe was hired as ADM for enforcement on October 7, 2001 and is still in that position.  Kline was the ADM technical from October 29, 1995 until his retirement on April 2, 2011.

From June 22, 2008 to June 5, 2011, Joseph Mackowiak was the ventilation department supervisor until he was promoted to the ADM technical position for District 4, a position he still holds.  Donald Winston was and still is the roof control supervisor in District 4.  He was selected for that job on July 22, 2007.  Edward Otis Matthews was the health supervisor from December 7, 2008 until November 29, 2009.  On January 19, 2010, Paul Prince was temporarily appointed to the health supervisor position.  On March 14, 2010, he was made permanent in that position.

In the Mount Hope field office, Michael Hicks was the field office supervisor with supervisory authority over the inspectors and trainees assigned to Workgroup 1; Thomas Moore was the field office supervisor with authority over Workgroup 2.  These two work groups alternated responsibility for UBB on a yearly basis.  In FY09, Hicks' workgroup was responsible for inspecting UBB.  According to personnel records, Hicks was in this position from March 30, 2008 until he retired on September 30, 2011.

During FY09, the IR report also noted that "during periods of short duration, five inspectors---David Sturgill, William Bane II, Albert Clark, Gary Huffman and Gerald Lucas---intermittently assumed supervisory responsibilities for Workgroup 1 and performed such functions as reviewing inspection notes and citations and orders."

Moore transferred from the Mt. Carbon field office to the Mount Hope field office supervisory position on January 17, 2010 and is still in that job.  Prior to Moore's arrival, Roger Richmond was the Workgroup 2 supervisor at Mt. Hope.  He applied for disability retirement on May 19, 2009.  He was on sick leave, annual leave, and eventually leave without pay before retiring from MSHA on November 3, 2009.  Richmond's position was temporarily filled by three acting field office supervisors: Paul Prince, from June 21, 2009 to September 12, 2009; Albert Clark, from September 13, 2009 to December 6, 2009; and James Humphrey from December 20, 2009 to January 17, 2010.

**Duties:**  Under the CMS&H Supervisor's Handbook (November 2008), the general duties of the CMS&H supervisors, including DMs, ADMs and field office supervisors include "a review of the work performed by their inspectors and supervisors:"

> This is accomplished through reviews of all inspection reports for completeness and thoroughness.  The supervisor must also accompany

7

inspectors and specialists on mine visits. The supervisor must also review the Inspection Tracking System (ITS) for E01 activities. Any deficiencies identified by the supervisor shall be documented along with the corrective actions taken.

In addition, the Handbook states that: "the supervisor shall review all inspection reports and work products generated by inspectors and specialists under his/her supervision related to an assigned field activity."

Under the handbook, the supervisor is also required to "initial the work products reviewed for the event. In addition, he/she will review the notes and date and initial the daily cover sheet to indicate that the notes have been reviewed. Also, each enforcement action will be reviewed and initialed by the supervisor."

All personnel, including supervisors, are held accountable under DOL's performance management system.

## Deficiencies Identified by the Internal Review Report

### Incomplete Regular Inspections

**Requirement:** Section 103(a) of the Mine Act provides that authorized representatives (ARs) of the Secretary "shall make inspections of each underground coal or other mine in its entirety at least four times a year" for the purpose of determining "whether an imminent danger exists and whether there is compliance with the mandatory health or safety standards or with any citation, order or decision" issued under the Mine Act. MSHA refers to these inspections as 'regular safety and health inspections' or 'regular inspections.'

MSHA directs its employees to conduct these inspections in accordance with procedures listed in program handbooks and Procedure Instruction Letters (PILs), which augment the handbooks. These procedures address how to conduct mandated inspections of mines in their entirety, as well as procedures for enhancing inspection quality. Handbooks and PILs in effect during the review period included the following:

- General Coal Mine Inspection Procedures and Inspection Tracking System Handbook (PH-08-V-1) (January 2008)
- Carbon Monoxide and Atmospheric Monitoring Systems Inspection Procedures Handbook (PH-08-V-2) (February 2008)
- Coal Mine Health Inspection Procedures Handbook (PH89-V-1) (21) (January 2008)
- Uniform Mine File Procedures Handbook (PH09-V-1) (July 2009)

8

Confidential Agency Document
DLB-000676          MSHA-G.FESAK-0014

- Coal Mine Safety and Health Supervisor's Handbook (AH-08-III-1 (2)) (November 2008)
- Procedure Instruction Letter No  I08-V-06, Weekend E01 Inspections (November 20, 2008)
- Procedure Instruction Letter No. I08-V-8, Procedures for Inspection of Seals, (December 19, 2008)

**Findings:** Some areas of UBB were not inspected as directed by the General Coal Mine Inspection  Handbook during each of the six regular inspections reviewed. These areas included air courses, non-pillared worked-out areas, seals, bleeder evaluation points and surface areas.  Most areas of UBB that inspectors missed during specific quarters were visited during subsequent inspections.

**Supervisors:** During the four FY09 inspections of the UBB mine, Michael Hicks was the field office supervisor in charge of the inspectors and inspections.  For each of the inspection reports in FY09, he certified the inspection as complete even though the IR team found it was not complete.  He also was responsible for reviewing the inspectors' notes.  According to the IR report, for the first inspection, he did not review the inspection notes until 28 days after the end of the inspection quarter, and for all, he did not identify the deficiencies with the notes and did not correct those deficiencies as required by the Supervisor's Handbook.  Hicks retired from the agency on September 30, 2011.

For the first quarterly inspection in FY10, Albert Benny Clark and James Humphrey were the acting supervisors in charge of the mine until Thomas Moore was transferred into the position on January 17.  Moore assumed his new position after the first quarterly inspection was concluded (December 31, 2009) and the next quarterly inspection had begun (January 6, 2010).  When he arrived he was faced with reviewing and certifying 17 mandatory regular inspections (including inspections of 8 Massey mines) conducted during the first quarter of FY10.  He certified the inspection for UBB 20 days into the second quarter of FY10.  Since the prior quarter had already closed, it was too late to correct any deficiencies he may have found in the inspections.  Clark and Humphrey initialed a majority of the inspection notes for the first quarterly inspection of FY10, but did not identify the deficiencies indicated in the notes.  Humphrey is currently a special investigator for District 4, and Clark is employed as an instructor in the Instruction Services Department at the Academy.


The second quarter of FY10 did not close until March 31, 2010, and the explosion at UBB occurred five days later.  At the close of the second quarter of FY10, Moore was required to review inspection reports covering 21 mandatory regular inspections

9

(including inspections of 13 Massey mines).  He certified the UBB inspection on April 7, 2010, two days after the explosion occurred.

**Mitigating Factors:**

- Operator Conduct: The operator's intentional and illegal conduct interfered with MSHA's ability to fulfill its responsibilities under the Mine Act.  (See page 3 above.)

- Resource Limitations:  Budgetary constraints and retirements of experienced inspectors depleted MSHA's inspectorate.  Increased funding after the Sago, Darby and Aracoma disasters resulted in an inexperienced workforce in District 4, a district that was responsible for inspecting 437 coal mines and facilities.  (See page 4 above.)

- Inspector and Supervisory Inexperience: Because of the reduction in staffing in the years before 2006, many experienced inspectors left MSHA and could not be replaced.  (See page 4 above.)  As a result, newly-appointed inspectors, some of whom had not completed all of their entry-level training, were directed to mentor trainees and oversee their on-the-job training.  Inspector and supervisor inexperience was evident at UBB:

  - All but one of the lead inspectors assigned to conduct regular inspections were hired by MSHA after the 2006 coal mine disasters.  A newly-hired trainee needs approximately two years to complete classroom and on-the-job training to become a journeyman inspector.

  - The most experienced lead inspector at UBB had 52 months of MSHA experience when he began his inspection [Joey Athey]; the least experienced had 13 months of MSHA experience [Gerald Lucas].  The average experience for an inspector was 30 months, including training.

  - Hicks had 6 months experience as a supervisor when he supervised the first quarterly inspection in FY09 at UBB; Moore had 29 months experience as a supervisor when he was reassigned to the Mount Hope field office.  Hicks and Moore received only one week of training related to the core administrative duties of a field office supervisor and were not fully trained on the technical aspects of supervising coal mine inspectors.

- MSHA's Directives System: The agency Directives System had fallen into disuse and MSHA did not consistently use it to provide its employees with instructions and information necessary to effectively and efficiently implement program and

10

mission-support activities.  As a result, District 4 inspectors, many of whom had limited MSHA experience, were not aware of or did not know where to locate all policies and procedures they were required to follow.  (See page 6 above.)

- <u>Acting Supervisors:</u> MSHA does not provide supervisory training to inspectors who might be assigned to fill in as acting supervisors.  Accordingly, acting supervisors in the Mt. Hope field office had not received supervisory training.  (See pages 5 & 6 above.)

*Inspections by Right of Entry Trainees*

**Requirement:** The Program Policy Manual states that, "Inspections and investigations under the Federal Mine Safety and Health Act of 1977 shall be conducted only by persons who have been authorized (Authorized Representatives or ARs) by the Secretary to conduct such inspections or investigations."  Initially, inspector trainees are issued credentials that limit their authority to the "right of entry" (ROE) into a mine.  They are not given credentials as Authorized Representatives of the Secretary to inspect mines until they are deemed to be qualified by the DM to conduct inspections, but not before completing approximately two-thirds of their entry-level training at the Mine Academy.

District 4 had developed guidance entitled: "Standard Operating Procedures for Authorized Representative Mentoring of Trainee." (SOP)  Item 3 of the guidance stated: "During any inspection activities at a surface or underground mine, the AR shall make certain that the ROE Trainee is close to him/her at all times."

**Findings: FY09 Q1 –** On December 3, 2008, AR Gerald Lucas allowed ROE trainee Perry Brown to inspect the intake air course parallel to the #4 and #5 North Belts by himself.  This is documented in Lucas' inspection notes and the inspection tracking map.  Supervisor Michael Hicks dated and initialed the notes on January 28, 2009 after the regular inspection was completed.

On December 9, 2008, AR Gerald Lucas allowed ROE trainee Johnny Syner to inspect Seal Sets #1, 2, 3, and 4 and the return air course in which these seals were located by himself.  This is documented on the inspection tracking map and in Syner's inspection notes that were also initialed by Lucas.  Supervisor Michael Hicks dated and initialed the notes on January 28, 2009 after the regular inspection was completed.

**FY09 Q2 –** On January 20, 2009, AR William Bane allowed ROE trainee Walter Jenkins to travel the intake air course from # 3 section and terminate one citation.  This activity was documented in Jenkins' inspection notes that were also initialed by Bane.  Supervisor Mike Hicks dated and initialed the notes on January 21, 2009, the next day.

11

On January 21, 2009, AR William Bane allowed ROE trainee Walter Jenkins to travel apart from him. This activity was documented on page 18 of Jenkins' notes for that day, which were also initialed by Bane. Supervisor Michael Hicks dated and initialed the notes on January 22, 2009, the next day.

**FY09 Q4** – On September 1, 2009, ROE trainee Jack Dempsey traveled to the Bandytown fan with the UBB chief electrician and was not accompanied by an AR. He went to the mine that day with AR Joey Athey. This was discovered during interviews and was not documented in the inspection notes.

**FY10 Q2** – On January 12, 2010, AR Perry Brown allowed ROE trainee Scott Van Dyke to travel to "3 unit" to terminate a citation. This was confirmed in interviews and is documented on page 10 of Brown's notes for that day. Notes also indicated and interviews confirmed that Van Dyke also had checked some equipment on the surface by himself. Supervisor Moore initialed these notes on January 20, 2010.

On March 14 and 15, 2010, AR Larry Hedrick allowed ROE trainee Scott Van Dyke to inspect equipment on the longwall by himself. Hedrick stayed on the headgate side and Van Dyke traveled across the longwall face. The notes led the internal review team to question whether the inspector and the trainee were actually apart; interviews confirmed that they were. The notes were initialed by Supervisor Moore on March 15, 2010. The notes were ambiguous and without time to fully explore the issue, it may not have been evident to the supervisor at that time that the trainee and inspector travelled apart.

**Mitigating Factors:** The supervisors and the ADM for enforcement with responsibility for UBB stated in interviews that they were unaware inspectors were not following the guidance established in the District 4 SOP.[9] In addition:

- At the beginning of each of the regular inspections, the lead inspector had an average of 30 months experience on the job, which included time in training. Hicks and Moore had limited experience as supervisors.

- The issue involving ROE trainee Jack Dempsey on September 1, 2009 was not documented in the inspection notes.

---

[9] This deficiency was documented in the inspection notes for three of the six regular inspections; a supervisor is required to review inspection notes. In the case of one inspection, some of the inspectors reviewed notes for the acting supervisors. The ADM would not necessarily be aware of what was in inspection notes unless he had reviewed them as part of a second level review.

Confidential Agency Document
DLB-000680                    MSHA-G.FESAK-0018

- The inspection notes do not clearly indicate that ROE trainee Scott Van Dyke inspected equipment on the longwall by himself on March 15, 2010.  The IR team came to this conclusion after interviewing the inspector and the trainee.

- Even though a ROE trainee had inspected longwall equipment by himself, AR Jerome Stone conducted a respirable dust survey on the longwall on March 23, 2010.  He inspected the dust control parameters on the shearer and observed the mining cycle.

- The ADM for enforcement was not required to and did not review the notes for these inspections.[10]

**Mine Plan Approvals**

*Coordination between Specialist Groups*

**Requirement:**  MSHA's Program Policy Manual requires the supervisory technical specialist or engineer to coordinate the progress of a plan through the approval process in order to ensure that "cross-communication with other plan approval groups occurs when appropriate."

**Findings:** The IR report stated that the ADM technical (Richard Kline) did not establish procedures to provide sufficient coordination between the technical departments under his direction during the plan review process.  Specialist departments did not effectively communicate to ensure that the requirements of the various plans and supplements were consistent.  This resulted in inconsistencies between the roof control plan, dust control plan and ventilation plan.  The report identified three instances where approved plans contained conflicting requirements:

- The methane and dust control plan (MMU plan) for the 1 North Longwall (MMU 050-0), approved on June 15, 2009, required 40,000 cfm of intake air for the section.  However, Performance Coal Company later submitted a ventilation plan supplement, approved on August 6, 2009, that included a map showing a minimum longwall intake quantity of 30,000 cfm.  In interviews, District 4

---

[10] Under the CMS&H Supervisor's Handbook, an ADM is required to review at least one FAR and one AA from each supervisor during the first and second half of each fiscal year.  ADM Selfe reviewed one FAR and one AA related to UBB, but the FAR and AA both were related to an E02 event for a section 103(i) spot inspection, and were not part of a regular inspection.

Confidential Agency Document
DLB-000681                    MSHA-G.FESAK-0019

Ventilation Department personnel (Joseph Mackowiak) indicated that approving 30,000 cfm was an oversight.[11]

- The ventilation plan contained four drawings illustrating ventilation on working sections, none of which addressed mining with two continuous mining machines simultaneously. Some of the approved MMU plans contained section drawings with a statement specifically stating that only one continuous mining machine could operate at a time when utilizing "split" ventilation. The roof control plan approved December 23, 2009, stated: "When using split-type ventilation, both continuous miners may mine coal at the same time." Two working sections were ventilated with split-type ventilation, where two continuous mining machines operated simultaneously.

- The MMU 050-0 plan, approved June 15, 2009, contained a drawing that did not show stoppings separating the active longwall tailgate travelway from the adjacent pillared area. This MMU plan also did not show stoppings separating the belt from the No. 2 headgate entry on the active longwall panel. The ventilation plan approved September 11, 2009, required stoppings at these locations. Additionally, the MMU plan showed the No. 3 entry providing intake air to the longwall face, but the ventilation plan showed this entry being used as a return for a development section.

*Roof Control Plans*

**Requirement:** Following the Crandall Canyon mine disaster (and in response to an OIG audit of MSHA's approval of the roof control plan at Crandall Canyon), the Administrator for Coal (Kevin Stricklin) issued *CMS&H Memo HQ-08-058-A* on June 5, 2008. The memo provided guidance for review and approval of complex and non-typical roof control plans and amendments. The Administrator defined complex plans to include those for "mining of high stress areas created by multiple seam interaction, or active mining below longwall panels or isolated remnant pillars." In pertinent part, the memorandum required the mine operator to submit the following with any complex or non-typical plan proposal:

- A risk assessment specific to the particular mining operation that includes depth of overburden, coal strength, pillar recovery method and development and retreat stability factors. The risk assessment will contain a statement detailing the basis on which the operator has determined that the plan is appropriate and suitable to the mining conditions.

---

[11] The IR team does not know the reason for the oversight.

14

- Data from currently available tools such as ARMPS [Analysis of Retreat Mining Pillar Stability], ALPS [Analysis of Longwall Pillar Stability], LAMODEL [Stress and Displacement Calculations], Rocscience [software tool for rock and soil], or other applicable software.

The memo also stated that MSHA "shall not approve the proposed plan or amendment until the operator has provided the data and evaluation supporting the proposal and a confirming evaluation(s) has been completed."

**Findings:** District 4 approved the 2009 base roof control plan submitted in October, 2009 on December 23, 2009, without requiring the operator to submit a risk assessment specific to the particular mining operation, including the submission of data and evaluation supporting the proposal, as directed by *CMS&H Memo No. HQ-08-058-A*. In particular, the operator did not provide information detailing the basis on which the plan was determined to be appropriate and suitable, such as a pillar stability analysis. Interviews with District 4 Roof Control Department personnel revealed that they did not always request the pillar stability analysis from mine operators.

Instead, District 4 roof control specialists (Donald Winston, Supervisor, and Daris Barker, Roof Control Specialist) indicated in their statements to the IR team that they requested examples of pillar stability analyses from operators to demonstrate the operators' ability to use the appropriate software. There was no pillar stability analysis submitted by Performance Coal Company with the October 2009 base plan. A note was affixed to the roof control plan tracking sheet by the ADM technical (Richard Kline) stating that District 4 would "still look at the [longwall] gate pillars – later." As a result of the note, the Roof Control department took no action to require the company to conduct the analysis, and the plan was approved without this requirement.

**Mitigating Factors:**

- A pillar stability analysis was conducted by the Roof Control Department when ground control conditions in the 1 North Longwall headgate deteriorated in 2009. The Ventilation Department supervisor was concerned about the suitability of the 1 North headgate for future mining and requested that the Roof Control Department complete an Analysis of Longwall Pillar Stability (ALPS) and Analysis of Multiple Seam Stability (AMSS) for pillars at two locations: near crosscut 72 in the headgate, and crosscut 95 in the tailgate.

- Roof Control Department supervisor (Donald Winston) stated he did not receive a copy of the *CMS&H Memo HQ-08-058-A* that was addressed to all DMs and ADMs.

15

*Six-Month Reviews of Roof Control Plans*

**Requirement:** On June 6, 2008, the Administrator for Coal (Kevin Stricklin) issued *CMS&H Memo HQ-08-059-A* with 29 pages of attached checklists for aiding MSHA personnel in the review of roof control plans. The form was to be used by inspectors and specialists when reviewing roof control plans and revisions, as well as during six-month and quarterly roof control plan reviews. This memorandum also included the following statement: "The regular inspector should conduct the six month reviews of the less complex mines in the District with assistance provided by the roof control specialist as needed. The roof control specialist should conduct the six month reviews of the more complex mines in the District."

**Findings:** The IR report found that six-month reviews of the UBB roof control plan were being conducted by regular inspectors and not roof control specialists. The mine was a complex mine as defined by the Administrator's memo and the roof control plan should have been reviewed by a specialist.

**Mitigating Factors:**

- MSHA employees stated the primary reason roof control specialists were unable to complete six-month plan reviews is that they were assigned to spend their time conducting mandatory regular mine inspections.

*Checklists for Roof Control Plans*

**Requirement:** The checklists from the Administrators memo (*HQ-08-059-A*) were initially required to be used by the roof control department supervisors only. Instructions to begin using the checklists universally were emailed on January 27, 2009 from a CMS&H headquarters employee to DMs and ADMs. The instructions were not issued via the established directives system. The correspondence required the use of the checklists during the next plan review.

**Findings:** The District 4 Roof Control Department supervisor indicated in his interviews that he began using the checklists for plan reviews immediately after receipt. However, copies of the completed checklists were not included in the District records provided to the IR team for the six-month plan reviews or for the review of the October 2009 base plan as directed by the memorandum.

District 4 also developed seven checklists and other documents for guidance when reviewing initial roof control plans and supplements, general safety precautions to be included in roof control plans, deep-cut minimum precautions, retreat mining

16

precautions and safety precautions for mobile roof supports. While the District 4 Standard Operating Procedures (SOPs) for plan reviews did not require these checklists to be used, the plan reviewers all stated that they used checklists to assist in completing roof control plan reviews. These checklists were not those developed by the Headquarters office for use in the field.

The District 4 checklist included a requirement that the mine operator's calculations for pillar stability be attached to, but not part of, the roof control plan. However, it did not specify that the calculations would be verified by the District.

**Mitigating Factors:**

- The IR team found the checklists used by District 4 included most of the considerations listed in the Headquarters checklists, and in some cases included additional considerations. Some items on the checklists were identical.

*Pillar Stability Analysis/Review by Technical Support*

**Requirement:** *Procedure Instruction Letter No. I08 V-02* states that roof control plans should be forwarded to MSHA Technical Support for review if they "…do not meet or exceed minimum safety criteria for other computer models used" for pillar design, or plans that are "…complex, non-typical, or present unique or novel situations (e.g. special over-mining or undermining situations).

**Findings:** District 4 technical department staff stated they would at times request stability analyses from operators for the purpose of reviewing plan supplements to assure the proper engineering calculations were being completed. For conventional stability factor determinations, District 4 staff indicated they were confident in their own abilities to run computer modeling programs to determine the suitability of pillar system designs and did not always need to consult with Technical Support for assistance. For special cases, District 4 would send plans to Technical Support for review. The UBB October 2009 base roof control plan was not forwarded to MSHA Technical Support for review even though the conditions met the guidelines specified in the PIL.

**Mitigating Factors**

- Interviews with Technical Support personnel indicated they were regularly contacted by the District 4 Roof Control Department for assistance on other issues for other mines.

Confidential Agency Document
DLB-000685                                    MSHA-G.FESAK-0023

*Consolidation of Ventilation and Methane and Dust Control Plans*

**Requirement:** Procedure Instruction Letter No. I09-V-03, issued on June 18, 2009, states: "Where a ventilation plan and a dust control plan have been submitted and approved separately … those separate plans are to be consolidated into a single plan subject to a single review date." [12]  The District 4 Health Department's SOP stated that: "District 4 has methane and dust control plans for each mine routed separate from the ventilation plan."  Accordingly, each type of plan or supplement was processed, tracked, approved and filed separately.

**Findings:** Allowing operators to submit separate methane and dust control plans that were subject to different review dates conflicted with MSHA guidance specified in Procedure Instruction Letter No. I09-V-03.  During interviews, District 4 personnel stated that they did not know when the longstanding practice of reviewing and approving methane and dust control plans separately from the remainder of the ventilation plan started, but it had existed for decades (Richard Kline, Paul Prince). Most of them recalled receiving PIL No. I09-V-03 and its plan consolidation requirements; however, they deferred to the District 4 SOP that required separate plan review and approval. District 4 personnel believed that separating the methane and dust control portion of the plan from the mine ventilation plan had several advantages. These included providing less cumbersome documentation for the inspectors and specialists in the field and placing a greater emphasis on controlling respirable dust and quartz on individual MMUs.

**Roof Support in the 1 North Tailgate Travelway**

**Requirement:** The operator submitted a new base roof control plan on October 27, 2009, which was approved by the District 4 DM on December 23, 2009.  This plan required the tailgate travelway of initial longwall panels to have supplemental support in the form of two rows of 8-foot long cable bolts or two rows of posts on 4-foot centers installed in the middle of the entry between primary supports.  This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times.

**Findings:** The Accident Investigation team found that there was only one row of supplemental support in the tailgate travelway as opposed to the two required in the roof control plan.  The single row of posts would have complied with the 2005 roof control plan tailgate travelway requirement but not with the requirement in the 2009 approved plan in effect at the time of the explosion.

---

[12] Procedure Instruction Letter I09-V-03 was a reissue of Procedure Instruction letter I06-V-01, which was issued on March 10, 2006.

18

The tailgate travelway was traveled four times during the second regular inspection for FY10. On March 9, 2010, a ventilation specialist (Keith Sigmond) and a field office supervisor (Thomas Moore) inspected the tailgate. While the specialist and field office supervisor identified a serious violation of the ventilation plan and issued an order for that condition, they did not cite any violations of the roof control plan. The specialist left the agency before he could be interviewed about the roof support in the tailgate entry.

On March 10, an inspector (Jerome K. Stone) traveled the 1 North Longwall tailgate travelway on the day shift and the same specialist who issued the order on the previous day traveled the tailgate on the evening shift. Neither the inspector nor the specialist documented any roof control plan violations during these shifts.

On March 11, the same inspector was in the tailgate travelway to terminate the order for the violation of the ventilation plan. According to the inspection tracking map, he traveled the entire tailgate travelway. The inspector did not cite a violation of the roof control plan that day and stated in his interview that he did not recall inspecting the travelway for compliance with the roof control plan. Since he counted this inspection toward completion of the regular inspection of the tailgate travelway, inspection procedures required him to examine the travelway for compliance with the roof control plan. This was the last time MSHA inspected the 1 North Tailgate travelway before the explosion.

**Mitigating Factors:**

- The start of this regular inspection was the first time the inspector (Jerome Stone) had inspected underground areas at UBB. He had approximately 22 months of total experience with MSHA when he inspected the longwall on March 11. He had experience on longwall mining sections prior to being employed by MSHA, but had never been on the UBB longwall tailgate before this inspection.

- The single row of posts would have complied with the 2005 roof control plan tailgate travelway requirement, but not with the requirement in the plan that was approved by the DM on December 23, 2009. The 2009 plan was filed in the UMF on January 20, 2010; two weeks after the inspector (Jerome Stone) reviewed the Mine File in preparation for the inspection.

- The specialist (Keith Sigmon) reviewed the UMF on March 9, before traveling to UBB that day. He commented on the Inspector's Certification Form in the UMF that he only reviewed the mine ventilation plan. Because of the time required to review the complete UMF, MSHA procedures allowed specialists to review only those sections of the file pertinent to their inspection.

19


*doesn't name inspectors.*

**Failure to Set Reasonable Abatement Times**

**Requirement:** Section 104(a) of the Mine Act requires the inspector to fix a reasonable time for the abatement of the violation. *when citing*

**Findings:** The IR team determined that inspector documentation indicated that a reasonable abatement time was not initially established for almost one-quarter of the citations issued at UBB during the review period. In one case, the abatement time for a citation for overexposure to respirable dust on MMU 064-0 was set at 33 days. The IR team found the typical termination due dates for similar citations in District 4 allowed 7 days for abatement. The field office supervisors (Hicks and Moore) and the ADM for enforcement (Selfe) were responsible for requiring inspectors to follow this provision of the Mine Act.

**Mitigating Factors:**

*for the team*

- The IR team used its experience and judgment when evaluating the reasonable time for abating violations cited at UBB. It is impossible to be aware of all of the factors considered by the inspectors when setting abatement times.

**Rock Dust Sampling in the Explosion Area**

*Failure to Take Rock Dust Samples in the Tailgate 1 North Entries*

**Requirements:** 30 CFR 75.402-1 states, "The term *too wet* means that sufficient natural moisture is retained by the dust that when a ball of finely divided material is squeezed in the hands water is exuded."

The General Coal Mine Inspection Handbook requires inspectors when conducting rock dust samples to:

> Determine the starting point from the face for such surveys, associating that point with something relatively permanent such as an intersection, survey station, pump room, or borehole. The sampling area shall be well described and precisely identified so it can be located on the mine map by either the operator or another inspector at a later date.

The General Coal Mine Inspection Handbook also states:

> The inspector shall conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the

Confidential Agency Document
DLB-000688                    MSHA-G.FESAK-0026

mine. Rock dust surveys shall also be conducted in previously mined active areas…The surveys are to be kept current, up to and including the last row of pillars immediately outby the loading point. If a working section has advanced and the loading point moved 500 feet or more since the last Regular Safety and Health Inspection, a survey shall be conducted…Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed. All active entries not previously surveyed shall be surveyed…Where possible, the maximum interval between sample locations shall be not more than 500 feet.

The *General Coal Mine Inspection Procedures and Inspection Tracking System* Handbook also states that with regard to survey sample locations too wet to sample:

Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year. The status of each of these individual wet locations shall be determined during each regular inspection conducted within this one-year period. Spot samples shall be collected if conditions permit on a re-inspection of a previously wet area. The previous compliance/non-compliance determination of rock dust surveys will not be affected by the additional analysis of spot samples collected during re-inspection of wet areas. A citation or order should be issued when non-compliance is indicated for 10% or more of the individual spot samples collected during re-inspection of areas previously indicated too wet for survey sampling. If the status of a re-inspected wet area changes, it shall be updated by the inspector in the Rock Dust Sample Submission Application and the data uploaded.

**Findings:** The operator mined the 1 North Tailgate entries during the regular inspection for the fourth quarter of FY08 (July-September 2008). Inspector William Richard Stevens, who retired from MSHA on January 3, 2009, conducted a rock dust survey of this area on September 30, 2008. However samples were not collected during the initial rock dust survey of this area because the inspector listed all locations as being too wet to sample at that time. He did not properly document the survey sample locations.

In addition:

- Stevens did not provide a zero point that precisely identified the sampling area so it could be located on the mine map. With no way to map these wet sample locations, subsequent inspectors could not accurately determine where to begin the next survey or where to collect samples if the area dried out.

21

Confidential Agency Document
DLB-000689                    MSHA-G.FESAK-0027

- Stevens submitted data for two rows of samples rather than the five rows of samples needed to survey the area mined since the last inspection. The inspector who conducted a May 21, 2008 survey of these entries, Kevin Lyall, clearly identified the last row of samples that he collected by listing the following in the *Collector Comments* field of the MSHA *Rock Dust Sample Submission Form* for his survey: "Ending Point Spad#22396 in #4 entry at break #30." During Inspector Stevens' September 30, 2008, survey, the section loading point was located near break 58, approximately 2,700 feet inby the last row of samples collected by Lyall during the May 21 survey. The September 30 survey should have started a maximum of 500 feet inby the previous survey, requiring at least five rows of samples on maximum 500-foot intervals to reach the last row of pillars immediately outby the loading point.

- During the regular inspection for the first quarter of FY09, inspector Gerald, on December 16, 2008, conducted the rock dust survey of Tailgate 1 North entries 2,700 feet from the last samples collected. The two rows of wet sample locations reported during the September 2008 survey covered a distance of only 1,000 feet beyond the samples collected in May 2008.

- Inspectors did not collect samples from any of the UBB locations previously reported as too wet to sample. After the explosion, the entire 2,700-foot un-sampled area in Tailgate 1 North had sufficiently dried to permit sampling.

- Inspectors in two field offices (Mt. Hope and Princeton), both of which were in ADM Lincoln Selfe's division, did not report collecting any samples from previously wet locations using the Rock Dust Sample Submission application at any mine before the explosion. The remaining District 4 field offices reported collecting 1,566 samples from previously wet locations during that time, which accounted for 34% of the national total.

**Mitigating Factors:**

- Sampling was not required under conditions reported by inspector Stevens because the material would have been too wet to propagate an explosion, and the mine dust could not have been collected by sweeping with a brush (the industry and government standard method used since prior to the Mine Act). Moist mine dust forms a paste, which cannot be swept.

- Wet mining conditions were common during development at UBB and at other mines in southern West Virginia. During FY08 and FY09, inspectors identified 67% of the all sampling locations in District 4 as being too wet to sample. Such conditions are most prevalent during summer months (such as during the

22

subject inspection) due to condensation, as fresh air cools while flowing through the mine.

- Elevations on the UBB mine map showed that advancing sections generally mined down-dip, particularly in the explosion area.  Any water produced in the advancing gate entries would tend to flow toward the working faces.  This was consistent with the inspectors' findings that newly mined areas were too wet to sample.  Observations after the explosion showed that advancing working sections in the explosion area had remained wet.

- With no way to map the September 2008 survey sample locations, Inspector Lucas could not accurately determine where to begin his survey.  Instead, Inspector Lucas started his December 2008 survey at break 58 (the section loading point at the time of the previous survey), which should have been the end point of the September 2008 survey by Stephens.  This was Inspector Lucas' first assignment as the lead inspector for an MSHA regular inspection.

- The September 2008 survey documentation deficiencies also made it difficult for subsequent inspectors to locate areas in Tailgate 1 North that needed to be re-inspected for sampling.  CMS&H did not incorporate instructions, implemented in 2006, to use MSHA Form 2000-210 (*Rock Dust Survey Wet Locations Tracking Form*) in the January 2008 revision to the *General Coal Mine Inspection Procedures and Inspection Tracking System* Handbook.

- Prior to the explosion, DM Robert Hardman became aware that the inspectors were not consistently using the *Rock Dust Survey Wet Locations Tracking Form* and took corrective actions with ADM Selfe who directed inspectors to use this form during regular inspections.  Inspector Jerome Keith Stone completed the form during the inspection immediately prior to the explosion, but had difficulty identifying previously wet locations from information on the form.  Since he was not directed to use the form until near the end of the inspection, he completed the form retroactively, instead of referencing it as a guide to identify areas that needed sampling.

*Here*

### Failure to Collect Rock Dust Samples in Previously Surveyed Areas

**Requirements**: The *General Coal Mine Inspection Procedures and Inspection Tracking System* Handbook directs inspectors to collect samples "when any doubt exists concerning adequacy of rock dust applications in the active workings of the mine."  It also specified that outby areas be inspected for "compliance with applicable standards," which includes 30 CFR 75.403.

Confidential Agency Document
DLB-000691                    MSHA-G.FESAK-0029

**Findings**: After the explosion, MSHA collected rock dust samples at UBB from areas where 38 surveys had been conducted since October 2004.  Analysis results of samples collected during the accident investigation showed that none of the original survey areas had remained in full compliance with 30 CFR 75.403.  These areas included both originally non-compliant surveys (after which additional rock dust was applied for violation abatement) and ten originally compliant surveys.  None of the Mt. Hope inspectors collected spot rock dust samples at UBB to determine if rock dust in previously surveyed areas had since been contaminated or to determine if compliance had been achieved when terminating violations of 30 CFR 75.403.

**Mitigating Factors**:

- Procedures in effect during the IR team's review period permitted inspectors to visually evaluate the adequacy of rock dust in older mine workings.

- The IR team did not identify a specific location where an inspector should have collected a spot rock dust sample.

### *Failure to Collect Rock Dust Samples where Mining Equipment had been Recently Removed*

**Requirements**: The *General Coal Mine Inspection Procedures and Inspection Tracking System Handbook* states:

> Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed.  All active entries not previously surveyed shall be surveyed.  Outby areas of a retreating section and active areas where advancing MMUs have been removed are considered active entries for rock dust survey purposes.

**Findings:** Inspectors did not collect rock dust survey samples in the Old 2 Section Panel and the Panel No. 2 Crossover within the explosion area.

On December 29, 2009, Inspector Kevin Lyall documented conducting a survey for 1 Section, but he did not collect any samples, reporting a single location as "No Sample."  The inspector commented on the Rock Dust Sample Submission Form: "The mine operator has mined less than 500 feet since last survey area."  However, since the prior rock dust survey for 1 Section, it had mined the last 500 feet of Headgate 1 North (Bandytown Shaft bottom area), the entire 1,400-foot long Panel No. 2 Crossover and the first 250 feet of Headgate #22.  Sampling should have been attempted in each of these areas at that time, except for portions of the Headgate #22 entries.

24

During the second regular inspection for FY10, Inspector Jerome Keith Stone submitted two rock dust surveys with no samples collected.  In both cases, the inspector documented on the Rock Dust Sample Submission Forms that the "section has not advanced 500 feet from last survey."  As in the previous example, the inspector did not consider areas from which mining equipment had been removed since the previous survey.  As a result, panels from which two mechanized mining units (MMUs) had recently been removed remained un-sampled prior to the explosion, including the Old 2 Section panel in the explosion area.

**Mitigating Factors**:

- Prior to 2008, MSHA procedures directed inspectors to conduct rock dust surveys only on advancing sections.  At that time, inspectors typically collected survey samples only from the entries immediately outby active advance mining.  As a result, inspectors frequently did not collect samples at the inby ends of panels or main entries where mining was completed between surveys.  After MSHA implemented the revised inspection procedures in 2008, some inspectors continued to sample only the set of entries being mined at the time of the survey.

- Inspector Lyall stated that he primarily learned how to conduct surveys by traveling with other inspectors.  The only Academy training he remembered was the instruction to take samples every 500 feet and how to collect band samples.  This further demonstrated that at least some inspectors continued to follow superseded procedures, passed on by more experienced inspectors and supervisors.

- Inspection procedures did not address how to document surveys in which no samples were collected for reasons other than wet locations.

*Failure to Extend the Rock Dust Survey in the Headgate #22 Entries*

**Requirements**: The *General Coal Mine Inspection Procedures and Inspection Tracking System Handbook* also states that "The inspector shall conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the mine."

**Findings**: On March 15, 2010, Inspector Jerome Keith Stone, with the assistance of Inspector Trainee Doy Russell, conducted the last survey on Headgate #22 prior to the explosion.  Inspector Stone ended the survey 1,000 feet outby the section loading point. At least two additional sample rows were needed to extend the survey to within 50 feet of the section loading point.

25

Confidential Agency Document
DLB-000693                          MSHA-G.FESAK-0031

**Mitigating Factors**:

- Interviews revealed that the inspection party had difficulty collecting samples due to high moisture content in this area.

### Inspectors Did not Always Use the Mine Operator's Records of Examinations When Determining Negligence

**Requirements:** The General Coal Mine Inspection Handbook stated: "In all cases, mine records pertinent to the issuance of a citation, order, or safeguard shall be reviewed prior to placing the enforcement action in writing." This Handbook further stated: "Daily documentation for enforcement actions; which shall include all facts relevant to the condition or practice cited and information regarding the negligence and gravity determinations.... When documenting these facts the inspector must show the level of negligence (none, low, moderate, high, and reckless disregard); the facts and circumstances that support the negligence level assigned for each citation and/or order."

MSHA regulation 30 CFR 100.3(d) defined high negligence as "The operator knew or should have known of the violative condition or practice and there are no mitigating circumstances." This regulation also stated that mitigating circumstances "may include, but are not limited to, actions taken by the operator to prevent or correct hazardous conditions or practices."

**Findings:** The IR team examined UBB's record books for the North Area Belts (area affected by the explosion) for the period December 6, 2009, to April 5, 2010. The record books contained a total of 335 on-shift belt examination records. A total of 2,194 entries describing uncorrected hazards were recorded for this period. The IR team compared MSHA inspections of belt conveyors to conditions identified in this limited sample of examination books. This comparison showed that inspectors inspected belt flights 19 times on shifts where examination records indicated that the area needed to be rock dusted or cleaned. Corrective actions were recorded for only 2 of the 19 accumulations. When inspectors examined these belts, they cited accumulations of combustible materials on six occasions, all with the operator's negligence evaluated as moderate.

**Mitigating Factors:**

- Inspectors documented that they checked mine records relevant to approximately two-thirds of the applicable citations and orders issued. However, they often did not document the specific examination records they reviewed but rather recorded general statements that applied to multiple

26

Confidential Agency Document
DLB-000694                    MSHA-G.FESAK-0032

records, such as weekly or preshift exams.  MSHA procedures did not provide specific guidance for inspectors to review older examination records relevant to enforcement actions.

- MSHA directives have not provided a clear process for evaluating negligence and gravity since the Mine Citation/Order Form was revised in 1982 to include the inspector's evaluation of these factors.  Note-taking instructions for documenting facts related to the inspector's evaluations of negligence and gravity were in the form of questions.  This likely caused some inspectors to simply record answers to these questions, rather than include the relevant facts used to derive their conclusions.  In many cases, inspectors answered these questions with opinion-based conclusions, rather than facts to support them.

- An evaluation of all enforcement actions during the review period showed that most inspectors performed poorly at documenting facts related to negligence. Based on the experience of the IR team, it is believed that this problem is not isolated to District 4.  Therefore, this issue is not specific to the few inspectors identified in the limited comparison of belt examination records to enforcement actions (only the last four months of belt examination records were available to the IR team).

## Coal Dust Accumulations and Rock Dusting in the 1 North Tailgate

**Requirements:** Mandatory safety standard 30 CFR 75.400 required, in relevant part, that "Coal dust, including float coal dust deposited on rock dusted surfaces, loose coal, and other combustible materials, shall be cleaned up and not be permitted to accumulate in active workings." The operator was required by 30 CFR 75.400-2 to establish and maintain a "program for regular cleanup and removal of accumulations of coal and float coal dust, loose coal, and other combustibles."

Mandatory safety standard 30 CFR 75.402 required all underground areas of a coal mine, except those areas in which the dust is too wet or too high in incombustible content to propagate an explosion, to be rock dusted to within 40 feet of all working faces, unless such areas are inaccessible or unsafe to enter.  All crosscuts that are less than 40 feet from a working face also were required to be rock dusted.

At the time of the explosion, mandatory safety standard 30 CFR 75.403 required rock dust to be distributed on the top, floor and sides of all underground areas of a coal mine and maintained in such quantities that the incombustible content of the combined coal dust, rock dust, and other dust was not less than 65%.  The incombustible content in return air courses was to be no less than 80%.

27

Confidential Agency Document
DLB-000695                          MSHA-G.FESAK-0033

The General Coal Mine Inspection Handbook directed inspectors to observe the complete mining cycle on each active producing working section during regular inspections, including an evaluation of cleanup and rock dusting.  This Handbook also directed inspectors to review the operator's cleanup program and compare it to their observations in the mine.

In addition, the Handbook directs inspectors to collect samples "when any doubt exists concerning adequacy of rock dust applications in the active workings of the mine." Accordingly, inspectors are expected to make visual estimations of rock dust adequacy during each regular inspection of all underground active workings, including each working section, air course, tailgate travelway, bleeder, and unsealed worked out area.

**Findings:** The MSHA Accident Investigation team found that a localized methane explosion near the longwall tailgate transitioned into a coal dust explosion when it suspended and ignited coal dust accumulated in the tailgate entries.  Dangerous float coal dust accumulations and insufficient rock dusting caused the explosion to propagate throughout the northern portion of UBB.

The Accident Investigation team observed coal accumulations in the explosion area that ranged from a thin observable layer of float coal dust on elevated surfaces to as much as four feet deep in travelways.  Many of these accumulations were created during the initial development stages of the mining process.  Concurrent with the accident investigation, MSHA also issued 24 citations and orders for similar conditions outby the explosion area.

The tailgate was traveled four times during the second regular inspection for fiscal 2010. On March 9, 2010, a ventilation specialist (Keith Sigmond) and a field office supervisor (Thomas Moore) inspected the tailgate as part of a ventilation saturation inspection.  On March 10, an inspector (Jerome K. Stone) traveled the 1 North Longwall tailgate travelway on the day shift and the same specialist who issued the order on the previous day traveled the tailgate on the evening shift.  On March 11, the same inspector was in the tailgate travelway to terminate an order for the violation of the ventilation plan issued as a result of the saturation inspection.

The specialist, supervisor, and inspector did not identify a violation of 75.400 (accumulations) or 75.403 (inadequate rock dusting) during these inspections.

**Mitigating Factors:**

- MSHA inspectors were not reluctant to cite accumulations of coal, coal dust and float coal dust at UBB when they recognized them.  Over the life of the mine, UBB received more citations and orders for violations of 30 CFR 75.400 than for

28

any other standard.  MSHA personnel issued 30 citations and orders during the IR review period for accumulations of loose coal, coal dust or float coal dust at UBB.  Of these, 25 involved accumulations along belt conveyors, one of which resulted in a section 104(b) order.

As indicated in the following table, inspectors cited coal and coal dust accumulations eight times during the last complete regular inspection before the explosion:

| Date | Location | Description |
|------|----------|-------------|
| January 19 | No. 5 Ellis Belt Drive | Coal and coal fines |
| January 19 | No. 5 Ellis Belt – 100 feet long | Coal and coal fines |
| January 28 | 22 Headgate Belt  - Entire length | Coal, coal dust and float coal dust |
| March 9 | 22 Headgate Belt- 360 feet long | Float Dust |
| March 15 | Longwall Belt Drive | Coal and Coal Dust |
| March 15 | Longwall Belt - Entire Length | Fine coal dust |
| March 15 | 5 North Belt - 350 feet long | Coal and fine coal dust |
| March 15 | 22 Headgate tailpiece- 8 feet wide | Loose coal and float coal dust |

- Inspectors also conducted two rock dust surveys during the inspection prior to the explosion.  A rock dust survey was conducted on the No. 3 Unit on January 26, 2010.  The survey results were noncompliant and the operator was cited on February 8.  On March 15, an inspector conducted a rock dust survey on the 22 Headgate section.  The results of the survey were not received until after the explosion.  (Seven of the eight samples collected were compliant.)

- There are two factors that could explain why inspectors did not cite accumulations of coal and coal dust in the 1 North tailgate entries during their inspection activities on March 9 – 11: they did not recognize the accumulations as noncompliant or the area became contaminated and noncompliant after their last presence:

  o **Inspectors did not recognize the area as non-compliant.**  MSHA procedures instruct inspectors to make visual estimations of rock dust adequacy during each regular inspection.  The procedures do not require inspectors to collect samples unless they doubt the adequacy of rock dust applications.

    **The 1 North Tailgate entries became contaminated after March 11.**  The operator did not routinely apply rock dust in the longwall tailgate entries.  Frequent application of rock dust downwind of coal dust generating sources, such as longwall shearers, is necessary to maintain compliance with 30 CFR

29

75.400 and 75.403.  When properly performed, this practice provides the dual protection of preventing float coal dust from accumulating on top of rock dusted surfaces and maintaining the incombustible content of the combined mine dust.  The rock dust survey conducted on the 22 Headgate section on March 15 is illustrative.  Seven of eight samples collected during the survey were compliant; however, all post-explosion samples on the section were noncompliant.

○  It is also possible that UBB personnel applied rock dust before MSHA inspectors arrived on the 1 North Longwall on March 9.  In testimony before the U.S. District Court for the Southern District of West Virginia Gary May, the former superintendent at UBB, stated that Performance Coal Company officials intentionally hid or corrected hazardous conditions and applied rock dust to areas in UBB as MSHA inspectors traveled to inspect those areas.

Inspection and mine production records indicate that six MSHA personnel arrived at UBB at about 8:10 am on March 9 to conduct a ventilation saturation inspection.  A specialist (Keith Sigmond) and supervisor (Thomas Moore) arrived on the 1 North longwall tailgate about 9:50 am.  When they arrived on the section the longwall had been shut down.  This allowed UBB personnel over one and a half hours to apply rock dust to the tailgate entries.

*Inspectors did not Identify the Widespread and Continued Non-compliance with Clean-up and Rock Dusting Standards along Belt Conveyors Reported in the Operator's Records of Examinations*

**Requirements:** The General Coal Mine Inspection Handbook stated:

Before physically inspecting an area of a mine, the inspector shall conduct a limited review of the operator's most recent examination records pertinent to the planned inspection activity for that day.  More than one record will often apply to an area, such as preshift, on-shift, daily, and weekly examinations.  When a record of examination lists a condition that may identify a serious hazard, the inspector should thoroughly document the hazards in the narrative portion of the inspection notes and proceed to this area immediately.  If additional areas are inspected (other than those planned at the start of the shift), pertinent examination records shall also be examined prior to leaving the mine property.  In all cases, mine records pertinent to the issuance of a citation, order, or safeguard shall be reviewed prior to placing the enforcement action in writing.

All records and postings listed in this section pertinent to the mine being inspected shall be reviewed during a Regular Safety and Health inspection.

30

Confidential Agency Document
DLB-000698                                MSHA-G.FESAK-0036

Before the inspection is completed, records shall be reviewed back in time to the ending date of the previous Regular Safety and Health inspection.

During all onsite enforcement activities, inspectors shall compare the results of their record and posting reviews to actual observations in or at the mine. The appropriate citation or order shall be issued when non-compliance has been determined during these reviews or observations."

**Findings:** The majority of the 2,194 total entries in the North Belt Examination books documenting uncorrected hazards suggest that violations of 30 CFR 75.400 and 30 CFR 75.363(a) existed and should have been cited. Inspectors did not recognize that repeated entries in the examination books of belt entries needing cleaning and dusting represented a serious hazard that they should address. There were no violations cited for the operator's failure to record corrective actions taken for reported hazards during these inspections.

**Mitigating Factors:**

- Many inspectors were not aware that the failure to record corrections to hazards identified in the examination books constituted a violation of 30 CFR 75.363(b).

- Prior to going underground, inspectors typically only have time to review examination records for areas that they plan to inspect on that day. Therefore, they would not always be aware of hazards recorded for other areas of the mine or thus be prompted to redirect their planned activity.

- Determining when the amount of coal dust or loose coal constitutes a violation of 30 CFR 75.400 can be subjective and varies between individuals. Therefore, an examination report that a belt "needs cleaned and dusted" does not necessarily mean that a violation 30 CFR 75.400 existed. This issue was not specific to a single inspector.

- Inspectors are only required by the Mine Act to inspect each belt four times per year. During that same period, the operator will typically conduct over 1,000 examinations of each belt. Therefore, the number of violations reported by the operator may be highly disproportionate to those cited by inspectors. After a belt is inspected, operators may be less attentive to compliance in that area until the next inspection quarter. The operator's records of examinations indicated that hazardous conditions became more prevalent after March 30, which was the last day before the explosion that MSHA inspected the northern portion of the mine.

31

## Review of Potentially Flagrant Violations

**Requirements:** Section 110(b)(2) of the Mine Act, as amended by the MINER Act, states:

> Violations under this section that are deemed to be flagrant may be
> assessed a civil penalty of not more than $220,000.  For purposes of the
> preceding sentence, the term 'flagrant' with respect to a violation means a
> reckless or repeated failure to make reasonable efforts to eliminate a
> known violation of a mandatory health or safety standard that
> substantially and proximately caused, or reasonably could have been
> expected to cause death or serious bodily injury.

Procedure Instruction Letter (PIL) No. I06-III-04, effective October 26, 2006, established
procedures for district personnel to identify violations of mandatory safety and health
standards as potentially flagrant violations.[13]

**Findings:** District 4 inspectors issued eight section 104(d)(2) orders for violations at UBB
that met the criteria outlined in PIL No. I08-III-02 for special assessment as potentially
flagrant violations.  Seven orders met the criteria for the "repeated failure" of the
operator to make reasonable efforts to eliminate known violations, and one met both
the "repeated failure" and "reckless failure" criteria.  However, District 4 personnel did
not review any of the eight orders as potentially flagrant violations.  As a result, none of
the eight orders were submitted to the Coal Administrator for him to determine
whether the violations were flagrant.[14]

MSHA has taken action to ensure that field personnel recognize and submit potentially
flagrant violations to the Administrator.  MSHA developed a tool for inspectors' laptop
computers that automatically alerts them when a violation meets the objective criteria
for a flagrant violation. This tool was provided to inspectors in April 2011.  In addition,
in June, 2011, MSHA deployed the "Potential Flagrant Violations Not Assessed"
oversight report, which incorporates the criteria used to identify flagrant violations to
give a tool to supervisors, managers and non-enforcement personnel to identify
potential flagrant violations.  Finally, effective February, 2012, MSHA implemented a
reorganization designed to centralize its oversight of certain cross-cutting, compliance-
related actions.  MSHA's Office of Assessments, Accountability, Special Enforcement

---

[13] MSHA reissued PIL I06-III-04 without substantive change as PIL I08-III-02 on May 29, 2008.

[14] Nationally, including District 4, at least 318 violations cited at coal mines during the review period met
the "numbered objective criteria" outlined in PIL No. I08-III-02 for review as potentially flagrant
violations.  Coal district offices reviewed and submitted 84 (26%) of these violations to the Administrator
for Coal for final determination as required by the PIL.

32

and Investigations manages the evaluation and development of strategies to improve the use of other enforcement tools, such as flagrant violations and special assessments.

**Mitigating Factors:**

*(handwritten: 1 and 7)*   *(handwritten: 7 of 8 repeated)*

- The "reckless failure" criteria for flagrant violations are easily recognizable as they relate only to the cited violation, and the determination is apparent during the citation or order writing process.  By contrast, the "repeated failure" criteria require the inspector to have knowledge of the unwarrantable failure violation history at the mine for the previous 15 months.  At the time of the April 5 explosion, MSHA did not have an automated tool to alert enforcement personnel that certain violations should be reviewed as potentially flagrant violations.

- Procedure Instruction Letter I06-III-04 implemented a revised Special Assessment Review (SAR) Form to initiate the special assessment process for "proposed" flagrant violations.  While the PIL clearly instructed inspectors to use the SAR Form when proposing a violation as flagrant, it did not specifically direct inspectors to complete a SAR Form for each violation that met the "numbered objective criteria" for potentially flagrant violations.  Although counter to MSHA's intent, this could be interpreted to give inspectors discretion in determining whether a SAR should be submitted.

- Training on and District oversight of the implementation of the flagrant violation provision of the MINER Act was not effective.  The IR team interviewed District 4 personnel regarding the criteria and procedures for evaluating potentially flagrant violations.  The DM, ADMs, and one inspector demonstrated a comprehensive understanding of MSHA procedures regarding flagrant violations.  Most other interviewees recalled flagrant violations being discussed during training or staff meetings, but they displayed limited or no knowledge of the criteria or procedures for evaluating them.

- The agency did not develop a computer report to allow headquarters to oversee field conformance to the procedures outlined in PIL No. I08-III-02.

**Review of Possible Knowing/Willful Violations**

**Requirements:** Section 110(c) of the Mine Act contains provisions for civil and criminal penalties against a director, officer, or agent of a corporate operator who knowingly orders, authorizes, or carries out a violation of the Mine Act or a mandatory safety or health standard.  Under section 110(d) of the Mine Act, the Agency may pursue criminal proceedings against an operator who willfully violates the Mine Act or a mandatory safety or health standard.

33

The MSHA Program Policy Manual and the Special Investigations Procedures Handbook both establish the types of citations and orders that must be reviewed to determine if they describe possible knowing and/or willful violations.

**Findings:** The IR team found that six section 104(d) citations and orders issued at UBB addressed conduct for which it would have been appropriate to open section 110(c) Special Investigations, or at minimum to conduct preliminary Special Investigations. However, the Special Investigations workgroup conducted only one Preliminary Special Investigation, and neither the Supervisory Special Investigator (SSI) nor the DM documented any recommendation for further action on the PKW Form. A special investigation was not pursued.

In the other five cases, the SSI disagreed with the inspectors' gravity determinations. The DM concurred with the SSI's decision and investigations were not conducted. The IR team <u>believes</u> that sufficient evidence was provided to document a high degree of risk to miners for each of these violations. The issuing inspectors' notes combined with the Condition or Practice section of the orders supported the inspectors' gravity determinations. The supervisory special investigator did not properly document the reasons for not conducting the special investigations.

<u>**Mitigating Factors:**</u>

- The District 4 Special Investigations workgroup did not have sufficient staff to conduct a full range of investigations. This limited the District's ability to use all of the enforcement tools provided by the Mine Act.

- The Special Investigations Procedures Handbook directed that the 35 section 105(c) discrimination complaints investigated during the review period be given resource priority over section 110(c) cases.

- Resource limitations also forced the DM to redirect SI personnel to assure that mandated inspections were completed.

34

Administrative Grievance

10 work days from tomorrow

- no specific form

grievance must contain everything on the letter.

DRR

filed w/ John K Moran

once grievance is filed
notified in writing of whether

accepted

discuss w/ Moran
his decision be final

— OSM process 1 day suspension
April 9, 2013

assuming its April 9, 2013
code be 8hr US
US.

will process the form 50
that will go into EOPF

letters will not go into EOPF
proposed letter already gone
away

did away w/ 2 charges
kept Change on flagrant.

Confidential Agency Document
DLB-000703                                    MSHA-SELFE-0001

| | |
|---|---|
| **From:** | Hugler, Edward - ASAM |
| **Sent:** | Monday, September 17, 2012 2:54 PM |
| **To:** | Silvey, Patricia - MSHA |
| **Subject:** | FW: MSHA Cases |
| **Attachments:** | Administrator counseling letter.doc; Winston proposed 14 day suspension.doc; Moore proposed 10 day suspension.doc; Selfe proposed 20 day suspension.docx; Thomas proposed 20 day suspension.doc |

Pat,

I think the attached drafts are a good foundation for the proposals. At this point, we need to transition this to MSHA for action as we discussed.

**From:** Rose, Sydney T - OASAM HRC
**Sent:** Monday, September 17, 2012 2:22 PM
**To:** Cameron, Ernest - MSHA; Crawford, Nancy M - MSHA
**Cc:** Hugler, Edward - ASAM; Kramer, Donna L - OASAM HRC; Hooper, Shawn - OASAM HRC
**Subject:** FW: MSHA Cases

Earnest and Nancy: Over the course of many discussions and meetings with MSHA, OASAM agreed to complete a draft counseling memo by September 19 and draft notices of proposed submission by the week of September 24. It has now come to my attention that Mr. Main wants and expects all of these notices to be completed by this Wednesday (9/19). It is not possible for us to meet that new deadline. As you know, Donna Kramer provides employee and labor relations services to all OASAM client agencies and her work load simply does not permit this sudden deadline adjustment. I am forwarding the work done by Donna Kramer thus far so that MSHA's HR Office can take over and complete these actions.

*Sydney*

**From:** Kramer, Donna L - OASAM HRC
**Sent:** Monday, September 17, 2012 12:32 PM
**To:** Rose, Sydney T - OASAM HRC
**Cc:** Hugler, Edward - ASAM
**Subject:** RE: MSHA

Please see attached.

Donna L. Kramer
Supervisory Human Resources Specialist
Office of Human Resources Consulting
and Operations
U.S. Department of Labor
OASAM/OHRCO
Phone: 202-693-7686
Kramer.Donna.L@dol.gov

The contents of this email and any attachments to it may contain confidential and/or legally priviledged information. This information is only for use by the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking action based upon the information contained herein is strictly prohibited. If this email was received in error, please notify the sender and return the documents immediately.

*How Was My Service? Click Here (3 minute survey):* http://dol-hrc.customerservicesurvey.sgizmo.com/s3/

| | |
|---|---|
| **From:** | Hicks, Jacquelyn - MSHA |
| **Sent:** | Tuesday, September 18, 2012 9:56 AM |
| **To:** | Fesak, George M - MSHA |
| **Cc:** | Crawford, Nancy M - MSHA; Polk, Lareatha - MSHA |
| **Subject:** | FW: MSHA Cases |
| **Attachments:** | Administrator counseling letter.doc; Winston proposed 14 day suspension.doc; Moore proposed 10 day suspension.doc; Selfe proposed 20 day suspension.docx; Thomas proposed 20 day suspension.doc |

**Importance:**        High

Good Morning Mr. Fesak,

Please see the attached memorandums.  OASAM was originally working on them but now they are back with MSHA HR.  I wasn't involved in the investigation so I'd like your help in finalizing them.  Do you have time today to assist me with these actions?

v/r,

~J~

Jacquelyn N. Hicks
HR Specialist, Labor/Employee Rel. Branch
Mine Safety and Health Administration (MSHA)
1100 Wilson Boulevard
Arlington VA 22209 -3939
Phone (202)693-9866
hicks.jacquelyn@dol.gov

*"My grandfather once told me that there were two kinds of people: those who do the work and those who take the credit. He told me to try to be in the first group. There is much less competition." -Ghandi*

*"A fundamental difference between management and leadership is the intrinsic understanding that just because you have the right to do it, doesn't make it the right thing to do." -Me*

Confidential Agency Document
DLB-000706  MSHA-SOURCE-1-ARCHIVE-0003

DATE:                    SEPTEMBER 17, 2012

MEMORANDUM FOR: KEVIN G. STRICKLIN
                         Administrator
                         Coal Mine Safety and Health

FROM:                    PATRICIA W. SILVEY
                         Deputy Assistant Secretary
                         Office of the Assistant Secretary

SUBJECT:                 Counseling Memorandum
                         Program Direction and Control

This is to notify you of an area of concern regarding your management
responsibilities as they relate to the duties of your position.

The duties of the Administrator for Coal Mine Safety and Health (CMS&H)
require you to exercise management control and direction of all programs
authorized by the Federal Mine Safety and Health Act to ensure the safety and
health of the nation's miners.  However, your oversight and control of all
programs has not been as effective as it should be.

The issues relating to this matter were raised to my attention when I read the
"Internal Review of MSHA's Actions at the Upper Big Branch Mine – South"
report (IR) of the April 10, 2010, Upper Big Branch accident investigation.
Accordingly, since I have recently become aware of your actions via the IR
report, I am now addressing your misconduct through this counseling
memorandum.

The IR report revealed that you relied too heavily on Deputy Administrator,
Charles Thomas, to provide sound leadership and direction in the planning,
development, execution, and administration of policies and programs designed to
prevent injury, disease, and death from mining in the coal mining industry.

You were unaware of issues that required your experience and attention even
though you had regular briefings with Mr. Thomas.  Specifically, you were
unaware  that District 4 failed to provide the necessary oversight to ensure that
the too wet to sample survey computer application was used in the Mt. Hope and
Princeton field offices; that District 4 failed to provide adequate oversight to
ensure that inspectors reviewed potentially flagrant violations in accordance with
the Procedure Instruction Letter, No. I08-III-02; that the District 4 Roof Control
Department did not use checklists required by CMS&H Memo HQ-08-059-A; that

I have determined that your conduct, as described above, is inappropriate.
Therefore, I must take the corrective measures to address your behavior.  As an

employee under my direct supervision, I am directing to you complete the following tasks prior to April 30, 2013.

- Ensure that all corrective actions assigned to Coal Mine Safety and Health (CMS&H) made in response to the Internal Review Report on Upper Big Branch are effectively and timely accomplished.
- Work with the Director of the Office of Assessments, Accountability, Special Enforcement and Investigations (OASSEI) to develop a means for evaluating the effectiveness of corrective actions in the agency's internal reviews, as well as in its accountability reviews.
- Ensure that new and revised inspection procedures are implemented through the established MSHA's Directives System.

Please be advised that failure to follow this course of your official duties may lead to future disciplinary action. However, I believe timely completion of the tasks above, in addition to the counseling memorandum, will ensure future misconduct does not occur.

September 28, 2012

MEMORANDUM TO:      THOMAS V. MOORE, SR.
Supervisory Coal Mine Safety and
Health Inspector

FROM:      KEVIN G. STRICKLIN
Administrator
Coal Mine Safety and Health

SUBJECT:      Notice of Proposed Ten (10) Day
Suspension

This is a notice of a proposal to suspend you from duty and pay for ten
(10) calendar days from your position of Supervisory Coal Mine Safety
and Health Inspector, GS – 1822 – 13, in the Mount Hope, WV Field
Office, no sooner than ten (10) calendar days from your receipt of this
notice.  This action is being proposed to promote the efficiency of the
service and is issued in accordance with Title 5, Code of Federal
Regulations, Part 752, and Departmental Personnel Regulations (DPR)
752.  The reasons and specifications upon which the proposal is based
are as follows.

**Reason:  Failure to Carry out Your Official Duties**

**Specification 1**

On January 12, 2010, Coal Mine Safety and Health (CMS&H) Inspector
and Authorized Representative (AR) Perry Brown, allowed a Right of
Entry (ROE) trainee Sabian Vandyke to travel to "3 unit" of the Upper
Big Branch (UBB) mine to check the lifeline citation 8090251 to
determine if it was terminated.

Inspector Brown recorded this information on page 10 of MSHA Form
7000-10K dated January 12, 2010.  He wrote "Scott Vandyke went to
3 unit and checked the lifeline citation # 8090251 is terminated.  P
wrote out citation and drove back to Mt. Hope."

On January 20, 2010, you initialed Inspector Brown's MSHA Form
7000-10K at the bottom of the form on the line designated for the

supervisor's initials and date. You did not question Mr. Brown or Mr. Vandyke regarding the possibility that Mr. Vandyke travelled alone.

When asked by the MSHA Internal Review (IR) Team about the District's policy regarding trainees travelling apart from the inspector they were assigned with you stated that they (trainees) are not to travel alone.

When you signed Form 7000-10K you condoned a violation of Section 103(a) of MSHA's Program Policy Manual, which states in relevant part:

*Inspections and investigations under the Federal Mine Safety and Health Act of 1977 shall be conducted only by persons who have been authorized by the Secretary to conduct such inspections or investigations.*

## Specification 2

On January 28, 2010, you documented that you reviewed the Uniform Mine File (UMF) prior to accompanying an inspector who was conducting a section 103(i) spot inspection at UBB. The approval letter is date stamped January 20, 2010, and the roof control plan was filed in the UMF.

Page 19 of the base roof control plan submitted by the mine operator on October 27, 2009, was approved by the District Manager on December 23, 2009, required the tailgate travelway of initial longwall panels to have supplemental support in the form of two rows of 8 – foot cable bolts or two rows or psts on 4 – foot cnteres installed in the middle of the entry between primary supports. This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times.

On March 9, 2010, you travelled with a ventilation specialist Keith ??? You and Mr. xxxxs inspected the tailgate of the 1 North Longwall at UBB. A serious violation of the ventilation plan was identified and an order issued for that condition. However, you failed to cite a violation of the roof control plan. When interviewed by the IR Team you stated that you could not recall if posts or cable bolts were installed in the tailgate entry.

Confidential Agency Document

A single row of posts would have complied with the 2005 roof control plan tailgate travelway requirement.  However, this was not the plan in effect on March 9, 2010.

Your failure to issue a citation or ensure Mr. XXX issued the citation for the tailgate roof support does not adhere to the established policies, rules, and regulations, interferes with the mission of the agency, and fails to promote the efficiency of the service.  It demonstrates a failure to carry out your official duties and mission critical tasks to which you have been assigned.

As a federal employee you are expected to carry out all of your official duties in a timely manner at all times.

In reaching my decision to propose a ten (10) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed.  You were and still are assigned to review the work of the inspection and technical personnel under your jurisdiction.  If you are unable to enforce agency policies by allowing an ROE trainee to travel unaccompanied and unable to cite a violation of the approved roof control plan, the inspectorate may be held to a lower standard of quality work.

A Supervisory CMS&H Inspector is a prominent position.  You are recognized by the mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act.

You were clearly on notice of agency policies and procedures.  In your position as a Supervisory CMS&H Inspector you are responsible for the quality and quantity of work produced by your subordinates ensuring agency policies are adhered to.  You were able to correctly recite District policy to the IR team when questioned on policy matters.

I considered your performance ratings for FY's 2010 and 2011 that were "Highly Effective", and the lack of prior disciplinary action in your personnel file.  Although you had 20 years of federal service at the time these infractions occurred, you had only worked in the Mount Hope Field Office for approximately four (4) months at the time of the Upper Big Branch mine explosion.

Confidential Agency Document

I believe that you will not commit these same or similar infractions in the future.  I am confident that you can be successful in carrying out all of your upcoming official duties.

However, these mitigating factors do not outweigh the seriousness of your actions.  I believe this proposed ten (10) calendar day suspension will promote the efficiency of the Federal service and is the least action I can take to correct your unacceptable conduct.  Any further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and other documentary evidence in support of your reply.  Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal.  Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration.  Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey<br>
Deputy Assistant Secretary for Operations<br>
1100 Wilson Blvd., 21st floor<br>
Arlington, VA 22209

If you wish to make an oral reply, you should contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative.  You must indicate your choice of representative in writing to Ms. Kramer at 200 Constitution Avenue, N.W., Room C-5516, Washington, D.C. 20210. Copies of the materials on which this proposal is based are attached.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Kramer.

You are advised to acknowledge receipt of this notice in the spaces provided below. An acknowledgment does not mean that you agree with the contents of this letter, only that you have received this notice.


_____          _____

Acknowledge Receipt – Signature              Date

September 28, 2012

MEMORANDUM TO:      CHARLES J. THOMAS
                                  Deputy Administrator
                                  Coal Mine Safety and Health

FROM:                  KEVIN G. STRICKLIN
                                  Administrator
                                  Coal Mine Safety and Health

SUBJECT:            Notice of Proposed Twenty (20) Day
                                  Suspension

This is a notice of a proposal to suspend you from duty and pay for twenty (20) calendar days from your position of Deputy Administrator, ES-1822, Coal Mine Safety and Health (CMS&H), no sooner than thirty (30) calendar days from your receipt of this notice.  This action is being proposed to promote the efficiency of the service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752.  The reasons and specifications upon which the proposal is based are as follows.

**It is important to note that at the time you failed to carry out your official duties, your position of record was the Director, Office of Accountability, GS – 0340 – 15, and you were detailed to the Deputy Administrator position.  As such, this proposed action is based upon your official position during the time period mentioned in this proposed action.**

**Reason:  Failure to Carry out Your Official Duties**
**Specification 1**

**Specification 2**

As a federal employee you are expected to conduct yourself in a professional manner at all times and to carry out all official duties.

In reaching my decision to propose a twenty (20) calendar day suspension, I considered the nature and seriousness of your actions.

Confidential Agency Document
DLB-000714  MSHA-SOURCE-1-ARCHIVE-0011

Failing to carry out your official duties is one of the most serious infractions that can be committed.  You were assigned direct responsibility for all CMS&H districts; you were in charge of supervisor, assistant district managers, and district manager details.

The Deputy Administrator for CMS&H is a very prominent position.  You are recognized by the public, mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act.

You were clearly on notice of agency policies and procedures.  In your position as the Director, Office of Accountability, you determined compliance with policies and procedures.  Yet you chose not to take corrective action when it was determined that your subordinate employees were not carrying out their official duties in the most effective manner.

I also considered your performance rating for FY 2009 of "Exemplary" and FY's 2010 and 2011 ratings of "Highly Effective", your 21 years of federal service at the time these infractions occurred, and the lack of prior disciplinary action in your personnel file.

From April 2009 through December 2009 you accepted constructive criticism and learned from your mistakes.  Therefore, I believe that you will not commit these same or similar infractions in the future.  I am confident that you will be successful in carrying out all of your upcoming official duties.

However, these mitigating factors do not outweigh the seriousness of your actions.  I believe this proposed twenty (20) calendar day suspension will promote the efficiency of the Federal service and is the least action I can take to correct your unacceptable conduct.  Any further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and other documentary evidence in support of your reply.  Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal.  Full consideration will be given to any reply you make.

Confidential Agency Document
DLB-000715  MSHA-SOURCE-1-ARCHIVE-0012

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration.  Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

If you wish to make an oral reply, you should contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative.  You must indicate your choice of representative in writing to Ms. Kramer at 200 Constitution Avenue, N.W., Room C-5516, Washington, D.C. 20210. Copies of the materials on which this proposal is based are attached.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Kramer.

You are advised to acknowledge receipt of this notice in the spaces provided below.  An acknowledgment does not mean that you agree with the contents of this letter, only that you have received this notice.

| | |
|---|---|
| _____ | _____ |
| Acknowledge Receipt – Signature | Date |

September 28, 2012

MEMORANDUM TO:   DONALD WINSTON
                 Supervisory Mine Safety and
                 Health Specialist

FROM:            KEVIN G. STRICKLIN
                 Administrator
                 Coal Mine Safety and Health

SUBJECT:         Notice of Proposed Fourteen (14) Day
                 Suspension

This is a notice of a proposal to suspend you from duty and pay for
fourteen (14) calendar days from your position of Supervisory Coal
Mine Safety and Health Specialist, GS – 1822 – 13, in the Mount Hope,
WV District 4 Office, no sooner than ten (10) calendar days from your
receipt of this notice.  This action is being proposed to promote the
efficiency of the service and is issued in accordance with Title 5, Code
of Federal Regulations, Part 752, and Departmental Personnel
Regulations (DPR) 752.  The reasons and specifications upon which the
proposal is based are as follows.

**Reason:  Failure to Carry out Your Official Duties**

**Specification 1**

On January 12, 2010, Coal Mine Safety and Health (CMS&H) Inspector
and Authorized Representative (AR) Perry Brown, allowed a Right of
Entry (ROE) trainee Sabian Vandyke to travel to "3 unit" of the Upper
Big Branch (UBB) mine to check the lifeline citation 8090251 to
determine if it was terminated.

Inspector Brown recorded this information on page 10 of MSHA Form
7000-10K dated January 12, 2010.  He wrote "Scott Vandyke went to
3 unit and checked the lifeline citation # 8090251 is terminated.  P
wrote out citation and drove back to Mt. Hope."

On January 20, 2010, you initialed Inspector Brown's MSHA Form
7000-10K at the bottom of the form on the line designated for the

supervisor's initials and date.  You did not question Mr. Brown or Mr. Vandyke regarding the possibility that Mr. Vandyke travelled alone.

When asked by the MSHA Internal Review (IR) Team about the District's policy regarding trainees travelling apart from the inspector they were assigned with you stated that they (trainees) are not to travel alone.

When you signed Form 7000-10K you condoned a violation of Section 103(a) of MSHA's Program Policy Manual, which states in relevant part:

*Inspections and investigations under the Federal Mine Safety and Health Act of 1977 shall be conducted only by persons who have been authorized by the Secretary to conduct such inspections or investigations.*

## Specification 2

On January 28, 2010, you documented that you reviewed the Uniform Mine File (UMF) prior to accompanying an inspector who was conducting a section 103(i) spot inspection at UBB.  The approval letter is date stamped January 20, 2010, and the roof control plan was filed in the UMF.

Page 19 of the base roof control plan submitted by the mine operator on October 27, 2009, was approved by the District Manager on December 23, 2009, required the tailgate travelway of initial longwall panels to have supplemental support in the form of two rows of 8 – foot cable bolts or two rows or psts on 4 – foot cnteres installed in the middle of the entry between primary supports.  This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times.

On March 9, 2010, you travelled with a ventilation specialist Keith ??? You and Mr. xxxxs inspected the tailgate of the 1 North Longwall at UBB.  A serious violation of the ventilation plan was identified and an order issued for that condition.  However, you failed to cite a violation of the roof control plan.  When interviewed by the IR Team you stated that you could not recall if posts or cable bolts were installed in the tailgate entry.

Confidential Agency Document
DLB-000718  MSHA-SOURCE-1-ARCHIVE-0015

A single row of posts would have complied with the 2005 roof control plan tailgate travelway requirement.  However, this was not the plan in effect on March 9, 2010.

Your failure to issue a citation or ensure Mr. XXX issued the citation for the tailgate roof support does not adhere to the established policies, rules, and regulations, interferes with the mission of the agency, and fails to promote the efficiency of the service.  It demonstrates a failure to carry out your official duties and mission critical tasks to which you have been assigned.

As a federal employee you are expected to carry out all of your official duties in a timely manner at all times.

In reaching my decision to propose a fourteen (14) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed.  You were and still are assigned to review the work of the inspection and technical personnel under your jurisdiction.  If you are unable to enforce agency policies by allowing an ROE trainee to travel unaccompanied and unable to cite a violation of the approved roof control plan, the inspectorate may be held to a lower standard of quality work.

A Supervisory CMS&H Specialist is a prominent position.  You are recognized by the mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act.

You were clearly on notice of agency policies and procedures.  In your position as a Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates ensuring agency policies are adhered to.  You were able to correctly recite District policy to the IR team when questioned on policy matters.

I considered your performance ratings for FY's 2010 and 2011 that were "Highly Effective", the lack of prior disciplinary action in your personnel file, and your 17 years of federal service at the time these infractions occurred.

I believe that you will not commit these same or similar infractions in the future.  I am confident that you can be successful in carrying out all of your upcoming official duties.

However, these mitigating factors do not outweigh the seriousness of your actions. I believe this proposed fourteen (14) calendar day suspension will promote the efficiency of the Federal service and is the least action I can take to correct your unacceptable conduct. Any further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

If you wish to make an oral reply, you should contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Kramer at 200 Constitution Avenue, N.W., Room C-5516, Washington, D.C. 20210. Copies of the materials on which this proposal is based are attached.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Kramer.

You are advised to acknowledge receipt of this notice in the spaces provided below.  An acknowledgment does not mean that you agree with the contents of this letter, only that you have received this notice.



_____               _____

Acknowledge Receipt – Signature                    Date

September 28, 2012


MEMORANDUM TO:     LINCOLN L. SELFE, JR.
                          Supervisory Mine Safety and
                          Health Inspector

FROM:              KEVIN G. STRICKLIN
                          Administrator
                          Coal Mine Safety and Health

SUBJECT:   Notice of Proposed Twenty (20) Day Suspension

This is a notice of a proposal to suspend you from duty and pay for twenty (20) calendar days from your position of Supervisory Mine Safety and Health Inspector, GS – 1822 – 14, in the Mount Hope, WV District 4 Office, no sooner than thirty (30) calendar days from your receipt of this notice.  This action is being proposed to promote the efficiency of the service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752.  The reasons and specifications upon which the proposal is based are as follows.

Reason:  Failure to Carry out Your Official Duties

Specification 1

On January 12, 2010, Coal Mine Safety and Health (CMS&H) Inspector and Authorized Representative (AR) Perry Brown, allowed a Right of Entry (ROE) trainee Sabian Vandyke to travel to "3 unit" of the Upper Big Branch (UBB) mine to check the lifeline citation 8090251 to determine if it was terminated.

Inspector Brown recorded this information on page 10 of MSHA Form 7000-10K dated January 12, 2010.  He wrote "Scott Vandyke went to 3 unit and checked the lifeline citation # 8090251 is terminated.  P wrote out citation and drove back to Mt. Hope."

On January 20, 2010, you initialed Inspector Brown's MSHA Form 7000-10K at the bottom of the form on the line designated for the supervisor's initials and date.  You did not question Mr. Brown or Mr. Vandyke regarding the possibility that Mr. Vandyke travelled alone.

Confidential Agency Document
DLB-000722  MSHA-SOURCE-1-ARCHIVE-0019

When asked by the MSHA Internal Review (IR) Team about the District's policy regarding trainees travelling apart from the inspector they were assigned with you stated that they (trainees) are not to travel alone.

When you signed Form 7000-10K you condoned a violation of Section 103(a) of MSHA's Program Policy Manual, which states in relevant part:

Inspections and investigations under the Federal Mine Safety and Health Act of 1977 shall be conducted only by persons who have been authorized by the Secretary to conduct such inspections or investigations.

Specification 2

On January 28, 2010, you documented that you reviewed the Uniform Mine File (UMF) prior to accompanying an inspector who was conducting a section 103(i) spot inspection at UBB.  The approval letter is date stamped January 20, 2010, and the roof control plan was filed in the UMF.

Page 19 of the base roof control plan submitted by the mine operator on October 27, 2009, was approved by the District Manager on December 23, 2009, required the tailgate travelway of initial longwall panels to have supplemental support in the form of two rows of 8 – foot cable bolts or two rows or psts on 4 – foot cnteres installed in the middle of the entry between primary supports.  This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times.

On March 9, 2010, you travelled with a ventilation specialist Keith ??? You and Mr. xxxxs inspected the tailgate of the 1 North Longwall at UBB.  A serious violation of the ventilation plan was identified and an order issued for that condition.  However, you failed to cite a violation of the roof control plan.  When interviewed by the IR Team you stated that you could not recall if posts or cable bolts were installed in the tailgate entry.

A single row of posts would have complied with the 2005 roof control plan tailgate travelway requirement.  However, this was not the plan in effect on March 9, 2010.

Your failure to issue a citation or ensure Mr. XXX issued the citation for the tailgate roof support does not adhere to the established policies, rules, and regulations, interferes with the mission of the agency, and fails to promote the efficiency of the service.  It demonstrates a failure to carry out your official duties and mission critical tasks to which you have been assigned.

As a federal employee you are expected to carry out all of your official duties in a timely manner at all times.

In reaching my decision to propose a twenty (20) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed.  You were and still are assigned to review the work of the inspection and technical personnel under your jurisdiction.  If you are unable to enforce agency policies by allowing an ROE trainee to travel unaccompanied and unable to cite a violation of the approved roof control plan, the inspectorate may be held to a lower standard of quality work.

A Supervisory CMS&H Inspector is a prominent position.  You are recognized by the mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act.

You were clearly on notice of agency policies and procedures.  In your position as a Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates ensuring agency policies are adhered to.  You were able to correctly recite District policy to the IR team when questioned on policy matters.

I considered your performance ratings for FY's 2010 and 2011 that were "Highly Effective", the lack of prior disciplinary action in your personnel file, and your 28 years of federal service at the time these infractions occurred.

I believe that you will not commit these same or similar infractions in the future.  I am confident that you can be successful in carrying out all of your upcoming official duties.

However, these mitigating factors do not outweigh the seriousness of your actions.  I believe this proposed twenty (20) calendar day suspension will promote the efficiency of the Federal service and is the least action I can take to correct your unacceptable conduct.  Any

further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey<br>
Deputy Assistant Secretary for Operations<br>
1100 Wilson Blvd., 21st floor<br>
Arlington, VA 22209

If you wish to make an oral reply, you should contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Kramer at 200 Constitution Avenue, N.W., Room C-5516, Washington, D.C. 20210. Copies of the materials on which this proposal is based are attached.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Kramer.

You are advised to acknowledge receipt of this notice in the spaces provided below. An acknowledgment does not mean that you agree with the contents of this letter, only that you have received this notice.

_____         _____
Acknowledge Receipt – Signature          Date

| | |
|---|---|
| **From:** | George Fesak <gfesak@gmail.com> |
| **Sent:** | Thursday, September 20, 2012 8:22 PM |
| **To:** | Fesak, George M - MSHA |
| **Subject:** | File |
| **Attachments:** | PA Matrix.doc |

Upper Big Branch
Proposed Actions
09/21/2012

| Employee | OASAM Proposal | MSHA Proposal | MSHA Decision (After Employee Response) |
|---|---|---|---|
| **Kevin Stricklin**<br>Lack of Management Oversight | Letter of Counseling | Letter of Counseling | Letter of Counseling (Does not go in OPF) |
| **Charles Thomas**<br>Lack of Management Oversight | 20-day Suspension | 10-day Suspension | 3-day Suspension (Including Saturday and Sunday) |
| **Lincoln Selfe**<br>Lack of Management Oversight | 20-day Suspension | 10-day Suspension | 3-day Suspension (Including Saturday and Sunday) |
| **Donald Winston**<br>• Did not require operator to conduct a pillar stability analysis.<br>• Did not implement roof control plan approval checklists. | 14-day Suspension | 7-day Suspension | 3-day Suspension (Including Saturday and Sunday) |
| **Thomas Moore**<br>• Allowed trainee (ROE) to conduct part of inspection.<br>• Did not identify that tailgate was not supported in accordance with roof control plan. | 10-day Suspension | 5-day Suspension or Reprimand | 1-day Suspension (Saturday or Sunday) |

**From:**         Fesak, George M - MSHA
**Sent:**         Monday, October 15, 2012 7:50 PM
**To:**           Cameron, Ernest - MSHA
**Subject:**      Moore Suspension Final Draft (2).doc
**Attachments:**  Moore Suspension Final Draft (2).doc

See question.

MEMORANDUM FOR   THOMAS V. MOORE, SR.
                 Supervisory Coal Mine Safety and Health Inspector


FROM:            ERNEST A. CAMERON
                 Director
                 Administration and Management


SUBJECT:         Notice of Proposed Five (5) Day Suspension


This is a notice of a proposal to suspend you from duty and pay for five (5) work days
from your position of Supervisory Coal Mine Safety and Health Inspector, GS–1822–13,
in the Mount Hope, WV, Field Office. This action is being proposed to promote the
efficiency of the service and is issued in accordance with Title 5, Code of Federal
Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752.

On April 5, 2010, an explosion occurred at the Upper Big Branch Mine (UBB) killing 29
miners and injuring 2. As is MSHA's usual practice, the Assistant Secretary directed
staff to conduct an internal review of the Agency's performance before the explosion.
The reason and specifications in this proposal are based on the findings in the Internal
Review report.

**Reason: Failure to Carry out Your Official Duties**

**Specification 1**

Page 19 of the UBB base roof control plan approved by the District 4 Manager on
December 23, 2009, required the tailgate travelway of initial longwall panels to have
supplemental support in the form of two rows of 8-foot long cable bolts or two rows of
posts on 4-foot centers installed in the middle of the entry between primary supports.
This supplemental support was required to be maintained 1,000 feet outby the longwall
face at all times. The MSHA Accident Investigation team found there was only one row
of supplemental support in the tailgate travelway as opposed to the two rows required in
the approved roof control plan.

On January 28, 2010, you documented that you reviewed the Uniform Mine File (UMF)
prior to accompanying an inspector who was conducting a section 103(i) spot inspection
at UBB. The date stamp on the approval letter indicates that the approved roof control
plan was filed in the UMF on January 20, 2010.

Confidential Agency Document

2

On March 9, 2010, you inspected the tailgate of the 1 North Longwall at UBB with ventilation specialist Keith Sigmon. You and Mr. Sigmon identified a serious violation of the ventilation plan and issued an order for that condition. However, neither you nor Mr. Sigmon identified the violation of the approved roof control plan. When interviewed by the Internal Review team you stated that you could not recall if posts or cable bolts were installed in the tailgate entry.

Your failure to conduct an adequate review of the Uniform Mine File does not adhere to established MSHA procedures, interferes with the mission of the Agency, and fails to promote the efficiency of the service. It demonstrates a failure to carry out your official duties and mission critical tasks to which you have been assigned.

**Specification 2**

On January 12, 2010, Coal Mine Safety and Health (CMS&H) Inspector and Authorized Representative (AR) Perry Brown allowed Right of Entry (ROE) trainee Sabian Vandyke to travel alone to "3 unit" of UBB to determine if a violation involving the lifeline had been abated.

Inspector Brown recorded this information on page 10 of MSHA Form 7000-10K dated January 12, 2010. He wrote: "Scott Vandyke went to 3 unit & checked the lifeline citation # 8090251 is terminated. Wrote out termination and drove back to Mt. Hope."

On January 20, 2010, you initialed inspector Brown's MSHA Form 7000-10K at the bottom of the form on the line designated for the supervisor's initials and date. You did not question Mr. Brown or Mr. Vandyke regarding the possibility that Mr. Vandyke had traveled alone.

When you signed Form 7000-10K you failed to identify your staff's failure to comply with Section 103(a) of the Mine Act as well as MSHA's Program Policy Manual, which states in relevant part:

> *Inspections and investigations under the Federal Mine Safety and Health Act of 1977 shall be conducted only by persons who have been authorized by the Secretary to conduct such inspections or investigations.*

You also did not enforce District 4's Standard Operating Procedures for authorized representative mentoring of trainees. Item 3 of the guidance stated: "During any inspection activities at a surface or underground mine, the AR shall make certain that the ROE Trainee is close to him/her at all times."

In reaching my decision to propose a five (5) work day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. You were and still are assigned to review the work of the enforcement personnel under your supervision. If you are unable to enforce agency policies by allowing an ROE trainee to travel unaccompanied and are unable to conduct an adequate review of the Uniform Mine File, inspectors may not know when they violate Agency policy and need to correct their actions.

Confidential Agency Document
DLB-000731  MSHA-SOURCE-1-ARCHIVE-0028

3

Supervisory CMS&H Inspector is a prominent position. You are recognized by mine operators, miners, miners' representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act, the MINER Act, implementing standards and regulations, and MSHA policies and procedures.

You were on notice of agency policies and procedures. In your position as a Supervisory CMS&H Inspector you are responsible for the quality and quantity of work produced by your subordinates ensuring agency policies are adhered to. You were able to correctly recite Agency policies and procedures when questioned by the Internal Review team.

I have considered your 'Highly Effective' performance ratings for FY's 2009, 2010, and 2011 and lack of prior disciplinary action in your personnel file. I also have considered that you had approximately 20 years of federal service at the time these infractions occurred.

I believe this proposed five (5) work day suspension will promote the efficiency of the Federal service. You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and/or other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

**Comment [gmf1]:** Ms Silvey would like you to verify this  Thanks!

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reason and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 23rd Floor
Arlington, VA  22209

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

Confidential Agency Document

4

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

I request that you sign and date this memorandum as evidence that you received it. Your signature does not constitute that you agree with the contents of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

_____    _____    _____
**PRINT NAME**              **SIGNATURE**               **DATE**

Confidential Agency Document
DLB-000733  MSHA-SOURCE-1-ARCHIVE-0030

**From:** Cameron, Ernest - MSHA
**Sent:** Tuesday, October 16, 2012 6:49 AM
**To:** Fesak, George M - MSHA
**Subject:** Moore Suspension Final Draft (2).doc
**Attachments:** Moore Suspension Final Draft (2).doc

George:

The 10 days to reply is correct.  I am fine with the letter as presented.

MEMORANDUM FOR  THOMAS V. MOORE, SR.
                Supervisory Coal Mine Safety and Health Inspector

FROM:               ERNEST A. CAMERON
                    Director
                    Administration and Management

SUBJECT:            Notice of Proposed Five (5) Day Suspension

This is a notice of a proposal to suspend you from duty and pay for five (5) work days from your position of Supervisory Coal Mine Safety and Health Inspector, GS–1822–13, in the Mount Hope, WV, Field Office. This action is being proposed to promote the efficiency of the service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752.

On April 5, 2010, an explosion occurred at the Upper Big Branch Mine (UBB) killing 29 miners and injuring 2. As is MSHA's usual practice, the Assistant Secretary directed staff to conduct an internal review of the Agency's performance before the explosion. The reason and specifications in this proposal are based on the findings in the Internal Review report.

**Reason: Failure to Carry out Your Official Duties**

**Specification 1**

Page 19 of the UBB base roof control plan approved by the District 4 Manager on December 23, 2009, required the tailgate travelway of initial longwall panels to have supplemental support in the form of two rows of 8-foot long cable bolts or two rows of posts on 4-foot centers installed in the middle of the entry between primary supports. This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times. The MSHA Accident Investigation team found there was only one row of supplemental support in the tailgate travelway as opposed to the two rows required in the approved roof control plan.

On January 28, 2010, you documented that you reviewed the Uniform Mine File (UMF) prior to accompanying an inspector who was conducting a section 103(i) spot inspection at UBB. The date stamp on the approval letter indicates that the approved roof control plan was filed in the UMF on January 20, 2010.

Confidential Agency Document
DLB-000735  MSHA-SOURCE-1-ARCHIVE-0032

2

On March 9, 2010, you inspected the tailgate of the 1 North Longwall at UBB with ventilation specialist Keith Sigmon. You and Mr. Sigmon identified a serious violation of the ventilation plan and issued an order for that condition. However, neither you nor Mr. Sigmon identified the violation of the approved roof control plan. When interviewed by the Internal Review team you stated that you could not recall if posts or cable bolts were installed in the tailgate entry.

Your failure to conduct an adequate review of the Uniform Mine File does not adhere to established MSHA procedures, interferes with the mission of the Agency, and fails to promote the efficiency of the service. It demonstrates a failure to carry out your official duties and mission critical tasks to which you have been assigned.

**Specification 2**

On January 12, 2010, Coal Mine Safety and Health (CMS&H) Inspector and Authorized Representative (AR) Perry Brown allowed Right of Entry (ROE) trainee Sabian Vandyke to travel alone to "3 unit" of UBB to determine if a violation involving the lifeline had been abated.

Inspector Brown recorded this information on page 10 of MSHA Form 7000-10K dated January 12, 2010. He wrote: "Scott Vandyke went to 3 unit & checked the lifeline citation # 8090251 is terminated. Wrote out termination and drove back to Mt. Hope."

On January 20, 2010, you initialed inspector Brown's MSHA Form 7000-10K at the bottom of the form on the line designated for the supervisor's initials and date. You did not question Mr. Brown or Mr. Vandyke regarding the possibility that Mr. Vandyke had traveled alone.

When you signed Form 7000-10K you failed to identify your staff's failure to comply with Section 103(a) of the Mine Act as well as MSHA's Program Policy Manual, which states in relevant part:

> *Inspections and investigations under the Federal Mine Safety and Health*
> *Act of 1977 shall be conducted only by persons who have been authorized*
> *by the Secretary to conduct such inspections or investigations.*

You also did not enforce District 4's Standard Operating Procedures for authorized representative mentoring of trainees. Item 3 of the guidance stated: "During any inspection activities at a surface or underground mine, the AR shall make certain that the ROE Trainee is close to him/her at all times."

In reaching my decision to propose a five (5) work day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. You were and still are assigned to review the work of the enforcement personnel under your supervision. If you are unable to enforce agency policies by allowing an ROE trainee to travel unaccompanied and are unable to conduct an adequate review of the Uniform Mine File, inspectors may not know when they violate Agency policy and need to correct their actions.

Confidential Agency Document
DLB-000736  MSHA-SOURCE-1-ARCHIVE-0033

3

Supervisory CMS&H Inspector is a prominent position. You are recognized by mine operators, miners, miners' representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act, the MINER Act, implementing standards and regulations, and MSHA policies and procedures.

You were on notice of agency policies and procedures. In your position as a Supervisory CMS&H Inspector you are responsible for the quality and quantity of work produced by your subordinates ensuring agency policies are adhered to. You were able to correctly recite Agency policies and procedures when questioned by the Internal Review team.

I have considered your 'Highly Effective' performance ratings for FY's 2009, 2010, and 2011 and lack of prior disciplinary action in your personnel file. I also have considered that you had approximately 20 years of federal service at the time these infractions occurred.

I believe this proposed five (5) work day suspension will promote the efficiency of the Federal service. You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and/or other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

> **Comment [gmf1]:** Ms. Silvey would like you to verify this. Thanks! George - This is correct.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reason and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 23rd Floor
Arlington, VA  22209

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

4

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

I request that you sign and date this memorandum as evidence that you received it.  Your signature does not constitute that you agree with the contents of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:


_____          _____          _____
**PRINT NAME**                        **SIGNATURE**                    **DATE**

**From:**      Silvey, Patricia - MSHA
**Sent:**      Monday, September 17, 2012 4:35 PM
**To:**        Fesak, George M - MSHA
**Subject:**   FW: MSHA Cases
**Attachments:** Administrator counseling letter.doc; Winston proposed 14 day suspension.doc; Moore
               proposed 10 day suspension.doc; Selfe proposed 20 day suspension.docx; Thomas
               proposed 20 day suspension.doc

As discussed

---

**From:** Hugler, Edward - ASAM
**Sent:** Monday, September 17, 2012 2:54 PM
**To:** Silvey, Patricia - MSHA
**Subject:** FW: MSHA Cases

Pat,

I think the attached drafts are a good foundation for the proposals. At this point, we need to transition this to MSHA for action as we discussed.

---

**From:** Rose, Sydney T - OASAM HRC
**Sent:** Monday, September 17, 2012 2:22 PM
**To:** Cameron, Ernest - MSHA; Crawford, Nancy M - MSHA
**Cc:** Hugler, Edward - ASAM; Kramer, Donna L - OASAM HRC; Hooper, Shawn - OASAM HRC
**Subject:** FW: MSHA Cases

Earnest and Nancy: Over the course of many discussions and meetings with MSHA, OASAM agreed to complete a draft counseling memo by September 19 and draft notices of proposed submission by the week of September 24. It has now come to my attention that Mr. Main wants and expects all of these notices to be completed by this Wednesday (9/19). It is not possible for us to meet that new deadline. As you know, Donna Kramer provides employee and labor relations services to all OASAM client agencies and her work load simply does not permit this sudden deadline adjustment. I am forwarding the work done by Donna Kramer thus far so that MSHA's HR Office can take over and complete these actions.

*Sydney*

---

**From:** Kramer, Donna L - OASAM HRC
**Sent:** Monday, September 17, 2012 12:32 PM
**To:** Rose, Sydney T - OASAM HRC
**Cc:** Hugler, Edward - ASAM
**Subject:** RE: MSHA

Please see attached.

Donna L. Kramer
Supervisory Human Resources Specialist
Office of Human Resources Consulting
and Operations

Confidential Agency Document
DLB-000739  MSHA-SOURCE-1-ARCHIVE-0036

U.S. Department of Labor
OASAM/OHRCO
Phone: 202-693-7686
Kramer.Donna.L@dol.gov

The contents of this email and any attachments to it may contain confidential and/or legally priviledged information. This information is only for use by the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking action based upon the information contained herein is strictly prohibited. If this email was received in error, please notify the sender and return the documents immediately.

*How Was My Service?  Click Here (3 minute survey):* http://dol-hrc.customerservicesurvey.sgizmo.com/s3/

**From:**       Fesak, George M - MSHA
**Sent:**       Thursday, September 20, 2012 3:23 PM
**To:**         Crawford, Nancy M - MSHA; Hicks, Jacquelyn - MSHA
**Subject:**    Winston proposed 10 day suspension.doc
**Attachments:** Winston proposed 10 day suspension.doc

Use this revised version for Winston.

Confidential Agency Document
DLB-000741  MSHA-SOURCE-1-ARCHIVE-0038

September 28, 2012

MEMORANDUM TO:    DONALD WINSTON
                             Supervisory Mine Safety and
                             Health Specialist

FROM:                KEVIN G. STRICKLIN
                             Administrator
                             Coal Mine Safety and Health

SUBJECT:         Notice of Proposed Ten (10) Day
                             Suspension

This is a notice of a proposal to suspend you from duty and pay for ten (10) calendar days from your position of Supervisory Coal Mine Safety and Health Specialist, GS–1822–13, in the Mount Hope, WV, District 4 Office, no sooner than ten (10) calendar days from your receipt of this notice.  This action is being proposed to promote the efficiency of the service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752.  The reasons and specifications upon which the proposal is based are as follows.

### Reason: Failure to Carry out Your Official Duties

### Specification 1

You failed to follow CMS&H Memo No. HQ-08-058-A when you recommended that the District 4 Manager approve the October 2009 base roof control plan for the Upper Big Branch Mine (UBB) without requiring Performance Coal Company to submit a risk assessment specific to the particular mining operation, including the submission of data and evaluation supporting the proposal.  In particular, the operator did not provide information detailing the basis on which the plan was determined to be appropriate and suitable, such as a pillar stability analysis.

MSHA intended for roof control specialists to review operators' ground control analyses to ensure that operators accurately calculated and applied these factors in all aspects of their mine design. Instead, you indicated in your interview that District 4 roof control specialists requested examples of pillar stability analyses from mine operators to demonstrate the operators' ability to use the appropriate software.

During an off the record discussion with members of the Internal Review team, you stated you did not receive a copy of CMS&H Memo HQ-08-058-A. After the interview was completed, you showed the interviewers a binder where you kept headquarters memos; the memo was not in the binder. The memo was addressed only to District Managers and Assistant District Managers.

A note was affixed to the roof control plan tracking sheet by the Assistant District Manager - Technical stating that District 4 would "still look at the [longwall] gate pillars – later."

### Specification 2

You failed to implement provisions of CMS&H Memo HQ-08-059-A. You did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and supplements. The checklists from the memorandum were initially required to be used by the roof control department supervisors only. Instructions to begin using the checklists universally were e-mailed on January 27, 2009. The e-mail required the use of the checklists during the next plan review.

District 4 had developed seven checklists and other documents for guidance when reviewing initial roof control plans and supplements. While the District 4 Standard Operating Procedures for plan reviews did not require these checklists to be used, the plan reviewers stated that they used the checklists to assist in completing roof control plan reviews. These checklists were not those required by CMS&H Memo HQ-08-059-A.

CMS&H Memo HQ-08-059-A also required that all documentation (MSHA Form 2000-204, checklists, drawings, sketches, etc.) explaining the rationale and supporting the roof control plan approval and associated 6-month plan review be maintained as part of the roof control file for that mine. However, copies of the completed checklists were not included in the District 4 records provided to the Internal

Review team for the review of the October 2009 base plan as directed by the memorandum.

As a federal employee you are expected to carry out all of your official duties in a timely manner at all times.

In reaching my decision to propose a ten (10) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed.  You were and still are assigned to review the work of technical personnel under your supervision.  If you are unable to properly apply agency policies and procedures in overseeing the review of roof control plans, specialists may be held to a lower standard of quality work.

A Supervisory CMS&H Specialist is a prominent position.  You are recognized by mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act.

You were clearly on notice of agency policies and procedures.  In your position as a Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates and for ensuring that agency policies and procedures are followed.  You were able to correctly recite agency policies and procedures to the Internal Review team when questioned on such matters.

I considered your performance ratings for FY's 2010 and 2011 that were "Highly Effective," the lack of prior disciplinary action in your personnel file, and your 17 years of federal service at the time these infractions occurred.

I believe that you will not commit these same or similar infractions in the future.  I am confident that you can be successful in carrying out all of your upcoming official duties.

However, these mitigating factors do not outweigh the seriousness of your actions.  I believe this proposed ten (10) calendar day suspension will promote the efficiency of the Federal service and is the least action I can take to correct your unacceptable conduct.  Any further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

Confidential Agency Document
DLB-000744  MSHA-SOURCE-1-ARCHIVE-0041

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and other documentary evidence in support of your reply.  Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal.  Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration.  Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

If you wish to make an oral reply, you should contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative.  You must indicate your choice of representative in writing to Ms. Kramer at 200 Constitution Avenue, N.W., Room C-5516, Washington, D.C. 20210.  Copies of the materials on which this proposal is based are attached.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Kramer.

You are advised to acknowledge receipt of this notice in the spaces provided below.  An acknowledgment does not mean that you agree with the contents of this letter, only that you have received this notice.



_____          _____
Acknowledge Receipt – Signature          Date

Attachments

Confidential Agency Document
DLB-000746  MSHA-SOURCE-1-ARCHIVE-0043

| | |
|---|---|
| **From:** | Hicks, Jacquelyn - MSHA |
| **Sent:** | Thursday, September 20, 2012 12:14 PM |
| **To:** | Fesak, George M - MSHA |
| **Subject:** | RE: Actions |
| **Attachments:** | Administrator counseling letter.doc; Thomas proposed 20 day suspension.doc |

| | |
|---|---|
| **Importance:** | High |

Mr. Fesak,

Thanks. I was able to open the CD up, finally. It looks like the attached are the only two left. I think the counseling letter is good to go but the Thomas memo is missing specifications. After that, I think we're all wrapped up. I'll just need to get the supporting documentation together so they can be attached to each disciplinary memo.

I really appreciate the help! ☺

v/r,

~J~

Jacquelyn N. Hicks
HR Specialist, Labor/Employee Rel. Branch
Mine Safety and Health Administration (MSHA)
1100 Wilson Boulevard
Arlington VA 22209 -3939
Phone (202)693-9866
hicks.jacquelyn@dol.gov

*"My grandfather once told me that there were two kinds of people: those who do the work and those who take the credit. He told me to try to be in the first group. There is much less competition." -Ghandi*

*"A fundamental difference between management and leadership is the intrinsic understanding that just because you have the right to do it, doesn't make it the right thing to do." -Me*

---

**From:** Fesak, George M - MSHA
**Sent:** Thursday, September 20, 2012 10:14 AM
**To:** Hicks, Jacquelyn - MSHA
**Subject:** Actions

Hi Jackie,

I sent a bunch of stuff down on CDs. I probably should review the final draft. I put it together in a hurry.

Thanks,

George

Confidential Agency Document
DLB-000748 MSHA-SOURCE-1-ARCHIVE-0045

DATE:                      SEPTEMBER 17, 2012

MEMORANDUM FOR: KEVIN G. STRICKLIN
                           Administrator
                           Coal Mine Safety and Health

FROM:                   PATRICIA W. SILVEY
                           Deputy Assistant Secretary
                           Office of the Assistant Secretary

SUBJECT:              Counseling Memorandum
                           Program Direction and Control

This is to notify you of an area of concern regarding your management
responsibilities as they relate to the duties of your position.

The duties of the Administrator for Coal Mine Safety and Health (CMS&H)
require you to exercise management control and direction of all programs
authorized by the Federal Mine Safety and Health Act to ensure the safety and
health of the nation's miners. However, your oversight and control of all
programs has not been as effective as it should be.

The issues relating to this matter were raised to my attention when I read the
"Internal Review of MSHA's Actions at the Upper Big Branch Mine – South"
report (IR) of the April 10, 2010, Upper Big Branch accident investigation.
Accordingly, since I have recently become aware of your actions via the IR
report, I am now addressing your misconduct through this counseling
memorandum.

The IR report revealed that you relied too heavily on Deputy Administrator,
Charles Thomas, to provide sound leadership and direction in the planning,
development, execution, and administration of policies and programs designed to
prevent injury, disease, and death from mining in the coal mining industry.

You were unaware of issues that required your experience and attention even
though you had regular briefings with Mr. Thomas. Specifically, you were
unaware that District 4 failed to provide the necessary oversight to ensure that
the too wet to sample survey computer application was used in the Mt. Hope and
Princeton field offices; that District 4 failed to provide adequate oversight to
ensure that inspectors reviewed potentially flagrant violations in accordance with
the Procedure Instruction Letter, No. I08-III-02; that the District 4 Roof Control
Department did not use checklists required by CMS&H Memo HQ-08-059-A; that

I have determined that your conduct, as described above, is inappropriate.
Therefore, I must take the corrective measures to address your behavior. As an

Confidential Agency Document
DLB-000749 MSHA-SOURCE-1-ARCHIVE-0046

employee under my direct supervision, I am directing to you complete the following tasks prior to April 30, 2013.

- Ensure that all corrective actions assigned to Coal Mine Safety and Health (CMS&H) made in response to the Internal Review Report on Upper Big Branch are effectively and timely accomplished.
- Work with the Director of the Office of Assessments, Accountability, Special Enforcement and Investigations (OASSEI) to develop a means for evaluating the effectiveness of corrective actions in the agency's internal reviews, as well as in its accountability reviews.
- Ensure that new and revised inspection procedures are implemented through the established MSHA's Directives System.

Please be advised that failure to follow this course of your official duties may lead to future disciplinary action. However, I believe timely completion of the tasks above, in addition to the counseling memorandum, will ensure future misconduct does not occur.

DATE:               SEPTEMBER 17, 2012

MEMORANDUM FOR: KEVIN G. STRICKLIN
                             Administrator
                             Coal Mine Safety and Health

FROM:              PATRICIA W. SILVEY
                             Deputy Assistant Secretary
                             Office of the Assistant Secretary

SUBJECT:        Counseling Memorandum
                             Program Direction and Control

This is to notify you of an area of concern regarding your management responsibilities as they relate to the duties of your position.

The duties of the Administrator for Coal Mine Safety and Health (CMS&H) require you to exercise management control and direction of all programs authorized by the Federal Mine Safety and Health Act to ensure the safety and health of the nation's miners. However, your oversight and control of all programs has not been as effective as it should be.

The issues relating to this matter were raised to my attention when I read the "Internal Review of MSHA's Actions at the Upper Big Branch Mine – South" report (IR) of the April 10, 2010, Upper Big Branch accident investigation. Accordingly, since I have recently become aware of your actions via the IR report, I am now addressing your misconduct through this counseling memorandum.

The IR report revealed that you relied too heavily on Deputy Administrator, Charles Thomas, to provide sound leadership and direction in the planning, development, execution, and administration of policies and programs designed to prevent injury, disease, and death from mining in the coal mining industry.

You were unaware of issues that required your experience and attention even though you had regular briefings with Mr. Thomas. Specifically, you were unaware that District 4 failed to provide the necessary oversight to ensure that the too wet to sample survey computer application was used in the Mt. Hope and Princeton field offices; that District 4 failed to provide adequate oversight to ensure that inspectors reviewed potentially flagrant violations in accordance with the Procedure Instruction Letter, No. I08-III-02; that the District 4 Roof Control Department did not use checklists required by CMS&H Memo HQ-08-059-A; that

I have determined that your conduct, as described above, is inappropriate. Therefore, I must take the corrective measures to address your behavior. As an

employee under my direct supervision, I am directing to you complete the following tasks prior to April 30, 2013.

- Ensure that all corrective actions assigned to Coal Mine Safety and Health (CMS&H) made in response to the Internal Review Report on Upper Big Branch are effectively and timely accomplished.
- Work with the Director of the Office of Assessments, Accountability, Special Enforcement and Investigations (OASSEI) to develop a means for evaluating the effectiveness of corrective actions in the agency's internal reviews, as well as in its accountability reviews.
- Ensure that new and revised inspection procedures are implemented through the established MSHA's Directives System.

Please be advised that failure to follow this course of your official duties may lead to future disciplinary action. However, I believe timely completion of the tasks above, in addition to the counseling memorandum, will ensure future misconduct does not occur.

**From:**          Fesak, George M - MSHA
**Sent:**          Tuesday, October 16, 2012 12:05 PM
**To:**            Cameron, Ernest - MSHA
**Subject:**       One More
**Attachments:**   Winston Suspension Final Draft (2).doc


The message is ready to be sent with the following file or link attachments:

Winston Suspension Final Draft (2).doc


Note: To protect against computer viruses, e-mail programs may prevent sending or receiving certain types of file attachments.  Check your e-mail security settings to determine how attachments are handled.

Confidential Agency Document
DLB-000753  MSHA-SOURCE-1-ARCHIVE-0050

MEMORANDUM FOR  DONALD WINSTON
Supervisory Mine Safety and Health Specialist


FROM:              ERNEST A. CAMERON
                   Director
                   Administration and Management


SUBJECT:           Notice of Proposed Seven (7) Day Suspension


This is a notice of a proposal to suspend you from duty and pay for seven (7) work days from your position of Supervisory Coal Mine Safety and Health Specialist, GS–1822–13, in the Mount Hope, WV, District 4 Office. This action is being proposed to promote the efficiency of the service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752.

On April 5, 2010, an explosion occurred at the Upper Big Branch Mine (UBB) killing 29 miners and injuring 2. As is MSHA's usual practice, the Assistant Secretary directed staff to conduct an internal review of the Agency's performance before the explosion. The reason and specifications in this proposal are based on the findings in the Internal Review report.

**Reason: Failure to Carry out Your Official Duties**

**Specification 1**

Following the August 2007 fatal coal outbursts at the Crandall Canyon mine, the Administrator for Coal Mine Safety and Health issued CMS&H Memo No. HQ-08-058-A which provided guidance for review and approval of complex and non-typical roof control plans and amendments.

You failed to follow CMS&H Memo No. HQ-08-058-A when you recommended that the District 4 Manager approve the base roof control plan submitted in October 2009 for UBB, without requiring Performance Coal Company to submit a risk assessment specific to the particular mining operation, including the data and evaluation supporting the proposal. In particular, Performance Coal did not provide information, such as a pillar stability analysis, detailing the basis on which it determined the plan to be appropriate and suitable for UBB.

CMS&H Memo No. HQ-08-058-A also required roof control specialists to review operators' ground control analyses to ensure that operators accurately calculated and applied pillar stability factors. Instead, District 4 roof control specialists requested examples of pillar stability analyses from mine operators to demonstrate the operators' ability to use the appropriate software.

**Specification 2**

You failed to implement provisions of CMS&H Memo No. HQ-08-059-A. You did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and supplements. The checklists were initially required to be used by roof control department supervisors only. Instructions to begin using the checklists universally were e-mailed to District Managers and Assistant District Managers on January 27, 2009. The e-mail required the use of the checklists during the next plan review. For UBB, this would have been the review of the new base plan submitted by the operator in October 2009.

District 4 had developed it own checklists and other documents for guidance when reviewing initial roof control plans and supplements. While the District 4 Standard Operating Procedures for plan reviews did not require the District checklists to be used, the plan reviewers stated they used the District checklists to assist in completing roof control plan reviews. The District 4 checklists were not the same as those required by CMS&H Memo No. HQ-08-059-A.

CMS&H Memo No. HQ-08-059-A also required that all documentation (MSHA Form 2000-204, checklists, drawings, sketches, etc.) explaining the rationale and supporting the roof control plan approval and associated 6-month plan reviews be maintained as part of the roof control plan file for each mine. However, neither the Headquarters nor the District 4 checklists were included in the District 4 plan approval records for the review of the October 2009 UBB base roof control plan.

In reaching my decision to propose a seven (7) work day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. You were and still are assigned to review the work of technical specialists under your supervision. If you are unable to properly apply MSHA policies and procedures in overseeing the review of roof control plans, specialists may not know when they violate Agency policy and need to correct their actions.

Supervisory CMS&H Specialist is a prominent position. You are recognized by mine operators, miners, miners' representatives, and MSHA as having in-depth knowledge of the Federal Mine Safety and Health Act, the MINER Act, implementing standards and regulations, and MSHA policies and procedures. In your position as Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates and for ensuring that agency policies and procedures are followed. You were able to correctly recite Agency policies and procedures to the IR team when questioned on such matters.

I have considered your 'Highly Effective' performance ratings for FY's 2009, 2010, and 2011, the lack of prior disciplinary action in your personnel file, and approximate 17 years federal service at the time these infractions occurred.

I believe this proposed seven (7) work day suspension will promote the efficiency of the Federal service. You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and/or other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reason and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 23rd Floor
Arlington, VA  22209

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

You are requested to sign and date this memorandum as evidence that you received it. Your signature does not constitute that you agree with the contents of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:


_____        _____        _____

**PRINT NAME**                    **SIGNATURE**                      **DATE**

Confidential Agency Document
DLB-000756  MSHA-SOURCE-1-ARCHIVE-0053

| | |
|---|---|
| **From:** | Kramer, Donna L - OASAM HRC |
| **Sent:** | Tuesday, March 19, 2013 12:59 PM |
| **To:** | Molina, Monique V - MSHA |
| **Subject:** | Letters are in SOL for review |
| **Attachments:** | Selfe decision letter.doc; Winston decision letter.doc |

Donna L. Kramer
Supervisory Human Resources Specialist
Office of Human Resources Consulting
and Operations
U.S. Department of Labor
OASAM/OHRCO
Phone: 202-693-7686
Kramer.Donna.L@dol.gov

The contents of this email and any attachments to it may contain confidential and/or legally priviledged information. This information is only for use by the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking action based upon the information contained herein is strictly prohibited. If this email was received in error, please notify the sender and return the documents immediately.

*How Was My Service?  Click Here (3 minute survey):* http://dol-hrc.customerservicesurvey.sgizmo.com/s3/

April 2, 2013

MEMORANDUM TO:     LINCOLN L. SELFE, JR.
                   Supervisory Mine Safety and
                   Health Inspector

FROM:              PATRICIA W. SILVEY
                   Deputy Assistant Secretary for Operations

SUBJECT:           Decision Letter of Proposed Seven (7) Day
                   Suspension

By letter dated December 5, 2012, Ernest Cameron, Director, Administration and
Management, proposed to suspend you from pay and duty status for seven (7)
calendar days from your position of Supervisory Mine Safety and Health
Inspector[1], GS-1822-14, in the District 4 Office in Mount Hope, WV, of the Mine
Safety and Health Administration (MSHA).  This decision is taken to promote the
efficiency of the Federal Service and is based on your failure to carry out your
official duties.

On December 20, 2012, you presented me with your oral reply to the proposed
suspension.  Also in attendance at the oral reply were Executive Assistant
Monique Molina, MSHA, and Donna Kramer, Supervisory Human Resources
Specialist, Office of the Assistant Secretary and Management (OASAM).

During the oral reply you also provided your written reply.  An extension was
granted until January 18, 2013, to allow you to supplement your written reply, if
you so desired.  On January 17, 2013, you submitted an e-mail containing
additional information for my consideration.

I have considered the oral and written replies that you presented to me as well as
the proposed suspension issued to you by Mr. Cameron and all supporting
documentation.

**Discussion on Decision to Suspend:**
Specification 1 of the proposed suspension concerned your failure to provide
adequate management oversight ensuring that inspectors and supervisors under
your supervision reviewed potentially flagrant violations in accordance with the
procedures established by Procedure Instruction Letter (PIL) No. I08-III-02.

During your oral reply and in your written reply, you noted that of the two types of
flagrant violations, inspectors only had difficulty with the repeated failure or S & S
violations.  You also stated that at the time of the Upper Big Branch (UBB) mine

---

[1] This position is commonly referred to as the Assistant District Manager.

accident there was not any mechanism available to assist inspectors in determining whether or not a cited violation was a repeat violation other than the inspectors or his/her supervisor's memory. You cited the lack of clear and concise guidance relative to the interpretation of the PIL No. I08-III-02 on specifically what two previous standards mentioned in the PIL actually refers to. Both of your replies also references the matters as being nationwide in scope and your belief that you should not disciplined for a nationwide problem.

Although I have considered your comments, for the purpose of this decision letter, I am focused on your actions regarding lack of adequate management oversight on potentially flagrant violations in accordance with the PIL procedures.

As stated in the proposed suspension, one of the key responsibilities of your position is to evaluate the results of policy implementation within your enforcement responsibility. The Mt. Hope Field Office inspectors issued eight section 104(d)(2) orders for violations at UBB that met the "numbered objective criteria" in PIL No. I08-III-02 for review as potentially flagrant violations. The eight violations issued were not reviewed as potentially flagrant violations by inspectors or supervisors.

In both your oral and written replies you did not offer any explanation as the reasons why only 9% of the 66 potentially flagrant violations required to be reviewed were reviewed within your enforcement responsibility. Therefore, I find that this specification is supported by the evidence.

Specification 2 of the proposed suspension concerned your failure to provide necessary management oversight to ensure that Right of Entry (ROE) trainees in the Mt. Hope Field Office did not conduct inspection activities apart from Authorized Representatives, (ARs).

In your oral and written replies you stated that you did not have any knowledge that ROE trainees were conducting inspection activities apart from the ARs. You also stated that you had no reason to believe or question that the directives you had issued regarding parameters of when an ROE trainee could be apart from the AR were not being followed. You asserted that if you knew these actions occurred you would have taken disciplinary action against those who failed to follow your directives, which were in compliance with Section 103(a) of the Miner Act.

Although, the Internal Review (IR) team determined that for portions of five of the six regular inspections at UBB, ROE trainees did conduct inspection activities apart from the ARs, I cannot find any evidence that indicates you were aware of these occurrences. As such, this specification as cited in the proposal cannot be supported.

Your failure to effectively use established Agency tools to identify and correct errors on the part of your subordinate inspectors and supervisors regarding Accompanied Activities (AAs) and Field Activity Reviews (FARs) is cited in Specification 3 of the proposed suspension.  This specification also references supervisors' lack of documentation of required information on many AA and FAR forms such as correct event activity codes, dates of the Uniform Mine File reviews, dates when inspectors were debriefed, and, in some cases, supervisors not accompanying inspectors on all aspects of an inspection or investigation. Your failure to identify apparent deficiencies in two second level reviews you conducted was also mentioned.

In the oral and written replies, you stated that the infractions listed in this specification are not limited to District 4; this is a national issue.  You also stated that ADM training is non-existent; you met with supervisors and addressed the issue of complete documentation; and instructed the supervisors that they had to travel with the inspector doing inspection activities in order to use the visit as an AA.

After reviewing this specification and your replies, I have determined that Specification 3 is not supported by the evidence.

**Penalty Selection:**
In reaching my decision to sustain one (1) of the three (3) specifications in the proposed seven (7) day suspension issued to you, I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981)

I considered the nature and seriousness of your actions.  Failing to carry out your official duties is one of the most serious infractions that can be committed.  As a management official you are tasked with setting a positive example for subordinate employees.  You were and still are assigned to review the work of the management and inspection personnel under your jurisdiction.  If you are unable to enforce agency policies and follow National Office directives, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the very miners MSHA is tasked with protecting.

A Supervisory CMS&H Inspector is a prominent position.  You are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to.  Additionally, you are recognized by the mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006.  Your responses to the IR team relative to Specification 1 indicated that you were aware of the criteria in PIL No. I08-III-02 for reviewing violations as potentially flagrant.

Although, as you indicated in both your oral and written replies, there may be other districts in violation of the Agency policies and directives, you failed to accept any responsibility for your actions.  Your statements that every other ADM in the country needs to be disciplined since you are being disciplined and MSHA is using the IR report as a "gotcha" does not indicate your acknowledgement that you could have carried out your official duties better.  This is particularly troublesome to me.  Even if other districts have deficiencies, you are responsible for District 4 and must be held accountable.

I have also considered your "Highly Effective" performance ratings for Fiscal Years (FY) 2010 and 2011, the lack of any prior disciplinary action in your personnel file, and your approximate 30 years of federal service.

I am unaware of other mitigating factors that warrant consideration as you did not share any with me.

It is my belief that you will not commit these same or similar infractions in the future.  I am confident that you can be successful in carrying out all of your upcoming official duties.  Your dedication to MSHA and all miners during your career is appreciated.

However, these mitigating factors do not outweigh the seriousness of your actions.  I have determined that a two (2) calendar day suspension will promote the efficiency of the service and is the least action I can take to correct your unacceptable conduct.

Your two day suspension will take place beginning on April 9, 2013, and continue through April 10, 2013, during which time you will be in a non-pay status.  Paid leave may not be used to offset the loss of pay resulting from suspension.  A Standard Form 50, Notification of Personnel Action, will be accessible via your Electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 11, 2013.  You will continue in your current position, grade and salary pending the effective date of this action.  Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

You are hereby advised that continued misconduct by you will not be tolerated in the future. Any recurrence of misconduct by you may lead to more severe disciplinary action or adverse action, up to and including your removal from Federal Service.

**NOTICE OF RIGHTS:**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008.  You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of

this action.  A formal grievance must:  (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested.  Your grievance must be filed with:

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325
Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a MSPB appeal as outlined above, or by filing a complaint with the Office of Special Counsel.  The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB.  A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, political affiliation, or physical handicap, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor.  If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Directorate of Civil Rights, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC  20212.  The Department of Labor will review the merits of the case as well as the charge of discrimination.  For further information regarding the EEO complaint process, you may contact the Department of Labor, Civil Rights Center at (202) 693-6500.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency.  However, you must designate your choice of representative in writing to Mr. Moran.  Any choice must include your representative's name, address, and phone number.

Confidential Agency Document
DLB-000762  MSHA-SOURCE-1-ARCHIVE-0059

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status.  You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Departments Employee Assistance Program (EAP).  The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind and services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

March 27, 2013

MEMORANDUM TO:     DONALD WINSTON
                   Supervisory Mine Safety and
                   Health Specialist

FROM:              PATRICIA W. SILVEY
                   Deputy Assistant Secretary for Operations

SUBJECT:           Decision Letter of Proposed Seven (7) Day
                   Suspension

By letter dated December 5, 2012, Ernest Cameron, Director,
Administration and Management, proposed to suspend you from pay
and duty status for seven (7) calendar days from your position of
Supervisory Mine Safety and Health Specialist, GS-1822-13, in the
Mount Hope, WV District 4 Office, of the Mine Safety and Health
Administration (MSHA).  This decision is taken to promote the
efficiency of the Federal Service and is based on your failure to carry
out your official duties.

On December 20, 2012, you presented me with your oral reply to the
proposed suspension.  Also in attendance at the oral reply were
Executive Assistant Monique Molina, MSHA, and Donna Kramer,
Supervisory Human Resources Specialist, Office of the Assistant
Secretary and Management (OASAM).

During the oral reply I granted an extension for submission of any
written reply until January 18, 2013.  On January 7, 2013, you
submitted your written reply.

I have considered the oral and written replies that you presented to
me as well as the proposed suspension issued to you by Mr. Cameron
and all supporting documentation.

**Discussion on Decision to Suspend**
Specification 1 of the proposed suspension concerned your failure to
follow CMS&H Memo No. HQ-08-058A, when you recommended that
the District 4 Manager approve the base roof control plan submitted in
October 2009 for Upper Big Branch (UBB), without requiring
Performance Coal Company to submit a risk assessment specific to the

Confidential Agency Document
DLB-000764  MSHA-SOURCE-1-ARCHIVE-0061

particular mining operation, including the data and evaluation supporting the proposed roof control plan.

During your oral and written replies, you noted that CMS&H Memo No. HQ-08-058A lists four criteria to be used in determining if a roof control plan is complex and/or non-typical. The fourth criteria concerned other conditions considered unusual by the District Managers, such as retreat mining between two gob areas, mining of high stress areas created by multiple seam interaction, or active mining above or below longwall panels or isolated remnant pillars.

After reviewing this specification, I have determined that the Memo does allow the District Manager's to exercise discretion relative to risk assessments. As such, this specification as cited in the proposal cannot be supported.

Specification 2 of the proposed suspension concerned your failure to implement provisions of CMS&H Memo No. HQ-08-059A when you did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and revisions. Instructions for all roof control personnel to begin using these checklists were e-mailed to District Managers and Assistant District Managers on January 27, 2009.

Additionally, the District 4 plan approval records for the October 2009 UBB base roof control plan did not contain the Headquarters or the District 4 checklists.

In both your oral and written replies you stated that prior to CMS&H Memo No. HQ-08-059A being issued District 4 developed checklists to be used when reviewing roof control plans. You stated that the District 4 checklists contained a large majority of the items that the CMS&H Memo No. HQ-08-059A checklist contained and thought the District 4 checklist was sufficient.

During your replies, you acknowledged that you continued to complete the District 4 checklists even after the Headquarters checklists were disseminated. You also affirmed that the October 2009 UBB base roof control plan file did not contain any checklist, Headquarters or District 4's.

In your written reply you admitted that you were aware that instructions requiring roof control specialists to use the Headquarters checklists were e-mailed on January 27, 2009, to the District Managers

and Assistant District Managers.  However, you stated that the e-mail distribution of the checklists did not include roof control supervisors; you did not receive the Headquarters checklist; and you were not informed that you had been using an incorrect checklist.

During the oral reply, you asserted the same position that your written reply contained regarding the checklists; you were not on the e-mail distribution list, did not receive the Headquarters checklist, and not informed that you were using an incorrect checklist.  However, during the oral reply, I asked you whether or not you received the Headquarters checklist.  Your response was that you could not say and you were not going to lie to me.  If you received the checklist, it would have been from District Manager Richard Kline[1].  You continued to state that you could only tell me that you were not aware of the Headquarters checklist.

Based on the information shared during the oral reply, I find that this specification is supported by the evidence.

**Penalty Selection:**
In reaching my decision to sustain one (1) of the two (2) specifications in the proposed seven (7) day suspension issued to you, I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981)

I considered the nature and seriousness of your actions.  Failing to carry out your official duties is one of the most serious infractions that can be committed.  As a management official you are tasked with setting a positive example for subordinate employees.  You were and still are assigned to review the work of the inspection and technical personnel under your jurisdiction.  If you are unable to enforce agency policies and follow National Office directives, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the very miners MSHA is tasked with protecting.

A Supervisory CMS&H Specialist is a prominent position.  You are recognized by the mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006.  You are also recognized by the Office of the Solicitor (SOL) as an expert on roof control as they have

---

[1] District Manager Kline has retired.

utilized your expertise on several legal cases which settled in a positive manner in MSHA's favor.

As a Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to. Although the Internal Review team concluded that the District 4 checklists for reviewing roof control plans were adequate to ensure the plans submitted by Performance Coal Company included the required information, you were unable to explain why any checklist was missing from the October 2009 UBB base roof control plan.

Regardless of what happened to the checklist from the October 2009 UBB base roof control plan, I find that you failed to exercise due diligence in implementing the checklists in CMS&H Memo No. HQ-08-059A.

I have also considered your "Highly Effective" performance ratings for Fiscal Years (FY) 2009, 2010 and 2011 and the lack of any prior disciplinary action in your personnel file, and your 20 years of federal service.

It is my belief that you will not commit these same or similar infractions in the future.  I am confident that you can be successful in carrying out all of your upcoming official duties and appreciate the dedication that you have shown to MSHA.

However, these mitigating factors do not outweigh the seriousness of your actions.  I have determined that a one (1) calendar day suspension will promote the efficiency of the service and is the least action I can take to correct your unacceptable conduct.

Your one day suspension will take place beginning on April 9, 2013, during which time you will be in a non-pay status.  Paid leave may not be used to offset the loss of pay resulting from suspension.  A Standard Form 50, Notification of Personnel Action, will be accessible via your Electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 10, 2013.  You will continue in your current position, grade and salary pending the effective date of this action.  Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

Confidential Agency Document
DLB-000767  MSHA-SOURCE-1-ARCHIVE-0064

You are hereby advised that continued misconduct by you will not be tolerated in the future. Any recurrence of misconduct by you may lead to more severe disciplinary action or adverse action, up to and including your removal from Federal Service.

**NOTICE OF RIGHTS:**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008.  You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of this action.  A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested.  Your grievance must be filed with:

> John K. Moran
> Deputy Assistant Secretary
> Veterans' Employment and Training Services
> 200 Constitution Ave., NW
> Room S 1325
> Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a MSPB appeal as outlined above, or by filing a complaint with the Office of Special Counsel.  The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB.  A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

> Complaint Examining Unit
> Office of Special Counsel
> 1730 M Street NW, Suite 218
> Washington, DC 20036-4505
> Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, political affiliation, or physical handicap, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor.  If you file an EEO

complaint with the U.S. Department of Labor, you should submit it to the Directorate of Civil Rights, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC  20212.  The Department of Labor will review the merits of the case as well as the charge of discrimination. For further information regarding the EEO complaint process, you may contact the Department of Labor, Civil Rights Center at (202) 693-6500.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency.  However, you must designate your choice of representative in writing to Mr. Moran.  Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status.  You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Departments Employee Assistance Program (EAP).  The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind and services are strictly confidential.  You may contact EAP directly by calling 202-693-8888.

**From:** Kramer, Donna L - OASAM HRC
**Sent:** Thursday, March 21, 2013 10:54 AM
**To:** Molina, Monique V - MSHA
**Subject:** Revised decision letters for your assistance and consideration.
**Attachments:** Selfe decision letter (jb edits).doc; Winston decision letter (jb edits).doc

Monique,

Attached are the SOL reviewed and revised decision letters.  Can George assist with the two comments on Selfe?  I re-read my notes but I'm at a loss on how the make it read clearer.  Also, please review Winston's letter for technical accuracy.  Thank you.

Donna L. Kramer
Supervisory Human Resources Specialist
Office of Human Resources Consulting
and Operations
U.S. Department of Labor
OASAM/OHRCO
Phone: 202-693-7686
Kramer.Donna.L@dol.gov

The contents of this email and any attachments to it may contain confidential and/or legally priviledged information. This information is only for use by the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking action based upon the information contained herein is strictly prohibited. If this email was received in error, please notify the sender and return the documents immediately.

*How Was My Service?  Click Here (3 minute survey):* http://dol-hrc.customerservicesurvey.sgizmo.com/s3/

April 2, 2013

MEMORANDUM TO:     LINCOLN L. SELFE, JR.
                   Supervisory Mine Safety and
                   Health Inspector

FROM:              PATRICIA W. SILVEY
                   Deputy Assistant Secretary for Operations

SUBJECT:           Decision Letter

By letter dated December 5, 2012, Ernest Cameron, Director, Administration and Management, proposed to suspend you from pay and duty status for seven (7) calendar days from your position of Supervisory Mine Safety and Health Inspector[1], GS-1822-14, in the District 4 Office in Mount Hope, WV, of the Mine Safety and Health Administration (MSHA).

On December 20, 2012, you presented me with your oral reply to the proposed suspension.  Also in attendance at the oral reply were Executive Assistant Monique Molina, MSHA, and Donna Kramer, Supervisory Human Resources Specialist, Office of the Assistant Secretary and Management (OASAM).

During the oral reply you also provided your written reply.  An extension was granted until January 18, 2013, to allow you to supplement your written reply, if you so desired.  On January 17, 2013, you submitted an e-mail containing additional information for my consideration.

I have considered the oral and written replies that you presented to me as well as the proposed suspension issued to you by Mr. Cameron and all supporting documentation. This decision is taken to promote the efficiency of the Federal Service and is based on your failure to carry out your official duties.

**Discussion on Decision to Suspend:**
Specification 1 of the proposed suspension concerned your failure to provide adequate management oversight ensuring that inspectors and supervisors under your supervision reviewed potentially flagrant violations in accordance with the procedures established by Procedure Instruction Letter (PIL) No. I08-III-02.

During your oral reply and in your written reply, you noted that of the two types of flagrant violations, inspectors only had difficulty with the repeated failure or S & S violations.  You also stated that at the time of the Upper Big Branch (UBB) mine accident there was not any mechanism available to assist inspectors in

---
[1] This position is commonly referred to as the Assistant District Manager.

Confidential Agency Document
DLB-000771  MSHA-SOURCE-1-ARCHIVE-0068

determining whether or not a cited violation was a repeat violation other than the inspectors or his/her supervisor's memory.  You cited the lack of clear and concise guidance from the National Office relative to the interpretation of the PIL No. I08-III-02 on specifically what two parts of the flagrant violation evaluation standards mentioned in the PIL actually refersto.  Both of your replies also reference the matters as being nationwide in scope and your belief that you should not disciplined for a nationwide problem.

**Comment [BJ-S1]:** Can we make this clearer?

Although I have considered your comments, for the purpose of this decision letter, I am focused on your actions regarding lack of adequate management oversight on potentially flagrant violations in accordance with the PIL procedures.

As stated in the proposed suspension, one of the key responsibilities of your position is to evaluate the results of policy implementation within your area of enforcement responsibility.  The Mt. Hope Field Office inspectors issued eight section 104(d)(2) orders for violations at UBB that met the "numbered objective criteria" in PIL No. I08-III-02 for review as potentially flagrant violations.  The eight violations issued were not reviewed as potentially flagrant violations by inspectors or supervisors.

In both your oral and written replies you did not offer any explanation as the reasons why only 9% of the 66 potentially flagrant violations required to be reviewed were reviewed within your area of enforcement responsibility.  Therefore, I find that this specification is supported by the evidence.

Specification 2 of the proposed suspension concerned your failure to provide necessary management oversight to ensure that Right of Entry (ROE) trainees in the Mt. Hope Field Office did not conduct inspection activities apart from Authorized Representatives (ARs).

In your oral and written replies you stated that you did not have any knowledge that ROE trainees were conducting inspection activities apart from the ARs.  You also stated that you had no reason to believe or question that the directives you had issued regarding the parameters of when an ROE trainee could be apart from the AR were not being followed.  You asserted that if you knew these actions occurred you would have taken disciplinary action against those who failed to follow your directives, which were in compliance with Section 103(a) of the Miner Act.

Although the Internal Review (IR) team determined that for portions of five of the six regular inspections at UBB, ROE trainees did conduct inspection activities apart from the ARs, I cannot find any evidence that indicates you were aware of these occurrences.  As such, this specification in the proposal cannot be supported.

Confidential Agency Document
DLB-000772  MSHA-SOURCE-1-ARCHIVE-0069

Specification 3 of the proposed suspension cites your failure to effectively use established Agency tools to identify and correct errors on the part of your subordinate inspectors and supervisors regarding Accompanied Activities (AAs) and Field Activity Reviews (FARs). This specification also references supervisors' lack of documentation of required information on many AA and FAR forms such as correct event activity codes, dates of the Uniform Mine File reviews, dates when inspectors were debriefed, and, in some cases, supervisors not accompanying inspectors on all aspects of an inspection or investigation. Your failure to identify apparent deficiencies in two second level reviews you conducted was also mentioned.

In the oral and written replies, you stated that the infractions listed in this specification are not limited to District 4; this is a national issue. You also stated that ADM training is non-existent; you met with supervisors and addressed the issue of complete documentation; and instructed the supervisors that they had to travel with the inspector doing inspection activities in order to use the visit as an AA.

After reviewing this specification and your replies, I have determined that Specification 3 is not supported by the evidence. Thus, I am sustaining one (1) of the three (3) specifications in the proposed seven (7) day suspension issued to you.

> **Comment [BJ-S2]:** Its not clear why we are dropping this one, especially in light of the statement later rejecting the "national issue" argument

**Penalty Selection:**
In reaching my decision to an appropriate penalty, I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981)

I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. As a management official you are tasked with setting a positive example for subordinate employees. You were and still are assigned to review the work of the management and inspection personnel under your jurisdiction. If you are unable to enforce agency policies and follow National Office directives, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the very miners MSHA is tasked with protecting.

A Supervisory CMS&H Inspector is a prominent position. You are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to. Additionally, you are recognized by the mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006. Your responses to the IR team relative to Specification 1 indicated that you were aware of the criteria in PIL No. I08-III-02 for reviewing violations as potentially flagrant.

Although, as you indicated in both your oral and written replies, there may be other districts in violation of the Agency policies and directives, you failed to accept any responsibility for your actions.  Your statements that every other ADM in the country needs to be disciplined since you are being disciplined and MSHA is using the IR report as a "gotcha" does not indicate your acknowledgement that you could have carried out your official duties better.  This is particularly troublesome to me.  Even if other districts have deficiencies, you are responsible for District 4 and must be held accountable.

I have also considered your "Highly Effective" performance ratings for Fiscal Years (FY) 2010 and 2011, the lack of any prior disciplinary action in your personnel file, and your approximate 30 years of federal service.

I am unaware of other mitigating factors that warrant consideration as you did not share any with me.

It is my belief that you will not commit these same or similar infractions in the future.  I am confident that you can be successful in carrying out all of your upcoming official duties.  Your dedication to MSHA and all miners during your career is appreciated.

However, these mitigating factors do not outweigh the seriousness of your actions.  I have determined that a two (2) calendar day suspension will promote the efficiency of the service and is the least action I can take to correct your unacceptable conduct.

Your two day suspension will take place beginning on April 9, 2013, and continue through April 10, 2013, during which time you will be in a non-pay status.  Paid leave may not be used to offset the loss of pay resulting from suspension.  A Standard Form 50, Notification of Personnel Action, will be accessible via your Electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 11, 2013.  You will continue in your current position, grade and salary pending the effective date of this action.  Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

You are hereby advised that continued misconduct by you will not be tolerated in the future. Any recurrence of misconduct by you may lead to more severe disciplinary action or adverse action, up to and including your removal from Federal Service.

**NOTICE OF RIGHTS:**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008.  You must present the grievance

directly under the formal procedure within ten (10) workdays of your receipt of this action.  A formal grievance must:  (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested.  Your grievance must be filed with:

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325
Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a MSPB appeal as outlined above, or by filing a complaint with the Office of Special Counsel.  The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB.  A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, or disability, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor.  If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Civil Rights Center, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC  20212.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency.  However, you must designate your choice of representative in writing to Mr. Moran.  Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status.  You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Departments Employee Assistance Program (EAP).  The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind and services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

Confidential Agency Document
DLB-000776  MSHA-SOURCE-1-ARCHIVE-0073