April 2, 2013


MEMORANDUM TO:    DONALD WINSTON
                          Supervisory Mine Safety and
                          Health Specialist

FROM:               PATRICIA W. SILVEY
                          Deputy Assistant Secretary for Operations

SUBJECT:         Decision Letter

By letter dated December 5, 2012, Ernest Cameron, Director, Administration and Management, proposed to suspend you from pay and duty status for seven (7) calendar days from your position of Supervisory Mine Safety and Health Specialist, GS-1822-13, in the Mount Hope, WV District 4 Office, of the Mine Safety and Health Administration (MSHA).
On December 20, 2012, you presented me with your oral reply to the proposed suspension. Also in attendance at the oral reply were Executive Assistant Monique Molina, MSHA, and Donna Kramer, Supervisory Human Resources Specialist, Office of the Assistant Secretary and Management (OASAM).

During the oral reply I granted an extension for submission of any written reply until January 18, 2013. On January 7, 2013, you submitted your written reply.

I have considered the oral and written replies that you presented to me as well as the proposed suspension issued to you by Mr. Cameron and all supporting documentation. This decision is taken to promote the efficiency of the Federal Service and is based on your failure to carry out your official duties.


### Discussion on Decision to Suspend

Specification 1 of the proposed suspension concerned your failure to follow CMS&H Memo No. HQ-08-058A, when you recommended that the District 4 Manager approve the base roof control plan submitted in October 2009 for Upper Big Branch (UBB), without requiring Performance Coal Company to submit a risk assessment specific to the

particular mining operation, including the data and evaluation supporting the proposed roof control plan.

During your oral and written replies, you noted that CMS&H Memo No. HQ-08-058A lists four criteria to be used in determining if a roof control plan is complex and/or non-typical. The fourth criteria concerns other conditions considered unusual by the District Managers, such as retreat mining between two gob areas, mining of high stress areas created by multiple seam interaction, or active mining above or below longwall panels or isolated remnant pillars.

After reviewing this specification, I have determined that the Memo does allow the District Managers to exercise discretion relative to risk assessments based upon their knowledge and experience of multiple seam mining. Given your experience with multiple seam mining and roof control, I find that you acted within the parameters of the Memo when you recommended that the District Manager approve the base roof control plan for UBB absent a risk assessment. As such, this specification in the proposal cannot be supported.

Specification 2 of the proposed suspension concerned your failure to implement provisions of CMS&H Memo No. HQ-08-059A when you did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and revisions. Instructions for all roof control personnel to begin using these checklists were e-mailed to District Managers and Assistant District Managers on January 27, 2009.

Additionally, the District 4 plan approval records for the October 2009 UBB base roof control plan did not contain the Headquarters or the District 4 checklists.

In both your oral and written replies you stated that prior to CMS&H Memo No. HQ-08-059A being issued District 4 developed checklists to be used when reviewing roof control plans. You stated that the District 4 checklists contained a large majority of the items that the CMS&H Memo No. HQ-08-059A checklist contained and you thought the District 4 checklist was sufficient.

During your replies, you acknowledged that you continued to complete the District 4 checklists even after the Headquarters checklists were disseminated. You also affirmed that the October 2009 UBB base roof control plan file did not contain any checklist, Headquarters or District 4's.

Confidential Agency Document

In your written reply you admitted that you were aware that on January 27, 2009, instructions requiring roof control specialists to use the Headquarters checklists were e-mailed to the District Managers and Assistant District Managers. However, you stated that the e-mail distribution of the checklists did not include roof control supervisors; you did not receive the Headquarters checklist; and you were not informed that you had been using an incorrect checklist.

During the oral reply, you asserted the same position that your written reply contained regarding the checklists; that you were not on the e-mail distribution list, did not receive the Headquarters checklist, and were not informed that you were using an incorrect checklist. However, during the oral reply, I asked you whether or not you received the Headquarters checklist. Your response was that you could not say and you were not going to lie to me. If you received the checklist, it would have been from District Manager Richard Kline[1]. You continued to state that you could only tell me that you were not aware of the Headquarters checklist.

Based on the information shared during the oral reply, I find that this specification is supported by the evidence. Thus, I am sustaining one (1) of the two (2) specifications in the proposed seven (7) day suspension issued to you

**Penalty Selection:**
In reaching my decision as to an appropriate penalty, , I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981)

I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. As a management official you are tasked with setting a positive example for subordinate employees. You were and still are assigned to review the work of the inspection and technical personnel under your jurisdiction. If you are unable to enforce agency policies and follow National Office directives, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the very miners MSHA is tasked with protecting.

A Supervisory CMS&H Specialist is a prominent position. You are recognized by the mine operators, miners, miner's representatives,

---

[1] District Manager Kline has retired.

Confidential Agency Document
DLB-000779 MSHA-SOURCE-1-ARCHIVE-0076

and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006. You are also recognized by the Office of the Solicitor (SOL) as an expert on roof control as they have utilized your expertise on several legal cases in which MSHA received a favorable settlement.

As a Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to. Although the Internal Review team concluded that the District 4 checklists for reviewing roof control plans were adequate to ensure the plans submitted by Performance Coal Company included the required information, you were unable to explain why any checklist was missing from the October 2009 UBB base roof control plan.

Regardless of what happened to the checklist from the October 2009 UBB base roof control plan, I find that you failed to exercise due diligence in implementing the checklists in CMS&H Memo No. HQ-08-059A.

I have also considered your "Highly Effective" performance ratings for Fiscal Years (FY) 2009, 2010 and 2011 and the lack of any prior disciplinary action in your personnel file, and your 20 years of federal service.

It is my belief that you will not commit these same or similar infractions in the future. I am confident that you can be successful in carrying out all of your upcoming official duties and appreciate the dedication that you have shown to MSHA.

However, these mitigating factors do not outweigh the seriousness of your actions. I have determined that a one (1) calendar day suspension will promote the efficiency of the service and is the least action I can take to correct your unacceptable conduct.

Your one day suspension will take place beginning on April 9, 2013, during which time you will be in a non-pay status. Paid leave may not be used to offset the loss of pay resulting from suspension. A Standard Form 50, Notification of Personnel Action, will be accessible via your Electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 10, 2013. You will continue in your current position, grade and salary pending the

effective date of this action.  Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

You are hereby advised that continued misconduct by you will not be tolerated in the future. Any recurrence of misconduct by you may lead to more severe disciplinary action or adverse action, up to and including your removal from Federal Service.

## NOTICE OF RIGHTS:

You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008.  You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of this action.  A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested.  Your grievance must be filed with:

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325
Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a MSPB appeal as outlined above, or by filing a complaint with the Office of Special Counsel. The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB.  A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, or disability, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor. If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Civil Rights Center, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC 20212.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency. However, you must designate your choice of representative in writing to Mr. Moran. Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status. You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Departments Employee Assistance Program (EAP). The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind and services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

Confidential Agency Document
DLB-000782 MSHA-SOURCE-1-ARCHIVE-0079

| | |
|---|---|
| **From:** | Kramer, Donna L - OASAM HRC |
| **Sent:** | Thursday, April 04, 2013 2:05 PM |
| **To:** | Silvey, Patricia - MSHA; Fesak, George M - MSHA |
| **Subject:** | C. Thomas letters attached |
| **Attachments:** | C  Thomas 7 day decision letter (jb edits).doc; C  Thomas LOR (jb edits).doc |

Attached for your review and consideration are the decision letter and LOR for Charlie.  Jim Blair has reviewed.

Please let me know if any revisions are necessary.  If not, please send me signed copies once the letters have been issued.  Thank you.

Donna L. Kramer
Supervisory Human Resources Specialist
Office of Human Resources Consulting
and Operations
U.S. Department of Labor
OASAM/OHRCO
Phone: 202-693-7686
Kramer.Donna.L@dol.gov

The contents of this email and any attachments to it may contain confidential and/or legally priviledged information. This information is only for use by the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking action based upon the information contained herein is strictly prohibited. If this email was received in error, please notify the sender and return the documents immediately.

*How Was My Service?  Click Here (3 minute survey):* http://dol-hrc.customerservicesurvey.sgizmo.com/s3/

DATE:               April 4, 2013

MEMORANDUM TO:  CHARLES J. THOMAS
                              Deputy Director
                              Coal Mine Safety and Health

FROM:              PATRICIA W. SILVEY
                              Deputy Assistant Secretary for Operations

SUBJECT:        Decision Letter

By letter dated December 4, 2012, Ernest Cameron, Director, Administration and Management, proposed to suspend you from pay and duty status for seven (7) calendar days from your position of Deputy Administrator, ES-1822, in Coal Mine Safety and Health (CMS&H).

The proposal advised you of your right to respond orally and/or in writing. On December 21, 2012, you submitted your written reply to the proposed suspension. On January 10, 2013, you presented your oral reply. Also in attendance at the oral reply were Executive Assistant Monique Molina, MSHA, and Donna Kramer, Supervisory Human Resources Specialist, Office of the Assistant Secretary for Administration and Management (OASAM).

I have considered the proposed suspension issued to you by Mr. Cameron, and all supporting documentation, as well as your written and oral replies. Considering the record as a whole, including your willingness to work with a mentor to become more proficient with administration, I have determined that the seven (7) day suspension shall be reduced to a Letter of Reprimand, which will be issued separately. This decision is taken to promote the efficiency of the Federal Service and is based on your failure to carry out your official duties.

If there is anything in this decision letter that you do not understand and wish to have explained, you may contact Donna L. Kramer, Supervisory Human Resources Specialist, Employee and Labor Relations, at 202-693-7686.

Confidential Agency Document
DLB-000784 MSHA-SOURCE-1-ARCHIVE-0081

DATE:           April 4, 2013

MEMORANDUM TO:  CHARLES J. THOMAS
                                Deputy Director
                                Coal Mine Safety and Health

FROM:           PATRICIA W. SILVEY
                                Deputy Assistant Secretary for Operations

SUBJECT:      Letter of Reprimand

This memorandum is issued to you as an official reprimand for failure to carry out your official duties. This action is initiated for such cause as it will promote the efficiency of the Federal Service.

By way of background: On April 5, 2010, an explosion occurred at the Upper Big Branch (UBB) Mine killing 29 miners and injuring two. As is MSHA's usual practice, the Assistant Secretary directed that an Internal Review (IR) of the Agency's performance before the explosion be conducted. The details in this letter of reprimand are derived from issues identified in the IR report.

Critical standards that field staff must enforce deal with the review and approval of certain mine plans. The IR identified several instances where District 4 management failed to follow CMS&H policies and procedures applicable to the plan approval process.

1. District 4 management did not follow the provisions of CMS&H Memo No. HQ-08-058-A when approving the UBB roof control plan. The Administrator for CMS&H issued this memorandum to provide guidance for review and approval of complex and non-typical roof control plans and amendments following the August 2007 fatal coal outbursts at the Crandall Canyon mine.
2. District 4 management did not implement the checklists specified by CMS&H Memo HQ-08-059-A when reviewing roof control plans and revisions. Instead, the roof control department continued to use its own checklists.
3. District 4 management did not revise the roof control plan approval SOP to comply with the Program Policy Manual as recommended by the Office of Inspector General in its 2008 Audit report.
4. District 4 management did not follow national guidance outlined in Procedure Instruction Letter No. I09-V-03, which specified that separate ventilation and dust control plans were to be consolidated into a single mine ventilation plan subject to a single review date.

At the time you failed to carry out your official duties you were detailed to the Deputy Administrator position. In that position, you shared the responsibility with others in the National Office to see that criteria and methods for ensuring compliance with safety and health standards are properly and uniformly applied by all Coal Mine Safety and Health (CMS&H) Districts. However, you focused your management oversight on Districts 7, 8, and 9. The failures on the part of District 4 demonstrate a lack of management oversight for all districts on your part.

In reaching my decision to issue this letter of reprimand, I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981)

I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. Although you were the Acting Deputy Administrator at the time of the IR report, you were assigned direct responsibility for all CMS&H districts.

Deputy Administrator for CMS&H is a very prominent position. You are recognized by the public, mine operators, miners, representatives of miners, and MSHA personnel as having an in-depth knowledge of the Mine Act, MINER Act, implementing standards and regulations, and MSHA policies and procedures.

You were clearly on notice of the Agency policies and procedures. In your position of record as the Director, Office of Accountability, you determined compliance with MSHA policies and procedures. Yet, as Acting Deputy Administrator you were unable to take timely corrective action when your subordinate managers were not carrying out their official duties in an effective manner.

As a management official you are tasked with setting a positive example for subordinate employees. You were and still are assigned direct responsibility for all CMS&H districts, including review of the work of the management and inspection personnel. If you are unable to enforce agency policies, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the very miners MSHA is tasked with protecting.

I also considered that the District 4 District Manager, Assistant District Manager, and field office supervisors in your management chain were reluctant to raise areas of concern to your attention; thus limiting your ability to correct all infractions. Although you are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to, I considered that you may have been precluded from taking all necessary

corrective action due to your limited knowledge of all matters occurring in every district.

Your "Highly Effective" performance ratings for Fiscal Years (FY) 2010 and 2011, your "Exemplary" performance rating for FY 2009, the lack of any prior disciplinary action in your personnel file, and your approximate 22 years of federal service were also considered.

It is my belief that you will not commit these same or similar infractions in the future. I am confident that you can be successful in carrying out all of your upcoming official duties. Your dedication to MSHA and all miners during your career is appreciated.

However, these mitigating factors do not outweigh the seriousness of your actions. I have determined that a letter of reprimand will promote the efficiency of the service. As a supplement to this letter of reprimand, I will identify a veteran member of the Senior Executive Service to serve as a mentor for you during the period that this letter of reprimand remains in your file. I will also identify training that must complete. I believe these actions are the least actions I can take to correct your conduct. Any further instances of conduct of this nature will result in more serious disciplinary action, up to and including removal from the Federal Service.

This Letter of Reprimand is a matter of record and a copy will be placed in your Official Personnel Folder (OPF), where it will remain for no longer than one (1) year.

If you believe that your actions are due to personal problems, I would like to remind you of the Departments Employee Assistance Program (EAP). The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind and services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

**NOTICE OF RIGHTS:**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008. You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of this action. A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested. Your grievance must be filed with:

<div align="center">

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325

</div>

Confidential Agency Document
DLB-000787  MSHA-SOURCE-1-ARCHIVE-0084

Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a complaint with the Office of Special Counsel. The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB. A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, or disability, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor. If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Civil Rights Center, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC 20212.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency. However, you must designate your choice of representative in writing to Mr. Moran. Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status. You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

Confidential Agency Document
DLB-000788 MSHA-SOURCE-1-ARCHIVE-0085

| | |
|---|---|
| **From:** | Kramer, Donna L - OASAM HRC |
| **Sent:** | Monday, April 08, 2013 11:35 AM |
| **To:** | Molina, Monique V - MSHA |
| **Subject:** | RE: Hi |
| **Attachments:** | C  Thomas 7 day decision letter (jb edits).doc; C  Thomas LOR (jb edits).doc |

Please see attached.  Both letters have to be issued.  I will need signed copies of both letters once they're issued.

Donna L. Kramer
Supervisory Human Resources Specialist
Office of Human Resources Consulting
and Operations
U.S. Department of Labor
OASAM/OHRCO
Phone: 202-693-7686
Kramer.Donna.L@dol.gov

The contents of this email and any attachments to it may contain confidential and/or legally priviledged information. This information is only for use by the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking action based upon the information contained herein is strictly prohibited. If this email was received in error, please notify the sender and return the documents immediately.

*How Was My Service?  Click Here (3 minute survey):* http://dol-hrc.customerservicesurvey.sgizmo.com/s3/

**From:** Molina, Monique V - MSHA
**Sent:** Monday, April 08, 2013 11:22 AM
**To:** Kramer, Donna L - OASAM HRC
**Subject:** Hi

Pat wanted me to print Charlie's letter, I don't see it in her e-mail.  Can you send it to me she must of saved it or deleted it.

Thank you

DATE:                April 4, 2013

MEMORANDUM TO:   CHARLES J. THOMAS
                 Deputy Director
                 Coal Mine Safety and Health

FROM:            PATRICIA W. SILVEY
                 Deputy Assistant Secretary for Operations

SUBJECT:         Decision Letter

By letter dated December 4, 2012, Ernest Cameron, Director, Administration and Management, proposed to suspend you from pay and duty status for seven (7) calendar days from your position of Deputy Administrator, ES-1822, in Coal Mine Safety and Health (CMS&H).

The proposal advised you of your right to respond orally and/or in writing. On December 21, 2012, you submitted your written reply to the proposed suspension. On January 10, 2013, you presented your oral reply. Also in attendance at the oral reply were Executive Assistant Monique Molina, MSHA, and Donna Kramer, Supervisory Human Resources Specialist, Office of the Assistant Secretary for Administration and Management (OASAM).

I have considered the proposed suspension issued to you by Mr. Cameron, and all supporting documentation, as well as your written and oral replies. Considering the record as a whole, including your willingness to work with a mentor to become more proficient with administration, I have determined that the seven (7) day suspension shall be reduced to a Letter of Reprimand, which will be issued separately. This decision is taken to promote the efficiency of the Federal Service and is based on your failure to carry out your official duties.

If there is anything in this decision letter that you do not understand and wish to have explained, you may contact Donna L. Kramer, Supervisory Human Resources Specialist, Employee and Labor Relations, at 202-693-7686.

DATE:            April 4, 2013

MEMORANDUM TO:  CHARLES J. THOMAS
                           Deputy Director
                           Coal Mine Safety and Health

FROM:            PATRICIA W. SILVEY
                           Deputy Assistant Secretary for Operations

SUBJECT:      Letter of Reprimand

This memorandum is issued to you as an official reprimand for failure to carry out your official duties. This action is initiated for such cause as it will promote the efficiency of the Federal Service.

By way of background: On April 5, 2010, an explosion occurred at the Upper Big Branch (UBB) Mine killing 29 miners and injuring two. As is MSHA's usual practice, the Assistant Secretary directed that an Internal Review (IR) of the Agency's performance before the explosion be conducted. The details in this letter of reprimand are derived from issues identified in the IR report.

Critical standards that field staff must enforce deal with the review and approval of certain mine plans. The IR identified several instances where District 4 management failed to follow CMS&H policies and procedures applicable to the plan approval process.

1. District 4 management did not follow the provisions of CMS&H Memo No. HQ-08-058-A when approving the UBB roof control plan. The Administrator for CMS&H issued this memorandum to provide guidance for review and approval of complex and non-typical roof control plans and amendments following the August 2007 fatal coal outbursts at the Crandall Canyon mine.
2. District 4 management did not implement the checklists specified by CMS&H Memo HQ-08-059-A when reviewing roof control plans and revisions. Instead, the roof control department continued to use its own checklists.
3. District 4 management did not revise the roof control plan approval SOP to comply with the Program Policy Manual as recommended by the Office of Inspector General in its 2008 Audit report.
4. District 4 management did not follow national guidance outlined in Procedure Instruction Letter No. I09-V-03, which specified that separate ventilation and dust control plans were to be consolidated into a single mine ventilation plan subject to a single review date.

Confidential Agency Document

At the time you failed to carry out your official duties you were detailed to the Deputy Administrator position. In that position, you shared the responsibility with others in the National Office to see that criteria and methods for ensuring compliance with safety and health standards are properly and uniformly applied by all Coal Mine Safety and Health (CMS&H) Districts. However, you focused your management oversight on Districts 7, 8, and 9. The failures on the part of District 4 demonstrate a lack of management oversight for all districts on your part.

In reaching my decision to issue this letter of reprimand, I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981)

I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. Although you were the Acting Deputy Administrator at the time of the IR report, you were assigned direct responsibility for all CMS&H districts.

Deputy Administrator for CMS&H is a very prominent position. You are recognized by the public, mine operators, miners, representatives of miners, and MSHA personnel as having an in-depth knowledge of the Mine Act, MINER Act, implementing standards and regulations, and MSHA policies and procedures.

You were clearly on notice of the Agency policies and procedures. In your position of record as the Director, Office of Accountability, you determined compliance with MSHA policies and procedures. Yet, as Acting Deputy Administrator you were unable to take timely corrective action when your subordinate managers were not carrying out their official duties in an effective manner.

As a management official you are tasked with setting a positive example for subordinate employees. You were and still are assigned direct responsibility for all CMS&H districts, including review of the work of the management and inspection personnel. If you are unable to enforce agency policies, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the very miners MSHA is tasked with protecting.

I also considered that the District 4 District Manager, Assistant District Manager, and field office supervisors in your management chain were reluctant to raise areas of concern to your attention; thus limiting your ability to correct all infractions. Although you are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to, I considered that you may have been precluded from taking all necessary

corrective action due to your limited knowledge of all matters occurring in every district.

Your "Highly Effective" performance ratings for Fiscal Years (FY) 2010 and 2011, your "Exemplary" performance rating for FY 2009, the lack of any prior disciplinary action in your personnel file, and your approximate 22 years of federal service were also considered.

It is my belief that you will not commit these same or similar infractions in the future. I am confident that you can be successful in carrying out all of your upcoming official duties. Your dedication to MSHA and all miners during your career is appreciated.

However, these mitigating factors do not outweigh the seriousness of your actions. I have determined that a letter of reprimand will promote the efficiency of the service. As a supplement to this letter of reprimand, I will identify a veteran member of the Senior Executive Service to serve as a mentor for you during the period that this letter of reprimand remains in your file. I will also identify training that must complete. I believe these actions are the least actions I can take to correct your conduct. Any further instances of conduct of this nature will result in more serious disciplinary action, up to and including removal from the Federal Service.

This Letter of Reprimand is a matter of record and a copy will be placed in your Official Personnel Folder (OPF), where it will remain for no longer than one (1) year.

If you believe that your actions are due to personal problems, I would like to remind you of the Departments Employee Assistance Program (EAP). The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind and services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

**NOTICE OF RIGHTS:**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008. You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of this action. A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested. Your grievance must be filed with:

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325

Confidential Agency Document
DLB-000793 MSHA-SOURCE-1-ARCHIVE-0090

Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a complaint with the Office of Special Counsel. The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB. A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, or disability, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor. If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Civil Rights Center, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC 20212.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency. However, you must designate your choice of representative in writing to Mr. Moran. Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status. You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

Confidential Agency Document
DLB-000794  MSHA-SOURCE-1-ARCHIVE-0091

| | |
|---|---|
| **From:** | Molina, Monique V - MSHA |
| **Sent:** | Monday, March 25, 2013 4:20 PM |
| **To:** | Kramer, Donna L - OASAM HRC |
| **Subject:** | Winston decision letter (jb edits)(2).doc |
| **Attachments:** | Winston decision letter (jb edits)(2).doc |

April 2, 2013

MEMORANDUM FOR DONALD WINSTON
                 Supervisory Mine Safety and
                 Health Specialist

FROM:            PATRICIA W. SILVEY
                 Deputy Assistant Secretary for Operations

SUBJECT:         Decision Letter

By letter dated December 5, 2012, Ernest Cameron, Director,
Administration and Management, proposed to suspend you from pay
and duty status for seven (7) calendar days from your position of
Supervisory Mine Safety and Health Specialist, GS-1822-13, in the
Mount Hope, WV District 4 Office, of the Mine Safety and Health
Administration (MSHA).

On December 20, 2012, you presented me with your oral reply to the
proposed suspension.  Also in attendance at the oral reply were
Executive Assistant Monique Molina, MSHA, and Donna Kramer,
Supervisory Human Resources Specialist, Office of the Assistant
Secretary for Administration and Management (OASAM).

During the oral reply I granted an extension for submission of any
written reply until January 18, 2013.  On January 7, 2013, you
submitted your written reply.

I have considered the oral and written replies that you presented to
me as well as the proposed suspension issued to you by Mr. Cameron
and all supporting documentation.  This decision is taken to promote
the efficiency of the Federal Service and is based on your failure to
carry out your official duties.

Confidential Agency Document
DLB-000796  MSHA-SOURCE-1-ARCHIVE-0093

## Discussion on Decision to Suspend

Specification 1 of the proposed suspension concerned your failure to follow CMS&H Memo No. HQ-08-058A, when you recommended that the District 4 Manager approve the base roof control plan submitted in October 2009 for Upper Big Branch (UBB), without requiring Performance Coal Company to submit a risk assessment specific to the particular mining operation, including the data and evaluation supporting the proposed roof control plan.

During your oral and written replies, you noted that CMS&H Memo No. HQ-08-058A lists four criteria to be used in determining if a roof control plan is complex and/or non-typical. The fourth criteria concerns other conditions considered unusual by the District Managers, such as retreat mining between two gob areas, mining of high stress areas created by multiple seam interaction, or active mining above or below longwall panels or isolated remnant pillars.

After reviewing this specification, I have determined that the Memo does allow the District Managers to exercise discretion relative to risk assessments based upon their knowledge and experience of with multiple seam mining. Given your experience with multiple seam mining and roof control, I find that you acted within the parameters of the Memo when you recommended that the District Manager approve the base roof control plan for UBB absent a risk assessment. As such, this specification in the proposal cannot be supported.

Specification 2 of the proposed suspension concerned your failure to implement provisions of CMS&H Memo No. HQ-08-059A when you did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and revisions. Instructions for all roof control personnel to begin using these checklists were e-mailed to District Managers and Assistant District Managers on January 27, 2009.

Additionally, the District 4 plan approval records for the October 2009 UBB base roof control plan did not contain the Headquarters or the District 4 checklists as required by the Memo.

In both your oral and written replies you stated that prior to CMS&H Memo No. HQ-08-059A being issued, District 4 had developed checklists to be used when reviewing roof control plans. You stated that the District 4 checklists contained a large majority of the items that the CMS&H Memo No. HQ-08-059A checklists contained and you thought the District 4 checklists was were sufficient.

During your replies, you acknowledged that you continued to complete the District 4 checklists even after the Headquarters checklists were disseminated. You also affirmed that the October 2009 UBB base roof control plan file did not contain any checklist, Headquarters or District 4's.

In your written reply you admitted that you were aware that on January 27, 2009, instructions requiring roof control specialists to use the Headquarters checklists were e-mailed to the District Managers and Assistant District Managers. However, you stated that the e-mail distribution of the checklists did not include roof control supervisors; you did not receive the Headquarters checklists; and you were not informed that you had been using the incorrect checklists.

During the oral reply, you asserted the same position that your written reply contained regarding the checklists; that you were not on the e-mail distribution list, did not receive the Headquarters checklist, and were not informed that you were using an the incorrect checklists. However, during the oral reply, I asked you whether or not you received the Headquarters checklists. Your response was that you could not say and you were not going to lie to me. If you received the checklists, it would have been from Assistant District Manager Richard Kline[1]. You continued to state that you could only tell me that you were not aware of the Headquarters checklists.

Based on the information shared during the oral reply, I find that this specification is supported by the evidence. Thus, I am sustaining one (1) of the two (2) specifications in the proposed seven (7) day suspension issued to you.

**Penalty Selection:**
In reaching my decision as to an appropriate penalty, I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981).

I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. As a management official you are tasked with setting a positive example for subordinate employees. You were and still are assigned to review the work of the inspection and technical personnelspecialists under your jurisdictionsupervision. If you are

[1] District Manager Kline has retired.

4

unable to enforce agency policies and follow National Office directives, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the very miners MSHA is tasked with protecting.

A Supervisory CMS&H Specialist is a prominent position. You are recognized by the mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006. You are also recognized by the Office of the Solicitor (SOL) as an expert on roof control as they have utilized your expertise on several legal cases in which MSHA received a favorable settlement.

As a Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to. Although the Internal Review team concluded that the District 4 checklists for reviewing roof control plans were adequate to ensure the plans submitted by Performance Coal Company included the required information, you were unable to explain why any checklist was missing from the October 2009 UBB base roof control plan.

Regardless of what happened to the checklist from the October 2009 UBB base roof control plan, I find that you failed to exercise due diligence in implementing the checklists in CMS&H Memo No. HQ-08-059A.

I have also considered your "Highly Effective" performance ratings for Fiscal Years (FY) 2009, 2010, and 2011, and the lack of any prior disciplinary action in your personnel file, and your 20 years of federal service.

It is my belief that you will not commit these same or similar infractions in the future. I am confident that you can be successful in carrying out all of your upcoming official duties and appreciate the dedication that you have shown to MSHA.

However, these mitigating factors do not outweigh the seriousness of your actions. I have determined that a one (1) calendar day suspension will promote the efficiency of the service and is the least action I can take to correct your unacceptable conduct.

Your one day suspension will take place ~~beginning~~ on April 9, 2013, during which time you will be in a non-pay status. Paid leave may not be used to offset the loss of pay resulting from suspension. A Standard Form 50, Notification of Personnel Action, will be accessible via your Electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 10, 2013. You will continue in your current position, grade, and salary pending the effective date of this action. Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

You are hereby advised that continued misconduct by you will not be tolerated in the future. Any recurrence of misconduct by you may lead to more severe disciplinary action or adverse action, up to and including your removal from Federal Service.

## NOTICE OF RIGHTS

You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008. You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of this action. A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested. Your grievance must be filed with:

<div align="center">

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325
Washington, DC 20210

</div>

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a MSPB appeal as outlined above, or by filing a complaint with the Office of Special Counsel. The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB. A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out

Confidential Agency Document
DLB-000800  MSHA-SOURCE-1-ARCHIVE-0097

Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, or disability, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor. If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Civil Rights Center, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC 20212.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency. However, you must designate your choice of representative in writing to Mr. Moran. Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status. You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Department's Employee Assistance Program (EAP). The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind, and its services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

Confidential Agency Document
DLB-000801 MSHA-SOURCE-1-ARCHIVE-0098

| | |
|---|---|
| **From:** | Molina, Monique V - MSHA |
| **Sent:** | Monday, March 25, 2013 4:17 PM |
| **To:** | Kramer, Donna L - OASAM HRC |
| **Subject:** | Selfe decision letter (jb edits)(2).doc |
| **Attachments:** | Selfe decision letter (jb edits)(2).doc |

April 2, 2013


MEMORANDUM FOR  LINCOLN L. SELFE, JR.
Supervisory Mine Safety and
Health Inspector


FROM:              PATRICIA W. SILVEY
Deputy Assistant Secretary for Operations


SUBJECT:           Decision Letter


By letter dated December 5, 2012, Ernest Cameron, Director, Administration and Management, proposed to suspend you from pay and duty status for seven (7) calendar days from your position of Supervisory Mine Safety and Health Inspector[1], GS-1822-14, in the District 4 Office in Mount Hope, WV, of the Mine Safety and Health Administration (MSHA).

On December 20, 2012, you presented me with your oral reply to the proposed suspension. Also in attendance at the oral reply were Executive Assistant Monique Molina, MSHA, and Donna Kramer, Supervisory Human Resources Specialist, Office of the Assistant Secretary for Administration and Management (OASAM).

During the oral reply you also provided your written reply. An extension was granted until January 18, 2013, to allow you to supplement your written reply, if so desired. On January 17, 2013, you submitted an e-mail containing additional information for my consideration.

I have considered the oral and written replies that you presented to me as well as the proposed suspension issued to you by Mr. Cameron

---

[1] This position is commonly referred to as the Assistant District Manager.


Confidential Agency Document
DLB-000803  MSHA-SOURCE-1-ARCHIVE-0100

2

and all supporting documentation.  This decision is taken to promote the efficiency of the Federal Service and is based on your failure to carry out your official duties.

**Discussion on Decision to Suspend**
Specification 1 of the proposed suspension concerned your failure to provide adequate management oversight by ensuring that inspectors and supervisors under your supervision reviewed potentially flagrant violations in accordance with the procedures established by Procedure Instruction Letter (PIL) No. I08-III-02.

During your oral reply and in your written reply, you noted that of the two types of flagrant violations, inspectors only had difficulty with the repeated failure or S & S violationscriterion.  You also stated that at the time of the Upper Big Branch (UBB) mine accident explosion there was not any mechanism available to assist inspectors in determining whether or not a cited violation was a repeat violation other than the inspector's or his or ✗her supervisor's memory.

 You cited the lack of clear and concise guidance from the National Office relative to the interpretation of the PIL No. I08-III-02 on specifically what two parts of the flagrant violation evaluation standards mentioned in the PIL actually refers to.  Both of your replies also reference the matters issue as being nationwide in scope and your belief that you should not disciplined for a nationalwide problem.

Although I have considered your comments, for the purpose of this decision letter, I am focused on your actions regarding lack of adequate management oversight on potentially flagrant violations in accordance with the provisions of the PIL procedures.

As stated in the proposed suspension, one of the key responsibilities of your position is to evaluate the results of policy implementation within your area of enforcement responsibility.  The Mt. Hope Field Office inspectors issued eight section 104(d)(2) orders for violations at UBB that met the "numbered objective criteria" in PIL No. I08-III-02 for review as potentially flagrant violations.  The eight violations issued were not reviewed as potentially flagrant violations by inspectors or supervisors.

During your interview with the IR team, you demonstrated a comprehensive understanding of MSHA procedures regarding flagrant violations.  Nevertheless, you personally reviewed three of the eight violations at UBB that met the "numbered objective criteria" outlined

> **Comment [BJ-S1]:** Can we make this clearer?

3

in PIL I08-III-02 and did not recognize that any of the violations was potentially flagrant.

In ~~both~~ neither your oral nor your ~~and~~ written repl~~ies you~~y did you ~~not~~ offer any explanation as ~~the reasons~~to why only 9% of the 66 potentially flagrant violations required to be reviewed were reviewed within your area of enforcement responsibility.  Therefore, I find that this specification is supported by the evidence.

Specification 2 of the proposed suspension concerned your failure to provide necessary management oversight to ensure that Right of Entry (ROE) trainees in the Mt. Hope Field Office did not conduct inspection activities apart from Authorized Representatives (ARs).

In your oral and written replies you stated ~~that~~ you did not have any knowledge that ROE trainees were conducting inspection activities apart from the ARs.  You also stated that you had no reason to believe or question that the directives you had issued regarding ~~the parameters of~~ when an ROE trainee could be apart from the AR were not being followed.  You asserted that ~~if you~~ had you known~~new~~ these actions were occurring~~occurred~~ you would have taken disciplinary action against those who had failed to follow your directives~~, which were in compliance with Section 103(a) of the~~ Miner Act.

Although the Internal Review (IR) team determined that for portions of five of the six regular inspections at UBB, ROE trainees did conduct inspection activities apart from the ARs, I cannot find any evidence that indicates you were aware of these occurrences.  As such, this specification in the proposal cannot be supported.

Specification 3 of the proposed suspension cites your failure to effectively use established Agency tools to identify and correct errors on the part of your subordinate inspectors and supervisors regarding Accompanied Activities (AAs) and Field Activity Reviews (FARs).  This specification also references supervisors' lack of documentation of required information on many AA and FAR forms such as correct event activity codes, dates of the Uniform Mine File reviews, dates when inspectors were debriefed, and, in some cases, supervisors not accompanying inspectors on all aspects of an inspection or investigation.  Your failure to identify apparent deficiencies in two second level reviews you conducted was also _-cited~~mentioned~~.

Your written response identified an error in Specification 3.  The Coal Mine Safety and Health Supervisor's Handbook requires a supervisor to

Confidential Agency Document
DLB-000805  MSHA-SOURCE-1-ARCHIVE-0102

4

accompany an inspector during all aspects of a mine visit, not all
aspects of an inspection or investigation as stated in Specification 3.

In the oral and written replies, you did not dispute the fact that
Mt. Hope Field Office supervisors did not conduct (or document)
several required AAs and FARs. You indicated that the oversights
occurred because there were acting supervisors in the Mt. Hope Field
Office between May and December 2009. You also stated there was
no training on conducting AAs, FARs, and second level reviews
provided to acting supervisors, supervisors, and assistant district
managers until after the UBB internal review.

You asserted that you had identified issues with AAs during your
second level reviews and addressed the issues with your subordinate
supervisors. Finally, you stated that Specification 3 inappropriately
holds you accountable for deficiencies in AAs and FARs that you did
not review and were not required to review.

~~In the oral and written replies, you stated that the infractions listed in
this specification are not limited to District 4; this is a national issue.
You also stated that ADM training is non-existent; you met with
supervisors and addressed the issue of complete documentation; and
instructed the supervisors that they had to travel with the inspector
doing inspection activities in order to use the visit as an AA.~~

After reviewing this specification and your replies, I have determined
that Specification 3 is not supported by the evidence. Thus, I am
sustaining one (1) of the three (3) specifications in the proposed seven
(7) day suspension issued to you.

**<u>Penalty Selection</u>:**
In reaching my decision to an appropriate penalty, I have considered
the factors established by Merit System Protections Board case
Douglas v. VA, 5 MSPB 313 (1981).

I considered the nature and seriousness of your actions. Failing to
carry out your official duties is one of the most serious infractions that
can be committed. As a management official you are tasked with
setting a positive example for subordinate employees. You were and
still are assigned to review the work of the management and
inspection personnel under your jurisdiction. If you are unable to
enforce agency policies and follow National Office directives, the
inspectorate may be held to a lower standard of quality work which

> **Comment [BJ-S2]:** Its not clear why we are dropping this one, especially in light of the statement later rejecting the "national issue" argument

> **Formatted:** Underline

Confidential Agency Document
DLB-000806 MSHA-SOURCE-1-ARCHIVE-0103

5

could jeopardize the safety of the very miners MSHA is tasked with
protecting.

A Supervisory CMS&H Inspector is a prominent position. You are
responsible for the quality and quantity of work produced by your
subordinates while ensuring agency policies are adhered to.
Additionally, you are recognized by the mine operators, miners,
miner's representatives, and MSHA as having an in-depth knowledge
of the Federal Mine Safety and Health Act of 1977 as amended by the
Mine Improvement and New Emergency Response Act of 2006. Your
responses to the IR team relative to Specification 1 indicated that you
were aware of the criteria in PIL No. I08-III-02 for reviewing violations
as potentially flagrant.

Although, as you indicated in both your oral and written replies, there
may be other districts in violation of the Agency policies and directives,
you failed to accept any responsibility for your actions. Your
statements that every other ADM in the country needs to be
disciplined since you are being disciplined and MSHA is using the IR
report as a "gotcha" does not indicate your acknowledgement that you
could have carried out your official duties better. This is particularly
troublesome to me. Even if other districts have deficiencies, you are
responsible for District 4 and must be held accountable.

I have also considered your "Highly Effective" performance ratings for
Fiscal Years (FY) 2010 and 2011, the lack of any prior disciplinary
action in your personnel file, and your approximate 30 years of federal
service.

I am unaware of other mitigating factors that warrant consideration as
you did not share any with me.

It is my belief that you will not commit these same or similar
infractions in the future. I am confident that you can be successful in
carrying out all of your upcoming official duties. Your dedication to
MSHA and all miners during your career is appreciated.

However, these mitigating factors do not outweigh the seriousness of
your actions. I have determined that a two one (21) calendar day
suspension will promote the efficiency of the service and is the least
action I can take to correct your unacceptable conduct.

Your two one day suspension will take place beginning on April 9,
2013, and continue through April 10, 2013, during which time you will

Confidential Agency Document

6

be in a non-pay status. Paid leave may not be used to offset the loss of pay resulting from suspension. A Standard Form 50, Notification of Personnel Action, will be accessible via your Electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 10‡, 2013. You will continue in your current position, ~~grade~~grade, and salary pending the effective date of this action. Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

You are hereby advised that continued misconduct by you will not be tolerated in the future. Any recurrence of misconduct by you may lead to more severe disciplinary action or adverse action, up to and including your removal from Federal Service.

**NOTICE OF RIGHTS:**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008. You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of this action. A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested. Your grievance must be filed with:

<div align="center">

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325
Washington, DC 20210

</div>

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

7

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a MSPB appeal as outlined above, or by filing a complaint with the Office of Special Counsel. The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you or your right to file an Individual Right of Action appeal to the MSPB. A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, or disability, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor. If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Civil Rights Center, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC 20212.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency. However, you must designate your choice of representative in writing to Mr. Moran. Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status. You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Department's Employee Assistance Program (EAP). The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind, and

Confidential Agency Document
DLB-000809  MSHA-SOURCE-1-ARCHIVE-0106

8

its services are strictly confidential.  You may contact EAP directly by
calling 202-693-8888.

Confidential Agency Document
DLB-000810  MSHA-SOURCE-1-ARCHIVE-0107

| | |
|---|---|
| **From:** | Stricklin, Kevin G - MSHA |
| **Sent:** | Tuesday, June 26, 2012 2:47 PM |
| **To:** | Kapitan, Monica S - MSHA; Tarr, Jane E - MSHA |
| **Subject:** | RE: another question |

Kline was asked to be on a detail to District 1 on the day UBB occurred.

---

**From:** Kapitan, Monica S - MSHA
**Sent:** Tuesday, June 26, 2012 2:32 PM
**To:** Tarr, Jane E - MSHA; Stricklin, Kevin G - MSHA
**Subject:** FW: another question

This was Kline, wasn't it?

*Monica S. Kapitan*
Coal Mine Safety and Health
Phone: 202-693-9545

---

**From:** Dondis, Lynn - MSHA
**Sent:** Tuesday, June 26, 2012 2:25 PM
**To:** Kapitan, Monica S - MSHA
**Cc:** Stricklin, Kevin G - MSHA
**Subject:** another question

Monica:  I forgot to ask you about this.  But I think that before one of these supervisor's retirement, there were plans to discipline/terminate him.  Can you identify who this was?.

Lynn Dondis
Special Assistant to the Assistant Secretary for
Mine Safety and Health
Mine Safety and Health Administration
U.S. Department of Labor

(Tel): (202) 693-9477

Confidential Agency Document
DLB-000811  MSHA-SOURCE-1-ARCHIVE-0108

**From:**        Selfe, Lincoln L - MSHA
**Sent:**        Friday, December 14, 2012 12:30 PM
**To:**          Carpenter, Charles E - MSHA
**Subject:**     response
**Attachments:** Response to memorandum dated December 5.doc

Hi Charlie,

Can you please review the attached document and provide any help you can?

Thanks,
Link

Confidential Agency Document
DLB-000812  MSHA-SOURCE-1-ARCHIVE-0109

Response to memorandum dated December 5, 2012 from Ernest Cameron to Lincoln Selfe regarding a proposed seven (7) day suspension

It is stated in the memorandum that the reason and specifications for this proposed action are derived from issues identified in the Internal Review Report from the April 5, 2010 explosion at the Upper Big Branch Mine. The internal review team concluded that they did not find evidence that actions of MSHA employees caused this tragedy. On page 192 of the internal review report the internal review team discusses that district 4 personnel were dedicated in their efforts to enforce provisions of the Mine Act at UBB and in the months before the explosion, they identified hundreds of hazardous conditions and violations, issued citations and orders, and followed up to ensure conditions and violations were corrected. In fact in FY09, the Upper Big Branch Mine was one of the most cited mines in the nation (684 citations and orders issued) and was cited the most unwarrantable failure violations (56 issuances under 104-D) of any mine in the nation. These findings and facts are inconsistent with your allegation in the memorandum that I failed to provide appropriate direction and management oversight necessary to ensure proper and consistent enforcement of the Federal Mine Safety and Health Act of 1977 (Mine Act) as amended by the Mine Improvement and New Emergency Response Act of 2006 (Miner Act).

Specification # 1. The memorandum states that I failed to provide oversight to ensure potentially flagrant violations were reviewed. It also states that when the internal review team interviewed the inspectors about the flagrant review criteria that none of the inspectors knew the criteria and that some could not remember receiving training on this important enforcement tool. I have documentation for two Mt. Hope Field office staff meetings that show the flagrant violation procedure instruction letter and the criteria within was presented in the staff meetings (staff meetings conducted July 30, 2007 and March 31, 2008) . To further address inspection consistency I also have included a memorandum presented to the inspectors in a staff meeting conducted January 4 & 5, 2010, addressing insufficient documentation in inspection notes. I also want to point out that there are two parts to the flagrant review; one is for violations where the negligence is evaluated as reckless disregard. These violations are easily evaluated and the inspectors had little or no problem identifying these. The problems were with the second part of the flagrant review addressing two unwarrantable issuances on the same standard in the past 15 months. There was no mechanism in place in the Agency to identify the violations meeting this criteria other than the inspectors or his supervisor's memory. With the vast number of citations and orders issued in CMS&H District 4, it was an impossible task. This was not a

Confidential Agency Document
DLB-000813 MSHA-SOURCE-1-ARCHIVE-0110

specific CMS&H District 4 issue but was a nationwide issue. After this internal review identified this issue, headquarters had PEIR develop a fix and implement it into the IPAL program so that the system tracks and identifies standards where two or more unwarrantable violations have been cited in the past 15 months. Furthermore there are still issues with the second part of the flagrant violation evaluation. There is interpretation that it is not only two previous issuances on the same standard as is written in the procedure letter but that the issuances must be addressing the same specific hazard. This is still affecting the evaluations for potential flagrant violations, and we still need clear and concise guidance for this important inspection tool and to date we have not been provided that guidance. In summary the internal review team found the failure to review potentially flagrant violations was a nationwide issue, not one that was limited to my enforcement division. Nationally, including District 4, at least 318 violations cited at coal mines during the review period met the "numbered objective criteria" outlined in the PIL 108-III-02 for review as potentially flagrant violations. Coal district offices reviewed and forwarded 84 (26%) of these violations to the Administrator for final determination. The internal review team concluded that more violations likely would have been reviewed for flagrant assessments if procedures had clearly directed inspectors to submit SAR forms for all violations meeting the objective criteria and oversight reports had been developed and used to identify them. They also suggested the Agency and SOL should have developed and provided additional written guidance for analyzing and processing potentially flagrant violations. (In this case it seems that you are proposing to discipline me for an issue that was not specific to me and my inspection division, which according to the internal review team, was most likely present in every MSHA district).

Specification #2. The memorandum states I did not provide management oversight to ensure Right of Entry (ROE) trainees in the Mt. Hope Field Office did not conduct inspection activities apart from Authorized Representatives. You also state that I did not take effective action to identify and correct this noncompliant behavior. I had given a directive to all the inspectors, trainees, and supervisors stating that inspector trainees were not to be left alone during inspections.  I stated that the trainee was to be with the inspector at all times, and the only case where a trainee was permitted to assist the inspector was while conducting respirable dust surveys and that was only if the trainee was certified to sample for respirable dust and the inspector remained on the section with the trainee. When the internal review team asked me if I would believe that trainees were conducting inspection activities I responded no. I was shocked to find that they were conducting inspection activity. I had given the directive several times at different staff meetings and when l accompanied supervisors, inspectors and trainees on mine visits the trainees were never out of sight of the inspectors so I had no reason to believe or question that my directive was not being followed, or

that there was a noncompliance issue with the Act. There are no systems in place to alert me as to this occurrence and there were no systems in place at the time this occurred. The field supervisors are required to review the daily inspection notes and that is the only place that this action was documented. I am only required to review the notes for Special Assessment Reviews (SAR's) and Possible Knowing and Willful Reviews (PKW's). This action was not reflected in any of these documents. I am required to conduct a 2nd level review of one accompanied activity every inspection half for each supervisor. This noncompliant behavior did not show up in any of the second level reviews that I conducted. In this case you are proposing discipline on me for something I had no knowledge of ever occurring and from my observation had no reason to suspect.

Specification #3  The memorandum states that I did not use the established Agency tool to identify and correct errors on the part of my subordinate inspectors and supervisors. Mt. Hope Field Office supervisors were required to conduct 78 Accompanied Activities (AAs) and 39 Field Activity Reviews (FARs) during the internal review period. However, documentation provided to the IR team indicated that only 32 AAs and 23 Fars had been conducted. Supervisors did not document required information on many AA and FAR forms.  You also state the supervisor must accompany an inspector on all aspects of an inspection or investigation and this did not occur in some cases.  (This is not a true statement. The supervisor can not possibly cover all aspects of an inspection in one mine visit. The supervisor is to travel with the inspector and observe the inspector as he conducts the inspection and note various things about the inspector's performance. He is also required to note the condition of the mine and examine a part of a beltline during his activity.) First, I am not familiar with any Agency "tools" other than a simple tracking sheet provided on coal's w:drive to track mine visits, established to identify and correct errors on the part of my subordinate inspectors and supervisors relative to accompanied activities and field activity reviews. Luther Mars, the division 2 ADM, and I created a tracking form to try and manually track these activities to ensure that the activities were conducted.

   In the case of Mt. Hope Field Office, the field supervisor applied for disability retirement on May 19, 2009. He was on sick, annual, and eventually went on leave without pay before his retirement was approved. There were acting supervisors in the Mt. Hope Field Office during all the months he was on leave and even though they had traveled some with the inspectors, they did not complete accompanied activity documentation.  There was no training available for acting supervisors in place during this time because I had mentioned training for some of them and was told it was impossible because it would be construed as pre-selection for the position and we could not do that. Also there was never training required or provided for field supervisors or assistant district mangers

Confidential Agency Document
DLB-000815  MSHA-SOURCE-1-ARCHIVE-0112

on conducting accompanied activities, field activity reviews, or second level reviews. As with the other issues that you have addressed in the memorandum, the internal review team identified this as a national issue not specific to my enforcement division during their review and since that determination, training has been developed for both full time field supervisors and also an online training course that is to be completed before someone can perform a detail as acting supervisor. Both of these training formats include training on AAs and FARs that was previously not available to MSHA personnel.  Furthermore I am only required to review one FAR every half. It takes two AAs for a FAR, so that means I am only required to review two AAs for each supervisor each half. The internal review team reviewed all of the AAs and FARs for their review period. The internal review team reviewed many documents that I had never seen, or was not required to see, yet I am being held accountable for review of these documents. The memorandum states that I had failed to identify apparent deficiencies in two of the second level reviews that I had conducted. This is also not a true statement. I had identified that some supervisors had turned in AAs for visits made during the inspection closeouts and had not gone into the mine to assess the mine condition or the inspector's performance. I had met with the supervisors and addressed this issue and instructed them that they had to travel with the inspector doing inspection activities to be able to use the visit as an AA. Furthermore I addressed this issue with all of the supervisors in supervisor staff meetings. Once again I feel that you are proposing a disciplinary action on me for something that the internal review team found to be a national issue. I again want to point out that to date there has been no training required, developed or provided for assistant district managers relative to issues that are deemed so important.

Additional Mitigating Factors:

I want to bring out that I performed a 120 day detail as District Manager in CMS&H District 3 in 2007. This was after Sago, Darby, and Tri Star, and Crandall Canyon disasters. I thought about everything from these events and had discussion with the coal administrator about how after every disaster they seem to fault MSHA management. I discussed how we train supervisors on LMR issues etc. but we had never trained the supervisor on what his job actually entails on a daily basis. We discussed the need for developing training specific to the supervisor's needs and a part of that discussion was how to conduct field activity reviews. The administrator told me that he understood what I was saying and would look into it. Had training been developed and given at that time, it is likely we would not be going through this today.

Confidential Agency Document
DLB-000816  MSHA-SOURCE-1-ARCHIVE-0113

During this timeframe, CMS&H District 4 was the biggest district in MSHA with responsibility for inspecting 437 mines and facilities. Budgetary constraints and retirements had depleted MSHA's inspectorate.  Because of the reduction in staffing many experienced inspectors had left MSHA and were not replaced. CMS&H District 4 Mt. Hope Field Office had the second highest number of inspector trainees of any field office in MSHA. TheMt. Hope Field Office had the highest number of active mechanized mining units (MMUs) per supervisor in the nation. The most experienced inspector in the Mt. Hope Field Office had only 5 years with the Agency at the time of the internal review, yet District 4 inspectors led the nation in enforcement issuing more than 35000 citations and orders during the internal review's review period. That amounted to 23% of the total issuances by MSHA. District 4 also led the nation in issuances designated as unwarrantable failure to comply. Thirty-four percent of all unwarrantable citations and orders in the nation were issued in CMS&H District 4. The internal review team described District 4 enforcement as "aggressive". This fact is definitely not consistent with your allegation that l did not provide appropriate direction and management oversight to ensure proper and consistent enforcement of the Act.


 Also for your consideration, I also want to discuss my 38 year career in the mining industry. From 1974 to 1982 I completed a management training program with Clinchfield Coal Company in Virginia. I was trained in engineering, industrial engineering, safety, was a staff assistant to the vice president of operations, was a foreman and assistant mine foreman at Clinchfield's Training Mine, and introduced people into the mining field. From 1982 to 1990 I was with MSHA in CMS&H District 5, working as a coal mine inspector and accident investigator. During this timeframe I served as a subject matter expert and was taken to HQ in 1986 to review potential applicants for MSHA employment. In 1998 I was selected to participate in an MSHA management training program and went through extensive training. Also in 1990 I performed a detail as field supervisor in CMS&H District 6 before moving to CMS&H District 3 as staff assistant to the District Manager. In CMS&H District 3 I also performed details as field supervisor and roof control supervisor. I spent almost 15 years on MSHA's Mine Emergency Unit (MEU) and worked mine emergencies in Virginia, Kentucky, West Virginia, Alabama, lllinois, Utah, and Colorado. Because of my leadership skills I as designated as one of the captains on the MEU. I was map man in two International Mine Rescue Competitions and in 1999 we were the first place winners in the International Mine Recue Competition. I reported to the Washington area with the team for 911 during the Pentagon event and also responded to Hurricane Katrina. I represented the United States for Mine Rescue in both Canada and Poland. In 2001 I moved to CMS&H District 4 as Assistant District Manager for Enforcement Programs. I am very dedicated and passionate

about my job to protect the miners and feel it is reflected by my highly effective performance ratings that you referenced in the memorandum. The past 30 years of my life have been dedicated to MSHA. I feel I have had a really good career and have earned the respect and established credibility with all my peers and coworkers. I have found this memorandum to be unwarranted and highly insulting to me and respectfully request that it be stricken from any and all of my records. Secondly, I don't understand how my being suspended for seven days will promote efficiency of the Agency, it would only put me farther behind in the things I need to be doing.

**From:**       Selfe, Lincoln L - MSHA
**Sent:**       Tuesday, December 18, 2012 11:02 AM
**To:**
**Subject:**    FW: Documents
**Attachments:** Lselfe - 12-07-2010-final.pdf; LSelfe 6-15-2011.pdf; Lselfe - 12-08-2010-final.pdf

**Importance:** High
**Sensitivity:** Confidential

**From:** Cameron, Ernest - MSHA
**Sent:** Monday, December 10, 2012 5:13 AM
**To:** Selfe, Lincoln L - MSHA
**Cc:** Cameron, Ernest - MSHA; Crawford, Nancy M - MSHA
**Subject:** Documents
**Importance:** High
**Sensitivity:** Confidential

Mr. Selfe:                                              Dec. 10, 2012

In the interest of facilitating prompt receipt of the documents you requested I am including your interview statements in this email.

I will also be sending the hard copies of the documents to you to your office address today.

If you have questions please let us know.

Regards,

Ernest

*Ernest A. Cameron*
*Director, Administration and Management*
*Mine Safety and Health Administration*
*1100 Wilson Blvd. Room 2125*
*Arlington, VA*
*Phone - 202-693-9800*
*cameron.ernest@dol.gov*

Confidential Agency Document
DLB-000819 MSHA-SOURCE-1-ARCHIVE-0116

**From:** Thomas, Charles J - MSHA
**Sent:** Thursday, December 06, 2012 4:04 PM
**To:**
**Subject:** Document1 [Compatibility Mode]
**Attachments:** Document1 [Compatibility Mode].doc

This is something I can work on my laptop at home.

Confidential Agency Document
DLB-000820 MSHA-SOURCE-1-ARCHIVE-0117

December , 2012

MEMORANDUM FOR PATRICIA W. SILVEY
                               Deputy Assistant Secretary for Operations

THROUGH:          EARNEST A. CAMERON
                     Director of Administration and Management

                     NANCY CRAWFORD
                     Director of Human Resources

                     Kevin G. Strickland
                     Administrator for Coal Mine Safety and Health

SUBJECT:          Mitigating facts and background on why a Seven (7) Day
                     Suspension is not warranted

On April 5, 2010 , and explosion occurred at the Upper Big Branch Mine (UBB) killing 29 miners and injuring 2. The internal review investigation team determined and I quote from page 1 of the executive summary: *"The MSHA Accident Investigation team determined that the explosion occurred because Performance Coal Company (Operator) and its parent company, Massey Energy Company (Massey), violated fundamental safety standards and failed to take corrective actions to prevent catastrophic explosion."*

As background concerning myself, I am 56 years old, graduated from Barrackville High School, near Fairmont, West Virginia. Attended WVU and graduated from Fairmont State College with a Bachelors degree in Board of Regents. Took over 50 hours of post graduate work at both WVU and Marshall University in Safety Management. I worked in the Engineering Departments for Eastern Associated Coal Company that provided surveying and mapping and plan submittals for Federal #1 Mine, Federal #2 Mine, and Joanne Mine at Rachel, WV.

I obtained my Mine Foreman/Examination certification and have been employed as a timber crew foreman, belt foreman, production foreman, and longwall production foreman and longwall coordinator. I am a former member of both the AEP Southern Ohio Coal Company Mine Rescue team and the Department of Labor, MSHA, MEO rescue team and have participated in numerous mine fires, mine explosions, and mine recovery operations. To name a few, Galatia Mine Fire, Oak Grove Mine Seal Explosion, Jim Walters #5 Mine Explosion and recovery, Loveridge Mine Fire, Oxbow Mine Explosion and recovery, Willow Creek Mine explosion and recovery. During these operations I have voluntary risked by life in oxygen deficient atmosphere while under apparatus at 98% methane and 2 % oxygen.

Confidential Agency Document
DLB-000821 MSHA-SOURCE-1-ARCHIVE-0118

I have worked in three different coal districts D2, D3, and D11 in Pennsylvania, Northern West Virginia, and the Alabama District office in Birmingham. I have been a regular inspector, accident investigator, roof control supervisor, electrical supervisor, impoundment supervisor, field office supervisor, roof control specialist in HQ, Chief of Health, Director and established the MSHA Accountability Office, and now Deputy Administrator for Coal reporting directly to Kevin Stricklin the Administrator. I have investigated four coal mining fatals as lead investigator and assisted in numerous.

My father Charles Junior Thomas was an MESA/ MSHA inspector in the Fairmont, WV MSHA field office for 27 years and served in the Navy for 7 years and was one of the person who did the body recovery at Farminington No. 9 mine for three years the recovery operations took place. My grandfather was the Safety Director at CONSOL Robinson Run #95 mine in Shinnston, WV, and my great grandfather hand loaded coal at Owens Mine, near Shinnston, WV. I am a fourth generation Coal Miner and have lost family members such as my Uncle, Guy Thompson in a track motor haulage accident where he was crushed to death. Saying all that I know Coal Mining was born into it and lived, breathed, and heard discussion around the dining room table about fires, explosions, and fatal accidents. I know the importance of my role, leadership, and the vast responsibility that my office holds.

Fact: **The internal review team nor did the UBB accident investigation team interview me to hear the facts, circumstances, mitigating issues that were charged against me in this memorandum dated December 4, 2012.** If the prevention and protection of the miners is the primary focus of this accident investigation and internal review audit, Senior Management, the investigators, and the Internal Review audit should have alerted me, counseled me on the alleged failure to conduct my official duties directly after the physical investigation not 973 days later. The charges are very egregious but the administering of discipline was very slow when Miners were at risk.

Fact: An explosion could occur today this very instance if a foreman on a longwall would permit the production crew to mine coal without water sprays and without water pressure

Fact: I fully understand Congress intent with the 2006 MINER ACT to increase penalties and identifying and correcting hazards present to coal miners by whatever enforcement method is more important than how much a penalty is going to be assessed. Our primary mission is the health and safety of the coal miner our most precious resource, not how much money the US Treasury collects. I know the message that we try to send to the Coal Operators to change their behavior is the penalty amount, but our primary mission is the health and safety of the coal miner our most precious resource. What box is checked on a citation/order form is secondary to identifying and correcting hazards in coal mines. I will provide data that more citations and orders were written in 2009 and 2010 in the

history of MSHA. I and the inspectorate that I am in charge of take that responsibility seriously and just because one field office did not issue enough flagrant' s is not reflective of the entire nation.

Fact: Figure 11, page 104 of internal review team report indicated that rockdusting was improving in all Districts, and that UBB was going in a downward trend instead of upward. So in essence rockdusting was improving in most mines except UBB.

Fact: The Headquarters managed "Dust Busters" prior to UBB explosion were identifying and citing deficiencies in face ventilation and respirable dust requirements Nationwide, this was not only a UBB problem but a National problem that was being addressed.

Fact: Kevin Stricklin and I had to make a headquarter decision to complete mandatory Mine Act 4s and 2s EO1 inspection or send supervisors and journeyman inspectors to training. The inspections are mandated by the ACT, the training is policy requirements.

Fact: Attached are Monthly "Key Indicator Reports" that my secretary RoseAnn Dickens prints for my review every month. I have e-mails, I have phone conversations with DMs and their staff concerning indicators that need addressed. Since I have assumed the acting and full time position of Deputy Administrator for Coal:

1. Abatement times have decreased nationwide
2. Vacates have decreased nationwide
3. Level of enforcement increased
4. Amount of time underground during 103(i) mandatory spot inspections have increased.
5. Reportable Roof falls have decreased and roof fall fatals have decreased.

The oversight of the plans is a joint effort in headquarters. Plans are reviewed by the Coal Division of Safety, the health aspects of the plans are reviewed by the Coal Division of Health. I feel that I am being singled and discriminated when there are others on the Headquarters staff this responsibility is delegated to, and they did identify problems in certain districts and the Administrator directed me to investigate further.

Fact: Kevin Stricklin told me to concentrate my enforcement oversight efforts in District 5, Districts 7, District 8, and District 9 because of the level of enforcement, accident trends, reportable roof falls, roof related injuries and concerns that both of us had with the plan approval process.

District 5 Deputy Administrator Oversight Involvement

Conducted an all enforcement meeting in District 5 in September 23-25, 2009 because of concerns with low level of enforcement and not utilizing all enforcement tools, S&S rate increased immediately and level of enforcement increased

I organized and participated in a "**Saturation Inspection**" at **Richard Gilliam Mines** in October of 2009 in District 5, primary focus was on accumulations and roof control plan compliance. Company was ultimately sold as result of enforcement actions.

District 7 Deputy Administrator Oversight Involvement

Participated in KY Coal Association Safety Committee Meeing in District 7, focused on mine examiners conducting adequate examinations and roof control plan upgrades when warranted.

Made underground mine visits in D7

District 8 Deputy Administrator Oversight involvement

DM meeting at Academy November 16-20, 2009 to provide oversight and discussion of enforcement actions.

Underground Mine Visits in D8, discussed enforcement, staffing, and plans with DM December14-18th and also made a mine visit to D10 same trip.

District 9 Deputy Administrator Oversight involvement

July 13, 2009 District 9 "All Employee Meeing" Grand Junction, CO went over general inspection procedures manual front to back with all ARs.

February 7-February 11, 2010 Mine Visits Texas Lignite Surface Mines Longview, Elgin, TX and roll out for end black lung in Austin, TX.

June 22-26, 2010 Bull Mountain UG mine visit, Roundup, MT this mine had compliance problems on PPOV.

Confidential Agency Document
DLB-000824 MSHA-SOURCE-1-ARCHIVE-0121

**From:**        Thomas, Charles J - MSHA
**Sent:**        Thursday, December 06, 2012 4:07 PM
**To:**
**Subject:**     Document1 [Compatibility Mode]
**Attachments:** Document1 [Compatibility Mode].doc

To work on my laptop at home.

Confidential Agency Document
DLB-000825  MSHA-SOURCE-1-ARCHIVE-0122

| | |
|---|---|
| **From:** | Silvey, Patricia - MSHA |
| **Sent:** | Monday, April 15, 2013 8:54 PM |
| **To:** | Parker, Douglas - MSHA |
| **Attachments:** | UBBpersonnel.doc |

Please review.  Thanks.

Memorandum to:     Dan Petrole

From:                    Joseph A. Main

Subject:  Disciplinary Action Related to Upper Big Branch Mine Accident

This is in reference to the Mine Safety and Health Administration's (MSHA) disciplinary actions as a result of the Agency's Internal Review (IR) Report related to the Upper Big Branch (UBB) mine disaster.

At the outset, it is important to note that three of the principal individuals with direct responsibility for managing the district and field offices with authority over the UBB mine retired within six months of the accident.  Based on a review of the findings in the UBB IR Report, MSHA considered disciplinary action related to the performance of five individuals (who were working for the Agency at the time the UBB IR Report was issued).  Four of the five individuals were disciplined and one received administrative action.  Individuals were all management, and included headquarters, district and field office.  Actions ranged from Letter of Warning to Suspension without Pay.  One employee retired before disciplinary action could be taken.

| | |
|---|---|
| **From:** | Silvey, Patricia – MSHA |
| **Sent:** | Monday, April 15, 2013 8:56 PM |
| **To:** | Stricklin, Kevin G - MSHA; Thomas, Charles J - MSHA |
| **Attachments:** | UBBpersonnel.doc |

Please review and provide your comments.  You can give them to me in person.

Memorandum to:     Dan Petrole

From:              Joseph A. Main

Subject:  Disciplinary Action Related to Upper Big Branch Mine Accident

This is in reference to the Mine Safety and Health Administration's (MSHA) disciplinary actions as a result of the Agency's Internal Review (IR) Report related to the Upper Big Branch (UBB) mine disaster.

At the outset, it is important to note that three of the principal individuals with direct responsibility for managing the district and field offices with authority over the UBB mine retired within six months of the accident.  Based on a review of the findings in the UBB IR Report, MSHA considered disciplinary action related to the performance of five individuals (who were working for the Agency at the time the UBB IR Report was issued).  Four of the five individuals were disciplined and one received administrative action.  Individuals were all management, and included headquarters, district and field office.  Actions ranged from Letter of Warning to Suspension without Pay.  One employee retired before disciplinary action could be taken.

Confidential Agency Document
DLB-000831  MSHA-SOURCE-1-ARCHIVE-0128

| | |
|---|---|
| **From:** | Silvey, Patricia - MSHA |
| **Sent:** | Friday, April 19, 2013 6:27 PM |
| **To:** | Louviere, Amy - MSHA |
| **Subject:** | FW: draft statement on disciplinary actions |

See suggested change to last sentence.  Tx,

**From:** Louviere, Amy - MSHA
**Sent:** Friday, April 19, 2013 11:26 AM
**To:** Main, Joseph A - MSHA; Silvey, Patricia - MSHA
**Cc:** Aaronson, Julie E - MSHA
**Subject:** draft statement on disciplinary actions

Draft Statement:

Since the explosion at the Upper Big Branch Mine, the Mine Safety and Health Administration has taken a number of actions to improve mine safety and continues to work with the Department of Justice regarding any wrongdoings.

MSHA's internal review specifically determined that agency actions did not contribute to the accident, or to its severity.  Nevertheless, we found that improvements could be made, and set about to make them.  These improvements covered a wide variety of actions, including the splitting of District 4 into two districts, monthly impact inspections, training for supervisors and a revamped pattern of violations process.  After reviewing the internal review report, MSHA administered appropriate disciplinary actions.

Confidential Agency Document
DLB-000852  MSHA-SOURCE-1-ARCHIVE-0149

Response to memorandum dated December 5, 2012 from Ernest Cameron to Lincoln Selfe regarding a proposed seven (7) day suspension:

It is stated in the memorandum that the reason and specifications for this proposed action are derived from issues identified in the Internal Review Report from the April 5, 2010 explosion at the Upper Big Branch Mine. The internal review team concluded that they did not find evidence that actions of MSHA employees caused this tragedy. On page 192 of the internal review report the internal review team states that district 4 personnel were dedicated in their efforts to enforce provisions of the Mine Act at UBB and in the months before the explosion, they identified hundreds of hazardous conditions and violations, issued citations and orders, and followed up to ensure conditions and violations were corrected. In fact in FY09, the Upper Big Branch Mine was one of the most cited mines in the nation (684 citations and orders issued) and was cited for the most unwarrantable failure violations (56 issuances under 104-D) of any mine in the nation. These findings and facts are inconsistent with your allegation in the memorandum that I failed to provide appropriate direction and management oversight necessary to ensure proper and consistent enforcement of the Federal Mine Safety and Health Act of 1977 (Mine Act) as amended by the Mine Improvement and New Emergency Response Act of 2006 (MINER Act).

Specification #1. The memorandum states that I failed to provide oversight to ensure potentially flagrant violations were reviewed. It also states that when the internal review team interviewed the inspectors about the flagrant review criteria that none of the inspectors knew the criteria and that some could not remember receiving training on this important enforcement tool. The criteria is in the March 2008 Citation and Order Writing Handbook for Coal Mines and Metal and Nonmetal Mines, Handbook Number PH08 – 1- 1. The inspectors received training on this during their academy training. Flagrant Violations is covered in three different academy courses, Law, Regulation, Policy (LRP), Citation and Order Writing, and Unwarrantable Failures. Furthermore I have documentation for two Mt. Hope Field office staff meetings that show the flagrant violation procedure instruction letter and the criteria within were presented in the staff meetings conducted July 30, 2007 and March 31, 2008. To further address inspection consistency I also have included a memorandum presented to the inspectors in a staff meeting conducted January 4 & 5, 2010, addressing insufficient documentation in inspection notes. I also want to point out that there are two parts to the flagrant review; one is for violations where the negligence is evaluated as reckless disregard. These violations are easily evaluated and the inspectors had little or no problem identifying these. The problems were with the second part of the flagrant review criteria, addressing two unwarrantable issuances on the same standard in the past 15 months. There was no mechanism

*[handwritten margin note: 2 LINE earlier]*

*[handwritten margin note: not presented by LS]*

in place in the Agency to identify the violations meeting this criteria other than the inspectors or his supervisor's memory. With the vast number of citations and orders issued in CMS&H District 4, this was an impossible task. The internal review team determined this was not a specific CMS&H District 4 issue but was a nationwide issue. After the internal review team identified this issue, headquarters had PEIR develop a fix and implemented it into the IPAL program so that the system tracks and identifies standards where two or more unwarrantable violations have been cited in the past 15 months. Furthermore there are still issues with the second part of the flagrant violation evaluation. It has been interpreted that it is not only two previous issuances on the same standard as is written in the procedure letter but that the issuances must be addressing the same specific hazard or condition. This is still affecting the evaluations for potential flagrant violations, and we still need clear and concise guidance for this important inspection tool. To date we have not been provided that guidance. In summary the internal review team found the failure to review potentially flagrant violations was a nationwide issue, not one that was limited to my enforcement division. Nationally, including District 4, at least 318 violations cited at coal mines during the review period met the "numbered objective criteria" outlined in the PIL 108-III-02 for review as potentially flagrant violations. Coal district offices reviewed and forwarded only 84 (26%) of these violations to the Administrator for final determination. The internal review team concluded that more violations likely would have been reviewed for flagrant assessments if procedures had clearly directed inspectors to submit SAR forms for all violations meeting the objective criteria and oversight reports had been developed and used to identify them. They also suggested that the Agency and SOL should have developed and provided additional written guidance for analyzing and processing potentially flagrant violations. (In this case it seems that you are proposing to discipline me for an issue that was not specific to me and my inspection division, which according to the internal review team, was present in every MSHA district. The internal review team found numerous issues with the flagrant violation program nationwide).

Specification #2. The memorandum states I did not provide management oversight to ensure Right of Entry (ROE) trainees in the Mt. Hope Field Office did not conduct inspection activities apart from Authorized Representatives. You also state that I did not take effective action to identify and correct this noncompliant behavior. I had given a directive to all the inspectors, trainees, and supervisors stating that inspector trainees were not to be left alone during inspections. I stated that the trainee was to be with the inspector at all times, and the only case where a trainee was permitted to assist the inspector was while conducting respirable dust surveys and that was only if the trainee was certified to sample for respirable dust and the inspector remained on the section with the trainee. When the internal review team asked me if I would believe that trainees

*when ?*

were conducting inspection activities I responded no. I was shocked to find that they were conducting inspection activity. I had given the directive several times at different staff meetings and when I accompanied supervisors, inspectors and trainees on mine visits the trainees were never out of sight of the inspectors. I had no reason to believe or question that my directive was not being followed, or that there was a noncompliance issue with the Act. There are no systems in place to alert me as to this occurrence and there were no systems in place at the time this occurred. The field supervisors are required to review the daily inspection notes and that is the only place that this action was documented. I am only required to review the notes for Special Assessment Reviews (SAR's) and Possible Knowing and Willful Reviews (PKW's). This action was not reflected in any of these documents. I am required to conduct a 2nd level review of one accompanied activity every inspection half for each supervisor. This noncompliant behavior did not show up in any of the second level reviews that I conducted. In this case you are proposing discipline on me for something I had no knowledge of ever occurring and from my observation had no reason to suspect. There is absolutely no doubt that I would have corrected this non compliant behavior had I been aware of it.

*no one ever told him?*

Specification #3. The memorandum states that I did not use the established Agency tools to identify and correct errors on the part of my subordinate inspectors and supervisors. Mt. Hope Field Office supervisors were required to conduct 78 Accompanied Activities (AAs) and 39 Field Activity Reviews (FARs) during the internal review period. However, documentation provided to the IR team indicated that only 32 AAs and 23 Fars had been conducted. Supervisors did not document required information on many AA and FAR forms. You also state the supervisor must accompany an inspector on all aspects of an inspection or investigation and this did not occur in some cases. (This is not a true statement. The supervisor can not possibly cover all aspects of an inspection in one mine visit. The supervisor is required to travel with the inspector and observe the inspector as he conducts the inspection and note various things about the inspector's performance. He is also required to note the condition of the mine and examine a part of a beltline during his activity.) First, I am not familiar with any Agency "tools" other than a simple tracking sheet provided on coal's W:Drive to track mine visits, established to identify and correct errors on the part of my subordinate inspectors and supervisors relative to accompanied activities and field activity reviews. Luther Mars, the Division 2 ADM, and I created a tracking form to try and manually track these activities to ensure that they were conducted.

*his responsibility*

*where is it?*

     In the case of Mt. Hope Field Office, the field supervisor applied for disability retirement on May 19, 2009. He was on sick, annual, and eventually went on leave without pay before his retirement was approved. There were acting supervisors in the Mt. Hope Field Office during all the months he was on leave

MSHA-0233

and even though they had traveled some with the inspectors, they did not complete accompanied activity documentation. There was no training available for acting supervisors in place during this time. I had mentioned training for some of them and was told it was impossible and would be construed as pre-selection for the position and we could not do that. Also there was no training required or provided for field supervisors or assistant district mangers on conducting accompanied activities, field activity reviews, or second level reviews. As with the other issues that you have addressed in the memorandum, the internal review team identified this as a national issue not specific to my enforcement division during their review. Since that determination, training has been developed for both full time field supervisors and an online training course that is to be completed before someone can perform a detail as acting supervisor. Both of these training formats include training on AAs and FARs, none of which were previously available to MSHA personnel. Furthermore I am only required to review one FAR every half. It takes two AAs for a FAR, so that means I am only required to review two AAs for each supervisor each half. The internal review team reviewed all of the AAs and FARs for their review period. The internal review team reviewed many documents that I had never seen, or was not required to see, yet I am being held accountable for review of these documents. The memorandum states that I had failed to identify apparent deficiencies in two of the second level reviews that I had conducted. This is also not a true statement. I identified that some supervisors had turned in AAs for visits made during the inspection closeouts and had not gone into the mine to assess the mine condition or the inspector's performance. I met with the supervisors and addressed this issue and instructed them that they had to travel with the inspector doing inspection activities to be able to use the visit as an AA. Furthermore I addressed this issue with all of the supervisors in supervisor staff meetings. Once again I feel that you are proposing a disciplinary action on me for something that the internal review team determined to be a national issue. I again want to point out that to date there has been no training required, developed or provided for assistant district managers relative to issues that are deemed so important.

Additional Mitigating Factors:

I want to bring out that I performed a 120-day detail as District Manager in CMS&H District 3 in 2007. This was after Aracoma, Sago, Darby, Tri Star, and Crandall Canyon disasters. I thought about everything from these events and had discussion with the Administrator for Coal about how after every disaster they seem to fault MSHA management. I discussed how we train supervisors on LMR issues etc., but we had never trained the supervisor on what his job actually entails on a daily basis. We discussed the need for developing training specific to the supervisor's needs and a part of that discussion was how to conduct field activity reviews. The Administrator told me that he understood what I was saying and would look into it. Had training been developed and given at that time, it is likely we would not be going through this today. As a result of this internal review, training is now available and provided as we had discussed in 2007.

During this timeframe, CMS&H District 4 was far and away the largest district in MSHA with responsibility for inspecting 437 mines and facilities. Budgetary constraints and retirements had depleted MSHA's inspectorate. Because of the reduction in staffing many experienced inspectors had left MSHA and were not replaced. CMS&H District 4 Mt. Hope Field Office had the second highest number of inspector trainees of any field office in MSHA. The Mt. Hope Field Office had the highest number of active mechanized mining units (MMUs) per supervisor in the nation. The most experienced inspector in the Mt. Hope Field Office had only 5 years with the Agency at the time of the internal review, yet District 4 inspectors led the nation in enforcement issuing more than 35,000 citations and orders during the internal review's review period. That amounted to 23% of the total issuances by MSHA. District 4 also led the nation in issuances designated as an unwarrantable failure to comply. Thirty-four percent of all unwarrantable citations and orders in the nation were issued in CMS&H District 4. The internal review team described District 4 enforcement as "aggressive". This fact is definitely not consistent with your allegation that I did not provide appropriate direction and management oversight to ensure proper and consistent enforcement of the Act. I personally went to the UBB mine twice upon learning of compliance issues to provide support and guidance for the young inspectors assigned there.

The Agency conducts accountability reviews in the districts, and internal reviews after disasters. These reviews have always been utilized to evaluate our performance to identify if there are weaknesses in areas that need improvement. We have always been told they are tools to make us better and not mechanisms to place blame or initiate disciplinary actions.

Confidential Agency Document
DLB-000861

MSHA-0235

Also for your consideration, I want to discuss my 38 year career in the mining industry. From 1974 to 1982 I completed a management training program with Clinchfield Coal Company in Virginia. I was trained in engineering, industrial engineering, and safety. I was a staff assistant to the vice president of operations, a foreman and assistant mine foreman at Clinchfield's Training Mine, and introduced new people into the mining field and there were no lost time accidents or injuries to any of the people under my supervision during this period. From 1982 to 1990 I was with MSHA in CMS&H District 5, working as a coal mine inspector and accident investigator. During this timeframe I served as a subject matter expert and was taken to HQ in 1986 to review potential applicants for MSHA employment. In 1998 I was selected to participate in an MSHA management training program and went through extensive training. Also in 1990 I performed a detail as field supervisor in CMS&H District 6 before moving to CMS&H District 3 as staff assistant to the District Manager. In CMS&H District 3 I performed other details as field supervisor and roof control supervisor. I spent almost 15 years on MSHA's Mine Emergency Unit (MEU) and worked mine emergencies in Virginia (South Mountain explosion), Kentucky (Elmo and Day Branch explosions), West Virginia (Blacksville shaft explosion where I picked up body parts for three days, Loveridge mine fire where I coordinated all MSHA activity on site in addition to working under apparatus in low oxygen and high methane, Pinnacle fire and explosion, Sago explosion, and Upper Big Branch explosion), Alabama (two mine fires at Jim Walters No. 5 mine and two explosions at Oak Grove mine), Illinois (Galatia mine fire), Utah (Willow Creek mine fire. I had more than 500 hours under apparatus in this event working in atmospheres as low as zero oxygen, and as high as 85% methane), and Colorado (Sanborn Creek mine explosion, where on one day as I arrived for my shift I was told I had a problem. When I inquired about the problem, I was told there was 11% methane and 19.8% oxygen coming out the drifts. I personally took a team into the mine and located and corrected the ventilation issue causing the problem). I was selected from the MEU to work with the Fairfax County Structure Rescue Team in Morgantown when a power plant silo collapsed fatally injuring one of their employees. I personally located and identified the dead power plant employee inside the collapsing silo and at that time a decision was made that it was too hazardous to try and recover the body. Because of my leadership skills I was designated as one of the captains on the MEU. I was selected to participate as map man on the MSHA competition mine rescue teams. In 1999 we were the first place winners in the International Mine Recue Competition in Louisville, Kentucky, and designated world champions of mine rescue. The other International Competition was 2004, in Glogow, Poland where we won third place with a blended team from both coal and metal/nonmetal, but I had a perfect map with zero docks. I reported to the Washington area with the team for 911 during the Pentagon event and I also

MSHA-0236

responded and worked for OSHA during Hurricane Katrina. I represented the United States for Mine Rescue in other countries, Canada and Poland at mine rescue conferences. In 2001 I moved to CMS&H District 4 as Assistant District Manager for Enforcement Programs. I have personally been involved in events that the majority of MSHA management and employees have only read about in reports. This experience has molded my view for rigid and consistent enforcement. I have been on call 24/7 my whole career and have gone at a moments notice to every event that I was called to go to, often being away from home and family for months. I am very dedicated and passionate about my job to protect the miners and feel it is reflected by my highly effective performance ratings that you referenced in the memorandum. The past 30 years of my life have been dedicated to MSHA. I have had a really good career and have earned the respect and established credibility with all my peers and coworkers. I have found this memorandum to be unwarranted and highly insulting to me and I respectfully request that it be stricken from any and all of my records. Secondly, I fail to understand how my being suspended for seven days will promote efficiency of the Agency or provide tools for the betterment of my position. It appears that this action would only put me farther behind in the things I need to be doing for the safety and health of the miners.

Attachments:

1) Staff meeting template for July 30, 2007
2) Staff meeting template for March 31, 2008
3) Staff meeting template for January 4 and 5, 2010
4) Copy of Enforcement Over-Sight Expectations for Field Office Supervisors, Daily Documentation of Field Office Supervisory Activities, Checklist of items to be submitted to ADM for 2nd Level Review, Staff Meetings Tracking Sheet (all these were developed by D4 ADM's to assist with oversight after the 2006 Aracoma fire)
5) Copy from MSHA Handbook Series dated March 2008, Number PH08-I-1, pages 25 through 31 that address Unwarrantable Failure and Flagrant Citations and Orders Criteria

Confidential Agency Document
DLB-000863                                    MSHA-0237

| | Initials | Review Date |
|---|---|---|
| **ADMs for Enforcement** | RDH | 7-30 2007 |
| **CLRs** | | 7-30-2007 |
| **OWCP Coordinator** | | 7-31-07 |
| **Admin Supervisor** | | 7/31/07 |
| **Technical ADM** | | 7/31/07 |
| **District Manager** | | 3/1/2007 |

# District 4 Monthly Staff Meeting Tracking Sheet

**Routing:** A field office staff meeting will be conducted each month. This tracking sheet will be completed by the supervisor immediately following the completion of a monthly staff meeting and the original returned by pouch mail to the ADMs for Enforcement. The tracking sheet will then be routed through the Conference Litigation Representatives (CLR), the OWCP coordinator, Administrative Officer, Tech ADM, to the District Manager for their review. The DM clerical department will maintain a file containing all completed tracking sheets.

Field Office: __Mt. Hope__    Month: __July__    Day: __30__    Year: __2007__

Workgroup: __01 and 02__

Supervisor(s): __Ray Saunders__    _____

## 1. MSHA Employee Safety (list topics discussed):

**GOAL:** District MSHA employee accidents will be discussed. A report containing this information will be faxed to each F.O. supervisor by the OWCP coordinator on the first day of each month.

District 4 Employee Accidents
Strains and Sprains

## 2. Inspection Procedure Requirements (list topics discussed):

**GOAL:** A minimum of one topic will be discussed at each monthly staff meeting. The topics will match the shortcomings or problems noticed by the supervisor during his/her review of inspection activities, reports, AA's, FAR's, etc.

30 CFR – 75.516 and Policy
Flagrant Violation Memorandum
Past Due Citation Memorandum
District 4 Peer Review – Inspection time on all shifts, accurate event calendar, and
citation/order evaluations and documentation
Inspection Tracking Program

## 3. Vehicle Inspection (list any discrepancies and corrective actions taken):

**GOAL:** All GOV's will be visually inspected for safety hazards during each monthly staff meeting.

Vehicle Recall Notice – Jeep Liberty 2006 and 2007

Confidential Agency Document
DLB-000864

MSHA-0238

Field Office: __Mt. Hope_____     Month: __July_____     Day: __30___   Year: __2007____

Supervisor(s): __Ray Saunders_____     _____

## 4. Workplace Inspection (list any discrepancies and corrective actions taken):
**GOAL:** Each MSHA employee's office space will be visually inspected for safety hazards during each monthly staff meeting.

Inspection conducted – no issues

## 5. EAPG Meeting (list topics discussed and/or member concerns):
**GOAL:** Each MSHA F.O Employee Accident Prevention Group will meet during each monthly staff meeting.

Discussion on employee accidents – preventive measures

## 6. Inspection Consistency: (list topics discussed):
**GOAL:** Each MSHA F.O supervisor will discuss the Conference & Litigation Representative (CLR) report with all AR's during each monthly staff meeting. A report containing the previous month CLR activities will be faxed to each F.O. by the CLR department on the first day of each month.

Eight items of documentations required on citations.

## 7. Laptops Connected to LAN:
**GOAL:** Each MSHA F.O supervisor will instruct each laptop computer user to log onto the Local Area Network and maintain that connection for at least two hours. The purpose of this activity is to assure that laptop users receive operating system, Inspector Resources file updates.

Reminder to users to log on LAN

## 8. Other: (list topics discussed):

Confidential Agency Document
DLB-000865

MSHA-0239

## Staff Meeting Attendance List

Field Office: ___20401___ Month: ___May___ Day: ___14___ Year: ___07___

Supervisor(s) ___Ray Saunders___     _____

Kevin Lyall
Tom Clark
Robert Hatfield
Benny Clark
Fred Wills
Miachel Hicks
Andrew Sedlock
Keith Sigmon
James Humphrey

Gary Huffman
Ben Dulin
William Bane
David Sturgill
James Wilson
Vince Nicolau
Reba Crawford
William Stevens

Confidential Agency Document
DLB-000866

MSHA-0240

| | Initials | Review Date |
|---|---|---|
| ADMs for Enforcement | CS | 4/3/08 |
| CLRs | RDH | 4-7-08 |
| OWCP Coordinator | NKJ | 4-7-08 |
| Admin Supervisor | AH | 4-9-08 |
| Technical ADM | DLL | 4/10/08 |
| District Manager | | 4/10/08 |

# District 4 Monthly Staff Meeting Tracking Sheet

**Routing:** A field office staff meeting will be conducted each month. This tracking sheet will be completed by the supervisor immediately following the completion of a monthly staff meeting and the original returned by pouch mail to the ADMs for Enforcement. The tracking sheet will then be routed through the Conference Litigation Representatives (CLR), the OWCP coordinator, Administrative Officer, Tech ADM, to the District Manager for their review. The DM clerical department will maintain a file containing all completed tracking sheets.

Field Office: _____Mt. Hope_____     Month: _March_____     Day: _31__  Year: _2008_____

Workgroup: _01 and 02_____

Supervisor(s): __Roger Richmond_____     ___Miachel Hicks_____

## 1. MSHA Employee Safety (list topics discussed):
**GOAL:** District MSHA employee accidents will be discussed. A report containing this information will be faxed to each F.O. supervisor by the OWCP coordinator on the first day of each month.

Supervisor will be sure each inspector receives a copy of the monthly report

## 2. Inspection Procedure Requirements (list topics discussed):
**GOAL:** A minimum of one topic will be discussed at each monthly staff meeting. The topics will match the shortcomings or problems noticed by the supervisor during his/her review of inspection activities, reports, AA's, FAR's, etc.

General Coal Mine Inspection Procedures
Citation and Order Writing
Taking Detailed Notes
Criteria for S+S, unwarrantable failure, imminent dangers, and
flagrant:

## 3. Vehicle Inspection (list any discrepancies and corrective actions taken):
**GOAL:** All GOV's will be visually inspected for safety hazards during each monthly staff meeting.

Reminded all to turn in vehicle mileage log

Confidential Agency Document
DLB-000867

MSHA-0241

Field Office: __Mt. Hope____     Month:____March_____   Day: __31_  Year: ___2008___

Supervisor(s) _Roger Richmond_____   ___Miachel Hicks_____

## 4.  Workplace Inspection (list any discrepancies and corrective actions taken):
**GOAL:** Each MSHA employee's office space will be visually inspected for safety hazards during each monthly staff meeting.

No hazards were observed during the inspection of offices.

## 5.  EAPG Meeting (list topics discussed and/or member concerns):
**GOAL:** Each MSHA F.O Employee Accident Prevention Group will meet during each monthly staff meeting.

EAPG Meeting

## 6.  Inspection Consistency: (list topics discussed):
**GOAL:** Each MSHA F.O supervisor will discuss the Conference & Litigation Representative (CLR) report with all AR's during each monthly staff meeting. A report containing the previous month CLR activities will be faxed to each F.O. by the CLR department on the first day of each month.

Discussed identifying hazards as being S & S or Non S & S

## 7.  Laptops Connected to LAN:
**GOAL:** Each MSHA F.O supervisor will instruct each laptop computer user to log onto the Local Area Network and maintain that connection for at least two hours. The purpose of this activity is to assure that laptop users receive operating system, Inspector Resources file updates.

We are not having any problems at present time.

8. <u>Other: (list topics discussed):</u>

(1) Gravel for parking lot  *[handwritten, illegible]*

(2) Jobs – Question on new employees.  Have we hired any more?

(3) Question on overtime

(4) Can we check and see if we can put new hires names and retiree's names on e-mail

Confidential Agency Document
DLB-000869

MSHA-0243

## Staff Meeting Attendance List

Field Office: __Mt. Hope____     Month:___March_____   Day: __31_  Year: ___2008___

Supervisor(s) _Roger Richmond_____     ____Miachel Hicks_____

_Jim Wilson_____     __Link Selfe_____

_Richard Stevens_____     _____

_Kevin Lyall_____     _____

_Keith Sigmon_____     _____

_Larry Hedrick_____     _____

_Andrew Sedlock_____     _____

_Reba Crawford_____     _____

_Benny Clark_____     _____

_Ben Dulin_____     _____

_Bob Hatfield_____     _____

_Gary Huffman_____     _____

_Gearld Lucas_____     _____

_Dave Sturgill_____     _____

_Tim Bower_____     _____

_Jeffery Wyrick_____     _____

Confidential Agency Document
DLB-000870

MSHA-0244

| | Initials | Review Date |
|---|---|---|
| ADMs for Enforcement | LS | 1-6-10 |
| CLRs | RJH | 1-7-2010 |
| OWCP Coordinator | NKJ | 1-7-2010 |
| Admin Supervisor | JH | 1-7-2010 |
| Technical ADM | RE | 1/7/10 |
| District Manager | | 1/11/2010 |

# District 4 Monthly Staff Meeting Tracking Sheet

Routing: A field office staff meeting will be conducted each month. This tracking sheet will be completed by the supervisor immediately following the completion of a monthly staff meeting and the original returned by pouch mail to the ADMs for Enforcement. The tracking sheet will then be routed through the Conference Litigation Representatives (CLR), the OWCP coordinator, Administrative Officer, Tech ADM, to the District Manager for their review. The DM clerical department will maintain a file containing all completed tracking sheets.

Field Office: __Mt. Hope___     Month: _January_  Day: _4-5_  Year: __2010___

Workgroup: __01 and 02___

Supervisor(s): _Miachel Hicks_____     _Jim Humphrey_____

## 1. MSHA Employee Safety (list topics discussed):
GOAL: District MSHA employee accidents will be discussed. A report containing this information will be faxed to each F.O. supervisor by the OWCP coordinator on the first day of each month.

The following district accidents were discussed:

1. Employee becoming stuck in mud (knee twisting injury);
2. Employee's head struck low mine top jamming his neck;
3. Slip and fall on ice snow (back injury);
4. Hearing loss claim.

## 2. Inspection Procedure Requirements (list topics discussed):
GOAL: A minimum of one topic will be discussed at each monthly staff meeting. The topics will match the shortcomings or problems noticed by the supervisor during his/her review of inspection activities, reports, AA's, FAR's, etc.

The following were addressed:

1. Notes must include all eight elements;
2. CLR presented PowerPoint presentation on proper documentation;
3. Past due citations;
4. SOP on ERP and shelters;
5. Insufficient documentation on notes (12/30/09 email from ADM Luther Marrs).

## 3. Vehicle Inspection (list any discrepancies and corrective actions taken):
GOAL: All GOV's will be visually inspected for safety hazards during each monthly staff meeting.

Addressed having vehicles cleaned monthly.

## 4. Workplace Inspection (list any discrepancies and corrective actions taken):
GOAL: Each MSHA employee's office space will be visually inspected for safety hazards during each monthly staff meeting.

Individual office inspections were conducted.
SCSR check was conducted by Reba Crawford.

Confidential Agency Document
DLB-000871

MSHA-0245

Field Office: __Mt. Hope__     Month: __January__   Day: __4-5__   Year: __2010__

Supervisor(s): __Michael Hicks__          __Jim Humphrey__

## 5. EAPG Meeting (list topics discussed and/or member concerns):

GOAL: Each MSHA F.O Employee Accident Prevention Group will meet during each monthly staff meeting.

The following topics were discussed:

1. Parking lot - slip on snow and ice;
2. Questions regarding administrative leave for weather conditions.  Union representative Reba Crawford is researching 12/29/09 Sandy Humphrey memo for conflict with union.

*Discussed with R. Crawford & T. Reynolds.*

## 6. Inspection Consistency: (list topics discussed):

GOAL: Each MSHA F.O supervisor will discuss the Conference & Litigation Representative (CLR) report with all AR's during each monthly staff meeting. A report containing the previous month CLR activities will be faxed to each F.O. by the CLR department on the first day of each month.

1. Linda Hrovatic discussed note requirements and what mine operators are telling their people;
2. People Time.

## 7. Laptops Connected to LAN:

GOAL: Each MSHA F.O supervisor will instruct each laptop computer user to log onto the Local Area Network and maintain that connection for at least two hours. The purpose of this activity is to assure that laptop users receive operating system, Inspector Resources file updates.

All inspectors were informed that they must upload every day, download weekly, and to keep computers turned on in office.

## 8. Other: (list topics discussed):

- Part 18 Belts
- Yellow contractor form to be completed on every contractor inspected
- No texting while driving GOV
- Rock dust surveys (Mike Dickerson)
- Water gauge to check miner (Paul Prince)

## Staff Meeting Attendance List

Field Office: Mt. Hope        Month: January    Day: 4-5   Year: 2010

Supervisor(s): Miachel Hicks              Jim Humphrey

Larry Hedrick                    Ernie Ross

Gary Huffman                     Johnny Syner

Bill Bane                        Walter Jenkins

Perry Brown

Kevin Lyall

Gearld Lucas

Reba Crawford

Ben Dulin

Paul Prince

Andy Sedlock

Tom Clark

Vince Nicolau

Joey Athey

Jack Dempsey

Matilda Collins

Keith Stone

Scott VanDyke

Doy Russell

Clarence Short

Mike Dickerson

Bob Hatfield

Confidential Agency Document
DLB-000873                                   MSHA-0247

Okes, Lisa K - MSHA

| | |
|---|---|
| From: | Humphrey, Sandra S - MSHA |
| Sent: | Tuesday, December 29, 2009 11:48 AM |
| To: | zzMSHA-Coal 04 All |
| Subject: | Administrative Leave during Snow Storm |

Numerous questions have been asked regarding the approval of administrative leave by the District Manager for various days of the work week beginning December 20, 2009.

On Monday, December 21, 2009, the Pineville and Madison offices were closed due to the loss of electrical service as a result of the snow storm. All employees of those offices who were not previously on approved leave were granted administrative leave for December 21, 2009. Power was restored to the Madison office, and it reopened on December 22, 2009. The Pineville office reopened on Wednesday, December 23, 2009. All other offices were open for business throughout the work week.

For those employees affected by the winter storm who were unable to report to work during that period due to road conditions or power outages, supervisors should review each request and adopt a liberal policy of approving accrued annual leave.

Please note that only the District Manager is authorized to approve administrative leave.

Thanks,

Sandy Humphrey for Bob Hardman

Confidential Agency Document
DLB-000874

| INJURY DATE | ACCIDENT TYPE | | NOTES |
|---|---|---|---|
| | | FY-10 | |
| 12/10/2009 | First Aid | | While walking down the offside of a belt, an employee became stuck in mud. While pulling loose from the mud, he twisted his knee. |
| 12/1/2009 | Medical | | Employee's head struck low mine top, jamming his neck. |
| 12/22/2009 | First Aid | | While walking down the paved decline to the Stadium Drive garage entrance, an employee stepped on ice and fell onto his back and left arm. The accident resulted in his back being bruised and swollen. |
| | OCCUPATIONAL CLAIMS | | |
| | Hearing Loss | | One claim has been filed in FY-10. |

Confidential Agency Document
DLB-000875

MSHA-0249

# ROUTING AND TRANSMITTAL SLIP

**Date:** 12/30/09

**TO:** HICKS      HUMPHREY      WILLS
MOORE         MORRIS          FOWLER

| | | |
|---|---|---|
| ☒ Action | ☐ File | ☐ Note and Return |
| ☐ Approval | ☐ For Clearance | ☐ Per Conversation |
| ☐ As Requested | ☐ For Correction | ☐ Prepare Reply |
| ☐ Circulate | ☐ For Information | ☐ See Me |
| ☐ Comment | ☐ Investigate | ☐ Signature |
| ☐ Coordination | ☐ Justify | |

**SUBJECT:** Insufficient Supporting Documentation for Enforcement Actions

**REMARKS:** Please find attached the hard copy memo that was emailed by
Luther Marrs on December 30, 2009.

Attachment

**FROM:** Lincoln L. Selfe, Jr., ADM
Inspection Division No. 1

Confidential Agency Document
DLB-000876

MSHA-0250

**U. S. Department of Labor**

Mine Safety and Health Administration
100 Bluestone Road
Mount Hope, WV 25880-1000



December 30, 2009

MEMORANDUM FOR All Inspection Supervisory Personnel
Inspection Division I
Inspection Division II

FROM:            LUTHER E. MARRS
                 Assistant District Manager Division II

                 Lincoln Selfe
                 Assistant District Manager Division I

SUBJECT:         Insufficient Supporting Documentation For Enforcement actions.

Report audits conducted by personnel from within the district and those conducted by personnel assigned by headquarters have resulted in the same findings time and again. As a district we are not providing sufficient supporting documentation that contains facts relevant to the condition or practice cited and information regarding the negligence and gravity determinations. This documentation is required in The General Coal Mine Inspection Procedures and Inspection Tracking System Handbook Number: PH-08-V-1 in section VI. Item 2 and our failure to thoroughly document how we made our determinations when evaluating each part of the gravity and negligence of an enforcement action at the time it is issued has resulted in our inability to support our enforcement actions during legal proceedings. This is coming more and more evident as the percentage of enforcement action being changed due to a lack of documentation is increasing. This lack of documentation has required SOL to contact our inspectors on increasingly more frequent occasions in an attempt to support our enforcement actions. This is causing an unacceptable drain on our inspector resources, when they are staying in the office trying to support their enforcement actions after the fact.

Attached is a list of questions intended to draw out the required documentation needed to support our actions at the time they are being issued. This is not a required form and must not be presented as such. It is your responsibility as a supervisor to assure that inspectors assigned to you comply with the inspection procedure handbook. You should be able to answer the questions on this form for each enforcement action that you initial off on, after reviewing the inspector notes, if not, the notes are not in compliance with the handbook.

Attachments: 2
cc: ADM

MSHA:CMS&H:LEMARRS:lem:12/30/09

Confidential Agency Document
DLB-000877

MSHA-0251

Citation Number: _____ Mine ID: _____ Date: _____ Insp. Initials: _____

**Gravity:**

A- What is the likelihood an accident or injury will occur? _____. Based on facts and / or experience explain how you made this determination.

_____

_____

_____

B- Should an accident occur, what could the results reasonably be expected to be? _____
_____. Based on facts and / or experience explain how you made this determination.

_____

_____

_____

_____

C- How many persons are exposed to this condition? _____. How are they exposed?

_____

Based on facts and / or experience explain how you made this determination and for what period
of their working shift are they exposed? _____

_____

_____

**Negligence:**

A- Who knew or should have know the violation existed? _____.
Based on facts and / or experience explain how you made this determination. _____.

_____

_____

_____

_____

_____

B- How long has the violation existed? _____. Explain how did
you make this determination? _____

_____

_____

_____

Page 1 of _____
Confidential Agency Document
DLB-000878

MSHA-0252

Citation Number: _____ Mine ID: _____ Date: _____ Insp. Initials: _____

Continuation:

Page ____ of _____

Confidential Agency Document
DLB-000879

MSHA-0253

District 4

# Enforcement Over-Sight Expectations
## for
## Field Office Supervisors

To assure there is adequate supervisory over-sight of the day to day activities in each Field Office workgroup, all field office supervisors will comply with the following procedures.

Daily

- Review all enforcement actions including citations, the review shall include each page of inspection and any other related documents to determine if enforcement tools available to the inspector or specialist were properly used and whether the level of enforcement is appropriate for the compliance behavior of the operator. Dating and initialing each item, including each and every page of notes will be acceptable documentation that the required reviews were conducted. Deficiencies identified by the review are to be discussed with the inspector or specialist and appropriate corrective action shall be taken immediately, where necessary. Documentation of these discussions will be maintained by the supervisor for one year and used in the inspectors performance evaluations where warranted.

- Inform the ADM or acting ADM of any reported accident at a mine, any action taken that closes a mine, any complaint received that alleges a imminent danger and any complaints making allegations against an inspector or specialist.

Weekly

- Check status of all outstanding citations issued at assigned mines and make assignment adjustments to address citations with overdue termination dates.

- Check the status of all complaint reports, accident investigation reports and plan reviews, expedite the process where necessary.

- At least one week in advance provide ADM with a schedule of planned days out of the office. (Include vacation days and field activities).

Monthly

- Provide the ADM with a detailed report for all required workgroup activities, such as completion progress E01's, FAR's and , Noise Surveys, Respirable Dust Sampling, etc.

- Provide ADM with a complete copy of all completed FAR reports, including review documentation and corrective actions taken.

Quarterly

- Underground mines, review the uniform mine file to become familiar with the various plans, variances, petitions for modification, etc. and to determine if the file is complete, up-to-date and the inspectors have signed the certifications review sheet as required. Deficiencies identified by the review are to be discussed with the inspector or specialist, if appropriate and sign the supervisory certification sheet to indicate the review was conducted.

- Determine which mines have approved mine plans (Roof Control, Ventilation, Etc.) that are due for a review during the quarter and make mine assignments that indicate when these reviews are due and assure they are conducted.

- Hold a pre-inspection conference with the assigned inspector or specialist, prior to the first mine visit, to discuss the operator's compliance history and develop expectations for the event including the completion of any scheduled plan reviews, health sampling or surveys. The supervisor will document and maintain a record of the expectations set for each event.

- Conduct a complete review of each inspection and investigation report completed or worked on at assigned mines during the quarter. The review shall include each page of inspection notes along with any enforcement actions and required forms to determine whether the inspection or investigation was conducted and documented in accordance with the applicable provisions of the Mine Act and MSHA regulations, policies and procedures. Any deficiencies identified during the review regarding the thoroughness and/or completeness of the event and the corrective action taken must be documented. Dating and initialing each item, including each and every page of notes will be acceptable documentation that the required reviews were conducted. The supervisor will meet with the inspector or specialist to discuss these deficiencies and the required corrective actions. Documentation of this meeting will be maintained by the supervisor for one year and used in the inspectors performance evaluations where warranted.

Semi-Annually

- Surface mines, review the uniform mine file to become familiar with the various plans, variances, petitions for modification, etc. and to determine if the file is complete, up-to-date and the inspectors have signed the certifications review sheet as required. Deficiencies identified by the review are to be discussed with the inspector or specialist, if appropriate and sign the supervisory certification sheet to indicate the review was conducted.

- Rotate mine assignments between inspectors and provide the ADM with a copy of all assignment changes as they occur.

- Conduct a Field Activity Review with each inspector or specialist of a complete major inspection assignment (E01).  Following the procedures stipulated to in the Supervisors Handbook.

<u>Yearly</u>

- Rotate mine list between workgroups supervisors in offices where possible.

Confidential Agency Document
DLB-000882

MSHA-0256

Date: _____

## Daily Documentation of Field Office Supervisory Activities

Field Office: _____   Work Group: _____   Supervisor's Name: _____

### Inspector's Work Products Reviewed:

|  | New Issues | Terminations | Modified | Vacated |
|---|---|---|---|---|
| Citations: | _____ | _____ | _____ | _____ |
| Orders: | _____ | _____ | _____ | _____ |
| Safeguards: | _____ | _____ | _____ | _____ |

| | | | |
|---|---|---|---|
| Willful Review Forms: | _____ | Special Assessment Reviews: | _____ |
| Complaints Received and Assigned: | _____ | Complaint Memos Reviewed: | _____ |
| Final Reports Reviewed: | _____ | Far Reviews: | _____ |
| Time and Activity Sheets: | _____ | Other: | _____ |

### Plans and Other Reviews

| | | | | | |
|---|---|---|---|---|---|
| Legal Id Reviews: | _____ | Ventilation: | _____ | Respirable Dust Control: | _____ |
| Roof Control: | _____ | Ground Control: | _____ | Shaft and Slope Sinking: | _____ |
| Training Plans: | _____ | SCSR's Storage Plans: | _____ | Impoundment and Refuse: | _____ |
| Bath House Waivers: | _____ | Mining in Close Proximity of Gas Well | _____ | Mining Under a Body of Water: | _____ |
| Shot Fire Waivers: | _____ | Blasting Within 500' of UG Mine: | _____ | Evacuation (1502 Plan): | _____ |
| Overdue Citations: | _____ | Outstanding Events: | _____ | Other: | _____ |

### Discussion with Inspectors

| Inspectors Name | Nature of Discussion, (Such as Inspection Activities, Safety Contacts, etc.) |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

## Field Visit

| Mine ID | Company Name | Mine Name |
| --- | --- | --- |
| | | |

### MSHA Personnel On Visit:

Shift Visit Conducted On: _____

## Special Events
### (such as meetings with operators, specialist dept, district staff, conference calls, etc.)

Type Event: _____          Purpose: _____

Comments: _____

_____

_____

_____


Type Event: _____          Purpose: _____

Comments: _____

_____

_____

_____


Type Event: _____          Purpose: _____

Comments: _____

_____

_____

_____

## Special Events
### (such as meetings with operators, specialist dept, district staff, conference calls, etc.)

Type Event: _____  Purpose: _____

Comments: _____

_____

_____

_____

_____

Type Event: _____  Purpose: _____

Comments: _____

_____

_____

_____

_____

Type Event: _____  Purpose: _____

Comments: _____

_____

_____

_____

_____

Type Event: _____  Purpose: _____

Comments: _____

_____

_____

_____

Checklist of items to be submitted to ADM for 2nd Level Reviews

☐ Complete Inspection Report including:
  ☐ Inspection Procedure Header Documentation Sheets
  ☐ Supervisor Certification Sheet
  ☐ Copy of the Inspection Tracking System

☐ Also include:
  ☐ Supervisor's Field Activity Review / Accompanied Activity Documentation (Forms), (including field notes and any additional documentation of your review)
  ☐ Deficiencies you found during your review and the corrections to those deficiencies
  ☐ Copy of the inspector's Uniform Mine File review certification sheet
  ☐ Copy of supervisor's Uniform Mine File review certification sheet

|  | Initials | Review Date |
|---|---|---|
| ADMs for Enforcement | | |
| CLRs | | |
| OWCP Coordinator | | |
| Admin Supervisor | | |
| Technical ADM | | |
| District Manager | | |

# District 4 Monthly Staff Meeting Tracking Sheet

**Routing:** A field office staff meeting will be conducted each month. This tracking sheet will be completed by the supervisor immediately following the completion of a monthly staff meeting and the original returned by pouch mail to the ADMs for Enforcement. The tracking sheet will then be routed through the Conference Litigation Representatives (CLR), the OWCP coordinator, Administrative Officer, Tech ADM, to the District Manager for their review. The DM clerical department will maintain a file containing all completed tracking sheets.

Field Office: _____  Month: _____  Day: _____  Year: _____

Workgroup: _____

Supervisor(s): _____    _____

## 1. MSHA Employee Safety (list topics discussed):

**GOAL:** District MSHA employee accidents will be discussed. A report containing this information will be faxed to each F.O. supervisor by the OWCP coordinator on the first day of each month.

## 2. Inspection Procedure Requirements (list topics discussed):

**GOAL:** A minimum of one topic will be discussed at each monthly staff meeting. The topics will match the shortcomings or problems noticed by the supervisor during his/her review of inspection activities, reports, AA's, FAR's, etc.

## 3. Vehicle Inspection (list any discrepancies and corrective actions taken):

**GOAL:** All GOV's will be visually inspected for safety hazards during each monthly staff meeting.

Field Office: _____     Month: _____     Day: _____   Year: _____

Supervisor(s) _____     _____

### 4.  Workplace Inspection (list any discrepancies and corrective actions taken):

GOAL: Each MSHA employee's office space will be visually inspected for safety hazards during each monthly staff meeting.

### 5.  EAPG Meeting (list topics discussed and/or member concerns):

GOAL: Each MSHA F.O Employee Accident Prevention Group will meet during each monthly staff meeting.

### 6.  Inspection Consistency: (list topics discussed):

GOAL: Each MSHA F.O supervisor will discuss the Conference & Litigation Representative (CLR) report with all AR's during each monthly staff meeting. A report containing the previous month CLR activities will be faxed to each F.O. by the CLR department on the first day of each month.

### 7.  Laptops Connected to LAN:

GOAL: Each MSHA F.O supervisor will instruct each laptop computer user to log onto the Local Area Network and maintain that connection for at least two hours. The purpose of this activity is to assure that laptop users receive operating system, Inspector Resources file updates.

### 8.  Other: (list topics discussed):

# Staff Meeting Attendance List

Field Office: _____   Month: _____   Day: _____   Year: _____

Supervisor(s) _____   _____

# MSHA Handbook Series



U.S. Department of Labor
Mine Safety and Health Administration
Coal Mine Safety and Health
Metal and Nonmetal Mine Safety and Health

March 2008

Handbook Number PH08-I-1

## CITATION AND ORDER WRITING HANDBOOK FOR COAL MINES AND METAL AND NONMETAL MINES

Confidential Agency Document
DLB-000890

MSHA-0264

## XIII. SECTION 104(d) CITATIONS AND ORDERS

### A. Criteria for Issuing a 104(d)(1) Citation

A 104(d)(1) citation shall be issued if:

1. there is a violation of a mandatory health or safety standard;

2. the violation significantly and substantially contributes to the cause and effect of a mine safety or health hazard; and

3. there is an unwarrantable failure of the mine operator or contractor to comply with the standard.

**Note:** A violation of a section of the Mine Act cannot be issued as a 104(d) citation or a 104(d) order even if the negligence evaluation is determined to be "high" or "reckless disregard." Violations of regulations at 30 CFR Parts 40, 41, 43, 44, 45, or 50 [excluding 50.10] also cannot be issued as 104(d) citations or orders even if the negligence evaluation is "high" or "reckless disregard." However, violations of interim mandatory health and safety standards found in Title 2 and Title 3 of the Mine Act, not superseded by mandatory health and safety standards, can be cited as "S&S" and evaluated as unwarrantable failure citations or orders based on the evaluations conducted in Items 10A and 10B of the Citation/Order form.

A violation is caused by an unwarrantable failure if it is determined that the mine operator or contractor has engaged in aggravated conduct constituting more than ordinary negligence.

### B. Determining "Aggravated Conduct" for Purposes of Determining Unwarrantable Failure

Factors inspectors should evaluate when determining "aggravated conduct" include one or more of the following:

1. the violative condition or practice was obvious or extensive;

2. the violative condition or practice had existed for a period of time;

3. similar violations have been issued at the mine or to the contractor in the recent past;

4. an agent of the operator or contractor had conducted an examination or had been in the area, or was aware of the existence of the condition;

25

Confidential Agency Document
DLB-000891

MSHA-0265

5. the violative condition or practice had been reported to the operator or contractor who then allowed it to exist, without correcting or adequately addressing the problem, for a period of time;

6. the individual who committed or allowed the condition or practice to exist was a supervisor or an agent of the operator or contractor;

7. reasonable efforts were not made by the mine operator or contractor to correct the violative condition or practice; and

8. other factors, not enumerated above, resulted in a negligence evaluation by the inspector of "high" or "reckless disregard."

Only one 104(d)(1) citation can be issued during a 90-day period, or for as long as the mine operator or contractor remains under the 104(d) series. The inspector who issues the 104(d)(1) citation must keep other MSHA inspectors at the mine informed that the operator or contractor is under the 104(d) series to avoid the issuance of two 104(d)(1) citations to the operator or contractor.

**Note:** The mine operator or contractor remains on the 104(d) citation series until 90 days pass since the issuance of the original 104(d)(1) citation.

If another unwarrantable failure violation is observed during the same inspection, or any other type of inspection being conducted at the same time, or any other inspection within 90 days of the issuance of the unwarrantable failure citation, a 104(d)(1) order must be issued. If a 104(d)(1) order is issued, inspectors will issue 104(d)(2) orders for unwarrantable failure violations observed during any subsequent inspections until the mine is inspected in its entirety without an unwarrantable violation found.

## C. Criteria for 104(d) Orders

Section 104(d) orders are required to meet the following criteria:

1. there is a violation (either "S&S" or "non-S&S") of a mandatory health or safety standard which was caused by the mine operator's or contractor's unwarrantable failure to comply;

2. the first 104(d)(1) order must be issued within 90 days of the issuance of a 104(d)(1) citation; and

3. 104(d)(2) orders follow the issuance of a 104(d)(1) order and must be issued on a subsequent inspection following issuance of a 104(d)(1) order. All 104(d)(2) orders are to refer to the original 104(d)(1) order.

**Note:** Section 104(d) orders do not have to be issued for a violation of the same health or safety standard as the 104(d)(1) citation. The violation causing the

26
Confidential Agency Document
DLB-000892

issuance of a 104(d)(1) or (d)(2) order does not have to be evaluated as "S&S." The only requirement for a 104(d)(1) or (d)(2) order is that the safety or health violation was caused or contributed to by the operator's or contractor's aggravated conduct.

Unwarrantable failure violations observed on a subsequent inspection will be 104(d)(2) orders if two conditions are met:

- the operator or contractor is on the 104(d) series; and

- a 104(d)(1) order was issued on a previous inspection

Section 104(d) orders will be issued until a "clean" inspection is made of the <u>entire mining operation</u>, through any combination of enforcement related inspections, and no unwarrantable failure violations are observed. **The mine operator or contractor remains on the 104(d) order series until this clean inspection occurs and no further unwarrantable failure violations are observed.**

**Note:** The 90 day time frame established for 104(d) citations does not apply to 104(d) orders.

If a 104(d)(1) or (d)(2) order is issued at a large mine and it is not possible to inspect the entire mine during the same inspection, the areas inspected will be documented until the mine is inspected in its entirety. Examples of the 104(d) series are:

**Scenario:** The inspector issues a 104(d)(1) citation. Other unwarrantable failure violations are not found on that inspection or any other inspection within 90 days. Other violations are cited but they are not unwarrantable failures. The operator is removed from the 104(d) series.

**Scenario:** The inspector issues a 104(d)(1) citation on a regular inspection. Another unwarrantable failure is found during the same inspection and a 104(d)(1) order is issued. Another inspector returns to the property several days later and conducts a subsequent inspection of the entire operation. Unwarrantable failure violations are found during the inspection and 104(d)(2) orders are issued.

**Scenario:** The inspector issues a 104(d)(1) citation. Other unwarrantable failure violations are not found during the inspection. An inspector goes back to the property within 90 days. Another unwarrantable failure violation is found and a 104(d)(1) order is issued. Several other unwarrantable failure violations are cited during the same inspection - all are 104(d)(1) orders.

**Scenario:** The inspector issues a 104(d)(1) citation. Another inspector returns to the property within 90 days on a subsequent inspection to check on compliance of an outstanding citation and finds no unwarrantable failure violations. The mine

Confidential Agency Document
DLB-000893

operator remains on the 104(d) series for the remainder of the 90 days (assuming that other unwarrantable violations are not found and cited during that time).

**Scenario:** The inspector issues a 104(d)(1) citation and a 104(d)(1) order during the same inspection. Another inspector returns to the property on a subsequent inspection, finds an unwarrantable failure violation and issues a 104(d)(2) order. Several days later, an inspection is made of the entire mine and unwarrantable failure violations are not found during that inspection. The operator is removed from the 104(d) series because of this "clean" inspection.

**Scenario:** The mine operator is issued a 104(d)(1) citation. Ninety days pass and other unwarrantable failure violations are not found. An inspector returns to the mine on the 91st day and finds an unwarrantable failure violation. The unwarrantable sequence starts over with the issuance of a Section 104(d)(1) citation.

**Scenario:** An operator is issued a 104(d)(1) citation and a 104(d)(1) order. On a subsequent inspection the operator is issued a 104(d)(2) order. Two weeks later a complete inspection of the entire mine is conducted and unwarrantable failure violations are not cited. An inspector returns to the property after this clean inspection and finds an unwarrantable failure violation. The unwarrantable series is started anew with the issuance of a 104(d)(1) citation.

**Scenario:** The inspector issues a 104(d)(1) citation. Other unwarrantable failure violations are not found during the inspection. An inspector goes back to the property within 90 days. An imminent danger with an unwarrantable failure violation is found, a 107(a) order is issued, and a 104(d)(1) order is issued in conjunction with the 107(a). Several other unwarrantable failure violations are cited during this same inspection; all are 104(d)(1) orders.

**D. Documentation for Section 104(d) Citation/Orders**

1. **Section 104(d)(1) Citation:** Item 8 of the Mine Citation/Order Form shall include the following statement in the violation narrative:

"This violation is an unwarrantable failure to comply with a mandatory standard."

The remainder of the form is completed similarly to a 104(a) citation except that "104(d)(1)" is written in Item 12. Item 8 of the Mine Citation/Order Form shall also include the factors that explain how the operator engaged in aggravated conduct. The violation must be evaluated as "S&S," the "Yes" block checked, and negligence evaluation marked at least "High."

**Note:** A Section 104(b) withdrawal order will be issued, not a 104(d) order of withdrawal, if the operator or contractor fails to abate or correct a condition cited under a 104(d)(1) citation.

28
Confidential Agency Document
DLB-000894

2. **Section 104(d)(1) Order:** Item 8 of the Mine Citation/Order Form shall include the factors that show how the operator engaged in aggravated conduct. The following statement must also be written within the violation narrative:

"This violation is an unwarrantable failure to comply with a mandatory standard."

Enter "104(d)(1)" in Item 12 and check the "Order" block in Item 13. **The order can be evaluated as "S&S" or "non-S&S."** Complete Item 14 by checking the "Citation" block and Items 14E and F with the number of the 104(d)(1) citation and the date it was issued.

3. **Section 104(d)(2) Order:** The procedure is the same as for the 104(d)(1) order except in Item 14 E & F, check the "Order" block; in Item 14E refer to the <u>first</u> 104(d)(1) order; and in Item 14F enter the date the first 104(d)(1) order was issued. **The order can be evaluated as "S&S" or "non-S&S."** Note: All 104(d)(2) orders must refer to the <u>first</u> 104(d)(1) order issued.

4. **Section 104(d)(1) and 104(d)(2) Orders:** Item 15 "Area or Equipment" is completed with information relating to what is ordered withdrawn. Enter the phrase "No Area Affected" if the 104(d) order is a technical violation and evaluated as "non-S&S."

5. Initiate both a Possible Knowing/Willful Violation Review Form for each 104(d)(1) citation **and** each "S&S" 104(d) order issued.

6. Prepare and send to the District Office a packet that includes: the original Possible Knowing/Willful Violation Review Form; a copy of the Legal Identity Report; a copy of the relevant general field notes; a copy of the citation/order notes; photographs if available; a copy of relevant citation(s) or order(s); and a copy of all modifications. Each photograph should be identified by the citation or order number and a descriptive and legible narrative should be attached or written underneath each photograph. This packet shall be submitted to the District Office in a timely manner <u>or as directed by the District Manager</u>.

## XIV. FLAGRANT CITATIONS AND ORDERS

There are two types of violations which can be deemed to be flagrant - reckless and repeat failures. Only violations of mandatory health or safety standards can be evaluated as flagrant violations. Most violations of sections of the Mine Act can not be designated as "flagrant" because they are not mandatory health or safety standards. However, violations of interim mandatory health and safety standards found in Title 2 and Title 3 of the Mine Act, not superseded by mandatory health and safety standards, can be cited as "S&S" and evaluated as flagrant violations. Flagrant violations also require that the cited condition or practice has to be the <u>substantial and proximate cause of the injury or expected injury</u>.

29

Confidential Agency Document
DLB-000895

**A violation must meet the criteria below to be classified as flagrant:**

Flagrant violations that arise from a mine operator's **reckless failure** must have been -

1. evaluated as significant and substantial;
2. evaluated with an expected injury of at least permanently disabling,
3. marked as an unwarrantable failure; and
4. evaluated with a negligence level of reckless disregard.

Flagrant violations that arise from a mine operator's **repeat failures** must have –

1 been evaluated as significant and substantial;
2. been evaluated with an expected injury of at least permanently disabling;
3. been marked as an unwarrantable failure; and
4. two prior "unwarrantable failure" violations of the same safety or health standard have been cited within the past 15 months.

For repeat failure evaluations, prior citations must be violations of the same safety or health standard citing the same subsections (e.g., citing 56/57. 14201(a) and 56/57.14201(b) do not meet the criteria for flagrant repeat violation consideration), and have been cited as 104(d)(1) or 104(d)(2) enforcement actions.  Prior violations do not have to have been evaluated as significant and substantial.

**Scenario:**  A 104(d)(1) "S&S" citation was issued for the mine operator's failure to install a  guard on the tail pulley of a conveyor belt with miners working in the area. Injury or illness was evaluated as permanently disabling and negligence was evaluated as reckless disregard because the mine operator had been informed of the condition for several work shifts prior to being cited and had instructed miners to continue operating the belt without providing a suitable guard.

This type of violation is required to be evaluated as a "reckless" flagrant violation in conjunction with the unwarrantable failure violation.  This violation is also required to be reviewed as a possible knowing/willful violation.

**Scenario:**  A 104(d)(2) "S&S" order of withdrawal was issued for a mine operator's having failed to install a guard on the tail pulley of a conveyor belt with miners working in the area.  Injury or illness was evaluated as permanently disabling. Negligence was evaluated as high negligence because the operator had: (a) been informed of the condition several work shifts prior to being cited; (b) instructed miners to continue operating the belt without providing a suitable guard; and (c) given miners an oral warning to be careful in this area.  The inspector determined that three unwarrantable violations of the same subsection of the guarding standard (56.14107a) had been cited within the past 15 months.

Confidential Agency Document
DLB-000896

This violation is required to be reviewed as a possible knowing/willful because it is a "repeat" flagrant violation issued in conjunction with the unwarrantable failure violation.

Inspectors should send to the District Office a packet that includes: the completed Possible Knowing/Willful Violation Review Form; a copy of the Legal Identity Report; a copy of the relevant general field notes; a copy of the citation/order notes; photographs if available; a copy of relevant citation(s) or order(s); and a copy of all modifications. This packet shall be submitted to the District Office in a timely manner or as directed by the District Manager.

## XV.  SECTION 104(e) PATTERN OF VIOLATIONS

Section 104(e) of the Mine Act provides for sanctions against mine operators who have a pattern of violations of mandatory health and safety standards that could significantly and substantially contribute to the cause and effect of health and safety hazards. 30 CFR Part 104 includes procedures for initial screening of mines that may be developing a pattern of violations; criteria for determining whether a pattern of violations exists at a mine; procedures for issuance of potential pattern notice and final pattern notice; and procedures for terminating a Notice of Pattern of Violations. Either the Administrator for Coal Mine Safety and Health or the Administrator for Metal and Nonmetal Mine Safety and Health makes the final determination as to whether a Notice of Pattern of Violations will be issued at a specific mine. Mine operators remain on the 104(e) Pattern of Violation series until:

- No 104(e) Order of Withdrawal is issued within 90 days of issuance of the initial 104(e) Notice of Pattern of Violations;

- An inspection of the entire mine occurs and no "S&S" violations are issued; or

- Partial mine inspections, collectively covering the entire mine, are conducted within 90 days of issuance of the 104(e) Notice of Pattern of Violations and no "S&S" violations are cited.

### A.  Issuance of a Notice of Pattern of Violations

The Notice of a Pattern of Violations shall only be issued by a District Manager on an MSHA Citation/Order Form 7000-3.

1. Complete Item 8 with the following language:

Pursuant to Section 104(e)(1) of the Federal Mine Safety and Health Act of 1977 (Mine Act), you are hereby notified that a violation exists at the (Name of Mine). If upon any inspection within 90 days after issuance of this Notice, an Authorized Representative of the Secretary finds any violation of a mandatory health or safety standard that could significantly and substantially contribute to the cause and effect of a coal or other mine

31
Confidential Agency Document
DLB-000897

December 21, 2012

MEMORANDUM FOR PATRICIA W. SILVEY
Deputy Assistant Secretary for Operations

THROUGH:     EARNEST A. CAMERON
             Director of Administration and Management

             NANCY CRAWFORD
             Director of Human Resources

             KEVIN G. STRICKLIN
             Administrator for Coal Mine Safety and Health

FROM:        CHARLES J. THOMAS     12/21/2012
             Deputy Administrator for Coal Mine Safety and Health

SUBJECT:     Mitigating facts and background on why a Seven (7) Day
             Suspension is not warranted to Charles J. Thomas over the UBB
             Internal Review alleging poor oversight in memorandum dated
             December 4, 2012

On April 5, 2010 , and explosion occurred at the Upper Big Branch Mine (UBB) killing
29 miners and injuring 2.  The internal review investigation team determined and I quote
from page 1 of the executive summary:  *"The MSHA Accident Investigation team
determined that the explosion occurred because Performance Coal
Company (Operator) and its parent company, Massey Energy Company
(Massey), violated fundamental safety standords and failed to take
corrective actions to prevent catastrophic explosion."*

## Background Information on Charles J. Thomas

I am not confident that everyone involved in the decision to propose discipline for me
does not fully know my background, experience, work ethic or what makes me tick as a
Senior Executive.  As background concerning myself, I am 56 years old, graduated from
Barrackville High School with honors, near Fairmont, West Virginia.  I am a veteran of
the United States Marine Co   s who **volunteered** and was not drafted and served a six
(6) year military obligation of 3 years active service and 3 years inactive reserves in the
10th Marines field artillery regiment.  While in the United States Marine Corps I was
meritoriously promoted two (2) times.  Prior and after the military service I attended
WVU for four complete semesters with a 3.2 GPA and graduated from Fairmont State
College while working in the Engineering Department at Federal #2, Federal #1, and
Joanne Mine, and attending night school and earned a Bachelor's degree in Board of

Regents. I have accumulated over 50 hours of post graduate work at both WVU and Marshall University in Master's Degree Safety Management while employed with MSHA, but did not finish my Master's Degree when I was promoted and chose to accept the roof control supervisors position and was promoted and moved to Pelham, AL to work as the Roof Control/Impoundment/Electrical Supervisor. I worked in the Engineering Departments for Eastern Associated Coal Company that provided surveying and mapping and plan submittals for Federal #1 Mine, Federal #2 Mine, and Joanne Mine at Rachel, WV.  I also worked in the surveying and engineering department at Martinka #1 mine at Fairmont, WV for over three years before being promoted into production management.

I obtained my Mine Foreman/Examination certification in 1981 and have been employed as a timber crew foreman, belt foreman, production foreman, and longwall production foreman and longwall coordinator. I am a former "**volunteered**" member of the American Electric Power (AEP) Southern Ohio Coal Company, **Martinka #1 Mine Rescue** team and the Department of Labor, **MSHA, MEO Rescue Team** from 9-11-1995 until 4-1-2002. I have participated in numerous mine fires, mine explosions, and mine recovery operations. To name a few, Galatia Mine Fire, Oak Grove Mine Seal Explosion, Jim Walters #5 Mine Explosion and recovery, Loveridge Mine Fire, Oxbow Mine Explosion and recovery, Willow Creek Mine and UBB Mine explosion and recovery. During these operations I have voluntary risked by life in oxygen deficient atmosphere while under apparatus at 98% methane and 2 % oxygen.  This rescue team work is on a "volunteer basis." I also placed 7th in the 1988 National Drager BG 174-A Bench contest in Louisville, KY when with employed with AEP.

I have worked in three different coal districts D2, D3, and D11 in Pennsylvania, Northern West Virginia, and the Alabama District office in Birmingham.  Being an inspector in three different Coal Districts has exposed me to many different mining methods, different geology, different equipment and coal seams and coal safety cultures.  I have been a regular inspector, accident investigator, roof control supervisor, electrical supervisor, impoundment supervisor, field office supervisor, roof control specialist in HQ, Chief of Health in HQ, and Director and established the first MSHA Accountability Office from the ground up and interviewed over 24 candidates from both coal and metal to make a final selection of two accountability auditor specialist at the GS-14 level. I acted as the Deputy Administrator for Coal from April 2009 until September 2010 and now Deputy Administrator for Coal reporting directly to Kevin Stricklin the Administrator.

I have investigated four coal mining fatals as lead investigator and assisted in numerous others and have an oversight role on the fatal contributing factor enforcement issuances here in HQ. While Chief of Health I was the lead investigator on the Tri-Star double fatal ighwall collapse in Coal District 3 in Maryland. The unwarrantable contributing factor enforcement actions were not challenged by opposing counsel because the facts and evidence were substantially documented.  The penalties ordered in the settlement motion were $105,324.00 and it required that I and the investigation team be very forceful in defending the enforcement actions with the Regional SOL. I stood firm against Regional SOL advisement to not support unwarrantable and was successful. This may and I believe

did prevent an internal review investigation in Coal District 3. My immediate supervisor Kevin Stricklin is in agreement with that assessment.

I have interviewed and hired the last seven (7) Coal District Managers. These seven new District Managers consume a vast amount of my time coaching, mentoring, making mine visits and answering their questions on both the "Administrative and Enforcement" side of their job descriptions. I do not know of anytime in MSHA history except the inception that seven (7) District Managers were brought on board the Agency in a three year period and it is a very tall task to train, instruct, provide oversight on that many senior field management persons at one time. No other Deputy was faced with that challenge except the first Deputy Administrator. I received nothing but positive feedback from the DMs and my supervisor Kevin Stricklin. If I was doing a poor or substandard job of that mentoring it was never mentioned in my performance appraisals, mid-year reviews, or in conversations on a daily basis. It is very hurtful and demeaning to be told my conduct was and I quote from Specification 1, "This reflects a lack of management oversight on your part in ensuring effective implementation of an important provision of the MINER Act.

Let's stop right there for a moment, there were many provisions of the Miner Act such as lifelines, refuge alternatives, seals, wireless communication, tracking of miner's underground, mine rescue team improvement and response, family liaison, breathable air, emergency response plans. It is not fair that everything was properly implemented and one component is alleged to have not been properly oversight implemented and that was flagrant violation oversight. The real problem of administering oversight is with SOL not being supportive of the inspector, FOS, ADM, DM, Deputy and Administrator. I have in my possession and to be made part of this response to the notification of proposed seven (7) day suspension over thirteen (13) examples where SOL would not support the flagrant assessment. This constant rejection of applying the MINER Act has connections with the legal support not entirely the enforcement component. If Districts constantly submit packages to the regional SOL and they get rejected it is a policy process problem not an oversight problem. On many occasions I have had to be "pulled back" because I get emotional and argumentative about the SOL decisions and have been told I need to look at the big picture. The major responsibility I am charged by the ACT is the health and safety of the miner our most precious resource. Congress intent was to raise penalties on egregious repeat violations of the same standard that are termed flagrant. I have always stalwartly supported that endeavor, but SOL has not always been supportive in all cases. Discussions have been made by the Solicitor for MSHA that certain Regional SOL are "soft" and I requested that District 5 flagrant review be switched to Nashville and that idea was rejected. **So as a Deputy Administrator I have tried and suggested that changes be made.** Again it is hurtful and demeaning and soils my reputation to make a statement that I did not provide proper oversight on the flagrant portion of the 2006 MINER ACT.

Confidential Agency Document
DLB-000900

Fact:

**At the time of the explosion, sophisticated computer tools that are now used to identify Potential Pattern of Violations mines and mines that warrant impact inspection did not exist.**

Fact:

**Identification of potentially flagrant violations by inspectors and managers alike is extremely difficult without computer tools. Such tools were not available until after the explosion.**

When all components of the 2006 MINER ACT were implemented on time, training conducted, and oversight was provided on my part. There were many new coal mine inspectors at UBB and this is a mitigating circumstance, there were temporary acting field office supervisors at UBB and that was stated in the IR report, which is also a mitigating circumstance. I was acting as Deputy Administrator until September 2010 and directed most of my attention to Districts 5, D7, D8, and D9 as instructed that is another mitigating circumstance.

My father Charles Junior Thomas was an MESA/ MSHA inspector in the Fairmont, WV MSHA field office for 27 years and served in the Navy for 7 years and was one of the persons who did the body recovery at Farmington No. 9 mine for three years the recovery operations took place. His MESA coveralls had the smell of dead flesh, he had difficulty eating lunch underground at Farmington No. 9 mine, he recovered two of my classmates bodies they were (Roger Carpenter from Fairmont who son was a classmate is a former mine rescue and benchman from Federal #2 and a Bud Hillberry whose son Ken I graduated high school with) My father was my friend, mentor, coach and role model and he is the primary reason I am filing this reply. His reputation and my reputation are at stake. This is a shock and very hurtful and stressful for me to go through defending my reputation my integrity and my family honor. In one word it is "PAINFUL" to me and my family. My wife asked me what did I do wrong? My answer is nothing, I did my duty, I did my job, and I enforced the regulations with integrity and with enthusiasm. I was asked recently about the rock dusting unwarrantable failures being issued to Consol. There were unwarrantable failures issued at Road Fork #51, Justice and other mines in D4, there were unwarrantable failures issued at Consol and Patriot Mines. The reason that UBB mine exploded was they were mining on the longwall without water pressure, water sprays and cutting bits maintained. My oversight was not the cause and this memorandum I am answering alludes to that. One of the things I remember most is that my father said, "Son whatever you do, remember this, MESA is an enforcement agency and you are charged with going to mine, finding hazards and citing them to be corrected, you have no friends when you go underground and people cannot buy respect, they have to earn it. Don't overlook citations for your high school friends or neighbors, you cut them some slack they will expect it every time, they will tell others you are soft. **He also told me to always turn in a rock dust survey with a AAA inspection to "prove" you have the mine compliant. He told me that rock dust covers a multitude of sins."**

Confidential Agency Document
DLB-000901

MSHA-0275

What he meant that proper rock dust application inerted the explosive float coal dust. My deceased brother was a coal miner (roof bolter), my grandfather James G. Thompson was the Safety Director at CONSOL Robinson Run #95 mine in Shinnston, WV trainer of first aid and mine rescue teams, and my great grandfather hand loaded coal at Owens Mine, near Shinnston, WV. I am a fourth generation Coal Miner and have lost family members such as my Uncle, Guy Thompson in a track motor haulage accident where he was crushed to death by empty coal cars that were off track and put himself in a pinch point position trying to re-rail the wrecked coal cars. Saying all that I know Coal Mining, I know the sad stories of fatalities in my family and in my classmate's family. I was born into it and lived, breathed, and heard discussion around the dining room table about fires, explosions, and fatal accidents. I know and fully realize the importance of my role, leadership, and the vast responsibility that my office holds. I was competent enforcing all regulations and petitions of modification.

Fact: **The internal review team nor did the UBB accident investigation team interview me to hear the facts, circumstances, mitigating issues that were charged against me in this memorandum dated December 4, 2012.** The team had ample time, opportunity to ask me questions, but they failed to do so. I would now like an opportunity to tell what I know and what I did in oversight prior, during, and after the UBB explosion on April 5, 2010. If the prevention and protection of the miners is the primary focus and goal of this accident investigation and internal review audit, Senior Management, the investigators, and the Internal Review audit should have alerted me, counseled me on the alleged failure to conduct my official duties directly after the physical investigation not 973 days later (from the time of the explosion at UBB until the day I received by proposal to suspend for seven (7) days was 973 days that miners were alleged to be at risk.) The two (2) alleged stipulations are very egregious but the administering of unjust discipline was very slow when Miners were supposedly at risk. No one in Headquarters or any member of the IR team told me during my performance appraisal or midyear appraisal to cease and desist of how I was conducting enforcement oversight. This confounds me that I was never informed either orally or in written form that my oversight was deficient during conversations or performance ratings. Kevin Stricklin as my witness knows how passionately I require District Managers to enforce ventilation, rock dusting, permissibility, and especially roof control plans and all standards. On numerous occasions Kevin said I like that I have to "pull you back Charlie" it is more difficult to spur people ahead to make aggressive enforcers out of Managers and HQ folks. I also ask that you ask Industry Leaders for Consol, Patriot, Jim Walters what type of enforcer I was. Names that I know would give you an honest assessment of m  oversight on enforcement are Lou Barletta, Dave Clise, John Higgins, Jim Siko, Underwood, Cliff Forest, Mike Sinozich, Terry Hudson, Walt Scheller, Dale Byrum, David Hales, Sam Kitts, Alan Dupree, Kenny Murray, Doug Conaway, Gary Wirth, Jeff Wirth, Anthony Webb. Anyone of them will tell you where I stand on enforcing the law especially rock dusting, face ventilation, and permissibility, and mine rescue stations and equipment. Ask any of them if I and the DMs under my oversight use all the enforcement tools when warranted and supported by SOL?

Fact: An explosion could occur today this very instance if a foreman on a longwall would permit the production crew to mine coal without water sprays and without water pressure and without proper cutting bits being maintained at all times.

Fact: I fully understand Congress intent with the 2006 MINER ACT to increase penalties and identifying and correcting hazards present to coal miners by whatever enforcement method is more important than how much a penalty is going to be assessed. Our primary mission is the health and safety of the coal miner our most precious resource, not how much money the US Treasury collects. I know the message that we try to send to the Coal Operators to change their behavior is the penalty amount, but our primary mission is the health and safety of the coal miner our most precious resource. What box is checked on a citation/order form is secondary to identifying and correcting hazards in coal mines. I will provide data that more citations and orders were written in 2009 and 2010 in the history of MSHA. I and the inspectorate that I am in charge of take that responsibility seriously and just because one field office did not issue enough flagrant' s is not reflective of the entire nation.

Fact: Figure 11, page 104 of internal review team report indicated that rockdusting was improving in all Districts, and that UBB was going in a downward trend instead of upward. So in essence rockdusting was improving in most mines except UBB under COAL HQ oversight.

Fact: The Headquarters managed "Dust Busters" prior to UBB explosion were identifying and citing deficiencies in face ventilation and respirable dust requirements Nationwide; this was not only a UBB problem but a National problem that was being addressed.

Fact: I had to make a headquarter decision to complete mandatory Mine Act 4s and 2s EO1 inspection or send supervisors and journeyman inspectors to training. The inspections are mandated by the ACT, the training is a policy requirement. Training was an issue that we could not address at the time of UBB because of staffing and the sheer number of trainees.

Fact: Attached are Monthly "Key Indicator Reports" that my secretary RoseAnn Dickens prints for my review every month. I have e-mails, I have phone conversations with DMs and their staff concerning indicators that need addressed. Since I have assumed the acting and full time position of Deputy Administrator for Coal:

1. Abatement times have decreased nationwide
2. Vacates have decreased nationwide
3. Level of enforcement increased
4. Amount of time underground during 103(i) mandatory spot inspections have increased.
5. Reportable Roof falls have decreased and roof fall fatals have decreased.

Confidential Agency Document
DLB-000903

The oversight of the plans is a joint effort in headquarters. Plans are reviewed by the Coal Division of Safety, the health aspects of the plans are reviewed by the Coal Division of Health. I feel that I am being singled and discriminated when there are others on the Headquarters staff this responsibility is delegated to, and they did identify problems in certain districts and the Administrator directed me to investigate further.

Fact: Kevin Stricklin told me to **concentrate my enforcement oversight efforts in District 5, Districts 7, District 8, and District 9 because of the level of enforcement, accident trends, reportable roof falls, roof related injuries and concerns that both of us had with the plan approval process.** I would be insubordinate to not follow the Administrators instruction while learning and training in my "Acting" capacity as Deputy Administrator. I was never temporary promoted while "Acting" Deputy Administrator for Coal, it is customary if one acts more than 30 days they are compensated for the job description they were filling, we do that for DMs, ADMs, and FOS, but I was never paid Deputy Administrator wage scale while acting for over 14 months. Kenny Murray was the prior Deputy Administrator and I found oversight lacking in Health where MMUs were given out freely in D6, I was not aware of this problem in D4 and at UBB, so this demonstrates there were problems that I did identify and I did correct in other Districts. There was also dust fraud with sampling devices in D6 that the Division of Health investigated and found vermiculite inside a sampling cassette.

### District 5 Deputy Administrator Oversight Involvement

Conducted an all enforcement meeting in District 5 in September 23-25, 2009 because of concerns with low level of enforcement and not utilizing all enforcement tools, S&S rate increased immediately and level of enforcement increased
I organized and participated in a **"Saturation Inspection"** at **Richard Gilliam Mines** in October of 2009 in District 5, primary focus was on accumulations and roof control plan compliance. Company was ultimately sold as result of enforcement actions. This saturation inspection was selected by me on repeat non-compliance by one particular operator before PPOV was initiated.

### District 7 Deputy Administrator Oversight Involvement

Participated in KY Coal Association Safety Committee Meeting in District 7, focused on mine examiners conducting adequate examinations and roof control plan upgrades when warranted.

Made underground mine visits in D7 pertaining to roof control problems I identified.

### District 8 Deputy Administrator Oversight involvement

DM meeting at Academy November 16-20, 2009 to provide oversight and discussion of enforcement actions.

Confidential Agency Document
DLB-000904

Underground Mine Visits in D8, discussed enforcement, staffing, and plans with DM December14-18th and also made a mine visit to D10 same trip. Primary focus was roof control, rockdusting, bleeder evaluations and general conditions of the mine.

<u>District 9 Deputy Administrator Oversight involvement</u>

July 13, 2009 District 9 "All Employee Meeting" Grand Junction, CO went over general inspection procedures manual front to back with all ARs. I answered questions from the inspectors in all field offices. As a follow-up to the office of accountability, I was aware of the low S&S rate and requested Richard McDorman provide training on S&S, Gravity, and Negligence determination in all D9 field offices.

February 7-February 11, 2010 Mine Visits Texas Lignite Surface Mines Longview, Elgin, TX and roll out for end black lung in Austin, TX. I found that the lignite mines were in good compliance and commended the Texas inspectorate.

June 22-26, 2010 Bull Mountain UG mine visit, Roundup, MT this mine had compliance problems on PPOV. Division of Safety and I walked the tailgate of the longwall and evaluated the bleederless system after carbon monoxide problems at this mine. Found that the new system was working according to plan requirements and CO was low.

Answering Specification 1,

I was never interviewed on how I provide oversight on flagrants. Kevin Stricklin reviewed all flagrants, I did review approximately 20 flagrants received in HQ and gave the Administrators my recommendations. HQ maintains flagrants on the Coal Digital Dashboard. Here is the link: W:\COAL\Specproj\Flagrants

During performance appraisals where I was rated Exemplary and Highly Effective nothing verbally or written told or instructed me that I was deficient on reviewing or providing oversight on flagrants. **The PIL is currently expired and I have no written directive to provide oversight on flagrants at present time.** MSHA COAL, MSHA METAL, and SOL do not have a current policy or directive in affect to follow or guide both Management and inspectors at this present time.

I have attached several SOL "Special Assessment for Review Packages" to resent my case that it is difficult to get suppo for flagrant. I have read and summarized reasons that SOL gave "not to support flagrant determination to the DM and to the Administrator", these packages with memorandums to DMs, "conditioned" folks that it had to be a compelling case to be supported by SOL. We all know that no one can predict how a commission will rule.

What is more important is that miner's got hazards abated quickly to protect their health and safety. Gravity and Negligence determinations are important but not as important as Miner health and safety.

Some of the explanations given by SOL are:

"It would be difficult" but no concrete reason given for not supporting flagrant Order # 8357920.

"Have reservation" "Thin evidence" "It is likely that a non-flagrant special assessment would serve well as a flagrant assessment" This is not what Congress intended in my humble opinion.

A RTLB (Rules to Live By) standard Order # 8353173 may meet the standard we do not recommend assessing it as flagrant violation as citation 835172 involves same condition, and citing both "APPEARS" to be double dipping. CMI ARs are required to cite each and every violation they observe. In this case the inspector notes indicate:

Question: Why did the foreman not rockdust this area?
Foreman's Answer: "Didn't have a scoop driver because he quit.

This shows aggravated conduct above ordinary negligence when the foreman made a conscious decision not to comply with the law, mine coal and not rockdust as required by the standard. There are photos in this package at BELL COUNTY COAL CORPORATIN, JELLICO #1, ID 15-19336


Answering Specification 2

This specification mentions mine plans. If the mine plans were followed by the operator at UBB there would have been no mine explosion. There were more citations and orders issued at this District 4 mine than any other mine in D4. How can my oversight be deficient when more orders were issued at this mine than any in the Nation.

The ventilation plan was violated, the roof control plan was violated, the mine examiners did not conduct required bleeder examinations around the longwall perimeter. Checking a box on a checklist, or have two independent plans on ventilation and respirable dust parameters did not cause the explosion. The District had been doing separate vent and dust plans for 30 years, other Deputy Administrator and Administrators had not been following policy and did not make corrections. This is not egregious conduct on my part. Two other "acting" Deputy Administrators and Kenny Murray preceded me. I feel really hurt that I am singled out on this "policy" requirement that does not harm miners.

The District Manager and the Assistant District Manager for Technical Programs are responsible to review and utilize checklists, if our audits would have caught this I would

MSHA-0280

have provided oversight. It is not reasonable to believe that I have the time to look at 450 underground vent plans and provide oversight of whether a checklist was properly filled out or whether it was utilized. The more important point is whether the plans are adequate for current mining conditions. I firmly believe the plans were adequate in D4 and if followed by the operator this tragedy could have been avoided or mitigated. It should not be expected the Deputy Administrator or Administrator be personally responsible for 450 actual Underground Mine Plan reviews. **My role is to audit and give training to field personnel and policy, not review the plans on a mine by mine basis. Mr. Rich Kline was responsible for this to sign off on the plan. I removed him from his position when I came aware and transferred him to Anthracite Coal District 1, this would have come out in the interview had I been given an opportunity to tell what I knew. A mitigating factor is that I did not sign the plan the DM, ADM, and either vent or roof supervisor signed the plan. How can I be held personally responsible for something I did not see. Kevin will tell you that before I make a mine visit, I request a copy of the vent, roof, and ERP and have the Division of Safety review it before I make a mine visit, and any deficiencies are put on the plan and given to the DM to correct when I make the mine visit. This would have come out in interviews had I been afforded the opportunity by the AI or the IR team members.**

Additional Mitigating Factors

- Operator Conduct:  The operator's intentional and illegal conduct interfered with MSHA's ability to fulfill its responsibilities under the Mine Act.
- Resource Limitations:  Budgetary constraints and retirements of experienced inspectors depleted MSHA's inspectorate. Increased funding after Sago, Darby, and Aracoma disasters resulted in and inexperienced workforce in District 4, a district that was responsible for inspecting 437 coal mines and facilities at the time of the UBB explosion.
- Directive System:  The agency Directives System had fallen into disuse and MSHA did not consistently use it to provide its employees with instructions and information necessary to effectively and efficiently implement program and mission-support activities. As a result, District 4 inspectors, many of whom had limited MSHA experience, were not aware of or did not know where to locate all policies and procedures they were required to follow.
- Acting Supervisors:  MSHA did not have a program when I became "Acting" Deputy Administrator to train inspectors who might be assigned to filling as acting supervisors.
- The Technical Assistant District Manager;  Rich Kline is now retired, was directly res onsible for the identifying and correcting significant deficiencies in the review and approval of the roof control, ventilation, and dust control plans identified by the IR. On the contrary, the ADM condoned approving the roof control plan without a pillar stability analysis. Oversight by the District 4 manager was also lacking, but he had asked me to remove Kline from the District. I as an "Acting" Deputy Administrator did not get questioned by the AI or the IR teams to see what actions I was in the process of taking with Mr. Kline. My long

career in enforcement identified that the DM was having issues with the ADM, we were in the process of acting on them when the UBB explosion occurred. I was never questioned by the AI or the IR teams concerning ADM Kline.

- Inspector and Supervisory Inexperience:  Because of the reduction in staffing in the years before 2006, many experienced inspectors left MSHA and could not be replaced. As a result, new-appointed inspectors , some of whom had not completed all of their entry-level training, were called on to mentor trainees and oversee their on-the-job training.  Inspector and supervisor inexperience was evident at UBB.

  - All but one of the lead inspectors assigned to conduct regular inspections were hired b MSHA after the 2006 coal mine disasters.  A newly-hired trainee needs approximately two years to complete classroom and on-the-job training to become a journeyman inspector.
  - The most experienced lead inspector at UBB had 52 months of MSHA experience when he began his inspection; the least experienced had 13 months of MSHA experience.  The average experience for an inspector was 30 months, including training

  - **Computer Glitch in PPOV- I was not responsible for the computer glitch that failed to identify UBB as a PPOV, this is beyond my role and my area of responsibility.**

**Where is the discipline for this oversight? No one from the IR asked me about this oversight and how it may have prevented the UBB explosion.**

**District 4 split was delayed- I was not responsible for the delay to split D-4, this request was submitted during previous Administrator Ray McKinney. According to records the D4 submit request dates back to 2004. District 4 after being split in half is still the biggest Coal District in MSHA with forty-six (46) active underground mines and is still the largest Coal District.  Having one District Manager over such a large District is difficult to manage and was out of my control to make the split happen.  I have attached documentation when the D4 split was first proposed and a timeline.**

**In summary, I was the "Acting" Deputy Administrator in a trial training and observation period from April 2009 to September 2010 and did not have full authority to make independent decisions on splitting D4, or major policy changes without concurrence of MSHA top staff.**

**It is unjust and unfair that I was not afforded the opportunity to face a "jury of my peers" and be interviewed by either the UBB Accident Investigation Team or the**

UBB Internal Review Team to give facts, reasons, observations of what I knew about UBB, District 4, or MSHA Coal in general.

I worked for, received, and was evaluated as Exemplary and Highly Effective twice the last three ratings on performance.  At no time during my "Acting" Deputy Administrator did anyone give me anything in writing or verbally that my oversight was not effective or lacking substance. On the contrary I have evidence that flagrant enforcement actions were repeatedly denied or rejected by Regional SOL 14 times. This constant rejection caused District Managers to be "conditioned" not to recommend enforcement actions for flagrant determination and there was no computer prompt to inform or remind inspectors and specialists to consider enforcement actions for flagrant.

The policy of having separate ventilation and dust control plans was prevalent in District 4 for over 30 years and did not contribute or cause the UBB explosion this was a breach of policy that was accepted by previous Administrator, Deputy Administrators, and District Mangers.

I was the only "Acting" Deputy administrator given a letter for alleged failure to carry out duties. There were two other "Acting" Deputies' prior to my detail in COAL.

In closing this proposed seven (7) day suspension memorandum has tarnished my family and my reputation, made me feel hurt, and has caused me to be stressed and have difficulty sleeping and upset my stomach.  I have always put the Miner's health and safety as the principal mission of this Agency and in my efforts to enforce the regulations, policies, and procedures and at no time have I been inadequate in providing oversight to ensure that the regulations were not being rigorously enforced.  At no time was I informed either in writing or verbally that my oversight, leadership, or level of enforcement was lacking by either my immediate supervisor or anyone higher in the MSHA chain of command or organization chart.

I do not believe these specifications have merit or substance, and strenuously find them unfair, unjust, and undeserving to a career Senior Executive Deputy who made multiple visits to underground Coal Mines and provided "hands on" oversight.

The Upper Big Branch coal mine explosion was caused by the operator's non-compliance, and this was the most heavily cited underground coal mine in District 4. The fault lays with the coal operator not me, and the accident investigation has proved that fact and I should not be a scapegoat.

The PPOV list is at a historic all-time low of four mines. This is a good trend under my oversight and nobody can deny that fact. I have an attachment pointing that out as well.

The PPOV list is at a historic all-time low of four mines. This is a good trend under my oversight and nobody can deny that fact. I have an attachment pointing that out as well.

Page 1 of the UBB IR Executive Summary under *Significant findings.*  Paragraph 6 states, *"As detailed in the MSHA Accident Investigation report, Massey, through its subsidiary Performance Coal Company, violated numerous, widely –recognized safety standards and failed to prevent or correct numerous hazards that ultimately caused the catastrophic explosion.*

*The Operator concealed its highly non-compliant conduct in a number of significant ways. The Operator provided advance notice of MSHA inspections, allowing foreman to correct violations before inspectors arrived underground to detect them."*

Other underlying causes were Resources, Inspector Experience, Management Turnover, Directive System, and Training.  These are mitigating factors that were not in my immediate control.

This is a mitigating factor which makes it difficult for an "Acting" Deputy Administrator to detect trends in violations or hazards when the Company conceals them from our inspectorate and our management structure.

Please give my facts, attachments, and memorandum your due consideration. I am not deserving of this seven (7) day suspension which takes money not only away from me but my wife and mother. It is painful to be thought of and wrongfully accused of failure to perform my duties and has caused me much anguish. I also feel that I was singled out from other "Acting" Deputy Administrators.

If the Miners are MSHA's highest priority, why was I never instructed, coached, mentored, or informed that my oversight was lacking until 973 days after the UBB Disaster by anyone in MSHA?

Attachments include Key Indicator
Attachment Tri-Star Settlement Agreement
Attachment of District 4 split timeline
Attachment of 13 Flagrant Legal Analysis

Confidential Agency Document
DLB-000910

MSHA-0284

Donald E. Winston
Mine Safety and Health Administration
100 Bluestone Road
Mount Hope, WV 25880

Ms. Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 23rd Floor
Arlington, VA 22209

Subject: Notice of Proposed Seven (7) Day Suspension

Dear Ms. Silvey:

Thank you for meeting with me on December 20, 2012 and allowing me to respond to Specifications 1 and 2, which I received on December 5, 2012. As we discussed I am submitting a written response to these specifications.

**Specification 1:**

1. Following the August 2007 fatal coal outbursts at the Crandall Canyon mine, the Administrator for Coal Mine Safety and Health issued CMS&H Memo No. HQ-08-058-A which provided guidance for review and approval of complex and non-typical roof control plans and amendments.

   You failed to follow CMS&H Memo No. HQ-08-058-A when you recommended that the District 4 Manager approve the base roof control plan submitted in October 2009 for UBB, without requiring Performance Coal Company to submit a risk assessment specific to the particular mining operation, including the data and evaluation supporting the proposed roof control plan. In particular, Performance Coal did not provide information, such as a pillar stability analysis, detailing the basis on which it determined the plan to be appropriate and suitable for UBB.

Response:

Procedure Instruction Letter No. I08-V-2 (PIL) issued on May 29, 2008 and CMS&H Memo No. HQ-08-058-A (Memo) issued on June 5, 2008 each lists four criteria to determine if a roof control plan is complex and/or non-typical . The criteria in the PIL (attachment 1) and Memo (attachment 2) are very similar and appear to have the same purpose of determining when a plan is complex and/or non-typical.

The Internal Review (IR) report on page 144 (attachment 3) identified the criteria that required the UBB plan to be classified as complex and/or non-typical in which it states, The Administrator defined complex plans to include those for "mining of high stress areas created by multiple seam interaction, or active mining below longwall panels or isolated remnant pillars." The phrase in quotes is a portion of the fourth criteria in the Memo, but it leaves out an important part of the criteria.

Confidential Agency Document
DLB-000911

MSHA-0285

Ms. Patricia W. Silvey
January 7, 2013
Page 2

Criteria 4 in the Memo states, "Other criteria considered **unusual** by the District Manager, such as retreat mining between two gob areas, mining of high stress areas created by multiple seam interaction, or active mining above or below longwall panels or isolated remnant pillars."

The Criteria 4 in the PIL is very similar which states, "Any other criteria at the **discretion** of the District Manager, including plans that are complex, non-typical, or present unique or novel situations, (e.g. special overmining or undermining situations).

The words unusual (in the Memo) and discretion (in the PIL) are very important when determining if a plan meets the fourth criteria of complex and/or non-typical. When the PIL first came out I discussed criteria 4 (multiple seam interactions) with Joe Cybulski (Tech Support). I explained that the majority of mines in District 4 have multiple seam mining. Mr. Cybulski acknowledged that roof control plans in some districts that would be considered non-typical would be typical in District 4. Furthermore, during a VTC work shop with all districts on September 2012 (focusing on how we handle the evaluation and engineering data for complex and/or non-typical roof control plans), Mr. Cybulski recalled our conversation and he again stated plans considered non-typical by some districts would be considered typical in District 4.

Mr. Cybulski recognized the experience we have in District 4 with multiple seam interactions. I have been in the roof control department since 1999 and I have been analyzing multiple seam interactions since starting in the roof control department. Prior to being employed by MSHA, I worked 19 years in the engineering department for two different coal companies (13 years as Manager of Engineering) and roof control was a large part of my responsibilities.  I am a Registered Professional Engineer and I have a Masters of Engineering Degree in Mining from Virginia Tech.

The first roof control plan for the UBB Mine was approved in 1994. The roof control plan shows 175 ft. of interburden between the UBB mine and the overlying Powellton Seam Mine which is abandoned. Since the majority of the mines in District 4 have multiple seam mining with interburdens of 175 ft. or less, I did not considered this unusual. The Powellton Seam was extensively mined over the UBB mine and during the 10 years I was in the Roof Control Department I was not aware of any problems caused by the overmining.

For these reasons, the UBB plan does not meet the fourth criteria of the Memo to be classified as complex and/or non-typical. Therefore, a pillar stability analysis was not required to be submitted by the company and the plan was not sent to Tech Support for review.

Ms. Patricia W. Silvey
January 7, 2013
Page 3

To support the determination that the overmining in the Powellton Seam did not cause unusual multiple seam interactions at the UBB mine , refer to the following information provided in the Internal Review (IR) report:

Tables 1a and 1b (attachment 4) on page K-4 of the IR report. The pillar stability factors in these two tables are calculated using ALPS without any multiple seam stress included.  Table 1a is a Historical ALPS Analyses of Longwall Mining of Tailgate11 to Headgate 16. Not one of the ALPS tailgate pillar stability factors in table 1a meets the 1.18 required by NIOSH. In table 1b the HG 1N ALPS tailgate pillar stability factor is 0.75, much lower than the 1.18 required. While the ALPS tailgate pillar stability factors in both tables are low, it is not due to multiple seam interactions.

Tables 2a and 2b (attachment 5) on page K-6 of the IR report. The pillar stability factors in these two tables are calculated with multiple seam stress included. These stability factors were calculated using the AMSS . A map showing the "Location of the UBB AMSS Evaluations", page K-9 of the IR report is included as attachment 6. Table 2a is a Historical AMSS Analyses of Longwall Mining of Tailgate 11 to Headgate 16. Seven of the 10 ALPS tailgate pillar stability factors are below the 1.18 required.

The historical data in tables 1a and 2a show tailgate stability factors in the previously mined longwall panels that are substantially below 1.18.

Finally, in table 2b the HG 1N at crosscut 71 the AMSS pillar stability factor is 0.77. A copy of this AMSS analyses by Mike Gauna (Tech Support) is included as attachment 7. AMSS will determine the critical interburden and provide a color code of projected ground conditions (Local Stability). The color code includes:

GREEN: A major interaction is unlikely.

YELLOW: A major interaction should be considered likely unless a pattern of supplemental roof support (cable bolts or equivalent) is installed. Rib instability is also likely.

Red: A major interaction should be considered likely even if a pattern of supplemental roof support is installed. It may be desirable to avoid the area entirely.

On attachment 7, page 2 of 5 of Mr. Gauna's analyses the color code for the Tailgate is "GREEN: A major interaction is unlikely." Page 5 of 5 also shows the color code and critical interburden.

This confirms that the multiple seam interaction was not the problem.

Ms. Patricia W. Silvey
January 7, 2013
Page 4

**Specification 1** (continued)

2. CMS&H Memo No. HQ-08-058-A also required roof control specialist to review operators' ground control analyses to ensure that operators accurately calculated and applied pillar stability factors.

Response:

As soon as it is determined that a plan is complex and/or non-typical, the required information is requested (see page 2/2 of PIL) and then sent to Tech Support. Specialists have not reviewed stability analyses for complex and/or non-typical plans. If the UBB plan had met one of the four criteria as previously discussed, the plan would have been sent to Tech Support for review.

**Specification 1** (continued)

3. Instead, District 4 roof control specialists requested examples of pillar stability analyses from mine operators to demonstrate the operators ability to use the appropriate software.

Response:

This was not in reference to reviewing complex and/or non-typical plans. As previously stated complex and/or non-typical plans are sent to Tech Support for review.

On January 2008, the Coalburg Mine (I.D. # 46-09082) was partial pillaring when a massive pillar collapse occurred. The approved plan required a stability factor of 1.5 in sandstone when partial pillaring. When the collapse was investigated it was determined the stability factor of the remnants was approximately 0.5, much lower than the required 1.5 SF. A D-1 citation was issued for not following the approved roof control plan.

During the depositions, the company representative maintained he did not understand that the 1.5 SF was for the remnants, but rather he thought it was for the active mining zone (AMZ). Thanks to some excellent work by our solicitor, their argument proved not the have any merit and the operator paid a substantial fine.

In order not to allow another operator to make a similar excuse of not understanding what the plan required, if cited for not following the approved plan, we required all the operators to submit pillar stability analyses representing the type of retreat mining in their approved plan.

Ms. Patricia W. Silvey
January 7, 2013
Page 5

**Specification 2**

1. You failed to implement provisions of CMS&H Memo No. HQ-08-059-A. You did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and revisions. The checklists were initially required to be used by roof control department supervisors only. Instructions for all roof control personnel to begin using the checklists were e-mailed to District Managers and Assistant District Managers on January 27, 2009. The e-mail required the use of the checklists during the next plan review. For UBB, this would have been the review of the new base plan submitted by the operator in October 2009.

Response:

Prior to Memo No. HQ-08-059-A being issued, District 4 had developed checklists to be used when reviewing roof control. I was on the committee (formed by Casey Sears) that developed the Arlington checklists. I shared the District 4 checklists with the committee and a large majority of the items in the Arlington checklists came from the District 4 checklists. When the Arlington checklists first came out the supervisor had to complete them and I immediately started using the checklists. The District 4 checklists were updated to include items in the Arlington checklists that were not in the District 4 checklists. The specialists used the updated District 4 checklists when reviewing the roof control plans and supplements. Per your request I have included copies of the District 4 checklists (attachment 8). The District 4 checklists do not have a date, but I was able to locate older checklists that I would estimate were in use at or near the time of the UBB plan review. Note that the "Deep Cut Plans Check Sheet" was completed for I.D. No. 46-09217.

It is my understanding that instructions requiring roof control specialists to use the checklists were e-mailed on January 27, 2009, from a CMS&H headquarters employee to the District Managers and Assistant District Managers. The distribution did not include roof control supervisors or specialists. I do not remember receiving the January 27, 2009 e-mail and at no time was I made aware that I was using the wrong checklists by the District Manager or Assistant District Manager. So, I continued to complete the original checklists. Once I became aware of the new checklists, I immediately required the specialists to complete them.

The IR team concluded on page 151 of the IR report, "District 4 checklists for reviewing roof control plans were adequate to ensure the plans submitted by Performance Coal Company included the required information."

MSHA-0289

Ms. Patricia W. Silvey
January 7, 2013
Page 6

**Specification 2** (continued)

2.  CMS&H Memo No. HQ-08-059-A also required that all documentation (MSHA
    Form 2000-204, checklists, drawings, sketches, etc.) explaining and supporting
    the roof control plan approval and associated 6-month plan reviews be
    maintained as part of the roof control plan file for each mine. However, neither
    the Headquarters nor the District 4 checklists were included in the District 4 plan
    approval records for the review of the October 2009 UBB base roof control plan.

Response:

I did complete the original Headquarters checklists when reviewing the UBB plan. This
would be obvious if you compare the previously approved plan with the plan approved
on December 2009. The IR report confirmed the plan submitted by Performance Coal
Company included the required information as previously stated. However, the
checklists were not included in the file with the approved UBB plan.


Sincerely,

*Donald E. Winston*

Donald E. Winston



Attachments (8):
  Attachment 1 (2 pages) - Procedure Instruction Letter No. I08-V-2
  Attachment 2 (3 pages) - CMS&H Memo No. HQ-08-058-A
  Attachment 3 - Page 144 of the Internal Review report.
  Attachment 4 - Page K-4 of the Internal Review report showing ALPS  Analyses
    (Tables 1a and 1b)
  Attachment 5 - Page K-6 of the Internal Review report showing AMSS Analyses
    (Tables 2a and 2b)
  Attachment 6 - Page K-9 of the Internal Review report (Map showing the location of
    the UBB AMSS evaluations)
  Attachment 7 (5 pages) - AMSS analyses by Mike Gauna of the HG 1N x-cut 71
    shown in Table 2b
  Attachment 8 (12 pages) - District 4 Check Sheets

MSHA-0290



# U.S. Department of Labor
**Mine Safety and Health Administration**
Protecting Miners' Safety and Health Since 1978



**www.msha.gov**           Search MSHA          Advanced Options | A to Z | Help

Find It! in DOL | Compliance Assistance | En Español

Printer Friendly Version

U.S. Department of Labor

Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-
3939



EFFECTIVE DATE: May 29, 2008

EXPIRATION DATE: 03/31/2010

PROCEDURE INSTRUCTION LETTER NO. I08-V-2

FROM:        MARK E. SKILES
             Director for Technical Support

             KEVIN G. STRICKLIN
             Administrator for
             Coal Mine Safety and Health

SUBJECT:   Technical Support Assistance in Reviewing Roof Control Plans

## Scope
This Procedural Instructional Letter (PIL) applies to Coal Mine Safety and Health District Managers, coal mine enforcement personnel and Technical Support (TS) personnel.

## Purpose
The purpose of this PIL is to provide guidance for district personnel on when to send roof control plan and amendments to TS for further review. Roof control plans and amendments meeting certain criteri should be forwarded to TS for additional analysis.

## Procedure Instruction
Roof control plans or amendments for coal mines that meet any of the following criteria should be forwarded to TS:

- Bounce- and bump-prone mines;
- Utilize room and pillar retreat mining at overburden depths of 1000 feet and greater;
- Do not meet or exceed the ARMPS stability Program Information Bulletin (PIB) P08-08, or that do not meet or exceed PIB safety criteria for other computer models used and

Confidential Agency Document
DLB-000017

- Any other criteria at the discretion of the District Manager, including plans that are complex, non-typical, or present unique or novel situations (e.g. special overmining or undermining situations).

Along with the roof control plan or amendment the following information (if available) should be forwarded to TS:

- Mine map (preferably in AutoCAD format) that depicts;
  o Current mine workings;
  o Mining projections for the next 12 months;
  o Reportable roof falls, coal or rock outbursts;
  o Overburden contours at 100 foot intervals;
  o Overmining and undermining (with interburden distance noted);
  o Mine workings in the same seam in adjacent mines;
- Pillar stability analyses such as ARMPS, LAMODEL (including input and plot files) or other numerical modeling conducted by District personnel, the operator or consultant;
- Core hole location and logs;
- Other information upon request by TS; and
- Contact information for the District and the mine operator.

## Background

Recent evaluations of the Roof Control Plan Approval Process have resulted in recommendations to improve the sometimes complex review of roof control plans. One of these recommendations addressed the need to establish guidelines for District personnel concerning the requesting of assistance from TS during the roof control plan review process. The implementation of such guidelines helps to ensure TS involvement in those situations deemed necessary due to the complexity or perceived risk of the proposed roof control plan or amendment. The criteria listed in the PIL were chosen for two reasons. First, ground control hazards associated with room and pillar retreat mining tend to intensify with depth. At overburden depths of 1000 feet and greater, extra precautions such as the use of substantial barrier pillars are needed. Secondly, it is anticipated that operators will increasingly be submitting consultant's reports, computer modeling and other analyses, in-lieu-of or in addition to an ARMPS evaluation to MSHA, to be used as justification for plan approval.

## Authority

The Federal Mine Safety and Health Act of 1977

## Filing Instructions

This PIL should be filed behind the tab marked "Procedure Instruction Letters" in the Coal Mine Safety and Heath General Inspection Procedures Handbook.

## Issuing Office and Contact Persons

Coal Mine Safety and Health, Chief, Safety Division
Stephen Gigliotti, (202) 693-9479
E-mail: Gigliotti.Stephen@dol.gov

Technical Support, Pittsburgh Safety and Health Technology Center
Joseph A. Cybulski, (412) 386-6920
E-mail: Cybulski.Joseph@dol.gov

## Distribution

MSHA Coal Program Policy Manual Holders

Confidential Agency Document
DLB-000918

MSHA-0292

**U.S. Department of Labor**

Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



JUN - 5 2008

CMS&H Memo No. HQ-08-058-A (PRT-75)

MEMORANDUM FOR DISTRICT MANAGERS
ASSISTANT DISTRICT MANAGERS

FROM:            KEVIN G. STRICKLIN
                 Administrator for
                 Coal Mine Safety and Health

SUBJECT:         Approval of Complex and/or Non-typical Roof Control Plans
                 and Amendments

Recent evaluations of the Roof Control Plan Approval Process have produced several
recommendations to improve the quality of resulting plans. The current procedures for
review and approval of roof control plans rely on the specific language of 30 C.F.R.
75.222 and 75.223, which were published as final rules in January of 1988.

All new roof control plans and amendments that are complex and/or non-typical shall
be evaluated to assure that plans provide for adequately designed support systems.

Roof control plans considered complex and/or non-typical meet one or more of the
following criteria: 1) room and pillar retreat mining at overburden depths of 1000 feet
or greater; 2) design criteria that does not meet the stability factors calculated using the
Analysis of Retreat Mining Pillar Stability (ARMPS) Computer Program and
recommended in Program Information Bulletin No. P08-8; 3) mines with a history of
bounces or bumps, regardless of the amount of overburden cover; or 4) other criteria
considered unusual by the District Manager, such as retreat mining between two gob
areas, mining of high stress areas created by multiple seam interaction, or active mining
above or below longwall panels or isolated remnant pillars. For complex and/or non-
typical plans or amendments, the mine operator shall provide the data and engineering
evaluations conducted to support their determination that systems provide safe work
environments for miners.

The mine operator shall submit with any complex and/or non-typical plan proposal the
following:



You can now file your MSHA forms online at www.MSHA.gov. It's easy, It's fast, and it saves you money!

2

a)  A risk assessment specific to the particular mining operation that includes
depth of overburden, coal strength, pillar recovery method, and development
and retreat stability factors. The risk assessment will contain a statement
detailing the basis on which the operator has determined that the plan is
appropriate and suitable to the mining conditions.

b)  Where recommendations are made by consulting engineers, the operator shall
provide the reports upon which the assertion of adequacy depends and direct
the consultants to cooperate fully with the MSHA plan reviewers in verifying
their conclusions.

c)  Data from currently available tools such as ARMPS, ALPS, LAMODEL,
Rocscience, or other applicable software. MSHA may compare the proposed
plan evaluation method against a different evaluation system developed by
third parties.

d)  Where plans are based in any part on empirical information, such as those
utilizing a support system or pillar sizing proven to work under similar mining
conditions (e.g., similar mining depth and roof conditions), information
sufficient to permit field evaluations of the installed systems and verification of
the similarity in mining conditions. This information can be included with the
operator's statement in "a" above that the plan is appropriate and suitable to
the mining conditions.

e)  A detailed and comprehensive review of technical and engineering data
submitted in support of the proposed plan, and an analysis of potential hazards
and other relevant factors.

MSHA shall first establish that the submitted supporting information is adequate, given
the complexity and severity of the mining environment, and request additional
information if needed. The evaluation shall also include previous plan submittals and
approvals, citation history, and roof fall accidents (injury and non-injury). The
assistance of MSHA's Technical Support Roof Control Division shall be sought and
their recommendations considered in all complex and/or non-typical plan approvals
and amendments. A site visit shall also be made by District personnel where
applicable.

MSHA shall not approve the proposed plan or amendment until the operator has
provided the data and evaluation supporting the proposal and a confirming
evaluation(s) has been completed. MSHA shall keep all plan review information as
long as the plan is in effect that explains the rationale behind the approval of
plan/amendment, including the completed appropriate checklist evidencing the review
with signatures, dates and comments.

Confidential Agency Document
DLB-000920

MSHA-0294

3



When and where site mine specific pillar size and pillar stress loading tools have generated reliable design parameters and minimum safety factors, those validated features may be utilized as a basis for plan approvals for mining under the same or less severe conditions.



On June 3, 2008, the Administrator for Coal issued *CMS&H Memo No. HQ-08-055-A*.[54] The purpose of the memo was to strengthen inspection efforts to ascertain the adequacy of roof control plans, and to determine the effectiveness of miner training concerning roof control plans.

On June 5, 2008, the Administrator for Coal issued *CMS&H Memo HQ-08-058-A* which provided guidance for review and approval of complex and non-typical roof control plans and amendments. The Administrator defined complex plans to include those for "mining of high stress areas created by multiple seam interaction, or active mining below longwall panels or isolated remnant pillars." It specified: "MSHA shall not approve the proposed plan or amendment until the operator has provided the data and evaluation supporting the proposal and a confirming evaluation(s) has been completed." In pertinent part, the memorandum required the mine operator to submit the following with any complex or non-typical plan proposal:

- ○ A risk assessment specific to the particular mining operation that includes depth of overburden, coal strength, pillar recovery method and development and retreat stability factors. The risk assessment will contain a statement detailing the basis on which the operator has determined that the plan is appropriate and suitable to the mining conditions.

- ○ Data from currently available tools such as ARMPS [Analysis of Retreat Mining Pillar Stability], ALPS [Analysis of Longwall Pillar Stability], LAMODEL [Stress and Displacement Calculations], Rocscience [software tool for rock and soil], or other applicable software.

- ○ MSHA shall not approve the proposed plan or amendment until the operator has provided the data and evaluation supporting the proposal and a confirming evaluation(s) has been completed.

On June 6, 2008, the Administrator for Coal issued *CMS&H Memo HQ-08-059-A*[55] with 29 pages of attached checklists for aiding MSHA personnel in the review of roof control plans. The form was to be used by inspectors and specialists for reviewing roof control plans and revisions, as well as six-month and quarterly roof control plan reviews. This memorandum also included the following statement: "The regular inspector should conduct six month reviews of the less complex mines in the District with assistance provided by the roof control specialist as needed. The roof control specialist should conduct the six-month reviews of the more complex mines in the District."

Four finalized checklists were released in December 2008. They were sent by a Coal headquarters staff employee to district managers and assistant district managers via electronic mail on January 27, 2009. The correspondence specified that Coal required the use of the checklists during the next plan review. The following is a list of the checklists.

- ○ MSHA Form 2000-226, Roof Control Plan Approval Process
- ○ MSHA Form 2000-227, Roof Control Plan Review Checklist – 6-Month Review
- ○ MSHA Form 2000-228, Roof Control Plan Review Checklist – New Submittal
- ○ MSHA Form 2000-229, Roof Control Plan Review Checklist – Plan Revisions

*Program Information Bulletin No. P09-03*, issued March 16, 2009, provided: "the mining community with general guidelines when utilizing numerical modeling to evaluate ground control aspects of proposed mining plans." The Bulletin discussed the Analysis of Retreat Mining Pillar Stability (ARMPS) computer program, and the Analysis of Longwall Pillar Stability (ALPS) program.

The *Program Policy Manual* provided that each Coal district develop fundamental management system controls, implemented in writing, to properly administer the approval process for all types of plans. This policy listed 20 objectives that these controls should accomplish. Accordingly, District 4 developed a written SOP for each type of plan processed by the District.

---

[54] *CMS&H Memo Nos. HQ-08-055-A* and *HQ-08-058-A* were written in 2008 to address the recommendations of an OIG audit report completed following the Crandall Canyon disaster.

[55] Ibid.

4

**Table 1a - ALPS Analyses; Historical LW Mining Tailgate 11 to Headgate 16**

| Area | Pillar Design - centers, ft | Depth (1), ft | Type Overlying MS Boundary | ALPS(R) SF Active LW Face (HG Loading) | ALPS(R) SF Bleeder Loading | ALPS(R) SF TG Loading | Percent of NIOSH Suggested ALPS(R) TG SF=1.18 for CMRR 61 | Meets Suggested ALPS(R) TG SF | NIOSH AMSS Projected Ground Condition (2) |
|---|---|---|---|---|---|---|---|---|---|
| TG 11 | 100x100 100x100 100x100 | 1020 | N/A | 1.74 | 1.39 | N/A | N/A | Bleeder Exceeds TG Criteria | N/A |
| HG 11 | 90x105 115x105 | 1035 | N/A | 1.84 | 1.24 | 0.91 | 77.1% | No | N/A |
| HG 12 | 90x105 115x105 | 980 | N/A | 1.76 | 1.34 | 0.99 | 83.8% | No | N/A |
| HG 14 | 90x105 115x105 | 970 | N/A | 1.78 | 1.36 | 1.01 | 85.6% | No | N/A |
| HG 15 | 90x105 115x105 | 1020 | N/A | 1.67 | 1.27 | 0.93 | 79.0% | No | N/A |
| HG 16 | 90x105 115x105 | 1115 | N/A | 1.40 | 1.12 | 0.91 | 60.0% | No | N/A |

**Table 1b - ALPS Analyses; Tailgate 1 North & Headgate 1 North**

| Area | Pillar Design - centers, ft | Depth (1), ft | Type Overlying MS Boundary | ALPS(R) SF Active LW Face (HG Loading) | ALPS(R) SF Bleeder Loading | ALPS(R) SF TG Loading | Percent of NIOSH Suggested ALPS(R) TG SF=1.18 for CMRR 61 | Meets Suggested ALPS(R) TG SF | NIOSH AMSS Projected Ground Condition (2) |
|---|---|---|---|---|---|---|---|---|---|
| TG 1N east | 70x100 70x100 70x100 | 1020 | N/A | 1.40 | 1.13 | N/A | N/A | Bleeder Does Not Exceeds TG Criteria | N/A |
| HG 1N | 100x100 100x100 | 1115 | N/A | 1.28 | 1.04 | 0.75 | 63.6% | No | N/A |

SF 0.75 →

Note:  (1) = High Average Depth for gate entries (3 x Max Depth + Min Depth) / 4
(2) = Color code ground condition refers to required roof support (Local Stability requirements)
The Stability Factors (SF) refer to the required pillar design (Global Stability requirements).

## AMSS Analyses

The AMSS evaluates the potential impact from overlying or underlying older workings onto the pillar design being evaluated. The AMSS offers two modes of analysis: a modified ALPS analysis for multiple seam mining conditions and a modified pillar recovery analysis (ARMPS-Analysis of Retreat Mining Pillar Stability) that is adjusted for multiple seam conditions. The multiple seam mining stresses are estimated and added onto the pillar design being studied. In the case for UBB, AMSS adjusts the ALPS analyses to account for these multiple seam stresses from the gob boundaries in the overlying Powellton coal seam and furnishes an evaluation of the Eagle coal seam pillar design. The pillar design assessment is referred to as a global stability assessment. The AMSS also furnishes an estimate of the impact on mine roof and rib conditions

6

**Table 2a – AMSS Analyses; Historical Longwall Mining Tailgate 11 to Headgate 16**

| Area | Pillar Design – centers, ft | Depth (1), ft | Type Overlying MS Boundary | ALPS(R) SF Active LW Face (HG Loading) | ALPS(R) SF Bleeder Loading | ALPS(R) SF TG Loading | Percent of NIOSH Suggested ALPS(R) TG SF=1.18 for CMRR 61 | Meets Suggested ALPS(R) TG SF | NIOSH AMSS Projected Ground Condition (2) |
|---|---|---|---|---|---|---|---|---|---|
| TG 11 Xcut spad 10583 | 100x100 100x100 100x100 | 650 | Gob Solid | 3.11 | 2.76 | N/A | N/A | Bleeder Exceeds TG Criteria | Green |
| TG 11 Xcut spad 10819 | 100x100 100x100 100x100 | 555 | Gob Solid | 2.85 | 2.55 | N/A | N/A | Bleeder Exceeds TG Criteria | Green |
| TG 11 Xcut spad 10880 | 100x100 100x100 100x100 | 685 | Gob Solid | 2.30 | 2.00 | N/A | N/A | Bleeder Exceeds TG Criteria | Green |
| HG 11 Xcut 128 | 90x105 116x105 | 930 | Gob Solid | 1.92 | 1.20 | 0.90 | 83.0% | No | Green |
| HG 11 Xcut 136 | 90x105 115x105 | 935 | Remnant | 1.41 | 1.15 | 0.91 | 77.1% | No | Yellow |
| HG 11 Xcut 146 | 90x105 115x105 | 745 | Gob Solid | 2.07 | 1.71 | 1.35 | 116.3% | Yes | Green |
| HG 12 Xcut 62 | 90x105 115x105 | 650 | Remnant | 1.90 | 1.62 | 1.34 | 113.0% | Yes | Yellow-Almost Green |
| HG 12 Xcut 130 | 90x105 115x105 | 1125 | Gob Solid | 1.38 | 1.00 | 0.74 | 62.7% | No | Yellow-Almost Green |
| HG 14 Xcut 51 | 90x105 116x105 | 960 | Gob Solid | 1.74 | 1.41 | 1.10 | 91.2% | No | Green |
| HG 14 Xcut 62 | 90x105 115x105 | 670 | Gob Solid | 2.37 | 1.97 | 1.60 | 135.4% | Yes | Green |
| HG 14 Xcut 134 | 90x105 115x105 | 980 | Gob Solid | 1.57 | 1.24 | 0.95 | 80.5% | No | Green |
| HG 15 Xcut 63 | 90x105 115x105 | 1065 | Remnant | 1.24 | 0.90 | 0.75 | 63.0% | No | Yellow |
| HG 15 Xcut 18 | 90x105 115x105 | 1070 | Gob Solid | 1.37 | 1.07 | 0.80 | 67.8% | No | Green |

**Table 2b – AMSS Analyses; Tailgate 1 North & Headgate 1 North**

| Area | Pillar Design – centers, ft | Depth (1), ft | Type Overlying MS Boundary | ALPS(R) SF Active LW Face (HG Loading) | ALPS(R) SF Bleeder Loading | ALPS(R) SF TG Loading | Percent of NIOSH Suggested ALPS(R) TG SF=1.18 for CMRR 61 | Meets Suggested ALPS(R) TG SF | NIOSH AMSS Projected Ground Condition (2) |
|---|---|---|---|---|---|---|---|---|---|
| TG 1N Xcut 75 | 70x100 70x100 70x100 70x100 | 725 | Gob Solid | 1.73 | 1.51 | N/A | N/A | Bleeder Exceeds TG Criteria | Green |
| TG 1N Xcut 84 | 94x100 70x100 70x100 70x100 | 635 | Gob Solid | 1.33 | 1.12 | N/A | N/A | Bleeder Does Not Meets TG Criteria | Green |
| TG 1N Xcut 100 | 94x100 70x100 70x100 70x100 | 600 | Gob Solid | 1.58 | 1.36 | N/A | N/A | Bleeder Exceeds TG Criteria | Green |
| HG 1N Xcut 71 | 100x100 100x100 | 1050 | Gob Solid | 1.33 | 1.03 | 0.77 | 65.3% | No | Green |

Note: (1) = Average depth in vicinity of overlying gob/remnant boundary
(2) = Color code ground condition refers to required roof support (Local Stability requirements).
The Stability Factors (SF) refer to the required pillar design (Global Stability requirements).
Green: A major interaction is unlikely.
Yellow: A major interaction should be considered likely unless a pattern of supplemental
roof support (cable bolts or equivalent) is installed. Rib instability is also likely.

S.F. - 0.74 →
S.F. 0.75 →
S.F. 0.77 →

9

Appendix 2
Location of UBB AMSS Evaluations



MSHA-0299

AMSS module build: 1.0.56
Project File: Q:\PGHROOF\Ganna\2010FY\IR-UBB Assistance_2010\Area LW
1N\AMSS Info\AMSS HG 1N Xcut 71 area.AMS
Input Units:  (ft) (psi)

[PROJECT TITLE]
Headgate 1N Xcut 71 area

[PROJECT DESCRIPTION]
Average depth 200 ft inby & outby used.  6 ft Powellton
mining height

[MULTIPLE SEAM PARAMETERS]
Interburden Thickness.........205 (ft)
Previous Mining...............Gob Solid Layout
Vertical Position............Active UNDER Previous
Active Seam Mining Mode........Analysis of Longwall Pillar Stability

[PREVIOUS SEAM PARAMETERS]
Seam Thickness...................,6 (ft)
Width of Gob.........,...............,.......,595 (ft)
Age of Workings.................................10 years

[ACTIVE SEAM PARAMETERS]
CMRR.............,.....................................51

[ALPS DATA]
Entry Height.........................,,.,.............7 (ft)
Depth of Cover...................................1050 (ft)
Panel Width.......................................1024 (ft)
Entry Width..........................,..............21 (ft)
Number of Entries.............,........,.............3
Crosscut Spacing.........,.:.....................100 (ft)
Center to Center Distance #1......................100 (ft)
Center to Center Distance #2......................100 (ft)

[ALPS DEFAULT PARAMETERS]
In Situ Coal Strength............................900 (psi)
Abutment Angle...................................21 (deg)
Unit Weight of Overburden....,.,.....................162 (pcf)


[AMSS Output]

[MULTIPLE SEAM PILLAR STABILITY FACTORS]
Development Stability Factor.....................1.87

MSHA-0300

TAILGATE Loading.................................0.77

Tailgate pillar SF is less than the suggested value of 1.05
The pillar design may be inadequate to prevent a major multiple seam interaction.
Consider increasing the pillar size by changing the entry spacing, the crosscut spacing,
and/or the pillar width.

[PREDICTED CONDITIONS]
Development: GREEN:  A major interaction is unlikely.

Tailgate: GREEN:  A major interaction is unlikely.


[WARNING MESSAGES]

[CALCULATED STRESSES]
Single seam development stress......................1893 (psi)
Multiple seam stress..............................369 (psi)
Total vertical stress (Development)...............2261 (psi)
Tailgate abutment stress..........................2714 (psi)
Total vertical stress (Tailgate Loading)..........4975 (psi)

[SUGGESTED CRITICAL INTERBURDEN AND STRESS]
  Critical Interburden for Development............76 (ft)
  Allowable Total Vertical Stress.................6000 (psi)
If a pattern of supplemental roof support is installed, then:
  Critical Interburden for Development............24 (ft)
  Allowable Total Vertical Stress.................8425 (psi)

  Critical Interburden for Tailgate Loading.......171 (ft)
  Allowable Total Vertical Stress................6000 (psi)
If a pattern of supplemental roof support is installed, then:
  Critical Interburden for Tailgate Loading.......84 (ft)
  Allowable Total Vertical Stress.................8490 (psi)


[ALPS STABILITY FACTORS - STANDARD GEOMETRY]

|  | Classic ALPS | ALPS (R) |
|---|---|---|
| Development Loading............ | 2.24 | 2.24 |
| Headgate Loading............... | 1.51 | 1.51 |
| Bleeder Loading................ | 1.14 | 1.14 |
| *** Tailgate Loading........... | 0.82 | 0.82 |
| Isolated Loading............... | 0.74 | 0.74 |

Confidential Agency Document
DLB-000927

MSHA-0301

[ALPS STABILITY FACTORS - STANDARD GEOMETRY - MULTI SEAM
CONDITIONS]

|  | Classic ALPS MS | ALPS (R) MS |
| --- | --- | --- |
| Development Loading | 1.87 | 1.87 |
| Headgate Loading | 1.33 | 1.33 |
| Bleeder Loading | 1.03 | 1.03 |
| *** Tailgate Loading | 0.77 | 0.77 |
| Isolated Loading | 0.70 | 0.70 |

[ALPS PILLAR LOAD BEARING CAPACITY]

PILLAR #1
   for Pillar Width (ft)...........................................79.0
   and Pillar Length (ft)......,.....................,.................79.0
   Width/Height Ratio...............................................11.29
   Unit Pillar Strength (psi)......................................4233
   Pillar Load Bearing Capacity (lbs) / (ft) of gate entry........3.80E+07

   Unit Pillar Strength (R) (psi).................................4233
   Pillar Load Bearing Capacity (R) (lbs) / (ft) of gate entry....3.80E+07

PILLAR #2
   for Pillar Width (ft)...........................................79.0
   and Pillar Length (ft)..........................................79.0
   Width/Height Ratio...............................................11.29
   Unit Pillar Strength (psi)......................................4233
   Pillar Load Bearing Capacity (lbs) / (ft) of gate entry........3.80E+07

   Unit Pillar Strength (R) (psi).................................4233
   Pillar Load Bearing Capacity (R) (lbs) / (ft) of gate entry....3.80E+07

TOTAL PILLAR SYSTEM LOAD BEARING CAPACITY [ALPS Classic]
   Total Load (lbs) / (ft) of gate entry...........................7.61E+07

TOTAL PILLAR SYSTEM LOAD BEARING CAPACITY [ALPS (R)]
   Total Load (lbs) / (ft) of gate entry...........................7.61E+07

To view the distribution of Unit Pillar Loading
select 'View Plots->Settings->Unit Pillar Loading'
To view the distribution of Load Bearing Capacity
select 'View Plots->Settings->Load Bearing Capacity'

Confidential Agency Document
DLB-000928

[ALPS SINGLE SEAM LOADS ON PILLAR SYSTEM (lbs) / (ft) of gate entry]

    Development Loading................................34,020,000
    Headgate Loading...................................50,507,920
    Bleeder Loading....................................66,995,840
\*\*\* Tailgate Loading...................................92,296,020
    Isolated Loading...................................102,580,000


[ALPS MULTIPLE SEAM LOADS ON PILLAR SYSTEM (lbs) / (ft) of gate entry]

    MS Development Load................................37,332,350
    MS Headgate Load...................................52,992,180
    MS Bleeder Load,...................................68,652,020
\*\*\* MS Tailgate Load...................................92,792,880
    MS Isolated Load...................................102,580,000

ALPS: Actual Pillar Dimensions (width*length, ft). Entries shown from left to right.





## GENERAL SAFETY PRECAUTIONS

1. The ATRS system, maintained in proper working condition, is acceptable roof support during roof-bolting operations provided such supports are placed firmly against the mine roof, and the controls are operated from permanently supported roof before the roof bolt operator(s) precede inby permanently supported roof.

2. Any full-face crossbar type ATRS system must be installed no greater than _____ feet inby the last full row of permanent support.

3. When the ATRS system will not provide adequate support due to excessive height, or if the roof is too low for the ATRS to be used, two rows of temporary supports installed on 4 foot maximum spacing shall be installed and advanced row-by-row as each row of roof bolts are installed. When mining under these conditions, the maximum cut depth shall be limited so as to effectively control the roof and no more than 20 foot deep cuts shall be taken for a total distance not to exceed 40 feet in any entry, room or crosscut before corrective action is taken to provide an acceptable ATRS system to accommodate this condition. Where temporary supports are used under the conditions described above, a certified canopy shall be provided in accordance with MSHA regulations.

4. Where loose material is being taken down, a minimum of two temporary supports on centers of not to exceed 5 feet shall be installed between the miner and the material, unless such work can be accomplished from an area supported adequately by permanent supports.

5. All posts (except breaker posts), shall be installed with a wooden cap block, plank or crossbar between the post and the mine roof.

6. All openings that create an intersection, including headings, shall be supported with a minimum of two full rows of roof bolts or two rows of timbers across the mouth of the openings prior to any work or travel into the intersection. This shall include starting an additional opening or holing through into an intersection. This does not prevent passing by the opening to conduct the required pre-shift and/or on-shift examinations.

7. When adverse roof conditions are encountered such as horsebacks, slickensided slip formations, clay veins, kettle bottoms, surface cracks, mud seams or a similar type of adverse roof condition is found to exist in the mine roof, supplemental roof supports shall be installed in addition to the primary support, as appropriate in the affected area, to adequately support the roof.

8. When underground workings approach and/or mining is done within 150 feet of the outcrop or highwall, roof bolts shall not be used as the sole means of roof support. Roadway width shall be limited to 16 feet or less and at least a 3" X 8" header or equivalent shall be installed in each row of roof bolts.

9. Where roof bolts are being installed, in an area where roof failure is indicated, at least two rows of temporary supports on not more than (5) five foot centers shall be installed across the opening so that the work in progress is done between the installed temporary supports and permanent supports installed in sound roof. The distance between the permanent supports and the nearest temporary supports shall not exceed (5) five feet. Where damaged roof bolts are being replaced in isolated instances without the use of an ATRS system, a minimum of (2) two temporary supports shall be installed in a manner that will best protect the miners replacing the supports.

10. Where overhead crossbars, beams, or similar roof supports, are installed along haulage roadways they shall be provided with a means to prevent the support from falling in the event the supporting legs become dislodged.

11. When the continuous miner is being trammed anywhere in the mine, other than when cutting or loading coal, no person shall be allowed along either side of the continuous mining machine.



12. Supplemental roof support materials, tools and equipment necessary to install such material shall be available at a readily accessible location on each working section and this material shall be maintained at a location no greater than four (4) crosscuts from the working faces. These materials shall consist of no less, but not limited to, 20 roof bolts one (1) foot longer than being used on the working section; 40 wedges or gluts; 20 posts; 20 cap blocks; enough crib blocks to construct one (1) crib; one (1) bow saw with spare blade; one (1) axe or a 16 ounce hammer; one (1) ten ton lifting jack with suitable bar; one (1) slate bar of suitable length to safely scale the mine roof. When deep cut mining is being performed roof support materials listed above will be doubled.

13. All unstable material shall be removed from the highwall above intended mine openings and areas between openings where miners travel or are required to perform work. A substantially constructed canopy (minimum 6", 8", or 12" H-beams), or of reinforced concrete, shall be provided at all intended drift or slope openings before penetrating the coal seam. Canopies shall also be installed at any other drift or slope openings prior to being used by workers to enter or exit the mine. The canopy shall extend from the highwall for a distance which will provide for adequate protection from falling highwall material.

14. Before any entry or crosscut is holed through, an examination shall be made to ensure that the adjacent entry or crosscut is clear of persons and equipment. 

15. Where damaged roof bolts are being replaced or additional support is being installed, in isolated instances without the use of an ATRS system, a minimum of (2) two temporary supports shall be installed in a manner that will best protect the miners performing work.

16. In the event of a continuous mining machine malfunction or breakdown that requires anyone to go inby permanent roof support to correct the condition; the unsupported area, where practical, will be supported with roof bolts and the remaining unsupported roof in the working place supported with temporary supports set on (4) four foot centers lengthwise and crosswise at least two rows inby the deepest point needing to be accessed. If cribs are necessary, temporary roof support shall be installed in the area first. Temporary roof support will be removed only by remote means. All work shall be performed under the direct supervision of a certified foreman. 

17. At any time the continuous mining machine is being operated using a remote control unit, the unit shall be equipped with an emergency stop switch or panic bar that will de-energize the continuous mining machine quickly in the event of an emergency. The emergency stop switch or panic bar shall be prominent, readily accessible, and shall trip the circuit breaker at the electrical distribution center.



18. The pump motor of the continuous mining machine shall be de-energized during loading or unloading of the trailing cable that supplies electrical power to the continuous mining machine.

19. The continuous mining machine operator and helper shall wear readily visible reflective outer clothing to be seen from all directions.

20. When the remote systems are being transported or stored in the mine, they shall be secured and/or de-energized. Only one remote control system using the same frequency may be used on the same section at any one time.

21. A row of bolts is to be installed within ___ inches of the rib when continuous miners are used before the first cut is made in a crosscut.

*Note: the following only applies when the condition exists*

- When mining within the safety zone of a potential impoundment water body, the additional roof control precautions outlined in the approved plan under 30 CFR 75.1716 shall be complied with at all times.

*Note: all of the following must be in either the general safety precautions, or the retreat mining precautions, or preferably somewhere near beginning of the plan.......*
*(ARMPS calculations must also be provided with the plan)*

- An ARMPS pillar stability factor of _____, as recommended in guidance PIB No. P08-08, shall be maintained during all phases of development mining.

## SAFETY PRECAUTIONS FOR ALL RESIN-GROUTED ROOF BOLTS

The use of resin-grouted rods is approved for roof support at this mine provided the following criteria are complied with:

The relationship between hole dimension, bolt size, and the size and number of resin cartridges is critical to good performance; therefore, resin-grouted rods shall be installed in accordance with manufacturer's recommendations. Such recommendations shall not be in conflict with the following requirements.

1. All resin bolts shall be installed with approved bearing plates installed and maintained firmly against the mine roof and roof bolting machine operators shall wear adequate eye protection while installing the bolts.

2. Resin packages shall be stored in accordance with the manufacturer's recommendations and shall not be used if the manufacturer's recommended shelf life is exceeded. Broken or deteriorated cartridges shall not be permitted to accumulate in the mine.

3. The different types or makes of resin shall not be intermixed.

4. Test holes are not required for resin-grouted rods.

5. All fully grouted non-tensioned roof bolts shall be 100% fully grouted. If a return of resin grout cannot be observed by the roof bolting crew, one roof bolt without a plate shall be installed to allow the passage of a device that can touch the resin grout in the drilled hole to determine the amount the resin bolt has been grouted. If not 100% fully grouted, additional resin shall be added during the normal bolting cycle to accomplish a fully grouted installation. This test need only be conducted in each working place where a visible resin grout return cannot be observed and corrective measures apply only to the working places where the condition exists.

Confidential Agency Document
DLB-000935

## RETREAT MINING PRECAUTIONS

1. Prior to retreat mining, supplemental support will be installed in each intersection. The minimum support will be _____. Such supplemental support may be installed during development.

2. A visible mark must be placed on the continuous miner to indicate the depth of cut. The cut depth cannot exceed one-half the width of the pillar being mined when mining twin lifts (christmas tree pillaring).

3. The coal ribs shall be clearly marked by a certified foreman to indicate the minimum size of the stump not to be mined.

4. Prior to retreat mining, a mandatory test hole (a minimum depth of (2) two feet longer than the primary support installed) shall be drilled in each intersection to determine any separation in the strata. If the test holes are drilled during development they must be left open for examination. Such test holes shall be examined by a certified foreman prior to beginning second mining in the pillar(s) immediately inby. The examiner shall place his dates/times/initials at the test hole upon completion of the examination. If any separations are detected, additional support such as longer bolts anchored above the separation, timbers, cribs, or crossbars shall be installed prior to retreat mining.

5. During retreat mining, a certified person knowledgeable in the retreat mining method being used shall be present on the working section during coal extraction.

6. During pillar recovery, no person except haulage equipment operators shall be inby the continuous mining machine operator while coal is being mined. In addition, all work or travel in the intersection immediately outby the pillar being mined shall be limited to those employees necessary to mine the coal and/or install supports. All personnel must be positioned outby the active intersection during the push-out.

7. A copy of the current approved roof control plan, including any supplements, shall be maintained on the section.

√ 8. A minimum of one full row of un-mined pillars shall be left if the angle of retreat changes to the extent that pillars would not be uniform in size or that second mining of the pillars would result in an uneven pillar line or pillars that project inby the break-line. A pillar plan is only valid for mining pillars in the sequence shown on page no. ____ of the roof control plan. If panel configurations differ, such that the sequence in this Drawing is no longer applicable, then an addendum shall be submitted and approved prior to mining that panel.

9. Prior to any retreat mining, all persons engaged in retreat mining (including new crew members) shall be trained in the provisions of the approved roof control plan relative to retreat mining. Such training shall be documented on a 5000-23 form. Training shall be conducted before retreating of a new panel begins.

√ 10. MSHA will be notified in writing one week before the start of pillaring operations in each panel; and also one week before completion of retreat mining in that panel.



11. Dimensions of production and barrier pillars shall be sized as shown on page no. ____ of the roof control plan. The dimensions of these pillars shall be designed to provide a minimum stability factor of ____ as recommended in guidance PIB No. P08-08 and calculated with the Analysis of Retreat Mining Stability (ARMPS) program or other applicable software, taking into consideration any side gobs that are present.

12. Pillar extraction shall be done in a sequence as illustrated on page no. ____ of the roof control plan. The sequence is indicated by numbers which correspond to individual pillar lifts.

13. Immediately after each lift, roof supports will be installed as indicated on page no. ____ of the roof control plan. Under no circumstances shall anyone travel inby installed breaker posts.

14. Roof evaluations shall be made at the 1st and the 2nd rows of pillars outby the line of pillars being mined. During these evaluations the roof shall be examined for deteriorating conditions and additional stress resulting from abutment loading. If adverse roof is detected, supplemental roof support shall be installed before mining adjacent pillars.

15. A roof evaluation shall be made before pillaring a previously mined section that wasn't developed with the intent to perform retreat mining. The section will be evaluated for pillar sizes, primary and supplemental roof supports, and roof conditions so that an adequate retreat mining plan can be developed.

16. Management shall show the sequence of recovering pillars on an up to date mine map.



## SAFETY PRECAUTIONS FOR MOBILE ROOF SUPPORTS

1. All section personnel shall be trained in the pillar recovery methods utilizing mobile roof supports (MRS). Only persons who have received the proper task training are permitted to operate an MRS.

2. All personnel shall be positioned clear of all pinch points when the Mobile Roof Supports (MRS) are being trammed. Under no circumstances shall anyone be permitted beside or within the turning radius of the Mobile Roof Supports when the units are being moved.

3. Onboard manually operated controls or manual overrides shall be "locked out" or under a bolted-down cover plate to restrict their usage. These controls are for maintenance and troubleshooting purposes only. If the unit is set against the mine roof, adequate temporary roof support shall be installed prior to lowering the unit manually.

4. The MRS units are equipped with umbilical cords that allow remote tramming. This is not considered a manual operation.

5. Maintenance should be performed in areas where permanent roof supports are maintained outby the active pillaring area. If it is necessary to perform maintenance on a disabled MRS on an active pillar line, temporary supports shall be installed to adequately support the roof in the work area. In outby areas, temporary roof supports will be set before pressurizing or depressurizing an MRS unit manually.

6. MRS units used in-lieu-of breaker and/or radius turn posts during mining of pillars will be positioned for each cut as indicated on the attached drawing(s). The positions of the MRS units will be sequenced with the pillar lift as the lifts are mined. Some variation in the location of the MRS units may exist due to roof conditions present during pillar recovery. However, MRS units should be kept as close as practical to the continuous mining machine during each lift.

7. While in the active pillaring area, the MRS units shall be operated in pairs, using the radio remote control. When moving from pillar lift to pillar lift, each MRS shall be advanced sequentially so that one unit will never be offset more than one half the length of its companion unit. At least one unit shall be pressurized against the roof at all times, and never shall more than one unit at a time be lowered and moved when the units are in the active pillaring area.

8. When setting and lowering the MRS unit, the operator shall be positioned in a safe location at least 25 feet away from the unit and outby the active intersection created by the pillar lift(s). All other personnel shall be located outby the MRS operator during these processes and any time the units are moved between lifts. Personnel will not be allowed to congregate in the area (last open crosscut and inby) when the MRS units are being raised, set, lowered, or cycled.

MSHA-0312

9. No person shall go inby the outby corner of the pillar lift/split, or to within 25 feet of an MRS unit, whichever is greater to retrieve cable hangers. MRS cables will be hung with break-away cable hangers in order that the cable can be pulled down from a remote location outby the pillar lift/split or a minimum of 25 feet from the MRS unit, whichever is greater.

10. MRS trailing cables shall not be stored on the units in an active pillar line.

11. While pillaring, MRS pressure gages or load indicating lights shall be used to monitor roof loading. Pressure gages or load indicating lights should first be observed to ensure that the MRS units have been properly set against the mine roof. These gages shall be large enough to allow observation of the pressure readings from a safe distance.

12. Pressure gages or load indicating lights are to be continually observed to determine if pillaring operations need to be stopped in a specific lift. Pillaring operations shall cease when the MRS yield pressure is reached; (mining shall cease in that cut/lift and the mobile roof supports will be moved/ set-up for the next cut/lift). The mobile roof supports have a yield pressure of _____ psi. If neither the pressure gages nor the load indicating lights are operational, then pillaring shall cease immediately until repairs are made.

13. Upon completion of mining in a given pillar, all the MRS units shall be moved sequentially until they are between solid coal pillars. The MRS operator shall be positioned at a remote location outby the active pillaring area intersection during this move. Once the units are between solid coal pillars, the umbilical remote may be used for tramming to the next set-up location.

14. Immediately upon the completion of mining a block, the approaches to the gob will be supported according to the approved roof control plan.

15. When using four MRS units, if one of the units positioned inby the continuous miner becomes inoperative, one of the two (2) MRS units positioned on the outby end of the pillar will be moved inby the continuous miner to provide two (2) MRS units between the continuous miner and the gob area. The remaining MRS unit on the outby side of the pillar will be re-positioned to act as a breaker at a location adjacent to the intersection as indicated in the drawing(s). At this location, a minimum of eight (8) posts or two (2) cribs will be utilized in place of the removed outby unit. The block of coal being mined may be completed in this manner, after which all four units must be operational before mining the next pillar.

16. When utilizing the plan for two (2) MRS units, when one becomes inoperative, mining shall be discontinued until it is made operative, or support procedures shall revert to an approved timber plan.

Confidential Agency Document
DLB-000939

17. Breaker posts may be pushed out with the MRS units to allow positioning when mining is started on a block. However, before dislodging posts with one MRS unit, its companion unit must be pressurized against the roof.

18. When parking the MRS units for an extended period of time, they should be positioned between solid coal pillars outby the active pillaring area. The units shall remain in contact with the roof to prevent dynamic loading in the event of a roof fall. However, just enough set force to contact the roof should be used. The radio remote control units should be stored in a safe area away from the machines.

19. Mined heights in excess of the working range of MRS units shall be anticipated and addressed using OEM extensions. However, in isolated (unanticipated) cases, when the MRS units cannot be set firmly against the roof, extensions meeting the following criteria may be used to increase the reach of the MRS units:

   a)   The extensions shall not exceed 18 inches in height, and shall be constructed from a single layer of wood blocks, placed skin-to-skin.

   b)   The wood blocks shall either be hickory, white oak or red oak and shall be replaced when damaged.



   c)   The wood blocks shall be restrained by channel or angle iron tack-welded to three sides of the MRS roof contact plate, and held in place by chains, straps, or other equivalent means.

Wood extensions as a means of extending the reach of the MRS unit shall only be used for a maximum of three rows of pillars, then a manufacturer approved extension must be used.

Confidential Agency Document
DEB-000940

92.17

# Deep Cut Plans Check Sheet

Deep cut plans must be approved for evaluation purposes, and an on-site review conducted, before they can be recommended for final approval.  The following precautions or statements outlined below must be on either the same page as the drawing or on another page which refers to the drawing showing the deep cut.

1. Continuous miner runs are made on alternate sides until the face has been advanced a maximum distance of _____ feet inby the last full row of permanent roof supports. Should any roof bolts be rendered ineffective; the depth of penetration will be measured from the last full row of undisturbed roof bolts.  The continuous miner may be used to push coal into the adjacent entry to permit bolting from that side.

2. Under no circumstances shall any person proceed beyond the next to last full row of permanent roof supports, except to install temporary or permanent supports.

3. No person shall be inby the continuous miner operator's work position while the continuous miner is operating.  This does not include haulage equipment operators.

4. An approved ATRS system will be maintained and used during bolting operations.

5. Reflective materials (two or more) will be used to indicate the location of the next to the last full row of permanent roof supports. The reflective material shall be round or arranged in such a position that it is visible from all directions.  In elevated heights, the reflective material shall be positioned at or near eye level and will be a minimum of four inches in length.

6. A conspicuous reference mark on the continuous mining machine, or some other visual means, shall be provided for the continuous miner operator to determine when the maximum depth of cut is attained.

7. When adverse roof conditions are encountered the depth of cut shall be limited to 20 feet or less until roof conditions have improved to a point where extended cuts may be safely resumed.

8. Where the face has been advanced beyond the inby corner of a projected crosscut, a minimum of 10 feet of roof shall be supported inby the projected inby rib line prior to starting the crosscut.  If the face has not been advanced a sufficient distance to allow the installation of 10 feet of permanent roof support, the unsupported area will be supported by the installation of roof bolts on required centers to within four (4) feet of the face.  The working face may be advanced no more than 50 feet inby the proposed inby corner of the crosscut rib line before the crosscut is completed.

9. The first cut when turning a crosscut will be limited to a maximum of 24 feet in depth from the last full row of roof bolts.

Confidential Agency Document
DLB-000941

10. When the average of five (5) or more dust samples obtained by the operator or MSHA in the same bi-monthly sampling period exceeds the applicable standard:

- The operator shall revert back to the twenty foot cut plan specified in the approved roof control plan

- The operator shall achieve compliance on both Operator Bimonthly and MSHA survey samples before extended cut operations can resume

12. No deep cut shall be left unsupported for more than a 24 hour period.

13. At no time will two unsupported openings adjacent to the same intersection be permitted.

14. Extended cuts will not be taken when mining within 150 feet of the outcrop.

15. A minimum of six (6) bolts must be installed in the last full row of bolts prior to mining a deep cut.

16. Corners may be rounded off, as shown, provided that additional roof bolts are installed to within 4 feet of the rib. Only one corner may be rounded off in each intersection except two outby corners may be rounded off in one intersection in one entry only.

17. Lengthwise spacing of bolts shall not exceed 4 feet. Crosswise spacing of bolts shall not exceed 5 feet and a minimum of 4 bolts per row shall be maintained. Bolts shall not exceed 4 feet from the rib on installation.

18. This plan is a supplement to the approved Roof Control Plan. This plan will be covered in annual refresher training, and shall be covered with all affected employees before beginning extended cuts.

19. This drawing applies to MMU's _____ and _____only.

20. All deep cuts shall be bolted with a dual head roof bolt machine with an ATRS. Single head roof bolt machines are not allowed to bolt deep cuts.

---

*Note: The following sentence needs to be added to the general safety precaution which refers to the list of supplemental roof support kept outby the section............*
- When deep cut mining is being performed supplemental roof support materials outlined here will be doubled.

---

*Also: Check that page 1 lists "Deep Cut" under "Type(s) of Roof Control Plan(s)"*

Confidential Agency Document
DLB-000942

**Kramer, Donna L - OASAM HRC**

| | |
|---|---|
| **From:** | Silvey, Patricia - MSHA |
| **Sent:** | Thursday, January 17, 2013 9:52 PM |
| **To:** | Kramer, Donna L - OASAM HRC |
| **Cc:** | Molina, Monique V - MSHA |
| **Subject:** | FW: December 15, 2012 memorandum |

FYI

**From:** Selfe, Lincoln L - MSHA
**Sent:** Thursday, January 17, 2013 3:48 PM
**To:** Silvey, Patricia - MSHA
**Cc:** Carpenter, Charles E - MSHA
**Subject:** December 15, 2012 memorandum

Good Afternoon Ms Silvey,

Tomorrow is the deadline for my responses to you concerning the memorandum I was given in December 15, 2012 by Ernest Cameron. I hope I have provided adequate mitigating information and clarified the issues from the Internal Review Team. I am still very upset with these allegations and how they have been misinterpreted and singled me out for a disciplinary action when the team actually identified the issues as nationwide issues, not specific to me and CMS&H District 4. One thing I failed to include in my response is that I am a Certified Mine Safety Professional and have been recognized as a Professional Member of the International Society of Mine Safety Professionals. I have strived to be a mentor and set an example for MSHA in every assignment that I have performed in my 30 year career. I hope this has stood out to you from my past work experiences, performance appraisals, and the various duties I have performed for MSHA. I also want to thank you for the face to face meeting December 18th at the academy and giving me the opportunity to discuss the issues in person. If you need any clarifications or have other questions that will assist you in making the right decision, please do not hesitate to contact me.

Thank you,
Link Selfe

MSHA-0317

**U.S. Department of Labor**       Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



DEC 0 4 2012

MEMORANDUM FOR  CHARLES J. THOMAS
Deputy Administrator
Coal Mine Safety and Health

FROM:                    ERNEST A. CAMERON
Director of Administration and Management

SUBJECT:              Notice of Proposed Seven (7) Day Suspension

This is a notice of a proposal to suspend you from duty and pay for seven (7) calendar
days from your position of Deputy Administrator, ES-1822, Coal Mine Safety and Health
(CMS&H). This action is being proposed to promote the efficiency of the service and is
issued in accordance with Title 5, Code of Federal Regulations, Part 752, and
Departmental Personnel Regulations (DPR) 752.

It is important to note that at the time you failed to carry out your official duties you were
detailed to the Deputy Administrator position. As such, this proposed action is based
upon your position of acting Deputy Administrator during the time period addressed by
this proposed action.

On April 5, 2010, an explosion occurred at the Upper Big Branch Mine (UBB) killing 29
miners and injuring 2. As is MSHA's usual practice, the Assistant Secretary directed
staff to conduct an Internal Review (IR) of the Agency's performance before the
explosion. The reason and specifications in this proposal are derived from issues
identified in the Internal Review report.

**Reason: Failure to Carry out Your Official Duties**

You did not provide appropriate leadership and management oversight necessary to
ensure proper and consistent implementation of the Federal Mine Safety and Health Act
of 1977 (Mine Act) as amended by the Mine Improvement and New Emergency
Response Act of 2006 (MINER Act), implementing standards and regulations, and
MSHA policies and procedures by District 4 personnel under your supervision, as
evidenced by the specifications listed below. Proper management oversight was
particularly important considering the numerous challenges faced by District 4. The
deficiencies that existed in District 4, taken together, should have alerted you that you
had a problem in this District and with UBB.

Confidential Agency Document
DLB-000944                                              MSHA0001

**Specification 1**

One of the key responsibilities of your position is to evaluate the results of policy implementation in the field to ensure that Agency objectives are achieved. However, you did not provide adequate management oversight to ensure that District 4 personnel reviewed potentially flagrant violations in accordance with the procedures established by Procedure Instruction Letter (PIL) No. I08-III-02.

During the Internal Review period, 7% of the 137 potentially flagrant violations cited by inspectors in District 4 were reviewed as required by PIL No. I08-III-02. This reflects a lack of management oversight on your part in ensuring effective implementation of an important provision of the MINER Act. This is particularly important since the flagrant violation was a new enforcement tool in the MINER Act.

**Specification 2**

Another one of your key responsibilities is to ensure criteria and methods for ensuring compliance with safety and health standards are properly and uniformly applied by all Coal Mine Safety and Health (CMS&H) Districts. Critical standards that field staff must enforce deal with the review and approval of certain mine plans. The IR identified several instances where District 4 management failed to follow CMS&H policies and procedures applicable to the plan approval process.

- District 4 management did not follow the provisions of CMS&H Memo No. HQ-08-058-A when approving the UBB roof control plan. The Administrator for CMS&H issued this memorandum to provide guidance for review and approval of complex and non-typical roof control plans and amendments following the August 2007 fatal coal outbursts at the Crandall Canyon mine.

- District 4 management did not implement the checklists specified by CMS&H Memo HQ-08-059-A when reviewing roof control plans and revisions. Instead, the roof control department continued to use its own checklists.

- District 4 management did not revise the roof control plan approval SOP to comply with the *Program Policy Manual* as recommended by the Office of Inspector General in its 2008 Audit report.

- District 4 management did not follow national guidance outlined in Procedure Instruction Letter No. I09-V-03, which specified that separate ventilation and dust control plans were to be consolidated into a single mine ventilation plan subject to a single review date.

These failures on the part of District 4 show a lack of management oversight on your part.

Failing to carry out your official duties is one of the most serious infractions that can be committed. You were assigned direct responsibility for all CMS&H districts. District

3

managers, assistant district managers, and field office supervisors were in your management chain.

Deputy Administrator for CMS&H is a very prominent position. You are recognized by the public, mine operators, miners, representatives of miners, and MSHA personnel as having an in-depth knowledge of the Mine Act, MINER Act, implementing standards and regulations, and MSHA policies and procedures.

You were on notice of Agency policies and procedures. In your position as the Director, Office of Accountability, you determined compliance with MSHA policies and procedures. Yet, as acting Deputy Administrator, you did not take corrective action when your subordinate managers were not carrying out their official duties in an effective manner.

I have considered your performance rating for FY 2009 of 'Exemplary' and your FY 2010 and FY 2011 ratings of 'Highly Effective,' your approximate 21 years of federal service at the time these infractions occurred, and the lack of any prior disciplinary action. I believe this proposed seven (7) calendar day suspension will promote the efficiency of the Federal service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and/or other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reason and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

<div style="text-align:center">

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 23rd Floor
Arlington, VA 22209

</div>

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

Confidential Agency Document
DLB-000946

MSHA0003

4

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

I request that you sign and date this memorandum as evidence that you received it. Your signature does not mean you agree with the contents of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

CHARLES J. THOMAS          12/04/2012

**PRINT NAME**          **SIGNATURE**          **DATE**

Confidential Agency Document
DLB-000947          MSHA0004

**U.S. Department of Labor**     Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



DEC 0 5 2012

MEMORANDUM FOR DONALD WINSTON
    Supervisory Mine Safety and Health Specialist

FROM:         ERNEST A. CAMERON
              Director of Administration and Management

SUBJECT:      Notice of Proposed Seven (7) Day Suspension

This is a notice of a proposal to suspend you from duty and pay for seven (7) calendar days from your position of Supervisory Coal Mine Safety and Health Specialist, GS–1822–13, in the Mount Hope, WV, District 4 Office. This action is being proposed to promote the efficiency of the service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752.

On April 5, 2010, an explosion occurred at the Upper Big Branch Mine (UBB) killing 29 miners and injuring 2. As is MSHA's usual practice, the Assistant Secretary directed staff to conduct an Internal Review (IR) of the Agency's performance before the explosion. The reason and specifications in this proposal are derived from issues identified in the Internal Review report.

**Reason: Failure to Carry out Your Official Duties**

**Specification 1**

Following the August 2007 fatal coal outbursts at the Crandall Canyon mine, the Administrator for Coal Mine Safety and Health issued CMS&H Memo No. HQ-08-058-A which provided guidance for review and approval of complex and non-typical roof control plans and amendments.

You failed to follow CMS&H Memo No. HQ-08-058-A when you recommended that the District 4 Manager approve the base roof control plan submitted in October 2009 for UBB, without requiring Performance Coal Company to submit a risk assessment specific to the particular mining operation, including the data and evaluation supporting the proposed roof control plan. In particular, Performance Coal did not provide information, such as a pillar stability analysis, detailing the basis on which it determined the plan to be appropriate and suitable for UBB.

CMS&H Memo No. HQ-08-058-A also required roof control specialists to review operators' ground control analyses to ensure that operators accurately calculated and

Confidential Agency Document
DLB-000948

MSHA0005

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

2

applied pillar stability factors. Instead, District 4 roof control specialists requested examples of pillar stability analyses from mine operators to demonstrate the operators' ability to use the appropriate software.

**Specification 2**

You failed to implement provisions of CMS&H Memo No. HQ-08-059-A. You did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and revisions. The checklists were initially required to be used by roof control department supervisors only. Instructions for all roof control personnel to begin using the checklists were e-mailed to District Managers and Assistant District Managers on January 27, 2009. The e-mail required the use of the checklists during the next plan review. For UBB, this would have been the review of the new base plan submitted by the operator in October 2009.

District 4 had developed its own checklists and other documents for guidance when reviewing initial roof control plans and supplements. While the District 4 Standard Operating Procedures for plan reviews did not require the District checklists to be used, the plan reviewers stated they used the District checklists to assist in completing roof control plan reviews. The District 4 checklists were not the same as those required by CMS&H Memo No. HQ-08-059-A.

CMS&H Memo No. HQ-08-059-A also required that all documentation (MSHA Form 2000-204, checklists, drawings, sketches, etc.) explaining and supporting the roof control plan approval and associated 6-month plan reviews be maintained as part of the roof control plan file for each mine. However, neither the Headquarters nor the District 4 checklists were included in the District 4 plan approval records for the review of the October 2009 UBB base roof control plan.

In reaching my decision to propose a seven (7) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. You were and still are assigned to review the work of technical specialists under your supervision. If you are unable to properly apply MSHA policies and procedures in overseeing the review of roof control plans, specialists may not know when they violate Agency policy and need to correct their actions.

Supervisory CMS&H Specialist is a prominent position. You are recognized by mine operators, miners, representatives of miners, and MSHA personnel as having in-depth knowledge of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006, implementing standards and regulations, and MSHA policies and procedures. In your position as Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates and for ensuring that Agency policies and procedures are followed. You were able to correctly recite Agency policies and procedures to the IR team when questioned on such matters.

Confidential Agency Document
DLB-000949

MSHA0006

3

I have considered your 'Highly Effective' performance ratings for FY 2009, FY 2010, and FY 2011, the lack of any prior disciplinary action, and your approximate 17 years federal service at the time these infractions occurred.  I believe this proposed seven (7) calendar day suspension will promote the efficiency of the Federal service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and/or other documentary evidence in support of your reply.  Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal.  Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration.  Any written reply you make in response to the reason and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

<div style="text-align:center">

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 23rd Floor
Arlington, VA  22209

</div>

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative.  You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

You are requested to sign and date this memorandum as evidence that you received it.  Your signature does not mean you agree with the contents of this memorandum.  However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

_Donald Winston_     _Donald Winston_          _12/5/12_
**PRINT NAME**              **SIGNATURE**                    **DATE**

Confidential Agency Document
DLB-000950

MSHA0007

**U.S. Department of Labor**   Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



DEC 05 2012

MEMORANDUM FOR THOMAS V. MOORE, SR.
Supervisory Coal Mine Safety and Health Inspector

FROM:       ERNEST A. CAMERON
Director of Administration and Management

SUBJECT:       Notice of Proposed Five (5) Day Suspension

This is a notice of a proposal to suspend you from duty and pay for five (5) calendar days
from your position of Supervisory Coal Mine Safety and Health Inspector, GS–1822–13,
in the Mount Hope, WV, Field Office. This action is being proposed to promote the
efficiency of the service and is issued in accordance with Title 5, Code of Federal
Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752.

On April 5, 2010, an explosion occurred at the Upper Big Branch Mine (UBB) killing 29
miners and injuring 2. As is MSHA's usual practice, the Assistant Secretary directed
staff to conduct an Internal Review (IR) of the Agency's performance before the
explosion. The reason and specifications in this proposal are derived from issues
identified in the Internal Review report.

**Reason: Failure to Carry out Your Official Duties**

**Specification 1**

Page 19 of the UBB base roof control plan approved by the District 4 Manager on
December 23, 2009, required the tailgate travelway of initial longwall panels to have
supplemental support in the form of two rows of 8-foot long cable bolts or two rows of
posts on 4-foot centers installed in the middle of the entry between primary supports.
This supplemental support was required to be maintained 1,000 feet outby the longwall
face at all times. The MSHA Accident Investigation team found there was only one row
of supplemental support in the tailgate travelway as opposed to the two rows required in
the approved roof control plan.

On January 28, 2010, you documented that you reviewed the Uniform Mine File (UMF)
prior to accompanying an inspector who was conducting a section 103(i) spot inspection
at UBB. The date stamp on the approval letter indicates that the approved roof control
plan was filed in the UMF on January 20, 2010.

Confidential Agency Document
DLB-000951

MSHA0008

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves

2

On March 9, 2010, you inspected the tailgate of the 1 North Longwall at UBB with ventilation specialist Keith Sigmon. You and Mr. Sigmon identified a serious violation of the ventilation plan and issued an order for that condition. However, neither you nor Mr. Sigmon identified the violation of the approved roof control plan. When interviewed by the Internal Review team you stated that you could not recall if posts or cable bolts were installed in the tailgate entry.

Your failure to conduct an adequate review of the Uniform Mine File does not adhere to established MSHA procedures, interferes with the mission of the Agency, and fails to promote the efficiency of the service. It demonstrates a failure to carry out your official duties and mission critical tasks to which you have been assigned.

**Specification 2**

On January 12, 2010, Coal Mine Safety and Health (CMS&H) Inspector and Authorized Representative (AR) Perry Brown allowed Right of Entry (ROE) trainee Sabian Vandyke to travel alone to "3 unit" of UBB to determine if a violation involving the lifeline had been abated.

Inspector Brown recorded this information on page 10 of MSHA Form 7000-10K dated January 12, 2010. He wrote: "Scott Vandyke went to 3 unit & checked the lifeline. citation # 8090251 is terminated. Wrote out termination and drove back to Mt. Hope."

On January 20, 2010, you initialed inspector Brown's MSHA Form 7000-10K at the bottom of the form on the line designated for the supervisor's initials and date. You did not question Mr. Brown or Mr. Vandyke regarding the possibility that Mr. Vandyke had traveled alone.

When you signed Form 7000-10K you failed to identify your staff's failure to comply with Section 103(a) of the Mine Act as well as MSHA's Program Policy Manual, which states in relevant part:

> *Inspections and investigations under the Federal Mine Safety and Health*
> *Act of 1977 shall be conducted only by persons who have been authorized*
> *by the Secretary to conduct such inspections or investigations.*

You also did not comply with District 4's Standard Operating Procedure for authorized representative mentoring of trainees. Item 3 of the guidance stated: "During any inspection activities at a surface or underground mine, the AR shall make certain that the ROE Trainee is close to him/her at all times."

In reaching my decision to propose a five (5) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. You were and still are assigned to review the work of the enforcement personnel under your supervision. If you do not enforce MSHA policy by allowing an ROE trainee to travel unaccompanied and are unable to conduct an adequate review of the Uniform Mine File, inspectors may not know when they violate Agency policy and need to correct their actions.

Confidential Agency Document
DLB-000952
MSHA0009

3

Supervisory CMS&H Inspector is a prominent position. You are recognized by mine operators, miners, representatives of miners, and MSHA personnel as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006, implementing standards and regulations, and MSHA policies and procedures.

You were on notice of agency policies and procedures. In your position as a Supervisory CMS&H Inspector you are responsible for the quality and quantity of work produced by your subordinates and for ensuring Agency policies and procedures are followed. You were able to correctly recite Agency policies and procedures when questioned by the Internal Review team.

I have considered your 'Highly Effective' performance ratings for FY 2009, FY 2010, and FY 2011 and the lack of any prior disciplinary action. I also have considered that you had approximately 20 years of federal service at the time these infractions occurred. I believe this proposed five (5) calendar day suspension will promote the efficiency of the Federal service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and/or other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reason and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

<div align="center">
Patricia W. Silvey<br>
Deputy Assistant Secretary for Operations<br>
1100 Wilson Blvd., 23rd Floor<br>
Arlington, VA 22209
</div>

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

Confidential Agency Document
DLB-000953

MSHA0010

4

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

You are requested to sign and date this memorandum as evidence that you received it. Your signature does not mean you agree with the contents of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

*Thomas V. Moore*  *Thomas V. Moore*  *12/5/2012*
**PRINT NAME**    **SIGNATURE**    **DATE**

Confidential Agency Document
DLB-000954

MSHA0011

**J.S. Department of Labor**  Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



DEC 0 5 2012

MEMORANDUM FOR LINCOLN L. SELFE, JR.
Supervisory Mine Safety and Health Inspector

FROM: ERNEST A. CAMERON
Director of Administration and Management

SUBJECT: Notice of Proposed Seven (7) Day Suspension

This is a notice of a proposal to suspend you from duty and pay for seven (7) calendar days from your position of Supervisory Mine Safety and Health Inspector, GS–1822–14, in Coal Mine Safety and Health District 4. This action is being proposed to promote the efficiency of the service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752.

On April 5, 2010, an explosion occurred at the Upper Big Branch Mine (UBB) killing 29 miners and injuring 2. As is MSHA's usual practice, the Assistant Secretary directed staff to conduct an Internal Review (IR) of the Agency's performance before the explosion. The reason and specifications in this proposal are derived from issues identified in the Internal Review report.

**Reason: Failure to Carry out Your Official Duties**

At the time you failed to carry out official duties, you were the Assistant District Manager with responsibility for all enforcement activities in the Mt. Hope, Mt. Carbon, Summersville, and Princeton Field Offices. You did not provide appropriate direction and management oversight necessary to ensure proper and consistent enforcement of the Federal Mine Safety and Health Act of 1977 (Mine Act) as amended by the Mine Improvement and New Emergency Response Act of 2006 (MINER Act), implementing standards and regulations, and MSHA policies and procedures by enforcement personnel under your supervision, as evidenced by the specifications listed below. Proper management oversight is particularly important for the development of inexperienced inspectors and supervisors like those in the Mt. Hope Field Office. The deficiencies that existed in the Mt. Hope Field Office, taken together, should have alerted you of a problem in this Field Office and with UBB.

**Specification 1**

One of the key responsibilities of your position is to evaluate the results of policy implementation within your enforcement responsibility to ensure that desired Agency

Confidential Agency Document
DLB-000955

MSHA0012

2

objectives are achieved. However, you did not provide adequate management oversight to ensure that inspectors and supervisors under your supervision reviewed potentially flagrant violations in accordance with the procedures established by Procedure Instruction Letter (PIL) No. I08-III-02.

Mt. Hope Field Office inspectors issued eight section 104(d)(2) orders for violations at UBB that met the "numbered objective criteria" outlined in PIL I08-III-02 for review as potentially flagrant violations. However, inspectors and supervisors in the Mt. Hope Field Office did not review any of the eight orders as potentially flagrant violations. Within your enforcement responsibility, only 9% of the 66 potentially flagrant violations required to be reviewed were reviewed.

This reflects a lack of management oversight on your part in ensuring effective implementation of an important provision of the MINER Act. This is particularly important since the flagrant violation was a new enforcement tool in the MINER Act.

In your interview with the IR team, you were able to correctly enumerate the criteria in PIL No. I08-III-02 for reviewing violations as potentially flagrant. However, none of the inspectors under your enforcement responsibility interviewed by the IR team knew the criteria. Some of your inspectors could not remember receiving training on this important enforcement tool.

**Specification 2**

You did not provide the necessary management oversight to ensure that Right of Entry (ROE) trainees in the Mt. Hope Field Office did not conduct inspection activities apart from Authorized Representatives (ARs). The IR team determined that ROE trainees conducted inspection activities apart from ARs for portions of five of the six regular inspections at UBB during the review period. Proper management oversight was particularly important given the number of inexperienced inspectors and supervisors in the Mt. Hope Field Office.

In your interview with the IR team you demonstrated that you were aware that this practice was a violation of section 103(a) of the Mine Act, which is also contained in MSHA policy, as well as internal District 4 guidance. You did not take effective action to identify and correct this noncompliant behavior.

**Specification 3**

You did not effectively use established Agency tools to identify and correct errors on the part of your subordinate inspectors and supervisors. Mt. Hope Field Office supervisors were required to conduct 78 Accompanied Activities (AAs) and 39 Field Activity Reviews (FARs) during the internal review period. However, documentation provided to the IR team indicated that only 32 AAs and 23 FARs had been conducted.

Supervisors did not document required information on many of the AA and FAR forms. Some supervisors did not document the correct event activity code on the forms, the dates of Uniform Mine File reviews, or the dates when inspectors were debriefed. As part of

Confidential Agency Document
DLB-000956

MSHA0013

3

an AA, the supervisor must accompany an inspector on all aspects of an inspection or investigation. This did not occur in some cases.

During the review period, you documented conducting five second level reviews of enforcement activities conducted by Mt. Hope Field Office personnel, but you did not identify apparent deficiencies in two of your reviews. When interviewed by the IR team, you demonstrated you were aware of the requirements for second level reviews.

In reaching my decision to propose a seven (7) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. You were and still are assigned to review the work of enforcement personnel under your supervision. If you do not provide the direction and management oversight necessary to monitor and evaluate the work of personnel under your supervision, they may not know when they violate Agency policy and need to correct their actions.

The Assistant District Manager for Enforcement is a prominent position. You are recognized by mine operators, miners, representatives of miners, and MSHA personnel as having in-depth knowledge of the Mine Act, MINER Act, implementing standards and regulations, and Agency policies and procedures.

You were on notice of agency policies and procedures. In your position as an Assistant District Manager, you are responsible for the quality and quantity of work performed by your subordinates and for ensuring that Agency policies and procedures are followed. You were able to correctly recite MSHA policies and procedures to the IR team when questioned on these matters. Yet you did not take corrective action when it was evident your subordinates were not carrying out their official duties in an effective manner.

I have considered your performance ratings for FY 2009, FY 2010, and FY 2011 that were 'Highly Effective,' the lack of any prior disciplinary action, and your approximate 28 years of federal service at the time these infractions occurred. I believe this proposed seven (7) calendar day suspension will promote the efficiency of the Federal service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and/or other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reason and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 23rd Floor

Confidential Agency Document
DLB-000957

MSHA0014

4

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

You are requested to sign and date this memorandum as evidence that you received it. Your signature does not mean you agree with the content of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

_Lincoln L. Selfe, Jr_
**PRINT NAME**            **SIGNATURE**            12/5/2012
                                                   **DATE**

Confidential Agency Document
DLB-000958

MSHA0015

122K

Don Petrole 13 Aug 2012

① Memo — question for add'l 30 days request for time

TRO → r

Hufer had some
issue w/ that,

Confidential Agency Document

MSHA0016

#3 things to not
give back back.

3 actions of ___ does not
go into OPF

21 Aug 2012

UBB — disciplinary actions

(1) coal admin — letter of counseling
written counseling w/ a _plan_
for take care of some of actions
mentioned

2nd
Week of
September

Draft of
Plan for
Book @

- how operational & institutional
- pick out three areas where
Kevin sets milestones as to how
things will be corrected.

Suspension  14 days or below — no right of appeal to
appeal — file an administrative grievance
(could go to OASAM)          MSPB

PS to Kevin

Kevin proposing official for all under
him (PS is deciding official)
admin appeal to Joe, can be
re delegated to me (by memo)

Proposing #  w/ mitigating factors,
a deciding #    15 days
1. Dep Admn — 30 days w/ mitigating
   14 or below.  6 or less  15 days
2. ADM for enforcement 30 days to 14
   or below

What specifically are the infraction

22 Aug 2012

Conversation w/ Jeffrey Rose

UR B issue

I can move about 25%

how can end up w/ 3 days — (exclude weekend)
Sat, Sunday, Monday + therefore
employee only loses 1 day 2 pay)
after considering the totality of the
circumstances, including mitigating factors,
the employee's information submitted on appeal,
and the mine operator's conduct in its ...

I tho I have decided

All of the investigative reports
found that contents
MSHA didn't cause accident.

23 Aug 2012   and the employee's
actions did in no way contribute
to the accident. mine

Conversation w/ Rosey Rooney:
① Question of who provide proposed decision.
Maybe PS to KS; AO to others (PS Deciding official)
Concern! Kevin is part of picture.
② Bring Seth early

Give Jerome some facts

Charlie

① Reprimand

15 Feb 2013 ② Thomas Moore

Don Winston                    Letter of

Counseling

③

① HQ 08-58A - needs to be revised

1/4th category - not clear

Counsel as to when its approps

to do

② - not using the checklist

Facts

ⓐ not using the revised checklist

ⓑ District checklist

[or 2 days]

7 days to # days (Dowsa

recommends 3 days, but she

can leave live w/ this)

Didn't use or file checklist

what he did was not right.

Lincoln Selfe

Spec 3 - revise policy for AA's + FARs

Specification 2 - Drops

Specification - 2 days.

# Give Link credit for using

unwarrantable failure actions.

Confidential Agency Document
DLB-000962                    MSHA0019

detail - in

Gus Fetty
Eddie Sparks
Carlos Mosley
Jim Poynter

Deskut people - Darlene
from M/N/M

Safety Dept    Don Hairston - 1 day
              Liniola 2 days

Confidential Agency Document
DLB-000963

MSHA0020

With self

Understand that this is a sensitive issue
I respect the point that you hold to
protect your confidentiality
Questions concerns or anything that
you would like to share w/ me
now.

Feels like he's been treated
in a disparate manner.

Administrative grievance —
○ 10 workdays from
April 3, 2013.

we decided to work w/ MSHA

Scott Mandeville

Charlie: He hired Scott cause he wanted someone
strong in ventilation.



Don Winston 3 April 2013

3

25 7 days

Confidential Agency Document
DLB-000965                    MSHA0022

89 (8-1-1601)

22 Oct 12    Fire boss

to 7:2
Oct-2
9/30

Debbie
Calvin

Impact Inspections

Call John Howard —
— Letter to John Howard —
— Letter from John Howard to Sec.

OASAM/SOL role — proxy for Hill/public

Table of penalties
what you gave us was not comparable
Put on next
page

Charlie Thomas
down to two or 3

Possible disconnect →

We're going to hold you to a higher standard
Correction of some of systemic issue.

Charlie —
include certain things in the
decision. Remedial action: Look @
dashboard + identify areas, is
use that designed to alert
you of deficiencies in priority areas.

Confidential Agency Document
DLB-000966                    MSHA0023

Meeting w/ Seth 1 Nov.

Kevin: Remedial actions, i.e. corrective
actions in Fy 13 performance plan.

Charlie: Remedial actions in Fy 13 perf. plan
re: dash board.

Charlie

① Kevin —
Letter of counseling
- lack of mgt oversight. ~~Although he~~
relied on Charlie more than
① Too wet to sample (rock dust
computer application for tracking) didn't
go back
② potentially flagrant - didn't review
③ pillar stability analysis -
roof control plan.                    direct
systems
Remedial aspect - 3 things in his Fy 13 perf. plan - those
3 things.

② Charlie
lack of supp mgt oversight. Didn't            A
- flagrant                                       mi
- pillar stability analysis
- using checklist for approving roof control plan
- consolidate ventilation and methane and
dust control plan into one.
                                  Field the
                                  other plans
                                  reviews
                                  report
③ Lincoln self
- lack of mgt oversight, as evidenced by
- flagrant
- Inspect ~~oversee~~ Field Entry (trainee) inspect
  traveling along

Confidential Agency Document
DLB-000967

- not ~~entire~~ oversee Field ~~and~~ activity Review  Accomp

MSHA0024

drafting Q's + A's — (no details about action/individual
                       satisfies
                      (that MSHA caused UBB disaster

**Olde
Brian
Kennedy**
                      {
                        Does this mean that I will be punished,
                        Does this mean that I done aft during my 10 perf. review)?
                        why wasn't this done
                      }

Seth's concerns:

messaging within MSHA + outside of MSHA

Punishment for performance.

Seriousness threshhold we have to surpass.

**Seth:** going significantly below 7 is going to be
a problem —
        Deciding official has to come to conclusion
oneself.

        when I get to mitigation, have conversation
w/ OASAM / SOL.

        4 business days, work days.

                    Use
~~Lto~~ Timing
— rest week
— 10 day appeal
— discussions w/ leadership, D 4 + 12,
— All-hands meeting
        Audiences

**O/G**
They're getting pressure from Hel!     Internal MSHA discussions
Nancy to handle!                        ① Respect for privacy
                                        ② What to say
                                        ③ DOL as a whole
                                        ④ Wait to see what
                                           reaction is,

                                        ⑤ Q's + A's or talking points

Dana Payne
Affidavit                        5 Nov 2012

Charlie Thomas —

100% - getting that done w/ so many trainees,
all his colleagues got HE or EX on
Result 3.

realignment + strengthening of existing
functions.

Timeline for implementation.

Confidential Agency Document
DLB-000969                                    MSHA0026

Nancy Rooney

(1) List addition for Cabinet Affairs

(2) Letter to John Howard

Good News

Proposed actions in UBB — Yes, Nancy Ruiz Can

OIG — Check back with them when there's a final decision

Confidential Agency Document
DLB-000970

MSHA0027

Heidi

Fire boss          19 Nov 2012

1. RTLB - Evaluation
   - Drug, Develop time fame (Dec).

2. Wahlberg letter - cleared thru DOL.
   Kline letter - awaiting WH approval

3. Corrective Actions — must be vetted
   (3) things that we don't need,

- Inspection hour per mine - skyrocketed
UMWA - sending inspectors out of Ky to WVA (cause
   they have nowhere to go),
   - over age of inspectors
Russell Riley —

4. Coal Mine Rescue Contest —
   - have we sent material to BCOA ?
   - MOU  draft
   - list of funding items
   ($5,000 deposit due by Dec 6),

John Howard letter (IPA)

NMA to take over mine rescue,
Call Bruce.

   UBB disciplinary — Next week
Impact inspection
   - 15ᵗʰ of month.

Confidential Agency Document
DLB-000971                                    MSHA0028

(Transcripts)

UBB Disciplinary actions
— they all

1. Donald Winston —
A. pillar stability analysis (ARMPS or
   ALPS)

B. Checklist —
   all of the information req'd by
   Checklist was provided

2.

Hard copy - 7 Dec 2012,

● UBB Discipline Conversations

1, Don Winston — out X130
   left message

2, Tom Moore   X 119,

3, Link Selfe —
   copy of your transcript

mail to you at office

● In the past — accountability
reviews & peer reviews, Put fa
corrective action programs,
Internal Reviews — Same thing, —

— Not gotcha

PIL — reckless disregard — no

2 days

Conference CP11 Day Before trip
Jim Blair, Donna Krammer, Silvy, Sydney Rose, George Fesak
Manguel notive

Monday 12/17/12 - Silvy. Jim, Donna, Sydney
I spoke to the employees. I spoke w/
Rink Selfe MSHA Also done review accountability etc.
PEIR reviews. Also stated no one has
ever been punished before. Accountability
report didn't do all they were suppose
to (statistical targeting) mines that were
slow.
per Pat he is going to make that a
part of his appeal.
With respect to performance all prior
to UBB explosion. More than 2 years
time period. (trouble spot)

Sydney Rose: These are issues you are
going to look at. (mitigation)

Silvy: you all think about three 2 trouble spots.

Sydney: Below 15 days cannot go to the Board.

D. Kramm will have administrative Grievance
rights. CAN go to AS main designee.
They could grieve to AS main (your supervisor)
& even though you were the deciding official.
A lot more latitude for non Bargaining.
Grievance Decision would be the final decision.
EEO challenge can go higher outside DOL
Could file EEO complaint. (Gender, Age)
ex. Different Age or race can show no
decisive happen

Confidential Agency Document
DLB-000974

MSHA0031

Jim Blair: They don't have MSPB rights
As long as it was not discriminatory

To false

1.) Copies of Letters (Monique)
2) IR- report (George)

Confidential Agency Document
DLB-000975

MSHA0032

Notes 12/20/12

8:00 Am Interview    Winston

Silvey: were here as you know because
of the results of disciplinary action as I will
be the deciding official. You indicated to
me you wanted to present you

Dr Winston: Given extension to Jan 18th I would
like to send you a written argument.
I am prepared to give you my mitigating
circumstances. Intend to give the same thing to you.

Silvey: Send to me when you feel comfortable
By Jan 18, th

Winston: I am a little nervous I might
forget something here. so I will follow
up w/ a letter.                                    (Specifics

Winston: Wooden First of all I would
like to: 1st Policy issued may 29, 2008
talks about criteria when a plan is considered
complex if a plan follows any one it has to
be sent to TS. memo Came out June 6th
the way I understand this memo if the
roof plan meets any of this criteria
once it meets this (2 criteria) can't meet
one w/out the other. Once I determine
it meets the criteria 200 pg. on memo
does include Pillar shelf evaluation Request
from co. + send to Doc for their review

Confidential Agency Document
DLB-000976                                        MSHA0033

memo Approval of complex and/or Non typical
roof Control Plans & amendments

Winston:  Don't want to address the ~~poor~~ Pillar
much 2 reason why it was addressed
he reads the memo. Want to emphasize
this is talking about retreat mining.
~~the flood side~~
ALP is a pillar stability.

analysis,  Based on memo I did not think it required an
NO mention of ALPS (refer to memo Dates
June 5, 2008 TO DM
From Strickline

.mention ALPS on second page
See (C) of memo But not in

my argument in order to require this
See memo it has to meet this
Its highlighted ~~from~~ if met it would
have Been Sent to TS (never Sent to TS
cuz I never felt it (met the 4 criteria
if don't meet this the Second pg. does
not Apply.

refer   Highlighted ~~what the specifically~~
two →  parts in the memo

PIL     other criteria at the discretion
Dated
may 29, 2008  NO IOB V-2 (Technical Support Assistance
in Reviewing Roof Control Plans)

MSHA0034

Other districts may consider a plan typical or D-4 may consider it non typical cuz multiple Seam mining is much more common.

Winston: When I first received the PIL I call Joel Sabrosky if I asked him about that. Every mine in this district has this he recognize that Based on my experience another district might consider it typical other might feel non typical. If I was comfortable I did not have to send to TS. Shows an e-mail where they even have a mtg w/ Districts & Joe repeated refers to highlighted area-

During that Conference he recalled our discussion & repeated it some may have considered it typical As D-4 will not consider it non typical. Joe & Chris Mark did the training.

Winston: Okkk I am a professional engineer I have a master's degree in mining. Worked Before MSHA all that timing in Engineering + 13 year as Chief (Roof control) Came to MSHA 1993 & 1995 Came to roof control At time of UBB I have over 10years of roof control I have deal w/ mutiple seams I have a good idea when it may or may not Be a problem I am referring to MULTIPLE Seam mining. Different Districts have geological differance. D-4
Chris mark talks about coal mine roof rating (CMRR) goes goes from zero to 100 he recognize

MSHA0035

<u>Winston:</u>

I would say the majority fall 45 to 65   45 is low end. why we may ra Be different.

Most g D4 fall into 45

UBA was

mike Gona uses 51 for UBD

Shaw roof control plan: Closest mine above then on the plan is 175 ft.

Based on my experince I did not consider 175f (Unused hass data to Back it up) → ma burden to tripse this. mine had Been operating sent 1994 (15 year) that is when tan first roof control plan was Approved. Operating 15 year. I been to long wall & tail gate. Did note see where multiple Seam Caused any problems

D4
Crandall
example

OIG listed 26 mines As a sample reviewed 26 mies Note D-4 & D-10 Seperated just Any an exercise went to see 175 in a burden there where 17 that pretty well saids what we have as multiple seam mining in D-4.

Appendix k (Internal Review Report mike Gona (TS) he did 4 tables I like to point out he discusses, discusses ALPs he reads Appendix k 4. Less the required statistic document ALPs

Confidential Agency Document
DLB-000979

MSHA0036

Continued 12/20/12 Interview

Don Winston: When conducting an
ALPS evaluation you could have
an adequate tail gate size true opposite
can occur. See high light Appendix K
just tells how ALPS works its works
with the type of roof you have.

All my time here we never required
an ALPS stability for any of them.
I have after UBB But not before (ALPS).
We are only required to TS if it does not
you two. meet the criteria.

They met the criteria. I felt like I was
meeting the criteria.

K-4
Internal
review
Report
I wanted to point out this is table 1A + 1B
was generated from history 1A
this is pure ALPS the calculation do not
take into consideration any ALPS.
point everyone the stability factor is low
even though multiple seam action is not
considered in the table.
Shows a table that has multiple seam
mining, 3 are not low
reason Being cover is less this does take
in consideration over mining.  Over mining
or not stability factors are low
particularly point to a analysis active longwall
cross cut 71 done By mike Gona.

※  multiple seam interaction did not cause these pillars
to be low

Confidential Agency Document
MSHA0037

AMSS (multiple seam mining)

POSMS anaylis of this. inaburden was

takes ALPS program

2 modes  One for ALPS (longwall)
One for Arms

~~Atlas you to press~~

pt 77 Anaylis. mike did.

Amss looks at different conditions
Green good red real Bad. Anaylis said
major interaction is unlikely. sugged criteria
Suids 76 ft.

Using this to determine my decision
making my experience

Lacina (TS)
Anaylis from mike ~~green~~ done for
this Report. It was the Back up.

Silvy: make sure this is attached.

For most part that is my argument

one or

Both DM + ADM received that (June 5, 2004)
memo + they approved that plan
~~Neither~~ Both of them sined off on
the approval of the UBB plan.
with no problems

Confidential Agency Document
DLB-000981                                    MSHA0038

12/20/12    Don Denniston

Donna: what is the Standard office practice on the plans:
Winston would not have Been approved would come back to me.

unless we have a transmittal sheet w/ are
approved starts w/ specialist FO sup/ or
Inspector than me then to ADM tech +
enforcement + ADM + DM anyone of them
would have a comment finally DM would have
approved.

Donna: practice would read the plan or just sign and
pass on?

Winston: It would have come Back if not
a plan that is the common practice

Winston: If it did not meet the criteria
this other stuff would not apply.
Once we determine that criteria it goes
to TS we do not review complex or
non typical it goes to TS. Again if the
first one did not apply then the second one
would.

Sentence that came to say what your
practice was in the interview. I did not
explain it well.
That second one, we don't review them
we send them.

CHAPH Feb. 20 partial pillar (massive collapse)
Still retreat mining stopping when we in
inverdale there                 to TS

We issued them a citation we did not
know that meant reminine we thought
it meant AMD. That argument did not
fly & they had to pay. (Coal Byrd mine)

S~~everal~~.

Did you require any operators to submit the
results of the stability anaylsir he said ARP5
only although we do now.
Any operators did not require to submit ALP5

Donna: when you were talking about you called
Joe Cybulsky when PIL issued re:
multiple seam mining did you discuss w/ADM
or DM? Don: No
BB when it came up did you mention
to anyone when it come up? GOD
what about HQ? Don: No I don't do that.

Specification 2: referring ~~to~~ to IR report
                  D-4 Chr list.
*Did not
use CK list
& use proper
form*
As I understand the second specification
Say we did not Chr it did not use proper
form it is true I did not do that -
But I want to add my statement. I was using
the original CK list. Email sat to Jan 27, 2005
to AP & DM. I was continuing to use the
original CK list & don't know why it could have
been my oversight. (Original ones that were sent cuz
                    that is the one came out of Arlington)
*Did not use this 226 2271*
our own CK list goes above & beyond. Using CK list
that originally came out of Arlington. ~~by it~~

MSHA0040

COPYRIGHT ©

12/20/12

Don Winston:

I was not aware of those new CK list that e-mail was sent to ADM + DM. I cant say I did or did not get the Ck list I can only say I was not aware of this. It would have sent by Kline. he may have make a copy or forward I do can only say I was not aware I was using what I thought I was to use the original out of Arlington. Again I am feeling these out & putting ~~them out~~ I am attaching CK list w/ plans. Again they were not being sent back to me they were being approved.
Wheither CK list were not in the Base plan.
Bon. The only thing I can ensure when WBB ~~it~~ happened they started ~~requiring~~ I looked at them I did complete them But for whatever reason it was not in the file.
~~I do not have the CK list that was submitted~~
W the items were in the plan.
The plan included the items were in the check list. It's obvious that I used a CK list to evaluate the plan you can see where I noted.

Plans were not there I would not find. CK list ~~that~~ was not w/ the plan.
I was using the original CK list that came from Arlington for WBB that is the checklist I used but I could not find it.
I did not require them to complete ~~these~~ the CK list but they have there own CK list that go above ~~beyond what they document~~ themselves I complete the CK list.

Confidential Agency Document
DLB-000984

MSHA0041

Silvey: Do you have a copy of what your specialist used for the Base plans

Don: No. once I did learn about the proper ck list I did start using it ~~text~~ I learned about it on Jan. 2012. from a conference call w/ All Supervisors (roof control supervisors & Johnny Calhoun & Chris Mark) & the checklist came up

Johnny sent me all the forms now I am using this & so are the specialist.

Silvey Did your specialist know about this?

Don: No

My point I was filling out the checklist I6 was satisfied. Again I am filling out these ck list & no one is telling me this is wrong.

Roof Control Specialist were using these only ck list as a guide. For them to go above & Beyond. Then the plan would come to me to fill out & onto others to approve

Silvey: Send me an example what D4 roof control Specialist were using as a guide.

Donna: Want to add anything else.

Don: I will repeat All this time I am filling out this ck list no one tells me I am doing wrong.

Confidential Agency Document

DLB-000985

MSHA0042

Continued · Don Lapinsden 12/20/12

Donna: Anything going on w/ you to chip Mas Sibey reach a decision?

Don: NO    I think I have covered all this.

Confidential Agency Document
DLB-000986

MSHA0043

12/20/12                    12:38 pm

Interview Lincoln Selfe. Jr

Silvey: As you know this is your to present your oral
issued proposal displinary action you
have the option to present your motivation factors
you stated to me you wanted to present
this orally & you wanted written
In terms of the appeal you asked for
an extension yes till Jan. 18, 2013.
per Nancy Crawford. Any additional info
you can send to me by Jan. 18, 2013.

Lincoln: Allegation in there from IR report
No evidence that MSHA employees cause the
accident (Reading IR report)
Fiscal year 09 most cited at that mine
unwantable failure. issues s6 only
findings + facts in IR reports are inconsistent
specification: Flagrant violation came out
in 2006 you can have a reckless violation

Inspectors had little problems with the reckless
violation. If it's unwarrantable.
2 types - repeated failure that is when the
inspectors had the issue. 2 or more in
the last 2 months meets flagrant
no tracking for inspectors. At the times
of UBB nothing was in place other than a
memory. For the inspector he could not
possibly remember this other than a memory.
Still a problem with a flagrant. The issues
are for a specific hazard, alot of research
still needs to be —

Confidential Agency Document
DLB-000987

MSHA0044

Silvey: When you say they still have
problem who?, Line → MSHA
so many different things in that ventilation
plan.

Silvey: Even now post UBB we put out
the tracking systems policy.

Lincoln: yes there are problems w/ interpretation
showed an example: read off the IR report.
Coal District offices instructed pg. 2 of report
In this case. your proposal to describe me
according was present in every district. Stopy.
See pg. 2 of IR report

Silvey: At what point did you interact w/
SOL? not me per Line the DM
does. I recommend then DM puts a
packet together + then SOL reviews +
incoln   Sends to Administrator to Joel Stricklin.
Charlie Carpenter makes final recommendations

Silvey: Did you go back + look at any
were Recommended which at the time
were were sent to DM

Nationwide had trouble. We issued 600
were counting on the inspectors memos
nothing was in placed at the time
of UBB.

Confidential Agency Document
DLB-000988

MSHA0045

Continue Lincoln Selk Interview
12/29/12

Linc: that flare it now that we
have issue (system in place)

Issue about training on flagrant
re: I had not provided training. or remember
~~having~~ having training. mact 200
Handbook Traing wPs received
I have documented for 2 mt Hope
Staff mtrs training wPs provided.
(He has the documentation) memo was
Sent to all See Attachments.
July 30, 2007 staff meeting.

~~[scribbled out]~~

Specification #2 (ROE trainee mt. Hope
I gave directive to Supervision + Inspectors
trainee was not to be left alone at
any time. When I R asked would you
believe trainees were Conducting
Sent directive + went w/ them.
No system in place to alert me that they
were not following. For me I only review
Inspector notes, it did not show up
I had no knowledge of this occurred, had I
know it I would have taken corrective action.
I am being held accountable what was
son.
Special Assecc unlawful possible knowing willful violation
are the only ones I review - part of policy has to
present a high

MSHA0046

policy to have Linc:
need It has highly likely to occur
people & meet criteria to meet Cur does not meet Criteria
at What is a tool we do not set to use

Silvy: you said you had given the directive
how did you sell it to them.
Any written? Linc: I don't recall But verbal
I talked several time at the staff
mtgs.
When I give a directive I expect to
be carried out. I travel w/ them &
had no reason to believe this were going on.
I travel w/ sup 36 times a year.

Silvy: Accompany activities you travel with
an inspector?
Linc: trainee /supervisor/ Inspector I
traveled with them each time everything
was done right. No trainee was left alone.

Silvy: Field activity review
Linc: I only look at serious paper.
Field office sup looks at those & he did
not tell me anything about it. I was
Shocked when they told me post uBs.
4 field officers Before & after.

Silvy What kind of discussion did you have
when you found out
Linc: I Gave the staff directive I don't

MSHA0047

Continued Linc. Interviews
12/20/12

Linc: recall writing it. I thought about taking
dis plinary action But I didn't. we are
So much under stress to get our mine
done.

Specification #3  Read it off the memo

Not a true statement a supervisor cannot
travel w/ an inspector to all mines.
Agms policy what supervisor is suppose
to do. Not a true statement
I am not familer w/ any tracking sheet
other than the one on Coal w drive to show
we have Been at all the mines.

Sity: Don't you have ITS.
Linc yes. But it shows we have covered the mines

Linc: Allegation sands covers field reviews
your saying I did not establish agung
yools. There is no agency tools to go By.
W Drive it's called mine visit.

Field office supervisor applied for disibility
retirement on may 19, 2009  see ps. 3
he was on sick / AL and leave
w/ out pay See Ps. 3. they probablay
did not
No training provided  Read ps. 4 of
L: written on

MSHA0048

Line: I am only required 2 review
not required to review. the IR team
reviewed many documents that I never
Seen + not required to do.
See pg 4  Once again no training
required develope or provided for
A DM relative that we deemed so important.

Litzy: De you have any written on

Lina: 3 where did come f

Line: we weren't how underground, still
they were doing an Art.
This something they determine to be a
material this f not something specific to me

I perfor

Donna: you said you were told you
Can't do any training for the
Acting Cuz it would look like pre select.
our Administrator offices Sand Humphry.

Lina:

Donna: I said an Anything preventy
you for doing more than one

Line: Time

Lincoln Site
Interview

<u>Linc:</u> 2007 Acted D-3 I thought
about all these events. I discussed how we
train on all these issues. Part of that
discussion how to do the training to train.
Had training Been develope we would
not Be going through this today.
D-4 is the largest District in MSHA
were using this now as we Gotcha you ya.

He Read pgs 6 + 7

<u>Sil___:</u> We appreciate the importance you
have done on mine resue team. I recall
the regulation we put in place.

<u>Linc:</u> I have Been so dedicated to MSHA
& proud what I have done. This letter you
present as well knew the on my face

Lost site of the MSHA's mission this is
so politically driven. It's driven By politics
and politicans. you all picked issues that are not
true so just so you can go Back & tell the politicians
you discipline me. I have 30 years I
can retire to But I still have passion left
in me to help the miners. That's my
passion  what is this doing By suspending
me nothing of this helps the miners & me
By suspendes me does not help at all.

Agency & the academy provided training.
I did provide training.

Confidential Agency Document
DLB-000993

MSHA0050

<u>Linc:</u>   We appreciate your information
$ you have till Jan 18, 2013
If you think so any thing you want to
Supplement Call me send it to me etc.

<u>Linc:</u> Since Dec. 5th I received this
letter I can't Concentrate & I have alot
to get done.

Donna: you mentioned there was a period of
Time when you were in Colorado.
Any other mitigation factor in close proximity
any issues any medications that mr. Siho need to know.

<u>Linc:</u> I take 10 mg lipitor a day
that's it not other health issues.

<u>Linc:</u> UBB & DU got to stay on team

I am 58 year old I can still help the
miners & protect the inspectors.

Thomas Moore Been off with his Back
Other supervisor try try to keep up

<u>Linc:</u>   Certification of EOL: It is going to
Be a virtually impossibly. So many more &
So many reports So we can get the miners day
& make sure miners are protected.
Can't Certify until reports are done &
will not be complete in MSIS. Said need
to be done within the 10th day of the
next quarter.            every month

Confidential Agency Document
DLB-000994                                    MSHA0051

Linc: Continued 12/20/12

Linc: Thomas Moore has been go to
Mt. Hope. I can not afford to take one
3 his inspector out to act.
3 from Chark selected for a 14 here at the
academy. I am going to come out line
Same suitvations in pt Hope & somerville
office has went on. bere doen try here
we can do

If I an being descipline for what you
have here than now need to disciplen
all ADm's in the country.

Confidential Agency Document
DLB-000995

MSHA0052

Interview Thomas Moore

Silvey: First of all thank you for coming in you got a proposed letter of disciplinary action you have a right to appeal & provide mitigating factors to support your appeal. You indicated I want to speak to you in writing. & nothing written.

T. moore: Today I just want to speak orally no additional time.

Donna: You can reply in writing & oral

T. moore: I just choose oral.

At this time I read it over & over I understand all of that. First want to say who I am & what this to me. All my life I have been committed Vietnam Vet Father and fathers were in the coal mines. I became a Supervisor miners I believe in doing the right thing & treat people how I want to be treated. When I took this job I took it for the health & safety of miners I would never put or jeopardize the health & safety of the mines. My performance is exemplary I repaired every coal mines & I let them know. I took this supervisory job 2006 & went to Mt Carls good report & I felt like I helped them & did help Specification my responsibility or lack of

Confidential Agency Document
DLB-000996

MSHA0053

picked it out. I understand what
I M team was. All miners know they
could not travel alone I made it my
business to travel w/ them. The paperwork
AP's FAR's everything was on getting Cahos
10 inspectors & reading notes all different
travel writers & read every note. & sign off on
every PIL, Plan, preform duty Att for
him visit lack of training I had I measure
I did well. When I read this said.
I failed to comply w/ PPL etc. there are
6 Book 6 inch thick I don't believe
anyone can retain that anyone can
read the uniform mine file.
Both & those men Brown & Sismon
Both were trainees. I am Committed
to my Job.

Specification #1. Said I inadequately reviewed.

Many revision that come thru uniform mine
file. I had Been in that position for 2 months
Jan. 15 as a supervisor I Believe in doing
the right thing. I feel I was a help &
was making a contribution. No one who
feels about health & safety of the miners to
to feel for the miners & given my best I
have not comprimised there safety.
The words used in this memo were
not Correct.
The reason I took the job for someone
to do this than who I see & use these.
words to the Confidential Agency Document
DLB-000997 have always Challenge

MSHA0054

Interview Thomas Moore
12/20/12

& respect & responsibility. I am an
honest man & Believe in honesty.

Silvy: First specification read to Thomas

Thomas: we were not conducting 103 (i)
Spot Inspections.

Silvy: March 9 you inspected the tail gate
(Reading Specification 1).

Is that correct what you tale in
Yes that is correct.

Thomas: I reviewed the uniform mine file at
that particular time there were numerous revisions
& upper mgt. was not aware of. The up-to-date
material was not in there at that time.
I walked w/ keith simmon that day
& we investigated & when we had a
map & followed to find out the problem
at that time the men were with drawn

Why was air? Regulator was in place
that should not have Been.

Silvy: I am understanding the revision
made it confusing yes

Thomas: Correct

Silvy with respe to two rows to support
when you determin wa a wa row on with

MSHA0055

the Ventilation? Did roof support
affect ventilation. Thomas he was
not ventilator, It was the regulator.
All men were withdrawn + Inspector
+ myself. Doing this we carefully found
out why it was not moving. If there been
two doors of post it still would not
be moving.

Silvey: Would you review log control
plan Jan. 28. You did not put partial.

Thomas: If an inspection often times pulled
to 103 spot they may review ventilation
plan + put partial review.

Silvey: purpose going B on 103

Thomas: I put them in the middle of the
quarter + Comments had been assigned.
None had a Supervisor they were
acting.

Thomas: we had one of the busiest field office
I mine, but we were overwhelmed
its obvious we broke off in D-10
you can overlook the mine for loss
you had CRP you name it. Same revision
with ventilation plan.

Silvey: they were not taking old out
+ replacing new

Confidential Agency Document

MSHA0056

Continue ~~to~~ 12/20/12
                Thomas Moore

Thomas: You are know Nelly what to
Throw away as far as revisions.

Silver: I want to go Back to 103
try some other Case how went out 103
spot inspection. I can See you looking
at the ventilation plan. Do you
ever would partial review when you did Uniform
mine file?

Moore: No never did that

Silver: When Inspector Keith went with you
he would have to look at Conifor mine file?

Thomas: I don't know how he did it I
Came up with ~~to~~ the event System ~~to~~ they
would sign the sheet.

Silver: On March 9th when you & Sisman went out?
what would indicated a sign in?

Thomas: EOI he would indicate that ~~sign~~ signed

~~By at the~~

Silver: At the time you were a Supervisor any
training? not the supervising.
Some training have you found it useful?

Thomas: yes just force how the different
district do things different. For Instance
the event sheet, the last training event sheet come
up. We should our example

Confidential Agency Document
DLB-001000
MSHA0057

Moore: Not all have minin & experience as they should.

Silvy: Back to the notes we still have requirements to do the notes?

Moore: Yes you can do the notes on the computer. There are some notes you really need to after. Cites.

Silvy: What do you do when you have an inspector who cannot write legible.

Moore: I tell them to take true time & write legibly. When you have 25 30 pgs of notes it hard to understand.

Silvy: Back to Specification 2. The 7000 LK Forms must be the one they use for the notes.

Moore: Yes

Silvy: How long had Brown been an inspector? Brown had been AR But Vandike not.

Thomas Moore: All inspectors had notes to be reviewed & some press Jan. 12th & it was a challenge to write into get an Order.

Confidential Agency Document

MSHA0058

DLB-001001

Continued Interview 12/20/12

Silver: How long had Vandyke Been an inspector?

Moore: He is Back in my group.
With what I dealt w/ Jan 12 to Jan 20th
my inspectors knew they could not travel
alone. They were instructed it was policy.

Silver: They knew they could not travel alone
how did you instruct them?

Moore: They were signed issued an inspector.
I did that orally (instructing them not to
travel alone).

Silver: RoE not part they were not to
travel alone at co all.

Moore: No you do not travel alone.

Silver: If RoE were going with regulars
inspector, you must let the RoE inspector
do it.

Moore: Charlie Thomas + I worked together
+ would say yes so when they would
Ask question this is to so it his AR card

Silver: In Mt Carbon did you have any
occasion were any RoE engineers travel alone
Moore: None