Donna? No questions have covered it

Moore: I respect the job I am
doing & the position I am in.
I have alot to offer the young inspectors
& take my job seriously. I would
not teach cut of doing things. I say
all the time do the right thing.

Silvey: Do you think the uniform
mine file put together Betts? post UBB

Moore: I think electronic mine file,
is better. Everything is hand copy in
our district I think electronic is the
way to go. Uniform mine file could
be deficient. I feel like my
record speaks for it self. I issued alot
of meaning violation papers & was at the
top I was rated exemplary 3/4 times
before I took Supervisor job.

Gals in Beckley 12/20/12

Remaining Action Items 12/20/12 prior to

1.) Talk to Charlie (Moniques) 1st 4/8th
to determine if she wishes to present orally
in addition to in writing extension Jan 1st 2013
Copy to George Lincoln written reply

2.) Lincoln - take Lincoln written reply
& go thru the proposal (George)
Line shoot as down on every specification

3.) Wait on Winston written reply & George
goes over written reply & match up to letter.

4.) OK to draft enough to draft out for Moore

5.) 18th supplemental info comes in George
can go over & match up.

6.) meet in Jan 1st & 18th

Donna recommendation of the most letter of
reprimand least a warning.

7.) For Grievance process for outside has to be
at or above your level. Dan possible Rich Fairbol

8.) Donna will look at Lincolns response
& then look at the proposal letter

9.) Pat will discuss further appeal with Bob Main

MSHA0061

Options

Lincdni: Oral Low Level Suspension
If George looks thru Selter reply one & finds he one
were wrong Still issue a proposed &
Send him to training.

Confidential Agency Document

MSHA0062

DLB-001005

# Charlie Thomas notes 1/10/13

## Silva

Charlie: whoever crafted this memo it was heavily handed + stern failure to carry out official duties is pretty broad talk about obstacles I have to have to get into the system policy on flagrant dependent on getting support from SOL enforcement action flagrant known + I agree we need to answer/support from SOL matters as a team. I did not want to say

I don't think I should shoulder the flagrant ~~issues~~

No computer system I think was the most experienced. Some of the language they use to issue a D2 order it's not their choice to make no support from SOL.

D-4 largest Coal District 4 that decision to split the district very difficult to manage the more inspection another decision out of my control another decision

× key indicators that I did not provide my supervisor should have a voice or opinion on what kind of job I did. My biggest problem no one ever interviews from WBB internal review than everyone else that was disciplined were allowed to be interviewed.

MSHA0063

Key Indicators they decreased in average an abatement from 19 7 day Rock Dust prior to UBB I had discussions w/marser I went out Werl and Bailey mine + wrote citation went to macalster

never collected a rock dust survey for a mine. I was taught by some of my Best my father was in it the mine for 27 years It's not like I did not care about rock dust.

If I am going to be held responsible for 7 day suspension. I was Being paid for GS-15 pay. I was never paid SES pay, if I am going to Be responsible I think I need to Be paid SES pus.

Rock control plan the inspector missed it Supervisor missed + ADM. It is difficult for me to know every plan. But OM retire ADM retired + field office sup was deducted.

Having the ventilation + Dust control Plan seperate, has always Been like that. To pick that out + say I lacked in leadership that did not cause UBB to Blow up that the plans are in two seperate documents.

Confidential Agency Document

MSHA0064

Continue Charlie Thoma
1/10/13

I have always Been a stern
disciplinarian my self example poncrott
Ex. When you need a day off he told
him to call him re: Das off—
AL Davis I tried for 2 years to get
him out of his position. Tommy/Hodder
received nots on appraisal. When I came
on Board ~~~~~~~~ Actions concentrat
7 8 and 9 per kevin. I Participates
in Seminars I Am one person & I
Cannot be in every District. I was
doing what I was instructed to do. I
Am not throwing kevin under my Bus
I was doing what I was told to
do. My hardest sticking point I did not
get interviewed & then these Charges without
defending my self. I could have explained
I sent Mr. Kline to D-1 he retired.

→ After UBB. Mr Kreff went on a
detail he declined & then retired.

Vacates. Lowest they have ever Been
in coal means it is improperly wrote
there are some areas that t supervise
that improve. If you ask any coal
operators they will probably tell you
I am an enforcer. I felt George should
have interviewed me & provided some facts
about the deputy position.

MSHA0065

Silvre: I understand about SOL
did not support some of the things
flagrant.
One question USB- we had written the
most unwarrantable
with the best we had written. A-2
Congress had put in the miner act.
Any at UBA?
Charlie: NO of I wrote violation
after violation unwarantable what's
the use w/ SOL & conference officer
et Junk As After you write so many
the inspector will take the attitude
Some one will write it to a 102
of its mess they criticer for a flagrant
SOL & should not have any authority
to do that. I truly believe it we
had ~~so~~ support from SOL we would
have wrote more.

I would rely on a ~~tet~~ technical
person, they should have involved TS.
But Bob or Kline let me know we
had these issues, I would have involved
TS. He should have alerted Kline or
to we would have done something
But they never asked for help.

~~they did not~~
This mine should have been put on
POV, that computer glich I should
not have been responsible for that

Confidential Agency Document

MSHA0066

DLB-001009

Continuer Charles J. Thomas 1/10/13

Charlie: I am not going for the emotional word to feel sorry for me when you Attack someone I take miners seriously. I worked in 3 Districts & have learned alot from all of them. I have learned a tremendous amount from Kevin he has talents It was hurtful to say I did not provide oversight

I agree my people & my subordinate did their job we could not get SOL to support us

Silvas: Did D.4 identify any flagrants? Charlie: yes they did But not for UBB.

Rejected to have a set of eyes. looked at this.

Silvas: any particular not work at UBB for a reason?

Charlie: no I think at UBB They had someone from UBB managemend come out + intimidate some of those young inspectors. Mgt. played on inspectors emotions a flagrant they pleaded more w/ them.

MSHA0067

Silvey: Hardman & Klim retired detailes
2 months & then retired. Do you
think either of Both were not adequate
doing their job?

Charlie: yes. ex. performance
Appraisal what can't do the
that you do your job more effective

I have
noted
in my
pramon

Hardman: Get rid of Klim
per Charlie Klim received a HE
performance rating (2009)
→ I will double check.

Silvey: that doe not match
they know Klim was a problem

Charlie: Hardman was overwhelming size
of district so many plans he had
impossible task it was just impossible
to do well they review one size &
any district

Silvey: Lets talk about methane &
Dust Control Plan. We agreed to the plan.

Charlie: Agreed to be combined
the two plans

Charlie continued 1/10/13

Charlie: Health Groups reviewing
the plans & the Dust groups.
It did not affect the law.

Silver: might it present the opportunity
that was critical to Dust + Ventilation?

when D c n

Charlie: For consistency you had ~~resources~~ resources than
were we going to miss something
missing something as for a
inspector they are responsible

Silver: Kline would have responsibility
for the district.

Charlie: Yes.   UBB was not the
only problematic mine in D4

Lot of plans were weak Kevin + I
Strived hard we focused on other
mines that had other issues. I did
provided oversight at other mines

Charlie: He was not an aggressive
ADM he was more of setting the
plans they or ASK for weakness
Kline did not want any outside help
he shielded problems from his district
we would find out when an order was
written or ~~Confidential Agency Document~~ that their plans were not Approve

Confidential Agency Document
DLB-001012
MSHA0069

**Charlie:** The performance Appraisal
I received from Kevin & Ray
was exemplary on HE. If my Behavior
or Conduct was not right there should
have been some type of interaction from
Kevin or you I never had any conversation
that I was doing a Bad Job.

**Silvy:** proposes discipline BASED on
IG report & it did not come out
till MARCH 2012 It took a
long time to get the Report at
that is one of the reason do
not mention performance

**Silvy:** you mention you were in an
acting Job which was sort of a
training period. Do you consider that
a training program? Are you
aware this was not SES Candidate
training?

**Charlie:** I Brought Kline to Kevin about
my conversation w/ Hardman Kline being
weak If I was the full force
deputy I would have had the autonomy
to move them around I would have
prevented all kinds of permission. I could
have moved folks if I was in that
position.

Continued Charlie 1/10/13

Charlie: Kline & Hardman were not a good fit never saw eye to eye on the plans.

7days Suspension does not only affect me it also affects my family.

Silvy: Who were the other active defenders

Charlie: Bentley-, Melinda Pon , 120days

Silvy: me you & Kevin need to talk about AL Davis Letter. (Aside from this)
per— we need to wrap it up in the next few days

Silvy: With respect to today, you know 4 to 5 -86 or 87 Belong to Coal All do respect

Joe feels the same Russell Ridly & others to remove stuff we did not need Basically the Requirement is to Many.

Silvy: How are we doing today? Superviors Steps? Firm audit in any District

Charlie: Charlie speaking only for no one else The documentation today technology it would be much easier do have a microphone & then transponed

MSHA0071

to a report. on an 8 hour day
8 hour a day - we need to get to try
21st Century to with the new technology
voice recognition soft ware etc.
we do more documenting then we do
Inspecting. I don't want to Back off on
Supervisory Visits. Eves

Mine visit leave the same
& Far's should out in half
need to field going supervisors some
latitude. I would like to
travel more with my trainees.

Silvg: Higher head reviews

Charlie. were not missing large portions
of the mms.
Supervisors need to work on weak
inspector But not a wide spread
problems.

Schy: I think about of our inspectors
have pen nowship pro issues.

Charlie: I Argube they should print
This is when modern technology
would Be useful.

Donna: Bear in mind I don't understand that IR like you 4 all do. Could you ask to be interviewed.

Charlie: I asked Kevin he said its up to FLSA+ team probably not your actis.

Situs: They determined who they want to interview (IR). Even AS cannot step in, there is a policy on how they IR team Acts + does. Policy said Drafts report SOP, AS, Administrators CPM review for accuracy. IR team picks the people.

Donna: When you sat w/ Handman + he told you Kline was not doing this job was that the first time you heard that.

Charlie: yes I sat with Lewis + explained we had a plan (Kevin + I) previous performance Appraisal his name never came up

Donna: Separate plan - did you know

Charlie: yes knew they had a Dual Control plan. Cave would so parameters

35 years in D.4. had separate plans who had no Bearing on the explosion sure, preven DM ADM you still no problem

But we agreed to the plan. This had
no Bearing on the plan
Should not had Ben in the
proposed removal

Donna☞  Talk about Kim shielding
This paperwork. First time you heard
this about plan

Charlie- no we saw these were weak
plan (Kevin & I) we knew about
Several mines not just UBB we
would you feed Back to the distinct
Health & safety committee we provide
oversight to plan. Kevin & I plan pull us
from each distinct & reviews all
plans from the distinct & provide
oversight-

Silvey: Fla sant we don't have any
Written policy & we never reached an agreement w/ 50s

Charlie: It's expired-

Charlie- wanted to Be treated fairly
This is a tarnished mark ✓ my
Career. Look Back on my career
Career & never had problems
I thought I would have heard
from Kevin by now - I enjoy coming
to work every day & have learned a lot w/     Beter to
Kevin.  Confidential Agency Document to get trained    get coaled
or pretound

Confidential Agency Document

MSHA0074

CDK: Who

Silvy: How did you determine
Who was Interviewed.

ESUV: only interviewed District was a Alternative decision
Kevin Guz he was on Site.
→ limited to recovery operations
Because he was on Site.

Set up time for next week

Thomas Moore = warning / training
field office Supervisor
We need the dates ⟍

Decision letter could say until we
reach final Resolution on this

Confidential Agency Document
DLB-001018

MSHA0075

Notes from 1/24/13 mtg.

Donna Krammer: Corrective Actions Recommendations

Moore: Letter of Warning ~~5 days of training~~

Does not go in his ~~OPB~~ OPF (Hope to get done quick) — Issue a decision on proposed letter + then a issue warning letter mitigate to a warning

2 step proal letters can be sent together

Donald Winston - Proposed 7 days down to 3 days days Rational Specification 1, could not tell us Specification on the check list.

Lincoln Selk: No mitigation per Silva Don't agree. Call Donna when you know where you are + ready to write a letter.

Charles Thomas: Mitigate to 3 days But not comfortable w/ that. Can't throw it out He has some responsibility. We have to mitigate cuz I am concerned he will talk about ~~this~~ ex ~~lecture this action~~ ex. Retire + go to the media (Best interest to the Govt.). I could make a reprimand in Charlie's case. If we do the letter needs to stay in OPF for a couple of years. No training in the reprimand But discuss w/ him.

Administrative Grievance: Discussing John Moran Career Deputy in Vets John can make a decision + will support his decision. Strong man + leader, dealt w/ personnel issues in vets. Team player.

Confidential Agency Document
DLB-001019                                              MSHA0076

Silvas:
After Moore's letters lets aim to
get the others. I want to get this
done, Winston/ Pop Rink I want to hand
deliver + Charlie Thomas I will deliver here.

Rinki per Donna said he does not produce
documentation. Prop Spec I will put you
down to 5 days

Confidential Agency Document
DLB-001020

MSHA0077

Mtg. 2/15/13          10:50 Am

D. Krammer, Silvey, Fesak, McLina

Gmore — Retired No need to
do anything. Silvey Called him
before he retired.

Donald Winston: Fesak thoughts Il Specifications
for not doing the AMS, Be

Silvey: My thought on that memo should Be
done & it was our fault. the memo needs to
Be revised. We should not Be writing him up for that

Fesak: memo permitted discussion poorly
Written & needs to Be rewritten & revised
Next one he is all over the place about orders
the check list District did not have anything my option
they Blew up the checklist.

Silvey: Clear to me they were not using
the revised checklist. had Been using the
revised there Checklist. Any Safety gain
from the the rewcklist? If there was no
change from this

Donna   Take 7 day down to 3 days (For Winston)

Silvey   what if I todo it down to 2 days
U am thinking 1 day. We do not want our
Supervisor's doing that when our memos come out we need to do something

Undoe consideration
instead of dropping
spec. 1.

Reginning)

Lincoln: Fesar. Reconsider Drop Spec. 1
Silva, we can not hold him accountable
For FAR's + AA. Dismiss 3. Revise policy for
AA's + FAR's Spec. 3 - Spec. 2 is weak
No evidence + Drop Spec. 2.

Specification 1 - looking at 2 days.

Charloe: Reprimand w/ training

Fesar will send analysis to Donna

4/3/13

## Issued Letters (Link)

Dec 18 '13

Silvy. proposed suspension was issued to
you. It's taken me some time to reach a
decision. I have taken into consideration all
you have submitted / year of dedicated service to
MSHA. I mitigated it down to a one
day suspension. There are appeal rights in this.
We will work w/ OASAM on the suspension to
protect confidentiality.


Link: Every District in the Nation was charged
w/ the same thing. I am the only one to be
charged.

280 same on the flagrants. If flagrant was a
much broader issue then D-4
your depending on my memory, inspectors + ohrs.
Flagrant is very timing consuming.

10 work days to Administrative Grievance

Code people time US (non work)

MSHA0080

4/3/13

Issued Letter Don Winston

DOR Winston:

Silvey: process ab why were here
today on the decision on proposed
suspension.

1.) Dealt w/ check list + one dealt w/
approving roof control plan.
Added good work cases.

Winston: Appreciate that & I think
this is fair decision. I appreciate it very
much.

Confidential Agency Document
DLB-001024

MSHA0081

John Moran

Th 1/24/13
3:10p - 3:45p

recommendations —

TM - 5 day → LOW supplemented w/ training
retiring 1/31/13
DW - 7 day → 3 days (GF-LOR)
PIC allows discretion on item 4
may have had checklist, couldn't say for sure

LS - 7 day → 7 day (GF-drop spec 1) 5 day
no responsibility
no dates or suff. doc relating to meetings or instructions
focuses on formal training, no mention of OJT

CT - 7 day → 3 day (PS - LOR?) mentor outside scope of LOR but still do it
limited SOL suppt. on flagrants
could have done better KS said he'd handle D 2, 3, 4
doing as he was told, many conversations w/ Hardman on unwarrantable)
media concern

Fr 2/15/13
11am - 11:45am

TM - retired

DW - drop spec 1 - memo allowed discretion 058 A, needs to
be revised
spec. 2 - not using revised checklist, had been using draft
checklist + developed DW own's checklist
blew off HQ checklist, disregard for HQ authority   not filing checklists
goal is to save miners
1 day to 1 day

LS - drop spec 3 revise policy for AA's + FAR's
no evidence he was aware - spec 2
spec 1 - flagrants new tool in miner Act
didn't send enough flagrants to ECC to have them tracked down
had repeated used un. failure tool should have considered better application
7 day to 2 day

CT - 7 day to LOR w/ training + mentoring

DOL-OASAM-0001

Debriefing

Th 12/20/12
5p - 5:30p 6p

Silvey      Fesak
Kramer      Molina

remaining action: Charlie to schedule oral
        has ext til 1/18/13
        compare LB's written statement to proposed - George
        + schedule follow up
        after 1/18/13 George can match up DW's written reply

Staggered approach - decide Moore - his reply nothing to add to
                    meet on LS                            others
                    meet on DW
                    oral on CT

recommend Moore gets LOW + training F.O.S.

✗— Rich Fairfax Dep Asst Sec.
  ~~Dorothy Doherty~~ OSHA possibility for mgmt official for
  grievance    enforcement agency

may supplement any actions w/training

MEMORANDUM TO KEVIN G. STRICKLIN
                Administrator
                Coal Mine Safety and Health

FROM:        PATRICIA W. SILVEY
                Deputy Assistant Secretary for Operations
                Mine Safety and Health Administration

SUBJECT:      Letter of Warning

This is to notify you of an area of concern regarding your management responsibilities as they relate to the duties of your position.

The duties of the Administrator for Coal Mine Safety and Health (CMS&H) require you to exercise management control and direction of all programs authorized by the Federal Mine Safety and Health Act to ensure the safety and health of the nation's miners.  However, your oversight and control of all programs has not been as effective as it should be.

The issues relating to this matter were raised to my attention when I read the "Internal Review of MSHA's Actions at the Upper Big Branch Mine – South" report (IR) of the April 10, 2010, Upper Big Branch accident investigation.  Accordingly, since I have recently become aware of your actions via the IR report, I am now addressing your misconduct through this Letter of Warning.

The IR report revealed that you relied too heavily on Deputy Administrator, Charles Thomas, to provide sound leadership and direction in the planning, development, execution, and administration of policies and programs designed to prevent injury, disease, and death from mining in the coal mining industry.

You were unaware of issues that required your experience and attention even though you had regular briefings with Mr. Thomas.  Specifically, you were unaware that District 4 failed to provide the necessary oversight to ensure that the too wet to sample survey computer application was used in the Mt. Hope and Princeton field offices; that District 4 failed to provide adequate oversight to ensure that inspectors reviewed potentially flagrant violations in accordance with the Procedure Instruction Letter, No. I08-III-02 and that the District 4 Roof Control Department did not use checklists required by CMS&H Memo HQ-08-059-A.

I have determined that your conduct, as described above, was inappropriate.  Therefore, I must take the corrective measures to address your behavior.  As an employee under my direct supervision, I am directing you to complete the following tasks prior to April 30, 2013.

- Ensure that all corrective actions assigned to Coal Mine Safety and Health (CMS&H) made in response to the Internal Review Report on Upper Big Branch are effectively and timely accomplished.

1

Confidential Agency Document
DLB-001027

DOL-OASAM-0003

- Work with the Director of the Office of Assessments, Accountability, Special Enforcement and Investigations (OAASEI) to develop a means for evaluating the effectiveness of corrective actions in the agency's internal reviews, as well as in its accountability reviews.
- Ensure that new and revised inspection procedures are implemented through the established MSHA's Directives System.

I believe timely completion of the tasks above, in addition to this memorandum, will ensure future misconduct does not occur. Please be advised, any further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

You are requested to sign and date this memorandum as evidence that you received it. Your signature does not constitute that you agree with the contents of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

_____    _____    _____
PRINT NAME                                         SIGNATURE                                    DATE

## Winston

### Specification 1

Following the August 2007 fatal coal outbursts at the Crandall Canyon mine, the Administrator for Coal Mine Safety and Health issued CMS&H Memo No. HQ-08-058-A which provided guidance for review and approval of complex and non-typical roof control plans and amendments.

Winston failed to follow CMS&H Memo No. HQ-08-058-A when he recommended that the District 4 Manager approve the base roof control plan submitted in October 2009 for UBB, without requiring Performance Coal Company to submit a risk assessment specific to the particular mining operation, including the data and evaluation supporting the proposed roof control plan. In particular, Performance Coal did not provide information, such as a pillar stability analysis, detailing the basis on which it determined the plan to be appropriate and suitable for UBB. 

CMS&H Memo No. HQ-08-058-A also required roof control specialists to review operators' ground control analyses to ensure that operators accurately calculated and applied pillar stability factors. Instead, District 4 roof control specialists requested examples of pillar stability analyses from mine operators to demonstrate the operators' ability to use the appropriate software.

### Analysis

The first three criteria specified in CMS&H Memo No. HQ-08-058-A did not apply at UBB. These criteria are: "1) room and pillar retreat mining at overburden depths of 1000 feet or greater; 2) design criteria that does not meet the stability factors calculated using the Analysis of Retreat Mining Pillar Stability (ARMPS) Computer Program and recommended in Program Information Bulletin No. P08-8; 3) mines with a history of bounces or bumps, regardless of the amount of overburden cover."

The fourth criterion in the memo is discretionary: "4) other criteria considered unusual by the District Manager, such as retreat mining between two gob areas, mining of high stress areas created by multiple seam interaction, or active mining above or below longwall panels or isolated remnant pillars." Winston stated that he did not consider ground control conditions at UBB to be "unusual." Winston stated that he has a Masters degree in mining engineering, 19 years of industry mining experience, and over 10 years experience in the District 4 roof control department, implying that he is qualified to determine whether conditions at UBB were unusual. He pointed out that both the Assistant District Manager and the District Manger signed off on the UBB roof control plan without a pillar stability analysis.

Winston agreed with the Technical Support analysis presented in Table 1b of Appendix K of the Internal Review report that the pillar stability factors in the 1 North Headgate and Tailgate entries did not meet the recommended NIOSH safety factors. In fact, the pillar stability factor in the 1 North Headgate was 64% of the value recommended by NIOSH. (The 1 North Headgate entries failed, requiring the

2

Operator to develop the 22 Tailgate entries.)  In addition, Winston did not address the fact that the 1 North headgate and tailgate pillars were significantly smaller than those in earlier UBB longwall panels.

## Conclusion

Winston did not fail to follow CMS&H Memo No. HQ-08-058-A because the memo permitted him to use discretion.  However, as evidenced by the failure of the 1 North Longwall headgate entries and the inadequate pillar stability safety factor in these entries, Winston used poor judgment when he did not require Performance Coal to provide information, such as a pillar stability analysis, detailing the basis on which it determined the roof control plan to be appropriate and suitable for UBB.

## Recommendation

Eliminate Specification 1, but counsel Winston on when it is appropriate to require a mine operator to provide a pillar stability analysis.

## Specification 2

You failed to implement provisions of CMS&H Memo No. HQ-08-059-A.  You did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and revisions.  The checklists were initially required to be used by roof control department supervisors only.  Instructions for all roof control personnel to begin using the checklists were e-mailed to District Managers and Assistant District Managers on January 27, 2009.  The e-mail required the use of the checklists during the next plan review.  For UBB, this would have been the review of the new base plan submitted by the operator in October 2009.

District 4 had developed its own checklists and other documents for guidance when reviewing initial roof control plans and supplements.  While the District 4 Standard Operating Procedures for plan reviews did not require the District checklists to be used, the plan reviewers stated they used the District checklists to assist in completing roof control plan reviews.  The District 4 checklists were not the same as those required by CMS&H Memo No. HQ-08-059-A.

CMS&H Memo No. HQ-08-059-A also required that all documentation (MSHA Form 2000-204, checklists, drawings, sketches, etc.) explaining and supporting the roof control plan approval and associated 6-month plan reviews be maintained as part of the roof control plan file for each mine.  However, neither the Headquarters nor the District 4 checklists were included in the District 4 plan approval records for the review of the October 2009 UBB base roof control plan.

## Analysis

Winston stated he began using the headquarters checklists as soon as he received CMS&H Memo No. HQ-08-059-A; however, he did not remember receiving the January 27, 2009, e-mail requiring all roof control personnel to use the checklists.  He also stated he was never told that his specialists were using the wrong checklists.

Confidential Agency Document
DLB-001030

Winston also stated that the District 4 checklists were updated to include items in the headquarters checklists that were not already in the District 4 checklists and that roof control specialists began using the updated checklists. However, the checklists provided to the internal review team did not contain all of the considerations in the headquarters checklists.

Winston did not dispute the fact that neither the Headquarters nor the District 4 checklists were included in the District 4 plan approval records for the review of the October 2009 UBB base roof control plan.

The Internal Review team concluded that the District 4 checklists for reviewing roof control plans were adequate to ensure the plans submitted by Performance Coal Company included the required information.

### Conclusion

The District 4 checklists were adequate to ensure the plans submitted by Performance Coal Company included the required information. However, Winston did not exercise due diligence in implementing the checklists provided in CMS&H Memo No. HQ-08-059-A. If the District 4 checklists were modified to be consistent with the headquarters checklists, they were modified after the Internal Review team examined the checklists. Checklists were not included in the approval records for the review of the October 2009 UBB base roof control plan as required.

### Recommendation

Issue a written reprimand to Winston for his failure to implement the headquarters roof control plan approval checklists in a timely and effective manner.

Confidential Agency Document
DLB-001031

### Winston

#### Specification 1

Following the August 2007 fatal coal outbursts at the Crandall Canyon mine, the Administrator for Coal Mine Safety and Health issued CMS&H Memo No. HQ-08-058-A which provided guidance for review and approval of complex and non-typical roof control plans and amendments.

Winston failed to follow CMS&H Memo No. HQ-08-058-A when he recommended that the District 4 Manager approve the base roof control plan submitted in October 2009 for UBB, without requiring Performance Coal Company to submit a risk assessment specific to the particular mining operation, including the data and evaluation supporting the proposed roof control plan. In particular, Performance Coal did not provide information, such as a pillar stability analysis, detailing the basis on which it determined the plan to be appropriate and suitable for UBB. 

CMS&H Memo No. HQ-08-058-A also required roof control specialists to review operators' ground control analyses to ensure that operators accurately calculated and applied pillar stability factors. Instead, District 4 roof control specialists requested examples of pillar stability analyses from mine operators to demonstrate the operators' ability to use the appropriate software.

#### Analysis

The first three criteria specified in CMS&H Memo No. HQ-08-058-A did not apply at UBB. These criteria are: "1) room and pillar retreat mining at overburden depths of 1000 feet or greater; 2) design criteria that does not meet the stability factors calculated using the Analysis of Retreat Mining Pillar Stability (ARMPS) Computer Program and recommended in Program Information Bulletin No. P08-8; 3) mines with a history of bounces or bumps, regardless of the amount of overburden cover."

The fourth criterion in the memo is discretionary: "4) other criteria considered unusual by the District Manager, such as retreat mining between two gob areas, mining of high stress areas created by multiple seam interaction, or active mining above or below longwall panels or isolated remnant pillars." Winston stated that he did not consider ground control conditions at UBB to be "unusual." Winston stated that he has a Masters degree in mining engineering, 19 years of industry mining experience, and over 10 years experience in the District 4 roof control department, implying that he is qualified to determine whether conditions at UBB were unusual. He pointed out that both the Assistant District Manager and the District Manger signed off on the UBB roof control plan without a pillar stability analysis.

Winston agreed with the Technical Support analysis presented in Table 1b of Appendix K of the Internal Review report that the pillar stability factors in the 1 North Headgate and Tailgate entries did not meet the recommended NIOSH safety factors. In fact, the pillar stability factor in the 1 North Headgate was 64% of the value recommended by NIOSH. (The 1 North Headgate entries failed, requiring the

Operator to develop the 22 Tailgate entries.)  In addition, Winston did not address the fact that the 1 North headgate and tailgate pillars were significantly smaller than those in earlier UBB longwall panels.

### Conclusion

Winston did not fail to follow CMS&H Memo No. HQ-08-058-A because the memo permitted him to use discretion.  However, as evidenced by the failure of the 1 North Longwall headgate entries and the inadequate pillar stability safety factor in these entries, Winston used poor judgment when he did not require Performance Coal to provide information, such as a pillar stability analysis, detailing the basis on which it determined the roof control plan to be appropriate and suitable for UBB.

### Recommendation

Eliminate Specification 1, but counsel Winston on when it is appropriate to require a mine operator to provide a pillar stability analysis.

### Specification 2

You failed to implement provisions of CMS&H Memo No. HQ-08-059-A.  You did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and revisions.  The checklists were initially required to be used by roof control department supervisors only.  Instructions for all roof control personnel to begin using the checklists were e-mailed to District Managers and Assistant District Managers on January 27, 2009.  The e-mail required the use of the checklists during the next plan review.  For UBB, this would have been the review of the new base plan submitted by the operator in October 2009.

District 4 had developed its own checklists and other documents for guidance when reviewing initial roof control plans and supplements.  While the District 4 Standard Operating Procedures for plan reviews did not require the District checklists to be used, the plan reviewers stated they used the District checklists to assist in completing roof control plan reviews.  The District 4 checklists were not the same as those required by CMS&H Memo No. HQ-08-059-A.

CMS&H Memo No. HQ-08-059-A also required that all documentation (MSHA Form 2000-204, checklists, drawings, sketches, etc.) explaining and supporting the roof control plan approval and associated 6-month plan reviews be maintained as part of the roof control plan file for each mine.  However, neither the Headquarters nor the District 4 checklists were included in the District 4 plan approval records for the review of the October 2009 UBB base roof control plan.

### Analysis

Winston stated he began using the headquarters checklists as soon as he received CMS&H Memo No. HQ-08-059-A; however, he did not remember receiving the January 27, 2009, e-mail requiring all roof control personnel to use the checklists.  He also stated he was never told that his specialists were using the wrong checklists.

Winston also stated that the District 4 checklists were updated to include items in the headquarters checklists that were not already in the District 4 checklists and that roof control specialists began using the updated checklists. However, the checklists provided to the internal review team did not contain all of the considerations in the headquarters checklists.

Winston did not dispute the fact that neither the Headquarters nor the District 4 checklists were included in the District 4 plan approval records for the review of the October 2009 UBB base roof control plan.

The Internal Review team concluded that the District 4 checklists for reviewing roof control plans were adequate to ensure the plans submitted by Performance Coal Company included the required information.

### Conclusion

The District 4 checklists were adequate to ensure the plans submitted by Performance Coal Company included the required information. However, Winston did not exercise due diligence in implementing the checklists provided in CMS&H Memo No. HQ-08-059-A. If the District 4 checklists were modified to be consistent with the headquarters checklists, they were modified after the Internal Review team examined the checklists. Checklists were not included in the approval records for the review of the October 2009 UBB base roof control plan as required.

### Recommendation

Issue a written reprimand to Winston for his failure to implement the headquarters roof control plan approval checklists in a timely and effective manner.

Confidential Agency Document
DLB-001034

DOL-OASAM-0010

MEMORANDUM TO DONALD WINSTON
               Supervisory Mine Safety and Health Specialist

FROM:              ERNEST A. CAMERON
                       Director
                       Administration and Management

SUBJECT:         Notice of Proposed Seven (7) Day Suspension

This is a notice of a proposal to suspend you from duty and pay for seven (7) calendar days from your position of Supervisory Coal Mine Safety and Health Specialist, GS–1822–13, in the Mount Hope, WV, District 4 Office. This action is being proposed to promote the efficiency of the service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752. The reasons and specifications upon which the proposal is based are as follows.

**Reason: Failure to Carry out Your Official Duties**

**Specification 1**

You failed to follow CMS&H Memo No. HQ-08-058-A when you recommended that the District 4 Manager approve the October 2009 base roof control plan for the Upper Big Branch Mine (UBB) without requiring Performance Coal Company to submit a risk assessment specific to the particular mining operation, including the submission of data and evaluation supporting the proposal. In particular, the operator did not provide information detailing the basis on which the plan was determined to be appropriate and suitable, such as a pillar stability analysis.

Under applicable agency policy issued following the Crandall Canyon accident, MSHA intended for roof control specialists to review operators' ground control analyses to ensure that operators accurately calculated and applied these factors in all aspects of their mine design. Instead, you indicated in your interview that District 4 roof control specialists requested examples of pillar stability analyses from mine operators to demonstrate the operators' ability to use the appropriate software.

During an off the record discussion with members of the IR team, you stated you did not receive a copy of CMS&H Memo HQ-08-058-A. After the interview was completed, you showed the interviewers a binder where you kept headquarters memos; the memo was not in the binder. The memo was addressed only to District Managers and Assistant District Managers. You should have been aware of this memo.

A note was affixed to the roof control plan tracking sheet by the Assistant District Manager - Technical stating that District 4 would "still look at the [longwall] gate pillars – later."

**Specification 2**

You failed to implement provisions of CMS&H Memo HQ-08-059-A. You did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and supplements. The checklists from the memorandum were initially required to be used by the roof control department supervisors only. Instructions to begin using the checklists universally were e-mailed to District Managers and Assistant District Managers on January 27, 2009. The e-mail required the use of the checklists during the next plan review.

District 4 had developed seven checklists and other documents for guidance when reviewing initial roof control plans and supplements. While the District 4 Standard Operating Procedures for plan reviews did not require these checklists to be used, the plan reviewers stated that they used the checklists to assist in completing roof control plan reviews. These checklists were not those required by CMS&H Memo HQ-08-059-A.

CMS&H Memo HQ-08-059-A also required that all documentation (MSHA Form 2000-204, checklists, drawings, sketches, etc.) explaining the rationale and supporting the roof control plan approval and associated 6-month plan review be maintained as part of the roof control file for that mine. However, copies of the completed checklists were not included in the District 4 records provided to the Internal Review team for the review of the October 2009 base plan as directed by the memorandum.

As a federal employee you are expected to carry out all of your official duties in a timely manner at all times.

In reaching my decision to propose a seven (7) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. You were and still are assigned to review the work of technical personnel under your supervision. If you are unable to properly apply agency policies and procedures in overseeing the review of roof control plans, specialists may be held to a lower standard of quality work.

A Supervisory CMS&H Specialist is a prominent position. You are recognized by mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act.

You were clearly on notice of agency policies and procedures. In your position as a Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates and for ensuring that agency policies and procedures are followed. You were able to correctly recite agency policies and procedures to the IR team when questioned on such matters.

I considered your 'Highly Effective' performance ratings for FY's 2009, 2010 and 2011 as well as lack of prior disciplinary action in your personnel file, and approximate 17 years federal service at the time these infractions occurred. However, these mitigating factors do not outweigh the seriousness of your actions.

I believe this proposed seven (7) calendar day suspension will promote the efficiency of the Federal service and is the least action I can take to correct your unacceptable conduct. Any

further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period or if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

You are requested to sign and date this memorandum as evidence that you received it. Your signature does not constitute that you agree with the contents of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

_____        _____        _____
**PRINT NAME**                              **SIGNATURE**                              **DATE**

3

Confidential Agency Document
DLB-001037

DOL-OASAM-0013

Don Winston                           Th 12/19/12  20
Oral reply                            8:05a - 9:45a

Silvey      Winston       Issued letter different from
Molina      Kramer        draft

Ext til 1/18/13 written reply
Crawford told him he may want to make changes even though
he has written reply ready

DW - nervous
      Spec 1 - failed to follow memo
    ┌ 5/29/08 PIL - 4 criteria  states send to tech sppt.
    ├ 6/5/08 memo - 4 criteria complex for roof control plan
    └ pillar stability analysis - says 2 reasons why PIL developed
      retreat mining

PS - pillar stability analysis ALPS?
DW - ALPS deals w/ longwalls
PS - stability analysis
DW - yes - can I explain
PS - should ALPS analysis been req?

DW - didn't think SD - no mention of ALPS - PIL determines if
PS - 4 goes to tech sppt
PS - 058 A
DW - does mention ALPS in order to req analysis it has to
meet criteria on pg 1 - never sent to tech sppt - didn't think
it met 4 criteria

ask            058 A #4 says other unusual  pg 144 IR report
for            PIL - at discretion of DM
clarification?   When 1st recv'd PIL 1-3 straightforward 4 is discretionary
discuss   ┌ called Joe Sbaffoni in tech sppt says depends on your exp
2/DM?  ∩ └ & comfort zone w/ multiple seam mining may not need to
              send to tech sppt
         9/14/12 email VTC repeated this  Je + Chris Mark did training
              other districts may consider non-typical but could be
Cybulski      typical in D4 - multiple seam mining more common here
         Prof. Engineer - masters in mining engineering
         20 yrs industry - 13 yrs chief engineer part of resp. incl.
         1993 - MSHA              roof control
         1994 - roof control. 10 yrs exp prior to UBB w/ roof control
         good idea when multiple seam mining may be problem

         discussion coal mine roof rating UBB was 51 according to Mike
         DW - based on his exp didn't consider 175' to be unusual  Gonna
                                                       interburden
             UBB 1st roof control plan 1994 approval - extensively overmined
         no knowledge where seam above caused problems

Don Winston cont'd

OIG just reviewed 26 mines in D4 for Crandall audit
Did D12 separate        17 mines (65%) had innerburdens less
                              than 175

*not address 3rd*
*category up*
*diff spec*

App K⁴ of IR report - Mike Gonna tech sppt did 4 tables discusses ALPS
              quality of roof rating

PS- thinks he's talking about ALPS eval - company didn't submit ALPS
        analysis
DW- never req. ALPS stability factor to be submitted
        didn't think of asking for one 7 longwalls operation @ one time

*beginning when?*

have req. after UBB - have 2 now + have req. but meet criteria
                              in his opinion
PS- sent to tech sppt?
DW- only if meets criteria

*sent any? N*

Table 1A + 1B pg. K-4
last analysis on K-6 post UBB    AMSS - multiple seam
multiple point interaction had little to do w/ UBB accident
ALPS - longwall         this validates his exp + decision making at
ARPS - retreat          the time
DW asked Mike Gonna for analysis which was back up for K-6
            Gonna

*office 2 practice*

DM + ADM recv'd O58A + approved plan - Rethert
Klein                   both signed + never asked for anything
if no one told him he was doing anything wrong he thought he was right

would return to me  transmittal sheet  sometimes would come back
not rubber stamps -

3rd paragraph spec 1 - said during IR - taken out of context
2/08 massive collapse of partial pillaring - issued D citation
at hearing thought AMZ not remnants - were lying   Coalburg mine
wanted to ensure another operator couldn't say they didn't under-
stand - did this to know operators could use software
PS- but didn't req. ALPS analysis? N
      req any operator to submit analysis

DW- only ARPS, no ALPS  but do now

Spec 2 - checklists pg. 151 IR report
      O59A - can't deny but clarifies
      using original checklists 11/27/09 - not accurate title it changed
not using new checklists - was not using D4 checklists b/c no
agreement w/ union - after union agreement
not using 226 + 227 - using what originally came out of NO

*using now? O59A started when?*

PS- D4 developed + use own checklist?        DM + ADM did not
DW- yes b/c we req more than NO              share checklists
PS- did you get it or not?

*Jan 2012*

DW- can't say, won't lie to you, would have been from
      Klein, can only say he wasn't aware of it
      were not re...            he did all

②

Don Winston cont'd

was not told he was using wrong form
Spec 2 - true no checklist attached to plan - knew they were
missing but remembers completing checklist - doesn't know where
it went - offers checklist now that was done after plan developed
to show plan was complete
PS- fact checklist not w/plan?
DW - correct - specialists had their own checklist that was above +
beyond what no reg - 4 specialists working for him

what — these checklists not attached to plan
happened       using checklist
to them?    D-9 created fillable checklists + sent to all districts
don't know     became aware of correct checklist Jan 2012 + specialists
               completing

BOD      # specialists didn't know about this before Jan 2012
Newberry
LMR        IG didn't consider checklists deficiencies b/c IG gave DW
meetings    list of deficiencies
         no one told him checklists were wrong - Jan 2012 conf call seemed
         like all other districts using no checklist

PS- reg sample of DW checklist

DR- Douglas factors mitigating - stress, family problems, etc
DW- no
PS- make sure to send any
felt comfortable


Klein - mean

<u>Moore</u>

### Specification 1

Page 19 of the UBB base roof control plan approved by the District 4 Manager on December 23, 2009, required the tailgate travelway of initial longwall panels to have supplemental support in the form of two rows of 8-foot long cable bolts or two rows of posts on 4-foot centers installed in the middle of the entry between primary supports. This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times. The MSHA Accident Investigation team found there was only one row of supplemental support in the tailgate travelway as opposed to the two rows required in the approved roof control plan.

On January 28, 2010, you documented that you reviewed the Uniform Mine File (UMF) prior to accompanying an inspector who was conducting a section 103(i) spot inspection at UBB. The date stamp on the approval letter indicates that the approved roof control plan was filed in the UMF on January 20, 2010.

On March 9, 2010, you inspected the tailgate of the 1 North Longwall at UBB with ventilation specialist Keith Sigmon. You and Mr. Sigmon identified a serious violation of the ventilation plan and issued an order for that condition. However, neither you nor Mr. Sigmon identified the violation of the approved roof control plan. When interviewed by the Internal Review team you stated that you could not recall if posts or cable bolts were installed in the tailgate entry.

### Analysis

Moore did not dispute that he did not detect the roof control violation during his March 9, 2010, inspection of the 1 North Longwall tailgate.

Moore reviewed the UBB Uniform Mine File more than a month before his March 9, 2010, inspection and may have forgotten about the requirement in the roof control plan for two rows of posts or cable bolts in the tailgate travelway. In the first half of CY 2010, Moore's Workgroup was responsible for inspecting 17 underground mines, each with its own roof control plan.

Moore may have overlooked the requirement in the UBB roof control plan. He reviewed the UMF on January 28, 2010, prior to accompanying an inspector on a section 103(i) spot inspection at UBB. Section 103(i) spot inspections are focused on ventilation and methane liberation, not roof control.

Finally, Moore made a strong (valid) case that the violation of the ventilation plan was so serious that it consumed all of his and Sigmon's attention.

### Conclusion

This issue was an oversight on Moore's part and not an intentional failure on his part to carry out his official duties.

Confidential Agency Document
DLB-001041

2

**Recommendation**

Issue a letter of counseling to Moore.

**Specification 2**

On January 12, 2010, Coal Mine Safety and Health (CMS&H) Inspector and Authorized Representative (AR) Perry Brown allowed Right of Entry (ROE) trainee Sabian Vandyke to travel alone to "3 unit" of UBB to determine if a violation involving the lifeline had been abated.

Inspector Brown recorded this information on page 10 of MSHA Form 7000-10K dated January 12, 2010. He wrote: "Scott Vandyke went to 3 unit & checked the lifeline citation # 8090251 is terminated. Wrote out termination and drove back to Mt. Hope."

On January 20, 2010, you initialed inspector Brown's MSHA Form 7000-10K at the bottom of the form on the line designated for the supervisor's initials and date. You did not question Mr. Brown or Mr. Vandyke regarding the possibility that Mr. Vandyke had traveled alone.

When you signed Form 7000-10K you failed to identify your staff's failure to comply with Section 103(a) of the Mine Act as well as MSHA's Program Policy Manual, which states in relevant part:

> *Inspections and investigations under the Federal Mine Safety and Health Act of 1977 shall be conducted only by persons who have been authorized by the Secretary to conduct such inspections or investigations.*

You also did not comply with District 4's Standard Operating Procedure for authorized representative mentoring of trainees. Item 3 of the guidance stated: "During any inspection activities at a surface or underground mine, the AR shall make certain that the ROE Trainee is close to him/her at all times."

**Analysis**

Moore did not dispute that, during his review of the inspection notes, he missed the fact that AR inspector Perry Brown allowed ROE trainee Sabian Vandyke to travel alone to "3 unit" of UBB. He indicated he followed an acting supervisor into the job and that the office was in chaos when he arrived. He said he had catch up with reviewing notes from workgroup inspectors that should have been reviewed by the previous acting supervisor and indicated he was overwhelmed when he started his new job. He indicated that inspection notes can be 20 to 30 pages per day.

The Internal Review team determined Moore transferred from the Mt. Carbon field office to the Mount Hope field office supervisory position on Sunday, January 17, 2010. Because Monday, January 18, was a federal holiday, Moore was in his new position 2 days when he reviewed and initialed inspector Perry

Confidential Agency Document
DLB-001042

DOL-OASAM-0018

3

Brown's notes. Moore followed an acting supervisor into the job. The acting supervisor should have reviewed Brown's notes the prior week.

Moore indicated he was well aware that trainees could not travel apart from inspectors and that his inspectors knew that too. He stated that he routinely told trainees they could not travel alone when he assigned them to travel with inspectors.

It is important to note inspector Brown and trainee Vandyke reported to the acting supervisor at the time Vandyke traveled alone. The Internal Review team determined that a trainee traveled apart from the inspector on one occasion during Moore's tenure as supervisor. However, the team made this determination from interviews, not by reviewing inspection notes.

### Conclusion

This issue was the result of an oversight on Moore's part. He did not intentionally disregard the Mine Act or Agency policy. His review of the inspection notes did not detect the fact that the trainee traveled alone, most likely because he had recently inherited a field office from an acting supervisor who had not kept up with his review of inspection documents.

### Recommendation

Issue a letter of counseling to Moore.

Confidential Agency Document
DLB-001043

DOL-OASAM-0019

Winston    me                                    W 4/3/13
mclura   Silvey                                  10:30a -
                                                 10:35a - 10:55a

PS- procedural issues + thanks for service + dedication
DW - hands folded on table - attentive , nodding head
mitigated to 1 day - DW made good case on spec 1  so not
                        sustained
DW- thank you - that one bothered me most
PS- spec 2, wasn't quite clear on checklist
in factoring into mitigation D4 had a checklist
2 specs / 7 days = 3.5 days
lists of mines, roof control plans
new IG report stung us  one item was checklists
important to use in future, checklist
audit reflects more accurately work of D4 than UBB
reflects
DW - D4  1 of 2 out of 20 that had all done correctly
PS- wanted to explain to you
DW- fair decision, thank you for removing #1
      appreciate your consideration
DK- explained appeals process + processing 50's
DW- probably won't appeal
DK - we'll wait anyway

Confidential Agency Document
DLB-001044                                    DOL-OASAM-0020

MEMORANDUM TO THOMAS V. MOORE, SR.
Supervisory Coal Mine Safety and Health Inspector

FROM            ERNEST A. CAMERON
                Director
                Administration and Management

SUBJECT         Notice of Proposed Five (5) Day Suspension

This is a notice of a proposal to suspend you from duty and pay for five (5) calendar days from
your position of Supervisory Coal Mine Safety and Health Inspector, GS–1822–13, in the Mount
Hope, WV, Field Office. This action is being proposed to promote the efficiency of the service
and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental
Personnel Regulations (DPR) 752. The reasons and specifications upon which the proposal is
based are as follows.

**Reason: Failure to Carry out Your Official Duties**

**Specification 1**

On January 12, 2010, Coal Mine Safety and Health (CMS&H) Inspector and Authorized
Representative (AR) Perry Brown, allowed a Right of Entry (ROE) trainee Sabian Vandyke to
travel to "3 unit" of the Upper Big Branch (UBB) mine to check the lifeline citation No. 8090251
to determine if the violation had been abated.

Inspector Brown recorded this information on page 10 of MSHA Form 7000-10K dated January
12, 2010. He wrote "Scott Vandyke went to 3 unit & checked the lifeline citation # 8090251 is
terminated. Wrote out termination and drove back to Mt. Hope."

On January 20, 2010, you initialed Inspector Brown's MSHA Form 7000-10K at the bottom of
the form on the line designated for the supervisor's initials and date. You did not question
Mr. Brown or Mr. Vandyke regarding the possibility that Mr. Vandyke had traveled alone.

When asked by the MSHA Internal Review (IR) team about District 4's policy regarding trainees
traveling apart from the inspectors they were assigned with you stated that they (trainees) are not
to travel alone.

When you signed Form 7000-10K you condoned the failure to comply with Section 103(a) of the
Mine Act as well as MSHA's Program Policy Manual, which states in relevant part:

> *Inspections and investigations under the Federal Mine Safety and Health Act of
> 1977 shall be conducted only by persons who have been authorized by the
> Secretary to conduct such inspections or investigations.*

Confidential Agency Document
DLB-001045

1

DOL-OASAM-0021

**Specification 2**

Page 19 of the base roof control plan submitted by the operator on October 27, 2009, and approved by the District 4 Manager on December 23, 2009, required the tailgate travel way of initial longwall panels to have supplemental support in the form of two rows of 8-foot long cable bolts or two rows of posts on 4-foot centers installed in the middle of the entry between primary supports. This supplemental support was required to be maintained 1,000 feet out by the longwall face at all times. The MSHA Accident Investigation team found there was only one row of supplemental support in the tailgate travel way as opposed to the two required in the approved plan.

On January 28, 2010, you documented that you reviewed the Uniform Mine File (UMF) prior to accompanying an inspector who was conducting a section 103(i) spot inspection at UBB. The date stamp on the approval letter indicates that the approved roof control plan was filed in the UMF on January 20, 2010.

On March 9, 2010, you travelled with a ventilation specialist Keith Sigmon. You and Mr. Sigmon inspected the tailgate of the 1 North Longwall at UBB. You identified a serious violation of the ventilation plan and issued an order for that condition. However, you failed to cite a violation of the roof control plan. When interviewed by the IR team you stated that you could not recall if posts or cable bolts were installed in the tailgate entry.

Your failure to issue a citation or ensure Mr. Sigmon issued a citation for the inadequate tailgate roof support does not adhere to the established policies, rules, and regulations, interferes with the mission of the agency, and fails to promote the efficiency of the service. It demonstrates a failure to carry out your official duties and mission critical tasks to which you have been assigned.

As a federal employee you are expected to carry out all of your official duties in a timely manner at all times.

In reaching my decision to propose a five (5) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. You were and still are assigned to review the work of the enforcement personnel under your supervision. If you are unable to enforce agency policies by allowing a ROE trainee to travel unaccompanied and unable to cite a violation of the approved roof control plan, inspectors may be held to a lower standard of quality work.

A Supervisory CMS&H Inspector is a prominent position. You are recognized by mine operators, miners, miner's representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act and its implementing standards and regulations.

You were clearly on notice of agency policies and procedures. In your position as a Supervisory CMS&H Inspector you are responsible for the quality and quantity of work produced by your subordinates ensuring agency policies are adhered to. You were able to correctly recite District procedures to the IR team when questioned on policy matters.

I considered your 'Highly Effective' performance ratings for FY's 2009, 2010 and 2011 and lack of prior disciplinary action in your personnel file. Although you had approximately 20 years of federal service at the time these infractions occurred, you had only worked as a supervisor in the Mount Hope Field Office for approximately three (3) months at the time of the UBB mine explosion.

Confidential Agency Document
DLB-001046

DOL-OASAM-0022

I believe this proposed five (5) calendar day suspension will promote the efficiency of the Federal service and is the least action I can take to correct your unacceptable conduct. Any further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period or if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

You are requested to sign and date this memorandum as evidence that you received it. Your signature does not constitute that you agree with the contents of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

Confidential Agency Document
DLB-001047

DOL-OASAM-0023

PRINT NAME

SIGNATURE

DATE



4

DOL-OASAM-0024

Thomas Moore                                    Th 12/20/12
Moore    Molina    (very emotional)             3:10p - 4:05p
Silvey   Kramer

Ext til 1/18/13
No written reply req.
Understands he could
TM - committed & dedicated Vietnam vet, 3rd generation miner,
production supv in industry - believes in doing the right thing & treating
people has he wants to be treated
health & safety of miners, would not compromise
Ex 1 gtings as insp.   2006 supv in Mt. Carbon - 1st supv job in MSHA
felt like he helped those less exp. CMT's
Spec 2 - RCE trainee, should have picked it out  trainee's knew they
          couldn't travel alone in Mt. Carbon

not making an excuse for himself - deciphering handwriting difficult
job. signing off on all papers & perform other duties w/lack of
supv. training
UMF 3-4 books 6" thick - doesn't believe anyone can retain all info.
Mr. Brown & VanDyke both trainees, Brown had just got his AR
large resp. & knew all acct.  committed to his job b/c he thought he
had something to offer
2 mos. @ Mt. Hope 1/19/10
failed to do & inadequate - not making excuses
could do IE in any F.O. & find same things as what we're doing to
him
honest man & believes in honesty



DK - mitigating family, med, stress?

PS - Spec 1  1/28/10  on 3/9/10 insper tailgate w/vent spec  no violation
of roof control plan cited   REVIEW UMF but so thick

TM - so many revisions in roof control plan - UMF cleaned out afterwards
young insp said thought air being manipulated, so sent lots of insp.
investigated air - men w/d then not returned for 9 days
regulator missing
PS - extendums, confusing?
TM - not always updated
PS - 2 rows spots - did you notice or think about it? determine
      if roof sppt affected vent?
TM - no roof sppt didn't affect vent, more posts wouldn't change
      vent
PS - 1/28/10 UMF  review roof control plan for 103(i) in same way
TM - no  103(i) spot partial review of UMF
PS - did you put partial review?
TM - no & I was travelling w/insp I had not travelled with
      arrived in mid-quarter

Moore cont'd

largest/biggest field office bigger than some districts
can be overlooked
PS- not purging?
TM - no, no one knows what to throw away
PS- ever write partial review?
TM - no, some insp. do but I haven't
PS- did Keith Sigmon indicate partial review?
TM - don't know - came up w/system for event sheet
PS- on 3/9/10 what would KS indicate?
TM- E-01 event but knew what we were looking for

2006-1/19/10 - supv Mt. Carbon
PS- supv training?
TM- not from perspective of supv pool - have found useful to see
how every dist. does things differently - sharing ideas
all dist in same dilema of inexp. CMI's - inexp trying to mentor new,
not all have mining exp.
PS- you're right about handwriting
TM- started to use comp b/c notes not legible Perry Brown
shared PB's notes w/PS
PS- what do you do when someone can't write legible
TM- take your time, PB spends more time typing than writing  PB problems
w/hands    PB- less than 3 yrs exp.
penmanship ↱
like this
since he   ★ 1/12/10 notes turned in one week before he arrived + had to review
came        he got there - had 10 insp.

DK- pg 2 DU's sep arrive of?
PS- no way they could travel alone? N  →TM
PS- how did Mt. Carbon insp know they couldn't travel alone?
TM- I instructed them when I assigned to part. insp. orally
started w/Charlie Thomas, insp together
PS- accession in Mt. Carbon when ROE's travelled alone?
TM- not that I knew of

respect job he's doing, has alot to offer young insp + takes
his job seriously
all hard copy UMF's - prefers electronic - could still be deficient
respects IK process - when insp issued lots of meaningful paper
humbely accept whatever

he clearly has not conferred w/others - his own presentation
emotional
Church pastor since 1981

MEMORANDUM FOR CHARLES J. THOMAS
                          Deputy Administrator
                          Coal Mine Safety and Health


FROM:              ERNEST A. CAMERON
                       Director
                       Administration and Management


SUBJECT:          Notice of Proposed Ten (10) Day Suspension


This is a notice of a proposal to suspend you from duty and pay for ten (10) calendar days from your position of Deputy Administrator, ES-1822, Coal Mine Safety and Health (CMS&H). This action is being proposed to promote the efficiency of the service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and Departmental Personnel Regulations (DPR) 752. The reason and specifications upon which the proposal is based are as follows.

It is important to note that at the time you failed to carry out your official duties, your position of record was the Director, Office of Accountability, GS-0340-15, and you were detailed to the Deputy Administrator position. As such, this proposed action is based upon your position of acting Deputy Administrator during the time period addressed by this proposed action.

**Reason: Failure to Carry out Your Official Duties**

**Specification 1**

You did not provide the appropriate direction and oversight necessary to ensure effective enforcement of the Mine Act, as amended by the Mine Improvement and New Emergency Response Act (MINER Act), and implementing standards and regulations by personnel in District 4. Proper oversight was critically important considering the numerous challenges faced by District 4.

**Specification 2**

During the Internal Review (IR) period, only 7% of the 137 potentially flagrant violations cited by inspectors in District 4 were reviewed as required by PIL No. I08-III-02. This shows a lack of oversight on your part in ensuring effective enforcement of an important provision of the MINER Act.

Confidential Agency Document
DLB-001051

DOL-OASAM-0027

**Specification 3**

The IR identified several instances where District 4 management failed to follow CMS&H policies and procedures applicable to the plan approval process.

- The District 4 Manager approved the October 2009 base roof control plan for the Upper Big Branch Mine without requiring Performance Coal Company to submit data and an evaluation supporting the proposal and without conducting a confirming evaluation as directed by CMS&H Memo HQ-08-058-A.

- District 4 management did not implement the checklists specified by CMS&H Memo HQ-08-059-A when reviewing roof control plans and supplements. Instead, the roof control department continued to use its own checklists.

- The District 4 roof control plan approval SOP was not revised to comply with the *Program Policy Manual* as recommended by the Office of Inspector General in its 2008 Audit report.

- District 4 did not follow national guidance outlined in Procedure Instruction Letter No. I09-V-03, which specified that separate ventilation and dust control plans were to be consolidated into a single mine ventilation plan subject to a single review date.

These failures on the part of District 4 management show a lack of oversight on your part.

Failing to carry out your official duties is one of the most serious infractions that can be committed. You were assigned direct responsibility for all CMS&H districts. District managers, assistant district managers, and field supervisors were in your management chain.

The Deputy Administrator for CMS&H is a very prominent position. You are recognized by the public, mine operators, miners, miners' representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act and the MINER Act.

You were on notice of agency policies and procedures. In your position as the Director, Office of Accountability, you determined compliance with policies and procedures. Yet, as acting Deputy Administrator, you did not take corrective action when it was evident your subordinate managers were not carrying out their official duties in the most effective manner.

I appreciate that there were more coal mines under District 4 jurisdiction than in any other CMS&H district, accounting for 28% of the nation's underground coal mines and 14% of the nation's surface coal mines and facilities. Moreover, District 4 inspected over 63 percent of the Massey Energy mines and facilities in the nation. Although these factors should have highlighted the need for you to provide an increased level of direction and oversight, I have also considered them as mitigating.

I also considered your performance rating for FY 2009 of 'Exemplary' and FY's 2010 and 2011 ratings of 'Highly Effective,' your approximate 21 years of federal service at the time these infractions occurred, and the lack of prior disciplinary action in your personnel file. However, these mitigating factors do not outweigh the seriousness of your actions.

I believe this proposed ten (10) calendar day suspension will promote the efficiency of the Federal service and is the least action I can take to correct your unacceptable conduct. Please be

advised, any further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period or if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

You are requested to sign and date this memorandum as evidence that you received it. Your signature does not constitute that you agree with the contents of this memorandum. However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

_____      _____      _____

**PRINT NAME**                            **SIGNATURE**                              **DATE**

Confidential Agency Document
DLB-001053

DOL-OASAM-0029

Charlie Thomas

Th 1/10/13
10:35a – 12 pm

Silvey      me
molina    Thomas

need better + reply 12/21/12

proposed 7 day

CT - memo heavy handed
    failure to carry out official duties
obstacles to get flagrants into system
policy dependent on GOL sppt.
CT alone not responsible/misleading; MSHA's a team
shouldn't shoulder entire responsibility

no computer system for flagrants
no GOL sppt on all flagrants - limited sppt
D4 large - asked for 4rs to split D4 - waiting on DOL
difficult to mng mines, paperwork       approved

ask?  Key indicators - his supvs should have opinion   asked KS +
    - never interviewed by IR team                didn't see need
    Everyone else disciplined talked w/team        was GF's call
    emails on spending too much time on 602's
    avg abatement time decreased

what did he do?  did provide oversight - never didn't look @ key indicators  D7
    visited western mines on rock dust mr Alisuer + Sebastian
    supv ADM + DM not doing about lack of rock dust surveys
    relies on subordinates b/c he can't be in 600 places @ once

    if held responsible w/acting Dep only getting GS-15 pay
    never @ SES pay - wants compensation difference

did he?  roof control plan not being complied with - relies on
    subordinates - once he + Levin became aware would have
    taken disc action

    vent plan + roof control plan separate, always been that way
    no bearing on accident - lame accusation

    CT stern disciplinarian - LOR for absenteeism/leave
    restriction     meets
    Al Davis - tried 2 4rs to get him out of position )  D7
    Hacker - meets              divided for oversight
    KS told him to focus on D7, 8, 9
    KS said he'd handle D 2, 3, 4
    CT doing as he's instructed
    could have shared w/IR team + accident team
    sent Klein to D1 for mentoring - post UBB
    sent Napp on detail, he declined to comply - post UBB

Narcotes @ lowest rate in Coal - some improvement in D4
operators would probably say he's harsh

increased # health violations

~~GF should have interviewed him~~

PS - has heard SOL doesn't always spot
    UBB most unwarrantables - see th D2 orders
    any flagrants @ UBB? N
    should she have marked flagrant? condition no writing, no
                                      . use if not getting spot.
CT - SOL no authority to overturn if Adm & Dep Adm
    think should be flagrant
many conv w/ Hardman D4 on unwarrantable

PS - after UBB looked @ one vent. violation after another,
    & wasn't working - what happened?
CT - most tech ADM's would have connected the dots, relies
    on RDM's & they didn't involve tech spot
Bob or Klein never told him - don't know if he was
reviewing.
Poorly engineered mine - op bears some resp.
PS - corrected systemic problem?
CT - should have been on violation pattern but due to
computer glitch
PS - would it have mattered? would UBB have made it?
CT - severity rate lacking
not going for emotional chord - heart & soul in protected
miners - always looks for challenge
worked in D2, 3, & 11 always learned something
always ~~tested~~ for responsibility
      accepted
KS great mentor - this is hurtful
PS - prior to UBB mid/09 - 4/10 only D4 flagrants?

failed
Hardman
twice &
only heard
this once

CT - yes - 2 DM's wanted to switch regional SOL - wanted Nash-
    Hardman & McKinney        ville instead of h.o.
idea was rejected
PS - any reason no flagrants @ UBB?
CT - no - going inspectors intimidated by pleading operators
    thinks CMI's harassed
PS - Hardman & Klein retired - think they not doing their job?

1st time
heard this?
4

CT - yes - Klein not doing his job
    have to file w/ Hardman perf rating - Hardman asked to get
    rid of Klein - discussed w/ KS
HE rating on Hardman
PS - contradictory
CT - will ha...  ....  Confidential Agency Document  ....ting - knew he
was a problem

②

Hardman probably overwhelmed - impossible task
He acting
dust control
PS - vent + methane plan - IR rec. combining plans - we agreed
why?

Knew
prior to    CT - consistency   all other 10 districts had 1 plan  D4 only
UBB? 4         dist w/ 2 plans
25 yrs)
according   PS - opp. to miss something?
to Bob      CT - better for resources if only 1 EE reviewing
Thaxton
            PS - Klein resp. for plan review? 4
              approach to plans

            CT - D4 had other troubled mines - strived w/ KS for good para-
when          meters, focused on other mines also   Klein not aggressive
learned?    ADM - wanted to get plans thru not to ask for help or review
prior to    shielded KS, CT, + Hardman from problems
acting when didn't share problems w/ superiors
reviewing   training plans - salary + others on committee - KS' idea pre 2009
training    penalty size - 1st infraction 7 days
changed -   had he known substandard behavior would have changed
pay?

            KS or PS should have said something - CT was shocked
            over 900 days since incident

            PS - mitigating said acting + not full authority on indep.
              decisions or changes
              Acting was training period - SES candidate program; this
              detail was not

actions
did you  -  CT - acting dep V real dep
take?         told KS about Klein + moving him - if full force dep he
told KS +   could have made personnel change - would have to get
working on it permission - maybe could have moved faster
            Klein + Hardman not good chemistry + good fit

            CT - 7 days affects family w/o pay

            PS - other acting deps
              Melinda Pon  120 days
              Terry Bentley  90 days

            need to talk about Al Davis letter w/ KS
            rescue who issues letter DOL?

③

86/87 4BB corrective actions belong w/coal + me
too large requirement
how are we doing?

CT - doc difficult for CMI's easier to have MIC + record notes
to transfer to word — CMI's spend 3 hrs/day documenting
4 hrs inspecting - need to get to 21st century - do more
documenting than inspecting
don't want to back off supv visits 2 per yr

PS - too much in mgmt
higher level review?

CT - not missing large portions of mines

PS - pete found should have written stronger violations

CT - CMI's not going w/soft attitude

PS - CMI's have penmenship problems? 4

CT - difficult sometimes

When will he get final decision?

PS - gave everyone til 1/18 - so sometime after that
quickly as possible

PS - PIL on flagrant?

CT - expired, need advance notice better

PS - you gotta tell me

CT - wants fair treatment, tarnish his career, no previous
problems - KS would have told him if doing substandard
job - KS doesn't agree w/this action - enjoys working
w/ KS, glad KS' on his side

PS - this doesn't mean others aren't on your side

CT - never saw it coming, shocked when Ernest came up to
him - willing to work to get better on admin
open to coaching + mentoring
big job updates

MEMORANDUM FOR LINCOLN L. SELFE, JR.
             Supervisory Mine Safety and Health Inspector


FROM:          ERNEST A. CAMERON
               Director
               Administration and Management


SUBJECT:     Notice of Proposed Ten (10) Day Suspension


This is a notice of a proposal to suspend you from duty and pay for ten (10) calendar days from
your position of Supervisory Mine Safety and Health Inspector, GS-1822-14, in Coal Mine
Safety and Health District 4. This action is being proposed to promote the efficiency of the
service and is issued in accordance with Title 5, Code of Federal Regulations, Part 752, and
Departmental Personnel Regulations (DPR) 752. The reasons and specifications upon which the
proposal is based are as follows.

**Reason: Failure to Carry out Your Official Duties**

**Specification 1**

You did not provide appropriate direction and oversight necessary to ensure effective
enforcement of the Mine Act and its implementing standards and regulations by enforcement
personnel under your supervision. Proper oversight is particularly important to the development
of inexperienced inspectors and supervisors like those in the Mt. Hope Field Office.

**Specification 2**

You did not provide the necessary oversight to ensure that Right of Entry (ROE) trainees in the
Mt. Hope Field Office did not conduct inspection activities apart from Authorized
Representatives (ARs). The Internal Review (IR) team determined that ROE trainees conducted
inspection activity, apart from ARs, for portions of five of the six regular inspections at Upper
Big Brach (UBB) during the review period. In your interview with the IR team you demonstrated
that you were well aware that this practice was a violation of section 103(a) of the Mine Act,
which is also contained in MSHA policy, as well as internal District 4 guidance. Nevertheless,
you did not take effective action to identify and correct this noncompliant behavior.

**Specification 3**

You did not provide adequate oversight to ensure that inspectors and supervisors under your
supervision reviewed potentially flagrant violations in accordance with the procedures established
by Procedure Instruction Letter (PIL) No. I08-III-02.

District 4 inspectors issued eight section 104(d)(2) orders for violations at UBB that met the
criteria in PIL No. I08-III-02 for review as potentially flagrant violations. Mt. Hope Field Office

Confidential Agency Document
DLB-001058

1

personnel did not review any of the eight orders as potentially flagrant violations. Only 9% of the 66 potentially flagrant violations cited by inspectors under your enforcement supervision were reviewed as required by PIL No. I08-III-02. This shows a serious lack of oversight on your part in ensuring effective implementation of an important provision of the MINER Act.

### Specification 4

You did not effectively use established Agency tools to manage the effectiveness of your subordinate inspectors and supervisors. Mt. Hope Field Office supervisors were required to conduct 78 Accompanied Activities (AAs) and 39 Field Activity Reviews (FARs) during the internal review period. However, documentation provided to the IR team indicates that only 32 AAs and 23 FARs were conducted.

As part of an AA, the supervisor must accompany an inspector on all aspects of an inspection or investigation; this did not occur in all cases. Some supervisors did not observe inspectors conducting complete inspections or investigations. Supervisors documented traveling apart from inspectors during parts of some AAs. On one occasion, a supervisor only traveled to the mine for a close-out conference. These occasions were improperly documented as Accompanied Activities.

Supervisors did not document required information on many of the AA and FAR forms. Some supervisors did not document the correct event activity code on the forms, the dates of Uniform Mine File reviews, or the dates when inspectors were debriefed.

During the review period, you documented conducting five second level reviews of enforcement activities conducted by Mt. Hope Field Office personnel. You did not identify apparent deficiencies in two of your reviews. You did not identify that a FAR was conducted on an incomplete inspection event. You also did not identify that two AAs were conducted on the same day for the same inspector, contrary to established Agency procedures.

When interviewed, you demonstrated you were aware of the requirements for second level reviews.

In reaching my decision to propose a ten (10) calendar day suspension, I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. You were and still are assigned to review the work of the enforcement personnel under your supervision. If you are unable to provide the direction and oversight necessary to ensure effective enforcement of the Mine Act by personnel under your supervision, inspectors and supervisors may not effectively perform their duties.

An Assistant District Manager is a prominent position. You are recognized by mine operators, miners, representatives of miners, and MSHA personnel as having in-depth knowledge of the Federal Mine Safety and Health Act, the MINER Act, implementing standards and regulations, and MSHA policies and procedures.

You were on notice of agency policies and procedures. In your position as an Assistant District Manager you are responsible for the quality and quantity of work performed by your subordinates and for ensuring that agency policies and procedures are followed. You were able to correctly recite MSHA policies and procedures to the IR team when questioned on these matters. Yet you did not take corrective action when it was evident your subordinates were not carrying out their official duties in the most effective manner.

I appreciate that there were more coal mines under District 4 jurisdiction than in any other CMS&H district, accounting for 28% of the nation's underground coal mines and 14% of the nation's surface coal mines and facilities. Moreover, District 4 inspected over 63 percent of the Massey Energy mines and facilities in the nation. Although these factors should have highlighted the need for you to provide an increased level of direction and oversight, I have also considered them as mitigating.

I considered your performance ratings for FY's 2009, 2010 and 2011 that were 'Highly Effective,' the lack of prior disciplinary action in your personnel file, and your approximate 28 years of federal service at the time these infractions occurred. However, these mitigating factors do not outweigh the seriousness of your actions.

I believe this proposed ten (10) calendar day suspension will promote the efficiency of the Federal service and is the least action I can take to correct your unacceptable conduct. Any further instances of conduct of this nature may result in more serious disciplinary action, up to and including removal from the Federal Service.

You have the right to respond to this proposal orally and/or in writing and to furnish affidavits and other documentary evidence in support of your reply. Any reply is to be made no later than ten (10) calendar days following your receipt of this proposal. Full consideration will be given to any reply you make.

The deciding official in this case will be Ms. Patricia W. Silvey, Deputy Assistant Secretary for Operations, Mine Safety and Health Administration. Any written reply you make in response to the reasons and specifications, as well as any written request for an extension of the reply period, should be directed to the attention of Ms. Silvey at the address below.

Patricia W. Silvey
Deputy Assistant Secretary for Operations
1100 Wilson Blvd., 21st floor
Arlington, VA 22209

If you wish to make an oral reply, you should contact Ms. Nancy Crawford, Director, Human Resources Division, at 202-693-9808, to arrange for the time and place for the reply.

You have the right to be represented by an attorney or other representative of your choice, unless such choice represents a conflict of interest or position, unreasonable cost to the Government, or the Government has a priority need for the services of an employee who wishes to serve as your representative. You must indicate your choice of representative in writing to Ms. Crawford at 1100 Wilson Blvd., 21st floor, Arlington, VA 22209.

As soon as possible after your reply is received, or after the expiration of the reply period or if you do not reply, you will be notified in writing of the decision in this case.

If there is anything in this notice concerning the proposed action that you do not understand or if you have a question about the process used, please contact Ms. Crawford.

Confidential Agency Document
DLB-001060

DOL-OASAM-0036

You are requested to sign and date this memorandum as evidence that you received it.  Your signature does not constitute that you agree with the content of this memorandum.  However, your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:



**PRINT NAME**          **SIGNATURE**          **DATE**

Confidential Agency Document
DLB-001061          DOL-OASAM-0037

Lincoln Selfe
oral reply                                    Th 12/20/12
Selfe        Matthews                         12:30p - 2pm
Silvey       Kramer
             Molina

LS provided copy of written reply
Nancy Crawford said could have ext. til 1/18/13
PS- will let him add to written reply if needed

LS - allegation
    IR team said no evidence that MSHA personnel contributed to
    accident, pg. 1 of written reply
Spec 1 -
    2 types of flagrants - reckless disregard - CMI's little problem w/this
    repeated failure - CMI's had issue S+S
    no guidance or policy given by agency to identify 2 or more
    issuances in 15 mos at UBB time - now can be flagged in IPAL
    CMI's couldn't possibly remember all issuances
    requires alot of research - MSHA + CMI's still have some issues
    PS - w/tracking system still problems?
    LS - w/interpretation   pg. 2
        not limited to his enforcement division - discipline him for issue
    not only limited to his division
    PS - when did you interact w/SOL?
    LS - I didn't really - DM would. Kevin has finally say
                              'Charlie Carpenter
    didn't look to see if any he recommended was accepted by SOL
    criteria in hbk - CMI's had training @ academy pg. 1
    Spec 2 - pg 2  staff meetings 1/4 + 1/5/10  1/30/01 + 3/31/08
    learned we don't adequately doc what we cover in staff meeting
    also meetings in 1/4 + 1/5/10   strived hard for consistency w/all
    mines
    nationwide problem but only want to discipline me
    trying to be diplomatic, usually very blunt
    Spec 2 - pg. 2 -

then        directive given several times, no reason to believe his directive
you learned  being followed
what did    Proposing discipline for something I didn't know was happening or
you do?     reason to suspect
        PS- ADM doesn't review daily insp. notes?
            LS - correct

        discussion on policy not related

        PS- how was directives given?
        LS - verbal don't recall any written
        looked for notes but couldn't find any
        travelled w/trainees, but did everything correct
                        sup + CMI's.
        only looks @ serious papers - field office supv never said anything
        had 8 field office supvs
        → talked to them + gave same directive orally
        PS- when you talked to them did they tell you it had occurred?

Confidential Agency Document
DLB-001062                                    DOL-OASAM-0038

①

Selfe cont'd

LS- no -thought about disc action but didn't

Spec 3- pg 3
P5- giving me agency policy on what supv supposed to do?
LS- yes, letter is incorrect
allegation fails about AA's & field reviews
mine visit may not be an AA & W drive not
apologize for calling everyone honey brought up in south, doesn't
mean anything by it

Mt. Hope pg. 3
- by who?  — was told he couldn't train acting supv's b/c coued be pre-selection
A.O. Sandy Humphrey—
coued have      only required to review one FAR
done more?     P5- only sampling?
              LS- not required to but being held acct
time          proposing to discipline me for a national issue
constraints   no ADM training     pg.4 3rd from last sentence - addressed the issue
              verbally

pg 5- training
went to UBB twice - would try to support young CMI's
went w/ Faith Sigmond, vent. spec.
doesn't know of anyone who's been disciplined after IR- using as
a gotcha- not as a tool to assist us  pg.5

pg.6 - career exp.
pg. 7 - wants stricken from record - doesn't understand how it promotes
eff. of svc    likes being able to help families & tell them what happened,
i.e., did their loved one do something wrong
N.O. lost sight of agency mission- too politically driven - feels like
politicians wants someone's head & that's not right - this does nothing
to help miners, lives his life to help miners
                                          (family issues? 7
DK- other mitigating factors, stress, meds &
(he's angry, edgy voice)(clearly is devoted to agency & families)


now hard to concentrate @ work since he got this memo
Roger Richmond then
[ in about now like he was then - Thomas Moore out w/his back]
will be virtual impossibility to complete EOI's this year-reports get
done later - can't certify in MSTS with reports done - not done/ by 10th day
[ I supv now instead of 2

need to disc. every ADM if country if you're disc. me   short staffed
                                                         lost 3 others

other districts refer to Charlie Thomas

## Kramer, Donna L - OASAM HRC

| | |
|---|---|
| **From:** | Silvey, Patricia - MSHA |
| **Sent:** | Friday, December 28, 2012 1:13 PM |
| **To:** | Kramer, Donna L - OASAM HRC |
| **Subject:** | Fw: Reminder concerning HQ Memo: CMS&H No. HQ-12-024-A (SEC103) dated September 13, 2012 |
| **Attachments:** | FW: DM Memo - UBB IR Corrective Action #75 |

FYI

**From:** Selfe, Lincoln L - MSHA
**Sent:** Friday, December 28, 2012 11:42 AM
**To:** Silvey, Patricia - MSHA
**Cc:** Carpenter, Charles E - MSHA
**Subject:** Fw: Reminder concerning HQ Memo: CMS&H No. HQ-12-024-A (SEC103) dated September 13, 2012

Please add this memo to my attachments. This clearly shows the internal review team saw this as a nationwide issue and not a specific issue for me.

Thank you,
Link

**From:** Thomas, Charles J - MSHA
**Sent:** Friday, December 28, 2012 11:31 AM
**To:** zzMSHA-Coal District Managers; zzMSHA-Coal District Managers Secretaries ; zzMSHA-Coal Assistant District Managers; zzMSHA-Coal Staff Assistants
**Cc:** zzMSHA-COAL HQ Division Managers; Dickens, Rose - MSHA; King, Michelle K - MSHA
**Subject:** Reminder concerning HQ Memo: CMS&H No. HQ-12-024-A (SEC103) dated September 13, 2012

All,

This is a reminder that District SOPs for training for **temporary promoted** Supervisors are to be revised by January 31, 2013.

The UBB internal review corrective action #75 states: …

B. *CMS&H will issue guidelines for ADMs to provide the level of oversight necessary for work groups with inexperienced acting field office supervisors.*

The attached memo has the two checklists and one guideline checklist to be made part of the District SOP for acting FOS. Make sure that the SOPs have been updated and provide an e-mail from the DM to me that the SOP was updated and that the checklist and guideline was incorporated in the SOP by January 25th, 2013. Please cc: RoseAnn Dickens.

Charlie

Confidential Agency Document
DLB-001064                                                    DOL-OASAM-0040

**Kramer, Donna L - OASAM HRC**

| | |
|---|---|
| **From:** | King, Michelle K - MSHA |
| **Sent:** | Friday, December 28, 2012 11:25 AM |
| **To:** | Thomas, Charles J - MSHA |
| **Subject:** | FW: DM Memo - UBB IR Corrective Action #75 |
| **Attachments:** | DM Memo HQ-12-024-A.PDF; Attachment to DM Memo HQ-12-024-A Inspection Tracking - SUR.xls; Attachment to DM Memo HQ-12-024-A Inspection Tracking - UG.xls; Attachment to HQ-12-024-A Guideline Checklist 8-28-2012.doc; Signature Sheet.PDF |

**From:** Dickens, Rose - MSHA
**Sent:** Thursday, September 13, 2012 7:41 AM
**To:** zzMSHA-Coal District Managers; zzMSHA-Coal Assistant District Managers; zzMSHA-Coal Staff Assistants; zzMSHA-Coal District Managers Secretaries
**Cc:** Stricklin, Kevin G - MSHA; Thomas, Charles J - MSHA; Pon, Melinda - MSHA; Bentley, Terry L - MSHA; Tarr, Jane E - MSHA; Gigliotti, Stephen J. - MSHA; Thaxton, Robert A - MSHA; King, Michelle K - MSHA
**Subject:** DM Memo - UBB IR Corrective Action #75

Good morning,

Attached is a memo to district managers regarding Upper Big Branch Internal Review Corrective Action #75, Guidelines and Training for Temporarily Promoted Supervisors.

If you have any questions, please let me know.

Rose Ann
202-693-9508

Confidential Agency Document
DLB-001065

DOL-OASAM-0041

Selfe.   me                                          W   4/3/13
molina   silvey                                      9:05a-10am

PS- procedural review   LS-hands tightly clenched
                                fingers intertwined
                                staring @ PS - no head movement
PS- 1 day susp.
     OASAM will process - confidentiality / prominent position
LS- don't understand/national problem          actions indicate
PS- removed 2 specs                            LS-will not read
     mitigated 1 spec                          letter w/us here
LS- IE team identified 285 flagrants
PS- objective criteria was used
LS- 7 days, immaterial
     letter in his file biggest concern

DK- letter not in file / memorialized on 50
LS- peir now has too!
DK- repeated failure - no tools to assist
     asked about appeal r's              US in people
DK- appeal r's explained - privacy concerns    time.
LS- asked how my role b/c I'm Department   LS- no disc.
DK- explained MSHA asked for assistance    or whistle blow
LS- asked how she arrived @ TU instead of M
DK- spring break/family considerations, it's take leave
     on M + F don't want to interfere if we can avoid it
LS- said he was led to believe he wouldn't get any days
930a- LS asked for a few min alone w/ PS
mm + I stepped out

sounds like discussion on DM job
LS not happy - said Charlie talked to him.
PS talks about how many times she applied for DAS before
she got the job - told LS she needs to have this conversa-
tion w/Charlie or Kevin

  DK - asked who told him? LS wouldn't say - DK - sorry
     you were mislead but unless you heard it from PS

LS-
   presented paper - sounds like susp
    PS talking about rescheduling 4/9 conf. call
LS asking about why suspension?
PS- can't give her personal opinion
945a - DK knocked on door
     asked how they're doing. PS+LS said fine
 PS- berated by someone & was angry
     did best she could
     decision reflects acknowledgment
     asked LS - did he think about it @ some point
     at some point you should have asked
3 specs +
DOL-OASAM-0042

PS told LS she made some good points
not easy for her
LS- still pleading his case 9:55a
PS- "gotcha"
10a sounds like discussion on John Moran - career deputy

CT told LS he selected. Scott Mandaville b/c he wanted
someone strong in ventilation according to LS

Confidential Agency Document
DLB-001067                                   DOL-OASAM-0043

## Kramer, Donna L - OASAM HRC

| | |
|---|---|
| **From:** | Silvey, Patricia - MSHA |
| **Sent:** | Thursday, January 17, 2013 9:52 PM |
| **To:** | Kramer, Donna L - OASAM HRC |
| **Cc:** | Molina, Monique V - MSHA |
| **Subject:** | FW: December 15, 2012 memorandum |

FYI

**From:** Selfe, Lincoln L - MSHA
**Sent:** Thursday, January 17, 2013 3:48 PM
**To:** Silvey, Patricia - MSHA
**Cc:** Carpenter, Charles E - MSHA
**Subject:** December 15, 2012 memorandum

Good Afternoon Ms Silvey,

Tomorrow is the deadline for my responses to you concerning the memorandum I was given in December 15, 2012 by Ernest Cameron. I hope I have provided adequate mitigating information and clarified the issues from the Internal Review Team. I am still very upset with these allegations and how they have been misinterpreted and singled me out for a disciplinary action when the team actually identified the issues as nationwide issues, not specific to me and CMS&H District 4. One thing I failed to include in my response is that I am a Certified Mine Safety Professional and have been recognized as a Professional Member of the International Society of Mine Safety Professionals. I have strived to be a mentor and set an example for MSHA in every assignment that I have performed in my 30 year career. I hope this has stood out to you from my past work experiences, performance appraisals, and the various duties I have performed for MSHA. I also want to thank you for the face to face meeting December 18th at the academy and giving me the opportunity to discuss the issues in person. If you need any clarifications or have other questions that will assist you in making the right decision, please do not hesitate to contact me.

Thank you,
Link Selfe

Confidential Agency Document
DLB-001068

DOL-OASAM-0044

## Kramer, Donna L - OASAM HRC

| | |
|---|---|
| **Subject:** | Update on the D4 personnel issue |
| **Location:** | confr call |
| **Start:** | Wed 4/25/2012 4:00 PM |
| **End:** | Wed 4/25/2012 4:30 PM |
| **Show Time As:** | Tentative |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Required Attendees:** | DePompeo, Deborah - OASAM; Kramer, Donna L - OASAM HRC |

When: Wednesday, April 25, 2012 4:00 PM-4:30 PM (GMT-05:00) Eastern Time (US & Canada).
Where: confr call

*~*~*~*~*~*~*~*~*~*

Donna, Im at

Debbie I'll call you at

**Administrator**

FY 10 – EX rating, Michael A. Davis, Deputy for Operations, rating official at plan establishment time; Greg Wagner, end of year rating official, Joe Main, reviewing official.

Received a bonus greater than 10% of his salary.

FY 11 – EX rating, Greg Wagner, rating official at plan establishment time; Pat Silvey, end of year rating official, Greg Wagner, reviewing official

Result 2:  Stresses innovation, creativity and risk – taking.

Encouraged and empowered but not micro managing his HQ division chiefs and field DM's to be creative with their efforts to manage their programs, e.g. developing slogans for winter alter, stickers for coal miners emphasizing various hazards, developing and disseminating safety and health flyers, etc

Giving numerous personnel opportunities to "act" or be temporarily promoted into positions outside their area as a result of a drain on resources due to UBB investigations.

Result 5:  rotating personnel, this ensured that his districts had resources to meet the mandated inspections.

Result 5:  Communication and morale – practicing an open door policy and brainstorming session empowering employees to share ideas

Routinely holding conference calls with district personnel to encourage and promote their efforts in support of the Agency's mission.

Standard 1:  5 % reduction in FY 10 from the average number of fatalities for FY 2005 – FY 2009.  Status of citations issued is monitored for timeliness of abatement. Performance will be measured by the degree to which the District is able to terminate citations within the period established by policy for abatement, hazard condition complaints are timely processed, conferences and contested cases are handled appropriately, 105(c) and 110 cases have been timely investigated and mine plan approvals are evaluated in a timely matter.  Progress will be measured by using a variety of reports.

- CMS&H were the sole authors or co-authors on 24 S & H information bulletins and instruction letters.  Examples include, crushing hazard on battery powered scoops, exam of electrical underground coal mine equipment, and inadequate ventilation.

Standard 2:  The incumbent demonstrates the use of the MSHA key indicators and other reports in the daily managerial decision – making process, demonstrates an understanding

DOL-OASAM-0046

of the root causes for variances, accounts for their and remedy and where applicable shares best practices with relevant MSHA employees. The incumbent must ensure that the completion rate of all E01 inspections is 100%. Exception to this only may granted if the incumbent can demonstrate supporting aberrations beyond the control of the incumbent's management ability that prevented 100 % completion. The completion rate of all E01 inspections at 100% will be for all coal mines nationwide.

- Indications of lacking oversight were addressed at the highest levels of the district, to ensure that the DM was aware that ultimately he/she was responsible for the expectations he/she put on the district personnel.
- To achieve 100 % completion, redistribution of personnel primarily to D 8 and D 9 were necessary.

Standard 3: Focused inspections are used to target the most egregious and persistent violators; conduct special emphasis respirable coal mine dust and noise inspections in FY 2010; continually review noise controls in situations of continuing non – compliance to determine if all feasible noise controls have been applied; revise and improve coal mine dust related inspections based on lessons learned in the "Dust Busters" effort; conduct quarterly reviews of sampling data; initiate systemic reviews of the quality of dust controls in approved mine ventilation and dust control plans during the six month review of the plans to foster continuous improvement.

Standard 4: required mine visits are made; repeat audit findings are reduced or eliminated, personnel are trained as necessary, field activity and second level reviews are completed, deficiencies are timely addressed; there is consistency in citations/orders issues, hazard condition complaints are processed following SOP's conferences and contested cases are not modified or vacated at an unreasonable rate; 105 (c) and 110 cases have been investigated in accordance with the handbook, policies and procedures and mine plan approvals are evaluated accurately and thoroughly.

Provides the necessary leadership and resources to ensure openness, transparency and timely disclosure when responding to all FOIA's.

Strategies and initiative support the Agency's commitment in assuring that miners are free to exercise their legal right to identify hazardous conditions and request Agency inspections without discrimination by overseeing the programs designed to empower miners to request and receive appropriate Agency response and protection.

Provide liaison support and coordination with the DOL for COOP activities and provide executive leadership by assigning appropriate resources for COOP implementation within the Agency.

- CMS&H attained its goal of completing 100 % of the mandatory S & H inspections for FY 2010. This is the third year CMS&H has reached this accomplishment.

Confidential Agency Document
DLB-001071

- Continued to monitor inspection data and the level of consistence in inspections. Audits were conducted and discrepancies were corrected.

**Recommendation – Letter of Reprimand**
**Failure to Discharge the Duties of your Position**

- Has responsibility for all districts. See specifics below that occurred in FY 10.

**Douglas Factors:**
Aggravating:

- DF 1 – Failure to discharge the duties of the position is a serious offense. He has responsibility for all districts and personnel. Issues in need of correction were not addressed expeditiously and errors were made. Checklists were used that were not developed by HQ; not all roof control plans were forwarded to Tech Support as necessary; condoned the ADM not following Handbook directions for three second level reviews. Specifically, in one review ADM did not identify that one of the FAR's was conducted on an incomplete event. One second level review was not signed by the DM. Another review did not indentify that two AA's were conducted on the same day for the same inspector. Failed to follow through or have conversations with individuals on the issues in the field. Appears a lot of reports were reviewed and emails sent. Encourages and empowers the field.
- DF 2 – Prominence of position. Administrator is the most prominent position. Has contact with the public and media. Accompanies Secretary Solis and various congressional members on mine visits.
- DF 8 – Notoriety of offense and its impact upon the reputation of the agency. Negative impact on agency reputation if the mining community were to know of the issues.
- DF 9 – Clarity of notice. According to performance ratings, he was aware of agency polices and procedures.
    - Routinely holds conference calls with district personnel to encourage and promote their efforts in support of Agency's mission. FY 10 performance rating.
    - Monitors the timely investigation and resolution of hazardous conditions reported. FY 10 performance rating.
    - CMS&H were the sole authors or co-authors on 24 Safety/Health Information Bulletins and Instruction Letters.
    - Addressed lack oversight at the highest levels of the district to ensure DM was aware that they were ultimately responsible for the expectations on district personnel. FY 10 performance rating.

Mitigating:

- DF 3 – No active disciplinary action.
- DF 4 – Last two years of EX performance ratings.

Confidential Agency Document
DLB-001072

DOL-OASAM-0048

- DF 5 – Coal still has confidence that Administrator can perform satisfactorily in the future.
- DF 10 – Potential for rehabilitation.  Coal believes these same mistakes will not be repeated in the future.
- DF 11 – Mitigating circumstances:
  - o  Less experienced Deputy Administrator from April 2009 – September 2010, placed greater responsibility on Administrator.
  - o  Became the face and voice of MSHA during UBB as the world watched the rescue/recovery efforts. FY 10 performance rating.
  - o  Key Indicator reports continued to indicate that D4 was too large for their enforcement activities.  Continued to push to split D4.
- DF 12 – Alternative sanctions.  Proposed 30 day is serious penalty and should deter such repeated conduct.

Not Applicable:

- DF 6 – No other roof control supervisor being disciplined.
- DF 7 – DOL does not have a table of penalties.

Confidential Agency Document
DLB-001073

copy

**Deputy Administrator**

GS – 15, Acting Deputy Administrator from April 2009 – September 2010; became Deputy Administrator on September 26, 2010.

Direct front line responsibility for all districts.

FY 09 – EX
FY 10 – HE
FY 11 – HE

FY 10 – HE rating, Kevin Stricklin, Administrator, rating official; Greg Wagner, reviewing official.

**Organizational Performance Elements, FY 10 summary**

Standard 1 (same as Administrator): 5 % reduction in FY 10 from the average number of fatalities for FY 2005 – FY 2009. Status of citations issued is monitored for timeliness of abatement. Performance will be measured by the degree to which the District is able to terminate citations within the period established by policy for abatement, hazard condition complaints are timely processed, conferences and contested cases are handled appropriately, 105(c) and 110 cases have been timely investigated and mine plan approvals are evaluated in a timely matter. Progress will be measured by using a variety of reports.

Standard 2 (same as Administrator): The incumbent demonstrates the use of the MSHA key indicators and other reports in the daily managerial decision – making process, demonstrates an understanding of the root causes for variances, accounts for their and remedy and where applicable shares best practices with relevant MSHA employees. The incumbent must ensure that the completion rate of all E01 inspections is 100%. Exception to this only may granted if the incumbent can demonstrate supporting aberrations beyond the control of the incumbent's management ability that prevented 100 % completion. The completion rate of all E01 inspections at 100% will be for all coal mines nationwide.

Standard 3 (same as Administrator): Focused inspections are used to target the most egregious and persistent violators; conduct special emphasis respirable coal mine dust and noise inspections in FY 2010; continually review noise controls in situations of continuing non – compliance to determine if all feasible noise controls have been applied; revise and improve coal mine dust related inspections based on lessons learned in the "Dust Busters" effort; conduct quarterly reviews of sampling data; initiate systemic reviews of the quality of dust controls in approved mine ventilation and dust control plans during the six month review of the plans to foster continuous improvement.

Standard 4: Mine visits are made; repeat audit findings are reduced or eliminated, personnel are trained as necessary, field activity and second level reviews are completed,

DOL-OASAM-0050

deficiencies are timely addressed; there is consistency in citations/orders issues, hazard condition complaints are processed following SOP's conferences and contested cases are not modified or vacated at an unreasonable rate; 105 (c) and 110 cases have been investigated in accordance with the handbook, policies and procedures and mine plan approvals are evaluated accurately and thoroughly.  Serves on or oversees employees who serve on rulemaking committees to assure timely promulgation of regulations listed in the Agency's semi annual agenda affecting CMS&H.

B. Resource Management:

- Was in charge of supervisor, ADM, and DM details during FY 2010.

#7 Using Key Indicators:

- Has greatly assisted the districts to assure that 100 % inspection completion rates are accomplished nationwide by balancing both inspector resources and supervisors and managers and assigning them as necessary.  Inspection enforcement, presence, and coverage have increased while 100 % of inspection completers have still been achieved.

**Recommendation:  Proposed 30 day suspension**
**Failure to Discharge the Duties of your Position**

- Has responsibility for all districts.  See specifics below that occurred in FY 10.
- Manages District program areas for quality and performance.  FY 10 performance rating.

**Douglas Factors:**
Aggravating:

- DF 1 – Failure to discharge the duties of the position is a serious offense.  He was in charge of supervisor, ADM, and DM details during FY 10 as well as had direct responsibility for all districts.  Because of failure to follow procedures and apply policies equitably errors were made; checklists were used that were not developed by HQ; not all roof control plans were forwarded to Tech Support as necessary; condoned the ADM not following Handbook directions for three second level reviews.  Specifically, in one review ADM did not identify that one of the FAR's was conducted on an incomplete event.  One second level review was not signed by the DM.  Another review did not indentify that two AA's were conducted on the same day for the same inspector.  Failed to follow-through or have conversations with individuals on the issues in the field.  Appears a lot of reports were reviewed and emails sent.
- DF 2 – Prominence of position.  Director, Office of Accountability and Deputy Administrator are prominent positions.  Has contact with the public.

DOL-OASAM-0051

- DF 8 – Notoriety of offense and its impact upon the reputation of the agency. Negative impact on agency reputation if the mining community were to know of the issues.
- DF 9 – Clarity of notice. According to performance ratings, he was aware of agency polices and procedures.
    o While in the Office of Accountability, suggested to Administrator and EFD Director that EFS specialists present handouts underground at all of Coal's 103(i) spot mines. This had a positive impact on rockdusting, permissibility, work place examinations, and ventilation best practices. FY 09 performance rating.
    o Was promoted to a GS – 14 roof control specialist in 2005. Served on interview panel for roof control specialists. FY 10 performance rating.
    o Share root cause of accidents in the field with DM's. FY 10 performance rating.
    o Scheduled quarterly DM meetings to disseminate information, policy, and regulation changes. FY 10 performance rating
    o Review and comment on Congressional inquiry response letters and memorandum, directives, PIL's, PPL's, PIBS, portions of handbooks, policy manuals, accident emphasis information, and related correspondence. FY 10 performance rating.
    o Involved in several briefings/discussions with RSOL/SOL regarding recommendations related to accident investigations, enforcement actions or proposed violations, or violations in contest, where RSOL/SOL was not in agreement with Coal's positions. FY 10 performance rating
    o Stayed abreast of rulemaking and offered support to the DOH concerning Dust Busters and problematic operators/MMU. FY 10 performance rating.

Mitigating:

- DF 3 – No active disciplinary action.
- DF 4 – Last two years of HE performance ratings.
- DF 5 – Coal still has confidence that Deputy Administrator can perform satisfactorily in the future..
- DF 10 – Potential for rehabilitation. Coal believes these same mistakes will not be repeated in the future.
- DF 11 – Mitigating circumstances:
    o From April 2009 through December 2009, while detailed to Coal, accepted constructive criticism and learned from his mistakes. FY 09 performance rating.
    o Carried out Administrator's recommendation that specialists work 50 % of available time dedicated to E01's and E02's. FY 10 performance rating.
    o Met with Administrator almost daily to share updates on issues, enforcement, and correspondence. FY 10 performance rating.
    o Problems with Bowie Mine were brought to HQ attention. Made mine visits to assess conditions. FY 10 performance rating. Leads me to

Confidential Agency Document
DLB-001076

> believe that if he knew of UBB problems he may have conducted site visits.
> - o Visited some districts in 2010 but not D4.  FY 10 performance rating.
> - o Not converted to SES until September 2010.

- DF 12 – Alternative sanctions.  Proposed 30 day is serious penalty and should deter such repeated conduct.

Not Applicable:

- DF 6 – No other Deputy being disciplined.
- DF 7 – DOL does not have a table of penalties.

## ADM for Enforcement (ADM) – Wet Sample Tracking

**Issue:** The ADM did not provide the necessary oversight to ensure that the too wet to sample survey computer application was used in the Mt. Hope and Princeton field offices. Inspectors in these offices did not follow some of the procedures on pages 62-63 of the 2008 *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook, which stated: "Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year. The status of each of these individual wet locations shall be determined during each regular inspection conducted within this one-year period. Spot samples shall be collected if conditions permit on a re-inspection of a previously wet area....If the status of a re-inspected wet area changes, it shall be updated by the inspector in the Rock Dust Sample Submission Application (RDSS) and the data uploaded." Inspectors in these offices did not use RDSS to report collecting any samples from previously wet locations at any mine before the UBB explosion.

**Supporting Documentation:**

- CMS&H Memo No. HQ-06-053-A, *New Procedures for Collecting and Tracking Rock Dust Samples* (HQ-06-053-A.pdf)

- *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook, Handbook Number: PH-08-V-1, January 1, 2008, pages 45, 62, and 63 (Pages from PH08-V-1.pdf)

- *Rock Dust Sample Submission User's Guide*, Coal Inspector Version, Version 2.00, January 3, 2005 (this is the document in effect during the review period and has since been revised) (RockDustInspV2.0.pdf)

- *Rock Dust XML Data Retrieval User's Guide,* Production Version 1.0.0, April 20, 2006 (RDDR.pdf)

- Pages 185-188 from transcript of ADM's December 7, 2010, interview where he indicates that he does not know procedures for entering wet samples data and that he had just identified (before the explosion) that previously wet areas were not being properly tracked and took corrective actions. (Pages 185-188 from ADM Interview - 12-07-2010.pdf)

- Pages 112-116 from transcript of inspector's October 20, 2010, interview where he verifies that he was instructed to complete wet tracking form (MSHA Form 2000-210) shortly before the explosion and explains difficulties he had completing the form. (Pages 112-116 from Inspector Interview - 10-20-2010.pdf)

- Rock Dust Survey Wet Locations Tracking Form (MSHA Form 2000-210) for second regular inspection of fiscal 2010 showing that the field office supervisor initialed the form on April 7, 2010 (Rock Dust Survey Wet Locations Tracking Form from 2Q-FY2010 Inspection Report.pdf)

Confidential Agency Document
DLB-001078

DOL-OASAM-0054

**Mitigating Factors:** CMS&H Memo No. HQ-06-053-A directed district managers to ensure that the RDDR-generated wet tracking form (MSHA Form 2000-210) be filed with each E01; however, the 2008 *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook did not include this requirement. Instead, the handbook stated: "Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year" (p 45), but no guidance was provided to record the inspector's findings on the wet tracking form in the corresponding *Documentation Required* section.

Shortly before the explosion, District 4 managers, including the ADM, found that inspectors were not filing an MSHA Form 2000-210 during each regular inspection and provided training to inspectors. Inspectors completed these forms during the last regular inspection at UBB before the explosion. The form was submitted with the completed inspection report (as intended) at the end of the inspection quarter, leaving the field office supervisor little time before the explosion to review the report for accuracy (he initialed reviewing the form after the explosion, on April 7, 2010).

MSHA Form 2000-210 was designed, in part, as a mechanism for recording which previously wet areas needed to be updated in the rock dust database. MSHA provided a Rock Dust Sample Submission User Guide for the application, but did not incorporate its instructions into the directives system or provide copies through standard inspector resources. The Inspector was not trained to use Form 2000-210 until late in the inspection quarter immediately preceding the explosion. He had difficulty completing the form, in part because he had to enter information from memory for areas that he inspected early in the quarter.

MSHA did not develop oversight reports to monitor wet sample location updates to rock dust data to ensure that the system was properly used. The IR team recognized usage patterns for this application only after a team member ran an ad hoc query of this database. Few people were familiar with this relatively new database, including the ADM (although the DM helped develop the program when he was ADM in District 6).

Notwithstanding the issues identified in the Mt. Hope and Princeton, the remaining District 4 field offices, including two in the ADM's inspection division, reported collecting 34% of the national total samples from previously wet areas during the review period.

DOL-OASAM-0055

**U.S. Department of Labor**

Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



APR 1 2 2006

CMS&H Memo No. HQ-06-053-A (SUB-C71)

MEMORANDUM FOR DISTRICT MANAGERS

FROM:            RAY McKINNEY
                 Administrator for
                 Coal Mine Safety and Health

SUBJECT:         New Procedures for Collecting and Tracking Rock Dust
                 Samples

The attached procedures for collecting, submitting, and tracking rock dust samples are to be implemented by July 1 in all bituminous coal districts. These procedures implement the computer-based, Rock Dust Data Retrieval application which will ensure that relevant compliance actions are taken and that wet sample tracking is consistently conducted. The system will generate a form listing locations where samples were not collected due to wet conditions during the previous year (refer to attached sample Form MSHA Form 2000-210). This form, which must be filed with each E01 inspection report for underground bituminous coal mines, will be used by enforcement personnel to verify that previously wet areas were re-inspected.

Mr. Bob Hardman will host a NetScreen meeting April 20 to provide "train-the-trainer" instruction on use of the computer application. This meeting will be directed at IT specialists and other persons who will be responsible for training in the use of and providing future assistance to enforcement personnel regarding the system. Please provide Mr. Hardman with email addresses of the persons who will logon to the meeting for your district.

If you have any questions, please contact Chris Weaver at 202-693-9506.

Attachments

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

Confidential Agency Document
DLB-001080

DOL-OASAM-0056

<u>Procedures for Rock Dust Samples</u>

1. <u>Collecting Samples</u>. Collect samples to substantiate the violation when citing inadequate rock dust. Samples should be collected when any doubt exists concerning adequacy of rock dust applications in the active workings of the mine; including working sections in areas at least 40 feet outby the working faces. Collect samples of mixed dust by the band or perimeter method from the entry or room, including a 1-inch depth of the material on the floor. Combine dust from the roof, ribs, and floor into one "band" sample. If the amount collected is more than required, thoroughly mix the sample, cone and quarter to cut the bulk to the desired amount. Occasionally, it may be necessary to take more than one strip, but in such case, the total width of the strip must be the same for the roof, each rib, and floor. Collect separate samples of dust from the roof, ribs, or floor when necessary. Where a greater entry height makes it impractical or unsafe to collect full perimeter samples, collect a floor sample and a sample from the ribs to the maximum height that can be done safely and practically. The rib sample and the floor sample may be either combined or prepared separately. When rib samples are collected and reported separately, assume the incombustible content of the rib sample represents the incombustible content of the rib and roof surface at the sampling location.

   Fill the plastic sample bags at least half full. The identifying tags are blank and inspectors can use their own numbering system on the face of the tag. Include the name of the inspector and the name of the mine on the back of the tab. Consecutively number or code the samples for any one inspection. The numbers or code used shall not exceed three digits. Be certain that the identification is legible. The bags are long enough to permit tying a knot in the open ends when they contain the average size sample. Securely tie the string of the tag within the formed knot of the sample bag.

   The inspector must consecutively number spot location samples with numbers only. Do not use letters, since letters are used to designate dust survey samples. Spot location samples and dust surveys shall be listed on separate sample cards, but they can be mailed in the same box.

   The laboratory needs the inspector's name, the name of the mine, the properly numbered tag attached firmly to the sample, and a completed sampling card. If the mine name is clearly printed on the A-1 sample tag and about every other tenth bag of the survey samples, it will be sufficient for the laboratory's needs. Do not put these sample numbers in the column for "Lab. No." For the "Sample of" column, the word "band" is acceptable for a sample representing the full perimeter at the point of sampling. Include the words "return air course" or "intake air course" in parentheses, as applicable, after the location of each sample on the cards forwarded with the samples. All samples submitted

without the collector's name and office address will be analyzed but the report will be held until this information is received.

Tests for methane shall be made at each rock dust sample location with a properly calibrated hand-held methane detector and the results recorded in the inspection notes. If less than 1.0 percent methane is detected, that percentile will be used to determine compliance with 30 CFR 75.403; concerning additional incombustible content when methane is present in the ventilating current. Where methane is detected at or above 1.0 percent on a hand-held methane detector at sampling location, a bottle sample of mine air shall also be collected at the sample location and the bottle number recorded in the inspection notes. The bottle sample will be sent for analysis and the results used to determine compliance with 30 CFR 75.403.

It is the responsibility of the Mount Hope laboratory supervision to ensure that rock dust spot and survey analysis reports and accompanying analysis data are promptly made available for use by the districts. The Rock Dust Data Retrieval Application permits monitoring of prompt issuance of citations/orders for non-compliant samples or surveys, tracking wet survey location re-inspections, mining analysis data, and printing of oversight reports.

Each Regular Safety and Health Inspection report must contain a printed copy of the inspector-submitted MSHA Form 2000-156. If MSHA management has given the inspector instructions not to collect a survey, the supervisor responsible for inspections at the mine shall document clearly why a survey was not conducted. Such documentation shall contain, as a minimum: documentation why a survey was not collected, the inspection event number, the MMU number, the supervisor's signature, and the date the document was prepared. This document shall be included within the inspection report. The responsible supervisor shall assure that all rock dust spot or survey analysis reports returned from the Mount Hope Lab by email attachment to the district are included within the appropriate inspection report. A citation or order shall be promptly issued for non-compliant rock dust spot samples or surveys. The citation or order number of each non-compliance issuance shall promptly be entered into the Rock Dust Sample Submission Application and the data uploaded.

2.  Rock Dust Surveys. During each Regular Safety and Health Inspection, a uniform rock dust survey shall be made in each advancing working section to determine compliance with 30 CFR 75.403. If for any reason a survey is not possible, the inspectors must promptly notify their supervisor. The supervisor, after consulting with district management, will provide guidance to the inspector. The surveys are to be kept current, up to and including the last row

of pillars immediately outby the loading point.  For example, if a working section has advanced and the loading point moved one crosscut or more inby since the last Regular Safety and Health Inspection, a survey must be conducted.

Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed.  All active entries not previously surveyed on retreating sections; including longwall units, will be surveyed.  Include in the collection of dust samples a representative number of crosscuts.

*Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.*  The status of each of these individual wet locations must be determined during each regular inspection conducted within this one-year period.  *Spot samples must be collected if conditions permit on a re-inspection of a previously wet area.*  The previous compliance/non-compliance determination of rock dust surveys will not be affected by the additional analysis of spot samples collected during re-inspection of wet areas.  A citation or order should be issued when non-compliance is indicated for 10% or more of the individual spot samples collected during re-inspection of areas previously indicated too wet for survey sampling.  If the status of a re-inspected wet area changes, it must be updated by the inspector in the Rock Dust Sample Submission Application and the data uploaded.

Rock dust surveys should include samples from a representative number of crosscuts.  Where possible, the maximum interval between sample locations shall be not more than 500 feet.  If the sampling location is less than 40 feet from the face, do not take a sample.  Normally, not more than five rows of samples will be collected without including dust samples from the crosscuts.  If more than five rows of samples are collected without including a line of crosscut samples, an explanation must be provided in the narrative portion of the inspection notes explaining why crosscut samples were not included in the survey.  The survey number shall precede the sample number when two or more surveys are made.

Determine the starting point from the face for such surveys, associating that point with something relatively permanent such as an intersection, survey station, pump room, or borehole.  To say that a sample was collected a certain distance from a working face is meaningless.  The sampling area must be well described and precisely identified so it can be located on the mine map by either the operator or another inspector at a later date.

3. <u>Data Submittal and Mailing of Bagged Samples.</u>  Rock dust spot or survey sampling data must be entered into and submitted utilizing the Rock Dust Submittal Application. Any combination of bagged rock dust samples and/or wet locations (including those where all locations are wet) are considered a survey. *It is extremely important that all survey data be entered into and submitted utilizing the Rock Dust Submittal Application.*  Entering this data and providing the subsequent updates concerning citation or order issuance and wet sample status provides assurance that compliance actions are being taken and that wet sample tracking is being consistently conducted in all bituminous districts.

Mail the samples as soon as possible in accordance with postal regulations. Securely seal the shipping boxes to prevent loss of samples in transit.  Include the return address on the shipping label.  Use a regular corrugated pasteboard carton, but fill voids around the bags with crumpled newspaper to keep the bags from breaking open from rough handling.  Do not use crumpled manila envelopes, excelsior, paper towels, or tissues as packing.  Dust Sampling Lab Report (MSHA Form 2000-156) should be prepared and uploaded to the Mt. Hope Lab Server using the Inspector Laptop Rock Dust Database.  A copy of MSHA Form 2000-156 must be printed and shipped with the bagged sample(s). Compliance/noncompliance concerning rock dust spot samples or rock dust surveys will be determined at the Mount Hope lab and the results returned to the three email addresses submitted by the inspector on MSHA Form 2000-156.

The Mount Hope laboratory supervisor will notify the appropriate District Manager should spot or survey boxed samples arrive at the lab and no accompanying MSHA Form 2000-156 data is available on the file server. Hard copies of MSHA Form 2000-156 will no longer be accepted for submittal of rock dust spot or surveys to determine compliance with 30 CFR 75.403. *Only data concerning spot or survey samples collected to determine compliance with 30 CFR 75.403 should be entered and submitted utilizing the Rock Dust Submittal Application.*  Visual determinations are normally sufficient to determine non-compliance with 75.400.

DOL-OASAM-0060

### Drawing #1

This drawing shows separate surveys where a single MMU has mined multiple distinct areas of a mine.  In this case, three zero points are required to clearly show the extent of each survey.



Surveys will be kept current to the last full row of pillars immediately outby the working section loading point.

**Survey 001-0 C**
Conducted in 2 Right
Zero Point = Survey Spad 20

**2 RIGHT**

A separate survey will be conducted in each distinct mined area (in this case, the Mains, 1 Right, and 2 Right).  Each area is also to be considered separate and distinct for compliance/non-compliance determinations.

**1 RIGHT**

**Survey 001-0 A**
Conducted in Mains
Zero Point = Mine Drifts

**Survey 001-0 B**
Conducted in 1 Right
Zero Point = Survey Spad 12

Confidential Agency Document
DLB-001085

### Drawing #2

This drawing shows how each sample location would be designated, documented on the bag sample tag, and entered on each of the three distinct surveys. The three surveys are separate and would be entered as separate surveys in the Rock Dust Sample Submission Application. The surveys also would be considered separately for compliance or non-compliance determinations.



Coal Rock Dust Survey Data Retrieval System

U.S. Department of Labor
Mine Safety and Health Administration

**Rock Dust Survey Wet Locations Tracking**

Record Count: 7

Selection Criteria:    1500000

From:    4/6/05 to 4/6/06    Event Number:

| | Office Cd | Mine ID | Survey Date | Prior Event # | MMU #1 | # 2 | Sampling Area | Bag # | L/R | Zero Point | Collector |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Remains Wet / Sampled / Inaccessable | 0609 | 1500000 | 6/8/05 | 4567890 | | 0010 | First Left Mains Headings | A1 | | 5' Inby Spad #5422 | JOHN DOE |
| Remains Wet / Sampled / Inaccessable | 0609 | 1500000 | 6/8/05 | 4567890 | | 0010 | First Left Mains Headings | X | I | 25' Inby Spad | JOHN DOE |
| Remains Wet / Sampled / Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | 0010 | | 001 MMU , 2 South Panel | A2 | I | 25' inby spad #5433 (#2 entry) | JOHN DOE |
| Remains Wet / Sampled / Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | 0010 | | 001 MMU , 2 South Panel | I2 | R | 25' Inby spad #5433 (#2 entry) | JOHN DOE |
| Remains Wet / Sampled / Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | 0010 | | 001 MMU , 2 South Panel | B1 | I | 25' inby spad #5433 (#2 entry) | JOHN DOE |
| Remains Wet / Sampled / Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | 0010 | | 001 MMU , 2 South Panel | A1 | I | 25' Inby spad #5433 (#2 entry) | JOHN DOE |
| Remains Wet / Sampled / Inaccessable | 0609 | 1500000 | 9/15/05 | 4567890 | 0010 | | 001 MMU , 2 South Panel | J2 | R | 5' Inby spad #5433 (#2 entry) | JOHN DOE |

Thursday, April 06, 2006

MSHA Form 2000-210 (1/06)

1 of 1 Pages

Confidential Agency Document
DLB-001087

DOL-OASAM-0063

conducted with affected miners and mine supervisors to evaluate their familiarity with plan requirements.

*Documentation Required: The inspector's evaluation of mining near a potential body of water or under water shall be documented in the hard-copy inspection notes to show the in-mine location), the date started, and the date this procedure was fully completed. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. No other documentation is required unless a violation is observed.*

12. **Potable Water (Working Section).** The inspector shall determine if potable water is available.

*Documentation Required: Availability of potable water shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU). A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, availability of the potable water shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

13. **Rock Dust Survey.** The inspector shall conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the mine. Rock dust surveys shall also be conducted in previously mined active areas. Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.

*Documentation Required: The mechanized mining unit number (MMU), the sampling area description, the survey begin zero point, each sampling point (referenced in feet from the zero point), the percentile of methane detected on a hand-held detector and the number of any air bottle collected at each sampling location shall be documented in the inspection hard-copy notes for each survey collected. Additionally, a minimum amount of rock dust survey information shall be documented in the Inspection Tracking System MMU Log to show the MMU number, the date survey was started and the date fully completed. No other documentation is required unless a violation is observed.*

14. **Sanitary Facilities.** Sanitary facilities located on a working section shall be inspected for compliance with applicable standards.

*Documentation Required: Sanitary facility observations shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU), the date started, and the date this procedure was fully completed for that MMU. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, sanitary facilities observations shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

Confidential Agency Document
DLB-001088                                          DOL-OASAM-0064

*Documentation Required:*  *The locations and results of Ventilation (Diesel Equipment) tests for the presence of carbon monoxide and nitrogen dioxide shall be documented in the inspection hard-copy notes.  No other documentation is required unless a violation is observed.*

K.  **Air Sample Locations.**  The quantity of airflow shall be measured and samples of mine air collected for analysis to determine the quality of the air at the following locations:

1. In each of the working section return entries, outby and as close as practical to the last permanent stopping (to determine section face liberation); and

2. At all locations where air leaves the mine (to determine total mine methane liberation).  On blowing ventilation systems this may include roadways, belt conveyor entries, and/or other areas where air leaves the mine.

Samples of mine air shall also be collected and submitted for analysis where methane is detected at or above 1.0 percent on a hand-held methane detector at a rock dust survey or spot sampling location. Samples may also be collected at other locations deemed necessary to evaluate air quality.

*Documentation Required:*  *The quantity of airflow measured, the hand-held methane and oxygen readings in percentile, the bottle number of samples collected, and the location of the measurement or collection shall be documented in the hard-copy notes.  Additionally, where it will be considered for total liberation of methane at the mine the bottle number and location description shall be entered by the inspector into the Inspection Tracking System Air Samples for Total Liberation section.  Samples collected that will not be considered for total liberation purposes shall be entered by the inspector into the Inspection Tracking System Air Samples Collected section*

Confidential Agency Document
DLB-001089

DOL-OASAM-0065

When special samples are collected in connection with a problem arising at a mine or to substantiate a violation (e.g., less than 19.5 volume per centum of oxygen, more than 0.5 volume per centum of carbon dioxide, harmful quantities of other noxious or poisonous gases), inform laboratory personnel of the problem involved.  Mark the Mine Atmosphere Sample Record for special samples with a conspicuous red "S" on the front of the card in the upper left corner.  Such samples are given preference over other samples and the analytical results will be promptly reported to the appropriate office.

2.   Procedures for Processing Air Samples taken to substantiate violations:

   a.   Describe in the citation or order the location where the air samples were taken to substantiate the violation.

   b.   Make a notation on the Mine Atmosphere Sample Record stating the number of the citation or order, the initials of the inspector, and the date and time of issuance.

Where possible, mail the maximum number of samples that a holder/mailer will accommodate at one time; however, mail air samples within five calendar days after collecting (the five days include Saturday and Sunday).  Samples collected from more than one mine may be mailed in the same holder/mailer.  Mail all air samples (in accordance with postal regulations) to MSHA's Gas Analysis Laboratory in Mt.  Hope, WV.

If the analysis of an air sample discloses a violation not determined with testing instruments during the inspection, the inspector shall issue the appropriate enforcement action.

B.  Rock Dust Samples

1.   Collecting Samples.  Collect samples to substantiate the violation when citing inadequate rock dust.  Samples should be collected when any doubt exists concerning adequacy of rock dust applications in the active workings of the mine including working sections in areas at least 40 feet outby the working faces.  Collect samples of mixed dust by the band or perimeter method from the entry or room, including a 1-inch depth of the material on the floor.  Combine dust from the roof, ribs, and floor into one "band" sample.  If the amount collected is more than required, thoroughly mix the sample, cone and quarter to cut the bulk to the desired amount.  Occasionally, it may be necessary to take more than one strip, but in such case, the total width of the strip shall be the same for the roof, each rib, and floor.  Collect separate samples of dust from the roof, ribs, or floor when necessary.  Where a greater entry height makes it impractical or unsafe to collect full perimeter samples, collect a floor sample and a sample from the ribs to the maximum height that

Confidential Agency Document
DLB-001090

DOL-OASAM-0066

can be done safely and practically. The rib sample and the floor sample may be either combined or prepared separately. When rib samples are collected and reported separately, assume the incombustible content of the rib sample represents the incombustible content of the rib and roof surface at the sampling location.

Fill the plastic sample bags at least half full. The identifying tags are blank and inspectors can use their own numbering system on the face of the tag. Include the name of the inspector and the name of the mine on the back of the tab. Consecutively number or code the samples for any one inspection. The numbers or code used shall not exceed three digits. Be certain that the identification is legible. The bags are long enough to permit tying a knot in the open ends when they contain the average size sample. Securely tie the string of the tag within the formed knot of the sample bag.

The inspector shall consecutively number spot location samples with numbers only. Do not use letters, since letters are used to designate dust survey samples. Spot location samples and dust surveys shall be listed on separate sample cards, but they can be mailed in the same box.

The laboratory needs the inspector's name, the name of the mine, the properly numbered tag attached firmly to the sample, and a completed sampling card. If the mine name is clearly printed on the A-1 sample tag and about every other tenth bag of the survey samples, it will be sufficient for the laboratory's needs. Do not put these sample numbers in the column for "Lab. No." For the "Sample of" column, the word "band" is acceptable for a sample representing the full perimeter at the point of sampling. Include the words "return air course" or "intake air course" in parentheses, as applicable, after the location of each sample on the cards forwarded with the samples. All samples submitted without the collector's name and office address will be analyzed but the report will be held until this information is received.

Tests for methane shall be made at each rock dust sample location with a properly calibrated hand-held methane detector. If less than 1.0 percent methane is detected, that percentile will be used to determine compliance with 30 CFR 75.403 (concerning additional incombustible content when methane is present in the ventilating current). Where methane is detected at or above 1.0 percent on a hand-held methane detector at a sampling location, a bottle sample of mine air shall also be collected at the sample location. The bottle sample will be sent for analysis and the results used to determine compliance with 30 CFR 75.403.

It is the responsibility of the Mount Hope laboratory supervision to ensure

Confidential Agency Document
DLB-001091                                          DOL-OASAM-0067

that rock dust spot and survey analysis reports and accompanying analysis data are promptly made available for use by the districts.  The Rock Dust Data Retrieval Application permits monitoring of prompt issuance of citations/orders for non-compliant samples or surveys, tracking wet survey location re-inspections, mining analysis data, and printing of oversight reports.

The responsible supervisor shall assure that all rock dust spot or survey analysis reports returned from the Mount Hope Lab by email attachment to the district are included within the appropriate inspection report.  A citation or order shall be promptly issued for non-compliant rock dust spot samples or surveys.  The citation or order number of each non-compliance issuance shall promptly be entered into the Rock Dust Sample Submission Application and the data uploaded.

2. Rock Dust Surveys.  During each Regular Safety and Health Inspection, a uniform rock dust survey shall be made in each advancing working section to determine compliance with 30 CFR 75.403.  If for any reason a survey is not possible, the inspectors shall promptly notify their supervisor.  The supervisor, after consulting with district management, will provide guidance to the inspector.  The surveys are to be kept current, up to and including the last row of pillars immediately outby the loading point.  If a working section has advanced and the loading point moved 500 feet or more since the last Regular Safety and Health Inspection, a survey shall be conducted.

Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed.  All active entries not previously surveyed shall be surveyed. Outby areas of a retreating section and active areas where advancing MMUs have been removed are considered active entries for rock dust survey purposes.  Include in the collection of dust samples a representative number of crosscuts.  Drawings Number 1 and 2 on the following pages provide further guidance concerning rock dust surveys.

*Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.*  The status of each of these individual wet locations shall be determined during each regular inspection conducted within this one-year period.  *Spot samples shall be collected if conditions permit on a re-inspection of a previously wet area.*  The previous compliance/non-compliance determination of rock dust surveys will not be affected by the additional analysis of spot samples collected during re-inspection of wet areas.  A citation or order should be issued when non-compliance is indicated for 10% or more of the individual

Confidential Agency Document
DLB-001092                                          DOL-OASAM-0068

spot samples collected during re-inspection of areas previously indicated too wet for survey sampling. If the status of a re-inspected wet area changes, it shall be updated by the inspector in the Rock Dust Sample Submission Application and the data uploaded.

Rock dust surveys should include samples from a representative number of crosscuts. Where possible, the maximum interval between sample locations shall be not more than 500 feet. If the sampling location is less than 40 feet from the face, do not take a sample. Normally, not more than three rows of samples will be collected without including dust samples from the crosscuts. If more than three rows of samples are collected without including a line of crosscut samples, an explanation shall be provided in the narrative portion of the inspection notes explaining why crosscut samples were not included in the survey. The survey number shall precede the sample number when two or more surveys are made.

Determine the starting point from the face for such surveys, associating that point with something relatively permanent such as an intersection, survey station, pump room, or borehole. The sampling area shall be well described and precisely identified so it can be located on the mine map by either the operator or another inspector at a later date.

3. <u>Data Submittal and Mailing of Bagged Samples.</u>  Rock dust spot or survey sampling data shall be entered into and submitted utilizing the Rock Dust Submittal Application. Any combination of bagged rock dust samples and/or wet locations (including those where all locations are wet) are considered a survey. *It is extremely important that all survey data be entered into and submitted utilizing the Rock Dust Submittal Application.* Entering this data and providing the subsequent updates concerning citation or order issuance and wet sample status provides assurance that compliance actions are being taken and that wet sample tracking is being consistently conducted in all bituminous districts.

Mail the samples as soon as possible in accordance with postal regulations. Securely seal the shipping boxes to prevent loss of samples in transit. Include the return address on the shipping label. Use a regular corrugated pasteboard carton, but fill voids around the bags with crumpled newspaper to keep the bags from breaking open from rough handling. Do not use crumpled manila envelopes, excelsior, paper towels, or tissues as packing. Dust Sampling Lab Report (MSHA Form 2000-156) should be prepared and uploaded to the Mt. Hope Lab Server using the Inspector Laptop Rock Dust Database. A copy of MSHA Form 2000-156 shall be printed and shipped with the bagged sample(s). Compliance/noncompliance concerning rock

Confidential Agency Document
DLB-001093                                DOL-OASAM-0069

dust spot samples or rock dust surveys will be determined at the Mount Hope lab and the results returned to the three email addresses submitted by the inspector on MSHA Form 2000-156.

The Mount Hope laboratory supervisor will notify the appropriate District Manager should spot or survey boxed samples arrive at the lab and no accompanying MSHA Form 2000-156 data is available on the file server. Hard copies of MSHA Form 2000-156 will no longer be accepted for submittal of rock dust spot or surveys to determine compliance with 30 CFR 75.403. *Only data concerning spot or survey samples collected to determine compliance with 30 CFR 75.403 should be entered and submitted utilizing the Rock Dust Submittal Application.* Visual determinations are normally sufficient to determine non-compliance with 75.400.

Confidential Agency Document
DLB-001094

DOL-OASAM-0070

## Drawing #1

This drawing shows separate surveys where a single MMU has mined multiple distinct areas of a mine. In this case, three zero points are required to clearly show the extent of each survey.



Surveys will be kept current to the last full row of pillars immediately outby the working section loading point.

**Survey 001-0 C**
Conducted in 2 Right
Zero Point = Survey Spad 20

A separate survey will be conducted in each distinct mined area (in this case, the Mains, 1 Right, and 2 Right). Each area is also to be considered separate and distinct for compliance/non-compliance determinations.

**MAINS**

**2 RIGHT**

**1 RIGHT**

**Survey 001-0 A**
Conducted in Mains
Zero Point = Mine Drifts

**Survey 001-0 B**
Conducted in 1 Right
Zero Point = Survey Spad 12

Confidential Agency Document
DLB-001095

DOL-OASAM-0071



**Drawing #2**

This drawing shows how each sample location would be designated, documented on the bag sample tag, and entered on each of the three distinct surveys. The three surveys are separate and would be entered as separate surveys in the Rock Dust Sample Submission Application. The surveys also would be considered separately for compliance or non-compliance determinations.

Confidential Agency Document
DLB-001096

DOL-OASAM-0072



Mine Safety and Health Administration

*U.S. Department of Labor*

# Rock Dust Sample Submission User's Guide

**Coal Inspector Version**
**Version 2.00**
**01/03/2005**

Copyright © 2005 Mine Safety and Health Administration, U.S. Department of Labor

Confidential Agency Document
DLB-001098

DOL-OASAM-0074

# Table of Contents

TABLE OF CONTENTS .................................................................................................. 1

APPLICATION OVERVIEW ........................................................................................... 1

OPENING THE APPLICATION ......................................................................................... 1
Create a New Rock Dust Sample Submission Form ......................................................... 2
Open an Existing Rock Dust Sample Submission Form ................................................... 3
Update Citation Numbers / Wet Samples Status ............................................................. 4
MAIN SWITCHBOARD ................................................................................................. 5
Current Form Options ............................................................................................... 6
Other Options ........................................................................................................... 7
TOOL AND MENU BARS .............................................................................................. 7
Menu Bars ............................................................................................................... 7
Tool Bars ................................................................................................................. 8
SETTING DEFAULT INFORMATION ............................................................................... 9
Defaults Tab ............................................................................................................ 9
Paths Tab ............................................................................................................... 11

ROCK DUST SAMPLE SUBMISSION FORM .............................................................. 13

COMPLETING THE FORM ........................................................................................... 13
Mine Information Tab ............................................................................................. 13
Samples Tab ........................................................................................................... 16
Inspector Information Tab ....................................................................................... 17
SUBMITTING THE FORM ............................................................................................ 19
REVIEWING LAB ANALYSIS ....................................................................................... 19
SUBMITTING UPDATES ............................................................................................. 20

Confidential Agency Document
DLB-001099

DOL-OASAM-0075

Confidential Agency Document
DLB-001100

DOL-OASAM-0076

# Application Overview

This application is to be used to submit samples collected during rock dust surveys of coal mines or spot samples collected where previously wet areas have dried sufficiently to collect a sample. It is to be used to determine compliance with 30 CFR 75.403 only. Other types of samples (rock dust quartz content, samples collected to support 75.400 citations, etc.) are to be submitted using the hand written rock dust card.

This is Phase II of the development of the Rock Dust Sample Submission application. Principle changes for the Inspector version include:

- ✓ Adding ability to update wet sample status
- ✓ Improving the process for adding a citation number to previously submitted surveys

The inspector will see a few changes to the screens from earlier versions of the application. These were necessary to support handling of the new update forms.

Help screens have been updated to the new HTML format. These screens can be accessed by clicking on the Help option on the Menu Bar and selecting Help Topics. The Help feature can also be activated by pressing the F1 key from anywhere within the program.

## *Opening the Application*

Double-click on the Rock Dust Sample Submission shortcut on the desktop to open the application.



Rock Dust
Application

**Figure 1 – Rock Dust Sample Submission Shortcut (Inspectors' Program)**

As the application opens, it wants to know if the user is creating a new submission form, reviewing an existing form, or creating a new update form.

1

DOL-OASAM-0077

## Create a New Rock Dust Sample Submission Form

When the application is started for the first time, the initial screen appears as in Figure 2, below. The radio button "Create a new Rock Dust Sample Submission form" is marked. Click "OK" to open the Main Switchboard. A blank submission form is attached to the application as the Current Form.



Figure 2 – Opening Screen for First Use

When electing to create a new form, a warning message is displayed if there is an existing form that has not yet been submitted.



Figure 3 – New Form Warning Message

Starting a new form when there is an existing un-submitted form causes the existing form to be replaced, as only one form can be in process at any given time. Once the application is opened, a different form can be selected by using either buttons available on the Main Switchboard or using the Tool and Menu Bars.

Confidential Agency Document
DLB-001102

DOL-OASAM-0078

## Open an Existing Rock Dust Sample Submission Form

If there is a form in process, the initial screen appears as in Figure 4, below. The radio button "Open an existing Rock Dust Sample Submission form" is marked. The "Current working form" selection is highlighted. Click "OK" to attach the form to the application as the Current Form.



**Figure 4 – Opening Screen for Current Working Form**

Forms are submitted to a LAN location and archived to a local folder. Forms are stored in a layer of folders identified by District, Mine ID, and MMU. A previously submitted form can be viewed by selecting the form from the history list and clicking OK. To view a submitted form not in the list, select "More Forms…" and click OK. Select the desired form from the Windows Open dialog box and click OK. (The Open dialog box and the history list default to the local archive folder. The lab removes the forms from the LAN location as they are processed.) The selected form is attached to the application as the Current Form. Existing forms may be reviewed, but not changed.

3

Confidential Agency Document
DLB-001103

DOL-OASAM-0079

## Update Citation Numbers / Wet Samples Status

To create an update form, mark the radio button for, "Update Citation numbers and/or Wet sample status". Then, click "OK".



Figure 5 – Opening Screen for Update Forms

The Updates Form opens, ready for the user to enter citation number or wet sample status update information. See the Submitting Updates section for a look at the Updates Form.

Confidential Agency Document
DLB-001104

DOL-OASAM-0080

## Main Switchboard

The Main Switchboard is divided into two segments.  The left side contains information about the application, current form, and network status.  The right side is the work area, devoted to creation, viewing, and submission of the forms.



**Figure 6 – Main Switchboard**

On first use of the application, the Main Switchboard appears as in Figure 6, above.

On the left, version information is displayed.  Because this is the application that resides on the inspector's computer, the display reads "Inspector Version" followed by the version number.

Below the version information is the status of the current form.  Because a new blank form is attached to the application, there is no information to display for Mine ID, MMU Number, and Date Collected.  This information is updated as the form is completed.

The Form Status is "Not Submitted" at this time.  The words are in **RED** to remind the inspector that the form has not yet been submitted.  Once the form is submitted, the status is changed to "Submitted" and the text is **Black**.  In addition, the submitted form name is printed below the Form Status line.  The form name consists of the Mine ID, an underscore, the MMU Number, the MMU Alpha Suffix, an underscore, the collection date, and ".xml".  Example: 4202028_0010A_20031010.xml.

The last item on the left is an Offline/Online flag indicating whether or not the user is connected to the network and whether an archive folder has been specified and is valid.  The Rock Dust Sample Submission forms can be completed offline.  However, once completed, the inspector must be online to submit the form to the LAN.  The Offline flag

5

is **RED.** The Online flag is **GREEN.** The colored Offline and Online flags allow the inspector to easily recognize the status of the network connection and archive folder. The user must be connected to the network and an archive folder must be specified to submit a form.

On the right, the screen is divided. The upper portion on the screen allows the inspector to work on the current form. The lower portion allows the inspector to view a previously submitted form, create a new form, create and submit an update form, or exit the program. All options are accessed by buttons located to the left of the option description. Underlined letters within options indicate selection can be made by holding down the Alt-Key and the underlined letter key simultaneously. Example: Alt-V opens the View/Edit Current Form option.

## Current Form Options

**View/Edit Current Form**
Open the current Rock Dust Sample Submission form for review and/or editing. Caption changes to View Current Form if a submitted form has been selected as the Current Form.

**Submit Current Form**
Submit the current Rock Dust Sample Submission form to the LAN. The user is first asked to verify the form submission.



*Figure 7 – Submit Option*

Select "Yes" to submit or "No" to return to the form. Upon submission, the user is presented with a verification message.



*Figure 8 – Submit Verification*

Click "OK". At this time, the user is offered the option to print the submitted form.

6



**Figure 9 – Print Verification**

Select "Yes" to print or "No" to return to the form. When printing, no other options are offered. The form is sent directly to the default printer.

## Other Options

**Open/Create Different Form**
Use to select a previously submitted form or create a new form. When electing to create a new form, a warning message is displayed if there is an existing form that has not yet been submitted (see Figure 5 for the New Form Warning Message).

**Update Submitted Data**
Use to enter Citation Number and Wet Sample Status updates. Updates are submitted directly from the update form.

**Exit Application**
Close the Rock Dust Sample Submission application.

## *Tool and Menu Bars*

Tool and menu bars are displayed in the upper left corner of the screen. They provide the ability to perform routine actions from a centralized location. Additionally, they manage default information required by the Rock Dust Sample Submission application.

Tool and menu bars are displayed from the Main Switchboard, the Submission and Update forms, and the Preview screens. Each set varies in its options.

## Menu Bars

The Menu Bar appears just below the application name in the upper left corner of the screen. Below are descriptions of menu bar options that might be available.

File
    **New** – Create new a new form
    **Open** – Open current or existing form
    **Close** – Close form
    **Page Setup** – Set page parameters
    **Print** – Print form
    **Preview** – Preview form on screen
    **Update** – Update submitted data
    **Exit** – Exit application

7

Confidential Agency Document
DLB-001107

Edit     **Undo** – Undo last action
         **Cut** – Cut information
         **Copy** – Copy information
         **Paste** – Paste information

View     **Zoom** – Size text
         **Select Page Display** – Display multiple pages

Tools    **Options** – Set or display default information

Window   Standard window display options

Help     **Help Topics** – Selected help screens
         **About** – Application version information

## Tool Bars

Tool bars are located just below the menu bars. Below are descriptions of Tool Bar options that might be available.

**New** – Create new a new form

**Open** – Open current or existing form

**Print** – Print current form

**Preview** – Preview current form

**Cut** – Remove text

**Copy** – Copy text

**Paste** – Paste text

**Undo** – Undo last action

**Update** – Update submitted data

**View** – Select screen view

Close    **Close** – close open screen

8

Confidential Agency Document
DLB-001108

DOL-OASAM-0084

## Setting Default Information

The Rock Dust Sample Submission application requires the entry of default data prior to creating and submitting actual forms. Some of the default data is preset if IPAL is installed on the computer.

To set or preview default data, open the Rock Dust Sample Submission application, click on the Tools option on the Menu Bar, and then click on Options. The Options screen has two tabs: Defaults and Paths.

### Defaults Tab

The *Defaults tab* is topmost and has 2 sections. The top section contains inspector information and the lower section displays e-mail addresses of the inspector, supervisor, and clerk who are to receive notification when the lab has completed processing of the samples.

Information contained on this tab is automatically inserted into the new Rock Dust Sample Submission form. If information is not entered here, it will need to be entered on each Rock Dust Sample Submission form that is completed.



Figure 10 – Default Data for Inspector Information Tab

If IPAL is installed on the computer, there is a check in the Get from IPAL box and the inspector's AR Number, Name, and Office information are pulled from the IPAL user information. Changes to the User Profile in IPAL changes information displayed here.

9

Confidential Agency Document
DLB-001109

DOL-OASAM-0085

Input fields are described below.

**Get from IPAL:**  A check in the box allows the application to retrieve inspector information from the IPAL application.  The check is preset by the application if IPAL is installed on the computer.  If IPAL is not on the computer, inspector information is blank and must be entered by the inspector if default information is desired.

**AR Number:**  Inspector's 5-digit assigned AR Number.

**AR Name:**  First Name, Middle Initial, and Last Name.  Example:  Steven J. Jones

**F. O. Code:**  4-digit Field Office Code.  Example:  0602

**Field Office:**  City and State of Field Office.  Example:  Elkhorn City, KY

**E-mail Addresses:**  E-mail addresses for the inspector, the inspector's supervisor, the clerk, and the Manager must be entered in their respective fields to provide default information for new Rock Dust Sample Submission forms.  Click on the lookup button to the right of each field to open the e-mail address book.



Figure 11 – E-Mail Address Lookup – Supervisor

The Title Bar displays which address is to be selected.  Select the appropriate name and click "OK".  A Microsoft Outlook message announces that the program is trying to access e-mail addresses.  Place a check in the "Allow access for" box and click "Yes".

10

Confidential Agency Document
DLB-001110

DOL-OASAM-0086



Figure 12 – E-Mail Address Verification

The selected e-mail address is placed in the appropriate field on the Defaults screen.

## Paths Tab

The *Paths tab* contains information required by the application to create, submit, and retrieve the Rock Dust Sample Submission form.



Figure 13 – Default File Paths

Fields on the Paths tab are described below:

**Submission Folder:** Target location for the submitted Rock Dust Sample Submission form. This field is preset by the application and is only to be changed if the target destination is officially changed. If this occurs, the District IT Specialist or Help Desk

Confidential Agency Document
DLB-001111

DOL-OASAM-0087

personnel will notify inspectors and provide instructions.  Inappropriate changes will result in the non-functioning of the application.

**Update Folder:**  Target location for the submitted Rock Dust Update form.  As with the Submission Folder, this field is preset by the application and is only to be changed if the target destination is officially changed.  If this occurs, the District IT Specialist or Help Desk personnel will notify inspectors and provide instructions.  Inappropriate changes will result in the non-functioning of the application.

**Submission Archive Folder:**  Target location for the archive copy of the submitted Rock Dust Update form.  This field is preset to the application folder but can be changed by the inspector.  This path must be set in order to submit forms.

**Mine/Event Table Path and Database:**  File containing mine and event information used by the Rock Dust application.  If IPAL is installed on the computer, there is a check in the Use IPAL Data Container box and D:\Inspect\Ipaldat.mdb is entered in text box.  If IPAL is not installed, another database path could be entered.  Generally, it is the path for Ipaldown.mdb.

**Use IPAL Data Container (IPALDAT.MDB):**  A check in the box allows the application to retrieve needed information from the IPAL data container.  The check is preset by the application if IPAL is installed on the computer.  If IPAL is not on the computer, there is no check in the box and the inspector must input the path provided by the IT Specialist or Help Desk personnel to access required mine and event information.

12

DOL-OASAM-0088