1

1    MINE SAFETY AND HEALTH ADMINISTRATION

2        UPPER BIG BRANCH MINE – SOUTH

3              INTERNAL REVIEW

4

5        WEDNESDAY, SEPTEMBER 14, 2010

6

7

8              AUDIOTAPED

9              INTERVIEW

10             OF  *Roof control Specialist*

11

12

13

14

15   MSHA:

16

17

18

19

20

21

22   INTERVIEWEE:

23

24

25

74

1   that -- does that compare it to what you use in your analysis?

2       A:    In the analysis I use what they actually had.  This

3   analysis was run on existing conditions.  It was not run on

4   anything, you know, it wasn't run on what was projected.

5       Q:    Right.  So what they already had driven?

6       A:    This is what they have, right, and crosscut spacing,

7   100 feet, center-to-center distance, 80 feet.  That was the --

8   that's based off of the mine map that I had.  I pulled it off the

9   mine map.

10      Q:    Okay.  And this was spacing of what?

11      A:    Eighty.

12      Q:    Eighty?

13      A:    So they've exceeded it but, you know, like I said,

14  those minimums are not really -- that shouldn't, you know, that's

15  not driving what the minimums are required in the plan.

16      Q:    Okay.

17      A:    Them abiding by that PIL is what's driving -- what they

18  should be -- you know, that's driving their --

19      Q:    Okay.  Under your ARMPS program, that -- that's

20  something you did for ventilation --

21      A:    Right.

22      Q:    -- but that's something that the company should have

23  done before they even drove those panels; right?

24      A:    That's required by their plan.

25      Q:    Right.  Do you know if they provided that information

Confidential Agency Document
DLB-001233

DOL-OASAM-0209

75

1   to you for this panel?

2        A:   We do not require them to provide that information for

3   every panel they drive, no.

4        Q:   So they may have done it, they just didn't give it to

5   us or we don't --

6        A:   We don't require it so they don't give it to us.

7        Q:   So the only requirement in the plan is that they use it

8   to --

9        A:   That they abide by the -- yeah, the PIL.

10       Q:   And we don't -- how would we know if they do that or

11   not?

12       A:   Well, we'd have to go check.

13       Q:   Is there any way we could check and be sure that --

14       A:   We could check it anytime we wanted to, I guess, you

15   know, if we had some -- you know, if --

16       Q:   For instance --

17       A:   The checking would be just a matter of going out and

18   somebody that knows how to use the program go out to the mine and

19   check what they have.

20       Q:   But as far as enforcing whether or not they ran the

21   program prior to driving these entries, how were you going to

22   enforce that?  Do we ask them after the fact?  Today, could we go

23   out to the mine and say, can we see your ARMPS analysis for this

24   panel?

25       A:   I don't know if they keep that or not.  We don't -- I

1   mean, there's nothing in the plan to require them to keep that as

2   a record, no.

3       Q:   Okay.  Who would you expect to be responsible for

4   ensuring compliance with that provision of the roof control plan?

5       A:   As far as the company's concerned?  Well, the operator

6   is responsible.

7       Q:   No.  As far as ensuring compliance from an inspection

8   standpoint?

9       A:   From an inspection standpoint?

10      Q:   From an MSHA standpoint.

11      A:   Well, the CMI is -- you know, he's responsible for

12  making the -- the inspection, so if he gets -- if he's in a

13  situation where he's either got a question on it or if he sees

14  some instability, then, you know, all he has to do is come back

15  and ask for help.

16      Q:   Well, he's -- he's doing the plan reviews.  Is that

17  correct?  The CMI, are they doing the six-month reviews?

18      A:   Well, they -- they were probably -- they sign off on

19  that and review it every quarter I'm assuming.

20      Q:   Okay.

21      A:   I always did when I was a CMI.

22      Q:   So --

23      A:   Whether the plan was, you know --

24      Q:   -- one of the things they do as a part --

25      A:   -- adequate or whatever, part of your time, your

DOL-OASAM-0211

1  triple -- you know, EO1, they do it.

2      Q:   One of the requirements for them on a regular

3  inspection is to assure compliance with the roof control plan.

4      A:   That's true, too.

5      Q:   So how would we expect that inspector to ensure that

6  they're complying with that provision, with what it says they

7  have to do?

8      A:   Well, I'm not going to -- I don't know what -- I'm not

9  going to sit there and guess what the capability of each

10  inspector is but, you know, if he can -- if he can run ARMPS, he

11  should be able to check that but, if he can't, then he should be

12  able -- he's either going to have to ask -- if he sees a problem,

13  he's going to have to ask for help.

14      Q:   If --

15      A:   I mean, I don't -- I don't see how -- where you're

16  going with that because, if -- you know, if you're saying you

17  want something quick and easy like minimum centers for every

18  panel, I mean, that's not really what we're doing.

19      Q:   No.   It's just a provision in the plan that looks

20  really good.   To be honest with you, it requires them to do

21  something that they need to do --

22      A:   -- to do engineering, right.

23      Q:   -- to do engineering.   So I guess the -- you're

24  pointing towards conditions in the mine and the provision is --

25  seems irrelevant to that.   The provision is that the need to do

DOL-OASAM-0212

78

1   -- do this engineering work.  So I would think that the check

2   would be to check that they have done the engineering work, so we

3   would check the engineering work.

4       A:   Well, that's what I'm --

5       Q:   So who would be responsible to check the engineering

6   work?

7       A:   We don't have anybody that goes out and checks their

8   engineering processes.  We don't do that, but we do ask them to

9   supply us with an ARMPS run on a roof control plans, you know.

10  We ask them to provide us with an ARMPS run to make sure that

11  operator does know how to run that.

12      Q:   So we've checked that they know how to do it, but we're

13  not checking that they do it?

14      A:   That they do it?  Well, you know, of course, then

15  again, the proof's in the pudding, you know, if they start having

16  problems.

17      Q:   Yeah.  Do you know if they had problems on the headgate

18  with the pillars or was it heaving, the main problem?

19      A:   From what I understand, from what I was told, that the

20  main problem was heaving, was floor heaving, which I've already

21  stated previously is not -- doesn't necessarily mean that the

22  pillars are unstable.

23      Q:   Nobody ever told you the pillars were crushing out?

24      A:   No.

25      Q:   Would the --

DOL-OASAM-0213

1    A:   Now, I mean, if pillars are crushing out, you know,

2  that's a whole different issue and I'd -- from what I -- from as

3  far as I know, I don't know if anybody from roof control went

4  down there to check on pillars crushing.  Now, I did hear that

5  there was a lot of floor heaving which, you know, that's --

6    Q:   That's not related to this at all though.

7    A:   Right.  It's -- that's a whole different issue, you

8  know.  One of the -- some of the people say, well, how do you

9  correct it?  Well, one way to -- one way that's been successful

10  is you increase pillar sizes.  Well, what that does, that just

11  distributes the load better so maybe that soft material that's in

12  the floor doesn't get -- doesn't hoove.  It doesn't mean that the

13  previous pillar was unstable either.  You know what I'm saying?

14  Just because you increase it and the problem goes away, well,

15  that increases that -- you know, the floor heaving problem but it

16  doesn't necessarily mean that you're going to -- that there was

17  an issue with the pillar stability.  So floor heave is a whole

18  separate issue.  That's just like -- that's just like pillar

19  stability also doesn't guarantee that you're going to have a good

20  stable roof, you know.  That's why we put the bolts in.

21    Q:   You mentioned the inspector signs off on one of those

22  reviews each quarter.

23    A:   Normally.  I always did.

24    Q:   What does that review entail?

25    A:   Well, it means that he's reviewed the roof control plan

1

1   MINE SAFETY AND HEALTH ADMINISTRATION

2   UPPER BIG BRANCH MINE - SOUTH

3   INTERNAL REVIEW

4

5   WEDNESDAY, DECEMBER 15, 2010

6

7   AUDIOTAPED

8   INTERVIEW

9   AD*h* Technical

10  ██████████████

11

12

13 MSHA:

14  ██████████████

15  ██████████████

16  ██████████████

17  ██████████████

18  ██████████████

19  ██████████████

20  ██████████████

21

22

23 INTERVIEWEE:

24  ██████████████

25

Confidential Agency Document
DLB-001239

DOL-OASAM-0215

79

1    A:  Yeah.

2    Q:  Did you write part of them?  Did you write those

3  numbers?  *RC Supervisor*

4    A:  ~~redacted~~ wrote the top part, I wrote, "still to look

5  at longwall eight pillars later.

6    Q:  Okay.  What was the intent, and then did you followup

7  and check on what it indicated?

8    A:  Ah yes.  Now I'm trying to think.  A question came from

9  somewhere about the stability of the pillars at the Upper Big

10 Branch headgate and tailgate.  And I asked ~~redacted~~ *Roof Control Supervisor* to look at

11 that again and he did another of the stability analysis from

12 ~~redacted~~ and well, I don't know if you guys will get into

13 that, but excuse me, I'm trying to think of all it all went.  We

14 had ventilation in there and ~~redacted~~ *Ventilation Supervisor* went up in there and

15 he saw the ribs spalling, he saw floor heave.  ~~redacted~~, I

16 don't know and that's where I'm losing it.  I think ~~redacted~~ I don't

17 know if ~~redacted~~ *RC Supervisor* was in there.  Maybe ~~redacted~~ *RC Supervisor* went in.  We

18 didn't see any roof problems.  The roof wasn't breaking up in

19 there but you did have your abutment pressure coming back and

20 getting the floor heave.  So I asked ~~redacted~~ *RC Supervisor* to relook at those

21 pillars.  They were submitted whenever, I don't know the date,

22 and the calculation was done and the stability factors were done.

23 And you had numbers of 112 and 113, so you had 112 the

24 calculation being slightly under.  ~~redacted~~ program with 113.

25 But then you had to go into that program and look at the input

81

1    Q:  Okay.

2    A:  Let me continue.  When we get into the Upper Big Branch

3  where we have the headgate and the tailgate, we really need a

4  finite element analysis there if you want to get the final answer

5  to it.  We don't require that and we don't have operators that

6  know how to do that now if they have to be tech support or

7  university type thing.

8    Q:  Well, we'll be asking some questions about that about

9  here.  Back to this one, you know, the notes said that you

10  followup on gate pillars later and I think you said it was

11  followed up on?

12    A:  Yes sir.

13    Q:  On that one, did the company run that or did MSHA?

14    A:  _RC Specialist_ (unidentified name) ran that.

15    Q:  _RC Specialist_ r is a specialist?

16    A:  He works for _RC Supervisor_

17    Q:  Okay.

18    A:  A specialist in the district office.

19    Q:  Okay.  Why did he run it?

20    A:  Because ████ asked him to.  I don't want to be----

21    Q:  Yeah, I know.

22    A:  ----whatever you call that, flipped here.

23    Q:  Yeah, okay. I mean, was he specialized to run it.  Is he

24  familiar with it?  Is he trained to do that?

25

82

1    A:  Both of them, all of them are.  No, the engineers and

2   ~~RC Supervise~~ are.

3    Q:  Okay.

4    A:  The other two specialists are not. They're trying to

5   learn it, but---

6    Q:  Okay.

7    A:  Now remember, someone asked a question of those pillars.

8   They said they weren't stable and so on.  I don't remember who it

9   was.

10    Q:  Okay.  And I think you might have referred to this

11   earlier, but what all do you know was happening as far as any

12   pillar design problems or any ground control problems at Upper

13   Big Branch during the time of this last longwall panel was being

14   pulled or being mined?

15    A:  As I recall, as I recall, _Ventilation supervisor_ ~~went in to try~~

16   to go up that headgate and do the ventilation work there.  He

17   indicated that those ribs were spalling and the floor was

18   heaving.  He called that failure and I think that was taken by

19   other people, and I can't remember who. I don't know. I don't

20   know.  It wasn't the district, so questions were made of the roof

21   control people. It looks like those pillars were not sized

22   properly.  And that's when I asked ~~_RC Supervisor_~~ to please go back

23   and revisit that situation and it's more complicated than that

24   because you had now a single longwall, you have no gob on either

25   side.  And when it's done according to the way ~~Roof Control Supervisor~~ wanted

Confidential Agency Document
DLB-001243

DOL-OASAM-0219

### Roof Control Supervisor – Required Checklist

**Issue:** The District 4 Roof Control Department did not use the checklists required by CMS&H Memo HQ-08-059-A when reviewing the October 2009 base roof control plan for UBB. The checklists from the Administrator's memo were initially required to be used by the roof control department supervisors only. Instructions to begin using the checklists universally were e-mailed on January 27, 2009 from a CMS&H headquarters employee to District Managers and Assistant District Managers. The e-mail required the use of the checklists during the next plan review.

The District 4 Roof Control Department supervisor indicated in his interviews that he began using the checklists for plan reviews immediately after receipt. However, copies of the completed checklists were not included in the District records provided to the IR team for the six-month plan reviews or for the review of the October 2009 base plan as directed by the memorandum.

District 4 also developed seven checklists and other documents for guidance when reviewing initial roof control plans and supplements, general safety precautions to be included in roof control plans, deep-cut minimum precautions, retreat mining precautions and safety precautions for mobile roof supports. While the District 4 Standard Operating Procedures (SOPs) for plan reviews did not require these checklists to be used, the plan reviewers all stated that they used checklists to assist in completing roof control plan reviews. These checklists were not those developed by CMS&H Headquarters for use in the field.

The District 4 checklist included a requirement that the mine operator's calculations for pillar stability be attached to, but not part of, the roof control plan. However, it did not specify that the calculations would be verified by District 4 staff.

**Supporting Documentation:**

- CMS&H Memo HQ-08-059-A (HQ-08-059-A.pdf)
- E-mail requiring use of the checklists during the next plan review (Checklist E-mail - 01-27-2009.pdf)
- District 4 roof control plan SOP (District 4 Roof Control Plan SOP.pdf)
- Pages from Roof Control Supervisor's transcript where he talks about using the checklist but not filing it (Roof Control Supervisor - Missing Checklist.pdf)
- Pages from Roof Control Specialist transcript where he talks about not using the District 4 checklist (Roof Control Specialist - Checklist.pdf)

Confidential Agency Document
DLB-001244

**Mitigating Factors:** The instructions were not issued via the established directives system.  The IR team found the checklists used by District 4 included most of the considerations listed in the Headquarters checklists, and in some cases included additional considerations.  Some items on the checklists were identical.

**U.S. Department of Labor**     Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



JUN - 6 2008

CMS&H Memo No. HQ-08-059-A (PRT-75)

MEMORANDUM FOR DISTRICT MANAGERS
ASSISTANT DISTRICT MANAGERS

FROM:        KEVIN G. STRICKLIN   *Kenneth A. Murray*
Administrator for
Coal Mine Safety and Health

SUBJECT:        Documentation of Roof Control Plan Reviews

Checklists have been created to aid MSHA personnel in the review and subsequent
documentation explaining the rationale behind the approval of roof control plans. The
appropriate checklist(s) should be used for review of new underground mine roof
control plans, roof control plan revisions, and six month and quarterly roof control plan
reviews. These checklists will provide guidance for MSHA personnel to review roof
control plans for the prevailing geological conditions and the mining systems used in all
underground coal mines.

The "Roof Control Plan Approval Process" document establishes a system for multi-
level review and oversight to identify and address deficiencies in roof control plans.
The "New Submittal – New Mine Openings (Development Only) Roof Control Plan
Review Form Checklist" provides a list of items and safety precautions that should be
included in the initial roof control plan for a new mine. This information will be
associated with the mine for its entire life. A separate checklist entitled "Roof Control
Plan Review Form Checklist for Plan Revisions" is also attached to serve as a guide
during the review of associated roof control plan revisions.

During the course of each Regular Safety and Health Inspection (E01), the Plan Review
form (MSHA Form 2000-204) is completed by the inspector to document whether the
current Roof Control Plan is adequate and/or to describe any deficiencies in the Plan.
The form should also be completed by the Roof Control Specialist during Plan reviews.
The form shall be signed and dated by the inspector/specialist and their supervisor. A
brief narrative relative to the adequacy or deficiency of the Plan should be included on
the 2000-204 Form to satisfy the six month plan review of the Roof Control Plan. The
regular inspector should conduct the six month reviews of the less complex mines in the
District with assistance provided by the roof control specialist as needed. The roof

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

Confidential Agency Document
DLB-001246                    DOL-OASAM-0222

2

control specialist should conduct the six month reviews of the more complex mines in the District. The attached document entitled "Six Month and Quarterly Roof Control Plan Review Form Checklist" should be used when conducting the six month plan review and may be submitted as an attachment to the MSHA Form 2000-204 to further clarify and elaborate on the subject plan review.

All documentation (MSHA Form 2000-204, checklists, drawings, sketches, etc.) explaining the rationale and supporting the decision of the roof control plan approval and associated six month plan review will be maintained as part of the roof control file for that mine.

Three additional checklists are attached and should be used as part of the roof control plan review of addendums associated with mobile roof support systems ("Mine-Specific Mobile Roof Supports Checklist", retreat mining ("Retreat Mining Precautions Checklist" and extended cuts ("Extended Cuts Safety Precautions Checklist").

It is recognized that roof control plans are developed and revised on a mine-by-mine basis taking into consideration the overall safety of affected miners. Consequently, not all items on the checklists are always applicable for each and every mine. If an item on any of the checklists is not applicable during a review, the reviewer should mark the item "N/A." In considering whether to approve a proposed plan, the District Manager shall determine whether the plan is consistent with all relevant, mandatory provisions of the Mine Act and its standards and regulations. In addition, the District Manager should use the attached checklists as guidance and may require additional plan provisions that are necessary to provide miner protection given factors and conditions specific to a particular mine.

The collective bargaining agreement between MSHA and the National Council of Field Labor Locals (NCFLL), which is the recognized bargaining unit for MSHA's mine inspectors, requires concurrence prior to MSHA's implementation of these checklists. Once agreement has been reached, CMS&H will require the approved checklists to be used by inspectors during the next plan review. Until an agreement is reached with the NCFLL relative to the use of these checklists, the checklists shall be completed by the supervisor. The completed checklists are to be dated and signed by the person who filled out the checklist and each level of supervision in the approval process.

Attachments

## Roof Control Plan Approval Process

1. When a new plan, revision, or addendum is received, the Roof Control Department logs the plan into the MSIS. The Roof Control Supervisor assigns the plan to a Roof Control Specialist for review. The plans are usually reviewed on a first come first serve basis. Some plans may require Technical Support review and input as described in the approved guidance document.

2. The specialist reviews the plan, and, if there are deficiencies, the specialist contacts the operator. Depending on the number and type of deficiencies the operator may be contacted by telephone, e-mail or a letter signed by the District Manager. The specialist, Field Office Supervisor, or CMI will visit the mine site if needed, and the specialist will calculate or verify the ARMS / ALPS stability factors if applicable. The person conducting the review will complete all applicable checklist items for the review and forward through steps 3 through 7.
   Roof Control Specialist date and sign _____

3  The Field Office Supervisor and/or CMI familiar with the mine will be contacted for comments or concurrence.
   Field Office Supervisor date and sign_____
   Coal Mine Inspector date and sign _____

4  The Roof Control Supervisor reviews the plan and makes recommendations or concurs.
   Roof Control Supervisor date and sign _____

5  The ADM Technical Programs reviews the plan and makes recommendations or concurs.
   ADM Technical Programs date and sign _____

6  The District Manager reviews, makes recommendations, or approves the plan and signs the approval letter.
   District Manager date and sign _____

Note: If deficiencies are found in steps 3 through 6, the plan is sent back to the Roof Control Supervisor / reviewer with comments concerning the deficiencies. All deficiencies must be addressed prior to plan approval. Sequence of review may vary.

The completed checklist will be reviewed, dated, and signed by each level of supervision in the approval process.

**Bragg, Melody E - MSHA**

| | |
|---|---|
| **From:** | ⬛⬛⬛⬛⬛ - MSHA |
| **Sent:** | Wednesday, June 29, 2011 9:17 AM |
| **To:** | ⬛⬛⬛⬛⬛ - MSHA |
| **Subject:** | FW: Checklists posted to the W drive |
| **Attachments:** | June 5 2008 HQ- 08-058-A (2).pdf; Checklist MOU 121708 (2).pdf; June 5 2008 HQ-08-060-A (2).pdf |

⬛⬛⬛⬛
This email message and attachments will need to be added to the official record. Thanks!

---

**From:** ⬛⬛⬛ E - MSHA
**Sent:** Tuesday, January 27, 2009 3:47 PM
**To:** zzMSHA-COAL - HQ Division Managers; zzMSHA-Coal District Managers Group; zzMSHA-Coal - Assistant District Managers
**Cc:** zzMSHA–Coal–District Managers Secretaries Group; ⬛⬛⬛⬛ MSHA; ⬛⬛⬛⬛ - MSHA ⬛⬛⬛⬛⬛
MSHA
**Subject:** Checklists posted to the W drive

Folks,

Attached are the June 5, 2008 memos that spoke about various checklists (Roof Control and ERPs specifically).

The attached memo # 060 specifically states "The collective bargaining agreement between MSHA and the National Council of Field Labor Locals (NCFLL), which is the recognized bargaining unit for MSHA's mine inspectors, requires concurrence prior to MSHA's implementation of these checklists. Once agreement has been reached CMS&H will require the approved checklists to be used by the inspectors during the next plan review. Until an agreement is reached with the NCFLL relative to the use of these checklists, the checklists shall be completed by the supervisor. The completed checklists are to be dated and signed by the person who filled out the checklist and each level of supervision in the approval process."

Bargaining did take place with the union on a number of checklists EXCLUDING the ERP Checklists. The MOU was signed by Labor and Management and I have been notified today that the forms are now posted on the W drive. The MOU covers a few other checklists outside of the Roof Control Plans (Slope and Shaft as well as Belt Fire Suppression).

W:\ALLMSHA\DIRECTIV\Forms\2000 series

---

Roof Control Plan Approval Process - 2000-226
Roof Control Plan Review Form Checklist - 2000-227
New Submittal-New Mine Openings (development only) - 2000-228
Roof Control Plan Review Form Checklist for Plan Revisions - 2000-229
Mine-Specific Mobile Roof Supports Checklist - 2000-230
Extended Cut Safety Precautions Checklist - 2000-231
Retreat Mining Precautions Checklist - 2000-232
Checklist for Review of Slope and Shaft Sinking Plans - 2000-233

Confidential Agency Document
DLB-001249

DOL-OASAM-0225

Belt Drive Fire Suppression Checklist of Basic Requirements:
   Deluge-type Water Spray Systems 2000-222
   Water Sprinkler Systems 2000-224
   Dry Powder Chemical Systems 2000-225

We are also working on converting them to pdf fillable W:\ALLMSHA\DIRECTIV\Forms\2000 series\2000 fillable )

The memo is still in affect with respect to the ERPs; it had been decided that it was not worth negotiating the ERPs checklist until we had a final rule.  With the final rule published we can begin the process.



Confidential Agency Document
DLB-001250

DOL-OASAM-0226

# CMS&H DISRTICT 4

## STANDARD OPERATING PROCEDURES

## ROOF CONTROL PLAN APPROVAL

September 2006

The following sequence of events is to be used in processing a Roof Control Plan submitted for approval by a mine operator.

All new highwall development and pre-existing highwalls for facing of the portal area for underground mine openings will have an onsite evaluation by the field office or district specialist before the roof control plan is approved. This onsite evaluation will determine if the plan requirements are adequate for the geological conditions. This evaluation must occur after the operator has completed the highwall and before the commencement of any underground development. If the onsite evaluation finds that the highwall is unstable or not developed in competent strata, approval of the roof control plan shall not be granted.

The operator should be informed that additional highwall development or other work is needed prior to approving the roof control plan.

The operator shall submit all plans and revisions to the District Manager.  The plans and revisions will be delivered to the District Office or a Field Office and date stamped, per compliance with a memorandum dated February 13, 1993 from the Administrator.  The Field Office will forward all plans to the District Office, and the plans will be logged into the MSIS system and a tracking number assigned.  The Roof Control Secretary will attach the plan review form (Attachment A) and give to

1   SOP Roof Control – September 2006

Confidential Agency Document
DLB-001251

DOL-OASAM-0227

the Supervisor for assigning.  The plans will be technically reviewed by the District Roof Control specialist using appropriate regulation requirements listed in the Title 30 CFR Subpart C – Roof Support.  The roof control group reviewer shall contact the assigned inspector and supervisor of the mine to solicit comments on appropriateness of the plan.  Other information that could be pertinent when reviewing a mine plan are items such as: Arlington PIB's , PIL's, roof fall history, previous inspection reports, input from coal mine inspector or supervisor assigned to the mine, accident and injury experience at the mine.  The roof control group shall check that the appropriate miner's representatives had the opportunity to review and make comments on the proposed plans.  This can be done by the miner representative reviews and comments being sent with all new plans or revisions. Minor problems with the roof control plans will be handled by contacting the operator for corrections.  Plans being held for minor corrections shall be kept in a separate file from plans awaiting review. The roof control department shall track plans for minor corrections on a dry erase board kept in the District office.  Immediate need plans will be handled on a case by case basis.

    a. If the plan is technically acceptable and can be recommended for approval, a letter will be prepared by the Roof Control Work Group, and forwarded through the Roof Control Supervisor, the Assistant District Manager of Technical Programs, the Inspection Division Assistant District Manager (ADM), and then to the District Manger.

Confidential Agency Document
DLB-001252

DOL-OASAM-0228

    b.  If the plan is not acceptable a letter of denial will be drafted, by the Roof Control Work Group, with all deficient items detailed in the letter.  This letter will be routed as above, to the District Manager for signature.

    c.  Significant interactions, such as meetings with the operators, should be documented in the MSIS tracking system.

After approval by the District Manager, the plan and the approval letter are returned to the Roof Control Department for distribution. One copy of the completed approved plan shall be sent to the field office for the Uniform Mine File.  A second copy will be distributed to the supervisor/inspector assigned to the mine. The mine operator will be sent the original approval letter.  The date the approval is signed by the District Manager shall be recorded in the MSIS system by the Roof Control Work Group.

Reviews of the roof control plans will be completed every quarter by an AR in the field office, to assure that the plans are suitable to current geological conditions and mining systems in the mine. The assigned mine inspector can also contact the roof control group with concerns.  The 2000-204 form will be used to document the review of the plan as part of the regular E01 inspection. These forms will be entered into the MSIS system every quarter by the field office. The inspector shall record on the form the names of mine officials and miner representative who participated in the review discussion.  If the 2000-204 Form indicates a deficiency or needed change, the form shall be sent to the District Roof Control Supervisor for evaluation.

To insure that the plans in the Uniform Mine File of each field office are current, the field office supervisor will review the active mine files periodically.  He will document

Confidential Agency Document
DLB-001253

DOL-OASAM-0229

the review by signing the supervisory review form in the Uniform Mine File book. Every quarter the appropriate Field Office Secretary will generate a report for the F.O. supervisor identifying the plans requiring a six month review, as part of the District oversight.

The District Roof Control Work Group will track that no more than three supplements will be permitted on an approved plan before they are incorporated into an updated plan.  The entire plan approval process should normally not exceed 30 calendar days from the time of receiving the plan until it is approved by the District Manger.  In the event this time is exceeded an explanation shall be made under remarks on the sign-off sheet.

Plans and revisions that are no longer applicable at an operation will be maintained in the District office for at least three years.  Then the material will be discarded or archived.

Confidential Agency Document
DLB-001254

ATTACHMENT A

The Following Roof-Control Plan is for Circulation, and Recommendation for
Approval or Disapproval

MSIS No.: _____          Field Office Code: _____

**PLAN INFORMATION**

Company Name: _____

Mine Name: _____ I.D. No.: _____

Date Received: _____

Technical Review Date: _____

Comments: _____

_____

**Recommendation and Comments By:**

**District Roof-Control Specialist:** _____ Date: _____

Comments: _____

**Comments from Inspector & Supervisor Assigned to Mine:** _____

_____

**District Roof-Control Supervisor:** _____ Date: _____

Comments: _____

**Assistant District Manager
Technical Programs:** _____ Date: _____

Comments: _____

**Assistant District Manager
Inspection Division:** _____ Date: _____

Comments: _____

Confidential Agency Document
DLB-001255                      DOL-OASAM-0231

1

1    MINE SAFETY AND HEALTH ADMINISTRATION

2    UPPER BIG BRANCH MINE - SOUTH

3    INTERNAL REVIEW

4

5    WEDNESDAY, JUNE 15, 2011

6

7

8    AUDIOTAPED

9    INTERVIEW

10   Roof Control Supervisor

11

12

13

14

15   MSHA:

16

17

18

19

20

21   INTERVIEWEE:

22

23

24

25

Confidential Agency Document
DLB-001256

DOL-OASAM-0232

1    Q:   ████, that's the wrong checklist.

2    Q:   Oh, it is?  That's in the other checklist.  Alright,

3    I'm sorry.  Forget that question.

4    Q:   Let's skip number six then.

5    Q:   There is no checklist attached to a copy of the

6    October 2009 roof control plan tracking sheet or six-month

7    review forms.  Was this or any checklist used for this Upper Big

8    Branch plan review?  Would you know?

9    A:   Yeah.  I did this.

10   Q:   Now – now, you did that?

11   A:   Yes and if you go through there, you'll pretty well

12   find it that they're in there.

13   Q:   We can't find the checklist [crosstalk].

14   A:   No, no, on there.  I don't know what [end of] the

15   checklist because I noticed that but I used it.  I did use it

16   and what I'm saying is if you look at the plan and you look at

17   this checklist, I think you'll find it's there.  There may be

18   one I don't know about but I think you'll find it's there.

19   Q:   But you don't save a copy of the checklist?

20   A:   I don't know why I used it.  I know I used it because

21   we had to even go back and get some things changed because it

22   wasn't in there so I know I used it.  Now, why [crosstalk]…

23   Q:   Do you happen to know why a copy wasn't attached or

24   misplaced [crosstalk]?

25   A:   I don't know.  I don't know.  It must – I don't know.

Confidential Agency Document
DLB-001257

1   I don't have the answer to that because I looked and I know it's

2   not there, but I do know I did it and if you want to go through

3   the plan, I think you - which I'm sure you have, how many

4   weren't in there?

5       Q:   Do you usually keep a copy with your other ones?

6       A:   Yes.  Yes, we do.  I put this - the way we do our

7   plans, we have a folder.  We put the plan on the right with the

8   approval letter and all the back-up on the left and then when we

9   get it approved, she puts everything together and I'll always

10  put this on the left with the routing sheet and I know I did it.

11  And like I say, if there's something that's in here that's not

12  in there… what is it?

13      Q:   Where does those copies normally - where are they

14  maintained in [crosstalk]?

15      A:   In our file.

16      Q:   Okay.  On page six of that document, the checklist

17  requires a check of possible overlying bodies of water.

18      A:   Right, right.

19      Q:   Okay.  Was this checked off on the Upper Big Branch or

20  would you remember?  Was that checked off?

21      A:   I think it was probably checked off I would think.

22      Q:   Don, how do you do that as far as going back and

23  looking for bodies of water?

24      A:   I don't.  The other people do it.  There's usually a

25  statement in there and then again, I don't have the plan for it.

1

1    MINE SAFETY AND HEALTH ADMINISTRATION

2    UPPER BIG BRANCH MINE - SOUTH

3    INTERNAL REVIEW

4

5    MONDAY, JUNE 13, 2011

6

7

8    AUDIOTAPED

9    INTERVIEW

10    OF   Roof Contol Specialist

11    �altered▐

12

13

14

15    MSHA:

16    ▬▬▬▬▬▬▬▬▬▬

17    ▬▬▬▬▬▬▬

18    ▬▬▬▬▬▬▬

19

20

21    INTERVIEWEE:

22    ▬▬▬▬▬▬▬

23

24

25

Confidential Agency Document
DLB-001259

DOL-OASAM-0235

4

1    opportunity to make a statement and provide us with any other

2    information that you believe to be important.  If at any time

3    after the interview, you recall any additional information that

4    you believe might be useful, please contact ▓▓▓▓▓▓▓ at the

5    telephone number or email address being provided to you.

6         Q:   Okay.  Referring to the Roof Control Department check

7    sheet, is the use mandatory for plan reviews, and I'll provide

8    you with a copy of that.  On the top that says "Initial Roof

9    Control Plan Checklist" refer to 75.221, 75.222 and use the

10   following as a guideline.

11        A:   This checklist right here?

12        Q:   Yes, and is - is that mandatory for the reviews?

13        A:   It's not mandatory that I use the checklist. I - there

14   is a checklist that ▓▓▓▓ makes sure that's used  , you know, the

15   Arlington gave out that he's got to go through.

16   Now, internally, we've generated our own checklist that we use

17   just to make sure that we've got, you know, for our own benefit

18   to make sure everything's in there that, that we don't miss

19   anything in it, you know.  So -

20        Q:   Okay.  Is that the checklist that you're talking

21   about?

22        A:   Well…  ·

23        Q:   And we're not [crosstalk]

24        A:   It looks, it looks very similar to the one we - the

25   one we use.  I'm just not - this is an initial.  I believe - I

1 believe these are the Arlington check - checklists that you have

2 presented me with, which ours are very similar, so - the ones

3 that we use, so.

4     Q:  Okay.  When was the check sheet in - instituted?  Do

5 you recall?

6     A:  I don't remember the date.  I mean, we've been…

7     Q:  Is it like for a couple of years?  Two years?

8     A:  We've been doing - we've been doing - yeah, it's been

9 a year, two years that Arlington did that.  That was initiated

10 back when ████████ was up in Arlington.  Prior to that, prior

11 to that, we had our own that we used that we generated for our

12 own use.

13     Q:  Okay.  And this checklist that you're speaking about

14 that you've used, could we get a copy of that?

15     A:  I'm sure you did if you asked for it.  I'm not sure.

16 I mean, we provided everything that was asked for.

17     Q:  Okay, but I'm…

18     A:  It's very similar to this.

19     Q:  Okay.  Could we get a copy of it then?

20     A:  Sure, if you want. I'll give it out.

21     Q:  Okay.

22     Q:  Exactly what should I request?

23     A:  Just ask for our checklist.  It's, you know, we just

24 use that for our own benefit, you know.  That way…

25     Q:  Yeah.

Confidential Agency Document
DLB-001261

DOL-OASAM-0237

Donna's Working copy

**Roof Control Supervisor**
**Supervisory Mine Safety and Health Specialist**

GS – 13, direct front line responsibility for roof control in D 4

FY 09 – HE
FY 10 – HE
FY 11 – HE

FY 10 – HE rating, Richard Kline (now retired) rating official; Robert Hardman (now retired) reviewing official.

**Organizational Performance Elements, FY 10 summary**

Leadership narrative: He is confident and knowledgeable; long and short range goals to utilize the grossly understaffed group; organized the roof control group & efficiency is excellent; his leadership of the group follows policy and other trends in the industry; he is good at anticipating problems and keeping the proper perspective between the inspection groups and the technical work group

Resource Management: He demonstrated his ability to effectively use the specialists assigned to his work group. He keeps management apprised of his group resources. In spite of this shortcoming, has continued to push the specialists to do quality work. He has trained them properly, assessing them, and keeping their morale at a high level.

Coalition Building and Communication: He continually talked with the CMI's, supervisors, and ADM's to forge an understanding of the plans and procedures that are being submitted now. His communications are understandable and clear. He keeps his staff aware of the changes going on in the District and their extent of authority. He promotes an open atmosphere for all specialists to communicate with the district staff at all levels

Result 1: His group had few violations past due

Result 2: Good planning to enable proper use of the specialists

Result 3: He demonstrates each day the technical expertise that he uses in reducing the problems in the district mines. Each plan is given proper evaluation with hardly any technical issues and few mistakes. His technical knowledge shows in getting the plans evaluated properly and according the applicable regulations.

Result 4: He coaches his staff to get the standard evaluation of all the plans. All plan approvals were done technically correct. The manager makes quarterly visits to the field offices and makes on – site safety inspections of the offices;

DOL-OASAM-0238

**Recommendation:  Proposed 30 day suspension**
**Failure to Discharge the Duties of your Position**

- Pg 147 & MSHA recommendation notes.  Said that he began using checklists for plan reviews immediately after receipt of CMS&H Memos HQ – 08 – 058 – A and 059 – A.  Copies of checklists were not in district records. *[handwritten: but doesn't say it has to be in file]*

  *[handwritten left margin: ask George]*

- Pgs 147 and 149  Did not maintain tracking sheets in the roof control department working files for some UBB submissions during the review period.  No tracking sheet attached to the 2008 plan. *[handwritten: Yes, HQ – 08 – 059 A required but was following]*

  *[handwritten left margin: Lynn will check X]*

- Pg 147 and 149  Did not meet 30 day turn around for roof control plans; said 30 days was not realistic; backlog of plans. *[handwritten: D4 SOP under SOP, if over 30 days explanation made]*

- Pgs 147, 148  HQ checklists similar to D4 checklists   Used checklists for plan reviews that were not developed by HQ for use in the field.

- *[handwritten: ?]* Pg 148  Approved four supplements to the 2005 base plan even though the roof control plan approval SOP in D4 stated that "no more than three supplements will be permitted on an approved plan before they are incorporated into an updated plan."  D4 reviewed the proposed base plan for nearly nine months before denying approval on February 17, 2009.  During that time, D4 approved three additional supplements to the October 2005 base plan. *[handwritten: DM approves plans]*

- 2009 UBB plan was not forwarded to MSHA Tech Support even though the conditions met the guidelines specified in the PIL No. 108 – V – 02. *[handwritten: What was his role? Was responsible?]*

- *[handwritten: X]* Pg 151  There is no indication that he inspected the area or asked his staff to do so.  Inspectors and specialists told roof control department that there was some floor heave and rib sloughage in the longwall headgate and stoppings were crunching out between entries in the headgate.  Roof control supervisor said these issues are not uncommon for any longwall sections and potential pillar failure was not reported or indicated by other reports from MSHA personnel.

- MSHA recommendation notes.  Pillar stability analysis

**Douglas Factors:**
Aggravating:

- DF 1 – Failure to discharge the duties of the position is a serious offense.  Because of failure to follow procedures and apply policies equitably checklists were used that were not developed by HQ; not all roof control plans were forwarded to Tech Support as necessary; did not follow D4 SOP's on supplements
- DF 2 – Prominence of position.  Roof Control Supervisor is a prominent position within the mining industry.  He is regarded as an expert in his field.
- DF 8 – Notoriety of offense and its impact upon the reputation of the agency.  Negative impact on agency reputation if the mining community were to know of the issues.
- DF 9 – Clarity of notice.  According to performance ratings, employee was aware of agency polices and procedures.
  - He is a technical expert in roof control.  FY 09 performance rating
  - Use of Tech Support on problem mines aided in using his resources.  FY 09 performance rating

Confidential Agency Document
DLB-001263

DOL-OASAM-0239

- ○ Provided technical expertise to SOL during depositions and hearings involving roof control violations. FY 09 performance rating
- ○ Has long and short range goals to utilize the grossly understaffed group. His planning in long and short time goals is consistent with agency mission. His leadership of the group follows policy and other trends in the industry, FY 10 performance rating
- ○ Continued to push the specialists to do quality work. He has trained them properly, assessing them, and keeping their morale high. FY 10 performance rating
- ○ Continually talked with the CMI's, supervisors, and ADM's to forge an understanding of the plans and procedures that are being submitted now. His communications are clear and understandable. He promotes an atmosphere for all specialists to communicate with the district staff at all levels. FY 10 performance rating
- ○ He has a quick grasp of new rules and policies, and applies them across the board. His inspection experience has helped his group understand the problems at the mines. He teaches and coaches his specialists so they have an understanding of the policy. FY 10 performance rating
- ○ Has good planning to enable proper use of specialists. FY 10 performance rating.
- ○ Is a good supervisor. FY 10 performance rating
- ○ Coaches his staff to get the standard evaluation of all the plans. All plan approvals were done technically correct. FY 10 performance rating
- ○ SOL utilized his expertise on several legal cases which were all settled in a positive manner in MSHA's favor. FY 11 performance rating
- ○ An effective engineer with exceptional skills in problem solving. He is an excellent communicator and utilizes his data gathering skills to fully understand situations before developing well though out and calculated solutions. FY 11 performance rating

<u>Mitigating:</u>

- DF 3 – No active disciplinary action.
- DF 4 – Last three years of HE performance ratings.
- DF 5 – Coal still has confidence that he can perform satisfactorily in the future..
- DF 10 – Potential for rehabilitation. Coal believes these same mistakes will not be repeated in the future.
- DF 11 – Mitigating circumstances:
  - ○ Pg 149 SOP did not require D4 to maintain checklists in the roof control department.
  - ○ Pg 150 Said he did not receive a copy of GMS&H Memo HQ—08—058 – A. Memo addressed to all DM's and ADM's.
  - ○ Roof control supervisor's group had few violations past due. FY 10 performance rating
- DF 12 – Alternative sanctions. Proposed 30 day is serious penalty and should deter such repeated conduct.

Confidential Agency Document
DLB-001264

<u>Not Applicable:</u>

- DF 6 – No other roof control supervisor being disciplined.
- DF 7 – DOL does not have a table of penalties.

### Inspector – Tailgate Roof Support

**Issue:** Page 19 of the base roof control plan submitted by the operator on October 27, 2009, and approved by the District Manager on December 23, 2009, required the tailgate travelway of initial longwall panels to have supplemental support in the form of two rows of 8-foot long cable bolts or two rows of posts on 4-foot centers installed in the middle of the entry between primary supports. This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times. The MSHA Accident Investigation team found there was only one row of supplemental support in the tailgate travelway as opposed to the two required in the approved plan.

On March 10, the Inspector traveled the 1 North Longwall tailgate travelway on the day shift and did not document a violation of the approved roof control plan. On March 11, the Inspector was in the tailgate travelway to terminate an order for a violation of the ventilation plan. According to the inspection tracking map, he traveled the entire tailgate travelway. The Inspector did not cite a violation of the roof control plan that day and stated in his interview that he did not recall inspecting the travelway for compliance with the roof control plan. Since he counted this inspection toward completion of the regular inspection of the tailgate travelway, inspection procedures required him to examine the travelway for compliance with the roof control plan. This was the last time MSHA inspected the 1 North Tailgate travelway before the explosion.

The Inspector documented that he reviewed the Uniform Mine File (UMF) on January 6, 2010, at the beginning of the regular inspection of UBB for the second quarter of FY 2020. The date stamp on the approval letter shows that the roof control plan was not filed in the UMF until January 20, 2010.

The Field Office Supervisor provided information during an interview on the distribution and filing of approved plans within the field office. He stated copies are provided to him and the inspector assigned to the particular mine and another copy is placed in the UMF.

**Supporting Documentation:**

- Copy of December 23, 2009, roof control plan approval letter showing the approved roof control plan was filed in the UMF on January 20, 2010 (Approval Letter for RC Plan.pdf)

- Page 19 of the approved roof control plan (RC Plan Page 19.pdf)

- UMF certification sheet showing that the Inspector reviewed the UMF on January 6, 2010, for a regular (E01) inspection (The Inspector – Tailgate Travelway.pdf)

- The Inspector's inspection notes for March 11 (The Inspector – Tailgate Travelway.pdf)

DOL-OASAM-0242

- Pertinent pages from The Inspector's Interview (The Inspector – Tailgate Travelway.pdf)

- Inspection Tracking Map (The Inspector – Tailgate Travelway Map.pdf)

**Mitigating Factors:** The single row of posts would have complied with the 2005 roof control plan tailgate travelway requirement but not with the requirement in the 2009 approved plan in effect at the time of the explosion.  The approved roof control plan was filed in the UMF two weeks after the Inspector reviewed the file.

Confidential Agency Document
DLB-001267

DOL-OASAM-0243

*Attachment #2*

**U. S. Department of Labor**

Mine Safety and Health Administration
100 Bluestone Road
Mount Hope, WV 25880-1000



DEC 23 2009

UNDERGROUND MINE FILE
DATE FWD. 1/5/2010
INITIALS ___

Mr. Berman Cornett
Safety Director
Performance Coal Company
P.O. Box 69
Naoma, WV 25140

Dear Mr. Cornett:

Subject:    Update of the Roof-Control Plan, Upper Big Branch Mine- South,
I.D. No. 46-08436, Performance Coal Company, Montcoal, Raleigh
County, West Virginia, Permit No. 4-RC-11-94-12307-12

Your roof-control plan, received on October 27, 2009, has been reviewed and is
approved. This approval is based upon a District review of the roof conditions
and roof-control practices in the mine by representatives of the Mine Safety and
Health Administration, and includes any changes made by you at that time.

Should you have any questions concerning your roof-control plan, please contact
Don Winston at this office, (304) 877-3900, Extension 130.

Sincerely,

MSHA
MOUNT HOPE, WV

JAN 06 2010

RECEIVED
MOUNT HOPE FIELD

Robert G. Hardman
District Manager
Coal Mine Safety and Health, District 4

Enclosure

cc:    State Inspector-at-Large, Oak Hill Division (1 encl.)
Mount Hope Field Office (3 encl.)
_____ (1 encl.)
Files/cls

FIELD MINE FILE
DATE FILED 1/20/10
INITIALS ___

Confidential Agency Document
DLB-001268

DOL-OASAM-0244

# ROOF CONTROL PLAN DIAGRAM NO. 9
## SUPPLEMENTAL SUPPORT IN TAILGATE ENTRY



□ Primary Roof Support
△ Cable Bolt or Post

In Longwall development entries of initial longwall panels, the Tailgate Entry will have supplemental support in the form of two (2) 8' Cable Bolts or Posts installed between primary support.

This supplemental support shall be maintained 1000' outby the longwall face at all times.

PERFORMANCE COAL COMPANY, INC.
UPPER BIG BRANCH MINE
MSHA ID NO. 46-08436   WV State # U-3042-92

ROOF CONTROL PLAN DIAGRAM NO. 9
SUPPLEMENTAL SUPPORT IN TAILGATE ENTRY

DATE: 10-27-08                    SCALE: 1" = 10'

PAGE 19

Confidential Agency Document
DLB-001269

DOL-OASAM-0245

Mine File – Reviewed Prior to Inspection

U. S. Department of Labor
Mine Safety and Health Administration

Mine Name

| Date Reviewed | Inspector's Signature | Comments (missing documents, obsolete data, etc.) |
|---|---|---|
| 9-15-09 | | EO1 |
| 9-15-09 | | EO2 |
| 9-24-09 | | EO2 |
| 10-1-09 | | EO1 |
| 10-5-09 | | EO1 Respirable Dust |
| 10-6-09 | | EO1 Electrical |
| 10-8-09 | | EO2 |
| 10-14-09 | | EO2 |
| 10-19-09 | | EO1 Positive Q Review |
| 10-26-09 | | EO2 |
| 10 05 09 | | EO2 |
| 11 10 09 | | EO1 |
| 11-19-09 | | EO1 Review |
| 11-19-09 | | EO1 Review-Limited |
| 11-23-09 | | EO2 |
| 12-5-9 | | EO2   EO1 Reviewable Dust |
| 12-7-09 | | EO1 Partial Review / |
| 12-11-09 | | EO2 |
| 12-15-9 | | EO1 |
| | | EO1 |
| 12-21-09 | | EO1 |
| 12-21-09 | | EO2 |
| 12-22-09 | | EO1 |
| 1/6/09 | | EO1 |
| 1/6/09 | | EO2 |
| 1-7-10 | | EO2 |
| 1-15-10 | | EO2 |
| 1-28-10 | | EO2 |

MSHA Form 2000-137, Oct 79

CPO 683 426

Confidential Agency Document
DLB-001270

DOL-OASAM-0246



Attachment #3

MSHA Form 7000-10A, June 93 (revised)

DAILY COVER SHEET

Day

Date: 2/11/10    Event No. 6256108

Arrived at the Mine: 2050    Departed from the Mine:

List Records Books Checked: CWP PET SHEET

Accompanied By/ Company Representative: LEWIS BURCHFIELD

IRON WORKERS, PLUS BROWING, FIRE BOSS
INTAKE AREA

Miners Representative: N/A

AREAS OF INSPECTION ACTIVITY:

THE CERT SURFACES OF
UNDERGROUND

Inspector's Initials

Supervisor's Initials and Date

*U.S. Government Printing Office: 1997 - 505-470    Page No. 1

MSHA Form 7000-10K, June 93 (revised)

Date 3/11/10

Assued or Upper Big
Branch Mine - Steers
Patrol

Mr. will Mackrowski
to Discuss Revision of
Tailgate and inform
Faron from Order loved
By termoyors axis
Revision is Unaccess By
Criticor Ving. Conditions
Underground @ Tailgate

Route Map of Bero
To Be inspected with
Management

Inspector's Initials _____

Supervisor's Initials and Date _____

Page No. 2

*U.S. GPO: 2005-541-759

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/11/10

Entry Goodlaw Per Survey
Book (two)

Entry 98,760
G - 805
160 - 822

MPL - 14,932
MPLS - 35,400

far with Excess Gevernance
Faron Kluishing Joe Price
Tim Davis to Go to
Tailgate

Entry MT-7 Markers
Coal (13) SESN's (Gk)

Inspector's Initials _____

Supervisor's Initials and Date _____

Page No. 3

*U.S. GPO: 2005-541-759

---

MSHA Form 7000-10K, June 93 (revised)

Date 3/11/10

Tracis to House of
Ventilate on Tailgate (two)

Check Ventilation Controls
and Compared Them to
Revision Submitted (two)

Joe Air Readings at
Evacuators and Petsy
Fac

Singed other Readings
on Way

Took Kronk @ L60
Jack on Longwall
Face

Inspector's Initials _____

Supervisor's Initials and Date _____

Page No. 4

*U.S. GPO: 2005-541-759

Confidential Agency Document
DLB-001272

DOL-OASAM-0248

MSHA Form 7000-10I, June 93 (revised)

46-08436

**DAILY COVER SHEET**

Event No. 6286108

Date: 3-11-10

Arrived at the Mine: 0600   Departed from the Mine:

List Records Books Checked: Quarterly Exam

→ Daily Exam of coal

Accompanied By Company Representative: Henley Tupper

Miners Representative:

AREAS OF INSPECTION ACTIVITY:

Seal Numbers 15 thru

4

Inspector's Initials

Supervisor's Initials and Date

Page No. 1

*U.S. Government Printing Office: 1997 - 508-476

---

MSHA Form 7000-10K, June 93 (revised)

Date: 3/11/10

Type out Termination

Also present at Management

Return to Mt. Hope Office

Inspector's Initials

Supervisor's Initials and Date

Page No. 6

*U.S. GPO: 2009-541-759

---

MSHA Form 7000-10K, June 93 (revised)

Date: 3/11/10

Inspected state Numbers

Spoke out

Check out Smoke Tests

on city Gate to Mouth

Air flow is as shown

on map in Air Books

Inspan Back to

Seals

Cross MSHA Office

Spoke with Ventilation

Supervisor whames Hm

re of Findings

Close Back on Computer

@ 1400

Inspector's Initials

Supervisor's Initials and Date

Page No. 5

*U.S. GPO: 2009-541-759

Confidential Agency Document
DLB-001273

DOL-OASAM-0249



*Inspector Interview 6/15/2011 Session 2*

15

1    Q:   Particularly paragraph about pillar sizing.

2    A:   Okay.

3    Q:   What determines the size the pillar has to be?

4    A:   That is – I think their engineers come up with the

5 [unintelligible] something like that and then they'd send you a

6 roof control plan on the minimum size of entry width.

7    Q:   What constitutes a violation of that standard in

8 respect to pillar size?

9    A:   I guess, anything smaller than what the plan would

10 require.

11    Q: What if it's larger than what the plan requires and you

12 observe pillar failures?

13    A:   I guess, pillar failure would still be a violation of

14 roof-control plan.

15    Q:   It'll be a violation of the roof-control plan or that

16 standard?

17    A:   I guess the standard.

18    Q:   Would that have ever have occurred to you prior to the

19 accident to look for that as far as compliance to best standard?

20    A:   It would occur to me prior to today.

21    Q:   Thinking back to the head gate entry, the conditions

22 in the head gate entry on the longwall, were there pillar

23 failures? Do you recall or did you go in there?

24    A:   Behind? I never went behind the longwall.

25    Q:   Okay. How do you inspect the longwall tailgate for

DOL-OASAM-0250

16

1   compliance with the roof-control plan?

2       A:    Right off the top of my head, I'm not sure. I guess –

3   I mean we walked out in there.

4       Q:    How did you walk down in there? Do you remember a

5   specific time that you did that?

6       A:    Not right off. I mean, I know – if I'm not mistaken

7   there might be some stuff in there that talks about

8   [unintelligible] something to that effect.

9       Q:    Do you recall accessing the tailgate from the longwall

10  face? If that was possible?

11      A:    If I have – yeah. If I remember correctly yes, sir.

12      Q:    And how did you get out off of the face into the

13  tailgate? What precautions did you take? Were you able to climb

14  over to the side of the last shield or did you have to stop and

15  lock up the panline?

16      A:    If I – if I'm remembering correctly I crossed right –

17  right across the front of the shield.

18      Q:    So you had to go out onto the panline or…?

19      A:    To be honest it's all kinda fuzzy.

20      Q:    I guess, what I'm wonder….

21      A:    I know one day, one of the days that they were down

22  for under an order – and then a couple of other times but I know

23  I have crossed in front of the shield and I have crossed to the

24  panline.

25      Q:    Don't they have a – Do you recall seeing a large

```
1   shield or guarded piece of metal at the end of the last shield
2   on the tailgate to prevent [rib] rolls, material rock from
3   coming in on the tailgate side?
4       A:   Not right off.
5       Q:   What were the conditions like in the tailgate when you
6   got out there? Was it pretty bad break there at the last shield
7   or was it holding up pretty clean?
8       A:   I've been going - the only day I can really remember
9   being there is the couple of days under the order. I don't
10  remember the conditions being bad.
11      Q:   Do you recall how many [prop setters] they were
12  required to have?
13      A:   No.
14      Q:   Did you check the roof-control plan when you inspected
15  the tailgate to see what the requirements were?
16      A:   I don't recall. No. I don't recall inspecting the
17  tailgate for the roof-control period. I don't recall
18  that.
19      Q:   But when you did inspect it, were you familiar with -
20  because you did go out…
21      A:   Yeah. No. I [didn't].
22      Q:   Do you recall what the conditions in the tailgate
23  looked like? Was it wet? Was it dry?
24      A:   I'm wanting to say maybe a little bit of both.
25  Overall, I think it is - I'm gonna say mostly dry.
```

Confidential Agency Document
DLB-001276



## Inspector – Rock Dust Survey of Headgate #22 Section

**Issue:** The March 15, 2010, rock dust survey in Headgate #22 Section should have included two additional rows of samples. The Inspector, assisted by a ROE trainee, collected four rows of samples, stopping 1,000 feet outby the section loading point. Page 45 of the *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook directs the inspector to "conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the mine."

**Supporting Documentation:**

- *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook, Handbook Number: PH-08-V-1, January 1, 2008, pages 45 and 62 (Pages from PH08-V-1.pdf)

- Pages 44-46 from transcript of ROE trainee's October 8, 2010, interview where he describes efforts taken by the Inspector to collect samples on March 15, 2010. (Pages 44-46 from the ROE trainee's Transcript - 10-08-2010.pdf)

**Mitigating Factors:** The Inspector demonstrated efforts to follow procedures when conducting a rock dust survey on March 15, 2010, despite adverse conditions. The ROE trainee described the conditions on Headgate #22 Section as "sloppy wet," requiring considerable effort to obtain the eight samples collected (rather than documenting all areas as too wet to sample).

## Inspector – Rock Dust Survey of Old No. 2 Section

**Issue:** Rock dust surveys were not conducted in the Old No. 2 Section panel, where the operator completed mining during the second inspection of fiscal 2010 and moved the MMU to the Tailgate #22 entries. On March 16, 2010, the Inspector submitted a rock dust survey for this MMU with no samples collected. He indicated on the survey submittal form that the "section has not advanced 500 feet from the last survey."

Although the Tailgate #22 entries had not advanced 500 feet, survey samples had not been collected in the 1,000-foot long Old No. 2 Section Panel during previous inspections. Page 45 of the *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook stated that "Rock dust surveys shall also be conducted in previously mined active areas" (in addition to advancing sections). Page 62 of the handbook provided further guidance, which stated: "Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed. All active entries not previously surveyed shall be surveyed. Outby areas of a retreating section and active areas where advancing MMUs have been removed are considered active entries for rock dust survey purposes."

DOL-OASAM-0254

**Supporting Documentation:**

- *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook, Handbook Number: PH-08-V-1, January 1, 2008, pages 45 and 62. (Pages from PH08-V-1.pdf)

- Pages 100-103 and 108-109 from transcript of the Inspector's October 20, 2010, interview, as well as pages 40, 44-45, and 86-87 of his October 21, 2010, interview, where he indicated that he did not understand revised procedures that directed him to collect samples from areas where MMUs had been removed. (Pages from the Inspector's Transcript - 10-20-2010.pdf and Pages from the Inspector's Transcript - 10-21-2010.pdf)

**Mitigating Factors:** Prior to 2008, MSHA procedures directed inspectors to conduct rock dust surveys only on advancing sections. At that time, inspectors typically collected samples only from the advancing set of entries in which the MMU was actively mining during the survey. As a result, inspectors frequently did not collect samples at the inby ends of panels or main entries where mining was completed between surveys. After MSHA implemented the revised inspection procedures in 2008, some inspectors continued to sample only the set of entries being mined at the time of the survey. This practice was not unique to the Inspector, as inspectors conducted surveys in only 3 of the 17 non-pillared panels in active workings at UBB.

The Inspector stated that he was not aware of the revised procedures for collecting rock dust surveys in such areas. He also stated that he primarily learned how to conduct rock dust surveys from more experienced inspectors (who were trained on the old procedures) and that he remembered little from his relevant training at the MSHA Academy.

conducted with affected miners and mine supervisors to evaluate their familiarity with plan requirements.

*Documentation Required: The inspector's evaluation of mining near a potential body of water or under water shall be documented in the hard-copy inspection notes to show the in-mine location), the date started, and the date this procedure was fully completed. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. No other documentation is required unless a violation is observed.*

12. <u>**Potable Water (Working Section).**</u>  The inspector shall determine if potable water is available.

*Documentation Required: Availability of potable water shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU). A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, availability of the potable water shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

13. <u>**Rock Dust Survey.**</u>  The inspector shall conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the mine. Rock dust surveys shall also be conducted in previously mined active areas. Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.

*Documentation Required: The mechanized mining unit number (MMU), the sampling area description, the survey begin zero point, each sampling point (referenced in feet from the zero point), the percentile of methane detected on a hand-held detector and the number of any air bottle collected at each sampling location shall be documented in the inspection hard-copy notes for each survey collected. Additionally, a minimum amount of rock dust survey information shall be documented in the Inspection Tracking System MMU Log to show the MMU number, the date survey was started and the date fully completed. No other documentation is required unless a violation is observed.*

14. <u>**Sanitary Facilities.**</u>  Sanitary facilities located on a working section shall be inspected for compliance with applicable standards.

*Documentation Required: Sanitary facility observations shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU), the date started, and the date this procedure was fully completed for that MMU. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, sanitary facilities observations shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

Confidential Agency Document
DLB-001280                                    DOL-OASAM-0256

that rock dust spot and survey analysis reports and accompanying analysis data are promptly made available for use by the districts. The Rock Dust Data Retrieval Application permits monitoring of prompt issuance of citations/orders for non-compliant samples or surveys, tracking wet survey location re-inspections, mining analysis data, and printing of oversight reports.

The responsible supervisor shall assure that all rock dust spot or survey analysis reports returned from the Mount Hope Lab by email attachment to the district are included within the appropriate inspection report. A citation or order shall be promptly issued for non-compliant rock dust spot samples or surveys. The citation or order number of each non-compliance issuance shall promptly be entered into the Rock Dust Sample Submission Application and the data uploaded.

2.   Rock Dust Surveys. During each Regular Safety and Health Inspection, a uniform rock dust survey shall be made in each advancing working section to determine compliance with 30 CFR 75.403. If for any reason a survey is not possible, the inspectors shall promptly notify their supervisor. The supervisor, after consulting with district management, will provide guidance to the inspector. The surveys are to be kept current, up to and including the last row of pillars immediately outby the loading point. If a working section has advanced and the loading point moved 500 feet or more since the last Regular Safety and Health Inspection, a survey shall be conducted.

Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed. All active entries not previously surveyed shall be surveyed. Outby areas of a retreating section and active areas where advancing MMUs have been removed are considered active entries for rock dust survey purposes. Include in the collection of dust samples a representative number of crosscuts. Drawings Number 1 and 2 on the following pages provide further guidance concerning rock dust surveys.

*Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.* The status of each of these individual wet locations shall be determined during each regular inspection conducted within this one-year period. *Spot samples shall be collected if conditions permit on a re-inspection of a previously wet area.* The previous compliance/non-compliance determination of rock dust surveys will not be affected by the additional analysis of spot samples collected during re-inspection of wet areas. A citation or order should be issued when non-compliance is indicated for 10% or more of the individual

Confidential Agency Document
DLB-001281

DOL-OASAM-0257

44

1   some things around there.  We checked the supplemental supplies

2   and fire plan.

3        Q:   Let's take a break real quick.

4             WHEREUPON, a recess was taken from the interview,

5   after which it continued as follows, to-wit:

6        Q:   Okay.  We're back on the record in Session 3 with ▨  ROE trainee

7   ▨         ▨         during the break I gave you an additional page of

8   notes from the 15th.  I apologize that we haven't given them to

9   you.  Why don't you go ahead and look those over and see if

10  there's any additional items that you did that we need to talk

11  about.

12        A:   I don't see anything.

13        Q:   Look at the last page there.  Well, first of all,

14  look at the first page.

15        A:   Of?

16        Q:   Of the 15th.

17        A:   Okay.

18        Q:   Can you read, read the areas of inspection to us?

19        A:   Oh, okay.  Respirable dust, rock dust survey, clip

20  sequence, fire suppression, oh, one and two section belts,

21  terminate Citations in two sections, one belt.  Rock dust.

22        Q:   I don't think we mentioned the rock dust survey.

23        A:   Let's see here.

24        Q:   Do you recall doing a rock dust survey that day?

25        A:   I do recall doing one rock dust survey that ▨ --

45

1  matter of fact, ▓▓▓▓ the one that was showing me how to do a
2  rock dust survey.

3      Q:  Was that at Upper Big Branch?

4      A:  It was.  I remember most of the, where the took me
5  and we started out and he showed me how to do it.  And most of
6  the area was wet, I mean actually sloppy wet.  The ribs were wet
7  and the floor.  And we went over into the belt area. I believe
8  there was a trickle duster setting in there throwing dust out.
9  And then from that we went on across.  And most, most of the
10 entries were wet.  I do recall that.

11     Q:  Do you recall if that was this day?

12     A:  It had to be, because that's the only time I remember
13 doing any dust survey with ▓▓▓▓

14     Q:  Do you remember whether you got quite a few samples
15 or---

16     A:  We -- I don't know exactly how many samples we got,
17 but most of the stuff was wet.  And on the outer entries and we
18 had got some samples of where we're more closer to the track
19 entries.  But I don't think it was a whole lot; see, most of it
20 was wet.

21     Q:  Can you -- did you go across each row or did you go
22 up and down each entry?  Can you kinda give us an idea how you
23 did that?

24     A:  We, we, uh, did the entries and then we'd go down so
25 far. ▓▓▓▓ was, was guiding me and we'd go down so far and then

Confidential Agency Document
DLB-001283

DOL-OASAM-0259

46

1   stop, do the entries and then crosscuts.  And then we kept doing
2   that for ever how far he had to go.  I don't know if he knew
3   where it was marked from the last time.  You know, we gathered
4   the samples, put them back in two backpacks and took them with
5   us.

6       Q:   You say you don't remember how he knew where to
7   start?

8       A:   No, I don't know if he had it on his map or if he had
9   it in his notes.  I don't know.  I don't recall that.

10      Q:   Do you remember him saying anything about areas outby
11  that hadn't been sampled before or where the section had moved
12  from?

13      A:   No.

14      Q:   Have you had training yet on, at the academy, on rock
15  dust surveys.

16      A:   We had training here, at the academy, in the
17  classroom; I think it was the last month - or, I'm not sure -
18  of them showing how to take a rock dust survey and how to mark
19  it.

20      Q:   Did they also teach you recordkeeping or note taking:
21  What's required in the notes when you do a rock dust survey?

22      A:   They explained to us on a map and a PowerPoint on how
23  to identify your samples.  As far as actually the notes part of
24  it I'm not sure.

25      Q:   Can you tell me what's required in the notes?

conducted with affected miners and mine supervisors to evaluate their familiarity with plan requirements.

*Documentation Required: The inspector's evaluation of mining near a potential body of water or under water shall be documented in the hard-copy inspection notes to show the in-mine location), the date started, and the date this procedure was fully completed. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. No other documentation is required unless a violation is observed.*

12. **Potable Water (Working Section).** The inspector shall determine if potable water is available.

*Documentation Required: Availability of potable water shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU). A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, availability of the potable water shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

13. **Rock Dust Survey.** The inspector shall conduct a rock dust survey to within 50 feet outby the section dumping point on each advancing active working section in the mine. Rock dust surveys shall also be conducted in previously mined active areas. Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.

*Documentation Required: The mechanized mining unit number (MMU), the sampling area description, the survey begin zero point, each sampling point (referenced in feet from the zero point), the percentile of methane detected on a hand-held detector and the number of any air bottle collected at each sampling location shall be documented in the inspection hard-copy notes for each survey collected. Additionally, a minimum amount of rock dust survey information shall be documented in the Inspection Tracking System MMU Log to show the MMU number, the date survey was started and the date fully completed. No other documentation is required unless a violation is observed.*

14. **Sanitary Facilities.** Sanitary facilities located on a working section shall be inspected for compliance with applicable standards.

*Documentation Required: Sanitary facility observations shall be documented in the hard-copy inspection notes to show the mechanized mining unit number (MMU), the date started and the date this procedure was fully completed for that MMU. A short statement such as "No Violations Observed" or "NVO" shall be included when no hazards or violations are observed. Additionally, sanitary facilities observations shall be documented in the Inspection Tracking System MMU Log to show the MMU number. No other documentation is required unless a violation is observed.*

Confidential Agency Document
DLB-001285

DOL-OASAM-0261

that rock dust spot and survey analysis reports and accompanying analysis data are promptly made available for use by the districts. The Rock Dust Data Retrieval Application permits monitoring of prompt issuance of citations/orders for non-compliant samples or surveys, tracking wet survey location re-inspections, mining analysis data, and printing of oversight reports.

The responsible supervisor shall assure that all rock dust spot or survey analysis reports returned from the Mount Hope Lab by email attachment to the district are included within the appropriate inspection report. A citation or order shall be promptly issued for non-compliant rock dust spot samples or surveys. The citation or order number of each non-compliance issuance shall promptly be entered into the Rock Dust Sample Submission Application and the data uploaded.

2. <u>Rock Dust Surveys</u>. During each Regular Safety and Health Inspection, a uniform rock dust survey shall be made in each advancing working section to determine compliance with 30 CFR 75.403. If for any reason a survey is not possible, the inspectors shall promptly notify their supervisor. The supervisor, after consulting with district management, will provide guidance to the inspector. The surveys are to be kept current, up to and including the last row of pillars immediately outby the loading point. If a working section has advanced and the loading point moved 500 feet or more since the last Regular Safety and Health Inspection, a survey shall be conducted.

Prior to completing a Regular Safety and Health Inspection, a careful review of the mine map shall be made to assure that all active areas of the mine have been surveyed. All active entries not previously surveyed shall be surveyed. Outby areas of a retreating section and active areas where advancing MMUs have been removed are considered active entries for rock dust survey purposes. Include in the collection of dust samples a representative number of crosscuts. Drawings Number 1 and 2 on the following pages provide further guidance concerning rock dust surveys.

*Locations where samples were not previously collected due to wet conditions shall be tracked and inspected for a period of one year.* The status of each of these individual wet locations shall be determined during each regular inspection conducted within this one-year period. *Spot samples shall be collected if conditions permit on a re-inspection of a previously wet area.* The previous compliance/non-compliance determination of rock dust surveys will not be affected by the additional analysis of spot samples collected during re-inspection of wet areas. A citation or order should be issued when non-compliance is indicated for 10% or more of the individual

Confidential Agency Document
DLB-001286

DOL-OASAM-0262

100

1    A    And I believe that was the reg.  I don't know.  I might

2    be wrong.

3    Q    Okay.  But that -- that regulation is for whenever

4    you're using belt air on a section?

5    A    Right.  Right.

6    Q    And I realize that's what he told you to do and that's

7    what you would have done.  But there were no other provisions in

8    the ventilation plan that you recall that you would cite that

9    under?

10   A    No, not that I'm aware of.

11   Q    Do you know who was the person at the Upper Big Branch

12   who maintained the calibration of the CO system?

13   A    Was it ████████, ██████████?  Is that it?

14   CRAWFORD:  ██████

15   Q    Okay.  And I know you didn't do the -- you said

16   Mr. Hicks did that, but do you know if that's the person that he

17   traveled with whenever he did that?

18   A    I can't answer that.

19   Q    We'll talk a little bit about rock dust surveys.

20   What's your understanding of where rock dust samples are required

21   to be collected during an E01?

22   A    On active sections, at no more than 500-foot intervals;

23   crosscuts before -- I guess, less than every 1500 foot, so before

24   every third one, a crosscut sample; every entry up to the feeder.

25   Q    Is there any other places that the handbook requires

*Inspector Transcript*

101

1  you to take surveys?

2      A    Not that I'm aware of.

3      Q    What's the intent of a rock dust survey?

4      A    To determine the combustible content.

5      Q    Of?

6      A    Rock dust.

7      Q    For what part of the mine?

8      A    The whole mine, I guess, or for that one particular

9  entry or area.

10     Q    Representative of the area for the whole mine?

11     A    Yes, sir.

12     Q    What do you -- what are you required to do if a section

13 is pillaring?

14     A    I assume nothing.

15     Q    Why's that?

16     A    Because they're on retreat.

17     Q    What instruction have you been given on that?

18     A    None that I'm aware of.

19     Q    Have you had training -- what do you remember of your

20 training for -- how were you trained to collect rock dust

21 samples?

22     A    As far as hands-on training, another inspector showed

23 me how to conduct one, how to take one, and then I think we went

24 over through it in my CMI training at the Academy.

25     Q    Do you remember anything specific from what you were

102

1   taught at the Academy?

2        A    No, sir, not really.

3        Q    Did you go over the handbook?  Did you use diagrams?

4   Did they --

5        A    I don't recall seeing anything.

6        Q    Did they teach you how to use the rock dust submittal

7   form at the Academy?

8        A    Not that I recall.

9        Q    Have you ever been with another inspector while you

10  were a trainee when, on a section that was pillaring, you had to

11  deal with rock dust?

12       A    No, sir.

13       Q    Have you ever gotten any feedback from a supervisor as

14  to where you should take rock dust samples?

15       A    On a pillaring section or just anywhere?

16       Q    Both, either one.

17       A    Yeah, I mean, you know, we've just been instructed, you

18  know, the mouth of the section.  That's at least every 500 feet

19  just like I explained.

20       Q    Anything specific at the pillaring?

21       A    No, sir.

22       Q    Then where did you get the impression that you didn't

23  have to do anything if they were pillaring?

24       A    I believe it's -- to be honest with you, I don't know.

25  I've never inspected the mines that had a section pillaring

103

1  occur, other than, you know, the longwall.

2      Q    Well, Upper Big Branch.  And the longwall's one, that's

3  right.  What if an area was drove up since, say, a small panel

4  was drove up, you got your last rock dust samples in the mains

5  and drove a little panel up and started pillaring, they just

6  started pillaring since the last survey, and they had driven the

7  entire panel and started pillaring since the last survey, what

8  would you have to sample?

9      A    You know, like I said, by just talking to other

10 inspectors -- I've not been with nobody that's done it -- but I

11 was just under the assumption that, if they was doing any kind of

12 retreat mining, you didn't have to take one.

13     Q    What if we had the same scenario, except instead of

14 pillaring when they got to the back of the panel, they just

15 pulled out and went to another -- went back to the mains?  What

16 would you -- say, they went 500 feet in the mains, what would you

17 have to sample?

18     A    I assume the whole thing.

19     Q    What whole thing?

20     A    The section they're driving again now, and if nothing

21 up there's been sampled, I'd assume you'd have to do that one.

22     Q    In the panel?

23     A    Yes, sir.

24     Q    How many surveys would that be?

25     A    I guess it would depend on how far they drove it.

Confidential Agency Document
DLB-001290

DOL-OASAM-0266

108

1   A   Usually, I try to get the last inspector's -- sometimes
2   they'll make a copy of their rock dust survey sheet submittal
3   form and give it to whoever is preceding them, or I'll try to get
4   their inspection report and try to get spad numbers, or sometimes
5   they might draw on their map, some people draw on their tracking
6   map where they stopped at and I just go from there.

7   Q   Is that not a policy to put it on a tracking map?  I
8   mean, is that not an office policy, I guess, practice I should
9   say?  Everybody doesn't do that?

10   A   I don't know.  I mean, because a lot of times I don't
11   pull it.  I mean, I just look at -- a lot of times they'll give
12   us the submittal and it's got starting point and ending point and
13   we just go off of it.

14   Q   Does the office keep a -- does the office keep a map or
15   any way for you to be able to look real quick and see what all's
16   been surveyed and what hasn't for each month?

17   A   Not as far as rock dust surveys that I'm aware of.

18   Q   How would you know -- if you looked at just the
19   endpoint, say, in the mains --

20   A   Yes, sir.

21   Q   -- let's just take for example the Three Section.
22   Three Section had all these little panels on the side.

23   A   Okay.

24   Q   I know you didn't survey in that area, but how would
25   you know that all those side panels had been -- if the ending

109

1   point was in the mains, how would you know whether or not they

2   had since mined one of these small panels to the break, to

3   whether or not you were responsible for that?

4        A    I don't know how you'd know.

5        Q·   Would you think to even look for that?

6        A    No, sir.

7        Q    Okay.  The handbook specifically says that you have to

8   do all areas mined since the last survey.

9        A    Okay.

10       Q    Has anybody ever explained that to you in that way?

11       A    No, sir.

12       Q    Do you feel like your system is adequate for ensuring

13  that that --

14       A    Not with that scenario you just give me, it's not.

15       Q    What is determined -- how do you determine if an area

16  is too wet to sample?

17       A    Usually, I'll go through that area checking top, ribs,

18  floor.  Usually, if it sticks to my fingers and it bucks up or,

19  you know, balls up, it's too wet to sample.

20       Q    Do you ever -- have you ever collected a sample that

21  was just a little bit damp where you had to just push it through

22  the screen or --

23       A    I think I have.

24       Q    Have you?  Okay.

25       A    Not actually pushed it through the screen, but it felt

1    MMUs, was it not?

2    A      Uh, yes, sir.

3         Q      Okay.  Do you know what the policy -- what the

4    inspections procedures require when you're, for the MMU, what

5    areas you have to survey?

6         A      Ask that again.

7         Q      When you do a rock dust survey---

8    A      Okay.

9         Q      ---for an MMU---

10        A      Yes, sir.

11        Q      ---what areas are you required to survey?

12        A      Uh, if I, if I'm understanding it right I, I guess

13   I'll answer it the best I can.  Uh, active minings up to within

14   50 foot of the feeder line -- or tail piece.  Is that what

15   you're asking me?

16        Q      That's part of it.  There's another requirement that

17   says, "All other areas mined by that MMU since the last rock

18   dust survey for that MMU."

19        A      Okay.

20        Q      Were you aware of that at the time you did this

21   inspection?

22        A      No, sir.

23        Q      Have you -- until this interview were you aware of

24   that requirement?

25        A      No, sir.

44

1    trying to, uh, mark it on a map and try to locate that spad

2    later.  I mean, I, I document my rock dust surveys in my hard

3    copy notes.  And at that time I didn't; I tried to mark them on

4    a map.  And when I would fill these sheets out I would take, try

5    to take that information off that map.  And, like you said,

6    sometimes spad numbers are hard to see.

7         Q    Okay.  Did you have any assistance in completing that

8    form -- the rock dust submitted form that day?

9         A    Uh, I don't recall having any assistance.

10        Q    Do you recall the training that you had on collecting

11   rock dust samples, or at least which was consistent with it, or

12   when you had the training on rock dust samples?

13        A    As far as, I guess training, you know, kinda

14   wondering where, it's come from other inspectors.

15        Q    As far as the academy training?

16        A    To be honest, I really don't recall, as far as, you

17   know, as far as going through it and determining, maybe, a

18   location they may have.  But, but my -- the only thing I can

19   really think of is the training I received from other

20   inspectors.

21        Q    And where would you have gotten the guidance or

22   perception that you would submit a "no sample" for a section

23   that had moved from another panel?

24        A    If I'm not mistaken, uh, I'm not sure, I mean, I'm --

25   if I filled it out I was probably told I had to fill it out.  I

1   don't know if it was by another inspector or, or, or what.  I'm

2   thinkin' I seen in some of the old mine files or, or, or

3   something that where they had a idle section, or a section that

4   hadn't advanced or started yet and they had it in there, and it

5   was just a -- but as far as being instructed, I can't say I was

6   instructed to do it.

7       Q      Why wasn't that form uploaded?

8       A      This one?

9       Q      Uh-huh.  [Yes]

10      A      I don't guess I know.

11      Q      When you enter it into your computer?

12      A      Yes, sir.

13      Q      That sample form will stay in there until you push

14  the "Submit" button?

15      A      Correct.

16      Q      This one wasn't in the database as ever being

17  uploaded or submitted.

18      A      Uh, as far as I know, I thought it was.  Uh...

19      Q      Does the -- does the rock dust submittal application

20  let you know if an upload, if something's been uploaded?

21      A      Uh, if you'll bear with me I'll try to think.  Uh, I

22  think the last thing you do is, is, once you get your

23  information and you got your, the emails who it's sent to, you

24  validate, you save it.

25      Q      Uh-huh.  [Yes]

Confidential Agency Document
DLB-001295

```
 1    for three weeks.  And it was, it was really confusing.
 2         Q     Did it make it hard to plan your inspection?
 3         A     Huh?
 4         Q     Did it make it difficult for you to plan your
 5    inspection?
 6         A     Uh, yeah.  Yeah, actually I guess it did.
 7         Q     Why -- do you know where the samples were collected
 8    from the previous quarter for that section?
 9         A     I assume up at that crossover to the head gate.  The
10    length of the, yeah.
11         Q     Okay.  Can you show me on the map?
12         A     I assume this crossover here up through---
13         Q     It comes down here; right?
14         A     The quarter before?
15         Q     The before.
16         A     Uh, where it was at down here?  No, sir; I'm not
17    sure.
18         Q     So for that MMU do you know where the rock dust
19    samples were collected for that MMU that you were sampling that
20    day during the previous quarter?
21         A     No, sir; I'm not.
22         Q     So how would you have known where to begin this
23    inspect... -- this rock dust survey?
24         A     Again, I went from their starting point on their
25    panel.
```

1    Q    So you were just looking at their panel?

2    A    Which I know is wrong now.

3    Q    Okay.

4    A    But at the time I thought I was right.

5    Q    So is that why you didn't collect rock dust samples

6    from the, the panel and rooms that were mined---

7    A    Yeah.

8    Q    ---outby the longwall stop location?

9    A    Yeah, cause this -- I mean, you know, like I said

10   when I started here they, it was idle, and it produced for a

11   week or two and it wouldn't, and I was all over the place.  And

12   when they actually started this one they was completed here.

13   You know, the equipment and stuff was done located here.  I did

14   not do that.

15   Q    Did you know that you needed to do that at that time?

16   A    No, sir; I don't guess I did.

17   Q    Okay.  Did your supervisor ever point out to you that

18   you had missed that area?

19   A    No, sir.

20   Q    Has your supervisor ever asked you to plot on your

21   mine map where you collect -- on your tracking map where you

22   collected your rock dust samples?

23   A    No, sir; not that I'm aware.

24   Q    Why wasn't the survey documented in your notes?

25   A    Uh, uh, like I stated before, uh, you know a lot of

no obvious reasons
for disc. action

pg 17  Michael Hicks, Fred Willis, Lincoln Selfe, Luther Marts
        SUP                    SUP           ADM          ADM

pg 21 - reminders + training needed
        David Sturgill, Michael Sturmate, Jerome Stone,
        Kevin Lyall + William Bane II

Pg 22 - reminder + training needed
        Larry Hedrick

Pg. 23 - reminder + trang needed
        Jerome Stone   + supv consistently complied w/hbk provisions
        ( Pg 25 FY 10  Stone
Pg 25 - Thomas Moore - oversight on his part - reminder
        SUPV
Pg 26 - sup michael Hicks - reminder

        Pg 28 corrective actions on training taken

Pg. 32 + 34 insp Kevin Lyall not timely submitting samples
        training needed
Pg. 44 cmI George Lucas - training needed
Pg. 52 cmI Bane II - training needed
Pg 60 - D4 reviewed 0 of 8 orders as potentially flagrant - training ?

        Pg. 63 corrective actions taken

pg 67  SSI Rhodes + D4 ADM Haidman - not documenting reasons
        for not conducting SI's - training?
        pg 68 said should require

Pg 75  Fred Marting - gave advance notice or instructed to + never
        did ? sounds like he did - tie to Pauley

Pg. 80  training records check  Lyall, Stone, Hedrick, Collins, +
        Van Dyke - training needed ?

Pg 106 - supv Hicks didn't req Lucas to correct standard - training
Pg. 109 - training needed on rock dust

        pg. 116 instructions issued to all inspectors

pg. 119 - CmI Stone - training needed

pg. 120 was recommendation implemented?

pg 168 - so sad

pg. 172 - rescue operations deviated from established mine rescue protocol & exposed miners rescuers to unnecessary risks   John Urosek in charge - Chief Mine Emergency Ops.

pg 173 - log of significant events by family liasons - training

- many recommendations on training throughout report but have they been implemented?

Confidential Agency Document
DLB-001300

DOL-OASAM-0276

**From:** Fesak, George M - MSHA
**Sent:** Tuesday, May 01, 2012 8:44 AM
**To:** Hugler, Edward - ASAM
**Cc:** Silvey, Patricia - MSHA
**Subject:** FW: Attached

Ed,

Here is the UBB Internal Review report with the employee names added.  Let me know if the attachment doesn't go through.

I am sorry this took so long, but it was a <u>much</u> bigger job than I had estimated.

George

**From:** Francart, William J. - MSHA
**Sent:** Monday, April 30, 2012 5:58 PM
**To:** Fesak, George M - MSHA
**Subject:** Attached

Confidential Agency Document
DLB-001301

DOL-OASAM-0277

Tu 3/27/12
3:05p ~
3:20p

Syaney          Ed          Jerome
Jim             me          Pat Silvi
Patrick         Yvette      George

• hearing this morning - Joe Main ducked question
  some failings go all way up to HQ
• no withhunt                institutional perspective
• read IR + advise (DOL) on perf or conduct
• call George if any questions; technical questions
  Mark Schultz in Pittsburg or Brewston)
• MSHA has to tell us what you want to do
• transmit recommendations thru A+m Jerome
• NIOSH report released Fr 3/23/12
• Pat thinks hard to discipline in most instances
• no names - George thinks may need to add
  names to report
• impartiality remains intact who names - Jerome +
  Pat say
• Sydney - add names + wants 4 more copies
• George will add names - appox 1 week

Jane's update
on Linc + Charlie                    3/29/12 Th
            conversations

    Lincoln – ███████████ ( ██████████ )
      culture +
      goes on at everymine – condition of
      assignment


Charlie – similar to Linc

Confidential Agency Document
DLB-001303

DOL-OASAM-0279

Hugler, Sudney, & me
6/5/12 Tu
3pm - 3:15p
no obvious reasons for discipline
review NIOSH report if asked
mention pg. 75 Fred main as
possible comperator to Bobbie
Pawley

Confidential Agency Document
DLB-001304

DOL-OASAM-0280

IG                                                    Th 6/7/12

Dan Petrole calling Pat Silvey
what plans does MSHA have to take action on mgmt.
officials
Charlie Thomas' name?

NIOSH report


too late for perf actions
MSHA asked for advisory opinion to assist them in
formulating action

- will draft advisory report



Hugler, me, Jim                              Fr 6/8/12
                                              305p - 320p
• work on advisory report next week


Sydney, me                                   Th 6/14/12
                                              1030a -
UBB
Senator Kline - MSHA responsibility          JOE WHEELER ⟩ Sen's
Joe Main - Larry Hendrick, supv              LAUREN SWEAT ⟩ office
            1st trainee

    michael Hicks ⟩ supv
     Thomas moore ⟩ siging off on citations

Sydney, Hugler, me                           Fr 6/15/12
                                              930a -
trainee on longwalls - NIOSH
IG gitting pressure from Sen's office
wants accountability
tie back to gov's -
                        ~~anit for pressure~~
political pressure - EE's said

main wants to focus on 3 folks - Larry Hendrick CMI      longwall
                                  Sabian Van Dyke  trainee
                                  michael Hicks ⟩ supv's
                                   Thomas moore ⟩

Charlie Thomas - doesn't do his
job, approves in writing not        premature re-entry
according to policy, making
it's                                ventilation short in some areas

Confidential Agency Document
DLB-001305                                          DOL-OASAM-0281

Fr 6/8/12

REVIEW OF IR REPORT

• Charlie Thomas mentioned once on pg. 181
under section on relevant national-level positions of
particular Congressional concern:
Deputy Ad. for CMSH
Chief, AI Division
Dir. Tech Sppt
Associate Solicitor for MSHA

nothing negative noted


NIOSH REPORT

• pg i - 2nd paragraph - does not dispute mine operator, not
MSHA caused the explosion, however, believes the
characterization of the facts underlying the conclusion
understates the role that MSHA's enforcement could have
had in preventing the explosion....

4th paragraph - (2) if required enforcement actions .... could
have prevented roof-fall, air flow, methane buildup for explosion
would have been eliminate   (3) dust explosion reduced if
inspection completed properly
- 3 opportunities to prevent or minimize explosion
• pg ii - top summary

○ pg 4 - numerous instances in which enforcement personnel
exhibited a lack of understanding of MSHA's policies &
procedures, CMI's & supervisors
nothing hidden or misrepresented by MSHA 'in' interviews

○ pg 5 - interviewers asked leading questions, need trained
interviewers
      c - narrow interpretation of section 1204(b) caused
missed opportunities to discover practices or mechanisms
that might have interfered w/ EE's ability or willingness to
translate their knowledge into timely & effective enforcement
action.

○ pg 6 A - mine operator did not, & could not, conceal readily
observable violative conditions such as float dust accumulations
throughout UBB & missing supplemental roof supports.
The Act places primary responsibility on mine operator - no
evidence inadequacies in MSHA caused the explosion.

DOL-OASAM-0282

- pg. 8 2. Preventing a fuel source for the initial gas explosion methane gas
  2nd paragraph  roof support plan approved 12/09 - 4 inspections never verified against approved plan - if it was missing supports would have been noticed

- pg 9 3. Preventing the dust explosion
  when CMI's observed excessive accumulations of coal dust, they failed to take appropriate actions
  4- conclusion  if MSHA had.... could have been prevented

- pg 10 - similar (remarkable overlap) in enforcement lapses identified in Crandall Canyon, Darby, Aracoma, Sago & Jim Walter
  MSHA IR Team acknowledged + listed 8 actions it believes will be needed for successful implementation of recommendations

- pg 11 MSHA's current enforcement paradigm needs to be re-examined


Charlie Thomas not on witness list
not mentioned anywhere - gone through each link

DOL-OASAM-0283

Dep Solicitor
Debra Greenfield        Sydney        Pat Silvey              W. 7/25/12
Hugler                  Jim           Ernest Cameron, AO      3:30p - 5:15p
me                                    Lynn ~~Jeurdice~~
                                           Dandis

EH - WORKFORCE Planning issue
DG - Policy manual fell into disuse
   - not enough control + oversight by MSHA mgmt

PS - agress to some degree
   supporting doc/primarily factual - summarized from IR report
   put EE's in acting job all the time w/o lots of training
   - IR report recommends training for all actors
LJ - also looked @ NIOSH report

PS - MSHA's recommendations -
   ADM Enforcement - letter of counseling - Lincoln Selfe
   wet sampling + flagrant violations

EH - may warrant susp.
SR - abdication of mgmt responsibility
PS - flagrant violations
   (roof control plans  ADM Technical     Richard Kline )
                                          ~~Luther Marrs~~
EH - 93% not reviewed
DK - abatement times pg. 20
PS - di

PS - Roof control supv - letter of counseling  Donald Winston

   Field office supv - letter of counseling  Thomas Moore

   Inspector Tailgate Roof Support  Jerome Stone + Rock Dust Survey
JB - who's responsible for filing in UMF?
PS - will not be clear
LJ - didn't understand what he was supposed to do
PS - new procedures not followed - doing it in old way
X SR - where does responsibility lie?
EH supv looking at notes + not evident ~~stop~~ AR + trainee not together
LJ - in some cases trainee didn't do anything
SR - public relations issue?
EH - SSI included for non-referral?
 LJ - resources too much of an issue
    disc would have been on responsibility
   HQ         ~~not fair to discipline b/c acting~~

PS - Kevin Stricklin
   Charlie Thomas - direct line resp for field
   4/09 - 9/10 Dir Acct
            Acting Dep Adm
SR - would Kevin take resp?
PS - probably - acct for Coal
SR - would have to disc as GS-15 b/c acting

geographic constraints on reassigning CMI's ?
did NCFLL nego time constraints prohibit field ops manual
updates ? EE's couldn't find updates
were EE meetings held ?
mine rescue competitions deferred ?

Michael Davis
top career person

resulted in investigation
which identified sloppy
business practices
system failures

Deborah Greenfield                              Tu 8/14/12
Jim, Sydney, me, Hugler                         430p - 445p

Failure to Discharge the duties of your position

perspective - from perf ratings  were so good were
rated HE or EX so they were proficient @ their
duties  + IR report-focused on a period of time  2 yrs
-

proposals - single proposing + deciding official
          Kevin                    Pat

SOL pre-meeting + SOL meeting        Fr 8/17/12
Deborah Greenfield                   10:15a - 11:30a
Jim, Sydney, me, Hugler

no CMI's - actions point to UBB account not string of past
          deficiencies
                          my idea - Lynn Dondis
                          assist me

Roof control ) too harsh
Field office

Failure to Discharge - not widely used
Failure to policy + procedures
Failure to Enforce 30 CFR - aracoma
misrepresentation- aracoma
Decision letters
                    5
Field office supv - less than 10 day - 10 day
Roof Control   - less than 10 day  - 14 day
ADM- less than 14 day - 20 day
Administrator = counseling letter + address systemic issues
    come up w/a plan w/time limits in FY 13 perf. plan
Deputy Administrator - 14 day - 20 day

Confidential Agency Document
DLB-001310

DOL-OASAM-0286

Pat          Ed
Lynn         Sydney
Ernest       me                                    Tu 8/21/12
                                                   11:30a

Failure to enforce 3O CFR

Administrator - counseling written + plan w/milestones
Dep Admin - proposed 2O day / 10-14 day
ADM - proposed 2O day / 10-14 day
Roof Control Supv - proposed 14 day / 10 day         Failure to
Field Office Supv - proposed 10 day / 5 day          Carry out your
                                                     official duties


has would current plan be operationalized (can use current
plan) top 3 items/milestones
   Kevin - proposing
   Pat - deciding
   Joe - mgmt deciding official
        can delegate to Pat
   Crandal Canyon settlement getting public
   Charlie - may appeal

Stop step 1 on
   Donna + Lynn
 ★ 3pm W 8/22 Lynn


Fed Tort Claims Act ?
2nd week - counseling
3rd week - all proposals     } timelines
4th week - issue

need roof control supv

P.D's
30 CFR citations – have they changed?
PIL's
PIB's
memo's                          First 40?
– handbooks


ADM Enforcement –
have DS3 A
need copy of D4 form

Lynn                                    9/12/12
mE                                      4p

Roof control supv –
Field office supv –

was Charlie interviewed? no

meeting w/MSHA to date —

W 8/22   3p- 5p blocked by me
              Lynn scheduled a 4pm so only stayed 1 hr
              She did bring pd's I would for
              planned follow up meeting for next day
Th 8/23   3p- 5p Ernest told me Lynn would probably
              not make it but he would bring me CFR
              Lynn cancelled but we scheduled next meeting
              for W 9/5 from 4p-6p (after our vacations)
              Ernest delivered CFR to Sydney
W 9/5   called Lynn for top 3 bullet points
              scheduled for 4p-6p, said she had to ask
              Pat if she was coming- she had spoken to Ernest
              about she had more questions than answers, Ernest
              told her to talk to Pat + Joe
              Lynn called me back + said she wasn't coming;
              if I had any questions I was to ask Hugler,
              said she would get me the bullet points

Fr 9/7  bullet points delivered through Sydney

Hugler        Pat                    Tu FFI 9/10/12
me            Lynn                   1:05p - 1:30p
Sydney        Ernest
Jim

EH- asked for best advice - we've given it
PS- Donna + Lynn drafting letters
      wants charges
      2 or 3 specifications

DL- Failure to Enforce 30 CFR
JB- Failure to discharge duties of your position

    ADM - 2 specifications

• 9/18 draft counseling letter due
• 4th week Sept  all other drafts for review

      4p-6pm  w  Lynn

Charlie - FY11 HE    acting Dep    4/5/10 explosion
                                   Admin 4/09
only met on ←    FY10 HE    9/26/10 SES
fatality element
exceeded all       FY9 EX
others

Kevin - FY09 ⟩ EX    No record of discipline to 1993
        10 11

Jesse Cole - DM D4  retired 8/3/06

Kenneth Murray - Dep Adm 3/08 - 11/08

Robert Hardman - DM D4  8/31/11 retired 11/19/09 - 9/30/10 DM HE
              Charlie Thomas was ~~reviewing~~ rating official - Kevin review

Lincoln Selfe - FY11 HE  FY10 HE - Reviewing official Charlie
           ADM D4 since 10/7/01 - present

Luther Marrs - ADM D4  FY10 HE  Charlie reviewing  11/16/09 - 10/25/10 FY10 HE
          ~~10/29/95 - 4/2/11~~ Susp 2/17/08  Failure to carry out official duties   HE FY08 &
Richard Kline -            2/24/08                                      09
     10/29/95 - 4/2/11  retired  FY10 Eff  Charlie reviewing official

Joseph Makoviak - ADM FY11 HE  Eff in new position 6/30/11  Kevin reviewing
             FY10 EX  Supv Ventilation

Donald Winston - roof control supv 7/22/07 - pres
BOE            FY11 HE  FY10 HE

Edward Otis Matthews - FY11 ~~HE~~ FY10 HE  Health supv 12/7/08 - 11/29/09
          other times CMT!

Paul Prince - 1/19/10 acting Health supv  3/14/10 promo to Health supv
          FY11 HE    FY09 HE  FY10 HE

Michael Hicks - retired 9/30/11  FY10 HE  FY09 HE

Thomas Moore - supv mt Hope  FY11 ~~HE~~ Charlie review FY10 HE   ★ resp for
Charles Thomas Moore      FY09 HE  trans to mt Hope 1/17/10      UBB insp.
                                                   pg. 7          in FY10

Roger Richmond - 5/19/09 applied dis retir  approved 11/3/09
          prior mt Hope supv

As you know, there have been many changes in ODLRN over the past several months.
After a review of the office requirements for support services, several changes to the
administrative position are under consideration. Based on those anticipated changes, it
has been determined that your temporary SCEP appointment will not be continued.

Kevin disciplined?
    lower perf rating?

Donald Winston should have questioned Kline about note on pillar stability pg. 15 — when he learned of memo he should have been proactive & disapproved plan rist assesment

used checklist in 059-A

allowed use of checklists not approved by HQ pg 16

did not forward UBB roof control plan to TECH SPPT pg 17

ADM

• Lincoln Selfe - should have forwarded &/or discussed EMS+H memo HQ-08-058-A on roof control plans

Responsible for ensuring 6 month reviews of UBB roof control plan were conducted by roof control spec IAW CMS+H HQ-08-059-A

pg 15-16 - roof control spec conducting mandatory ins. instead, not good mgmt of personnel

allowed use of checklists not approved by HQ pg. 16

" UBB roof control plan not to be forwarded to tech sppt pg 17

yet tech sppt regularly contacted for other mines

allowed following SOP's instead of PIL no ICA-V-03 methane & dust control plans pg. 18

roof control plan not filed until 1/20/10-2 week after Stone's insp pg 19

reasonable abatement time not established pg 20

pg. 22 too wet took dust samples

• SUPV Thomas Moore pg. 18 did not cite serious violation of vent plan but no citation roof control plan

pg. 18 allowing inspectors not to perform complete inspections

pg 20 reasonable abatement times not established

pg. 28 no violation of 75.400 or 75.403 noted

• DEP Admin. Charlie Thomas

Failure to discharge duties   30 day

14

Hardman Hardware between Selfe + Thomas layer

**U.S. Department of Labor**            Mine Safety and Health Administration
                                        1100 Wilson Boulevard
                                        Arlington, Virginia 22209-3939



**JUL 2 3** 2012

MEMORANDUM FOR DEBORAH GREENFIELD
                Deputy Solicitor

FROM:           PATRICIA W. SILVEY
                Deputy Assistant Secretary for Operations
                Mine Safety and Health

SUBJECT:        Agency Actions on Upper Big Branch Mine Explosion

MSHA has carefully reviewed the Agency's Internal Review (IR) Report on the Agency's actions leading up to the Upper Big Branch mine explosion.  The IR report contains information dealing with enforcement actions that MSHA could have done better, and includes facts, deficiencies and 86 recommendations.  MSHA has put together an extensive plan to address each of the recommendations.  The Agency has already taken a number of actions to respond to the IR recommendations, including:  (1) training of all enforcement personnel in District 4 (which has now been split into two districts) and the new District 12; (2) issued directives to MSHA staff to reiterate agency policy regarding certain enforcement requirements; and (3) established a process to review all Agency enforcement policies and procedures.  These, and other changes that we are implementing, should minimize the possibility that the types of deficiencies identified in the IR report will recur.

With respect to deficiencies referenced in the IR report, the Agency has identified 28 personnel (from Administrator of Coal Mine Safety and Health to coal mine inspector), to determine if some type of potential personnel action is warranted.  In addition, the Agency has carefully considered the mitigating circumstances involved with each employee.  Some personnel have left the agency, through retirement or resignation, and for these personnel, MSHA did not explore further action, since they no longer work for MSHA.  With respect to the 28 personnel mentioned above, we intend to have a further conversation (in addition to the training already provided) to reiterate the importance of following Agency policy and procedures.

At this point, we are considering proposed personnel action to address deficiencies referenced in the IR report for five personnel; a separate document details the facts and mitigating circumstances related to these potential cases.  We would like to consult with you relative the specific nature of any potential proposed action to assure that any proposed decision is appropriate and supported by the facts.

Attachments

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

Confidential Agency Document
DLB-001353

**U.S. Department of Labor**        Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



JUL 2 3 2012

MEMORANDUM FOR EDWARD C. HUGLER
              Deputy Assistant Secretary for Operations

FROM:         PATRICIA W. SILVEY
              Deputy Assistant Secretary for Operations
              Mine Safety and Health

SUBJECT:      Agency Actions on Upper Big Branch Mine Explosion

MSHA has carefully reviewed the Agency's Internal Review (IR) Report on the Agency's actions leading up to the Upper Big Branch mine explosion. The IR report contains information dealing with enforcement actions that MSHA could have done better, and includes facts, deficiencies and 86 recommendations. MSHA has put together an extensive plan to address each of the recommendations. The Agency has already taken a number of actions to respond to the IR recommendations, including: (1) training of all enforcement personnel in District 4 (which has now been split into two districts) and the new District 12; (2) issued directives to MSHA staff to reiterate agency policy regarding certain enforcement requirements; and (3) established a process to review all Agency enforcement policies and procedures. These, and other changes that we are implementing, should minimize the possibility that the types of deficiencies identified in the IR report will recur.

With respect to deficiencies referenced in the IR report, the Agency has identified 28 personnel (from Administrator of Coal Mine Safety and Health to coal mine inspector), to determine if some type of potential personnel action is warranted. In addition, the Agency has carefully considered the mitigating circumstances involved with each employee. Some personnel have left the agency, through retirement or resignation, and for these personnel, MSHA did not explore further action, since they no longer work for MSHA. With respect to the 28 personnel mentioned above, we intend to have a further conversation (in addition to the training already provided) to reiterate the importance of following Agency policy and procedures.

At this point, we are considering proposed personnel action to address deficiencies referenced in the IR report for five personnel; a separate document details the facts and mitigating circumstances related to these potential cases. We would like to consult with you relative the specific nature of any potential proposed action to assure that any proposed decision is appropriate and supported by the facts.

Attachments

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

Confidential Agency Document
DLB-001354

**U.S. Department of Labor**      Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



NOV 2 0 2012

MEMORANDUM FOR ERNEST A. CAMERON
                        Director,
                        Administration and Management

FROM:           PATRICIA W. SILVEY
                        Deputy Assistant Secretary for Operations
                        Mine Safety and Health

SUBJECT:        Delegation of Authority to Propose Disciplinary Actions

This memorandum delegates authority for issuing proposed disciplinary actions related to the Upper Big Branch Mine accident to the Director of Administration and Management (A&M).

This authority is effective immediately and will remain in force until otherwise revoked, rescinded or superseded.  The Director of A&M is hereby delegated authority to serve as the proposing official in all cases involving employees of Coal Mine Safety and Health, except for the Administrator of Coal.

Confidential Agency Document
DLB-001355

Case 5:18-cv-00591   Document 703-16   Filed 09/05/18   Page 88 of 126 PageID #: 3671

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.**   Select the
   Print button on the print dialog box that appears. Note: If your browser does not support this function
   select Print from the File menu to print the label.

2. **Fold the printed sheet containing the label at the line so that the entire shipping label is visible.**
   **Place the label on a single side of the package and cover it completely with clear plastic**
   **shipping tape. Do not cover any seams or closures on the package with the label.**   Place the
   label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic
   shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **UPS locations include the UPS Store®, UPS drop boxes, UPS customer centers, authorized**
   **retail outlets and UPS drivers.**
   Find your closest UPS location at: www.ups.com/dropoff
   Take your package to any location of The UPS Store®, UPS Drop Box, UPS Customer Center, UPS
   Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you. Items sent via UPS
   Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location
   nearest you, please visit the Resources area of CampusShip and select UPS Locations.

   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

FOLD HERE



Confidential Agency Document
DLB-001356

Case 5:18-cv-00591   Document 703-16   Filed 09/05/18   Page 89 of 126 PageID #: 3672

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.** Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed sheet containing the label at the line so that the entire shipping label is visible. Place the label on a single side of the package and cover it completely with clear plastic shipping tape. Do not cover any seams or closures on the package with the label.** Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **UPS locations include the UPS Store®, UPS drop boxes, UPS customer centers, authorized retail outlets and UPS drivers.**
   Find your closest UPS location at: www.ups.com/dropoff
   Take your package to any location of The UPS Store®, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.

   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

   FOLD HERE



Confidential Agency Document
DLB-001357

**UPS CampusShip: View/Print Label**

1. **Ensure there are no other shipping or tracking labels attached to your package.**   Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2. **Fold the printed sheet containing the label at the line so that the entire shipping label is visible. Place the label on a single side of the package and cover it completely with clear plastic shipping tape. Do not cover any seams or closures on the package with the label.**   Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3. **GETTING YOUR SHIPMENT TO UPS**
   **UPS locations include the UPS Store®, UPS drop boxes, UPS customer centers, authorized retail outlets and UPS drivers.**
   Find your closest UPS location at: www.ups.com/dropoff
   Take your package to any location of The UPS Store®, UPS Drop Box, UPS Customer Center, UPS Alliances (Office Depot® or Staples®) or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest to you, please visit the Resources area of CampusShip and select UPS Locations.

   **Customers with a Daily Pickup**
   Your driver will pickup your shipment(s) as usual.

FOLD HERE



Confidential Agency Document
DLB-001358

**Turow, Stephen D - MSHA**

| | |
|---|---|
| **From:** | Stricklin, Kevin G - MSHA |
| **Sent:** | Monday, June 25, 2012 10:35 AM |
| **To:** | Tarr, Jane E - MSHA |
| **Subject:** | RE: |

You are correct that Hugler recommended nothing.  However, Mike Kerr (Hugler's boss) now says that OASAM should not be involved in this.  Sounds political.  I think that rep kline's office is pushing someone for some action.

---

**From:** Tarr, Jane E - MSHA
**Sent:** Monday, June 25, 2012 10:27 AM
**To:** Stricklin, Kevin G - MSHA
**Subject:** Re:

I agree. Have we even been kept in the loop on this? Also I thought huiglers looked into it and came back with nothing. Am I wrong on that or was that the ig? I recall donna kramer looking into it

---

**From:** Stricklin, Kevin G - MSHA
**Sent:** Monday, June 25, 2012 10:16 AM
**To:** Tarr, Jane E - MSHA
**Subject:**

Pat called about disciplinary action to personnel at UBB, she has to have names to DOL by COB tomorrow.  She called George before me and George said that Kevin should make the decision.  I kind of went off on her.  I said that George wrote this caustic report saying what District 4 didn't do, not me.  I have not read any of the IR transcripts.  That was george and his team's job.  He is such a weasel.  We sill see today what happens.  I understand that I am the administrator and will carry out the recommendations but, I don't have time nor the need to do George's work.

Confidential Agency Document
DLB-001359

**Turow, Stephen D - MSHA**

| | |
|---|---|
| **From:** | Stricklin, Kevin G - MSHA |
| **Sent:** | Monday, June 25, 2012 5:40 PM |
| **To:** | Tarr, Jane E - MSHA |
| **Subject:** | Re: |

All up to hq

**From:** Tarr, Jane E - MSHA
**Sent:** Monday, June 25, 2012 05:24 PM
**To:** Stricklin, Kevin G - MSHA
**Subject:** RE:

in all d4 positions during UBB? Or a particular position

**From:** Stricklin, Kevin G - MSHA
**Sent:** Monday, June 25, 2012 3:20 PM
**To:** Tarr, Jane E - MSHA
**Subject:** Re:

No. Just need dates of persons acting etc

**From:** Tarr, Jane E - MSHA
**Sent:** Monday, June 25, 2012 05:16 PM
**To:** Stricklin, Kevin G - MSHA
**Subject:** Re:

Do you want me in on the call?

**From:** Stricklin, Kevin G - MSHA
**Sent:** Monday, June 25, 2012 05:10 PM
**To:** Tarr, Jane E - MSHA
**Subject:** Re:

Disciplinary action after ebb

**From:** Tarr, Jane E - MSHA
**Sent:** Monday, June 25, 2012 05:08 PM
**To:** Stricklin, Kevin G - MSHA
**Subject:** RE:

What's this about?

████████mtg is at 9 tomorrow.

**From:** Stricklin, Kevin G - MSHA
**Sent:** Monday, June 25, 2012 3:07 PM
**To:** Kapitan, Monica S - MSHA

Confidential Agency Document
DLB-001360

**Cc:** Dondis, Lynn - MSHA; Tarr, Jane E - MSHA
**Subject:**

Please keep 11 am available tomorrow for a meeting with Lynn and I.  We may need Sandy Humphrey or whoever is acting for her on the call as well

**Turow, Stephen D - MSHA**

| | |
|---|---|
| **From:** | Stricklin, Kevin G - MSHA |
| **Sent:** | Monday, December 10, 2012 1:14 PM |
| **To:** | Selfe, Lincoln L - MSHA |
| **Subject:** | RE: |

You didn't deserve this.  It's a bunch of crap.

---

**From:** Selfe, Lincoln L - MSHA
**Sent:** Monday, December 10, 2012 12:58 PM
**To:** Stricklin, Kevin G - MSHA
**Subject:** Re:

Thanks Kevin. I called and got an extension until January 18th. I am struggling getting started. Pat Silvey called and I tried to tell her these are issues like should be found in an accountability review and in such case we would develop an action plan to prevent a recurrence and that we have always said the accountability reviews and internal reviews are things we do to try and get better and not any head hunting mission for disciplinary actions. I also told her that none of the things I saw in my letter had any impact on UBB. To me she acted like she called because she had to. When I get my response drafted I would like you to see it and give me your opinion on it. Thanks again. I hope my mind settles until I can get on it soon. I went to a mine to try and clear my mind one day last week.

---

**From:** Stricklin, Kevin G - MSHA
**Sent:** Monday, December 10, 2012 09:43 AM
**To:** Selfe, Lincoln L - MSHA
**Subject:**

Hi Link,
I just wanted to check up on you and make sure you are doing ok.  Is there anything that I can do for you?

Confidential Agency Document
DLB-001362

**Turow, Stephen D - MSHA**

**Sent:**          Friday, May 11, 2018 3:17 PM
**Subject:**      Mightly small that you could not look me in the eye and give me a letter of suspension

Joe and Pat,

I have to get my emotions off my chest, it is mighty small that neither of you could look me in the eye and present me with my intended letter of 7 day suspension.  You are the ultimate leaders of this MSHA agency and when the internal review is the basis of this decision I am appalled that I Charlie Thomas **was never interviewed by the internal review** to present my side of the events facts and circumstances leading up to the Upper Big Branch Explosion.  How in the United States can a person be found guilty and not even be interviewed by a jury of his peers and never questioned during either the investigation or the internal review?

I am shocked, hurt, and cannot believe that neither of you had the fortitude to look me in the eye and sent Earnest Cameron to do your "dirty work".

When a mining company foreman mines coal on a longwall face without adequate water and without water sprays,  also the weekly examiner never turned on his methane detector to check for methane in the bleeders,how can I as an "ACTING" Deputy Administrator prevent such an egregious act?

I will be submitting many written mitigating circumstances.

Disappointed,

Charlie Thomas

Confidential Agency Document
DLB-001363

**Turow, Stephen D - MSHA**

| | |
|---|---|
| **From:** | Parker, Douglas - MSHA |
| **Sent:** | Thursday, June 21, 2012 11:13 AM |
| **To:** | Thomas, Carol J - MSHA |
| **Cc:** | Hayes, Carol - MSHA |
| **Subject:** | 4 pm call |

Please set up a conference call at 4 with me, joe, pat and lynn to discuss ubb disciplinary actions.

Confidential Agency Document
DLB-001364

| | |
|---|---|
| **Subject:** | Copy: Meeting on UBB |
| **Location:** | Dep Sec Office |
| **Start:** | Mon 10/1/2012 10:30 AM |
| **End:** | Mon 10/1/2012 11:00 AM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Organizer:** | Harris, Seth  - OSEC |
| **Required Attendees:** | Silvey, Patricia - MSHA; Kerr, Michael - ASAM; Greenfield, Deborah - SOL; Rooney, Nancy - SOL; McClintock, Laura - OSEC; Allen-Holmes, Tiffany - EXECSEC; Close, Nalini - EXECSEC; Deleon, Terri - EXECSEC; FitzGerald, Erin L. - EXECSEC; Heimlich, Judith - EXECSEC; Swirsky, Stephanie - EXECSEC; Cameron, Ernest - MSHA |
| **Optional Attendees:** | Hugler, Edward - ASAM |

*You will discuss UBB Disciplinary Issues*

Confidential Agency Document
DLB-001365

| | |
|---|---|
| **Subject:** | Meeting on UBB |
| **Location:** | Dep Sec Office |
| **Start:** | Mon 10/1/2012 10:30 AM |
| **End:** | Mon 10/1/2012 11:00 AM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Meeting organizer |
| **Organizer:** | Harris, Seth  - OSEC |
| **Required Attendees:** | Silvey, Patricia - MSHA; Kerr, Michael - ASAM; Greenfield, Deborah - SOL; Rooney, Nancy - SOL; McClintock, Laura - OSEC; Allen-Holmes, Tiffany - EXECSEC; Close, Nalini - EXECSEC; Deleon, Terri - EXECSEC; FitzGerald, Erin L. - EXECSEC; Heimlich, Judith - EXECSEC; Swirsky, Stephanie - EXECSEC; Cameron, Ernest - MSHA |
| **Optional Attendees:** | Hugler, Edward - ASAM |

*You will discuss UBB Disciplinary Issues*

Message

| | |
|---|---|
| **From**: | Aaronson, Julie E - MSHA [/O=DOL/OU=MSHA-ARL/CN=RECIPIENTS/CN=AARONSON.JULIE] |
| **Sent**: | 1/29/2014 1:32:30 AM |
| **To**: | Main, Joseph - MSHA [main.joseph@dol.gov] |
| **Subject**: | Fw: UBB piece with changes suggested by Lynn |
| **Attachments**: | Closing a chapter on Upper Big Branch (2).docx |

Attached is the Ubb article - I need to add a few edits from Pat -and I have a draft column that I will send next.

---

**From**: Cleeland, Nancy - MSHA
**Sent**: Tuesday, January 28, 2014 01:37 PM
**To**: Aaronson, Julie E - MSHA; Dondis, Lynn - MSHA
**Subject**: UBB piece with changes suggested by Lynn

## Closing a chapter on the Upper Big Branch mine disaster

Those of us who work in mine safety and health will never forget the afternoon of April 5, 2010, when an explosion ripped through the Upper Big Branch coal mine in West Virginia, killing 29 men and injuring 2 others. The worst U.S. mining disaster in decades devastated a community, riveted the nation, and exposed a deadly culture of production over safety in the operation of the mine. It also led to a period of soul-searching, improvement, and renewed vigor at our agency.

"I was stunned," said Kevin Stricklin, administrator for coal mine safety. "It really shook me up. Stuff was going on when MSHA wasn't at the mine that was just awful. I didn't think we were that bad as an industry."

Investigations into the disaster found that the operator at Upper Big Branch went to great lengths to circumvent safety laws, altering records and hastily covering up problems when inspectors arrived, leading to criminal charges and a jail term for at least one high level manager. And miners who valued their jobs learned not to complain to the federal agency that was created to protect them. Indeed, in the four years that preceded the explosion, not a single safety complaint had been filed by a miner, even though interviews revealed that concerns were widespread.

Although MSHA's accident investigation and other inquiries determined that mine operator Massey Energy was at fault, an exhaustive internal agency review did find room for improvement in some areas at MSHA. The Divisions of Coal, MNM EPD, PIER and others collaborated to quickly follow through on those internal suggestions, while continuing other initiatives launched immediately after the accident.

In late December, when Assistant Secretary Joe Main announced that all of the [ HYPERLINK "http://www.msha.gov/PerformanceCoal/UBBInternalReview/UBBCorrectiveAction s.asp" ] recommended by the internal review had been addressed, it marked a turning point in the agency's response to the disaster. It's worth pausing for a moment to reflect on what has changed as a result, thanks to the hard work of many MSHA employees.

The review committee made approximately 100 recommendations, ranging from major procedural, policy and technological changes to specific tweaks to handbooks. Among the most significant results:

- The agency established a new centralized directives system to review and ensure the orderly and consistent development and dissemination of agency policy.
- Numerous handbooks and policy manuals were updated and clarified. The Coal and Metal/Nonmetal Mine Inspection Procedures handbooks were significantly revised, and a new Coal Roof Control Handbook was developed.
- Inspectors were given better tools to do their jobs, some made possible by technological change. For example, inspectors now have access to the agency's policies through electronic links on their laptops to ensure that they have the most up-to-date information. Also, a new Inspector Tracking System will allow inspectors to input findings directly into fillable forms from the field, saving them time and allowing others in the agency to access real-time inspection information.
- More than 20 sessions were developed to ensure that inspectors, supervisors and others were trained on subjects ranging from ventilation plans to long-wall mining equipment.

Confidential Agency Document
DLB-001377

- Additional guidance was developed regarding what actions by operators or their agents would constitute giving unlawful advance notice of MSHA's presence to impede an inspection.

While tackling these necessary but time-consuming tasks, MSHA employees continued implementing other initiatives started in the wake of Upper Big Branch, such as targeting known bad operators, and improving protections for miners who are retaliated against for reporting hazardous conditions. Stricklin said one of the most meaningful initiatives began immediately after the UBB explosion and continues to this day. That was the creation of impact inspections, which are unannounced and staged during weekends or off-hours when operators will not be expecting them. In some cases, inspectors have seized the phones and other communications equipment on arrival so that advance warnings can't go out – as they did at UBB.

In recent years, mine operator compliance has continuously improved, and fatalities and injuries have, for the most part, dropped significantly. (As mentioned in last month's column, however, we did see a troubling increase in mining deaths in the final quarter of the calendar year, when 14 fatalities were recorded.)

Countless hours were spent by employees in just about every office of MSHA in response to what was revealed by the Upper Big Branch disaster. We are a better, stronger agency because of it. Though we'll never forget, we can now close a chapter on the Upper Big Branch mine disaster and move forward in new ways to keep America's miners safe and healthy.

"For over three and a half years, we were consumed with UBB, and we finally finished it in December 2013," said Stricklin. "I'm looking forward to being proactive again, getting on the front end of this stuff rather than the back end."

Message
_____

| | |
|---|---|
| **From**: | Main, Joseph - MSHA [/O=DOL/OU=MSHA-ARL/CN=RECIPIENTS/CN=MAIN.JOSEPH] |
| **Sent**: | 1/29/2014 1:36:20 PM |
| **To**: | Aaronson, Julie E - MSHA [aaronson.julie@dol.gov] |
| **Subject**: | Re: UBB piece with changes suggested by Lynn |

Here are my edits. Tried to tell more of the story and put things in perspective.
Add text at (( ))
Delete text at ((( )))

Closing a chapter on the Upper Big Branch mine disaster

Those of us who work in mine safety and health will never forget the afternoon of April 5, 2010, when an explosion ripped through the Upper Big Branch coal mine in West Virginia, killing 29 men and injuring 2 others. The worst U.S. mining disaster in decades devastated a community, riveted the nation, and exposed a deadly culture of production over safety in the operation of the mine. It also led to a period of soul-searching, improvement, and renewed vigor at our agency.

"I was stunned," said Kevin Stricklin, administrator for coal mine safety. "It really shook me up. Stuff was going on when MSHA wasn't at the mine that was just awful. I didn't think we were that bad as an industry."

Investigations into the disaster found that the operator at Upper Big Branch went to great lengths to circumvent safety laws, altering records and hastily covering up problems when inspectors arrived, leading to criminal charges and a jail term for at least one high level manager. And miners who valued their jobs learned not to complain to the federal agency that was created to protect them. Indeed, in the four years that preceded the explosion, not a single safety complaint had been filed by a miner, even though interviews revealed that concerns were widespread.

Although MSHA's accident investigation and other inquiries determined that mine operator Massey Energy was at fault, an exhaustive internal agency review did find (((room for))) (( that a number of )) improvement((s)) (((in some areas))) (( were needed)) at MSHA. (( MSHA however, had not waited on the internal review report to begin to respond to the worst coal mine disaster in 40 years. Work began quickly after the tragedy. Assistant secretary Main immediately directed coal and m nm to begin impact inspections to look hard at troubled mines and directed an overhaul of the pattern of violations program designed by congress to reign in chronic violators, a program not fully implemented since enacted in 1977. Under the direction of the assistant secretary and coal administrator kevin Stricklin MSHA began beefing up enforcement of the mine act particularly on advance notice of inspections,worker rights, mine ventilation, rockdusting and other areas. )) The Divisions of Coal, MNM EPD, PIER ((TS))and others collaborated to quickly follow through on those internal suggestions, while continuing other initiatives launched immediately after the accident. ((On March 6, 2012 the internal report was released and included the list of corrective actions MSHA committed to take and a time table for completion that Assistant secretary Main pledged to carry out. As a starter, training of findings in MSHA began that very day))

In late December, when Assistant Secretary (((Joe))) Main announced that all of the corrective actions recommended by the internal review had been addressed, it marked a turning point in the agency's response to the disaster. (( It also was a statement about the dedicated staff at MSHA that worked tirelessly to fulfill the commitments made despite the work needed to carry out normal activities, implementing many new initiatives, and during the sequestration budgets and a government shutdown)) It's worth pausing for a moment to reflect on what has changed as a result, thanks to the hard work of many MSHA employees.

The review committee made approximately 100 recommendations, ranging from major procedural, policy and technological changes to specific tweaks to handbooks. Among the most significant results:

▢ (( there were major reorganizations in MSHA, the office of Assessments was tasked with the responsibility of managing oversight of key enforcement programs including impact inspection POV, expanded worker protection enforcement,

Confidential Agency Document
DLB-001385

District 4 was split into two districts creating. New District 12. The dust lab located in the coal district 4 office was elevated to a national and transferred to technical support.)) The agency established a new centralized directives system to review and ensure the orderly and consistent development and dissemination of agency policy.

⬛ Numerous handbooks and policy manuals were updated and clarified. (( Most notably )) The Coal and Metal/Nonmetal Mine Inspection Procedures handbooks were significantly revised (( providing inspectors with updated guidance )), (((and a))) ((a)) new Coal Roof Control Handbook was developed.

⬛ Inspectors were given better tools to do their jobs, some made possible by technological change. For example, inspectors now have access to the agency's policies through electronic links on their laptops to ensure that they have the most up-to-date information. Also, a new Inspector Tracking System will allow inspectors to input findings directly into fillable forms from the field, saving them time and allowing others in the agency to access real-time inspection information.

⬛ More than 20 sessions were developed to ensure that inspectors, supervisors and others were trained on subjects ranging from ventilation plans to long-wall mining equipment.

⬛ Additional guidance was developed regarding what actions by operators or their agents would constitute giving unlawful advance notice of MSHA's presence to impede an inspection.

While tackling these necessary but time-consuming tasks, MSHA employees continued implementing other initiatives started in the wake of Upper Big Branch, such as targeting known bad operators, and improving protections for miners who are retaliated against for reporting hazardous conditions. Stricklin said one of the most meaningful initiatives began immediately after the UBB explosion and continues to this day. That was the creation of impact inspections, which are unannounced and staged during weekends or off-hours when operators will not be expecting them. In some cases, inspectors have seized the phones and other communications equipment on arrival so that advance warnings can't go out – as they did at UBB.

(( Assistant secretary main noted that the administrative changes providing better oversight and monitoring of enforcement and the revisions made in the POV program improved mine safety as well. The POV program reduced the number of chronic violators substantially. He noted that splitting district 4 allowed MSHA staff to better manage mine safety enforcement in southern wva.))

In recent years, mine operator compliance has continuously improved, and fatalities and injuries have, for the most part, dropped significantly. (As mentioned in last month's column, however, we did see a troubling increase in mining deaths in the final quarter of the calendar year, when 14 fatalities were recorded.)

Countless hours were spent by employees in just about every office of MSHA in response to what was revealed by the Upper Big Branch disaster. We are a better, stronger agency because of it. (( Although we still have more to do as a result of that disaster and though )) (((Though))) we'll never forget, we can now close a chapter on the Upper Big Branch mine disaster and move forward in new ways to keep America's miners safe and healthy.

"For over three and a half years, we were consumed with UBB, and we finally finished it in December 2013," said Stricklin. "I'm looking forward to being proactive again, getting on the front end of this stuff rather than the back end."

---

**From**: Aaronson, Julie E - MSHA
**Sent**: Tuesday, January 28, 2014 06:32 PM
**To**: Main, Joseph - MSHA
**Subject**: Fw: UBB piece with changes suggested by Lynn

Confidential Agency Document
DLB-001386

Attached is the Ubb article - I need to add a few edits from Pat -and I have a draft column that I will send next.

---

**From**: Cleeland, Nancy - MSHA
**Sent**: Tuesday, January 28, 2014 01:37 PM
**To**: Aaronson, Julie E - MSHA; Dondis, Lynn - MSHA
**Subject**: UBB piece with changes suggested by Lynn

Confidential Agency Document
DLB-001387

Message

**From**: Main, Joseph A - MSHA [/O=DOL/OU=MSHA-ARL/CN=RECIPIENTS/CN=MAIN.JOSEPH]
**Sent**: 7/2/2010 9:54:13 PM
**To**: Wagner, Gregory - MSHA [wagner.gregory@dol.gov]
**Subject**: Fw: DRAFT Op-Ed for WV

Who in msha checked the section out on the massey mines fo the secretary's section that I requested?

-----Original Message-----
From: Main, Joseph A - MSHA
To: Navin, Jeffrey - OSEC
CC: Wagner, Gregory - MSHA
Sent: Fri Jul 02 17:48:43 2010
Subject: Re: DRAFT Op-Ed for WV

There are some errors.  On the 3 mines shut down after ubb those were not massey mines. The 3 massey mines where mines where complaints where made that triggered msha inspections where msha captured phones. 2 were before ubb and 1 after. Those resulted in closure orders but not mine closures. I thought msha staff was checking that part for accuracy (sorry for the errors)

Confidential Agency Document
DLB-001388



**BRIEFING BY DEPARTMENT OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION ON DISASTER
AT MASSEY ENERGY'S UPPER BIG BRANCH MINE-SOUTH**



## Purpose and Scope of Report

This report for the President is presented by the Secretary of Labor and the Assistant Secretary for Mine Safety and Health.  It is a *preliminary* report that summarizes the facts we believe to be accurate as of today, with the caveat that the Mine Safety and Health Administration (MSHA) has just begun its investigation as to what went wrong at the Upper Big Branch Mine.

The investigation process did not begin until the rescue and recovery operations were completed.  Until every miner was accounted for, MSHA's sole focus was, as it should have been, on its emergency response functions.

We fully expect that through the course of this investigation, we will discover that some of our previous assumptions were incorrect.  New information will be found that will result in new understandings as to how this particular event transpired. Nothing in this report should be viewed as presupposing the results of MSHA's investigation, and nothing in this report should be viewed as overruling or conflicting with the statements of fact and conclusions that will be contained in the final report.  The final report will be the official view of MSHA as to what went wrong and why.

MSHA will issue its final report after a thorough and comprehensive review of the physical evidence, mine records and other documents, and statements from miners, management and government inspectors.  This preliminary report is designed to give you an early indication as to what appears to have gone wrong and the steps we can take to prevent a similar tragedy from happening again.

Introduction

The Department of Labor is charged with enforcing the laws that require employers to provide safe and healthy workplaces for America's workforce.  The Mine Safety and Health Administration is charged with enforcing workplace safety and health laws relating to mines.

The tragedy that occurred on April 5, 2010, at the Upper Big Branch Mine in Montcoal, West Virginia took the lives of 29 miners.  Courageous mine rescue teams put their own lives at risk in order to try to save the lives of any survivors of the blast, even though they knew the chances of survival were small.  And while the Department of Labor will leave no stone unturned as we investigate what went wrong at Upper Big Branch, we should be mindful that, on average, 14 Americans die at work every day.  In February, an explosion at a power plant under construction in Connecticut killed six and injured dozens more.  The Friday before the Upper Big Branch explosion, an explosion and fire at a Tesoro refinery in Washington State killed six workers.  And while rescue crews looked for survivors in West Virginia, a 56 year-old construction worker in Ohio was killed when a trench he was working in collapsed.

Every worker should work in a safe and healthy workplace.  Every worker has a right to go home at the end of his or her shift, and to do so without a workplace injury or illness.  Workplace fatalities – even in an industry like underground coal mining – are preventable.  Industries like mining, construction, refining and others may require additional levels of diligence, planning and care, but there is simply no acceptable excuse for any worker to lose his or her life in an effort to earn a decent living for his or her family.  Throughout the media coverage of this tragedy, many commentators implied that we should expect and accept a certain number of fatalities every year in coal mining.  The Department of Labor and the Mine Safety and Health Administration could not disagree more strongly.  Fatalities in coal mines are preventable.  Explosions in coal mines are preventable.  We know this because science tells us what causes these kinds of deadly accidents, and that established methods of controlling explosive gasses and dust, when strictly followed, will prevent them.

Fortunately, many mine operators and other employers in dangerous industries have a culture of protection driven by the recognition that they are responsible for safeguarding the safety and health of their employees, as well as complying with other employment laws.  Their ordinary, day-to-day business practices protect workers against safety and health hazards, ensure benefits and family leave, abide by wage and overtime laws, and give workers a voice in the workplace.  Like the millions of ordinary citizens who obey state and federal laws every day and never encounter law enforcement personnel, responsible corporate citizens have little adversarial contact with Department of Labor regulators.

Yet, there are other mine operators that have a different approach to mine safety and health.  Some are complacent and depend upon luck or happenstance to avoid workplace

violations. Still others make a calculated decision whether to comply with mine safety and health laws. They assess the benefits of refusing to comply with the law and compare them to the costs of complying with the law. Then, they weigh these costs and benefits against the likelihood they will be caught and the penalty they might suffer if they are caught. This is the "catch me if you can" safety and health system in action. It's a system that puts miners' safety and health in danger.

The "catch-me-if-you-can" model of workplace health and safety appears to have been at work at Upper Big Branch. The company that owns this mine, Massey Energy, has a troubling record when it comes to protecting its workers. Systemic safety problems are not limited to the Upper Big Branch Mine, to Massey Energy, or to the mining industry. Indeed the "catch-me-if-you-can" approach to compliance is a national problem in all types of American workplaces, impacting all worker protections.

MSHA wants to change the health and safety culture at these "catch me if you can" operations so mining companies take responsibility to find and fix problems before they are discovered by MSHA inspectors. MSHA cannot be in every mine every day, on every shift, in every section of a mine. The employer is the first and most important line of defense against hazardous conditions, and miners who identify hazardous conditions in the course of their work must be protected. While many of the reforms considered in this paper focus on adjusting statutes, regulations or policies, the goal is to foster an industry-wide culture of responsibility and compliance, with a focus on prevention. To achieve this goal, we need a system that encourages employers to engage in planning and control of hazards that results in actual protection of workers, while also giving MSHA the tools to ensure that operators who continually fail, or simply refuse, to comply with the law do not get the opportunity to continue activities that endanger miners.

Every year on April 28, we celebrate Workers' Memorial Day to commemorate those workers killed on the job. This year, we will remember the 29 miners who lost their lives at Upper Big Branch, along with their families and co-workers. And while the Department of Labor's worker protection personnel will pause to reflect on those who have lost their lives, we will also recommit ourselves to the important work of ensuring the safety and health of all of America's workers.

**Part 1: Fatal Explosion at Massey's Upper Big Branch Mine**

On Monday, April 5, 2010, there was a catastrophic underground coal mine explosion at Performance Coal Company's Upper Big Branch Mine-South (UBB) in Montcoal, West Virginia. Performance Coal Company is a subsidiary of Massey Energy.

Carbon monoxide alarms at the mine were triggered at 3:02pm, indicating this was the likely time of the explosion that killed 29 miners and put two survivors in the hospital. Initial reports indicate that the explosion was massive, and that air displaced by the explosion was felt by miners who were miles from the likely origin of the explosion.

*The Likely and Preventable Causes of Coal Mine Explosions*

On April 7, 2010, MSHA appointed a team to investigate the Upper Big Branch South Mine explosion. The accident investigation team will evaluate all aspects of this accident and identify the cause of the disaster. We will need to wait for their final report to determine the root and contributing causes. This preliminary briefing is based on a much more limited set of observed and anecdotal data, and it should not be read in any way as definitive. It should be noted that the investigation team has not yet been able to travel underground because of the hazardous conditions that still exist.

The violence of the explosion in the Upper Big Branch mine gives evidence, however, that something went horribly wrong. The affected area was widespread, indicating an extremely violent and extensive explosion.

Based upon the reports from the mine rescue teams, the most extensive damage appears to have occurred in and near active working sections of the mine. The rescue teams reported mining equipment severely damaged in these areas, with large pieces of heavy equipment sustaining damage that would require an incredible amount of force. Every miner working in this area was killed and was likely killed almost instantly. Some miners in parts of the mine unaffected by the blast reported strong currents of air pushed by the explosion as far as five miles from the most likely explosion site.

At this point, we cannot say with certainty what caused the explosion. Most mine explosions are caused by the combustion of accumulations of methane, at times combined with combustible coal dust mixed with air. Methane naturally occurs in coal seams and coal dust is generated from the mining process. MSHA requires every mine to ensure enough ventilation and rockdusting to keep methane and coal dust levels below the point at which they would be combustible. When methane and coal dust levels are controlled, explosions from these sources can be prevented.

In some cases, an initial blast can cause coal dust from the walls and floor of the mine to become suspended in the air, propagating the explosion by literally adding more fuel to the fire. Historically, blasts of this magnitude have involved propagation from coal dust.

Explosions in coal mines are preventable.  Mine operators can use methane drainage and adequate ventilation to minimize methane concentrations.  Operators can add sufficient rock dust to counter the explosive potential of coal dust.  Operators can eliminate ignition sources, like electrical equipment that shed sparks.  Barriers can suppress propagating explosions to mitigate their effects.  But while mitigation efforts are laudable, the best approach is to prevent mine explosions from occurring in the first place.  Every mine operator knows the conditions that cause explosions, and every mine operator knows how to prevent these conditions

*The Aftermath of the Upper Big Branch Explosion: Rescue and Recovery Efforts*

The explosion at the Upper Big Branch Mine occurred at or around the time of a shift change.  It killed miners in and around two working sections of the mine.  It also killed and injured miners who we believe were traveling from the working sections to the surface.

Two miners later reported that when the explosion occurred, they felt a blast of displaced air coming from the blast area.  They reported that they immediately started heading towards the blast on a mantrip (a vehicle that travels on rails and transports miners).  According to the miners, they discovered another mantrip containing the first group of victims: nine miners who appear to have been exiting the mine when the blast occurred.  Early reports indicate that six of the dead were on this mantrip as well as the three injured miners.  Using both mantrips, the miners drove the victims out of the mine.  At this time it is not clear whether the mantrip in which the victims were discovered was driven out of the mine by the surviving passenger whose injuries were less severe, or by one of the miners who discovered the victims.   One of the three miners who survived the initial blast was later pronounced dead at an area hospital.

Prior to rescue teams arriving, miners already in the mine reportedly proceeded deeper into the mine. Those miners determined from carbon monoxide levels that it was unsafe for anyone other than trained rescue teams with oxygen masks to continue.  As such, they withdrew from the mine.  Massey would ultimately determine there were 22 unaccounted for miners.

At 3:27pm, MSHA records indicate the company alerted the Mine Safety and Health Administration (MSHA) and the West Virginia Department of Miners' Health, Safety and Training of the explosion.

The first priority in any mine emergency is to launch rescue operations.  The mine rescue response began immediately:  more than 20 mine emergency rescue teams from Massey, other coal companies in the region, the state, and MSHA responded to the disaster.

Records indicate that the first rescue teams went underground at approximately 5:30pm. Because of damage to the rail tracks from the explosion, they reportedly had to proceed more than a mile on foot to reach the working section and rushed to the expected location of a second crew of miners on the longwall section (i.e., the section of the mine where

coal was actively being mined).  There, they reportedly observed a large debris field across a wide area caused by a violent explosion.  Teams said they discovered 4 bodies in the headgate area of the longwall section at 7:55 PM.  At 12:01 AM on April 6, 2010, teams reportedly discovered 1 body at the longwall stageloader (where coal is dumped onto the conveyor belt for transport out of the mine) and 6 bodies on the longwall face. Rescue teams left the longwall section and proceeded to longwall 22 (an area where new belt or ventilation entries were being established for a new area to be mined).  The teams said they found the bodies of six more victims in a mantrip at 12:50 a.m.

Thus, within the first 10 hours of the explosion, the rescue teams had found 18 victims of the explosion in the Upper Big Branch Mine, in addition to the 7 dead and 2 injured miners evacuated by fellow miners immediately following the explosion.

Rescue efforts continued in the early morning hours of April 6. While searching the area of longwall 22, mine rescue teams reportedly encountered heavy smoke and detected an explosive methane mix with high carbon monoxide (CO) levels.  The decision was made to suspend the rescue efforts to protect the mine rescue teams.  Rescuers started drilling boreholes (holes drilled into the mine from the surface and used for ventilation, gas readings, communication with trapped miners, or to lower a camera) and clear the air inside the mine before the rescue teams reentered the mine.

Early in the morning of Wednesday, April 7, officials determined that it was safe for rescue teams to reenter the mine.  Shortly after the teams entered the mine, however, readings indicated that gas levels had risen.  Monitoring continued while four teams proceeded through the mine.  The teams reportedly made it to near the longwall face before they were recalled to the surface because hazardous gas levels were again detected.

On the night of Thursday, April 8, rescue teams made another attempt to enter the mine. That attempt was also halted because they reportedly encountered explosive gasses and visible smoke.  One borehole was drilled near the locations of the refuge chambers to determine whether they were activated by any potential survivors.  However the borehole missed the mine.

Early in the morning of Friday, April 9, rescue teams entered the mine again to determine whether any of the missing miners had reached the refuge chambers.  They progressed as far as the longwall inflatable rescue chamber (one of several types of airtight safe areas with caches of breathable oxygen, food and water), where they discovered the chamber had not been deployed.   The rescue teams then attempted to travel to the longwall 22 section to search for the other chamber, but they reportedly encountered smoke and high levels of carbon monoxide that forced them to withdraw.

At this point, nitrogen, which is injected into mines to inert explosive gasses and prevent ignitions, was pumped into the mine.  When air quality was determined to be safe on Friday afternoon, rescue teams again entered the mine with the intention of reaching the refuge chamber near longwall 22.

The four miners who had not been previously accounted for were found late in the evening of April 9.  According to the rescue teams, three were found in the longwall 22 section between 10:10pm and 10:20pm, and one was found in the headgate area of the longwall at 11:22pm.  At this point, all miners who were in the Upper Big Branch Mine at the time of tragedy had been accounted for.  As of today, 29 miners are confirmed dead while one remains hospitalized.  Recovery of the bodies was concluded early Tuesday morning, April 12.  All miners are out of the mine.

**Part II: The Record of Extensive and Serious Safety and Health Violations at Massey's Upper Big Branch Mine**

*The Legal Background*

Congress enacted the Federal Mine Safety and Health Act of 1977 (Mine Act) to assure that the health and safety of the nation's miners would be the "first priority and concern" for all in the mining industry. Simply, Congress sought to prevent miners from suffering death, injury, and disease from mining. The law was updated in 2006 by the passage of the MINER Act, which was a response to a number of deadly accidents, including the disaster at Sago in West Virginia.

Federal law places the responsibility for compliance with safety and health standards on mine operators. It also gives individual miners and their representatives specific rights and protections to voice concerns about working conditions at their mines.

MSHA is charged with enforcement of mine safety and health standards. Under the Mine Act, MSHA inspects all underground coal mines at least four times annually and all surface operations at least twice annually. The Act requires inspectors to cite all violations they observe. MSHA also investigates all fatal accidents and miner complaints of hazardous conditions or discrimination (i.e., retaliation for raising a safety or health complaint).

Both the mine operator and MSHA have roles to play in the realm of mine safety. But the law is very clear about who is responsible for what.

It is the legal duty of every mine operator to ensure the safety and health of everyone who enters its mine. Fulfilling that duty requires planning, prevention and protection—careful planning to avoid hazardous conditions, prevention of exposure to hazards that cause death, injuries and disease, and a relentless commitment to protecting workers.

MSHA's job is to ensure that mine operators are fulfilling that duty. It does so by inspecting mines, reviewing and approving mine plans, issuing citations and orders when violations of the law are found, assessing proposed penalties for violations, and requiring mine operators to fix violations.

But MSHA cannot be in every mine, every day, every shift, on every section. Ultimately, it is the responsibility of mine operators—companies like Massey—to take all of the actions necessary to ensure the safety and health of their employees.

*Massey's Upper Big Branch Mine: Non-Compliance with the Law*

The Upper Big Branch Mine-South is an underground bituminous coal mine, controlled by Massey Energy Company and located near the unincorporated town of Montcoal in Raleigh County, WV. The mine employed an average of 195 persons in calendar year

2009 and reported 1,235,462 tons of coal production.  The coal at this mine is metallurgic and is used in the production of steel, rather than in energy production.

 Massey opened the Upper Big Branch Mine 1994.  Between 1998 and 2003, three miners died in separate accidents at the Upper Big Branch Mine.

In 2006, MSHA inspectors issued an increased number of citations because of marked spike in the number of violations.  Those violations included an alarming increase in the kinds of serious problems that required miners to be removed from portions of the mine.

In December 2007, MSHA informed the mine it could be placed on "pattern of violation" status if it did not take steps to reduce its significant and substantial violations.  MSHA continued to monitor the mine.  Elevated enforcement actions went down at the Upper Big Branch Mine in 2007 and 2008, although violations as well as the numbers and seriousness of citations remained above the averages for comparably sized mines in both years.

The mine again experienced a significant spike in safety violations in 2009.  MSHA issued 515 citations and orders at the Upper Big Branch Mine in 2009 and another 124 so far in 2010.  MSHA issued fines for these violations of nearly $1.1 million, though most of the fines are being contested.

The following chart shows citations and orders annually from 2005-2009 at the Upper Big Branch Mine.  By comparison, the average number of citations and orders at underground coal mines of similar size (by number of employees and production) in both MSHA Coal District 4 (Southern West Virginia) and nationally are included:



**Issuances**
[citations/orders/safeguards]

| | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| UBB | 143 | 173 | 272 | 198 | 515 |
| District | 157 | 80 | 131 | 102 | 282 |
| National | 248 | 112 | 143 | 124 | 292 |

Calendar Year

The citations MSHA has issued at Upper Big Branch have not only been much more numerous than average, they have been more serious as well. Over 39% of citations issued at Upper Big Branch in 2009 were for "significant and substantial" (S&S) violations, defined in Federal Mine Safety and Health Commission (FMSHRC) case law as violations reasonably likely to contribute to a hazard and result in an injury of a reasonably serious nature. As the next chart shows, in some prior years the S&S rate at Upper Big Branch has been as much as 12% higher than the national average:



**S&S Percent**

| | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| UBB | 42.3% | 47.9% | 36.7% | 42.1% | 39.7% |
| District | 47.4% | 40.7% | 33.3% | 36.1% | 38.7% |
| National | 37.3% | 38.2% | 36.0% | 31.9% | 33.6% |

Calendar Year

In what is the most troubling statistic, in 2009, MSHA issued 48 withdrawal orders at the Upper Big Branch Mine for *repeated* significant and substantial violations that the mine operator either knew, or should have known, constituted a hazard. It failed to address these violations over and over again until a federal mine inspector ordered it done. The mine's rate for these kinds of violations is nearly 19 times the national rate.

The following chart shows the rate at which MSHA has taken elevated enforcement actions to shut down all or part of Upper Big Branch, including orders for unwarrantable failures to comply with the Mine Act, repeated S&S violations of which the operator knew or should have known, and withdrawal orders for imminent dangers. MSHA issued these orders at Massey mines at a rate 8.63 times the national average:



**Elevated Enforcement**
[104(d), 107(a), 104(b)]

| | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|
| UBB | 4.73 | 22.55 | 2.14 | 4.63 | 29.67 |
| District | 2.33 | 5.21 | 5.47 | 3.28 | 4.21 |
| National | 3.25 | 2.59 | 3.90 | 2.30 | 3.31 |

Calendar Year

Massey's CEO has claimed that safety violations are a regular part of mining, and that many of the violations in this particular mine were insignificant. In fact, in the twelve months before the explosion, the most common citation at this mine were for violations of the standards for mine ventilation (38 citations), accumulations of combustible materials (37 citations), protection from roof, face and rib falls (21 citations), safeguards (17 citations), roof control plans (17), ventilation controls (14), records of pre-shift examinations (13), maintenance of belt conveyors and equipment and conveyor entries (11), machinery maintenance (11), and power wires and cables (10). Mine ventilation, accumulation and ventilation control violations are the violations most directly related to ignition/explosion potentials. And Massey violated the ventilation and combustible material standards at a rate that far exceeds the national average. Violations of mine ventilation plan standards, and ventilation controls at Upper Big Branch were 2.35, and 3.58 times the national rates, respectively.

Finally, while the overall focus of this report is the record at Upper Big Branch Mine, Massey's overall corporate record is far from adequate. As the table at Appendix A shows, Massey has the greatest number of fatalities at both underground (including the Upper Big Branch disaster) and surface coal fatalities over the last ten years.

In 2007, MSHA implemented the current version the Pattern of Violation program to identify the mines with the worst safety records and to place them into an enhanced enforcement regime. Since the program began the agency has identified 13 Massey operations (one of those was identified twice) that met the screening criteria used to identify mines exhibiting a potential pattern of violations. This number represents 35%

of the 53 coal operations sent potential pattern of violation letters. In October 2009, three of the 10 operations that received letters were owned by Massey.

In fact, but for a computer program error, Upper Big Branch would have been placed into potential pattern of violation status in October 2009 due to the number of violations in 2008 and 2009. The error involved the program used to determine whether a mine met the criteria to be included into potential pattern of violation status. A review of the program revealed that one set of citations was not being included in calculations to determine eligibility. Because, however, of a reduction of their rate of significant and substantial violations in the fourth quarter of 2009, Upper Big Branch would have avoided pattern of violation status. As such, on the day of the explosion, the mine was in the same status it would have been even if the error did not occur. While this computer program error has been fixed, it highlights a problem with the pattern of violation program. Ultimately, even if this mine, with its troubling safety record were included in the potential pattern of violation status, the current rules make it relatively easy for mines to avoid being placed into pattern of violation status.

Despite the 515 citations and orders issued at Upper Big Branch, three other Massey mines had more citations. The Department of Labor is in litigation to establish that one of these, the Tiller #1 Mine operated by Massey's Knox Creek Coal Corporation, is a pattern violator.

In short, this was a mine with a significant history of safety issues, and a mine that MSHA was watching carefully. The significant and substantial violation rate increased, closure orders were issued at a particularly high rate to correct unwarrantable failure deficiencies, a Potential Pattern of Violations letter was issued in December 2007, and MSHA increased the presence of enforcement personnel at the mine site. Site time of MSHA personnel at this mine doubled from 2005 to 2009.

**Part III: MSHA's Efforts to Force Massey's Upper Big Branch Mine to Comply with the Law**

MSHA is required to inspect underground mines at least four times each year, and often inspects mines with a record of violations more often. From 2007 until today, MSHA has steadily increased its enforcement presence at Upper Big Branch Mine.

- In 2007, MSHA spent 135 days inspecting the mine (including travel and other inspection-related time) for a total of 1,586 hours of inspection time.
- In 2008, MSHA inspected 153 days for a total of 1,845 hours.
- In 2009, MSHA inspected the Upper Big Branch mine 180 days for a total of 2,999 hours.
- In 2010, MSHA enforcement personnel had inspected Upper Big Branch 51 days and have logged 803 hours of inspection time prior to the disaster.



One legitimate question that has been posed is, why didn't MSHA close down the Upper Big Branch Mine? Or, why didn't MSHA deprive Massey of the authority to manage the Upper Big Branch Mine?

Even at a mine with a safety record like the Upper Big Branch, MSHA lacks the legal authority to force the mine to close. In specific circumstances MSHA can *temporarily* withdraw miners from areas of a mine. It should be noted that in almost all cases, MSHA can only stop mining operations temporarily in the area of a mine where a hazard exists, and only until the violation that led to the closure has been abated. MSHA does not have the authority to close a mine permanently or indefinitely, or to strip a mine operator of its authority to manage a mine. At this mine, MSHA had issued a temporary withdrawal order for a section of the mine (for a problem relating to ventilation) as recently as March 9, 2010. MSHA confirmed that the mine corrected the problem on March 11, 2010, and as such, this section of the mine was permitted to be reopened.

There are four circumstances in which the law authorizes MSHA to withdraw miners or equipment for safety or health violations:

1) MSHA can withdraw miners from a mine, or a section of a mine, if an inspector finds a condition which presents an 'imminent danger.'  The withdrawal order remains in effect until the hazard is abated.

- Since 2000, MSHA has issued five imminent danger orders that terminated at least some mining operations at the Upper Big Branch Mine.  The last order was issued in 2009.

2) If MSHA finds a violation, it issues a citation to the mine operator.  If that violation is not abated within a prescribed period of time, MSHA can stop mining operations by withdrawing miners from the affected portion of the mine until the operator corrects the condition and MSHA ensures that the hazard no longer exists.

- Since 2000, MSHA has issued 17 of these withdrawal orders at the Upper Big Branch Mine.  Four of these orders were issued in 2009, and one in 2010.

3) If MSHA finds that a violation was the result of the operator's "unwarrantable failure" to comply with a safety rule, MSHA puts the operator on notice that it must exercise more diligence to find and fix safety violations before MSHA finds additional violations. The unwarrantable failure standard means that an operator knew or should have known that the particular action or failure to take action was in violation of health and safety rules.  If further MSHA inspections reveal additional "unwarrantable failure" violations, MSHA can immediately issue orders withdrawing miners from the affected area of the mine until MSHA determines that the violation is abated.

- Since 2000, MSHA has issued 17 withdrawal orders at the Upper Big Branch Mine based on unwarrantable failures.  The last order was issued in 2009. MSHA has issued an additional 62 withdrawal orders at the Upper Big Branch Mine based on repeated, unwarranted activity since 2000.  The bulk of these withdrawal orders occurred recently.  Since 2009, 58 withdrawal orders of this type have been issued.

4) MSHA does not have the authority to shut down a mine based upon a set number of violations.  However, MSHA does have the authority to place a mine into a "pattern of violation" (POV) category based upon a number of criteria including the number of serious violations.

In 2007, in response to a spike in significant and substantial violations in the previous 24 months, MSHA notified Upper Big Branch that it was being placed on "potential pattern of violation" status.   When MSHA puts a mine on a "pattern of violation" status, MSHA can issue withdrawal orders for every serious violation that MSHA finds until the violation is fixed.  This is a significant event, and one that mine operators are careful to avoid.

To be placed into potential pattern of violation status, a mine must have failed to meet ten criteria, including a large number of adjudicated significant and substantial violations within the previous 24 months.

Under the existing MSHA policies, once a company is placed into "potential pattern of violation" status they are given an opportunity to reduce their levels of violations by 30%, or below industry averages for comparable mines, to avoid being placed into "pattern of violation" status.

The Upper Big Branch Mine was placed into a "potential pattern of violation" category in 2007. Massey quickly reduced their level of adjudicated serious and significant violations by 30%. As such, MSHA removed Upper Big Branch from the potential pattern of violation status in 2008.

As noted above, an MSHA computer programming error kept this mine off of the October 2009 potential pattern of violation list. Other mines with troubling safety records are avoiding potential pattern of violation status by contesting large numbers of their significant and substantial citations. The current regulations require only final orders (i.e. those not contested) to be considered in determining eligibility for potential pattern of violation status. As such, mines can use the contest process to avoid large numbers of their citations from being considered by MSHA. In fact, the Upper Big Branch Mine contested the majority of its serious violation citations that form the basis of the pattern of violation status determination. In 2007, for example, the mine contested 97% of its significant and substantial violations.

The current pattern of violation process enables many of these mines to avoid being placed into pattern of violation status because of the requirement that only final orders be considered, and because of a significant backlog in contested cases. Due to a 16,000 case backlog at the independent Mine Safety and Health Review Commission (MSHRC), it takes over 500 days for the average contested citation to be adjudicated. Since MSHA must consider citations that have become final orders in the previous 24 months towards pattern of violation status, this legal strategy has allowed a number of mines to avoid being placed into the "potential pattern of violation" category, or if they are placed on a potential pattern, that potential pattern has been developing for a significant time before MSHA can act to enhance enforcement. There are, however, steps MSHA can take without changing the statute or the regulations to improve the system. MSHA was reviewing these potential policy changes prior to the explosion at Upper Big Branch.

This loophole removes an important tool from MSHA's toolbox, and forces the agency to rely on citations and the threat of fines as its primary tool to encourage even the most problematic mines to reverse their safety problems. While operators are required to fix the hazards while citations are pending, MSHA must respond to violations one at a time. It can fine operators – in this case over $1.2 million since January 2009, and it can require an operator to remove miners from hazardous conditions until they are fixed.

However, its tools to respond to systemic problems at a mine under current policies are much more limited.

The policies this Administration inherited make it relatively easy for operators like Massey to avoid pattern of violation status.  In fact, MSHA has been able to place only one mine into pattern of violation status, and that order was revoked when one of the violations on which was based was thrown out through the contest process.  As Assistant Secretary for Mine Safety and Health Joe Main mentioned in his congressional testimony on February 23, 2010, MSHA has been reviewing potential changes to the pattern of violation rules to make it more difficult for operators to avoid being placed into pattern of violation status.

**Part IV: Preliminary Proposals for Reforming Mine Safety Laws and Practices**

The Department of Labor and MSHA are committed to taking action now to stop scofflaw mine operators from recklessly risking their workers' lives. Some of these steps are within our own power, requiring changes in regulations or our own practices. Other steps, however, will require actions by Congress. All of these steps can be taken without undermining the activities of the many mining companies that responsibly protect their workers' health and safety.

Today, some mine operators can consistently engage in dangerous violations of the law, and then avoid penalties by aggressively contesting every citation. DOL recommends immediate action to change these companies' behavior by:

- Strengthening MSHA's capacity to investigate, prevent, and punish dangerous wrongdoing;
- Enhancing miners' ability to protect themselves; and
- Bringing cases to justice with greater speed and certainty.

These recommendations are preliminary. They are the beginning, not the end, of the work to make our mines safe. DOL is only beginning its investigation in the causes of the recent deaths. These steps will not address every problem in mine safety enforcement and regulation. Instead they are a starting point for the important and difficult discussions to come about how the federal government, working with our partners in state governments and stakeholders in the mining industry, can better prevent catastrophic accidents like the Upper Big Branch Mine disaster from ever happening again.

<u>Compel Chronic Violators to Provide for the Health and Safety of Their Employees</u>

The vast majority of mines are able to operate profitably without miners dying. For mine operators that simply refuse to follow the law, the Federal Mine Safety and Health Act of 1977 created the "pattern of violations" (POV) so that MSHA could prompt and force actions to strengthen mine safety or require companies to pull workers out of the mine. In fact, MSHA has been able to place only one mine into pattern of violation status, and that order was revoked when one of the violations on which was based was thrown out through the contest process. DOL recommends that the Administration:

- Support changes in regulations and/or statute that would streamline the criteria for placing mines into the program.

- Consider greater use of other authorities for stopping scofflaw mine operators, such as injunctive relief.

<u>Give MSHA and Prosecutors More Tools to Investigate and Punish Wrongdoing</u>

Unlike other federal law enforcement agencies, MSHA lacks the authority to subpoena testimony and documents as part of its investigative process. Currently knowing

violations of mandatory health and safety standards: or an order to withdrawal miners from a mine, or an order to abate hazards conditions are only misdemeanors.  The Administration should consider changes in law that:

- Empower MSHA to use subpoena authority to require companies and individuals to turn over information promptly when needed.
- Enhance criminal penalties so that knowing violations of key safety laws are felonies, not misdemeanors.

<u>Empower Miners to Protect Themselves</u>

Miners who are empowered to raise safety concerns to their managers, and to MSHA when a mine operator will not act, are an important line of defense in preventing mine accidents.  Too many miners, however, are afraid of losing their jobs or facing other forms of retaliation for raising valid safety concerns to MSHA.  DOL and MSHA recommend that the Administration:

- Support statutory changes that would enhance whistleblower protections for miners.
- Enhance the law so that miners do not lose pay while a withdrawal order is in effect.
- Build on recent improvements in the transparency of data on MSHA's website, so that before an accident occurs, miners and the public can easily identify operators and companies that are flouting the law.

<u>Bring Chronic Violators to Justice More Quickly</u>

There are more than 16,000 cases pending before the Federal Mine Safety and Health Review Commission (FMSHRC), including $209 million in contested fines.  The average case takes more than 500 days to resolve from the time it is contested.  DOL believes the Administration should consider budgetary, regulatory, and legislative proposals that would:

- Eliminate the backlog of cases before MSHA, building on the Administration's proposed 27% increase in FMSHRC's budget this year to provide sufficient personnel to quickly resolve disputes.

- Require mine operators to put significant penalty amounts into escrow, and otherwise ensure that contesting cases for the sake of delay does not pay.

This is not an exhaustive list.  Other critical steps, for example, could address particular conditions such as mine gases and rock dust.  DOL is now reviewing the full range of legal and regulatory authorities, as well as management reforms, to determine steps to

ensure that another disaster like the explosion at the Upper Big Branch Mine does not happen again.