**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**Beckley Division**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 5:14-CR-00244** |
| | ) | **Civil No. 5:18-CV-00591** |
| | ) | |
| **DONALD L. BLANKENSHIP** | ) | |
| | ) | |
| **Defendant.** | ) | |

**AMENDED MEMORANDUM IN SUPPORT OF MOTION TO**
**VACATE CONVICTION PURSUANT TO 28 U.S.C. § 2255**

Donald L. Blankenship, by and through counsel, respectfully submits this memorandum in support of his motion pursuant to 28 U.S.C. § 2255 ("Motion").

## INTRODUCTION

Don Blankenship was prosecuted based on a central theme that he placed profits above the safety of his miners. The government affirmatively advanced this theme at trial, while its discovery violations kept from Mr. Blankenship exculpatory and impeachment evidence that went to the core of the government's theory of prosecution. Even the Assistant United States Attorneys ("AUSA"s) and agents assigned to the prosecution team admitted to the Office of Professional Responsibility ("OPR") that materials that should have been turned over in discovery would have helped the defense attack these themes. Yet members of the prosecution team appear to shrug off this stunning suppression of exculpatory evidence on the asserted—though not established— ground that Mr. Blankenship may have known about much of the exculpatory evidence from other sources.

1

OPR charitably concluded that the discovery process was "reckless," violated Department of Justice policy, and amounted to "professional misconduct" by the lead prosecutors: former U.S. Attorney Booth Goodwin and former AUSA Steve Ruby. Incredibly, Ruby even admitted to OPR that Goodwin directed him *not* to turn over reports containing discoverable information to the defense, because the defense had upset him. Such unconscionable actions cannot be allowed to stand as the underpinnings of the conviction of any person, lest those actions and the decision of this Court be a defense for unscrupulous prosecutions in the future. These actions violated Mr. Blankenship's constitutional and legal rights to due process and a fair trial, among others, and they undermine any confidence in the outcome of his trial.

Though Don Blankenship promoted miner safety in numerous ways—as the government's belatedly produced documents repeatedly evidence—he was nevertheless targeted and prosecuted in the wake of the Upper Big Branch ("UBB") mine disaster. The prosecution was highly publicized, unprecedented and arose in the wake of extreme public pressure to hold a high level executive at Massey accountable for the disaster. The charges leveled against Mr. Blankenship, which could have resulted in over two decades imprisonment, reflected nothing less than an effort to find a crime, any crime, to get a man. Despite the government's extraordinary efforts to get Don Blankenship—efforts we now know were both unfair and in violation of *the Department of Justice's own policies*—the jury acquitted him on every felony count after lengthy deliberations. It is evident from the record that this was a difficult and close case for the jury on the one misdemeanor count on which they did convict.

But Don Blankenship's conviction was not the end of this matter. After trial, he was sentenced to a full year in jail despite this being his first offense and ordered to serve that time immediately despite his appeal. His prosecutors, by contrast, had other plans. U.S. Attorney Booth

Goodwin resigned his post and ran for governor, citing his prosecution of Mr. Blankenship. Lead AUSA Ruby also left the U.S. Attorney's Office to pursue private practice, from which vantage he continues to denigrate Mr. Blankenship's efforts to seek justice.[1] Neither of these men had any hand in revealing all the improperly withheld material, nor has either expressed even the slightest contrition or barest apology for violating Don Blankenship's rights, not to mention their own Department's policies.

Rather, it was only after those former prosecutors became the investigated that the materials *began* to be produced. But every step of this process has been a grudging effort, and there is still no surety that all materials have been produced. *Only after* being investigated by their own Office of Professional Responsibility did the government begin to produce what would ultimately be 61 reports of interviews that had never been produced before. *Only after* Mr. Blankenship raised issues with the U.S. Attorney's Office for the Southern District of West Virginia did further Mine Safety and Health Administration ("MSHA") materials begin to be produced. *Only after* he filed a motion to review the government's supposed privilege claims did the government give over the materials it had originally logged. Even still the government persisted in erroneous claims of attorney-client privilege, forcing him to make further filings to secure materials he should have received long ago. The road to justice that Don Blankenship has been made to walk should never have been this long and hard.

Justice is supposed to be available to all, but the obstructions the government has erected at every turn of this case would have daunted and bankrupted most hard-working Americans long ago. As it is, Don Blankenship has been put to extraordinary expense—and even more

---

[1] *See, e.g.,* Brad McElhenny, *Blankenship, now a Senate candidate, wants his conviction set aside*, WV Metro News (Apr. 18, 2018).

significantly, been labeled a criminal and served time—to pursue what the government's own policies and the Constitution say he should have received for free *before his trial*.

While OPR has concluded that former U.S. Attorney Goodwin and AUSA Ruby committed "professional misconduct" during Mr. Blankenship's prosecution, OPR's findings are not binding on this Court.[2]   Indeed, Mr. Blankenship intends to establish—at an evidentiary hearing if necessary—that the prosecution committed even more egregious misconduct than what was found by OPR.  But Mr. Blankenship references the OPR report because he doubts the Department will dispute those findings and those findings *alone*—and especially in combination with other late-produced materials that OPR did not even consider—are more than sufficient to merit vacating his conviction.  Voluminous materials were not provided to Mr. Blankenship prior to trial.  Those voluminous materials contained information helpful to the defense.  This failure on the prosecution's part was the result of *at least reckless prosecutorial misconduct*, not some honest mistake or reasonable though erroneous decision about what material was discoverable.  And though members of the prosecution team assert that Mr. Blankenship may have had access to some of this information by other means, even the prosecution team members do not appear to claim that all of the information was available to the defense.

In fact, the breathtaking scope of the suppression here appears unprecedented in reported case law.  Attempting to pin down a specific statement that might have changed the outcome confuses the issue—these memos could have changed the entire defense strategy.  Armed with a

---

[2] For example, OPR found Ruby to be "credible" —a surprising conclusion in light of the number of times his version of events is contradicted by other members of the prosecution team.  (OPR–000080). ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  In light of his stated mindset, it is unbelievable that he would have been taken this approach to discovery unless he was taking an intentional, calculated risk.

*complete* picture of what the government's evidence showed and witnesses would say, it is self-evident that Mr. Blankenship would have approached trial preparation, cross-examination, and his own defense case in substantially different ways. The prosecutors' misconduct served to hamstring his ability to cross-examine witnesses and present a defense by withholding key statements that testifying witnesses or potential witnesses had made during interviews with federal agents. The government even failed to produce *multiple* reports for its central witnesses in the case—Chris Blanchard, Bill Ross, and the testifying case agent—all of which contained information that was exculpatory or could have been used to impeach these witnesses.

The scores of interview reports, and the MSHA emails and records, that the government has provided belatedly defy easy summary. What these records do make plain is that MSHA officials were subjected to modest internal reprimands for their conduct in relation to Massey Energy Company ("Massey")'s Upper Big Branch ("UBB") mine, whereas Mr. Blankenship was singled out for criminal prosecution. And these records show that even MSHA officials debated what constituted violations of the mine safety laws, and yet Mr. Blankenship was criminally prosecuted for supposed willful violations of matters not even clear to MSHA. These records further reflect patent bias against Mr. Blankenship—including shockingly vile statements about him–thus supporting his defense that he was unfairly targeted. Moreover, the documents provided since trial provide further evidence that MSHA officials altered and destroyed documents that almost certainly contained *Brady* material. These materials would have been helpful to the defense and their withholding from the defense undermines any confidence in the verdict rendered.

The result of the prosecutors' misconduct is clear: prosecutors only managed to convict Mr. Blankenship of a single misdemeanor because their professional misconduct effectively hid reams of reports, information, and evidence that would have enabled the defense to eviscerate the

rest of their case.  The *collective* weight of these violations is such that the Court can have no confidence in the outcome of these proceedings, heavily contested and apparently razor thin for the jury as they were.  *See, e.g., Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F.3d 801, 834 (10th Cir. 1995) (holding cumulative weight of multiple non-disclosures undermined confidence in the verdict even though each piece "standing alone, may seem somewhat trivial").  By engaging in this misconduct, the government violated the Constitution and laws of the United States, violated this Court's discovery orders, and made misrepresentations to the Court[3] and Mr. Blankenship's defense counsel.  Even now, it is far from clear that everything that should have been disclosed has been turned over.  The wrongful fruit of that prosecution—Mr. Blankenship's conviction and sentence—must be set aside.  A just verdict can only result from a just process, and what happened to Mr. Blankenship was anything but.  The conviction that resulted from this terribly flawed, unconstitutional, and unlawful process cannot stand.

## BACKGROUND

Both before and during the trial, Mr. Blankenship's attorneys repeatedly fought to obtain exculpatory and impeachment information from prosecutors.  As set forth in the Motion, they made numerous formal and informal requests to prosecutors for specific *Brady* information and filed a half-dozen separate motions with the Court on the subject.  (Mot. ¶¶ 14-20).  In response, prosecutors insisted that they had complied with all the government's obligations under *Brady* and this Court's orders.  (Mot. ¶¶ 14 n.4, 17, 19-20).  As OPR discovered, this was simply not true.

---

[3] As Mr. Blankenship raised this issue in his Motion, OPR determined that it would allow this Court to make the determination regarding whether it was misled by prosecutors' statements.

I.     **SUMMARY OF THE MATERIALS TURNED OVER AFTER TRIAL**

In 2017, after Mr. Blankenship's trial and after US Attorney Goodwin and AUSA Ruby left the U.S. Attorney's Office, the government began producing hundreds of documents to Mr. Blankenship that it had not produced before trial.  Over the following year and a half, the United States Attorney's Office has sent Mr. Blankenship a series of letters enclosing newly produced materials:

- On January 31, 2017, the government produced 10 Memoranda of Interviews ("MOI") not previously disclosed.  (USAO0000121) (ECF No. 663-6).

- On February 3, 2017, the government produced one MOI not previously disclosed. (USAO0000126) (ECF No. 663-6).

- On February 7, 2017, the government produced 11 MOIs not previously disclosed. (attached as USAO0000153).

- On February 14, 2017, the government produced 14 MOIs not previously disclosed. (USAO0000116) (ECF No. 663-6).

- On February 16, 2017, the government produced 25 MOIs not previously disclosed. (The government included in this production another MOI that it had previously disclosed.) (attached as USAO0000156).

- On October 20, 2017, the government produced the contents of an attorney proffer by Chris Adkins. (attached as USAO0000174).

- On November 17, 2017, the government produced 48 MSHA emails not previously disclosed. (USAO0000001) (ECF No. 663-6).

- On April 6, 2018, the government produced 21 pages of disciplinary records for MSHA employees in connection with UBB. (USAO0000130) (ECF No. 663-6).

- On May 2, 2018, the government produced a number of miscellaneous emails and records related to MSHA employee performance.  The letter indicated that MSHA was conducting an additional review of its files and more documents may be produced in the coming weeks. (ECF No. 669-1).

- On July 30, 2018, after Mr. Blankenship sought this Court's intervention by filing a motion for *in camera* review, the government produced dozens of MSHA and Department of Labor ("DOL") records subject to a protective order.  (DLB-000001-001644) (inclusive of gaps for withheld privilege materials).

- On August 15 and 21, the government produced four additional documents[4] previously withheld in whole or in part on attorney-client privilege grounds.  (DLB-002563-77, 1496-1501, 1532).

Since Mr. Blankenship filed his motion on April 18, 2018, the government has produced over 1,000 additional pages of documents that Mr. Blankenship should have received years earlier.

## II.    SUMMARY OF OPR REPORT

On August 13, 2018, OPR released its report of its investigation into the prosecution team's conduct.  It concluded that Goodwin and Ruby committed professional misconduct by failing to disclose the 61 MOI.  It also concluded that they were, at a minimum, "exceedingly careless" in their statements to the Court and that "If either Ruby or Goodwin had remained in the federal service, OPR would have referred this finding to the Department to take whatever action it thought appropriate to ensure such conduct was not repeated."  (OPR–000094–95).  The evidence uncovered by OPR is shocking. Tellingly, the former U.S. Attorney declined to cooperate with the investigation, only submitting two short, self-serving statements in response.[5]

### A.  Failure to Disclose MOI

Perhaps the most remarkable fact uncovered by OPR is that, according to AUSA Ruby, U.S. Attorney Goodwin, feeling that Zuckerman's aggressive defense of Mr. Blankenship constituted a personal attack on him, directed AUSA Ruby to disregard the office's discovery policy to "disclose reports of interview to defense counsel, in the exercise of an expansive discovery practice."  (OPR-000040).  Instead, supposedly, prosecutors would only disclose the

---

[4] A redacted version of one document (DLB-001532-33) had been produced in the government's July 30 production.

[5] Mr. Blankenship is submitting a Motion for Evidentiary hearing contemporaneously with this motion.  This is an example of further evidence that could be developed at an evidentiary hearing if necessary.

exculpatory material in any MOI—an odd decision for prosecutors who told the defense that no exculpatory information existed at all.  (OPR–000029, Mot. at ¶ 16).  Thus, prosecutors determined to disclose all pre-indictment MOI, but to provide only summary disclosures by letter for post-indictment MOI.  This arbitrary distinction has absolutely no basis in law, nor in any Department policy.  Ruby claimed that all members of the prosecution team signed off on this policy–but OPR found that no one else other than Goodwin was even aware that this was being done.

If Ruby's account can be believed, Ruby and Goodwin even failed to comply with their own arbitrary policy.  Ruby failed to disclose 11 pre-indictment MOI and provided only a single, woefully inadequate disclosure letter describing three out of fifty post-indictment MOI.  He acknowledged that he based these disclosures solely on his memory and did not even review the MOI itself when drafting the letter.  (OPR–000091).  Included in these undisclosed MOI were numerous exculpatory statements and other information OPR found to be discoverable.  The list of such statements identified by OPR takes up seven full pages of the report.  (OPR–000034-38, 40, 44-46).  Moreover, other members of the trial team—and in some cases Ruby himself—agreed that these statements were discoverable.  In fact, AUSA #2 told OPR "I think we should have turned over all of these . . . under Department policy and under *Brady*."  (OPR–000047).  Among the undisclosed statements that everyone, including Ruby, agreed would have been helpful to the defense were:

- *Blankenship or Massey was willing to spend money to improve safety.*

- *Blankenship wanted MSHA violations reduced.*

- *Blankenship wanted to receive information about Massey or UBB violations in order to reduce them.*

- *Blankenship or other Massey leaders wanted workers to comply with safety regulations.*

- *Blankenship wanted to receive information about who was committing violations.*

- *UBB had decreasing numbers of infractions.*

- *MSHA was biased against Massey as opposed to other companies.*

- *Violations of safety standards were not intentional.*

Other members of the prosecution team agreed that many of the other statements would have been helpful to the defense at trial.  Remarkably, Ruby continued to dispute that these obviously exculpatory statements would have been helpful to the defense.

- *Blankenship did not want production targets to be too aggressive.*

- *MSHA decisions and policies made mine conditions less safe.*

- *MSHA violations reflect opinions, not facts.*

- *MSHA was aware of dangers but did not act in response.*

- *Violations of safety standards were not a result of a worker shortage, but of worker inexperience.*

In short, OPR found copious amounts of discoverable information in the MOI that Ruby failed to provide to the defense.  And the meager disclosures he did provide failed to properly convey the discoverable statements.  Ruby's discovery practices failed to comply with Department policy, his own office's policy, or even his own stated approach.  In what can only be described as an enormous understatement, Ruby admitted to OPR that "a different approach would have been better."[6]  Similarly, OPR found that Goodwin made no effort to ensure that the government complied with its discovery obligations—including its own arbitrary process.  (OPR–000088).

---

[6] Ruby sought to excuse his misconduct by arguing that he needed "more time and more resources" to have developed a better process.  (OPR–000041)  This is laughable.  First, "[o]nce an indictment has been returned, the Government is presumed to be ready to proceed to trial." *United States v. Aguilar Noriega*, 831 F. Supp. 2d 1180, 1184-85 (C.D. Cal. 2011).  Nearly a year passed between indictment and the start of trial.  Second, DOJ is the largest legal employer in the world, backed by the power and resources of the FBI.  It is ludicrous to think Ruby could

### B.  Statements to the Court and Defense Regarding Discovery

In his 2255 Motion, Mr. Blankenship explained how the prosecution team misrepresented its compliance with its discovery obligations and this Court's discovery orders, including discovery of *Brady* material.  (Mot. at ¶¶47-49).  OPR found that these statements were potentially misleading but did not ultimately render a decision because it could not gather the Court's opinion.  (OPR–000092).   "Moreover, those statements were central to the government's arguments that the defendant's motions should be denied because the government had complied with, or exceeded, its discovery obligations."  (*Id*.)  But the arguments themselves were not true—the government had neither complied with, nor exceeded, its obligations.  Indeed, OPR took the view that the most logical reading of the government's assertions was that all MOIs had been disclosed.  (OPR–000092).  Similarly, when evaluating Ruby's oral statement to the Court that the government had "disclosed 302s from our interviews with [Chris Blanchard]", OPR found that "the most natural understanding of Ruby's oral statement . . . is that the government had disclosed all of [Blanchard's] MOIs."  (Mot. at ¶49; OPR–000094).  Of course, this was not the case.

### ANALYSIS

A conviction may be challenged in a motion under Section 2255 if it was obtained "in violation of the Constitution or laws of the United States" including the defendant's constitutional rights to due process and a fair trial.  28 U.S.C. § 2255; *Schledwitz v. United States*, 169 F.3d 1003, 1010-11, 1017 (6th Cir. 1999).

---

not have obtained "more resources."  If prosecutors cannot satisfy their discovery obligations, they should not bring the case.

I.   **THE GOVERNMENT SUPPRESSED MATERIAL, EXCULPATORY, AND IMPEACHMENT EVIDENCE IN VIOLATION OF *BRADY* AND *GIGLIO*.**

The Constitution requires prosecutors to provide a defendant with evidence that is favorable to the defendant and material to the question of guilt or punishment.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Hoke v. Netherland*, 92 F.3d 1350, 1355-56 (4th Cir. 1996).  Such evidence includes material that tends to impeach the government's witnesses.  *Giglio v. United States,* 405 U.S. 150, 154-550 (1972); *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 556 (4th Cir. 1999).  Prosecutors violate their *Brady* and/or *Giglio* obligations by withholding such evidence, regardless of whether that suppression is intentional.  A conviction or sentence must be set aside if (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) the defendant suffered prejudice due to the suppression.  *Spicer*, 194 F.3d at 555.  All of these elements are met here.

A.  **The government suppressed evidence.**

The government suppresses evidence when it knows of potential exculpatory or impeachment evidence that it does not provide to the defense.  *See id.* at 557.

More than a year after Mr. Blankenship was tried and sentenced, the government began disclosing exculpatory evidence it had never before provided to the defense.  In total, since January 2017, the government has produced 61 MOIs and dozens of emails and other documents to the defense—and it continues to produce more evidence that was never before disclosed.[7]  All of this evidence was suppressed.

---

[7] Mr. Blankenship does not expect the government to contest that these materials were not provided before or during trial.  *See, e.g.,* (ECF No. 663-6 at pp. 64-76) (cover letters from the government conveying materials "not provided previously"); (OPR–000002).  Should the government contest this, however, Mr. Blankenship can present evidence on this point at an evidentiary hearing.

### B.  The suppressed evidence was favorable to Mr. Blankenship's defense.

The numerous MOIs, emails, and other documents suppressed by the government contained exculpatory and impeachment evidence favorable to Mr. Blankenship.  Indeed, OPR concluded—and the prosecution team even admitted—that dozens of statements in the MOIs would have helped the defense.  The government violates *Brady* by suppressing both admissible evidence and information that could lead to the discovery of admissible evidence, identify potential defense witnesses, or impeach government witnesses.  *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002); *Maynard v. Gov't of Virgin Islands*, 392 F. App'x 105, 115 (3d Cir. 2010) ("a defendant may predicate a *Brady* claim upon prosecutorial suppression that causes the defendant to abandon lines of independent investigation, defenses, or trial strategies that he otherwise would have pursued" (internal quotation and alteration omitted)).

The evidence suppressed by the government in this case spans all of these categories.  In particular, the government suppressed evidence that (1) would have supported the defense, (2) would have led to identification of defense witnesses, and (3) would have impeached key government witnesses. (*See* OPR–000034-38, 40, 44-50, 58)

### 1.   The suppressed materials regarding MSHA contained admissible evidence or would have led to its discovery.

The suppressed MSHA materials, including emails and disciplinary records only recently disclosed, are incredibly favorable to Mr. Blankenship and would have provided significant support for his defense at trial on multiple issues.  These materials could have caused the defense to change its decision and present a case, including by presenting the compelling point that Mr. Blankenship was subject to criminal prosecution when MSHA officials were given a slap on the wrist for their own conduct.  Moreover, evidence obtained since trial further supports the assertions

Mr. Blankenship made at trial that an MSHA official altered and destroyed documents that likely contained additional exculpatory and impeachment information.[8]

As one key example, the MSHA materials would have supported Mr. Blankenship's defense that Massey's practice of informing miners when inspectors arrived at the mine did not constitute illegal advance notice. The government repeatedly asserted, including during its closing argument, that Mr. Blankenship's knowledge of and participation in this practice was a fraud on the DOL and as well as evidence of his knowledge and participation in a conspiracy to violate the mine safety regulations. (*See, e.g.,* Trial Tr. Vol. XXVIII at 5847-51). Internal MSHA emails, however, reveal that MSHA officials themselves were conflicted as to whether Massey's practice violated mine regulations. In one especially pointed email, a MSHA investigator explained: "The fact is most [inspectors] did not really think that what was going on was advance notice. The lack of citations says a lot." (USAO0000030) (ECF No. 663-5).

Not only does this email show that MSHA itself did not believe Massey violated advance notice regulations, but it emphasizes the tremendous discretion and uncertainty inherent in the decision to issue a citation. And yet Mr. Blankenship was prosecuted for *willfully* violating mine safety regulations when MSHA itself could not decide whether the alleged practices actually constituted violations.

Although Mr. Blankenship made some of these points during trial, he did so largely through former Massey employees, without the benefit of a MSHA witness. Therefore, this MSHA evidence would have provided independent corroboration of Mr. Blankenship's contentions. *See, e.g, Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001) ("[I]ndependent corroboration of the

---

[8] A more detailed description of the evidence that could be developed on this issue is contained in Mr. Blankenship's Motion for Evidentiary Hearing.

defense's theory of the case by a neutral and disinterested witness is not cumulative of testimony by interested witnesses, and can undermine confidence in a verdict.").

Another argument critical to Mr. Blankenship's defense was that a MSHA citation does not necessarily reflect an actual violation of mine safety laws. Mr. Blankenship argued that some of the MSHA citations his mines received were objectively incorrect, and even for those that were debatable, the decision to issue the citation involved significant discretion. Accordingly, the citations could not form the basis for a conviction to "willfully" violate mine safety laws.

The suppressed MSHA documents would have supported this defense by showing that (1) MSHA issued citations and resisted challenges to citations even in cases where there was insufficient proof of a violation; (2) MSHA employees were biased against Massey and Mr. Blankenship; and (3) MSHA inspectors often disagreed about what constituted a violation.

For example, one email from a MSHA attorney discusses several citations issued to UBB. (USAO0000114) (ECF No. 663-6). The attorney observes that one citation could not be sustained and must be vacated. The attorney writes further that more information would be needed to sustain two other citations if Massey pressed its challenge, but notes that MSHA still would not vacate those citations. This email would have provided crucial evidence explaining why Mr. Blankenship often considered MSHA citations the "cost of doing business" and chose not to challenge them on the merits—MSHA simply would not budge, regardless of their tenuous basis for a given citation.

In another email, a MSHA employee points out a "potential violation" at UBB, stating that one section "seem[ed] to be mining" on a particular date but written notice of the change was not supplied for two weeks after that date. (USAO0000028) (ECF No. 663-5). He received the following response: "Sounds like a violation is in order. Let Norman know about it and I am sure he will be more than happy to give them one more piece of paper." This email would have

established MSHA's willingness to issue citations without sufficient proof that the underlying violation occurred, as well as its bias against Massey and Mr. Blankenship.

Additional MSHA emails further paint an even more compelling picture of this bias. In one response to a draft press release regarding complaints about Massey mines, MSHA Mine Administrator Kevin Stricklin (one of the MSHA employees later disciplined in connection with UBB) states: "My only comment is to put a dagger into massey." (USAO0000033) (ECF No. 663-5). This remark is tame in comparison with what another MSHA employee wrote in another suppressed email: "I hope that him [Blankenship] and Glenn Beck get raped by a rhinoceros. Horn end." (USAO0000109) (ECF No. 663-6). A recently disclosed email, originally redacted as privileged, includes a DOL official reporting Mr. Blankenship's indictment to the Secretary of Labor: "And sometimes bad things happen to bad people." (DLB-001532). The Secretary immediately sought to contact Booth Goodwin. Had these emails been available to Mr. Blankenship at trial, they would have severely undermined MSHA's credibility and allowed Mr. Blankenship to present an effective defense. Though the government avoided calling as witnesses the MSHA inspectors who actually issued the citations, the credibility of MSHA's citation process was still central to the entire prosecution.

Finally, the MSHA employment records only recently provided to Mr. Blankenship show that MSHA employees responsible for oversight of the UBB mine during the period of the indictment were subject to disciplinary action including for their failure to consider the interaction between the mine dust and the ventilation plans MSHA required at the UBB mine. (ECF No. 663-6); (ECF 669-1). This evidence would have supported a key defense argument: the MSHA-required and approved ventilation plan—not some criminal conspiracy—actually caused many of the violations for which the government sought to hold Mr. Blankenship responsible. In fact,

another undisclosed email suggests that MSHA's own Internal Review initially reached that same conclusion. In this email, one MSHA employee chastises another: "you told Lynn that the Internal Review report still made it appear that MSHA was responsible for a defective ventilation plan at UBB. (It would have been really good if you had told me that, since I am the one who can fix it.)" (USAO0000024) (ECF No. 663-5). This is real, independent evidence that not only directly supported the defense argument, but could have opened a number of avenues of further inquiry. And, like the other suppressed MSHA evidence, these employment records in general would have allowed Mr. Blankenship to pursue a more effective defense as well as supported his pre-trial claims of selective or vindictive prosecution.

### 2. The suppressed materials would have led to the identification of favorable defense witnesses.

Other suppressed materials would have further supported Mr. Blankenship's defense by disclosing fruitful lines of pre-trial investigation and/or identifying potential defense witnesses at trial. Mr. Blankenship did not put on a defense case at trial. These newly disclosed MOIs, however, identify potentially favorable defense witnesses. Moreover, as discussed further in the next section, the information in the reports could have provided useful information and fodder for cross-examination of other witnesses, even if the reports could not be directly admitted into evidence for that purpose. It is important for the defense to know whether witnesses will corroborate evidence in determining whether to advance an argument in its own case. Knowing that multiple witnesses will support a given proposition is critical both to determining which witness can provide that information most credibly, as well as whether a statement could be corroborated if the witness were impeached.

Specifically, the MOIs identify five potential defense witnesses who could have given exculpatory testimony on behalf of Mr. Blankenship: Mark Clemens, Steve Sears, Sabrina Duba,

Charlie Bearse, and Stephanie Ojeda.  The government never turned over any statements from these witnesses, whether in the form of an MOI, grand jury transcript, or proffer agreement.[9]  (*See* OPR–000051-52).  The statements these witness provided in their MOIs contradicted the government's theory that Mr. Blankenship pushed production over safety and failed to budget sufficient funds to hire more safety personnel, which was perhaps the single most important issue at trial.  Moreover, these witnesses were all employees whose roles gave them more insight than many of the witnesses who ultimately testified.  Given this fact, their testimony about these facts could have been seen by the jury as more credible than any similar testimony the defense managed to elicit on cross-examination.  *See Boss,* 263 F.3d at 745 (testimony by independent witness not considered cumulative); *Forrest v. Steele,* 764 F.3d 848, 856-57 (8th Cir. 2014) (assuming, without deciding, that evidence is non-cumulative if derived from a more credible source than existing evidence).

The government never turned over any MOI for Clemens, who was in charge of Massey's production, sales, and budgeting.  Due to Clemens's role at Massey, he was uniquely qualified to address the government's theory that Mr. Blankenship pressured subordinates to run coal and ignore safety.  The late-disclosed MOI demonstrates that Clemens would have rejected this theory, as he told the government that "there was pressure at Massey to run coal, but not enough to overlook safety."  (MOI-001506) (ECF No. 663-2).

Likewise, Sears, who oversaw Massey Coal Sales—Massey's sales arm—stated in his undisclosed MOI that "Massey's primary focus was safety.  Blankenship started a safety program for individuals and pushed safety more than any other CEO in the industry.  People have been fired

---

[9] The inadequate disclosures in Ruby's September 21, 2015 letter concerned Ojeda, Bearse, and Bill Ross.

because of safety." (MOI-0011509) (ECF No. 663-2).   The MOI also shows that Sears told the government that "he had a positive opinion about safety at all of Massey's operations." (*Id.*)

Duba, a Massey senior accountant who ran the budgeting process for the mines, provided a number of exculpatory statements which Mr. Blankenship could have elicited at trial.   In particular, Duba told the government that "Blankenship would tell them to go back and make sure the [production] figures used were not too aggressive." (MOI-001412) (ECF No. 663-3).  This statement would have contradicted the government's theory that Mr. Blankenship relentlessly pushed production.   Additionally, the MOI shows that Duba would have testified that: (1) Mr. Blankenship did not participate in budget meetings or have involvement in the final business plan reviews (MOI-001413); (2) Chris Adkins instructed Duba to focus on eliminating the most serious violations (MOI-001414); and (3) Mr. Blankenship directed her to identify the people responsible for violations to learn who were the "repeat offenders." (*Id.*)

Bearse would also have provided evidence undermining the prosecution's theory of the case.   Bearse was a president of a Massey resource group.   While two other resource group presidents testified for the government, Bearse contradicted them on key points.   Most importantly, Bearse stated that Massey's section staffing was the "industry standard," (MOI-001392) (ECF No. 663-2), which directly contradicts the government's overarching theory that "the defendant never came up with the money for that one more coal miner," and supports Mr. Blankenship's contention that the mine was properly staffed.   (Trial Tr. Vol. I at 55).

Further, "Bearse explained [to the government] that if there was something wrong at the mine, you were expected to stop, fix the problem and then move on." (MOI-001393).   "There were not discussions that violations were OK, but there were discussions about trying to get better." (*Id.*)   Bearse also told the government that full compliance was unattainable: "You can

go to any mine and find safety violations." (MOI-001394).  Finally, Bearse confirmed that he had been reprimanded over a violation for operating without air in a section and that he feared discipline over compliance issues at times.  (*Id.*)

Testimony by Ojeda, an in-house lawyer at Massey, would have further dismantled the government's theory of prosecution.  Ojeda's MOI states: (1) "Ojeda knew that Blankenship wanted a report [on her meeting with Ross] but was not sure how she learned that" (MOI-001519) (ECF No. 663-4); (2) "Blankenship and Adkins seemed to think Ross was legitimate", and "Ojeda thought they were looking for solutions from Ross" (MOI-001522); (3) "Blankenship did not like learning of inadequacies at Massey . . . Ojeda [] advised that Adkins was going to take heat for what Ross had stated" (MOI-001523); (4) "The Hazard Elimination Committee started around the same time as Ross' recommendations were made" (MOI-001526); and (5) "Ojeda was certain issues raised by Ross were discussed by the Hazard Elimination Committee."  (*Id.*)

In addition, Ojeda made numerous exculpatory statements about the confidentiality designations on the memoranda that memorialized Ross' thoughts and recommendations.  For example, the government characterized Ojeda's instruction to keep confidential certain materials related to Ross as evidence of a conspiracy with Mr. Blankenship.[10]  (Government Exhibit 188; *see, e.g.,* Trial Tr. Vol I at 53-54).  Ojeda's MOI establishes that neither she nor Blankenship were engaged in any such conspiracy.  In particular, Ojeda informed the government that she "was not specifically told to attend the Ross meeting so that the meeting between Ross and [Stan] Suboleski

---

[10] The government generally attempted to connect Mr. Blankenship to the confidentiality designations through an audio-tape where he said that he meant to keep the information confidential and that the memorandum was worse than a Charleston Gazette article.  (*See, e.g.*, Trial Tr. Vol. XIX at 3832-33).  Ojeda's MOI would have demonstrated, however, that her decision to mark the documents confidential occurred before Mr. Blankenship saw the memo or knew its contents, and that no one specifically directed her to mark it confidential.

would remain privileged;" and "it was typical to include a warning on privileged documents." (MOI-001521-22). Further, Ojeda's MOI contradicted the government's suggestion that the warning was intended to hide the materials from Elizabeth Chamberlin, who oversaw safety at Massey. (Trial Tr. Vol. XX at 4000-01; MOI-001521) ("Ojeda does not remember adding the language . . . to warn Ross not to share the report with Chamberlin.").

### 3. The suppressed materials would have led to more effective cross examination of key government witnesses.

The government suppressed five MOIs *each* for central witnesses Chris Blanchard and Bill Ross. These MOIs were rife with impeachment information that Mr. Blankenship could have used on cross-examination of these witnesses to further undermine the government's case. *See Gil*, 297 F.3d at 104 (undisclosed evidence may be material under *Brady* if it "would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise"). In *Aguilar Noriega*, the Court found that one way the defense suffered prejudiced from undisclosed materials was in its ability to conduct efficient, targeted cross-examinations. 831 F. Supp. 2d at 1204 & n. 19. Such was the case here. Even when the defense was able to separately elicit similar points on cross-examination, the suppression of these MOIs undermined the effectiveness with which the defense was able to further probe the witnesses' testimony. It is one matter for a witness to state a fact on the stand, but it is a further matter if the witness can be impeached about that fact based on an inconsistent prior statement, or if the witness can be corroborated by the fact that the witness made a consistent prior statement. Fed. R. Evid. 801(d)(1). Without these reports, the defense must to an extent fly blind on cross-examination, and lacks the ability to use impeaching or corroborating evidence that the Federal Rules of Evidence may permit.

*Chris Blanchard.* Blanchard was the government's main witness, whose testimony was intended to connect Mr. Blankenship to the alleged conspiracy. The contents of his MOIs show

that their suppression put Mr. Blankenship at a tremendous disadvantage when cross-examining Blanchard.

Most significantly, when asked by prosecutors in the grand jury and on redirect at trial about "whether there was an understanding at Massey and UBB that it was often cheaper simply to pay the fines that came along with violations than it was to spend the money that would have been necessary to follow the law," Blanchard replied "That was the implicit understanding. " (Trial Tr. Vol. XVI at 3321). In one of his MOIs, however, Blanchard had more clearly explained the "understanding," stating that: "Blankenship viewed violations as the cost of doing business and felt violations were going to be written by MSHA. There are always going to be violations that MSHA could cite . . . Blankenship felt MSHA made things up." (MOI-001402) (ECF No. 663-2).

In other words, the alleged understanding was not that Massey would not comply with the law, but rather that (1) MSHA would always find some reason to issue citations, especially given the degree of judgment (not to mention bias) involved on the part of the inspectors, and (2) some citations, although incorrect, would not be worth the cost of disputing. This information could have been used by the defense to make it clear to the jury that Blanchard's purported "understanding" testimony did not reflect any criminal conspiracy, but was instead a reflection of the fact that MSHA inspectors would write citations regardless of what steps Massey took. This is, again, consistent with the evidence contained in the MSHA emails.

Additionally, the MOIs show that Blanchard told the government that he "was surprised to read the testimony from UBB miners that respirable dust fraud was occurring at the mine," because "the company did not want people cheating on their respirable dust sampling." (MOI-001581) (ECF No. 663-4). Blanchard further stated that "decisions MSHA made ended up endangering the

health and safety of miners." (MOI-001580). This crucial impeachment evidence went undisclosed and thus unused by Mr. Blankenship at trial.

*Bill Ross.* Ross was another key witness at trial for whom multiple MOIs were undisclosed. In discovery, the government produced a 302 of a May 12, 2010 interview with Ross, and a September 13, 2011 grand jury transcript. The government failed to disclose five MOIs memorializing five interviews with Ross.

Just before trial, however, prosecutors disclosed to the defense that during an interview, Ross had "said he did not agree with [MSHA's] general policy of denying proposed ventilation plans that proposed to use belt aircourses for ventilation." (attached as USAO0000170). The defense responded that this disclosure was insufficient under *Brady* and requested the full notes of the interview. The government never provided those notes. Presumably, this watered-down disclosure on the eve of trial reflected Ross's more pointed statement in one of the undisclosed MOIs that "Joe Mackowiak did not want belt air to be used to ventilate the mines in his district. Ross told Mackowiak that he should reconsider what he was saying with mines that liberated a lot of methane." (MOI-001532) (ECF No. 663-4).

In that same interview, "Ross advised that the UBB mine was set up to fail based on the ventilation system [a non-belt air system] MSHA forced the UBB mine to use." (MOI-001532). This statement is substantially different in both tone and content from the feeble disclosure provided by the government and simply did not arm Mr. Blankenship with sufficient information to adequately address this topic on cross-examination. Ross's actual statement would have proved far more powerful if disclosed to the defense.

The Ross MOI dovetails with the MSHA materials withheld until April 2018, which reveal that a high level MSHA administrator was disciplined in connection with UBB for failing to follow

MSHA guidance "which specified that separate ventilation and dust control plans were to be consolidated into a single mine ventilation plan." (USAO0000132) (ECF No. 663-6). It appears that MSHA later recognized deficiencies in its handling of the UBB ventilation plan.

Ross's other suppressed MOIs contained a wealth of information that would have been "an effective tool in disciplining [Ross] during cross-examination." *Gil,* 297 F.3d at 104. This evidence included Ross's statements that Blankenship told Ross that Massey needed to reduce violations, and was going to address the violations it was receiving. (MOI-001487) (ECF No. 663-4); (MOI-001476) (ECF No. 663-3). Additionally, Ross told the government that at an August 5, 2009, meeting, "[Chris] Adkins stated that they should comply with all regulations at the mine site and that they did not have to worry anymore." (MOI-001477).

Further, the suppressed MOIs would have undermined the government's portrayal of Ross as a "whistle-blower," (Trial Tr. Vol. I at 49), who had the "courage" to confront Massey Management about issues he observed, (Trial Tr. Vol. XXVIII at 5945). Instead, the MOIs reveal multiple occasions where senior officials at Massey sought out Ross's input on conditions at the mines. (MOI-001475) (ECF No. 663-3) (stating that at Adkins's direction, Ross had an all-day meeting with Ojeda and Suboleski "to discuss some of the issues he had observed while visiting Massey Energy mines"); (MOI-001476) (stating that after this meeting, "Adkins instructed Ross to go tell Don Blankenship what he thought about Massey and MSHA's view of Massey"); (MOI-001530) (ECF No. 663-4) ("Blankenship wanted Ross to talk to him about the issues."). Additionally, Adkins directed Ross to visit mines in need of additional expertise on safety, and Ross was otherwise able to travel to whichever mines he chose to teach foremen about ventilation, respirable dust, and other safe workplace measures. (MOI-001474) (ECF No. 663-3); (MOI-001531) (ECF No. 663-4).

### C. The favorable information was material and its suppression prejudiced Mr. Blankenship's defense.

The government's failure to disclose this favorable evidence severely prejudiced Mr. Blankenship.  The prejudice prong of *Brady* requires a showing that the suppressed evidence is material:  "whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Spicer*, 194 F.3d at 559 (citation omitted).  The court must "assess the materiality of exculpatory evidence '*collectively*, not item by item.'"  *Monroe v. Angelone*, 323 F.3d 286, 298 (4th Cir. 2003) (quoting *Kyles v. Whitney*, 514 U.S. 419, 436 (1995)) (emphasis added); *see also Campbell v. Polk*, 447 F.3d 270, 276 (4th Cir. 2006) ("[C]ourts examine the cumulative impact of all the undisclosed evidence.").

Unsurprisingly, even the prosecutors themselves cannot claim that Mr. Blankenship had access to all this information at the time of trial.  Instead, they argued that "most" or "many" or "essentially all" of that information was available or came out at trial.  (OPR–000050-52).  Ruby himself argued that "most or all of that information was available to the defense in some other form."  (OPR–000051).  However, OPR determined that "Ruby's assertion that there was significant overlap . . . is partially correct."  (*Id.*)  It proceeded to identify "six important witnesses[11] [for whom] the prosecution team had not disclosed any other MOI, grand jury transcript, MSHA transcript, immunity agreements, or proffer agreements."  (*Id.* at 000051-52).  OPR also provided Ruby a list of 100 discoverable statements and asked him to identify "whether

---

[11] As discussed earlier, five of those witnesses were Duba, Ojeda, Bearse, Sears, and Clemens. John Ryan Patrick was the sixth witness.

the information in those statements was 'known or available to the defense from other sources.'" (OPR–000051).  Tellingly, Ruby never responded.[12]

The cumulative impact of the undisclosed evidence, as described above, eliminates any confidence in the verdict against Mr. Blankenship.  The sheer volume of suppressed material in this case is staggering.  Counsel has not identified a case involving a comparable degree of suppression.  The collective force of this suppressed evidence establishes prejudice, particularly here, where the matter was so evidently close for the jury even as it acquitted on every felony count.  The Court should lack any confidence in the single misdemeanor verdict against Mr. Blankenship, and should vacate the conviction.

## II.   THE GOVERNMENT SUPPRESSED EVIDENCE IN VIOLATION OF THE JENCKS ACT AND DEPRIVED MR. BLANKENSHIP OF DUE PROCESS.

The Jencks Act, 18 U.S.C. § 3500, requires government prosecutors to produce any statements by a government witness relevant to that witness's testimony on direct examination.  The government repeatedly violated the Jencks Act by withholding numerous statements by testifying government witnesses. The government's Jencks violations were so pervasive and prejudicial on the facts of this case as to amount to a violation of Mr. Blankenship's constitutional rights to due process and a fair trial.

The formal MOIs withheld by the government in this case qualify as statements of key government witnesses on two bases.   First, FBI Special Agent James Lafferty authored approximately two-thirds of the undisclosed MOIs and testified extensively at trial regarding his

---

[12] OPR drew an adverse interest against USA Goodwin by virtue of his failure to cooperate with its investigation.  (OPR–000081-82).  It also effectively drew an adverse inference against Zuckerman based on its declination to specify evidence of prejudice.  (OPR–000089). Curiously, it drew no adverse inference about Ruby's failure to respond to this inquiry.  This is especially notable given that Ruby appeared to have cooperated with the investigation until this point.

investigation into Massey.  The undisclosed MOIs are undoubtedly Jencks statements for Special

Agent Lafferty.  *See United States v. Hinton*, 719 F.2d 711, 714 n.2, 716, 722 (4th Cir. 1983)

(formal MOIs are considered a government agent's statement for Jencks Act purposes).

Second, these MOIs contain "substantially verbatim recital[s]" of a number of testifying

witnesses' oral statements related to their trial testimony, including but not limited to critically

important statements by both Blanchard and Ross.  18 U.S.C. § 3500(e)(2).  For example, one of

the Blanchard MOIs contains a direct quotation from Blanchard on the issue of advance notice.

(MOI-001403) (ECF No. 663-2) ("Blanchard stated that the purpose of calling is to fix things,

'lighten up compliance' and to make sure people are in place for safety concerns.").  This MOI not

only contains a direct quote from Blanchard on a key issue, but otherwise recites his statement

substantially verbatim.  Similarly, one of Ross's MOIs shows that: "Ross stated that Blankenship

never challenged him over the issues he raised during their meeting."  (MOI-001477) (ECF No.

663-3).  Further, although Ross testified at length regarding ventilation and mining operations,

(*see, e.g.*, Trial Tr. Vol. XIX at 3904-05), the government failed to disclose an MOI containing a

diagram *drawn by Ross* explaining the operation of continuous mining with ventilation

systems.  (MOI-001497, MOI-001504) (ECF No. 663-3).  The Jencks Act requires that *every*

witness statement relevant to their trial testimony be provided.  Here, that clearly did not happen.

There is a very clear remedy for a violation of the Jencks Act: to strike the witnesses'

testimony or to declare a mistrial.  18 U.S.C. § 3500(d); Fed. R. Crim. P. 26.2(e).  Of course, due

to the government's wrongful suppression of these statements, the defense was not able to make a

motion to strike or for mistrial based on the statement at the time of trial.  That was through no

fault of the defense.  The government should not receive a better result because it suppressed

evidence than it would have obtained had it fulfilled its statutory and Constitutional obligations.

Accordingly, the testimony of all witnesses for whom full Jencks statements were not provided should have been stricken, or a mistrial declared. This certainly included Lafferty, Blanchard, and Ross. Without the testimony of any one of those three central witnesses, much less all three, there is no doubt the outcome of the trial would have been different, particularly given what an evidently close case it was for the jury. Moreover, on the facts of this case, and particularly in light of the volume of statements not provided and the centrality of the affected witnesses to the outcome of the trial, the failure to disclose the statements to Mr. Blankenship violated his constitutional due process and fair trial rights.

## III.   THE GOVERNMENT VIOLATED THE DISTRICT COURT'S DISCOVERY ORDERS AND COMMITTED PROSECUTORIAL MISCONDUCT.

By failing to disclose these documents, the government violated both a Rule 17(c) subpoena and this Court's order regarding the production and identification of *Brady* material. In doing so, prosecutors repeatedly misrepresented the government's compliance with these orders. These violations were so prejudicial as to undermine Mr. Blankenship's constitutional rights to due process and a fair trial.

Mr. Blankenship incorporates here the sections of his Motion detailing the government's pervasive misconduct, including its misrepresentations to the Court and defense counsel. (Mot. ¶¶ 16-20, 40, 47-49, 51-56). Prosecutorial misconduct can deprive a defendant of due process of law and therefore merit vacating the conviction. *See United States v. Kojayan*, 8 F.3d. 1315, 1324-25 (9th Cir. 1993) (vacating conviction where prosecutor failed to disclose co-conspirator's cooperation agreement but told court it had complied with discovery obligations). The government's misrepresentations prejudiced Mr. Blankenship by suggesting to his defense counsel that material did not exist and potentially changing the way the Court ruled on multiple discovery

issues.  (*See* OPR–000092) ("Moreover, those statements were central to the government's arguments that the defendant's motions should be denied").

Although Ruby claimed that his arbitrary discovery policy was to produce pre-indictment MOIs only, the defense requests for materials were never so limited.  Moreover, Ruby never articulated his arbitrary policy to the either the defense or to the Court.  More specifically, with respect to Ruby's assertions that he "turned over MOIs" for Chris Blanchard (*see* Mot. at ¶ 49), his statement is simply not true.  He had turned over a single MOI.  Ruby told OPR that he incorrectly believed that two MOIs had been turned over to the defense.  (OPR–000061).  OPR concluded that, taking Ruby's excuse at face-value, the "most natural understanding of Ruby's oral statement . . . is that the Government had disclosed all of [Blanchard's] MOIs."  (OPR–000094).  But while OPR decided that Ruby did not intentionally mislead the Court, it is still mind-boggling that Ruby would not have even offered to ensure that his memory of the government's production was accurate.  This is especially true in light of the fact ███████████████ ████████████████████████████████████████████████████████████████████████ ████████ that he had been relying solely on his memory to ensure that *Brady* material was being produced.  Moreover, Goodwin presumably heard Ruby's assertions to the Court and did nothing to correct them or to otherwise ensure that his team had complied with its discovery obligations.  (OPR–000061).  *See Kojayan*, 85 F.3d at 1320 (discussing expectation that U.S. Attorney would exercise supervision and control over line prosecutors' conduct).

Similarly, OPR found that the "most logical reading" of the government's written pleadings was that prosecutors had disclosed *all* MOIs.  (*Id.*)  In short, these repeated misleading statements may have changed the Court's rulings on key discovery motions.  Even if the defense could have known the government was not disclosing all MOIs—which it did not—it is hard to see what else

they could have done to obtain these materials. It pressed the government over and over for everything it had and was repeatedly stonewalled. It sought the Court's intervention only to have its requests denied based on the government's representations. As the Supreme Court has stated, "the more specifically the defense requests certain evidence . . . the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of that assumption." *United States v. Bagley*, 473 U.S. 667, 682-83 (1985)).[13] And yet we now know that evidence did, indeed, exist.

Due to the government's misconduct here, Mr. Blankenship was forced to mount a defense without any knowledge of the significant amounts of favorable, exculpatory and impeachment evidence possessed by the government. Given that Mr. Blankenship nearly secured a full acquittal, these new revelations undermine confidence in the one guilty verdict the jury returned. The resulting prejudice to Mr. Blankenship requires vacatur of his conviction.

## CONCLUSION

Mr. Blankenship was denied his constitutional rights, including his rights to due process and a fair trial. His conviction was obtained only in violation of the laws of the United States. The conviction and sentence that resulted from these violations must be set aside.


Dated: September 6, 2018                                    Respectfully submitted,

                                                           /s/  Howard C. Vick
                                                           Howard C. Vick
                                                           Michael A. Baudinet
                                                           MCGUIREWOODS LLP
                                                           Gateway Plaza
                                                           800 E. Canal Street
                                                           Richmond, VA 23219-3916

---

[13] The government's misconduct also validates concerns Mr. Blankenship raised in his Motion to Dismiss for Selective and Vindictive Prosecution. (ECF No. 189-1).

Tel: (804) 775-1000
Fax: (804) 775-1061
tvick@mcguirewoods.com
mbaudinet@mcguirewoods.com

Benjamin L. Hatch
MGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510-1655
Tel: (757) 640-3700
Fax: (757) 640-3701
bhatch@mcguirewoods.com

/s/ W. Henry Jernigan, Jr.
W. Henry Jernigan, Jr. (WVSB No. 1884)
DINSMORE & SHOHL LLP
707 Virginia Street, East, Suite 1300
P.O. Box 11887
Charleston, West Virginia 25339-1887
Telephone: (304) 357-0900
Facsimile: (304) 357-0919
henry.jernigan@dinsmore.com

*Counsel for Donald L. Blankenship*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Beckley Division**

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff/Respondent,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 5:14-CR-00244** |
| | ) | **Civil No. 5:18-CV-00591** |
| | ) | |
| **DONALD L. BLANKENSHIP** | ) | |
| | ) | |
| **Defendant/Petitioner.** | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I, W. Henry Jernigan, do hereby certify that a foregoing **Amended Memorandum in Support of Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. § 2255** was served through the Court's electronic filing system on this the 6th day of September, 2018 upon the following counsel of record:

Douglas W. Squires, Esquire
Assistant U.S. Attorney
U.S. Attorney's Office for the Southern District of Ohio
303 Marconi Blvd., Suite 200
Columbus, OH 43215

/s/ W. Henry Jernigan, Jr.
W. Henry Jernigan, Jr. (WVSB No. 1884)