

**U.S. Department of Justice**

Office of Professional Responsibility

*950 Pennsylvania Avenue, N.W., Suite 3266*
*Washington, D.C.  20530*

**MAY 3 0 2018**

## MEMORANDUM

TO:        James A. Crowell IV
Acting Director
Executive Office for U.S. Attorneys

John V. Geise
Chief
Professional Misconduct Review Unit

Robert M. Duncan, Jr.
United States Attorney
Eastern District of Kentucky[1]

FROM:     Robin C. Ashton
Counsel

SUBJECT:   Report of Investigation into the Conduct of Former United States Attorney R. Booth
Goodwin II and Former Assistant U.S. Attorney Steven Ruby in *United States v.
Blankenship*, Cr. No. 5:14-00244 (S.D.W. Va.)

Enclosed is the Office of Professional Responsibility (OPR) Report of Investigation into the conduct of former United States Attorney R. Booth Goodwin II and former Assistant U.S. Attorney Steven Ruby in *United States v. Blankenship*, Cr. No. 5:14-00244 (S.D.W. Va.).

On April 5, 2010, an explosion in the West Virginia Upper Big Branch (UBB) coal mine killed 29 coal miners. The United States Attorney's Office for the Southern District of West Virginia (USAO) commenced a criminal investigation shortly after the explosion.

On November 13, 2014, a federal grand jury indicted Donald Blankenship, Chief Executive Officer and Chairman of the Board of Directors of Massey Energy Company, which owned UBB. Ruby led the government's criminal investigation and litigation team. Goodwin was an active

---

[1]    In May 2018, the United States Attorney's Office for the Southern District of West Virginia was recused from the *Blankenship* case. The United States Attorney's Office for the Eastern District of Kentucky now represents the government in that matter.

participant during the criminal investigation and trial. Blankenship was represented by the law firm Zuckerman Spaeder LLP (Zuckerman). The *Blankenship* case was tried in the fall of 2015. At the conclusion of the trial, Blankenship was convicted of a misdemeanor conspiracy to violate mine safety standards and acquitted of all other charges.

In March 2016, Zuckerman sent a letter to the Department of Justice Criminal Division's Assistant Attorney General, alleging, among other things, that: (a) the government failed to disclose exculpatory e-mails in the possession of the Mine Safety and Health Administration (MSHA); (b) the government made false statements to the court and jury about Blankenship's involvement in Massey budget decisions; (c) the government did not call MSHA inspectors to testify at trial in order to avoid revealing the government's discovery violations; and (d) an MSHA employee destroyed MSHA documents shortly after the UBB explosion. Zuckerman's allegations were forwarded to OPR.

As a result of its investigation, OPR found that Zuckerman's initial misconduct allegations were without merit. OPR found that: (a) the government did not withhold exculpatory MSHA e-mails; (b) the government did not make false statements about Blankenship's involvement in the Massey budget process; (c) the government did not inappropriately decide not to use MSHA inspectors as trial witnesses; and (d) there was no evidence to support the allegation that an MSHA employee destroyed MSHA documents shortly after the UBB explosion.

During OPR's investigation, however, OPR learned that the government had failed to disclose to the defense numerous memoranda of interviews (MOIs) written by law enforcement agents on the prosecution team. Although prior to the *Blankenship* trial the government disclosed to the defense approximately 370 MOIs, it failed to disclose 61 MOIs, including 11 pertaining to pre-indictment interviews, and 50 pertaining to post-indictment interviews. As a result of its investigation, OPR made the following factual findings and reached the following conclusions regarding Ruby's and Goodwin's conduct related to the failure to disclose the 61 MOIs:

(1) Some of the undisclosed MOIs contained discoverable statements that were required to be disclosed by applicable Department discovery rules and policies, including United States Attorneys' Manual Section 9-5.001(C)(1)-(3). OPR concludes that neither Ruby nor Goodwin withheld discoverable statements from the defense with the intent of preventing the defense from obtaining those statements. However, OPR found that: (a) Ruby recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in 11 pre-indictment MOIs; (b) Ruby and Goodwin recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in some of the 50 post-indictment MOIs; (c) Ruby and Goodwin recklessly violated discovery requirements imposed by a January 2010 memorandum from then-Deputy Attorney General David Ogden (the Ogden Memorandum), which requires prosecutors to "develop a process for review of pertinent information to ensure that discoverable information is identified;" (d) Ruby's and Goodwin's "process" for deciding which statements contained in post-indictment MOIs to disclose was to rely on their memory of what was said during interviews, some of which occurred months before they made disclosure decisions; their deficient process resulted in the failure to disclose discoverable statements contained in numerous post-indictment MOIs; and (e) because Ruby and Goodwin recklessly violated the Department's discovery policies regarding the disclosure of discoverable statements, they committed professional misconduct.

OPR - 000002

(2) OPR found insufficient evidence to conclude that Ruby's and Goodwin's failure to disclose discoverable statements contained in the undisclosed MOIs violated *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or West Virginia Rule of Professional Conduct (RPC) 3.8(d), which requires the disclosure of information that tends to negate the accused's guilt.  The government violates its *Brady* obligations only if, *inter alia*, a defendant is prejudiced by the failure to disclose.  Zuckerman Spaeder LLP, the firm representing Blankenship, and the entity in the best position to explain whether, how, and to what extent the defense was prejudiced by the government's failure to disclose the 61 MOIs, explicitly declined OPR's request to provide it with that information.  Prosecution team members credibly told OPR that the discoverable statements contained in the 61 undisclosed MOIs were not only available to the defense from other sources, but were in fact used during the defense's cross-examination of government witnesses.  Based on the facts known to it, OPR cannot prove by preponderant evidence that Blankenship was prejudiced by the government's failure to disclose the discoverable statements in the 61 MOIs, and so cannot conclude that the government's conduct violated *Brady, Giglio*, or West Virginia RPC 3.8(d).

(3) Ruby failed to make a full disclosure of discoverable statements contained in three MOIs, and statements made during one proffer session, which he attempted to summarize in two summary disclosure letters.  OPR found Ruby's disclosures to be inadequate and incomplete. Although OPR concludes that Ruby's inadequate disclosures were not intended to withhold exculpatory statements from the defense, OPR nevertheless concludes that Ruby's inadequate disclosures were made in reckless disregard of the requirement, as set forth in the Ogden Memorandum, that prosecutors take "great care" when making disclosures by summary letter. Ruby was responsible for both of the deficient letter disclosures.  OPR found that Goodwin was also responsible for the inadequate and incomplete disclosures in one of the two summary disclosure letters.   OPR finds that Ruby and Goodwin recklessly violated the Ogden Memorandum's requirements and therefore committed professional misconduct.

(4) The government filed three arguably misleading pleadings with the court, and Ruby made one arguably misleading statement in court, regarding the government's MOI disclosures. Those pleadings and Ruby's statement may have led the court to reasonably, but erroneously, believe that the government had disclosed all MOIs in its possession.  OPR reached the following conclusions about the alleged misstatements to the court:

(a)   Ruby and Goodwin did not intentionally mislead the court regarding the government's MOI disclosures.

(b) Ruby and Goodwin did not violate West Virginia RPC 3.3(a)(1), which prohibits an attorney from *knowingly* making a false statement to the court, because OPR found that neither Ruby nor Goodwin intentionally made false statements to the court.

(c) OPR found insufficient evidence to conclude that the government's pleadings and Ruby's statement in court about the government's MOI disclosures violated West Virginia RPC 4.1, which prohibits attorneys from knowingly making false material statements to third parties such as Zuckerman Spaeder LLP.

(d) OPR did not reach a conclusion about whether Ruby and Goodwin recklessly made misleading statements to the court about the government's MOI disclosures. When OPR investigates an allegation that the government made misleading statements to the court, OPR would ordinarily request to interview the court to ask how the court interpreted the statements at issue. OPR could not follow its usual procedures in the *Blankenship* case because the case is being actively litigated and the court would be unable to engage in *ex parte* communications with the government. OPR is therefore unable to ascertain the court's views as to whether the court was misled by the government's statements about its MOI disclosures.

In early 2017, OPR informed the USAO that the government had not disclosed numerous MOIs to the defense. Shortly thereafter, the USAO disclosed all 61 MOIs to the defense. In the fall of 2017 and the spring of 2018, the USAO made additional disclosures of MSHA documents to defense counsel. In December 2017, Blankenship obtained new counsel from the law firm McGuireWoods, LLP. On April 18, 2018, McGuireWoods filed a "Motion to Vacate and Set Aside Defendant's Conviction and Sentence Pursuant to 28 U.S.C. § 2255." The motion alleges that the government's failure to disclose prior to trial 61 MOIs, as well as certain MSHA documents that were disclosed to the defense in 2017 and 2018, violated *Brady* and *Gigli*o, and that the government had made misrepresentations to the court regarding its discovery disclosures.

OPR has informed Goodwin and Ruby of the results of its investigation, and has advised them to contact the Professional Misconduct Review Unit (PMRU) if they intend to appeal OPR's findings and conclusions. OPR will inform McGuireWoods of the results of OPR's investigation after the PMRU has addressed the merits of Goodwin's and Ruby's anticipated appeal of OPR's findings and conclusions.

Enclosure

cc:    Scott Schools
       Associate Deputy Attorney General
       (with enclosure)

       Jay Macklin
       General Counsel, EOUSA
       (with enclosure)

# DEPARTMENT OF JUSTICE



## OFFICE OF
## PROFESSIONAL RESPONSIBILITY

## REPORT

Investigation of Allegations of
Misconduct Against Former United States
Attorney R. Booth Goodwin II and Former
Assistant U.S. Attorney Steven Ruby Related to *United
States v. Blankenship*, Cr. No. 5:14-00244 (S.D.W. Va.)

May 30, 2018

NOTE: THIS REPORT CONTAINS SENSITIVE AND PRIVACY ACT PROTECTED INFORMATION. DO NOT DISTRIBUTE THE REPORT OR ITS CONTENTS WITHOUT THE PRIOR APPROVAL OF THE OFFICE OF PROFESSIONAL RESPONSIBILITY.

## INTRODUCTION

On April 5, 2010, an explosion in the Upper Big Branch (UBB) coal mine, located in West Virginia, killed 29 coal miners. UBB was then owned and operated by a subsidiary of the Massey Energy Company (Massey). Donald Blankenship was Massey's Chief Executive Officer and Chairman of the Board of Directors. The United States Attorney's Office for the Southern District of West Virginia (USAO) commenced a criminal investigation shortly after the explosion.

A federal grand jury indicted Blankenship on November 13, 2014, and returned a three-count Superseding Indictment on March 10, 2015. Blankenship was charged with conspiracy to violate federal mine safety standards, in violation of 30 U.S.C. § 820(d) and 18 U.S.C. § 371; causing false statements to be filed with the Securities and Exchange Commission, in violation of 18 U.S.C. §§ 1001(a)(2) and (3) and 18 U.S.C. § 2; and causing false statements to be made in connection with the purchase and sale of securities, in violation of 15 U.S.C § 78ff and 18 U.S.C. § 2.

Assistant U.S. Attorney (AUSA) Steven Ruby led the government's criminal investigation and litigation team. United States Attorney R. Booth Goodwin II was an active participant in the criminal investigation and litigation team, including conducting the direct examination of several witnesses at trial and delivering the government's closing argument. Both Ruby and Goodwin have left the federal service. The other members of the prosecution team included AUSA #1, AUSA #2, DOL Attorney, FBI SA #1, DOL SA #1, Paralegal #1, and Paralegal #2



The trial of *United States v. Blankenship*, Cr. No. 5:14-00244 (S.D.W. Va.) began on October 1, 2015. The government presented the testimony of 27 witnesses. The defense rested without calling any witnesses. The jury reached a verdict on December 3, 2015. Blankenship was convicted of a misdemeanor conspiracy to violate mine safety standards and acquitted of all other charges. On April 6, 2016, the court sentenced Blankenship to one year in prison and imposed a substantial fine. Blankenship appealed to the U.S. Court of Appeals for the Fourth Circuit, which after oral argument affirmed his conviction. Blankenship appealed to the Supreme Court, which denied his petition for a writ of certiorari. *United States v. Blankenship*, 846 F.3d 663 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 315 (October 10, 2017). In the spring of 2017, Blankenship was released from federal prison.

Blankenship was represented by the Washington, D.C. law firm Zuckerman Spaeder LLP (Zuckerman).[1] In March 2016, Zuckerman sent a letter to the Department of Justice (Department or DOJ) Criminal Division's Assistant Attorney General, alleging, *inter alia*, that the government had violated its constitutional obligations by failing to disclose exculpatory documentary and testimonial evidence from several sources. Zuckerman did not raise on appeal any of the allegations contained in its March 2016 letter to the Department. One of Zuckerman's allegations was that the government had failed to disclose exculpatory statements obtained during several

---

[1]     On December 14, 2017, Zuckerman informed OPR that it no longer represented Blankenship. Shortly thereafter, OPR was notified that Blankenship had retained new counsel from the law firm McGuireWoods LLP.

pretrial witness interviews.  Zuckerman's allegations were forwarded to the Department's Office of Professional Responsibility (OPR).  OPR opened an inquiry into Zuckerman's allegations, which was later converted to an investigation.

OPR's investigation of Zuckerman's misconduct allegations included the following investigative measures.  OPR: (1) reviewed the e-mail accounts of Ruby, Goodwin, AUSA #1, AUSA #2, Paralegal #1, and Paralegal #2 for the relevant time periods; (2) obtained Ruby's written response to Zuckerman's initial misconduct allegations;[2] (3) on several occasions obtained additional information and documents from Ruby to supplement his written response;[3] (4) on several occasions obtained additional information and documents from Zuckerman pertaining to its misconduct allegations;[4] (5) on several occasions obtained information and documents from the USAO;[5] (6) reviewed relevant documents, pleadings, and trial transcripts; and (7) interviewed Ruby, AUSA #1, AUSA #2, DOL SA #1, DOL Attorney, FBI SA #1, Paralegal #1, and Paralegal #2.[6]  As described in more detail below, Goodwin declined OPR's requests for an interview.

In its initial letter to the Department, Zuckerman alleged, among other things, that:  (a) the government failed to disclose exculpatory e-mails in the possession of the Mine Safety and Health Administration (MSHA); (b) the government made false statements to the court and jury about Blankenship's involvement in Massey budget decisions; (c) the government did not call MSHA inspectors to testify at trial in order to avoid revealing the government's discovery violations; and (d) an MSHA employee destroyed MSHA documents shortly after the UBB explosion.

As a result of its investigation, OPR found that Zuckerman's initial misconduct allegations were without merit.  OPR found that:  (a) the government did not withhold exculpatory MSHA e-mails; (b) the government did not make false statements about Blankenship's involvement in the Massey budget process; (c) the government did not inappropriately decide not to use MSHA inspectors as trial witnesses; and (d) there was no evidence to support the allegation that an MSHA employee destroyed MSHA documents shortly after the UBB explosion.

After receiving Ruby's Written Response, OPR asked him some follow up questions.  In response to one of those questions, Ruby cited a Memorandum of Interview (MOI) to support his contention that certain information had been disclosed to the defense.  When OPR cited that MOI

---

[2]  June 4, 2016 Ruby Written Response (Written Response).  Ruby's Written Response is attached at Tab A.

[3]  *See e.g.*, September 30, 2016 Ruby letter to OPR, attached at Tab B; January 19, 2017 Ruby e-mail to OPR, attached at Tab C.

[4]  *See e.g.*, April 19, 2016 Zuckerman e-mail to OPR; December 19, 2016 Zuckerman e-mail to OPR; May 16, 2017 Zuckerman letter to OPR.

[5]  *See e.g.*, January 24, 2017 USAO e-mail to OPR; June 5, 6, and 28, 2017 USAO e-mails to OPR; November 6, 2017 USAO e-mail to OPR.

[6]  OPR's interview of Ruby was conducted under oath in the presence of a court reporter, and was transcribed.  The transcript is attached at Tab D.  OPR's other interviews were digitally recorded.  Some of those interviews were later transcribed.  On October 27, 2017, OPR sent Ruby a copy of his interview transcript, and offered him the opportunity to comment on or make corrections to the transcript.  Ruby did not respond to OPR's offer.

- 2 -

to Zuckerman, Zuckerman told OPR that it never received the MOI.   After checking USAO records, Ruby told OPR that the MOI was mistakenly not disclosed to the defense.  OPR thereafter undertook an exhaustive investigation of the government's handling of MOIs.

During the criminal investigation, law enforcement agents assigned to the investigation had written hundreds of MOIs.   OPR found that although prior to the *Blankenship* trial the government disclosed to the defense approximately 370 MOIs, it failed to disclose 61 MOIs, including 11 pertaining to pre-indictment interviews, and 50 pertaining to post-indictment interviews (collectively, "undisclosed MOIs").[7]

After OPR learned of the government's failure to disclose 61 MOIs, OPR asked Goodwin for a written response pertaining to that issue.   On May 24, 2017, Goodwin responded with a two-page letter that did not answer most of OPR's questions.[8]  OPR twice asked Goodwin (who was no longer a Department of Justice employee) for an opportunity to interview him.   OPR informed Goodwin that it had obtained information that was inconsistent with Goodwin's statement to OPR in his short written response that, "It is frustrating to me if memoranda of interview were not turned over."[9]  OPR also told Goodwin that it was concerned that "at least three pleadings filed by the government contain arguably misleading information about the government's disclosure of [MOIs]."[10]  Goodwin declined OPR's first request for an interview and failed to reply to OPR's second request.

As a result of its investigation, OPR made the following factual findings and reached the following conclusions regarding Ruby's and Goodwin's conduct related to the failure to disclose the 61 MOIs:

(1) Some of the undisclosed MOIs contained discoverable statements that were required to be disclosed by applicable Department discovery rules and policies, including United States Attorneys' Manual Section 9-5.001(C)(1)-(3).   OPR concludes that neither Ruby nor Goodwin withheld discoverable statements from the defense with the intent of preventing the defense from obtaining those statements.   However, OPR found that:   (a) Ruby recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements

---

[7]       In early 2017, OPR informed the USAO that the prosecution team had not disclosed numerous MOIs.  Shortly thereafter, the USAO produced 61 previously undisclosed MOIs to the defense.  Although Zuckerman told OPR that Blankenship's defense was prejudiced by the government's failure to disclose the 61 MOIs, it declined OPR's request to identify how the defense had been prejudiced, stating in part that it might raise that issue with the court.  On April 18, 2018, McGuireWoods filed a "Motion to Vacate and Set Aside Defendant's Conviction and Sentence Pursuant to 28 U.S.C. § 2255."  The motion alleges that the government's failure to disclose prior to trial 61 MOIs, as well as certain MSHA documents that were disclosed to the defense in 2017 and 2018, violated *Brady* and *Giglio*, and that the government made misrepresentations to the court regarding its MOI disclosures.  In May 2018, the United States Attorney's Office for the Southern District of West Virginia was recused from the *Blankenship* case.  The United States Attorney's Office for the Eastern District of Kentucky was assigned to handle *Blankenship*, and will respond to the Section 2255 motion.

[8]       Goodwin's May 24, 2017 letter is attached at Tab E (Goodwin Letter).

[9]       Goodwin Letter at 1; October 5, 2017 OPR e-mail to Goodwin.

[10]      *Id.*

- 3 -

contained in 11 pre-indictment MOIs; (b) Ruby and Goodwin recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in some of the 50 post-indictment MOIs; (c) Ruby and Goodwin recklessly violated discovery requirements imposed by a January 2010 memorandum from then-Deputy Attorney General David Ogden (the Ogden Memorandum), which requires prosecutors to "develop a process for review of pertinent information to ensure that discoverable information is identified;" (d) Ruby's and Goodwin's "process" for deciding which statements contained in post-indictment MOIs to disclose was to rely on their memory of what was said during interviews, some of which occurred months before they made disclosure decisions; their deficient process resulted in the failure to disclose discoverable statements contained in numerous post-indictment MOIs; and (e) because Ruby and Goodwin recklessly violated the Department's discovery policies regarding the disclosure of discoverable statements, they committed professional misconduct.

(2) OPR found insufficient evidence to conclude that Ruby's and Goodwin's failure to disclose discoverable statements contained in the undisclosed MOIs violated *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or West Virginia Rule of Professional Conduct (RPC) 3.8(d), which requires the disclosure of information that tends to negate the accused's guilt. The government violates its *Brady* obligations only if, *inter alia*, a defendant is prejudiced by the failure to disclose. Zuckerman Spaeder LLP, the firm representing Blankenship, and the entity in the best position to explain whether, how, and to what extent the defense was prejudiced by the government's failure to disclose the 61 MOIs, explicitly declined OPR's request to provide it with that information. Prosecution team members credibly told OPR that the discoverable statements contained in the 61 undisclosed MOIs were not only available to the defense from other sources, but were in fact used during the defense's cross-examination of government witnesses. Based on the facts known to it, OPR cannot prove by preponderant evidence that Blankenship was prejudiced by the government's failure to disclose the discoverable statements in the 61 MOIs, and so cannot conclude that the government's conduct violated *Brady, Giglio,* or West Virginia RPC 3.8(d).

(3) Ruby failed to make a full disclosure of discoverable statements contained in three MOIs, and statements made during one proffer session, which he attempted to summarize in two summary disclosure letters. OPR found Ruby's disclosures to be inadequate and incomplete. Although OPR concludes that Ruby's inadequate disclosures were not intended to withhold exculpatory statements from the defense, OPR nevertheless concludes that Ruby's inadequate disclosures were made in reckless disregard of the requirement, as set forth in the Ogden Memorandum, that prosecutors take "great care" when making disclosures by summary letter. Ruby was responsible for both of the deficient letter disclosures. OPR found that Goodwin was also responsible for the inadequate and incomplete disclosures in one of the two summary disclosure letters. OPR finds that Ruby and Goodwin recklessly violated the Ogden Memorandum's requirements and therefore committed professional misconduct.

(4) The government filed three arguably misleading pleadings with the court, and Ruby made one arguably misleading statement in court, regarding the government's MOI disclosures. Those pleadings and Ruby's statement may have led the court to reasonably, but erroneously, believe that the government had disclosed all MOIs in its possession. OPR reached the following conclusions about the alleged misstatements to the court:

- 4 -

(a) Ruby and Goodwin did not intentionally mislead the court regarding the government's MOI disclosures.

(b) Ruby and Goodwin did not violate West Virginia RPC 3.3(a)(1), which prohibits an attorney from *knowingly* making a false statement to the court, because OPR found that neither Ruby nor Goodwin intentionally made false statements to the court.

(c) OPR found insufficient evidence to conclude that the government's pleadings and Ruby's statement in court about the government's MOI disclosures violated West Virginia RPC 4.1, which prohibits attorneys from knowingly making false material statements to third parties such as Zuckerman Spaeder LLP.

(d) For the following reasons, OPR did not reach a conclusion about whether Ruby and Goodwin recklessly made arguably misleading statements to the court about the government's MOI disclosures.  When OPR investigates an allegation that the government made misleading statements to the court, OPR would ordinarily request to interview the court to ask how the court interpreted the statements at issue.  OPR could not follow its usual procedures in the *Blankenship* case, because the case is being actively litigated, and the court would be unable to engage in *ex parte* communications with the government.  OPR is therefore unable to ascertain the court's views as to whether the court was misled by the government's statements about its MOI disclosures.  In its Section 2255 motion, McGuireWoods has alleged that the government made misrepresentations to the court about its MOI disclosures.  The defense, if it chooses, may further pursue that allegation in the post-conviction litigation, which will allow the court to inform the parties as to whether it was misled by the statements at issue.

On March 22, 2018, OPR sent its draft report to the USAO, Ruby, and Goodwin, and provided them with an opportunity to review and comment on the draft report.  The USAO told OPR that it had no substantive comments about the draft report.  Ruby submitted an eight-page letter, and Goodwin submitted a four-page letter, in response to OPR's draft report.[11]  After carefully considering Ruby's and Goodwin's comments, OPR changed one of its findings and made minor revisions to its report.

## I.  FACTUAL BACKGROUND

### A.  Upper Big Branch Coal Mine Explosion

On April 5, 2010, an explosion killed 29 coal miners in West Virginia's Upper Big Branch (UBB) coal mine.  UBB was then owned and operated by a subsidiary of the Massey Energy Company (Massey).  At the time of the explosion, Donald Blankenship was Massey's Chief Executive Officer and Chairman of the Board of Directors.

---

[11]  Ruby's comments on the draft report are attached at Tab F.  Goodwin's comments on the draft report are attached at Tab G.

### B.      The Mine Safety and Health Administration's Post-Explosion Investigations

The Mine Safety and Health Administration (MSHA), a component of the U.S. Department of Labor (DOL), enforces federal laws, regulations, and safety standards (collectively, safety standards) governing coal mine safety.  During the period covered by the indictment, MSHA coal mine inspectors regularly inspected UBB and issued citations and imposed monetary fines when they found violations of safety standards.  After the UBB explosion, MSHA conducted an investigation to determine the cause(s) of the accident.  In a December 6, 2011 report, MSHA concluded that the 29 coal miner deaths were preventable and resulted from Massey's failure to comply with applicable federal safety standards.[12]  After the UBB explosion, MSHA also conducted an internal review of its own pre-explosion enforcement activities at UBB, and issued a report of the results of that review on March 6, 2012.[13]

The MSHA post-explosion investigation concluded that the physical conditions that led to the explosion were the result of a series of basic and avoidable safety violations at UBB.  The MSHA investigation concluded that the UBB accident began with a small explosion resulting from the ignition of methane gas, triggering a much larger explosion of coal dust, which killed the 29 miners.  According to MSHA, Massey could have prevented the initial methane gas explosion if it had properly maintained UBB's "longwall" coal-mining machine.  When properly working and maintained, a longwall coal-mining machine uses sprays of water to both suppress potentially-explosive coal dust that is generated as result of mining coal, and to reduce heat generated by the longwall coal-mining machine during its operation that could ignite methane gas released during the mining process.

MSHA found that UBB's longwall coal-mining machine was not properly maintained, which likely caused the initial methane gas ignition.  In addition, MSHA found that Massey failed to follow basic safety procedures for detecting levels of methane gas in the mine.  MSHA also found that Massey failed to comply with the MSHA-approved ventilation and roof control plans for UBB, which increased the probability of unsafe levels of methane gas accumulation.  Underground coal mines must maintain adequate ventilation to provide miners with safe air to breathe, and to prevent the accumulation of unsafe levels of methane and other dangerous gasses.  MSHA found that Massey failed to install proper supports for the mine's roof, which contributed to the accumulation of methane gas.  Finally, MSHA found that Massey violated basic safety standards by allowing an excessive accumulation of coal dust, which ultimately fueled the large explosion.  MSHA found that Massey failed to properly use rock dust in the mine, which can control and render inert coal dust and prevent it from catching fire.[14]

---

[12]      MSHA's *Report of Investigation, Underground Coal Mine Explosion, April 5, 2010, Upper Big Branch Mine-South, Performance Coal Company, Montcoal, Raleigh County, West Virginia, ID No. 46-08436,* December 6, 2011.

[13]      *Internal Review of MSHA's Actions at the Upper Big Branch Mine-South, Performance Coal Company, Montcoal, Raleigh County, West Virginia,* March 6, 2012.

[14]      MSHA's *Report of Investigation,* Executive Summary at 2.

- 6 -

## C. Criminal Investigation

The USAO commenced a criminal investigation soon after the UBB mine explosion occurred.

### 1. The Prosecution Team

The government's investigative and prosecution team consisted of USAO attorneys, an FBI Special Agent, a DOL Office of the Inspector General (DOL OIG) Special Agent, and DOL attorneys, several of whom were appointed as Special AUSAs for the *Blankenship* trial.

R. Booth Goodwin II was the United States Attorney for the Southern District of West Virginia from 2010 to the end of 2015.[15]  Goodwin was an active member of the USAO's investigative and prosecution team.  Goodwin participated in discovery decisions, witness interviews, and pretrial and trial strategy.  Goodwin conducted the examination of several witnesses during the *Blankenship* trial and delivered the government's closing argument.  Ruby told OPR that he and Goodwin met daily to discuss the *Blankenship* case.  Ruby asserted that Goodwin approved all significant decisions the trial team made during the UBB explosion investigation and *Blankenship* litigation.[16]

Steven Ruby was an AUSA in the USAO from 2009 to early 2017.[17]  In 2012, Ruby was appointed Counsel to the United States Attorney.  Ruby led the prosecution team and was involved in almost every decision the team made.  Ruby was a relatively inexperienced federal trial prosecutor; Ruby told OPR that prior to the *Blankenship* case, he had tried two relatively minor cases in federal court.[18]

---

[15] 

[16]     September 28, 2017 OPR interview of Steven Ruby (Ruby Interview) at 9.  Specifically, Ruby said, "I would say the decision-making authority on decisions of any significance rested with [Goodwin].  The . . . grunt work of preparing for trial was largely me, but . . . the case was very important to him, and not without reason.  It was obviously a significant case.  And he made clear from the beginning, that . . . any decision of significance had to be made by him, and he reiterated that more strongly around the summer of 2015.  And that [continued] through the pretrial process and all the way through trial."  *Id.* at 190-91.

[17] 

[18]     *Id.* at 28. 



▆▆▆▆▆s.  ▆AUSA #1▆ was added to the *Blankenship* prosecution team in February 2015, in large part because of his extensive trial experience.

▆AUSA #2▆▆▆▆▆▆▆, and was immediately assigned to the *Blankenship* team.  Because of her federal court inexperience, ▆AUSA #2▆ was assigned primarily to conduct legal research, writing, and other supporting tasks.

▆DOL Attorney▆▆▆▆▆ was Ruby's chief DOL point-of-contact.  ▆DOL Attorney▆ assisted the prosecution team with searches of MSHA documents and other tasks.  ▆DOL Attorney▆ was appointed as a Special AUSA (SAUSA), and attended the *Blankenship* trial (though he did not play an active role during the trial).

▆FBI SA #1▆ has been an FBI Special Agent (SA) for 15 years.  ▆FBI SA #1▆ was assigned to the criminal investigation shortly after the UBB mine explosion.

▆DOL SA #1▆ has been a DOL OIG SA for 16 years.  ▆DOL SA #1▆ was assigned to the criminal investigation shortly after the UBB mine explosion.

▆Paralegal #1▆ is a paralegal specialist in the USAO.  ▆Paralegal #1▆ was responsible for almost all of the technical aspects of the government's collection of evidence and the disclosure of materials to the defense.

▆Paralegal #2▆ was a legal assistant in the USAO at the time of the *Blankenship* investigation and trial ▆Paralegal #2▆ ▆Paralegal #2▆ assisted ▆Paralegal▆ and prosecution team attorneys with various administrative tasks.

## 2.   Blankenship's Defense Team

Blankenship was represented by a large team of attorneys from the Washington, D.C. law firm Zuckerman Spaeder LLP (Zuckerman), as well as local counsel.  The lead attorney was a nationally prominent criminal defense attorney, William Taylor, III.  Zuckerman defended Blankenship aggressively throughout the criminal investigation, trial, and appellate proceedings.

## 3.   Pre-Indictment Criminal Investigation

The UBB mine exploded in April 2010.  Blankenship was indicted in November 2014. During the four and one-half intervening years, the USAO conducted an active criminal investigation.  As a result of obtaining documents during that investigation, and obtaining documents generated by MSHA's accident investigation and internal review following the UBB mine explosion, at the time of the indictment the USAO possessed over four million pages of documents related to the explosion. ▆Paralegal #1▆ maintained a computer software electronic searchable database (called Relativity) into which ▆▆▆ put most of the documents the government received through its investigation. ▆Paralegal #1▆ placed Bates-stamp markings on the electronic documents both in Relativity and on the paper documents maintained elsewhere.

During the criminal investigation, the prosecution team interviewed numerous witnesses, some multiple times. [DOL SA #1], [FBI SA #1], or both, attended almost all of those interviews. Ruby attended almost all interviews, and Goodwin attended many as well, including interviews of witnesses whose MOIs were not disclosed to the defense.[19]   Either [DOL SA #1] or [FBI SA #1] took handwritten notes during witness interviews, and they thereafter drafted memoranda to memorialize the substance of the interviews.[20]   Neither [DOL SA #1] nor [FBI SA #1] sent drafts of their MOIs to others who attended the interview for review or comment.[21]   Both [DOL SA #1] and [FBI SA #1] said that no one ever told them to include or omit information in any of the MOIs they wrote.[22]

[DOL SA #1] and [FBI SA #1] prepared MOIs for witnesses who were being prepared for their trial testimony. [DOL SA #1] did so in all cases. [FBI SA #1] said that on occasion, when a witness had nothing new to say during a witness preparation session, [FBI SA #1] would not memorialize that preparation session in an MOI.[23]

Once completed, [DOL SA #1] and [FBI SA #1] either hand-delivered or e-mailed MOIs to the USAO. [DOL SA #1] and [FBI SA #1] almost always gave completed MOIs to [Paralegal #1], though they would occasionally give them to Ruby or [Paralegal #2]. [Paralegal #1] put completed MOIs in the Relativity database, and would apply a Bates-stamp label beginning with the letters "MOI" and ending with a six-digit number.  The first page of the first Bates-stamped MOI was labeled, "MOI-000001." [Paralegal #1] would apply Bates-stamp label numbers to the MOIs [Paralegal #1] received based solely on when [Paralegal #1] received them, and not based on the dates of the interview or the dates of when the MOI was drafted.  By the time the *Blankenship* trial ended (a few MOIs were prepared during trial), [DOL SA #1] and [FBI SA #1] had written over 425 MOIs.

---

[19]      A few interviews were conducted by attorneys from the Criminal Division and not the USAO.  For example, [Witness #1]                                                          , by [DOL SA #1] and an attorney from the Criminal Division's Fraud Section.  One of Zuckerman's initial misconduct allegations was that the government had failed to disclose exculpatory evidence [Witness #1] provided the government during that interview.  When asked about this allegation, Ruby initially told OPR that [Witness #1] had not been interviewed because the government refused to grant [    ] immunity.  Ruby Written Response at 10.  Later, however, OPR learned that the government had failed to disclose 11 pre-indictment MOIs, including [Witness #1] MOI.  When OPR asked Ruby about this, Ruby told OPR that because he had not been present during [Witness #1] interview, he had forgotten that the Criminal Division had interviewed [Witness #1].  Ruby reiterated that [Witness #1]                                        January 19, 2017 Ruby e-mail to OPR.

[20]      [FBI SA #1] memoranda were labeled as FBI form 302s.  [DOL SA #1] memoranda were labeled as DOL/OIG reports of interview.  Because the prosecution team Bates-stamped all of these memoranda using the letters "MOI" (Memorandum of Interview), OPR will refer to these documents as MOIs.

[21]      [DOL SA #1] said that [  ] might have provided Ruby with a draft MOI for [Witness #2]                                        (though OPR found no evidence that [  ] did so).  The [Witness #2] MOI was the only post-indictment MOI disclosed to the defense.  September 26, 2017 OPR interview of [DOL SA #1] at 23.

[22]      [DOL SA #1] Interview at 24-25; September 27, 2017 OPR interview of [FBI SA #1]                              Interview) at 48.

[23]      [FBI SA #1] Interview at 17.

- 9 -

### D.   The *Blankenship* Indictment

#### 1.   The Indictment and Superseding Indictment

Blankenship was indicted on November 13, 2014. A three-count Superseding Indictment was returned on March 10, 2015, charging Blankenship with conspiracy to violate federal mine safety standards, in violation of 30 U.S.C. § 820(d) and 18 U.S.C. § 371; causing false statements to be filed with the Securities and Exchange Commission, in violation of 18 U.S.C. §§ 1001(a)(2) and (3) and 18 U.S.C. § 2; and causing false statements to be made in connection with the purchase and sale of securities, in violation of 15 U.S.C § 78ff and 18 U.S.C. § 2.

#### 2.   The Government's Factual Basis for Alleging Criminal Conduct: The Mine Safety Count[24]

The indictment set forth an extensive factual recitation supporting the charge that Blankenship conspired with others to violate mine safety standards. That charge was premised upon, *inter alia*, the following factual allegations.

##### a.   Blankenship Failed to Employ Sufficient Workers

The indictment alleged that unsafe conditions in UBB were caused in part because Blankenship, in order to increase profits, employed an insufficient number of workers to do the jobs that were required to keep UBB conditions safe.[25]

##### b.   Blankenship Imposed Aggressive Production Quotas

The indictment alleged that unsafe conditions in UBB were caused in part because Blankenship set coal production quotas that left too little time for workers to implement and maintain safety measures.[26]

##### c.   Blankenship Emphasized Profit Over Safety

The indictment alleged that unsafe conditions in UBB were caused in part because Blankenship decided that profits would be maximized by paying regulatory fines instead of paying

---

[24]   OPR's Report will not discuss the indictment's securities-related charges, because the discovery issues discussed below do not relate to those counts. The indictment alleged that after the UBB explosion, Blankenship had violated federal securities laws by authorizing and approving statements to the public that falsely asserted that Massey strove to comply with mine safety standards and that Massey did not condone safety violations. The indictment alleged that such statements were fraudulent and deceived sellers and potential purchasers of shares of Massey stock. The jury acquitted Blankenship of the securities-related charges.

[25]   Indictment ¶¶ 24, 26, 27, 30, 36, 49, 92, 100(a).

[26]   Indictment ¶¶ 24, 26, 27, 30, 36, 49, 68, 100(a), 100(g).

- 10 -

workers to implement safety measures or for structural improvements to enable UBB to comply with federal safety standards.[27]

### d.      UBB Managers Were Instructed to Violate Safety Standards

The indictment alleged that during the indictment period, Blankenship instructed and encouraged UBB managers to violate mine safety standards.   The indictment alleged that Blankenship disregarded safety violations when communicating with UBB managers, which led them to understand that Blankenship accepted and expected such violations.   The indictment alleged that members of the conspiracy falsified the results of coal dust samples taken in UBB as required by federal safety standards.[28]

### e.      Budget Decisions Were Made to Maximize Profit, Regardless of the Impact on Safety

The indictment alleged that Blankenship was the highest-ranking official involved in Massey's annual budget and production plan process, which determined how many workers were budgeted for safety-related positions, and set the amount of coal each mine was required to produce.  The indictment alleged that Blankenship repeatedly denied requests by UBB managers to hire more workers to fill jobs that were critical to mine safety, and reduced the number of workers in such positions.[29]

### f.      Employee Compensation Rewarded Profit While Ignoring Mine Safety Violations

The indictment alleged that Blankenship used employee compensation as a means of communicating to employees that it was acceptable for UBB to violate mine safety standards.[30]

### g.      UBB Provided Workers with Advance Warning Regarding the Presence of MSHA Inspectors

The indictment alleged that unsafe conditions in UBB existed in part because UBB employees outside the mine unlawfully provided employees working in the mine with advance notice that MSHA inspectors had arrived at UBB, and were on the way to inspect the mine.[31]

---

[27]      Indictment ¶ 58.

[28]      Indictment ¶¶ 59, 91, 94, 99, 100(b), 100(f).

[29]      Indictment ¶¶ 50, 67, 69.

[30]      Indictment ¶¶ 79, 95, 100(h).

[31]      Indictment ¶¶ 37, 97, 98, 100(c), 100(d), 100(e).

OPR - 000016

## II.   FACTS RELEVANT TO ZUCKERMAN'S INITIAL MISCONDUCT ALLEGATIONS

On March 7, 2016, Zuckerman sent a letter to the Department of Justice alleging that the *Blankenship* prosecution team had engaged in prosecutorial misconduct.[32]   At that time, Zuckerman was unaware that the government had not disclosed 61 MOIs, and therefore did not raise that issue in its letter (although Zuckerman did question why it had received only one MOI memorializing a post-indictment interview).   Zuckerman's allegations are set forth below.

### A.   The Government Allegedly Misrepresented Blankenship's Attendance at Budget Meetings

Zuckerman alleged that the government failed to disclose exculpatory evidence and misled the court regarding Blankenship's attendance at budget and planning meetings for Massey and its subsidiaries, including UBB.   Zuckerman noted that one of the government's central allegations was that in order to increase profits, Blankenship refused to adequately staff UBB to ensure mine safety.   Zuckerman alleged that the government failed to disclose evidence that was inconsistent with that contention, and that the government elicited false testimony to support its contention.[33]

Specifically, Zuckerman alleged that ▋Witness #3▋ told the government in a pretrial interview that Blankenship did not attend Massey budget and planning meetings, a fact that Zuckerman said was inconsistent with the government's contention that Blankenship made decisions regarding staffing levels for safety-related positions.[34]   Zuckerman said that the government never disclosed the information ▋Witness #▋had provided the government. Zuckerman also alleged that the government told the court and the jury that Blankenship attended budget and planning meetings, which the government knew was false because of the information ▋Witness #▋provided.   Zuckerman alleged that Ruby designed his questions to ▋Witness #4▋ in such a way as to avoid directly asking about Blankenship's presence at budget and planning meetings, and to create the false impression that Blankenship was involved in those meetings.[35]

In his written response to this allegation, Ruby stated that Zuckerman had misstated the government's contention.   Ruby said that Blankenship's attendance at budget and planning meetings was irrelevant; what the government contended and proved at trial was that Blankenship made budget and planning decisions.   Ruby stated that while Blankenship may not have attended some budget and planning meetings, the information discussed in those meetings was provided to

---

[32]   Zuckerman sent its letter to the Criminal Division's Assistant Attorney General.   The letter was forwarded to OPR.

[33]   March 7, 2016 Zuckerman letter to DOJ at 1-8.

[34]   ▋Witnes▋ did not testify at trial.   Presumably, Zuckerman spoke with ▋Witnes▋or ▋Wit▋ attorneys after▋Wit▋ spoke with the government, and were told what information ▋Witnes▋ had provided the government during▋Wit▋interview.

[35]   *Id.* at 3-8.

- 12 -

him, and that Blankenship made the ultimate budget and planning decisions, including decisions about staffing.[36]

Ruby also responded to Zuckerman's allegation by asserting that the information ██████ provided that the government allegedly withheld – that Blankenship did not attend all budget and planning meetings – was provided to the defense in other materials the government had disclosed, including:[37] (1) an October 22, 2014, ██████ MOI ████████████████████████ ████████████████; [38] (2) an August 23, 2013, ██████ MOI (██████ ████████████████████████████; an August 2009 calendar of Blankenship's activities; and (3) voluminous e-mails that showed that Blankenship received information about the budget and planning process outside of committee meetings.[39]

OPR asked ██████ ████ ████████ and ██████ for their views regarding Zuckerman's allegation that the government withheld evidence that showed that Blankenship did not attend budget and planning meetings. Each agreed with Ruby's explanation that the government's contention, supported by evidence presented at trial, was that Blankenship made the final budget and planning decisions, and that Blankenship's presence or absence at budget and planning meetings was not relevant.[40]

---

[36]    Ruby Written Response at 6-7.

[37]    Ruby also made the obvious point that Blankenship himself knew whether he attended budget and planning meetings. September 30, 2016 Ruby letter to OPR at 6. It would therefore be difficult for the defense to allege that the failure to disclose ██████ statements about those meetings would have prejudiced the defense.

[38]    Although Ruby told OPR that the October 22, 2014 ██████ MOI had been disclosed, as discussed above, that assertion was erroneous. When OPR asked Zuckerman to respond to Ruby's contention that the information they alleged had been withheld was provided in other documents, including the October 2014 ██████ MOI, Zuckerman told OPR that it never received that MOI. OPR had told Ruby that OPR might show Zuckerman any documents Ruby used to refute Zuckerman's allegations: "We may show any such documents to Taylor and ask him to explain his allegation that Blankenship's defense was prejudiced by the government's decision not to produce ██████ statements in light of the production of those documents." July 18, 2016 OPR e-mail to Ruby. The fact that Ruby cited and provided OPR with a copy of the ██████ MOI, knowing that OPR intended to show it to Zuckerman, tends to support Ruby's assertion that the failure to disclose 11 pre-indictment MOIs, including the October 2014 ██████ MOI, was a mistake, and that he had not been aware of that mistake until Zuckerman told OPR that it never received the October 2014 ██████ MOI. Similarly, in both Ruby's Written Response and his September 30, 2016 letter to OPR, Ruby discussed an MOI from an undisclosed pre-indictment interview of ██████ ████████████████████████ Ruby's citation to the undisclosed ██████ MOI, knowing that OPR might show that MOI to Zuckerman, is further evidence that Ruby mistakenly believed that the MOI had been disclosed.

[39]    OPR noted that the voluminous e-mails that Ruby provided OPR to demonstrate Blankenship's involvement in the budget and planning process outside of the budget and planning committee meetings were e-mails that were sent to Blankenship, and did not include return e-mail communications. When asked about this, witnesses told OPR that it was very unusual for Blankenship to send e-mails. Rather, he would either communicate by telephone, or he would make handwritten notes on the messages sent to him, which would then be faxed to whoever needed to know Blankenship's thoughts, response, or instructions. September 27, 2017 OPR interview of ██████ Interview) at 54; September 27, 2017 OPR interview of ██████ Interview) at 67; ██████ Interview at 41-42; ██████ Interview at 58.

[40]    ██████ Interview at 52-53; ██████ Interview at 66; ██████ Interview at 38-40; ██████ Interview at 57.

Zuckerman's supposition that the government had interviewed Witness #3 and decided not to disclose her MOI was correct, for Ruby acknowledged that he decided not to disclose Witness #3 MOI.[41]   However, while Zuckerman alleged that decision was made to suppress exculpatory evidence, Ruby said he made that decision because Witness #3 statements were inculpatory, not exculpatory.[42]   Ruby said that Witness #3 confirmed that Blankenship had final approval over the budget and planning process, which was consistent with the government's contention.[43]

The MOI memorializing Witness #3 interview addressed Blankenship's role in the budget and planning process, as well as other issues.[44]   The MOI contains the following statements about Blankenship's involvement in the budget and planning process:

- *Blankenship reviewed data on spreadsheets pulled from a computer program used for budgeting.*

- *Blankenship was provided with production figures supported by detailed worksheets.*

- *Blankenship used to attend budget meetings, but in 2008, when the location for the meetings changed, Blankenship did not attend them.*

- *Blankenship became less involved in the budget review over a two-to-three-year span.*

- *Blankenship was not involved in the final business plan reviews.*

- *If Blankenship reviewed the budget plans he reviewed them on his own.*

- *Blankenship received three copies of the final plan book.*

- *Witness #3 would keep Blankenship updated on the process of preparing the plan summary, and Blankenship would call or fax questions to Witness #3.*

- *Blankenship reviewed a high-level summary of the budget book.*

---

[41]   Ruby Written Response at 6. Ruby affirmatively considered disclosing Witness #3 MOI, but then decided against producing it.  On September 10, 2015, Ruby sent himself a "to do" list for the *Blankenship* case.  Included in that list was the notation, "Produce Witness #7 Witness #8 Witness #9 [MOIs]" On September 21, 2015, Ruby sent Zuckerman a letter summarizing discoverable information from the Witness #7 and Witness #9 MOIs, but not the Witness #8 MOI.

[42]   Ruby Written Response at 6.  In his interview, after reviewing certain statements in the Witness #3 MOI, Ruby acknowledged that his initial statement to OPR was not correct.  Ruby acknowledged that some of Witness #3 statements were discoverable.  Ruby Interview at 134-37.  *See* summary of Witness #3 MOI discussed below in Section III(E)(6).

[43]   Ruby Written Response at 6.

[44]   As noted in Section III(E)(6) below, OPR identified several statements in Witness #3 MOI that are inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment, and therefore should have been disclosed to the defense.

Some statements in the [Witness #3] MOI support the government's contention that Blankenship was involved in the budget and planning process. Others contradict that position (and are inconsistent with other statements in the MOI). In particular, the statement that, "Blankenship was not involved in the final business plan reviews," is inconsistent with the government's contention that Blankenship had the final say regarding Massey's business plans. OPR asked [FBI SA #1], who wrote the [Witness #3] MOI, and Ruby about this statement, and whether it contradicted the government's factual basis for alleging criminal conduct. [FBI SA #1] said that statement was "probably a poorly worded sentence on my part," and noted that it was not consistent with the other statements in the MOI.[45] [FBI SA #1] said that even if [Witness] had made that statement, it was not consistent with the government's evidence.[46] Ruby said that the statement that Blankenship was not involved in business plan "reviews" referred to meetings, not decisions, and so was not inconsistent with the government's factual basis for alleging criminal conduct.[47] OPR examined [FBI SA #1] handwritten notes taken during [Witness #3] pretrial interview, which contained the statements used to draft [Witness #3] MOI. On page five of [FBI SA #1] notes, [he] wrote, "Final Business Plan Reviews – DB [Blankenship] not involved in meetings." [FBI SA #1] handwritten notes show that the statement in [Witness #3] MOI that Blankenship was not involved in final business plan reviews was not an accurate description of what [Witness #3] said during [his] interview.

## B.    The Government Allegedly Withheld Exculpatory MSHA E-Mails

Zuckerman alleged that the government intentionally withheld exculpatory evidence because the government did not disclose any e-mails from the two MSHA inspectors who wrote the majority of UBB citations during the indictment period.[48] Zuckerman further alleged that among the 70,000 pages of MSHA documents it had subpoenaed shortly before the trial, it found only two e-mails to or from eight MSHA inspectors who inspected UBB during the indictment period.[49] Zuckerman alleged that it had information from two current or former MSHA employees who told Zuckerman that MSHA employees communicated by e-mail. Zuckerman therefore inferred that the government intentionally failed to disclose MSHA inspector e-mails that contained exculpatory information.

Ruby told OPR that Zuckerman's allegation was factually false, as the government had disclosed to the defense "hundreds" of MSHA inspector e-mails.[50] OPR asked Ruby to send it a

---

[45]    [FBI SA #1] Interview at 60.

[46]    *Id.* at 61.

[47]    Ruby Interview at 136.

[48]    March 7, 2016 Zuckerman letter to DOJ at 10.

[49]    *Id.* at 11.

[50]    Ruby Written Response at 13.

sample of those e-mails; Ruby then sent OPR about 20 e-mails to or from many of the MSHA inspectors who had inspected UBB during the indictment period.[51]

In addition to providing OPR with e-mails to and from some of the MSHA inspectors who inspected UBB during the indictment period that had been disclosed to the defense, Ruby told OPR that the reason why there were fewer substantive e-mails to or from MSHA inspectors about UBB than one would ordinarily expect was that MSHA had a policy that directed MSHA inspectors to discuss inspection findings only in official MSHA documents.[52] Ruby said █DOL Attorney█ ████████████ told him about that MSHA policy.[53]

In fact, Zuckerman was aware of MSHA's policy regarding e-mail communications well before it alleged that the government had engaged in misconduct by failing to disclose exculpatory MSHA inspector e-mails. On September 17, 2015, Zuckerman filed a motion to compel MSHA to comply with an early-return subpoena Zuckerman had sought in August 2017. Zuckerman alleged in part that the documents the government produced in response to the subpoena failed to include MSHA inspector e-mails, and that those e-mails were likely exculpatory. On September 24, 2015, the Department of Labor filed a brief in opposition to the motion to compel.[54] The DOL informed the court that the reason why the MSHA documents produced to the defense did not include voluminous e-mails in which UBB conditions were discussed was that MSHA policy required MSHA inspectors to use official MSHA forms to record their observations about mine conditions.[55]

█DOL Attorney█████ told OPR that Ruby accurately described to OPR the MSHA policy that discouraged MSHA inspectors from discussing their inspection findings in anything other than official documents, and that such discussions were not likely to be found in MSHA e-mails because of that policy.[56]

---

[51]     September 30, 2016 Ruby letter to OPR, exhibits 39-59.

[52]     Ruby Written Response at 13.

[53]     Ruby Interview at 66. █AUSA #2█, █DOL SA #1█ and █FBI SA #1█ said they had not heard of any such MSHA policy. █AUSA #2█ Interview at 54; █DOL SA #1█ Interview at 46; █FBI SA #1█ Interview at 53-54. █AUSA #1█ said █she█ recalled that Ruby told █her█ about such an MSHA policy. █AUSA #1█ Interview at 47-49.

[54]     Zuckerman incorporated by reference its September 17 motion into a second motion to compel filed on November 6, 2015. The court denied that motion on December 9, 2015.

[55]     The DOL brief cited the following passage in an MSHA Citation and Order Writing Handbook: "For Coal inspectors, the forms provided to document inspectors' observations during enforcement activities are MSHA Form 7000 Series. Inspectors are not to take notes on other paper and copy them to these forms unless otherwise directed." September 24, 2015 brief at 4.

[56]     October 13, 2017 OPR interview of █DOL Attorney█████ Interview).

- 16 -

### C.     The Government Allegedly Did Not Have MSHA Inspectors Testify at Trial to Avoid Revealing Discovery Violations

A significant part of the government's evidence adduced at trial was the volume and seriousness of the citations that MSHA inspectors issued after inspecting UBB during the indictment period.  However, the government did not call any MSHA inspectors to testify during the trial.  Zuckerman alleged that "the only conceivable explanation" for why the government did not have MSHA inspectors testify was that "doing so would have exposed Jencks and discovery violations."[57]   Zuckerman did not support its allegation with any testimonial or documentary evidence.

Ruby told OPR that the government intentionally decided not to use MSHA inspectors as witnesses, but not for the reasons Zuckerman alleged.  Ruby said that he was concerned that a West Virginia jury might be hostile or unreceptive to the testimony of MSHA inspectors, who are federal government employees, and who are sometimes perceived by some in the West Virginia federal jury pool as hostile to the coal industry, a key West Virginia employer.  Ruby said that the government was able to elicit from coal miner witnesses the same facts about unsafe conditions in UBB as the government would have elicited from MSHA inspectors.[58]  Both DOL Attorney and FBI SA #1  told OPR that they recalled that the government did not use MSHA inspectors as trial witnesses for the same reason Ruby articulated.[59]

### D.     An MSHA Employee Allegedly Destroyed Documents Shortly After the UBB Explosion

Zuckerman alleged that the government failed to investigate or disclose evidence concerning MSHA's destruction of UBB records after the mine explosion.  In support of its allegation, Zuckerman cited two declarations filed in an unrelated civil proceeding concerning an attempt by the Massey subsidiary that owned UBB to obtain documents from MSHA.  One declaration was from a former-MSHA employee; the other was from an employee of a different Massey subsidiary.  The two declarations contained allegations that in the summer of 2010, an MSHA employee destroyed MSHA documents related to UBB.[60]

The defense raised the document destruction issue with the court.  In a December 9, 2015 decision, the court denied the defense motion related to the allegation.  The court found that the two declarations the defense cited were "rife with hearsay."[61]  The court noted that two of the MSHA officials accused of the document destruction submitted sworn declarations denying the

---

[57]     March 7, 2016 Zuckerman letter to DOJ at 11.

[58]     Ruby Written Response at 14.

[59]     DOL Attorney Interview; FBI SA #1 Interview at 52-53.  Ruby said that he recalled discussing this issue with Goodwin. Ruby Interview at 68.  Neither AUSA #2 nor DOL SA #1 recalled any discussion about not using MSHA inspectors as trial witnesses. AUSA #2 Interview at 52-53; DOL SA #1 Interview at 47.

[60]     March 7, 2016 Zuckerman letter at 11-12.

[61]     December 9, 2015 opinion at 5.

allegations, and that one of the two declarants cited by the defense acknowledged in an *in camera* hearing during the *Blankenship* trial that he had no firsthand knowledge of any document destruction. Ruby said that the government had been unaware of the allegation of document destruction until mid-trial, when Zuckerman raised the issue with the court.[62]

**E.    The Government Allegedly Failed to Disclose Exculpatory Evidence Provided by** ███████

███████ ███████ entered into an immunity agreement with the government prior to trial. ███████ cross-examination lasted five-days. During cross-examination, ███████ testified that he had committed no crimes; ██ and Blankenship had not conspired to violate mine safety laws; Blankenship did not instruct him to violate mine safety laws; and that Blankenship wanted and ordered UBB to reduce MSHA violations. ███████ also testified on cross-examination that he or his attorneys made similar statements to the government prior to trial. Zuckerman alleged that the government intentionally failed to disclose those statements to the defense before trial.[63]

Ruby told OPR that ███████ statements during cross-examination identified by Zuckerman surprised the government. Ruby said that it was not uncommon in federal criminal practice for witnesses to change their stories during cross-examination. The government interviewed ███████ six times prior to and during trial, but disclosed only one of the six MOIs memorializing those interviews. None of the statements that Zuckerman alleges were intentionally withheld were contained in any of the five undisclosed MOIs. ███████ told OPR that if ███████ had made statements during interviews that ██ had not conspired with Blankenship, or that ██ had not broken any laws, ██ would have put those statements in the MOIs ██ drafted.[64] ███████ said that the closest ███████ came to making a statement such as those he made during cross-examination was a statement contained in an April 8, 2015 undisclosed MOI: ███████ advised that ██ never knowingly gave a direct order where ██ told someone to do something that caused a law to be broken."[65] Ruby, however, did not view that statement as inconsistent with the government's factual basis for alleging criminal conduct. Ruby said that the government's contention was that the conspiracy to violate mine safety standards in order to maximize profits was a tacit, and not an explicit, agreement.[66]

OPR examined the handwritten notes that ███████ and ███████ took during ███████ six interviews by the prosecution team, which they used to write ███████ MOIs (not all were legible). OPR did not find any evidence that ███████ said to the government before trial the

---

[62]    Ruby Written Response at 5.

[63]    March 7, 2016 Zuckerman letter to DOJ at 9.

[64]    ███████ Interview at 42-43.

[65]    ███████ Interview at 44.

[66]    Ruby Interview at 123.

statements ▮ made during cross-examination that were the basis for Zuckerman's misconduct allegation.

OPR asked Zuckerman whether it was aware of any evidence other than ▮Witness #4▮ statement on cross-examination that ▮ or ▮ attorneys provided that information to the government, that supported its contention that the government intentionally failed to disclose ▮Witness #4▮ statements. Zuckerman said it was not aware of any additional evidence to support its contention.[67]

## F.    The Government Allegedly Failed to Disclose Two Specific Exculpatory Documents

Zuckerman alleged that the government failed to disclose two exculpatory documents:  a letter from an MSHA manager in which he expressed his approval of a Massey plan to reduce MSHA citations; and a summary of an MSHA inspector report in which the inspector expressed positive opinions regarding UBB conditions.

### 1.    The "Applaud" Letter

On September 17, 2015, the defense filed a motion to compel MSHA to comply with an early-return subpoena.  The defense claimed that MSHA's search for documents in response to the subpoena was deficient because MSHA's response did not include a July 24, 2009, letter from ▮Witness #9▮ (UBB was located in District 4) to ▮Witness #10▮ ▮.  In the letter, ▮Witness #9▮ twice stated that ▮ "applaud[ed]" a new Massey initiative to eliminate hazards to miners working in Massey coal mines.  Zuckerman's contention that the government had not disclosed this document was correct.  OPR asked Zuckerman how it obtained the "applaud" letter, given that the government had not disclosed it.  Zuckerman told OPR that it "did not have permission" to tell OPR how it obtained the letter.[68]

Ruby told OPR that he first saw the "applaud" letter when reviewing the defense's September 17, 2015 motion to compel.[69]  Ruby said that he asked ▮DOL Attorney▮ to try to determine why the letter had not been disclosed to the defense.  According to Ruby, DOL could not find a copy of the "applaud" letter in any DOL file, and did not know why DOL did not have a copy.  Ruby said that ▮DOL Attorney▮ speculated that whoever sent the letter ▮Witness #9▮ or an administrative staff member) may not have kept a copy for DOL records.[70] ▮DOL Attorney▮

---

[67]    May 16, 2017 Zuckerman letter to OPR, Exhibit 3 at 4.

[68]    *Id.*, Exhibit 3 at 6.

[69]    Ruby Written Response at 9.  OPR asked ▮Paralegal #1▮ to search the Relativity database for the "applaud" letter.  ▮Paralegal #1▮ could not find that letter in the database, which supports Ruby's contention that the letter was not in the government's possession.  September 28, 2017 ▮Paralegal #1▮ e-mail to OPR.

[70]    September 30, 2016 Ruby letter to OPR at 9.

confirmed Ruby's recollection. ████ said that Ruby asked ████ to try to determine why the "applaud" letter had not been disclosed, and that DOL could not find the letter in its files.[71]

Ruby's assertion that the government had not seen the "applaud" letter before September 17, 2015 was not entirely correct.  On August 22, 2014, several months before Blankenship was indicted, Ruby and ████ met with two attorneys representing ████████ ██████████████████████████████████.  ████ took extensive notes during that meeting.  It is clear from a review of those notes, and an e-mail that ████ sent to Ruby later that day, that ████████ attorneys described the "applaud" letter in detail during the meeting, but for unstated reasons did not provide the government with a copy of the letter.[72]  Thus, in August 2014, Ruby and ████ were informed about, but not provided a copy of, the "applaud" letter.

OPR found that ████ notes from the August 22, 2014 meeting with ████████ attorneys contained discoverable material.  That material includes the following representations by ████████ attorneys:

- ████████ wanted the Hazard Elimination Program (a new Massey safety initiative) to reduce violations by 20%, but Blankenship wanted them reduced by 50%.

- Massey mines were safe.

- MSHA violations were not related to safety.

- Having zero MSHA violations was not realistic.

- If you fix 75 violations, MSHA would find 75 more.

- MSHA inspections are subjective.

- MSHA was harder on Massey than other mines.

- The number of MSHA violations corresponds to the number of MSHA inspection hours.

- Receiving violations did not mean that a mine was unsafe.

- Blankenship received the weekly minutes from the Hazard Elimination Committee.

- "Report cards" (documents containing information about mine conditions) were Blankenship's idea to increase accountability.

On June 22, 2015, in response to a court order discussed below, Ruby sent Zuckerman a letter in which he provided the defense with information that it might claim to be *Brady* material. In that letter, Ruby summarized the discoverable statements made by ████████ attorneys as follows:

---

[71]   ████ Interview.

[72]   In ████ notes, ████ noted, "need this ltr," and in ██ e-mail ████ commented that ██ e had not "seen the whole thing [letter]."  August 22, 2014 ████ e-mail to Ruby.

"Blankenship was involved in the development of violation targets and report cards for the so-called hazard elimination program. Witness #10 also believed that Massey made some degree of effort to comply with mine safety laws."

On September 27, 2017, OPR received AUSA #2 notes from ____ meeting with Witness #10 attorneys. On October 5, 2017, OPR provided those notes to the USAO, alerting it to the fact that the notes might contain discoverable material, and noting that as far as OPR was aware, the government had not made any disclosures to the defense about the statements by Witness #10 attorneys; in fact, OPR's statement was incorrect, as Ruby had made the minimal disclosure noted above in his letter of June 22, 2015. On October 20, 2017, the USAO made a supplemental disclosure to the defense about Witness #10 attorneys' statements to the government. The USAO noted the following statements by Witness #10 attorneys:

- Witness #10 *suggested a goal of 20% reduction of MSHA violations at Massey mines in conjunction with the Hazard Elimination Program; Blankenship responded that there should be a 50% reduction goal.*

- Witness #10 *believed that the number of citations at Massey corresponded to the number of MSHA inspection hours.*

- Witness #10 *believed that not all violations at Massey related to safety and that violations did not mean the mines were unsafe.*

- Witness #10 *believed that Blankenship shared his view that the number of violations cited did not mean the mines were unsafe but corresponded to the number of MSHA inspection hours.*

On November 18, 2017, OPR realized that Ruby had in fact made a short disclosure regarding statements made by Witness #10 attorneys in his June 22, 2015 letter to Zuckerman. On that date, OPR informed the USAO that OPR's prior statement that to its knowledge Ruby had not made such a disclosure was erroneous.

## 2. MSHA Inspector Witness #11 Inspection Notes

In response to the defense's August 2015 request for an early-return subpoena, the government produced thousands of pages of documents. Among them was a chart summarizing the results of MSHA inspections of various mines, including UBB. One entry on the chart summarized the results of an October 14, 2009 inspection of UBB by MSHA inspector Witness #11 ____, who found, among other things, that "the section is very clean and well kept . . . the belts are well rock dusted and very clean. The condition of this mine is very good. Management is trying very hard to improve the condition of the mine, they are doing a good job." Zuckerman alleged that the government's failure to disclose that document except in response to the

- 21 -

OPR - 000026

defendant's subpoena indicated that the government had failed to properly search MSHA documents for exculpatory evidence.[73]

In response to Zuckerman's allegation, Ruby said that the reason why the document containing the summary of ▇▇▇▇ UBB inspection was not disclosed earlier was because it contained information about other mines as well as UBB.[74]  Ruby stated that although the chart containing that entry was not disclosed, the government had disclosed the handwritten notes taken by MSHA inspectors who were at UBB on October 14, 2009.[75]  OPR reviewed those notes and found that they contain many, but not all, of the positive comments about UBB conditions that were in the chart entry quoted above.

## III.    FACTS RELEVANT TO THE GOVERNMENT'S MOI DISCLOSURES

### A.    Ruby's Initial Statements to OPR Regarding Disclosure Decisions

In Ruby's first communications with OPR, he said that he was the prosecution team member primarily responsible for decisions regarding what material should be disclosed to the defense and the timing of those disclosures, and that other attorneys on the prosecution team played only "minor roles in discovery matters."[76]  Ruby also said that the prosecution team's law enforcement agents were not involved in discovery decisions.[77]  However, during his OPR interview, Ruby clarified his earlier statements regarding who made disclosure decisions.  In his interview, Ruby said that his initial statements to OPR were meant to describe discovery decisions related to the government's initial – and by far the largest – disclosure of information after the indictment.  Ruby said that his initial statements to OPR did not accurately describe the process by which the decision was made not to disclose MOIs of interviews occurring post-indictment, discussed below.[78]

### B.    The Government's Initial Disclosures

On December 4, 2014, the government provided the defense with its initial discovery disclosures.  Essentially, the government provided the defense with almost all of the four million

---

[73]      In its September 17, 2015, motion to compel MSHA to comply with its subpoena, Zuckerman raised the issue of the government's failure to disclose the chart containing the summary of ▇▇▇▇ October 14, 2009 UBB inspection as evidence that the government was violating its discovery obligations.  Zuckerman incorporated by reference its September 17 motion into a second motion to compel filed on November 6, 2015.  The court denied that motion on December 9, 2015.

[74]      Ruby Written Response at 11-13.

[75]      *Id.*

[76]      *Id.* at 3, fn. 4.  ▇AUSA #1▇ said that Ruby made most of the case-related decisions, but also that ▇▇ was not privy to what Ruby and Goodwin discussed in ▇▇ absence.  ▇AUSA #1▇ Interview at 10-11.

[77]      Ruby Written Response at 3, fn. 4.  Both ▇DOL SA #1▇ and ▇FBI SA #1▇ said that they did not know who made disclosure decisions.  ▇DOL SA #1▇ Interview at 7; ▇FBI SA #1▇ Interview at 10.

[78]      Ruby Interview at 32-33.

pages of documents in its Relativity database, as well as other materials (some of which could not be put into Relativity for technical reasons). The vast majority of the documents the government disclosed came from Massey, Massey's corporate subsidiaries (including UBB), and MSHA. The government's initial disclosures also included more than 300 MOIs. The government's December 4, 2014 disclosures were provided to the defense in an electronic database, which enabled the defense to search the documents disclosed.

The defense acknowledged that the government's initial disclosure of documents and MOIs contained what it contended was exculpatory material. In a pleading filed in February 2015, the defense stated that its review of the four million pages of documents the government disclosed in December 2014 "revealed information highly favorable to the defense."[79] In a pleading filed in July 2015, the defense stated that the government had conducted over 350 interviews, and that "the [MOIs] of many of those interviews make plain that persons interviewed gave exculpatory information to the government."[80] As discussed below, the fact that the defense acknowledged that the government disclosed what the defense considered to be exculpatory material is relevant to OPR's assessment of whether Ruby and Goodwin intentionally withheld exculpatory material in undisclosed MOIs and MSHA documents.

### C.   Ruby and Goodwin Decide to Disclose Some, But Not All, MOIs

Ruby and Goodwin provided OPR with conflicting information about who decided to disclose only some of the MOIs in the government's possession. Ruby told OPR that he and Goodwin decided that the government should disclose essentially all materials in its possession as of the date of the government's initial disclosures in December 2014.[81] That decision included the disclosure of all of the hundreds of MOIs in the government's possession at that time. Ruby said that it was their intention to disclose all MOIs reflecting pre-indictment interviews.[82]

Ruby told OPR that after the indictment was filed, Zuckerman conducted an extremely aggressive defense of Blankenship that included (in the prosecution team's view) personal attacks on Goodwin and ███████████████████████████████████████████[83] Ruby said that these aggressive attacks caused Goodwin to change his views regarding the scope of the government's future disclosures.[84] According to Ruby, Goodwin decided that the

---

[79]   Memorandum in Support of Defense Motion . . . to Enforce the Government's *Brady* Obligations at 3.

[80]   Motion to Compel Compliance with *Brady* Order and for Other Appropriate Relief at 4.

[81]   Ruby Interview at 34-35.

[82]   *Id.* at 96.

[83]   *Id.* at 38-39. ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████

[84]   Ruby said that his belief about why Goodwin changed his views as to the scope of the government's disclosures was an inference based on his understanding and recollection of events. *Id.* at 41. In Goodwin's comments

government would disclose only material that was required to be disclosed by applicable rules and policies.[85]  As one consequence of this policy change, they decided that the government would not disclose any MOI that reflected a post-indictment interview, but would instead disclose by letter information in those MOIs that was required to be disclosed.[86]  Specifically, Ruby said:

> [Goodwin] started, at some point, to develop a view that we are not going to give them more than we have to.  He said, "we are not" – he said those words to me at least once, but I don't think he thought that we were – I don't think he thought that we were violating our discovery obligations.  I think his view was that there was no requirement to turn over the [MOIs] in full, as long as we disclose the exculpatory information, and I didn't argue with that.[87]

Ruby emphasized that he would not have unilaterally made the decision not to disclose post-indictment MOIs:

> The U.S. Attorney personally ran the case.  And I have -- I would like to think that I have some skills as a lawyer that I think were helpful to our team at trial and pretrial proceedings, but to be perfectly blunt, I was not the discovery expert here.  The U.S. Attorney had a lot more seniority, not just in terms of rank in the office, but also in time in the office than I did.  And I didn't make any of the decisions about disclosure of post-[indictment] MOIs without consulting with him.[88]

Because Goodwin chose not to fully cooperate with OPR's investigation, OPR was unable to ask him whether Ruby's account of the decision not to disclose MOIs reflecting post-indictment interviews was correct, or whether Goodwin had a different recollection and account of that decision.  Although Goodwin declined OPR's request to interview him, he did send OPR a short letter in response to OPR's request for a written response to the allegation that the government had failed to disclose MOIs containing discoverable statements.  In his letter, Goodwin stated: "[I]t was my intention and direction to [Ruby] that all information we gathered during the lengthy

---

on OPR's draft report, he adamantly denied the inference that Ruby drew regarding the decision to restrict the scope of the government's disclosures:  "Any perception that I did or did not do something because of personal attacks made on me and my family by the defense is absolutely false."  April 19, 2018 Goodwin letter at 4.

[85]     Ruby Interview at 8.  In addition to deciding that the government would only disclose what was required, Ruby said that Goodwin also decided that the government would no longer respond to Zuckerman's e-mail correspondence about the case (Zuckerman's attorneys frequently raised issues with the government by e-mail).  *Id.* at 124-26.  According to Ruby, Goodwin said that if Zuckerman wanted information from the government, the defense could file a motion with the court, to which the government would respond.  As noted below, Zuckerman sent Ruby several e-mails asking questions about the disclosure of MOIs, to which Ruby did not respond.

[86]     *Id.* at 38-39.

[87]     *Id.* at 39.

[88]     *Id.* at 21.

investigation be provided . . . If anything was not produced, I am confident it must have been inadvertent . . . It is frustrating to me if memoranda of interview were not turned over."[89]

OPR asked Ruby to respond to the assertions in Goodwin's letter to OPR. Ruby said,

All I can say to that is that we specifically discussed how we were going to handle the post-[indictment] MOIs. And I don't know if he, in writing this, is thinking about his -- the approach that we took on the materials from the pretrial phase when we did just produce it all or at least intended to produce it all. I don't know. I don't know what he is referring to there, but we certainly had many conversations about the approach that we took with the post-[indictment] MOIs.[90]

OPR found no independent evidence to support Ruby's contention that Goodwin knew about and authorized the decision not to disclose post-indictment MOIs. OPR found no e-mails or documents to support Ruby's assertion, and no witnesses said that they believed Goodwin knew of or authorized the decision. Ruby said that he usually did not communicate with Goodwin by e-mail, because his office was near Goodwin's, and they would be in each other's offices many times a day to discuss the *Blankenship* case.[91]

Paralegal #1 maintained the Relativity electronic database where the vast bulk of the documents the government obtained during its investigation was stored. Paralegal #1 also maintained and regularly updated a spreadsheet containing an index of the documents stored in Relativity or elsewhere in the government's possession. Paralegal #1 put a substantial amount of information in the spreadsheet about documents in the government's possession, including notations about instructions from the attorneys regarding a particular document or class of documents. Beginning in August 2014, Paralegal #1 spreadsheet contained an entry that Goodwin wanted "to produce everything we have in this case." This entry was included in all of the later versions of the spreadsheet that OPR reviewed. This entry is arguably inconsistent with Ruby's assertion that after the government's initial disclosures in December 2014, Goodwin decided to disclose to the defense only material that the government was required to disclose. Ruby told OPR that he believed that this entry in Paralegal #1 spreadsheet referred to a decision that he and Goodwin had made to disclose essentially all material in the government's possession at the time of the initial December 2014 disclosure, and that it did not apply to later disclosure decisions, including decisions about the disclosure of MOIs reflecting post-indictment interviews.[92]

---

[89]     May 24, 2017 Goodwin written response. OPR had sent Goodwin a request for written response on May 23, 2017. Goodwin responded to OPR's questions in five paragraphs, and did not respond to most of OPR's questions. In contrast, Ruby's June 4, 2016 written response, and Ruby's September 30, 2016 letter to OPR, totaled 25 pages, and Ruby attached hundreds of pages of exhibits to his correspondence.

[90]     Ruby Interview at 92.

[91]     *Id.* at 194.

[92]     *Id.* at 34-36.