In sum, Ruby and Goodwin provided OPR with inconsistent and conflicting information about who made the decision not to disclose post-indictment MOIs, but rather to disclose by letter only those statements they deemed discoverable contained in post-indictment MOIs.[93]

Ruby told OPR that all members of the prosecution team were aware and approved of the decision not to disclose post-indictment MOIs, and instead to make required disclosures by summary letter. In a January 19, 2017 e-mail to OPR, Ruby stated, "the decision to make disclosures from post-indictment interviews by means of letters rather than production of full interview memoranda was a decision made by the prosecution team, and ultimately the then-U.S. Attorney." In his interview, Ruby stated, "the team discussed, fairly extensively, over the course of the pretrial process, the issue of what was exculpatory from our post-indictment witness interviews and agreed that the disclosure letters that we sent included everything that was even arguably exculpatory. And the U.S. Attorney personally signed off on the completeness of those letters."[94]

OPR found no evidence to support Ruby's contention that the prosecution team members were aware of (other than Paralegal #1) or approved the decision not to disclose post-indictment MOIs. AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that prior to the start of OPR's investigation, they believed that the prosecution had disclosed to the defense all MOIs, whether reflecting pre- or post-indictment interviews.[95] All said they were unaware that the government had intentionally not disclosed MOIs reflecting post-indictment interviews.[96] DOL SA #1 and FBI SA #1 said they were surprised to learn that some MOIs were not disclosed.[97] AUSA #1 said

---

[93] On April 19, 2018, Goodwin sent OPR a four-page letter with comments concerning OPR's draft report. As to the disclosure of post-indictment MOIs, Goodwin states, "I apparently do not recall matters in the exact way [Ruby] does," apparently referring to Ruby's contention that Goodwin made the decision not to disclose post-indictment MOIs, and instead to disclose discoverable information in those MOIs by letter. April 19, 2018 letter at 3. In his comments on OPR's draft report, Goodwin defends the decision not to disclose post-indictment MOIs in their entirety by asserting that post-indictment MOIs were prepared during trial preparation, and their disclosure would have revealed the prosecution's trial strategy. OPR disagrees with Goodwin's assertion as it related to most, if not all, of the undisclosed post-indictment MOIs. For example, some of the undisclosed post-indictment MOIs relate to the prosecution team's discovery in May 2015 that prior to the UBB explosion, Witness #13 , had written a memorandum that was at least in part critical of Massey's safety practices. The MOIs generated as a result of that discovery reflected the prosecution team's initial gathering of evidence related to the Witness #1 memorandum, and did not relate to its trial preparation strategy.

[94] *Id.* at 20.

[95] AUSA #1 Interview at 13; AUSA #2 Interview at 11-12; DOL SA #1 Interview at 10; FBI SA #1 Interview at 15. DOL Attorney told OPR that DOL was not involved in discovery decisions, and so did not know what decisions the prosecution had made regarding the disclosure of MOIs. DOL Attorney Interview.

[96] FBI SA #1 told OPR that he recalled only one instance when FBI knew that an MOI would not be disclosed. FBI SA #1 said that FBI S had been present for an interview that occurred during the *Blankenship* trial. FBI SA #1 recalled that Ruby told FBI SA # that the MOI FBI SA #1 intended to draft would not be disclosed because the interview was solely for the purposes of trial preparation. FBI SA #1 said FBI S did not recall any other situation where FBI S knew that an MOI FBI S prepared would not be or was not disclosed. FBI SA #1 Interview at 13.

[97] DOL SA #1 Interview at 10-11; FBI SA #1 Interview at 15.

[redacted] was "kind of shocked" to learn that all MOIs were not disclosed.[98] [redacted] said [redacted] simply assumed that all MOIs were being disclosed, and that [redacted] had "no reason to doubt" that all MOIs were disclosed.[99]

The evidence shows that [redacted] knew that Ruby had decided not to disclose some MOIs. [redacted] maintained a spreadsheet in which [redacted] made notations about some of the documents in the government's possession. Among the entries on the spreadsheet are several that indicate that on January 29, 2015, Ruby had directed [redacted] not to produce five MOIs to the defense. In addition, at various times in 2015, [redacted] sent Ruby several e-mails about MOIs that the USAO had received that indicate that [redacted] understood or was aware that Ruby did not want those MOIs produced.[100] No one else was copied on those e-mails, and OPR found no evidence that [redacted] told anyone else about Ruby's instruction not to disclose certain MOIs.

### D. Disclosure of Pre-Indictment MOIs

#### 1. The Government Disclosed 372 Pre-Indictment MOIs

On April 21, 2015, Ruby sent Zuckerman a list of 372 MOIs that the government had previously disclosed (most on December 4, 2014). The list was organized by Bates-stamp numbers, and did not contain the names of the persons interviewed. The listed MOIs were marked with Bates-stamp numbers from MOI-000001-001361.[101] In his transmittal e-mail, Ruby told Zuckerman that "these memoranda are not Jencks material; the United States has provided them as a courtesy to the defense." All of the 372 MOIs contained information about interviews that had been conducted prior to the November 2014 indictment.

#### 2. The Government Did Not Disclose 11 Pre-Indictment MOIs

Ruby told OPR that he and Goodwin intended to disclose to the defense all MOIs that memorialized interviews conducted before the November 13, 2014 indictment. During the course of its investigation, however, OPR learned that the government had not disclosed to the defense 11 MOIs resulting from pre-indictment interviews. Attached at Tab H to this Report is a chart containing information about the 11 pre-indictment MOIs that were not disclosed to the defense, including the witness' name, date of interview, Bates-stamp labels, the date the USAO received the MOI from [redacted] or [redacted], and whether the witness testified at trial.

As shown in the chart attached at Tab H, the USAO first received these 11 MOIs after the initial indictment was filed in November 2014, and after the government's initial disclosures were made on December 4, 2014, and in some cases many months later. [redacted] drafted ten of the

---

98 [redacted] Interview at 19.

99 [redacted] Interview at 12.

100 *See e.g.*, April 21 and June 23, 2015 [redacted] e-mails to Ruby.

101 There are two small gaps in the Bates-stamp labels: 001284 and 001346-1348 are missing. The reason why 001284 is missing is not relevant to OPR's investigation. The MOI with Bates-stamp numbers 1346-1348 is missing because it reflected a post-indictment interview and was therefore not disclosed. Ruby did not inform Zuckerman about the reasons for those gaps.

11 MOIs; [redacted] drafted one of the MOIs. [redacted] e-mailed several of the 11 MOIs directly to Ruby, and the remainder to [redacted] or [redacted] who forwarded them to Ruby. Most of the 11 MOIs were attached to transmittal e-mails, and each e-mail contained an icon for the attached MOI that showed the MOI's pre-indictment date. Thus, if Ruby had read the transmittal e-mails carefully, he either knew or should have known that the 11 MOIs reflected pre-indictment interviews.

The e-mails that transmitted those 11 MOIs to Ruby made clear that the attached MOIs had not previously been disclosed. For example, [redacted] sent Ruby an e-mail on January 23, 2015, attaching the September 18, 2014 [redacted] MOI (*see* Tab H). In [redacted] e-mail, [redacted] asked Ruby if he wanted to add the [redacted] MOI to the next discovery production. OPR did not find a response to this e-mail. As another example, on February 13, 2015, [redacted] sent Ruby an e-mail attaching several MOIs, including the [redacted], [redacted], [redacted], and [redacted] MOIs (*see* Tab H). In [redacted] e-mail, [redacted] informed Ruby that [redacted] had received the MOIs "this week." As noted immediately above, the dates on the icons attached to these e-mails showed clearly that the attached MOIs were pre-indictment MOIs. Thus, if Ruby had carefully read these e-mails, he knew or should have known that some of the attached MOIs were pre-indictment MOIs that had not been disclosed.

OPR asked Ruby why he did not provide the defense with the 11 pre-indictment MOIs, in light of Ruby's stated intent to disclose all such MOIs. Ruby told OPR that he did not intentionally withhold the 11 MOIs from the defense. Rather, Ruby said that the failure to disclose those 11 MOIs was a mistake. Ruby said that he assumed that any MOIs the USAO received after November 2014 related to post-indictment interviews and therefore were not going to be disclosed. Ruby said that he must have been so busy with other matters that he never looked at the dates of the 11 MOIs when he received the e-mails transmitting them. Ruby said that because he received all of the 11 MOIs after the initial indictment was returned, sometimes months after the MOI was drafted, he must have assumed that the MOIs memorialized post-indictment interviews.[102]

Specifically, Ruby stated, "And all I can say is that, I mean, to be bluntly honest, I didn't keep track of them. I just didn't -- I did not -- I lost visibility of the fact that there were, if I knew it at the time, that there were memos from '14 that hadn't been put in the file yet or completed yet at the time of the indictment. And, you know, those just didn't get produced."[103]

Ruby denied that he intentionally failed to disclose the 11 pre-indictment MOIs in order to withhold exculpatory evidence from the defense: "[N]obody in this office or on the trial team intentionally withheld anything that they believed should have been produced to the defense in the *Blankenship* case."[104]

---

102 Ruby said that, "my belief at the time was that that the . . . MOIs that were coming in post-indictment were from post-indictment interviews." Ruby Interview at 97-98.

103 *Id.* at 97.

104 *Id.* at 4-5.

### 3. The Government Made One Letter Disclosure of Information In a Pre-Indictment MOI

On September 21, 2015, shortly before trial, Ruby sent Zuckerman a letter in which he disclosed potential exculpatory statements obtained during interviews of three witnesses: [redacted], and [redacted].[105] The [redacted] interview was conducted, and an MOI was drafted, prior to the November 2014 indictment. Ruby did not receive the MOI until February 2015. Ruby provided the defense with some of the discoverable statements from the [redacted] interview in the letter, but did not provide the defense with the [redacted] MOI. OPR asked Ruby why he did not disclose the entire [redacted] MOI, as that would have been consistent with what Ruby said was the government's decision to disclose all pre-indictment MOIs. Ruby told OPR that,

> I've given some thought to how that happened. It hadn't been produced. I don't remember paying attention to the date of interview on [redacted]. And all I can -- the only explanation I can come up with for why it didn't register is number one, we were in the week before trial and all of that going on and number two, you do, over the course of an investigation a thousand interviews, and you are not necessarily going to have an accurate mental chart of when they all happened. It just didn't -- I did not -- I have no recollection of noticing at the time I included the language about the [redacted] interview when the interview had taken place.[106]

As discussed below, OPR found that Ruby's letter disclosure did not fully disclose all of [redacted] discoverable statements. *See* Sections III(D)(4) and III(E)(4).

### 4. The 11 Undisclosed Pre-Indictment MOIs Contained Discoverable Statements

OPR found that all of the 11 pre-indictment MOIs that were not disclosed to the defense contained statements inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment (*see* Section I(D)(2) above), or that were otherwise helpful to the defense. Those MOIs, or discoverable statements in those MOIs, therefore should have been disclosed prior to trial. OPR concluded that the 11 undisclosed pre-indictment MOIs listed in the chart attached at Tab H included the following discoverable statements:[107]

---

105 [redacted]

106 Ruby Interview at 99-100.

107 OPR is not suggesting that its understanding of the *Blankenship* case is sufficient so as to allow it to act as the final arbiter concerning the relevance or discoverability of each statement contained in the undisclosed MOIs. Rather, it has set forth in this Report what it believes are the clearest examples of discoverable statements contained in the MOIs.

a. Two Witness #14 [redacted] MOIs. Witness #14 [redacted].

- *Witness #14 [redacted] asked Witness #4 [redacted] if a certain action Witness #4 [redacted] wanted to take was legal, but Witness #4 [redacted] ignored the question and said do it.*[108]

- *No MSHA inspector had ever said for Witness #14 [redacted] not to call ahead; this was not an enforced rule.*

- *Witness #14 [redacted] was never told not to put something in the log book.*

- *UBB had good ventilation when a certain fan was operating.*

b. Witness #8 [redacted] MOI. Witness #8 [redacted].

- *Witness #8 [redacted] suspected that compensation was tied to safety.*

- *There were a lot of safety violations enforced now that were not before.*

- *If Blankenship had not been involved, the list of safety-related initiatives would be half of what it was.*

- *Witness #8 [redacted] always tried to follow the law.*

- *Committing violations was not intentional.*

- *It was not manpower shortages, but the level of experience that contributed to violations.*

- *Massey put pressure on people and held them accountable.*

- *Witness #8 [redacted] never told anyone to break the law.*

- *The intent was zero violations.*

- *Massey section staffing was the industry standard.*

- *Safety was implied and always there (Witness #8 [redacted] gave the example of telling someone you love them, if you don't tell them every time you see them, it does not mean you don't love them, and this was the same for Blankenship and safety).*[109]

---

[108] This statement was potential impeachment material as to Witness #4 [redacted], one of the government's most important witnesses, which would be required to be disclosed by *Giglio v. United States*, 405 U.S. 150, 154 (1972).

[109] Ruby summarized this statement in the Witness #8 [redacted] MOI in his letter disclosure as discussed in Section III(E)(4), below.

- *If something was wrong, you were expected to stop and fix it.*
- *It is not economically possible to have zero violations, you would have to shut down every mine.*
- *There were no discussions that violations were ok. There were discussions about trying to get better.*
- *You were always trying to achieve zero violations.*
- *If Massey was tolerant of violations, then everyone in the industry is as well.*
- *Upper management wanted* Witness #8 *to read every violation.*
- *Everyone was trying to do a good job, but could have done better.*
- *It was a useless exercise to get MSHA approval because MSHA put up hurdles, and the process was dysfunctional.*
- *Every mine has safety violations.*
- Witness #8 *was reprimanded for running a mine with no air.*
- Witness #8 *feared discipline as a result of compliance issues.*
- *Massey did a good job reporting violations.*

c. Witness #4 MOI. Witness #4

- *There was enough air in the mine to meet the minimum requirements.*
- *The violation reduction program started in 2009.*
- *Blankenship sometimes attended budget meetings.*
- *Violations were a cost of doing business.*
- *MSHA is always going to write violations.*
- *Blankenship felt MSHA made things up.*
- *If* Witness #4 *told someone to break the law it went from civil to criminal.*
- *There will always be MSHA violations to cite.*

d. Witness #6 [redacted] MOI. Witness #6 [redacted]

- *When Blankenship wrote on a report card (a document containing information about mine conditions), it meant he was not happy with failed rates and violations, that a corrective action plan was needed, and that he wanted to set up a meeting.*

- *Violation reduction targets were the first step to getting something in place to start reducing violations and to show improvement.*

- *Prior to 2009, Massey did not have a target number for violations until* Witness #6 [redacted] *implemented the Hazard Elimination Program; the target was derived from numbers from the previous quarter.*

- *The target would have been a 50% reduction in violations based on the average of the last two quarters.*

- *Blankenship was familiar with the Hazard Elimination Program.*

e. Witness #12 [redacted] MOI. Witness #12 [redacted]

- *The Hazard Elimination Program called for a 50% reduction in violations.*

- *People left the meeting where the plan was discussed wanting to reduce violations.*

- *MSHA and Massey disagreed about what constituted a violation, because it is a subjective decision.*

f. Two Witness #15 [redacted] MOIs. Witness #15 [redacted]

- *Blankenship received daily violation reports.*

- Witness #15 [redacted] *was brought in to obtain more useful safety information related to violations.*

- Witness #10 [redacted] *said that they needed to be better at tracking trends and that safety was lacking.*

- Witness #10 [redacted] *wanted to see the full violations.*

- Witness #15 [redacted] *believed accidents were discussed in the context of best practices and how to prevent future accidents.*

g. Witness #1 [redacted] MOI. Witness #1 [redacted]

- *In 2009, no one wanted to buy coal.*

- *There was pressure to run coal, but not enough to overlook safety.*

- *UBB was run well, and* Witness #1 *had not heard anything negative about the mine.*

h. Witness #16 MOI. Witness #16

- *Massey's primary focus was safety.*
- *Blankenship pushed safety more than any CEO in the industry.*
- *People have been fired because of safety violations.*
- Witness #16 *had a positive opinion of safety at all Massey mines.*

i. Witness #17 MOI. Witness #17

- *The sense was that MSHA wrote violations at Massey that it did not write at other mines.*
- Witness #17 *believed that the violations per inspection rate was not as bad as at other mines.*
- *There was a sense that MSHA was picking on Massey, and that some violations were legitimate and some were not.*
- *No one thought that you could go through an inspection and not receive any violations.*
- *There was a big push to conduct accurate respirable dust sampling.*
- Witness #17 *did not believe that Massey had an attitude that it was acceptable to receive violations and then just keep on going.*

## E. Non-Disclosure of Post-Indictment MOIs

### 1. The Government Did Not Disclose 50 Post-Indictment MOIs

The prosecution team continued to interview witnesses after the November 2014 indictment, and those interviews were memorialized in MOIs. As discussed above, Ruby (and Goodwin, according to Ruby) decided not to disclose post-indictment MOIs to the defense, and instead decided to provide by summary letter any discoverable statements contained in the MOIs. OPR found that the government possessed, but did not disclose prior to or during trial, 50 post-indictment MOIs. Attached at Tab I to this Report is a chart containing information about the 50 post-indictment MOIs that were not disclosed to the defense, including the witness' name, date of interview, Bates-stamp numbers, and whether the witness testified at trial.

### 2. The Government Disclosed One Post-Indictment MOI

Notwithstanding the decision to not disclose post-indictment MOIs, the government did in fact disclose one post-indictment MOI. On August 27, 2015, Ruby sent Zuckerman an MOI

memorializing the interview of Witness #2, who had been interviewed on July 21, 2015.[110] Witness #2

OPR asked Ruby why, if he and Goodwin decided not to disclose post-indictment MOIs, he nevertheless provided the Witness #2 MOI to Zuckerman. Ruby said that there was no formal process by which he decided which post-indictment MOIs should be disclosed, and that he relied on his recollection of the substance of the post-indictment interviews.[111] Ruby said that Witness #2 "was somebody who was without question going to give exculpatory testimony, if Witness were called . . . there was a lot of exculpatory material in there in Witness # interview."[112]

OPR found no evidence in the trial team's e-mail accounts or elsewhere that Ruby discussed with anyone his decision to disclose the Witness #2 MOI to the defense. DOL SA #1 said that DOL S did not recall that Witness #2 provided more exculpatory evidence than did other witnesses.[113] FBI SA #1 said that FBI SA did not know why the Witness #2 MOI was disclosed, and did not recall that Witness #2 provided information that was particularly harmful to the government's case.[114] AUSA #1 said AUSA had no recollection of discussing the Witness #2 MOI with Ruby.[115]

Ruby sent Zuckerman the Witness #2 MOI on August 27, 2015. The next day, Zuckerman sent an e-mail to Ruby, Goodwin, and AUSA #1, in which Zuckerman asked whether there were "additional interviews . . . that contain exculpatory information [] that you have not turned over [such as] Witness #3, Witness #1 [and] Witness #7." OPR found no evidence that the government responded to Zuckerman's question. In fact, the government possessed MOIs for Witness #3 Witness #1 and Witness #7 that had not been disclosed (the Witness #1 MOI was one of the 11 pre-indictment MOIs that were not disclosed, and the Witness #3 and Witness #7 MOIs were post-indictment MOIs).[116] About two weeks later, Ruby sent himself a list of things to do on the *Blankenship* case, including deciding whether to "Produce Witness #7 Witness #3 Witness #8 [MOIs]"[117] Although this item on Ruby's to-do list makes it appear that Ruby was considering how to respond

---

110 The Witness #2 MOI was marked with the Bates-stamp labels Witness #2.

111 Ruby Interview at 129. Ruby said that, "in retrospect and with infinite time and resources, would we have done that [process] differently? Probably." *Id.* at 130.

112 *Id.*

113 DOL SA #1 Interview at 24.

114 FBI SA #1 Interview at 37.

115 AUSA #1 Interview at 26.

116 Witness #3. Witness #1

117 September 10, 2015 Ruby e-mail to himself.

to Zuckerman's question about the existence of additional MOIs, Ruby said that he could not be sure whether he was thinking about Zuckerman's question when he wrote that to-do list item.[118]

### 3. The Witness #2 MOI Contained Discoverable Statements

OPR identified the following discoverable statements in the Witness #2 MOI:

- *People said MSHA picked on Massey and was harder on Massey than other companies.*
- *Massey started a Hazard Elimination Committee to reduce hazards, and Blankenship asked* Witness #2 *to sit in on meetings and to give advice.*
- *Blankenship wanted two safety personnel working in UBB every day.*
- *After two safety engineers were added at UBB, there was a drop in violations.*
- Witness #2 *believed the rock dusting was always good.*
- *Blankenship thought Massey was pretty good compared to other operators.*
- *MSHA decisions about mine operations caused a decrease in ventilation airflow.*
- Witness #2 *described a list of Massey safety innovations.*
- *Many MSHA violations reflect opinions.*
- *MSHA inspectors have quotas (one violation per inspection day).*
- *The largest number of violations at any mine is for coal accumulation, and you can always find coal accumulation.*

### 4. Ruby Made One Letter Disclosure of Discoverable Statements Contained in Three MOIs

As noted above, Ruby told OPR that he intended to review all post-indictment MOIs to determine if the witnesses provided potentially exculpatory statements, and if so, to disclose those statements by letter, rather than by disclosing the entire MOI. This decision was unusual for the USAO. The USAO discovery policy in effect in 2015 stated that, "Generally, we disclose reports of interview to defense counsel, in the exercise of an expansive discovery practice."[119] AUSA #1

---

118 Ruby Interview at 156-57.

119 October 20, 2010 USAO Discovery Policy at 6.

told OPR that the standard USAO practice was to disclose MOIs, and not to make disclosures by letter.[120]

In fact, Ruby sent one letter to Zuckerman in which he made disclosures of information obtained during witness interviews.[121] On September 21, 2015, shortly before trial, Ruby sent Zuckerman a letter disclosing information provided by Witness #13, Witness #7, and Witness #8 was interviewed, and Witness MOI was written, before the indictment. Witness #13 was interviewed six times, both before and after the indictment. The information about Witness #13 contained in the September 21 letter was obtained during post-indictment interviews. Witness #7 interview occurred post-indictment.

Ruby told OPR that when deciding which statements to disclose from post-indictment MOIs, including the Witness #7 and Witness #13 MOIs, he relied on his memory for what had been said during interviews: "[T]here wasn't a formal process in place for reviewing [] post-indictment MOIs to see if, should they be produced, should they not be produced. We really relied on our recollections of the interviews. And in retrospect and with infinite time and resources, would we have done that differently? Probably."[122] Ruby acknowledged that his process for selecting statements to disclose was "imperfect" and "not ideal,"[123] and that "in retrospect with more time and more resources and the benefit of hindsight, I would certainly say that a different approach would have been better."[124] Ruby said that while he did not recall whether he looked at the Witness #8 MOI before deciding what to disclose, he "probably" reviewed it.[125]

Ruby said that Goodwin was aware that Ruby was making disclosure decisions about statements contained in post-indictment MOIs based on Ruby's memory, and not based on a review of the MOIs themselves:

> The [] post-indictment [MOIs] were not being reviewed. I don't know that we had a specific conversation about it, but based on the conversations that we did have -- it was clear when we discussed the subject of what to put in these [disclosure] letters, that we were having that discussion based on our recollections of witness interviews. I mean, there would have been -- there would have been no reason for him to believe that there was a systematic process in place to -- the evidence, I

120 AUSA #1 Interview at 10, 12.

121 On June 22, 2015, Ruby sent Zuckerman a letter in which he identified discoverable material. The letter contained one paragraph in which Ruby provided discoverable statements the government obtained during two separate proffers from attorneys representing two Massey employees. No MOIs were generated from those proffer sessions. Ruby's disclosure of discoverable statements from one of those proffer sessions is discussed in Section II(F)(1) above.

122 Ruby Interview at 129-30.

123 *Id.* at 131-33.

124 *Id.* at 132-33.

125 *Id.* at 132.

guess, based on -- the evidence that he would have had, based on our discussions, was that we were working from recollection and that neither he nor I nor anybody else undertook to put in place a process where we systematically reviewed each MOI for discoverable information.[126]

Ruby's September 21, 2015, letter disclosed very little information. The letter informed the defense that: (1) Witness #7 said Witness # was not sure that Blankenship received the memorandum about mine safety that Witness #13 had sent Witness # in February 2010;[127] (2) Witness #13 said that Witnes did not agree with a particular MSHA mine ventilation policy; and (3) Witness #8 said that Blankenship was interested in safety even though he did not expressly say so,[128] and that Blankenship was involved with a number of changes to equipment that Witness #8 believed improved safety.

Ruby told OPR that all of the members of the prosecution team reviewed the September 21, 2015 letter before it was sent: "[T]he team discussed, fairly extensively, over the course of the pretrial process, the issue of what was exculpatory from our post-indictment witness interviews and agreed that the disclosure letters that we sent included everything that was even arguably exculpatory. And the U.S. Attorney personally signed off on the completeness of those letters."[129] Ruby said that AUSA #1 reviewed the disclosure letter and agreed that everything exculpatory had been disclosed.[130]

OPR reviewed the e-mail accounts of all of the attorneys on the prosecution team. OPR found no evidence that Ruby sent a draft of the September 21, 2015 letter to anyone for his or her review. OPR found no evidence that any of the attorneys commented on the September 21, 2015 letter before or after it was sent. Ruby said it was not surprising that there were no such e-mails, as he would have simply walked to AUSA #1 or Goodwin's office to show them a hard copy of the draft letter to obtain their views, and would not have sent a draft by e-mail.[131]

AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 all denied that they had ever reviewed or approved of a draft of the September 21, 2015 letter, or had seen the final letter at the time it was sent.[132] AUSA #1

---

126 *Id.* at 189-90.

127 Witness #13. The Witness #1 memorandum contained Witness #13 findings of Witness review of Massey safety issues.

128 The letter paraphrased the MOI, which stated that Witness #8 likened Blankenship's interest in safety to a romantic relationship where one person knows the other loves him or her even if not expressly stated.

129 Ruby Interview at 20. Although Ruby referred to "disclosure letters," OPR is only aware of one letter in which disclosures were made about information contained in MOIs. As noted above in Section II(F)(1), Ruby sent a letter in June 2015 in which he made disclosures about information obtained in two attorney proffer sessions. According to Ruby, Goodwin "signed off" on the disclosure letters by reviewing and approving them before they were sent.

130 *Id.* at 16.

131 *Id.* at 87.

132 AUSA #1 Interview at 21-22; AUSA #2 Interview at 22-23; DOL SA #1 Interview at 35; FBI SA #1 Interview at 50.

said he was certain he had never seen the letter before it was sent, for when he first saw the letter in 2017, he did not know who Witness #8 was, and would have reviewed the Witness #8 MOI before signing off on the letter.[133] AUSA #1 said that AUSA did not believe that the September 21, 2015 letter contained all of the discoverable statements in the Witness #8 MOI that Ruby summarized.[134]

OPR asked Ruby for his response to AUSA #1 assertion that AUSA #1 never reviewed the September 21, 2015 letter. Ruby said that he recalled asking Goodwin and AUSA #1 for their input on the letter, and said that "I am very confident" that AUSA #1 reviewed the letter. However, Ruby also said that he did not think that AUSA #1 was being untruthful.[135] Ruby said he had a specific recollection of talking to Goodwin about whether the September 21 letter accurately described what Witness #8 had said in Witness interview, and that Goodwin said that he was fine with the language in the draft letter.[136]

### 5. Ruby's September 21, 2015 Letter Did Not Disclose All Discoverable Statements Contained in the Three MOIs

OPR compared the discoverable statements in the Witness #8 Witness #13 and Witness #7 MOIs to the information contained in Ruby's September 21, 2015 disclosure letter. OPR concluded that Ruby did not disclose all discoverable statements contained in those MOIs.[137]

### 6. Some of the 50 Undisclosed Post-Indictment MOIs Contained Discoverable Statements

In addition to the Witness #13 and Witness #7 post-indictment MOIs, which were partially summarized in a letter disclosure, there were 48 other post-indictment MOIs that were neither disclosed nor summarized. Some of those 48 post-indictment MOIs contained statements that were inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment, or were otherwise helpful to the defense. Those MOIs, or the discoverable statements contained in them, should have been disclosed prior to trial. OPR concluded that, at a minimum, the undisclosed post-indictment MOIs contained the following discoverable statements:

---

133 AUSA #1 Interview at 21-22. AUSA #1 told OPR that AUSA disagreed with Ruby's contention that the team had agreed to make a disclosure by letter of information in post-indictment MOIs. *Id.* at 25.

134 *Id.* at 23.

135 Ruby Interview at 87, 91-92.

136 *Id.* at 89.

137 *Compare* Section III(D)(4) above (summarizing the discoverable statements in the Witness #8 MOI) and Section III(E)(6) below (summarizing the discoverable statements in the Witness #13 and Witness #7 MOIs), with the few statements Ruby included in the September 21, 2015 disclosure letter.

a. Four Chris Witness #4 MOIs.[138]

- *Witness #4 never gave an order causing a law to be broken.*
- *Witness #4 was surprised that dust fraud was occurring, as the company did not want cheating on dust sampling.*
- *No amount of money or resources can cure all violations at a mine.*
- *MSHA decisions endangered the health and safety of miners.*
- *Several UBB managers did all they could to focus on safety.*

b. Five Witness #13 MOIs.[139]

- *Blankenship told Witness #13 that Massey needed to reduce violations, and that Massey was going to look at and get a handle on violations.*
- *Blankenship told Witness #13 that he did not know why miners thought he wanted things done a certain way.*
- *Witness #10 said everyone should comply with all regulations and that they should not worry anymore.*
- *Witness #10 told Witness #13 to tell Witness #7 and Witness #2 about Witness findings concerning safety, and Witness #7 took all of Witness #13 notes.*
- *Witness #10 told Witness #13 that Blankenship wanted to meet with Witness #13*
- *Blankenship asked Witness #13 what he should do about Witness #13' findings.*
- *Blankenship never challenged Witness #13 over the issues Witness raised.*
- *Witness #10 told Witness #13 Witnes wanted Witness # to teach workers how to ventilate.*
- *Witness #10 told Witness #13 to tell Blankenship Witness views.*
- *Blankenship talked about a commitment to safety.*
- *Blankenship wanted Witness #13 to tell him about the issues.*
- *Witness #13 was hired to teach foremen about ventilation, respirable dust, and safety issues.*

---

138 The government disclosed to the defense one Witness #4 pre-indictment MOI, and mistakenly failed to disclose a second Witness #4 pre-indictment MOI.

139 The government disclosed to the defense one Witness #1 pre-indictment MOI.

- *You would be hard pressed to go to a mine and not find some violations.*
- *UBB was going to fail because of MSHA ventilation system requirements.*
- *An MSHA official said belt air should not be used to ventilate mines;* Witness #13 *told him to reconsider for certain mines.*
- *The UBB mine was set up to fail based on the ventilation system MSHA forced the UBB mine to use.*

c. Witness #3 MOI.

- *Blankenship said not to make production figures too aggressive.*
- Witness #10 *said* Witness *wanted to focus on more serious violations and eliminate them.*
- *Blankenship told* Witness #3 *to reprogram the system to determine who was responsible for violations and for not eliminating violations.*
- *Blankenship wanted to know the identity of repeat offenders.*

d. Witness #7 MOI.

- *Blankenship wanted a report from* Witness #7 *meeting with* Witness #13
- *The legal warnings that* Witness #7 *placed on the* Witness #13 *memorandum were more expansive than usual, but* Witness # *could have cut and pasted them, and does not recall adding the warnings to prevent* Witness #13 *from sharing the report with* Witness #18 .[140]
- *Blankenship and* Witness #10 *thought* Witness #13 *was legitimate and were looking for solutions from* Witness #13
- Witness #7 *thought Blankenship would want to see the* Witness #13 *memorandum.*
- *The Hazard Elimination Committee began work at about the same time that* Witness #13 *started raising safety issues.*
- *The Hazard Elimination Committee discussed the issues* Witness #13 *raised.*

---

140 Zuckerman told OPR that the portions of the Witness #7 MOI that concerned the legal warnings that Witness #7 placed on the Witness #1 memorandum (regarding the issue of safety in Massey mines) were exculpatory because they were inconsistent with the government's contention during trial that those warnings were intended to keep Witness #13 memorandum secret. May 16, 2017 Zuckerman letter to OPR, Exhibit 2 at 6-8.

e. Witness #5 MOI. Witness #5

- *When* Witness #5 *told Blankenship that production was going to drop, because* Witness #5 *wanted to get it right.*

f. Two Witness #19 MOIs. Witness #19 had been a mine superintendent at UBB.

- Witness #19 *said that* Witness #4 *was willing to accept a certain amount of violations to get a certain mine operation set up, and that* Witness #4 *made a conscious decision to violate the law.*[141]

- *The track at the UBB mine usually looked pretty decent.*

- *UBB was one of the better mines.*

g. Witness #20 MOI. Witness #20

- Witness #20 *called* Witness #4 *the most arrogant a**h*** someone would have to deal with in their life.*[142]

- Witness #20 *believed that the MSHA report on the explosion was ridiculous.*

h. Witness #11 MOI. Witness #11.

- *UBB appeared to be a typical coal mine.*

- *The belt appeared to be rock dusted well.*

- *If the conditions* Witness *saw had been worse,* Witness *would have written citations to coincide with* Witness *notes.*

- Witness #11 *never had a Massey Energy employee complain about not being able to talk to MSHA inspectors.*

### F. The USAO and Prosecution Team Members Acknowledged that Some of the Undisclosed MOIs Contained Discoverable Statements

In early 2017, in part as a result of information provided by OPR, the USAO learned that the government had not disclosed 11 pre-indictment MOIs and 50 post-indictment MOIs prior to the *Blankenship* trial. By this time, both Ruby and Goodwin had left the USAO. After reviewing

---

141 This statement was potential *Giglio* material as to Witness #4 one of the government's most important witnesses.

142 This statement was potential *Giglio* material as to Witness #4 one of the government's most important witnesses.

the MOIs, the USAO decided to provide Zuckerman with the 61 MOIs, which it did in several productions.[143] AUSA #1 told OPR that the USAO concluded that some of the MOIs contained statements that should have been disclosed prior to trial.[144] AUSA #2 stated, "I think we should have turned over all of these [undisclosed MOIs]. And I think these statements are exculpatory, they should have been included in our production . . . we should have turned [them] over . . . under Department policy and under *Brady*."[145]

OPR asked the prosecution team members for their views – based on their extensive knowledge of the government's case and Blankenship's defense – as to whether some of the statements in the undisclosed MOIs would have been helpful to the defense had they been disclosed prior to trial.[146] Those statements (italicized for clarity) and the responses of the team members follow.

*Blankenship or Massey was willing to spend money to improve safety.* Ruby, AUSA #1 AUSA #2 and DOL SA #1 told OPR that statements of this sort would have been helpful for the defense.[147]

*Blankenship cared about safety.* AUSA #1 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[148]

*Blankenship wanted MSHA violations reduced.* Ruby, AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[149]

---

143 In its transmittal letters, the USAO stated that it was not taking a position as to whether the MOIs were required to have been disclosed prior to trial, or whether the defense suffered any prejudice as a result of the failure to have disclosed those MOIs.

144 AUSA #1 Interview at 14.

145 AUSA #2 Interview at 40-42.

146 Rather than question witnesses about their views regarding voluminous individual statements from undisclosed MOIs, OPR asked them about common themes that were found in many of the undisclosed MOIs. OPR asked witnesses about certain potentially exculpatory statements even if they were only contained in one or two MOIs.

147 Ruby Interview at 176; AUSA #1 Interview at 30-31; AUSA #2 Interview at 36; DOL SA #1 Interview at 30. Ruby said such statements "in isolation" would be helpful.

148 AUSA #1 Interview at 33; DOL SA #1 Interview at 30; FBI SA #1 Interview at 37.

149 Ruby Interview at 177; AUSA #1 Interview at 33; AUSA #2 Interview at 36; DOL SA #1 Interview at 30; FBI SA #1 Interview at 37. Ruby said such statements "in isolation" would be helpful. AUSA #1 said Blankenship wanted to reduce violations not to improve safety, but to reduce monetary fines.

*Blankenship wanted to receive information about Massey or UBB violations in order to reduce them.* Ruby, AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[150]

*Blankenship or other Massey leaders wanted workers to comply with safety regulations.* Ruby, AUSA #2 and DOL SA #1 told OPR that statements of this sort would have been helpful for the defense.[151]

*Blankenship or Massey wanted to start a program to reduce violations and to teach workers how to reduce violations.* Ruby, AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[152]

*Blankenship did not want production targets to be too aggressive.* AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[153] Ruby told OPR that this statement "maybe" was discoverable.[154]

*Blankenship wanted to receive information about who was committing violations.* Ruby, AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[155]

*MSHA decisions and policies made mine conditions less safe.* AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[156] Ruby told OPR that statements of this sort would not have been helpful for the defense.[157]

---

150 Ruby Interview at 178; AUSA #1 Interview at 33-34; AUSA #2 Interview at 36; DOL SA #1 Interview at 31; FBI SA #1 Interview at 37. Ruby said such statements "in isolation" would be helpful. AUSA #1 said Blankenship wanted to reduce violations not to improve safety, but to reduce monetary fines.

151 Ruby Interview at 178-79; AUSA #2 Interview at 36; DOL SA #1 Interview at 31. Ruby said such statements "in isolation" would be helpful.

152 Ruby Interview at 179; AUSA #1 Interview at 34; AUSA #2 Interview at 36; DOL SA #1 Interview at 31; FBI SA #1 Interview at 40. Ruby said such statements "in isolation" would be helpful. AUSA #1 said that while helpful, most Massey workers never heard of the program to reduce violations and were not invited to attend the initial meeting about the program.

153 AUSA #1 Interview at 34-35; AUSA #2 Interview at 37; DOL SA #1 Interview at 31; FBI SA #1 Interview at 40.

154 Ruby Interview at 134-35. Ruby said that this statement was not inconsistent with the government's theory of the case, as the government maintained that whatever the production quota was, Blankenship told workers to beat that figure. Ruby said the statement was therefore neither exculpatory nor material. *Id.* at 134-35. OPR notes that the indictment does not support Ruby's interpretation, as it asserted that production quotas left too little time for workers to implement required safety measures.

155 Ruby Interview at 179; AUSA #1 Interview at 35; AUSA #2 Interview at 37; DOL SA #1 Interview at 32; FBI SA #1 Interview at 40. Ruby said such statements "in isolation" would be helpful.

156 AUSA #1 Interview at 35; AUSA #2 Interview at 37; DOL SA #1 Interview at 32; FBI SA #1 Interview at 40.

157 Ruby Interview at 180.

*MSHA violations reflect opinions, not facts.* AUSA #1 and AUSA #2 told OPR that statements of this sort would have been helpful for the defense.[158] Ruby and FBI SA #1 told OPR that statements of this sort would not have been helpful for the defense.[159]

*MSHA was aware of dangers but did not act in response.* AUSA #1 AUSA #2 and DOL SA #1 told OPR that statements of this sort would have been helpful for the defense.[160] Ruby and FBI SA #1 told OPR statements of this sort would not have been helpful for the defense.[161]

*UBB operations met minimum regulatory requirements.* AUSA #2 told OPR that statements of this sort might be helpful to the defense.[162] AUSA #1 and FBI SA #1 told OPR that statements of this sort would not have been helpful for the defense.[163]

*UBB was a well-run mine.* Ruby, AUSA #1 AUSA #2 and FBI SA #1 told OPR that statements of this sort would have been helpful to the defense.[164]

*MSHA inspectors were sometimes complimentary of UBB conditions.* AUSA #1 AUSA #2 and DOL SA #1 told OPR that statements of this sort would have been helpful for the defense.[165] Ruby told OPR that statements of this sort were marginally helpful.[166] FBI SA #1 told OPR that statements of this sort would not have been helpful for the defense.[167]

*UBB had decreasing numbers of infractions.* AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[168] Ruby told OPR that statements of this sort might be helpful for the defense.[169]

---

158 AUSA #1 Interview at 35; AUSA #2 Interview at 37.

159 Ruby Interview at 181; FBI SA #1 Interview at 40.

160 AUSA #1 Interview at 35-36; AUSA #2 Interview at 37; DOL SA #1 Interview at 32.

161 Ruby Interview at 181; FBI SA #1 Interview at 40.

162 AUSA #2 Interview at 37.

163 AUSA #1 Interview at 36; FBI SA #1 Interview at 40.

164 Ruby Interview at 184; AUSA #1 Interview at 36; AUSA #2 Interview at 37; FBI SA #1 Interview at 40. Ruby said such statements would be helpful if they referred to safety, not profit.

165 AUSA #1 Interview at 36-37; AUSA #2 Interview at 38; DOL SA #1 Interview at 33.

166 Ruby Interview at 185-86. Ruby said such evidence was akin to saying that for 29 out of 30 days, a bank robber did not rob a bank.

167 FBI SA #1 Interview at 41. FBI SA #1 said that if MSHA inspectors found positive conditions, it could have been because the mine had advance notice of MSHA inspectors' visits.

168 AUSA #1 Interview at 38; AUSA #2 Interview at 38; DOL SA #1 Interview at 33; FBI SA #1 Interview at 41-42.

169 Ruby Interview at 186. Ruby said that the statement itself was not true.

*MSHA was biased against Massey as opposed to other companies.* Ruby, AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[170]

*There was no difference in conditions or violations between UBB and other mines.* AUSA #1 and AUSA #2 told OPR that statements of this sort would have been helpful for the defense.[171] FBI SA #1 told OPR that statements of this sort would not have been helpful for the defense.[172]

*It is impossible to have perfect mine conditions; there will always be citations that can be written.* AUSA #1 and AUSA #2 told OPR that statements of this sort would have been helpful for the defense.[173] DOL SA #1 and FBI SA #1 told OPR that statements of this sort would not have been helpful for the defense.[174]

*Violations of safety standards were not intentional.* Ruby, AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[175]

*Violations of safety standards were not a result of a worker shortage, but of worker inexperience.* AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 told OPR that statements of this sort would have been helpful for the defense.[176]

### G. Prosecution Team Members Asserted that the Defense Was Not Prejudiced by the Failure to Disclose 61 MOIs

As noted above, prosecution team members acknowledged that some of the undisclosed MOIs contained discoverable statements that should have been disclosed prior to trial. However, these same witnesses asserted that most, if not all, of those discoverable statements were available to the defense from other sources, including produced documents and disclosed MOIs. These witnesses asserted that during the defense's cross-examination of the government's witnesses,[177] it

---

170 Ruby Interview at 187; AUSA #1 Interview at 38; AUSA #2 Interview at 38; DOL SA #1 Interview at 33; FBI SA #1 Interview at 41-42. Ruby said that such statements "in isolation" were helpful. AUSA #1 said that if MSHA was biased, it was because of all the violations found at Massey mines.

171 AUSA #1 Interview at 39; AUSA #2 Interview at 39.

172 FBI SA #1 Interview at 42.

173 AUSA #1 Interview at 39; AUSA #2 Interview at 39.

174 DOL SA #1 Interview at 33-34; FBI SA #1 Interview at 42.

175 Ruby Interview at 188; AUSA #1 Interview at 39; AUSA #2 Interview at 39; DOL SA #1 Interview at 34; FBI SA #1 Interview at 41-42. Ruby said that such a statement "in isolation" would be helpful.

176 AUSA #1 Interview at 40; AUSA #2 Interview at 39; DOL SA #1 Interview at 34; FBI SA #1 Interview at 41-42. Ruby said that because Witness #8 made this statement, it was not relevant because Witness #8 did not work at UBB.

177 The defense called no witnesses.

was able to introduce documents and elicit testimony that covered essentially all of the discoverable statements that were contained in the undisclosed MOIs.

Ruby made this point as follows:

> [T]o the extent there was information that could be regarded as materially favorable [in the undisclosed MOIs], most or all of that information was available to the defense in some other form. In that regard, it is important to emphasize the larger context of the discovery, in which hundreds of other memos and interview transcripts--including memos and transcripts of interviews with many of these same witnesses--were disclosed, not to mention hundreds of thousands of documents, many of which disclosed the same information discussed in these memos. One of the benefits of making broad disclosures is that even if discoverable information from one source is inadvertently omitted from a production, the same information will be made available from another source. If there were inadvertent omissions here, you will find that this redundancy effect generally applied.[178]

Ruby added that the fact that the discoverable statements contained in the undisclosed MOIs was readily available to the defense by the time of trial from other sources is evidence that the failure to disclose the statements in those MOIs was not intentional, for it would make no sense to suppress information already in the defense's possession.[179]

At the conclusion of Ruby's OPR interview, he agreed to provide OPR with evidence to support his claim that the discoverable statements in the 61 undisclosed MOIs were available to the defense from other sources.[180] A few days after Ruby's interview, OPR sent him a list of over 100 arguably discoverable statements from some of the 61 MOIs, most of which are discussed in this report, and asked him whether the information in those statements was "known or available to the defense from other sources."[181] Ruby did not respond to OPR's question, and did not provide OPR with evidence that the defense had access to the information in those statements from other sources.

Ruby's assertion that there was significant overlap between statements contained in the undisclosed MOIs and other materials that were disclosed is partially correct. Some witnesses whose MOIs were not disclosed had been interviewed on other occasions, either by the prosecution team, before the grand jury, or by MSHA after the UBB explosion, and the MOIs, grand jury transcripts, or MSHA interview transcripts had been disclosed to the defense. However, the USAO told OPR that for six important witnesses whose statements were memorialized in undisclosed MOIs – Witness #3, Witness #15, Witness #7, Witness #8, Witness #16, and Witness #1 – the prosecution team had not disclosed any other MOI, grand jury transcript, MSHA

178 January 19, 2017 Ruby e-mail to OPR.

179 Ruby Interview at 178.

180 *Id.* at 197.

181 October 3, 2017 OPR e-mail to Ruby.

transcript, immunity agreements, or proffer agreements. Of course, the information in the undisclosed MOIs for those six witnesses may have been available from other sources, such as Massey or MSHA documents, or MOIs for other witnesses.

AUSA #1 told OPR that many of the discoverable statements in the undisclosed MOIs were brought up by the defense during trial.[182] AUSA #2 stated, "I don't think any of these [undisclosed MOIs] would have changed the direction of trial . . . Because most of it was introduced during their cross-examination of our witnesses . . . none of [them] would have changed the outcome of the trial had we disclosed [them]."[183] DOL SA #1 said that many of the statements in the undisclosed MOIs that would have been helpful to the defense were brought out during the defense's cross-examination of the government's witnesses.[184] FBI SA #1 told OPR that many of the statements in the undisclosed MOIs that may have been helpful to the defense were brought out by the defense during the trial.[185]

It is important to note that no one, including Ruby, told OPR that the reason why the 61 undisclosed MOIs were not disclosed was because the information in those MOIs was available to the defense from other sources, including the 372 disclosed MOIs or the four million pages of discovery produced to the defense. If that had been the reason why some or all of the 61 MOIs were not disclosed, OPR would have to undertake a different factual and legal analysis than that reflected in this report. But neither Ruby nor anyone else asserted that claim. The reason why the 11 pre-indictment MOIs were not disclosed was because, as Ruby admitted, he made a mistake, and not because he knew that the defense already possessed the statements in those 11 MOIs. And the reason why the 50 post-indictment MOIs were not disclosed was because, according to Ruby, he and Goodwin decided to make disclosures by letter, and not because they knew that the defense already possessed the statements in those 50 MOIs. The fact that the defense may have possessed some or all the discoverable statements contained in the undisclosed MOIs is therefore only relevant to the issue of whether the defense was prejudiced by the failure to disclose the 61 MOIs. It is not relevant to the issue of whether the government violated its discovery obligations when it failed to disclose them.

### H. Blankenship's Defense Team Declined to Explain How the Government's Failure to Disclose 61 MOIs Prejudiced the Defense

OPR asked Zuckerman whether and how Blankenship's defense had been prejudiced by the government's failure to disclose 61 pre- and post-indictment MOIs. Zuckerman declined to fully answer OPR's question, but stated:

> A number of the questions that you have posed ask us to address prejudice to the defense from the government's failure to disclose exculpatory information. While

182 AUSA #1 Interview at 30-39.

183 AUSA #2 Interview at 40-42.

184 DOL SA #1 Interview at 48-49.

185 FBI SA #1 Interview at 43.

Mr. Blankenship was prejudiced by the government's misconduct, we do not address that issue in our responses. Nor do we believe this is the appropriate forum to address prejudice, especially because we may yet raise such issues with the Court. Even if the government misconduct did not prejudice the defense, respectfully, that is not the question. The issue is whether the government prosecutors committed misconduct.[186]

## I. The Government Identified for the Defense Ten MOIs that Contained Discoverable Statements

### 1. The Court Orders the Government to Identify *Brady* Material

On June 12, 2015, in response to a defense motion, the court directed the government to designate and disclose to the defense all *Brady* material of which it was aware. A few days after the court's order, DOL SA #1 recalled that Ruby asked DOL SA #1 to review the MOIs DOL SA #1 had drafted to identify those that contained *Brady* material.[187] On June 19, 2015, DOL SA #1 sent Ruby an e-mail, attaching 12 MOIs, stating, "Per our discussion. I have reviewed and attached the following." Of the 12 MOIs attached to DOL SA #1 June 19 e-mail, ten were pre-indictment and two were post-indictment.[188] Of the ten pre-indictment MOIs DOL SA #1 selected, six had not been disclosed previously to the defense.[189]

On June 22, 2015, pursuant to the court's order, Ruby sent Zuckerman a letter identifying documents and MOIs that "the Defendant might claim are *Brady* material."[190] Ruby identified ten MOIs as possibly containing *Brady* material: Witness #22 (May 11, 2010); Witness #21 (April 28, 2010); Witness #12 (November 16, 2011); Witness #25 (February 5, 2012); Witness #6 (June 9, 2012); Witness #24 (November 10, 2011); Witness #26 (February 4, 2014); Witness #27

[186] May 16, 2017 Zuckerman letter to OPR at 1. Blankenship's attorneys did in fact eventually raise this issue with the court. On April 18, 2018, McGuireWoods filed a "Motion to Vacate and Set Aside Defendant's Conviction and Sentence Pursuant to 28 U.S.C. § 2255." The motion alleges that the government's failure to disclose 61 MOIs as well as certain MSHA documents prejudiced Blankenship's defense.

[187] DOL SA #1 Interview at 14-15. Ruby told OPR that he did not recall asking DOL SA #1 or FBI SA #1 to conduct a search of MOIs they drafted to look for *Brady* material. Ruby Interview at 57. FBI SA #1 said that FBI SA did not recall Ruby asking FBI SA # to conduct a search of the MOIs FBI S drafted to look for *Brady* material. FBI SA #1 Interview at 27, 30. OPR found no evidence that FBI SA #1 conducted such a search.

[188] Pre-indictment MOIs: Witness #17 (March 11, 2014); Witness #21 (April 28, 2010); Witness #22 (May 11, 2010); Witness #12 (June 4, 2014); Witness #6 (August 14, 2014); Witness #23 (August 27, 2014); Witness #24 (November 10, 2011); Witness #1 (November 10, 2011); Witness #16 (November 10, 2011); Witness #8 (February 5, 2014). Post-indictment MOIs: Witness #14 (January 16, 2015); Witness #5 (January 21, 2015).

[189] The six MOIs pertained to Witness #17; Witness #12; Witness #6; Witness #1 Witness #16 and Witness #8

[190] June 22, 2015 Ruby letter to Zuckerman at 1. In the letter, Ruby stated that, "the United States does not know of any evidence that truly tends to exculpate [the] Defendant."

Witness #27 (August 27, 2014); Witness #19 (November 15, 2010); Witness #23 (August 27, 2014). All ten MOIs were pre-indictment and had previously been disclosed to the defense.

Ruby said he did not recall how he chose the ten MOIs he identified as containing potential *Brady* material.[191] There are, however, significant overlaps, as well as significant differences, between the list of 12 MOIs DOL SA #1 selected, and the list of ten MOIs Ruby ultimately selected. DOL SA #1 selected two post-indictment MOIs. Ruby did not select either one. DOL SA #1 and Ruby selected the same MOIs for Witness #22, Witness #21 Witness #24 and Witness #23. DOL SA #1 and Ruby both selected MOIs from Witness #12 and Witness #6 but selected different MOIs; Witness #6, Witness #12 had been interviewed multiple times.[192] Although DOL SA #1 selected MOIs from Witness #17 Witness #1 and Witness #8 as containing potential *Brady* material, Ruby did not select those MOIs in the list he sent to the defense. The Witness #17 Witness #1 and Witness #8 MOIs had not been disclosed, and as discussed above, each contained statements that OPR finds should have been disclosed.

### 2. Discoverable Statements in the Ten MOIs Identified By Ruby

OPR reviewed the ten MOIs that Ruby told the defense might contain potential *Brady* material in order to identify the discoverable statements contained in those MOIs. As discussed later in this report, OPR found no difference between the discoverable statements contained in those ten MOIs and the discoverable statements contained in some of the 61 undisclosed MOIs. This finding supports both OPR's conclusion that the discoverable statements in some of the 61 undisclosed MOIs should have been disclosed to the defense, and the prosecution team's assertion that the defense was not prejudiced by the failure to disclose the 61 MOIs, because the discoverable statements in them were available to the defense from other sources, such as MOIs that had been disclosed.

OPR found that the ten MOIs Ruby identified as containing potential *Brady* material contained the following discoverable statements.

a. Witness #27 MOI. Witness #27 [redacted].

- *Blankenship wanted to see the report cards (regarding mine conditions) even if he was traveling.*
- *Blankenship never told* Witness #27 *to say or not to say something to investigators.*
- Witness #27 *was never concerned that what Blankenship was asking* Witness # *to do might be against the law.*

---

191 Ruby Interview at 59-60. Ruby told OPR that he did not have a formal process for reviewing all of the MOIs. Ruby said that based on his discussions with the trial team, he believed the team knew the evidence well enough to make disclosure decisions without a formal review process. *Id.* at 61.

192 Notably, DOL SA #1 identified MOIs pertaining to Witness #12 and Witness #6 that had not been disclosed. Ruby selected MOIs pertaining to Witness #12 and Witness #6 that had been disclosed.



b. Witness #23 MOI. Witness #23 Although both DOL SA #1 and Ruby identified the Witness #23 MOI as one that contained discoverable statements, OPR did not identify any such statements in Witness #23 MOI.[193]

c. Witness #25 MOI. Witness #25

- *Blankenship would not directly tell you to break the law.*
- *Blankenship never instructed* Witness *not to inform MSHA of issues* Witness *was experiencing at [a mine].*

d. Witness #19 MOI. Witness #19.

- Witness #4 *had once advised* Witness #19 *to operate the mine in a way that would have violated the law.*

e. Witness #12 MOI.

- Witness #12 *made a decision to shut down a Massey mine because of high methane levels.*
- Witness #12 *discussed with Blankenship spending $1 million for certain seals to be installed at a Massey mine and Blankenship approved the purchase.*
- *Blankenship never specifically directed* Witness #12 *to keep producing coal while the mine was in violation status.*
- Witness #12 *said* Witness *was unaware that* Witness #4 *or anyone else at Massey ever took the position that something needed to be withheld from MSHA.*

f. Witness #21 MOI. Witness #21

- *There were no safety issues at UBB that affected* Witness #21 *personally and* Witness *did not believe any safety issues contributed to the explosion.*
- Witness #21 *believed that the water problem at a certain mine section was under control at the time of the explosion.*

---

193 OPR asked the USAO, Ruby, and DOL SA #1 why Ruby and DOL SA #1 put the Witness #23 MOI on the list of MOIs they described as containing potential *Brady* material. The USAO said that the Witness #23 MOI was identified because "Witness #23 had some positive things to say about Blankenship and Witness relationship with Witness #23 December 15, 2017 USAO e-mail to OPR. Ruby did not respond to OPR's e-mail. DOL SA #1 told OPR that Witness #23 had had positive work experiences with Blankenship, as evidenced by several positive comments Witness #23 made about Blankenship as noted in Witness MOI. December 4, 2017 DOL SA #1 e-mail to OPR. OPR does not necessarily agree that such information was discoverable material that was required to be disclosed in a case about a conspiracy to violate mine safety standards and securities law violations.

- *[redacted] was never told to lie to an inspector and never heard of anyone else lying.*
- *On the day of the explosion mine conditions and air quality was good, and no methane was detected.*
- *[redacted] did not believe negligence played any part in the explosion.*
- *[redacted] wanted to know what caused the explosion, but cannot link the explosion to something someone did or did not do.*

g. [redacted] MOI. [redacted]

- *[redacted] never asked [redacted] men to do anything that was unsafe.*
- *[redacted] told [redacted] men that if [redacted] ever did anything that was not safe, [redacted] would be fired.*
- *Blankenship and [redacted] wanted miners to work safely.*

h. [redacted] MOI. [redacted]

- *[redacted] never observed a violation that was not fixed.*
- *[redacted] focused on safety at his operations.*
- *With MSHA's scrutiny there were going to be violations.*
- *[redacted] mine managers thought they were running safe operations.*
- *It was not accepted that [redacted] mines were going to violate safety standards.*
- *When Massey began to grow, [redacted] and [redacted] attended more budget meetings than Blankenship.*
- *Massey's management did not tolerate violations.*
- *[redacted] was not aware of giving the mines advance notice of the presence of MSHA inspectors.*
- *[redacted] was never told by [redacted] superiors that advance notice should be given at [redacted] mines.*
- *Every mine would receive violations.*
- *[redacted] was never told by anyone at Massey to specifically break the law or that they did not care how often [redacted] broke the law.*
- *[redacted] was not aware of any actions by Blankenship that [redacted] believed were illegal.*

i. Witness #24 MOI. Witness #24

- *A certain statistical measure of safety was the only thing that figured into executive compensation before the UBB explosion.*
- *Bonuses were tied to production, safety, and performance.*
- *Group president bonuses were based on safety, production, and environmental violations.*
- *Safety was always discussed at Massey and the discussions seemed real and important.*

j. Witness #6 MOI.

- *The "kill the spider" program to eliminate mine hazards was initiated on August 1, 2009.*
- Witness #10 *wanted to reduce the number of citations and injuries.*
- *The Hazard Elimination Program reduced citations and accidents at Massey.*
- *Blankenship set a goal of reducing hazards by 50%.*
- *During* Witness #6 *first visit to UBB* Witness *found the mine well ventilated and rock dusted.*
- *A ventilation test was created after Blankenship told* Witness #6 *that he wanted to ventilate a mine.*
- Witness #6 *once shut down a mine without any discouragement for doing so.*
- Witness #6 *was sure that MSHA knew that advance notice was being given of their inspections.*
- *Blankenship never turned down any suggestions* Witness #6 *made regarding ventilation.*
- *During the first year of the Hazard Elimination Program, there were fewer citations and penalties at Massey.*

### J. Potential *Giglio* Material in Undisclosed MOIs

In late June 2015, Ruby asked Paralegal #1 to review all of the MOIs drafted during the *Blankenship* investigation and prosecution and identify all negative statements in those MOIs about Witness #4[194] Paralegal #1 created a 59-page chart as a result of her MOI review. The chart

[194] Ruby told OPR that he did not recall asking Paralegal #1 to prepare the chart. Ruby Interview at 152-53. Ruby said that there was a lot of negative information about Witness #4 in MOIs that were disclosed, and that he did not recall thinking about disclosure issues in connection with the chart. *Id.* at 153-54.

contained the witness' name, the MOI date and Bates-stamp numbers, and a summary description of the negative information about Witness #4 contained in the MOI. Paralegal #1 sent the chart to Ruby on June 29, 2015, and at Ruby's request to AUSA #2 on July 13, 2015.[195]

The chart contained information culled from numerous MOIs that had been disclosed to the defense, and other information culled from ten MOIs that had not been disclosed. Among other statements, an undisclosed MOI from a March 17, 2015, interview of Witness #19 stated that Witness #4 was willing to accept a certain number of violations in order to get a certain mining operation set up, and that Witness #4 made a conscious decision to violate the law.

## IV. FACTS RELEVANT TO THE GOVERNMENT'S REPRESENTATIONS TO THE COURT AND THE DEFENSE ABOUT MOI DISCLOSURES

The defense filed numerous motions seeking orders requiring the government to comply with its *Brady* obligations and to disclose the handwritten notes taken by government agents during witness interviews. In response to those motions, the government made representations to the court and the defense about its MOI disclosures. Zuckerman has alleged that the government's representations to the court and the defense were false or misleading.[196] In addition, Zuckerman sent Ruby several e-mails about the government's MOI disclosures, one of which revealed Zuckerman's misunderstanding of the government's practice, to which Ruby did not respond.

### A. February, May, and July 2015 Pleadings Regarding MOI Disclosures

On February 6, 2015, the defense filed a "Motion to Enforce the Government's *Brady* Obligations." The supporting memorandum requested that the government produce handwritten or typewritten notes from the interviews the government had conducted. On February 20, 2015, the government filed a response entitled, "United States' Response to Defendant's Motion to . . . Enforce the Government's *Brady* Obligations." In the response, the government opposed Blankenship's motion, stating in part, "the United States has provided extensive discovery. . . . Includ[ing] . . . materials which the United States is not required to disclose, including FBI 302s."[197] The government did not inform the court that it was not disclosing post-indictment MOIs to the defense. Ruby electronically signed the pleading.

AUSA #1 drafted the February 20, 2015 brief, and sent a draft to Goodwin and Ruby before it was filed.[198] Ruby told AUSA #1 that he thought the draft "looks great."[199] Goodwin told Ruby

---

195 AUSA #2 told OPR that did not recall why Paralegal #1 sent Witness the chart, but that around that time, the team was preparing for the cross-examination of witnesses. AUSA #2 Interview at 68. If, as AUSA #2 asserts, AUSA # believed that all MOIs were being disclosed, then AUSA #2 would not have been aware that the chart contained potential *Giglio* material that had not been disclosed to the defense.

196 May 16, 2017 letter from Zuckerman to OPR, Exhibit 1 at 3.

197 Brief at 2.

198 February 19, 2015 e-mail from AUSA #1 to Goodwin, Ruby, and AUSA #3

199 February 19, 2015 e-mail from Ruby to AUSA #1 Goodwin, Paralegal #1 and AUSA #3

that he reviewed the draft and that "no further changes [are] necessary."[200] Goodwin also sent a draft of the pleading to AUSA #2.[201]

On May 6, 2015, the defense filed a brief entitled, "Motion to Compel Production of Witness Interview Notes . . . Containing *Brady* Information." In the motion, the defense stated that its February 6 motion requested "all handwritten and typewritten notes of witness interviews . . . which contain *Brady* information."[202] The motion again requested "all handwritten and typewritten notes of witness interviews . . . that contain *Brady* material."[203] It is clear that the defense was seeking the underlying materials for all witness interviews. On May 14, 2015, the government filed a response entitled, "United States' Response to Defendant's Motion to Compel Production of Witness Interview Notes and Records of Attorney Proffers Containing *Brady* Information." In the brief, the government opposed Blankenship's motion to obtain attorney and agent handwritten notes taken during witness interviews, stating in part, "the United States has exceeded its discovery obligations by producing – in a digitally searchable format – typed 302 reports that summarize witness interviews, regardless of whether they contain exculpatory information."[204] The government did not inform the court that it was not disclosing post-indictment MOIs to the defense. Ruby electronically signed the pleading.

AUSA #2 drafted the May 14, 2015, brief, and sent a draft to Ruby.[205] Ruby sent the draft to AUSA #1[206] The brief was filed after minor revisions. On May 14, Paralegal #2 sent a copy of the filed brief to Goodwin and others on the prosecution team.[207]

On July 8, 2015, the defense filed a Motion to Compel Compliance with *Brady* Order. The motion requested an order compelling the government to "produce all handwritten and typewritten notes . . . of witness interviews."[208] It is clear that the defense was seeking the underlying materials for all witness interviews. On July 14, 2015, the government filed a response entitled, "United States' . . . Response to Defendant's Motion to Compel Compliance With *Brady* Order." In the brief, the government opposed Blankenship's motion to compel the government to disclose *Brady* material, stating in part, "the United States has produced memorandums that reflect the substance of well over 300 witness interviews. The Court has already rejected Defendant's claim that he is entitled to the United States' work product relating to witness interviews, and since the United

---

200 February 20, 2015 e-mail from Goodwin to Paralegal #1 and Ruby.

201 February 20, 2015 e-mail from Goodwin to AUSA #2

202 Defense motion at 1.

203 *Id.* at 4.

204 Brief at 2.

205 May 13, 2015 e-mail from AUSA #2 to Ruby.

206 May 13, 2015 e-mail from Ruby to AUSA #1

207 May 14, 2015 e-mail from Paralegal #2 to Goodwin and others.

208 Defense motion at 12.

States has complied with [the court's] Brady Order with respect to the substance of those interviews, there is no need to revisit that ruling."[209] The government also wrote that, "Defendant's renewed request for . . . notes of interviews, should be denied . . . [because] the United States has already produced memorandums that memorialize the substance of those interviews. . . ."[210] The government did not inform the court that it was not disclosing post-indictment MOIs to the defense. Ruby electronically signed the pleading.

Ruby drafted the July 14, 2015 brief, and sent a draft to Goodwin, AUSA #1 and AUSA #2 for their review.[211] Both Goodwin and AUSA #2 made revisions to the draft.[212]

AUSA #1 told OPR that when AUSA drafted the February pleading, AUSA believed that the government had disclosed all MOIs, and did not intend to mislead the court.[213] AUSA #2 said that with respect to all three pleadings, AUSA #2 believed that the government had disclosed all MOIs.[214] Ruby told OPR that with respect to these three pleadings, the government did not intend to mislead the court through the government's representations about its MOI disclosures. Ruby stated, "we certainly didn't file anything with the intent of misleading the court or say anything in a pleading with the intent of misleading the court . . . . [A]ll of these statements were intended to refer to the pre-indictment interview memoranda that we had produced."[215]

### B. Ruby's Statement During Trial Regarding MOI Disclosures

During Witness #4 five-day cross-examination, Witness #4 testified that Witness had not conspired with Blankenship and had not committed any crimes, and that Blankenship wanted MSHA violations reduced. Witness #4 testified that Witness or Witness attorneys had provided that information to the government prior to trial. The defense then alleged that the government violated its *Brady* obligations by failing to disclose that information. (This allegation is discussed more fully above in Section II(E).) The prosecution and defense discussed this matter with the court, outside the presence of the jury. During that discussion, Ruby told the court, "We've turned over Grand Jury material from this witness [Witness #4 We have also turned over 302s from our interviews with this witness . . . and so to the extent that there is exculpatory information that we had from this witness, that's been turned over to the defense."[216]

---

209 Brief at 8.

210 Brief at 12.

211 July 13, 2015 e-mail from Ruby to Goodwin, AUSA #1 and AUSA #2

212 *See* various e-mails among Ruby, Goodwin, AUSA #2 and AUSA #1 from July 13 and July 14, 2015, including a July 13, 2015 e-mail from Goodwin to the team, in which Goodwin asks to receive the most current draft for review.

213 AUSA #1 Interview at 22.

214 AUSA #2 Interview at 45.

215 Ruby Interview at 105, 109.

216 October 30, 2015 Trial Transcript at 3712.

DOL SA #1 and FBI SA #1 prepared six MOIs memorializing Witness #4 interviews from the following dates: October 22, 2014; November 11, 2014; April 2, 2015; September 12, 2015; September 21, 2015; and October 18, 2015. In fact, the government had disclosed only the pre-indictment MOI dated November 11, 2014. According to Ruby, he mistakenly believed that the second pre-indictment MOI, dated October 22, 2014, had also been disclosed. Because the remaining four Witness #4 MOIs reflected post-indictment interviews, Ruby intentionally had not disclosed them. Ruby's statement to the court that the government had "turned over 302s from our interviews with this witness" was arguably misleading.[217]

Ruby told OPR that he did not intend to mislead the court, and that his statement was meant to refer to the two pre-indictment MOIs (one of which Ruby mistakenly believed had been disclosed).[218] Ruby said that he did not mean to state that all of Witness #4 MOIs had been disclosed and that it never crossed his mind to mislead the court.[219] Witnesses told OPR that Goodwin attended the trial every day.[220] Because Ruby's statements about the disclosure of Witness #4 MOIs were made in open court, Goodwin presumably heard them. Because Goodwin declined OPR's request for an interview, OPR was unable to ask Goodwin why he did not correct Ruby's arguably misleading statement, if, as Ruby asserts, Goodwin knew that the government had not disclosed post-indictment MOIs.

### C. Zuckerman Asked the Government Whether It Was Disclosing All MOIs

On April 15, 2015, a Zuckerman attorney sent an e-mail to Ruby, asking, "From your earlier statements to us and the Court, we understand that all of the [MOIs] that the government conducted as part of its investigation . . . have been provided to the defense. . . . If our understanding is incorrect, please let us know."[221] On April 17, 2015, the same Zuckerman attorney sent another e-mail to Ruby, asking him to respond to the attorney's April 15 e-mail. OPR found no evidence that Ruby forwarded either of these e-mails to anyone. Both AUSA #1 and AUSA #2 told OPR that they did not recall seeing this e-mail.[222] OPR found no evidence that Ruby responded to Zuckerman's question, notwithstanding that the e-mail showed that Zuckerman wrongly understood that it had

---

217 OPR notes that Ruby's statement to the court on October 30, 2015 that "[w]e have also turned over 302s from our interviews with this witness" occurred only 12 days after the government's final interview of Witness #4 on October 18, 2015. Ruby attended that interview. In addition, Witness #4 was interviewed twice in September 2015, the month before Ruby made his arguably inaccurate statement to the court; both Ruby and Goodwin attended those interviews.

218 Ruby Interview at 118.

219 *Id.* at 119-20.

220 AUSA #1 Interview at 29.

221 In his April 15, 2015 e-mail, the Zuckerman attorney stated that the defense could not locate all of the MOIs that the government had previously disclosed, and that the MOIs appeared to have different Bates-stamp markings. Ruby responded to that portion of Zuckerman's April 15 e-mail. On April 21, 2015, Ruby sent Zuckerman a list of all MOIs that the government had disclosed, arranged by Bates-stamp numbers.

222 AUSA #1 Interview at 21; AUSA #2 Interview at 48.

received all MOIs in the government's possession.[223] OPR asked Ruby why he did not respond to Zuckerman's e-mail. Ruby said that as a result of Goodwin's decision that the team should not respond to Zuckerman's e-mails, he may not have read the e-mail carefully, but that it was not his intent to mislead Zuckerman by failing to respond.[224]

### D. Evidence that Zuckerman Knew or Should Have Known that the Government Was Not Disclosing All MOIs

As described above, on several occasions the government made statements to the court that could be read to indicate that the government was providing the defense with all MOIs in its possession. OPR found no reason to believe that the court knew or should have known that the government was not in fact disclosing all MOIs to the defense. In contrast, OPR found evidence that by August 2015 Zuckerman knew or should have known that the government was not disclosing all MOIs.

First, Zuckerman was aware that the Witness #2 MOI that was disclosed in August 2015 was the only post-indictment MOI it received. In its March 7, 2016 letter to the Department of Justice alleging government misconduct, Zuckerman noted that the government "provided the defense with only a single [MOI] conducted after the indictment was returned."[225]

Second, on September 21, 2015, Ruby sent Zuckerman a letter in which he disclosed potential exculpatory statements the government had obtained during interviews of Witness #7, Witness #8, and Witness #13 In the letter, Ruby told Zuckerman that the information he was disclosing came from witness interviews. Zuckerman therefore knew that at least for these three witnesses, the government was not providing complete MOIs memorializing the interviews.

Third, all of the MOIs disclosed to the defense were marked with Bates-stamp numbers. In August 2015, Ruby sent the defense the Witness #2 MOI, with Bates-stamp markings MOI 1534-1540. The highest Bates-stamp marking of an MOI provided to the defense prior to the disclosure of the Witness #2 MOI was MOI 1356-1361. Had Zuckerman carefully examined the MOIs it received from the government, it would have seen that there was a gap of almost 200 pages. The obvious explanation for that gap is that there were MOIs marked with Bates-stamp numbers MOI 1362-1533 that the government had not disclosed.[226]

---

223 AUSA #2 said that AUSA # was generally aware that Ruby did not respond to all of Zuckerman's e-mails. AUSA #2 said that the team was concerned that whatever the response, it would be used against the government. AUSA #2 Interview at 49-50.

224 Ruby Interview at 124-26.

225 March 7, 2016 letter at 3.

226 The fact that there was a 200-page Bates-stamp number gap between the Witness #2 MOI and next highest numbered MOI is evidence that Ruby did not intentionally mislead the defense about the existence of undisclosed MOIs. Had Ruby sought to hide the existence of the undisclosed MOIs, he would have directed that the Witness #2 MOI be marked with the Bates-stamp number MOI-1362, the number immediately after the last page of the highest Bates-stamp number on an MOI disclosed to the defense.

Fourth, OPR found evidence to suggest that Zuckerman was communicating with some witnesses after those witnesses had been interviewed by the government. If that is so, and if Zuckerman never received MOIs for those witnesses, then Zuckerman knew or should have known that it was not receiving all MOIs. For example, in its March 7, 2016 letter to the Department, Zuckerman stated that it had learned that "the government interviewed several individuals who provided information that obviously was favorable to Mr. Blankenship's defense but was never disclosed."[227] When OPR asked Zuckerman to identify those individuals, Zuckerman identified Witness #1, Witness #6, and Witness #8. In fact, the government had interviewed Witness #1 and Witness #8 and had not disclosed the MOIs from those interviews (though Ruby did provide the defense with some information about Witness #8 interview in his September 21, 2015 letter as discussed above). It is reasonable to conclude that Zuckerman spoke to those witnesses or their counsel after the government had interviewed them, and thus had reason to believe that it had not received all MOIs, if MOIs had been prepared after the government's interviews of those witnesses.

In sum, there is substantial evidence that by August 2015, Zuckerman was or should have been aware that it was not receiving all MOIs the government generated.

## V. FACTS RELEVANT TO THE GOVERNMENT'S SEARCH FOR EXCULPATORY EVIDENCE

Zuckerman alleged that the government systematically withheld exculpatory evidence. OPR found evidence inconsistent with Zuckerman's assertion that the government ignored or intentionally violated its discovery obligations. OPR found that the government searched MSHA documents at least three times for exculpatory evidence. In addition, as noted above, in pleadings filed with the court, the defense acknowledged that the government had disclosed what the defense described as exculpatory material both in MOIs and documents that the government had disclosed.

### A. February 2015 Search of MSHA Documents

According to DOL Attorney, in February 2015, Ruby instructed the DOL to search MSHA documents for potentially exculpatory evidence.[228] On February 20, 2015, DOL Attorney sent Ruby an e-mail describing in detail how DOL intended to search MSHA documents. In DOL Atty e-mail, DOL Attorney stated that DOL would use the following search terms to identify potentially relevant documents: Blankenship; UBB; Upper Big Branch; PCC; Performance Coal; Advance Notice. DOL Attorney told Ruby that those search terms would be used to search the e-mail accounts of four groups of MSHA employees within specific time frames: MSHA District 4 (which included UBB) from January 1, 2008 to April 5, 2010; MSHA Headquarters from January 1, 2008 to March 6, 2012; the MSHA Accident Investigation team, from April 12, 2010 to December 6, 2011; and the MSHA Incident Review team, from April 29, 2010 to March 6, 2012. DOL Attorney also told

227 March 7, 2016 letter at 3.

228 DOL Attorney Interview.

Ruby that DOL would search Incident Review team non-e-mail documents, using the same search terms.[229]

Ruby forwarded DOL Attorney e-mail to Goodwin. Goodwin responded to DOL Attorney e-mail on February 24, 2015.[230] Goodwin told DOL Attorney that "the point of this exercise is to determine if there is any 'exculpatory' information concerning Massey/UBB in general, and Defendant Blankenship in particular." Goodwin told DOL Attorney that such exculpatory information would include, but would not be limited to "(1) statements or indications that Blankenship/UBB was good on safety; (2) statements or indications that MSHA was targeting UBB/Blankenship for improper motives (e.g. because he was critical of MSHA); or (3) statements or indications that citations issued at UBB might be overstated."

On March 26, 2015, DOL Attorney told Ruby that DOL attorneys had reviewed about 24,000 e-mails and marked 936 as potentially exculpatory, though DOL Attorney noted that "[m]ost of these are not likely to be exculpatory when you review them—we're erring on the side of inclusion."[231] In March 27 and 30 e-mails, DOL Attorney informed Ruby that contractors for DOL were sending Ruby discs containing the 936 e-mails. Ruby forwarded both e-mails to AUSA #2

When OPR initially interviewed the trial team members, they either said they had no knowledge of the February/March 2015 MSHA e-mail searches, or did not recall whether the government had disclosed any of the 936 e-mails identified by DOL attorneys.[232] Because no prosecution team member could recall with any certainty whether any of the 936 MSHA e-mails that DOL attorneys had identified as potentially exculpatory had been disclosed, OPR asked the USAO to determine what had happened to the 936 e-mails.

---

229 Ruby told OPR that he thought that DOL attorneys searched non-e-mail documents only from the Incident Review team because non-e-mail documents from the other three groups had already been searched. Ruby Interview at 51-52.

230 Ruby told OPR that he believed that Goodwin responded to DOL Attorney e-mail because this was around the time

231 March 26, 2015 e-mail from DOL Attorney to Ruby. DOL Attorney also told Ruby that the team reviewing the e-mails had stopped reviewing e-mails that had been sent "to" those whose e-mail accounts they were searching, and were only searching e-mails that had been sent "from" those whose e-mail accounts they were searching. DOL Attorney told OPR that DOL had stopped searching "to" e-mails because they were mostly duplicative of other e-mails, and the search terms were so broad that they captured irrelevant documents such as media reports about the UBB explosion that were contained in "to" e-mail accounts, but not in "from" e-mail accounts. DOL Attorney Interview.

232 DOL SA #1 and AUSA #1 said they had no knowledge about the February/March DOL search of MSHA e-mails. DOL SA #1 Interview at 21-22; AUSA #1 Interview at 50. FBI SA #1 said FBI S did not know whether the 936 e-mails identified by DOL attorneys were disclosed. FBI SA #1 Interview at 29. Even though contemporaneous e-mails showed that AUSA #2 reviewed the 936 e-mails identified by DOL attorneys, during AUSA # interview AUSA # had no recollection of doing so. AUSA #2 Interview at 33. DOL Attorney said DOL / had no knowledge about whether any of the 936 e-mails identified by DOL attorneys were disclosed. DOL Attorney Interview. Ruby said he did not recall why in February 2015 he asked DOL to initiate a search of MSHA documents for exculpatory evidence. Ruby Interview at 51. Ruby said that most of the 936 e-mails identified by DOL attorneys were not exculpatory, and some were disclosed, though he did not recall how many. *Id.* at 52-53.

After reviewing its records, the USAO determined that Ruby had asked AUSA #2 to review the e-mails identified by DOL attorneys. AUSA #2 reviewed the e-mails, and selected those AUSA #2 believed might be discoverable. On April 1, 2015, AUSA #2 sent Ruby a link to an electronic folder containing the e-mails AUSA #2 had identified, and on April 3 AUSA #2 sent the same link to Goodwin, AUSA #1 and Ruby (again). In those e-mails, AUSA #2 said that AUSA #2 had identified e-mails about how MSHA inspectors "did not know how advance notice worked," and identified post-explosion e-mails that contained MSHA employees' negative opinions about Blankenship or Massey. On April 6, 2015, Ruby sent Zuckerman a letter concerning various issues. At the end of the letter, Ruby stated that the government was disclosing "a small set of additional documents." Those documents included nine MSHA e-mails (and one attached spreadsheet) related to the issue of advance notice. These e-mails were among the 936 e-mails identified by DOL attorneys as potentially containing exculpatory material. The government did not at that time disclose any of the other 936 e-mails identified by DOL attorneys.

After OPR asked the USAO to try to determine how many of the 936 e-mails identified by DOL attorneys had been disclosed, the United States Attorney asked the *Blankenship* team to review those e-mails to determine if further disclosures were warranted. On November 17, 2017, the USAO sent Zuckerman a disc containing 48 e-mails that were among the e-mails the DOL attorneys had identified as potentially exculpatory in March 2015 that had not previously been disclosed. OPR asked the USAO to explain why it had selected those 48 e-mails to disclose to the defense. The USAO said that, "[t]here is no one specific reason why the emails were selected. If they arguably related in any way to a negative attitude toward or treatment of Massey or Blankenship, we included them."[233]

Nine of the 48 MSHA e-mails that the USAO disclosed in November 2017 were dated before the UBB mine explosion. The 48 e-mails contained information about several different issues, including the following: MSHA employees' negative opinions of Blankenship or Massey (most of those date from after the UBB mine explosion); whether MSHA inspectors knew about or enforced the rule against mines providing advance notice of MSHA inspector activities; discussions of various issues related to UBB as MSHA's report of its internal review about the explosion was being drafted and revised; and technical discussions of various conditions at UBB prior to the explosion (in some cases several years before the explosion). OPR did not reopen its investigation to determine whether the government was required to disclose the 48 e-mails before trial because: (a) OPR reached conclusions regarding similar disclosure issues with respect to MOIs; (b) OPR's investigation was substantially complete when the USAO disclosed the 48 MSHA e-mails; and (c) Blankenship's Section 2255 motion raised the issue of the late disclosure of the 48 MSHA e-mails and is pending before the court.[234]

---

233 December 15, 2017 USAO e-mail to OPR. The defense discussed some of the 48 e-mails in its Section 2255 motion.

234 On April 6, 2018, after OPR's investigation was complete, the USAO informed OPR that on that date it had made another disclosure of MSHA documents to Blankenship's attorneys. The USAO disclosed documents related to MSHA's disciplining of four MSHA employees as a result of information learned during its internal review of its pre-explosion enforcement activities at UBB. The documents showed that two employees received one-day suspensions, one employee received a letter of reprimand, and one employee received a letter of counseling. The defense discussed some of these documents in its Section 2255 motion. In May 2018, the USAO informed OPR that

### B. June 2015 Search of Selected Documents in the USAO's Database

The defense made repeated motions seeking an order compelling the government to disclose *Brady* material. Although the court largely denied those motions, on June 12, 2015, the court ordered that the government should "designate and disclose to defense counsel any and all *Brady* material by the close of business on June 22, 2015."[235] To comply in part with the court's order, Ruby selected approximately 600 documents. On June 18, 2015, Ruby told AUSA #1 and AUSA #2 that he and they would each review approximately 200 documents to identify potential *Brady* material. Both AUSA #1 and AUSA #2 reviewed their sets of documents and sent Ruby a list of documents that they suggested be identified as potential *Brady* material.[236] On June 21, 2015, Ruby sent a letter to the defense, identifying approximately 140 documents and ten MOIs as containing potential *Brady* material.

### C. September 2015 Search of MSHA Documents

On August 13, 2015, the defense moved for an early-return subpoena seeking production of certain MSHA documents. The government thereafter disclosed approximately 70,000 pages of documents. Ruby asked DOL attorneys to search those documents for discoverable evidence. On September 8, 2015, DOL Attorney sent Ruby an e-mail, attaching a chart listing 115 documents that might be considered exculpatory. DOL Attorney told OPR that many of the documents on the chart were duplicates, and so the actual number of potentially exculpatory documents was less than 115. In a September 10, 2015, letter to Zuckerman, Ruby identified as potentially exculpatory two of the documents that DOL Attorney had identified in DOL Att chart. Ruby told OPR that although he had no recollection of how many of the documents identified in the September search as potentially exculpatory were disclosed, some of the documents on the chart DOL Attorney prepared were used by the defense at trial, which suggested that they had been disclosed.[237] DOL Attorney said that the defense used some of the documents on DOL Attorney chart during its cross-examination of witnesses during trial.[238]

DOL SA #1 and AUSA #1 told OPR they had no knowledge about the September search of MSHA documents.[239] AUSA #2 said that AUSA #2 did not recall ever seeing the chart DOL Attorney sent Ruby listing the

---

it was disclosing additional MSHA documents to the defense, some of which were related to the MSHA documents disclosed on April 6.

235 Memorandum Opinion and Order at 14.

236 Neither AUSA #1 nor AUSA #2 knew whether Ruby accepted their suggestions as to what documents should be designated as discoverable. AUSA #2 Interview at 26-28; AUSA #1 Interview at 41, 45-46. AUSA #2 said that to identify potential *Brady* material, AUSA # looked for documents in which Blankenship expressed anger about a mine's safety record, or where he said something positive about mine safety. AUSA #2 Interview at 26-28.

237 Ruby Interview at 64-65.

238 DOL Attorney Interview.

239 DOL SA #1 Interview at 21-22; AUSA #1 Interview at 51.

115 documents.[240] [redacted] said [redacted] was aware of the September search of MSHA documents because there had been discussions in court about that issue during pretrial motions.[241]

As noted above, in March 2015, DOL attorneys identified 936 MSHA e-mails as potentially exculpatory. In September 2015, in response to a subpoena, the government produced thousands of MSHA documents. The USAO told OPR that there were approximately 200 documents that were included in both the March and September 2015 sets of documents.[242] Thus, in September 2015, the government had disclosed to the defense about 200 of the e-mails that DOL attorneys had identified in March 2015 as potentially exculpatory.

## VI. APPLICABLE STANDARDS

### A. OPR's Analytical Framework

OPR finds professional misconduct when an attorney intentionally violates or acts in reckless disregard of a known, unambiguous obligation imposed by law, applicable rule of professional conduct, or Department regulation or policy. In determining whether an attorney has engaged in professional misconduct, OPR uses the preponderance of the evidence standard to make factual findings.

An attorney intentionally violates an obligation or standard when the attorney (1) engages in conduct with the purpose of obtaining a result that the obligation or standard unambiguously prohibits; or (2) engages in conduct knowing its natural or probable consequence, and that consequence is a result that the obligation or standard unambiguously prohibits.

An attorney acts in reckless disregard of an obligation or standard when (1) the attorney knows or should know, based on his or her experience and the unambiguous nature of the obligation or standard, of an obligation or standard; (2) the attorney knows or should know, based on his or her experience and the unambiguous applicability of the obligation or standard, that the attorney's conduct involves a substantial likelihood that he or she will violate, or cause a violation of, the obligation or standard; and (3) the attorney nonetheless engages in the conduct, which is objectively unreasonable under all the circumstances. Thus, an attorney's disregard of an obligation is reckless when it represents a gross deviation from the standard of conduct that an objectively reasonable attorney would observe in the same situation.

If OPR determines that an attorney did not engage in professional misconduct, OPR determines whether the attorney exercised poor judgment, made a mistake, or acted appropriately under all the circumstances. An attorney exercises poor judgment when, faced with alternative courses of action, he or she chooses a course of action that is in marked contrast to the action that the Department may reasonably expect an attorney exercising good judgment to take. Poor judgment differs from professional misconduct in that an attorney may act inappropriately and thus exhibit poor judgment even though he or she may not have violated or acted in reckless

240 [redacted] Interview at 33.

241 [redacted] Interview at 29.

242 November 6, 2017 USAO e-mail to OPR.