**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

DONALD L. BLANKENSHIP,

   Movant,

v.          CIVIL ACTION NO.  5:18-cv-00591
            (Criminal No. 5:14-cr-00244)

UNITED STATES OF AMERICA,

   Respondent.

**MEMORANDUM OPINION AND ORDER**

On April 18, 2018, the Movant filed a motion pursuant to 28 U.S.C. § 2255, alleging that

his conviction should be overturned due to violations of his constitutional rights.  By *Standing*

*Order* (Document 665) entered on April 20, 2018, the matter was referred to the Honorable Omar

J. Aboulhosn, United States Magistrate Judge, for submission to this Court of proposed findings

of fact and recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  The Court has

reviewed the Magistrate Judge's *Proposed Findings and Recommendation* (PF&R) (Document

736), to which no objections have been filed, and has reviewed the various underlying motions as

well as the attendant briefing.

On March 10, 2015, the Movant was charged in a three-count superseding indictment with

(1) conspiring to willfully violate mandatory federal mine safety and health standards at Massey

Energy Company's (Massey) Upper Big Branch-South mine (UBB), in violation of 30 U.S.C. §

820(d) and 18 U.S.C. § 371, and to defraud the United States by impeding the Mine Safety and

Health Administration (MSHA) in the administration and enforcement of mine safety and health laws at UBB, (2) making false statements to the Securities and Exchange Commission in violation of 18 U.S.C. § 1001 and 18 U.S.C. § 2 and (3) making false and fraudulent statements in connection with the sale or purchase of securities in violation of 15 U.S.C. § 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.10b-5.  (Document 170 at 34−41.)

Following a 36-day jury trial, the Movant was found guilty of conspiracy to violate Mine Safety regulations, in violation of 30 U.S.C. § 820(d) and 18 U.S.C. § 371, as charged in Count One of the Superseding Indictment, and was acquitted on the remaining two counts.  (Documents 529, 553.)  On April 6, 2016, the Movant was sentenced to twelve months of imprisonment, a one-year term of supervised release, a fine of $250,000, and a special assessment of $25.  (Document 589.)

On April 7, 2016, the Movant filed a *Notice of Appeal* to the United States Court of Appeals for the Fourth Circuit (hereinafter, "Fourth Circuit") seeking relief from his conviction and sentence on the grounds that this Court: (1) erroneously concluded that the superseding indictment sufficiently alleged a violation of Section 820(d), (2) improperly denied Defendant the opportunity to engage in re-cross examination of Chris Blanchard, an alleged co-conspirator, (3) incorrectly instructed the jury regarding the meaning of "willfully" in 30 U.S.C. § 820(d), which makes it a misdemeanor for a mine operator to "willfully" violate federal mine safety laws and regulations and (4) incorrectly instructed the jury as to the United States' burden of proof.  (Documents 591, 647 at 5−6.)  On January 19, 2017, the Fourth Circuit affirmed the decision of this Court, finding no reversible error.  *United States v. Blankenship*, 846 F.3d 663 (4th Cir. 2017).

2

The Movant then petitioned the United States Supreme Court for certiorari, arguing that this Court incorrectly instructed the jury regarding the meaning of the term "willfully," and improperly denied re-cross examination of Mr. Blanchard. On October 10, 2017, the Supreme Court denied certiorari. *Blankenship v. United States*, 138 S.Ct. 315 (2017).

On April 18, 2018, the Movant filed this *Motion to Vacate and Set Aside Defendant's Conviction and Sentence Pursuant to 28 U.S.C. § 2255*, arguing that his sentence and conviction should be vacated on the following grounds: (1) the United States suppressed material exculpatory and/or impeachment evidence in violation of *Brady v. Maryland* and *Giglio v. United States*, (2) the United States suppressed evidence in violation of the Jencks Act and Rule 26.2 of the Federal Rules of Criminal Procedure and (3) prosecutorial misconduct denied Movant due process and a fair trial, in violation of the Fifth Amendment. (Document 663 at 10−19.)

On June 6, 2018, the United States Attorney's Office for the Southern District of West Virginia filed a *Notice of Recusal*, recusing itself from defending the Section 2255 motion filed by the Movant. (Document 672.) Due to the recusal, the United States Attorney for the Southern District of Ohio was ultimately assigned to represent the United States in this matter. *Id.*

Following an extension of time, the Movant filed a *Memorandum in Support of Motion to Vacate Conviction Pursuant to 28 U.S.C. § 2255* (Document 703) on September 5, 2018, and on September 6, 2018, filed an *Amended Memorandum in Support of Motion to Vacate Conviction Pursuant to 28 U.S.C. § 2255* (Document 705). The Movant also filed a *Motion for Oral Argument* (Document 733) and a *Motion for Evidentiary Hearing* (Document 704-1), arguing that if the § 2255 petition for relief was not granted, then an evidentiary hearing would be needed to resolve factual issues. On November 16, 2018, the United States filed the *Government's Consolidated*

*Response in Opposition to Defendant's Motion to Vacate Under 28 U.S.C. § 2255 and Defendant's Request for Evidentiary Hearing* (Document 728) and on November 30, 2018, the Movant filed his *Consolidated Reply to Government's Consolidated Response in Opposition to Motion to Vacate Under 28 U.S.C. § 2255 and Motion for Evidentiary Hearing* (Document 731).

On August 26, 2019, the Magistrate Judge filed the PF&R. The Court has reviewed the Magistrate Judge's PF&R, to which no objections have been filed, under a de novo standard of review. After careful consideration and for the reasons stated herein, the Court finds that the findings and conclusions of the PF&R should be rejected.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636, the district court reviews the magistrate judge's proposed findings and recommendations regarding a petition for posttrial relief made by individuals convicted of criminal offenses or petitions challenging conditions of confinement. 28 U.S.C. § 636(b)(1)(B) and (C). If no objections are filed, the district judge "may accept reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *Thomas*, 474 U.S. at 150, 153; *Nettles v. Wainwright*, 667 F.2d 404, 409 (5th Cir. 1982), *overruled on other grounds by Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (noting that the district court "has the duty to conduct a careful and complete review" when deciding whether to accept, reject, or modify the magistrate judge's recommendations); *see also Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (citing *Louis v. Blackburn*, 630 F.2d 1105 (5th Cir. 1980)). "The district judge has jurisdiction over the case at all times," and "retains full authority to decide whether to refer a case to the magistrate, to review the magistrate's report, and to enter judgment." *Thomas*, 474 U.S. at 154. "Moreover, while the statute does not require

4

the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard." *Id.*

## FACTS

The Movant is the former chairman and chief executive officer of Massey. In 2009 and 2010, MSHA issued numerous citations to Massey for violating requirements of the Mine Safety and Health Act of 1977, 30 U.S.C. § 801 *et seq.* At trial, the United States introduced testimony to show that Massey was issued the most citations for safety violations in the country during the indictment period, including some of the most serious safety violations. The United States presented evidence at trial that the Movant conspired to violate mine safety laws by prioritizing coal production over mine safety.

The evidence presented included cheating on dust samples, advance warning of visits by mine inspectors, lack of adequate staff, concealing safety warnings as confidential, and testimony from numerous coal miners demonstrating that they were required to work in unsafe conditions or conditions with inadequate ventilation. The United States presented further evidence that the Movant was aware of the violations at UBB mine in the years leading up to a deadly explosion and received daily reports showing numerous citations for safety violations at the mine and warnings from a Massey safety official about the serious risks posed by violations at UBB.

Following a six-week jury trial involving lengthy deliberations, the Movant was ultimately convicted of the misdemeanor offense of conspiring to violate mine safety laws and acquitted of the remaining felony offenses. Prior to returning a verdict, the jury deliberated for approximately

two weeks, twice informed the Court that they could not agree on a verdict and received an *Allen* charge from the Court.

The Movant notes that the charges against him were "vigorously contested" and "his attorney served numerous formal and informal demands for discovery on the prosecution team." (Document 663, at 1.) Throughout pre-trial, trial, and appellate proceedings, the defense team made several informal and formal requests—including six motions filed with this Court—seeking the disclosure of *Brady* material from the prosecution, along with several other motions regarding discovery.[1] In response, the United States asserted that it had complied with all discovery requests, including all Court orders regarding *Brady* obligations.[2] The Court reviewed the motions submitted by the Movant, and issued several orders regarding the prosecution's discovery obligations.[3]

---

[1] Motions filed with this Court seeking exculpatory material include: Motion to Enforce the Government's *Brady* Obligations (Document 111); Defense Motion to Compel the Government to Identify in its Production *Brady* and Rule 16(a)(1) Material (Document 245); Motion to Compel Production of Witness Interview Notes and Records of Attorney Proffers Containing *Brady* Information (May 6, 2015) (Document 248); Motion to Compel Production of MSHA Material (Document 261); Motion to Compel Compliance with *Brady* Order and for Other Appropriate Relief (Document 283); Motion to Compel MSHA to Comply with Subpoena Duces Tecum (Document 377) and Motion to Compel Compliance with Subpoena, for Production of *Brady*, Rule 16, and Jencks Material, and for Evidentiary Hearing (Document 481). The defense counsel notes that in addition to the listed motions, it also sent a number of communications directly to the United States Attorney's Office seeking the same material.

[2] *See, e.g.*, United States' Response to Defendant's Motion No. 19, Motion to Enforce the Government's *Brady* Obligations (Document 133); United States' Response to Defense Motion to Compel Concerning *Brady* and Rule 16 (Document 246); United States' Response to Defendant's Motion to Compel Production of Witness Interview Notes and Records of Attorney Proffers Containing *Brady* Information (Document 251); United States' Response to Defendant's Motion to Compel Production of MSHA Material (Document 273); United States' Combined Motion for Production of Reciprocal Discovery and Response to Defendant's Motion to Compel Compliance with *Brady* Order and Other Appropriate Relief (Document 284); Response to Motion to Compel MSHA to Comply with Subpoena Duces Tecum (Document 388) and United States' Response to Defendant's Motion to Compel Compliance with Subpoena , for Production of Brady, Rule 16, and Jencks Material, and For Evidentiary Hearing (Document 496).

[3] Document 222 (denying Defendant's Motion to Enforce the Government's Brady Obligations (Document 111) as premature.); Document 279 (granting in part and denying in part defendant's motions for Brady disclosures); Document 295 (denying Defendant's motion to Compel Compliance with Brady Order and for Other Appropriate Relief (Document 283)); Document 358 (granting Defendant's request for a Rule 17(c) subpoena duces tecum to be served on MSHA); Document 551 (denying the motion to compel compliance with subpoena, for production of Brady, Rule 16, and Jencks Material, and for Evidentiary Hearing (Document 481)).

Following the Movant's conviction, he continued to request evidence believed to have been suppressed by the United States. In 2017, the United States Attorney's Office began sending the Movant previously suppressed materials.

The facts underlying the Movant's claims are undisputed. Prior to trial, the United States failed to produce numerous documents to the Movant. The undisclosed documents include sixty-one Memoranda of Interviews (MOIs) authored by law enforcement agents. Eleven of the MOIs pertain to pre-indictment interviews and fifty pertain to post-indictment interviews. Ten of the undisclosed MOIs pertain to two of the United States' main witnesses, Chris Blanchard and Bill Ross. In addition, the United States Attorney's Office produced the contents of a previously undisclosed attorney proffer by Chris Adkins, former Chief Operating Officer at Massey and Mr. Blanchard's immediate supervisor.

The United States also failed to produce MSHA material prior to trial. This material includes 48 MSHA emails, twenty-one pages of disciplinary records for MSHA employees in connection with UBB and a number of miscellaneous emails and records related to MSHA employee performance. On July 30, 2018, the United States Attorney's Office produced dozens of MSHA and Department of Labor (DOL) records subject to a protective order. In August 2018, that office produced four additional documents previously withheld in whole or in part based on attorney-client privilege.

## ARGUMENT

Based on these previously undisclosed documents, the Movant claims that his sentence and conviction should be vacated on the following grounds: (1) the United States suppressed material exculpatory and/or impeachment evidence in violation of *Brady v. Maryland* and *Giglio v. United*

*States*; (2) the United States suppressed evidence in violation of the Jencks Act and Rule 26.2 of the Federal Rules of Criminal Procedure and (3) the United States violated the District Court's Orders regarding discovery thereby committing prosecutorial misconduct, depriving Movant of his constitutional right to due process and a fair trial. (Document 663 at 10−19.)

First, the Movant argues that the prosecution violated *Brady v. Maryland* and *Giglio v. United States* by suppressing evidence that was both exculpatory and/or impeaching. In particular, the Movant claims that nondisclosure of the MOIs from the United States' two main witnesses, Blanchard and Ross, impeded the ability to conduct efficient, targeted cross-examination of the witnesses. The Movant claims that material contained in suppressed MOIs for Blanchard would show that MSHA inspectors would write citations to Massey that were both illegitimate and biased, that Massey did not want cheating on the respirable dust samples, and that MSHA was responsible for decisions that ended up endangering the health and safety of miners.

For Ross, the Movant argues that undisclosed MOIs would reveal that the UBB mine was set up to fail based on the ventilation system [a non-belt air system] MSHA forced the UBB mine to use. According to him, the Ross MOI would pair with other withheld MSHA materials to reveal that MSHA recognized deficiencies in its handling of the UBB ventilation plan. The Movant further argues that the withheld material would negate the United States' portrayal of Ross as a whistleblower.

The Movant also argues that MOIs for five other potential witnesses—Sabrina Duba, Charlie Bearse, Stephanie Ojeda, Steve Sears, and Mark Clemens[4]—all of whom were former Massey employees, were never disclosed and contained exculpatory and impeachment material

---

[4] The Movant originally listed Frampton and Williams as additional witnesses, however, in later filings it appears that these witnesses were abandoned. Therefore, the Court will not address the Frampton or the Williams MOIs.

that could have helped his defense. The Movant argues that statements these witnesses provided in their MOIs contradicted the United States' theory that he pushed production over safety and failed to budget sufficient funds to hire more safety personnel, which he claims was perhaps the single most important issue at trial. The Movant also notes that, "[t]hese witnesses were all employees whose roles gave them more insight than many of the witnesses who ultimately testified." (Document 709, at 18.) Additionally, the Movant argues that an attorney proffer for Chris Adkins, former Chief Operating Officer for Massey Energy and Blanchard's immediate supervisor, was undisclosed.

The Movant further argues that MSHA turned over dozens of exculpatory and impeaching documents that could demonstrate: (1) MSHA issued unsubstantiated violations to UBB, (2) MSHA had animus/contempt toward the Movant and Massey, (3) MSHA itself was conflicted as to whether Massey's practices involving advance notice actually violated regulations, (4) MSHA's role in violations at UBB, including MSHA requiring an inadequate ventilation plan at UBB, and (5) disparity in government treatment of Blankenship (criminal prosecution) and MSHA employees responsible for UBB's mine safety (slap on wrist). The Movant essentially argues that withheld MSHA materials would show that the citations could not form the basis for a conviction to "willfully" violate mine safety laws.

Second, the Movant argues that suppression of evidence constituted a violation of the Jencks Act and Rule 26.2 of the Federal Rules of Criminal Procedure because some of the MOIs contained statements made by witnesses who testified at trial, including MOIs for Ross, Blanchard, and Lafferty. The Movant argues that his sentence and conviction must be vacated, since some of the excluded evidence was central to the United States' case.

Third, the Movant argues that his constitutional right to a fair trial was violated because the United States committed prosecutorial misconduct by failing to comply with both this Court's Order requiring the prosecution to turn over any known *Brady* material (Document 279) and this Court's order granting the request for a Rule 17(c) subpoena duces tecum to be served on MSHA (Document 358). The Movant argues that the prosecutors not only failed to disclose information pursuant to the Rule 17(c) subpoena and this Court's order regarding the production and identification of *Brady* material, but also misrepresented the United States' compliance with both obligations in court filings and oral arguments. The Movant argues that these violations were of such magnitude as to undermine confidence in the verdict and deprive him of his constitutional right to due process and a fair trial. Thus, he argues that vacating his sentence and conviction is warranted in this case.

On August 26, 2019, the Magistrate Judge issued a PF&R recommending that this Court grant the Movant's motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct sentence by a person in federal custody. Because the United States concedes that the materials at issue were suppressed, the Magistrate Judge conducted his analysis as follows:

> [T]he undersigned must consider whether the suppressed documents were (1) favorable to Movant either because the documents were exculpatory or impeaching, and (2) material to the verdict such that the suppression prejudiced Movant's defense. The cumulative effect of all suppressed evidence favorable to a defendant must be considered, rather than considering each item of evidence individually. Thus, the cumulative effect requirement applies to the materiality element—not the favorability element. The undersigned, therefore, will first determine whether the suppressed evidence individually was favorable to the Movant. Once making this determination, the undersigned will consider the cumulative effect of all suppressed evidence favorable to Movant.

(PF&R at 14.) (citations omitted). The Magistrate Judge determined that all undisclosed evidence was favorable to the Movant, except for one email regarding an exchange about an MSHA employee issuing another violation at UBB.[5] In sum, the Magistrate Judge determined that: (1) the MSHA email concerning advance notice was favorable to the Movant, (2) four MSHA emails showing agency bias were favorable to the Movant, but one email alleged to reveal agency bias was not favorable to the Movant and (3) the MSHA disciplinary records and internal emails were favorable to the Movant.[6]

The Magistrate Judge further concluded that the undisclosed MOIs for the five potential defense witnesses, Mark Clemens, Steve Sears, Sabrina Duba, Charlie Bearse, and Stephanie Ojeda, were favorable to the Movant. The Magistrate Judge determined that the "other source" exception to *Brady*, as explained in *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990), was not applicable to these witnesses because: (1) it was clear the United States had the undisclosed documents (whereas in other cases it was not clear the government actually had exculpatory documents), (2) defense counsel actually sought the material and the United States misrepresented that such evidence had been disclosed and (3) in this case, the MOIs were clearly under the control of the prosecution and there is no indication that the MOIs were available to defense counsel

---

[5] "Although the email indicates that a certain MSHA employee would be 'happy to give [Movant and Massey] one more piece of paper,' such does not reveal agency bias because the email clearly provides evidence supporting the issuance of a violation. Accordingly, the foregoing email is not favorable to Movant. (Criminal Action No. 5:14-00244, Document No. 663-5, p. 40, Page ID 23404, USAO0000028.)" (PF&R at 24.)

[6] "[T]he undersigned has concluded that the following MSHA documents are favorable to Movant: (1) USAO0000030 (Criminal Action No 5:14-00244, Document No. 663-5, pp. 44-45, Page ID No. 23408.); (2) USAO0000114 (Criminal Action No. 5:14-cr-00224, Document No. 663-6, p. 55, Page ID No. 23527.); (3) USAO0000033 (Criminal Action No. 5:14-00244, p. 10, citing Document No. 663-5, p. 49, Page ID No. 23413.); (4) USAO0000109 (Criminal Action No. 5:14-00244, Document No. 663-6, p. 49, Page ID No. 23531.); (5) DLB-001532 (Criminal Action No. 5:14-00244, Document No. 696-2, p. 1, Page ID No. 23797.); (6) USAO 000132 (Criminal Action No. 5:14-00244, Document No. 663-6, p. 80, Page ID No. 23552.); and (7) USAO0000024 (Criminal Action No. 5:14-00244, Document No. 663-5, p. 34, Page ID No. 23398.). The undersigned finds that USAO0000028 is not favorable to Movant. (Criminal Action No. 5:14-00244, Document No. 663-5, p. 40, Page ID No. 23404; USAO0000028.)" (PF&R at 29−30.)

through other sources. In addition, the Magistrate Judge concluded that the MOIs for the central witnesses, Blanchard and Ross, were also favorable to the Movant.

The Magistrate Judge next concluded that, considered cumulatively, the suppressed evidence was material, and found that there was a reasonable probability that its disclosure could have made a difference in the resulting verdict. Specifically, the Magistrate Judge determined that the United States might have had a weaker case and the defense might have had a stronger case if the suppressed materials from MSHA and the MOIs for the five potential witnesses had been disclosed. Moreover, the Magistrate Judge determined that disclosure of the "suppressed MOIs could have reduced the value of Mr. Blanchard and Mr. Ross as witnesses for the United States." (PF&R at 57.)

The Magistrate Judge ultimately concluded that he did not have confidence in the verdict, and found that, based on the above reasoning, he lacked assurance that the jury's verdict would have been the same had the suppressed evidence been disclosed. The Magistrate Judge determined that the "Movant has satisfied his burden of proof, establishing by a preponderance of the evidence that the United States violated his constitutional rights by committing a *Brady* violation justifying Section 2255 relief." (PF&R at 58.) The Magistrate Judge recommended that this Court grant the Movant's Section 2255 motion. Based on the Magistrate Judge's finding with respect to a *Brady* violation, he did not address the Movant's claims regarding the Jencks Act and prosecutorial misconduct. In sum, the Magistrate Judge recommended that this Court grant the Movant's motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Document 663), deny as moot Movant's Motion for Evidentiary Hearing (Document 704-1), deny

as moot Movant's Motion for Oral Argument (Document 733), and remove this matter from the Court's docket.

## SUBSTANTIVE LAW

In *Brady v. Maryland*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Three essential components of a *Brady* violation circumscribe the duty [of disclosure]: (1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999) (internal quotation marks omitted). "Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

Undisclosed *Brady* evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id*. at 682 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110 (1976). To establish a *Brady* claim, the burden of proof rests with the defendant. *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018); *see also Garlotte v. Fordice*, 515 U.S. 39, 46 (1995).

"[W]hile courts of necessity examine undisclosed evidence item-by-item, their materiality determinations must evaluate the cumulative effect of all suppressed evidence to determine whether a *Brady* violation has occurred." *United States v. Ellis*, 121 F.3d 908, 91 (4th Cir. 1997); *see also Kyles v. Whitley*, 514 U.S. 419, 436 (1995); *Monroe v. Angelone*, 323 F.3d 286, 298 (4th Cir. 2003). The evidence is not material if, "considering the collective impact of the evidence, it could not 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Campbell v. Polk*, 447 F.3d 270, 276 (4th Cir. 2006) (quoting *Kyles*, 514 U.S. at 435). Impeachment evidence may be material if it was the "only significant impeachment material," or if the witness to be impeached "supplied the only evidence of an essential element of the offense." *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (quoting *United States v. Bartko*, 728 F.3d 327, 339 (4th Cir. 2013)). "In contrast, impeachment evidence is not material if it is cumulative of evidence of bias or partiality already presented and thus would have provided only marginal additional support for the defense." *Id.* (quoting *Bartko*, 728 F.3d at 339) (internal quotation marks omitted).

The materiality of suppressed evidence is also assessed in light of the evidence presented at trial. *Bartko*, 728 F.3d at 339; *United States v. Gil*, 297 F.3d 93, 103 (2d Cir. 2002). "Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin." *Gil*, 297 F.3d at 103. The context of the entire record is used to evaluate the omission. *Agurs*, 427 U.S. at 112−13. "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable

doubt." *Id.* Additionally, admissibility of the suppressed evidence also bears on its materiality. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (finding that suppressed evidence was not "material" under *Brady* due, in part, to its inadmissibility at trial).

However, the Fourth Circuit has firmly established that where the suppressed evidence is both available to the defendant and in a source where a reasonable defendant would look, the *Brady* rules do not apply.[7] *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990); *United States v. Bros. Const. Co. of Ohio*, 219 F.3d 300, 316 (4th Cir. 2000); *Lovitt v. True*, 403 F.3d 171, 184 (4th Cir. 2005). This includes suppressed evidence that could have been obtained by the defendant through "reasonable and diligent investigation." *Barnes v. Thompson*, 58 F.3d 971, 976 (4th Cir. 1995); *Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996). Moreover, when the defense counsel has failed to investigate an obvious and readily available source of evidence, it may bolster the conclusion that failure to investigate was an apparent "tactical decision" by the defense counsel and no *Brady* violation occurred. *Barnes*, 58 F.3d at 977.

The *Brady* rule illustrates the "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). The United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose

---

[7] Moreover, "[t]he majority of federal circuits . . . refuse to find a *Brady* violation where the defense can access the material through its own due diligence." *State v. Mullen*, 171 Wash. 2d 881, 896 n.5 (2011) (citing *Ellsworth v. Warden*, 333 F.3d 1, 6 (1st Cir. 2003); *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006); *United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005); *United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009); *Pondexter v. Quarterman*, 537 F.3d 511, 526 (5th Cir. 2008); *Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008); *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008); *Mandacina v. United States*, 328 F.3d 995, 1001-02 (8th Cir. 2003); *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991); *Ward v. Hall*, 592 F.3d 1144, 1183 (11th Cir. 2010); *Xydas v. United States*, 445 F.2d 660, 668 (D.C. Cir. 1971)).

interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

Because of this role, prosecutors in doubt should resolve close calls in favor of disclosure. *Kyles*, 514 U.S. at 439. Favoring disclosure also works "to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Id.* at 540. "*Brady* material" often is used to describe prosecutors' broad duty of disclosure, however, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'" *Strickler*, 527 U.S. at 282. That is because the *Brady* rule is designed to ensure compliance with the due process requirement that the defendant receive a fair trial. *Bagley*, 473 U.S. at 675.

## DISCUSSION

The United States does not dispute that the evidence at issue was suppressed. Therefore, to determine whether a violation of *Brady/Giglio* occurred, the analysis will turn on whether the suppressed information was (a) favorable to the Movant and (b) material such that it undermines confidence in the verdict. The Court will assess each piece of evidence item by item but make the overall materiality determination by looking at the evidence cumulatively. *Ellis*, 121 F.3d at 91. Again, there are three main bodies of undisclosed evidence at issue in this case: MOIs from five potential defense witnesses and an attorney proffer for Chris Adkins, MOIs from two government witnesses, Blanchard and Ross, and MSHA materials.

Prior to addressing the three main bodies of undisclosed evidence, however, the Court has observed that the Movant has woven several repeated arguments throughout his submissions that

should be resolved initially. The Movant argues that some of the undisclosed evidence would have shown MSHA's awareness of danger at the UBB mine and its failure to address it, MSHA's uncertainty about whether certain conditions at the mine were actually violations that should support a citation, MSHA'S issuance of unsubstantiated violations to UBB, and that MSHA employees received a "slap on the wrist" for misconduct while he was criminally prosecuted. Given the substance of the Movant's conviction, and the applicable law, any undisclosed evidence tending to prove any of these issues would have been inadmissible. The Movant and the United States agreed, pre-trial, that the allegations in this case did not include the *cause* of the UBB mine explosion. (United States' Motion in Limine Document 320; Defendant's Motion for Jury Instructions Regarding the UBB Mine Explosion and to Exclude Evidence Regarding the Explosion Document 287; and United States' Response Document 290.) Thus, neither MSHA's negligence or failures, if any, its uncertainty about regulations nor the fact that its employees were not criminally prosecuted was at issue, relevant, or admissible during the trial of this case. Evidence of this nature would, therefore, not be material for purpose of *Brady* analysis.

Moreover, the Movant argues that the undisclosed evidence indicates that MSHA citations are such that they do not establish violations of safety laws, that it issued unsubstantiated violations to UBB and that MSHA decisions and policies made mine conditions less safe, specifically its ventilation plan. The Court instructed the jury, on at least two occasions, that the citations could not be used to establish violations of safety laws. (Document 601 at 585; Document 626 at 5819.) Further, this Court granted a motion in limine to exclude "claims that federal mine safety standards were incorrect, misguided or imprudent" (Oct. 6, 2015 Tr. at 266.) and specifically granted a motion in limine regarding the Movant's quarrel with MSHA's ventilation plan (Document 463.).

Thus, any undisclosed evidence tending to prove that citations do not establish safety law violations or were unsubstantiated, or tending to prove the efficacy of the ventilation plan or other standard, would not have been admissible and, therefore, is not material for *Brady* purposes. *Wood,* 516 U.S. at 6, (1995).

### *A.  MOIs from Five Potential Defense Witnesses and Attorney Proffer*

Potentially, some of the most "material" evidence, meaning evidence most likely to undermine confidence in the verdict, is found in the MOIs of Clemens, Sears, Duba, Bearse, and Ojeda.  The MOIs suggest that these witnesses could have testified that the Movant did not push production over safety, that there were steps taken to insure safety, that the Movant took Ross's recommendations about safety seriously, and that staffing was not an issue as suggested by the United States.  This information would have been favorable to the Movant.

However, all of these people were current or past employees of Massey who held administrative or executive positions.  Clemens was in charge of production, sales, and budgeting, Sears oversaw Massey coal sales, Duba was a Massey senior accountant, Bearse was President of Massey resource group and Ojeda was Massey in-house counsel.  Each of them held positions with Massey (the very company of which the Movant was CEO) that would require them to have knowledge about production, sales, safety, and/or staffing.  In fact, as noted above, the Movant, in his brief, stated that "[t]hese witnesses were all employees whose roles gave them more insight than many of the witnesses who ultimately testified."[8]  (Document 709 at 18.)  Moreover, it is

---

[8] The Movant chose to rest without calling witnesses.

undisputed that all of these Massey employees, except Sears (who was retired at time of trial), were on the **Movant's** trial witness list.[9]

Given the clear language of *Wilson*, the Movant is not entitled to the benefit of *Brady* protection for these witnesses even though their MOIs are favorable, because the "exculpatory information [was] not only available to the defendant but also lies in a source where a reasonable defendant would have looked . . . " 901 F.2d at 381. Importantly, the substance of those MOIs was available to the Movant through employees of the very company of which he was CEO. The Movant was actually in a better position than the United States to know what the testimony of these witnesses, relative to production, sales, safety and staffing, was likely to be.

Under *Brady*, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley*, 473 U.S. at 676. Requiring a defendant to exercise reasonable diligence in interviewing potentially exculpatory witnesses does not constitute deprivation of a fair trial.

Factors relevant to the Court's finding include the fact that all but one of the witnesses were on the Movant's trial witness list, the witnesses occupied positions that would make them both obvious and available sources of potential exculpatory information, the Movant had knowledge of the witnesses and that this case was—in the Movant's own words—"vigorously contested" by the defense counsel. (Document 663 at 1.) These factors lead the Court to conclude that defense counsel's failure to call or interview these witnesses, if indeed they were not interviewed by the defense, was an apparent "tactical decision," rather than a constitutional

---

[9] The fact that Sears was retired did not make him unavailable as a witness.

deprivation. *Barnes*, 58 F.3d at 977. Although unnecessary to the analysis here, the Court finds it unlikely that persons listed as potential trial witnesses by the defense were not interviewed.

As noted above, the Magistrate Judge determined that the "other source" exception to *Brady* was not applicable to these five potential witnesses because (1) it was clear that the United States had the undisclosed documents (whereas in other cases it was not clear the government actually had exculpatory documents); (2) defense counsel actually sought the material and the government misrepresented that such evidence had been disclosed and (3) in this case, there is no indication that the MOIs were available to defense counsel through other sources. The Court finds, however, that this reasoning does not render the "other source" exception inapplicable to this case.

First, there is nothing in the *Wilson* opinion that suggests its language is not applicable if the government actually possesses the *Brady* material. The very import of *Wilson* is that a Defendant cannot rely on the government's failure to disclose the material if it is otherwise available to the Defendant or is in a place where a reasonably diligent defendant would have looked. It will always be the case that the government has possession of the evidence and failed to produce it, or our analysis would not be within the realm of *Brady*. *Spicer*, 194 F.3d at 555.

Second, for a *Brady* claim, the distinction among situations in which the defendant makes "no request," a "general request," or a "specific request" for the disclosure of suppressed evidence has been dissolved. *Bagley*, 473 at 682; *Strickle*r, 527 U.S. at 280 (noting that the prosecutorial duty to disclose evidence is the same "even though there has been no request by the accused"). "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S.

at 433 (quoting *Bagley*, 473 U.S. at 682). The Movant's request regarding MOIs in this case does not alter the *Brady* analysis, and likewise has no bearing on the application of the "other source" exception under *Wilson*.

Last, although the MOIs were in the control of the prosecutors and not accessible to the Movant, it is the exculpatory interview information contained in the MOIs or the *substance* of the MOIs, that is really at issue for purposes of *Brady*, not the MOI documents. The actual *substance* of the MOIs from these witnesses was clearly available to the Movant. When a witness is readily available for a defendant to interview or question, and the witness is a source where a defendant, using reasonable diligence would look, the Fourth Circuit has held that the *Wilson* exception applies and does not require the prosecution to turn over information or notes from interviews with such witnesses. *See Wilson*, 901 F.2d at 381 (finding no *Brady* violation where defendant could have interviewed a witness that was likely to have exculpatory evidence prior to trial); *Hoke*, 92 F.3d at 1355 (finding no *Brady* violation where police failed to disclose interview notes from three witnesses with potentially exculpatory information because defendant could have discovered the witnesses through reasonably diligent investigation); *Lovitt*, 403 F.3d at 184 (finding exception to *Brady* where defendant could have questioned doctor about her opinion regarding the murder weapon's potential to inflict the victim's wounds).[10] To be clear, it is access to the witnesses themselves, not access to documents containing interview notes, that guides the analysis when determining whether the *Wilson* exception is applicable. In this case, by conducting reasonably

---

[10] In reaching the opposite conclusion regarding the MOIs from these witnesses, the Magistrate Judge appears to have relied primarily on *Strickler v. Greene*, 527 U.S. 263 (1999) (finding that petitioner may reasonably rely on prosecution's open file policy as representation that the suppressed information had been disclosed) and *United States v. Parker*, 790 F.3d 550 (4th Cir. 2015) (finding that the defendant's knowledge that a witness was involved in a scam did not relieve the government of its obligations under *Brady* to disclose that the witness was subject of an ongoing fraud investigation by the SEC). However, the Court finds the line of cases specifically dealing with suppressed interview information from available and obvious witnesses to be more pertinent to this particular case.

diligent investigation, the Movant could have interviewed the five potential witnesses to obtain exculpatory statements.

Thus, there is no *Brady* violation resulting from prosecutorial failure to disclose the MOIs for these witnesses. Because MOIs from these witnesses fall under the *Wilson* "other source" exception to the *Brady* rule, the MOIs from Clemens, Sears, Duba, Bearse, and Ojeda do not factor into the cumulative materiality of the non-disclosures, despite being favorable to the Movant. Additionally, and perhaps parenthetically, most of the favorable substance of these MOI's was brought out as evidence during the trial making the statements made in the MOI's cumulative, at best.

The Movant argues a proffer made by an attorney for Chris Adkins, the Chief Operating Officer at Massey and Blanchard's immediate supervisor, was undisclosed. The Court has reviewed the attachments submitted by the Movant and notes the attorney proffer was not submitted to the Court as an exhibit.[11] In addition, apart from stating that the attorney proffer was undisclosed, the Movant has not made any further argument that the proffer was favorable such that it could serve as the basis for a *Brady* violation.

Pursuant to the Court's Order, filed June 12, 2015, the United States was not required to produce documents containing handwritten and typewritten notes of interviews made by government attorneys and agents or attorney proffers, but instead, was required to produce the "substance" of such documents. (Document 279.) After careful review of the record, the Court has discovered that the substance of an attorney proffer from counsel representing Mr. Adkins,

---

[11] The attachments to Document 703 do not include a document labeled USAO0000174 as cited by the movant. (See Document 705, at 7.) Instead, the series of USAO documents submitted with the Movant's memorandum end at USAO0000173. (Document 703-3)

dated August 22, 2014, was, in fact, disclosed to the Movant. Specifically, the United States disclosed the following:

> Mr. Adkins' counsel related information from Mr. Adkins that included the following: Mr. Blankenship was involved in the development of the violation targets and report cards for the so-called hazard elimination program. Mr. Adkins also believed that Massey made some degree of effort to comply with mine safety laws.

(Document 283-1, at 3.) Because the Movant failed to submit the attorney proffer to the Court, the Court cannot verify whether the above-disclosed attorney proffer was the same as that cited by the Movant as undisclosed. However, due to the Movant's failure to make any argument regarding the favorability of the attorney proffer, the Court order requiring only that the substance of such proffers be disclosed and the Movant's failure to submit the purportedly undisclosed proffer for Court review, the Court finds the Movant has failed to meet his burden of proof in establishing that such evidence was, in fact, *Brady* material.

### B.  *MOIs from Government Witnesses: Ross and Blanchard*

The Movant argues that ten MOIs from two of the government's main witnesses should have been disclosed. As an initial matter, it is not clear that the MOIs from Ross and Blanchard contain information that is, in fact, favorable. After careful review, the Court observes that the MOIs from Ross and Blanchard are overwhelmingly negative toward the Movant, and that most of the favorable information cited by the Movant may only be viewed as such when taken entirely out of context of the full documents. A *Brady* claim arises when there is an "obviously exculpatory character of certain evidence" or "the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce . . ." *Agurs*, 427 U.S. at 107. It is not

apparent that such a duty applies to evidence that may only be construed as favorable when entirely stripped from the surrounding context. In addition, at least two of the MOIs contained no information that could be construed as favorable to the Movant. (Document 663-4 at 42, MOI-001550; Document 663-4 at 24, MOI-001553.)

Moreover, several statements cited by the Movant as favorable directly contradict the theory of the case pursued by the defense team. For example, the Movant cites part of the following statement from Blanchard's MOI as exculpatory, "Blankenship viewed violations as the cost of doing business and felt violations were going to be written by MSHA. . .. Blankenship had a disdain for MSHA first, above DEP and the state. Blankenship felt MSHA made things up." (Document 663-2, MOI 001402.) However, the notion that Blankenship felt violations were made up was entirely contradictory to the defense theory of the case, which was instead that Blankenship was serious about remedying violations and did not willfully break the law or ignore violations. (See Document 613 at 3042, lines 14-19; Document 613 at 3056, lines 2-24.) In fact, although the defense claims it did not have access to the above-mentioned statement, it extensively questioned Blanchard on cross-examination to make the point that Blankenship *did not* think that citations were just made up or the "cost of doing business." (*See e.g.*, Document 610 at 2546-47; Document 611 at 2694, lines 14-18; Document 614 at 3094, lines 3-17.)

Similarly, the Movant cites two statements from the Ross MOIs as exculpatory although they directly contradict the defense theory of the case. First, the Movant cites a few lines from a MOI in which Ross describes a conversation with Blankenship about violations, noting that "Blankenship was most interested in knowing why MSHA was so biased against Massey." (Document 663-3, MOI 001492.) Second, the Movant cites the following statement: "Ross

24

advised that when he met with Blankenship, Blankenship wanted to know if Massey was getting all of the violations because MSHA was biased." (Document 663-3, MOI 001499.) In the MOI, the following sentence is found: "Ross explained to Blankenship that the reason Massey received violations was because they had compliance issues." *Id.*

Statements tending to establish that the Movant *believed* MSHA was biased are not favorable. Instead, information proffered to the effect that the Movant thought violations were not real or serious would not have helped him avoid a finding that he willfully violated mine safety laws. Consistent with this, the defense counsel went to great lengths to draw out the exact opposite point on cross-examination: that the Movant believed all citations from MSHA were legitimate and that he was serious about remedying violations. (*See e.g.*, Document 610 at 2527; Document 613 at 3042, 3056.)

For the remainder of the statements cited by the Movant as exculpatory, the Court has assumed their favorability and examined the record to determine whether the statements were material to the outcome of the trial. After careful review of the trial transcript, the Court has discovered that the subject of *every single* exculpatory statement cited by the Movant as undisclosed was covered by the defense counsel during cross-examination at trial.[12] In fact, all of the undisclosed allegedly exculpatory statements contained in the Blanchard and Ross MOIs were covered thoroughly and repeatedly with the witnesses during cross-examination.

For example, the Movant cites, as undisclosed *Brady* material, two statements demonstrating that both Ross and Blanchard thought all mines would have at least some citations.

---

[12] The Court notes that ideally, consistent with professional and ethical standards, prior to filing such a motion, Movant's counsel would have reviewed the trial transcript to ensure the accuracy of arguments related to nondisclosure.

This topic, however, was extensively covered with both witnesses on cross-examination. For Blanchard, the Movant cites the following statement from an undisclosed MOI: "Blanchard stated there was no amount of money or resources that could take care of all violations at a mine." (Document 663-4 at 33, MOI-001547.) However, during cross-examination, the defense questioned Blanchard about this exact point at least five separate times. (*See e.g.*, Document 610 at 2546-47 (testifying that it would take an impossible amount of money to get to zero citations and that it does not matter how many workers you have in a mine, there will still be some citations); Document 611 at 2587, 2589, 2694; Document 612 at 2852.) Similarly, during cross-examination Ross provided a response that was nearly identical to the undisclosed statement in the MOI. The undisclosed piece of evidence from the Ross MOI states: "Ross advised that you would be hard pressed to go to a mine and not find some violations." (Document 663-4 at 16, MOI-001531.) However, during cross-examination Ross stated, "It would be hard pressed to find a mine that you wouldn't find at least some violations. I don't know how many." (Document 618 at 4161-62.) Ross further explained this point at trial by stating that he was not aware of any mines in the country with zero citations. *Id.*

Furthermore, the Movant argues that several statements tending to show MSHA bias were wrongfully suppressed. (Document 663-4 at 74, MOI-001580; Document 663-3 at 85-98, MOI-001492; Document 663-3 at 85-98, MOI-001499.) At trial, however, the defense team exhausted the concept of MSHA bias during cross-examination of Ross and Blanchard, rendering the additional statements in the MOIs merely cumulative of evidence previously presented. (*See e.g.*, Document 611 at 2603; Document 618 at 4168-72, 4194-96; Document 619 at 4221-25, 4233-37, 4251-52, 4302, 4305-06, 4314-15, 4315-17; Document 614 at 3284-3308.)

To argue for wrongful suppression, the Movant cites the following undisclosed statement: "Blanchard advised that he never knowingly gave a direct order where he told someone to do something that caused a law to be broken." (Document 663-3 at 48-51, MOI-001457.) However, on cross-examination at trial, Blanchard testified that there was no information indicating that Blankenship wanted to violate safety laws, that Blanchard never committed a willful violation of mine safety regulations, and that there was no agreement or understanding between Blanchard and Blankenship to violate mine safety laws. (Document 610 at 2527, 2531; Document 611 at 2694.) Therefore, the additional statement would have added no value to Blanchard's testimony for the Movant, since it was merely redundant or cumulative of exculpatory evidence previously presented to the jury during trial.

Another exculpatory statement from an undisclosed MOI cited by the Movant reads: "Blanchard was surprised to read the testimony from UBB miners that respirable dust fraud was occurring at the mine. Blanchard added the company did not want people cheating on their respirable dust sampling." (Document 663-4 at 74, MOI-001580.) However, this exact point was repeatedly elucidated on cross-examination at trial. (Document 610 at 2527-28; Document 613 at 3068-69.)

Next, the Movant cites the following undisclosed statement: "Blanchard does not believe that MSHA or anyone from MSHA was trying to do something to endanger the health and safety of miners. Blanchard does think decisions MSHA made ended up endangering the health and safety of miners." (Document 663-4 at 74, MOI-001580.) However, during cross-examination at trial, the defense more fully questioned Blanchard about his understanding of the decisions MSHA made—particularly how some MSHA decisions made ventilation of the mine more difficult.

(Document 611 at 2603; Document 613 at 3264, 3284-3308.)  As such, all of the favorable information contained in the undisclosed Blanchard MOIs was covered on cross-examination at trial.

Likewise, for the undisclosed Ross MOIs, *every single* exculpatory statement cited by the Movant was covered extensively on cross-examination at trial.  One such piece of evidence referenced by the Movant states: "Blankenship also informed Ross that Massey needed to reduce violations for sure."  (Document 663-3 at 73, MOI-001487.)  This point, however, was covered numerous times during cross-examination of Ross.  For example, one line of questioning stated: "Q: And you did know, didn't you, that [Blankenship] wanted the operators of these mines to reduce the citations? A: Yes."  (Document 618 at 4126; *see also* Document 618 at 4151; Document 619 at 4255-56, 4318, 4374, 4375-76.)

The Movant also cites the following undisclosed statement: "Blankenship wanted Ross to talk to him about the issues."  (Document 663-4 at 16, MOI-001530.)  During cross-examination the fact that Blankenship wanted feedback and suggestions from Ross regarding citation issues was covered on at least eight separate occasions.  (Document 618 at 4123-25, 4136-37, 4146, 4148-49, 4161; Document 619 at 4254, 4322.)  Covering the same point for the ninth time would have added no possible value to the defense.

Next, the Movant notes that a Ross MOI stated: "Ross advised that he was hired by Massey Energy to teach foremen about ventilation, respirable dust, and other safe workplace measures. Ross was able to travel wherever he wanted to travel. Ross would also be told by Chris Adkins to visit certain mines where they thought his assistance was needed."  (Document 663-2 at 67, MOI-001474.)  During cross-examination at trial, the defense counsel demonstrated extensive

knowledge about Ross' employment and the nature of his role at Massey, making the undisclosed statement repetitious considering exculpatory information on the same point presented at trial. (Document 618 at 4121-22, 4126, 4151, 4163-73.)

The Movant also argues that the following statement was material: "Ross explained to Blankenship that Massey miners think the way they are doing things was the right way for Blankenship. Blankenship informed Ross that he did not know why they were getting this idea. Blankenship stated that he did not know that was the way Massey miners thought." (Document 663-3 at 73, MOI-001488.) As noted above, the point was made repeatedly that Blankenship wanted mine operators to reduce citations. Additionally, it was covered at trial that Blankenship had a hard time understanding why there were so many citations at the mine, and that he wanted miners to do a better job eliminating violations. (Document 618 at 4128-29.)

Last, the Movant cites the following undisclosed statement: "On August 5, 2009, at a meeting with all of Massey Energy's salaried people at Scott High School . . . Adkins stated that they should comply with all regulations at the mine site and that they did not have to worry anymore." (Document 663-2 at 67-71, MOI-001476.) However, once again, the fact that Adkins wanted compliance with regulations was covered extensively on cross-examination at trial. The trial transcript reflects an exchange between defense counsel and Ross regarding Adkins' statements at the same August 5, 2009 meeting as follows:

> Q: And you have also heard Mr. Adkins say, "We've gotten ourselves in a situation where we'll take a violation just to keep running coal. That's the wrong mindset to have, and it's what we're going to change today." You heard him say that?
> A: Yes.
> Q: Do you recall him saying, "I'm asking everybody to step it up a notch. I'm asking for everybody at Massey to ramp it up a

notch, that that's all I'm asking, eliminate the hazard. You see a hazard, eliminate it immediately." Do you recall him saying that?

A: Yes.

Q: And do you recall his saying near the end of the meeting, "If you are violating the law, it's because you want to do it. Because I'm sitting here telling you today the main guy over all production, Massey plants and everything, I'm telling you, you don't have to do it. So, if you're doing it, you're doing it on your own. I'm not winking. I'm not nodding. I'm telling you, don't do it." Do you remember his saying that?

A: Yes.

Q: And as you suggested at some point that Mr. Blankenship and Mr. Adkins make it clear what their message was, that is what Mr. Adkins did right then; isn't it?

A: Yes.

(Document 619 at 4325; see also Document 618 at 4151.)  Therefore, not only did the defense counsel elucidate the point that Mr. Adkins wanted people to comply with regulations and reduce violations, but it also appears as though defense counsel had access to a script of what Mr. Adkins said during the August 5, 2009 meeting.

After careful review of the record, it is apparent that the favorable information in the undisclosed MOIs for Ross and Blanchard is merely redundant of evidence presented to the jury at trial when viewed cumulatively.  *Parker*, 790 F.3d at 558 (quoting *Bartko*, 728 F.3d at 339). The substance of the undisclosed exculpatory statements was covered extensively and repeatedly with Ross and Blanchard at trial.  Because additional statements going to the same points that were covered at trial are cumulative of evidence previously presented, their disclosure could have no impact on the outcome of the case.  Therefore, the Court finds that the MOIs for Ross and Blanchard are not material, and the nondisclosure of the Ross and Blanchard MOIs cannot serve as the basis for a *Brady* violation.

*C. MSHA Material*

The Movant further argues that several MSHA documents should have been disclosed. The Movant argues that the undisclosed material was exculpatory and could have been used to demonstrate that (1) MSHA citations did not reflect actual violations; (2) MSHA bias and contempt toward Massey and Blankenship; (3) it was not clear that Massey's practices related to advance notice were actually illegal and (4) several MSHA supervisors were disciplined by the agency for inadequate supervision over UBB—particularly for failing to consider the interaction between mine dust and the approved ventilation plans. The Magistrate Judge determined that one MSHA email was not favorable to the Movant, and the Court agrees. (Document 663-5 at USAO0000028.) For the remaining undisclosed MSHA materials, the Court has assumed their favorability. However, the Court finds that the undisclosed MSHA materials were not material, because there was no reasonable probability that the evidence could have had an impact on the verdict. Most of the Movant's arguments here were addressed by the Court earlier in this opinion.

As previously stated, evidence that is inadmissible at trial is not material under *Brady*, since it has no bearing on the outcome of the case. *Wood*, 516 at 6. Again, pursuant to this Court's pretrial rulings, evidence related to unsubstantiated violations, advance notice, and improper MSHA ventilation plans was inadmissible. By Order entered October 6, 2015, this Court ruled that evidence designed to show that a system of advanced notice was lawful would not be admissible. (Oct. 6, 2015, Tr. at 870-71.) The Movant's argument that suppressed MSHA material could have supported a defense that Massey's practice of informing miners when inspectors arrived was lawful has no merit, since evidence going toward such a defense would have been barred at trial.

Similarly, by the same Order, this Court ruled that citations from MSHA would be admissible only if they are "not being offered for the truth of the matter asserted in them or, in other words, to prove violations of safety standards but are being offered as evidence of the defendant's knowledge, intent, and/or willfulness as well as notice." (Oct. 6, 2015, Tr. at 854.) These citations were admissible only to show Blankenship's knowledge or intent relative to safety issues as opposed to evidence of actual safety law violations. Therefore, evidence related to the legality of advanced notice and unsubstantiated citations are not material.

The Movant also argues that evidence showing that MSHA officials failed to consider the interaction between the ventilation plans and mine dust in approving plans was material. The Movant argues that this evidence would have supported a key defense—that the ventilation plan MSHA imposed created unavoidable violations. (Document 663 at 13.) However, as previously stated, by Order entered on October 6, 2015, the Court granted the United States' motion in limine to exclude "claims that federal mine safety standards were incorrect, misguided, or imprudent." (Oct. 6, 2015, Tr. at 866.) Because the Movant seeks to argue that MSHA ventilation plans were incorrect or misguided, this evidence and defense would have been inadmissible. In addition, arguments presented before and during trial suggest that the Movant was well aware of such evidence. Therefore, evidence related to MSHA discipline for the ventilation plans is not material due to its inadmissibility.

The remaining exculpatory evidence consists of several undisclosed emails from MSHA employees, which the Movant argues would have supported the defense that MSHA was biased against both Massey and Blankenship. For example, an MSHA employee sent an email stating: "I hope that him [Blankenship] and Glenn Beck get raped by a rhinoceros. Horn end." (Document

663-6 at USAO0000109.) Another email demonstrates an MSHA Mine Administrator responding to a draft press release regarding complaints about Massey mines by stating: "My only comment is to put a dagger into massey [sic]." (Document 663-5 at USAO0000033.)

The Court must now determine whether these emails contain information that, if disclosed, would have been exculpatory in such a manner as to undermine confidence in the verdict. Importantly, this inquiry must be undertaken in light of the entire record. *Agurs*, 427 U.S. at 112-13. Emails tending to show bias on behalf of individual MSHA employees does not necessarily substantiate a claim that the agency itself was biased against the Movant or Massey. In fact, as the Movant acknowledged, the sentiment contained in at least one of the two emails was directly "overruled by the head of MSHA." (Document 663-5 at USAO0000033.) This supports the notion that decisions made on behalf of the agency were not impacted by bias held by individual MSHA employees.

Moreover, the evidence presented against the Movant was substantial. At trial, the Court instructed the jury on the count of conviction as follows:

> Thus, in order to find the Defendant guilty of Count One, the Government must prove beyond a reasonable doubt that two or more persons agreed to willfully violate mandatory mine safety standards at UBB during the indictment period; that the Defendant intentionally joined the agreement knowing that one of its objectives was to willfully violate mine safety standards at UBB; that the Defendant intended that willful violations of mine safety standards be committed at UBB; and that at least one overt act in furtherance of the conspiracy was knowingly and willfully committed by at least one member of the conspiracy during the life of the conspiracy.

(Document 540 at 22.) It is not evident that information related to MSHA bias is directly relevant to whether the Movant willfully violated mine safety standards. The core evidence regarding safety violations was not MSHA citations, but testimony from miners and others with direct,

firsthand knowledge of conditions in the mine. The jury trial proceeded for six weeks, during which numerous individual miners testified and considerable additional evidence was presented to show that the Movant willfully violated mine safety regulations. In this light, even if the Court viewed the individual employee emails as evidence of *agency* bias, the Court finds that the Movant has failed to meet his burden of demonstrating that a reasonable probability exists that the outcome of the trial might have been different had the suppressed evidence, alleged to be related to MSHA bias, been disclosed prior to trial.

In sum, all evidence cited by the Movant in support of the § 2255 motion was either excluded by Court rulings, exhaustively covered at trial, or immaterial to the charge. The record makes clear that much, if not all, of the information cited by the Movant as *Brady* material was available to the defense team from some source. For the Ross and Blanchard MOIs, every single statement cited as undisclosed pertained to topics covered extensively by the defense team at trial. Moreover, as noted above, a majority of the MSHA documents cited as *Brady* material covered topics that the Court ruled on repeatedly prior to and during trial, making it apparent to the defense team that such evidence was inadmissible.

Having considered all of the arguments made by the Movant, the nature and content of the undisclosed documents, the substantive evidence presented at trial and the applicable law, the Court finds the Movant has failed to meet his burden to establish that a reasonable probability exists that the outcome of the trial might have been different had the suppressed evidence been disclosed prior to trial. Specifically, after thorough review, nothing has been presented to undermine confidence in the jury's verdict.

34

### D. Jencks Act

The Movant argues that the prosecution violated the Jencks Act by failing to disclose MOIs. However, a Jencks Act claim fails where the failure to disclose does not result in prejudice. *Rosenberg v. United States*, 360 U.S. 367, 371 (1959). Moreover, the Jencks Act applies to statements that are written and "signed or otherwise adopted or approved by the witness as well as a recording of a witness' oral statement that is a substantially verbatim recital." *United States v. Roseboro*, 87 F.3d 642, 645 (4th Cir. 1996) (quoting 18 U.S.C. § 3500(b)) (internal quotation marks omitted) (noting that "when a government agent interviews a witness and takes contemporaneous notes of the witness' responses, the notes do not become the witness' statement"). The MOIs at issue in this case are not producible under the Jencks Act. The MOIs constitute summaries of conversations with such witnesses, evidenced by the use of third person to reference the interviewees throughout the documents. Additionally, during its *Brady* analysis, the Court determined that failure to disclose the MOIs did not result in prejudice. Therefore, the Court finds that the Movant's request for relief pursuant Jencks Act claim should be denied.

### E. Prosecutorial Misconduct

The Movant argues that the United States committed prosecutorial misconduct by misrepresenting compliance with the Court's discovery orders. "To prevail on a claim of prosecutorial misconduct, a defendant must show (1) that the prosecutor's remarks and conduct were, in fact, improper and (2) that such remarks or conduct prejudiced the defendant to such an extent as to deprive the defendant of a fair trial." *United States v. Tipton*, 581 Fed. Appx. 188, 189 (2014) (quoting *United States v. Allen*, 491 F.3d 178, 191 (4th Cir. 2007)). The Movant, however, appears to be essentially rehashing and converting the *Brady* claim into the legal

framework for prosecutorial misconduct. Although this Court does not condone any violation of its orders, because the prosecution's conduct resulted in no prejudice to the Movant, the Court finds that the requested relief should be denied.

### F. Motions for Evidentiary Hearing and Oral Argument

The Movant also filed a *Motion for Oral Argument* (Document 733) and a *Motion for Evidentiary Hearing* (Document 704-1), arguing that if the § 2255 petition for relief was not granted, then an evidentiary hearing would be needed to resolve factual issues. The Court finds that there are no pending factual disputes since the parties agree to the underlying facts regarding nondisclosure. Therefore, an evidentiary hearing and oral argument would not benefit the Court in this matter. These motions should be denied.

### CONCLUSION

Again, it is undisputed that the United States failed to disclose documents and that this failure is violative of Department of Justice policy and the rules of discovery. The sheer number of undisclosed documents is troubling. Moreover, basic review of the record reveals that many of the statements made by Counsel for the Movant, as to his knowledge of undisclosed materials and the impact of nondisclosure, are simply inaccurate. The legal profession and this Court demand more of all concerned. Importantly, however, there is clear precedent that guides the analysis and dictates the ultimate resolution in this matter.

WHEREFORE, after thorough review and careful consideration, the Court **ORDERS** that the *Motion to Vacate and Set Aside Defendant's Conviction and Sentence Pursuant to 28 U.S.C. § 2255* (Document 663) be **DENIED** and that this matter be **DISMISSED** and **STRICKEN** from the Court's docket.

Further, the Court **ORDERS** that the Movant's *Motion for Evidentiary Hearing* (Document 704-1) and *Motion for Oral Argument* (Document 733) be **DENIED** and that all other pending motions be **TERMINATED AS MOOT**.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to the Honorable Omar J. Aboulhosn, to counsel of record, and to any unrepresented party.

ENTER:    January 15, 2020

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA