**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 20-6330**

───────────────

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

      v.

DONALD L. BLANKENSHIP,

                    Defendant - Appellant.

───────────────

Appeal from the United States District Court for the Southern District of West Virginia, at
Beckley.  Irene C. Berger, District Judge.  (5:14-cr-00244-1; 5:18-cv-00591)

───────────────

Argued:  September 22, 2021                          Decided:  December 7, 2021

───────────────

Before NIEMEYER, DIAZ, and QUATTLEBAUM, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Diaz
and Judge Quattlebaum joined.

───────────────

**ARGUED:**  James McCall Cagle, Charleston, West Virginia, for Appellant.  Thomas
Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellee.  **ON BRIEF:**  Nicholas L. McQuaid, Acting Assistant Attorney General, Robert
A. Zink, Acting Deputy Assistant Attorney General, Criminal Division, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

───────────────

NIEMEYER, Circuit Judge:

In this proceeding under 28 U.S.C. § 2255, Donald Blankenship seeks to vacate his conviction for conspiring to willfully violate coal mine safety standards, alleging that the federal prosecutors violated his due process rights in failing to produce documents favorable to him before trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (requiring the government to disclose exculpatory evidence), and *Giglio v. United States*, 405 U.S. 150 (1972) (requiring the government to disclose impeaching evidence).

Following an explosion at Massey Energy Company's Upper Big Branch coal mine in Montcoal, West Virginia, that killed 29 miners, Blankenship — who was at the time of the explosion the Chairman of the Board and CEO of Massey — was charged with and convicted of conspiring to willfully violate mandatory federal mine safety and health standards, in violation of 30 U.S.C. § 820(d) and 18 U.S.C. § 371.  The trial evidence centered on the allegation that Blankenship had *willfully* failed to address numerous notices of mine safety violations that Massey had received, favoring coal-mine production and profits over safety.

Following the trial and in response to Blankenship's ongoing requests, the government produced documents to Blankenship that it had not produced before trial and that it should have produced under applicable Department of Justice ("DOJ") policies. Indeed, an internal DOJ review concluded that prosecutors in the case failed, as DOJ policies require, to "develop a process for review of pertinent information to ensure that discoverable information [was] identified."  The suppressed documents fell broadly into two categories: (1) memoranda of interviews conducted of seven Massey employees and

2

(2) internal emails and documents of the Mine Safety and Health Administration ("MSHA") showing, among other things, some MSHA employees' hostility to Massey and Blankenship.

The district court, recognizing that the documents were improperly suppressed, concluded nonetheless that they were not material in that there was not a reasonable probability that they would have produced a different result had they been disclosed before trial. The court stated that "after thorough review, nothing ha[d] been presented to undermine confidence in the jury's verdict." It accordingly denied Blankenship's § 2255 motion.

Having given the record a close review ourselves, we reach the same conclusion as the district court. Accordingly, we affirm.

I

Before the explosion at the Upper Big Branch mine, which occurred on April 5, 2010, Massey had repeatedly been cited with respect to that mine for violations of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 *et seq*. Indeed, in the 15 months prior to the explosion, it received the third-most serious safety citations of any mine in the United States.

In November 2014, a federal grand jury returned an indictment against Blankenship, who by then had retired from Massey, and the grand jury's superseding indictment alleged that from 2008 through April 9, 2010, Blankenship had, in connection with the Upper Big Branch mine, conspired to willfully violate federal mine safety and health standards, in

violation of 30 U.S.C. § 820(d) and 18 U.S.C. § 371.  It also charged that Blankenship had conspired to defraud the United States by impeding the MSHA in the enforcement of mine safety and health laws; had made false statements to the Securities and Exchange Commission, in violation of 18 U.S.C. § 1001(a) and § 2; and had engaged in securities fraud, in violation of 15 U.S.C. § 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.

At trial, the government's proof focused mainly on its allegation that Blankenship had conspired with other Massey employees to willfully violate mine health and safety standards in order to produce more coal at a lower cost.  It presented evidence that Blankenship had received daily reports showing the numerous citations for safety violations at the mine.  Bill Ross, one of Massey's senior safety officials, testified about his concern over the number and type of citations that Massey had been receiving and how his concerns had been communicated to Blankenship.  For example, in a June 2009 memorandum prepared for Blankenship by a Massey in-house attorney, Blankenship was advised that Ross believed that "[t]he attitude at many Massey operations is 'if you can get the footage, we can pay the fines.'"  The memorandum noted further that Ross's observation was that the company "would rather get violations, including unwarrantable actions, than wait for approval" from the MSHA, which "show[ed] a lack of concern for both safety and the law."

The evidence also showed that Blankenship had fostered this lax attitude toward safety by directing mine supervisors to focus on "running coal" rather than complying with safety standards.  In particular, the Massey executive in charge of managing the Upper Big Branch mine, Chris Blanchard, testified (pursuant to a cooperation agreement) that

4

Blankenship had made statements to him to the effect that "safety violations were the cost of doing business the way he wanted it done," taking from his various conversations with Blankenship that Blankenship "saw it as cheaper to break the safety laws and pay the fines than to spend what would be necessary to follow the safety laws."  Blanchard agreed that Blankenship had "continually pressured" him "on profit and costs but rarely, if ever, said anything about the hundreds of safety law violations at [the Upper Big Branch mine]." According to Blanchard, Blankenship's policy was "to invariably press for more production even at mines that he knew were struggling to keep up with safety laws." Indeed, even though Massey employees advised Blankenship that the lack of adequate staff was a key factor in the high number of safety violations at the Upper Big Branch mine, Massey reduced staff there less than two months before the accident, a decision Blankenship would have had to approve given his close supervision of mine operations and staffing.

In addition to the testimony of Ross and Blanchard, the government also presented testimony from numerous coal miners about how they were required to work in unsafe conditions at the mine.

Blankenship's primary defense at trial was that none of the violations of safety standards had been willful.  He acknowledged that he had pushed his subordinates to increase coal production while keeping costs down, but he maintained that the evidence also showed that he took safety seriously and had led a successful initiative in 2009 to cut down citations at all the Massey mines, including the Upper Big Branch mine.  To present his defense, Blankenship's counsel vigorously cross-examined both Ross and Blanchard,

5

presenting numerous Massey documents through them in support of his defense. Blankenship did not, however, call any witnesses, even though he had, in a pretrial filing, designated several high-level Massey employees as among those whom he might call to testify on his behalf.

The jury, after deliberating for approximately two weeks, convicted Blankenship of the misdemeanor offense of conspiring to willfully violate mine safety and health standards and acquitted him on the remaining counts. The district court sentenced Blankenship to 12 months' imprisonment and imposed a $250,000 fine.

On appeal, we affirmed the district court's judgment, *United States v. Blankenship*, 846 F.3d 663 (4th Cir. 2017), and the Supreme Court denied Blankenship's petition for a writ of certiorari, *Blankenship v. United States*, 138 S. Ct. 315 (2017).

Following his conviction, Blankenship continued to request evidence that he believed the government had suppressed both before and during trial, despite his repeated requests and motions for the evidence. The government had responded to his earlier requests by stating that it had complied with its discovery obligations. But in response to Blankenship's post-trial requests, the United States Attorney's Office began providing Blankenship with documents it had not previously produced, having by then concluded that its earlier production of documents had not complied with DOJ policies governing discovery.

The documents belatedly produced fell into two broad categories. First, the government produced memoranda prepared by federal law enforcement agents summarizing their interviews of seven individuals who had been high-ranking Massey

6

employees during the time period charged in the indictment (2008 to 2010).  Two of these employees were Ross and Blanchard, who testified at trial and were cross-examined extensively, while the remaining five — Mark Clemens, Steve Sears, Sabrina Duba, Charlie Bearse, and Stephanie Ojeda — did not testify at trial.  Four of those five, however, had been included on Blankenship's pretrial witness list.  Only Sears, who had overseen Massey's sales operation, was not.  The second category of documents produced by the government were internal documents from the MSHA, including emails and disciplinary records for a few MSHA employees in connection with their supervision of the Upper Big Branch mine.  Some of the MSHA documents contained statements by several employees that indicated a hostility to Massey and Blankenship.

In response to the government's late production of documents, Blankenship filed a § 2255 motion to vacate his conviction, asserting that the government had violated its obligations under *Brady* and *Giglio* by suppressing materially favorable evidence in violation of the Due Process Clause.

Blankenship's motion was initially referred to a magistrate judge, who recommended to the district court that the motion be granted.  The district court, however, reviewed the matter de novo and issued an opinion and order dated January 15, 2020, denying the motion.  The court concluded that while the documents at issue had been improperly suppressed, Blankenship had not been prejudiced, as the documents were not material to the outcome of the trial.  Specifically, the court concluded that the memoranda relating to the interviews of Ross and Blanchard were "overwhelmingly negative toward [Blankenship], and that most of the favorable information cited by" Blankenship in the

7

summaries could "only be viewed as such when taken entirely out of context of the full documents." The court observed that "several statements cited by [Blankenship] as favorable" — including Blanchard's statements that "Blankenship had a disdain for MSHA," "felt MSHA made things up," and "viewed violations as the cost of doing business" — "directly contradict[ed] the theory of the case pursued by the defense team" at trial, which was "that Blankenship was serious about remedying violations and did not willfully break the law or ignore violations." And, as to the remainder of the statements in these memoranda that Blankenship identified as exculpatory, the court concluded, "[a]fter careful review of the trial transcript," that "all of the undisclosed allegedly exculpatory statements contained in the Blanchard and Ross [interview memoranda] were covered thoroughly and repeatedly" in the cross-examination of those witnesses at trial.

With respect to the memoranda relating to the interviews of the remaining five Massey employees who did not testify at trial, the district court agreed with Blankenship that the memoranda suggested that those individuals could have provided some trial testimony that would have been favorable to him. It noted, however, that "all but one of the witnesses were on [Blankenship's] trial witness list" and that they all "occupied positions that would make them both obvious and available sources of potential exculpatory information." In view of those circumstances, the court concluded "that defense counsel's failure to call or interview these witnesses, if indeed they were not interviewed by the defense, was an apparent 'tactical decision,' rather than a constitutional deprivation." In this regard, it relied on our prior holding in *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990), that a *Brady* violation is not shown when the "exculpatory

information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked."  The court also observed that "most of the favorable substance of these [interview memoranda] was brought out as evidence during the trial," making the statements "cumulative, at best."

Finally, with respect to the internal MSHA records, the court concluded that they "were not material, because there was no reasonable probability that the evidence could have had an impact on the verdict."  Blankenship had argued that the undisclosed MSHA records "could have been used to demonstrate that (1) MSHA citations did not reflect actual violations; (2) [there was] MSHA bias and contempt toward Massey and Blankenship; (3) it was not clear that Massey's practices related to advance notice to [miners that inspectors had arrived at the site] were actually illegal; and (4) several MSHA supervisors were disciplined by the agency for inadequate supervision over [the Upper Big Branch mine] — particularly [with respect to the mine's] approved ventilation plans."  The court noted, however, that pursuant to its pretrial rulings, evidence relating to unsubstantiated citations, the legality of Massey's advance notice practices, and improper MSHA ventilation plans was not admissible at trial.  In particular, the court explained that the MSHA citations had been admitted "only to show Blankenship's knowledge or intent relative to safety issues, as opposed to evidence of actual safety law violations" and that the jury had been instructed at least twice that the citations could not be used to establish violations of safety laws.  As for the MSHA emails showing employee hostility to Blankenship and Massey, the court noted that "[e]mails tending to show bias on behalf of individual MSHA employees [did] not necessarily substantiate a claim that the agency

9

itself was biased."   Moreover, the court observed, the materiality "inquiry must be undertaken in light of the entire record," and "the evidence presented against [Blankenship] was substantial."   "The core evidence regarding safety violations was not MSHA citations," the court explained, "but testimony from miners and others with direct, firsthand knowledge of conditions in the mine."   At bottom, the court concluded that Blankenship had "failed to meet his burden to establish that a reasonable probability exist[ed] that the outcome of the trial might have been different had the suppressed evidence been disclosed prior to trial."

By order dated October 23, 2020, we granted Blankenship's request for a certificate of appealability on the issue of whether the government violated *Brady* and *Giglio*.

## II

Due process requires that in a criminal prosecution, the government must disclose to the defendant evidence favorable to him if the suppression of that evidence would deny him a fair trial.   "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."   *Brady v. Maryland*, 373 U.S. 83, 87 (1963).   The Court in *Brady* held that the prosecution's suppression of evidence that is favorable to the accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."   *Id.*   And evidence *favorable to the defendant* includes not only exculpatory evidence but also evidence that the defendant can use to impeach government witnesses.   *See Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *United*

10

*States v. Bagley*, 473 U.S. 667, 676 (1985). Just as the *Brady* rule does not depend on the good faith, *vel non*, of the prosecutor, it also is not limited to evidence known only to the prosecutor. Thus, the obligation applies to "evidence known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

Nonetheless, "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Id.* at 436–37. Rather, the suppressed evidence must be materially favorable to the accused — that is, the nondisclosure must be "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). Stated otherwise, the question is whether "the favorable evidence," "considered collectively," "could reasonably be taken to put the whole case in such a different light as *to undermine confidence in the verdict*." *Kyles*, 514 U.S. at 435–36 (emphasis added).

With these governing principles in hand, we now turn to the two categories of documents at issue to determine whether they were favorable to Blankenship and whether there is a reasonable probability that their disclosure would have produced a different result — i.e., whether Blankenship was prejudiced by their suppression.

### A

With respect to the suppressed memoranda relating to the interviews of seven Massey employees, several described interviews with Ross and Blanchard, who testified at trial. Blankenship acknowledges on appeal that "[t]he District Court was correct in finding that the substance of [the] undisclosed exculpatory statements" made by Ross and

Blanchard in their pretrial interviews "was covered" during defense counsel's thorough cross-examination of these witnesses at trial and therefore that "these nondisclosures were not ultimately violations of *Brady*."

With respect to the memoranda relating to the pretrial interviews of the remaining five Massey employees, it is significant that these employees held executive or administrative positions at Massey that placed them in close contact with Blankenship during the relevant period. Mark Clemens was Senior Vice President of Operations for Massey Coal Services and reported directly to Blankenship; Steve Sears oversaw the company's sales operation and reported on an informal basis to Blankenship; Sabrina Duba was a senior accountant who communicated with Blankenship on a daily basis; Charlie Bearse was responsible for a group of mines and communicated regularly with Blankenship; and Stephanie Ojeda was the in-house lawyer who prepared the June 2009 memorandum for Blankenship that summarized Ross's safety concerns.

The statements in these interview memoranda that might have been helpful to Blankenship's defense generally pertained to things that Blankenship himself had said or done with respect to safety or to the employees' overall perception of the company's commitment to safety. Clemens, for example, stated generally that "there was pressure at Massey to run coal, but not enough pressure to overlook safety" and that he had "initiated a non-fatal days lost (NFDL) audit" at Blankenship's direction after MSHA found that not all accidents were being reported. Sears stated that "Massey's primary focus was safety" and that "Blankenship [had] started a safety program . . . and pushed safety more than any other CEO in the industry." Duba helped develop the format for the daily violation report

that Blankenship received and stated that Blankenship "wanted to know" the identities of "the repeat offenders." Bearse acknowledged that the mines he supervised "receiv[ed] a lot of citations" but stated that "[t]he [i]ntent was always zero violations" and that "he could make a list of safety things that he was involved with" and that "the list would be half" as long without Blankenship's involvement. Bearse also stated that Massey's staffing on mine sections "was the industry standard" and that while "Blankenship was very aggressive and in your face," "safety was implied." Ojeda, who had been interviewed by Blankenship's counsel a few weeks before her interview with the government agents, stated that Blankenship "seemed to think that Ross was legitimate" and that she thought he was "looking for solutions from Ross."

It is apparent that each of these five witnesses held high positions in Massey and, from those positions, interacted closely with Blankenship, indeed engaging with him on some of the very issues raised in his prosecution. Blankenship knew what he had told them and asked them to do, and undoubtedly he also had a sense of their views about the company's approach to safety. Indeed, he listed four of the five individuals as potential witnesses to testify *on his behalf* in his pretrial witness list, surely knowing how they might help his case.

These facts do not describe a circumstance where Blankenship was required to "scavenge for hints of undisclosed *Brady* material" or which amounted to a hide-and-seek process in which Blankenship was the seeker. *Banks v. Dretke*, 540 U.S. 668, 695–96 (2004). Rather, the information was in Blankenship's own house and held by in-house witnesses close to him. At the very least, he knew of the availability of this type of

13

information and where to find it.  Its location was surely where he would first look —
indeed, probably did look.  This circumstance therefore is governed by our holding in
*Wilson* that "where the exculpatory information is not only available to the defendant but
also lies in a source where a reasonable defendant would have looked, a defendant is not
entitled to the benefit of the *Brady* doctrine."  901 F.2d at 381.

Blankenship contends that *Wilson* is no longer good law in light of the Supreme
Court's subsequent decision in *Banks*, even though we have continued to apply *Wilson*
following *Banks*.  *See, e.g.*, *United States v. Parker*, 790 F.3d 550, 561–62 (4th Cir. 2015);
*United States v. Catone*, 769 F.3d 866, 872 (4th Cir. 2014); *Lovitt v. True*, 403 F.3d 171,
184 (4th Cir. 2005).   *Wilson* and *Banks*, however, control two entirely different
circumstances.  In *Banks*, the State suppressed information that a key government witness
had set up the defendant's arrest and had served as a paid police informant.  540 U.S. at
678–84.  Moreover, the State covered up the paid-police-informant fact during trial by
failing to correct the witness's false testimony that he was not a paid informant.  *Id.*  In the
postconviction proceeding, the State nonetheless argued that the defendant had failed to
use "appropriate diligence in pursuing" his *Brady* claim, faulting him for failing to discover
the suppressed facts earlier.  *Id.* at 695.  The Supreme Court rejected this argument,
explaining that its "decisions lend no support to the notion that defendants must scavenge
for hints of undisclosed *Brady* material when the prosecution represents that all such
material has been disclosed."  *Id.*  It characterized the State's argument as essentially being
"that 'the prosecution can lie and conceal and the prisoner still has the burden to . . .
discover the evidence,' so long as the 'potential existence' of a prosecutorial misconduct

claim might have been detected." *Id.* at 696 (citation omitted).  And it admonished that a rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.*

The circumstances in *Banks* in no way describe those here.  To obtain access to the testimony of individuals who had once been his own employees, Blankenship would not have been required to scavenge, guess, search, or seek.  He had the evidence before him and undoubtedly was aware of it, as he indicated his choice to use the very same employees as his own witnesses at trial.  This case instead falls squarely under the principle that the *Brady* doctrine is not available where the favorable information is available to the defendant and lies in a source where a reasonable defendant would have looked.  *See Wilson*, 901 F.2d at 381.

To be clear, the government's need to comply with its *Brady* obligations is not obviated by the defendant's lack of due diligence.  The constitutional right cannot be so burdened.  It is, after all, the fairness that inheres in the fulfillment of the government's *Brady* obligations that must be satisfied — the fairness of disclosing to the defendant evidence favorable to him — and the government cannot ignore fundamental fairness concerns by arguing that the defendant failed to find evidence that the government did not disclose.  The government's role is grander than serving as an advocate solely for conviction; it must be an advocate for the just outcome of a criminal prosecution. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (noting that the government's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done").

Yet, while that precept is overriding, common sense should not be ignored.  Thus, when assessing the defendant's role in preparing his defense, he should not be allowed to turn a willfully blind eye to available evidence and thus set up a *Brady* claim for a new trial.  In this manner, we distinguish the burden of due diligence — which the defendant need not carry in asserting a *Brady* claim — from the common-sense notion of self-help imputable to a defendant in preparing his case.  This is precisely the distinction between *Wilson* and *Banks*.

In this case, the district court also appropriately noted the lack of materiality where Blankenship was able to elicit most of the favorable substance of the statements in the interview memoranda through the cross-examination of Ross and Blanchard and then decided, as a matter of strategy, not to call any witnesses to testify.  Blankenship's lead counsel even highlighted this point during closing arguments, noting that he had told the jury in his opening statement "that it might take us a while to put on the evidence that indicated that Massey did not want citations.  *I didn't realize that we were going to do it with the Government's key witness*," i.e., Blanchard.  (Emphasis added).

We conclude accordingly that the suppression of the interview memoranda for Ross, Blanchard, and the five potential defense witnesses did not prejudice Blankenship.

B

With respect to the internal MSHA documents that were suppressed — consisting primarily of emails between and among agency employees and disciplinary records for three MSHA employees that stemmed from an internal agency review conducted after the

16

Upper Big Branch mine explosion — Blankenship contends that they should have been produced under *Brady* and *Giglio* to allow him to demonstrate, most notably, that the MSHA was biased against him and Massey.

One document in this category was generated before the explosion. When an MSHA public affairs employee circulated to other MSHA employees a Massey press release noting that two Massey mines were receiving a safety award from the MSHA, one employee wrote to another, "This won't play well with certain parties." All the other "bias" documents were dated after the fatal explosion and indicated that certain MSHA employees viewed Blankenship or Massey negatively. For instance, about two weeks after the explosion, one MSHA official commented that a "hazard complaint news release" that the agency was preparing to release should "put a dagger into massey" by noting a complaint that the MSHA had received at another Massey mine "even after the explosion." This "dagger" comment appears to have prompted the head of the MSHA to warn in response that the news release was "about presenting the facts to the public in a responsible way." Several months later, when an MSHA employee forwarded to a colleague an article with the title "Don Blankenship Is an Evil Bastard," the colleague joked that it appeared that the other employee had written the title. About a year later, when news circulated in December 2011 that Blankenship intended to start a new coal company, an employee at MSHA lamented that "[t]he Grinch that stole safety is back." And, in the most vivid exchange, one MSHA employee used graphic and violent language to discuss his vehement dislike of Blankenship after Blankenship, who at the time was still the head of Massey, was quoted in the news as saying that the fatal explosion had "impact[ed] production in that people

17

[were] trying to make sure they're in compliance with every rule."  The employee wrote that he "hope[d] that [Blankenship] . . . get[s] raped by a rhinoceros.  Horn end."

These records were indeed unflattering to the MSHA and undoubtedly could be used to show hostility of the particular employees involved.  But it does not follow that they were material to Blankenship's prosecution for conspiracy to willfully violate mine safety and health standards.  First, none of the MSHA employees who wrote the "bias" emails testified at Blankenship's trial, nor were any of them proffered as witnesses or even — as far as we can tell — mentioned in the lengthy proceeding.  There is also no indication that any of these MSHA employees had any involvement in the decision by the United States Attorney's Office to charge Blankenship with criminal offenses.  In these circumstances, it is far from clear how Blankenship would have been able to introduce these documents into evidence at trial or even use them to discover admissible evidence.  *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (inadmissible evidence "could have had no direct effect on the outcome of trial" for *Brady* purposes).

Blankenship's theory appears to be that the records would have been admissible to show that the MSHA as an agency was biased against him.  But the district court rejected the argument, stating that "[e]mails tending to show bias on behalf of individual MSHA employees do[] not necessarily substantiate a claim that the agency itself was biased against [Blankenship] or Massey."  Moreover, even if Blankenship were somehow able to introduce the records into evidence, they may well have done his defense more harm than good, as the records themselves generally indicated that the reason certain MSHA

employees were hostile to Blankenship was because they perceived him as being reckless with regard to mine safety.

We agree with the district court that the suppression of these documents and the other MSHA records did not violate *Brady* and *Giglio*. The bias of individual MSHA employees — if bias is the correct word when considering that the employees' hostile comments were in response to the perceived lack of mine safety — could not be accepted to show agency bias unless it was shown that the employees spoke for the agency or had some responsibility in regard to Blankenship's prosecution. But that has not been shown. Most importantly, the core issue at trial did not relate to the validity of the mine safety citations or to MSHA conduct; it focused on Blankenship's state of mind — whether he conspired to *willfully* violate mine safety standards. And the evidence relevant to that issue came from (1) miners and others with factual knowledge of the conditions at the mine and (2) Massey employees and documents providing evidence relevant to Blankenship's state of mind.

We agree with the district court that this category of documents was not material to the outcome of the trial and that their suppression therefore did not constitute a *Brady* violation. *See Bagley*, 473 U.S. at 682.

\*     \*     \*

The circumstances that have brought us to this point in the prosecution of Blankenship are not flattering to the government, and Blankenship's protest is not a frivolous one. Nonetheless, after a careful review, we conclude that the suppression at issue — both with respect to the individual categories of documents and when they are

considered cumulatively — does not undermine confidence in the verdict.  The verdict that Blankenship conspired to willfully violate mandatory mine standards was supported by ample evidence, and there is not a reasonable probability that the jury's conclusion would have been altered by the documents' disclosure.  The district court's order denying Blankenship's § 2255 motion is accordingly

AFFIRMED.